UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| MEDLIANT INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No. 1:23–cv–00203–MAC |
| v. | ) | |
| | ) | |
| KATRINA PONCE DE LEON, | ) | |
| | ) | |
| *Defendant*. | ) | |

**APPENDIX TO MEDLIANT INC.'S RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

## *Cases*

1. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105 (Nev. 2015) ....................................1–4

2. *AudioEye, Inc. v. accessiBe Ltd.*, No. 6:20-CV-997-ADA, 2022 WL 827805 (W.D. Tex. Mar. 9, 2022) ............................................................................................5–13

3. *BarZ Adventures Inc. v. Patrick*, No. 4:20-cv-299-ALM, 2020 WL 6342951 (E.D. Tex. Oct. 29, 2020) ...................................................................................................14–16

4. *Burch v. 2d Judicial Dist. Ct.*, 49 P.3d 647 (Nev. 2002) .............................................17–20

5. *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2023 WL 5104066 (S.D. Ohio Aug. 9, 2023) ...................................................................................................21–34

6. *Codilla v. CTX Mortg. Co., LLC*, No. 2:10-CV-01469-RLH-PAL, 2011 WL 673753 (D. Nev. Feb. 17, 2011) ...................................................................................35–38

7. *Coppola v. Baron*, No. 2:07-cv-00664-BES-RJJ, 2007 WL 4180590 (D. Nev. Nov. 20, 2007) ................................................................................................................39–41

8. *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491 (E.D. Tex. July 20, 2023) .................................................................................................42–57

9. *Dobron v. Bunch*, 215 P.3d 35 (Nev. 2009)...............................................................58–63

10. *Estavilla v. Goodman Grp., LLC.*, No. CV 21-68-M-KLD, 2022 WL 539192 (D. Mont. Feb. 23, 2022).....................................................................................................64–79

11. *Fed. Nat'l Mortgage Assoc. v. 8th Judicial Dist. Ct. in and for Cnty. Of Clark*, 528 P.3d 586 (Table), 2022 WL 19697697 (Nev. Dec. 22, 2022).............................80–82

12. *FQ Men's Club, Inc. v. Doe Dancers I*, 136 Nev. 809, No. 79265, 2020 WL 5587435 (Nev. Sept. 17, 2020) .....................................................................................83–87

13. *Garcia-Lopez v. Waste Mgmt. of Tex.*, Inc., No. 22-20112, 2022 WL 17547458 (5th Cir. Dec. 9, 2022) .................................................................................................88–90

14. *Halcyon Silver, LLC v. Evelynmoe*, 526 P.3d 1110, 2023 WL 2661524 (Nev. Ct. App. Mar. 24, 2023)......................................................................................................91–98

15. *Haromy v. Sawyer*, 654 P.2d 1022 (Nev. 1982) ......................................................99–101

16. *Henderson v. Watson*, 131 Nev. 1290, 2015 WL 2092073 (2015).........................102–105

17. *Hillestad v. LLOG Expl. Co., LLC*, No. 3:17-cv-341, 2018 WL 4938708 (S.D. Tex. Sept. 20, 2018) ................................................................................................. 106–113

18. *Huawei Techs. Co. v. Yiren Huang*, No. 4:17-CV-00893, 2018 WL 1964180 (E.D. Tex. Apr. 25, 2018) ..................................................................................................... 114–124

19. *Iliescu v. Regional Trans. Comm'n of Washoe Cty.*, 522 P.3d 453 (Nev. Ct. App. 2022) ............................................................................................................................ 125–133

20. *Khan v. Bakhsh*, 306 P.3d 411 (Nev. 2013) ........................................................... 134–136

21. *Land Baron Inv. v. Bonnie Springs Family LP*, 356 P.3d 511 (Nev. 2015) ............ 137–145

22. *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2023 WL 2710178 (E.D.N.Y. Mar. 30, 2023) ................................................................... 146–171

23. *Mason v. Fakhimi*, 865 P.2d 333 (Nev. 1993) ....................................................... 172–175

24. *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-cv-2042-D, 2008 WL 794533 (N.D. Tex. Mar. 26, 2008) ................................................................ 176–180

25. *Moates v. Facebook, Inc.*, No. 4:20-cv-896-ALM-KPJ, 2021 WL 3013371 (E.D. Tex. May 14, 2021) ................................................................................................... 181–190

26. *Mort Wallin of Lake Tahoe, Inc. v. Com. Cabinet Co.*, 105 Nev. 855 (1989) ......... 191–192

27. *Paguirigan v. Prompt Nursing Employ. Agency, LLC*, No. 17-CV-1302 (NG), 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ...................................................... 193–211

28. *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) ...................................................................... 212–218

29. *Phillips v. Valley View Surgical, LLC*, 498 P.3d 1290, 2021 WL 5370984 (Nev. Ct. App. Nov. 17, 2021) ............................................................................................ 219–223

30. *Prothera, Inc. v. Zhou Ye*, No. 3:18-cv-00401-MMD-CLB, 2020 WL 3073345 (D. Nev. June 10, 2020)  .......................................................................................... 224–229

31. *Provitas, LLC v. Quality Ingredients Corp.*, No. 4:21-cv-00196, 2021 WL 5907790 (E.D. Tex. Dec. 14, 2021) ...................................................................... 230–245

32. *Putnam v. Perficient, Inc.*, No. 4:21-CV-00739-SDJ-CAN, 2022 WL 4480329 (E.D. Tex. July 20, 2022) ...................................................................................... 246–255

33. *Putnam v. Perficient, Inc.*, No. 4:21-CV-00739-SDJ-CAN, 2022 WL 4474901 (E.D. Tex. Sept. 26, 2022) ............................................................................................ 256

34. *Shelton v. Shelton*, 78 P.3d 507 (Nev. 2003) ........................................................257–261

35. *Sherman v. Smead*, 527 P.3d 973, 2023 WL 2960921 (Nev. App. 2023) ..............262–268

36. *Stuntz v. Lion Elastomers, L.L.C.*, No. 1:17-CV-33, 2017 WL 11613239 (E.D. Tex. Sept. 12, 2017) ................................................................................................269–275

37. *TMX, Inc v. Volk*, 131 Nev. 1355, 2015 WL 5176619 (Nev. Ct. App. Aug. 31, 2015) ...............................................................................................................276–278

38. *Trustees, Carpenters v. Better Building Co.*, 710 P.2d 1379 (Nev. 1985) .............280–282

39. *Venable's Constr. Inc. v. Oneok Arbuckle II Pipeline, LLC*, No. 2:20-CV-018-Z-BR, 2020 WL 2841398 (N.D. Tex. June 1, 2020) ...................................................283–290

40. *Vorrey v. City of Brownsville*, No. 17-cv-222, 2018 WL 7291458 (S.D. Tex. Oct. 5, 2018) .........................................................................................................291–298

41. *Western Cab Co. v. Kellar*, 90 Nev. 240 (1974).....................................................299–301

42. *Wiggins v. Seeley*, No. 3:16-cv-00642-HDM-WGC, 2017 WL 969186 (D. Nev. Mar. 13, 2017).............................................................................................302–304

43. *Word to Info, Inc. v. Facebook, Inc.*, No. 3:14-cv-04387-K, 2015 WL 13870507 (N.D. Tex. Jul. 23, 2015) ...............................................................................305–309

## *Regulations & Statutes*

44. 20 C.F.R. § 656.12(b) ...........................................................................................310–311

45. 20 C.F.R. § 655.731 .............................................................................................312–326

46. Nev. Rev. Stat. Ann. § 18.010 (West) ..................................................................327–28

## *Miscellaneous*

47. 22 Am. Jur. 2d Damages § 24 (May 2023 Update) ................................................329–331

48. U.S. District Court – Judicial Caseload Profiles for the Eastern District of Texas .........332

49. Annual Report of the Nevada Judiciary Fiscal Year 2022 Appendix Tables..........333–434

359 P.3d 105, 131 Nev. Adv. Op. 73

131 Nev. 737
Supreme Court of Nevada.

AMERICA FIRST FEDERAL CREDIT UNION,
A Federally Chartered Credit Union, Appellant,
v.
Franco SORO, an Individual; Myra Taigman–
Farrell, an Individual; Isaac Farrell, an
Individual; Kathy Arrington, an Individual; and
Audie Embestro, an Individual, Respondents.

No. 64130
|
Sept. 24, 2015.

**Synopsis**

**Background:** After lender held trustee's sale of property that secured commercial loan, lender brought action deficiency action against borrowers. The Eighth Judicial District Court, Clark County, Jerry A. Wiese, J., 2013 WL 10871290, dismissed for lack of subject matter jurisdiction. Lender appealed.

On an issue of apparent first impression, the Supreme Court, Hardesty, C.J., held that forum selection clause was permissive rather than mandatory.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**Attorneys and Law Firms**

**\*\*105** Ballard Spahr, LLP, and Stanley W. Parry, Timothy R. Mulliner, and Matthew D. Lamb, Las Vegas, for Appellant.

Bogatz Law Group and I. Scott Bogatz and Charles M. Vlasic III, Las Vegas, for Respondents.

Before the Court En Banc.

*OPINION*

By the Court, HARDESTY, C.J.:

**\*738** In this opinion, we must determine whether a contract clause stating that the parties "submit themselves to the jurisdiction of" another state results in a mandatory forum selection clause requiring dismissal of the Nevada action. We hold that such a clause consenting to jurisdiction is permissive and therefore reverse the district court's order granting a motion to dismiss based on lack of subject matter jurisdiction in Nevada.

*FACTS AND PROCEDURAL HISTORY*

In 2002, appellant America First Federal Credit Union (the credit union) loaned $2.9 million, secured by real property in Mesquite, **\*\*106** Nevada, to respondents (borrowers) [1] for the purchase of a liquor/mini-mart. The borrowers defaulted, and the credit union held a trustee's sale, resulting in a deficiency on the loan balance of approximately $2.4 million. The Utah-based credit union sued the borrowers in Clark County to recover the deficiency.

The borrowers moved to dismiss the action under NRCP 12(b)(1), arguing that the credit union could not sue to recover the deficiency in Nevada and citing several clauses in the "Commercial Promissory Note" and "Business Loan Agreement" to support their argument. An "Applicable Law" clause in the loan agreement stated that "[t]his Agreement (and all loan documents in connection with this transaction) shall be governed by and construed in accordance with the laws of the State of Utah." The loan agreement also contained the following: "Jurisdiction. The parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." A clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located."

The district court agreed with the borrowers and granted the motion to dismiss. The district court found that the note and loan agreement **\*739** " contain language which clearly expresses the parties' intent to submit litigation relating to the Agreement and the Note, to the jurisdiction of the State of Utah.... [T]he language clearly enough identifies Utah as the forum[,] which they selected for purposes of subject matter jurisdiction." This appeal followed.

*DISCUSSION*

On appeal, the credit union argues that the district court erred in enforcing the clauses in question to preclude its complaint for a deficiency action.[2] More specifically, the credit union argues that the jurisdiction clauses here were permissive, and while the complaint could have been brought in Utah, the clauses do not mandate that Utah was the exclusive forum. In response, the borrowers contend that whether a forum selection clause is mandatory or permissive is a matter of contract interpretation, and therefore, the clauses are ambiguous and must be construed against the credit union as the contract drafter. Whether forum selection clauses may be mandatory or permissive is an issue of first impression for this court.

*Standard of review*

This court reviews a district court's decision regarding subject matter jurisdiction de novo. *Ogawa v. Ogawa,* 125 Nev. 660, 667, 221 P.3d 699, 704 (2009). Additionally, "[c]ontract interpretation is a question of law and, as long as no facts are in dispute, this court reviews contract issues de novo, looking to the language of the agreement and the surrounding circumstances." *Redrock Valley Ranch, LLC v. Washoe Cnty.,* ——Nev. ——, ——, 254 P.3d 641, 647–48 (2011). The objective of interpreting contracts "is to discern the intent of the contracting parties. Traditional rules of contract interpretation are employed to accomplish that result." *Davis v. Beling,* —— Nev. ——, ——, 278 P.3d 501, 515 (2012) (citation and internal quotation marks omitted). This court initially determines whether the "language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." *Id.* An ambiguous contract is susceptible to more than one reasonable interpretation, and "[a]ny ambiguity, moreover, should be construed against the drafter." *Anvui, LLC v. G.L. Dragon, LLC,* 123 Nev. 212, 215–16, 163 P.3d 405, 407 (2007).

**\*740** *The district court erred when it dismissed the case based on the forum selection clauses*

The credit union argues that the clauses do not contain any mandatory language **\*\*107** and, therefore, all of the forum selection clauses are merely permissive. We agree.

We have not yet distinguished between mandatory and permissive forum selection clauses. In *Tuxedo International, Inc. v. Rosenberg,* 127 Nev. 11, 251 P.3d 690 (2011), we reversed a district court's grant of a motion to dismiss based on the defendants' argument that any litigation must be brought in Peru. *Id.* at 14, 24–25, 251 P.3d at 692, 699. There, we

remanded the case to the district court to determine which of three separate forum selection clauses potentially controlled the dispute. *Id.* at 26, 251 P.3d at 699–700. In analyzing the clauses, we noted that one of the clauses contained both a consent to jurisdiction in Peru and a Peruvian choice-of-law provision. *Id.* at 22–23, 251 P.3d at 697. We then stated:

> It can be argued, however, that there is no requirement contained in this clause that Peru is the *exclusive* forum for jurisdiction over any dispute between the parties. *See, e.g., Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76–77 (9th Cir.1987) (distinguishing between exclusive and nonexclusive forum selection clauses). If it is determined that the parties did not intend for the clause to act as an *exclusive* forum selection clause, then arguably, there is no contractual bar to [plaintiff] bringing its tort claims in the Nevada district court.

*Id.* at 23–24, 251 P.3d at 698 (second emphasis added). We also noted that another clause "resemble[d] a traditional exclusive forum selection clause," containing language that "any action ... must be brought in a court in the Country of Peru." *Id.* at 24, 251 P.3d at 698. Thus, *Tuxedo International* observed the distinctions between mandatory and permissive forum selection clauses, but the facts of the case did not provide an opportunity for us to affirmatively adopt a rule. *See id.* at 26 n. 5, 251 P.3d at 700 n. 5.

Other state courts have distinguished between mandatory and permissive forum selection clauses. *See, e.g., Garcia Granados Quinones v. Swiss Bank Corp. (Overseas), S.A.,* 509 So.2d 273, 274 (Fla.1987) (recognizing that a mandatory jurisdiction clause requires "a particular forum be the exclusive jurisdiction for litigation," while permissive jurisdiction is merely a consent to jurisdiction in a venue (internal quotation marks omitted)); *Polk Cnty. Recreational Ass'n v. Susquehanna Patriot Commercial Leasing Co.,* 273 Neb. 1026, 734 N.W.2d 750, 758–59 (2007) (distinguishing a mandatory forum selection clause based on the words "shall be brought **\*741** only in" a particular jurisdiction from a permissive forum selection clause where parties only " consent and submit to the jurisdiction" of other courts);

359 P.3d 105, 131 Nev. Adv. Op. 73

*Caperton v. A.T. Massey Coal Co.,* 225 W.Va. 128, 690 S.E.2d 322, 338–39 (2009) ("[T]o be enforced as mandatory, a forum-selection clause must do more than simply mention or list a jurisdiction; in addition, it must either specify venue in mandatory language, or contain other language demonstrating the parties' intent to make jurisdiction exclusive."). For example, the Wisconsin Court of Appeals stated:

> Clauses in which a party agrees to submit to jurisdiction are not necessarily mandatory. Such language means that the party agrees to be subject to that forum's jurisdiction *if sued there.* It does not prevent the party from bringing suit in another forum. The language of a mandatory clause shows more than that jurisdiction is *appropriate* in a designated forum; it unequivocally mandates *exclusive* jurisdiction. Absent specific language of exclusion, an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere.

*Converting/Biophile Labs., Inc. v. Ludlow Composites Corp.,* 296 Wis.2d 273, 722 N.W.2d 633, 640–41 (2006) (citations and internal quotation marks omitted).

> Similarly, federal circuit courts generally agree that where venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive.

*Paper Express, Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753, 757 (7th Cir.1992); *see Excell, Inc. v. Sterling Boiler & Mech., Inc.,* 106 F.3d 318, 321 (10th Cir.1997) (describing **\*\*108** the "mandatory/permissive dichotomy"

and concluding that the clause, "jurisdiction shall be in the State of Colorado, and venue shall lie in the County of El Paso, Colorado," was mandatory (internal quotation marks omitted)); *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.,* 22 F.3d 51, 52–53 (2d Cir.1994) (holding the forum selection clause, "[a]ny dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts," as permissive (internal quotation marks omitted)); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76–78 (9th Cir.1987) (holding the forum selection clause, "[t]he courts of California, County of **\*742** Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract," as permissive, and noting that to be considered mandatory, a forum selection clause must clearly require that a particular court is the only one that has jurisdiction (internal quotation marks omitted)); *Keaty v. Freeport Indon., Inc.,* 503 F.2d 955, 956–57 (5th Cir.1974) (holding the forum selection clause, "[t]his agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York," as permissive (internal quotation marks omitted)).

We agree with the distinctions made by other state and federal courts regarding mandatory and permissive forum selection clauses described above. Here, there are two jurisdictional clauses at issue. First, the loan agreement contains a clause entitled "Jurisdiction," which provides that "[t]he parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." We conclude that this language is permissive as there is no language within the clause containing words of exclusivity. Absent such language, we deem the clause permissive.

Second, a clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located." This language is also permissive as there is no language within the clause containing words of exclusivity. *See Golden Palm Hospitality, Inc. v. Stearns Bank Nat'l Ass'n,* 874 So.2d 1231, 1233–37 (Fla.Dist.Ct.App.2004) (concluding that the language, "[i]f there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of STEARNS County, the State of Minnesota" as permissive, and thus permitted, but did not require, that the action be brought in Minnesota (internal quotation marks omitted)).

359 P.3d 105, 131 Nev. Adv. Op. 73

Thus, the case may be heard in another appropriate venue besides the courts in Utah.

Without articulating why, the borrowers argue that the forum selection clauses are ambiguous and therefore must be construed against the credit union. We conclude that this argument is without merit as the clauses are clear and unambiguous and this court need not interpret the contract any differently from the contract's plain meaning. *See, e.g., Hunt Wesson Foods,* 817 F.2d at 77 ("A primary rule of interpretation is that '[t]he common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it.' ") (quoting 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 618 (3d ed.1961)). The clauses provide no words of exclusivity and to interpret the clauses as mandatory forum selection clauses would read language into the contract that is not there.

**\*743** *CONCLUSION*

In this case, none of the clauses contain exclusive language. Accordingly, all clauses are permissive forum selection clauses, and the district court erred when it found Utah was the sole forum for any controversy and dismissed the case for lack of subject matter jurisdiction. We therefore reverse the district court's order dismissing the case and remand this matter to the district court for further proceedings.

PARRAGUIRRE, CHERRY, GIBBONS, DOUGLAS, SAITTAA and PICKERING, JJ., concurring.

**All Citations**

131 Nev. 737, 359 P.3d 105, 131 Nev. Adv. Op. 73

## Footnotes

1    While eight individuals signed the note and loan agreement, the only borrowers in the instant action are Franco Soro, Myra Taigman–Farrell, Isaac Farrell, Kathy Arrington, and Audie Embestro.

2    Additionally, the credit union argues that Nevada's six-month statute of limitations for recovery of deficiency judgments applies to the action, not Utah's three-month statute of limitations. However, because the district court did not decide this issue, we do not address it here.

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 827805
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Waco Division.

AUDIOEYE, INC., Plaintiff,
v.
ACCESSIBE LTD., Defendant.

6:20-cv-997-ADA
|
Signed 03/09/2022

**Attorneys and Law Firms**

Brian Horne, Pro Hac Vice, Jared C. Bunker, Pro Hac Vice, Stephen C. Jensen, Pro Hac Vice, Knobbe Martens, Los Angeles, CA, Austin Michael Schnell, Brian Christopher Nash, Morrison & Foerster LLP, Austin, TX, for Plaintiff.

Amadou Kilkenny Diaw, Goodwin Proctor LLP, Washington, DC, Cabrach J. Connor, Connor Lee & Shumaker PLLC, Austin, TX, Jesse Cheng, Lucas Dahlin, Pro Hac Vice, Indra Neel Chatterjee, Michael C. Ting, Goodwin Procter LLP, Redwood City, CA, Samuel Sherry, Pro Hac Vice, Goodwin Procter LLP, Boston, MA, Kevin S. Kudlac, Radulescu LLP, Austin, TX, for Defendant.

### ORDER GRANTING ACCESSIBE'S MOTION TO RECONSIDER AMENDED ORDER DENYING MOTION TO TRANSFER VENUE TO THE WESTERN DISTRICT OF NEW YORK [ECF No. 71]

ALAN D ALBRIGHT, UNITED STATES DISTRICT JUDGE

**\*1** Came on for consideration this date is Defendant accessiBe Ltd.'s Motion to Reconsider Amended Order Denying Motion to Transfer Venue to the Western District of New York, filed December 13, 2021. ECF No. 71 (the "Reconsideration Motion"). Plaintiff AudioEye, Inc. filed an opposition on December 27, 2021, ECF No. 73, to which accessiBe replied on January 3, 2022, ECF No. 74. After careful consideration of the Reconsideration Motion, the Parties' briefs, and the applicable law, the Court **GRANTS** the Reconsideration Motion.

## I. BACKGROUND

Plaintiff AudioEye first filed suit against accessiBe on September 4, 2020, in the Austin division of the Western District of Texas. No. 1:20-cv-00924, ECF No. 1. On October 26, 2020, it voluntarily dismissed that case, No. 1:20-cv-00924, ECF No. 13, and refiled this case in Waco the same day, ECF No. 1. AudioEye filed its second amended complaint on December 29, 2020. *See* ECF No. 13 ("SAC").

accessiBe is registered and located in Israel. ECF No. 21 at 3. It does not have any locations in the United States or employees located here. *Id.* AudioEye is based in Tucson, Arizona and incorporated in Delaware. ECF No. 13 ¶ 11.

The SAC alleges that accessiBe infringes nine related patents. The SAC also includes Lanham Act claims for False Advertising and Product Disparagement (collectively the "Lanham Act claims"). It further includes five New York state law claims for Product Disparagement, Slander/Defamation, Tortious Interference with Prospective Economic Advantage, Deceptive Business Practices, and Unjust Enrichment (collectively the "NYSL claims"). The Lanham Act claims and the NYSL claims (collectively the "Non-Patent claims") relate to conduct alleged to have occurred while marketing accessiBe's products, and more specifically, accessiBe's statements regarding accessiBe's or AudioEye's products and/ or services that AudioEye alleges to be false, misleading, or disparaging.

Consistent with most of the Non-Patent Claims being brought under New York law, Plaintiff has focused on accessiBe's alleged conduct regarding three entities located in New York: the Marketing Association for the Finger Lakes Wine Country of New York ("Finger Lakes"), Hoselton Auto Mall ("Hoselton"), and an unnamed potential consumer in New York (eventually revealed to be AudioEye personnel). ECF No. 13 ¶¶ 189–191; ECF No. 37 at 4. The Lanham Act and unjust enrichment claims rely at least on the same set of underlying allegations as the NYSL claims, or explicitly reference Finger Lakes or Hoselton.

On March 8, 2021, accessiBe filed a motion to transfer venue under 28 U.S.C. § 1404(a) to the U.S. District Court for the Western District of New York ("WDNY") or, in the alternative, dismiss for lack of personal jurisdiction. ECF No. 21 (the "Transfer Motion"). The Parties conducted venue and jurisdictional discovery and on October 18, 2021, the Court

entered an order denying the relief sought in the Transfer Motion. ECF No. 51.

Though satisfied that the WDNY is a clearly more convenient venue, the Court denied transfer because accessiBe failed to show that venue and jurisdiction are proper in the WDNY. *See generally id.* On November 3, 2021, the Court issued an amended order correcting its erroneous holding as to venue but maintaining that accessiBe failed to show that jurisdiction was proper in the WDNY. ECF No. 60 (the "Amended Transfer Order"). On November 5, 2021, accessiBe filed a petition for a writ of mandamus, seeking to reverse the amended order's denial of transfer. *See* Petition, *In re AccessiBe, Ltd.*, No. 2022-113, ECF No. 2 (Fed. Cir. Nov. 5, 2021). On December 6, 2021, the Federal Circuit denied that petition, stating that it would not be futile "for accessiBe to ask the district court to first reconsider its decision in light of its arguments." *In re AccessiBe Ltd.*, No. 2022-113, 2021 WL 5764861, at *1, 2021 U.S. App. LEXIS 35858, at *3 (Fed. Cir. Dec. 6, 2021). On December 13, 2021, accessiBe filed its Reconsideration Motion. That Motion is now ripe for judgment.

## II. LEGAL STANDARD

### A. Reconsideration

 **\*2**  Federal Rule of Civil Procedure 54(b) "allows parties to seek reconsideration of interlocutory orders and authorizes the district court to 'revise[ ] at any time' 'any order or other decision ... [that] does not end the action.' " *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (alterations in original) (quoting Fed. R. Civ. P. 54(b)). "Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Id.* at 336 (quotation marks omitted). "Although the precise standard for evaluating a motion to reconsider under Rule 54(b) is unclear ... [s]uch a motion requires the Court to determine whether reconsideration is necessary under the circumstances." *Dallas Cnty., Tex. v. MERSCORP, Inc.*, 2 F. Supp. 3d 938, 950 (N.D. Tex. 2014) (quotation marks omitted).

### B. Transfer Under 28 U.S.C. § 1404(a)

In patent cases, motions to transfer under § 1404(a) are governed by the law of the regional circuit. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Section 1404(a)

provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

"The preliminary question under § 1404(a) is whether a civil action 'might have been brought' in the [transfer] destination venue." *In re Volkswagen, Inc.*, 545 F.3d 304, 312 (5th Cir. 2008) ("*Volkswagen II*"). If the destination venue would have been a proper venue, then "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004). The private factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*") (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1982)). The public factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id.* The weight the Court gives to each of these assorted convenience factors will necessarily vary from case to case. *See Burbank Int'l, Ltd. v. Gulf Consol. Int'l, Inc.*, 441 F. Supp. 819, 821 (N.D. Tex. 1977). A court should not deny transfer where "only the plaintiff's choice weighs in favor of denying transfer and where the case has no connection to the transferor forum and virtually all of the events and witnesses regarding the case ... are in the transferee forum." *In re Radmax, Ltd.*, 720 F.3d 285, 290 (5th Cir. 2013).

The burden to prove that a case should be transferred for convenience falls squarely on the moving party. *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010). The burden that a movant must carry is not that the alternative venue is more convenient, but that it is *clearly*

more convenient. *Volkswagen II*, 545 F.3d at 314 n.10. While "clearly more convenient" is not explicitly equivalent to "clear and convincing," the moving party "must show materially more than a mere preponderance of convenience, lest the standard have no real or practical meaning." *Quest NetTech Corp. v. Apple, Inc.*, No. 2:19-cv-118, 2019 WL 6344267, at *7 (E.D. Tex. Nov. 27, 2019). Yet, the Federal Circuit has clarified that, for a court to hold that a factor favors transfer, the movant need not show that that factor *clearly* favors transfer. *In re Apple Inc.*, 979 F.3d 1332, 1340 (Fed. Cir. 2020).

### III. ANALYSIS

#### A. Reconsideration and Jurisdiction in the WDNY

**\*3**  The Court disagrees with accessiBe that the Amended Transfer Order offended the "party presentation rule," constituting a "drastic[ ] ... abuse of discretion." ECF No. 71 at 10. This Court did not adduce new evidence. This Court did not present new arguments. accessiBe had a burden. The Court determined that accessiBe fell short of it. accessiBe recognizes that Parties "are responsible for advancing the facts and arguments entitling them to relief," yet it shirked its responsibility to advance facts and arguments entitling it to its requested relief: transfer under § 1404(a). ECF No. 71 at 9 (quoting *Baude v. United States*, 955 F.3d 1290, 1303–04 (Fed. Cir. 2020)). It then laid blame at this Court's doorstep. The Court would have drawn nearer to offending the party presentation rule had it done as accessiBe suggests and, on the briefing before it at the time of the Amended Transfer Order, made accessiBe's arguments for it—including corralling relevant evidence and citing and applying New York, Federal Circuit, and Second Circuit law— to conclude that jurisdiction lays in the WDNY for all the asserted claims (including those untouched by accessiBe's Rule 12(b)(2) challenge).

The Reconsideration Motion, however, lays out sufficient facts, arguments, and law to convince this Court that the WDNY has personal jurisdiction over AudioEye for all the asserted claims. *See* ECF No. 71 at 5–8. AudioEye does not dispute that jurisdiction is proper in the WDNY. accessiBe has overcome the threshold question vexing its Transfer Motion. Revisiting this Court's Amended Transfer Order will not work too great a prejudice against AudioEye, so the Court will proceed to balance the conveniences under § 1404(a).

#### B. Private Interest Factors

##### 1. Relative Ease of Access to Source of Proof

"In considering the relative ease of access to proof, a court looks to where documentary evidence, such as documents and physical evidence, is stored." *Fintiv, Inc. v. Apple Inc.*, No. 6:18-cv-00372-ADA, 2019 WL 4743678, at *2, 2019 U.S. Dist. LEXIS 171102, at *5 (W.D. Tex. Sept. 10, 2019). This factor relates to the relative—not absolute—ease of access to non-witness evidence. *See In re Radmax*, 720 F.3d at 288; *In re Apple*, 979 F.3d at 1339. And "the movant need not show that all relevant documents are located in the transferee venue to support a conclusion that the location of relevant documents favors transfer." *In re Apple*, 979 F.3d at 1340.

The Fifth Circuit has held that, even in the context of electronic documents that can be accessed anywhere on earth, this factor is not superfluous. *See Volkswagen II*, 545 F.3d at 316; *see also In re Dish Network L.L.C.*, No. 2021-182, 2021 WL 4911981, at *——, 2021 U.S. App. LEXIS 31759, at *6 (Fed. Cir. Oct. 21, 2021). Though having persistently characterized that holding as antiquated in the setting of a modern patent dispute, this Court will continue to analyze this factor with a focus on the location of physical documents and other evidence; and the hardware storing the relevant electronic documents. *See, e.g., Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*, No. 6-20-CV-00731-ADA, 2021 WL 3134262, at *—— & n.1, 2021 U.S. Dist. LEXIS 137400, at *7 & n.1 (W.D. Tex. July 22, 2021), *vacated on other grounds, In re Pandora Media, LLC*, No. 2021-172, 2021 WL 4772805, 2021 U.S. App. LEXIS 30963 (Fed. Cir. Oct. 13, 2021).

*Party Evidence.* accessiBe states that its sources of proof are located in Israel, where accessiBe's marketing efforts are based and where it researched, designed, and developed the accused instrumentality that is the focus of the patent claims. ECF No. 21 at 6. accessiBe also alleges that to the extent there is relevant information on accessiBe's servers, those are located in New York or abroad. *Id.* at 4; ECF No. 21-1 ¶ 6 (testifying that accessiBe's hosting server is located in New York, with a backup in Europe). Evidence located in Israel and Europe is neutral under this factor because such evidence is remote from the WDNY and this District. But this Court has repeatedly recognized that the location of hardware storing relevant electronic documents bears on convenience. *See, e.g., Bluebonnet*, 2021 WL 3134262, at *—— & n.1, 2021

U.S. Dist. LEXIS 137400, at *7 & n.1. So the location of accessiBe's servers in New York is accorded some weight.

 **\*4**  accessiBe further contends that there are two members of AudioEye's sales team residing in New York—Emily Baksic and Randall Heller—who purportedly interacted with accessiBe's sales team, performing what accessiBe refers to as "stealth competitive intelligence." ECF No. 37 at 2. AudioEye's SAC references that interaction and accessiBe asserts that these two AudioEye personnel likely maintain evidence in New York regarding that interaction. *See id.* AudioEye notes that, to the extent it even maintains relevant documents in its New York office, it would also have relevant documents at its headquarters in Arizona and its office in Portland. ECF No. 34 at 15. And its documents are primarily stored in the cloud and IT personnel managing the cloud environment reside in Georgia. *Id.*

The Court gives weight to information that may reside in AudioEye's New York office, including that maintained by Mr. Heller, who AudioEye itself recognizes as a relevant witness. ECF No. 34 at 18. But it also gives some shrift to evidence purportedly located with AudioEye in Arizona and Oregon.

*Non-party Evidence.* AudioEye argues that accessiBe has [redacted] customers in Texas and they may have information relevant to induced infringement and purchasing decisions relevant to the Lanham Act claims. ECF No. 34 at 14. accessiBe notes in response that it has "t[redacted] customers in New York." ECF No. 37 at 3.

AudioEye also asserts that accessiBe has strategic partners in Texas with evidence relevant to the Lanham Act claims. ECF No. 34 at 14. For example, Texas-based RealPage was in talks with AudioEye before accessiBe solicited it with marketing materials including the allegedly false and misleading statements. *Id.* AudioEye alleges that RealPage possesses evidence about these statements and the damages accessiBe caused AudioEye. *Id.* Moreover, Austin-based BigCommerce and Volusion, two of accessiBe's strategic partners, purportedly have "evidence about accessiBe's marketing efforts that relate to the Lanham Act claims." *Id.* According to AudioEye, accessiBe offers BigCommerce and Volusion "financial incentives to sell accessiBe's accused tool to [their] customers" and marketing materials to aid sales efforts. *Id.* at 5. accessiBe acknowledges that these two companies "can influence the decision of a very large group of people." *Id.* AudioEye contends that Volusion and

BigCommerce help accessiBe disseminate its allegedly false and misleading statements. *Id.* accessiBe provides evidence, however, of its nationwide strategic partnerships, including at least three in the tristate area.

The Court accords little to no weight to the location of evidence retained by accessiBe customers and strategic partners. AudioEye has not represented that accessiBe's Texas customers or partners maintain any evidence a New York customer or partner would not have. *See Moskowitz Fam. LLC. v. Globus Med., Inc.,* No. 6:19-CV-00672-ADA, 2020 WL 4577710, at \*3 (W.D. Tex. July 2, 2020) (disregarding customers in the forum because it was unlikely they maintained unique evidence regarding indirect infringement). For example, AudioEye remarks that RealPage has evidence about allegedly "false and misleading statements" because accessiBe sent it marketing materials. ECF No. 34 at 4–5, 14–15. The Court finds it unlikely that RealPage is unique among accessiBe's partners in receiving accessiBe marketing material. The accessiBe marketing materials AudioEye attaches to its opposition are generic; there is no evidence that materials were especially made for accessiBe's Texas partners. *See* ECF No. 34 at 14–15. There are specific emails directed at RealPage but the Court is not convinced these reveal relevant information unlike anything shared with other partners beyond Texas. In addition, it seems likely that the evidence AudioEye would solicit from accessiBe's partners, like communications accessiBe directs at its partners, is cumulative of that which AudioEye can discover from accessiBe itself when discovery opens. The Court, therefore, accords the location of accessiBe's customers and partners little to no weight in this analysis. The same rationale also militates against according weight to accessiBe customers and partners under the next two factors.

 **\*5**  There is one exception: the Court will not disregard evidence possessed by Finger Lakes and Hoselton. The SAC founds many of its NYSL claims on conduct directed at New York-based Finger Lakes and Hoselton. *See* ECF No. 13 ¶¶ 185, 189–191, 198–201, 207–08, 213. The NYSL claims have different elements from the federal claims and are naturally centered on conduct arising from New York or directed at New York residents. *See* ECF No. 37 at 2. It is therefore more likely that Finger Lakes and Hoselton, as the New York residents AudioEye has placed at issue, maintain unique and relevant evidence bearing on the NYSL claims.

In sum, this factor favors transfer. Evidence in favor of transfer includes evidence maintained by Finger Lakes and

Hoselton, accessiBe documents maintained on New York-based servers, and evidence maintained by New York-based AudioEye personnel. Only the evidence AudioEye maintains in Arizona and Oregon favors maintaining this Action here, and only slightly so given their distance from Texas. The evidence favoring transfer overwhelms the evidence against it.

### 2. Availability of Compulsory Process

Under the Federal Rules, a court may subpoena a witness to attend trial only (a) "within 100 miles of where the person resides, is employed, or regularly transacts business in person"; or (b) "within the state where the person resides, is employed, or regularly transacts business in person, if the person ... is commanded to attend a trial and would not incur substantial expense." *Fed. R. Civ. P. 45(c)(1)(A), (B) (ii)*; *Gemalto S.A. v. CPI Card Grp. Inc.*, No. 15-CA-0910, 2015 WL 10818740, at *4 (W.D. Tex. Dec. 16, 2015). Under this factor, the Court focuses on non-party witnesses whose attendance may need to be secured by a court order. *Fintiv*, 2019 WL 4743678, at *—, 2019 U.S. Dist. LEXIS 171102, at *14 (citing *Volkswagen II*, 545 F.3d at 316). This factor "weigh[s] heavily in favor of transfer when more third-party witnesses reside within the transferee venue than reside in the transferor venue." *In re Apple, Inc.*, 581 F. App'x 886, 889 (Fed. Cir. 2014). When "there are several witnesses located in the transferee forum and none in the transferor forum," this factor favors transfer. *In re Google*, No. 2021-171, 2021 WL 4592280, at *5 (Fed. Cir. Oct. 6, 2021).

The Federal Circuit has held that, under Fifth Circuit law, "when there is no indication that a non-party witness is willing, the witness is presumed to be unwilling and considered under the compulsory process factor." *In re HP Inc.*, No. 2018-149, 2018 WL 4692486, at *3 n.1 (Fed. Cir. Sept. 25, 2018); *see also In re Hulu, LLC*, No. 2021-142, 2021 WL 3278194, at *4, 2021 U.S. App. LEXIS 22723, at *10 (Fed. Cir. Aug. 2, 2021) ("[W]here ... the movant has identified multiple third-party witnesses and shown that they are overwhelmingly located within the subpoena power of only the transferee venue, this factor favors transfer even without a showing of unwillingness for each witness."). Further, this Court cannot "discount" third-party entities having pertinent information in the transferee venue "just because individual employees were not identified." *In re Apple Inc.*, No. 2021-181, 2021 WL 5291804, at *3, 2021 U.S. App. LEXIS 33788, at *8 (Fed. Cir. Nov. 15, 2021)

(quoting *In re HP Inc.*, 826 F. App'x 899, 903 (Fed. Cir. 2020)).

accessiBe asserts that New York-based Finger Lakes and Hoselton are particularly important to the Non-Patent Claims because "[t]hey would provide relevant information regarding, for example, the extent to which the allegedly false statements impacted their choice in accessibility products, their reasons for choosing accessibility products that are unrelated to the allegedly false statements, or any effort expended by Plaintiff as a result of any allegedly false statements." ECF No. 21 at 7. [1]

**\*6** The same rationale supporting this Court's finding that Finger Lakes and Hoselton maintain relevant evidence further supports a finding that Finger Lakes and Hoselton personnel likely possess relevant knowledge. And because such personnel are likely located in New York, the WDNY may be able to compel their testimony (or likely the testimony of any other New York customer or partner); this Court cannot. The Parties do not identify any other relevant witnesses that this Court or the WDNY can compel to testify. (As indicated *supra*, this Court will disregard witnesses associated with accessiBe's Texas-based customers and partners.) Accordingly, this factor favors transfer.

### 3. Cost of Attendance of Willing Witnesses

"The convenience of witnesses is the single most important factor in the transfer analysis." *Fintiv*, 2019 WL 4743678, at *6, 2019 U.S. Dist. LEXIS 171102, at *17. The Fifth Circuit has established the "100-mile rule," providing that "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204–05.

The Federal Circuit has held that, where witnesses would be required to travel a significant distance no matter where they testify, those witnesses will only be slightly more inconvenienced by having to travel to, for example, California, compared to Texas. *In re Apple*, 979 F.3d at 1342 (discussing witnesses traveling from New York) (citing *Volkswagen II*, 545 F.3d at 317); *In re Genentech*, 566 F.3d at 1344 (stating that the 100-mile rule should not be "rigidly" applied in the context of foreign witnesses). It has opined elsewhere that "[t]he comparison between the transferor and

transferee forum is not altered by the presence of other witnesses and documents in places outside both forums." *In re Toyota Motor Corp.*, 747 F.3d at 1340; *In re Google LLC*, No. 2021-170, 2021 WL 4427899, at *4, 2021 U.S. App. LEXIS 29137, at *12 (Fed. Cir. Sept. 27, 2021) ("[W]hen there are numerous witnesses in the transferee venue and the only other witnesses are far outside the plaintiff's chosen forum, the witness-convenience factor favors transfer."). And, in yet other cases, it has considered only hypothetical travel-time statistics, and not distance, under this factor. *See, e.g., In re Google LLC*, 2021 WL 4427899, at *4, 2021 U.S. App. LEXIS 29137, at *12.

The Federal Circuit has recognized that "an employer's cooperation in allowing an employee to testify may diminish certain aspects of inconvenience to the employee witness (for instance, the employee is not acting contrary to their employer's wishes)." *In re Hulu*, Nos., 2021 WL 3278194, at *5, 2021 U.S. App. LEXIS 22723, at *13. Elsewhere it has stated that inconvenience is not attenuated *at all* when the witnesses are employees of the party calling them. *See, e.g., In re Juniper Networks, Inc.*, 14 F.4th 1313, 1319 (Fed. Cir. 2021).

accessiBe argues that WDNY would be more convenient for accessiBe's Israeli personnel because all flights from Israel to Austin already include a connection in New York. ECF No. 21 at 9. accessiBe specifically identifies Dekel Skoop, its Chief Operations Office, as having knowledge about accessiBe and its operations. ECF No. 21-1 ¶ 3. Mr. Skoop also testifies that "[a]ll of accessiBe's engineers who are knowledgeable about the design and functionality of the accused accessiBe software are located in Israel." *Id.* ¶ 5. All employees responsible for accessiBe's "[s]ales, marketing, customer support, finances and interactions with third party accessibility organizations ...are also based in Israel." *Id.* The Court accords the convenience of these Israeli-based witnesses little weight; they will travel a significant distance irrespective of transfer. Flights from Israel to the United States may have to connect through New York City—which is not in the WDNY—but that does not transform New York City into the *de facto* residence for accessiBe's witnesses under this factor.

 **\*7** accessiBe also contends that "[t]o the extent [AudioEye's] New York office houses employees more knowledgeable about New York customers and potential customers," the WDNY would be more convenient for them. ECF No. 21 at 9. AudioEye accedes that its VP of Sales,

Randall Heller, lives in New York and has knowledge relevant to damages and accessiBe's marketing and business practice. ECF No. 34 at 18. But it also names the following AudioEye personnel as having relevant knowledge: Hawaii-based Sean Bradley is a named inventor on the Asserted Patents and has knowledge regarding the claimed invention, AudioEye's products and services, and accessiBe's business practices; Oregon-based Dominic Varacalli is AudioEye's President and has knowledge relevant to developments of the Asserted Patent's claimed invention, AudioEye's products and services, and accessiBe's marketing and business practices; Georgia-based David Pinckney is a named inventor and has knowledge of the developments of the claimed invention; and Arizona-based Tyler D'Amore is an AudioEye VP with knowledge of AudioEye's products and services, damages related to accessiBe's accused conduct, and accessiBe's marketing and business practices. *Id.* at 17–18. AudioEye contends that these four witnesses reside nearer this District than the WDNY. *Id.* at 18.

Mr. Heller's presence in New York favors transfer. Yet, under the 100-mile rule, this District is, in this Court's judgment, more convenient for the other four AudioEye personnel, though, for some, only marginally so.

The Parties each argue that post-filing events affect the convenience analysis. This Court is comfortable considering post-complaint facts in evaluating convenience. *See Unification Techs. LLC v. Micron Tech., Inc.*, No. 6:20-cv-500-ADA, 2022 WL 92809, at *—— – ——, 2022 U.S. Dist. LEXIS 4127, at *9-11 (W.D. Tex. Jan. 10, 2022) (interpreting *Hoffman v. Blaski*, 363 U.S. 335, 343, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960)). AudioEye asserts that its General Counsel and Senior Counsel reside in this District. ECF No. 73 at 9 n.2. Their convenience is owed no weight without a representation as to the relevant knowledge they possess. AudioEye also represents that Ms. Baksic, one member of the New York-based AudioEye sales team referenced *supra*, has since left AudioEye and New York for another opportunity in Florida. ECF No. 73 at 9 n.2; ECF No. 39 ¶ 2. With any indication that she is obligated to travel to testify in this Action, the Court does not regard her as a willing witness—nor will the Court consider her under the compulsory process factor, given that she has moved beyond the authority of the WDNY.

accessiBe argues that "much of accessiBe's leadership is now based in New York." ECF No. 71 at 2. It did not provide an affidavit to that effect. In its Transfer Motion briefing,

Mr. Skoop testified that he, along with another accessiBe founder, Gal Vizel, were "*in the process* of relocating to New York," where accessiBe's U.S. subsidiary has leased office space. ECF No. 37-1 ¶ 4. The Court is satisfied that Mr. Vizel—accessiBe's Chief Revenue Office, with knowledge of accessiBe's U.S. sales and marketing operation—and Mr. Skoop have relevant knowledge. And though it has no evidence that Mr. Vizel and Mr. Skoop have completely relocated to New York, the Court is satisfied that accessiBe's establishing a place of business in New York may render the WDNY somewhat more convenient for Mr. Vizel and Mr. Skoop, at least relative to this District.

The WDNY is more convenient for Mr. Heller and likely slightly more convenient for Mr. Vizel and Mr. Skoop. Waco is more convenient for Mr. Bradley, Mr. Varacalli, Mr. Pinckney, and Mr. D'Amore, but not by a wide amount. The Court finds, then, that this factor favors transfer, but only slightly.


### 4. Practical Problems

When considering the private interest factors, courts must consider "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 314. "[G]arden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer" but delay in already protracted litigation may account for some weight. *In re Radmax*, 720 F.3d at 289.

"Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer." *PersonalWeb Techs., LLC v. NEC Corp. of Am., Inc.*, No. 6:11-cv-655, 2013 WL 9600333, at *5 (E.D. Tex. Mar. 21, 2013). The interests of justice may be best served by transferring ancillary matters pending in other forums to the forum of the main action, particularly if the main action is complex. *Bank of Texas v. Computer Statistics, Inc.*, 60 F.R.D. 43, 45 (S.D. Tex. 1973). "[T]he ability to transfer a case to a district with numerous cases involving some overlapping issues weighs at least slightly in favor of such a transfer." *In re Apple*, 979 F.3d at 1344. But district courts should not rely "on considerations of judicial economy arising after the filing of the lawsuit or the transfer motion," such as, for example, suits filed in the transferor district after a request to transfer. *In re Netscout Sys.*, No. 2021-173, 2021 WL 4771756, at *4, 2021 U.S. App. LEXIS 30500, at *12 (Fed. Cir. Oct. 13, 2021). Further,

"the mere co-pendency of infringement suits in a particular district" does not automatically tip transfer in one direction or the other. *Id.* at *5, 2021 U.S. App. LEXIS 30500, at *13.

 **8**  Neither Party made a particularly cogent or compelling case under this factor, so the Court finds it neutral.


### C. Public Interest Factors

#### 1. Court Congestion

The relevant inquiry under this factor is "[t]he speed with which a case can come to trial and be resolved." *Genentech*, 566 F.3d at 1347; *In re Apple*, 979 F.3d at 1343. A faster average time to trial means more efficient and/ economical resolutions of the claims at issue. That said, "[a] court's general ability to set a fast-paced schedule is not particularly relevant to this factor." *In re Apple*, 979 F.3d at 1344. Moreover, when other relevant factors weigh in favor of transfer or are neutral, "then the speed of the transferee district court should not alone outweigh all of those other factors." *In re Genentech*, 566 F.3d at 1347.

The Federal Circuit has held that a difference in the number of pending cases between the transferor and transferee forums is "too tenuously related to any differences in speed by which these districts can bring cases to trial." *Id.* In another case, it has opined that a "proper" analysis "looks to the number of cases per judgeship and the actual average time to trial." *In re Juniper Networks, Inc.*, No. 2021-156, 2021 WL 4519889, at *3, 2021 U.S. App. LEXIS 29812, at *8 (Fed. Cir. Oct. 4, 2021).

AudioEye cites statistics showing that the average time to trial in the WDNY is "more than four years." ECF No. 34 at 19. AudioEye further argues that this factor weighs against transfer because of Covid-related delays in the WDNY. ECF No. 34 at 19. accessiBe concedes that this factor "at-most, weighs slightly in favor of this Court." ECF No. 21 at 11. The Court finds that this factor favors maintaining this Action here.


#### 2. Local Interests

Under this factor, the Court must evaluate whether there is a local interest in deciding local issues at home. *Volkswagen II*, 545 F.3d at 317. Local interests in patent case "are not a

fiction." *In re Samsung*, 2 F.4th at 1380. "A local interest is demonstrated by a relevant factual connection between the events and the venue." *Word to Info, Inc. v. Facebook, Inc.*, No. 3:14-cv-04387-K, 2015 WL 13870507, at *4 (N.D. Tex. Jul. 23, 2015). "[T]he sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue." *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009). "This factor most notably regards not merely the parties' significant connections to each forum writ large, but rather the 'significant connections between a particular venue and *the events that gave rise to a suit.*' " *In re Apple*, 979 F.3d at 1344 (quoting *In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010)) (emphasis in original). But courts should not heavily weigh a party's general contacts with a forum that are untethered from the lawsuit, such as a general presence. *Id.* Where the movant has a "significant presence" in the transferor forum, this factor "heavily" favors transfer where the transferee forum has a "significant connection to the event that gave rise to [the] suit." *In re Apple*, 2021 WL 5291804, at *5, 2021 U.S. App. LEXIS 33788, at *14–15. Moreover, "little or no weight should be accorded to a party's 'recent and ephemeral' presence in the transferor forum, such as by establishing an office in order to claim a presence in the district for purposes of litigation." *In re Juniper Networks*, 14 F.4th at 1320 (quoting *In re Microsoft Corp.*, 630 F.3d 1361, 1365 (Fed. Cir. 2011)).

**\*9** AudioEye argues that this factor weighs against transfer because accessiBe has [redacted] customers in Texas and strategic partners here. ECF No. 34 at 19. accessiBe argues that this factor favors transfer because the events giving rise to the Non-Patent claims "involve alleged conduct with regard to customers or potential customers," like Hoselton and Finger Lakes, in the WDNY. ECF No. 21 at 10. The Court

finds that Texas and New York have an equally strong interest in resolution of the federal claims. But this factor favors transfer because the NYSL claims naturally center on conduct arising from New York or directed at New York residents. The state of New York and its residents, therefore, have an interest in the outcome of these disputes.

### 3. Familiarity of the Forum with Law-At-Issue

The familiarity of the forum state with governing law should only be considered a public-interest factor weighing in favor of transfer if the governing law is "exceptionally arcane." *See Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 68, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013). The Supreme Court has held that "federal judges routinely apply the law of a State other than the state in which they sit." *Id.* A portion of this Action is premised on New York state law. This factor is neutral or only slightly favors transfer because this Court is confident in its ability to apply New York state law.

### 4. Conflict of Laws

The Parties do not dispute that this factor is neutral and the Court agrees.

### IV. CONCLUSION

Having considered the private and public interest factors, Court's conclusions for each factor is summarized in the following table:

| Factor | The Court's Finding |
| --- | --- |
| Relative ease of access to sources of proof | Weighs in favor of transfer |
| Availability of compulsory process to secure the attendance of witnesses | Weighs in favor of transfer |
| Cost of attendance for willing witnesses | Weighs slightly in favor of transfer |
| All other practical problems that make trial of a case easy, expeditious and inexpensive | Neutral |
| Administrative difficulties flowing from court congestion | Weighs against transfer |
| Local interest | Weighs in favor of transfer |

| Familiarity of the forum with law that will govern case | NNeutral or slightly favors transfereutral or slightly favors transfer |
|---|---|
| Problems associated with conflict of law | Neutral |

Two private interest factors and one public interest factor weigh in favor of transfer. Only the docket-congestion factor weighs against transfer. Given the foregoing, the Court finds that accessiBe has shown that the WDNY is clearly more convenient than this District. accessiBe's Motion, ECF No. 71, is therefore **GRANTED**. The Court **ORDERS** that:

- the Amended Transfer Order, ECF No. 60, is **VACATED** and **SUPERSEDED**;

- the discovery hearing set for March 11, 2022 is **VACATED**;

- the above-captioned case is transferred to the Western District of New York.

**All Citations**

Slip Copy, 2022 WL 827805

## Footnotes

1    accessiBe also places these witnesses under the willing-witnesses factor. Because they are non-parties and nothing in the record suggests they are willing to travel to testify, the Court will only consider them under the compulsory-process factor.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

BarZ Adventures Inc. v. Patrick, Slip Copy (2020)

2020 WL 6342951
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

BARZ ADVENTURES INC. d/
b/a Bar-Z Mobile Development
v.

Timothy PATRICK, App Star, LLC, Colleyville
Chamber of Commerce, Princeton Chamber of
Commerce and Greater Celina Chamber of Commerce

Civil Action No. 4:20-CV-299-ALM
|
Signed 10/29/2020

**Attorneys and Law Firms**

Cynthia L. Saiter, Daniel Craig Bitting, Scott Douglass &
McConnico LLP, Austin, TX, Amie Pina Fordan, Marcus
Lawrence Tolliver, Robert Wayne Gordon, Touchstone
Bernays Johnston Beall Smith & Stollenwerck, Dallas, TX,
Clyde Moody Siebman, Siebman Forrest Burg & Smith LLP,
Sherman, TX, for BarZ Adventures Inc.

William Zachary Duffy, Steven Nelson Williams, Munsch
Hardt Kopf & Harr, PC, Dallas, TX, for Timothy Patrick, APP
Star, LLC, Colleyville Chamber of Commerce, Princeton
Chamber of Commerce.

Kyle Benjamin Fonville, Decker Jones, P.C., Fort Worth, TX,
for Greater Celina Chamber of Commerce.

**MEMORANDUM OPINION AND ORDER**

AMOS L. MAZZANT, UNITED STATES DISTRICT
JUDGE

**\*1** Pending before the Court is Defendant Timothy Patrick's
Motion to Dismiss for Forum Non Conveniens (Dkt. #44).
Having considered the Motion, briefing, and the relevant
pleadings, the Court finds that Defendant's Motion to Dismiss
for Forum Non Conveniens should be **DENIED**.

**BACKGROUND**

**I. Factual History**

This is a trade secret misappropriation suit regarding a mobile
app for chambers of commerce. On April 3, 2017, Plaintiff
BarZ Adventures Inc. d/b/a Bar-Z Mobile Development
("Bar-Z") and Defendant Timothy Patrick ("Patrick") entered
into an employment agreement ("Agreement") (Dkt. #44,
Exhibit A at p. 6). The Agreement was drafted by Bar-Z to
hire Patrick as a new salesperson. It contained the following
two provisions:

**Arbitration and Equitable Relief**

Arbitration. Except as provided below, I agree that any
dispute or controversy arising out of or relating to any
interpretation, construction, performance, or breach of this
Agreement, shall be settled by arbitration to be held in
Travis County in the State of Texas ... The arbitrator may
grant injunctions or other relief[.] [...]

Equitable Remedies. I agree that it would be impossible
or inadequate to measure and calculate the Company's
damages from any breach of the covenants set forth herein.
Accordingly, I agree that if I breach any of such covenants,
the Company will have available, in addition to any other
right or remedy available, the right to obtain an injunction
from a court of competent jurisdiction restraining such
breach or threatened breach. [...]

In September 2018, Bar-Z terminated Patrick's employment.

**II. Procedural History**
On March 16, 2020, Bar-Z sued Patrick and the other
defendants in Collin County, Texas state district court. Bar-Z
alleges Patrick used Bar-Z's confidential information to help
Patrick's subsequent employer develop a competing app. On
April 16, the case was removed to this Court (Dkt. #1).

During discovery, Bar-Z produced the Agreement. On
September 15, Patrick filed his Motion to Dismiss for Forum
Non Conveniens based on the Arbitration clause (Dkt. #44).
On September 30, Bar-Z responded (Dkt. #58) and filed an
amended complaint that only asserts claims for injunctive
relief against Patrick (Dkt. 61). On October 6, Patrick replied,
maintaining that every claim should be dismissed (Dkt. #64).
On October 13, Bar-Z filed its Sur-Reply (Dkt. #65).

**LEGAL STANDARD**

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens.*" *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). The doctrine of *forum non conveniens* "enables a court to decline to exercise its jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001).

The Court engages in a two-step analysis when the parties' contract contains a valid forum selection clause. *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768, 770 (5th Cir. 2016). First, the Court determines whether the forum selection clause is mandatory or permissive. *Id.* at 768. Next the Court decides whether the forum selection clause applies to the dispute at hand, which involves two separate determinations: (1) whether the forum selection clause is valid and enforceable, and (2) whether the particular case falls within the scope of the forum selection clause. *Id.* at 773, 775-76. Forum selection clauses are presumptively valid and the party resisting enforcement bears a "heavy burden of proof." *Haynsworth v. The Corp.*, 121 F.3d 956, 962-63 (5th Cir. 1997).

## ANALYSIS

**\*2** The Court finds that the forum selection clause mandates arbitration for legal remedies, but not equitable remedies. As Bar-Z amended its complaint to only request injunctive relief against Patrick, it falls outside the scope of the arbitration clause. Bar-Z may pursue such equitable relief in a federal district court. Accordingly, Patrick's Motion for Forum Non Conveniens is denied.

### I. Mandatory or Permissive Nature of Forum Selection Clause

The first step is to determine whether the forum selection clause is mandatory or permissive. A mandatory forum selection clause "affirmatively requires that litigation arising from the contract be carried out in a given forum." *Weber*, 811 F.3d at 768. Conversely, a permissive forum selection clause "is only a contractual waiver of personal-jurisdiction and venue objections if litigation is commenced in the specified forum." *Id.* "Only mandatory clauses justify transfer or dismissal." *Id.*

The employment agreement contains two relevant provisions: "Arbitration" and "Equitable Remedies." The Court addresses each clause separately before construing them together.

The Arbitration clause provides that "any dispute ... relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration[.]" (Dkt. #44, Exhibit A at p. 9). By using "shall," the clause requires arbitration for "any" disputes arising from the agreement. At first glance, the Arbitration clause appears to require all disputes be arbitrated because of its broad scope and mandatory language. However, the Equitable Remedies clause adds nuance to this reading.

The Equitable Remedies clause provides that "if" Patrick breaches, Bar-Z "will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction." (Dkt. #44, Exhibit A at p. 9). This clause is permissive because it states Bar-Z "will have" injunctive relief available from a court "in addition to any other right or remedy available[.]" In contrast to "shall," "will have" is open-ended. Because court-ordered injunctions are "in addition to" other available remedies, the clause does not require Bar-Z pursue injunctive relief in a specific venue. Thus Bar-Z could pursue injunctive relief either in arbitration or litigation.

Read together, the clauses provide that Bar-Z must pursue legal claims in arbitration and may pursue equitable claims either in arbitration or in litigation. It is a "cardinal principle" to give effect to all provisions of a contract and render them internally consistent. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). The Court's construction gives effect to each clause because it recognizes the mandatory arbitration language with a narrow carve-out for injunctive relief. If all claims had to be arbitrated, the language permitting equitable claims in "a court of competent jurisdiction" would be superfluous because no claims would ever be filed in district court. This reading is internally consistent because the clauses appear under a single heading ("Arbitration and Equitable Remedies"), indicating the drafter intended each provision to have a distinct, but related, impact on dispute resolution. As such, arbitration is mandatory for legal claims but permissive for equitable claims.

### II. Patrick's Counterarguments

Patrick's counterarguments are unpersuasive. First, Patrick argues that the Equitable Remedies clause contains a condition precedent and so court-ordered injunctive relief is only available if Patrick is first found to have breached the agreement. [1] But this clause contemplates that injunctive relief will be available for "such breach or threatened breach" [.] A threatened breach is one that has not happened yet. It does not make sense to read injunctive relief conditioned on a finding of past harm when the clause contemplates both past and future harms.

**\*3** Further, there is a presumption against condition precedents. *Aery v. OGM Land Co. Ltd.*, No. 5:12-CV-68, 2013 WL 12309861, at \*4 (S.D. Tex. Mar. 20, 2013); *see Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Courts will not construe a condition when imposing one would create an "absurd" result. *Criswell*, 792 S.W.2d at 948. Patrick's reading is unnecessarily narrow because it requires Bar-Z to prevail at arbitration and then separately ask a court to issue injunctive relief—even though that arbitrator could issue the same relief. There seems to be no advantage to overlook the arbitrator and instead pursue the same relief in district court. It would therefore be "absurd" for the drafter to include an additional provision for no discernable reason. *See id.*

Similarly, Patrick's second argument is also unpersuasive. Patrick argues "the Equitable Remedies section is meant to cover temporary or preliminary injunctive relief" because the clause references security bonds, [2] which are required for temporary or preliminary injunctive relief. This contradicts Patrick's condition precedent argument because temporary and preliminary injunctions necessarily occur before any finding of liability. Even so, the clause's mention of bonds

does not preclude permanent relief. There is no express language prohibitting permanent injunctions or otherwise limiting the available relief to a specific type of injunction. Instead, the clause is under a broad heading of "Equitable Remedies". The clause should therefore be understood as encompassing all types of injunctive relief: temporary, preliminary, and permanent.

### III. Bar-Z's Claims for Injunctive Relief May Be Brought in Federal Court

Under the employment agreement, Bar-Z may seek injunctive relief in a court of competent jurisdiction. With its Third Amended Complaint, Bar-Z only seeks injunctive relief against Patrick (Dkt. 61). In its Sur-Reply, Bar-Z "renounces any such claim for damages from Patrick for misappropriation of trade secrets." (Dkt. #65 at 3). This Court also has competent jurisdiction. As arbitration is permissive for Bar-Z's claims, the Court need not continue the analysis. The Motion to Dismiss for Forum Non Conveniens is therefore **DENIED**.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Timothy Patrick's Motion to Dismiss for Forum Non Conveniens (Dkt. #44) is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 6342951

---

**Footnotes**

1       Patrick focuses on the following portion of the Equitable Remedies clause: "I agree that *if* I breach any of such covenants ..." (emphasis added)

2       Patrick focuses on the following portion of the Equitable Remedies clause: "I further agree that no bond or other security shall be required in obtaining such equitable relief."

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Burch v. Second Judicial Dist. Court of State ex rel. County..., 118 Nev. 438 (2002)

49 P.3d 647

118 Nev. 438

Supreme Court of Nevada.

James BURCH and Linda Burch, Petitioners,

v.

The SECOND JUDICIAL DISTRICT COURT
OF the STATE of Nevada, in and for the
COUNTY OF WASHOE, and the Honorable
Steven R. Kosach, District Judge, Respondents,

and

Double Diamond Ranch, LLC, A Nevada
Corporation; and Double Diamond Homes, LLC,
A Nevada Corporation, Real Parties in Interest.

No. 38283

|

July 17, 2002.

|

Rehearing Denied Sept. 11, 2002.

|

Reconsideration En Banc Denied Oct. 29, 2002.

**Synopsis**

Home purchasers brought action against developer for breach of express and implied warranties, negligence, and fraud and misrepresentation. The Second Judicial District Court, Washoe County, Steven R. Kosach, J., granted developer's motion to compel arbitration. Home purchasers petitioned for writ of mandamus. The Supreme Court held that arbitration clause in home warranty was procedurally and substantively unconscionable.

Petition granted.

**Attorneys and Law Firms**

**648  *438** Robert C. Maddox & Associates and Samuel S. Crano, Reno, for Petitioners.

Walther Key Maupin Oats Cox & LeGoy and Donald A. Lattin, Reno, for Real Parties in Interest.

Vannah Costello Canepa Riedy Rubino & Lattie, Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

**439** Before SHEARING, ROSE and BECKER, JJ.

*OPINION*

PER CURIAM:

This petition challenges a district court order granting a motion to compel arbitration in favor of real parties in interest Double Diamond Ranch, LLC and Double Diamond Homes, LLC (Double Diamond). Petitioners James and Linda Burch purchased a new home and a homebuyer warranty from Double Diamond. When problems developed in their home, they contacted Double Diamond to fix them. After attempts at mediation failed, the Burches filed a complaint in district court for damages relating to Double Diamond's construction of their new home. The district court concluded that the Burches had entered into a valid contractual **440** agreement, via the homebuyer warranty, to resolve any disputes concerning their home through arbitration. We disagree, and we, therefore, grant this petition for a writ of mandamus.

*FACTS*

In March 1997, the Burches purchased a new Diamond Country home developed and constructed by real parties in interest Double Diamond. In October 1997, approximately four months after closing, Double Diamond gave Linda Burch a thirty-one-page warranty booklet and asked her to sign a one-page "Application for Home Enrollment" for the 2–10 Home Buyers Warranty (HBW) offered by Double Diamond. She signed the "application" form, but she did not read the thirty-one-page booklet.

The HBW purports to be an express limited warranty. It provides one-year coverage that warrants the home will be free from materials and workmanship defects. In the second year, the coverage narrows to electrical, plumbing, and mechanical systems defects. For ten years, the HBW provides coverage that warrants the home will be free from structural defects.

The one-page "Application for Home Enrollment" states in paragraph nine that,

> [b]y signing, Homebuyer acknowledges that s/he has viewed and received a video of "Warranty Teamwork: You, Your Builder & HBW", read the warranty and has received a copy of this form with the Home Buyers

49 P.3d 647

Warranty Booklet and CONSENTS TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION contained therein.

The HBW's arbitration clause provides, in pertinent part, that:

Any controversy, claim or complaint arising out of or relating to Builder's workmanship/systems limited warranty coverages provided by Builder under the terms of this agreement which Homebuyer and Builder do not resolve by mutual agreement shall be settled by *final and binding* arbitration in accordance with the Construction Arbitration Services (CAS) or other [National Home Insurance Company] NHIC/HBW approved rules applicable to the home warranty industry in effect at the time of the arbitration....

Any controversy concerning a claim arising out of or relating to the Builder's ten year structural coverage (insured by NHIC) shall be settled by final and binding arbitration.... Arbitration of all structural warranty disputes will be conducted by arbitrators supplied by an NHIC approved arbitration service.

**\*441** This arbitration clause further provides that the final and binding arbitration is governed by the Federal Arbitration Act (FAA) [1] "to the exclusion of any provisions of state arbitration law."

**\*\*649** In January 1999, the Burches complained to Double Diamond about "serious problems underneath [their] house"—a saturated floor joists, wet insulation, muddy ground, and a wet, moldy foundation. They requested that Double Diamond remedy the situation by removing the insulation, professionally treating the area with mildew and fungicide controls, installing upgraded insulation with proper venting, constructing a proper water barrier underneath the house, and reimbursing them for all current and future fees for professional inspections. While contesting liability, Double Diamond offered to completely dry the crawl space underneath the house, install two additional foundation vents and a six-mill vapor barrier, treat all areas of active fungus with an approved fungicide, and reinstall insulation except at the rim joist.

The Burches were not satisfied with this offer. After both parties stipulated to waive mediation, the Burches filed a complaint for damages with the district court, alleging breach of express and implied warranties, negligence, and fraud and misrepresentation. Double Diamond filed a motion for a stay and a motion to compel arbitration, arguing that the HBW provided for final and binding arbitration of all disputes relating to the construction of the Burch home. The district court found the HBW valid and granted the motion to compel arbitration. The Burches now request that this court issue a writ of mandamus directing the district court to vacate its order compelling the Burches to arbitrate their claims against Double Diamond.

*DISCUSSION*

Because an order compelling arbitration is not directly appealable, the Burches appropriately seek writ relief from this court. [2] When there is no plain, speedy, and adequate remedy at law, a writ of mandamus is available to compel the district court to perform a required act, or to control an arbitrary or capricious abuse of discretion. [3] Under the circumstances of this case, the HBW is an unconscionable adhesion contract and, therefore, unenforceable. **\*442** The district court should not have compelled arbitration under the unenforceable clause. Accordingly, we grant the petition for a writ of mandamus.

This court has defined an adhesion contract as "a standardized contract form offered to consumers ... on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." [4] "The distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms." [5] Here, the one-page "application" and the HBW were pre-printed, standardized contract forms. The Burches, the weaker party, were not given an opportunity to negotiate the HBW's terms with Double Diamond or its insurer, National Home Insurance Company (NHIC); they were required to "take it or leave it." Therefore, the HBW agreement between the Burches and Double Diamond is an adhesion contract. This court permits the enforcement of adhesion contracts where there is "plain and clear notification of the terms and an understanding consent[,]" [6] and "if it falls within the reasonable expectations of the weaker ... party." [7] This court need not, however, enforce a contract, or any clause of a contract, including an arbitration clause, [8] that is unconscionable. [9]

**\*\*650** Although the FAA establishes a strong public policy favoring arbitration for the purpose of avoiding the unnecessary expense and delay of litigation where

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 23 of 438 PageID #:  372

Burch v. Second Judicial Dist. Court of State ex rel. County..., 118 Nev. 438 (2002)
49 P.3d 647

parties have agreed to arbitrate, [10] it does not mandate the enforcement of an unconscionable contract or arbitration clause. [11] The United States Supreme Court has interpreted § 2 of the FAA and held that "[s]tates may regulate **\*443** contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' " [12] Unconscionability, therefore, is a legitimate ground upon which to refuse to enforce the HBW and its arbitration clause. [13]

 Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a contract or clause as unconscionable. [14] The circumstances present in this case significantly render the HBW procedurally unconscionable. The Burches did not receive a copy of the HBW's terms until after Double Diamond had paid the premium to enroll the Burch home in the warranty program and almost four months after they closed escrow on their home. Double Diamond told the Burches that the HBW's issuance was "automatic" and offered extra protection for their home, when in fact the warranty limited their protection under Nevada law. [15] The Burches did not have an opportunity to read the one-page "application" form, or the thirty-one-page HBW booklet, or to view the HBW video before signing the "application." The arbitration clause was located on page six of the HBW booklet, after five pages of material only relevant to persons residing outside of Nevada. The Burches were not sophisticated

consumers, they did not understand the HBW's terms, and the HBW's disclaimers were not conspicuous. [16] Under these circumstances, the Burches did not have a meaningful opportunity to decide if they wanted to **\*444** agree to the HBW's terms, including its arbitration provision. As a result, the HBW was procedurally unconscionable.

 Because the procedural unconscionability in this case is so great, less evidence of substantive unconscionability is required to establish unconscionability. [17] The HBW's arbitration clause is also substantively unconscionable because it grants Double Diamond's insurer, NHIC, the unilateral and exclusive right to decide the rules that govern the arbitration and to select the arbitrators. **\*\*651** These provisions are "oppressive terms," [18] and as such, are substantively unconscionable and unenforceable. We do not hold that a homebuyer warranty with an arbitration clause will always be unconscionable or unenforceable. Under the circumstances in this case, however, the HBW and its arbitration clause *are* unconscionable and, therefore, unenforceable.

We, therefore, grant the petition and direct the clerk of this court to issue a writ of mandamus directing the district court to vacate its order compelling arbitration. [19]

**All Citations**

118 Nev. 438, 49 P.3d 647

## Footnotes

1  9 U.S.C. §§ 1–16 (2000).

2  *See* NRS 38.205 (no direct appeal from order *granting* motion to compel arbitration); NRS 34.170 (writ to issue when no plain, speedy, and adequate remedy in law exists); *Kindred v. Dist. Ct.,* 116 Nev. 405, 409, 996 P.2d 903, 906 (2000) (recognizing that mandamus is an appropriate method to challenge an order compelling arbitration).

3  *See* NRS 34.160; NRS 34.170; *see also* *Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 603–04, 637 P.2d 534, 536 (1981).

4  *Obstetrics and Gynecologists v. Pepper,* 101 Nev. 105, 107, 693 P.2d 1259, 1260 (1985).

5  *Id.*

49 P.3d 647

6   *Id.* at 108, 693 P.2d at 1261.

7   See *id.* at 107–08, 693 P.2d at 1261; *see also Bernstein v. GTE Directories Corp.,* 827 F.2d 480, 482 (9th Cir.1987) (applying Nevada law).

8   See NRS 38.035 ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" (emphasis added)).

9   See NRS 104.2302(1) (court may refuse to enforce an unconscionable contract).

10  See *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

11  See *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding that generally applicable contract defenses, such as unconscionability, may be used to invalidate an arbitration clause).

12  *Allied–Bruce Terminix,* 513 U.S. at 281, 115 S.Ct. 834 (quoting 9 U.S.C. § 2 (emphasis added)); *see also Doctor's Associates,* 517 U.S. at 687, 116 S.Ct. 1652.

13  See *Doctor's Associates,* 517 U.S. at 687, 116 S.Ct. 1652.

14  *See, e.g., First Family Financial Services, Inc. v. Fairley,* 173 F.Supp.2d 565, 569–71 (S.D.Miss.2001); *Data Based Systems, Intern., Inc. v. Hewlett–Packard Co.,* No. CIV. 00–CV–4425, 2001 WL 1251212, at *10 (E.D.Pa. Sept.26, 2001); *Thomas Engineering, Inc. v. Trane Co.,* No. 92 C 1251, 1994 WL 692698, at *2– 3 (N.D.Ill.Dec.1, 1994); *Armendariz v. Foundation Health Psychcare,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000); *Villa Milano Homeowners Ass'n v. Il Davorge,* 84 Cal.App.4th 819, 102 Cal.Rptr.2d 1, 6–7 (2000); *Complete Interiors, Inc. v. Behan,* 558 So.2d 48, 52 (Fla.Dist.Ct.App.1990); *M.A. Mortenson Co. v. Timberline Software,* 140 Wash.2d 568, 998 P.2d 305, 314–15 (2000).

15  *Cf. Sierra Diesel Injection Service v. Burroughs Corp.,* 890 F.2d 108, 113 (9th Cir.1989) ("[E]xclusions of warranties are generally disfavored .... They are subject to the general obligation of good faith and of not imposing unconscionable terms upon a party.").

16  See NRS 104.1201(10) ("Whether a term or clause is 'conspicuous' or not is for decision by the court."); *see also Sierra Diesel,* 890 F.2d at 115 (explaining that even the use of capital letters in disclaimers will not be "effective in all cases").

17  See *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690.

18  *24 Hour Fitness, Inc. v. Superior Court,* 66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533, 541 (1998).

19  See NRS 34.160; *see also Round Hill,* 97 Nev. at 603–04, 637 P.2d at 536.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5104066
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Novie Dale CARMEN, et al., Plaintiffs,

v.

HEALTH CAROUSEL, LLC, Defendant.

Case No. 1:20-cv-313
|
Signed August 9, 2023

**Attorneys and Law Firms**

Robert E. DeRose, II, Jacob Assaf Mikalov, Barkan Meizlish DeRose Cox, LLP, Columbus, OH, Anna P. Prakash, Pro Hac Vice, Charles A. Delbridge, Pro Hac Vice, Nicole J. Schladt, Pro Hac Vice, Nichols Kaster, PLLP, Minneapolis, MN, Bryce W. Ashby, Pro Hac Vice, Donati Law, PLLC, Memphis, TN, David H. Seligman, Pro Hac Vice, Valerie L. Collins, Pro Hac Vice, Towards Justice, Denver, CO, Jennifer Dale Bennett, Pro Hac Vice, Gupta Wessler LLP, San Francisco, CA, for Plaintiffs.

Beth A. Bryan, Russell S. Sayre, Spencer S. Cowan, Taft Stettinius & Hollister LLP, Cincinnati, OH, Kenneth Foisy, Taft Stettinius & Hollister LLP, Covington, KY, for Defendant.

**OPINION AND ORDER**

DOUGLAS R. COLE, UNITED STATES DISTRICT JUDGE

**\*1**  This cause comes before the Court on Defendant Health Carousel, LLC's (Health Carousel) Motion to Dismiss (Doc. 44) Plaintiffs Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores' Third Amended Complaint (Doc. 43). Health Carousel also moves to Strike Plaintiffs' Class Allegations (Doc. 45) and to Stay Discovery (Doc. 47). For the reasons discussed below, the Court **DENIES** Health Carousel's Motion to Dismiss (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay (Doc. 47) **AS MOOT**.

**BACKGROUND**

This is a putative class action. Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores bring this case on behalf of similarly situated immigrants that Health Carousel currently or previously employed. (3d Am. Compl., Doc. 43, #986). And this is not Defendant's first Motion to Dismiss in this case. On June 17, 2021, the Court issued an Opinion denying Health Carousel's combined Motion to Dismiss Carmen's (first) Amended Complaint and Motion to Strike Class Allegations (Doc. 21). Later, Carmen amended her Complaint two more times, resulting in the now-operative Third Amended Complaint, filed on December 17, 2021. (Doc. 43).

The Third Amended Complaint removed some previously alleged facts, while also adding new allegations, two new plaintiffs (Amistoso and Flores) and five new causes of action. (*See id.*). In response, Health Carousel has now moved to dismiss the Third Amended Complaint, to strike class allegations, and to stay discovery while the Court considered these Motions. (Docs. 44, 45, 47).

**\*2**  The Court has already extensively detailed the general facts in its previous Opinion and Order. (Doc. 21, #598–608). Yet that was two years ago. So the Court will repeat those common allegations that appear in both the Amended Complaint and the Third Amended Complaint, before turning to note the differences. [1]

> Health Carousel is a recruiting and staffing company headquartered in Hamilton County, Ohio, that enlists foreign nurses, primarily from the Philippines, to work in healthcare facilities across the United States. The healthcare facilities that employ the nurses pay Health Carousel an amount in excess of the nurse's hourly wages. Health Carousel then pays the nurses the wages to which they are entitled, keeping the difference for itself. As the description suggests, the amount of return that Health Carousel generates for a given nurse depends on how many hours that nurse works through the auspices of the Health Carousel program.
>
> The nurses receive several benefits from Health Carousel in exchange for their participation in the arrangement. Beyond the obvious benefit of placing the nurses in a job, Health Carousel also sponsors the nurses' permanent U.S. resident visa petitions; pays related expenses, including

examination, filing, and attorney's fees; pays airfare to the United States; provides free temporary housing in the United States; pays cash bonuses when participating nurses arrive in the United States; and provides medical benefits and life insurance.

Those benefits last, however, only while the nurse is employed through Health Carousel. So, for example, if a nurse is residing in Health Carousel-supplied housing, that nurse must leave such housing within 48-hours after her last shift as a Health Carousel employee. Health Carousel calls its business model the "Passport USA" program.

Each nurse executes two agreements as part of this business arrangement. The first is a form contract, the "Employment Contract," which each foreign nurse signs to initiate her employment relationship with Health Carousel. As this agreement is executed before Health Carousel begins the visa process, nurses will almost always sign this contract while still abroad.

As relevant to this case, the Employment Contract includes four provisions that set forth a participating nurse's obligations. First, the contract contains a "Commitment Period" provision. This term requires the participating nurse to work "for a period of time commencing upon the completion of [the nurse's] orientation ... and becoming fully licensed and ending upon the later of (i) 36 months or (ii) 6,240 regular-time work hours." In other words, the period starts upon the later of orientation or licensure, and then continues for at least three years of 52-week-per-year, forty-hour work weeks (i.e., 3 x 52 x 40 = 6,240). Moreover, any hours of overtime do not count toward the 6,240-hour target. And, if a nurse takes any vacation, of course, that time off likewise will not accrue any hours in regard to the contractually-specified Commitment Period.

Second, each Employment Contract contains an "Exclusivity" provision. Here, a participating nurse acknowledges that Health Carousel will invest "a significant amount of time, effort, and money" into the participating nurse's licensing and visa processing. Based on that, the nurse agrees not to seek sponsorship or accept any employment in the United States from another company, without Health Carousel's written consent, before that nurse has fulfilled his or her obligations under the Employment Contract.

Third and relatedly, each Employment Contract contains a non-compete and non-solicitation clause. This term prohibits a nurse from "seek[ing] employment ... with any other healthcare provider within 50 miles of [the nurse's] Client facilities for one year after [the date the nurse leaves Health Carousel if the nurse violated the terms of the Employment Contract]." A nurse who left Health Carousel before the end of the Commitment Period, for example, would trigger this non-compete obligation.

Fourth and finally, each of Health Carousel's Employment Contracts contains a "Breach Obligation" provision. This clause states that, in the event of a given nurse's breach, "[the nurse] agree[s] that damages sustained by Health Carousel ... are impossible, or at least very difficult, to estimate accurately and, for that reason, [the nurse] agree[s] that the [liquidated damages] amount is a reasonable forecast of fair compensation for any such breach." The Employment Contract does not specify a dollar figure for the liquidated damages, but rather sets forth a list of expenses and potential lost profit items that both parties agree will be used to determine the liquidated damages amount in a given case. And rather than provide a precise computation, the term merely states, if the nurse breaches the Employment Contract, the nurse "shall pay the liquidated damages to be agreed upon and shall be settled amicably by the parties without prejudice of filing the case in the proper court."

**\*3** But the Employment Contract at issue here also includes an Addendum that further amends the Breach Obligation provision. Through the Addendum, the parties agree to a range of specifically identified liquidated damages figures. The applicable figure in each case depends on when the breach occurs in relation to the progress on the nurse's visa application. More specifically, the liquidated damages are set at: $1,000 if the breach occurs before Health Carousel filed for the visa; $10,000 if the breach occurs after filing but before issuance of the visa; and finally, $20,000 if the breach occurs after the issuance of the visa but before the end of the ("Commitment Period."). The Complaint further alleges that Health Carousel amended the Addendum over time to increase the liquidated damages figures for nurses who were recruited later—for example, raising the top amount from $20,000 to $35,000. Upon arrival in the United States, a nurse receives and signs various agreements that, together, form a 183-page "Employee Handbook." (Employee Handbook). The Handbook mostly consists of Health Carousel's workplace policies and employee benefits information. Some of these policies simply notify Health Carousel employees of standard safety practices, like how to react in the case of a fire or how

to safely transport a patient. Other policies provide rules that govern the nurse's workplace behaviors. For example, the Handbook prevents nurses from discussing the terms and conditions of their employment and prohibits "gossip" at work. Still other policies further describe the relationship between Health Carousel and the nurses. The Handbook, for instance, explains that "[a]s long as [a nurse] remain[s] in good standing with Health Carousel, we will continue to be [that nurse's] advocate for immigration purposes."

The Handbook also revises some provisions in a nurse's earlier Employment Contract. Two of those revisions are relevant to Health Carousel's Motion. First, while the Employment Contract provides that a nurse's "Commitment Period" does not begin until the nurse obtains full licensure, the Handbook explains that "[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility." Second, the Handbook tweaks the Breach Obligation provision from the Employment Contract. The Handbook does not alter the liquidated damages figures, but it does use different language when describing other consequences that flow from a breach. Specifically, while the Employment Contract provides that the liquidated damages shall be "settled amicably," the Handbook drops that language and states only that any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment. Further, the Handbook indicates that Health Carousel will file suit and seek damages from any nurse who breaches the Employment Contract and fails to pay liquidated damages. The Handbook then warns nurses that if they "leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad."

A. Health Carousel Employs Carmen.

Carmen is a citizen of the Republic of the Philippines. She worked there as an emergency-room nurse from approximately 2014 to 2018. "Lured" by the opportunity to come to the United States, in late-2014, Carmen contacted Health Carousel about its Passport USA programs. A few months later, on April 6, 2015, Carmen and Health Carousel executed an Employment Contract. Under the terms of that Contract, Carmen joined Health Carousel's Global Express Program.

In her Employment Contract, Carmen agreed to the (1) non-compete agreement; (2) Breach Obligation provision; and (3) Commitment Period. The Addendum in her agreement

specified that Carmen would owe $20,000 in liquidated damages if "[e]arly termination occurs after the issuance of [her] visa but prior to completing [her] Commitment Period."

After Carmen executed her Employment Contract, nearly three years passed before she received the visa that she needed to enter the United States. Carmen arrived in this country on January 17, 2018. The day after her arrival, Health Carousel presented Carmen with the Handbook, and required her to sign it at the time that she received it. Carmen alleges that many of the terms in the Handbook "surprised" her, including, for example, the Handbook's threat to litigate if Carmen breached the agreement. In any event, Carmen signed the Handbook and began working at The University of Pittsburgh Medical Center ("UPMC") in Muncy, Pennsylvania, less than a month later, i.e., the second week of February 2018. Carmen officially became a Health Carousel employee on her first day of work with UPMC Muncy.

 **\*4**  When Carmen began at UPMC, she had not yet obtained her permanent nursing license from Pennsylvania, but instead was working under a temporary license. ... Given that the Commitment Period provision in her Employment Contract only began to run when Carmen was fully licensed, Carmen's work before August 2018 did not count against her Commitment Period, although it did benefit Health Carousel.

B. Carmen Leaves Health Carousel.

Not long after Carmen began working for Health Carousel, she learned that her colleagues who were working directly for UPMC (i.e., not through Health Carousel) were earning more than her. Her salary, among other factors, led Carmen to conclude that she wished to terminate her employment with Health Carousel.

Carmen claims that the terms in Health Carousel's contracts, however, forced her to continue working. Her first, and apparently most pressing, concern was that Health Carousel would sue her for $20,000 in liquidated damages under the Breach Obligation provision of her Employment Contract if she left her position before the expiration of the Commitment Period. Second, Carmen alleges that she felt forced to continue working for Health Carousel because the non-compete in her Employment Contract limited her employment options.

Finally, Carmen claims that she hesitated to terminate her employment because the Handbook "implies" that any nurse who leaves before the end of the Commitment Period will suffer adverse immigration consequences. The relevant section of the Handbook states "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes." Carmen reasons that the opposite is also true: that if she leaves early, Health Carousel will try to send her back to the Philippines.

Despite her claimed fears, Carmen terminated her employment with Health Carousel in November 2019. At the time she quit, Carmen had worked for Heath Carousel for 22 months—i.e., since February 2018. As Carmen did not gain her full license until August 2018, only about sixteen of those months counted toward Carmen's three-year Commitment Period. When Carmen left, she borrowed $20,000 from her boyfriend to pay Health Carousel the liquidated damages for her early termination due under both the Employment Contract and the Handbook. Carmen alleges that she has experienced hardship, stress, anxiety, guilt, and depression as a result of having to borrow this money from her boyfriend. At some point after paying Health Carousel, Carmen moved to Hershey, Pennsylvania, where she found a nursing job that pays more than her old position at Health Carousel.

(Doc. 21, #598–608 (citations omitted)).

Carmen includes the same principal allegations in her Third Amended Complaint, but with a few key differences. First, Carmen once alleged that Health Carousel "slow-rolled" or otherwise interfered with her obtaining her license so it could extract more labor from her. (*Id.* at #605–06). Carmen has now dropped that allegation. (*Compare* Am. Compl., Doc. 11, #139–40, *with* Doc. 43). Second, Carmen now alleges that Health Carousel falsely reported in visa applications to the United States Citizenship and Immigration Services (USCIS) that Health Carousel would pay workers the prevailing wage after arrival. (Doc. 43, #1016–17). Third, Carmen alleges that in those same applications Health Carousel falsely reported that Plaintiffs had "full-time, permanent employment" awaiting them, despite knowing their work depended on matching immigrants with companies. (*Id.*). Fourth, Carmen provided additional facts relating to her claim that Health Carousel paid her beneath the prevailing wage —alleging Health Carousel paid her just $25.50 per hour, while her domestic-born coworkers received "almost $29 per hour." (*Id.* at #1007).

**\*5** The Third Amended Complaint also added two additional named Plaintiffs—Amistoso and Flores. (*Id.* at #985). Similar to Carmen, both immigrated to the United States through Health Carousel's program, and both believe Health Carousel illegally exploited them. (*Id.* at #988, 991–1020). In addition, both signed initial contracts in the Philippines, and Health Carousel subjected both to a Commitment Period and a liquidated damages penalty if they did not complete their obligations. (*Id.*). And both claim Health Carousel isolated them, demanding they not discuss their contract with others. (*Id.* at #1004–05).

Beyond these similarities, Amistoso and Flores also had their differences. Amistoso, a native of the Philippines, worked for Health Carousel as a physical therapist in the Denver, Colorado region. (*Id.* at #1003). After arriving in the United States, Health Carousel had her undergo a three-month unpaid orientation, despite allegedly leading her to believe it would last two weeks. (*Id.* at #996). Moreover, despite working during this orientation, Amistoso's labor did not count toward her Commitment Period. (*Id.*). As with Carmen, Health Carousel had Amistoso sign the New Employee Binder upon arrival, which contained new terms absent from the Philippines contract. (*Id.* at #994). Yet unlike Carmen, Health Carousel paid Amistoso not by the hour but by patient visit. (*Id.* at #1009). Her alleged pay disparity is more striking —she claims to have been paid $45.56 per visit, while her domestic-born coworkers earned anywhere from $75 to $105 per visit. (*Id.* at 1008–09). Amistoso also claimed she had more experience than her counterparts, yet Health Carousel paid her less because "she went to school in the Philippines and not in the United States." (*Id.* at #1009).

Health Carousel assigned Amistoso a mandatory 30-visit weekly target, all in-person and spread over a large geographic region. She claims she at times drove over 100 miles per day to administer care but did not receive compensation for her travel. (*Id.* at #1009). Then, when she got home, Amistoso allegedly worked into the night to finish paperwork from the day's visits, also receiving no compensation for this work. (*Id.*). Amistoso also claims she received no respite from her weekly visit goal. (*Id.*). For holidays and personal time, she simply had to make up her missed visits elsewhere.

According to Amistoso, this arrangement contradicted representations Health Carousel had made in the Philippines while recruiting her. (*Id.*). And when she later talked with

Health Carousel personnel in this country about her concerns, they allegedly suggested that "if she was not still working for Health Carousel, she could not remain in the United States." (*Id.* at #1007).

Then in January 2020, the facility employing Amistoso downsized, ending her contract. (*Id.* at #1013). Health Carousel allegedly informed Amistoso that she would have to wait, without pay, until Health Carousel could find a new employer, and that her new job would likely require Amistoso to move outside Colorado. (*Id.* at #1013–14). With a new baby, Amistoso balked at moving, but Health Carousel insisted her only other alternative would be coughing up the $20,000 liquidated damages. (*Id.*). And Health Carousel provided Amistoso an accounting of its expected damages to justify the $20,000 demand, which included about $8,000 in "back office administrative support fees." (*Id.*).

Ultimately, Amistoso refused to move and breached her contract. (*Id.* at #1014). But she did not have money to pay the liquidated damages. (*Id.*). Worried, Amistoso contacted Legal Aid, who sent a letter to Health Carousel contesting the liquidated damages provision's legality. (*Id.* at #1014–15). Since then, Health Carousel has allegedly not contacted Amistoso about the damages, and it appears Amistoso has not paid. (*Id.* at #1015).

**\*6** Flores, a Registered Nurse, faced her own difficulties. (*Id.* at #992). Unlike Carmen and Amistoso, the Third Amended Complaint does not explicitly allege Flores received or signed the New Employee Binder upon arrival. (*See id.* at #994–95). But it does claim she "was subject to substantially the same rules upon her arrival" and "was also surprised by Health Carousel's policies and practices." (*Id.*). Health Carousel placed Flores with the West Virginia University Health System, and she underwent her unpaid orientation from November 12 through January 6. (*Id.* at #996). Flores claims her orientation period ended January 6, yet Health Carousel "objected and insisted Flores's time be classified as orientation time for an additional six days." (*Id.*).

After orientation, Flores began working long hours, only to realize that her overtime did not count toward her commitment period. (*Id.* at #1010). Flores also worried because Health Carousel had assigned her work she felt untrained to handle. (*Id.* at #1011). When she complained, Health Carousel ignored her. (*Id.*). Flores then discussed breaching her contract with Health Carousel, and staff members allegedly "suggested to [her] that if she terminated

her contract without paying the breach fee, she would have immigration-related problems." (*Id.* at #1007).

In September 2021, the facility employing Flores restructured, ending her contract. (*Id.* at #1015). Health Carousel told Flores she would receive daily "ad hoc" assignments with the West Virginia Health Care Systems. (*Id.*). Flores protested, believing she did not have the training to "provide care in the variety of units they attempted to place her." (*Id.*). But Health Carousel persisted. (*Id.*). Flores became despondent, taking off "three days of accrued personal time off." (*Id.*). After that, Health Carousel ended her contract and demanded $30,000 in liquidated damages immediately. (*Id.*). Flores, not having the money, offered $10,000 as full satisfaction. (*Id.*). Health Carousel accepted the money, but still demanded the additional $20,000. (*Id.*). The $20,000 remains outstanding. (*Id.*).

Collectively, Carmen, Amistoso, and Flores bring ten claims in their Third Amended Complaint. These are: (1) Violations of the Trafficking Victims Protection Act (TVPA) under 18 U.S.C. § 1589(a); (2) Violation of the TVPA under 18 U.S.C. § 1589(b); (3) Violation of the TVPA under 18 U.S.C. § 1590(a); (4) Violation of the TVPA under 18 U.S.C. § 1594(a); (5) Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act under 18 U.S.C. § 1962 predicated on Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351; (6) Violations of the RICO Act predicated on Visa Fraud under 18 U.S.C. § 1546; (7) Violations of the RICO Act predicated on Trafficking under 18 U.S.C. § 1590; (8) Violation of Ohio Corrupt Practices Act (OCPA) under Ohio Rev. Code § 2923.32; (9) Violations as to Carmen of the Fair Labor Standards Act (FLSA) under 29 U.S.C. § 201 *et seq.*; (10) Violation of Ohio's Human Trafficking Law under Ohio Rev. Code § 2905.32. (*Id.* at #1026–37). Carmen had pled five in her Amended Complaint—only the RICO, OCPA, and FLSA claims appear for the first time.

On January 3, 2022, Health Carousel moved under Rule 12(b)(6) to dismiss the Third Amended Complaint. (Doc. 44). Health Carousel also moved to strike class allegations from the Third Amended Complaint, arguing Plaintiffs' allegations were not suited to class treatment. (*See* Doc. 45). Finally, three days later, Health Carousel moved to stay discovery while the Court considered these motions. (Doc. 47). All three are now ripe.

## STANDARD OF REVIEW

Plaintiffs press ten claims, and Health Carousel moves to dismiss all ten for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In resolving that motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted).

**\*7** That is so, however, only as to well-pled factual allegations. The Court need not accept " 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, there must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

The Court has already addressed the sufficiency of five of the ten claims in a previous Opinion denying a motion to dismiss. Although the Third Amended Complaint presents some different allegations, they do not change the outcome as to those claims. As for the new claims, the Court finds Plaintiffs have plausibly alleged each cause of action. Separately, the Court denies Health Carousel's Motion to Strike Class Allegations. And because the Court denies both these Motions, it also denies Health Carousel's Motion to Stay Discovery as moot.

### A. Plaintiffs Again Plausibly Allege Trafficking Victims Protection Act Claims.

Let's start with how we got here. When first examining Carmen's Amended Complaint (before Amistoso and Flores joined the suit), the Court found that she had plausibly alleged her four TVPA counts. (Doc. 21, #621). After finding Carmen's TVPA claims came down to whether she suffered the threat of a "serious harm," the Court set about defining how such harm could be shown. (*Id.* at #611). The Court noted that an employment contract, even if voluntarily entered, can at times result in illegally compelled labor. (*Id.* at #612–13). The Court highlighted that no one clause or term is dispositive but that a court should "consider all the

surrounding circumstances" to determine whether the total effect is coercive. (*Id.* at #615). The Court further recognized that a "bait-and-switch" tactic could create coercive effects, where a party is misled about the terms in a way that compels their labor. (*Id.* at #615–16). Then, the Court summarized:

> In short, it is not the existence or non-existence of an employment contract that controls. Rather, the key questions relate to the substantive terms of the alleged contract (e.g., are they too one-sided?), as well as the parties' conduct in the formation and performance of the agreement. Indeed, in some ways, it is not unlike the contractual unconscionability framework, which also has both a substantive and procedural component.

(*Id.* at #617).

Applying that framework, the Court found Carmen's Amended Complaint had plausibly alleged that she had suffered a risk of serious harm that compelled her labor. And the Court highlighted two bait-and-switch allegations. First, that Health Carousel impeded Carmen's ability to obtain her full license, in turn extending her Commitment Period. (*Id.* at #618). Second, that Health Carousel compelled her to work extensive overtime without counting those hours towards her Commitment Period. (*Id.*). Separately, the Court found that Carmen pled sufficient "allegations of substantive egregiousness" through the liquidated damages "penalty." (*Id.* at #619).

Fast forward to today. Now in the Third Amended Complaint, the Court concludes that Plaintiffs Carmen, Amistoso, and Flores have plausibly alleged their TVPA claims. They provide sufficient allegations that Health Carousel created a threat of "serious harm" to compel their labor. Many of the same allegations from the Amended Complaint remain, including allegations that Health Carousel forced the Plaintiffs to work excessive overtime and that Health Carousel used liquidated damages as a "penalty" to lock Plaintiffs in. (Doc. 43, #995, 998).

**\*8** True, Carmen no longer alleges Health Carousel stalled her full licensure. Even without Plaintiffs' "stalling"

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

allegation, though, Plaintiffs have still plausibly alleged a threat of serious harm. As the Court held previously, assessing a serious harm requires a holistic analysis. And looking at the surrounding circumstances here, the Court finds it plausible, based on the allegations in the now-operative Complaint, that Health Carousel subjected Plaintiffs to a threat of serious harm though its liquidated damages provision and working conditions.

This case in many ways mirrors *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019). There, the healthcare staffing company defendant contracted to pay the immigrant plaintiffs the prevailing wage upon their arrival. *Id.* at *2. Yet after arrival, the defendant failed to pay the prevailing wage, and threatened plaintiffs with a $25,000 liquidated damage penalty to ensure they continued to work. *Id.* at *18. On a motion for summary judgment, the *Paguirigan* court found the $25,000 liquidated damages "provision constitutes a threat of sufficiently serious financial harm." *Id.* Here too, Plaintiffs allege Health Carousel seeks to compel Plaintiffs' labor through the liquidated damages penalty.

In response, Health Carousel asks the Court to apply the Rule of Lenity. (Doc. 44, #1075). Health Carousel argues no prior caselaw gave it notice that its employment contracts violated the TVPA. (*Id.* at #1075–76). And as statutory language must have the same meaning in both criminal and civil contexts, Health Carousel says, the Court must hold that the statute cannot be applied in this "new" context, even civilly. (*Id.* at #1076). The company summarizes, "[i]f there is any doubt whether liquidated damages could cause 'serious harm' under the TVPA, ... the Court should apply the rule of lenity." (*Id.* at #1076).

The Rule of Lenity reflects the notion that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Yet the Rule of Lenity is triggered *only* when "after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.'" *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)).

Health Carousel, on the other hand, fashions its own conception of the Rule. In the company's view, the Rule demands that Plaintiffs identify an exact case match that

put Health Carousel on notice—almost akin to the "clearly established" principle from qualified immunity. But that is not and never has been the law. The Rule is not triggered simply through a novel application of a criminal statute. After all, every statute has to be invoked for a first time. Rather, the Rule comes into play when a novel application implicates an unacceptable vagueness latent *within the statute itself*. Before invoking the Rule of Lenity, then, Health Carousel must first grapple with the TVPA's text and context. It did not.

Accordingly, the Court finds, again, that Plaintiffs have plausibly alleged sufficient facts to support their four claims under the TVPA. Again, that is not to suggest that Plaintiffs will succeed on those claims. But that is not the question now.

## B. Plaintiffs Again Plausibly Allege An Ohio Human Trafficking Statute Claim.

In its previous Opinion, the Court explained that Ohio's Human Trafficking statute "expressly contemplates that 'fraud,' which leads to 'compelled ... labor,' could establish a claim" and found that standard plausibly met. (Doc. 21, #622–23). But there, the Court focused on Carmen's claim that Health Carousel stalled her licensure. (*Id.*). Now, the Third Amended Complaint has dropped that allegation.

**\*9** Still, the Court finds the Third Amended Complaint plausibly alleges Health Carousel used fraud to compel Plaintiffs' labor, although based on different allegations. Plaintiffs says that Health Carousel, while recruiting them to come to the United States, misled them about working conditions, pay rates, work expectations, hours, and overall length of service. (Doc. 43, #995–96, 1008, 1010–11). For example, Plaintiffs say they did not know Health Carousel would make them work overtime. Yet after arrival, Plaintiffs say they felt compelled to work overtime, for fear of otherwise being assessed the liquidated damages "penalty." (*Id.* at #986). And if Health Carousel in fact made material misrepresentations to Plaintiffs about their contractual obligation to work overtime or other material aspects of their employment, that may suffice to show the company violated Ohio's human trafficking statute.

Health Carousel otherwise only responds with recycled arguments the Court has already considered and rejected in its prior Opinion. Thus, the Court finds Plaintiffs have plausibly stated a claim under the Ohio Human Trafficking statute.

## C. Plaintiffs Plausibly Allege RICO Claims.

Now for Third Amended Complaint's novel claims, starting with Plaintiffs' three RICO claims. A civil RICO plaintiff starts with four core elements they must show as to the defendant: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); 18 U.S.C. § 1962(c). As part of that, a plaintiff must also show "(1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022). Covered predicate acts are listed in 18 U.S.C. § 1961(1), and include the three predicate acts on which Plaintiffs rely here: Fraud in Foreign Labor Contracting (18 U.S.C. § 1351); Visa Fraud (18 U.S.C. § 1546); and Trafficking (18 U.S.C. § 1590). (Doc. 43, #1029–35). "[T]he term 'enterprise' denotes any legal entity, such as a corporation, or 'any union or group of individuals associated in fact although not a legal entity.' " *Grow Michigan*, 50 F.4th at 594 (citing 18 U.S.C. § 1961(4)).

The RICO statute sweeps broadly so courts construe it liberally. *Sedima*, 473 U.S. at 497–98. But its scope is not unlimited. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 568 (6th Cir. 2013). For example, RICO only allows recovery for commercial-based injuries to "business or property." 18 U.S.C. § 1964(c); *see also Jackson*, 731 F.3d at 562. Finally, a plaintiff must show but-for and proximate cause between the predicate act and their injury. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).

Plaintiffs say that Health Carousel (and its affiliates) carry out a business plan that routinely violates multiple federal criminal statutes. (Doc. 43, #1029–35). Off the bat, it appears to the Court—and no party disputes—that Health Carousel is an enterprise operating in interstate commerce. Instead, the parties mainly contest whether Plaintiffs plausibly allege the following three elements: (1) that Health Carousel committed the requisite predicate acts; (2) that Plaintiffs suffered a RICO injury; and (3) that Health Carousel proximately caused said RICO injury. Ultimately, the Court agrees that Plaintiffs plausibly allege each of these elements.

### 1. Plaintiffs Plausibly Allege Health Carousel Committed Predicate Acts.

**\*10**  Plaintiffs' RICO predicates can be grouped into two categories: fraud-based and trafficking-based. Start with the two fraud-based predicate acts: Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351 and Visa Fraud under 18 U.S.C. § 1546. The two statutes prohibit largely the same conduct, but differ in the person to whom the defendant directs the misrepresentations. Fraud in Foreign Labor Contracting focuses on alleged misrepresentations to the foreign worker:

> (a) Work Inside the United States.-- Whoever knowingly and with intent to defraud recruits, solicits, or hires a person outside the United States or causes another person to recruit, solicit, or hire a person outside the United States, or attempts to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment shall be fined under this title or imprisoned for not more than 5 years, or both.

18 U.S.C. § 1351. Visa Fraud, on the other hand, covers, in part, situations where the defendant misrepresents material facts on immigration forms submitted to the government. 18 U.S.C. § 1546.

Plaintiffs have plausibly alleged Health Carousel committed both. Plaintiffs contend that Health Carousel misrepresented its intent to pay Plaintiffs the prevailing wage upon their arrival in this country, and that it made this representation both to the Plaintiffs and to immigration officials. As to the former, Plaintiffs claim Health Carousel told them, before they signed on, to expect to be paid the prevailing wage. (Doc. 43, #1029–30). Indeed, their contracts state: "Health Carousel will pay you an hourly wage rate in accordance with United States Department of Labor prevailing wage guidelines and the premium rate provided by state or federal law for all authorized and properly documented overtime worked for the Client facility(ies)." [2] (Doc. 1-2, #36). And, as to the latter, Plaintiffs say Health Carousel made a similar guarantee in their Form I-140 applications for Plaintiffs' visas to the USCIS. (Doc. 43, #1032–34).

But, according to Plaintiffs, Health Carousel never intended to pay Plaintiffs the prevailing wage upon arrival in the United States, and Plaintiffs' pay in fact fell well below the wages

their peers earned. [3] (*Id.* at #1007–10, 1016–17). And while the Court applies the heightened fraud pleading standard of Rule 9(b) to these fraud predicates, *see Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017), Plaintiffs have met that standard here. They present the actual contractual terms containing the alleged misrepresentations. [4] Indeed, Plaintiffs appear to say the contract terms and visa applications themselves contained fraud because Health Carousel had no intention to follow through on them. This specificity puts Health Carousel on notice of its alleged fraud. [5] *See U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (recognizing the "overarching purpose [of Rule 9(b)] is to ensure that a defendant possesses sufficient information to respond to an allegation of fraud").

**\*11** Moving on, Plaintiffs have also plausibly alleged Health Carousel committed Trafficking. That statute criminalizes:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1590. Notably, "in violation of this chapter" includes the TVPA allegations described above. As Health Carousel plausibly violated Plaintiffs' rights under the TVPA, Plaintiffs have adequately pled the predicate act of Trafficking. (Doc. 43, #1035).

### 2. Plaintiffs Plausibly Allege RICO Injuries.

As noted, only injuries to business or property constitute a RICO injury. 18 U.S.C. § 1962(c). Injuries, even monetary injuries, that " 'aris[e] directly out of' a personal injury" fall outside RICO's scope. *Jackson*, 731 F.3d at 565. Rather, "[p]laintiffs must allege a 'proprietary type of damage' to establish a RICO claim." *Id.* at 569. This can include "lost wages," but only if they arise from such a "proprietary" (non-personal injury) harm. *Id.*

Plaintiffs have, at minimum, alleged a RICO injury from Health Carousel denying them their contractual right to a prevailing wage. In the Employment Contracts, Health Carousel bound itself to pay Plaintiffs the prevailing wage.

(Doc. 1-2, #36). And Plaintiffs claim their pay fell below that level—violating the Employment Contracts. (*See, e.g.*, Doc. 43, #1007). That plausibly alleges a RICO injury. *See Jackson*, 731 F.3d at 569.

Health Carousel responds in two ways. First, it protests that Plaintiffs cannot claim an injury in an unknown wage differential. (Doc. 44, #1085–86). Health Carousel also says wage differences, like those here, are a common part of life and so cannot be a RICO injury. (*Id.*). Neither argument works. To start, Health Carousel agreed to pay Plaintiffs "in accordance with United States Department of Labor prevailing wage guidelines." (Doc. 1-2, #36). The Department of Labor, in turn, defines "prevailing wage" as "the average wage paid to similarly employed workers in a specific occupation in the area of intended employment." [6] If Health Carousel failed to meet that standard, as alleged, then any damages presumably can be calculated by reference to that definition. True, Plaintiffs may (or may not) need expert testimony to establish exactly what that is, depending on the nature of the proof otherwise available. But the need for expert testimony does not render those damages too speculative for recovery. And Plaintiffs are not "just" underpaid workers. Taking Plaintiffs' allegations and the reasonable inferences that follow from them at face value, Health Carousel violated provisions of its contract with the Plaintiffs—provisions meant to induce them to uproot their lives and travel halfway around the world.

### 3. Plaintiffs Plausibly Allege Health Carousel Caused Their RICO injuries.

Lastly, RICO plaintiffs must show the predicate act was both a but-for and proximate cause of their injuries, with "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.*, 559 U.S. at 9. Stemming from § 1964(c)'s "by reason of" language, proximate cause exists where "the defendant's racketeering offense 'led directly to the plaintiff's injuries.' " *Grow Michigan*, 50 F.4th at 594 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). Merely foreseeing that the injury may occur is not enough. *Id.* Similarly, "derivative or passed-on" indirect injuries cannot meet the proximate cause threshold. *Id.* at 595. Rather, courts generally require the most "immediate victims of an alleged RICO violation" to bring claims where they have an incentive to sue. *Id.* at 596 (quoting *Anza*, 547 U.S. at 460); *Hemi Grp.*, 559 U.S. at 11–12. Such a requirement helps avoid the "risk of duplicative injuries," as well as the danger of extending the RICO statute beyond its appropriate

context. *Grow Michigan*, 50 F.4th at 594 (quoting *Anza*, 547 U.S. at 459). Courts generally decline "to go beyond the first step" in determining causation. *Hemi Grp.*, 559 U.S. at 10.

**\*12** Plaintiffs say, among other things, that Health Carousel intentionally refused to compensate them at the prevailing wage. Plaintiffs also allege that Health Carousel furthered its scheme through the multiple predicate acts discussed. To Plaintiffs, Health Carousel defrauded the Plaintiffs by lying about its intention to pay them the prevailing wage, defrauded the USCIS by lying about the same, and transported Plaintiffs into the country to have them work for less than the prevailing wage. (Doc. 43, #986, 1007, 1035). Finally, they contend that "are the best situated to bring suit based on Health Carousel's racketeering" and in the "best position to 'to gather information about [Health Carousel's] conduct.' " (*Id.* (quoting *Alix v. McKinsey & Co.*, 23 F.4th 196, 208 (2d Cir. 2022))).

Plaintiffs have plausibly alleged that Health Carousel's predicate acts proximately caused their RICO injury. First, Health Carousel (again allegedly) committed each predicate act as essential steps furthering its scheme to underpay Plaintiffs and generate profit for itself. Put another way, Health Carousel's Fraud in Foreign Labor Contracting persuaded Plaintiffs to immigrate, its Visa Fraud got them into the country, and its Trafficking delivered them to the site where the alleged exploitation occurred. Plaintiffs are also the most natural RICO plaintiffs to recover on their prevailing wage injury. As parties to the Employment Contract, they are the most "immediate victims," making them best suited to recover for any violation of those contracts. *See Grow Michigan*, 50 F.4th at 595. Finally, Health Carousel has little danger of duplicative judgments. Although Health Carousel potentially could have exposure to criminal liability based on the predicate acts (if they in fact occurred), no other victims besides Plaintiffs and the putative class appear likely to recover financially in RICO. *See id.*

In fact, this case in some ways resembles *Bridge v. Phoenix Bond & Indem. Co.* 553 U.S. 639 (2008). In *Bridge*, the Supreme Court examined a RICO claim where a contractor defrauded a county government by improperly submitting multiple bids for the right to buy tax liens. *Id.* at 642–43. A losing bidder sued the contractor under RICO, predicating its claim on the mail fraud against the county. *Id.* The Court ultimately held the competitor's RICO claim could proceed because first-person reliance is not an element of mail fraud, although it can help to show proximate causation. *Id.* at 648–

49. In so doing, the Court recognized the flexible concept of proximate cause did not always require first-person reliance, and that a RICO claim may proceed even where the predicate act was directed toward a governmental third party. *Id.* at 659. Here too, Plaintiffs' Visa Fraud allegation can further their RICO claim even though Health Carousel allegedly defrauded the United States. As *Bridge* recognized, Plaintiffs need not show they personally relied on the Visa Fraud to show proximate cause, so long as the USCIS relied.

Health Carousel resists this outcome, pointing to decisions from the Fourth and Fifth Circuit: *Molina-Aranda v. Black Magic Enters. LLC*, 983 F.3d 779 (5th Cir. 2020), and *Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012). In both, the defendants allegedly lied to immigration officials about immigrant workers' anticipated pay upon arrival in the country. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. Those courts held that fraudulent statements to immigration officials did not proximately cause the eventual harm to the immigrants after arrival. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. The *Molina-Aranda* court, for example, relying heavily on *Walters*, stated that "[p]laintiffs' allegations ... do not support a conclusion that their underpayment injuries were directly caused by the ... alleged fraud in obtaining the H-2B visas. Rather, their complaint shows that the injury was caused by the alleged underpayments which were not required by the alleged fraud." 983 F.3d at 784–85.

**\*13** The Court is not convinced. *Walters* involved a very different set of facts. There, the plaintiffs were local workers at the same facility at which the foreign workers were employed. 684 F.3d at 437–38. They claimed that the employer's failure to pay the foreign workers in accordance with the promises it made in the H-2B paperwork had a carry-over impact of depressing wages for the local workers, as well. *Id.* at 438. That extra step between the fraud (relating to one set or workers) and the pay (for a different set of workers) makes causation more attenuated then here. So *Walters* can be distinguished.

True, the facts of *Molina-Aranda* appear far closer to the facts Plaintiffs allege in this matter. There as here, the *Molina-Aranda* plaintiffs were the immigrant workers themselves. 983 F.3d at 784–85. But in this Court's view, the *Molina-Aranda* court adopted too narrow a reading of RICO's flexible causation standard. After all, RICO penalizes illicit *schemes*, furthered through predicate acts. And as the Supreme Court clarified in *Bridges*, the RICO plaintiff need not be the

Appendix p. 030

target of the predicate act to recover. Thus, visa fraud on immigration officials, committed as part of a scheme to import and underpay immigrant laborers, strikes the Court as causally linked with the injury those laborers suffer when they immigrate and are underpaid.

Beyond that, even taking *Molina-Aranda* and *Walters* at face value, those cases concerned fraudulent statements made *to immigration officials*. Thus, they have little bearing on whether Plaintiffs meet proximate cause as to their RICO claims predicated on Fraud in Foreign Labor Contracting and Trafficking.

### D. Plaintiffs Plausibly Allege An Ohio Corrupt Practices Act Claim.

The Ohio Corrupt Practices Act states:

> No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

Ohio Rev. Code § 2923.32(A)(1). The statute is modeled after the federal RICO statute. *Portnoy v. Nat'l Credit Sys., Inc.*, 837 F. App'x 364, 372 (6th Cir. 2020). Thus, much like in the federal context, "a plaintiff must show the following: (1) the 'conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses;' (2) 'the prohibited criminal conduct of the defendant constitutes a pattern;' and (3) the 'defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise.' " *Id.* (quoting *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E. 2d 696, 708 (Ohio Ct. App. 2009)). Moreover, the predicate crimes must "be related and pose a threat of continued criminal activity." *Morrow*, 915 N.E. 2d at 708. And here as well, a plaintiff must show the defendant's illicit conduct was a but-for and proximate cause of their injury. *Bradley v. Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015).

Drawing on the analysis above, the Court finds that Plaintiffs have plausibly stated a claim under the OCPA. Plaintiffs have alleged Health Carousel operated an enterprise through illegal conduct designed to import and exploit underpaid foreign

labor. (Doc. 43, #1035–36). Plaintiffs claim they have been harmed by, among other things, "reduced wages"—beneath what Health Carousel contractually agreed to. (*Id.*). And as discussed above, Health Carousel's alleged predicate acts proximately and directly caused this injury. (*Id.*).

Health Carousel responds that Plaintiffs failed to cite the specific provision of the OCPA they intend to proceed under, and that Plaintiffs have failed to adequately allege Health Carousel engaged in any criminal activity. (Doc. 44, #1094–95). Not so. Plaintiffs' Third Amended Complaint makes clear which provision they proceed under by using the language of the statute: "Defendant's multiple and repeated commissions of various felonies ... form a pattern of corrupt activities through which Defendant conducted or participated in the affairs of the enterprise in violation of OCPA." (Doc. 43, #1035–36). This suffices for notice pleading. And the Court has already determined that Plaintiffs have adequately alleged Health Carousel committed criminal activity to further its enterprise. Therefore, Plaintiffs' OCPA claim has been plausibly alleged and may proceed.

### E. Carmen Plausibly Alleges A Fair Labor Standards Act Claim.

**\*14** Under the FLSA, an employer must compensate an employee with at least the minimum wage. 29 U.S.C. § 206(a). To be considered "paid," wages must be "paid finally and unconditionally or 'free and clear.' " 29 C.F.R. § 531.35. Wages will not be "free and clear" where an employer directly or indirectly deducts "kick-backs" intended for the employer's benefit. *Id.*; *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 531 (6th Cir. 2017); *Parker v. Battle Creek Pizza, Inc.*, 600 F. Supp. 3d 809, 812 (W.D. Mich. 2022) ("[E]mployers cannot shift business expenses to their employees if doing so drops the employees' wages below minimum wage."). And likewise, an employer may not demand illegal kickbacks even after a paycheck is delivered. *See Stein*, 873 F.3d at 531.

Examples of potentially illegal deductions or demands include costs to acquire the tools of trade for the employer's business, safety implements for workers, electricity used for commercial purposes, taxes and insurance on commercial buildings, and employer-required uniforms. 29 C.F.R. § 531.3, 531.32. On the other hand, an employer may lawfully deduct or demand reimbursement of expenses for items that primarily benefit the employee, like employee meals from a company restaurant, employee housing, and some commuter transportation. *See id.* § 531.32. Accordingly, where the employer demands liquidated damages for an employee's

breach of an employment contract, courts assess how those damages are calculated to determine whether they constitute permissible or illicit recoveries. *See, e.g.*, *Gordon v. City of Oakland*, 627 F.3d 1092, 1095–96 (9th Cir. 2010) (not counting contractual damages as a kickback because the damages recuperated employee training expenses); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) (same).

The parties disagree about whether the relocation costs from the Philippines to the United States count as expenses incurred for the employer's benefit or for the employee's benefit. Courts disagree too. *Compare Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1248 (11th Cir. 2002), *with Castellanos-Contreras v. Decatur Hotels, LLC*, 601 F.3d 621, 400–01 (5th Cir. 2010). Contributing to the confusion, the U.S. Department of Labor appears to have changed its view on this issue over the past decades in the context of temporary work visa laborers. *Compare* 73 Fed. Reg. at 78041, *with* 75 Fed. Reg. at 6915, *and Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 898–99 (9th Cir. 2013). Of course, Plaintiffs became permanent residents, not temporary workers, so that may matter, as well. In any event, the Court finds that it unnecessary to wade into that debate at this time.

That is because Carmen alleges she worked 51 hours her final week and received $1,300 as a result. Upon terminating her employment, Health Carousel demanded, and Carmen paid, $20,000 in liquidated damages. So the narrow question before the Court (for now) appears to be whether any portion of the $20,000 liquidated damages was intended to recoup expenses incurred for Health Carousel's benefit. (Doc. 44, #1095–96).

Health Carousel says no, claiming its liquidated damages merely recoup expenses it incurred for the immigrant employees' benefit, "including visa fees, attorney's fees, airfare, an 'arrival bonus,' and temporary housing while the professional locates her permanent housing." (Doc. 44, #1053). Yet when demanding liquidated damages from Amistoso, Health Carousel provided a line-item justification for the $20,000 figure—including $8,000 for "back office administrative support fees." (Doc. 43, #1014). And although Amistoso never paid, Carmen did. In effect, Carmen seeks to incorporate this break-down of expenses, suggesting that $8,000 of the $20,000 she paid compensated Health Carousel for its internal operating costs.

**\*15** For pleading, that is enough. Carmen has plausibly alleged that $8,000 of her liquidated damages covered Health Carousel's own operating expenses. And as Carmen only

received $1,300 her final week, an $8,000 kickback would reduce her net pay below zero. Of course, she will still need to prove that this same breakdown applies to her. And separately, Health Carousel may eventually show, with additional facts, that the company *properly* demanded "administrative support fees"—i.e., that these fees derived from services for Carmen's benefit, not Health Carousel's. But at least for now, Carmen has nudged this claim into the realm of plausibility.

### F. The Court Denies Health Carousel's Motion to Strike Class Allegations.

As noted, Health Carousel previously moved to strike class allegations. (Doc. 12). The Court denied that Motion in its prior Opinion. (Doc. 21, #624–30). Now, Health Carousel again moves to strike class allegations from the Third Amended Complaint. (Doc. 45).

In making that argument, Health Carousel faces an uphill battle. That is because a court can only strike class allegations where, "from the face of the ... complaint[,] ... it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 575 (M.D. Tenn. 2020) (quoting *Schilling v. Kenton County*, No. 10-cv-143, 2011 WL 293759, at \*4 (E.D. Ky. Jan. 27, 2011)). Without that showing, a court should deny the motion and allow discovery to proceed. *See id.* (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996)).

To begin, Health Carousel has failed to even discuss why Plaintiffs' RICO and OCPA claims and Carmen's FLSA claim should not proceed with class allegations. At most, Health Carousel claims Plaintiffs' RICO claims are "dubious." (*Id.* at #1135). Without an affirmative showing from Health Carousel, the Court declines to hold that it would be impossible for Plaintiffs' RICO, OCPA, and FLSA claims to be certified in a class action.

As to the TVPA claims, Health Carousel argues that common issues will not predominate over individual issues and that a class action is not a superior method of adjudicating the claims. (*See* Doc. 45). Let's start with predominance. Under Federal Rule of Civil Procedure 23(b)(3), before certifying a class, the district court must find that common issues of law or fact "predominate over any questions affecting only individual members." Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "To meet the predominance requirement, a

plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins.*, 646 F.3d 347, 352–53 (6th Cir. 2011)).

But "[a] plaintiff class need not prove that each element of a claim can be established by classwide proof." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 858 (citing *Amgen, Inc. v. Connecticut Ret. Plans & Tr. Fund*, 568 U.S. 455, 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

The Court finds it at least possible that common issues will predominate. To start, multiple issues seem to lend themselves to common resolution. For example, the putative class members claim to have entered largely uniform contracts with Health Carousel. (Doc. 43, #990). Plaintiffs allege these contracts created uniform compulsion from the liquidated damages clauses, isolation, and fear of deportation—resulting in a supposedly common fear of "serious harm." (*Id.* at #1026). And Plaintiffs allege the putative class members uniformly experienced forced overtime. (*Id.* at #995). These allegations provide a relevant foundation for a common resolution of the TVPA claims.

**\*16** True, Health Carousel is correct that some differences exist within the class. Carmen, Amistoso, and Flores each left Health Carousel on different terms, and only Carmen paid liquidated damages. (*Id.* at #1011–16). Each worked different roles in different conditions, with Carmen and Flores at a single site and Amistoso traveling between patients. (*See id.* at #1009). But the Court cannot say at this stage that these differences *necessarily* predominate over any common issues. While discovery may change that, the Court maintains its view that it is at least possible that Plaintiffs will be able to make the necessary predominance showing.

Health Carousel also says a class action is not a superior method of adjudicating the Plaintiffs' claims. (Doc. 45, #1139). There, Health Carousel argues, "[e]ach putative class member has a compelling incentive to pursue individual

claims" and "[t]hese allegedly high-value and individualized claims are best left to each individual." (*Id.* at #1139–40).

Health Carousel may be on to something. The superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Amchem*, 521 U.S. at 615). "Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861. Potentially small individual recoveries to class members support the use of class treatment. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007).

But again, the Court cannot say, based solely on the pleadings and as a matter of law, that a class action is not superior to individual actions. For example, as immigrants, the class members are likely unfamiliar with the American legal system. *See, e.g., Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2018 WL 4347799, at \*10 (E.D.N.Y. Sept. 12, 2018). And Plaintiffs specifically allege Health Carousel currently employs some putative class members and does not permit them to speak about their contract terms with anyone. (Doc. 43, #986). Some putative class members may interpret that directive as barring them from seeking legal advice or bringing their own action to vindicate their rights.

Accordingly, the Court cannot say it would be "impossible to certify the class as alleged." And finally, as the Court has denied Health Carousel's other requested relief, the Court also denies its Motion to Stay as moot.

## CONCLUSION

The Court is not today saying that Plaintiffs will ultimately prevail on their claims. Nor is the Court saying they won't. And the Court does not pronounce that this case is definitely amenable to class treatment, or that it isn't. Rather, the Court merely finds that Plaintiffs have alleged enough to render their claims plausible and open the doors to discovery, including discovery intending to show whether this case should proceed as a class action. What follows from that is a question for another day.

For the above reasons, the Court **DENIES** Health Carousel's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay Discovery (Doc. 47) **AS MOOT**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5104066

## Footnotes

1    For purposes of Health Carousel's Motion to Dismiss, the Court assumes true all factual allegations stated in the Third Amended Complaint. Therefore, the Court presents these allegations as fact for now, but without prejudice to Health Carousel challenging them in future filings.

2    Plaintiffs attached a contract to their initial Complaint. Health Carousel has never contested the accuracy of the contract. Although Plaintiffs did not re-attach the contract to the Third Amended Complaint, there seems little justification to disregard the contract simply because it was not needlessly re-submitted.

3    Health Carousel argues that Carmen has not alleged "Health Carousel paid her less than the hourly rate promised in her Employment Contract." (Doc. 44, #1059). But the Employment Contract states that Carmen will be paid the prevailing wage, and Plaintiffs do indeed contend that they received below prevailing wage. (Doc. 43, #1007). Of course, the Court for now takes no position on whether Plaintiffs' compensation actually fell below the prevailing wage.

4    To state a fraud claim with particularly under Rule 9(b), "a plaintiff, at a minimum, to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)).

5    Granted, this means Plaintiffs must be able to hold Health Carousel liable for fraudulent representations made within contractual terms. In the common law fraud context, courts are divided as to whether a misrepresentation within a contract can give rise to a fraud cause of action. *Compare NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 308–09 (7th Cir. 2018) ("The general rule in New York is that 'a fraud cause of action ... does not arise where the alleged fraud merely relates to a breach of contract.' "), *with Sofka v. Thal*, 662 S.W.2d 502, 507 (Mo. 1983) (en banc) (noting that under Missouri law, a "promise accompanied by a present intent not to perform is ... sufficient to constitute actionable fraud" (emphasis omitted)). Yet Fraud in Foreign Labor Contracting makes no direct reference as to whether the "materially false or fraudulent pretenses, representations, or promises" can be made in the terms of a contract itself. *See* 18 U.S.C. § 1351. But analogizing the common law, the Court concludes that fraud arises if contractual promises are made with "a present intent not to perform." *See Sofka*, 662 S.W.2d at 507.

6    *See Prevailing Wage Information and Resources*, U.S. Dep't of Labor (last visited August 8, 2023), https://www.dol.gov/agencies/eta/foreign-labor/wages.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 39 of 438 PageID #: 388

Codilla v. CTX Mortg. Co., LLC, Not Reported in F.Supp.2d (2011)

2011 WL 673753
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Jay CODILLA, an individual, Plaintiff,

v.

CTX MORTGAGE COMPANY, LLC, a Delaware
limited liability company; Bank of America Corporation,
a North Carolina corporation; Commerce Title
Company of America, LLC, a Delaware limited liability
company; Aurora Loan Services, LLC, a Delaware
limited liability company; Timothy M. Bartosh, an
individual; PRLAP, Inc., a North Carolina corporation;
Keller Williams Realty, Inc., a Texas corporation;
MERSCORP INC. d/b/a Mortgage Electronic
Registration Systems, Inc., a Virginia corporation; Does
I–X; and Roe Companies I–X, inclusive, Defendants.

No. 2:10–cv–01469–RLH–PAL.
|
Feb. 17, 2011.

**Attorneys and Law Firms**

Charles C. Rainey, Rainey Legal Group, Henderson, NV, for
Plaintiff.

Colt B. Dodrill, Wolfe Wyman, LLC, Jody Lynn Buzicky,
Poli & Ball, PLC, Ariel E. Stern, Steven G. Shevorski,
Akerman Senterfitt, LLP, Las Vegas, NV, for Defendants.

**ORDER**

ROGER L. HUNT, Chief Judge.

*1 Before the Court is Defendants CTX Mortgage
Company, Timothy M. Bartosh, and PGP Title, Inc.'s
(formerly known as Commerce Land Title, Inc., and
improperly referred to as Commerce Title Company of
America, LLC) (collectively, the "CTX Defendants") **Motion
to Dismiss** (# 6), filed September 22, 2010. The Court has
also considered Plaintiff Jay Codilla's Opposition (# 19), filed
October 8, 2010, and the CTX Defendants' Reply (# 24), filed
October 18, 2010.

Also before the Court is Defendants Bank of America, N.A.
(improperly referred to as Bank of America Corporation) and

PRLAP, Inc.'s (collectively, the "BOA Defendants") **Motion
to Dismiss** (# 12), filed September 30, 2010. The Court has
also considered Codilla's Opposition (# 23), filed October 18,
2010, and the BOA Defendants' Reply (# 26), filed October
28, 2010.

Finally before the Court is Defendants Aurora Loan Services,
LLC, and Merscorp, Inc.'s ("MERS") (collectively, the
"Aurora Defendants") **Motion to Dismiss** (# 18), filed
October 7, 2010. The Court has also considered Codilla's
Opposition (# 25), and the Aurora Defendants' Reply (# 27),
filed November 4, 2010.

**BACKGROUND**

On November 22, 2006, Plaintiff Jay Codilla purchased
a single family home in North Las Vegas, Nevada
(the "Property"). Codilla financed the purchase with
a $252,000.00 loan from CTX (the "First Mortgage"). The
CTX loan was secured by a deed of trust on the Property.
On December 8, 2006, Codilla obtained a home equity
line of credit (the "HELOC") through Bank of America,
which was also secured by a deed of trust on the Property.
In February 2007, CTX transferred the First Mortgage
to Aurora. Sometime thereafter Codilla defaulted on the
First Mortgage. Accordingly, Aurora foreclosed on the First
Mortgage and eventually purchased the Property at a trustee's
sale on May 12, 2010. Two days later Codilla received an
eviction notice from Keller Williams.

Codilla filed this lawsuit on August 30, 2010, asserting
the following claims: (1) declaratory relief; (2) injunctive
relief; (3) breach of the implied covenant of good faith
and fair dealing, contractual breach; (4) violation of the
Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.;*
(5) violations of the Real Estate Settlement Procedures Act
("RESPA"), 12 U.S.C. § 2601 *et seq.;* (6) recission; (7) fraud;
(8) Unfair and Deceptive Acts and Practices ("UDAP");
(9) lack of standing; (10) breach of fiduciary duty; (11)
unconscionability-UCC § 2–302; (12) predatory lending; and
(13) quiet title. Each claim is against all of the Defendants,
except the lack of standing claim, which is only against
MERS. All Defendants except Keller Williams subsequently
filed a motion to dismiss. To date no proof of service has been
filed as to Keller Williams. For the reasons discussed below,
the Court grants Defendants' motions.

Codilla v. CTX Mortg. Co., LLC, Not Reported in F.Supp.2d (2011)

## DISCUSSION

### I. Legal Standard

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A properly pled complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "Factual allegations must be enough to rise above the speculative level." Twombly, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Iqbal, 129 S.Ct. at 1949 (internal citation omitted).

 **\*2** In Iqbal, the Supreme Court recently clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. Id. at 1950. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. Id. at 1949. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. Id. at 1950. A claim is facially plausible when the plaintiff's complaint alleges facts that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. Id. at 1949. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but not shown—that the pleader is entitled to relief." Id. (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, plaintiff's complaint must be dismissed. Twombly, 550 U.S. at 570.

### II. Analysis

Codilla has agreed to voluntarily dismiss his claims for declaratory relief, injunctive relief, and quiet title. Therefore, the Court need not address those claims. Also, unless otherwise stated, the following analysis applies to all Defendants.

### A. Breach of the Covenant of Good Faith and Fair Dealing

Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and execution ." A.C. Shaw Constr. v. Washoe County, 784 P.2d 9, 9 (Nev.1989) (quoting Restatement (Second) of Contracts § 205). To state a valid claim for contractual breach of the covenant of good faith and fair dealing, a plaintiff must show: (1) plaintiff and defendant were parties to a contract; (2) defendant owed a duty of good faith to plaintiff; (3) defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) plaintiff's justified expectations were thus denied. Perry v. Jordan, 900 P.2d 335, 338 (Nev.1995).

Codilla's complaint alleges that he and Defendants were parties to a contract for the First Mortgage and the HELOC, and that Defendants violated the spirit and purpose of those contracts by willfully withholding numerous disclosures regarding those contracts. However, these allegations only deal with alleged conduct before these contracts were entered into. And this Court has previously held that a "party cannot breach the covenant of good faith and fair dealing before a contract is formed." Urbina v. Homeview Lending, Inc., 681 F.Supp.2d 1254, 1260 (D.Nev.2009) (citing Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 941 (2d Cir.1998) ("an implied covenant relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct")). Thus, to the extent Codilla's claim revolves around alleged conduct that occurred before the contract was entered into, it fails as a matter of law.

 **\*3** Codilla further alleges that while he was attempting to modify the First Mortgage Aurora and MERS proceeded to foreclose on the Property. However, neither Aurora nor MERS were contractually obligated to provide Codilla with a loan modification. Therefore, Codilla has failed to state a valid claim because he does not allege that Aurora and MERS violated the terms of the First Mortgage. Accordingly, the Court dismisses Codilla's claim for breach of the covenant of good faith and fair dealing.

### B. TILA

In general, TILA requires creditors to disclose certain information about the terms of a loan to the prospective borrower. See e.g., 15 U.S.C. §§ 1631–32, 1638; 12 C.F.R. § 226.17. Damages claims under TILA must be brought within one year from the date of the occurrence of the violation. 15 U.S.C. § 1640(e). However, equitable tolling may apply if the plaintiff can show fraudulent concealment on the part of the defendant. King v. California, 784 F.2d 910, 915 (9th

Cir.1986). Rescission claims, on the other hand, must be brought within three years from the date of the consummation of the transaction or upon the sale of the property, whichever occurs first. 15 U.S.C. § 1635(f). However, the Supreme Court has held that, unlike a claim for damages, a rescission claim cannot be tolled. *Beach v. Ocwen Federal Bank,* 523 U.S. 410, 417 (1998).

Codilla seeks both damages and rescission under TILA. Codilla alleges that Defendants violated TILA by failing to provide him with accurate material disclosures, among other things, as TILA requires. However, both of Codilla's loans closed in 2006 and this suit was commenced in August 2010—almost four years later. Therefore, the limitations period has run for both damages and rescission under TILA. Furthermore, the Court finds that equitable tolling is not appropriate for the damages claim because Codilla has not shown fraudulent concealment on the part of the Defendants. Therefore, because the limitations period has expired, Codilla's TILA claims fail as a matter of law and are dismissed.

### C. RESPA

In general, RESPA requires that borrowers receive disclosures regarding the costs associated with real estate closings and prohibits certain practices in the real estate business such as undisclosed kickbacks. 15 U.S.C. §§ 2601–2617. However, any RESPA action must be brought within either one or three years from the date of the occurrence of the violation depending on the alleged violation. *Id.* at § 2614. Thus, because Codilla's loans closed in 2006 and this suit was commenced almost four years later in August 2010, Codilla's RESPA claim fails as a matter of law. The Court refuses to apply the doctrine of equitable tolling for the same reason stated in its TILA analysis. Therefore, the Court dismisses Codilla's RESPA claim.

### D. Fraud

In order to state a claim for fraud in Nevada, a plaintiff must allege that (1) the defendant made a false representation; (2) the defendant knew or believed the representation to be false; (3) the defendant intended to induce plaintiff to rely on the misrepresentation; and (4) the plaintiff suffered damages as a result of his reliance. *Barmettler v. Reno Air, Inc.,* 956 P.2d 1382, 1386 (Nev.1998). Rule 9(b) of the Federal Rules of Civil Procedure further requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud."

**\*4** Codilla's fraud claim fails under Rule 9(b). Codilla merely alleges that Defendants "engaged in conduct" calculated to deceive him. However, he doesn't specify what this conduct was other than to say that Defendants unlawfully suppressed facts and made no effort to determine if Codilla had the ability to repay the loan. Codilla makes no specific allegation of any false representations by Defendants. Therefore, the Court dismisses Codilla's fraud claim for lack of specificity.

### E. Unfair and Deceptive Practices Act

Codilla's eighth cause of action is premised on the alleged violation of the "Federal Unlawful and Deceptive Acts and Practices statutes," although he doesn't cite any particular federal statute. (Dkt.# 1, Compl.19:27–28, 20:1–2.) However, in this motion Codilla now claims that this cause of action is premised on the alleged violation of NRS §§ 598 and 598A. The Court finds this to be a disingenuous attempt to amend a complaint outside of the proper procedural process. Thus, because a "motion to dismiss 'addresses the present state of the pleadings, not what an amended complaint might state,' " the Court dismisses this claim. *Lingad v. IndyMac Fed. Bank,* 682 F.Supp.2d 1142, 1151 (E.D.Cal.2010).

### F. Lack of Standing

Codilla's ninth cause of action alleges that MERS does not have standing to foreclose because it lacks a beneficial interest in the First Mortgage. However, this Court has previously held that "so long as the note is in default and the foreclosing trustee is either the original trustee or has been substituted by the holder of the note or the holder's nominee, there is simply no defect in foreclosures, at least in states such as Nevada where a trustee may foreclose non judicially." *Weingartner v. Chase Home Fin., LLC,* 702 F.Supp.2d 1276, 1280 (D.Nev.2010). Thus, because Codilla has defaulted on the loan, and because MERS is the designated nominee on the deed of trust (Dkt. # 6, Mot. to Dismiss Ex. A, Deed), Codilla's claim for lack of standing fails as a matter of law. Therefore, the Court dismisses this claim.

### G. Breach of Fiduciary Duty

To state a valid claim for breach of fiduciary duty, a plaintiff must show: (1) the defendant owed a fiduciary duty to the plaintiff; (2) the defendant breached that fiduciary duty; and (3) the plaintiff sustained damages. *Mosier v. S. Cal. Physicians Ins. Exch.,* 74 Cal.Rptr.2d

550, 565 (Cal.Ct.App.1998). "A fiduciary relationship exists between two persons when one of them is under a duty to act for the benefit of another upon matters within the scope of the relation." *Stalk v. Mushkin,* 199 P.3d 838, 843 (Nev.2009). However, courts have repeatedly held that a lender owes no fiduciary duties to a borrower absent exceptional circumstances, such as when a special relationship exists between the two parties. *See Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.,* 359 F.Supp.2d 1075, 1090 (D.Nev.2004) (stating "the Court is satisfied that the Nevada Supreme Court would hold that an arms-length lender-borrower relationship is not fiduciary in nature, absent exceptional circumstances"), *aff'd in relevant part by Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865 (9th Cir.2007). In this case, Codilla has only alleged the existence of a lender—borrower relationship with Defendants, which is insufficient to establish a fiduciary relationship. Therefore, Codilla's claim fails as a matter of law.

### H. Unconscionability

**\*5** Unconscionability is an affirmative defense that allows a court to refuse to enforce a provision or an entire contract to avoid unfair terms, it is not a cause of action. *Premiere Digital Access, Inc. v. Cent. Tel. Co.,* 360 F.Supp.2d 1161, 1168 (D.Nev.2005). Furthermore, this claim relies on UCC § 2–302 (codified in Nevada as NRS § 104.2302), which only applies to the sale of goods. *See* NRS 104.2107, 104.2105. Therefore, the Court dismisses this claim.

### I. Predatory Lending

Codilla's twelfth cause of action is a predatory lending claim against all Defendants. However, this claim is based entirely upon broad generalizations and conclusory legal statements.

While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions." *Iqbal,* 129 S.Ct. at 1949. Therefore, the Court dismisses this claim.

### III. Keller Williams

On January 26, 2011, this Court issued a notice of intent to dismiss Keller Williams pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Rule 4(m) requires service of process to be served upon a defendant within 120 days after the filing of the complaint. Codilla filed his complaint on August 30, 2010, and to date, no proof of service has been filed as to Keller Williams. Therefore, the Court dismisses Keller Williams from this case.

### CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that the CTX Defendants' Motion to Dismiss (# 6) is GRANTED.

IT IS FURTHER ORDERED that the BOA Defendants' Motion to Dismiss (# 12) is GRANTED.

IT IS FURTHER ORDERED that the Aurora Defendants' Motion to Dismiss (# 18) is GRANTED.

The Court orders the Clerk of Court to close the case.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 673753

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4180590
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Anthony F. COPPOLA, as Trustee of the
Anthony F. Coppola Living Trust (A), Plaintiff,
v.
Jed BARON, individually and doing business
as Nevada Title Loans; Nevada Title Loans;
E & G Investments, Inc., Defendants.

No. 2:07–CV–00664–BES–RJJ.
|
Nov. 20, 2007.

**Attorneys and Law Firms**

Neil J. Beller, Neil J. Beller, Ltd., Las Vegas, NV, for Plaintiff.

Richard A. Schonfeld, Las Vegas, NV, for Defendants.

Terrence A. Mazura, Santa Ana, CA.

### ORDER

BRIAN E. SANDOVAL, District Judge.

 **\*1** Presently before this Court is a Motion to Dismiss (# 11) filed on June 25, 2007 by Defendants Jed Baron, Nevada Title Loans and E & G Investments, Inc. ("Defendants"). Plaintiff Anthony F. Coppola, as Trustee of the Anthony F. Coppola Living Trust ("Coppola") filed an Opposition to the Motion to Dismiss (# 16) on July 12, 2007. No Reply was filed.

### I. *Background*

This dispute arises out of three promissory notes executed by Nevada Title Loans in favor of the Coppola Trust. According to the Complaint (# 1) filed on May 23, 2007, between August 2005 and April of 2006, Nevada Title Loans executed three separate promissory notes in favor of the Coppola Trust. The total amount owed to the Coppola Trust based upon the three notes was the sum of $200,000 plus interest. Coppola alleges that Defendant E & G Investments and Defendant Jed Baron ("Baron") are both guarantors of the notes. Baron signed a separate Guaranty Agreement which was attached to the Complaint. The maturity date of each note has passed.

Coppola made a written demand for payment to each of the Defendants, but the Defendants have failed to pay the money due under any of the notes.

Coppola filed the Complaint in the federal district court of Nevada in Clark County. In the Complaint, Coppola seeks money damages for breach of contract for each of the three notes. Each of the notes contains a forum selection clause which states, "Venue of any action brought hereon shall be Clark County, Nevada."

Defendants seek dismissal of the Complaint for lack of venue based upon the forum selection clause. Defendants also seek dismissal of all claims against Baron on the basis that Coppola has failed to state a claim upon which relief can be granted, primarily because the Complaint does not allege that Baron received consideration for guaranteeing the debt.

### II. *Analysis*

#### A. *Motion to Dismiss Based Upon Venue*
Defendant has requested that Plaintiffs' Complaint be dismissed "pursuant to 28 U.S.C. § 1391(a) for improper venue. Such a motion is recognized by Rule 12(b)(3) as a motion to dismiss for improper venue. On a 12(b)(3) motion, the pleadings need not be accepted as true. *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1137 (9th Cir.2004). In the context of a Rule 12(b)(3) motion based upon a forum selection clause, the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. *Murphy v. Schneider National, Inc.,* 362 F.3d 1133, 1138 (9th Cir.2004).

The Ninth Circuit has held that forum selection clauses should be enforced as written. *See, Mannetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 (9th Cir.1988). Forum selection clauses are prima facie valid and are enforceable absent a strong showing by the party opposing the clause that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching. *Id.* (citation omitted).

 **\*2** Here, Defendants are not arguing that the forum selection clause is invalid. Instead, Defendants are taking a position that the forum selection clause mandates that an action be filed in the state courts for Clark County. A forum selection clause will be enforced only where venue is specified with mandatory language. *Docksider, Ltd. v. Sea Technology, Ltd.,*

875 F.2d 762, 764 (9th Cir.1989). If the language of the forum selection clause is non-mandatory, the forum selection clause will not preclude suit elsewhere. *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). Hence, the issue before the Court is whether the forum selection clause is mandatory or permissive.

To be a mandatory forum selection clause, the clause must contain language that clearly designates a forum as the exclusive one. *Northern California Dist. Council of Laborers v. Pittsburg–Des Moines Steel Co.,* 69 F.3d 1034, 1037 (9th Cir.1995). The prevailing rule is clear that where venue is specified with mandatory language the clause will be enforced. *Docksider, Ltd.,* 875 F.2d at 763–764. "When only jurisdiction is specified, the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Docksider,* 875 F.2d at 764. A forum selection clause needs to contain mandatory language requiring a case to be litigated in only one forum. *Council of Laborers,* 69 F.3d at 1037.

A forum selection clause providing a particular court or state has jurisdiction, but says nothing about it being exclusive jurisdiction, is permissive rather than mandatory. *Hunt Wesson Foods Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). The effect of the language is merely that the parties consent to the jurisdiction of that particular court or state. *Kachal, Inc. v. Menzie,* 738 F.Supp. 371, 373 (D.Nev.1990). Such consent does not preclude the action from being litigated in another court. *Id; Northern California Dist. Council of Laborers,* 69 F.3d at 1036.

The forum selection clause in the parties' promissory notes provides that "Venue of any action brought hereon shall be Clark County, Nevada." This clause specifies that venue will be in Clark County, however, it does not specify whether the forum is the state court or the federal district court, both of which are located in Clark County. The language in the forum selection clause states nothing about the Clark County state courts having exclusive jurisdiction. The effect of the language is merely that the parties consent to the jurisdiction of the Clark County courts.

The language in the forum selection clause here is similar to that found in *Hunt Wesson Foods.* In *Hunt Wesson Foods,* 817 F .2d 75, the clause at issue contained the following language: "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter of the interpretation of this contract." *Id.*

at 76. The Ninth Circuit held that the clause was permissive because "in cases in which forum selection clauses have been held to require litigation in a particular court, the language of the clauses clearly required exclusive jurisdiction." *Id.* at 77. Hence, the forum selection clause in this case is permissive rather than mandatory and the action is not precluded from being litigated in the federal district court.

**\*3** Defendants rely on *Docksider Ltd. v. Sea Technology Ltd.,* 875 F.2d 762 (9th Cir.1989), which had a similar clause as the present one and which held that the matter must be pursued in state court. In *Docksider Ltd.,* the forum selection clause stated, "Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia" and the court held that the action must be held in the county courts for Gloucester County. *Docksider Ltd.,* 875 F.2d at 763–764. However, of importance in that case is the fact that there were no federal courts in Gloucester County. Hence, the court in *Docksider Ltd.* never addressed the issue of whether the state or federal court was the more appropriate venue and instead analyzed the issue in terms of the suit being brought in Virginia as opposed to courts in other states. As such, the *Docksider Ltd.* case is distinguishable from the facts of this case.

The Court has determined that the forum selection clause in this case is permissive. A permissive forum selection clause does not divest this Court of jurisdiction. This Court's subject matter jurisdiction is properly based on diversity of citizenship. Venue is proper in the district of Nevada under 28 U.S.C. § 1391(a).

### B. Motion to Dismiss Baron

Defendant's Motion also challenges jurisdiction over Baron, asserting that the Complaint should be dismissed because it fails to state a claim upon which relief can be granted against Baron because he did not sign the promissory notes in his personal capacity and the Complaint fails to state that Baron received any consideration for signing the Guaranty Agreement.

When considering a motion to dismiss under Rule 12(b)(6), the challenged complaint is construed liberally in favor of the plaintiff, and all factual allegations set forth in the complaint are accepted as true. *McGary v. City of Portland,* 386 F.3d 1259, 1261 (9th Cir.2004). However, a complaint, or portion thereof, will be dismissed for failure to state a claim upon which relief may be granted if Plaintiff cannot establish "any set of facts consistent with the allegations in

the complaint." *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1968–69 (2007). Plaintiff's obligation to provide the "grounds" of her entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. *Id.* at 1964–65. To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Id.* at 1969. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004). In other words, "a complaint must be dismissed if it does not plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* at 1974; *Garvais v. U.S.,* 2007 WL 1724956, *4 (E.D.Wash.,2007).

 **\*4** Defendants argue that the Guaranty Agreement violates the statute of frauds because the Guaranty Agreement fails to express that any consideration was given in return for the guaranty by Baron. However, the facts as alleged and presented in the Complaint and the accompanying

documents do not support Defendants' position. The Guaranty Agreement specifically states that the guaranty was being given for good consideration.[1] Furthermore, the Guaranty Agreement was signed by Baron and indicates that the Guaranty Agreement was executed by Baron in favor of Coppola. Hence, construing the Complaint liberally in favor of Coppola and accepting all factual allegations set forth in the Complaint as true, Coppola has stated a claim for relief against Baron under the Guaranty Agreement. As such, Baron is not dismissed from this matter.

## II. *Conclusion*

Based on the foregoing, IT IS ORDERED that Defendants' Motion to Dismiss (# 11) is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4180590

## Footnotes

1    Defendants argue that the consideration was lined out of the guaranty agreement, making the guaranty agreement invalid for failure of consideration. However, the Court finds that this crossed-out language only went to supplemental information regarding the guarantors' reasons for entering into the Guaranty Agreement.

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4670491
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Paul DAVIS, Plaintiff,
v.
META PLATFORMS, INC., Defendant.

Civil Action No. 4:22-CV-01001
|
Signed July 20, 2023

**Attorneys and Law Firms**

Paul M. Davis, Paul M. Davis & Associates, P.C., Frisco, TX, for Plaintiff.

Philip Cooper, Kirkland & Ellis LLP, Chicago, IL, Taj Jamar Clayton, Kirkland & Ellis LLP, Dallas, TX, for Defendant.

MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court are Plaintiff Paul Davis's Amended Emergency Motion for Remand (Dkt. #16) and Defendant Meta Platforms, Inc.'s Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20).[1] Having considered the motions, the briefs, and the applicable law, the Court finds that Plaintiff's Amended Emergency Motion for Remand (Dkt. #16) should be **DENIED** and that Defendant's Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20) should be **GRANTED**.[2]

BACKGROUND

Plaintiff Paul Davis ("Davis") accuses Defendant Meta Platforms, Inc. ("Meta") of censoring him in violation of Chapter 143A of the Texas Civil Practice & Remedies Code (Dkt. #1, Exhibit 3 ¶ 1). Davis is an attorney residing in Collin County, Texas, who regularly posts videos to social media platforms in which he discusses "legal topics important to political conservatives" (Dkt. #1, Exhibit 3 ¶ 17). Meta operates several online services and applications with billions of users worldwide (Dkt. #20 at p. 7). Most notable among

its online applications are Facebook and Instagram, both of which allow Meta's users to upload and share content to their networks of friends and followers (Dkt. #20 at p. 7).

**I. Meta's Terms of Service**

Every one of the billions of people who use Meta's applications—including Facebook and Instagram—must acknowledge and agree to Meta's terms of service at the time of registration (Dkt. #20, Exhibit 3 ¶¶ 3; 15). Practically speaking, when a new user creates an account on Facebook or Instagram, they encounter a notice informing them that their registration constitutes an agreement to the application's terms of service and a hyperlink that allows the user to review those terms. After reviewing and clicking through the hyperlinked notice of the terms of service, the new user then completes their account setup through the online registration process (Dkt. #20, Exhibit 3 ¶ 3).

Since 2005, Facebook's terms of service have featured a provision that makes clear that continued use of Facebook constitutes acceptance of any updates or additions to Facebook's terms of service (Dkt. #20, Exhibit 3 ¶ 7). Instagram's terms of service have included a similar continued-use provision since at least 2013 (Dkt. #20, Exhibit 3 ¶ 19).

Also featured in the terms of service for both applications are forum-selection clauses specifying that all disputes arising from the terms of service or the user's access to Meta's applications must be resolved in the United States District Court for the Northern District of California or a state court located in San Mateo, California—the county in which Meta is headquartered (Dkt. #20, Exhibit 3). Facebook's current terms of service, which have been in effect since July 26, 2022, state that:

> **\*2** You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any

such claim, and that the laws of the
State of California will govern these
Terms and any claim, cause of action,
or dispute without regard to conflict of
law provisions.

(Dkt. #20, Exhibit 4 at p. 16). Instagram's current terms
of service contain a substantively identical forum-selection
clause, which states that:

For any claim that is not arbitrated
or resolved in small claims court,
you agree that it will be resolved
exclusively in the U.S. District Court
for the Northern District of California
or a state court located in San Mateo
County. You also agree to submit to the
personal jurisdiction of either of these
courts for the purpose of litigating any
such claim.

(Dkt. #20, Exhibit 39 at p. 8). [3] Both Facebook and Instagram
have long included a California forum-selection clause in
their terms of service—Facebook first added a forum-
selection clause in 2005, while Instagram first added the
clause in 2013 (Dkt. #20, Exhibit 3 ¶¶ 6, 18).

## II. Davis's Use of Meta's Platforms

Davis has been a "near daily user" of Meta's platforms
since he created his first Facebook account in 2004 (Dkt.
#1, Exhibit 3 ¶ 20). [4] Like all Facebook users, Davis
agreed to Facebook's terms of service when he created his
account (Dkt. #1 ¶ 12). Under the terms of service in effect
at the time that he created his account, Davis authorized
Facebook to unilaterally modify its terms by posting notice
of the modifications on the site (Dkt. #20, Exhibit 3 ¶¶
12–13). Shortly after Davis created his account, Facebook
modified its terms of service to include a continued-use
provision (Dkt. #20, Exhibit 3 ¶ 7). Davis regularly used
his first Facebook account for over fifteen years. During the
period in which Davis maintained and regularly used his
first Facebook account, Facebook modified its terms over
two dozen times, with each modified version of the terms

containing a California forum-selection clause (Dkt. #20,
Exhibit 3 ¶ 13).

In 2012, Davis created his first Instagram account under
the username @Who_Is_Paul_Davis (Dkt. #1, Exhibit 3 ¶
14). [5] As he did when he joined Facebook, Davis agreed to
the Instagram terms of service when he created his account
(Dkt. #20, Exhibit 3 ¶ 24). The version of Instagram's terms
of service in effect when Davis created his account, and
all subsequent versions, include a continued-use provision,
which states that users accept any new or updated terms by
continuing to use Instagram (Dkt. #20, Exhibit 3 ¶¶ 24–26;
Dkt. #20, Exhibit 44 at p. 1). And, during the time that Davis
regularly used his first Instagram account, Instagram's terms
of service included a California forum-selection clause (Dkt.
#3, Exhibit 3 ¶ 25).

**\*3** Davis's first Facebook and Instagram accounts were
deactivated in January 2021 after Davis—a self-described
"J6er" [6]—posted a series of videos documenting his
participation in the January 6 insurrection at the United States
Capitol to his Instagram (Dkt. #1, Exhibit 3 ¶ 14; Dkt. #20 at
pp. 8–9). Shortly after the deactivation of his first accounts,
Davis created new Facebook and Instagram accounts under
the username @FiredUpTXLawyer (Dkt #1 ¶ 15). In creating
his new accounts, Davis again agreed to Meta's terms of
service for both Facebook and Instagram, which contained
California forum-selection clauses (Dkt. #20, Exhibit 6 at p.
12; Dkt. #20, Exhibit 41 at p. 9).

Davis's new Facebook and Instagram accounts are his
"primary means" of attracting new clients to his law
practice, which Davis alleges is his "sole means of earning
a living" (Dkt. #1, Exhibit 3 ¶¶ 15, 70). Beginning in
2021, Davis began promoting himself and his law firm by
posting regular videos and other content to his Facebook and
Instagram accounts, in which he discusses "a broad variety
of topics related to law and politics from a conservative
viewpoint" (Dkt. #1 ¶ 20). This promotional strategy proved
successful for Davis: He gained a significant following—
including over 15,000 followers on Instagram—and "[o]ver
90%" of his clients came to him through social media
applications, including Facebook and Instagram (Dkt. #1,
Exhibit 3 ¶¶ 17–19).

## III. Meta's Alleged Censorship of Davis's Current
## Accounts

According to Davis, his ability to attract clients was, however, curtailed when Meta began restricting his Instagram and Facebook accounts and reducing the visibility of his account to other users (Dkt. #1, Exhibit 3 ¶¶ 23–24). Davis contends that, although his @FiredUpTXLawyer Facebook and Instagram accounts remain active, Meta has suppressed the visibility of his posts and made it difficult for other users to find and follow Davis's accounts or to engage with and share Davis's content (Dkt. #1, Exhibit 3 ¶¶ 24–25).

Davis also alleges that Meta placed labels on Davis's posts declaring them false, arbitrarily removed his followers, and otherwise suppressed his accounts (Dkt. #1, Exhibit 3 ¶¶ 22–29). Meta's alleged suppression of Davis's accounts, which Davis characterizes as "shadowbanning," has caused a "massive drop" in Davis's new client appointments, thus threatening his sole means of earning a living (Dkt. #1, Exhibit 3 ¶ 70).

In short, because of Meta's alleged censorship, Davis went from being nearly "overwhelmed" by a new client appointment every single business day to struggling to arrange one or two new client appointments a week (Dkt. #1, Exhibit 3 ¶ 70).

### IV. Procedural History

Given the harm allegedly caused to his practice, Davis initially filed suit against Meta and TikTok and sought emergency injunctive relief in the 471st District Court in Collin County, Texas on November 21, 2022 (Dkt. #1, Exhibit 5). TikTok removed the case to this Court on the same day (Dkt. #1, Exhibit 6). Davis voluntarily dismissed the first case and filed the present action in the County Court at Law No. 4 in Collin County on November 23, 2022 (Dkt. #1, Exhibit 3). TikTok again removed the case on the same day that it was filed (Dkt. #1). TikTok then filed an amended notice of removal on November 28, 2022 (Dkt. #7). Meta consented to the removal one day later (Dkt. #10).

In the present case, Davis seeks declaratory and injunctive relief against Meta under Chapter 143A of the Texas Civil Practices and Remedies Code, which prohibits large social media platforms from "censor[ing]" a user based on the user's "viewpoint" (Dkt. #1, Exhibit 3 ¶¶ 49–58).[7] Davis asks the Court to order Meta to remove all restrictions from his current Facebook and Instagram accounts and to restore his deactivated Facebook and Instagram accounts (Dkt. #1, Exhibit 3 ¶¶ 54–58). In addition, Davis, who is representing

himself *pro se* seeks to recover his attorney's fees under Texas Civil Practice & Remedies Code § 143A.007(b)(1) (Dkt. #1, Exhibit 3 ¶ 76).

**\*4** Davis first moved to remand this case to state court on November 28, 2022 (Dkt. #6). But, citing his need to "diligently research[ ] and brief[ ]" issues raised in TikTok's amended notice of removal, Davis withdrew that motion on December 14, 2022 (Dkt. #14; Dkt. #23). Davis filed his amended motion to remand on January 2, 2023 (Dkt. #16). Meta responded on January 17, 2021 (Dkt. #21). Davis replied on January 23, 2023 (Dkt. #24) and Meta filed its sur-reply on January 30, 2023 (Dkt. #32).

In addition to opposing Davis's motion to remand, Meta moved to transfer this case under 28 U.S.C. § 1404(a) on January 11, 2023 (Dkt. #20). Davis filed his response on January 24, 2023 (Dkt. #25). Meta replied on January 31, 2023, and Davis filed a sur-reply on February 7, 2023 (Dkt. #36; Dkt. #39).

### LEGAL STANDARD

### I. Remand

Any civil action brought in a state court of which the district courts have original jurisdiction may be removed to the district court embracing the place where such action is pending. 28 U.S.C. § 1441(a). Federal courts are, of course, "courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Only state court actions that originally could have been filed in federal court may be removed to federal court by the defendant. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citing 28 U.S.C. § 1441(a)). So, in an action that has been removed to federal court, a district court is required to remand the case to state court if, at any time before final judgment, it determines that it lacks subject-matter jurisdiction. *See, e.g., Gutierrez v. Flores*, 543 F.3d 248, 251–52 (5th Cir. 2008).

As a starting point, a district court must presume that a suit lies outside its limited jurisdiction, and the burden of establishing federal jurisdiction "rests on the party seeking the federal forum." *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 537 (5th Cir. 2017). Because removal raises significant federalism concerns, federal courts construe the removal statutes strictly and any doubts about removal should

be resolved in favor of remand. *See, e.g., Hamerly v. Tubal-Cain Marine Servs., Inc.*, 62 F. Supp. 3d 555, 557 (E.D. Tex. 2014).

## II. 28 U.S.C. § 1404(a) Transfer

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "The underlying premise of § 1404(a) is that courts should prevent plaintiffs from abusing their privilege under § 1391 by subjecting defendants to venues that are inconvenient under the terms of § 1404(a)." *In re Volkswagen of Am., Inc. ("Volkswagen II")*, 545 F.3d 304, 313 (5th Cir. 2008).

For the ordinary § 1404(a) motion, the Court makes a threshold inquiry into "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties have consented to a particular jurisdiction. *In re Volkswagen AG ("Volkswagen I")*, 371 F.3d 201, 203 (5th Cir. 2004). The Court then considers the propriety of transfer based on the convenience of the parties (referred to as the "private interest factors") and various public interest considerations (the so-called "public interest factors"). *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).

 *5 "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* In determining whether to transfer a case under a forum-selection clause, the Court first determines whether the forum-selection clause is mandatory or permissive. *Weber v. PACT XPP Tech., AG*, 811 F.3d 758, 770–71 (5th Cir. 2016). The Court then decides whether the forum-selection clause applies to the dispute at hand, which involves two separate determinations: (1) whether the forum selection clause is valid, and (2) whether the particular case falls within the scope of the forum-selection clause. *Id.* at 770.

The Court then turns to the issue of enforceability. Forum-selection clauses are presumptively valid and should be enforced "unless [the party opposing enforcement] could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991) (noting that forum-selection clauses

are presumptively valid even absent arm's-length bargaining); *Haynsworth v. The Corp.*, 121 F.3d 956, 962–63 (5th Cir. 1997). The party resisting transfer therefore bears the "heavy burden" of showing that enforcement of the clause would be unreasonable under the circumstances. *See, e.g., Weber*, 811 F.3d at 773–74; *Haynsworth*, 121 F.3d at 962–63.

Ultimately, if the forum selection clause is valid and enforceable, district courts are required to "adjust their usual § 1404(a) analysis in three ways." *Atl. Marine*, 571 U.S. at 63. First, the plaintiff's choice of forum carries no weight. *Id.* Second, the court "must deem the private-interest factors to weigh entirely in favor of the pre-selected forum." *Id.* at 64. That is, the court may consider arguments only about public interest factors. *Id.* Because the public interest factors will rarely defeat a motion to transfer, "forum-selection clauses should control except in unusual cases." *Id.* Third, the transferee venue—that is, the pre-selected forum—will not carry with it the original venue's choice of law rules. *Id.*

## ANALYSIS

Before turning to the substance of the parties' motions, the Court must first decide which motion to prioritize. Meta contends that the Court should exercise its discretion to decide Meta's motion to transfer before addressing the motion to remand (Dkt. #21 at p. 14). Conversely, Davis contends that the Court must first decide the issue of remand before turning to venue (Dkt. #25 at p. 2).

It is axiomatic that a district court must consider subject-matter jurisdiction as a threshold issue in every case. *See, e.g., Stump v. Barnhart*, 387 F. Supp. 2d 686 (E.D. Tex. 2005) ("Subject-matter jurisdiction must be established as a threshold matter, inflexibly and without exception"); *Pharos Cap. Grp., LLC v. Nutmeg Ins. Co.*, 999 F. Supp. 2d 947, 952 (N.D. Tex. 2014). So, when presented with both a motion to remand and a motion to transfer, a district court will typically prioritize the motion to remand. *Id.*

Courts in the Fifth Circuit have, however, identified a set of limited circumstances that weigh in favor of departing from the typical order of operations and ruling on a motion to transfer before deciding a motion to remand when: (1) a suit is already pending in the transferee district; (2) the remand motion will not suffer as a result of the transfer; and (3) transfer would permit the court who would ultimately try the case to rule on the remand motion. *Oldham v. Nationwide Ins.*

*Co. of Am.*, No. 3:14-CV-00575, 2014 WL 3855238, at *4 (N.D. Tex. Aug. 5, 2014). But this case has no related suits pending in the Northern District of California, and Meta does not present any circumstances that would compel the Court to forego a jurisdictional analysis. *See Pharos*, 999 F. Supp. 3d at 952.

**\*6** Thus, the Court will begin its analysis with Davis's motion to remand. That said, having determined that remand is unwarranted, the Court will then turn to Meta's motion to transfer.

## I. Davis's Motion to Remand

Davis seeks to remand this case to state court, arguing that subject-matter jurisdiction is lacking (Dkt. #16 at p. 2). In removing this case, TikTok and Meta invoked both the Court's diversity jurisdiction under 28 U.S.C. § 1332 and its federal question jurisdiction under 28 U.S.C. § 1331 (Dkt. #7 at pp. 4–12). Davis challenges both bases of jurisdiction (Dkt. #12 at pp. 2–4). Davis argues that diversity jurisdiction is lacking because the amount-in-controversy does not exceed $75,000 (Dkt. #16 at p. 7). As for the issue of federal question jurisdiction, Davis argues that there is no actually disputed federal question necessary to the resolution of his Chapter 143A claims and that the exercise of federal question jurisdiction would disturb the balance of federal and state judicial responsibilities (Dkt. #12 at p. 15).

Meta counters that the amount-in-controversy requirement is satisfied because the individual and collective value of both the equitable relief sought by Davis and his likely attorney's fees exceed $75,000, and because Davis seeks hundreds of thousands of dollars in fines and penalties (Dkt. #21 at p. 15). Meta also argues that Davis's claim under Chapter 143A necessarily raises questions of federal law because "Chapter 143A's private cause of action compels a plaintiff to plead and establish questions of federal law" (Dkt. #21 at p. 25). The Court finds Davis's arguments regarding diversity jurisdiction unpersuasive and instead concludes that Meta has carried its burden of establishing that the amount-in-controversy requirement is satisfied here. The Court will address each of Davis's arguments in turn.

Critically, because the Court concludes that it has diversity jurisdiction, it need not turn to the question of federal question jurisdiction. *See, e.g., Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 608 n.5 (N.D. Tex. 2006) ("Because the court finds diversity jurisdiction present in this case, it need not decide the issue of federal question jurisdiction, even though that issue was argued by the parties.").

## A. The Requirements for Diversity Jurisdiction are Satisfied

Federal courts have original jurisdiction over civil actions in which the parties are completely diverse, and the amount-in-controversy exceeds $75,000. 28 U.S.C. § 1332. There is no dispute that the complete diversity prong is satisfied here, as Davis is a citizen of Texas and Meta is a citizen of Delaware and California. *E.g., McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004) ("The concept of complete diversity requires that all persons on one side of the controversy be citizens of different states than all persons on the other side.") (internal quotations omitted). Rather, Davis moves to remand this case on the ground that Meta cannot establish that the amount-in-controversy exceeds $75,000 (Dkt. #16 at p. 7).

To determine whether the amount-in-controversy requirement is satisfied, the Court must assess the jurisdictional facts as of the time that the complaint is filed, bearing in mind that subsequent events cannot serve to "deprive the Court of jurisdiction once it has attached." *St. Paul Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253–54 (5th Cir. 1998). In the removal context, the Court looks to the sum claimed by the plaintiff in its state court petition, and that claim controls if made in good faith. *See, e.g., Theriot v. Transamerica Life Ins. Co.*, 354 F. Supp. 3d 713 (E.D. Tex. 2017). Removal is proper if it is "facially apparent" from the plaintiff's state court petition that the claim or claims asserted exceed the jurisdictional amount. *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995). When it is facially apparent that the amount in controversy likely exceeds $75,000, remand is not warranted unless the plaintiff establishes "to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). Courts typically consider statutory damages, penalties, punitive damages, and attorney's fees in determining the amount-in-controversy. *Theriot*, 354 F. Supp. 3d at 719 (citing *Greenberg*, 134 F.3d at 1253).

**\*7** Meta contends that, on the face of Davis's state court petition, the value of the equitable relief sought by Davis, his demand for attorney's fees, and the statutory penalties available under Chapter 143A, both independently and in combination, satisfy the amount-in-controversy requirement (Dkt. #21 at pp. 15–23). With respect to the value of Davis's claims for equitable relief and attorney's fees, the Court agrees with Meta.

### 1. The Value of Davis's Claims for Equitable and Declaratory Relief

When, as here, a plaintiff seeks declaratory or injunctive relief, it is "well established" that the amount-in-controversy is measured by "the value of the object of the litigation." *Farkas v. GMAC Mortg., L.L.C.*, 737 F.3d 338, 341 (5th Cir. 2013) (per curiam) (quoting *Hunt v. Wash. State Apple Adver. Comm'm*, 432 U.S. 333, 347 (1977)). Put differently, in an action for declaratory and injunctive relief, the amount-in-controversy is the "value of the right to be protected or the extent of the injury to be prevented." *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983).

The purpose of the injunctive and declaratory relief sought by Davis—to prevent Meta from further censoring Davis and otherwise restricting his ability to attract clients to his law practice—establishes that Davis's right to use Meta's platforms to promote his law practice is the object of this litigation. *Cf. Farkas*, 737 F.3d at 341. And Davis's claimed injury is the considerable negative impact that Meta's alleged censorship has had on his practice, which has caused him pecuniary harm and threatened his "sole means of earning a living." *Cf. Leininger*, 705 F.2d at 729.

In this context, the Fifth Circuit takes a "common sense" approach to determining whether a removing defendant has met its burden with respect to the amount-in-controversy. *See Allen*, 63 F.3d at 1336. Applying that common sense approach to the claims presented on the face of Davis's state court petition, the Court concludes that the value of the object of the litigation and the extent of the injury that Davis seeks to prevent likely exceeds the amount-in-controversy threshold "[u]nder any reasonable basis." *Farkas*, 737 F.3d at 341.

Davis seeks to prevent further censorship and restrictions on his use of Meta's platforms, the means by which he previously attracted "[o]ver 90%" of his clients to his law practice at a standard hourly rate of $250 an hour (Dkt. #1, Exhibit 3 ¶ 17; Dkt. #16, Exhibit 1 ¶ 2). Although Davis's complaint omits some facts that could be useful in determining the exact value of the damage to Davis's business allegedly caused by Meta (*e.g.*, the number of new client appointments he arranged through Facebook and Instagram, how many of those potential clients actually retained him, how many hours he worked for those clients), the amount-in-controversy analysis "does not require exactness"—it merely requires

that the Court determine whether the amount-in-controversy is "likely to exceed the jurisdictional amount." *Davalos v. Allstate Fire & Cas. Ins. Co.*, 522 F. Supp. 3d 240, 247 (W.D. Tex. 2021) (quoting *Allen*, 63 F.3d at 1336). And, given the extensive and readily quantifiable nature of the harm alleged by Davis, the Court finds that the amount-in-controversy is likely satisfied based on the allegations on the face of Davis's state court petition.

To defeat removal, Davis now argues that the irreparable pecuniary harm alleged in his complaint was speculation, and that "such harm has not materialized" as his firm continues to operate at full capacity (Dkt. #24 at p. 3). This argument fails to move the needle on remand for two reasons.

**\*8** First, it is well-established that jurisdictional facts are determined at the time of removal, and that post-removal events do not affect properly established jurisdiction. *See, e.g., Louisiana v. Am. Nat. Prop. Cas. Co.*, 746 F.3d 633, 636 (5th Cir. 2014). This case was removed on the same day that Davis filed his state court petition, and, as a result, the jurisdictional facts established on the face of that petition control (Dkt. #1). And, as noted above, the facts alleged on the face of Davis's state court petition establish that the amount-in-controversy requirement is likely satisfied here. Davis cannot circumvent removal now by backtracking away from those allegations. *See, e.g., Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264–65 (5th Cir. 1995) (recognizing that removal jurisdiction is determined based on the complaint at the time of removal).

Second, the Court finds Davis's attempt to argue against the facts contained in his state court petition, which he signed under penalty of perjury, to be "somewhat disingenuous if not totally spurious." *Foret v. S. Farm Bureau Life Ins. Co.*, 918 F.2d 534, 538 (5th Cir. 1990). In support of his requests for emergency injunctive and declaratory relief, Davis specifically alleged that he had suffered pecuniary harm because of Meta's alleged censorship, including significant harm to his law firm (Dkt. #1, Exhibit 3 ¶ 70). The Court presumes that these allegations were necessarily concrete, as, under Texas law, "hypothetical and speculative" claims cannot support a request for injunctive or declaratory relief. *See, e.g., City of Plano v. Hatch*, 584 S.W.3d 891, 902 (Tex. App.—Dallas 2019, no pet.). Consequently, Davis cannot now recast those allegations as mere speculation in a transparent and disingenuous attempt to avoid this Court's jurisdiction. *See Foret*, 918 F.2d at 538; *Addo v. Globe Life & Acc. Ins. Co.*, 230 F.3d 759, 762 (5th Cir. 2000) (observing

the importance of "discourag[ing] disingenuous pleading" by plaintiffs to avoid removal). For these reasons, the Court finds that the "value of the object" of this litigation independently satisfies the amount-in-controversy requirement.

### 2. Attorney's Fees

The propriety of removal is bolstered by Davis's request for attorney's fees. In the Fifth Circuit, it is well-settled that attorney's fees are a part of the amount in controversy "when they are provided for by contract or by state statute." *E.g., Foret*, 918 F.2d at 537 (quoting 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3712 (2d ed. 1985)). Davis brings this case under a statute that explicitly provides for "costs and reasonable and necessary attorney's fees." TEX. CIV. PRAC. & REM. CODE § 143A.007(b)(1). Neither party disputes that Davis, a licensed attorney who is representing himself *pro se*, can recover attorney's fees under Texas law. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488 (Tex. 2019) (noting that an attorney can recover attorney's fees for *pro se* representation if the fee-awarding statute does not require the party to "incur" fees).

Davis contends, however, that he will not incur more than $75,000 in attorney's fees in this case (Dkt. #16 at pp. 7–8). But this argument misunderstands the focus of the amount-in-controversy analysis—the question is not whether Davis's attorney's fees alone will exceed $75,000; it is whether the total amount-in-controversy, including the value of Davis's injunctive and equitable relief *and* his claim for attorney's fees, exceeds $75,000. *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (noting that, if a state statute provides for attorney's fees, "such fees are included *as part of* the amount in controversy") (emphasis added).

**\*9** And, as Meta points out, it is highly likely that Davis will accrue substantial attorneys' fees in litigating this case (Dkt. #21 at p.13). After all, Davis has already stated that this case has required multiple rounds of "diligent[ ] researching and briefing" at Davis's standard hourly rate of $250 an hour (Dkt. #14 at p. 1). Indeed, if Davis spends even a hundred hours working on this case at his standard rate, he will accrue $25,000 in attorney's fees—nearly one-third of the amount-in-controversy. When coupled with the value of the object of this litigation, the Court therefore concludes that the amount-in-controversy requirement will likely exceed

$75,000. *Manguno*, 276 F.3d at 723 (noting that the amount-in-controversy requirement is satisfied when "it is apparent from the face of the petition that the claims are likely to exceed $75,000"). [8]

Accordingly, the Court concludes that Meta has carried its burden of establishing that the amount-in-controversy requirement is satisfied based on the allegations presented on the face of Davis's state court petition. As a result, the Court finds that it has subject-matter jurisdiction and that Davis's motion to remand should be denied.

### II. Meta's Motion to Transfer

Meta asks the Court to transfer this case to the United States District Court for the Northern District of California under 28 U.S.C. § 1404(a) (Dkt. #20). In considering whether to transfer a case under § 1404(a) when, as here, there is a forum-selection clause, courts in the Fifth Circuit apply a three-step process. *PCL Civil Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020).

First, courts interpret the forum-selection clause to determine whether it is mandatory or permissive, whether it is valid, and whether the parties' dispute falls within the scope of the clause. *Id.* at 1073. This interpretation is governed by state law, which is determined based on the original forum state's choice-of-law rules. *Weber*, 811 F.3d at 770.

If the court determines that the forum-selection clause is mandatory and valid, and that the parties' dispute falls within the scope of the clause, the court then moves to the second step and determines whether the clause is enforceable. *Id.* at 773–74. The enforceability of a forum-selection clause is a matter of federal law, and there is a "strong presumption in favor of the enforcement of mandatory-forum selection clauses." *PCL*, 979 F.3d at 1074 (cleaned up). Because of this presumption, a party opposing transfer must satisfy a "heavy burden" of showing that enforcement of the clause would be unreasonable under the circumstances. *Weber*, 811 F.3d at 773–74.

Finally, if the court finds that a forum-selection clause is enforceable, it must determine whether "extraordinary circumstances" weigh against transfer. *Atl. Marine*, 571 U.S. at 62 ("Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied."). In making this determination, the court considers the traditional "public interest" factors set out in

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*Atlantic Marine. Id.* at 64. The party opposing transfer must "bear the burden of showing that public interest factors overwhelmingly disfavor a transfer." *Id.* at 67. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 65.

Applying this framework here, the Court concludes that the Meta Forum-Selection Clause is mandatory, valid, and enforceable. Moreover, the Court finds that Davis cannot carry his heavy burden of establishing that this is "one of the rare cases" in which extraordinary circumstances can overcome a valid and enforceable forum-selection clause. *Weber*, 811 F.3d at 776.

### A. Interpreting the Meta Forum-Selection Clause

**\*10** The Court begins its analysis by interpreting the Meta Forum-Selection Clause. *Id.* at 770. Although federal law governs the enforceability of forum-selection clauses, their interpretation is a matter of state law. *Id.*; *Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215, 223 (5th Cir. 2020). Neither party has addressed the law applicable to the interpretation of the forum-selection clause at issue here. Ordinarily, the Court would thus begin with a choice-of-law analysis. *Moates v. Facebook, Inc.*, No. 4:20-CV-00896, 2021 WL 3013371, at \*3 (E.D. Tex. May 14, 2021) (noting that, when analyzing a forum-selection clause, "courts must ensure that they apply the proper substantive law at each step"). But, in this case, the interpretation of the Meta Forum-Selection Clause is the same whether the Court applies the law of the original forum state (Texas), or the law required by Meta's terms of service (California). *See, e.g., Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541 (W.D. Tex. 2017) (noting that contractual analysis related to terms of service agreement was identical under either Texas or California law). Under either state's law, the Meta Forum-Selection Clause is mandatory and valid, and it encompasses this case.

### 1. The Meta Forum-Selection Clause is Mandatory

The first interpretive issue that the Court must address is whether the Meta Forum-Selection Clause is mandatory or permissive in nature. There is a "sharp distinction" between mandatory and permissive forum-selection clauses—only a mandatory forum-selection clause justifies transfer or *forum non conveniens* dismissal. *Weber*, 811 F.3d at 769. A mandatory forum-selection clause is one that "affirmatively

requires that litigation arising from the contract be carried out in a given forum." *Id.*

The Meta Forum-Selection Clause requires that "any claim, cause of action, or dispute between [Meta and the user] that arises out of or relates to these Terms or [the user's] access or use of the Meta Products *shall be resolved exclusively* in the United States District Court for the Northern District of California or a state court located in San Mateo County" (Dkt. #20, Exhibit 4 at p. 16) (emphasis added). Whether it is interpreted under the law of Texas or California, this language makes clear that the Meta Forum-Selection Clause is mandatory. *See, e.g., In re Automated Collection Techs., Inc.*, 156 S.W.3d 557 (Tex. 2004) (concluding that a forum-selection clause designating "exclusive forum" was mandatory); *Olinick v. BMG Entm't*, 42 Cal. Rptr. 3d 268, 274 (Ct. App. 2006) (concluding that forum-selection clause with "express language of exclusivity of jurisdiction, specifying a mandatory location for litigation" was mandatory).

### 2. The Meta Forum-Selection Clause is Valid

Next, the Court must consider the validity of the Meta Forum-Selection Clause. Although Davis contends that the Clause is void as a matter of public policy under Texas law, this argument goes to its enforceability, rather than its validity. *Cf. Haynsworth*, 121 F.3d at 963. Davis does not dispute that, by creating and using his Facebook and Instagram accounts, he voluntarily bound himself to Meta's terms of service. Nor does he does point to any other issues that would call into question the Meta Forum-Selection Clause's validity. So, when interpreted under Texas law or California law, the Meta Forum-Selection Clause is valid. *See, e.g., In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010) ("Forum-selection clauses are generally enforceable and presumptively valid."); *Korman v. Princess Cruise Lines, Ltd.*, 243 Cal. Rptr. 3d 668, 675 (Ct. App. 2019) ("[T]he forum-selection clause is presumed valid and will be enforced unless the plaintiff shows that enforcement of the clause would be unreasonable under the circumstances."). In fact, courts in both states— including this Court—have explicitly blessed the validity of the Meta Forum-Selection Clause. *Moates v. Facebook, Inc.*, No. 4:21-CV-00694, 2022 WL 2707745, at \*5 (E.D. Tex. June 13, 2022), *report and recommendation adopted*, No. 4:21-CV-00694, 2022 WL 2705245 (E.D. Tex. July 12, 2022); *Doe v. Facebook, Inc.*, No. 4:22-CV-00226, 2023 WL 3483891, at \*5 (S.D. Tex. May 16, 2023); *Thomas v. Facebook, Inc.*, No. 1:18-CV-00856, 2018 WL 3915585, at

*4 (E.D. Cal. Aug. 15, 2018) (noting that "[n]umerous courts have affirmed the validity and enforceability" of Meta's terms of service "and the forum-selection clause contained therein") (cleaned up).

### 3. This Dispute is Within the Scope of the Meta Forum-Selection Clause

**\*11** The Court must also determine whether this case falls within the scope of the Meta Forum-Selection Clause. Under Texas law, this determination requires a "a common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims." *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (internal quotations omitted). When interpreting forum-selection clauses with "relates to" language, Texas courts interpret those clauses broadly to "encompass all claims that have some possible relationship with the agreement." *J.V. & Sons Trucking, Inc. v. Asset Vision Logistics, LLC*, No. 1:20-CV-00163, 2020 WL 10458645, at *4 (N.D. Tex. Dec. 15, 2020). Likewise, under California law, a "broad" forum-selection clause is one that contains language encompassing "any claim arising from or related to this agreement." *See Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Ct. App. 2018). To fall within the scope of a "broad" clause, the dispute between the parties "need only touch matters covered by the contract containing the" forum-selection clause. *See Ramos v. Super. Ct.*, 239 Cal. Rptr. 679, 689 (Ct. App. 2018) (cleaned up).

The Meta Forum-Selection Clause explicitly encompasses "any claim, cause of action, or dispute between [Meta and the user] that *arises out of or relates to* these Terms or your access or use of the Meta Products" (Dkt. #20, Exhibit 4 at p. 16) (emphasis added). This broad "arises out of or relates to" language applies to Davis's Chapter 143A claims, which relate directly to Meta's terms of service and to Davis's ability to use Meta's products without restriction. Therefore, this case is within the scope of the Meta Forum-Selection Clause. *J.V. & Sons Trucking*, 2020 WL 10458645, at *4; *Ramos*, 239 Cal Rptr. at 689.

In sum, having interpreted the Meta Forum-Selection Clause, the Court finds that the Clause is mandatory and valid, and that this case falls within its scope.

### B. The Meta Forum-Selection Clause is Enforceable

The Court turns next to the issue of enforceability. In diversity cases like this one, the enforceability of a forum-selection clause is a matter governed by federal law. *Weber*, 811 F.3d at 769; *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016). A valid, mandatory, and applicable forum-selection clause is presumptively enforceable. *Weber*, 811 F.3d at 773–74. Thus, the Court's conclusion that the Meta Forum-Selection Clause is mandatory, valid, and applicable requires the Court to find the clause enforceable unless Davis can carry the "heavy burden" of showing that enforcement of the Clause would be unreasonable here. *See id.*; *Haynsworth*, 121 F.3d at 963. The enforcement of a forum-selection clause may be unreasonable when:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of [her] day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*PCL*, 979 F.3d at 1074 (quoting *Haynsworth*, 121 F.3d at 963). Davis argues that two of these unreasonableness factors apply here. Specifically, Davis contends that transfer would practically deprive him of his day in court and that the enforcement of the Meta Forum-Selection Clause would contravene the public policy of the State of Texas (Dkt. #25 at pp. 3–14). The Court finds each of these arguments unavailing.

### 1. Enforcement of the Meta Forum-Selection Clause Will Not Deprive Davis of His Day in Court

Davis argues that a transfer to the Northern District of California would effectively deprive him of his day in court (Dkt. #25 at p. 8). To carry his heavy burden of making such a showing, Davis must demonstrate that, for all practical purposes, the courthouse doors will close to him

upon transfer. *Haynsworth*, 121 F.3d at 963. A showing of comparatively less convenience or of a personal preference for the original forum cannot carry Davis's heavy burden. *See, e.g., Noble House, L.L.C. v. Certain Underwriters at Lloyd's, London*, 67 F.4th 243, 251 (5th Cir. 2023). Indeed, a transferee forum is only inadequate when transfer would leave the plaintiff with "no remedy at all." *Kempe v. Ocean Drilling & Expl. Co.*, 876 F.2d 1138, 1141 (5th Cir. 1989).

**\*12** Davis does not argue that any grave inconvenience or unfairness will leave him with "no remedy at all" if this case proceeds in the Northern District of California. *See id.* Nor can he. Davis will have the same remedies available to him in either court, and a judge sitting in the Northern District of California is capable of applying Texas law. After all, "Texas state courts and Texas federal courts do not have a monopoly on adjudicating Texas constitutional, statutory, and common law claims." *Moates*, 2021 WL 3013371, at \*6. And federal judges "routinely apply the law of a State other than the State in which they sit." *Atl. Marine*, 571 U.S. at 67.

Instead, Davis posits that he will be unable to prevail on his Chapter 143A claim in California due to what he perceives to be a "left-leaning jury pool and judiciary" (Dkt. #25 at p. 10). In effect, Davis's argument against transfer centers on his plainly partisan speculation that he will receive a less favorable outcome if this case proceeds before a judge appointed by a president with viewpoints that differ from his own (Dkt. #25 at p. 10). The Court finds this argument unpersuasive and demeaning to the notions of independence and faithfulness to the law that have underpinned the federal judiciary since this nation's founding. *See, e.g.*, THE FEDERALIST NO. 78 (Alexander Hamilton); Stephen Breyer, *Judicial Independence: Remarks by Justice Breyer*, 95 GEO. L.J. 903, 907 (2007) ("In a word, judicial independence is an essential component of a rule of law, one that is necessary to tie together our Nation of 300 million people of every race, every religion, and every viewpoint imaginable.").

To begin with, a party's prediction that the result of a case litigated in the chosen forum might differ from that of a case litigated in the original forum does not factor into the Court's transfer analysis. *Noble House*, 67 F.4th at 251. Nor do a party's "predictions of the likelihood of a win on the merits." *Weber*, 811 F.3d at 774 (noting that "it is the *availability* of a remedy that matters, not predictions of the likelihood of a win on the merits.") (emphasis in original). And, beyond its legal irrelevance, Davis's argument

inappropriately conflates the competence and integrity of a federal judge with the political party of the president that appointed them. In so doing, Davis ignores the fact that every federal judge takes the same solemn oath to "faithfully and impartially discharge and perform all the duties incumbent [upon] them" under the Constitution and the laws of the United States. *See* 28 U.S.C. § 453. As made clear by Chief Justice John Roberts, "[w]e do not have Obama judges or Trump judges, Bush judges or Clinton judges. What we have is an extraordinary group of dedicated judges doing their level best to do equal right to those appearing before them." Adam Liptak, *Chief Justice Defends Judicial Independence After Trump Attacks 'Obama Judge'*, N.Y. TIMES (Nov. 21, 2018), https://www.nytimes.com/2018/11/21/us/politics/trump-chief-justice-roberts-rebuke.html. Davis has presented the Court with no reason to doubt that this case will proceed before a judge doing their level best to do equal right to the parties appearing before them in this case.

### 2. Enforcement of the Meta Forum-Selection Clause Does Not Contravene Texas's Public Policy

Davis also argues that enforcing Meta's forum-selection clause would contravene a strong public policy of the State of Texas (Dkt. #25 at p. 3). As a general rule, "Texas's strong public policy favoring freedom of contract" compels courts to "respect and enforce the terms of a contract that the parties have freely and voluntarily entered." *Phil. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). This strong public policy extends to the enforcement of forum-selection clauses. *See, e.g., In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) ("Contractual forum-selection clauses are generally enforceable in Texas."). And yet, Davis contends that this case presents the rare situation in which Texas's public policy weighs against the enforcement of the Meta Forum-Selection Clause, arguing: (1) that Chapter 143A prohibits the enforcement of forum-selection clauses, (2) that the Meta Forum-Selection Clause is a contract of adhesion, and (3) that Davis could not have contemplated this dispute at the time that he agreed to Meta's terms of service. The Court finds that none of these arguments allow Davis to carry his "heavy burden" of establishing that the Meta Forum-Selection Clause is unenforceable. *See Weber*, 811 F.3d at 773–74.

### a. Chapter 143A Does Not Prohibit the Enforcement of the Meta Forum-Selection Clause

**\*13** According to Davis, the plain language of § 143A.003 prohibits the enforcement of the Meta Forum-Selection Clause (Dkt. #25 at p. 3). In its current form, § 143A.003 states that:

> A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 143A.003(a). As Meta points out, this language says nothing about forum-selection clauses. To be sure, § 143A.003 expresses the Texas Legislature's desire to secure the substantive protections of Chapter 143A against choice-of-law agreements. But "even where Texas statutory provisions specify the application of Texas law, these provisions are irrelevant to the enforceability of a forum-selection clause where no statute 'requires suit to be brought or maintained in Texas.' " *In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (quoting *In re AIU Ins. Co.*, 148 S.W.3d 109, 114 (Tex. 2004)). Considering Texas's strong public policy in favor of the freedom of contract, the Supreme Court of Texas has set a high bar for rendering forum-selection clauses unenforceable: "[A]bsent a *statute requiring suit to be brought in Texas*, the existence of statutory law in an area [does] not establish such Texas public policy as would negate a contractual forum-selection provision." *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008) (citing *In re AutoNation*, 228 S.W.3d at 669) (emphasis added). And, although there are no magic words that establish a state's strong public policy, "statutes found to evince a policy against forum-selection clauses in certain contracts use the terms 'forum' and 'venue.' " *Al Copeland Inves., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 544 (5th Cir. 2018).

Neither term can be found in the current iteration of Chapter 143A, and nothing in the statute expressly requires suit to be brought in Texas courts. Not only does Chapter 143A contain no language requiring suit to be brought in Texas courts, but it expressly contemplates at least one type of forum-selection clause—§ 143A.003(a) indicates that parties can resolve disputes through arbitration, and an arbitration agreement is nothing more than "another type of forum-selection clause." *In re AIU Ins. Co.*, 148. The Court therefore finds that nothing in Chapter 143A establishes a public policy against the enforcement of forum-selection clauses.

This finding is supported by the Texas Legislature's recent decision to add an entirely new section "relating to venue" to Chapter 143A. *See* Tex. S.B. 1602, 88th Leg., R.S. (2023). The Legislature specifically recognized that the current and effective version of Chapter 143A "[does] not specify a venue for these actions." Tex. S. Comm. on Jurisprudence, Bill Analysis, Tex. S.B. 1602, 88th Leg., R.S. (2023). And so, Senate Bill 1602, which will take effect as Texas Civil Practice and Remedies Code § 143A.0035 on September 1, 2023, requires any action under Chapter 143A to be "brought and maintained in a court in this state," notwithstanding any forum-selection clause. Act of May 29, 2023, 88th Leg., R.S., ch. 289, § 1, 2023 Tex. Sess. Law Serv. (to be codified at TEX. CIV. PRAC. & REM. CODE ANN. § 143A.0035). Notably, however, this provision expressly applies "only to an action filed on or after" September 1, 2023, and is thus inapplicable here. *Id.* § 2.

**\*14** The Texas Legislature's addition to Chapter 143A—and the legislative history accompanying the bill—only highlights the fact that the version of the statute under which Davis brings this case is silent on the issue of venue. *Cf. Emergency Health Ctr. at Willowbrook, L.L.C. v. UnitedHealthcare of Tex., Inc.*, 892 F. Supp. 2d 847, 855 (S.D. Tex. 2012) (noting that, under Texas law, "when the legislature enacts an amendment, [a court] may presume that it thereby intended to change the original act"). Of course, the addition of § 143A.0035 reflects the Texas Legislature's desire to keep future cases brought under Chapter 143A in Texas courts. But, rather than making the amendment retroactive, the Legislature expressly limited § 143A.0035 "only to [cases] filed on or after" September 1, 2023. Thus, the Court concludes that Senate Bill 1602 does not override Texas's strong public policy in favor of forum-selection clauses here.

In the end, the Court "look[s] to state statutes and judicial decisions to determine public policy." *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 182 (Tex. App.—Fort Worth 2004, pet. denied). As noted above, the relevant statute here is currently silent on the issue of venue. That

is, there is no current statute "requiring suit to be brought in Texas" under Chapter 143A. *In re Lyon Fin. Servs.*, 257 S.W.3d at 234. Accordingly, the Court concludes that Davis cannot point to any "Texas public policy as would negate a contractual forum-selection provision." *Id.*

### b. Meta's Terms of Service Are Not Unenforceable as a Contract of Adhesion

Davis also argues that Meta's terms of service are a contract of adhesion, and that the forum-selection clause contained in those terms is thus unenforceable as a matter of Texas public policy (Dkt. #25 at pp. 12–13). In response, Meta argues that contracts of adhesion are not necessarily unenforceable, and that both the Supreme Court of the United States and the Supreme Court of Texas have upheld forum-selection clauses contained in contracts of adhesion (Dkt. #36 at p. 8).

Even if Davis is correct in classifying Meta's terms of service as a contract of adhesion, this fact alone does not establish a violation of any public policy. Under Texas law, an adhesion contract is not automatically unenforceable, unconscionable, or void. *In re AdvancePCS Health LP*, 172 S.W.3d 603, 608 (Tex. 2005); *see also Moates*, 2021 WL 3013371, at *7 (collecting cases). "The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006).

In fact, courts regularly uphold forum-selection clauses contained in contracts of adhesion that are not subject to negotiation—even when those clauses are enforced against relatively unsophisticated parties with little to no bargaining power. *Carnival Cruise Lines*, 499 U.S. at 593 (upholding enforcement of forum-selection clause against unsophisticated cruise ship passengers despite disparity in parties' bargaining power and the fact that contract was not subject to negotiation); *Haynsworth*, 121 F.3d at 965 (enforcing forum-selection clause "notwithstanding the disparity in the parties' bargaining power"); *Burbank v. Ford Motor Co.*, 703 F.2d 865, 867 (5th Cir. 1983) ("That the [forum-selection clause] was part of an adhesion contract is not, standing alone, reason to cast it aside.").

As a practicing attorney, Davis is more sophisticated than many of the individual consumers against whom forum-selection clauses are regularly enforced. *See Carnival Cruise Lines*, 499 U.S. at 593. For this reason, Davis can hardly claim

that the Meta Forum-Selection Clause is unduly surprising or oppressive. Nor can Davis point to a single instance of a court finding the Meta Forum-Selection Clause invalid as a product of a contract of adhesion. On the contrary, courts around the country have uniformly upheld Meta's forum-selection clauses. *See, e.g., Moates*, 2021 WL 3013371, at *7 (collecting cases); *Franklin v. Facebook, Inc.*, No. 1:15-CV-00655, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("[T]he forum selection clause contained [in Meta's terms of service] has been addressed by numerous courts in actions involving [Meta]. The Court cannot identify a single instance where any federal court has struck down [Meta's terms of service] as an impermissible contract of adhesion induced by fraud or overreaching or held the forum selection clause now at issue to be otherwise unenforceable due to public policy considerations.").

**\*15** In short, Davis cannot show that Meta's terms of service are unconscionable under Texas law and, as a result, the enforcement of the forum-selection clause contained in those terms does not violate Texas public policy.

### c. The Parties Could Have Contemplated This Dispute at the Time That Davis Agreed to Meta's Terms of Service

Finally, Davis argues that the enforcement of the Meta Forum-Selection Clause would violate Texas's public policy as the parties could not have had the present controversy in mind at the time that Davis agreed to Meta's terms of service (Dkt. #25 at p. 13). According to Davis, he could not have contemplated the present controversy "[a]t all relevant times where [he] accepted Meta's terms" because he did not know of Chapter 143A until it was introduced August 10, 2021 (Dkt. #25 at p. 13). This argument suffers from three fatal flaws.

First, the Court is unaware of any instance in which a federal court has held a forum-selection clause unenforceable on the ground that the parties to the agreement did not have the specifics of their controversy in mind at the time of formation. The language cited by Davis comes from the Supreme Court's decision in *M/S Bremen*, in which the Court noted that the fact that "the parties did not have the particular controversy in mind when they made their agreement" could factor into "the reasonableness of the [forum-selection] clause." 407 U.S. at 17. "[Y]et even there the party claiming [unenforceability] should bear a heavy burden of proof." *Id.*

Second, and relatedly, Davis fundamentally misunderstands the nature of the term "controversy" as the Supreme Court used it in *M/S Bremen.* The question is not whether the parties could have contemplated the specific statutory vehicle for the claim in question; it is whether the parties to the agreement could have foreseen the dispute subject to the forum-selection clause. *See id.* And, at its core, the dispute between Davis and Meta is exactly the type of dispute that the parties had in mind when they made their agreement. Ultimately, irrespective of the statutory vehicle, Davis's claim arises from Meta's alleged restrictions on his ability to freely access and use his accounts. Meta's terms of service expressly contemplate this type of dispute—after all, the Meta Forum-Selection Clause refers to disputes that arise from or relate to a user's "access or use of Meta's products" (Dkt. #20, Exhibit 4 at p. 16).

Finally, because of the continued-use provision contained in Meta's terms of service, Davis has repeatedly agreed to be bound by Meta's terms of service after learning of Chapter 143A and his dispute with Meta (Dkt. #20, Exhibit 4 at p. 13). Consequently, even applying Davis's narrow definition of "controversy," he is simply incorrect in claiming that he could not have foreseen this controversy "[a]t all relevant times where he accepted Meta's terms."

In conclusion, Davis has failed to carry the "heavy burden" of showing that the enforcement of the Meta Forum-Selection Clause would violate the public policy of Texas. *Weber,* 811 F.3d at 773–74. Tellingly, Davis does not point to a single instance in which a court found that the enforcement of a forum-selection clause would contravene Texas public policy. *Cf. Noble House,* 67 F.4th at 252 (noting that "federal courts presumptively must enforce forum-selection clauses"). If anything, Texas has a strong public policy in favor of the enforcement of forum-selection clauses, and the Court sees no reason to depart from that policy here. *In re AutoNation, Inc.,* 228 S.W.3d at 669.

**\*16** Because of the strong presumption in favor of enforcing forum-selection clauses, and because Davis has failed to establish that its enforcement would be unreasonable under the circumstances, the Court therefore concludes that the Meta Forum-Selection Clause is enforceable. *Weber,* 811 F.3d at 773–74.

### C. No Extraordinary Circumstances Weigh Against Transfer Here

Having determined that the Meta Forum-Selection Clause is mandatory, valid, applicable, and enforceable, the Clause

must be given "controlling weight" unless Davis can show that this is the "unusual" case in which "extraordinary circumstances" defeat transfer. *See Atl. Marine,* 571 U.S. at 64; *Weber,* 811 F.3d at 776. In making this determination, the Court considers the "public interest factors" typically employed in deciding a § 1404 motion. *Atl. Marine,* 571 U.S. at 64. These factors "justify a refusal to enforce a forum-selection clause only in truly exceptional circumstances." *Barnett,* 831 F.3d at 809. At all times, the party opposing transfer bears the burden of showing that the public interest factors "overwhelmingly disfavor" transfer. *Atl. Marine,* 571 U.S. at 67.

Davis makes no attempt to carry that burden here. Indeed, Davis's briefing makes no mention of extraordinary circumstances or of the public interest factors (Dkt. #25). And, in any event, the Court's own analysis of the public interest factors makes clear that this is not the rare case in which "extraordinary circumstances" defeat a valid and enforceable forum-selection clause. *Atl. Marine,* 571 U.S. at 64.

### 1. Administrative Difficulties
### Flowing from Court Congestion

The first of the four public interest factors looks to the administrative difficulties flowing from court congestion. *Stellar Restoration Servs., LLC v. James Christopher Courtney,* 533 F. Supp. 3d 394, 427 (E.D. Tex. 2021). This factor "considers not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another district because of its less crowded docket." *Id.* (internal quotations omitted). Of the four public interest factors, this factor is necessarily "the most speculative," and, as such, it alone should not outweigh the other factors. *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.,* 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012).

For the twelve-month period ending on March 31, 2023, there were approximately 399 civil cases per judge in the Eastern District of Texas, with a median time of 8.7 months for disposing of civil cases. *United States District Courts—National Judicial Caseload Profile,* UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2023.pdf (last visited July 14, 2023). During the same twelve-month period, there were 609 cases per judge in the Northern District of

California, with a median time of 7.5 months for disposing of civil cases. *Id.*

This factor generally weighs in favor of the district with fewer cases per judge. *See Frito-Lay*, 867 F. Supp. 2d at 871–72. That said, courts have also found this factor to weigh in favor of the district with a faster median time for disposition of civil cases. *See Young v. Capital One Bank USA NA*, No. 3:22-CV-00647, 2022 WL 17084387, at *4 (N.D. Tex. Nov. 18, 2022). Although the Eastern District of Texas has fewer cases per judgeship, the Northern District of California disposes of cases faster on average. Therefore, this factor is neutral. *See id.*

### 2. Local Interests in Having
### Localized Interests Decided at Home

*17 The second public interest factor assesses the local interests implicated in a case, in an effort to "uphold the principle that jury duty is a burden that ought not to be imposed on the people of a community which has no relation to the litigation." *See Stellar Restoration Servs.*, 533 F. Supp. 3d at 428 (cleaned up). This factor generally weighs in favor of the district in which the acts giving rise to the lawsuit occurred. *Id.* (citing *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-CV-02042, 2008 WL 794533, at *3 (N.D. Tex. Mar. 26, 2008)). For this reason, Texas has a localized interest in a case involving a Texas plaintiff alleging that he suffered harm in this state. *See id.* At the same time, however, a judicial district has a "strong local interest" in cases involving a corporate party headquartered in that district. *Moates*, 2022 WL 2707745, at *5 (finding that the Northern District of California "has a strong interest" in deciding a case involving Meta, "given that [Meta] is headquartered in California"). And in cases like this one, where a plaintiff accuses a defendant headquartered in another district of taking actions to restrict the plaintiff's First Amendment rights, courts have found this factor to be neutral. *Perez v. Linkedin Corp.*, No. 4:20-CV-02188, 2020 WL 5997196, at *5 (S.D. Tex. Oct. 9, 2020) (finding localized interest factor neutral when Texas-based plaintiff accused California-based defendant of violating plaintiff's First Amendment rights). Likewise, the Court finds this factor to be neutral here.

### 3. Familiarity of the Forum with
### the Law That Will Govern the Case

The third public factor looks to the relative familiarity of the transferor and transferee districts with the law that will govern the case. *See, e.g., Stellar Restoration Servs.*, 533 F. Supp. 3d at 428. Although the Northern District of California is perfectly capable of applying Texas law, this Court generally has greater familiarity with Texas law. *Id.*; *Coleman v. Brozen*, No. 4:19-CV-00705, 2020 WL 2200220, at *7 (E.D. Tex. May 6, 2020). But, given the relative novelty of Chapter 143A, the Court's familiarity with the law involved here is somewhat limited. As a result, this factor is also neutral.

### 4. Avoidance of Unnecessary Problems of Conflict
### of Laws or the Application of Foreign Law

The final public interest factor looks to the likelihood of unnecessary problems of conflict of laws or in the application of foreign law. *See Coleman*, 2020 WL 2200220, at *7. There is no indication that this factor is implicated here, and the Court considers it neutral.

To summarize, all four of the public interest factors are neutral here. As a result, this case falls far short of the rare instance in which the public interest factors "overwhelmingly disfavor" transfer. *Atl. Marine*, 571 U.S. at 64.

The Court therefore concludes that the Meta Forum-Selection Clause—which ultimately represents the parties' agreement to litigate this dispute in California—must be given "controlling weight," and that this case should be transferred to the United States District Court for the Northern District of California as a result. *Id.*

### CONCLUSION

It is therefore **ORDERED** that Plaintiff Paul Davis's Amended Emergency Motion for Remand (Dkt. #16) is **DENIED**.

It is further **ORDERED** that Defendant Meta Platforms, Inc.'s Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20) is **GRANTED** and it is further **ORDERED** that this case is **TRANSFERRED** to

the United States District Court for the Northern District of California.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 4670491

## Footnotes

1       Plaintiff's original petition also named TikTok, Inc. ("TikTok") as a defendant, hence the potential need for severance under Federal Rule of Civil Procedure 21 (Dkt. #1, Exhibit 3 ¶ 7; Dkt. #20 at p. 17). Plaintiff has since voluntarily dismissed his claims against TikTok and TikTok is no longer a party to this action (Dkt. #45).

2       Also before the Court is Meta's Motion to Dismiss Under Rule 12(b) (Dkt. #49). Having determined that this case should be transferred, the Court will leave this motion to the sound discretion of the transferee court.

3       Because the forum-selection clauses contained in Meta's terms of service for both Facebook and Instagram are substantively identical, the Court will refer to them collectively as the "Meta Forum-Selection Clause" for simplicity.

4       Per Meta's records, Davis actually joined Facebook for the first time on January 3, 2005 (Dkt. #20, Exhibit 20 ¶ 12). That said, because the date on which Davis joined Facebook is of no consequence here, the Court accepts Davis's allegation as true.

5       There is also a discrepancy about the date on which Davis created his first Instagram account. Davis alleges that he "first started using Instagram in 2012," but Meta's records indicate that he created his first account in April 2013 (Dkt. #1, Exhibit 3 ¶ 1; Dkt. #20, Exhibit 3 ¶ 25). As with the discrepancy regarding Davis's first Facebook account, the Court will accept Davis's allegations as true.

6       In fact, in the bio section of his Instagram, Davis describes himself as a "J6er," meaning a participant in the January 6 insurrection. *See* Paul Davis (@fireduptxlawyer), INSTAGRAM, https://instagram.com/fireduptxlawyer?igshid (last visited June 20, 2023).

7       At present, Chapter 143A is subject to an injunction entered by the United States District Court for the Western District of Texas over a year ago. *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021), *vacated and remanded*, 49 F.4th 439 (5th Cir. 2022). The Fifth Circuit initially stayed the injunction pending appeal, but the Supreme Court subsequently vacated the stay and reinstated the injunction. *NetChoice, L.L.C. v. Paxton*, No. 21-51178, 2022 WL 1537249 (5th Cir. May 11, 2022), *vacated sub nom. NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022). After full briefing and oral argument, the Fifth Circuit vacated the injunction and remanded the case back to the district court for further proceedings. *NetChoice*, 49 F.4th at 494. Critically, however, the Fifth Circuit has since stayed the issuance of a mandate. Order Granting Appellee's Unopposed Motion to Stay Mandate Pending Petition for Writ of Certiorari, *Netchoice v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (No. 21-51178). In the absence of a mandate, the injunction preventing the Texas Attorney General from enforcing Chapter 143A remains in effect. *United States v. Jackson*, 549 F.3d 963, 980 (5th Cir. 2008) (noting that a district court judgment remains in effect until a mandate issues).

8       Having determined that the amount-in-controversy requirement is satisfied based on Davis's claims for equitable and injunctive relief and his claim for statutory attorney's fees, the Court need not address Meta's argument that potential fines under Chapter 143A should factor into the amount-in-controversy analysis.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

125 Nev. 460

Supreme Court of Nevada.

Thomas DOBRON, Individually, Appellant,

v.

Del BUNCH, Jr., and Ernestine L. Bunch, Respondents.

No. 48730.
|
Sept. 10, 2009.

**Synopsis**

**Background:** After creditor successfully defended against debtors' claims of usury, creditor brought action against guarantor to loans, seeking attorney fees and costs that were incurred during the usury lawsuit. The Eighth Judicial District Court, Clark County, Stewart L. Bell, J., entered judgment in favor of guarantor. The Supreme Court remanded, concluding that attorney fees were potentially recoverable in an independent action based on the guaranty agreement. On remand, the district court found that creditor was entitled to attorney fees as damages under the guaranty agreement because defending the usury action directly affected its ability to collect the full amount of the loans, and that sufficient proof had been presented to support the amount of attorney fees awarded. Guarantor appealed.

The Supreme Court, Hardesty, C.J., held that guarantor was not liable under guaranty agreement for attorney fees incurred by creditor in defending against usury action brought by debtors.

Reversed.

Pickering, J., issued concurring opinion in which Cherry, J., agreed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*36** Wingert Grebing Brubaker & Goodwin LLP and Stephen C. Grebing, Henderson; John S. Addams, San Diego, CA, for Appellant.

Ellsworth, Moody & Bennion and Charles W. Bennion, Las Vegas, for Respondents.

Before the Court En Banc.

*OPINION*

By the Court HARDESTY, C.J.:

**\*461** This appeal raises the issue of whether a guarantor to a loan may be held liable for attorney fees incurred by the lender in defending **\*462** a usury action brought by the borrowers. We have previously held that a guarantor's obligation to a lender under a guaranty agreement should be strictly construed and will not require a guarantor to be responsible for obligations beyond those specified in the guaranty agreement. But we have also recognized a distinction between a surety who is compensated and one who is not and eliminated the strict construction rule in favor of the surety when the surety is compensated. While our prior precedent is unclear as to the application of this distinction to guaranty agreements, we nevertheless conclude that such a distinction is no longer necessary. Consequently, when interpreting a guaranty agreement, whether a guarantor is compensated is not relevant, and rather than apply a strict rule of construction, we will apply general contract construction rules.

In this case, the guaranty agreements stated that an obligation to pay attorney fees exists only in "collecting or compromising any such indebtedness" or in the enforcement of the guaranty agreement against the guarantor. Under general contract rules, specifically the rule that an attorney fees provision will not be interpreted more broadly than written, we conclude that the guarantor was not liable for attorney fees incurred by the lender in defending a usury action that did not include any affirmative effort on the part of the lender to collect any of the underlying loans. Accordingly, we reverse the district court's judgment awarding attorney fees to respondents.

*FACTS*

Appellant Thomas Dobron owned a number of companies that borrowed money from respondents Del Bunch, Jr., and Ernestine L. Bunch and their company. The transactions were incorporated into five different loan agreements. In connection with these loans, Dobron signed guaranty agreements with the Bunches, in which he promised to repay the loans if the companies failed to do so. All of the

guaranty agreements contained identical language, except for the identification of which loan was guaranteed.

Shortly after entering into the loans, the Dobron companies filed a usury action against the Bunches in California, claiming that the interest rate on the loans was usurious and therefore illegal. Dobron, personally, was not a party to that action. Under California's usury law, if a loan's interest rate is usurious, the borrower can recover three times the amount of interest paid in damages. The Bunches successfully removed the case to federal court and then transferred it to Nevada. The Nevada federal district court held that Nevada law applied to the loans, and as Nevada does not have a usury law, ruled in favor of the Bunches. The Ninth Circuit Court of Appeals affirmed. In the Ninth Circuit, the Bunches requested **\*\*37** that the case be remanded to the Nevada federal district court for a determination of attorney fees and costs. This request was granted, however, the **\*463** Bunches never sought the attorney fees or costs in the federal district court.

Approximately one year later, the Bunches filed suit in the Nevada state district court against Dobron personally, seeking attorney fees and costs that were incurred during the usury lawsuit. The Bunches based their claim on section 8 of the guaranty agreement, which states in relevant part that the "Guarantor [Dobron] shall also pay Lender's [the Bunches'] reasonable attorneys' fees and all costs and other expenses which Lender expends or incurs in collecting or compromising any such indebtedness or in enforcing this Guarantee against Guarantor." Following a short bench trial, the district court found in favor of the Bunches, and Dobron appealed.

After concluding that attorney fees were potentially recoverable in an independent action based on the guaranty agreement, this court remanded the case to the district court and directed the court to make specific findings as to whether the guaranty agreement provided for attorney fees for the Bunches' defense of the usury action and whether the amount of attorney fees was properly proved as damages based on the guaranty agreement. On remand, the district court found that the Bunches were entitled to attorney fees as damages under the guaranty agreement because defending the usury action directly affected their ability to collect the full amount of the loans, and that sufficient proof had been presented to support the amount of attorney fees awarded. The present appeal ensued.

*DISCUSSION*

*Determining the appropriate standard of review*

We review the interpretation of a contract de novo. *May v. Anderson,* 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). Previously, this court has held that the obligation of a guarantor will be strictly construed, *Adelson v. Wilson & Co.,* 81 Nev. 15, 21, 398 P.2d 106, 109 (1965), and we will not require the guarantor to be responsible for anything beyond what it clearly agreed to pay. *Homewood Inv. Co. v. Wilt,* 97 Nev. 378, 381, 632 P.2d 1140, 1143 (1981). This court has also held, however, in the context of interpreting a surety agreement, that the strict construction rule in favor of the surety does not apply when there is a compensated surety. *Zuni Constr. Co. v. Great Am. Ins. Co.,* 86 Nev. 364, 367, 468 P.2d 980, 982 (1970). While it is unclear how our prior precedent has applied this compensated/uncompensated distinction to guaranty contracts, we conclude that there is no sound reason to continue to use such distinctions, and thus, we reject any further use of different treatment based on whether the guarantor is compensated. In connection with removing the distinction of whether a guarantor is compensated, we **\*464** eliminate the construction rule that a guaranty agreement be strictly construed in any party's favor. Instead, general contract interpretation principles apply to interpret guaranty agreements.

This conforms with the modern trend stated in Restatement (Third) of Suretyship and Guaranty, section 14, comment c (1996). *See also WXI/Z Southwest Malls v. Mueller,* 137 N.M. 343, 110 P.3d 1080, 1083 (Ct.App.2005). The elimination of determining whether a party is compensated and the special interpretation rule provides a clearer, less mechanical approach to the interpretation of guaranty agreements and, as recognized by the Restatement, the policy behind the strict interpretation rule to protect an accommodating guarantor who is not in the guaranty business and derives no compensation from entering into the guaranty agreement is still covered by other general contract interpretation rules and substantive law protections.

Following this new approach in the present case, the applicable general contract interpretation rule concerns the interpretation of attorney fees provisions. This court has held that "[w]here a contract provision purports to allow attorney's fees in an action arising out of the terms of the instrument, we will not construe the provision to have broader application." **\*\*38** *Campbell v. Nocilla,* 101 Nev. 9, 12,

692 P.2d 491, 493 (1985). Such a rule has been applied on more than one occasion to determine that an attorney fees provision in a guaranty agreement that relates to collecting on the underlying note or loan, but that does not expressly state that it applies to enforcement of the guaranty agreement itself, results in no recovery for attorney fees by a lender when bringing suit against the guarantor to enforce the guaranty agreement. *See Servaites v. Lowden,* 99 Nev. 240, 246, 660 P.2d 1008, 1012 (1983); *Securities Investment Co. v. Donnelley,* 89 Nev. 341, 349, 513 P.2d 1238, 1243 (1973).

*The guaranty agreement's attorney fees and costs provision*
The main issue raised in this appeal concerns whether the guaranty agreement provides for the recovery of attorney fees and costs incurred in defending the usury action. The attorney fees provision in the guaranty agreement provides two bases for recovery of attorney fees from the guarantor—the lender's attempts to "collect or compromise" the loan and the enforcement of the guarantee agreement:

> Guarantor [Dobron] shall also pay Lender's [the Bunches'] reasonable attorneys' fees and all costs and other expenses which Lender expends or incurs in collecting or compromising any such indebtedness or in enforcing this Guarantee against Guarantor, whether or not suit is filed, including, without limitation, all such fees, costs and expenses incurred in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving Guarantor which in any way **\*465** affect the exercise by Lender of its rights and remedies hereunder.

The attorney fees at issue here were incurred in the defense of the usury action and did not involve an action to enforce the guaranty agreement, especially in light of the fact that Dobron, the guarantor, was not even a party to the usury action. Thus, the only issue before us for resolution is whether the defense of the usury action falls under the "collecting or compromising" language of the guaranty agreement as a basis for the recovery of attorney fees and costs. We conclude that it does not.

Dobron argues that defending the usury action does not fit within the meaning of "collecting or compromising" on the loan, and therefore, he cannot be held liable for the attorney fees and costs incurred. He points to the fact that the Bunches instituted separate actions to collect on the debts to support his assertion that the defense in the usury action was not a collection or compromise.

The Bunches contend that their defense in the usury action meets the requirement of "collecting or compromising" the loan because if they had not defended the suit they would have lost the ability to collect a large amount of the loans. The Bunches note that California's usury laws allow for treble damages, and in the usury case, the Dobron companies sought recovery of damages in excess of $2,700,000, while the loans were for $5,708,000. Thus, according to the Bunches, if they failed to defend the action, their ability to collect the loans would have been reduced substantially.

The district court held that the defense in the usury action fell under the guaranty agreement because the Bunches had to defend it in order to be able to collect the full amount of the loans given to the companies. Therefore, the court determined that the defense was sufficient to meet the requirement that the fees be incurred in "collecting" the loans.

As stated above, we apply general contract interpretation rules to determine whether the clause at issue provides for the recovery of attorney fees. The applicable contract interpretation rule in this case is that "[w]here a contract provision purports to allow attorney's fees in an action arising out of the terms of the instrument, we will not construe the provision to have broader application." *Campbell v. Nocilla,* 101 Nev. 9, 12, 692 P.2d 491, 493 (1985). Applying this rule to the present case, we conclude that the Bunches' defense of the usury action did not fall within the attorney fees provision of the guaranty agreement because it was not an action to collect or compromise the loan. There was no affirmative effort on the part of the Bunches to recover the debt from **\*\*39** either the borrowers or the guarantor Dobron in the usury action. In fact, the Bunches elected instead **\*466** to file separate actions to collect the debts, in which they were entitled to recover attorney fees pursuant to the guaranty agreement. The language of the guarantee agreement does not provide, however, for the recovery of attorney fees for defending the usury claim that did not also involve an attempt to collect under the loans.

*Additional authority supports the conclusion that the guaranty agreement's attorney fees provision does not allow for the recovery of attorney fees when there is no affirmative attempt to collect or compromise the loans*

Our conclusion is supported by this court's holding in *Campbell v. Nocilla,* 101 Nev. 9, 692 P.2d 491 (1985). In *Campbell,* the owners of real property brought a declaratory relief action against their real estate agent, seeking indemnification for damages from breach of contract claims brought by potential buyers of the property. *Id.* at 10, 692 P.2d at 492. Judgment was entered in favor of the real estate agent, along with attorney fees pursuant to the real estate listing agreement, which stated that the real estate agent was entitled to fees if suit was brought to enforce the contract. *Id.* at 10–12, 692 P.2d at 492–93. This court reversed the attorney fees award and determined that the property owner's declaratory relief action did not involve enforcement of the contract, and therefore, the real estate agent was not entitled to attorney fees for defending the indemnification claim. *Id.* at 12, 692 P.2d at 493. The present case is comparable to the *Campbell* case, in that the usury action, similar to the declaratory relief action in *Campbell,* was not brought specifically to collect or enforce the underlying debts, and as a result, attorney fees are not recoverable because the action does not fall under the specific provision in the contract allowing for recovery of fees.

Court decisions in other jurisdictions, which narrowly construe attorney fees obligations pursuant to guaranty agreements, are also consistent with our holding today. *See First Nat. Park Bank v. Johnson,* 553 F.2d 599, 602–03 (9th Cir.1977) (holding that an attorney fees provision allowing for recovery of attorney fees for enforcing a note did not provide for recovery of attorney fees in an action against the guarantor to enforce the guaranty agreement); *In re LCO Enterprises, Inc.,* 180 B.R. 567, 570–71 (B.A.P. 9th Cir.1995) (holding that attorney fees incurred by the lessor in defending a bankruptcy preference action by the lessee's bankruptcy trustee to recover money paid to the lessor were not recoverable under an attorney fees provision in a lease agreement because it was not an action to enforce the lease contract); *In re Wetzler,* 192 B.R. 109, 119–20 (Bankr.D.Md.1996) (holding that one of several guarantors on a guaranty agreement who incurred attorney fees to settle a claim by the lender against the guarantors could not recover a portion of those attorney fees from another guarantor because the guaranty agreement **\*467** only provided for attorney fees for enforcing payment of the underlying note or performance of the guaranty, and the settlement agreement was not an action by the guarantor to enforce the note or the guaranty agreement).

Particularly supportive of our conclusion is *Zimmerman v. First Production Credit Ass'n,* 89 Ill.App.3d 1074, 45 Ill.Dec. 83, 412 N.E.2d 216 (1980). In *Zimmerman,* the obligor on a note brought a declaratory relief action seeking a court order that the note was unenforceable. The note contained an attorney fees provision that required the obligor on the note to pay attorney fees if the note was given to an attorney or a lawsuit was instigated to collect on the note. *Id.,* 45 Ill.Dec. 83, 412 N.E.2d at 217. In resolving the appeal, the Illinois court addressed whether the obligor had to pay attorney fees to the payee on the note for the payee's defense of the declaratory relief action seeking to have the note invalidated. *Id.* The court concluded that, because the suit was not an attempt to collect on the note, attorney fees were not available pursuant to the attorney fees clause. *Id.* The defense of the declaratory relief action to invalidate the note directly affected the payee's ability to collect on the note. The court concluded, however, that because there was no affirmative effort to collect on the note, attorney fees were unavailable according to the language of the attorney fees clause. *Id.*

**\*\*40** Likewise, in the present case, while the defense of the usury action may have had a potential impact on the lenders' ability to collect the debts, the absence of an affirmative action to recover the loans precludes recovery of attorney fees under section 8 of the guaranty agreement. While the *Zimmerman* court also relied on the contract construction rule that a contract will be construed against the drafter, which does not apply in the present case because the parties have not provided evidence or argument regarding which party drafted the guaranty agreement, the reasoning of the *Zimmerman* court regarding the interpretation of the attorney fees clause requiring an attempt to collect on the note to recover attorney fees is still persuasive and supports our conclusion in the present case.

*Dobron would not have necessarily benefited from the usury action*

In concluding that the guaranty agreement does not provide for the recovery of attorney fees in this case, we reject the Bunches' assertion that Dobron would have necessarily benefited from a successful usury action. Dobron did not initiate the action and was not a party to the usury suit. In addition, as guarantor, Dobron's obligation on the loans was contingent in the context of the usury action because he was not required to make any payments on the loans unless and until the borrower defaulted. As the usury action was instituted by the borrowers and neither the borrowers nor the Bunches sought to bring Dobron into the action under

an argument that he was currently responsible for payment of the notes, the usury action **\*468** did not directly benefit Dobron. [1] Thus, there is no support for the argument that Dobron would necessarily have benefited from the usury action and therefore should be liable for the attorney fees.

*CONCLUSION*

Based on the language of the guaranty agreement, we conclude that Dobron was not liable for the Bunches' attorney fees in defending the usury action brought by the borrowers of the loans. The defense of the usury action did not constitute a recovery action by the Bunches. Therefore, since there was no affirmative attempt to collect or compromise the loans, the attorney fees provision in the guaranty agreement does not allow for the recovery of attorney fees. Accordingly, we reverse the judgment of the district court.

We concur: PARRAGUIRRE, DOUGLAS, SAITTA, and GIBBONS, JJ.

PICKERING, J., with whom CHERRY, J., agrees, concurring:

I join the majority based on the particular attorney fees clause involved. The guaranty provided for the Bunches, as "Lender," to recover fees the "Lender expends or incurs in collecting or compromising [the] indebtedness...." [1] Fees spent to defend the borrower's usury suit, which apparently did not involve any affirmative claims by the Bunches against the borrower, were not incurred by the Bunches "in collecting or compromising [the] indebtedness." Unlike California, Cal. Civ.Code § 1717, Nevada permits one-sided attorney fees clauses, see *Trustees, Carpenters v. Better Building Co.,* 101 Nev. 742, 746–47, 710 P.2d 1379, 1382 (1985), but the one-sided clause in favor of the lender in this case ended up being too restrictive to cover fees incurred defensively.

**\*\*41** I write separately to emphasize that the outcome depends on the fee clause involved. If the clause here had been worded more broadly, fees incurred defensively might well have been recoverable, even though incurred in a separate suit. See *Exchange Nat. Bank of Chicago v. Daniels,* 763 F.2d 286, 294 (7th Cir.1985) (upholding award of fees incurred to defend separate suits and counterclaims because **\*469** the fee clause "authorize[d] fees for all work in both the

'collection' and the 'enforcement' of the note"); *Thunderbird Investment Corporation v. Rothschild,* 19 Cal.App.3d 820, 97 Cal.Rptr. 112, 118 (1971) (upholding award of fees incurred to defend a note's interest provisions against a usury challenge where the fee clause provided for fees "[i]f action be instituted on this note"); *see also Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 524–25 (2d Cir. 1990) (discussing differences among various fee clauses and their application to fees incurred defensively).

While I join the majority's sound opinion, including its recognition of the rule stated in the Restatement (Third) of Suretyship and Guaranty section 14 (1996), I except from my joinder its suggestion that we are adopting a special rule that requires us to "narrowly construe attorney fees obligations pursuant to guaranty agreements." *Ante* at 39, citing *First Nat. Park Bank v. Johnson,* 553 F.2d 599, 602–03 (9th Cir.1977); *In re LCO Enterprises, Inc.,* 180 B.R. 567, 570–71 (B.A.P. 9th Cir.1995); *In re Wetzler,* 192 B.R. 109, 119–20 (Bankr.D.Md.1996). It is not clear to me that the cases cited establish this proposition, [2] or that we need a special rule of construction to decide this appeal. But more importantly, by statute, Nevada allows agreements that require one party to pay the other party's attorney fees, NRS 18.010(4), with particular reference to commercial agreements involving "money due or to become due on any contract." *See* NRS 99.050 (providing that "parties may agree for the payment of any rate of interest on money due or to become due on any contract, for the compounding of interest if they choose, *and for any other charges or fees*") (emphasis added). Perhaps because agreements allowing one side to recover its fees from the other depart from the normal "American Rule," the court has historically examined the language the parties used to establish their right to fees to be sure there was, in fact, an agreement to pay fees that applies. *Cf. First Commercial Title v. Holmes,* 92 Nev. 363, 550 P.2d 1271 (1976), *cited in Campbell v. Nocilla,* 101 Nev. 9, 12, 692 P.2d 491, 493 (1985). But I do not see this as a special rule of construction, and if it is, our cases have applied it to all fee-shifting agreements, not just those in guaranties.

I concur: CHERRY, J.

**All Citations**

125 Nev. 460, 215 P.3d 35

### Footnotes

1     In fact, it is possible that the usury action negatively affected Dobron, as he potentially could have raised a usury defense himself in a future collection action against him under the guaranty agreement. He would be precluded from raising such a defense based on the borrowers' usury action under issue preclusion principles. We need not address this issue, however, as the parties did not argue this point and it is unnecessary for resolution of this appeal.

1     The language at the end of the fee clause saying it applies to a range of reorganization or insolvency proceedings doesn't help. It is self-limiting, applying to fees incurred in "proceedings involving Guarantor which in any way affect the exercise by Lender of its rights and remedies hereunder." The guarantor is Dobron, who was not a party to the usury suit, and the reference to the lender's "rights and remedies hereunder" applies to the guaranty, not the note. The fees at issue here were incurred to defend the Bunches' rights against the borrower under the note, not rights against Dobron under the guaranty.

2     *First National Park Bank* involved a guaranty fee clause that only applied to suits to collect the note, not to suits arising under the guaranty, 553 F.2d at 602–03, which differs from the clause here, which specified that it applied to both. *LCO* involved a fee clause in a lease, not a guaranty. 180 B.R. at 568–69. And *Wetzler* involved a dispute between co-guarantors asserting indemnity claims against each other for fees one co-guarantor incurred dealing with litigation by the lender, which the court found were not covered by the fee clause in the guaranty, which only apply to litigation involving "payment of any amount due under the Note or performance of the Guaranty." 192 B.R. at 119.

---

**End of Document**                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 539192
Only the Westlaw citation is currently available.
United States District Court, D. Montana,
Missoula Division.

Jee Irene ESTAVILLA, individually, and on behalf
of all similarly situated individuals, Plaintiffs,
v.
The GOODMAN GROUP, LLC; Community
Nursing Inc., d/b/a The Village Health &
Rehabilitation f/k/a The Village Health Care
Center and John Does 1-10, Defendants.

CV 21-68-M-KLD
|
Signed 02/23/2022

**Attorneys and Law Firms**

Robert Farris-Olsen, Scott L. Peterson, Morrison, Sherwood,
Wilson & Deola, PLLP, Helena, MT, for Plaintiffs.

Christopher K. Oliveira, Kenneth K. Lay, Crowley Fleck
PLLP, Helena, MT, for Defendants The Goodman Group,
LLC, Community Nursing, Inc.

ORDER

Kathleen L. DeSoto, United States Magistrate Judge

 **\*1** This matter comes before the Court on Defendants
The Goodman Group, LLC ("Goodman") and Community
Nursing Inc., d/b/a The Village Health & Rehabilitation f/
k/a The Village Health Care Center's ("Village Health")
(collectively "Defendants") motion to dismiss Plaintiff Jee
Irene Estavilla's ("Estavilla") Complaint for failure to state a
claim upon which relief can be granted pursuant to Federal
Rule of Civil Procedure 12(b)(6). Defendants' motion is
granted for the reasons discussed below.

**I. Background** [1]

Village Health is a skilled nursing facility located in Missoula,
Montana and is a subsidiary of Goodman, which manages
The Village and several other senior communities across the
United States. (Doc. 5, at ¶¶ 2-3). Estavilla, a citizen of the
Republic of the Philippines, is a registered nurse and former
employee of Village Health. (Doc. 5, at ¶ 1).

On August 19, 2015, Village Health sent a conditional offer
of employment to Estavilla, who was residing at the time
in Cebut City, Philippines. ("Offer Letter") (Doc. 5, at ¶
6; Doc. 9-1). Village Health offered Estavilla employment
as a registered nurse at its Missoula facility, with a base
compensation rate of $25.52 per hour. (Doc. 5, at ¶ 7; Doc.
9-1, at 2). The Offer Letter advised Estavilla that in order
for her to be eligible for employment, Village Health would
need to sponsor her as an employment-based immigrant and
she would have to meet the immigration requirements of
the United States. (Doc. 5, at ¶ 8; Doc. 9-1, at 3). Village
Health also agreed to advance other compensation and costs,
including: (1) an initial incentive payment in the amount
of $1,000; (2) meals, lodging, and utilities for the first
three months of Estavilla's employment; and (3) the costs
associated with Estavilla's immigration to the United States.
(Doc. 5, at ¶¶ 10-11; Doc. 9-1, at 3-4).

The Offer Letter explained that Village Health would
"expend in excess of $20,000.00 USD to enable you to
have this employment opportunity," with the "specific figure
for the Advanced Amount [to] be determined following
your completion of the RN Onboarding Program and any
additional worksite orientation at the Facility." (Doc. 9-1,
at 4-5). The Offer Letter further advised Estavilla that the
Advanced Amount "is considered an advancement," but one
half of the Advanced Amount would be forgiven after two
years of employment with Village Health, and the remainder
would be forgiven if she remained employed with Village
Health for three years. (Doc. 5, at ¶ 12; Doc. 9-1, at 5).

Also relevant here, the Offer Letter stated that "failure to
make restitution or meet any of your obligations under the
terms of this letter" would be reported "to the Department
of Labor, Immigration and Naturalization Service and/
or Immigration and Customs Enforcement Agency under
applicable immigration fraud statutes." (Doc. 9-1, at 6). In
addition, the Offer Letter contained a non-compete clause
stating that if Estavilla did not remain employed for three
years, she agreed that she would not work for "any health care
or assisted living facility" in Montana "for a period of twelve
(12) months after termination of employment. (Doc. 5, at ¶
39; Doc. 9-1, at 6).

 **\*2** Estavilla signed the Offer Letter on August 21, 2015,
and Village Health reaffirmed the offer on or about July 3,
2017. (Doc. 5, at ¶ 17; Doc. 9-1, at 2 & 7). Estavilla moved to

Montana and began working for Village Health on or about November 6, 2017. (Doc. 5, at ¶ 18).

Estavilla's obligation to repay the Advanced Amount was documented in a promissory note in the amount of $26,642.47. ("Promissory Note") (Doc. 9-2). Estavilla alleges Village Health forced her to sign the Promissory Note, which contained provisions similar to those set forth in the Offer Letter. (Doc. 5, at ¶ 19). Estavilla further alleges that she signed the Promissory Note about three months after she moved to Montana, but at the request of Village Health she back-dated it to November 6, 2017. (Doc. 5, at ¶ 20). Estavilla claims "this was the first time she learned that the funds were considered an 'advance' and not a gift or other consideration for her to uproot her life in the Philippines and move to Montana." (Doc. 5, at ¶ 20).

Estavilla worked for Village Health until May 24, 2019, when her employment was terminated. (Doc. 5, at ¶ 21). Because Estavilla was terminated after having worked for only 18 months, Village Health demanded that Estavilla repay the Advanced Amount in full. (Doc. 5, at ¶ 24). Estavilla was unable to pay that amount, and in early October 2019 Village Health commenced a lawsuit against her in Minnesota state court (the "Previous Litigation").[2] (Doc. 5, at ¶ 24; Doc 9-4; Doc. 9-5). Village Health asserted claims against Estavilla for breach of contract and, alternatively, for unjust enrichment. (Doc. 9-4). Estavilla, who was proceeding pro se at the time, answered and counterclaimed for wrongful termination of contract. (Doc. 9-5). She also alleged affirmative defenses of "failure of consideration" and "discrimination and harassment." (Doc. 9-5). Village Health prevailed on summary judgment, and on March 12, 2020 the Minnesota court entered judgment against Estavilla in the total amount of $28,353.45. (Doc. 9-6). In doing so, the court determined that the Offer Letter was a "valid, binding contract" and that Estavilla's counterclaim was not supported by any evidence. (Doc. 9-6). Estavilla did not appeal this decision.

On May 11, 2021, Estavilla filed this putative class action in Montana state court on behalf of herself and others similarly situated. (Doc. 5). Defendants removed the case to this Court on June 3, 2021 based on federal question jurisdiction and diversity jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1441. (Doc. 1). Estavilla alleges federal forced labor and trafficking claims pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589, 1590, 1594(a)(b), 1595.

(Doc. 5, at 11-15). Estavilla additionally alleges state law claims under Mont. Code Ann. § 27-1-755, which permits a civil action under Montana's criminal statutes prohibiting human trafficking and involuntary servitude, Mont. Code Ann. §§ 45-5-702 and 45-5-703. (Doc. 5, at 16). Estavilla's Complaint also includes a declaratory judgment claim seeking a determination that the contractual venue and choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5, at 16).

**\*3** Defendants move to dismiss under Rule 12(b)(6) on the ground that the Complaint fails to state a claim for relief.

## II. **Legal Standard**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A cause of action may be dismissed under Fed. R. Civ. P. 12(b)(6) either when it asserts a legal theory that is not cognizable as a matter of law, or if it fails to allege sufficient facts to support an otherwise cognizable legal claim. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). When reviewing a Rule 12(b)(6) motion to dismiss, the court is to accept all factual allegations in the complaint as true and construe the pleading in the light most favorable to the nonmoving party. *Hospital Bldg. Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 740 (1976); *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir. 1989).

The court's review under Rule 12(b)(6) is informed by the provision of Fed. R. Civ. P. 8(a)(2) which requires that "a pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 129 S.Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must offer more than " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action ...'" *Ashcroft*, 129 S.Ct. at 1249 (quoting *Twombly*, 550 U.S. at 555).

To withstand a motion to dismiss under Rule 12(b)(6), "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.' " *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974). This means that the plaintiff must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule 12(b)(6) is appropriate. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *National Association of the Advancement of Psychoanalysis, v. California Board of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (citing *Halkin v. VeriFone, Inc.*, 11 F.3d 865, 868 (9th Cir. 1993). Additionally, "the court is not required to accepts legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.2d 752, 754-55 (9th Cir. 1994).

As a general rule, "a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion." *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). But the court "may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. National Education Assoc.*, 629 F.3d 992, 998 (9th Cir. 2010) (citations omitted). In addition, a court may consider "matters of which a court may take judicial notice" when ruling on Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). This includes matters of public record, such as publicly-filed pleadings in other judicial proceedings. See *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Duckett v. Godinez*, 67 F.3d 734, 741 (9th Cir. 1995).

**\*4** Under these standards, the Offer Letter, Promissory Note, and Minnesota state court pleadings submitted with Defendants' motion are properly considered by the Court in determining whether the Complaint states a claim for relief.[3]

## III. Discussion

Defendants maintain that Estavilla fails to state a claim for relief because: (1) the claims alleged in the Complaint were compulsory counterclaims that she should have asserted in the Minnesota state court litigation; and (2) the Complaint does not adequately allege the elements necessary to state a claim for relief under the TVPA or Montana law.

### A. Compulsory Counterclaims

As defined in Federal Rule of Civil Procedure 13(a), a compulsory counterclaim is "any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." The purpose of Rule 13(a) is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962). A party who fails to plead a compulsory counterclaim is held to have waived the claim and is precluded by principles of res judicata from later asserting the claim in separate litigation.[4] *Local Union No. 11, International Brotherhood of Electrical Workers, AFL-CIO v. G.P. Thompson Electric, Inc.*, 363 F.2d 181, 184 (9th Cir. 1966).

Whether a claim is a compulsory counterclaim that should have been pled in an earlier state court action is a question of state law. *Pochiro v. Prudential Ins. Co.*, 826 F.2d 1246, 1249 (9th Cir. 1987). Because Village Health brought the Previous Litigation in Minnesota state court, whether Estavilla's claims are compulsory counterclaims that she has waived by failing to plead them in the Previous Litigation is governed by Minnesota law. See *Pochiro*, 826 F.2d at 1249.

Minnesota Rule of Civil Procedure 13.01 on compulsory counterclaims provides in relevant part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction that is the subject matter of the opposing party's claim ...." Minn. R. Civ. P. 13.01. Minnesota Rule 13.01 is different from its federal counterpart, Fed. R. Civ. P. 13(a), in one material respect: it refers to counterclaims arising out of "the transaction" that is the subject of the opposing party's claim, while the federal rule refers more broadly to counterclaims arising out of the same "the transaction or occurrence." Fed. R. Civ. P. 13(a)(1). As initially drafted, Minnesota Rule 13.01 would have followed the federal rule and referred to counterclaims arising out of the same "transaction or occurrence." *House v. Hanson*, 72 N.W.2d 874, 877-78 (Minn. 1955). After further consideration, however, the Minnesota Supreme Court's advisory committee "revised the tentative draft of Rule 13.01 by substituting for the words 'transaction or occurrence' the words 'contract or transaction'." *House*, 72 N.W.2d at 878. Consistent with

the advisory committee's recommendation, the Minnesota Supreme Court approved Rule 13.01 in its final version, which describes compulsory counterclaims as those arising from the "transaction" that is the subject matter of the opposing party's claim. *House*, 72 N.W.2d at 878.

**\*5** *House* is the seminal Minnesota Supreme Court case addressing application of Minnesota Rule 13.01. *House* considered the legal issue of whether under Rule 13.01 "a defendant in a tort action arising out of an automobile collision must interpose as a counterclaim any claims he has against the plaintiff which arise out of the same collision or be forever barred from asserting them in another suit." *House*, 72 N.W.2d at 875. After considering the drafting history, the Minnesota Supreme Court held "that the word 'transaction' as used in Rule 13.01 does not embrace claims in tort and that therefore the failure of a defendant to assert as a counterclaim any claim he has against the plaintiff does not estop him from asserting such claim in an independent action against the plaintiff." *House*, 72 N.S.2d at 878.

Minnesota's intermediate appellate courts have since split on the issue of whether, under *House*, counterclaims that sound in tort can be compulsory counterclaims under Rule 13.01.[5] Compare *Leiendecker v. Asian Women United of Minnesota*, 731 N.W.2d 836 (Minn. Ct. App. 2007) (concluding that tort counterclaims are always permissive and cannot be compulsory); *St. Stephen State Bank v. Johannsen*, 2003 WL 1875500 (Minn. Ct. App. 2003) (concluding that while tort counterclaims cannot be compulsory in a tort action, they may be compulsory in a non-tort action).

In *Liendecker*, the Minnesota Court of Appeals concluded based on its reading of *House* "that the word 'transaction' in rule 13.01 does not embrace counterclaims in tort, whether the prior action was a tort action or a non-tort action." *Liendecker*, 731 N.W.2d at 840. "Instead, the Minnesota version of rule 13.01 provides a blanket exclusion for tort counterclaims." *Liendecker*, 731 N.W.2d at 840. Thus, *Liendecker* effectively held that tort counterclaims are always permissive, and can never be compulsory under Rule 13.01.

In *St. Stephen,* the Minnesota Court of Appeals read *House* differently and rejected the argument that tort counterclaims cannot be compulsory counterclaims under Rule 13.01. *St. Stephen*, 2003 WL 1875500, at \*2. *St. Stephen* interpreted *House* as holding "that the word 'transaction,' as used in rule 13.01, does not embrace claims in tort, therefore a defendant's failure to assert as a counterclaim, *in a tort action,* any

claim defendant has against plaintiff does not estop defendant from asserting such claim in a subsequent action against plaintiff." *St. Stephen*, 2003 WL 1875500, at \*2 (emphasis in original). The *St. Stephen* court found that the appellants were "misread[ing] *House* to say that counterclaims that sound in tort are never compulsory counterclaims," when in fact what "*House* actually says [is] that there are no compulsory counterclaims in a tort action." *St. Stephen*, 2003 WL 1875500, at \*2.

The Court agrees with *St. Stephen*'s interpretation of *House*, which is consistent with plain language of Rule 13.01. Under the Minnesota rule, a counterclaim is compulsory "if it arises out of the transaction that is the subject matter of the opposing party's claim." Minn. R. Civ. P. 13.01. *House* held that the word 'transaction' as used in rule 13.01 does not embrace claims in tort," which means that a defendant's failure to assert a counterclaim in a tort action does not preclude the plaintiff from later asserting the claim in an independent action against the plaintiff. *House*, 72 N.W.2d at 878. Under *House*, whether the original action is a tort action or non-tort action is certainly relevant to whether a claim can be considered compulsory under Rule 13.01. Whether the counterclaim itself sounds in tort, however, is immaterial. *House* did not consider whether the counterclaims at issue sounded in tort, and it does not appear that the Minnesota Supreme Court has ever applied Rule 13.01 to hold that a counterclaim is not compulsory if it sounds in tort.

**\*6** Because it is consistent with *House* and the plain language of Rule 13.01, the Court follows the *St. Stephen* court's reasoning. The fact that Estavilla's TVPA claims sound in tort does not mean they were necessarily permissive in the Previous Litigation, which was not a tort action. See e.g. *Rydberg Land, Inc. v. Pine City Bank*, 1989 WL 1551 (Minn. Ct. App. 1989) (affirming trial court's ruling that mortgagor's tort claims were compulsory counterclaims that should have been asserted in the original foreclosure action and were therefore barred by Rule 13.01). Thus, the Court will consider whether Estavilla's TVPA claims were compulsory counterclaims under the applicable test.

Minnesota courts have not established a test for interpreting the language of Minnesota's compulsory counterclaim rule, and thus look to federal caselaw interpreting Federal Rule of Civil Procedure 13(a) for guidance. *Bank of New York Mellon v. Kieran*, 2016 WL 4421302, at \*4 (Ct. App. Minn. Aug. 22, 2016). The Eighth Circuit has previously identified four tests federal courts have applied in determining whether a

counterclaim arises out the same transaction or occurrence: (1) whether the issues of fact and law raised by the claim and counterclaim are largely the same; (2) whether res judicata would bar a subsequent suit on the defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute the plaintiff's claim as well as the defendant's counterclaim; and (4) whether there is a logical relation between the claim and counterclaim. *Tullos v. Parks*, 915 F.2d 1192, 1195 & n. 8 (8th Cir. 1990) (citing *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 264 (8th Cir. 1979)) In *Tullos*, the Eighth Circuit agreed "with the majority of the federal courts that the logical relation test provides the needed flexibility for applying Rule 13(a)." *Tullos*, 915 F.2d at 1195 (citing Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1410 at 61-65 (2d ed. 1990)).

As the *Mellon* court thus recognized, the Eighth Circuit generally prefers the logical relation test to determine if a counterclaim is compulsory. *Mellon*, 2016 WL 4421302, at *4 (citing *Tullos v. Parks*, 915 F.2d 1192, 1195 (8th Cir. 1990)). "Under the logical-relation test, courts ask whether a counterclaim stems from the same 'aggregate of operative facts' as the original claim." *Mellon*, 2016 WL 4421302, at *4 (quoting *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000).

The Ninth Circuit also applies "the logical relationship test for compulsory counterclaims." *Mattel, Inc. v. MGA Entertainment, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013) (quoting *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195-96 (9th Cir. 2005)). Thus, Ninth Circuit caselaw is instructive for purposes of determining whether Estavilla's claims are compulsory counterclaims that should have been pled in the Previous Litigation.

Much like the Eighth Circuit, the Ninth Circuit has said that that "[a] logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *Mattel*, 394 F.3d at 1196 (quoting *In re Pegasus Gold Corp.*, 394 F.3d at 1196).

Defendants argue the logical relation test is satisfied here because the claims alleged in the Complaint and the claims litigated in the Previous Litigation are all based on the same set of operative facts, specifically, Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note. To illustrate their argument, Defendants compare the complaints in both lawsuits and note that both pleadings extensively refer to and quote the terms of the Offer Letter and Promissory Note. As Defendants point out, every factual allegation in Village Health's complaint in the Previous Litigation either: (a) references or quotes the Offer Letter or Promissory Note (Doc. 9-4, at ¶¶ 3, 4, 7, 8, 9, 11, 13, and 14); (b) describes when Estavilla began and ended her employment with Village Health (Doc. 9-4, at ¶¶ 5, 10, and 12); or (c) references that Village Health sponsored Estavilla for employment-based immigration to the United States (Doc. 9-4, at ¶ 6).

**\*7** Estavilla's Complaint contains similar factual allegations. For example, Defendants note that in the section setting forth the facts specific to Estavilla as the named plaintiff, nearly every factual allegation is derived from what is set forth in the Offer Letter (Doc. 5, at ¶¶ 6-17) or outlines language from the Promissory Note (Doc. 5, at ¶¶ 19-20). The few remaining allegations in this section of the Complaint relate to whether Village Health terminated Estavilla for cause. (Doc. 5, at ¶¶ 21-23). The Complaint also contains a section setting forth the facts common to all claims. (Doc. 5, at 6-9). While the factual allegations in this section relate more generally to the foreign nurse sponsorship program, nearly all of them are based on what is set forth in the Offer Letter or Promissory Note. (Doc. 5, at ¶¶ 28-41). Focusing on the substantial overlap in the underlying facts alleged in both pleadings, Defendants take the position that Estavilla's claims are barred because they should have been brought as compulsory counterclaims in the Previous Litigation.

Estavilla makes three arguments in response. First, she maintains that Goodman cannot be dismissed because it was not a party to the Previous Litigation, which means she could not have asserted a counterclaim against it. Next, Estavilla contends that her claims in this case are based on a significantly broader set of aggregate operative facts, and so were permissive rather than compulsory counterclaims in the Previous Litigation. Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

1. Rule 13.01's "Opposing Party" Requirement

Estavilla first argues that her claims against Goodman cannot be considered compulsory counterclaims under Rule 13.01 because Goodman was not a party to the Previous Litigation. Again looking to federal court decisions for guidance, Defendants counter that this unduly restrictive reading of Rule 13(a) and its reference to "any opposing party" has been rejected. Because it appears the Eighth and Ninth Circuits have not addressed the issue, Defendants cite the Third Circuit's decision in *Transamerica Occidental Life Ins. Co. v. Aviation of Am., Inc.*, for the proposition that "an unnamed party may be so closely identified with a named party as to qualify as an 'opposing party' under Rule 13(a)." 292 F.3d 384, 390 (3d. Cir. 2002) (citing and following *Avemco Ins. Co. v. Cessna Aircraft Co.*, 11 F.3d 998 (10th Cir. 1993)). Likewise, "a party not named in litigation may still be an opposing party for Rule 13 purposes in certain cases in which the party is functionally identical to the actual opposing party named in the litigation." *Transamerica*, 292 F.2d at 390 (citing and following *Banco Nacional de Cuba v. National City Bank of New York*, 478 F.2d 191, 193 n. 1 (2d. Cir. 1973). The Third Circuit reasoned that interpreting "opposing party" broadly would "give effect to the policy rationale of judicial economy underlying Rule 13." *Transamerica*, 292 F.3d at 391

The Court finds this reasoning persuasive, particularly in light of the fact that there does not appear to be any authority to the contrary in the Eighth or Ninth Circuits. Here, Estavilla's Complaint alleges that Goodman manages Village Health, and that Village Health is "a subsidiary of the Goodman Group." (Doc. 5, at ¶¶ 2-3). Throughout the Complaint, Estavilla alleges conduct by "the Defendants" collectively and does not differentiate between the actions of Village Health and Goodman. Taking the allegations in the Complaint as true, Goodman is so closely identified with Village Health that it is properly considered an "opposing party" within the meaning of Rule 13 and Minnesota Rule 13.01.

Again citing *Transamerica*, Defendants further argue that the doctrine of res judicata supports application of the compulsory counterclaim rule to Goodman. In *Transamerica*, the Third Circuit found that the doctrine of res judicata provided additional support for its approach, noting "the close connection" between Rule 13(a) and doctrine of claim preclusion. *Transamerica*, 292 F.2d at 39. The Eighth and Ninth Circuits have also recognized the connection between Rule 13(a) and concepts of res judicata. See e.g. *G.P. Thompson Electric, Inc.*, 363 F.2d at 184 (a party who fails to plead a compulsory counterclaim is precluded by principles of res judicata from later asserting the claim in separate

litigation); *Tullos*, 915 F.2d at 1195 n. 8 (noting that one test traditionally used by the Eighth Circuit to determine if a counterclaim is compulsory asks whether res judicata would bar a subsequent suit on the counterclaim).

**\*8** The doctrine of "[r]es judicata, or claim preclusion, prevents relitigation of claims that were raised, or could have been raised, in prior actions between the same parties or their privies." *Benson v. Kemske*, 2020 WL 4783886, at \* (D. Minn. Aug. 18, 2020). The fact that res judicata applies to both the named parties and their privies provides further support for interpreting "opposing party" to mean the named party and those in privity with it for purposes of Rule 13(a). See e.g., *Waldnew v. Bush*, 2006 WL 3312039, at 5 (D. South Dak. Nov. 13 2006) (describing res judicata as "the close relative of compulsory counterclaims" and concluding that an "opposing party" for purposes of Rule 13(a) includes an unnamed party in privity with the named party in earlier litigation).

As stated above, taking the allegations in Estavilla's Complaint as true, Goodman and Village Health are in privity with one another. Accordingly, and for the reasons discussed above, the Court concludes that Goodman is an "opposing party" within the meaning of Rule 13(a) and Minnesota Rule 13.01.

## 2. Permissive or Compulsory Counterclaims

Estavilla next argues that the human trafficking claims she alleges here are based on a on a significantly broader set of aggregate operative facts than those previously alleged by Village Health, and so are properly characterized as permissive counterclaims rather than compulsory counterclaims in the Previous Litigation.

Estavilla concedes there is some factual overlap between her current lawsuit and the Previous Litigation, but emphasizes that the allegations in her Complaint date back to 2015 and relate more broadly to Defendants' conduct in recruiting her, facilitating her move to the United States, employing her, terminating her, bringing suit and obtaining a judgment against her, and including an unenforceable non-compete clause in the Offer Letter. Estavilla contrasts the allegations in her Complaint with those made by Village Health in the Previous Litigation, which she characterizes as revolving around whether she was terminated for cause and what damages she owed. According to Estavilla, the difference in the breadth of her human trafficking claims is sufficient

to establish them as permissive rather than compulsory counterclaims, notwithstanding that many of the facts and written documents at issue in both cases overlap.

For support, Estavilla relies on *Popp Telecom v. American Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000), which she cites for the proposition that claims dealing with a limited transaction do not render claims concerning a larger set of overlapping transactions compulsory counterclaims. In *Popp Telecom*, the Eighth Circuit applied the logical relationship standard to determine whether a fraud counterclaim was compulsory. *Popp Telecom,* 210 F.3d at 941. The fraud claim was based on the method employed by a corporation to secure funds to purchase stock, while the prior appraisal proceeding dealt with a limited transaction, i.e., the exchange of money for stock. *Popp Telecom,* 210 F.3d at 941. Because the basis of the fraud counterclaim was not a concern in the prior proceeding, the Eighth Circuit concluded the fraud counterclaim "was not compulsory and it did not 'arise out of the transaction' of the appraisal proceeding nor did it 'stem from the same aggregate of operative facts'." [6] *Popp Telecom,* 210 F.3d at 941.

**\*9** Here, unlike *Popp Telecom*, the claims alleged in this action and in the Previous Litigation all stem from the same written agreements and core set of operative facts. The breach of contract and unjust enrichment claims asserted in the Previous Litigation stemmed from Estavilla's failure to reimburse Village Health for the Advanced Amount as required under the terms of the Offer Letter and Promissory Note. Estavilla's human trafficking claims are based on Estavilla's employment with Village Health as documented in the Offer Letter and Promissory Note. As a comparison between the two pleadings reflects, the claims alleged in this case and those litigated in the Previous Litigation all relate to Estavilla's employment with Village Health and, more specifically, the terms of the Offer Letter and Promissory Note and surrounding circumstances.

While the legal theory upon which Estavilla's human trafficking claims are premised is certainly different from the contractual legal theories advanced by Village Health in the Previous Litigation, the claims all arise from the same aggregate set of operative facts involving Estavilla's employment and the terms of the Offer Letter and Promissory Note. When applying the logical relation standard, "[t]he focus is on the similarity of the facts upon which the claims are premised, rather than the legal theory advanced by the parties. *Mattel*, 705 F.3d at 1110. In other words, "[w]hat

matters is not the legal theory, but the facts." *Mattel*, 705 F.3d at 1110. In *Mattel*, the Ninth Circuit held the fact that the parties may advance the same legal theory is not enough to make a counterclaim compulsory. Here, the opposite is true. The claims raised in Estavilla's Complaint and in the Previous Litigation advance different legal theories based on the same aggregate core set of facts.

Estavilla also relies on *Paguarian v. Prompt Nursing Employment Agency, LLC,* 827 F. App'x 116 (2d. Cir. 2020) (*Paguarian III*) to support her argument that her trafficking claims were not compulsory counterclaims in the Previous Litigation. In *Paguarian III,* the defendant companies recruited the plaintiff, a Filipino nurse, to come to the United States to work in New York-based nursing homes. *Paguarian III*, 827 F. App'x at 117. After working at one of the defendant nursing homes for nine months, the plaintiff quit and filed a class action suit alleging the defendants underpaid their nurses and violated federal human trafficking laws. *Paguarian III*, 827 F. App'x at 117. On the parties' subsequent cross-motions for summary judgment, the district court determined, "among other things, that (i) the nurses were paid below their contractually guaranteed amount, (ii) the liquidated damages provision in the nurses' contracts was an unenforceable penalty, and (iii) the use of that liquidated damages provision violated federal anti-trafficking laws." *Paguarian III*, 827 F. App'x at 117-18. The district also "entered a declaratory judgment that the liquidated damages clause was unenforceable and an injunction preventing Defendants from enforcing or threatening to enforce the liquidated damages clause against any class member." *Paguarian III*, 827 F. App'x at 118.

On appeal by the defendants, it was undisputed that the Second Circuit had jurisdiction to review the district court's decision concerning the liquidated damages provision because it was inextricably intertwined with the injunction. *Paguarian III*, 827 F. App'x at 118. At issue was whether the Second Circuit had pendent appellate jurisdiction over the plaintiff's federal trafficking claim. *Paguarian III*, 827 F. App'x at 118. Under Second Circuit law, pendent appellate jurisdiction is reserved for "exceptional circumstances," which "exist only when the unappealable issue is either 'inextricably intertwined with' or must be decided to 'ensure meaningful review' of the appealable issue." *Paguarian III*, 827 F. App'x at 118.

**\*10** The Second Circuit held this standard was not satisfied because the plaintiff's federal trafficking claim was "neither

inextricably intertwined with, nor necessary to decide, the liquidated damages issue." *Paguarian III*, 827 F. App'x at 118. While the court agreed that the topics were "related, since the illegality of the damages provision was the catalyst for the district court's decision that several of the Defendants had violated anti-trafficking laws," the court found there was no sound basis for taking pendent jurisdiction over the federal trafficking claim because it was not necessary to decide that claim before reviewing the district court's decision concerning the liquidated damages provision. *Paguarian III*, 827 F. App'x at 118.

*Paguarian III* is not particularly helpful here, however, because it addressed the standard for pendent appellate jurisdiction and did not involve any compulsory counterclaim issues or apply the logical relationship test. The issue here is not whether Estavilla's trafficking claims are inextricably intertwined with Village Health's breach of contract and unjust enrichment claims, but rather whether the claims all stem from the set of operative facts. In addition, as discussed at greater length below, the factual and legal scenario in the *Paguarian* litigation is materially distinguishable from the circumstances presented here for several reasons.

To the extent Estavilla also relies on *Javier v. Beck*, 2014 WL 3058456 (S.D. N.Y. July 3, 2014), that case is similarly distinguishable. In *Javier*, the plaintiff signed an employment agreement providing, among other things, that defendants would take all reasonable steps to obtain authorization for the plaintiff to work in the United States and would pay all fees associated with his visa application. *Javier*, 2014 WL 3058456, at *1. The plaintiff later sued the defendants, alleging that they charged him thousands of dollars for visa application fees, required that he sign a confession of judgment for $15,000 as a condition of employment, threatened that if he left their employment for any reason he would be forced to pay them $15,000, and threatened to withdraw their visa petition on his behalf if he questioned their conduct or refused to work as assigned. *Javier*, 2014 WL 3058456, at *2. The plaintiff asserted asserted several claims, including claims for violations of the TVPA, breach of contract, and unjust enrichment. *Javier*, 2014 WL 3058456, at *1.

In holding that the plaintiff had sufficiently pled a claim under the TVPA, the court observed that "[r]egardless of whether the contract was enforceable, the Complaint alleges that the Defendants used it as a threat to obtain [the plaintiff's] continued services." *Javier*, 2014 WL 3058456, at

*2. Estavilla relies on this observation by the court to support her argument that her TVPA claims are not compulsory counterclaims because they do not involve the same set of operative facts as the breach of contract and unjust enrichment claims asserted by Village Health in the Previous Litigation. As with *Paguarian III*, however, *Javier* is largely inapposite because it did not involve the logical relationship test for compulsory counterclaims.

Here, the Court finds that the trafficking claims alleged in the Complaint and the claims litigated in the Previous Litigation all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note, as required to make them compulsory counterclaims.

### 3. Ripeness

Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

**\*11**  Minnesota's compulsory counterclaim rule provides in part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party...." *Minn. R. Civ. P. 13.01*. This rule applies "only if the claim is ripe, i.e., if the claim is mature in the sense that a cause of action exists for which a lawsuit may properly be commenced." *Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 841 (Minn. App. 2007). The federal compulsory counterclaim rule is similar in that it applies to "any claim that – at the time of its service – the pleader has against an opposing party...." *Fed. R. Civ. P. 13(a)(1)*. Whether a claim is mature for purposes of *Fed. R. Civ. P. 13(a)(1)* is synonymous with whether a claim has accrued for statute of limitations purposes. See e.g. *Cabrera v. Courtesy Auto, Inc.*, 192 F.Supp.2d 1012, 1015 (D. Neb. 2002).

As a general rule, under Minnesota law, "[a] cause of action accrues when all of its elements exist to the extent that the claim could withstand a motion to dismiss for failure to state a claim upon which relief can be granted." *Abarca v. Little*, 54 F.Supp.3d 1064, 1070 (D. Minn. 2014) (citing *Noske v. Friedberg*, 656 N.W.2d 409, 412 (Minn. Ct. App. 2003); see also *Hermann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999).

Estavilla emphasizes that her TVPA claims involve two timelines – one based on alleged threats presented in the contractual language and the other based on actual harm caused by Defendants and actual abuse of the legal process. Even if she waived her threat-based trafficking claims by failing to bring them as compulsory counterclaims in the Previous Litigation, Estavilla argues, she did not waive her actual serious harm and abuse of legal process claims because they did not mature, or accrue, until Village Health actually obtained a monetary judgment against her.

Estavilla advances several claims under the TVPA's civil remedies provision, including a forced labor claim under 18 U.S.C. § 1595. Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by several means, including by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(2) & (3). Estavilla argues § 1589 thus distinguishes between "serious harm" and "threatened serious harm," and "abuse of law or legal process" and "threatened abuse of law or legal process."

Estavilla argues she did not actually suffer serious harm or abuse of legal process until the Previous Litigation was completed and judgment was entered against her, which means she could not have claims based on "serious harm" under the TVPA while the Previous Litigation was ongoing. Because those claims did not mature until after the Previous Litigation ended, Estavilla argues, they were not compulsory counterclaims.

While § 1589(a) imposes liability for existing and threatened serious harm and abuse of legal process, Estavilla does not provide a basis for distinguishing the two under the circumstances. Estavilla does not dispute that she could have asserted a claim based on threatened serious harm and abuse of legal process while the Previous Litigation was pending. Estavilla does not explain how any additional claims she might have asserted under subsections (2) and (3) after the Previous Litigation ended would have involved any different legal theories or potentially exposed Defendants to any additional liability. Because Estavilla could have asserted forced labor claims under § 1589(a)(2) and (3) while the Previous Litigation was pending, those claims were mature for purposes of Minnesota Rule 13.01 and Fed. R. Civ. P. 13(a)(1).

**B. TVPA Claims**

**\*12** Congress enacted the TVPA as part of the Victims of Trafficking and Violence Protection Act of 2000 "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386, § 102(a) (codified at 22 U.S.C. § 7101(a)). In doing so, Congress recognized that "the means used by modern-day traffickers 'are increasingly subtle' " U.S. v. Dann, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R.Rep. No. 106-939, at 10, 2000 U.S.C.C.A.N. 1380, 1392-93 (2000) (Conf. Rep.). Congress thus intended the TVPA " 'to reach cases in which persons are held in a condition of servitude through nonviolent coercion.' " U.S. v. Dann, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting 22 U.S.C. § 7101(b)(13)). In 2003, Congress amended the TVPA to provide for civil liability against individuals who violate the TVPA. 18 U.S.C. § 1595.

Estavilla advances several claims under the TVPA's civil remedies provision, alleging that Defendants violated the TVPA's prohibitions against forced labor under § 1589, forced labor trafficking under § 1590, attempt to engage in these offenses under § 1594(a), and conspiracy to engage in these offenses under § 1594(b). Defendants argue these claims are subject to dismissal because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subjected to forced labor, as required to state a claim for relief under §§ 1589, 1590, and §§ 1594(a) & (b) of the TVPA.

### 1. Section 1589

Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Estavilla does not allege that Defendants used any of the means specified in subsections (1) or (4) to obtain forced labor or services from her. Focusing instead on subsections (2) and (3), Estavilla claims that Defendants knowingly obtained her labor or services by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a) (2) & (3).

### a. *Serious harm or threats of serious harm*

In light of its stated purpose, the TVPA defines harm broadly as:

> as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continued performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). In other words, harm or threatened harm must be serious enough to compel a reasonable person in the victim's circumstances to continue working when otherwise would have left. See e.g. *United States v. Dann,* 652 F.3d 1160, 1169 (9th Cir. 2011); *Lesnik v. Eisenmann SE,* 374 F.Supp.3d 923, 952 (N.D. Cal. 2019). In evaluating serious harm, courts must consider "all the surrounding circumstances." *Dann,* 652 F.3d at 1171.

Defendants take the position that the harm alleged by Estavilla does not rise to the level of serious harm or threatened serious harm within the meaning of the TVPA. Defendants list several examples of conduct and conditions that courts have found may constitute "serious harm or threats of serious harm" as defined in the TVPA, including: withholding or threatening to withhold payment for work performed; threats of deportation, arrest, or imprisonment; intolerable working or living conditions; extreme isolation; threats of retaliation for an employee voicing criticism; threats to allow visas to expire without renewal; threats to terminate employment

when employees ask for reimbursement for housing fees; extortion; systemic fraud; and confiscating and withholding passports, identity documents, or immigration documents. (Doc. 8, at 27); citing *Echon v. Sackett,* 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017); *Lesnik v. Eisenman SE,* 374 F.Supp.3d 923, 953 (N.D. Cal. 2019); *United States v. Dann,* 652 F.3d 1160, 1171 (9th Cir. 2011); *United States v. Djoumessi,* 538 F.3d 547, 552 (6th Cir. 2008); *United States v. Calimlim,* 538 F.3d 706 (7th Cir. 2008). Because nothing comparable is alleged here, Defendants argue, Estavilla fails to state a forced labor claim under § 1589(a)(2).

**\*13** Estavilla responds that Defendants' argument is based on an outdated interpretation of human trafficking and ignores the plain language of the TVPA. It is well-settled that financial pressure, including the threat of financial harm, may constitute serious harm under the TVPA. See e.g. *Dann,* 652 F.3d at 1170-71; *Carmen v. Health Carousel,* 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021); *Paguirigan v. Prompt Nursing Employment Agency LLC,* 2018 WL 437799, at *8 (E.D. N.Y. Sept. 12, 2018) (*Paguirigan II*); *Javier v. Beck,* 2014 WL 3058456, at *6 (S.D. N.Y. July 3, 2014); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.,* 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011). "To constitute 'financial harm' within the meaning of the TVPA," however, "the threatened harm must be in some way improper or illicit." *Carmen,* 2021 WL 2476882, at *6.

Focusing on the TVPA's reference to financial harm, Estavilla maintains the liquidated damages provision in the Offer Letter and the threat of liability under the Promissory Notes constituted a "threat of serious harm," and the judgment subsequently entered against her in the Previous Litigation constituted actual "serious harm" within the meaning of § 1589. Estavilla argues this serious harm was further compounded by her at-will employment status, which allowed Defendants to terminate her employment at any time still collect the Advance Amount, as well as the Offer Letter's non-compete clause.

To support her position, Estavilla relies primarily on *Paguirigan* and *Carmen,* both of which involved Filipino nurses who were recruited to work at healthcare facilities in the United States and later brought suit under the TVPA. In *Paguirigan,* the employment contract at issue contained a liquidated damages provision that required nurses to pay a $25,000 contract termination fee if they left their jobs before the end of the contract term. *Paguirigan v Prompt Nursing Employment Agency,* 286 F.Supp.3d 430, 435 (E.D.

N.Y. 2017) (*Paguirigan I*). The nurses were also required to execute a $25,000 confession of judgment in favor of their employer as a condition of employment before leaving the Philippines. *Paguirigan I*, 286 F.Supp.3d at 435.

On summary judgment, the district court determined, among other things, that the liquidated damages provision was an unenforceable penalty intended to operate as a means to compel performance, ensuring that the plaintiff and other nurses did not resign before the end of their contract terms. *Paguirigan II*, 2019 WL 4647648, at *19. Notably, the confession of judgment provision went even further and "outright state[ed] that its purposes [was] to 'secure Employee's performance of the Employment Term.' " *Paguirigan II*, 2019 WL 4647648, at *19. The court also determined that the liquidated damages provision was an unenforceable penalty because the defendants' losses were ascertainable at the time of the contract, and the $25,000 did not bear a reasonable proportion to the probable loss, which the evidence demonstrated was only $4,435.50. *Paguirigan II*, 2019 WL 4647648, at *11.

Defendants argue that *Paguirigan* is distinguishable. Unlike the liquidated damages provision at issue in *Paguirigan*, which was for a set amount that bore no reasonable relation to the defendants' probable loss, the Advanced Amount at issue here was documented in a Promissory Note that Estavilla signed after she began working for Village Health. Defendants maintain that, unlike the liquidated damages provision in *Paguirigan,* the Advanced Amount represents the actual amounts Estavilla agreed to have Village Health advance on her behalf, and is a debt she voluntarily incurred for actual expenses. (Doc. 20, at 11). Importantly, Village Health prevailed in the Previous Litigation to enforce the repayment provisions of the Offer Letter and obtained a judgment requiring Estavilla to reimburse it for the actual amounts expended on her behalf. (Doc. 5, at ¶¶ 18-19). This is quite unlike *Paguirigan,* where the defendants filed several lawsuits against nurses based on a liquidated damages provision that courts had previously found to be unenforceable. For these reasons, the Court agrees with Defendant that the *Paguirigan* litigation is materially distinguishable.

 **\*14**  The second case Estavilla relies on, *Carmen v. Health Carousel, LLC*, 2021 WL 2476882 (S.D. Ohio June 17, 2021), is also distinguishable. In *Carmen*, the plaintiff alleged that the defendant used a variety of tactics to compel her and other nurses to continue working, including: (1) requiring a nurse to

leave temporary employer-supplied housing within 48 hours of the nurse's last shift; (2) including a non-compete clause in the employment contract prohibiting a nurse from seeking employment with any healthcare provider within 50 miles of the employer's facility for one year; (3) using a liquidated damages provision that did not specify a dollar figure and stated that if the nurse breaches the employment contract, the nurse shall pay an unspecified amount of liquidated damages "to be agreed upon" and "settled amicably" by the parties; (4) requiring nurses to sign a handbook upon arrival in the United States that revised provisions in the earlier employment contract, including stating that the any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment; (5) including a provision in the same handbook stating that the employer will continue to be an advocate for immigration purposes only so "as long as the nurse remains in good standing" with the employer, thereby making the implied threat that the employer would advocate for negative immigration outcomes if the nurse left; (6) implementing an "isolating no-gossip policy" between nurses; (7) purposeful delay in obtaining the nurse's permanent license. *Carmen*, 2021 WL 2476882, at **1-2; 6.

With the exception of the non-compete clause and immigration provision contained in the Offer Letter, Estavilla does not allege that Defendants engaged in any of the coercive tactics that the *Carmen* court found were sufficient to survive dismissal for failure to state a claim for relief under § 1589 of the TVPA. Notably, in *Carmen*, the plaintiff alleged in her complaint that she felt forced to continue working for the defendant because of the non-compete clause, and hesitated to terminate her employment because of the immigration provision in her employer's handbook. *Carmen*, 2021 WL 2476882, at *4. Estavilla makes no similar allegations here. Nor does she allege that Defendants enforced or threatened to enforce those provisions against her. Unlike *Carmen*, Estavilla's allegations are based entirely on the contents of the Offer Letter and Promissory Note, which were held to be enforceable in the Previous Litigation.

Given the distinction between Estavilla's allegations and those made by the plaintiff in *Carmen,* Defendants argue that the standards articulated by the court in *Panwar v. Access Therapies, Inc.,* 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) should apply. The Court agrees. In *Panwar*, the defendants recruited the plaintiffs to work as physical therapists at a rehabilitation facility in the United States and agreed to sponsor their visa applications. *Panwar*, 2015 WL 1396599,

at *1. The plaintiffs "were required to sign employment agreements setting forth the terms of employment, as well as a separate promissory note corresponding with the contracts' liquidated damages/recovery of expenses provisions." *Panwar*, 2015 WL 1396599, at *2. The employment agreements provided that if an employee left employment before completing the contract term, the employee was required to pay the amount of the promissory note to reimburse the employer's expenses and lost revenues. *Panwar*, 2015 WL 1396599, at *2. Both plaintiffs alleged they were not paid the full amount they were entitled to under the contract, and that the defendants threatened them with enforcement of the promissory note. *Panwar*, 2015 WL 1396599, at *2.

One plaintiff also alleged that the defendant threatened him with loss of his visa and deportation. *Panwar*, 2015 WL 1396599, at *2. The plaintiffs filed suit alleging, among other claims, that the defendants used a forced labor scheme in violation of the TVPA by means of threats of serious harm, including financial harm through enforcement of the promissory note, threats of visa revocation and deportation, and abuse of legal process. *Panwar*, 2015 WL 1396599, at *2.

The *Panwar* court found the plaintiffs' TVPA claims were problematic for a number of reasons, and granted summary judgment in favor of the defendants. *Panwar*, 2015 WL 1396599, at **3-5. Relevant here, the court found the plaintiffs' claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA was not supported by the evidence or the law. *Panwar*, 2015 WL 1396599, at **3-5. The court noted that the plaintiffs had not presented any evidence that the stipulated sums in the liquidated damages provisions of their employment agreements were grossly disproportionate to the losses the defendants were likely to incur if an employee terminated his contract early. *Panwar*, 2015 WL 1396599, at *4. Because the defendants had submitted evidence that the stipulated sums were proportionate to the loss likely to occur, the court upheld the liquidated damages provisions and refused to penalize the defendants "under the TVPA for practices which they are explicitly permitted to utilize under the relevant laws." *Panwar*, 2015 WL 1396599, at *4.

 **15** The *Panwar* court also rejected the plaintiffs' argument that the threat of deportation constituted a threat of serious harm under the TVPA. *Panwar*, 2015 WL 1396599, at *4. One of the *Panwar* plaintiffs alleged that the defendants

"threatened to revoke his visa and that he would be deported." *Panwar*, 2015 WL 1396599, at *4. Because the plaintiff's visa program required "that nonimmigrant employees remain employed by the company that sponsored their visas," the court reasoned that visa revocation was not left to the discretion of employers, who are required by law to notify the U.S. Citizenship and Immigration Service if a visa holder is no longer employed. *Panwar*, 2015 WL 1396599, at *4. If it were to accept the plaintiffs' argument, the court reasoned, any employer would be in violation of the TVPA merely by complying with the requirements of the visa program. *Panwar*, 2015 WL 1396599, at *4. The court therefore found that the threat of visa revocation and deportation under the circumstances was not a threat of serious harm for purposes of the TVPA. *Panwar*, 2015 WL 1396599, at *4.

Here, as in *Panwar*, the Advance Amount clause provides for a specific amount based on actual expenses, as evidenced by the fact that the contractual provision was found enforceable in the Previous Litigation. Likewise, to the extent Estavilla argues the Offer Letter's statement that "failure to meet any of your obligations under the terms of this letter" would be reported "to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency under applicable immigration fraud statues" (Doc. 9-1, at 6) constituted a threat of serious harm, the Court is not persuaded. Estavilla has not shown that the mere presence of this clause addressing Village Health's reporting duty under federal law constitutes harm or the threat of serious harm under the TVPA. As pointed out above, Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. To the contrary, the fact that she counterclaimed for wrongful termination of contract in the Previous Litigation indicates that, if anything, she did not want her employment with Village Health to come to an end.

In sum, even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly state a claim for relief based on "serious harm or the threat of serious harm" within the meaning of § 1589(a)(2) of the TVPA.

b. *Abuse or threatened abuse of law or legal process.*

Estavilla also claims that Defendants knowingly obtained her labor or services by means of "the abuse or threatened abuse of law or legal process" in violation of 18 U.S.C. § 1589(a)(3).

The TVPA defines the term "abuse or threatened abuse of law or legal process" as:

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(a).

Estavilla first argues that Defendants threatened the abuse of law in violation of § 1589(a)(3) by including the liquidated damages provision in the Offer Letter and suing her in Minnesota state court to enforce that provision. As discussed above, however, Defendants prevailed in the Previous Litigation. This case is thus different from *Paguirigan I*, where the court determined that the plaintiffs had sufficiently alleged abuse of legal process because the defendants brought suit against the plaintiff and other nurses to enforce the liquidated damages provision even after it had been declared unenforceable. *Paguirigan I*, 286 F.Supp.3d at 435.

Here, in contrast, the Minnesota state court ruled in Defendants' favor and enforced the liquidated damages provision in the Offer Letter. Estavilla's argument conflates permissible "use" of the legal process with "abuse" of the legal process. See *Panwar*, 2015 WL 1396599, at *5. Under these circumstances, it is difficult to see how Defendants could be said to have used the legal process "in any manner or for any purpose for which the law was not designed," as required to establish "abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3).

**\*16** Estavilla next argues that Defendants violated § 1589(a)(3) by including threatening in the Offer Letter to report her to immigration authorities if she failed to pay restitution. The threat of deportation may constitute threatened abuse of legal process under § 1590(a)(3). See *Nunag-Tanedo v. E. Baton Rough Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1146

(C.D. Cal. 2011). In addition, courts have held that threatening other adverse immigration consequences may be an abuse of legal process within the meaning of the TVPA. See *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d. Cir. 2019); *Mairi Nunag-Tanedo v. e. Baton Rouge Par. Sch. Bd.*, 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011). But the provision in the Offer Letter that Estavilla relies on relates to Village Health's reporting duty under federal law, and Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. As such it does not constitute an abuse of legal process within the meaning of the TVPA.

Finally, Estavilla maintains that Defendants impermissibly threatened abuse of law or legal process by including an illegal non-compete clause in the Offer Letter. Absent some allegation by Estavilla that she felt forced to continue working for Village Health because of the non-compete clause, or that Defendants attempted to enforce the clause against her, the Court finds this allegation is not sufficient establish "abuse or threatened abuse of law or legal process" as defined in § 1589(c)(1).

For the reasons outlined above, the even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly show that Defendants used or threatened use of a law or legal process in a manner for which the law was not designed, as required to establish "the abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3) of the TVPA.

Because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subject to forced labor within the meaning of § 1589(a), she fails to state a claim for relief under this section of the TVPA.

### 2. Section 1590

Estavilla also brings a claim under 18 U.S.C. § 1590, which prohibits human trafficking to further forced labor. Section 1590 imposes liability on "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a).

This claim fails for the same reasons that Estavilla's claim under § 1589(a) fails. Because Estavilla has not sufficiently alleged that she was subjected to forced labor, she has not stated a claim for relief under § 1590.

### 3. Section 1594(a),(b)

Estavilla further alleges claims for attempt to violate the TVPA under § 1594(a) and conspiracy to violate the TVPA under § 1594(b). Section 1594(a) extends liability to "whoever attempts to violate section 1581, 1583, 1589, 1590, or 1591" of the TVPA. Section 1594(b) imposes liability on "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592" of the TVPA.

Because Estavilla has not stated a claim for relief under §§ 1589 and 1590, she similarly fails to state a claim for relief under § 1594.

### 2. Montana law

In addition to her claims under the TVPA, Estavilla alleges a state law human trafficking claim under Mont. Code Ann. § 27-1-755. (Doc. 5, at 16). This civil remedies provision provides that "[a] victim of human trafficking may bring a civil action against a person who commits an offense against the victim under 45-5-702, 45-5-703, 45-5-704, or 45-5-705 for compensatory damages, punitive damages, injunctive relief, or any other appropriate relief. Mont. Code Ann. § 27-1-755(1).

 **\*17**  Estavilla alleges corresponding violations of Mont. Code Ann. § 27-2-702 and Mont. Code Ann. § 27-2-703. Section 702 provides for liability against anyone who purposely or knowingly:

> (a) recruits, transports, transfers, harbors, receives, provides, obtains, isolates, maintains, or entices another person intending or knowing that the person will be subjected to involuntary servitude ...; or

> (b) benefits, financially or by receiving anything of value, from facilitating any conduct described in subsection (1)(a) or from participation in a venture that has subject another person to involuntary servitude ...

Mont. Code Ann. § 45-5-702. Section 703, in turn, extends liability for involuntary servitude to anyone who "purposely

or knowingly uses coercion to compel another person to provide labor or services, unless the conduct is otherwise permissible under federal or state law." Mont. Code Ann. § 45-5-703.

For purposes of Montana's civil remedies provision, "coercion" is defined, in relevant part, to include the following:

> (a) the use or threat of force against, abduction of, serious harm to, or physical restraint of a person;

> (b) the use of a plan, pattern, or statement with intent to cause a person to believe that failure to perform an act will result in the use of force against, abduction of, serious harm to, or physical restraint of a person;

> (c) the abuse or threatened abuse of law or legal process; ...

> (f) the use of debt bondage.

Mont. Code Ann. § 45-5-701(2).

Defendants take the position that Estavilla's statutory claims under Montana law fail for the same reasons that her claims under the TVPA fail, namely, because she has not alleged sufficient facts to demonstrate human trafficking, or that she was subject to involuntary servitude or compelled to provide labor or services in violation of §§ 45-5-702 or 45-5-703. (Doc. 17, at 31).

In response, Estavilla focuses on the involuntary servitude provisions of § 45-5-703, which prohibits a person from using "coercion to compel another person to provide labor or services." Turning to the statutory definition of coercion, Estavilla agrees with Defendants that subsections (a) through (c) overlap with the TVPA's requirements. (Doc. 17, at 31). Thus, to the extent Estavilla's state law claims are premised on allegations of "serious harm," those claims rise and fall with her claims under the TVPA.

While Estavilla agrees that subsections (a) and (c) overlap with the TVPA, she maintains that subsection (f), which prohibits "the use of debt bondage," is unique and independent of her claims under the TVPA. As relevant to Estavilla's argument, "debt bondage" is defined as "inducing a person to provide: ... (b) labor or services in payment toward or satisfaction of a real or purported debt if: (i) the reasonable value of the labor or services is not applied toward the liquidation of the debt." Mont. Code Ann. § 45-5-701(4).

Estavilla contends that she has alleged sufficient facts demonstrating that Defendants engaged in this form of debt bondage. Estavilla claims that she was "forced" to sign a promissory note that required her to pay back $26,642.47 plus interest. Under the terms of the Promissory Note, that debt would be forgiven, but only if remained employed with Village Health through November 5, 2020. Village Health terminated Estavilla's employment on May 24, 2019, however, and sued her for repayment of the full amount. Estavilla thus contends that Defendants did not apply any of her labor or services to the liquidation of the debt, and engaged in coercion through debt bondage by failing to account for any of the 18 months that she was employed by Village Health. (Doc. 17, at 32).

**\*18** Defendants maintain in reply that, contrary to Estavilla's argument, debt bondage is contemplated under the TVPA and is governed by the "financial harm" standards discussed above. With respect to Estavilla's allegation that they did not apply "the reasonable value of her labor against the debt amount to liquidate the debt," Defendants maintain that the Minnesota court assessed the reasonable value of Estavilla's labor and services in the in the Previous Litigation. The Court agrees with Defendants that Estavilla's argument is foreclosed by the final judgment entered in the Previous Litigation, which has res judicata effect.

Moreover, like Estavilla's claims under the TVPA, her state law human trafficking claims are compulsory counterclaims that she has waived by failing to bring them in the Previous Litigation because they all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note.

### 3. Declaratory Judgment

Estavilla's Complaint also includes a declaratory judgment claim seeking a determination that the contractual venue and choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5, at 16).

Neither party addresses this claim in their briefs. Presumably, the parties agree that whether Estavilla's declaratory judgment claim survives dismissal depends entirely on whether any of her claims under the TVPA or Montana law also survive.

### IV. Conclusion

For the reasons discussed above,

IT IS ORDERED that Defendants' Motion to Dismiss the Complaint for Failure to State a Claim for Relief under Rule 12(b)(6) is GRANTED.

**All Citations**

Slip Copy, 2022 WL 539192

---

### Footnotes

1    Consistent with the legal standards applicable to Rule 12(b)(6) motions, the following facts are taken from the Complaint, evidence on which the Complaint necessarily relies, and state court documents of which this Court may take judicial notice.

2    The Offer Letter contained a choice of venue provision making Minnesota the proper venue for the Previous Litigation, and a choice of law provision stating that "the rights of the parties under this Offer Letter will be governed by, interpreted, and enforced in accordance with the laws of the State of Minnesota.... (Doc. 9-1, at 6).

3    The Court need not, and does not, consider the newspaper article Defendants have submitted as an exhibit in support of their motion. (Doc. 9-7).

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

4       The rule is the same in the Eighth Circuit, which encompasses Minnesota. See *Nelson v. Repossessors, Inc.,* *2018 WL 1891494, at \*2 (D. Minn. Apr. 20, 2018)* ("A compulsory counterclaim that is not brought is waived in subsequent litigation.") (citing *Schinzing v. Mid-States Stainless, Inc.* 415 F.3d 807, 813 (8th Cir. 2005))

5       As directed by the Court, the parties have submitted supplemental briefing addressing the impact, if any, of *Liendecker* and *St. Stephen* on the issue of whether Estavilla's TVPA claims can be considered compulsory counterclaims in the Previous Litigation under Minnesota Rule 13.01.

6       Notably, the court considered Minnesota Rule 13.01 and the "logical relation" in determining whether a fraud counterclaim arose from the "same aggregate of operative facts" or "out of the transaction" that was the subject of the original proceeding, without regard to the fact that the counterclaim at issue was a tort claim. *Popp,* 210 F.3d at 941. This bolsters the Court's conclusion above, that tort counterclaims can be considered compulsory under Minnesota Rule 13.01 if they meet the applicable test.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.   Appendix p. 079   16

528 P.3d 586 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, Petitioner,
v.

The EIGHTH JUDICIAL DISTRICT COURT
of the State of Nevada, IN AND FOR the
COUNTY OF CLARK; and the Honorable
Mark R. Denton, District Judge, Respondents,
and

Westland Liberty Village, LLC, a Nevada Limited
Liability Company; Westland Village Square, LLC,
a Nevada Limited Liability Company; Amusement
Industry, Inc.; Westland Corona LLC; Westland Amber
Ridge LLC; Westland Hacienda Hills LLC; 1097 North
State, LLC; Westland Tropicana Royale LLC; Vellagio
Apts of Westland LLC; the Alevy Family Protection
Trust; Westland AMT, LLC; AFT Industry NV, LLC;
and A&D Dynasty Trust, Real Parties in Interest.

No. 84575
|
Filed December 22, 2022

**Attorneys and Law Firms**

Snell & Wilmer, LLP/Las Vegas

Snell & Wilmer, LLP/Reno

Cooper & Kirk PLLC/Wash DC

Campbell & Williams

Law Offices of John Benedict

John W. Hofsaess

*ORDER GRANTING PETITION FOR
EXTRAORDINARY WRIT RELIEF*

**\*1**  This original petition for extraordinary writ relief
challenges a district court order denying petitioner's motion
to dismiss.

Real parties in interest Westland Liberty Village and
Westland Village Square (collectively, Westland) acquired
properties secured by loan agreements for which petitioner
Federal National Mortgage Association (Fannie Mae) is
the successor-in-interest to the original lender. Fannie
Mae commenced an action in district court, seeking the
appointment of a receiver as part of the process to
foreclose on the properties. Westland answered and asserted
counterclaims against Fannie Mae. As part of its first
amended countercomplaint, Westland joined several affiliated
corporate entities as parties (collectively with Westland,
RPIs) and asserted two counterclaims related to those entities
and a Master Credit Facility Agreement (MCFA). The MCFA
provided a credit line that RPIs allege Fannie Mae improperly
restricted. The MCFA contains a forum selection clause
providing that MCFA claims shall be litigated in the District
of Columbia. Fannie Mae filed a motion to dismiss, arguing
that the MCFA counterclaims could not be litigated in
Nevada. The district court denied Fannie Mae's motion to
dismiss, and Fannie Mae petitioned this court for a writ of
prohibition.

A writ of prohibition may issue when a district court acts
without or in excess of its jurisdiction and the petitioner lacks
a plain, speedy, and adequate remedy at law. NRS 34.320;
NRS 34.330; *Smith v. Eighth Judicial Dist. Court,* 107 Nev.
674, 677, 818 P.2d 849, 851 (1991). A writ of mandamus,
by contrast, is available to compel the performance of an act
that the law requires as a duty resulting from an office, trust,
or station or to control an arbitrary or capricious exercise
of discretion. NRS 34.160; *Int'l Game Tech., Inc. v. Second
Judicial Dist. Court,* 124 Nev. 193, 197, 179 P.3d 556, 558
(2008). This court may treat a petition seeking prohibition as
a petition for a writ of mandamus where, although prohibition
is not available, mandamus is appropriate. *City of Sparks v.
Second. Judicial Dist. Court,* 112 Nev. 952, 953 n.1, 920 P.2d
1014, 1015 n.1 (1996). We grant the petition for extraordinary
writ relief after concluding that the district court committed
clear legal error amounting to a manifest abuse of discretion
in failing to dismiss the MCFA counterclaims based on the
mandatory forum selection clause to which the parties agreed.

When a contract contains a forum selection clause, courts
determine whether the clause is mandatory, meaning that
the specified forum is the exclusive forum agreed upon by
the parties, or permissive, meaning that the parties
merely consented to venue in a particular forum. *Am. First
Fed. Credit Union v. Soro,* 131 Nev. 737, 740-42, 359

P.3d 105, 107-08 (2015) (noting and agreeing with other courts' explanation of the dichotomy between mandatory and permissive forum selection clauses). As with other issues of contractual interpretation, whether a forum selection clause is mandatory turns on its language, looking for "words of exclusivity." *Id.* at 742, 359 P.3d at 108; *see also id.* at 737, 739, 359 P.3d at 106 (providing that the court reviews contracts de novo and interprets clear and unambiguous provisions according to the contractual language as written). When a forum selection clause is mandatory and suit is brought in the incorrect forum, the matter should be dismissed. *See id.* at 738, 359 P.3d at 105 (reversing dismissal where forum selection clause was permissive, not mandatory).

 **\*\*2**  The MCFA has a forum selection clause entitled "Choice of Law; Consent to Jurisdiction" that provides that "Borrower agrees that *any controversy* arising under or in relation to the Notes, the Security Documents (other than the Security Instruments), or any other Loan Document *shall be*, except as otherwise provided herein, *litigated in the District of Columbia."* (Emphasis added.) It further provides that D.C. courts "shall ... have jurisdiction over all controversies which may arise under or in relation to the Loan Documents ...." It continues that "Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from [the loan instrument] and *waives any other venue* to which it might be entitled." (Emphasis added.) The clause also provides that it does not bar the Lender from bringing suit against the Borrower or the collateral in another forum and that any such action does not waive the designation of D.C. law as the controlling law.

We conclude that the forum selection clause here is mandatory. The clause states that litigation for "any controversy" arising under its loan documents "shall be litigated" in the District of Columbia. The phrase "shall be litigated," while not conclusive, strongly suggests that the forum selection clause is mandatory. *Soro,* 131 Nev. at 741-42, 359 P.3d at 107-08 (collecting and comparing forum selection clause cases). Confirming that the clause mandates Washington, D.C. as the forum for litigating MCFA claims, the agreement irrevocably consents to the jurisdiction and forum of D.C. courts and waives "any other venue." *E.g., Aguas Lenders Recovery Grp. v. Suez, S.A.,* 585 F.3d 696, 700 (2d Cir. 2009); *AAR Int'l, Inc. v. Nimelias Enters. S.A.,* 250 F.3d 510, 526 (7th Cir. 2001). Because the clause here goes further than signaling merely that D.C. courts are an appropriate forum and includes both irrevocable consent

to the designated forum and a waiver of all other fora the borrower might otherwise be entitled to access, we conclude that the forum selection clause demonstrates an intent to designate the District of Columbia exclusively and is therefore mandatory.

RPIs make three additional arguments against enforcing this clause as mandatory, none of which is persuasive. First, RPIs maintain the clause cannot be mandatory because it permits Fannie Mae to bring suit outside the District of Columbia. But one-sided forum selection clauses are permissible when the parties voluntarily agree to them. *See Montoya v. Fin. Fed. Credit, Inc.,* 872 F. Supp. 2d 1251, 1276 (D.N.M. 2012) (rejecting an argument that a forum selection clause was not binding where it was permissive as to actions filed by the lender but mandatory as to those filed by the borrower); *see also Union Steel Am. Co. v. M/V Sanko Spruce,* 14 F. Supp. 2d 682, 687 (D.N.J. 1998) (concluding that a forum selection clause was mandatory despite providing the cargo carrier alone with an option to pursue arbitration). Second. RPIs characterize their counterclaims as compulsory and argue that this takes them outside a mandatory forum selection clause. Even assuming the accuracy of this characterization, which is debatable, we agree with courts elsewhere that have held that this does not defeat a mandatory forum selection clause. *See, e.g., Publicis Commc'n v. True N. Commc'ns Inc.,* 132 F.3d 363, 366 (7th Cir. 1997) (enforcing forum selection clause "whether or not they would be 'compulsory' counterclaims" because the defendant had contracted not to litigate those claims in forums other than that designated in the forum selection clause); *see also Water & Sand Int'l Capital, Ltd. v. Capacitive Deionization Tech. Sys., Inc.,* 563 F. Supp. 2d 278, 284 (D.D.C. 2008) (refusing to allow parties to evade enforceable forum selection clauses by alleging what may be properly considered compulsory counterclaims). And finally, insofar as RPIs contend that fairness requires trying the counterclaims in Nevada courts, we disagree. "The parties are sophisticated corporations that freely contracted with each other, and enforcement of the forum selection clause does not offend due process." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.,* 485 F.3d 450, 457 (9th Cir. 2007). [1]

 **\*\*3**  The dispute asserted in counterclaims three and four arises from the MCFA, so the mandatory forum selection clause applies, and requires that those claims "shall be litigated" in Washington, D.C. Nevada public policy favors enforcing freely negotiated mandatory forum selection clauses that are not unreasonable or unjust and are entered into by sophisticated parties. *See Soro,* 131 Nev. at 741, 359

P.3d at 741 (quoting with approval decisions recognizing that mandatory forum selection clauses will be enforced); *Whitemaine v. Aniskovich,* 124 Nev. 302, 312 n.31, 183 P.3d 137, 144 n.31 (2008) (recognizing that the parties were sophisticated counterparts in determining whether appellant knowingly, voluntarily, and intelligently entered into an arbitration agreement); *Tandy Comput. Leasing v. Terina's Pizza, Inc.,* 105 Nev. 841, 844, 784 P.2d 7, 8 (1989) (barring enforcement of a forum selection clause that was not "freely negotiated" and would be "unreasonable and unjust" to enforce (internal quotation marks omitted); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972) (looking to declarations by statute or judicial decision to determine a states public policy concerning the enforcement of forum selection clauses); *Tuxedo Int'l Inc. v. Rosenberg,* 127 Nev. 11, 22, 251 P.3d 690, 697 (2011) (recognizing that parties are free to agree to binding forum selection clauses). The district court clearly erred in not applying the mandatory forum selection clause in this instance. *See Soro,* 131 Nev. at 739, 359 P.3d at 105 (providing that clear contractual provisions will be enforced as written).

The final question concerns the form, of writ relief appropriate. This court has original jurisdiction to issue a writ of prohibition to "arrest" proceedings that are "without or in excess of the jurisdiction" of the district court. NRS 34.320. The mandatory forum selection clause mandates Washington, D.C. as the venue for the MCFA counterclaims; it does not destroy jurisdiction in Nevada. *See Marra v. Papandreou,* 216 F.3d 1119, 1123 (D.C. Cir. 2000) ("[W]hile the forum-

selection clause defense is a creature that has evaded precise classification, most courts and commentators have characterized it as a venue objection[.]") (footnote omitted; collecting cases). This raises a question whether prohibition is available in this setting. *See* C.P. Jhong, Annotation, *Prohibition as an Appropriate Remedy to Restrain Civil Action for Lack of Venue,* 93 A.L. R.2d 882 (1962). But it is not necessary to decide the question here, since the district judge committed clear legal error amounting to a manifest abuse of discretion in not enforcing the parties' mandatory forum selection clause as to the MCFA counterclaims. This error qualifies for mandamus relief and we therefore elect to treat the petition as one seeking mandamus relief. *See City of Sparks,* 112 Nev. at 953 n.1, 920 P.2d at 1015 n.1. Although an appeal from final judgment would generally be an adequate legal remedy, because there is no factual dispute and a clear rule warranted dismissal, we grant writ relief as to these counterclaims. *Int'l Game Tech.,* 124 Nev. at 197-98, 179 P.3d at 559.

Accordingly, we

ORDER the petition **\*587** GRANTED AND DIRECT THE CLERK OF THIS COURT TO ISSUE A WRIT OF MANDAMUS directing the district court to grant petitioner's motion to dismiss counterclaims three and four. [2]

**All Citations**

528 P.3d 586 (Table), 2022 WL 19697697

## Footnotes

1      RPIs argue that the clause is not mandatory because its inclusion of the phrase "except as otherwise provided herein" adds unspecified exceptions to its scope. Because RPIs do not explain this argument in detail or provide supporting caselaw, therefore we do not consider it. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006).

2      The Honorable Patricia Lee did not participate in the decision in this matter.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

136 Nev. 809

Unpublished Disposition

This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.

Supreme Court of Nevada.

FQ MEN'S CLUB, INC., (d/b/a Reno Men's Club, the Men's Club, and Men's Club of Reno), a Nevada Corporation; French Quarter, Inc., (d/b/a Reno Men's Club, the Men's Club, and Men's Club of Reno), a Nevada Corporation; the French Quarter, Inc., a Nevada Corporation; French Quarter Restaurant, Inc., a Nevada Corporation; and Eugene Canepa, an Individual, Appellants,

v.

Jane DOE DANCERS I, II and III, Individually and on Behalf of Class of Similarly Situated Individuals, Respondents.

No. 79265
|
FILED SEPTEMBER 17, 2020

**Attorneys and Law Firms**

Law Offices of Mark Wray

Rusby Law, PLLC

Wetherall Group, LTD.

### ORDER OF AFFIRMANCE

 **\*1**  This is an appeal from a district court order denying a motion to compel arbitration in a labor dispute. Second Judicial District Court, Washoe County; David A. Hardy, Judge.

Respondents Jane Doe Dancers I, II, and III (hereinafter, the Dancers) each signed a licensing agreement before performing as exotic dancers for FQ Men's Club, Inc. (the Men's Club), a restaurant and adult entertainment establishment in downtown Reno. Thereafter, in December 2015, the Men's Club changed its policies and required the already-contracted Dancers to sign two documents pertinent to this appeal: (1) a memorandum, requiring the Dancers to classify as either employees or independent contractors and, if the Dancers elected to work as independent contractors, (2)

the Guest Cabaret Performer Licensing Agreement (GCPLA), which contained an arbitration agreement and class action waiver.

In December 2016, the Dancers filed a proposed class action complaint against the Men's Club for failure to pay minimum hourly wage, as required by state and federal law, and for unjust enrichment. The Men's Club moved to compel arbitration pursuant to the GCPLA. Following an evidentiary hearing on the motion, the district court entered its order denying the Men's Club's motion to compel arbitration, which invalidated the GCPLA's arbitration provision as procedurally and substantively unconscionable. The Men's Club appealed the district court's order. We vacated the district court order and remanded with instructions for the district court to reconsider the motion in light of *U.S. Home Corp. v. Michael Ballesteros Tr.,* 134 Nev. 180, 192, 415 P.3d 32, 42 (2018) (overruling Nevada precedent to the extent the unconscionability rules established therein "apply only to arbitration agreements or, in practice, have a disproportionate effect on arbitration agreements" when the Federal Arbitration Act (FAA) controls). *See FQ Men's Club, Inc. v. Jane Doe Dancers, I, II and III,* Docket No. 74037 (Order to Vacate and Remand, Dec. 21, 2018). On remand, the district court again denied the Men's Club's motion to compel arbitration, finding the GCPLA procedurally and substantively unconscionable. The Men's Club appeals.

We reject the Men's Club's arguments concerning the district court's unconscionability determinations. Because we conclude that the GCPLA is procedurally and substantively unconscionable, we affirm the district court's order denying the Men's Club's motion to compel.

### DISCUSSION

*Unconscionability of the GCPLA*

 **\*2**  The Men's Club argues that the district court erred in invalidating the GCPLA based on substantive and procedural unconscionability. "Contractual unconscionability involves mixed questions of law and fact." *D.R. Horton Inc. v. Green,* 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by Ballesteros,* 134 Nev. 180, 415 P.3d 32. We defer to the district court's underlying factual findings of unconscionability "so long as they are supported by substantial evidence." *Id.* "Whether, given the trial court's factual findings, a contractual provision is unconscionable is a question of law subject to de novo review." *Id.*

The FAA "preempts state laws that single out and disfavor arbitration." [1] *Ballesteros,* 134 Nev. at 188, 415 P.3d at 40. Accordingly, where the FAA applies, district courts may invalidate an arbitration provision under a generally applicable contract defense, such as unconscionability—but it may not apply that defense "in a fashion that disfavors arbitration." *Id.* at 189, 415 P.3d at 40 (quoting *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 341 (2011)); *see also* 9 U.S.C. § 2 (2018) (detailing that an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract" (emphasis added)).

"A contract is unconscionable only when the clauses of that contract and the circumstances existing at the time of the execution of the contract are so one-sided as to oppress or unfairly surprise an innocent party." *Bill Stremmel Motors, Inc., v. IDS Leasing Corp.,* 89 Nev. 414, 418, 514 P.2d 654, 657 (1973). Generally, "Nevada law requires both procedural and substantive unconscionability to invalidate a contract as unconscionable." *Ballesteros,* 134 Nev. at 190, 415 P.3d at 40. That said, procedural and substantive unconscionability operate on a sliding scale, such that "less evidence of substantive unconscionability is required" where the procedural unconscionability is great. *Burch v. Second Judicial Dist. Court,* 118 Nev. 438, 444, 49 P.3d 647, 650 (2002).

*The GCPLA is procedurally unconscionable*
The Men's Club argues that substantial evidence does not support the district court's findings as to procedural unconscionability, and further challenges several of the district court's conclusions. "A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." *D.R. Horton,* 120 Nev. at 554, 96 P.3d at 1162. Procedural unconscionability also considers "the manner in which the contract or the disputed clause was presented and negotiated[,]" *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1282 (9th Cir. 2006), as well as whether the drafting party misrepresented the nature or effect of the contract, *see Gonski v. Second Judicial Dist. Court,* 126 Nev. 551, 559, 245 P.3d 1164, 1170 (2010), *overruled on other grounds by Ballesteros,* 134 Nev. 180, 415 P.3d 32.

The district court made several determinations with respect to procedural unconscionability. First, the district court concluded that "[t]he Men's Club did not create a symmetrical transaction process to effectuate the GCPLA and, as a result, the dancers were not given a meaningful opportunity to agree to its terms." To support this, the district court explained that the Men's Club surprised the Dancers with the memorandum and GCPLA as they arrived for their routine work shift; the Men's Club hostesses required the Dancers to sign the documents "in a dimly lit and noisy entryway as front door hostesses, customers, and other dancers engaged in club business around them" which "was unconducive to concentration" and "imposed a time constraint"; and the owner of the Men's Club prohibited the Dancers both from removing the documents from the Men's Club to review and from working pursuant to their existing contractual agreement until they signed the documents—which incentivized the Dancers "to sign as quickly as possible to ensure they could begin earning money." The district court continued that "[t]his type of unequal, 'take it or leave it' approach, under which the weaker party is unable to negotiate terms, is indicative of an unconscionable adhesion contract."

**\*3** The district court further found that the Men's Club misrepresented the GCPLA by instructing the hostesses to inform the Dancers that "they should elect to become Guest Cabaret Performers if they 'wanted to stay the same as they have been.' " Because significant differences existed between the original contract and the GCPLA, including the arbitration provision and the class-action waiver, the district court found that "[t]he hostesses' explanation constituted an inducement for the dancers to sign the GCPLA without review of these changes, further contributing to procedural unconscionability."

Finally, the district court determined that the GCPLA's consequences "were not readily ascertainable on its face due to what appears to be careless drafting." In addition to misspelled words, the district court explained that the omission of essential words and phrases rendered certain provisions confusing. For example, the district court found the Dancers' right to reject the arbitration clause requiring "all Performers" to sign the written rejection notice within 30 days particularly problematic. Because the Dancers had no way of identifying the other performers who signed the GCPLA, and because the performers signed the GCPLA over a two month period, the district court found that the Dancers could not have possibly complied with this provision.

We now turn to the Men's Club's arguments challenging the district court's determinations. First, the Men's Club contends that the district court's requirement of "a symmetrical transaction process" is contrary to Nevada law because "[i]t is not the duty of a party to explain the legal effects of every provision of a contract," (quoting *CVSM, LLC v. Doe Dancer V*, Docket No. 72627, at *3 (Order of Reversal and Remand, Feb. 25, 2019)). We reject this argument as it mischaracterizes the district court's determination. While the Men's Club correctly points out that the law will not excuse a party's own negligence by failing to review a contract before signing it, *see* 1 Richard A. Lord, *Williston on Contracts* § 4:19 (4th ed. 2007) (detailing that a person cannot avoid the enforcement of a contract by failing to read it unless "a reasonable excuse appears"), we determine that the district court appropriately considered the Men's Club's efforts to deprive the Dancers of a meaningful *opportunity* to understand the GCPLA, *see Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) (explaining that "[p]rocedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time").

Second, the Men's Club argues that neither the record nor the law support the district court's findings addressing the environment in which the Dancers signed the GCPLA. Specifically, the Men's Club argues that the Dancers did not testify to the circumstances of signing the GCPLA, such that the district court's determinations surrounding such circumstances were not supported by substantial evidence. As an initial matter, because the Men's Club exaggerates the breadth of the district court's determination on appeal, the Men's Club's contention that the same is unsupported by law lacks merit.

We further conclude that substantial evidence supports the district court's findings. Here, each of the Dancers testified that they recalled signing the original licensing agreement and memorandum, but that they did not specifically remember signing the GCPLA. However, the Dancers testified to the circumstances of signing the memorandum, explaining that the hostess provided little explanation of the document, the front entryway was dimly lit and packed with people, and that the process for signing the document lasted minutes. In addition, a hostess at the Men's Club testified that the Dancers were provided the memorandum and GCPLA when they came in for their shifts, and told that the documents needed to be signed before they could perform. The hostess agreed that the circumstances in which she presented the memorandum and GCPLA were "hectic"; the Men's Club

debuted those documents over the New Years' holiday, where a large number of performers, employees, and customers were entering the building at the same time.

**\*4** Third, the Men's Club maintains that the district court erred in characterizing the GCPLA as an unconscionable adhesion contract. While we have declined to characterize employment contracts as unconscionable adhesion contracts due to the opportunity for negotiation, *see Kindred v. Second Judicial Dist. Court*, 116 Nev. 405, 411, 996 P.2d 903, 907 (2000), the district court reasoned that the circumstances did not provide for negotiation such that the GCPLA constituted an unconscionable adhesion contract. We decline to expressly address whether an employment contract can be deemed an unconscionable adhesion contract in Nevada, but to the extent we reject the district court's use of the label, we nevertheless conclude that the district court's findings support a determination that the Dancers "lack[ed] a meaningful opportunity to agree to" GCPLA "because of unequal bargaining power, *as in an adhesion contract*." *D.R. Horton*, 120 Nev. at 554, 96 P.3d at 1162 (emphasis added).

Fourth, the Men's Club claims that substantial evidence does not support the district court's invalidation of the GCPLA based on a theory of misrepresentation. We reject this argument, as the hostess testified that the Men's Club owner provided the hostesses with a separate memorandum outlining how the hostesses were to present the memorandum and GCPLA to the Dancers. Particularly, the hostess memorandum states, "Tell them that if they want to stay the same as they have been for the last 20 years, choose the Guest Cabaret Performer option." Because of the disparities between the original contract and the GCPLA, we conclude that the district court reasonably determined that the hostesses' misrepresentation contributed to its procedural unconscionability determination.

Fifth, the Men's Club argues that draftsmanship quality cannot render the GCPLA procedurally unconscionable. As an initial matter, the Men's Club does not cite to any law to support this proposition, aside from general principles of contract interpretation. Furthermore, if the draftsmanship of a contract prevents a party from "readily ascertain[ing]" the contract and its effects, as the district court found here, then such a consideration properly supports a finding of procedural unconscionability. *D.R. Horton*, 120 Nev. at 554, 96 P.3d at 1162. Thus, we reject this argument.

Finally, the Men's Club argues that failing to provide the Dancers with copies of the GCPLA cannot make the same procedurally unconscionable. We conclude that this argument lacks merit. First, substantial evidence supports the district court's determination that pursuant to the Men's Club policy, the Dancers were not permitted to take a copy of any of the contractual documents outside the premises of the Men's Club. Both a manager at the Men's Club, as well as one of the club's hostesses, testified to this. Furthermore, to the extent procedural unconscionability takes into account "the manner in which the contract or the disputed clause was presented and negotiated[,]" we conclude that the district court appropriately considered the Men's Club's policy prohibiting the Dancers from removing a copy of the GCPLA from the premises. *Nagrampa,* 469 F.3d at 1282.

Based on the foregoing, we hold that substantial evidence supports the district court's findings, and that such findings render the GCPLA procedurally unconscionable.

*The GCPLA is substantively unconscionable*

The Men's Club claims that the district court failed to make sufficient findings to establish substantive unconscionability. Substantive unconscionability focuses on terms that "are unreasonably favorable to the more powerful party." *Gonski,* 126 Nev. at 563, 245 P.3d at 1172 (quoting 8 Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed. 2010)); *see also Poublon v. C.H. Robinson* Co., 846 F.3d 1251, 1261 (9th Cir. 2017) (explaining that the substantive "unconscionability doctrine is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the more powerful party" (internal quotation marks omitted)). Thus, to determine substantive unconscionability, the focus is on "oppressive terms." *Burch,* 118 Nev. at 444, 49 P.3d at 651 (internal quotation marks omitted).

**\*5** Regarding substantive unconscionability, the district court found the following:

> [T]he payments provision of the GCPLA indicates a licensing house fee is set forth within the agreement's schedule provision, which is not the case. As such, the fee a dancer may be charged to work a shift remains open to an unbounded amount set at the whim of [the] Men's

Club. Similarly, typographical errors in the indemnification provision of the GCPLA make it nearly impossible to determine the scope of breaches for which a dancer may be required to indemnify the Men's Club, exposing dancers to significant financial risk simply by working a shift.

The Men's Club argues that the district court's finding concerning the payments provision only amounts to speculation that the term *could be* unconscionable, and that no evidence established that the Men's Club actually charged an offensive fee. The payments provision provides in relevant part, "Performer shall pay TMCR in advance, a licensing house fee for each Shift for access to the Premises as set forth below (see house fee schedule), or such other amounts as negotiated by the parties hereto." Because an unconscionability determination requires the provisions "existing at the time of the execution of the contract" to be one-sided and oppressive, we conclude that the Men's Club's claim that additional evidence of an offensive fee is required to show unconscionability lacks merit. *Bill Stremmel Motors,* 89 Nev. at 418, 514 P.2d at 657. Based on the language of the provision, and the Men's Club's failure to furnish the promised house fee schedule, we further conclude that substantial evidence supports the district court's determination that the Men's Club's failure to include the promised fee schedule grants the Men's Club the unilateral ability to set and alter the house fee at its discretion. In addition, we conclude that other payment provisions likewise unreasonably favor the Men's Club by permitting it to unilaterally set fees associated with the licensing percentage fee and dance tokens. *See* 8 *Williston on Contracts, supra,* § 18:10 (defining substantive unconscionability "as an unfair or unreasonably harsh contractual term which benefits the drafting party at the other party's expense").

The Men's Club also challenges the district court's finding with respect to the indemnification and liability provision. The provision provides that the Dancers agree to indemnify the Men's Club "and all of their respective directors, officers, employees, agents, designees and assignees against any and all loss, damages ..., claims, demands, liabilities, actions, suits and/or expenses arising out of, or connected with *a customer* any breach of the Licensing Agreement and/or Addendum." (Emphasis added.) We determine that the district court reasonably construed the provision's error of including

"a customer" against the Men's Club. *See Anvui, LLC v. G.L. Dragon, LCC,* 123 Nev. 212, 215-16, 163 P.3d 405, 407 (2007) (detailing that an ambiguous contract provision "should be construed against the drafter"). Furthermore, and despite the Men's Club's argument to the contrary, the provision is not reciprocal.

 **\*6** Pursuant to the foregoing, we conclude that the one-sided nature of the GCPLA's provisions render the same substantively unconscionable. *See* 17A Am. Jur. 2d *Contracts § 272 (2016)* (explaining that mutuality "is a paramount consideration when assessing the substantive unconscionability of a contract term"). We further conclude that substantial procedural unconscionability and sufficient substantive unconscionability operate in tandem to invalidate the GCPLA. Accordingly, we affirm the district court's order denying the Men's Club's motion to compel arbitration.

It is so ORDERED. [2]

**All Citations**

136 Nev. 809, 471 P.3d 753 (Table), 2020 WL 5587435

## Footnotes

1    The parties acknowledged the applicability of the FAA to this matter in the prior appeal. *See FQ Men's Club,* Docket No. 74037, at \*4 n.2.

2    In its reply brief, the Men's Club challenges the district court's authority to consider the unconscionability of the GCPLA, as opposed to just the arbitration provision therein. The Men's Club claims that the GCPLA itself delegates challenges to the enforceability of the contract, aside from the arbitration clause, to the arbitrator, and that such delegation is consistent with United States Supreme Court precedent. See *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 449 (2006) ("We reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."). While persuasive, we conclude that the Men's Club waived this argument by failing to raise it in its opening brief. NRAP 28(c); *see also Weaver v. State, Dep't of Motor Vehicles,* 121 Nev. 494, 502, 117 P.3d 193, 198-99 (2005) (stating that this court need not consider issues raised for the first time in an appellant's reply brief).

---

End of Document        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 92 of 438 PageID #:  441

Garcia-Lopez v. Waste Management of Texas, Incorporated, Not Reported in Fed. Rptr....

2022 WL 17547458
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Auner Alexander GARCIA-
LOPEZ, Plaintiff—Appellant,
v.
WASTE MANAGEMENT OF
TEXAS, INCORPORATED; Unnamed
Company X, Defendants—Appellees.

No. 22-20112
|
FILED December 9, 2022

Appeal from the United States District Court for the Southern
District of Texas, No. 4:21-cv-00944, Ewing Werlein, Jr., U.S.
District Judge

**Attorneys and Law Firms**

Alexander Zeno, Naimeh Salem & Associates, P.L.L.C.,
Houston, TX, for Plaintiff—Appellant.

Darryl Wade Anderson, Carolyn Webb, Norton Rose
Fulbright US, L.L.P., Houston, TX, for Defendants—
Appellees.

Before Higginbotham, Duncan, and Engelhardt, Circuit
Judges.

**Opinion**

Per Curiam: *

 **\*1**  Plaintiff-Appellant Auner Garcia-Lopez ("Garcia-
Lopez") challenges the dismissal of his claims under
the Trafficking Victims Protection Act ("TVPA") and
the Racketeer Influenced and Corrupt Organizations Act
("RICO"). Garcia-Lopez contends that the district court erred
in dismissing his complaint. For the reasons explained below,
we AFFIRM the district court's dismissal.

I

Garcia-Lopez was an employee of Defendant-Appellee Waste
Management of Texas ("Waste Management") from 2011 to
2014. Garcia-Lopez is a citizen of El Salvador and was never
authorized to work in the United States.

In 2012, in coordination with Unnamed Company X
("Company X"), a staffing agency, and with Waste
Management's knowledge, Garcia-Lopez obtained false
identification so that he could continue working for Waste
Management. A 2014 criminal investigation into Waste
Management's practice of hiring illegal immigrants resulted
in the convictions of several Waste Management managers.
In connection with this investigation, Garcia-Lopez was
terminated from his position with Waste Management.

On March 23, 2021, Garcia-Lopez filed a complaint against
Waste Management and Company X, asserting claims of
involuntary servitude, trafficking, and forced labor under the
TVPA. The complaint also included a RICO claim alleging
that Waste Management and Company X formed a RICO
enterprise. Garcia-Lopez alleged that the TVPA violations
were the predicate acts for the alleged pattern of racketeering
activity required for a RICO claim.

Garcia-Lopez filed his First Amended Complaint ("FAC")
on April 13, 2021. On June 14, 2021, Waste Management
moved to dismiss the FAC under Rule 12(b)(6), and Garcia-
Lopez responded by filing his Second Amended Complaint
("SAC").

On August 11, 2021, Waste Management moved to dismiss
the SAC under Rule 12(b)(6). On January 27, 2022, the
district court granted Waste Management's motion to dismiss.
The district court found that Garcia-Lopez did not adequately
plead his forced labor claims, and having failed to state a
TVPA claim, Garcia-Lopez lacked the requisite predicate
criminal acts for his RICO claim. Garcia-Lopez's unjust
enrichment claim was also dismissed as time-barred.

II

An appellate court conducts a *de novo* review of a district
court's dismissal of a complaint under Federal Rule of Civil
Procedure 12(b)(6). *See Clyce v. Butler*, 876 F.3d 145, 148
(5th Cir. 2017). "To survive a [Rule 12(b)(6)] motion to
dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007)); *see* Fed. R. Civ. P. 12(b)(6) (stating that claims will
be dismissed pursuant to Rule 12(b)(6) if a plaintiff fails "to
state a claim upon which relief can be granted"). "A claim

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 93 of 438 PageID #:  442

Garcia-Lopez v. Waste Management of Texas, Incorporated, Not Reported in Fed. Rptr....

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must view the well-pleaded facts in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *see also Iqbal*, 556 U.S. at 678. Further, a "complaint must allege 'more than labels and conclusions'" *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555), and will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). And though "we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### III

**\*2** The Federal Rules of Appellate Procedure require parties to provide references to the page numbers of the record to support statements of fact. Fed. R. App. P. 28(a)(6) and (8) (A); 5th Cir. R. 28.2.2. "Failure to comply with the rules of this court regarding the contents of briefs can be grounds for dismissing a party's claims." *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (per curiam). Dismissal is warranted where the non-compliance is not merely "technical or stylistic" but rather is so "fundamental" that it prevents the court from engaging in meaningful review. *Owens v. Sec'y of Army*, 354 Fed. Appx. 156, 158 (5th Cir. 2009) (per curiam) (dismissing appeal for want of prosecution on the ground that appellant's brief "lacks any argument in support of the issues that it raises"); *see also Clark v. Waters*, 407 Fed. Appx. 794, 796 (5th Cir. 2011) (per curiam) (affirming dismissal on the grounds that appellant's brief "is grossly non-compliant with Rule 28"). Garcia-Lopez lays out several assertions in his brief but includes no citations to the record as required by the rules. *See* Fed. R. App. P. 28(a)(6) and (8)(A); 5th Cir. R. 28.2.2. Accordingly, in addition to the other independent grounds for dismissal outlined below, we dismiss Garcia-Lopez's appeal for gross non-compliance with the rules. *See Clark*, 407 Fed. Appx. at 796.

### IV

Section 1589 of the TVPA provides criminal penalties for "forced labor," and Section 1595 authorizes victims of forced labor to assert private civil claims. 18 U.S.C. §§ 1589, 1595(a). Garcia-Lopez's claims arise under the forced labor provision found in § 1589(a)(3). The plain language of the statute makes clear that to plead a civil claim under § 1595(a) premised on violations of § 1589(a)(3), a plaintiff must plead allegations sufficient to satisfy that an abuse of law was: (1) undertaken "to exert pressure" on the plaintiff; (2) done "knowingly" by the defendant; and (3) that caused the plaintiff to provide labor or services he would otherwise not have willingly provided. 18 U.S.C. §§ 1589(a)(3), 1595(a), 1589(c)(1). "Abuse or threatened abuse of law or legal process" means

> [T]he use or threatened use of a law or legal process ... in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. 1589(c)(1). The district court found that Garcia-Lopez failed to adequately allege in the SAC that Waste Management knowingly abused any law or legal process to exert pressure on Garcia-Lopez to procure labor or services from him that he would not have willingly provided. We agree. Garcia-Lopez fails to plead any of the three statutorily required elements to support his claim. In his brief, Garcia-Lopez suggests that Waste Management's involvement with and knowledge of the use of fake identities is sufficient to meet this requirement. This is incorrect. To meet the TVPA pleading requirements, Garcia-Lopez must identify a law or legal process that Waste Management knowingly used or threatened to use in a manner for which it was not designed to pressure or coerce labor from Garcia-Lopez. 18 U.S.C. § 1589(a)(3). Nowhere within the SAC or his brief does Garcia-Lopez allege this.

Furthermore, Garcia-Lopez's assertion that he wanted to "keep his job" undercuts the statutory requirement that his employment be involuntary. Thus, Garcia-Lopez has failed to meet the pleading requirements for his § 1589(a) (3) claims. As Garcia-Lopez's claim under 18 U.S.C. 1589(b) was contingent on his 1589(a)(3) claims, the district court correctly dismissed Garcia-Lopez's 1589(b) claim. Accordingly, the District Court correctly dismissed Garcia-

Lopez's TVPA claims, and the District Court's decision is AFFIRMED.


## V

Aside from two cursory mentions, Garcia-Lopez failed to address the dismissal of his RICO claim in his brief. A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. *United States v. Skilling,* 554 F.3d 529, 568 n.63 (5th Cir. 2009) (citing *United States v. Lindell,* 881 F.2d 1313, 1325 (5th Cir. 1989)). It is not enough to merely mention or allude to a legal theory. *See, e.g., McIntosh v. Partridge,* 540 F.3d 315, 325 n.12 (5th Cir. 2008). Accordingly, in addition to the independent grounds for dismissal of his RICO claim outlined below, Garcia-Lopez's RICO claim has been waived.

**\*3** Notwithstanding the waiver of this claim, a successful RICO claim requires a "pattern of racketeering activity" which is absent here. *St. Germain v. Howard,* 556 F.3d 261 (5th Cir. 2009). A "pattern of racketeering activity" requires two or more predicate criminal acts, which are listed in 18 U.S.C. § 1961(1). Garcia-Lopez avers that the violations of the TVPA suffice as the predicate acts for purposes of his RICO claim. Because the District Court correctly dismissed Garcia-Lopez's claims under the TVPA, those alleged violations cannot be predicate acts for purposes of alleging a RICO violation. As Garcia-Lopez has suggested no alternative predicate acts, he has failed to properly plead his RICO claim. Accordingly, the District Court properly dismissed Garcia-Lopez's RICO claim and we AFFIRM the District Court's decision.


## VI

The judgment of the district court is AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 17547458


## Footnotes

\*      This opinion is not designated for publication. See 5th Circuit Rule 47.5.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

526 P.3d 1110 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Court of Appeals of Nevada.

HALCYON SILVER, LLC, d/b/a Metropolitan
Auto Body & Paint, A Nevada Corporation;
and Charles Fox, an Individual, Appellants,
v.
Hollis EVELYNMOE, an Individual, Respondent.

No. 84299-COA
|
Filed March 24, 2023

Halcyon Silver, LLC, d/b/a Metropolitan Auto Body & Paint
(Metropolitan), and Charles Fox appeal from a final judgment
in a contract action concerning automotive repair and
restoration.[1] Eighth Judicial District Court, Clark County;
Crystal Eller, Judge.

**Attorneys and Law Firms**

McAvoy Amaya & Revero, Attorneys

Law Office of S. Don Bennion

*ORDER AFFIRMING IN PART,
REVERSING IN PART, AND REMANDING*

**\*1**  In 2013, Hollis Evelynmoe took his 1970 Ford Mustang
(vehicle) to Vegas Stang—at the time, an auto body
shop in Las Vegas—which conducted numerous repairs.[2]
As relevant to this case, Evelynmoe made the following
approximate payments to Vegas Stang: $2,500 for a rebuilt
engine, $2,550 for a rebuilt transmission, $1,300 for a new
exhaust system, and at least $400 for four tires and rims.
Vegas Stang went out of business in 2016, at which time
Evelynmoe decided to take his vehicle to Metropolitan
for completion of additional repairs. In November 2016,
Evelynmoe delivered his vehicle to Metropolitan along with
the rebuilt engine, transmission, exhaust system, tires and
rims, and the remaining parts rebuilt by Vegas Stang. On
November 4, 2016, Evelynmoe paid Metropolitan $4,039.38
to strip the vehicle down to bare metal and examine its
component parts, which allowed Metropolitan to generate a
preliminary estimate of $40,918.03 for the cost of the full

repair and restoration work to be performed. Metropolitan
later revised this estimate to reflect Evelynmoe's desire for
his vehicle to be converted to a fastback. The revised estimate
reflected a cost of $68,704.28, which Evelynmoe approved.

On December 15, 2016, Evelynmoe met with Fox, the owner
of Metropolitan, to sign a work authorization contract for
Metropolitan to begin working on his vehicle. The contract
did not contain a "time is of the essence" provision, nor did
it list a specific date in which the work would be completed.
Rather, it merely stated that Metropolitan would not be
"responsible for the availability of parts, or delays in part
shipments beyond their control." Additionally, the contract
contained a bolded provision which read, "PLEASE NOTE:
A daily storage charge may be applied of up to $70.30 per
day for motor vehicles that have not been picked up after
3 working days from the date of notification that repairs
have been complete." Further, the contract contained a brief
paragraph in which the signee agreed to "pay all legal fees
associated with any and all disputes." The contract also stated
that "[a]n express mechanics lien is hereby acknowledged on
the above vehicle to secure the amount of repairs thereto."
Upon signing the contract, Evelynmoe paid Metropolitan
$20,000 to begin the work. When Evelynmoe signed the
contract, Fox explained that he could reasonably expect the
work to be completed by the end of summer 2017.

In the six months after Evelynmoe signed the contract,
Metropolitan obtained and installed a fastback conversion kit
in the amount of $4,944 and made preparations for paint in the
amount of $1,500. In this same timeframe, Evelynmoe made
payments of $15,367.46 on January 4, 2017, and $20,000
on February 4, 2017. However, at some point during that
time frame, Metropolitan stopped working on Evelynmoe's
vehicle. On May 31, 2017, Evelynmoe visited Metropolitan
to examine his vehicle's status and select a paint color.
Upon visiting, Evelynmoe learned that Metropolitan had not
resumed work on his vehicle since the work stoppage. After
selecting a paint color, Evelynmoe made a final payment of
$12,736.82 to Metropolitan, bringing his collective payments
to the $68,704.28 estimated for the completed repair and
restoration work.[3] Upon making this final payment, Fox
again told Evelynmoe that he could expect the work on his
vehicle to be completed by the end of summer 2017.

**\*2**  After making his final payment, Evelynmoe returned
to Metropolitan approximately once a month to check on
the status of his vehicle, only to learn that no further work
had been performed by Metropolitan. On April 25, 2018—

approximately 11 months after Evelynmoe paid the full price for the repair and restoration work—Evelynmoe discovered again that Metropolitan had performed no further work on his vehicle, whereupon he demanded that Metropolitan cease performing any further work and that they relinquish possession of his vehicle. Evelynmoe then took extensive photographs, which demonstrated that Metropolitan had not completed a majority of the contracted work.

Before Evelynmoe was allowed to retrieve his vehicle, Fox presented him with two forms, an indemnification agreement and a "Stop Work" order. The indemnification agreement required Evelynmoe to forego all legal claims against Metropolitan. The Stop Work order required Evelynmoe to pay Metropolitan $70.30 per day in storage fees and to agree that his vehicle received all of the contracted work. Believing that these agreements misrepresented the condition of his vehicle and required him to forego legal action that he was entitled to pursue, Evelynmoe refused to sign them. Thus, Fox and Metropolitan refused to relinquish Evelynmoe's vehicle to him on April 25, 2018. Evelynmoe arranged for a tow truck to retrieve his vehicle on April 25, 2018; however, he cancelled the tow truck because Fox and Metropolitan would not release any part of the vehicle without him signing the two agreements.

On May 11, 2018, Evelynmoe received a letter from Metropolitan demanding that he pay substantial storage fees or his vehicle would be sold at auction on June 27, 2018. This forced Evelynmoe to file a motion for preliminary injunction, the hearing for which took place on June 26, 2018. The court found Evelynmoe's testimony regarding the work performed by Metropolitan and its refusal to release his vehicle to be credible, and the court granted the preliminary injunction. In its order, the court demanded that Metropolitan return Evelynmoe's vehicle to him "at a mutually convenient time to the parties." Additionally, the court ordered that Metropolitan's lien on Evelynmoe's vehicle for storage fees was still valid. Finally, the court ordered Evelynmoe to post a bond in the amount of $2,000 to secure payment of storage fees should they be awarded. Despite the court's order, Evelynmoe did not post the required bond until September 4, 2019.

Metropolitan did not release Evelynmoe's vehicle until September 5, 2019, when a tow truck hired by Silver Arrow, another auto body shop in Las Vegas, picked it up. Gregory Young, the owner of Silver Arrow, was present at Silver Arrow when Evelynmoe's vehicle arrived. Young recalled

that only the shell of the vehicle was received, and that it was missing, at a minimum, the engine, transmission, exhaust system, and four tires with rims that Evelynmoe received from Vegas Stang, as well as the driveshaft, radiator, wiring harness, air conditioning assembly, seats, door panels, glass windows other than the rear window, gas tank, and rear bank drums.

Evelynmoe initiated the underlying action against Metropolitan and Fox in June of 2018. In the operative complaint, Evelynmoe alleged that Metropolitan breached the work authorization contract and the implied covenant of good faith and fair dealing by failing to perform the contracted work on his vehicle. Evelynmoe also asserted a claim for conversion against Metropolitan and Fox, alleging that they wrongfully exerted dominion over his vehicle in a manner inconsistent with his ownership rights. Evelynmoe additionally alleged that Fox made an intentional misrepresentation when he communicated that the contracted work would be completed by the end of summer 2017. In their answer, appellants contested each of Evelynmoe's claims and asserted a counterclaim for unjust enrichment, as they believed they were entitled to storage fees incurred from the time Evelynmoe's motion for preliminary injunction was granted to the time that Evelynmoe posted the $2,000 bond mandated by the court's order.

**\*3** Following a three-day bench trial, the district court entered its findings of fact, conclusions of law, and judgment. Preliminarily, the district court found that "Evelynmoe's testimony was consistent throughout the trial and was extremely credible," and that "Fox'[s] testimony was somewhat inconsistent and at times thoroughly unbelievable." The district court found that Metropolitan materially breached the work authorization contract by failing "to perform a majority of its promised work between December 16, 2016, and April 25, 2018." The district court further found that Metropolitan breached the implied covenant of good faith and fair dealing by performing in a manner that was unfaithful to the purpose of the contract. Moreover, the district court found that Metropolitan and Fox were liable for conversion for exerting wrongful dominion over Evelynmoe's vehicle and parts in a manner inconsistent with his ownership rights. Finding that the legal fees provision of the contract was both procedurally and substantively unconscionable, the district court refused to enforce the provision. And because the written contract governed the duties of the parties, the district court denied both parties' claims for unjust enrichment. Finally, the court found that

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

the estimated completion date communicated by Fox was an estimate rather than a guarantee, and thus, Fox did not make any intentional misrepresentation to Evelynmoe. In accordance with its findings of fact and conclusions of law, the district court awarded Evelynmoe damages of $76,332.90, which were broken down as follows:

a. $58,232.90 in monetary losses for work not performed by Metropolitan pursuant to the [work authorization] contract;

b. $11,350.00 for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration; [4]

c. $400.00 for the conversion of four tires and rims;

d. $2,500.00 for the conversion of [Evelynmoe]'s rebuilt engine;

e. $2,550.00 for the conversion of [Evelynmoe]'s transmission; and

f. $1,300.00 for the conversion of [Evelynmoe]'s exhaust system.

On appeal, appellants argue that the district court erred in ruling in Evelynmoe's favor on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. [5] Appellants further aver that the district court's award of damages violated the double recovery doctrine. Finally, appellants assert that the district court erred in denying their unjust enrichment claim, as well as in refusing to enforce the legal fees provision of the contract as unconscionable.

While Evelynmoe fails to address several of appellants' arguments, he argues that the district court appropriately ruled in his favor on his contract and conversion claims and that the district court correctly denied appellants' unjust enrichment claim and refused to enforce the contract's legal fees provision.

*Metropolitan breached the implied covenant of good faith and fair dealing by failing to perform a majority of its promised work between December 16, 2016, and April 25, 2018*

Metropolitan argues that, because the work authorization contract contained no "time is of the essence" provision, Evelynmoe never expressed dissatisfaction with appellants'

progress in completing the contracted work, and both parties were experienced in transactions of this kind, its failure to complete the contracted work on Evelynmoe's vehicle between December 16, 2016, and April 25, 2018, cannot be considered a material breach under *Mayfield v. Koroghli,* 124 Nev. 343, 184 P.3d 362 (2008). Metropolitan further contends that the district court erred in concluding that it breached the implied covenant of good faith and fair dealing because the district court did not make explicit findings of bad faith on its part, even though the district court found that Metropolitan "failed to complete the repair and restoration work on [the vehicle] in a reasonable time" and that Evelynmoe's "justified expectations were denied." Conversely, Evelynmoe argues that, because Metropolitan failed to perform a majority of the contracted work between December 16, 2016, and April 25, 2018, the district court correctly found that Metropolitan materially breached the work authorization contract.

**\*4** We review the district court's determination that Metropolitan materially breached the contract for clear error. *See Sheehan & Sheehan v. Nelson Malley & Co.,* 121 Nev. 481, 486, 117 P.3d 219, 223 (2005) ("[T]he district court's determination that the contract was or was not breached will be affirmed unless clearly erroneous ...."). Similarly, we review the district court's findings regarding Metropolitan's breach of the implied covenant of good faith and fair dealing for clear error, which will be upheld so long as such findings are supported by substantial evidence. *APCO Constr., Inc. v. Helix Elec. of Nev., LLC,* 138 Nev., Adv. Op. 31, 509 P.3d 49, 53-54 (2022). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Unionamerica Mortg. & Equity Tr. v. McDonald,* 97 Nev. 210, 211-12, 626 P.2d 1272, 1273 (1981) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)).

The time for performance pursuant to a contract is not considered of the essence unless indicated by an express provision or the circumstances so imply. *Mayfield,* 124 Nev. at 349, 184 P.3d at 366. Where a contract does not contain a clause indicating that time for performance is of the essence, the parties generally must render performance within a reasonable time. *Id.* "What constitutes a reasonable time for a contract's performance is a question of fact to be determined based on the nature of the contract and the circumstances surrounding its making." *Id.* at 346, 184 P.3d at 364. However, in the absence of a provision making time of the essence, "a party's failure to perform within a reasonable

time generally does not constitute a material breach of the agreement." *Id.* at 349, 184 P.3d at 366. Nevertheless, we need not decide whether the district court correctly determined that Metropolitan materially breached the contract, as the district court appropriately held Metropolitan liable for breach of the implied covenant of good faith and fair dealing.

Even where a defendant does not breach the express terms of a contract, a plaintiff may still recover contract damages for a defendant's breach of the implied covenant of good faith and fair dealing. *APCO Constr., Inc.,* 138 Nev., Adv. Op. 31, 509 P.3d at 53. A party to a contract breaches the implied covenant of good faith and fair dealing where it performs "in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.,* 107 Nev. 226, 234, 808 P.2d 919, 923 (1991). Whether a party's performance denies another of their reasonable expectations under a contract "is determined by the various factors and special circumstances that shape these expectations." *See id.* at 234, 808 P.2d at 924.

Our jurisprudence has noted that whether a party acted in bad faith is the primary inquiry in determining whether they breached the implied covenant of good faith and fair dealing. *See Renown Health v. Holland & Hart, LLP,* No. 72039, 2019 WL 1530161, at *2 (Nev. Apr. 5, 2019) (Order of Affirmance) (citing *Geysen v. Securitas Sec. Servs. USA, Inc.,* 142 A.3d 227, 237-38 (Conn. 2016)). "Examples of bad faith include 'evasion of the spirit of the bargain, *lack of diligence and slacking off,* willful rendering of imperfect performance ... and interference with or failure to cooperate in the other party's performance.' " *Id.* at *2 (emphasis added) (quoting Restatement (Second) of Contracts § 205 cmt. d (Am. Law Inst. 1981)).

Despite Evelynmoe making his final payment on May 31, 2017, and despite Fox's estimation that the work would be completed by summer 2017, Metropolitan performed no further work on Evelynmoe's vehicle from then until April 25, 2018, when Evelynmoe demanded that his vehicle be returned to him.[6] Metropolitan's lack of diligence in completing the contracted work, which denied Evelynmoe his justified expectations under the contract, illustrates that Metropolitan acted in bad faith, thereby breaching the implied covenant of good faith and fair dealing.[7] Therefore, we affirm the district court's award of damages for the work not performed by Metropolitan, not under the theory that Metropolitan materially breached the contract, but under the alternate

theory that Metropolitan breached the implied covenant of good faith and fair dealing.

*Appellants exerted wrongful dominion over the component parts of Evelynmoe's vehicle and are thus liable for conversion*

**\*5** Whether a conversion has occurred is a question of fact. *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000). As such, we defer to the district court's findings regarding appellants' conversion of the component parts of Evelynmoe's vehicle so long as they are not clearly erroneous and supported by substantial evidence. *Certified Fire Prot. Inc. v. Precision Constr., Inc.,* 128 Nev. 371, 377, 283 P.3d 250, 254 (2012) ("Where a question of fact has been determined by the trial court, this court will not reverse unless the judgment is clearly erroneous and not based on substantial evidence." (quoting *Kockos v. Bank of Nev.,* 90 Nev. 140, 143, 520 P.2d 1359, 1361 (1974))).

"Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title rights.' " *Evans,* 116 Nev. at 606, 5 P.3d at 1048 (quoting *Wantz v. Redfield,* 74 Nev. 196, 198, 326 P.2d 413, 414 (1958)). A party is not considered to have exerted wrongful dominion over property "where it affirmatively submits a genuine dispute regarding the property to the courts and then appropriately holds the subject property pending the court's decision." *Nev. State Educ. Assn. v. Clark Cty. Educ. Assn,* 137 Nev. 76, 86, 482 P.3d 665, 675 (2021).

At trial, counsel for appellants claimed that the title to Evelynmoe's vehicle was transferred to Fox following the June 26, 2018, preliminary injunction hearing and before the order granting the preliminary injunction was entered and Evelynmoe posted the requisite $2,000 bond. But the record does not support that the title was transferred, nor was such transfer permitted by the court following the preliminary injunction hearing. The requisite bond pursuant to the preliminary injunction was only to ensure that appellants would be able to recover storage fees should they be awarded by the court pursuant to their counterclaim, not to prevent the sale of the vehicle that the court unequivocally prohibited in its order. Because appellants attempted to transfer the title of Evelynmoe's vehicle to Fox, which the district court prohibited, their actions suggest that they were attempting to assert wrongful dominion over Evelynmoe's vehicle in violation of Nevada law. *See Nev. State Educ. Ass'n,* 137 Nev. at 86, 482 P.3d at 675 ("Of course, [the rule that a party does

not exert wrongful dominion over property where it submits a genuine dispute regarding the property to the courts and holds the property pending the court's decision] would not apply if the party s claim of right is made with 'malice,' or if the party improperly disposes of the property." (citations omitted)). Further, the fact that appellants did not raise the dispute of the vehicle's ownership to the court prior to allegedly transferring the title of the vehicle to Fox s name, coupled with the court's finding that appellants never released Evelynmoe's four tires and rims, rebuilt engine, transmission, and exhaust system demonstrates that their actions were inconsistent with Evelynmoe's ownership of the property, and supported the court's finding of liability for conversion. *Id.* at 85-86, 482 P.3d at 674. Therefore, we conclude that the district court did not err in finding that appellants were liable for the conversion of these missing parts and in awarding their corresponding values as damages. [8]

*The district court awarded Evelynmoe duplicative damages in violation of the double recovery doctrine*

**\*6** "Whether a party is entitled to a particular measure of damages is a question of law reviewed de novo." *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.,* 127 Nev. 480, 483, 255 P.3d 286, 288 (2011) (internal quotation marks omitted). Our jurisdiction applied the double recovery doctrine in *Elyousef v. O Reilly & Ferrario, LLC,* 126 Nev. 441, 442, 245 P.3d 547, 548 (2010). "[A] plaintiff can recover only once for a single injury even if the plaintiff asserts multiple legal theories." *Id.* at 444, 245 P.3d at 549. Accordingly, "satisfaction of the plaintiff's damages for an injury bars further recovery for that injury." *Id.*

At trial, testimony established that Evelynmoe suffered damages of $750 to remove the body of his vehicle from Metropolitan. Additionally, Young's testimony demonstrated that as of September 1, 2020, Evelynmoe owed Silver Arrow $2,600 for "[t]he initial retrieval of the car, the moving of the car into the warehouse, and storage [fees] incurred." This testimony indicates that the $2,600 figure also reflected the $750 cost to remove Evelynmoe's vehicle from Metropolitan. Nonetheless, the district court apparently awarded both these amounts in calculating Evelynmoe's damages. Because awarding Evelynmoe both amounts may have permitted him to recover damages twice for the same injury, the district court may have erred by awarding double recovery in violation of the double recovery doctrine and, thus, the court will need to recalculate these damages on remand. *See id.*

Turning to the value of Evelynmoe's vehicle and/or its parts, despite appellants' assertion that no testimony was offered at trial to establish the value of the vehicle when it was first dropped off at Metropolitan, Fox testified that "[t]he entire vehicle as a whole, as a coupe, is probably worth 3,500 to 8 grand." Because Evelynmoe first delivered his vehicle to Metropolitan along with the rebuilt engine, transmission, exhaust system, and four rims with tires, it stands to reason that this estimated value given by Fox included the value of these parts that accompanied the vehicle. Despite this, the district court awarded Evelynmoe damages of $11,350 "for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration," as well as "$400.00 for the conversion of four tires and rims; $2,500.00 for the conversion of Plaintiff's rebuilt engine; $2,550.00 for the conversion of Plaintiff's transmission; and $1,300.00 for the conversion of Plaintiff's exhaust system."

While the district court did not provide a complete breakdown of the $11,350 figure awarded to Evelynmoe, the order suggests that the court included the higher estimate of $8,000 for the vehicle with parts as provided by Fox's testimony, $2,600 for storage fees charged by Silver Arrow, and $750 for the removal of Evelynmoe's vehicle from Metropolitan. Assuming this correctly demonstrates the district court's award of damages to Evelynmoe, the court erred in awarding double recovery damages based on Metropolitan's conversion of the components after they were already accounted for as part of the vehicle's value when it was delivered to Metropolitan. *See id.* Further, the court may have erred in awarding an amount for the body of the vehicle, as it appears that the body without the component parts was delivered to Silver Arrow Car Restoration and, therefore, returned to Evelynmoe. For these reasons, we reverse and remand this matter to the district court to recalculate the conversion damages awarded so as to not violate the double recovery doctrine based on the award of $11,350. *See id.*

*The district court properly denied appellants' unjust enrichment claim*

**\*7** On appeal, appellants are seeking recovery of storage fees incurred as the result of storing Evelynmoe's vehicle under the theory of unjust enrichment. "Whether a claimant has been unjustly enriched is a mixed question of law and fact." *See Desert Miriah, Inc. v. B & L Auto, Inc.,* 12 P.3d 580, 582 (Utah 2000). Here, the district court after making factual findings declined to award appellants' damages for their storage fees based on unjust enrichment.

We review a district court's factual findings for clear error and will uphold such findings so long as they are supported by substantial evidence. *Vegas Valley Inv. Series 105, Inc. v. Celtic Bank Corp.,* 135 Nev. 456, 458-59, 453 P.3d 1229, 1231 (2019). "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortg. & Equity Tr.,* 97 Nev. at 212, 626 P.2d at 1273. A claim for unjust enrichment is unavailable when there is an express, written contract. *Leasepartners Corp. v. Robert L. Brooks Tr.,* 113 Nev. 747, 755, 942 P.2d 182, 187 (1997). "[Permitting] recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles." *Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 379, 566 P.2d 819, 824 (1977).

In this case, the district court determined that the written contract governed the duties of Metropolitan and Evelynmoe, and therefore, the equitable remedy of unjust enrichment did not apply. *See Leasepartners,* 113 Nev. at 755, 942 P.2d at 187. The district court further determined that Evelynmoe did not owe the storage fees to appellants because the "necessity for said storage was caused by [appellants'] refusal to return [Evelynmoe]'s vehicle when requested on April 25, 2018 and not by [Evelynmoe]'s lack of diligence in picking up his car upon completion of repairs." This factual determination by the district court is supported by substantial evidence in the record, including Evelynmoe's testimony, which the district court found credible throughout trial. Therefore, appellants' counterclaim for unjust enrichment as it relates to the storage fees for Evelynmoe's vehicle fails. *Id.* For this reason, we conclude that the district court did not err in denying appellants' counterclaim for unjust enrichment.[9]

*The contract's legal fees provision was unconscionable, and the district court did not err in refusing to enforce it*
"Whether, given the trial court's factual findings, a contractual provision is unconscionable is a question of law subject to de novo review." *D.R. Horton, Inc. v. Green,* 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by U.S. Horne Corp. v. Michael Ballesteros Tr.,* 134 Nev. 180, 415 P.3d 32 (2018). We will uphold a lower court's findings of fact supporting a finding of unconscionability so long as they are supported by substantial evidence. *Id.*

**\*8** Generally, both procedural and substantive unconscionability are required before a court will render a contractual provision unenforceable by reason of unconscionability. *Burch v. Second Judicial Dist. Court,* 118 Nev. 438, 443, 49 P.3d 647, 650 (2002). Procedural unconscionability is present where a contract is presented on a pre-printed, standardized form, which does not permit the weaker party to negotiate its terms. *See id.* at 442, 443-44, 49 P.3d at 649-50 (explaining that an application form is procedurally unconscionable where the application is presented on a pre-printed, standardized form, which does not allow the signee "a meaningful opportunity to decide if they [want] to agree" to its terms). On the other hand, "[t]he substantive element of unconscionability focuses on the actual terms of the contract and assesses whether those terms are overly harsh or one-sided." *See, e.g., Henderson v. Watson,* Docket No. 64545, 2015 WL 2092073, at \*2 (Nev. Apr. 29, 2015) (Order Affirming in Part, Reversing in Part, and Remanding) (citing *Armendariz v. Found. Health Psychcare Servs., Inc.,* 6 P.3d 669, 690 (Cal. 2000)). A contractual provision is not substantively unconscionable where the provision applies equally to both parties. *Id.* at \*2. Procedural and substantive unconscionability need not be present in the same magnitude, and less evidence of procedural unconscionability is required where the presence of substantive unconscionability is so substantial. *See Armendariz,* 6 P.3d at 690.

Here, the contract provided by Metropolitan was a pre-printed, standardized form that Metropolitan utilizes when customers appear inperson to finalize their agreements for repair and/or restoration work. The only portions of the contract that did not contain a pre-printed term were blanks for consumers to fill out their personal information, as well as for the price of the repair and restoration work sought. The legal fees provision in question states, "I agree to pay all legal fees associated with any and all disputes."

Because the work authorization contract was a pre-printed and standardized form, Evelynmoe did not appear to have the ability to negotiate regarding the legal fees provision and was instead required to "take it or leave it." *See Burch,* 118 Nev. at 442, 49 P.3d at 649. This demonstrates the presence of procedural unconscionability. *Id.* at 443-44, 49 P.3d at 650. Although appellants suggest that Evelynmoe could have negotiated a different contract, no language in the contract suggests that this was an option.

Additionally, the presence of substantive unconscionability in the legal fees provision is significant. The contract's requirement that Evelynmoe "pay all legal fees associated with any and all disputes" is entirely one-sided, as it does not

require appellants to pay legal fees under any circumstance. Appellants attempt to argue that a reversal of the district court's refusal to enforce the legal fees provision is warranted because the district court relied on *Horton* in coming to its conclusion, which is no longer good law. However, the principle in *Horton* that a provision is procedurally unconscionable where it is not more conspicuous than other terms in a contract, was overruled only in its application to arbitration provisions, which is distinguishable from the legal fees provision at issue here. *U.S. Home Corp.,* 134 Nev. at 190, 415 P.3d at 41 ("Requiring an arbitration clause to be more conspicuous than other contract provisions is exactly the type of law ... the FAA preempts ....." (citation omitted)). The district court's findings still support the presence of procedural unconscionability. *See Burch,* 118 Nev. at 443-44, 49 P.3d at 650. Further, the significant substantive unconscionability of the legal fees provision

required less evidence of procedural unconscionability for the court to refuse to enforce the provision. *Armendariz,* 6 P.3d at 690. For the foregoing reasons, we conclude that the district court did not err in refusing to enforce the legal fees provision. [10]

**\*9** In light of the foregoing, we affirm the district court's judgment as to appellants' liability, but we reverse the judgment for a partial recalculation of damages in accordance with our disposition.

It is so ORDERED.

### All Citations

526 P.3d 1110 (Table), 2023 WL 2661524

---

### Footnotes

1       Metropolitan and Fox are hereinafter collectively referred to as appellants where appropriate.

2       We recount the facts only as necessary for our disposition.

3       We note that Evelynmoe's payments total $68,104.28, which is $600 short of the $68,704.28 price for the completed repair and restoration work. However, we note that Metropolitan charged Evelynmoe a credit card fee of $600, which is reflected in Metropolitan's invoice for the repair and restoration work and would account for this discrepancy.

4       Although this breakdown of damages does not reflect it, the district court stated in its conclusions of law that "[Evelynmoe] sustained damages in the amount of $11,350.00 caused by Metropolitan's breach of the implied covenant of good faith and fair dealing, because [Evelynmoe]'s justified expectations were denied."

5       This court need not reach appellants' argument that the district court abused its discretion by letting Evelynmoe testify regarding the value of his vehicle and its components, as appellants fail to cite any relevant legal authority to support that expert testimony was required to establish these values of which Evelynmoe had personal knowledge. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

6       We reject appellants' contention that Evelynmoe's testimony regarding the estimated completion date constituted impermissible parol evidence. *See State ex rel. List v. Courtesy Motors,* 95 Nev. 103, 106, 590 P.2d 163, 165 (1979) (providing that "parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict ... written instruments which ... are contractual in nature and which are valid, complete, [u]nambiguous, and unaffected by accident or mistake" (first alteration in original) (internal quotation marks omitted)). The district court did not look to the testimony to vary the terms of the parties' agreement; rather, the court considered the testimony as evidence concerning what constituted a reasonable time for performance by appellants under the contract. Because the contract was silent as to time for performance and, therefore,

there was no term in the contract for this extrinsic oral evidence to contradict, we conclude that the district court did not abuse its discretion in admitting Evelynmoe's testimony regarding the estimated completion date.

7    We note that, while the district court did not label Metropolitan's actions as "bad faith conduct," such may be inferred by their failure to conduct any work for nearly a year after Evelynmoe paid in full for the contracted work. *See Pease v. Taylor,* 86 Nev. 195, 197, 467 P.2d 109, 110 (1970) ("[E]ven in the absence of express findings, if the record is clear and will support the judgment, findings may be implied.").

8    We note that the damages awarded to Evelynmoe pursuant to his conversion claim are applicable to both Fox and Metropolitan, and to the extent these damages were or could have been awarded against Metropolitan under the breach of the implied covenant of good faith and fair dealing, we note that the district court must avoid counting these damages twice in recalculating Evelynmoe's appropriate award in accordance with our analysis below.

9    Even if Evelynmoe's failure to timely post the bond voided the preliminary injunction, the work authorization contract supports that appellants still would not be entitled to the return of their storage fees. The work authorization contract states, "PLEASE NOTE: A daily storage charge may be applied of up to $70.30 per day for motor vehicles that have not been picked up after 3 working days from the date of *notification that repairs have been complete.*" (Emphasis added.) The plain language of this provision suggests that the storage fees would only begin accruing three days after Metropolitan's completion of the contracted repairs, which never occurred. Further, the preliminary injunction was only related to the storage fees and was not required to preserve the title to the vehicle that remained in Evelynmoe's name following the hearing on the preliminary injunction without the requirement of posting a bond.

10   Insofar as the parties have raised arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

654 P.2d 1022

98 Nev. 544
Supreme Court of Nevada.

Linda K. HAROMY and Franz J. Haromy,
Appellants and Cross-Respondents,

v.

Sandra SAWYER, Respondent and Cross-Appellant.

No. 12905.
|
Dec. 15, 1982.

**Synopsis**

Purchaser of apartment building filed suit against vendors for fraud, deceit and an accounting, and filed an amended complaint requesting equitable relief based on theory of unjust enrichment. The Eighth Judicial District Court, Clark County, Carl J. Christensen, J., found that purchaser failed to prove its claim of fraud, but was entitled to partial restitution under the theory of unjust enrichment. Appeal and cross appeal were taken. The Supreme Court held that: (1) the district court did not err in finding the parties' liquidated damages clause to be a penalty; (2) the district court did not err in awarding partial restitution to the purchaser on the theory of unjust enrichment; and (3) the computation of damages in awarding partial restitution was proper.

Judgment affirmed.

**Attorneys and Law Firms**

**\*545  \*\*1022** O'Brien & Avila, Beckley, Singleton, DeLanoy & Jemison, Las Vegas, for appellants and cross-respondents.

Clark & Zubel, Las Vegas, for respondent and cross-appellant.

OPINION

PER CURIAM:

On October 8, 1977, appellants Franz and Linda Haromy, owners of the Lake Apartments located in Las Vegas, Nevada, entered **\*\*1023** into a contract to sell the apartments to respondent, Sandra Sawyer.

Respondent agreed to pay $860,000 to appellants for the Lake Apartments. Pursuant to the terms of the contract, respondent

was to provide $50,000 as a downpayment, make one monthly payment of $5,300, six monthly payments of $7,300, and a balloon payment of the balance owed on June 30, 1978.

Shortly after respondent took possession of the Lake Apartments, disputes arose between the parties. Respondent alleged the appellants had deceived her as to the true condition of the **\*546** property. Consequently, respondent refused to pay the November and December payments as required under the contract.

Respondent filed suit against appellants for fraud, deceit and an accounting. She also filed an amended complaint requesting equitable relief based on the theory of unjust enrichment. While awaiting trial, the parties entered into a stipulation which provided that respondent would make all payments required under the contract to an escrow agent appointed by the parties. The stipulation also provided that appellants were entitled to take possession of the apartment property if any payments were more than ten days past-due.

On June 30, 1978, respondent failed to make the final balloon payment. Both parties filed motions for injunctive relief on various theories. Thereafter, a hearing was held on the parties' cross-motions for preliminary injunctions. The district court granted appellants' motion for a preliminary injunction, and held they were entitled to possession of the property.

At trial, the court, sitting without a jury, found that respondent failed to prove her claim of fraud. Nonetheless, the court found that respondent was entitled to partial restitution under the theory of unjust enrichment, and awarded her $83,600.85.

Appellants challenge the judgment awarding respondent partial restitution, contending that the terms of the parties' agreement required all monies paid by respondent to be forfeited in the event of default.

Respondent cross-appeals, claiming she is entitled to a greater award of damages than calculated by the court.

The parties' contract of sale included the following liquidated damage clause:

> 12. Should default be made by Buyer under any of the provisions hereof, the Sellers may declare this Contract void and the Premises, together with all

improvements and furnishings, and all payments made and all considerations given under this Contract shall be forfeited to the Sellers as liquidated damages and the Sellers may declare the unpaid balance of this Contract due forthwith, and the Sellers may take possession of the Premises without notice, and remove therefrom [sic] the Buyer or anyone claimed under her. Any occupancy of the Premises thereafter by the Buyer or her agents, with or without consent of the Sellers shall be deemed to be a tenancy at the will of the Sellers.

 Generally, liquidated damage provisions are prima facie valid. Thus, the party challenging the provision must establish **\*547** that its application amounts to a penalty. *Silver Dollar Club v. Cosgriff Neon,* 80 Nev. 108, 389 P.2d 923 (1964); *see also Freedman v. Rector, Etc.,* 37 Cal.2d 16, 230 P.2d 629 (1951). In order to prove a liquidated damage clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party. *Silver Dollar Club v. Cosgriff Neon,* 80 Nev. 108, 389 P.2d 923 (1964).

 At trial respondent introduced evidence that she made partial payments of $120,100.85 and expenditures of $48,500.00 in permanent capital improvements while in possession of the property. It was also established that respondent significantly increased the rental income of the property while in her possession. Additionally, respondent presented the testimony of an expert witness who stated the property had a fair market value in excess of $900,000.00.

 **\*\*1024** In contrast, the record reflects appellants failed to present any persuasive evidence to suggest they had sustained actual damages as a result of respondent's failure to perform the contract. Consequently, the district court found that the liquidated damage clause at issue constituted a penalty.

On this record, we cannot say the district court erred in finding the parties liquidated damage clause to be a penalty.

 In support of her claim for restitution based on the theory of unjust enrichment, respondent relies on *Kitchin v. Mori,* 84 Nev. 181, 437 P.2d 865 (1968). In *Kitchin v. Mori,* we

determined that a defaulting buyer may recover payments previously made by him, upon a showing that the payments exceed the amount of the seller's damage. We stated, "[e]ven a wilfully defaulting vendee may recover the excess of his part payments over the damages caused by his breach."

Here, the record establishes that respondent expended a total of $168,600.85 in partial performance of the contract. Additionally, respondent clearly established that appellants did not incur any actual damages as a result of her breach.

Accordingly, we conclude that the district court did not err in awarding respondent $83,600.85 in partial restitution based on the theory of unjust enrichment.

 Finally, in her cross-appeal, respondent challenges the district court's computation of damages in awarding partial restitution.

In its findings of fact, the district court stated: "plaintiff is **\*548** entitled to partial restitution for her part payments in the amount of $120,100.85 plus capital improvements in the amount of $48,500.00 minus rents in the amount of $85,000.00 for a total of $83,600.85 in damages."

Respondent complains that the court failed to credit her with $71,030.17 in expenses incurred to earn rental income, while in possession of the property. Certain witnesses testified to expenses allegedly incurred by respondent while she was in possession of the property at issue. Many of these alleged expenses were challenged by appellants as being unnecessary and unsupported by the facts. The court weighed the testimony of all the witnesses and chose to credit respondent with actual payments expended on the property, less income earned from said property. The trial court's findings will not be disturbed on appeal, where they are supported by substantial evidence. *Franklin v. Bartsas Realty, Inc.,* 95 Nev. 559, 598 P.2d 1147 (1979).

Accordingly, we conclude respondent's cross-appeal is without merit and affirm the district court's judgment in its entirety.


GUNDERSON, C.J., MANOUKIAN, SPRINGER and MOWBRAY, JJ., and ZENOFF, [1] Senior Justice.

Haromy v. Sawyer, 98 Nev. 544 (1982)

654 P.2d 1022

**All Citations**

98 Nev. 544, 654 P.2d 1022

## Footnotes

1    The Chief Justice designated the Honorable David Zenoff, Senior Justice, to participate in this case in the place of the Honorable Thomas Steffen, who voluntarily disqualified himself. Nev. Const. art. 6, § 19; SCR 10.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

131 Nev. 1290
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

Richard HENDERSON, M.D., An Individual; Emergency
Physicians Medical Group, Inc.; Emergency Medicine
Physician Partners, LLC; Emergency Medicine
Physicians Western Region; Emergency Medicine
Physicians Of Clark Saint Rose (MCCOURT)
PLLC; and Thomas Zyniewicz, D.O., Appellants,
v.
David L. WATSON, M.D., Respondent.

No. 64545
|
April 29, 2015.

**Synopsis**
**Background:** Former employee brought conspiracy action
against employer. The District Court, Clark County, Kerry L.
Earley, J., 2013 WL 10724684, denied employer's motion to
compel arbitration, and it appealed.

**Holdings:** The Supreme Court held that:

provision of employment contract that delegated subject
matter jurisdiction to arbitrator to determine the enforceability
of the agreement did not divest the District Court of subject
matter jurisdiction;

evidence was insufficient to demonstrate that arbitration
provision was procedurally unconscionable to the degree
necessary to render arbitration agreement unenforceable; and

evidence was insufficient to demonstrate that arbitration
provision of employment contract was substantively
unconscionable to the degree necessary to render arbitration
agreement unenforceable.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP/Las
Vegas

Fennemore Craig Jones Vargas/Las Vegas

*ORDER AFFIRMING IN PART,
REVERSING IN PART, AND REMANDING*

**\*1** This is an appeal from a district court order denying a
motion to compel arbitration. Eighth Judicial District Court,
Clark County; Kerry Louise Earley, Judge.

Respondent entered into an employment agreement with
appellant Emergency Physicians Medical Group, Inc.
(EPMG). The agreement contained an article providing that
all disputes would be resolved through binding arbitration.
When respondent was terminated, he filed an action in the
district court and appellants filed a motion to dismiss and
compel arbitration. The district court denied the motion
concluding that the arbitration article was unconscionable,
and thus, unenforceable. This appeal followed.

Having considered the parties' briefs and the record on
appeal, we conclude that the district court properly denied
appellants' motion to dismiss for lack of subject matter
jurisdiction but erred in denying appellants' motion to compel
arbitration. [1] As a threshold matter, appellants assert for the
first time on appeal that the district court lacked subject
matter jurisdiction to determine the enforceability of the
employment agreement because the agreement contained a
clause delegating such authority to the arbitrator. We conclude
that the existence of the delegation clause does not implicate
the district court's subject matter jurisdiction, and appellants
have waived this argument by failing to raise the issue below.
*Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 732 n. 7
(7th Cir.2005) (recognizing that "the proper course of action
when a party seeks to invoke an arbitration clause is to stay
the proceedings pending arbitration rather than to dismiss
outright" (emphasis omitted)). Further, because the district
court was not divested of subject matter jurisdiction, the court
did not err in denying appellants' request to dismiss the action
under NRCP 12(b)(1) and we affirm the district court's order
in that regard.

The district court, however, erred in concluding that the
arbitration article is unconscionable, and thus, unenforceable.

131 Nev. 1290

*Baker v. Osborne Dev. Corp.,* 159 Cal.App.4th 884, 71 Cal.Rptr.3d 854, 860 (Ct.App.2008) (applying de novo review in determining whether an arbitration agreement is unconscionable, but reviewing factual inferences relied on by the district court under the substantial evidence standard). To conclude that a contract is unenforceable based on unconscionability, the contract must be both procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (Cal.2000). While both forms of unconscionability must be present for a contract to be deemed unenforceable, they can be present on a sliding scale, meaning "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* Here, there is only a small degree of evidence demonstrating that the arbitration article is procedurally and substantively unconscionable.

*Procedural unconscionability*

**\*2** In analyzing procedural unconscionability, the circumstances surrounding the formation and negotiation of the contract are relevant, with a focus on whether there was "an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice" or whether a party may be surprised by the unconscionable term, meaning "the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Bruni v. Didion,* 160 Cal.App.4th 1272, 73 Cal.Rptr.3d 395, 409 (Ct.App.2008) (internal quotations omitted). While the fact that the contract is an employment agreement lends some credence to the idea that the contract is a contract of adhesion, and thus procedurally unconscionable, respondent did not present any evidence other than his own statement that he was unable to negotiate the contract. *See Mission Viejo Emergency Med. Assocs. v. Beta Healthcare Grp.,* 197 Cal.App.4th 1146, 128 Cal.Rptr.3d 330, 336 (Ct.App.2011) (providing that the party opposing enforcement of an arbitration agreement has the burden of establishing that the agreement is unenforceable). Further, respondent signed the arbitration article independently from the rest of the contract in an outlined box that provided in bold letters that he had the opportunity to have an attorney review the provision. He also signed the contract a full month before EPMG's president, indicating that he had time for an attorney to review the contract and time to negotiate the contract.

The district court relied upon EPMG's failure to provide respondent with copies of the American Arbitration Association (AAA) rules, Federal Rules of Civil Procedure, and Federal Arbitration Act as evidence of procedural unconscionability because the contract provided that certain provisions from each would be applicable. *Trivedi v. Curexo Tech. Corp.,* 189 Cal.App.4th 387, 116 Cal.Rptr.3d 804, 808 (Ct.App.2010) (providing that "the failure to provide a copy of the arbitration rules to which the employee would be bound, supported a finding of procedural unconscionability"). Because the AAA rules were applicable except for a few instances involving discovery and pre-hearing motions, EPMG's failure to provide respondent with copies of these three documents only demonstrates procedural unconscionability to a small extent. See *generally Lane v. Francis Capital Mgmt. LLC,* 224 Cal.App.4th 676, 168 Cal.Rptr.3d 800, 811–12 (Ct.App.2014) (providing that the "failure to attach the arbitration rules could be a factor in support of a finding of procedural unconscionability, but [we] disagree that the failure, by itself, is sufficient to sustain a finding of procedural unconscionability"). Thus, in considering all of the above, the arbitration article is procedurally unconscionable but only to a small degree.

*Substantive unconscionability*

The substantive element of unconscionability focuses on the actual terms of the contract and assesses whether those terms are overly harsh or one-sided. *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690. Neither the availability of preliminary injunctive relief, *see* Cal. Civ. Pro.Code § 1281.8(b) (allowing a party to an arbitration agreement to seek preliminary injunctive relief regardless of the arbitration agreement's language), nor the unavailability of an appeal from the arbitrator's decision demonstrates substantive unconscionability because they apply equally to both parties. And EPMG's duty to pay the arbitration costs incurred by both parties that would not be incurred if the matter proceeded in court does not demonstrate substantive unconscionability. Further, because respondent did not argue that an adequate remedy would be unavailable to him in the chosen jurisdiction, the choice-of-law and forum-selection provisions are not substantively unconscionable. *See Olinick v. BMG Entm't,* 138 Cal.App.4th 1286, 42 Cal.Rptr.3d 268, 283 (Ct.App.2006) (providing that "[a]n employer and an employee may validly agree to select a forum other than California, and may validly select the substantive law of another jurisdiction, provided the employee has an adequate remedy for his or her discrimination claim in the selected forum" (emphasis omitted)); *see also Mission Viejo,* 128 Cal.Rptr.3d at 335.

**\*3** Nevertheless, the presence of the confidentiality provision precluding the use or release of evidence outside of the arbitration proceeding demonstrates substantive unconscionability. *See Ting v. AT & T,* 319 F.3d 1126, 1151–52 (9th Cir.2003) (recognizing that "[c]onfidentiality provisions usually favor companies over individuals ... because companies continually arbitrate the same claims," and gag orders on those arbitrations prevent plaintiffs from accessing a body of knowledge regarding those companies). Additionally, because respondent has a conspiracy claim pending in the district court and arising from the same facts and circumstances as this matter, if he is unable to use the evidence discovered during arbitration, he will be forced to incur unfair duplicative costs.[2] But the presence of the confidentiality provision alone is not sufficient to establish the high degree of substantive unconscionability necessary to render the arbitration article unenforceable.[3]

Thus, because there is only minimal evidence that the arbitration article is procedurally and substantively unconscionable, the district court erred in concluding that the arbitration article is unenforceable and denying appellants' motion to compel arbitration. Accordingly, we reverse the district court's denial of appellants' motion to compel arbitration and remand this matter to the district court proceeding consistent with this order.

It is so ORDERED.

**All Citations**

Slip Copy, 131 Nev. 1290, 2015 WL 2092073 (Table)

## Footnotes

1    We conclude that California law is applicable here as the employment agreement provides that California law will apply, the agreement is not contrary to Nevada public policy, and California has a substantial relationship with this action because EPMG is a California corporation. *See Progressive Gulf Ins. Co. v. Faehnrich,* 130 Nev. Adv. Op. No. 19, 327 P.3d 1061, 1063–64 (2014) (providing that Nevada courts will honor choice of law provisions in contract actions when the situs fixed by the agreement has a substantial relationship with the transaction and the agreement is not contrary to the public policy of the forum); *D.R. Horton, Inc. v. Green,* 120 Nev. 549, 553–54, 96 P.3d 1159, 1162–63 (2004) (demonstrating that Nevada applies the same standards in determining the enforceability of an arbitration agreement as California); *see also generally Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty.,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, 1153 (Cal.1992) (explaining that "[a] party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract" (internal quotation marks omitted)).

2    While appellants argue that this court cannot consider the effect the conspiracy claim has on the enforceability of the arbitration article because this court must review the article at the time it was made, in order to determine if the arbitration article is sufficiently bilateral, this court may examine the actual effects of the challenged provisions. *Acorn v. Household Int'l, Inc.,* 211 F.Supp.2d 1160, 1169–71 (D.Cal.2002).

3    We note that on remand the confidentiality provision could be severed, allowing enforcement of the arbitration article minus the confidentiality provision, because no other provision of the arbitration article is substantively unconscionable and the contract provides that when one provision is held to be unenforceable, the remaining provisions shall continue in full force. *See Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 695–96 (explaining that when one unconscionable provision is present, it can be severed from an agreement to allow the majority of the agreement to be imposed); *see also Woodside Homes of Cal., Inc. v. Superior Court,* 107 Cal.App.4th 723, 132 Cal.Rptr.2d 35, 42 (Ct.App.2003) (discussing severing a confidentiality provision from the rest of the agreement).

131 Nev. 1290

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4938708
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Galveston Division.

Steven HILLESTAD Plaintiff.

v.

LLOG EXPLORATION
COMPANY, LLC, et al. Defendants.

Civil Action No. 3:17-CV-00341
|
Signed 09/20/2018

**Attorneys and Law Firms**

Marcus Raymond Spagnoletti, Francis I. Spagnoletti, Spagnoletti Co, Houston, TX, for Plaintiff.

Bradley Lane DeLuca, DeLuca Kurisky Gould PC, Christopher Joseph Tramonte, Tramonte Assoc, Houston, TX, Christopher Michael Volf, Johanson & Fairless LLP, Sugar Land, TX, for Defendants.

## MEMORANDUM AND RECOMMENDATION

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendants' Motion to Transfer Venue for Forum *Non Conveniens* ("Motion to Transfer Venue"). [1] Dkt. 22. The Motion to Transfer Venue was referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). Dkt. 30. Having considered the motion, response, reply, and applicable law, the Court RECOMMENDS that the Motion to Transfer Venue be DENIED.

## BACKGROUND

In 2016, Plaintiff Steven Hillestad ("Hillestad"), an employee of Wood Group PSN, Inc. ("Wood Group"), worked as an operator aboard the Grand Isle 115-A Platform ("the Platform") off the coast of Louisiana. In November of that year, Hillestad was seriously injured aboard the Platform in a flash fire (hereinafter "the Incident"). Hillestad filed this suit under the Outer Continental Shelf Lands Act against the Platform operators—Defendants LLOG Exploration Company, L.L.C. and LLOG Exploration Offshore, LLC—and the employer of the individual in charge on the Platform—Defendant Danos, L.L.C (collectively "Defendants"). Hillestad's employer, Wood Group, is not a party to this lawsuit.

Defendants have moved to transfer this case to the Houston Division, arguing that it is a more convenient forum.

## LEGAL FRAMEWORK

28 U.S.C. § 1404(a) allows a district court to transfer a civil action "for the convenience of parties and witnesses, in the interest of justice ... to any other district or division where it might have been brought." The statute is intended to save "time, energy, and money while at the same time protecting litigants, witnesses, and the public against unnecessary inconvenience." *Republic Capital Dev. Grp., L.L.C. v. A.G. Dev. Grp., Inc.*, No. H–05–1714, 2005 WL 3465728, at \*8 (S.D. Tex. Dec. 19, 2005). Motions to transfer venue under § 1404(a) are committed to the sound discretion of the district court. *See Jarvis Christian Coll. v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988). The party seeking transfer has the burden of showing good cause for the transfer. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("*In re Volkswagen II*"). The burden on the movant is "significant," and for a transfer to be granted, the transferee venue must be "clearly more convenient than the venue chosen by the plaintiff." *Id.*

The first inquiry when analyzing a case's eligibility for § 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*In re Volkswagen I*"). Once that threshold is met, courts analyze both public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues in hearing the case.

**\*2** The private factors include: 1) the relative ease of access to sources of proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *See Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 766–67 (5th Cir. 2016) (citation omitted). The public factors include: 1) the administrative difficulties flowing from court congestion;

2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *See id.* at 767 (citation omitted). The Court will address each of these factors.

The plaintiff's choice of venue is not a factor in this analysis. *See In re Volkswagen II*, 545 F.3d at 314-15. Rather, the plaintiff's choice of venue contributes to the defendant's burden of proving that the transferee venue is "clearly more convenient" than the transferor venue. *Id.* at 315. "[B]y requiring that a movant show the transferee venue is clearly more convenient, a plaintiff's choice of venue is given some—significant but non-determinative—weight." *Mata v. Freeport McMoran Inc.*, No. 3:15-CV-00155, 2016 WL 6037237, at *2 n.2 (S.D. Tex. Oct. 14, 2016) (Hanks, J.) (citations, internal quotation marks, and brackets omitted). Furthermore, though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen II*, 545 F.3d at 315.

### ANALYSIS

The Court first addresses "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen I*, 371 F.3d at 203 (citation omitted).

Defendants' Motion to Transfer Venue from the Galveston Division to the Houston Division is brought solely on convenience grounds under 28 U.S.C. § 1404(a). In his Complaint, Hillestad asserted that "[v]enue is proper ... pursuant to 28 U.S.C. § 1391 as Defendant[s] reside[ ] in [the Southern] District [of Texas]." Dkt. 1 at 2. Defendants have admitted this allegation in their respective answers to the Complaint. *See* Dkts. 5 at 2, 11 at 2, 19 at 2. Thus, the Southern District of Texas, which contains both the Galveston Division and Houston Division, is an undisputed proper venue for this lawsuit. *See Perry v. Autocraft Invs., Inc.*, No. 4:13-CV-01959, 2013 WL 3338580, at *2 (S.D. Tex. July 2, 2013) (Costa, J.) ("The venue statute, 28 U.S.C. § 1391, is based on districts, not divisions. If venue is proper in Galveston, it is also proper in Houston.").

### A. PRIVATE INTEREST FACTORS

### 1. Relative Ease of Access to Sources of Proof

The first private interest factor concerns the relative ease of access to sources of proof. Defendants make several arguments regarding three broad categories of proof: documents and records; witness testimony; and attorney convenience. The Court finds that only Defendants' argument concerning documents and records is properly considered under the first private interest factor. [2] *See e.g., Equal Employment Opportunity Comm'n v. Faurecia Auto. Seating, LLC*, No. 4:16-CV-199-DMB-JMV, 2017 WL 4158624, at *3 (N.D. Miss. Sept 19, 2017) ("The first factor focuses on the location of the relevant 'documents and physical evidence' relative to the transferee and transferor venues."); *Lugo v. Geo Grp., Inc.*, No. 2:17-CV-20, 2017 WL 1807678, at *2 (S.D. Tex. May 5, 2017) ("This factor is analyzed in light of the distance that documents, or other evidence, must be transported from their existing location to the trial."); *Coleman v. Trican Well Serv., L.P.*, 89 F. Supp. 3d 876, 881 (W.D. Tex. 2015) ("[T]he first factor to consider is the relative ease of access to sources of proof, specifically documents and records.").

**\*3** Defendants assert that the parties and certain non-parties possess relevant documents and records that are either located in Houston or Louisiana. More specifically, Defendants contend that all of the relevant documents possessed by the Wood Group (a non-party)—including Hillestad's personnel file, and numerous documents pertinent to the Incident and its attendant investigation—are all located in Houston. Defendants also assert that Hillestad's medical records, which were created by his Houston-based treating physicians (also non-parties), are located in Houston. With respect to Defendants' relevant documents and records, Defendants readily admit that all such documents are located in Louisiana, not in Houston or Galveston. Hillestad does not contest the location of the documents and records. Instead, he argues that in this digital age, the physical location of documents is less important because documents are generally easily produced and transported in a digital format. Neither Hillestad nor Defendants have identified any specific proof, or even categories of proof, located in Galveston.

In *Radmax*, the Fifth Circuit explained that when assessing the parties' access to sources of proof the "*relative* ease of access, not *absolute* ease of access" is the relevant inquiry. *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013). The Fifth Circuit ruled in favor of transfer because "all of the documents and physical evidence are located in the

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 112 of 438 PageID #:  461

Hillestad v. LLOG Exploration Company, LLC, Not Reported in Fed. Supp. (2018)

[transferee] Division." *Id.* (internal quotation marks and brackets omitted). *See also Perry*, 2013 WL 3338580, at *2 (determining that the first private factor favored transfer because the accident and all of plaintiff's medical treatment occurred in the transferee location). Generally, "[when] neither party has identified any potential sources of proof in the Galveston Division, Houston's relatively easier access to potential documentary evidence favors transfer." *Hebert v. Wade*, No. 3:13-CV-00076, 2013 WL 5551037, at *3 (S.D. Tex. Oct. 7, 2013) (Costa, J.).

Here, neither party has identified any sources of proof located in the Galveston Division, but Defendants have offered sources of proof that are located in both Houston and Louisiana. The Court finds that this factor does not weigh as strongly in favor of transfer in this case because, unlike in *Radmax*, all of the evidence is not located in the transferee location. The weight of this factor is further diminished because this case, at its core, is a personal injury suit, and in such cases, documentary evidence is rarely a significant factor. *See, e.g., Bennett v. Moran Towing Corp.*, 181 F. Supp. 3d 393, 399 n.3 (S.D. Tex. 2016) (Hanks, J.) ("Although the Court has considered the parties' relative ease of access to documentary evidence [in] this case, such access is rarely a significant factor in a personal injury case because such actions are 'unlikely to require extensive paper discovery or additional difficulties in accessing sources of proof.' ") (collecting cases).

Accordingly, the first private interest factor narrowly favors transfer under *Radmax*, but the weight of this factor is diminished given the nature of Hillestad's claim.

### 2. Compulsory Process to Secure the Attendance of Unwilling Witnesses

The second private interest factor examines the availability of compulsory process over witnesses. Defendants contend that this factor is neutral "because all material witnesses are subject to the Houston Division and Galveston Division's subpoena power or are outside the Houston Division and Galveston Division's subpoena power." Dkt. 22 at 10. As such, Defendants have not identified any witnesses for whom compulsory process will be needed. Based on this fact, the Court finds that this factor is neutral. *See e.g., Sivertson v. Clinton*, No. 3:11-CV-0836-D, 2011 WL 4100958, at *5 (N.D. Tex. Sept. 14, 2011) (finding second factor neutral where Defendant failed to "identif[y] any witnesses for whom compulsory process will be needed"); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No.

CIV.A. 309-CV-0488-D, 2009 WL 2634860 at *5 (N.D. Tex. Aug. 26, 2009) (finding second factor was neutral because defendant failed to identify witnesses for whom compulsory process would be needed).

### 3. Cost of Attendance for Willing Witnesses

**\*4** The third private interest factor, which is "probably the single most important factor in the transfer analysis," considers the cost of attendance for willing witnesses. *Sandbox Logistics LLC v. Grit Energy Sols. LLC*, No. 3:16-CV-12, 2016 WL 4400312, at *5 (S.D. Tex. Aug. 17, 2016) (Hanks, J.) (citation and internal quotation marks omitted). As previously explained by Judge George C. Hanks, Jr.:

> The inconvenience to witnesses increases with the additional distance to be traveled, including additional travel time, meal, lodging expenses, and time away from their regular employment. The Court must also consider the personal costs associated with being away from work, family, and community.

*Id.* "[I]t is the convenience of non-party witnesses, rather than that of party witnesses, that is the more important factor and is accorded greater weight in a transfer of venue analysis." *State Street Capital Corp. v. Dente*, 855 F. Supp 192, 198 (S.D. Tex. 1994) (collecting cases). "Particularly, it is the location of key, non-party witnesses that dominates." *Watson v. Fieldwood Energy Offshore, LLC*, 181 F. Supp. 3d 402, 410 (S.D. Tex. 2016) (Hanks, J.) (internal quotation marks omitted). The convenience of one key witness may outweigh the convenience of numerous less important witnesses. *See, e.g., Young v. Armstrong World Indus., Inc.*, 601 F. Supp. 399, 401–02 (N.D. Tex. 1984). "To designate a potential witness as 'key' under the inquiry, 'the movant must specifically identify the key witnesses and outline the substance of their testimony.' " *Faurecia Auto. Seating, LLC*, 2017 WL 4158624, at *5 (quoting *Watson*, 181 F. Supp. 3d at 410) (brackets omitted). "Nevertheless, 'although quite important, the convenience of witnesses does not stand alone and must be weighed against the other relevant factors that typically are considered.' " *Sandbox Logistics*, 2016 WL 4400312, at *5 (quoting 15 WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3851).

Because the convenience of non-party witnesses is paramount, the Court begins its discussion with the non-party witnesses identified by Defendants. Defendants specifically identify by name two Wood Group employees—both of whom "work in Wood's Houston office"—and the substance of their anticipated testimony. Dkt. 22-3 at 2. Defendants also specifically identify Hillestad's treating physicians —both of whom have medical practices in Houston— as prospective non-party witnesses, and Defendants quote Hillestad's initial disclosures to outline the substance of their anticipated testimony. With much less specificity, Defendants have indicated that other non-party fact witnesses, who are all Wood Group employees, are located in Louisiana. But Defendants do not specifically identify these other Wood Group employees, outline the substance of their anticipated testimony, or indicate how many other Wood Group employees are expected to testify.

In sum, Defendants have specifically identified four non-party witnesses—the two treating physicians and two Wood Group employees. With respect to the Wood Group witnesses, Defendants have submitted evidence, by way of affidavit, establishing the office location of the two witnesses. Notably, the affidavit does not address where the Wood Group witnesses reside. Similarly, Defendants merely offer the office addresses of the treating physicians, but, again, no mention of where the physicians reside. The Defendants failure to establish where the witnesses reside, as opposed to where they work, is problematic for two reasons. First, the case law strongly indicates that in considering the third private interest factor, the Court's focus is where a non-party witness resides not where he works. *See e.g., Mata,* 2016 WL 6037237, at *5 (holding the third factor favored retention because "there is ... a sizable population of witnesses ... whose *residence* is 'unknown' ") (emphasis added); *Watson,* 181 F. Supp. 3d at 411 (finding third factor favored transfer where "[Plaintiff], most Defendants, [Plaintiff's] employer —a non-party—and all witnesses including key non-party fact witnesses, *reside* far from Galveston") (emphasis added); *Barnes v. Romeo Papa, LLC,* No. 3:12-CV-365, 2013 WL 3049236, at *2 (S.D. Tex. June 17, 2013) (Costa, J.) (discussing where the lone non-party witness was "believed to *reside*") (emphasis added); *Frederick v. Advanced Fin. Sols., Inc.,* 558 F. Supp. 2d 699, 704 (E.D. Tex. 2007) (explaining the third factor favors transfer "[w]hen nearly all of the [key] nonparty witnesses ... *reside* elsewhere") (emphasis added); *Dupre v. Spanier Marine Corp.,* 810 F. Supp. 823, 826 (S.D. Tex. 1993) (considering residency of non-party

witnesses). Second, in the Lone Star State, it is common for individuals to live and work in different cities. [3] Given this reality, as a practical matter, the mere location of the non-parties' workplace, without more, is simply insufficient to demonstrate that a transfer from the Galveston Division to the Houston Division would be more convenient for the non-parties because their residence may well be closer to Galveston than Houston. This possibility is especially pertinent here because Defendants' argument regarding the convenience of the non-parties is based primarily, if not solely, on the mileage the non-party witnesses would have to drive to get to the courthouse.

 **5**  Further compounding the deficiencies described above is the fact that the entire argument regarding the convenience of the non-parties is presented from the viewpoint of Defendants, with absolutely no input from the non-parties. In other words, the Court is left to decide the convenience of non-parties who have not expressed any preference or thoughts on the matter. Because the non-parties did not participate in seeking this transfer, "there is no evidence as to whether [the non-parties] would be 'willing' or 'unwilling' to be [ ] witness[es] in this case." *Mata,* 2016 WL 6037237, at *5. "The Court declines to simply fill in the blanks." *Id.* As such, the non-party witnesses identified by Defendants do not tip this factor in their favor.

Turning to the party witnesses, Defendants assert that four specific party witnesses reside in Louisiana, and for those witnesses, "travel would be more convenient ... if the case is transferred to Houston." Dkt. 22 at 8. This is because "the Houston federal courthouse is much closer to Houston Hobby airport than the Galveston federal courthouse, resulting in the reduction in the costs of a taxi or rental car, and less time away from the office and home." *Id.*

Initially, the Court observes that Defendants' "Hobby Airport argument" concerns *party witnesses,* and party witnesses are not the focus of the third private interest factor. *See, e.g., USPG Portfolio Two, LLC v. John Hancock Real Estate Fin., Inc.,* 2011 WL 1103372, at *4 (N.D. Tex. Mar. 25, 2011) (explaining the third factor "primarily concerns the convenience of nonparty witnesses" and declining to consider parties' employees under third factor). From a factual standpoint, the distance from Hobby Airport to the Galveston federal courthouse, as compared to the Houston federal courthouse, is negligible. Hobby Airport is approximately 11 miles from the Houston federal courthouse, and approximately 42 miles from the Galveston federal

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 114 of 438 PageID #: 463

Hillestad v. LLOG Exploration Company, LLC, Not Reported in Fed. Supp. (2018)

courthouse. In other words, the Houston federal courthouse is only roughly 30 miles closer to Hobby Airport than the Galveston federal courthouse. Put another way, the drive from Hobby Airport to the Galveston federal courthouse is approximately 30 minutes longer than the drive from Hobby Airport to the Houston federal courthouse. In sum, Defendants' argument boils down to weighing the convenience occasioned by driving 30 fewer miles in 30 less minutes. The Court does not totally discount that the shorter drive distance and time represents a quantifiable measure of relative convenience to the party witnesses. However, such relative convenience is so slight that it barely tips this factor in favor of transfer. [4] After all, it is not as if the Galveston courthouse is located in the "wastelands of Siberia," [5] "the wilds of Alaska[,] or the furthest reaches on the Continental United States." [6] To the contrary, the drive to Galveston is serene, if not majestic. The party witnesses (and the non-party witnesses) will likely enjoy the smooth ride provided by the newly renovated highway leading to the island. They may gasp, as so many have, at the beauty confronting them as they traverse the causeway. [7] From the apex of the causeway, it is quite a spectacle—Galveston Bay appears as a sheet of glass, mirroring and magnifying the bright rays of the sun and clouds. The opportunity to gaze upon such beauty, while reflecting inwardly on the looming legal tasks, can hardly be described as an inconvenience. *See, e.g., Smith v. Colonial Penn Ins. Co.*, 943 F. Supp. 782, 784 (S.D. Tex. 1996) (noting "any inconvenience suffered in having to drive to Galveston may likely be offset by the peacefulness of the ride and the scenic beauty of the sunny isle").

**\*6** Given the close proximity of Galveston and Houston, the fact that the only witnesses properly offered for the Court's consideration are party witnesses (as opposed to key non-party witnesses), and the very minimal benefit the party witnesses will experience if venue were transferred, the Court finds that although this factor slightly favors transfer, it is entitled to very little weight. *See, e.g., Faurecia Auto. Seating, LLC*, 2017 WL 4158624, at *5 ("However, because [Defendant] has failed to show or argue that any of these witnesses may be deemed key non-party witnesses, the Court gives this factor little weight.") (citation omitted).

### 4. Other Practical Problems

The fourth private interest factor is all other practical problems that make going to trial easy, expeditious, and inexpensive. "Practical problems include those that are rationally based on judicial economy." *Eolas Techs., Inc. v.*

*Adobe Sys., Inc.*, 6:09-CV-446, 2010 WL 3835762, at *6 (E.D. Tex. Sept. 28, 2010), *aff'd In re Google, Inc.*, 412 F. App'x 295 (Fed. Cir. 2011). The Fifth Circuit has clarified that "the garden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer." *In re Radmax*, 720 F.3d at 289.

Here, neither party specifically identifies any "practical problems" based on judicial economy that would make trial of the case in either Galveston or Houston more or less easy, expeditious, and inexpensive. Nonetheless, the Court *sua sponte* finds that this factor favors retention given the relevant procedural background involved in this case.

Hillestad filed this suit in November 2017. Danos, L.L.C. filed its answer on December 14, 2018. LLOG Exploration Company, L.L.C.'s and LLOG Exploration Offshore, LLC's answers were due on December 28, 2018—both parties moved to extend their answer deadline. The Court granted their motion, extending the answer deadline to January 31, 2018. By January 31, 2018, all Defendants had filed their answers.

On March 2, 2018, the parties submitted their Joint Discovery/Case Management Plan, indicating that they believed discovery could be completed by November 30, 2018. Several days later, the Court held its Initial Scheduling Conference. At the Initial Scheduling Conference, the Court informed the parties that it was inclined to enter a scheduling order utilizing the deadlines specified in the parties' Joint Discovery/Case Management Plan. The parties were generally agreeable with this, except they specifically requested that the Court provide a trial date earlier than originally proposed by the Court. The Court honored the parties' request. In the end, the Court entered a Docket Control Order containing the November 30, 2018 discovery deadline offered by the parties, and based on the parties' request for an early 2019 trial date, the Court adjusted the dispositive motion deadline (to November 26, 2018) and scheduled the trial for March 2019. The Defendants did not raise the prospect of transferring venue at the Initial Scheduling Conference or within their Joint Discovery/Case Management Plan.

On April 26, 2018, a little over four months after the parties' answers were originally due, and nearly six months after the Complaint was filed, Defendants filed a letter requesting a pre-motion conference to discuss their intent to file the instant Motion to Transfer Venue. The Motion to Transfer

Venue was filed on May 30, 2018, and the subsequent briefing was completed on July 2, 2018. Thus, at the time that the Motion to Transfer Venue was fully briefed, the discovery and dispositive motion deadlines were just some five months away.

**\*7** In *Hibbard v. Target Corporation*, Judge Gregg Costa, the then District Judge for the Galveston Division, considered a defendant's motion to transfer to the Houston Division on convenience grounds. No. 3:12-CV-344, 2013 WL 4677831 (S.D. Tex. Aug. 30, 2013) (Costa, J.). Judge Costa began his discussion by noting that, earlier that year, in *Perry*, he had granted a similar transfer to the Houston Division on convenience grounds. *Id.* at *1. Judge Costa explained, however, that *Perry* would not control his decision because in "*Perry*[, the] defendant filed the motion to transfer with its answer, and [Judge Costa] entered the transfer order before ever issuing a schedule or holding a hearing." *Id.* After collecting and discussing various authorities demonstrating that a delay in filing is properly analyzed under the fourth private interest factor, Judge Costa held:

> The current scheduling order's deadline for discovery and dispositive motions is a little more than three months away.... Transferring to Houston, where the case would require a new scheduling order and trial setting, at this late stage is therefore likely to cause significant delay. The ... interest in 'expeditious and inexpensive' litigation thus weighs against transfer.

*Id.* at *1 (citations omitted).

The facts presented here are substantially similar to those in *Hibbard*. Defendants first raised the issue of transferring the case almost six months after the Complaint was filed, four months after all answers were due, and almost two months after attending an Initial Scheduling Conference and saying nothing to alert the Court that venue was an issue. If the Court now transfers this case to Houston, where the case would require a new scheduling order and trial setting, the parties certainly will not have this case resolved in early 2019—the trial period the parties specifically sought at the Initial Scheduling Conference. In other words, a transfer "at this late

stage is ... likely to cause significant delay." *Id.* For all of these reasons, the Court finds that the likely delay in this case is not of the garden-variety, and this factor weighs strongly in favor of retention.

The court now turns to the public interest factors.

## B. PUBLIC INTEREST FACTORS

### 1. Administrative Difficulties Flowing from Court Congestion

The focus of the first public-interest factor is " ' not whether [transfer] will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket.' " *Rosemond v. United Airlines, Inc.*, No. H–13–2190, 2014 WL 1338690, at *4 (S.D. Tex. Apr. 2, 2014) (quoting *Siragusa v. Arnold*, No. 3:12–CV–04497–M, 2013 WL 5462286, at *7 (N.D. Tex. Sept. 16, 2013) ). Defendants argue this factor is neutral because any difference in the disposition time between Galveston and Houston will only be a matter of a few months, which is negligible. In response, Hillestad quotes this Judge Hanks's 2016 *Sandbox* opinion, in which he noted that the "Galveston Division's lighter criminal docket allows it to resolve civil matters more quickly[,] ... [and,] [t]hus, this factor favor[ed] retaining the case." 2016 WL 4400312, at *7. Since issuing the *Sandbox* opinion, an eager, earnest, energetic, and erudite United States Magistrate Judge has joined Judge Hanks in the Galveston Division. As a result, the Galveston Division is fully staffed and firing on all cylinders, and the Court has been shuttling cases towards trial even more quickly than when *Sandbox* was written. For this reason alone, this factor favors retention. This is so even if Defendants' argument regarding disposition time is accurate. As detailed above, this case is already well down the path towards the parties' requested early 2019 trial setting. This means, in track terms, the parties are already near the finish line that the Court moved closer for their convenience. Based on these facts, Defendants will certainly receive a more speedy trial in this Court, notwithstanding any general statistic about trial dispositions that might suggest otherwise.

**\*8** Thus, this factor strongly favors retention.

### 2. Local Interest in Having Localized Interest Decided at Home

The second public interest factor evaluates the local interest in the dispute. Defendants argue that Galveston does not have a local interest because none of the witnesses or parties

is located in the division. Defendants contend that Houston has a greater local interest because some of the non-party witness offices are in Houston, and some of their relevant records are located in Houston. Based on these contentions, Defendants argue this factor weighs in favor of transfer to the Houston Division. Hillestad disagrees, arguing that this factor is neutral because neither the Galveston Division nor Houston Division has a local interest given that the incident giving rise to this suit occurred off the coast of Louisiana.

The local interest factor analyzes the "factual connection" that a case has with both the transferee and transferor venues. *In re Volkswagen I, 371 F.3d at 206.* "This factor generally favors the venue where the acts giving rise to the lawsuit occurred." *Metromedia Steakhouses Co., L.P. v. BMJ Foods P.R., Inc.,* 3:07–CV–2042–D, *2008 WL 794533, at \*3 (N.D. Tex. Mar. 26, 2008).* In this case, the acts giving rise to the lawsuit occurred off the coast of Louisiana. Neither the Galveston Division nor Houston Division has any special or meaningful connection to the facts giving rise to the lawsuit. Although the Court recognizes Defendants' argument regarding certain witnesses and records, it is simply insufficient to demonstrate that the Houston Division has a greater local interest than the Galveston Division. Because the facts giving rise to this case are unrelated to the Galveston and Houston Divisions, the Court regards this factor as neutral.

### 3. Familiarity of the Forum with the Law that Will Govern the Case

Neither this Court nor Houston Division is more or less familiar with Texas law, which will govern this case. Therefore, this factor is neutral.

### 4. Avoidance of Conflict of Laws or in Application of Foreign Law

The last factor—the possible conflicts of law arising from the application of foreign law—does not affect the analysis. Because there are no conflict of laws issues that would make this case better suited for either this Court or the Houston Division, this factor cannot weigh either for or against transfer. Accordingly, this factor is neutral.

### CONCLUSION AND RECOMMENDATION

After weighing the factors, the Court concludes that the two factors favoring retention in the Galveston Division (Private Interest Factor 4: all other practical problems that make going to trial easy, expeditious, and inexpensive; and Public Interest Factor 1: administrative difficulties flowing from court congestion), clearly outweigh those favoring transfer to the Houston Division (Private Interest Factors 1 and 3: relative ease of access to sources of proof and cost of attendance for willing witness). Consequently, Defendants have failed to meet their burden of establishing that Houston is "clearly more convenient." *In re Volkswagen II, 545 F.3d at 315.* For this reason, the Court RECOMMENDS that Defendants' Motion to Transfer Venue for Forum *Non Conveniens* (Dkt. 22) be DENIED.

**\*9** The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4938708

### Footnotes

1    The title of the Motion to Transfer Venue indicates that it is based on a "Forum *Non Conveniens*" theory. The body of the motion, however, indicates that it is based on convenience grounds under 28 U.S.C § 1404(a). The cause of this discrepancy is unclear. But for the benefit of the litigants, the Court notes that when a party "seeks transfer to another federal [court], forum non conveniens is an improper method of transfer." *Stuart v. Fire-Dex, LLC,* No. CIV. A. H-13-675, 2013 WL 5852234, at \*4 (S.D. Tex. Oct. 30, 2013). A motion based

on "28 U.S.C. § 1404(a) is the proper method." *Holmes v. Energy Catering Servs., LLC*, 270 F. Supp. 2d 882, 886 (S.D. Tex. 2003).

2    Although the Court does not consider Hillestad's arguments about witness testimony in the context of the first private factor, such arguments will be considered, as appropriate, in the context of the other private interest factors directly related to witness testimony. Defendants' argument that Houston is more convenient for all attorneys falls flat because "the convenience of attorneys is not a consideration in the section 1404(a) convenience transfer analysis." *Perry*, 2013 WL 3338580, at *2 (citing *In re Volkswagen I*, 371 F.3d at 206).

3    Indeed, the undersigned and his entire staff travel every day from neighboring cities (Stafford and Houston) to Galveston for work.

4    "Hobby's distance of 40 miles to the Galveston Federal Courthouse is not a significantly more arduous journey than the [11 miles from Hobby to the Houston Federal Courthouse], particularly when the free, nearby, and widely available parking at the Galveston federal building is taken into account." *Barnes*, 2013 WL 3049236 at *3 n.l.

5    *Jarvis Christian Coll.*, 845 F.2d at 528.

6    *Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 805 F. Supp. 1392, 1397 (S.D. Tex. 1992).

7    As an aside, the Court recommends "Galveston," Glen Campbell's 1969 number one hit single.on the Hot Country Singles and Easy Listening charts, as the perfect soundtrack for the journey to the historic Galveston federal courthouse. *See* GLEN CAMPBELL, GALVESTON (Capitol Records 1969).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1964180
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

HUAWEI TECHNOLOGIES CO.,

LTD., and Futurewei Technologoies, Inc.

v.

YIREN Ronnie HUANG, and CNEX Labs, Inc.

Civil Action No. 4:17-CV-00893
|
Signed 04/25/2018

**Attorneys and Law Firms**

Andrew S. Boutros, Michael D. Wexler, Seyfarth Shaw LLP, Chicago, IL, Elizabeth Siebman Forrest, Siebman, Burg, Phillips & Smith LLP, Plano, TX, Jesse M. Coleman, Seyfarth Shaw, LLP, Houston, TX, Clyde Moody Siebman, Siebman Burg Phillips & Smith LLP, Sherman, TX, for Huawei Technologies Co., Ltd., and Futurewei Technologoies, Inc.

Bryan Alexander Kohm, Michael J. Sacksteder, Fenwick & West, San Francisco, CA, Christopher John Schwegmann, Lynn Pinker Cox & Hurst LLP, Dallas, TX, Gabriel S. Gross, Latham & Watkins LLP, Menlo Park, CA, for Yiren Ronnie Huang, and CNEX Labs, Inc.

**MEMORANDUM OPINION AND ORDER**

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court are Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #14) ("Initial Motion to Dismiss"), Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss Plaintiffs' First Amended Complaint for Improper Venue and for Failure to State a Claim Under Rule 12(b) (6) ("Motion to Dismiss") (Dkt. #34), and Defendants CNEX Labs, Inc. and Yiren Ronnie Huang's Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing ("Motion for Leave") (Dkt. #56). Having considered the motions and the relevant pleadings, the Court finds that Defendants' Initial Motion should be denied as moot, Defendants' Motion to Dismiss as to Defendants' 12(b)(3) argument for improper venue should be denied, Defendants' 12(b)(6) argument for

failure to state a claim should be granted in part, and Defendants' Motion for Leave should be granted.

**BACKGROUND**

Plaintiff Huawei Technologies Co., Ltd. ("Huawei") is a multinational networking and telecommunications equipment and services company headquartered in China. Plaintiff Futurewei Technologies, Inc. ("Futurewei") is a subsidiary of Huawei with several offices throughout the United States, including Plano, Texas. In December 2010, Futurewei offered Yiren "Ronnie" Huang ("Huang") employment as a Principal Engineer for its solid-state drive ("SSD") storage group, to assist in development and implementation of Advance Computing Network ("ACN"), non-volatile memory express ("NVMe"), and SSD technology. Huang accepted the offer in January 2011. Huang worked in the Santa Clara office and was domiciled in Santa Clara County, California. At the Futurewei new hire orientation, Huang signed an employment contract (the "Employment Agreement"), which contained the following forum-selection clause:

**12. General Provisions.**

**(a) <u>Governing Law.</u>** This Agreement will be governed by and construed according to the laws of the State of Texas without regard to conflicts of law principles.

**(b) <u>Exclusive Forum.</u>** I hereby irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and I agree to the exclusive personal jurisdiction and venue to any court on Collin County Texas.

(Dkt. #34, Exhibit 1 at pp. 21–22). The Employment Agreement also contained provisions relating to non-disclosure, non-competition, and non-solicitation.

Based on Huang's job responsibilities, Plaintiffs contend that Huang had access to confidential, proprietary, and trade secret information. On May 31, 2013, Huang ended his employment with Futurewei. On June 3, 2013, Huang, along with others, incorporated CNEX Labs, Inc. ("CNEX"), a Delaware Corporation with its principal place of business in California. Plaintiffs allege, among other things, that Huang incorporated CNEX to compete directly with Plaintiffs, Huang is using Plaintiffs' confidential, proprietary, and trade secret information to develop and improve SSD technology

and NVMe related technology for CNEX, and further that Huang and CNEX are improperly soliciting employees away from Plaintiffs. Additionally, Plaintiffs allege that Huang started to engage in this behavior informally prior to leaving Futurewei. Plaintiffs further contend that Huang and CNEX began filing patent applications in June 2013, using the information that Huang obtained through his employment with Futurewei.

**\*2** Plaintiffs filed suit in the Eastern District of Texas on December 28, 2017, against Defendants seeking declaratory judgment and alleging a variety of causes of action including breach of contract, disclosure and misappropriation of confidential information and trade secrets, tortious interference with contract and prospective contracts, conspiracy claims, Racketeer Influence and Corrupt Organizations Act of 1970 ("RICO") claims, breach of fiduciary duty, and unfair competition under Lanham Act and Texas common and statuary law (Dkt. #1). On the same date, Defendants filed suit of a similar nature in the Superior Court of California, County of Santa Clara (Dkt. #34, Exhibit 5 at p. 1). [1]

In response to this Complaint, Defendants filed their Initial Motion to Dismiss on February 2, 2018 (Dkt. #14). Plaintiffs filed a response (Dkt. #22), but also filed Plaintiffs' First Amended Complaint (Dkt. #27). In response to the First Amended Complaint, on March 9, 2018, Defendants filed the present Motion to Dismiss (Dkt. #34). Plaintiffs filed a response (Dkt. #42), Defendants filed a reply (Dkt. #46), and Plaintiffs filed a sur-reply (Dkt. #50). The Court held a hearing on the Motion to Dismiss on April 2, 2018. After the hearing, Defendants filed a Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing (Dkt. #56). Plaintiffs have not yet filed a response.

### LEGAL STANDARD

#### I. Motion to Dismiss for Improper Venue Pursuant to Rule 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) allows a party the ability to move the Court to dismiss an action for "improper venue." The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Global Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685, at \*1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009) ). In determining whether venue is

proper, "the [C]ourt is permitted to look at evidence in the record beyond those facts alleged in the complaints and its proper attachments." *Ambraco*, 570 F.3d at 238. If venue is improper, the Court must dismiss it, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *accord* FED. R. CIV. P. 12(b)(3).

#### II. Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement ... showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2) ).

**\*3** In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."

*Id.* at 681. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.' " *Morgan v. Hubert*, 335 Fed.Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

### III. Federal Rule of Civil Procedure 9(b)

Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[ ] defendants with fair notice of the plaintiffs' claims, protect[ ] defendants from harm to their reputation and goodwill, reduce[ ] the number of strike suits, and prevent[ ] plaintiffs from filing baseless claims." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994) ). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.' " *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at \*14 (N.D. Tex. Aug. 26, 2010) (" '[W]hen the parties have not urged a separate focus on

the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at \*3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996) ).

## ANALYSIS

Defendants ask the Court to dismiss Plaintiffs' claims because the Eastern District of Texas is not the proper venue for the case and because Plaintiffs failed to properly state a claim for which relief can be granted. Plaintiffs assert that venue is proper and that the First Amended Complaint satisfies Federal Rules of Civil Procedure 8(a) and 9(b). The Court addresses each basis for dismissal in turn.

### I. Motion to Dismiss for Improper Venue Pursuant to 12(b)(3)

 **\*4**  Defendants argue that the Court should dismiss Plaintiffs' claims because the Eastern District of Texas is not a proper venue pursuant to the federal venue statutes and the forum-selection clause does not make venue proper. Further, Defendants maintain, that even if the forum-selection clause made venue proper in the Eastern District of Texas, venue is still improper because CNEX is not bound by the agreement and is an indispensable party. The Court first addresses the enforceability and effect of the forum-selection clause, then whether CNEX is properly bound by the forum-selection clause.

#### A. Forum-Selection Clause

Defendants ask the Court to dismiss the case arguing that venue is improper under the federal venue statutes and the forum-selection clause does not affect the propriety of venue. Plaintiffs counter that the forum-selection clause contained in Huang's Employment Agreement makes venue proper in the Eastern District of Texas. [2]

When analyzing the enforceability of forum-selection clauses "federal law applies ... in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240

Fed.Appx. 612, 615 (5th Cir. 2007) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974) ). Under federal law, forum-selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) ( "*The Bremen*"). A forum-selection clause may be found unreasonable when the movant shows: (1) that it is the product of fraud or overreaching; (2) that it violates a strong public policy of the forum; (3) that enforcement of the clause effectively deprives plaintiff of his day in court; or (4) that the fundamental unfairness of the chosen law will deprive plaintiff of a remedy. *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) ). The resisting party asserting unreasonableness bears " 'a heavy burden of proof.' " *Carnival Cruise Lines, Inc.*, 499 U.S. at 592 (quoting *The Bremen*, 407 U.S. at 17). If the forum-selection clause is found to be reasonable, courts must then determine whether the claims arise under the forum-selection clause. *Ginter ex rel. Ballard v. Belcher, Predergrast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998) ).

Additionally, courts must also determine whether the forum-selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *City of New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *accord Caldas & Sons*, 17 F.3d at 127. "For a forum[-]selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *City of New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indon., Inc.*, 503 F.2d 955 (5th Cir. 1974) ).

**\*5** Here, the parties do not dispute that the clause is mandatory or that Plaintiffs' claims are within the scope of the forum-selection clause. The forum-selection clause states "I hereby irrevocably agree that the *exclusive* forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and I agree to the *exclusive* personal jurisdiction and venue to any court on Collin County Texas." (Dkt. #34, Exhibit 1 at pp. 21–22) (emphasis added). The clause contains clear language that venue is appropriate only in state or federal courts in Collin County, Texas. As such, the only remaining

issue is whether the forum-selection clause is reasonable. If so, then venue is proper in the Eastern District of Texas.

In their reply, Defendants argue that the forum-selection clause is unreasonable and therefore unenforceable based on fraud and overreaching. Defendants maintain that the forum-selection clause is the result of fraud and overreaching because (1) Futurewei materially changed the terms of employment after Huang accepted employment and quit his prior job; (2) Huang was not permitted to consult an attorney or otherwise investigate the legality of the terms; (3) the factual scenario created an inequality of bargaining power; and (4) no one at Futurewei pointed out the terms of the "governing law" or "exclusive forum" section. Plaintiffs contend that the argument is waived because Defendants raised it too late. [3]

> [U]nreasonable fraud or overreaching 'does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud[,] ... the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the ***inclusion of that clause in the contract*** was the product of fraud or coercion.' Allegations of such [fraudulent] conduct as to the contract as a whole—or portions of it other than the ... [forum-selection] clause—are insufficient, the claims of fraud or overreaching must be aimed straight at the [forum-selection] clause in order to succeed.

*Oxysure Therapeutics, Inc. v. Gemini Master Fund, Ltd.*, No. 4:15-cv-821-ALM-CAN, 2016 WL 4083241, at \*4 (E.D. Tex. July 8, 2016), *report and recommendation adopted by*, 2016 WL 4039226 (E.D. Tex. July 28, 2016) (emphasis in original) (alterations in original) (quoting *Haynsworth*, 121 F.3d at 963); *accord Safety-Kleen Sys., Inc. v. McCoy Freightliner, Inc.*, No. 4:10-cv-608, 2011 WL 665812, at \*6 (E.D. Tex. Jan. 21, 2011), *report and recommendation adopted by*, 2011 WL 665854 (E.D. Tex. Feb. 14, 2011).

Here, regardless of whether Defendant waived the argument, the Court finds the argument unpersuasive. As to the first three reasons Defendants provided to prove fraud and overreaching, they address the Employment Agreement as a whole, as opposed to being specifically directed toward the forum-selection clause. As to Defendants' first argument —Futurewei materially changed the terms of Huang's employment after accepting his job and quitting his old job—Defendants argue that Huang received an offer letter (the "Offer Letter"), which Huang believed contained all the material terms of employment. According to Huang,

the Offer Letter made "no mention that the [Employment Agreement] would include a forum-selection clause or any clause requiring [him] to assign all of [his] inventions relating to Futurewei's business for one year after [he] left the company." (Dkt. #46, Exhibit 2 at ¶ 5). [4] Both of these clauses are contained in the Employment Agreement. As such, there are at least two provisions that Defendants contend Futurewei materially altered between what was contained in the Offer Letter to what was contained in the Employment Agreement. This falls short of a specific challenge to the forum-selection clause. *See Haynsworth,* 121 F.3d at 964.

**\*6** As to Defendants' second argument—Huang was not permitted to consult with an attorney—Huang's declaration claims that he "was not permitted nor encouraged to consult with an attorney before signing [the Employment Agreement]." (Dkt. #46, Exhibit 2 at ¶ 8). This is not a specific challenge to the forum-selection clause, but challenges the entirety of the agreement. Similarly, Defendants' third argument—the alleged inequality of bargaining power—is based on the circumstances surrounding Huang's signing of the Employment Agreement, stated differently, it is a challenge to the entirety of the Employment Agreement, not specifically the forum-selection clause. As previously detailed, a challenge to the Employment Agreement as a whole is insufficient to show that a forum-selection clause is unreasonable.

Finally, Defendants' fourth argument—Futurewei failed to point out the forum-selection clause—also fails to demonstrate fraud or overreaching. " 'A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it.' " [5] *Haynsworth,* 121 F.3d at 965 n.17 (quoting *In re Cajun Elec. Power Coop. v. Riley Stoker Corp.,* 791 F.2d 353, 359 (5th Cir. 1986) ) (citing *Bonny v. Soc'y of Llyod's,* 3 F.3d 156, 160 n.10 (7th Cir. 1993) ); *St. Petersburg Bank & Trust Co. v. Boutin,* 445 F.2d 1028, 1032 (5th Cir. 1971) ). Because all of Defendants' arguments fall short, the Court finds Defendants failed to meet their "heavy burden" to show the forum-selection clause is unenforceable. As a result, the Court finds that it should enforce the mandatory forum-selection clause.

Defendants contend that even if the Court finds that the forum-selection clause is enforceable and mandatory, venue is still improper pursuant to the Supreme Court of the United States' holding in *Atlantic Marine.* The Court is unpersuaded. The Supreme Court in *Atlantic Marine* faced a different

factual scenario and decided a wholly different issue. In *Atlantic Marine,* the parties entered into a forum-selection clause, which required disputes to be brought in the " 'Circuit Court for the City of Norfolk, Virginia, or the United States District Court for the Eastern District of Virginia, Norfolk Division.' " *Atlantic Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.,* 571 U.S. 49, 53 (2013). However, when a dispute arose, the plaintiff filed suit in the Western District of Texas, and the defendant subsequently moved to dismiss the suit, arguing that the forum-selection clause made venue "wrong" or "improper" in the Western District of Texas. *Id.* Thus, "[t]he question in [*Atlantic Marine*] concern[ed] the procedure that is available for a defendant in a civil case who seeks to enforce a forum-selection clause." *Id.* at 52. The Court decided that "[w]hether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.* at 55. Accordingly, the Supreme Court held that the proper vehicle for a defendant to enforce a forum-selection clause is § 1404 or *forum non conveniens,* if the forum-selection clause identified a state or foreign forum. *Id.* at 59–60.

The Supreme Court of the United States' holding in *Atlantic Marine* holding combatted concerns that enforcing a forum-selection clause could flout congressional intent. "[T]he venue statutes reflect Congress' intent that venue should always lie in *some* federal court whenever federal courts have personal jurisdiction over the defendant." *Atlantic Marine,* 571 U.S. at 56 (emphasis in original).

**\*7** "Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional grant with the other." Yet [the defendant's] approach would mean that in some number of cases—those in which the forum-selection clause points to a state or foreign court—venue would not lie in any federal district That would not comport with the statute's design, which contemplates that venue will always exist in some federal court.

*Id.* (quoting *Smith v. United States,* 507 U.S. 197, 203 (1993) ). Consequently, the Court held that "[i]f the federal venue statutes establish that suit may be brought in a particular district, a contractual bar cannot render venue in that district 'wrong,' " thereby ensuring at least one federal court would have proper venue in every case upholding Congressional intent. *Id.* at 58.

While some courts throughout the country [6] have found this holding to be applicable to the current set of facts, the Court respectfully finds *Atlantic Marine* is inapposite to the Court's analysis in this case. Initially, the present case presents an entirely different factual scenario. Here, Plaintiffs filed suit in the venue mandated by the forum-selection clause. Moreover, this set of facts does not present the same risk of running afoul Congress' intent to have venue lie in at least one federal court. This set of facts actually promotes the strong federal policy in favor of enforcing forum-selection clauses. *Calix-Chacon v. Global Int'l Marine, Inv.*, 493 F.3d 507, 513 (5th Cir. 2007) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 23 (1988) ). The Supreme Court in *Atlantic Marine* identified the importance of enforcing the parties' agreement:

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place.

*Atlantic Marine*, 571 U.S. at 66.

The general federal venue statute dictates that venue is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). The Court agrees with the holding in *Atlantic Marine* that "[w]hether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." *Atlantic Marine*, 571 U.S. at 56.

**\*8** However, what the Court in *Atlantic Marine* did not need to address is that "[v]enue also 'may be proper ... if consented to by the parties in a forum[-]selection clause." *Healthcare Servs. Grp., Inc. v. Skyline Servs. Grp.*, No. 17-2703, 2018 WL 637773, at \*5 (E.D. Pa. Jan. 30, 2018) (quoting *AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 706 (E.D. Pa. 2014) ) (citing *Carnival Cruise Lines, Inc.*, 499 U.S. at 591–94); *accord Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995) (holding "we find that the choice of forum provision validly contracts for venue in Dallas County, Texas, thereby granting the district court jurisdiction [7] over [the defendant].]"). Several district courts across the country after *Atlantic Marine* have agreed. [8] *See, e.g., Nymbus, Inc. v. Sharp*, No. 3:17-cv-1113, 2018 WL 705003, at \*6 (D. Conn. Feb. 5, 2018); *Healthcare Servs. Grp.*, No. 17-2703, 2018 WL 637773, at \*5; *Kamtel, Inc. v. Bore Tech Const., LLC*, No. 16-cv-633-bbc, 2017 WL 532337, at \*6 (W.D. Wis. Feb. 9, 2017); *Javeler Marine Servs. LLC v. Cross*, No. H-14-0670, 2014 WL 6886097, at \*7 (S.D. Tex. Dec. 4, 2014); *Mach 1 Air Servs., Inc. v. Mainfreight, Inc.*, No. CV-14-01444-PHX-SPL, 2015 WL 11181334, at \*4 (D. Ariz. Mar. 5, 2015).

Not only have courts found that venue is proper based on mandatory venue selection clauses, but also a permissive forum-selection clauses make venue proper. A permissive clause "authorizes filing in a designated forum but does not foreclose other fora." *TruGreen Landcare, L.L.C. v. Telfair Cmty. Ass'n, Inc.*, No. H–12–514, 2013 WL 2147471, at \*1 (S.D. Tex. May 14, 2013) (citing *Breakbulk Transp., Inc. v. M/V Renata*, Civ. A. No. H–07–2985, 2008 WL 1883790, at \*2 (S.D. Tex. Apr. 25, 2008); *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127–28 (5th Cir. 1994); *Keaty*, 503 F.2d at 956–57). If a permissive clause authorizes filing in the venue designated by the forum-selection clause, it necessarily follows that a mandatory clause would also "authorize[ ] filing in [the] designated forum." *Id.* (citations omitted).

Here, the Court found that the parties entered into a valid and enforceable mandatory forum-selection clause, in which the parties consented to venue in the Eastern District of Texas. Accordingly, venue is proper in the Eastern District of Texas.

Moreover, even if a forum-selection clause does not make venue "proper," dismissal based on improper venue would be inappropriate because "[t]he venue statute 'merely accords to the defendant a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election.' *Nymbus*, 2018 WL 705003, at \*6 (quoting *Neribo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) ) (citing *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) ). Indeed, the personal privilege of proper venue, "may be waived by express agreement or by conduct." *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1068 (5th Cir. 1986); *accord City of New Orleans*, 376 F.3d at 504; *In re RFC & ResCap Liquidating Trust Lit.*, 2017 WL1483374, at \*13 (D. Minn. Apr. 25, 2017). "A party may waive its rights by explicitly stating that it is doing so, by allowing the other party the right to choose venue, or by establishing an exclusive venue within the contract." *City of New Orleans*, 376 F.3d at 504. As previously noted, the parties established exclusive venue in the Employment Agreement. Accordingly, even if venue is not "proper," the parties waived their right to have their suit heard in a proper venue by contractually agreeing to venue in the Eastern District of Texas.

**\*9** Further, the Court's holding today also makes practical sense in terms of judicial efficiency. Under Defendants' reasoning, the Court would dismiss the case for improper venue allowing Plaintiffs to file in a place of a proper venue. However, once filed in the proper venue, Plaintiffs could then, pursuant to the Supreme Court's holding in *Atlantic Marine*, move to transfer the case under 28 U.S.C. § 1404(a), which "permits transfer to any district where venue is proper ... or to any other district to which the parties have agreed by contract or stipulation." *Atlantic Marine*, 571 U.S. at 59. The Supreme Court of the United States altered the analysis for transferring venue under § 1404(a) when a forum-selection clause is involved because " 'the interest of justice' is served by holding parties to their bargain." *Id.* at 66. "Because [the adjusted transfer analysis] will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. Therefore, the newly filed case in a court with proper venue would likely transfer the case back to the Eastern District of Texas. This is an inefficient use of the parties' time and the Court's time. This cannot be the result that the Supreme Court intended based on its holding in *Atlantic Marine*.

Accordingly, because the Court found a valid and enforceable forum-selection clause, selecting the Eastern District of Texas

as the agreed to forum and venue for disputes arising out of Huang's Employment Agreement, the Court finds that dismissal based on improper venue inappropriate.

### B. CNEX

Defendants maintain that even if venue is proper as to Huang based on the forum-selection clause, CNEX was not a party or a signatory to the Employment Agreement. Defendants contend that CNEX is an indispensable party, and accordingly, the Court must dismiss Plaintiffs' claims because venue is not proper as to CNEX. Plaintiffs maintain that CNEX is bound by the forum-selection clause as a closely related party.

Several circuits have held that a nonsignatory may be bound to a forum-selection clause if the nonsignatory or alleged conduct is closely related to the contractual relationship. *See, e.g.*, *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 758 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Hugel v. The Corp. of Lloyd's*, 999 F.2d 206, 209–10 (7th Cir. 1993). The Fifth Circuit has not yet spoken to the issue; however, the Fifth Circuit has recognized a non-exclusive number of theories through which a nonsignatory can be bound to a specialized forum-selection clause, an arbitration clause. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006). Further, several district courts within the Fifth Circuit have held that a nonsignatory can be bound by a forum-selection clause if the nonsignatory or the alleged conduct is closely related to the contractual relationship. *See, e.g.*, *Red Barn Motors, Inc. v. Nextgear Capital, Inc.*, No. 13-0078-BAJ-RLB, 2014 WL 4986674, at \*5–\*6 (M.D. La. Sept. 29, 2014); *Excel Mktg. Sols., Inc. v. Direct Fin. Sols., LLC*, No. 3:11-cv-109-D, 2011 WL 1833022, at \*6 (N.D. Tex. May 13, 2011); *Alt. Delivery Sols., Inc. v. R.R. Donnelley & Sons Co.*, No. Civ.SA05CA0172-XR, 2005 WL 1862631, at \*15–\*16 (W.D. Tex. July 8, 2005); *Tex. Source Grp., Inc. v. CCH, Inc.*, 967 F. Supp. 234, 237 (S.D. Tex. 1997). The Court joins these courts in finding this to be an appropriate means to bind a nonsignatory to a forum-selection clause.

"A nonparty can be bound to a forum[-]selection clause if the nonparty is 'closely related to the dispute such that it becomes foreseeable that it will be bound.' " *Excel Mktgs. Sols.*, 2011 WL 1833022, at \*6 (quoting *Harrison v. Procter & Gamble Co.*, 2007 WL 431085, at \*2 (N.D. Tex. Feb. 8, 2007) ); *accord Hugel*, 999 F.2d at 209. A nonparty can be

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 125 of 438 PageID #:  474

Huawei Technologies Co., Ltd. v. Yiren Huang, Not Reported in Fed. Supp. (2018)

"closely related" to the signatory or the alleged conduct can be "closely related" to the contractual relationship. *Duncan v. Banks*, No. SA-15-cv-148-XR, 2015 WL 5511253, at *19 (W.D. Tex. Sept. 16, 2015) (citing *Alt. Delivery Sols.*, 2005 WL 1862631, at *16). That is, if the nonsignatory is so inextricably intertwined with the signatories that he should be the subject of the forum-selection clause, it can be enforced against the nonsignatory. *Tex. Source Grp., Inc.*, 967 F. Supp. at 237 (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *Graham Tech. Sols., Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D. Cal. 1997) ).

**\*10** A case from the Seventh Circuit with a similar set of facts found the requisite close relationship to bind a nonsignatory to the forum-selection clause. *Hugel*, 99 F.2d at 209–10. In *Hugel*, the individual defendant entered into a "General Undertaking" in order to be a member of a corporation, which included a forum-selection clause. *Id.* at 207. The district court found that because the individual defendant was the president and chairman of the board for both corporate defendants and the individual defendant owned 99% of the stock of one of the corporate defendants, which in turn owned 100% of the stock of the other corporate defendant, the corporate defendants were "so closely related to the dispute that they are equally bound by the forum selection clause...." *Id.* at 210. The United States Court of Appeals for the Seventh Circuit held that those "findings [were] not clearly erroneous." *Id.* at 210.

Similarly here, the Court, taking as true the allegations in Plaintiffs' First Amended Complaint, finds CNEX is closely related to Huang and the alleged conduct against CNEX is closely related to Huang's Employment Agreement. Huang incorporated CNEX three days after ending his employment with Futurewei. Huang is the founder, promoter, agent, and officer of CNEX. According to Plaintiffs, Huang began operating as the founder, promoter, agent, and officer of CNEX informally, prior to CNEX's formal incorporation on June 3, 2013. Further, Plaintiffs allege that both Huang and CNEX solicited employees to leave Huawei and join CNEX. Accordingly, the Court concludes that CNEX is inextricably intertwined and closely related such that it is foreseeable it would be bound to the terms of the forum-selection clause.

## II. Motion to Dismiss for Failure to State a Claim Pursuant to 12(b)(6)

Defendants argue that the Court should dismiss Counts 7, 9, and 11–22 pursuant to Rule 12(b)(6). Defendants assert a variety of arguments as to the different counts and the Court will address the arguments in turn.

As to Counts 7, 11–14, 17, 19–20, and 22, Defendants argue that they are time-barred. Plaintiffs counter that the discovery rule, equitable estoppel, and fraudulent concealment all work to toll the applicable statute of limitations. The application of the statute of limitations is an affirmative defense. *KPMG Peat Marwick v. Harris Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *Nogart v. The Upjohn Co.*, 981 P.2d 79, 87 (Cal. 1999). [9] Accordingly, Defendants bear the burden of establishing as a matter of law that the statute of limitations applies to Plaintiffs' claims. *See KPMG Peat Marwick v.* 988 S.W.2d at 748; *Nogart*, 981 P.2d at 87. Where, as here, Plaintiffs assert the discovery rule, equitable estoppel, and fraudulent concealment, Defendants bear the burden of disproving their application—or proving the applicability of the statute of limitations in spite of the discovery rule, equitable estoppel, and fraudulent concealment—to prevail on a motion to dismiss. After reviewing the First Amended Complaint, the motion to dismiss, the response, the reply, and the sur-reply, the Court finds that Defendants have not met their burden of demonstrating the applicability to the statute of limitations in spite of the discovery rule, equitable estoppel, and fraudulent concealment, as a matter of law and Plaintiffs have stated plausible claims for purposes of defeating a Rule 12(b)(6) motion to dismiss.

Defendants maintain that the Court should dismiss Counts 9–11, Plaintiffs' claims under the Texas Uniform Trade Secrets Act, because the alleged misappropriation began prior to the Texas Uniform Trade Secrets Act's enactment. Plaintiffs counter that they have alleged a variety of acts extending over the course of several years. Based on the current standard and the face of the pleadings, the Court finds that Plaintiffs have adequately pleaded a cause of action under the Texas Uniform Trade Secrets Act; however, the Court does not foreclose Defendants from raising this argument in a later motion for summary judgment.

**\*11** As to Counts 15–16 and Count 20, Defendants argue that Plaintiffs' claims for common law civil conspiracy and RICO violations are not sufficiently pleaded under the heightened Rule 9(b) pleading standard. Further, Defendants aver that Plaintiffs have not pleaded the existence of an enterprise with any degree of specificity. Moreover, as to the conspiracy to commit fraud claim, Defendants claim that Plaintiffs' pleading falls far short of meeting the standards set

out by Rule 9(b). Plaintiffs maintain that they have adequately pleaded their RICO and conspiracy claims.

Plaintiffs assert a cause of action for common law civil conspiracy based on fraudulent activity. Further, Plaintiffs assert causes of action under RICO based on fraudulent conduct, alleging violations of 18 U.S.C. § 1962(c) and conspiracy to commit unlawful acts under 18 U.S.C. § 1962(c) pursuant to 18 U.S.C. § 1962(d). Because Plaintiffs' claims are based on fraud, Plaintiffs' must satisfy the heightened pleading standard contained in Rule 9(b). FED. R. CIV. P. 9(b).

"The elements of a common law civil conspiracy are: '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.' " *Hadnot v. City of Woodville*, No. 9:10-cv-117, 2011 WL 13221060, at *2 (E.D. Tex. Feb. 11, 2011) (quoting *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) ).

Further, common elements required to prove a violation of a subsection of § 1962 include: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct or control of an enterprise." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (citing *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988) ). "A RICO claim, 18 U.S.C. § 1962(c), 'requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ). "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan*, 319 F.3d at 229 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981) ). "The enterprise may be a legal entity or 'any group of individuals *associated in fact* although not a legal entity.' " *Id.* (emphasis in original) (quoting 18 U.S.C. § 1961(4) ).

"An association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). It " 'must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts.' " *Zastrow v. Houst. Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015)

(quoting *Montesano*, 818 F.2d at 427). Stated differently, "[t]he enterprise is not a pattern of racketeering activity, but must exist separate and apart from the pattern of racketeering activity in which it engages." *Whelan*, 319 F.3d at 229 (citing *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987) ); *accord Manax*, 842 F.2d at 811. An association-in-fact enterprise, "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948. "Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.* The plaintiff "must plead specific facts, not mere conclusory allegations, which establishes the enterprise." *Montesano*, 818 F.2d at 427.

**\*12** The Court agrees with Defendants that Plaintiffs have failed to plead with the requisite specificity an adequate claim for relief for RICO violations and common law civil conspiracy. However, in their response, Plaintiffs request leave to amend their complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served. FED. R. CIV. P. 15(a). After a responsive pleading is served, "a party may amend only with the opposing party's written consent or the court's leave." *Id.* Rule 15(a) instructs the court to "freely give leave when justice so requires." *Id.* The rule "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) ). But leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981) ). Whether to allow amendment "lies within the sound discretion of the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992). A district court reviewing a motion to amend pleadings under Rule 15(a) may consider "whether there has been 'undue delay, bad faith or dilatory motive, ... undue prejudice to the opposing party, and futility of amendment.' " *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88 F.3d 311, 314–15 (5th Cir. 1996) ). The Court finds no undue delay, bad faith, or dilatory motive. Defendants have not argued that an amendment would cause them any prejudice or that it would be futile. Accordingly, the Court grants Plaintiffs leave to amend their complaint to fix the deficiencies identified by Defendants in their motion to dismiss.

As to Count 21, Defendants argue that "corporate raiding" is not a cause of action under either Texas or California law. Plaintiffs respond that while it might not be an independent tort under Texas or California law, other courts have held the claim to be viable and courts in Texas recognize corporate raiding as engaging in unfair competition. Because Plaintiffs acknowledge that "corporate raiding" is not its own independent tort under either California or Texas law, the Court dismisses the cause of action. However, because the Court grants Plaintiffs leave to file an amended complaint, Plaintiffs may amend its complaint to include this conduct as part of their cause of action for unfair competition.

As to Count 22, Defendants assert that Plaintiffs failed to properly state a claim for unfair competition under the Lanham Act. Further, regarding Count 13, Defendants aver that Plaintiffs did not sufficiently allege a claim for international interference with prospective business relations because they do not identify any third party with which they would have done business, do not allege that there was a reasonable probability of entering into a contractual or business relationship with any third party, and did not allege that the prospective business relationships were disrupted. The Court agrees that Plaintiffs' complaint regarding unfair competition under the Lanham Act and tortious interference with prospective business relationships fall short of stating a plausible claim. Nonetheless, Plaintiffs requested leave to amend their complaint, which the Court should freely grant. FED. R. CIV. P. 15(a). Accordingly, the Court grants Plaintiffs leave to amend their complaint to fix the deficiencies identified by Defendants in their motion to dismiss.

As to Count 17, Defendants argue that the Court should dismiss Plaintiffs' conversion claim under Texas law because conversion does not include intellectual property and Plaintiffs have not alleged the conversion of any physical property. Plaintiffs maintain that the First Amended Complaint also alleges that "[o]ne of Futurewei's employees, a chief engineer who had worked with Huang before his departure to CNEX on June 6, 2014, was caught downloading thousands of Plaintiffs' documents to his personal computer without permission. This included hundreds of documents containing confidential, proprietary,

and trade secret information." (Dkt. #27 at ¶ 54); *accord* (Dkt. #27 at ¶¶ 10, 197). Nevertheless, Plaintiffs did not allege that these documents were within the possession, dominion, or control of Defendants. *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (explaining "[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion."). As such, the Court finds that this claim is not sufficiently pleaded; however, the Court grants Plaintiffs leave to file an amended complaint to fix the deficiencies noted by the motion to dismiss and this Order.

## CONCLUSION

**\*13** It is therefore **ORDERED** that Defendants CNEX Labs, Inc.'s and Yiren "Ronnie" Huang's Motion to Dismiss for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #14) is hereby **DENIED as moot**, Defendants CNEX Labs, Inc. and Yiren Ronnie Huang's Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing (Dkt. #56) is hereby **GRANTED**, and Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss Plaintiffs' First Amended Complaint for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #34) is hereby **DENIED** as to the Motion to Dismiss for Improper Venue and hereby **GRANTED in part** as to the Motion to Dismiss for Failure to State a Claim. The Motion to Dismiss for Failure to State a Claim is granted as to Count 21 and the Court hereby **DISMISSES WITH PREJUDICE** corporate raiding as its own independent cause of action. However, Plaintiffs shall file an amended complaint to address the deficiencies identified as to Counts 15–17, 20, and 22, and may also include the allegations of corporate raiding as part of Plaintiffs' claim for unfair competition within fourteen (14) days of this Order. The motion is denied as to the remainder of the grounds asserted.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1964180

**Footnotes**

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1  Neither party asked the Court to stay or dismiss this case based on *Colorado River* abstention. Thus, the Court does not engage in an analysis of whether it should abstain from the "virtual unflagging obligation ... to exercise the jurisdiction given to [it].' " *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910) ).

2  Plaintiffs additionally argue that venue is proper under 28 U.S.C. § 1391(b)(2) because they claim a substantial part of the events or omissions took place in the Eastern District of Texas. However, it is unnecessary for the Court to analyze whether a substantial part of the events took place in the Eastern District of Texas because the Court finds the forum-selection clause makes venue proper.

3  At the April 2, 2018 hearing, the Court also asked the parties whether Defendants waived this argument by not asserting it in the opening brief for the Motion to Dismiss. After the hearing and the sur-reply, Defendants filed their Motion for Leave arguing that the argument was not waived and maintained that Plaintiffs were not prejudiced by raising the argument in the reply (Dkt. #56). The Court hereby grants the Motion for Leave; however, as the Court further discusses whether or not Defendants raised the argument is immaterial to the Court's analysis.

4  The Court notes that the Offer Letter did indicate that his offer of employment was contingent upon his signing the Employment Agreement (Dkt. #47).

5  To the extent, if any, this is part of the argument as to why there was unequal bargaining power, it is similarly unpersuasive.

6  See generally *G4S Tech., LLC v. WCC Cable, Inc.*, No. 8:17cv182, 2017 WL 4564726 (D. Neb Oct. 10, 2017); *Red Mortgage Capital, LLC v. Shores, LLC*, No. 2:16-cv-678, 2017 WL 1196170 (S.D. Oh. Mar. 31, 2017); *Howmedica Osteonics Corp. v. DJO Global, Inc.*, No. 16-2330, 2017 WL 1136671 (D.N.J. Mar. 27, 2017); *CORT Bus. Servs. Corp. v. Eleven23 Mktg., LLC*, NO. 2:15-cv-2454-GMN-PAL, 2017 WL 701371 (D. Nev. Feb. 22, 2017); *Sightpath Med. Servs. LLC v. Terry*, 4:14-cv-1488-JCH, 2015 WL 362662 (E.D. Mo. Jan. 27, 2015); *Prosperity Bank v. Balboa Music Festival, LLC*, No. 4:13-cv-288, 2014 WL 1023935 (S.D. Tex. Mar. 13, 2014).

7  Venue selection clauses are treated similarly to forum selection clauses. *Alliance Health Grp., LLC v. Bridging Health Option, LLC*, 553 F.3d 397, 399 (5th Cir. 2008) (citing *Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 826 (5th Cir. 2006); *Collin Cty. v. Siemens Bus. Servs., Inc.*, 250 Fed.Appx. 45 (5th Cir. 2007) ).

8  As previously mentioned, there are also several district courts across the country that have not agreed with this result.

9  Defendants argue that California law applies; however, both parties go back and forth between using Texas and California law. Accordingly, the Court will analyze under both at this time.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Iliescu, Trustee of John Iliescu, Jr. and Sonnia Iliescu 1992..., 522 P.3d 453 (2022)

138 Nev. Adv. Op. 72

522 P.3d 453
Court of Appeals of Nevada.

John ILIESCU, Jr., and Sonnia Iliescu, TRUSTEEs
OF THE JOHN ILIESCU, JR. AND SONNIA ILIESCU
1992 FAMILY TRUST; John Iliescu, Jr., an Individual;
and Sonnia Iliescu, an Individual, Appellants,

v.

The REGIONAL TRANSPORTATION
COMMISSION OF WASHOE COUNTY, Respondent.

John Iliescu, Jr., and Sonnia Iliescu, Trustees
of the John Iliescu, Jr. and Sonnia Iliescu 1992
Family Trust; John Iliescu, Jr., an Individual;
and Sonnia Iliescu, an Individual, Appellants,

v.

Regional Transportation Commission
of Washoe County, Respondent.

No. 83212-COA, No. 83756-COA
|
Filed November 17, 2022

**Synopsis**
**Background:** Trust and its settlors asserted claims of waste, breach of contract, and trespass against county regional transportation commission, alleging that commission and its contractors damaged a trust-owned parking lot when, without permission, they drove work trucks over it and parked on it while working on a public utility easement. The District Court, Washoe County, David A. Hardy, J., granted in part commission's motion to dismiss, and granted commission's motion for summary judgment. Trust appealed.

**Holdings:** The Court of Appeals, Gibbons, C.J., held that:

complaint was not sufficient to place commission on notice that trust and settlors sought to hold it liable for waste;

trust and settlors did not demonstrate causal connection between any breach of agreement and damage to parking lot;

fact issues existed as to whether commission's conduct constituted an invasion of trust's property rights; and

stipulation to pursue compensatory and punitive damages relating to parking lot additionally preserved claim for nominal damages.

Affirmed in part, reversed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion to Dismiss.

 **\*454** Consolidated appeals from district court orders granting summary judgment and awarding attorney fees and costs in a tort and contract action. Second Judicial District Court, Washoe County; David A. Hardy, Judge.

**Attorneys and Law Firms**

Albright, Stoddard, Warnick & Albright and D. Chris Albright, Las Vegas, for Appellants.

Woodburn & Wedge and Dane W. Anderson, Reno, for Respondent.

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., TAO and BULLA, JJ.

*OPINION*

By the Court, GIBBONS, C.J.:

 **\*455**  In this appeal, we address the grants of dismissal and summary judgment as to claims of improper actions by the Regional Transportation Commission of Washoe County that occurred during the completion of a construction project on appellants' property after condemnation proceedings. In so doing, we discuss actions in tort and contract law that remain underdeveloped in Nevada law. We conclude that the district court correctly dismissed appellants' claims for waste and injunctive relief, and correctly granted summary judgment on their contract-based claims. However, the district court erred in granting summary judgment on appellants' claims for trespass and declaratory relief. For the reasons articulated herein, we affirm in part, reverse in part, vacate in part, and remand.

*FACTS AND PROCEDURAL HISTORY*

Although this is not an appeal from a condemnation action, the facts underlying this appeal began with one. Respondent Regional Transportation Commission of Washoe County (RTC) filed a complaint in eminent domain seeking to acquire a permanent easement, a public utility easement, and a temporary construction easement on commercial property owned by the John Iliescu, Jr. and Sonnia Iliescu 1992 Family Trust. Appellants John Iliescu, Jr., and Sonnia Iliescu (collectively, the Iliescus) are trustees of the family trust. The RTC sought the easements in furtherance of its "4th Street/ Prater Way Complete Street and [Bus Rapid Transit] Project" in Reno, which was intended to improve traffic flow along 4th Street and Prater Way. Specifically, the project included "undergrounding of existing overhead utilities within the [p]roject area, construction of curbs, gutters, pedestrian ramps and sidewalks, and installation of new lighting fixtures and landscaping within the [p]roject limits." Eventually, the parties stipulated to, and the district court ordered, the taking in exchange for a payment of $11,065 to the Iliescus as just compensation. The court also ordered that the permanent easement and the public utility easement were "perpetual easements" for access to and maintenance of the public utilities.

Ten months after the district court's order in the condemnation proceedings, the Iliescus filed a complaint alleging 12 causes of action against the RTC. According to the Iliescus, during the previous project and despite their objections, the RTC and its contractors drove over and parked their vehicles (including 20-ton work trucks) on the Iliescus' "Remaining Property"—a parking lot on the parcel not subject to condemnation. The Iliescus alleged that the RTC's conduct precluded them at times from using any portion of the "Remaining Property," caused physical damage to the parking lot, and caused both John and Sonnia to suffer severe and ongoing "psychological and emotional anguish, pain and distress, with physical manifestations."

The RTC filed a first motion to dismiss 8 of the complaint's 12 causes of action. During litigation, the parties stipulated that the Iliescus no longer wished to pursue damages for emotional distress or personal injury. The district court therefore dismissed their claim for intentional and/or negligent infliction of emotional distress.

The Iliescus filed an amended complaint alleging 11 causes of action. [1]  Thereafter, the RTC filed a supplemental motion to dismiss as to six of the causes of action. The district court granted the RTC's motion to dismiss as to the Iliescus'

claims for injunctive relief, breach of fiduciary duty, waste, conversion, and tortious breach of the covenant of good faith and fair dealing. The court denied the  *456  motion to dismiss as to the Iliescus' civil conspiracy claim.

The RTC eventually moved for summary judgment as to the Iliescus' remaining claims, which included breach of contract, breach of the implied covenant of good faith and fair dealing, trespass, civil conspiracy, negligence, and declaratory relief. The Iliescus opposed the motion and supported their opposition with various exhibits that had previously been filed in the case. The district court ultimately granted the RTC's motion for summary judgment, ruling that the Iliescus had failed to present any admissible evidence in support of their claims. [2]  It subsequently granted the RTC's motion for attorney fees, ruling that although the Iliescus appeared to have good faith bases for bringing their claims, "their counsel failed to produce discovery or dismiss the action if discovery would be impossible due to hardship." [3] The district court awarded the RTC $61,057.07 in attorney fees under NRS 18.010(2)(b) and $3,647.35 in costs as the prevailing party under NRS 18.020. The Iliescus now raise multiple issues on appeal. We address each in turn.

### The district court did, not err in dismissing the Iliescus' claim, for waste

The Iliescus argue the district court erred in dismissing their claim for waste and ruling that the RTC was not a guardian or tenant as to their "Remaining Property" (the parking lot) for the purposes of satisfying NRS 40.150. [4]  They argue the RTC "had been granted entry rights onto certain portions of [their] [p]roperty" and therefore was a tenant of the property and could commit waste by damaging the surface of the lot with its heavy equipment. The RTC counters that the Iliescus' complaint never alleged that the RTC was a tenant as to their parking lot. It argues that, indeed, the complaint made clear that the RTC and its contractors used the parking lot despite having no right to do so and over the Iliescus' frequent objections.

A defendant's motion to dismiss "under NRCP 12(b)(5) is subject to a rigorous standard of review on appeal." *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 227-28, 181 P.3d 670, 672 (2008) (internal quotation marks omitted). In reviewing dismissal under NRCP 12(b)(5), we recognize all factual allegations in the plaintiffs' complaint as true and draw all inferences in their favor. *Id.* at 228, 181 P.3d at 672. A claim should be dismissed under NRCP 12(b)(5) only if it

appears beyond a doubt that the plaintiffs could prove no set of facts, which, if true, would entitle them to relief. *Id.* Because Nevada is a "notice-pleading" jurisdiction, a complaint need only set forth sufficient facts to demonstrate the necessary elements of a claim for relief so that the defending party has "adequate notice of the nature of the claim and relief sought." *W. States Constr., Inc. v. Michoff*, 108 Nev. 931, 936, 840 P.2d 1220, 1223 (1992); *see also Droge v. AAAA Two Star Towing, Inc.,* 136 Nev. 291, 308-09, 468 P.3d 862, 878-79 (Ct. App. 2020) (discussing Nevada's liberal notice-pleading standard).

Nevada law provides for a cause of action against a guardian or tenant of real property who "commit[s] waste *thereon*." NRS 40.150 (emphasis added). "Waste is generally considered a tort defined as the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." 8 Michael Allan Wolf, *Powell on Real Property* § 56.01 (2021). A cause of action for waste requires the defendant to be in or have been in lawful possession of the property on which the alleged waste occurred. *See* **\*457** *Stephenson v. Nat'l Bank of River Haven*, 92 Fla. 347, 109 So. 424, 425-26 (1926) ("[W]aste is an abuse or destructive use of the property by one in rightful possession."); *Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 409 (Iowa 2001) ("A claim for waste is an action at law brought by a remainderman against a tenant in lawful possession of land ...."); *Mich. Oil Co. v. Nat. Res. Comm'n*, 406 Mich. 1, 276 N.W.2d 141, 147 (1979) ("[T]he ordinary use of the term 'waste' does not refer only to waste of oil and gas, but includes any spoilation or destruction of the land, including flora and fauna, by one lawfully in possession, to the prejudice of the estate or interest of another."); *Meyer v. Hansen*, 373 N.W.2d 392, 395 (N.D. 1985) ("Waste may be defined as an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in a substantial injury."). Not surprisingly, then, each type of tenancy mentioned in NRS 40.150 includes an interest in real property. *See* NRS 40.150 (stating that a waste action can be maintained against a "tenant for life or years, joint tenant or tenant in common of real property").

Here, the Iliescus alleged that, in completing its project, the RTC damaged their parking lot, which was on "that portion of [their] [p]roperty not subject to the condemnation, and not involved in whatsoever nature in the [p]roject." The Iliescus further alleged that they frequently objected to this "unauthorized and illegal use" of their parking lot. The Iliescus did not argue below, nor do they argue on appeal, that

the RTC had a legal right to use their parking lot. Rather, both below and on appeal, they argue that the RTC was a tenant only as to the property that was condemned.

Assuming the RTC was a tenant over the Iliescus' condemned property, under NRS 40.150, the RTC could only have committed waste "thereon"—on the condemned property, not on the Iliescus' parking lot. And the Iliescus have not alleged that the RTC committed waste as to the condemned portion of their property. Therefore, even taking every inference in the Iliescus' favor, *see Buzz Stew*, 124 Nev. at 228, 181 P.3d at 672, the district court did not err by dismissing their waste claim.

### *The district court did not err in dismissing the Iliescus' separate cause of action for injunctive relief*

The Iliescus argue the district court erred in dismissing their separate cause of action for injunctive relief because "[i]t is entirely possible and even plausible that the RTC" may again "overstep [its] boundaries in accessing and damaging the remaining portions of [their] property" during some future repairs to the RTC's permanent easements. [5]  As a threshold matter, injunctive relief is a remedy, not a separate cause of action. *See State Farm Mut. Auto. Ins. Co. v. Jafbros Inc.*, 109 Nev. 926, 928, 860 P.2d 176, 178 (1993) (explaining that a violated right is a prerequisite to granting injunctive relief and an injunction is not appropriate "to restrain an act which does not give rise to a cause of action" (internal quotation marks omitted)); *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("With respect to injunctive relief, that is a remedy, not a cause of action, and thus should not be pleaded as a separate count."); *Klay v. United Healthgrp., Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (explaining that "traditional injunctions are predicated upon [a] cause of action"); *Shell Oil Co. v. Richter*, 52 Cal.App.2d 164, 125 P.2d 930, 932 (1942) (explaining that injunctive relief is a remedy, not a cause of action, and thus, a cause of action must be asserted against the party before injunctive relief may be requested against that party); *Terlecki v. Stewart*, 278 Mich.App. 644, 754 N.W.2d 899, 912 (2008) ("It is well settled that an injunction is an equitable remedy, not an independent cause of action."). Therefore, to the extent that the Iliescus pleaded injunctive relief as an independent cause of action, the district court did not err in dismissing that claim. *See Knutson*, 932 F.3d at 576 n.4.

 **\*458**  However, "the question whether a litigant has a 'cause of action' is analytically distinct *and prior to* the question of

what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (emphasis added); *see also State Farm*, 109 Nev. at 928, 860 P.2d at 178 ("It is axiomatic that a court cannot provide a remedy unless it has found a wrong."). Therefore, even though we affirm the dismissal of the independent cause of action, as discussed below, we reverse the grant of summary judgment on the Iliescus' trespass claim. Therefore, on remand, they may seek permanent injunctive relief as a remedy for that claim, should they prevail on it.

*The district court did not err in granting the RTC's motion for summary judgment as to the Iliescus' contract-based claims*

The Iliescus argue the district court erred in granting summary judgment in favor of the RTC as to their breach-of-contract claim because the parties had entered into a contract by way of a stipulation in the prior condemnation proceedings. They argue that, at the very least, their evidence that a stipulation existed should have precluded summary judgment. The RTC counters that the prior stipulation was not relevant to any alleged use of or damage to the Iliescus' parking lot. It further argues that summary judgment was proper because the Iliescus failed to provide any evidence of causation or actual damages in support of their breach-of-contract claim.

We review a district court's order granting summary judgment de novo. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Summary judgment is proper if the pleadings and all other evidence on file demonstrate that there exists no genuine dispute of material fact "and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted); *see also* NRCP 56(a). "A factual dispute is genuine when the evidence is such that a rational trier of fact could return a verdict for the nonmoving party." *Wood*, 121 Nev. at 731, 121 P.3d at 1031. In rendering a decision on a motion for summary judgment, all evidence "must be viewed in a light most favorable to the nonmoving party." *Id.* at 729, 121 P.3d at 1029. The party moving for summary judgment must meet its initial burden of production to show there exists no genuine dispute of material fact. *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 602, 172 P.3d 131, 134 (2007). The nonmoving party must then "transcend the pleadings and, by affidavit or other admissible evidence, introduce specific facts that show a genuine [dispute] of material fact." *Id.* at 603, 172 P.3d at 134.

To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the defendant breached, and (4) that the breach caused the plaintiff damages. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006); *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 69 Cal.Rptr. 321, 442 P.2d 377, 381 (1968). Relating to damages, a plaintiff must prove both (1) a causal connection between the defendant's breach and the damages asserted, and (2) the amount of those damages. *See Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989) ("The party seeking damages has the burden of proving both the fact of damages and the amount thereof."); *Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 630 S.E.2d 304, 311 (2006) ("A plaintiff thus must prove two primary factors relating to damages. First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." (internal citations omitted)). [6] The burden of **\*459** proving the amount of damages "need not be met with mathematical exactitude, but there must be an evidentiary basis for determining a reasonably accurate amount of damages." *Mort Wallin*, 105 Nev. at 857, 784 P.2d at 955.

Here, the Iliescus alleged that, during the prior condemnation proceedings, they entered into a valid agreement by which the RTC was entitled to complete its project in exchange for compensating the Iliescus for the condemnation. They further alleged that the way in which the RTC carried out the project constituted a breach of the parties' agreement. The Iliescus supported these allegations with a portion of an order from the condemnation proceedings that ordered the parties to "cooperate so as to minimize interference between construction of the [p]roject and [the Iliescus'] use of the remaining land ... on APN 008-244-15." That order also made multiple references to a stipulation to which the parties had agreed. The Iliescus further provided a detailed quote for services, from Desert Engineering, to repair the parking lot for $84,550.

Below, the RTC met its initial summary judgment burden by pointing out that there was an absence of evidence to support the Iliescus' breach-of-contract claim as to damages. *See Cuzze*, 123 Nev. at 602-03, 172 P.3d at 134 (explaining that where the nonmoving party would bear the burden of persuasion at trial, the party moving for summary judgment can satisfy its burden of production by "pointing

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 133 of 438 PageID #: 482
Iliescu, Trustee of John Iliescu, Jr. and Sonnia Iliescu 1992..., 522 P.3d 453 (2022)
138 Nev. Adv. Op. 72

out ... that there is an absence of evidence to support the nonmoving party's case" (omission and internal quotation marks omitted)). Thus, the burden shifted to the Iliescus to "transcend the pleadings" and demonstrate there was a genuine dispute of material fact as to damages. *Id.* at 603, 172 P.3d at 134.

In response, the Iliescus provided photographs purporting to show the state of the parking lot prior to the RTC's project. They also provided photographs allegedly depicting the RTC's workers during the completion of the project, with their vehicles parked on the Iliescus' parking lot in the background. However, although the Desert Engineering quote may have served to demonstrate a dispute as to the amount of their damages, the Iliescus failed to present any evidence demonstrating a causal connection between the RTC's alleged breach of contract and the damage to the parking lot. They failed to provide photographs depicting the parking lot after the RTC completed its project; deposition testimony stating that the RTC's breach had caused the damage; expert testimony regarding causation, scope of repair, diminishment in value, and damages;[7] or any other evidence related to causation, only argument.

Additionally, although the Iliescus provided evidence that the parties had entered into a contract previously,[8] it is unclear how a breach of that contract could have caused damage to the parking lot. Even assuming the RTC had agreed, as the prior district court ordered, to "cooperate so as to minimize interference between construction of the [p]roject and [the Iliescus'] use of [their] remaining land," the Iliescus have not explained how a breach of that agreement could have caused physical damage to their parking lot.[9] Accordingly, the Iliescus did not **\*460** demonstrate that there existed evidence of causation, an essential element of a breach-of-contract claim, therefore failing to create a genuine dispute as to damages.

The Iliescus further summarily argue the district court erred in granting summary judgment against them as to their claim for breach of the implied covenant of good faith and fair dealing. "Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991). However, here, the Iliescus have not developed any argument or provided any relevant authority as to why the district

court erred in granting summary judgment as to this claim. Therefore, we need not consider it. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority). In light of the foregoing, the district court did not err in granting summary judgment in favor of the RTC as to the Iliescus' contract-based claims.

*The district court erred in granting summary judgment in favor of the RTC as to the Iliescus' trespass claim and their request for declaratory relief*

Finally, the Iliescus argue the district court erred in granting summary judgment in the RTC's favor as to their trespass claim. Nevada has long recognized trespass as an action for injury to a plaintiff's possession of land. *See Rivers v. Burbank*, 13 Nev. 398, 408 (1878). To maintain a trespass action, the plaintiff must demonstrate that the defendant invaded a property right. *Lied v. Clark County*, 94 Nev. 275, 279, 579 P.2d 171, 173-74 (1978). Where the evidence supports a trespass, an award of nominal damages is not improper. *Parkinson v. Winniman*, 75 Nev. 405, 408, 344 P.2d 677, 678 (1959); *see also Droge*, 136 Nev. at 312 n.17, 468 P.3d at 880 n.17 (stating that the plaintiffs could pursue nominal damages as to their trespass claim). And "an injunction is an appropriate remedy for the threat of continuing trespass." *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403, 416, 23 P.3d 243, 251 (2001).

To prevail on a claim for trespass, the Iliescus would need to prove that the RTC's conduct constituted an invasion of a property right. *See Lied*, 94 Nev. at 279, 579 P.2d at 173-74. Here, the Iliescus alleged the RTC and its contractors parked vehicles on their parking lot "on virtually every workday during the term of the [p]roject." These vehicles allegedly included the workers' personal vehicles ("pick-up trucks, SUV's[,] and automobiles") along with work trucks weighing approximately 20 tons. According to the Iliescus, this conduct occurred without their consent and despite their "frequent objections" to it. The Iliescus supported these allegations with photographs depicting the vehicles parked on the portion of their property not subject to condemnation (the "[r]emaining [p]roperty" or parking lot). The Iliescus also provided photographs appearing to depict workers working on the RTC's project, with trucks parked in the parking lot in the background. In addition, John testified at his deposition without objection that he assumed the trucks were associated with the RTC because the workers who drove them were not associated with him or Sonnia and "were doing RTC work."

Similarly, at her deposition, Sonnia testified that the trucks and equipment parked on the Iliescus' property belonged to "construction people working on the RTC project."

Considering the foregoing, the Iliescus introduced specific facts, using admissible evidence,[10] that demonstrated a genuine **461** dispute of material fact as to their trespass claim. *See Cuzze*, 123 Nev. at 603, 172 P.3d at 134. The RTC does not dispute that the Iliescus owned the property where the easements and parking lot are located, nor does it assert that it had permission or paid rent or some form of remuneration to use the parking lot. The Iliescus' photographs and deposition testimony are evidence such that a rational trier of fact could find that the RTC trespassed on the Iliescus' property and return a verdict in the Iliescus' favor.[11] *See Wood*, 121 Nev. at 731, 121 P.3d at 1031.

Below, the district court granted summary judgment as to the Iliescus' trespass claim by ruling that they had waived their right to pursue nominal damages—in stipulating to pursue only compensatory damages relating to their parking lot and punitive damages—and had then failed to present evidence as to compensatory damages or punitive damages.[12] In so doing, the district court effectively imposed an element of actual damages onto the trespass claim—an element that has not previously been required to sustain a trespass action in Nevada.[13] *See Lied*, 94 Nev. at 279, 579 P.2d at 173-74; *Parkinson*, 75 Nev. at 408, 344 P.2d at 678; *see also* Restatement (Second) of Torts § 158 (Am. Law Inst. 1965) ("One is subject to liability to another for trespass, *irrespective of whether [he or she] thereby causes harm to any legally protected interest of the other,* if [he or she] intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." (emphasis added)).

Further, in lieu of compensatory damages, nominal damages may still be awarded. Nominal damages are "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory ... damages." *Uzuegbunam v. Preczewski*, 592 U.S. ——, ——, 141 S. Ct. 792, 801, 209 L.Ed.2d 94 (2021). Indeed, as the United States Supreme Court recently recognized in *Uzuegbunam*, "the prevailing rule, 'well established' at common law, was 'that a party whose rights are invaded can *always* recover nominal damages without furnishing any evidence of actual damages.' " *Id.* at ——, 141 S. Ct. at 800 (emphasis added)

(internal citations omitted). Consistent with this approach, the Nevada appellate courts have long recognized that nominal damages are a proper remedy for trespass, in cases where actual damages cannot be proven. *See Parkinson*, 75 Nev. at 408, 344 P.2d at 678; *Droge,* 136 Nev. at 312 n.17, 468 P.3d at 880 n.17; *see also Uzuegbunam*, 592 U.S. at ——, 141 S. Ct. at 798 (discussing the importance of nominal damages to claims for trespass).

Given the relationship between nominal and compensatory damages, and the purpose behind an award of nominal damages, we conclude that, by preserving their claim **462** to compensatory damages, the Iliescus also preserved nominal damages, as these damages are available to remedy a trespass where compensatory damages are unavailable or unproven. Thus, the district court erred in determining that the Iliescus waived their right to recover nominal damages for trespass.[14] Further, proving damages is particularly unnecessary in this case because the RTC had been granted perpetual easements on the Iliescus' property and the Iliescus were seeking injunctive relief, an appropriate remedy for the threat of continuing trespass.[15] *See S.O.C., Inc.*, 117 Nev. at 416, 23 P.3d at 251.

Accordingly, the district court erred in granting summary judgment in favor of the RTC as to the Iliescus' trespass claim, and thus we reverse the grant of summary judgment on this claim and remand for further proceedings. To the extent that the district court's order granting summary judgment in favor of the RTC as to the Iliescus' request for declaratory relief was predicated on its ruling relating to their trespass claim, that ruling is likewise reversed and remanded for further proceedings.

*CONCLUSION*

The district court did not err in dismissing the Iliescus' waste claim because the RTC had no possessory interest as to the Iliescus' parking lot. The court also did not err in dismissing their injunctive relief claim to the extent that it was pleaded as a cause of action. Additionally, the court did not err in granting summary judgment in favor of the RTC as to the Iliescus' contract-based claims.

The district court, however, erred in granting summary judgment as to the Iliescus' trespass and declaratory relief claims. Because we reverse the district court's order granting summary judgment in favor of the RTC as to these claims, the

RTC might not be the prevailing party and the district court's order awarding it attorney fees and costs may no longer be appropriate under NRS 18.010(2)(b) and NRS 18.020. That order, therefore, is necessarily vacated. *See Cain v. Price, 134 Nev. 193, 198, 415 P.3d 25, 30 (2018)* (explaining that where a district court's order granting summary judgment is reversed, it is no longer appropriate to consider the respondents the prevailing party, and an award of attorney fees is inappropriate). Consistent with this opinion, we reverse and remand for further proceedings as to the Iliescus' trespass and declaratory relief claims, and if necessary, to determine if injunctive relief is appropriate. [16]

We concur:

Tao, J.

Bulla, J.

**All Citations**

522 P.3d 453, 138 Nev. Adv. Op. 72

## Footnotes

1    The causes of action included breach of contract, breach of the covenant of good faith and fair dealing (contract claim), breach of fiduciary duty, waste, conversion, trespass, civil conspiracy, negligence, tortious breach of the covenant of good faith and fair dealing, injunctive relief, and declaratory relief.

2    On appeal, the Iliescus only challenge the district court's rulings discussed herein.

3    We acknowledge that the Iliescus could have done more to vigorously prosecute their claims before the district court. During the proceedings below, the RTC requested multiple times that the court dismiss the Iliescus' case for lack of prosecution. As pertinent to this appeal, the district court denied each of those requests.

4    "If a guardian, tenant for life or years, joint tenant or tenant in common of real property commit waste thereon, any person aggrieved by the waste may bring an action against the guardian or tenant who committed the waste, in which action there may be judgment for treble damages." NRS 40.150.

5    The Iliescus also argue that the RTC could have been enjoined to restore their property to the state it was in before the RTC allegedly damaged it. However, they did not make this argument below, and we decline to consider it on appeal. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (explaining that issues not argued below are "deemed to have been waived and will not be considered on appeal").

6    *See also Omaha Pub. Power Dist. v. Darin & Armstrong, Inc.*, 205 Neb. 484, 288 N.W.2d 467, 474 (1980) ("It is a basic concept that in any damage action for breach of contract the claimant must prove that the breach of contract complained of was the proximate cause of the alleged damages."); *Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*, 933 P.2d 282, 296 (Okla. 1997) ("In order for damages to be recoverable for breach of contract they must be clearly ascertainable ... and it must be made to appear they are the natural and proximate consequence of the breach and not speculative and contingent."); *Logan v. Mirror Printing Co. of Altoona*, 410 Pa.Super. 446, 600 A.2d 225, 226 (1991) ("In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss."); *Abraxas Petroleum Corp. v. Hamburg*, 20 S.W.3d 741, 758 (Tex. App. 2000) ("The absence of [a] causal connection between the alleged breach [of contract] and the alleged damages will preclude recovery.").

7    The district court determined that expert evidence was needed on these matters. The Iliescus do not argue that the district court erred in this determination, so this issue is waived. *See Powell v. Liberty Mut. Fire Ins.*

Iliescu, Trustee of John Iliescu, Jr. and Sonnia Iliescu 1992..., 522 P.3d 453 (2022)

138 Nev. Adv. Op. 72

Co., 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (providing that issues not raised on appeal are deemed waived).

8    "A written stipulation is a species of contract." *DeChambeau v. Balkenbush,* 134 Nev. 625, 628, 431 P.3d 359, 361 (Ct. App. 2018) (quoting *Redrock Valley Ranch, LLC v. Washoe County,* 127 Nev. 451, 460, 254 P.3d 641, 647 (2011)).

9    We note that, in their stipulation to dismiss their personal injury claims, the Iliescus agreed that they would only pursue compensatory damages in this case as to physical damage to their parking lot—presumably waiving any right to recover compensatory damages for any interference with their use of their land.

10   A court may consider all evidence on file when ruling on a motion for summary judgment. *Wood,* 121 Nev. at 729, 121 P.3d at 1029; *see also* NRCP 56(c)(3). The RTC avers that the Iliescus failed to present any admissible evidence for their claims during the proceedings below, apparently only because the Iliescus "submitted no declarations or deposition testimony" in their opposition to the RTC's motion for summary judgment. The RTC does not cogently argue why any failure on the Iliescus' part to submit declarations or deposition testimony in opposition to the RTC's summary judgment motion would be fatal to their claims where there existed substantial evidence elsewhere in the court file that was presented for the court to consider regarding trespass, nor does it provide relevant authority in support of that argument. Therefore, we need not consider it. *See Edwards,* 122 Nev. at 330 n.38, 130 P.3d at 1288 n.38.

11   Although we reverse summary judgment on the trespass claim, we note that the damages available to the Iliescus on this claim may be limited, as the district court has already determined that expert testimony is required to prove certain damages, and that the Iliescus failed to timely identify an expert as required pursuant to NRCP 16.1.

12   We note that the Iliescus have not pursued the dismissal of their claim for punitive damages on appeal, and therefore, we need not address the propriety of the district court's dismissal of the same. *See Greenlaw v. United States,* 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) ("[I]n both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decisions and assign to courts the role of neutral arbiter of matters the parties present.").

13   The RTC does not argue on appeal that a plaintiff must prove damages as an element of *trespass* and therefore we do not further address this issue. *See Powell v. Liberty Mut. Fire Ins. Co.,* 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (providing that issues not raised on appeal are deemed waived).

14   The parties disagree as to whether the Iliescus, by stipulation or otherwise, waived their right to pursue nominal damages in this case because nominal damages were not specifically preserved in the stipulation. However, neither was a claim for nominal damages specifically waived. Further, the parties did not stipulate to dismissal of the Iliescus' trespass claim, nor any damages specifically related to that claim. As explained above, the Iliescus preserved their claim to nominal damages by preserving their claim to compensatory damages and because nominal damages are inherently available for certain types of claims such as trespass.

15   As explained above, while the district court correctly dismissed the Iliescus' separate cause of action for injunctive relief, they are nevertheless permitted to seek injunctive relief as a remedy.

16   Insofar as the parties have raised arguments that are not specifically addressed in this opinion, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 137 of 438 PageID #:  486
Iliescu, Trustee of John Iliescu, Jr. and Sonnia Iliescu 1992..., 522 P.3d 453 (2022)
138 Nev. Adv. Op. 72

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

306 P.3d 411, 129 Nev. Adv. Op. 57

129 Nev. 554
Supreme Court of Nevada.

Muhammad Q. KHAN, an Individual; and
Maimoona Q. Khan, an Individual, Appellants,
v.
Qadir BAKHSH, an Individual, Respondent.

No. 60262
|
Aug. 1, 2013.

**Synopsis**

**Background:** Vendor brought breach-of-contract action
against proposed purchasers of restaurant. Following bench
trial, the Eighth Judicial District Court, Clark County,
Michelle Leavitt, J., entered judgment in vendor's favor, and
purchasers appealed.

**Holdings:** The Supreme Court, Cherry, J., held that:

statute of frauds did not bar oral evidence regarding existence
and terms of written buy-and-agreement which was allegedly
lost or destroyed by vendor;

parol evidence rule did not bar testimony offered as evidence
that agreement was procured by fraud; and

liquidated damages clause was an unenforceable penalty.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*412** Michael H. Singer, Ltd., and Michael H. Singer, Las
Vegas, for Appellants.

Agwara & Associates and Liborius I. Agwara and George A.
Maglares, Las Vegas, for Respondent.

Before HARDESTY, PARRAGUIRRE and CHERRY, JJ.

**\*555** *OPINION*

By the Court, CHERRY, J.:

At the bench trial in this case, Muhammad Q. and Maimoona
Q. Khan presented evidence of an allegedly written, but
lost or destroyed, agreement between the Khans and Qadir
Bakhsh to purchase a certain restaurant and land from Bakhsh.
The district court excluded this evidence under the statute
of frauds because the Khans failed to produce the written
agreement. The question in dispute is whether the district
court erred when it applied the statute of frauds to preclude
consideration of the Khans' evidence regarding the existence
and terms of the allegedly lost or destroyed written agreement.
We conclude that the statute of frauds does not apply to
a writing that is subsequently lost or destroyed, and oral
evidence is admissible to prove the existence and terms of that
lost or destroyed writing. Thus, we reverse the district court's
order and remand this matter to the district court for further
proceedings.

*FACTS*

Respondent Qadir Bakhsh owned a restaurant and the
real property on which it was located, which appellants
Muhammad Q. and Maimoona Q. Khan agreed to purchase.
The parties' first buy-and-sell agreement provided that the
Khans would purchase the property for $600,000 by paying
off Bakhsh's outstanding first and second mortgages. Both
parties agreed that subsequent second and third agreements
existed, and the third agreement set a purchase price of
$990,000, wherein the Khans would pay off the $600,000
outstanding first and second mortgages and execute a
$390,000 promissory note in favor of Bakhsh. This third
agreement and promissory note proceeded through escrow
and, according to Bakhsh, was the operative agreement
between the parties. The Khans never made any payments on
the $390,000 promissory **\*556** note, and Bakhsh eventually
initiated the underlying suit against the Khans to recover the
principal and unpaid interest.

At the bench trial, the Khans presented evidence that a
fourth agreement existed, which again set the purchase price
for the property at $600,000. According to the Khans, the
only executed copy of this agreement was given to a third
party, Tahir Abbas Shah, for safekeeping. After relations
between Bakhsh and the Khans deteriorated, Bakhsh's brother
allegedly stole the signed copy of the fourth agreement from
Shah. Shah testified that when he confronted Bakhsh about

the stolen fourth agreement, Bakhsh initially agreed to return it, but never did so.

Bakhsh contended that the fourth agreement never existed, and that the third agreement and the promissory note, under which the purchase proceeded through escrow, contained the agreed-upon purchase price and terms of the sale. The Khans maintained that the fourth agreement, while stolen and allegedly destroyed by Bakhsh or his brother, was the actual agreement between the parties, or alternatively that the third agreement was fraudulently induced.

In its order after the bench trial, the district court refused to consider most of the evidence that the Khans presented. The court found that the Khans' evidence of the destroyed fourth agreement was barred by the statute of frauds because it was an "unwritten" agreement for the purchase of property. The district court also found that Muhammad Khan's testimony about terms that differed from the terms of the third agreement **413 was barred by the parol evidence rule. After declining to consider this evidence, the district court found that the Khans breached the third agreement and entered judgment in favor of Bakhsh. The district court awarded Bakhsh monetary damages of $390,000 plus interest for the Khans' failure to pay the $390,000 promissory note, $20,000 for Bakhsh's remaining interest in the restaurant, $585,000 in liquidated damages pursuant to a provision in the third agreement, and $1,359.77 in costs. The Khans appealed.

*DISCUSSION*

We begin our review of the issues presented in this appeal by examining the district court's application of the statute of frauds and the parol evidence rule, before addressing the damages award.

*Application of evidentiary rules*

*Statute of frauds*

The Khans argue that the district court erred when it applied the statute of frauds to bar their evidence of a fourth written contract that they alleged was later stolen and destroyed. We agree with the **557 Khans that the statute of frauds does not bar oral evidence of such a contract.

Nevada's statute of frauds provides that every contract for the sale of land is void unless the contract is in writing, and thus, oral agreements to convey real property cannot be

enforced. NRS 111.205(1); *see also Butler v. Lovoll,* 96 Nev. 931, 934–35, 620 P.2d 1251, 1253 (1980). Because the Khans did not present a writing evidencing the fourth agreement, the district court deemed it an "unwritten" agreement and applied the statute of frauds to bar the Khans' evidence of the fourth agreement. But the Khans did not allege that the fourth agreement was oral or unwritten. Instead, they presented testimony, from themselves and Shah, and documentary evidence regarding the existence and terms of a fourth *written* agreement, which was allegedly subsequently lost or destroyed by Bakhsh. Because this evidence pertained to the existence and terms of an allegedly *written* agreement, the statute of frauds is satisfied and this evidence is admissible. *See Lutz v. Gatlin,* 22 Wash.App. 424, 590 P.2d 359, 361 (1979).

The admissibility of evidence concerning a written agreement is not affected by the subsequent loss or destruction of such an agreement. Its loss or destruction does not render it "unwritten" and the evidence of its existence and terms barred by the statute of frauds. *Id.* Indeed, when one party allegedly stole or destroyed the agreement, as the Khans allege Bakhsh did here, that party may not use the statute of frauds to sanction his obliteration of the agreement to the detriment of the other party. *See Baker v. Mohr,* 111 Or.App. 592, 826 P.2d 111, 113 (1992). Thus, in this case, the district court erred when it found that the statute of frauds barred the Khans' evidence of the existence and terms of the alleged fourth written agreement. *Edwards Indus., Inc. v. DTE/BTE, Inc.,* 112 Nev. 1025, 1033, 923 P.2d 569, 574 (1996) (stating that the district court's application of the statute of frauds is a question of law, which this court reviews de novo). Accordingly, the Khans were entitled to present parol or other evidence to prove the existence and contents of the allegedly lost or destroyed fourth agreement. *Joseph E. Seagram & Sons, Inc. v. Shaffer,* 310 F.2d 668, 674–75 (10th Cir.1962); *Mark Keshishian & Sons, Inc. v. Wash. Square, Inc.,* 414 A.2d 834, 840 (D.C.Ct.App.1980). We therefore reverse that portion of the district court's judgment.

*Parol evidence*

The Khans also argue that the district court abused its discretion by applying the parol evidence rule to bar Muhammad Khan's and Shah's testimony regarding terms contrary to the third agreement **558 to show that the third agreement was induced by fraud. The parol evidence rule generally bars extrinsic evidence regarding prior or contemporaneous agreements that are contrary to the terms of an integrated contract. *Crow–Spieker No. 23 v. Robinson,*

97 Nev. 302, 305, 629 P.2d 1198, 1199 (1981). Extrinsic or oral evidence, however, is admissible to prove fraud in the inducement of an agreement, **414 *Golden Press, Inc. v. Pac. Freeport Warehouse Co.,* 97 Nev. 163, 164, 625 P.2d 578, 578 (1981),* to establish a subsequent alteration of an agreement, *M.C. Multi–Family Dev. v. Crestdale Assocs. Ltd.,* 124 Nev. 901, 914, 193 P.3d 536, 545 (2008), or to prove the existence and terms of a written, but lost or destroyed, agreement. *See, e.g., Joseph E. Seagram & Sons,* 310 F.2d at 674–75. Thus, the district court's application of the parol evidence rule to exclude testimony that was inconsistent with the terms of the third agreement, but that was offered as evidence that the third agreement was procured by fraud or that the subsequent fourth agreement was reached and memorialized in writing, but later lost or destroyed, was an abuse of discretion. *M.C. Multi–Family Dev.,* 124 Nev. at 913–14, 193 P.3d at 544–45 (providing that the district court's application of the parol evidence rule is reviewed for an abuse of discretion). We therefore reverse the district court's order to the extent that it excluded this evidence. Because we address only the district court's error in excluding admissible evidence, on remand, the district court should independently weigh the admissible evidence and enter a new judgment accordingly.

*Liquidated damages*

While we reverse and remand this case based upon the evidentiary errors, we also address the Khans' argument that the district court improperly awarded liquidated damages to Bakhsh because the liquidated damages provision was a penalty. "[L]iquidated damage provisions are prima facie valid," *Haromy v. Sawyer,* 98 Nev. 544, 546, 654 P.2d 1022, 1023 (1982), and serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable. *Joseph F. Sanson Inv. Co. v. 268 Ltd.,* 106 Nev. 429, 435, 795 P.2d 493, 496–97 (1990).

In this case, the liquidated damages provision in the third agreement required the breaching party to pay additional damages of "150% of actual damages." Thus, by its very terms, this liquidated damages clause requires ascertaining actual damages and imposes additional damages as a penalty for breach. Such a penalty for breach of an agreement is an unenforceable penalty. *See Mason v. Fakhimi,* 109 Nev. 1153, 1156–57, 865 P.2d 333, 335 (1993); *Joseph F. Sanson Inv. Co.,* 106 Nev. at 435, 795 P.2d at 497. Applying the de novo review appropriate to liquidated damages awards, **559 *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.,* 127 Nev. ——, ——, 255 P.3d 286, 288 (2011),* we conclude that the district court erred in awarding liquidated damages to Bakhsh because actual damages were ascertainable and the provision here operated as a penalty. *Am. Fire & Safety, Inc. v. City of N. Las Vegas,* 109 Nev. 357, 359–60, 849 P.2d 352, 354 (1993) (providing that the interpretation of contractual provisions, including liquidated damages, are reviewed de novo unless the interpretation turns on the credibility of extrinsic evidence). We therefore reverse this determination.

*CONCLUSION*

The district court incorrectly applied the statute of frauds to exclude evidence concerning the existence and terms of a fourth written, but allegedly lost or destroyed, agreement. Likewise, it improperly excluded evidence concerning whether the third agreement was induced by fraud or modified by a subsequent agreement because the parol evidence rule does not preclude such evidence. In addition, because actual damages were ascertainable and the liquidated damages provision operated as a penalty, the district court erred by awarding liquidated damages. For these reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

We concur: HARDESTY, and PARRAGUIRRE, JJ.

**All Citations**

129 Nev. 554, 306 P.3d 411, 129 Nev. Adv. Op. 57

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

131 Nev. 686
Supreme Court of Nevada.

LAND BARON INVESTMENTS, Inc., a Nevada
Corporation; Michael Chernine, a Trustee of
the Misha Trust; and Robert Black, Jr., Trustee
of the Blackbush Family Trust, Appellants,

v.

BONNIE SPRINGS FAMILY LIMITED
PARTNERSHIP, a Nevada Limited Partnership;
Bonnie Springs Management Company, a Nevada
Limited Liability Corporation; Alan Levinson,
an Individual; Bonnie Levinson, an Individual;
and April Boone, an Individual, Respondents.

No. 59687
|
Sept. 17, 2015.
|
Rehearing denied November 24, 2015.
|
Reconsideration En Banc Denied Jan. 22, 2016.

**Synopsis**
**Background:** Land purchaser brought action against vendor
for rescission based on mutual mistake, misrepresentation and
nondisclosure, and other claims, and vendor counterclaimed
for abuse of process and nuisance, among others, arising out
of purchaser's difficulty in obtaining access and water rights
for purchased land. The District Court, Clark County, Douglas
W. Herndon, Kathleen E. Delaney, and Gloria Sturman, JJ.,
granted summary judgment to vendor on water rights issues,
denied purchaser summary judgment on mutual mistake
claim and abuse of process and nuisance counterclaims,
2010 WL 7281239, and, after jury trial, awarded damages to
vendor for abuse of process and nuisance, 2011 WL 3565163.
Purchaser appealed.

**Holdings:** The Supreme Court, Hardesty, C.J., held that:

purchaser bore risk of mistake;

there was no evidence vendor represented facts as required
for misrepresentation claim;

vendor was not liable for alleged nondisclosure;

there was no evidence that purchaser held improper motive as
required for abuse of process counterclaim; and

sufficient evidence supported award of damages for nuisance
claim.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**Attorneys and Law Firms**

**\*\*514** Cotton, Driggs, Walch, Holley, Woloson &
Thompson and John H. Cotton and Christopher G. Rigler, Las
Vegas, for Appellants.

Greenberg Traurig, LLP, and Tyler R. Andrews and Philip M.
Hymanson, Las Vegas, for Respondents.

Darren J. Welsh, Chtd., and Darren J. Welsh, Las Vegas, for
Amicus Curiae Prudential Americana Group, Realtors.

BEFORE HARDESTY, C.J., PARRAGUIRRE and
CHERRY, JJ.

*OPINION*

By the Court, HARDESTY, C.J.:

**\*689** This appeal arises from a failed land sale contract and
raises three issues of first impression. First, we must consider
whether a mutual mistake will provide a ground for rescission
where one of the parties bears the risk of mistake. Second,
we must determine whether an abuse of process claim may be
supported by a complaint to an administrative agency instead
of one involving a legal process. Finally, we consider whether
a nuisance claim seeking to recover only emotional distress
damages requires proof of physical harm.

In addressing the first issue, we adopt the Restatement
(Second) of Contracts § 154(b) (1981), which provides that a
party bears the risk when "he is aware, at the time the contract
is made, that he has only limited knowledge with respect to
the facts to which the mistake relates but treats his limited
knowledge as sufficient." In this, **\*690** we reject mutual
mistake as a basis for rescission. We also reject the assertions
that an abuse of process claim may be supported by a

complaint to an administrative agency or that a nuisance claim seeking only emotional distress damages must be supported by proof of physical harm. Accordingly, we affirm in part and reverse in part the district court's orders and judgment.

## FACTS

### Factual background

In 2004, appellants Land Baron Investments, Inc., Michael Chernine, and Robert Black, Jr. (collectively, Land Baron), contracted to purchase land for $17,190,000 from respondents Bonnie Springs Family Limited Partnership, Bonnie Springs Management Company, Alan Levinson, Bonnie Levinson, and April Boone (collectively, Bonnie Springs) for the express purpose of building a subdivision. The property lies next to the Bonnie Springs Ranch, beyond the outskirts of Las Vegas and is surrounded largely by undeveloped land.

Prior to signing the purchase agreement, Land Baron verified that Bonnie Springs had title to the property but did not inquire into water or access rights or do any other due diligence. Land Baron drafted the purchase agreement, which stated that Bonnie Springs would allow Land Baron to use some of its treated wastewater for landscaping but did not mention access or water rights or make the contract contingent upon its ability to secure access, water, or any other utility necessary for the planned subdivision. Immediately after signing the agreement and while the sale was pending, Land Baron also began listing and relisting the property for sale, first as a single piece of property and then as separate parcels. However, obtaining access and water proved to be difficult, and beginning in December 2004, the parties amended the purchase agreement five times to extend the escrow period, with Land Baron paying a nonrefundable fee of $50,000 for each extension.

**\*\*515** The property is flanked by two gravel roads, Los Loros Lane and Gunfighter Lane, both of which overlap or border Federal Bureau of Land Management (BLM) land. Clark County informed Land Baron it would not approve either road as access into the proposed subdivision unless the road was widened and paved. After further researching the issue, Land Baron discovered that Gunfighter Lane could not be paved or widened because a right-of-way [1] would not **\*691** allow it and that Los Loros Lane [2] likewise could not be paved or widened because it was on National Conservation Land and use of that road could constitute a trespass.

In September 2005, Land Baron began a search for water rights for the subject property. An attempt to buy existing water rights from another owner in the area failed because the rights were not in the same water basin. Land Baron was unable to find a viable option for obtaining water rights from nearby water sources and was unable to bring in water by a pipeline from another development. Land Baron asked Bonnie Springs if it would be willing to share its commercial water rights from the Bonnie Springs Ranch, but Bonnie Springs informed Land Baron that it could not allow its commercial water to be used in the residential development. Despite these issues, Land Baron never attempted to amend the language of the agreement with Bonnie Springs to address concerns with access or water.

The parties met in August 2007 to discuss the access and water rights issues. Land Baron informed Bonnie Springs that, because the property would likely need to be sold as a single parcel rather than as individual lots in a subdivision, its value was greatly reduced. Following this meeting, Land Baron failed to make a payment to extend the escrow period through September 2007. On September 26, 2007, Bonnie Springs notified Land Baron that it was in breach and that Bonnie Springs was terminating escrow and keeping the deposits as liquidated damages. The next day, Bonnie Springs notified the title company of Land Baron's breach and requested that escrow be terminated.

Subsequent negotiations proved unsuccessful, and Land Baron filed a citizen's complaint with the Clark County Commissioner's office alleging that there were multiple county code violations on the Bonnie Springs Ranch. The complaints were based on investigations allegedly performed at Bonnie Springs Ranch by individuals it hired to search for code violations. These investigators allegedly found horses that had been electrocuted or infected with West Nile virus; turtles in the petting zoo that were infected with salmonella; licensing issues with the motel and business; code violations with the walkways, handrails, restrooms, shade structures, electrical wiring, and stairways; and other health, waste, and zoning issues. As a result, the county commissioner and multiple state and local regulatory agencies performed a large-scale inspection of the Bonnie Springs Ranch during business hours, when guests and school children were present. Officials from each county office arrived at the ranch in police vehicles that had lights flashing. No violations were found on the Bonnie Springs Ranch.

**\*692** *Procedural background*

*Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686 (2015)
356 P.3d 511, 131 Nev. Adv. Op. 69

The same month it filed the citizen's complaint, Land Baron also filed a complaint against Bonnie Springs in district court, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation and nondisclosure, negligent misrepresentation, rescission based on mutual mistake, rescission based on unilateral mistake, rescission based on failure of consideration, and rescission based on fraud in the inducement. All of the claims centered on Land Baron's difficulty obtaining access and water rights for the subject property. Bonnie Springs counterclaimed for breach of contract, abuse of **516 process, nuisance, fraudulent misrepresentation, intentional interference with contractual relations, and slander of title.

Several summary judgment motions were filed. Of note, Bonnie Springs filed a motion for summary judgment on the ground that it had no legal or contractual duty to provide or secure water rights for the property. And Land Baron filed a motion for summary judgment to confirm its right to rescind the contract based on mutual mistake.

The district court granted Bonnie Springs' motion for summary judgment on the water rights issues. It found that Bonnie Springs had no contractual duty to provide notice of water rights issues or to help secure water rights for the subject property, and that the burden was on Land Baron to secure water rights.

The district court then denied Land Baron's motion for summary judgment regarding mutual mistake. The court found that there was no mutual mistake because the parties did not know, at the time of the agreement, whether there were sufficient access and water rights to support a subdivision on the property, and it assigned the risk of that mistake to Land Baron. Finally, the district court granted Land Baron's second summary judgment motion dismissing Bonnie Springs' intentional interference with contractual relations and fraudulent misrepresentation claims because it found that there were no remaining factual issues. However, it denied the motion as to Bonnie Springs' counterclaims for breach of contract, abuse of process, nuisance, and slander of title because it found that factual issues remained.

The parties proceeded to trial on Bonnie Springs' remaining counterclaims for abuse of process and nuisance.[3] Prior to closing arguments, Land Baron made a motion for a directed verdict, arguing that Bonnie Springs had failed to satisfy the elements of each *693 claim and had failed to prove

the physical harm necessary to support emotional distress damages under the nuisance claim. The district court denied the motion.[4]

The jury returned a unanimous verdict for Bonnie Springs on its nuisance and abuse of process counterclaims, awarding Bonnie Springs $1,250,000 as compensatory damages for its abuse of process counterclaim and $350,000 as compensatory damages for its nuisance counterclaim. The jury awarded Bonnie Springs an additional $1,512,500 in punitive damages on the abuse of process counterclaim and an additional $762,500 in punitive damages on the nuisance counterclaim.

Land Baron moved for a mistrial. It argued, among other things, that emotional distress damages may not be awarded on a nuisance or abuse of process claim absent proof of physical harm. The district court denied the motion, finding that a party did not need to prove physical harm in order to recover emotional distress damages for nuisance and abuse of process claims in Nevada. Judgment on the jury verdict, including an award of attorney fees and costs in favor of Bonnie Springs, was entered. After, Land Baron moved for reconsideration, which the district court denied.

Land Baron now appeals.

## DISCUSSION

On appeal, the parties dispute whether the district court erred in denying Land Baron's motion for summary judgment on its rescission claim and granting Bonnie Springs' motion for summary judgment on Land Baron's misrepresentation and nondisclosure claims. Land Baron also argues that the district **517 court improperly denied its motions for a directed verdict on Bonnie Springs' abuse of process and nuisance claims.

We review de novo the grant or denial of summary judgment. *Wood v. Safeway, Inc.,* 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005); *see also* NRCP 56(c). Summary judgment should be granted when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact remaining in the case, and where the moving party is entitled to judgment as a matter of law. *Id.* at 729, 121 P.3d at 1029. In reviewing a ruling for or against a directed verdict, this court applies the same standard as the trial court, viewing the evidence in the light most favorable " 'to the party against whom the motion is made.' " *694 M.C.*

*Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686 (2015)

356 P.3d 511, 131 Nev. Adv. Op. 69

*Multi–Family Dev., LLC v. Crestdale Assocs., Ltd.,* 124 Nev. 901, 910, 193 P.3d 536, 542 (2008) (quoting *Bliss v. DePrang,* 81 Nev. 599, 601, 407 P.2d 726, 727 (1965)).

*The district court did not err in denying Land Baron's motion for summary judgment on its mutual mistake rescission claim*

Land Baron argues that it was entitled to summary judgment on its rescission claim because both Land Baron and Bonnie Springs mistakenly believed there would be sufficient access and water rights for a subdivision on the property, giving rise to a mutual mistake that would render the contract voidable.

 A contract may be rescinded on the basis of mutual mistake " 'when both parties, at the time of contracting, share a misconception about a vital fact upon which they based their bargain.' " *Gramanz v. Gramanz,* 113 Nev. 1, 8, 930 P.2d 753, 758 (1997) (quoting *Gen. Motors v. Jackson,* 111 Nev. 1026, 1032, 900 P.2d 345, 349 (1995)). However, mutual mistake will not provide grounds for rescission where a party bears the risk of mistake. Restatement (Second) of Contracts §§ 152(1), 154(b), (c) (1981). If the party is aware at the time he enters into the contract "that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient," that party will bear the risk. Restatement (Second) of Contracts § 154(b) (1981). Moreover, if the risk is reasonably foreseeable and yet the contract fails to account for that risk, a court may infer that the party assumed that risk. *United States v. Winstar Corp.,* 518 U.S. 839, 905–06, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (noting that in considering if a risk is foreseeable in a regulatory setting, absent a specific contract provision, the party assumes the risk); *see also Tarrant v. Monson,* 96 Nev. 844, 845–46, 619 P.2d 1210, 1211 (1980) ("One who is uncertain assumes the risk that the facts will turn out unfavorably to his interests," and where the party bargains "with conscious uncertainty," there cannot be mutual mistake). The party also bears the risk of mistake if the court allocates that risk to the party on the ground that to do so is reasonable under the circumstances. Restatement (Second) of Contracts § 154(c) (1981).

 Here, we need not determine whether Land Baron and Bonnie Springs shared a mistaken assumption about the certainty of procuring access and water rights because Land Baron bore the risk of mistake, foreclosing any possibility of rescinding the contract based on a mutual mistake. Land Baron is a sophisticated and experienced land buyer and developer, and in this instance, it contracted to purchase property that was

well beyond the outskirts of Las Vegas, surrounded by land that was mostly undeveloped, flanked by dirt **\*695** roads, and only a few minutes away from Red Rock Canyon, a well-known conservation area. Land Baron also drafted the contract and its amendments. Yet, despite including a section for contingencies, Land Baron failed to include language to address the possibilities that a narrow gravel road may not provide sufficient access to a subdivision, or that water may not be available to support a neighborhood complete with large homes and horse pastures. At best, this was a significant oversight for this type of project, and it can be fairly inferred that by failing to provide for such contingencies, Land Baron assumed the risk of mistake as to these issues. *Winstar Corp.,* 518 U.S. at 906, 116 S.Ct. 2432.

**\*\*518** Land Baron argues that Bonnie Springs assured it that water, at least, would not be a problem. However, Land Baron points to no evidence (as opposed to Land Baron's assertions) that Bonnie Springs ever actually made such a statement and thus fails to show a genuine issue of material fact. Rather, the record indicates that Land Baron entered into the contract without conducting any due diligence,[5] hoping that it could procure water, access, and any other utility necessary to obtain development permits. A hope that things will work out is not the same as a reasonable belief in a set of facts, and Land Baron assumed the risk by proceeding with the contract despite having limited knowledge of the actual conditions as to water and access. Thus, rescission is not appropriate on grounds of mutual mistake.[6] The district court did not err in granting summary judgment on Land Baron's rescission claims.

 Land Baron argues that Bonnie Springs misrepresented, either intentionally or negligently, Land Baron's ability to obtain access or water rights. Specifically, it alleges that Bonnie Springs knew Los Loros Lane was on BLM land and had previously dealt with the BLM regarding land use issues on the surrounding property, and that Bonnie Springs knew Land Baron would not be able to get water rights for the subdivision and had represented to Land Baron that Bonnie Springs would provide water. It asserts that genuine issues of material fact remain and that the district court erred in dismissing these claims on summary judgment.

 At the threshold, to establish a claim for either intentional or negligent misrepresentation, Land Baron must show that Bonnie **\*696** Springs supplied Land Baron with false information. *Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 446–47, 449, 956 P.2d 1382, 1386–87 (1998). Summary

Land Baron Inv. v. Bonnie Springs Family LP, 131 Nev. 686 (2015)

356 P.3d 511, 131 Nev. Adv. Op. 69

judgment is appropriate on either of these claims if Land Baron has not provided evidence of this essential element. *Id.* at 447, 956 P.2d at 1386. Here, Land Baron has provided no evidence that Bonnie Springs ever represented that there would be no impediment to gaining access for a subdivision via either Los Loros or Gunfighter Lanes, or that Bonnie Springs had stated that it would supply the property with water. Because the record does not indicate that Bonnie Springs ever misrepresented any facts regarding access or water to Land Baron, summary judgment was appropriate on the misrepresentation claims.

### The district court did not err in granting Bonnie Springs' motion for summary judgment on Land Barons nondisclosure claim

Land Baron next argues that Bonnie Springs knew, and did not disclose, that the property could not be supplied with adequate water and that both Los Loros and Gunfighter Lanes were on BLM land, giving rise to a claim for nondisclosure. Nondisclosure arises when a seller is aware of materially adverse facts that "could not be discovered by the buyer" after diligent inquiry. *Mackintosh v. Jack Matthews & Co.,* 109 Nev. 628, 633, 855 P.2d 549, 552 (1993). "[W]hen the defect is patent and obvious, and when the buyer and seller have equal opportunities of knowledge," a seller cannot be liable for nondisclosure. *Collins v. Burns,* 103 Nev. 394, 397, 741 P.2d 819, 821 (1987). Liability for nondisclosure is generally not imposed where the buyer either knew of or could have discovered the defects prior to the purchase. *Mitchell v. Skubiak,* 248 Ill.App.3d 1000, 188 Ill.Dec. 443, 618 N.E.2d 1013, 1017 (1993).

The record makes clear that Land Baron could have, and did, discover the facts surrounding the difficulty or impossibility of obtaining sufficient water and access for a subdivision on the property. Those defects arose from government regulations, were public knowledge, and were available to anyone upon inquiry. Thus, even if Bonnie **\*\*519** Springs had known about these facts and not disclosed them, there would still be no viable nondisclosure claim because the facts were discoverable and Land Baron had an "equal opportunit[y]" to discover, and did discover, those facts before closing. *Collins,* 103 Nev. at 397, 741 P.2d at 821. We also note that the record shows that Bonnie Springs was not aware, prior to signing the contract, that Land Baron would be unable to obtain water rights or that neither Los Loros Lane nor Gunfighter Lane would provide **\*697** suitable access. [7] Moreover, water rights are public

information that can be accessed through the Nevada District of Water Resources' (NDWR) website, and Black testified that Land Baron, through its engineering firm, was in the best position to know how much water was going to be needed for the proposed subdivision and whether it would be possible to procure that amount of water. Also, Land Baron was aware that it would need to obtain access approval across BLM land, as is evidenced by its August 2006 request for permission from Clark County to request a right-of-way across BLM land. [8]

Thus, we conclude that Bonnie Springs cannot be liable for nondisclosure regarding water rights or access. [9] Accordingly, we conclude that summary judgment was appropriate as a matter of law on Land Baron's nondisclosure claim.

### The district court's denial of Land Baron's motion for a directed verdict on Bonnie Springs' abuse of process and nuisance counterclaims

We next turn to whether the damages award was proper on Bonnie Springs' abuse of process and nuisance counterclaims, and whether Bonnie Springs was required to provide evidence of physical harm in order to recover emotional distress damages. We review questions of law de novo. *See Gonski v. Second Judicial Dist. Court,* 126 Nev. 551, 557, 245 P.3d 1164, 1168 (2010).

### Abuse of process

To support an abuse of process claim, a claimant must show " '(1) an ulterior purpose by the [party abusing the process] other **\*698** than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding.' " *LaMantia v. Redisi,* 118 Nev. 27, 31, 38 P.3d 877, 880 (2002); *Posadas v. City of Reno,* 109 Nev. 448, 457, 851 P.2d 438, 444–45 (1993) (quoting *Kovacs v. Acosta,* 106 Nev. 57, 59, 787 P.2d 368, 369 (1990)); *see also Exec. Mgmt., Ltd. v. Ticor Title Ins. Co.,* 114 Nev. 823, 843, 963 P.2d 465, 478 (1998). Thus, the claimant must provide facts, rather than conjecture, showing that the party intended to use the legal process to further an ulterior purpose. *LaMantia,* 118 Nev. at 31, 38 P.3d at 880 (holding that where the party presented only conjecture and no evidence that the opposing party actually intended to improperly use the legal process for a purpose other than to resolve the legal dispute, there was no abuse of process). The utilized process must be judicial, as the tort protects the integrity of the court.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*ComputerXpress, Inc. v. Jackson,* 93 Cal.App.4th 993, 113 Cal.Rptr.2d 625, 644 (2001); *Stolz v. Wong Commc'ns Ltd. P'ship,* 25 Cal.App.4th 1811, 31 Cal.Rptr.2d 229, 236 (1994). Furthermore, the tort requires a "willful act," and **520 the majority of courts have held that merely filing a complaint and proceeding to properly litigate the case does not meet this requirement. *See, e.g.,Pomeroy v. Rizzo,* 182 P.3d 1125, 1128 (Alaska 2008); *Ramona Unified Sch. Dist. v. Tsiknas,* 135 Cal.App.4th 510, 37 Cal.Rptr.3d 381, 389 (2005); *Weststar Mortg. Corp. v. Jackson,* 133 N.M. 114, 61 P.3d 823, 831 (2002); *Muro–Light v. Farley,* 95 A.D.3d 846, 944 N.Y.S.2d 571, 572 (2012); *Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now (C.L.E.A.N.),* 119 Wash.App. 665, 82 P.3d 1199, 1217 (2004).

We agree with the majority rule that filing a complaint does not constitute abuse of process. The tort requires a "willful act" that would not be "proper in the regular conduct of the proceeding," *Kovacs,* 106 Nev. at 59, 787 P.2d at 369, and filing a complaint does not meet this requirement. Moreover, we agree with other jurisdictions' holdings that abuse of process claims do not encompass actions involving administrative agencies. *See, e.g., ComputerXpress,* 113 Cal.Rptr.2d at 644. The tort requires the abuse of "legal process," *Kovacs,* 106 Nev. at 59, 787 P.2d at 369, but courts are not usually involved in the conduct of administrative agencies. *Crowe v. Horizon Homes, Inc.,* 116 S.W.3d 618, 623 (Mo.Ct.App.2003) (in contrast to administrative process, legal process is founded upon court authority).

Here, Bonnie Springs failed to establish the elements of abuse of process. Bonnie Springs alleges that Land Baron abused process by filing a civil complaint and by filing a citizen's complaint with the county commissioner for the ulterior purpose of coercion. However, filing a citizen's complaint does not demonstrate abuse of *legal* *699 process, and Bonnie Springs has alleged no facts that show Land Baron improperly abused the legal process in filing its complaint or litigating the case. Nor did it present any evidence at trial of an improper motive, other than its own allegations that Land Baron filed its complaint for an ulterior purpose. Therefore, we conclude that the district court erred in denying Land Baron's motion for a directed verdict on the abuse of process counterclaim. [10]

*Nuisance*

Nuisance arises where one party interferes with another party's use and enjoyment of land, and that interference is both substantial and unreasonable. *Sowers v. Forest Hills Subdivision,* ——— Nev. ———, ———, 294 P.3d 427, 432 (2013). In its answer to the complaint, Bonnie Springs based its nuisance counterclaim on the complaint filed with the county commissioner and the resulting inspection, alleging that this inspection caused "needless expense and loss of income" and that recoverable costs were incurred when Bonnie Springs paid attorney fees to defend itself in the ensuing litigation. During trial, however, Bonnie Springs' representatives admitted that it had suffered no known economic harm as a result of the inspection, and although it believed the inspection had damaged its reputation, it presented no evidence to that extent. Instead, they urged the jury to award damages for the emotional pain and suffering inflicted by the nuisance. [11]

Courts differ on whether a plaintiff must prove physical harm to recover for emotional distress arising under a nuisance claim. *Compare Bailey v. Shriberg,* 31 Mass.App.Ct. 277, 576 N.E.2d 1377, 1380 (1991) (concluding that evidence of physical injury is necessary in an emotional distress claim based on nuisance), *with Herzog v. Grosso,* 41 Cal.2d 219, 259 P.2d 429, 433 (1953) (determining that occupants could recover for mere annoyance and discomfort, such as lack of sleep, for a cause of action for nuisance). However,

> **521 [i]t seems to be the prevailing view in most jurisdictions that, in a nuisance action, an owner or occupant of real estate is entitled to recover damages for personal inconvenience, discomfort, annoyance, anguish, or sickness, distinct from, or in *700 addition to, damages for depreciation in value of property or its use.

Tracy A. Bateman, Annotation, *Nuisance as Entitling Owner or Occupant of Real Estate to Recover Damages for Personal Inconvenience, Discomfort, Annoyance, Anguish, or Sickness, Distinct From, or in Addition To, Damages for Depreciation in Value of Property or Its Use,* 25 A.L.R. 5th 568 (1994). *See, e.g., Kornoff v. Kingsburg Cotton Oil Co.,* 45 Cal.2d 265, 288 P.2d 507, 512 (1955) (reiterating that "[o]nce a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue") (internal quotations omitted); *Webster v. Boone,* 992 P.2d

1183, 1185–86 (Colo.App.1999) (holding that damages for nuisance claim can include discomfort and annoyance); *Reichenbach v. Kraska Enters., LLC,* 105 Conn.App. 461, 938 A.2d 1238, 1245 (2008) (holding that trier of fact can consider discomfort and annoyance in nuisance damages claim). Further, Restatement (Second) of Torts § 929(1) (c) (1979) provides that the damages for nuisance include "discomfort and annoyance" to the occupants.

This court has not previously addressed emotional distress damages arising under a nuisance claim. We conclude that California, Colorado, Connecticut, and the Restatement offer the better-reasoned approach for recovering damages based on a nuisance claim. Because damages for nuisance include personal inconvenience, discomfort, annoyance, anguish, or sickness, an occupant need not show physical harm to recover.

Bonnie Springs bases its nuisance counterclaim on Land Baron's complaint to the county commissioner and the resulting inspection of Bonnie Springs Ranch. The record shows that the inspection lasted several hours, during which the group of inspecting agents separately moved through the property conducting a thorough search, which included pulling apart beds in the motel and searching dark areas with a black light. Bonnie Springs' representatives testified that the inspection caused an interruption in business and that it believed the ranch's reputation had suffered as a result, even though the county failed to find evidence of any of the violations alleged by Land Baron. Bonnie Springs' representatives also testified that they lost sleep, had anxiety, and were very upset from the investigations and inspection.

While we do not opine as to whether the facts are sufficient to support a nuisance claim, the facts here support the damages arising under such a claim. Accordingly, we conclude that the district court **\*701** did not err by denying Land Baron's motion for a directed verdict on the nuisance counterclaim, as Bonnie Springs presented evidence sufficient to merit a damages award.

*CONCLUSION*

Because insufficient facts exist to support the abuse of process counterclaim, the district court erred in refusing to enter a directed verdict on this counterclaim. Therefore, the judgment on the jury's award of compensatory and punitive damages [12] for the abuse **\*\*522** of process claim must be reversed. Conversely, we affirm the damages award and corresponding punitive damages award under the nuisance counterclaim. [13] Based on our decision, we thus affirm the district court's award of attorney fees and costs. [14]

Accordingly, for the reasons set forth above, we affirm in part and reverse in part the district court's orders and judgment.

We concur: PARRAGUIRRE and CHERRY, JJ.

**All Citations**

131 Nev. 686, 356 P.3d 511, 131 Nev. Adv. Op. 69

## Footnotes

1   The BLM informed Land Baron that Gunfighter Lane was known as an "R.S. 2477 right-of-way" road. An employee from Clark County Development Services indicated that R.S. 2477 roads are roads across BLM land that have been adopted and maintained by the county as public roads but that cannot be altered from their original condition in any way.

2   At the time of this appeal, Land Baron's application with the BLM to widen and pave Los Loros Lane was still pending approval.

3   The parties also went to trial on Bonnie Springs' breach of contract and slander of title counterclaims. Bonnie Springs filed a separate trial brief seeking judicial determination in its favor on the breach of contract counterclaim, which the district court granted. The district court also granted Land Baron's motion for a directed verdict on the slander of title counterclaim, and the parties do not dispute either ruling on appeal.

356 P.3d 511, 131 Nev. Adv. Op. 69

4    The motion was brought on behalf of three parties: appellants Michael Chernine, Robert Black, and Land Baron. The motion was granted as to Chernine but denied as to the other parties. The parties do not appeal the grant in favor of Chernine.

5    Land Baron admitted that the only step it took was to ask a friend of the corporation whether Bonnie Springs actually held title to the property.

6    Because we conclude that Land Baron was not entitled to rescind the contract on the basis of mutual mistake, we do not address Bonnie Springs' arguments that Land Baron is precluded from seeking rescission because (1) the doctrine of unclean hands precludes equitable relief, and (2) Land Baron failed to seek rescission within a reasonable time.

7    Alan Levinson and April Boone both testified that they were not aware of these issues prior to signing the agreement, and that they had never attempted to widen or pave the roads themselves. Although there is evidence that at some point an official advised Bonnie Springs that the county would not approve a transfer of water rights from Bonnie Springs to the property for purposes of supplying water to a subdivision, that testimony does not show that Bonnie Springs knew, in advance of the contract, that Land Baron would be unable to procure *any* water rights for the property.

8    We reject Land Baron's argument that a prior dispute between Bonnie Springs and the BLM regarding a parking lot on the Bonnie Springs Ranch indicated that Bonnie Springs was aware of potential access issues because that dispute did not concern widening or paving either Los Loros Lane or Gunfighter Lane.

9    Because the record reveals that Bonnie Springs was not aware of the water rights and access issues, we do not address amicus curiae party Prudential Americana Group's argument that allowing Bonnie Springs not to disclose these issues will detrimentally harm purchasers of real estate by reinstating strict application of the rule of caveat emptor in Nevada.

10    We likewise conclude that the district court abused its discretion by denying Land Baron's motion for reconsideration on this issue. *AA Primo Builders, LLC v. Washington,* 126 Nev. 578, 589, 245 P.3d 1190, 1197 (2010) (noting that a motion for reconsideration is reviewed for an abuse of discretion when appealed with the underlying judgment).

11    On appeal, Land Baron does not argue that the district court inappropriately included the Bonnie Springs' entities in the counter-plaintiff category and, thus, does not argue whether such entities are incapable of emotion. *See HM Hotel Properties v. Peerless Indem. Ins. Co.,* 874 F.Supp.2d 850, 854 (D.Ariz.2012). Accordingly, we do not address this distinction.

12    Punitive damages generally may not be awarded when there is no basis for compensatory damages. *See Tucker v. Marcus,* 142 Wis.2d 425, 418 N.W.2d 818 (1988). *See also* Richard C. Tinney, J.D., Annotation, *Sufficiency of Showing Actual Damages to Support Award of Punitive Damages—Modern Cases,* 40 A.L.R.4th 11, § 2[a] (1985) ("The general rule that punitive damages may not be awarded unless the party seeking them has sustained actual damage is accepted universally...."); J.D. Lee & Barry A. Lindahl, 2 *Modern Tort Law: Liability and Litigation* § 21:49 (2d ed. 2002) ("As a general rule a plaintiff is required to establish actual damages before he or she may be entitled to recover punitive damages."); John J. Kircher & Christine M. Wiseman, 1 *Punitive Damages: Law and Practice* 2d § 5:21, 401 (2015) ("Abundant authority exists to support the proposition that a finding must be entered entitling the plaintiff to actual damages before that plaintiff will be allowed to recover punitive damages.").

13    After review, we conclude that Land Baron's remaining arguments are without merit.

14   We disagree that sanctions should issue for Bonnie Springs' "trial by ambush." Trial by ambush traditionally occurs where a party withholds discoverable information and then later presents this information at trial, effectively ambushing the opposing party through gaining an advantage by the surprise attack. *See, e.g., Clark v. Trailways, Inc.,* 774 S.W.2d 644, 646 (Tex.1989); *Johnson v. Berg,* 848 S.W.2d 345, 349 (Tex.App.1993). Here, Land Baron points to instances where Bonnie Springs briefly raised arguments and evidence that Land Baron was already aware of and objected to during the trial. The trial judge either overruled these objections or sustained them and took steps necessary to mitigate any damage. Such is not the type of action or level of seriousness that constitutes trial by ambush.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2710178

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Mary Grace MAGTOLES, Aira C. Tan, Ana Myrene Espinosa, and Ana Mervine Espinosa, individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED STAFFING REGISTRY, INC. d/b/a United Home Care and Benjamin H. Santos, Defendants.

21-CV-1850 (KAM) (PK)

|

Signed March 30, 2023

**Synopsis**

**Background:** Citizens of Republic of Philippines who worked as healthcare professionals in New York area brought putative class action lawsuit against staffing company which employed them and its owner, president, and chief executive officer (CEO), asserting claims under Trafficking Victims Protection Act (TVPA) and state law for breach of contract, unjust enrichment, and fraud, and seeking declaratory and injunctive relief regarding liquidated damages and noncompete-clauses in their employment contracts. Healthcare professionals moved for summary judgment.

**Holdings:** The District Court, Kiyo A. Matsumoto, J., held that:

liquidated damages clause in standard employment contract between healthcare professionals and staffing company was unenforceable;

non-compete clause in standard employment contract between staffing company and nurses was unenforceable;

staffing company breached provision of standard employment contract stating that employer undertook and agreed to pay employees prevailing wages based on location;

company was liable under TVPA provision creating liability for knowingly providing or obtaining labor by means of serious harm or threats of serious harm;

CEO was liable under TVPA provision creating liability for knowingly benefiting from participation in venture engaged in providing or obtaining of labor or services in violation of TVPA; and

fact issues precluded summary judgment on healthcare professional's claims for fraud and unjust enrichment.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment; Request for Declaratory Judgment; Motion for Permanent Injunction.

**Attorneys and Law Firms**

John J.P. Howley, The Howley Law Firm P.C., New York, NY, for Plaintiffs.

Felix Q. Vinluan, Law Office of Felix Q. Vinkuan, Woodside, NY, Manuel B. Quintal, New York, NY, for Defendants.

## MEMORANDUM & ORDER

KIYO A. MATSUMOTO, United States District Judge:

**\*1** Plaintiffs are citizens of the Republic of the Philippines who work as healthcare professionals in the New York area. Plaintiffs bring this putative class action against Defendants United Staffing Registry, Inc. ("the company"), and its sole owner, president, and chief executive officer, Benjamin H. Santos (collectively "Defendants"), for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 et seq. The complaint also asserts individual claims for breach of contract, unjust enrichment, and fraud, and seeks declaratory and injunctive relief and damages as to specific aspects of Plaintiffs' employment contracts.

Presently before the Court is Plaintiffs' motion for summary judgment. (ECF No. 54.) Plaintiffs request entry of summary judgment: (1) declaring that the liquidated damages and non-compete clauses in their standard employment contracts are unenforceable under both the Trafficking Victims Protection Act, 18 U.S.C. § 1589 et. seq., and under New York common law; (2) permanently enjoining Defendants from threatening or attempting to enforce either the liquidated damages provision or the non-compete clause; (3) finding both Defendants liable for breach of contract in amounts to be determined at trial or inquest, including piercing the corporate

veil of corporate Defendant United Staffing, Inc. to hold individual Defendant Santos personally liable; (4) finding both Defendants liable for violations of the TVPA in amounts to be determined at trial or inquest; and (5) awarding Plaintiffs reasonable attorneys' fees and the costs of this action as authorized by 18 U.S.C. § 1595(a). For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.

## BACKGROUND

The following facts are drawn from the parties' submissions in connection with this motion, including the parties' Local Civil Rule 56.1 Statements of Facts, opposing 56.1 Statements, and reply 56.1 Statements. [1] Upon consideration of a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### I. Factual Background

**\*2** The Court finds the following undisputed facts from the parties' submissions, unless otherwise noted.

#### A. The Defendants

Defendant Benjamin Santos is the sole owner, president, and chief executive officer ("CEO") of Defendant United Staffing Registry, Inc. ("United Staffing"), a staffing company in the business of recruiting foreign-trained nurses and other healthcare professionals, sponsoring them for lawful immigration status that will allow them to work in the United States, and employing them in New York. (Pls. 56.1 at ¶ 9; Defs. Resp. 56.1 at ¶ 9; *see also* ECF No. 45-1 ("United Staffing Dep.") at 17.) United Staffing assigns nurses to work at nursing homes and medical clinics owned and operated by its clients. (Pls. 56.1 at ¶ 7; Defs. Resp. 56.1 at ¶ 7.) Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Most of the nurses employed by United Staffing are from the Philippines. (Pls. 56.1 at ¶ 6; Defs. Resp. 56.1 at ¶ 6.)

United Staffing requires registered nurses ("RNs") that it sponsors to sign an Employment Agreement, although the timing may depend on whether the nurse was recruited from outside the United States or from within the United States. (ECF No. 45-5 ("Pascual Decl.") at ¶ 6.) Before foreign recruits are sponsored through the immigration process, United Staffing requires them to sign a three-year employment agreement with the company. (Pls. 56.1 at ¶ 11; Defs. Resp. 56.1 at ¶ 11; *see also* ECF No. 45-4 ("Santos Decl.") at ¶¶ 6-7 ("Those we recruit from abroad are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview."); Pascual Decl. at ¶¶ 6-7 ("United Staffing generally requires [non-U.S. citizens and non-lawful permanent residents RNs] whom we recruit and sponsor through the immigration process to sign a three-year Employment Agreement"; "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process.")). [2]

### B. The Nurse Plaintiffs and Their Employment Contracts

**\*3** In 2018 and 2019, Plaintiffs Mary Grace Magtoles, Aira C. Tan, and Ana Myrene Espinosa (collectively, the "Nurse Plaintiffs") each signed United Staffing's "Standard Contract" to work for the company as an RN. (Pls. 56.1 at ¶ 13; Defs. Resp. 56.1 at ¶ 13; *see, e.g.,* ECF Nos. 28-2 ("Magtoles Contract"), 28-3 ("Tan Contract"), 28-4 ("Ana Myrene Espinosa Contract").) [3] Four provisions of the contracts are relevant to the instant motion.

*First*, United Staffing's standard contract requires nurses to work a minimum number of hours during the three-year contract period. (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) Most of United Staffing's foreign recruits — including the Nurse Plaintiffs and more than fifty others — signed a contract requiring 6,000 hours of work over the three-year period. [4] (*See, e.g.*, Magtoles Contract; Pascual Decl. ¶ 22.) If a nurse leaves United Staffing's employ before working the specified number of hours, the contract requires the nurse to pay $15 in "liquidated damages" for each hour that the nurse did not complete. [5] (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) For example, if a nurse signed a contract requiring 6,000 hours of work and then left United Staffing after completing 2,000 hours of work over the course of one year, the nurse would owe $60,000 in "liquidated damages" for the 4,000 remaining hours. [6]

**\*4** *Second*, the contracts include a three-year, nationwide non-compete clause. (Pls. 56.1 at ¶ 37; Defs. Resp. 56.1 at ¶ 37; *see, e.g.,* Magtoles Contract at 3.) If a nurse leaves United Staffing before completing the minimum number of hours over the course of three years, the nurse cannot:

1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.*, Magtoles Contract at 3.)

*Third*, the contracts provide that United Staffing will pay the Nurse Plaintiffs "a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility" where the nurse works. (*See, e.g.,* Magtoles Contract at 4; ECF No. 40-40, Ex. O at 4; ECF No. 40-45, Ex. T at 4.)

*Fourth*, the contracts provide that, if the nurse breaches the contract, United Staffing "will report" a change in employment status to "appropriate government authorities, including but not limited to the United States Citizenship and Immigration Service (USCIS) and the Immigration and Customs enforcement (ICE)." (*See, e.g.,* Magtoles Contract at 4.) The contracts also state that "such report may lead to the termination of the Permanent Resident Card (Green Card) and deportation of EMPLOYEE from the United States." (*See, e.g.,* Magtoles Contract at 4; ECF No. 40-40, Ex. O at 11; ECF No. 40-45, Ex. T at 4.)

### C. Plaintiff Ana Mervine Espinosa

Plaintiff Ana Mervine Espinosa (a/k/a "Bhyng Espinosa"[7]) is a licensed physical therapy aide and a citizen of the Republic of the Philippines. (Pls. 56.1 at ¶ 4; Defs. Resp. 56.1 at ¶ 4.)

### II. Procedural History

Plaintiffs commenced this putative class action on April 6, 2021, bringing claims for violations of the TVPA, conspiracy

to violate the TVPA, and attempting to violate the TVPA. (ECF No. 1 ("Compl.") ¶¶ 93-120.) The Nurse Plaintiffs also assert claims for breach of contract and seek declaratory judgment and injunctive relief, and Plaintiff Bhyng Espinosa brings claims for unjust enrichment and fraud. (*Id.* ¶¶ 121-47.)

On June 21, 2021, Defendants filed a letter requesting a pre-motion conference for their motion to dismiss the Complaint for failure to state a claim. (ECF No. 15.) After considering the parties' submissions, this Court issued a Memorandum & Order on December 30, 2021, granting in part and denying in large part Defendants' motion to dismiss. *Magtoles v. United Staffing Registry,* No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021). Based on the liquidated damages provision, non-compete clause, and the immigration notification provision in United Staffing's standard contract, the court concluded that the Nurse Plaintiffs stated plausible claims for violations of the TVPA, breach of contract, and grounds for declaratory judgment. *Id.* at \*3-11. Although the Court concluded that Plaintiff Bhyng Espinosa could not assert claims under Section 1589 of the TVPA — because the Complaint failed to allege that she ever started work for United Staffing — the Court found that Ms. Bhyng Espinosa stated plausible claims for trafficking, conspiracy, and attempt under the TVPA, as well as for fraud and unjust enrichment under New York law. *Id.* at \*10, \*12. On February 8, 2022, Magistrate Judge Kuo issued an order certifying the close of all discovery. (2/8/22 Docket Order.) On May 25, 2022, this Court granted the Nurse Plaintiffs' motion for class certification and approved the notices to the putative class. *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2022 WL 1667005 (E.D.N.Y. May 25, 2022).

**\*5** Finally, on August 30, 2022, less than a week before the opt-out deadline, Defendants sent an email — without seeking leave from this Court — to United Staffing employees, including members of the certified class in this action, encouraging them to opt out of the class. (ECF No. 57-2 ("8/30/22 Email").) On September 2, 2022, class counsel moved by order to show cause, pursuant to Federal Rule of Civil Procedure 23(d), for an order: (1) prohibiting Defendants and their attorneys, employees, agents, and representatives from communicating with class members regarding this action and the claims asserted without prior court approval; (2) directing Defendants to provide class counsel with the names and email addresses of all individuals who received Defendants' August 30, 2022 email; and (3) authorizing class counsel to send a curative notice to class members. (ECF No. 57-4 at 1.) The Court held an Order to

Show Cause Hearing on September 6, 2022. In a September 6, 2022 Memorandum & Order granting class counsel's motion, the Court found:

> As the employer of class members, Defendants sent an email warning class members that "United Staffing filed counterclaims against the nurses for preterminating their contracts." (8/30/22 Email at 1.) Viewed in context, this statement conveys an implicit threat, by the Defendants to their employee class members, that they too will be sued if they choose to remain in the class. This statement is also misleading because it suggests that nurses will face liability for "preterminating their contracts" (*id.*), regardless of whether those contracts (as Plaintiffs contend) are unenforceable.
>
> ...
>
> Most notably, Defendants' email suggests that class members opt out with the following response: "I do not understand how your clients are claiming United Staffing forced them to work, when all of us voluntarily signed and we all understood the terms of our employment contract. I guess your clients just would like to get out of their 3-year contracts." (8/30/22 Email at 2.) Defendants' suggested responses also contain several other one-sided statements that parrot Defendants' defenses in this action and encourage class members to opt out, including: "I was not forced to work by United Staffing," "I signed my contract voluntarily," "The contract was clear," and "I was paid correctly." (*Id.*)

(ECF No. 61 at 10-11.)

This Court held that Defendants' unauthorized email was "misleading, coercive, and otherwise interfered with the proper administration of this class action." (*Id.* at 8.)

Plaintiffs now move for summary judgment as to: Defendants' liability under the TVPA and on the breach of contract claim; a declaration that the "liquidated damages" and "non-compete" clauses of the standard contract are invalid and unenforceable; and an injunction against the actual or threatened enforcement of those clauses. Plaintiffs also seek summary judgment in favor of Plaintiff Bhyng Espinosa on her claims for fraud and unjust enrichment, on the grounds that she paid Defendants $7,532.00 in connection with obtaining a labor certification, in violation of 20 C.F.R. § 656.12. (ECF No. 54-1 ("Pls. Mem.") at 10.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.' " *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. 2505 (citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A moving party may indicate the absence of a factual dispute by "showing ... that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Finally, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## DISCUSSION

### I. Enforceability of the Liquidated Damages Provision

**\*6** Plaintiffs request a declaratory judgment finding the liquidated damages provision of the contracts unenforceable.

They also request that Defendants be enjoined from attempting or threatening to enforce the provision.

### A. Legal Standard

Whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (summary order) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). A liquidated damages provision will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Id.* Accordingly, "[a] provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413, 68 S.Ct. 123, 92 L.Ed. 32 (1947)).

To that end, "New York courts will construe a purported liquidated damages provision strictly." *Agerbrink*, 196 F. Supp. 3d at 417. Courts will uphold and enforce liquidated damages provisions where (1) actual damages may be difficult to determine *and* (2) the damages amount awarded pursuant to the clause is not clearly disproportionate to the possible loss. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004). If the liquidated damages provision "does not satisfy one or both of these factors then it is considered an impermissible penalty and will not be enforced by the courts." *Union Cap. LLC v. Vape Holdings Inc.*, No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017).

Though the party challenging the liquidated damages provision bears the burden of demonstrating unenforceability, in doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages." *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990) (citation omitted); *see also Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) ("[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages

clause should be resolved in favor of a construction which holds that the provision is a penalty.").

Finally, in determining whether one side is exacting an unconscionable penalty, courts should also consider factors such as the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arm's length. *See Rattigan,* 739 F. Supp. at 172 (internal quotation marks omitted); *Union Cap. LLC,* 2017 WL 1406278, at *7.

### B. Damages Disproportionate to Potential Loss

**\*7** Here, Section 3(b) of the liquidated damages provision provides that "[i]n the event of a breach," a nurse must pay United Staffing $15 for "each hour or part of an hour not performed" of the required 6,000 hours in the contract. (*See, e.g.*, Magtoles Contract at 3.) Section 3(a), in turn, states in relevant part "... that the EMPLOYEE breaches the contract by severing its relationship with the EMPLOYER before completion of the term of THREE (3) YEARS[.]" (*Id.*)

Under these liquidated damages provisions, then, if a nurse pre-terminated his or her contract with United Staffing prior to completing any of the 6,000 hours, the nurse would owe a total of $90,000 — $15 for each hour. As discussed *supra* note 6, Defendants inexplicably "object" to this simple arithmetic based on the contract provisions' plain language, stating it is somehow "not a statement of fact." (Defs. Resp. 56.1 at ¶ 25; Pls. 56.1 at ¶ 25; *see also supra*, notes 5, 6.) The Court finds that this factual calculation, based on Defendants' own contract term, is undisputed.

In *Paguirigan v. Prompt Nursing Employment Agency, LLC*, the employment contracts between the class of Filipino nurses and the employment agency included a liquidated damages provision stating that the employees would pay the "Employer and/or its designee/assignee" $25,000 in the event that the nurses pre-terminated or otherwise breached the employment contract. *See No. 17-CV-1302 (NG), 2019 WL 4647648, at *2, *8 (E.D.N.Y. Sept. 24, 2019), aff'd in part, appeal dismissed in part, 827 F. App'x 116 (2d Cir. 2020)* (summary order). Judge Gershon found that the $25,000 was disproportionate to the contemplated injury, and was an unenforceable penalty, because "[c]onsidering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing." *Id.* at *8.

Here, too, the liquidated damages provision in Plaintiffs' contracts are unenforceable penalties because the damages awarded pursuant to the liquidated damages clause are patently disproportionate to the potential loss. Indeed, the potential liquidated damages that a nurse could be liable for, $90,000, is significantly larger than the amount in *Paguirigan*. Even if a nurse were to pre-terminate her employment agreement with United Staffing after one year and completion of 2,000 hours — the minimum number of hours required annually under Section 1(c) of the contract (*see, e.g.,* Magtoles Contract at 3) — the nurse would still owe $60,000 to United Staffing for the remaining 4,000 hours. Similarly, if a nurse were to cease working for United Staffing after two years and completion of 4,000 hours, the nurse would still owe $30,000 to United Staffing for the remaining 2,000 hours.

Here, Plaintiff Magtoles' payroll records indicate that in a week where she worked 40.00 hours at her hourly rate of $31.00, her net pay was $924.36 per week after taxes. (ECF No. 43-17 ("Magtoles Payroll Records") at 19.) It would have taken Magtoles approximately 97 weeks — almost *two years* — to pay off a liquidated damages amount of $90,000 had she quit United Staffing's employ without completing any hours, provided she put every dollar she earned towards paying off the amount and provided she "had no other expenditures such as food or housing," or any other living expense — an impossibility. *See Paguirigan*, 2019 WL 4647648, at *8. This nearly two-year period of time necessary to pay liquidated damages would be more than double the time (nine months) that constituted disproportionality in *Paguirigan*.

**\*8** Moreover, *Paguirigan* found that the nine months it would have taken the plaintiff to pay off the $25,000 liquidated damages further supported "the conclusion that this provision is *intended to operate as a means to compel performance*, ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms." *Id.* (internal quotation marks and citation omitted) (emphasis added); *see also Rattigan*, 739 F. Supp. at 169 ("If [a liquidated damages clause] is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced.") (citing *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977)). Accordingly, the Court follows the reasoning of *Paguirigan* to reach the same conclusion here: the liquidated damages provision is an unenforceable penalty.

Defendants argue that because the liquidated damages provision amount could "diminish[ ] over time, as the employee continues to perform under the agreement," this is "another factor indicating that the amount of actual damages Defendants anticipated resulting from a termination of the agreements prior to their execution was reasonably proportionate to the probable loss from the breach." (ECF No. 55 ("Defs. Mem.") at 23.) This argument is unavailing. The liquidated damages provision in *Paguirigan* also provided for a diminishing of liquidated damages to $16,666.67 or $8,333.34 if the plaintiff pre-terminated or breached the contract in her second or third year, respectively. *Paguirigan*, 2019 WL 4647648, at *2. As in *Paguirigan*, the "diminishing nature" of the liquidated damages amount does not impact the finding of disproportionate damages here.

Defendants also argue that unlike in *Paguirigan*, the standard contracts here do not contain (1) a confession of judgment that Defendants could file in court "should a plaintiff or recruited nurse [terminate] his or her contract early," or (2) language that the provision was intended "to secure Employee's performance of the Employment Term." (Defs. Mem. at 24); *see Paguirigan*, 2019 WL 4647648, at *7. Defendants then assert, in a conclusory fashion, that "[t]hus, the liquidated damages provision in United Staffing's contracts is not a penalty." (Defs. Mem. at 24.)

Defendants mention these distinctions without any accompanying legal authority or arguments as to their legal relevance. Defendants notably fail to recognize that Judge Gershon noted both points only after stating that "it is immaterial that the parties may describe the provision as a penalty." *Paguirigan*, 2019 WL 4647648, at *7. The immateriality of a party's characterization of a liquidated damages provision is a well-established principle of assessing the enforceability of liquidated damages clauses. *See, e.g., Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977) ("In interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' ... or have styled it as a penalty.") Neither a confession of judgment nor language that the purpose of a liquidated damages provision is "to secure Employee's performance of the Employment Term" ultimately speak to the crux of the analysis, specifically, whether the liquidated damages provision is plainly disproportionate to the contemplated injury or whether actual damages may be difficult to determine. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs.*

*Co.*, 369 F.3d 34, 70 (2d Cir. 2004). Defendants fail to argue or cite contrary material facts or legal authority, and thus fail to present a triable issue of material fact as to the provision's disproportionality to potential loss. The Court therefore finds that the liquidated damages provision is an unenforceable penalty based on disproportionality.

### C. Difficulty of Ascertaining Damages

**\*9** Because the Court has found that the liquidated damages amount is plainly disproportionate to the contemplated injury, the liquidated damages provision is an unenforceable penalty. The Court, however, also finds that the liquidated damages provision is separately unenforceable because actual damages upon a nurse's pre-termination of or breach of the contract would not have been difficult to ascertain when the parties entered into the standard contract.

First, Defendants argue that "the portion of the costs incurred by United Staffing recruitment team in recruiting a particular RN would be unknown at the time the RN executed the agreement, because the total number of RNs that would be successfully recruited on any given recruitment trip to the Philippines would be unknown at the time." (Defs. Mem. at 21.) In affirming the district court's holding that the liquidated damages provision in *Paguirigan* was an unenforceable penalty, the Second Circuit rejected the defendants' argument that the liquidated damages provision was necessary to account for recruiting costs:

> [B]y their very nature, these costs had already been incurred by the time the parties signed the contract — after all, Defendants no longer had to expend funds recruiting [plaintiff] once she had signed on the dotted line. As a result, it would be eminently reasonable to expect that [defendant] could have reviewed its expenses (*averaging them to provide a per-nurse cost if necessary*) so as to arrive at a figure for the cost they incurred to recruit [plaintiff].

*Paguirigan v. Prompt Nursing Emp. Agency, LLC*, 827 Fed. App'x 116, 121 (2d Cir. 2020) (summary order) (emphasis added).

This Court arrives at the same conclusion here. By the time a nurse and United Staffing were entering into the standard contract — in other words, the time at which liquidated damages would be estimated — recruiting costs would already have been incurred by United Staffing, and could be averaged to ascertain a "per-nurse" cost if necessary, as the Second Circuit has noted. Therefore, recruiting costs are not difficult to ascertain. Further, Defendants concede that reimbursements for "immigration sponsorship costs, training and living orientation costs ... would have been easily ascertained, considering United Staffing has indeed been in the business for about twenty years now." (Defs. Mem. at 22.)

Defendants also argue that "the costs of replacing a recruited RN that terminated his or her employment prematurely also could not be known at the time United Staffing entered into a contract with the nurse," and, relatedly, that "United Staffing could not know whether or when a nurse would leave his or her employment when hiring the nurse, which would render an amortization of the recruitment costs impossible at the time the contract was entered into." (Defs. Mem. at 21.) It is undisputed, however, that: (1) Most of the nurses employed by United Staffing are from the Philippines, from which Defendants have recruited nurses for years; (2) United Staffing has assigned nurses to work at twenty client facilities in New York City and on Long Island; and (3) Defendants Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than twenty years. (Pls. 56.1 at ¶¶ 6, 8, 10; Defs. Resp. 56.1 at ¶¶ 6, 8, 10.) Based on the undisputed facts before the Court and the unambiguous liquidated damages formula in the contracts, the Court respectfully rejects Defendants' argument that they could not reasonably ascertain the costs of replacing a nurse with their over two decades of experience in recruiting, employing, and assigning nurses, especially because multiple nurses have previously left Defendants' employ. (*See* United Staffing Dep. at 65:02-65:22 (discussing nurses terminating their contracts with United Staffing); at 26:24-27:03 (discussing United Staffing maintaining a nurse's file for at least "six years" after the nurse left United Staffing's employ).) Therefore, far from such costs being "incapable or difficult of precise estimation," the sophistication and experience of United Staffing show otherwise.

**\*10** Defendants attempt to distinguish the standard contract here with that in *Paguirigan*, arguing that the *Paguirigan* contracts list numerous costs encompassed in the liquidated damages amount: "recruiting the employee," "sponsoring the

Employee for an Immigrant Visa," "training the Employee in practice and procedures," and "orienting the Employee to living in the New York area" (Defs. Mem. at 21-22); *see also Paguirigan*, 2019 WL 4647648, at *2, whereas here, Defendants argue that the damages "envisioned in United Staffing's contracts also include, in addition, estimates for lost profit or lost income." (Defs. Mem. at 22.)

To support their argument that damages are difficult to ascertain, Defendants point to Human Resources Manager Ferdinand Pascual's "supplemental affidavit," filed months after Defendants' Responsive 56.1 Statement (ECF No. 44) was submitted. As an initial matter, this "supplemental affidavit" contravenes this Court's Chambers Practices III.B.4(i), which states: "Supplements to a 56.1 statement are not permitted absent leave of the Court and a showing of good cause." *See CIT Bank, N.A. v. Donnatin,* No. 17-CV-02167 (ADS), 2020 WL 248996, at *2 (E.D.N.Y. Jan. 16, 2020) ("The Court has broad discretion to determine whether to overlook a party's failure to comply with its individual rules." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001))) (cleaned up); *cf. Perez v. U.S. Immigr. & Customs Enf't,* No. 19-CV-3154 (PGG), 2020 WL 4557387, at *3 (S.D.N.Y. Aug. 6, 2020), *report and recommendation adopted,* No. 19-CV-3154 (PGG), 2020 WL 5362356 (S.D.N.Y. Sept. 8, 2020) ("A court may enforce its rules and orders by striking noncompliant portions of a party's brief.") (collecting cases).

Here, Defendants failed to request leave of the Court — let alone show good cause — prior to submitting Pascual's "supplemental affidavit." Defendants failed to request leave of the Court at any point after filing their Responsive 56.1 Statement and exhibits on May 10, 2022, nor in the *three full months* prior to the motion being fully submitted on August 25, 2022. Belated supplements to the record deprive a party of the opportunity to appropriately incorporate, respond to, or cite to any such "evidence" in their 56.1 Statements. [8]

Moreover, even if the "supplemental affidavit" did not violate this Court's motion practices, the portions to which Defendants cite in support of their lost profits argument would be inadmissible, to the extent Pascual relies on hearsay or lacks personal knowledge, and because those portions are not relevant to the ascertainment of damages analysis under Fed. R. Evid. 401, 402. Any consideration of lost profits or lost income here would be properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a

breach at the time of or prior to contracting." *See Kenford Co. v. Cty. of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007).

**\*11**  Defendants argue:

> The "lost income" or "lost profit" cannot be ascertained at the time of the execution of the contract because there is no way of knowing when a RN would preterminate; because there is no way of knowing where the RN would be assigned at, and because the future worksite facility is unknown, it cannot be known at the execution of the contract how much said worksite facility would be paying United Staffing for the services of its employees, as various healthcare facilities have different and varying pay schedules and pay rates.

(Defs. Mem. at 22-23.)

Therefore, Defendants' lost income and lost profit arguments are clearly based on "losses in relation to its nursing home clients, and thus properly categorized as consequential damages." *See Paguirigan*, 2019 WL 4647648, at *11 n.9. There is no admissible evidence in the record that "any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed," *see id.*, nor is there any admissible evidence suggesting that Defendants themselves contemplated lost profit damages at the time the standard contracts were executed. *Cf. Shred-It USA, Inc. v. Bartscher*, No. 02-CV-4082 (JO), 2005 WL 2367613, at *11 (E.D.N.Y. Sept. 27, 2005) ("Shred-It claims that it can recover its lost profits from the White & Case account. Such a theory requires Shred-It to prove first that the allegedly lost profits constitute consequential damages caused by Bartscher's breach, second that such lost profits are capable of being proved with reasonable certainty, and third *that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement.*") (emphasis added).

Finally, the standard contract's failure to list some or any of the costs contemplated by the liquidated damages provision in fact lends *more* support to finding the provision unenforceable. Unlike in *Paguirigan*, the plain language of the liquidated damages provision here reflects nothing of what costs may have been contemplated by the parties in including such a provision, let alone how the provision is a "reasonable measure" of anticipated damages from breach. See *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70-71 (2d Cir. 2004) (internal quotation marks and citation omitted) ("New York courts will sustain a liquidated damages provision 'only where the specified amount is a reasonable measure of the anticipated harm.' "); *compare Union Cap. LLC v. Vape Holdings Inc.,* No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) ("Union offers no explanation for how the daily payment is even conceivably linked to the damages Union suffered as a result of Vape's failure to deliver its converted shares. Obviously, the provision serves only to encourage Vape to abide by the terms of the contract, and it thus functions as the prototypical forbidden penalty — an invalid 'added spur to performance.' ") (citation omitted), *with GFI Brokers, LLC v. Santana,* Nos. 06-CV-3988 (GEL), 06-CV-4611 (GEL), 2009 WL 2482130, at *4 (S.D.N.Y. Aug. 13, 2009) (in assessing enforceability of a liquidated damages provision, noting that testimony from the party seeking enforcement "adequately explained the difficulties GFI prospectively anticipated").

### D. Attendant Circumstances

**\*12** The Court also concludes that the liquidated damages provision is an unenforceable penalty after "due consideration for the nature of the contract and the attendant circumstances." See *U.S. Fid. & Guar. Co.,* 369 F.3d at 71 (citation omitted). The parties' respective bargaining power is also a factor when determining "if one side is exacting an unconscionable penalty." *PacifiCorp Cap. Inc. v. Tano, Inc.,* 877 F. Supp. 180, 184 (S.D.N.Y. 1995); *see also Glob. Crossing Bandwith, Inc. v. OLS, Inc.,* 566 F. Supp. 2d 196, 202 (W.D.N.Y. 2008) (collecting cases).

Ferdinand Pascual is and was the Human Resources Manager at United Staffing, where he has been employed for more than 15 years. (Pls. 56.1 at ¶¶ 106-107; Defs. Resp. 56.1 at ¶¶ 106-107.) Pascual was responsible for making sure that the nurses signed the standard contract. He was also responsible for explaining the standard contract to nurses and answering their questions. (Pls. 56.1 at ¶¶ 108-10; Defs. Resp. 56.1 at ¶¶ 108-10.) Plaintiff Ana Myrene Espinosa

testified that, on the date the contract was presented to her, she "needed somebody to explain" the contract, had "to bring it back on that day, the same day," "did not have time to consult someone else," and "didn't really get the chance to read thoroughly the contract, because [she] had to go back before they closed the agency," and "Mr. Ferdi Pasquale [sic] asked [her] to submit it right away." She also testified: "I do understand the contract. *It's just at the time I was really eager to work.* I read it, scanned it really fast, and then signed." (ECF No. 40-28 ("Ana Myrene Espinosa Dep.") at 89:22-91:07 (emphasis added).) In addition, when asked if there came a point when she complained to the United States embassy about the employment agreement, Plaintiff Magtoles testified: "No. I was nervous." (ECF No. 40-26 ("Magtoles Dep.") at 106:15-106:18.)

Moreover, it is undisputed that Defendants were highly experienced in the practice of recruiting Filipino/Filipina nurses and in the use of their contracts that included the liquidated damages provision, which Defendants inserted into dozens of standardized contracts, in contrast to some nurses who relied on Defendants' representatives (such as Pascual) to explain the standard contract. Furthermore, nothing in the record before the Court suggests the parties engaged in any negotiations in the inclusion of the provision, that Plaintiffs had any hand in drafting or including the liquidated damages provision, or that Plaintiffs had any particular "familiarity with American contract law." See *Paguirigan,* 2019 WL 4647648, at *8.

In short, from the undisputed facts, the Court finds that the parties' respective bargaining power was grossly unequal. Under these circumstances and based on the undisputed evidence in the record, the Court cannot find that the liquidated damages provision was a valid and enforceable term of the contract "made by the parties at the time they enter[ed] into their agreement." See *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). The Court also reiterates that if there is "any doubt" as to whether a liquidated damages clause is an unenforceable penalty or a permissible provision, courts should construe such a provision as a penalty. *See, e.g., Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,* 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) (collecting cases); *see also Jordache Enter., Inc. v. Glob. Union Bank,* 688 F.Supp. 939, 944 (S.D.N.Y. 1988) ("Hostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker."). [9]

## II. Enforceability of Non-Compete Clause

### A. Declaratory Judgment

**\*13**  As an initial matter, Defendants do not argue that the non-compete clause is, in fact, enforceable. Instead, Defendants state only that Plaintiffs have "failed to show that there is a 'substantial controversy' 'of sufficient immediacy and reality' to warrant the issuance of a declaratory judgment," and that "there is nothing in the record of the case that will indicate Defendants had threatened to enforce the 'non-compete' provisions of Plaintiffs' employment agreements." (Def. Mem. at 24, 26); *see also Niagara Mohawk Power v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

Tellingly, Defendants have not represented that they will *not* seek enforcement, leaving nurses (and any of their potential employers) "uncertain as to whether [the nurse] will be embroiled in a lawsuit if [the nurse] accepts a position with [a competitor]." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (determining that employer's contention that "Plaintiff has failed to identify any facts that indicate that Omnicare plans to enforce the covenant against her" was "facetious"). It is well-established that where, as here, Plaintiffs are unsure whether they can pursue other employment to make a living, clarification and resolution of the uncertain enforcement of the liquidated damages provision serves "one of the main purposes of declaratory judgments." *See, e.g., id.*; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) ("In order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.").

In sum, Defendants cannot have their cake and eat it too — they cannot argue that Plaintiffs have not shown that Defendants intend to enforce the agreement, while simultaneously preserving the possibility of enforcement down the line. *See Arakelian*, 735 F. Supp. 2d at 41 (on summary judgment, holding that the employer "cannot move to dismiss [employee's] claim; refuse to agree not to enforce the Restrictive Covenants Agreement; and at the same time claim that [employee] has not shown that it intends to enforce the agreement"). The Court agrees with Plaintiffs that, "[h]aving created uncertainty by including the nationwide

non-compete clause in their Standard Contract, defendants should not be able to keep the nurses in a state of suspense and apprehension." (ECF No. 56 ("Pls. Reply") at 6.)

### B. Legal Standard of Enforceability

Non-compete provisions are enforceable under New York law only if they are (1) reasonable in duration and geographic scope, (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999 (VM), 2020 WL 1320867, at \*19 (S.D.N.Y. Mar. 20, 2020) (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1223 (1999) (citations omitted)). A violation of any prong renders the non-compete clause invalid. *Id.* Further, because restrictive covenants in employment agreements may restrain competition, "impinge on individual agency," and restrict "an employee's ability to make a living," New York courts subject such covenants to heightened judicial scrutiny. *Id.* (citing *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (collecting cases)).

### C. Application

**\*14**  If a nurse employee were to leave United Staffing before completing the minimum number of hours over the course of three years, the nurse would be prohibited from:

> 1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

> 2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.,* Magtoles Contract at 3.)

#### i. Reasonable in duration and geographic scope

Here, the sheer nationwide breadth of the geographic scope alone dooms the clause. Both subsections are unreasonable in

geographic scope. As this Court previously noted in denying Defendants' motion to dismiss the action:

> The limitation that a future employer be in competition with United Staffing in the United States – as well as the three-year time limitation – appear to apply only to the clause's second subsection. The first subsection, on its face, prohibits former employees from working as nurses without any limitation as to duration, geography, or a future employer's status as a competitor.

See *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063, at *6 (E.D.N.Y. Dec. 30, 2021).

It is undisputed that United Staffing places nurses only at facilities in New York City and on Long Island, and that United Staffing has never placed a nurse anywhere outside the State of New York. (Pls. 56.1 at ¶¶ 35-36; Defs. Resp. 56.1 at ¶¶ 35-36.) The ban that Nurse Plaintiffs cannot "operate, own, lease (as landlord or tenant), engage or participate in" *any* business in competition with United Staffing *within the United States* is baldly unreasonable. *See, e.g., Good Energy, L.P. v. Kosachuk*, 49 A.D.3d 331, 332, 853 N.Y.S.2d 75 (1st Dep't 2008) (non-compete covenant was unreasonable because employer operated in only eight states); *compare Yedlin v. Lieberman*, 102 A.D.3d 769, 770, 961 N.Y.S.2d 186 (2d Dep't 2013) ("The restrictive covenant here *applied to the entire United States*, and would have *precluded the plaintiff from merely 'participating'* in projects that involved the defendants' present or former clients.") (emphasis added), *with Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D.3d 856, 857-58, 768 N.Y.S.2d 504 (3d Dep't 2003) (finding a 35-mile restriction that was "narrower than [employer's] service area" to be "reasonable").

## ii. Necessary to protect the employer's legitimate interests

Cognizable employer interests include the "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and

(4) protection against irreparable harm where the employee's services are unique or extraordinary." *Flatiron Health, Inc.*, 2020 WL 1320867, at *19. Nothing in the record comes even close to implicating any of these, or any other, employer interests. Again, Defendants have simply made no arguments about what possible interest they would have in such an overbroad non-compete provision and, as before, this Court "struggles to imagine how a nurse would possess United Staffing's trade secrets, or how every nurse who signed United Staffing's 'standard employment contract' offered unique or extraordinary services." *See Magtoles*, 2021 WL 6197063, at *7.

### iii. Not harmful to the general public

**\*15** Although the Court recognizes that there are other nurses in the New York area, it would be plainly harmful to the general public if dozens of licensed nurses and practitioners were prohibited from contributing their services to an industry as valuable and important as nursing. *See Flatiron Health, Inc.*, 2020 WL 1320867, at *22 (finding that "[p]reventing [employee] from working at the job where he would be most productive and make the largest impact ... inflicts not only a private cost to [employee] but also a social cost," and recognizing that "[o]n that public policy ground, New York courts disfavor broad non-competes"). Moreover, as Defendant Santos himself affirms, there is an "ever-growing need of healthcare professionals to take care of our aging American population" and there are not "enough locally-produced registered nurses to take care of our own people." (Santos Decl. at ¶ 2.)

### iv. Not unreasonably burdensome to the employee

A provision that either prevents Plaintiffs from being involved in any capacity in their industry anywhere in the United States, or, even more broadly, simply anywhere that is not United Staffing, is patently unreasonable and unenforceable. *See Good Energy, L.P.*, 49 A.D.3d at 332, 853 N.Y.S.2d 75 ("[T]he covenant effectively excludes defendant from continued employment in the industry."); *see also Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 12 N.Y.S.3d 606, 34 N.E.3d 357, 370 (2015) ("New York law provides that covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood.") (collecting cases) (cleaned up).

For the foregoing reasons, the Court declares the non-compete clause in the employment contracts to be unenforceable and enjoins Defendants from attempting or threatening to enforce it.

### III. Breach of Contract

#### A. Legal Standard

To recover for breach of contract under New York law, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014).

In order to decide if a contract's terms were breached, a court considers whether the contract at issue is clear or ambiguous, and interprets the meaning of the contract language. "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590, 593 (1957)). If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations omitted).

#### B. Application

The relevant provision ("prevailing wages provision") in the standard contract states:

> **\*16**  The EMPLOYER undertakes and agrees to pay the EMPLOYEE a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility where EMPLOYEE works, applicable to Registered Nurses (RNs) and health care givers.

(*See, e.g.,* Magtoles Contract at 4.)

The only issue here is whether Defendants breached this provision of the contract. Plaintiffs argue that Defendants breached this provision in several ways, each of which the Court shall address in turn. (*See* Pls. Mem. at 15-16.)

#### i. Failure to Pay All Hours Worked

Plaintiffs first argue that Defendants breached the prevailing wages provision by "failing to pay the Nurse Plaintiffs and other class members for all the hours they worked." (Pls. Mem. at 15-16, citing 56.1 Statements at ¶¶ 47-73.) Plaintiffs' evidence includes Defendants' failure to pay all the hours when Plaintiffs worked overtime at their respective facilities or beyond the time that their shifts were scheduled to end, or paying Plaintiffs less than the hours on their timesheet records. (*See generally* ECF No. 40-27 ("Tan Dep."); Pls. 56.1 at ¶¶ 63-71 and exhibits cited thereto; Defs. Resp. 56.1 at ¶¶ 63-71 and exhibits cited thereto.)

#### a. United Staffing's Billing and Payment System

The parties' various purported disputes ultimately rest on one, overarching issue: Although timesheet and payroll records demonstrate that some nurses were not paid for all of the hours their timesheets reflect, Defendants contend that they are not in breach of the contracts because they "rely on the figures of work-hours computed and validated by the facilities" when payroll is prepared. (ECF No. 40-33 ("Ofendo-Reyes Decl.") at ¶ 9.)

Ofendo-Reyes, United Staffing's Financial Controller since 2005, described the billing and payment system, in part, as follows:

> We at United Staffing do not have a hand or participation in the monitoring of our employees' work-hours at the facilities, in the computation or counting of our employees' work-hours, and in the validation of our employees' work-hours. Each facility has its own procedures and policies on how they do these functions, and each facility has its own staff or employees performing these functions.
>
> ...
>
> We at United Staffing rely on the figures of work-hours computed and validated by the facilities when we prepare the payroll of our company. If the time sheets reflect that an employee had worked thirty seven (37) hours for that week, then that's what we prepare and process as the number of hours that our employee has to be paid.
>
> ...
>
> We at United Staffing never make any deductions on our employees' work-hours as validated by the facilities. We always follow the computations of the healthcare facilities.
>
> ...
>
> Our healthcare facility-clients have varied and different work-shifts, work schedules, and length of meal time or break periods.
>
> ...
>
> The number of validated work-hours by each of our RN-employees as evidenced by the time sheets or time records we receive from each of our healthcare facility-clients is our basis for sending our invoices or for billing our healthcare facility-clients. This means that if we paid our RN-employee so many hours for a particular work-week, that would also be the number of hours that we would bill our facility-client.

**\*17**  (Ofendo-Reyes Decl. at ¶¶ 5, 9, 12, 18.)

### b. "Nurses' Compensation"

Plaintiffs assert that "[t]he nurses' compensation was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned." (Pls. 56.1 at ¶ 20.) Defendants dispute Plaintiffs' assertion and respond: "Nurses' compensation was contingent on the amount paid to United Staffing by the facility where the nurse was assigned, so long as the nurses' compensation was at least, if not more than, the prevailing wage rates." (Defs. Resp. 56.1 at ¶ 20.)

Defendants do not argue that the provision itself is ambiguous or that its meaning is not clear on its face. Defendants instead rely (almost exclusively) on the extrinsic fact that the healthcare facilities were responsible for validating employee hours, which determined the amount that Defendants paid their nurses and billed their healthcare-facility clients where Defendants assigned their nurses to work. The Court, however, reiterates that Plaintiffs allege a claim for breach of the contract between *Plaintiffs* and *Defendants*. Therefore, in assessing this purported dispute, the Court must first determine whether the contract is ambiguous.

The prevailing wages provision in the parties' contract is not conditioned on the hours validated by Defendants' third-party healthcare-facility clients. The provision states that United Staffing "undertakes and agrees to pay" its nurse employees a salary or wage "that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility[.]" (*See, e.g.,* Magtoles Contract at 4.) The language of this provision is unambiguous. *See, e.g., Abundance Partners LP v. Quamtel, Inc.,* 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("A contract is unambiguous if on its face it is reasonably susceptible of only one meaning.") (internal quotation marks and citation omitted) (cleaned up). Nowhere does the contract (let alone the section governing payments to employees, entitled "Article II – Schedule/Rates of Wages") state or even suggest that Defendants' contractual obligation to pay employees prevailing wages depends on the particular hours computed by or the validation system of, Defendants' respective facility clients. Defendants do not even bother arguing that the contract says otherwise. *See, e.g., Deutsche Bank Sec., Inc. v. Rhodes,* 578 F. Supp. 2d 652, 662 (S.D.N.Y. 2008) ("If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract.") (collecting cases); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) (holding that "parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself *rather than from extrinsic evidence as to terms that were not expressed*") (emphasis added).

Moreover, the parties to the contract are unambiguously United Staffing, through its sole owner, president, and CEO Santos, and their nurse employees. Defendants, again, do not argue about the actual substance or interpretation of the contract. They do not assert that there was, for example, an assignment of contract between Defendants and the healthcare facilities, or that the facilities were otherwise a party to the contract at issue, thereby altering Defendants' contractual obligations to Plaintiffs. Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the nurses' compensation was to be paid as specified in the contract, and was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned. *See Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 312 (2d Cir. 2008)* ("Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine."); *cf. JA Apparel Corp., 568 F.3d at 396* ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation.").

### c. Timesheet and Payroll Records

**\*18** The undisputed record before the Court establishes that Defendants breached the contract's prevailing wages provision by failing to pay multiple class members for all the hours they worked at Defendants' respective client facilities.

When asked if there were times when she worked hours she was not paid for, Plaintiff Tan testified that although she was scheduled to work "from 3:00 [p.m.] to 11:00 [p.m.]," she instead went home "by 2:00 or 3:00 in the morning," and that she was not paid for the hours between 11:00 p.m. and 2:00 a.m. or 3 a.m. [10] (Tan Dep. at 161:11-161:21.) Further, "Tan was only paid up to the time her shift was scheduled to end. She was not paid for the extra hours." (Pls. 56.1 at ¶ 54.) Defendants "dispute" Tan's sworn factual assertion by responding that "Tan, like all other employees of Defendants, was paid according to the validated number of work-hours given by her facility to Defendants." (Defs. Resp. 56.1 at ¶ 54.) The Court finds that Defendants' contention fails to present a genuine dispute of material fact because it does not directly (or even, indirectly) respond to the substance of the assertion — that Tan "was not paid for the extra hours" she worked past her shift, a violation of the contract's clear language that Defendants pay their employees prevailing wages for this work.

Defendants also admit the following: Tan told Pascual that she was working more hours than United Staffing was paying her for; Tan complained to Pascual that she was not being paid for the additional hours she worked when she worked past the scheduled end of her shift; Plaintiff Magtoles complained to Pascual several times that her scheduled work hours were from 7 a.m. to 3 p.m., but she was actually working until 5 p.m. or 6 p.m.; and Plaintiff Ana Myrene Espinosa complained to Pascual that she was not being paid properly. (Defs. Resp. 56.1 at ¶¶ 57-61.) In Defendants' Responsive 56.1 Statements to Plaintiffs' evidence and assertions, Defendants assert only that "whenever [Pascual] received complaints about wages, such as from [nurse], [he] would refer these to the Accounting Department and sometimes would try to address the concerns by calling the concerned facility and ask them to investigate if the complaint was true and to help the nurses address their concerns." (*Id.*) The portions of Pascual's deposition that Defendants cite in support of this assertion do not address the outcome of their purported requests for an investigation, and consequently, Tan's showing that she was not paid for some of the hours she worked is not disputed. (*See* ECF No. 40-30 ("Pascual Dep.") at 63:17-64:18.)

**\*19** Defendants also admit the following: "United Staffing received timeclock records from Adira at Riverside Rehab showing that, on June 28, 2020, Nurse Ellaine Garduce clocked in at 7:06 a.m. and clocked out at 4:07 p.m. for a total of nine hours, but *United Staffing paid her for only seven hours.*" (Pls. 56.1 at ¶ 63; Defs. Resp. at ¶ 63 (emphasis added).) Further, Defendants "partially admit[ ] and partially dispute[ ]" Plaintiffs' assertion by adding, "with the understanding that United Staffing paid the validated number of hours, and that Adira, with its own policies and practices, might have deducted break time or meal period, and sent the validated number of hours to United, which United did pay." (*Id.*) In a substantively identical manner, Defendants also admit the same factual assertion that *seven other nurses* (at their varying facilities that validated their timesheet records) worked hours for which they were not paid. (Pls. 56.1 at ¶¶ 64-71; Defs. Resp. 56.1 at ¶¶ 64-71.) Finally, the Court notes that Defendants drafted and signed the contract with dozens of nurses and had ample opportunity to include in the contracts any explanation — or even mere reference — to the billing and payment process involving Defendants' healthcare-facility clients that Defendants now heavily rely on to dispute Plaintiffs' breach of contract claim.

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

In sum, the Court finds that the plain language of the contract is unambiguous, again noting that Defendants do not argue otherwise. Simply put, Defendants had a contractual obligation to pay prevailing wages to its nurses and it breached this obligation in multiple ways, as outlined above, and cannot expect the Court to exceed the explicit terms by importing extrinsic evidence. Courts may "not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (citation omitted); *see also Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous"). For the foregoing reasons, the Court finds that Defendants have failed to raise a genuine issue of fact for trial as to Plaintiffs' breach of contract claim predicated on Defendants' failure to pay Plaintiffs for all hours worked.

### ii. Deductions for meals or breaks not allowed or taken

Plaintiffs also argue that United Staffing breached the contracts' prevailing wages provision by "deducting time for breaks that were not allowed or taken." (Pls. Mem. at 15.) Plaintiffs present evidence that: "The Nurse Plaintiffs were supposed to take 30-minute breaks when they worked an eight-hour shift, but they were not allowed or able to take breaks." (Pls. 56.1 at ¶ 74; *see also, e.g.,* Tan Dep. at 62:15-63:20 (testifying that nurses were "not able to take" a break because "we couldn't even eat because of the kind of the work that we have" at the facility, and that for "more than a year in Regal Heights," she "only can remember probably less than 10 breaks" that she took).)

Defendants dispute Plaintiffs' assertion that "Nurse-Plaintiffs were not allowed or were not able to take breaks," arguing that "Nurse-Plaintiffs were given their meal breaks, depending upon the facility where they worked." (Defs. Resp. 56.1 ¶ 74.) Defendants also cite the following from Ofendo-Reyes' Declaration: "Some facilities give the employees thirty minutes of meal period only. Other facilities would give the employees one full hour of meal time. Most facility-clients follow the 'no work, no pay' rule. So, during meal periods, which are always controlled and determined by the facilities themselves, they do not count any compensable time to our employees." (Ofendo-Reyes Decl. at ¶ 12; Defs. Resp. 56.1 at ¶ 74.) Notwithstanding that the portion of Ofendo-

Reyes' Declaration cited is not based on personal knowledge, Defendants assert only that "some facilities" gave breaks of varying lengths. Defendants fail to submit evidence creating a genuine dispute as to Plaintiffs' showing that Plaintiffs were not allowed or were too busy, to take breaks, and were not paid for work during breaks.

**\*20** The Court agrees with Plaintiffs that Defendants confuse the issue here. Plaintiffs are not claiming that they should have been paid for breaks or meal periods' that they actually took, nor are Plaintiffs disputing facilities' "no work, no pay" rule. Instead, Plaintiffs are claiming and submit evidence (which is not comprehensible, as explained *infra*) that Defendants deducted time "for breaks that were not allowed or taken." The Court notes that Ofendo-Reyes lacks personal knowledge as to whether the facilities prohibited Plaintiffs from taking breaks but nonetheless deducted hours for breaks. Nonetheless, the Court cannot grant summary judgment on those grounds because Plaintiffs have not submitted evidence that would allow the Court to conclude that any disparity between the hours the Nurse Plaintiffs worked versus the hours United Staffing actually paid were attributable to deductions for meal periods or breaks. Specifically, in support of their assertions, Plaintiffs vaguely cite, in part, to "Exhibits 15-17" (ECF Nos. 43-17, 43-18, 43-19), more than 400 pages of payroll and time records for Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa. Plaintiffs, however, provide no pin citations nor any other guidance or analysis of their voluminous records to the Court to support their assertion that "Nurse Plaintiffs were paid for only 7.5 hours per day when they actually worked eight hours during their regular shifts." (Pls. 56.1 at ¶ 75.) It is well-established that a court has no obligation to sift through hundreds of pages of records — in this case, extremely detailed records spanning days, weeks, and multiple years of payroll and timesheet documents — to find support for a party's 56.1 Statement. *See, e.g., Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (citing *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405–06 (6th Cir. 1992) ("Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record .... What concept of judicial economy is served when judges ... are required to do the work of a party's attorney?")).

Therefore, the Court denies summary judgment on these grounds because Plaintiffs failed to present evidence in a useful manner establishing that Defendants breached the

prevailing wage provision by deducting time for meal periods or breaks Plaintiffs did not actually take.

### iii. Failure to give Plaintiffs 2,000 hours of work per year

Plaintiffs also argue that Defendants breached the contract by failing to give the Nurse Plaintiffs and other class members sufficient full-time work to achieve the contract requirement of at least 2,000 hours per year (and at least 6,000 hours over three years). (Pls. 56.1 at ¶¶ 81-89; *see, e.g.*, Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants, in turn, ignore the contract requirements that Plaintiffs work at least 2,000 hours per year and 6,000 hours over three years, and argue that there is nothing in "United Staffing's standard employment contracts with its employees that required it to give its employees 'full-time work', much less '40 hours per week.' " (Defs. Mem. at 18.) Defendants also argue that even assuming, *arguendo,* that such a provision existed, that "the term 'full-time' is subject to various interpretations, and may mean at least thirty (30) hours per week." [11] (*Id.* at 19.)

Defendants appear to misinterpret Plaintiffs' assertion in Plaintiffs' moving papers and 56.1 Statements. Plaintiffs' arguments about "full-time" work rely on the contract provision requiring at least 2,000 hours of work per year, and do not even mention a specific number of hours a week. Nor do Plaintiffs' moving papers argue that Defendants were obligated by contract to give nurses "40 hours per week" of work. Plaintiffs' 56.1 Statements focus "the lack of full-time work" claim on a six-week period between October 5 to November 15, 2019, where Plaintiffs Magtoles and Tan were not assigned any work by United Staffing. (Pls. 56.1 at ¶ 84; Defs. Resp. 56.1 at ¶ 84.) It is undisputed that United Staffing did not pay Magtoles and Tan any compensation during those six weeks; that Magtoles and Tan had no income during those six weeks; that, during those six weeks, Magtoles and Tan earned no credit towards the 6,000 hours requirement (and thereby, no credit towards the 2,000 hours per year requirement) specified in their contracts; and that, during those six weeks, Magtoles and Tan had no ability to work anywhere else because of the contractual provision requiring that they work exclusively for United Staffing. (*See* Pls. 56.1 at ¶¶ 85-88; Defs. Resp. 56.1 at ¶¶ 85-88.)

**\*21** Plaintiffs also state in their 56.1 Statement that, as a result, "United Staffing's failure to give nurses at least 2,000 hours of work per year resulted in the Nurse Plaintiffs being paid less than the annual prevailing wage." (Pls. 56.1 at ¶ 90.)

Defendants object to this assertion and respond that it is "not a statement of fact." (Defs. Resp. 56.1 at ¶ 90.) The Court analyzes this claim based on the contract provision requiring the employee to work at least 2,000 hours per year (and at least 6,000 hours over three years). (*See, e.g.,* Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants' opposition cites to depositions of Plaintiffs Magtoles and Tan to support Defendants' assertion that they were "in-between jobs, as they resigned from Meadowbrook facility without enough notice for United to find new assignments for them." (Defs. Resp. 56.1 at ¶ 84.) As a result of this genuine dispute of material fact, summary judgment on Plaintiffs' breach of contract claim cannot be awarded on the grounds that Defendants failed to give Nurse Plaintiffs and other class members sufficient work to achieve at least 2,000 hours of work per year.

### iv. Failure to Pay the Prevailing Wage for All Hours Worked

Finally, Nurse Plaintiffs argue that Defendants failed to pay them the prevailing wage for all hours worked. (Pls. Mem. at 15, citing 56.1 Statements at ¶¶ 91-105.) Plaintiffs' assertions primarily involve Defendants paying nurses who worked at Regal Heights Nursing & Rehabilitation Center ("Regal Heights") less than the prevailing wage rate during the nurses' orientation periods. Defendants argue that "Magtoles, Tan and Espinosa each voluntarily signed an orientation wage rate agreement with United Staffing, whereby each of them agreed to be paid $15.00 during their orientation period at Regal Heights." (Defs. Mem. at 15.)

The Orientation Agreement — a letter addressed to each nurse from Pascual — states in part:

> Regal Heights Nursing & Rehabilitation Center, as per their policy, will not pay you/us with an RN rate for the first week that you attend the orientation program. However, in fairness to you and out of our benevolence, we will give you an allowance rate of $15/ hour for the duration of [the] first week of the orientation to cover your transportation, food allowance, and a little extra to tide you over during the

period of orientation. This is not a company policy and we consider your case as an exception.

(*See, e.g.,* ECF No. 40-51 ("Orientation Agreement") at 3.)

It is undisputed that "[d]uring their first two weeks of work at the Regal Heights Rehabilitation and Care Center in Queens, New York, the Nurse Plaintiffs were paid only $15.00 per hour." (Pls. 56.1 at ¶ 93; Defs. Resp. 56.1 at ¶ 93; *see also* Defs. Mem. at 15 ("It is conceded that Plaintiffs Magtoles, Tan and Espinosa were paid $15.00 per hour during their orientation at the Regal Heights facility sometime in November 2019.")) This plainly breaches the prevailing wage provision of the standard contract, which provides no exceptions or qualifications as to United Staffing's obligation to pay its employee "prevailing wages," nor does anything in the contract suggest that nurses would be paid less during their orientation periods.

Nowhere in the Orientation Agreement or the standard contract does it state that the Orientation Agreement supersedes the standard contract, nor do Defendants even argue now that the Orientation Agreement should supersede the standard contract, or be treated as part of the standard contract. Defendants merely assert that such agreements "were the law between the contracting parties, and United Staffing abided with such agreements." (Defs. Mem. at 15.) To the contrary, Section 2(a) of Article VI of the standard contract states: "This Agreement constitutes the entire Agreement between the parties and shall as of the effective date *hereof supersede any and all other Agreements between the parties.*" (*See, e.g.,* Magtoles Contract at 6 (emphasis added).) The effective dates of Magtoles', Tan's, and Ana Myrene Espinosa's standard contracts were respectively November 22, 2018, November [sic], 2018, and September 17, 2019 — all dates substantially preceding the orientation start date of November 13, 2019. (Magtoles Contract at 7-8; Tan Contract at 7-8; Ana Myrene Espinosa Contract at 7-8; Orientation Agreement at 2-4.) It is also undisputed that the prevailing wage for an RN was $32.21 per hour in Queens County during 2019. (Pls. 56.1 at ¶ 92; Defs. Resp. 56.1 at ¶ 92.)

**\*22** On these facts, considering that both the standard contract and the Orientation Agreement are unambiguous, liability has been established against Defendants for breach of contract for class members who were required to sign the Regal Heights Orientation Agreement and thus were paid below the prevailing wage during the orientation period. *See, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.") (citing *South Rd. Assocs. LLC v. IBM,* 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005)).

### IV. Piercing the Corporate Veil

Plaintiffs also seek to hold Defendant Santos individually liable for breach of contract by piercing the corporate veil of United Staffing. (Pls. Mem. at 21-22.) Santos signed the standard contract in his corporate capacity as sole owner, president, and CEO of United Staffing, rather than in his individual capacity.

As Defendants "do not specifically oppose, or otherwise address," Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos, they have "seemingly abandoned any defense to that claim." *See Alvarado v. GC Dealer Servs. Inc.,* 511 F. Supp. 3d 321, 353-54 (E.D.N.Y. 2021) (granting a portion of plaintiffs' motion for summary judgment on the grounds that defendants had not addressed, and thus abandoned defense of, the issue); *A.H. by Horowitz v. Precision Indus. Maint. Inc.,* No. 19-CV-298 (FJS/CFH), 2021 WL 2417610, at *2 (N.D.N.Y. June 14, 2021) (holding that the defendants abandoned affirmative defenses because they "fail[ed] to refute or even address these issues in either their opposition to Plaintiffs' motion [for summary judgment] or their cross-motion for summary judgment"); *see also Azeez v. City of New York,* No. 16-CV-342 (NGG) (SJB), 2018 WL 4017580, at *6 (E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion.")

In *Jackson v. Fed. Express,* the Second Circuit held that, "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." 766 F.3d 189, 196 (2d Cir. 2014); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.,* 834 F.3d 128, 143-44 (2d Cir. 2016) (reiterating the Second Circuit's holding in *Jackson*). The Second Circuit's reasoning in *Jackson* was as follows:

> [T]here is a relevant distinction to be drawn between fully unopposed

and partially opposed motions for summary judgment in counseled cases. While the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts, a partial opposition may imply an abandonment of some claims or defenses. Generally, but perhaps not always, *a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.*

766 F.3d at 196 (emphasis added).

Here, the Court concludes that Defendants intended to and did abandon any defense to the portion of Plaintiffs' motion seeking a finding piercing the corporate veil as to Defendant Santos. (Pls. Mem. at 21-22.) The circumstances here reflect a "partial response to a motion," as discussed in *Jackson.* *Id.* at 197 (defining a "partial response to a motion" as one "referencing some claims or defenses but not others"). "Preparation of a response to a motion for summary judgment is a *particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses.* Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial." *Id.* at 196 (emphasis added).

**\*23** Defendants' opposition brief — although addressing Plaintiffs' other grounds for summary judgment and despite devoting about a third of its pages to specifically defending against Plaintiffs' breach of contract claim — makes no mention of piercing the corporate veil, let alone any reference to Plaintiffs' arguments in support. (*See generally* Defs. Mem. at 9-19); *see also* *Netherlands Ins. Co. v. Selective Ins. Co. of Am.*, No. 14-CV-7132 (KPF), 2016 WL 866348, at \*7 (S.D.N.Y. Mar. 3, 2016) (granting declaratory judgment on an issue in plaintiff's favor because "Defendant has abandoned any arguments regarding [the issue] because it failed to discuss this issue in its response brief"); *LPD New York, LLC v. Adidas Am. Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at \*27 (E.D.N.Y. Sep. 24, 2022) (granting defendants' summary judgment as to certain counterclaims because plaintiff did not dispute or respond to the counterclaims "in its memorandum in opposition ... and therefore has abandoned its defense of these claims")

(also collecting cases). Defendants also did not assert any additional facts in opposition to piercing the corporate veil in their Responsive 56.1 Statements, even though those Statements span 53 pages and contain 162 Statements, each of which Defendants responded to. (*See generally* Defs. Resp. 56.1.)

Moreover, Defendants here are counseled parties and thus, their lack of opposition to the corporate veil issue appropriately reflects "a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson*, 766 F.3d at 196.

> Where a partial response to a motion is made—*i.e.,* referencing some claims or defenses but not others —a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. *In contrast, in the case of a counseled party*, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.

*Id.* at 197-98 (emphasis added).

In addition, Defendants' counsel Felix Vinluan "is an experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years." (Pls. 56.1 at ¶ 154; Defs Resp. 56.1 at ¶ 154.) Thus, the Court finds from the papers and circumstances viewed as a whole, as explained above, that Defendants have abandoned any defense or rebuttal against Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos and, consequently, Plaintiffs' motion on that issue is granted.

## V. TVPA Claims

The TVPA provides a private right of action to persons who have been subjected to forced labor. 18 U.S.C. § 1595(a). A defendant is liable for forced labor when he "knowingly

provides or obtains the labor or services of a person" by any of the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id.* § 1589(a).

Plaintiffs argue that Defendants are liable under the second, third, or fourth subsections of Section 1589(a).

### A. § 1589(a)(2): Serious Harm or Threats of Serious Harm

TVPA § 1589(c)(2) defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

TVPA § 1589(c)(2); *see also Paguirigan*, 2019 WL 4647648, at *16 (stating that § 1589(c)(2) "defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA").

**\*24** Thus, "the relevant question" under § 1589(c)(2) as applied to § 1589(a)(2) is whether "defendants' conduct constituted a threat of harm serious enough to 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or

services in order to avoid incurring that harm.' " *Paguirigan*, 2019 WL 4647648 at *16. "This standard is a hybrid one," and the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances.' " *Id.* (citing *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015)).

Defendants first recycle their arguments as to why the liquidated damages provision is enforceable. (*See* Defs. Mem. at 27-28.) As this Court has already found, the liquidated damages provision specifying, *inter alia*, harsh financial consequences, is "unenforceable as a penalty under New York law," and therefore, "this argument fails. *See Paguirigan*, 2019 WL 4647648 at *17. The liquidated damages provision therefore "constitutes a threat of sufficiently serious financial harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm" under the TVPA. *Id.* at *18 (internal quotation marks omitted).

Defendants also argue without supporting evidence that:

> Plaintiffs' TVPA claims ... fail because they rest on the factually unsupported assumption that all of the recruited RNs subjectively felt compelled to provide labor or services to United Staffing due to the terms of their employment contracts. It is beyond belief that each and every recruited RN has continued to provide labor for United Staffing only because of the contractual obligations contained in their employment contracts, and not out of a desire to continue working for United Staffing, after they had applied for a position with United Staffing, obtained a visa, and moved thousands of miles to voluntarily accept the position.

(Defs. Mem. at 30-31.) Defendants then argue that, in the alternative, "[e]ven if the terms of the contract are unenforceable, Plaintiffs utterly fail to set out facts admissible in evidence which are sufficient to establish that United

Staffing violated the TVPA in a class action setting solely based on the terms of the employment contracts, because they fail to prove facts that would show that each and every one of the recruited RNs" only rendered labor because of the contract provisions. (*Id.* at 31.)

Defendants' arguments fail because they have a mistaken view of the law. As stated above, the *language of the TVPA itself* defines "serious harm" as conduct that would compel "*a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2) (emphasis added). Further, "in the class action context, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *See Paguirigan,* 2019 WL 4647648, at *16 (internal quotation marks and citation omitted). In addition, the TVPA also "applies to subtle, nonviolent threats that may still effectively compel an individual to keep working." *Id.* (citation omitted) (holding that testimony from several nurses stating "they were never verbally threatened" was "insufficient to avoid TVPA liability").

**\*25** Defendants next argue that to their knowledge, "there is not a single case where a court had held that a defendant could be liable under the TVPA's forced labor provision solely because it entered into an employment contract containing a provision that was found to be an unenforceable penalty." (Defs. Mem. at 31.) Defendants again misunderstand the law. The inquiry under the TVPA does not turn on such a specific issue. Rather, other considerations contribute to the finding of "serious harm" and liability under § 1589(a)(2) here, including the Court's findings that Defendants breached the plain language of the employment contract in multiple ways, and included an unenforceable non-compete clause into the contract prohibiting the nurses from working in the nursing industry in the United States for three years. *See Paguirigan,* 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering that the agency had breached the wages provision of the employment contract); *see also Dale Carmen v. Health Carousel, LLC,* No. 20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) ("[I]t is not the amount of liquidated damages, per se, that controls the analysis ... what matters is whether the specified liquidated damages in a given case rise to the level of serious harm

considering all of the surrounding circumstances — such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement.").

Moreover, multiple nurses — some working through the catastrophic COVID-19 pandemic — testified in their depositions that they were considerably overworked, that facilities were understaffed, and that the difficulties of their work caused near-daily emotional distress. Defendants offer no admissible contrary evidence on this point. In assessing TVPA liability, the Court would be remiss not to take such considerations into account. *See Paguirigan,* 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering, among other factors, that "[t]hree of the nurses who were deposed complained of being overworked or that the nursing home was understaffed"). After all, "the relevant question" under § 1589(c)(2) is a "hybrid one." *Id.* at *16 (the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances' ") (citing *Rivera,* 799 F.3d at 186-87).

Plaintiff Magtoles testified in her deposition that while at Meadowbrook Facility, although she had been oriented as an "entry level" registered nurse, she was given managerial responsibilities, noting "there was no written agreement between [Magtoles], United Staffing, or the Meadowbrook that [she] will do some managerial work" such as "doing the nursing care plans, [and] attending those managerial meetings." (Magtoles Dep. at 126-27.) Magtoles also stated that, as a result, although her "supposed[ ] work hours" were 7:00 a.m. to 3:00 p.m., most of the time she would end up working until 5:00 or 6:00 p.m., without being paid for hours that she worked beyond her shift schedule. (*See id.*) Although Magtoles spoke with Pascual regarding the issue "a few times," she was told "it's still in the adjusting period." (*Id.* at 127:23-128:03.) Magtoles further stated that she experienced emotional distress every time she went to work, including insomnia and anxiety. (*Id.* at 162, 186-87.) She ultimately resigned as a result, and because she was working "more than the regular working hours. Some are unpaid." (*Id.* at 181:09-181:12.)

Plaintiff Ana Myrene Espinosa testified that at the Regal Heights facility, she "worked with 40 patients and with just two aides." (Ana Myrene Espinosa Dep. at 34:19-34:24.) She also testified that her role was "to be a charge nurse, treatment nurse, and med pass nurse all at the same time,

*Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)*

which is impossible to take care of 40 patients," and that it was "overwhelming" and "we are overworked." (*Id.* at 34:25-35:05.) Espinosa also stated that after contracting COVID-19 a second time, United Staffing "said they are not going to pay me." "I had to ask them. I had to beg because I have been out from work for two weeks and I don't have any salary or anything." (*Id.* at 56:09-56:20.) Espinosa also stated: "I had those moments when I felt depressed, and it is like almost every day I feel the anxiety when I come to work, because I don't know if I'm going to have those patients and I believe I made Mr. Pasquale [sic] aware of that." (*Id.* at 70:20-70:24.)

**\*26** In explaining her reasons for her resignation, Espinosa testified:

> **Q:** What were the reasons for your resignation?
>
> **A:** Like I said, we were overworked and it is giving me almost every day anxiety whenever I go to work. It's not safe for the patients. And I even question myself if I want to be a nurse because I cannot provide quality care for my patients. Taking care of 40 patients is impossible. That is why I resigned and I was hoping to get a better job.
>
> **Q:** Is it fair to say because of these issues you decided to resign?
>
> **A:** For me it is fair because it is affecting my mental health. I believe it is really important for my profession to be mentally stable. If you are not stable, how can you give quality care?

(*Id.* at 81:20-82:12.)

Finally, Section 1589(a) contains a scienter requirement ("[w]however knowingly provides or obtains the labor or services of a person ..."). Defendants argue that the scienter requirement is not met here because, unlike in *Paguirigan*, "the record does not establish that either Defendant has sued any of the four Plaintiffs" and that there is "not even a suggestion that Defendants' standard employment contract has previously been found by any court to be unenforceable." (Defs. Mem. at 35.) Defendants have not cited nor has the Court found any authority suggesting that the § 1589(a) scienter analysis turns on such specific grounds, nor does *Paguirigan* suggest that finding scienter requires such a particular finding.

The Court finds that there is sufficient and undisputed "evidence from which the jury could find that the employer

intended to cause the victim to believe that she would suffer serious harm — *from the vantage point of the victim* — if she did not continue to work." *Paguirigan*, 2019 WL 4647648, at \*19 (quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017)) (emphasis added). Scienter requires sufficient evidence to "find that the defendant knew that the circumstance existed." *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008).

As described above, the Court has already found that the liquidated damages provision constitutes a threat of sufficiently serious harm. There is neither evidence nor any serious argument that Defendants, who were responsible for drafting and including the liquidated damages provision in the first place, did not intend for the nurses to believe they would, in fact, have to pay the liquidated damages provision amount — in other words, *suffer serious financial harm* — if the nurse left United Staffing's employ. The nurses' reliance on Pascual and Vinluan to explain the contract terms, as discussed *supra*, also clearly demonstrates that Defendants "knew that the circumstance existed," *see id.*, and that Defendants "knowingly ... obtain[ed] the labor or services" of the nurses, with the understanding that the liquidated damages provision "would effectively coerce nurses into continuing to work." *See Paguirigan*, 2019 WL 4647648, at \*19.

And effectively coerce it did. Despite the extremely fraught work circumstances and adverse impacts on her physical and psychological health that Plaintiff Ana Myrene Espinosa testified to, as described above (including but not limiting to having to "beg" United Staffing to pay her the second time she contracted the COVID-19 virus), Espinosa kept working for Defendants.

**\*27** **Q:** Were you forced to work by United Staffing?

> **A:** I was not forced to work. I believe I have to fulfill my — *I have a contract, so I have to finish it. I don't have a choice.* Even if I feel anxiety going to work, I still have to go to work, even though they don't force us.

(Ana Myrene Espinosa Dep. at 71:07-71:14.) (emphasis added).

Such testimony evokes the circumstances that Congress intended to reach and remedy with the TVPA's broad definition of "harm" — instances "in which persons are held in a condition of servitude through nonviolent coercion." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at \*6 (S.D.N.Y. July 3, 2014).

The inclusion of the liquidated damages provision was no accident. From the "vantage point of the victim," the Court finds there is sufficient "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm ... if she did not continue to work," *Paguirigan*, 2019 WL 4647648, at \*19 (citation omitted), especially when, as the Second Circuit directed in *Rivera*, considered with the "particular vulnerabilities" of the class members here. As discussed *supra*, such vulnerabilities include but are not limited to: Plaintiffs' emotionally and physically difficult work circumstances; reliance on Defendants' representatives to understand the contract; reluctance to complain to the United States embassy about the contract due to being "nervous"; Plaintiffs' lack of negotiating or bargaining power as to the terms of the contract, in comparison to the highly experienced Defendants; and the non-compete clause in the contract, which placed unenforceable restrictions on Plaintiffs' ability to work in the nursing industry should they leave Defendants' employ.

Having found Defendants liable under § 1589(a)(2), the Court does not reach whether Defendants violated § 1589(a)(3) or § 1589(a)(4).

### B. 18 U.S.C. § 1589(b)

Having found United Staffing liable under § 1589(a)(2), the Court also finds that Defendant Santos is liable under TVPA § 1589(b), which provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b).

As discussed above, Defendant Santos is the sole owner, president, and CEO of United Staffing. Santos clearly and undeniably "played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States to work at nursing homes affiliated with defendants," and thus, "knowingly benefit[ed] financially from labor obtained in violation of TVPA § 1589(a)." *See Paguirigan*, 2019 WL 4647648, at \*19 (quotation marks omitted). Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Furthermore, Santos acted with " 'know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services' through means prohibited by TVPA § 1589(a) — in this case, through the contracts' liquidated damages provisions." *See Paguirigan*, 2019 WL 4647648, at \*19. As in *Paguirigan*, individual Defendant Santos "testified regarding [his] direct knowledge of the provision" and "signed the contract itself." *Id.*; (*see, e.g.,* Santos Dep. at 90:07-90:17; United Staffing Dep. at 44:15-45:19.) Thus, Santos had clear knowledge of the provision.

### VI. Plaintiff Bhyng Espinosa's Claims of Fraud and Unjust Enrichment

 **\*28**  Finally, Plaintiff Bhyng Espinosa seeks summary judgment on her claims for fraud and unjust enrichment. (Pls. Mem. at 10.)

In relevant part, 20 C.F.R. § 656.12(b) provides that "[a]n employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application[.]" Plaintiff Bhyng Espinosa argues that, "[i]t is undisputed that, relying on the defendants' expertise in immigration matters, [Bhyng] Espinosa paid the defendants $7,532.00" for the "costs and attorneys' fees to obtain a labor certification used in connection with the employer's sponsorship of an individual for an employment-based visa," and that Defendants "should not be permitted to retain those funds." (Pls. Mem. at 10.)

In support, Plaintiff Bhyng Espinosa cites to Plaintiffs' Rule 56.1 Statement ¶ 30, where Plaintiff asserts, in relevant part, "Plaintiff Bhyng Espinosa paid United Staffing $7,532.00 to obtain a labor certification." (Pls. 56.1 ¶ 30.) Defendants, in turn, "object" to that assertion "to the extent that the alleged

payments made as purportedly evidenced by Exhibit '9' do not indicate payments were made to 'United Staffing' 'to obtain a labor certification.' " (Defs. Resp. 56.1 at ¶ 30.)

Upon review of "Exhibit 9" and other submitted evidence, the Court denies summary judgment as to Plaintiff Bhyng Espinosa's fraud and unjust enrichment claims. (*See generally* ECF No. 43-11.) Although the receipts allegedly relate to Ms. Bhyng Espinosa's payments for her "lawyer's and newspaper ad fees" (*id.* at 3), "her application" (*id.* at 4), "1/2 of [illegible] — motion to reopen/L.C." (*id.* at 5), and "her balance for the legal fees," (*id.* at 6), none of these receipts clearly reference a labor certification. As such, there is a genuine dispute of material fact as to the purpose of Plaintiff Bhyng Espinosa's payments to Defendants and summary judgment is not appropriate.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Plaintiffs' requested declaratory and injunctive relief is GRANTED. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision and non-compete clauses in all plaintiffs' contracts to be unenforceable and to enter an injunction permanently enjoining Defendants from attempting or threatening to enforce either.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is:

   a. GRANTED on the following grounds:

      i. failure to pay Plaintiffs for all hours worked;

      ii. failure to pay Plaintiffs the prevailing wage during Regal Heights Orientation.

   b. DENIED on the following grounds:

      i. deduction of time for meal periods or breaks that were not taken.

      ii. failure to give Plaintiffs 2,000 hours of work per year.

   c. GRANTED as to piercing the corporate veil of Defendant United Staffing to hold Defendant Santos individually liable for breach of contract.

   d. Damages to Plaintiff Magtoles and the class caused by Defendants' breach of contract are to be determined at a later date.

**\*29** 3. Plaintiffs' summary judgment motion as to Defendants' liability under the TVPA is GRANTED. Damages to Plaintiff Magtoles and the class under the TVPA are to be determined at a later date.

4. Plaintiff Bhyng Espinosa's summary judgment motion for fraud and unjust enrichment claims against Defendants is DENIED.

5. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

6. No later than one week after the date of this Memorandum and Order, the parties shall contact Magistrate Judge Peggy Kuo to schedule a settlement conference. Further, the parties are strongly encouraged to consent to Magistrate Judge Kuo's jurisdiction in this case.

7. If the parties do not resolve or settle this case, they shall: (a) file a joint status report to the Court within two business days to advise of their failure to settle, and to schedule a status conference to address: how damages are to be determined; Defendants' counterclaim for breach of contract as to Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa; and Plaintiff Bhyng Espinosa's claims for unjust enrichment and fraud, and (b) promptly meet and confer on these issues and present a joint plan to the Court.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 2710178

## Footnotes

1   (*See* ECF Nos. 43-1, Plaintiffs' Rule 56.1 Statement ("Pls. 56.1"); 67, Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. Resp. 56.1"); 46, Plaintiffs' Reply Rule 56.1 Statement ("Pls. Reply 56.1"); 43-2, Declaration of John J.P. Howley ("Howley Decl.") and exhibits attached thereto; 45, Declaration of Felix Vinluan ("Vinluan Decl.") and exhibits attached thereto; 46-1, Reply Declaration of John J.P. Howley ("Howley Reply Decl.") and exhibit attached thereto.

   The Court notes that Defendants first submitted their Response to Plaintiffs' Rule 56.1 Statement at ECF No. 44. That document contravened this Court's Chambers Practices III.B.4(c) which states: "A party's 56.1 Counter Statement to a 56.1 Statement must quote, verbatim, the 56.1 Statement, including all citations, and respond to the moving party's statements of fact immediately beneath each statement." The Court ordered Defendants to re-submit an identical version of ECF No. 44 with an inclusion of Plaintiffs' corresponding paragraphs per III.B.4(c). (01/24/2023 Docket Entry). Defendants filed their revised Response (ECF No. 67) on January 25, 2023 in accordance with the Court's Order, which the Court cites in this Memorandum and Order.

   The Court also incorporates certain documents submitted in connection to the motion to dismiss (ECF Nos. 27-31) and the motion to certify class (ECF No. 40) previously filed in this case, which the parties rely upon in connection with this motion for summary judgment but did not re-submit with the motion.

   Finally, all pagination citations, except for citations to deposition transcripts, refer to the page number assigned by the Court's CM/ECF system.

2   Defendants "dispute" Plaintiffs' assertion that "United Staffing required that foreign nurses sign a contract before it would file an immigration petition to sponsor them for permanent residence status or a 'green card,' " (Pls. 56.1 at ¶ 11), arguing that "United Staffing does not have any uniform policy when to require its RN-beneficiaries to sign an Employment Agreement." (Defs. Resp. 56.1 at ¶ 11.) The Court has reviewed the Santos Declaration and Pascual Declaration cited by Defendants, and concludes that Defendants' asserted dispute as to the material fact regarding Defendants' required contract is not genuine. The portions of both Declarations that Defendants cite clearly state, *inter alia*: "Those *we recruit from abroad* are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview" (Santos Decl. ¶ 6) (emphasis added), and "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process." (Pascual Decl. ¶ 7.) "Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312 (2d Cir. 2008).

3   Defendants' Responsive 56.1 Statements frequently respond: "Undisputed, to the extent that the 'standard contract' referred to is the 'second version' of the employment contract." To the extent such Defendant Responses are attempting to cabin "undisputed" factual assertions as only applying to a "second version," the Court rejects any such attempt. On May 25, 2022, this Court certified "a class of all Filipino nurses who were employed by Defendants at any time since April 5, 2011 pursuant to an employment contract containing a liquidated damages provision, non-compete clause, immigration notification provision, and a prevailing wage requirement." *See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 WL 1667005, at *11 (E.D.N.Y. May 25, 2022). Therefore, when appropriate, the Court treats the "standard contract" in parties' 56.1 Statements as the employment agreement with the four provisions at issue, as previously certified. *See Magtoles*, 2022 WL 1667005, at *7 ("[T]he court concludes that the minor variations in the

minimum number of hours do not materially affect the TVPA claims or the claims for declaratory and injunctive relief.").

4     Thirteen nurses signed an employment contract requiring the completion of 5,100 hours over the three-year period, rather than 6,000 hours. (Pascual Decl. ¶ 21; *see* ECF No. 40-40, Ex. O at 3.) Similarly, one nurse signed an employment contract requiring the completion of 5,616 hours over the three-year period. (Pascual Decl. ¶ 23; *see* ECF No. 40-45, Ex. T at 3.)

5     Defendants repeatedly dispute Plaintiff's factual statements, such as Pls. 56.1 Statement ¶ 26, without citing to supporting admissible evidence, including by stating: "OBJECTED TO. This is not a statement of fact." (*See, e.g.,* Defs. Resp. 56.1 at ¶¶ 24-27.) Defendants have not stated nor cited to any grounds for "objecting" to the factual assertion: "If a nurse stopped working before completing 6,000 hours of work, the 'liquidated damages' clause provided that she owed United Staffing $15 'for each hour or part of an hour performed of the [6,000-hour] requirement.' " (*See* Pls. 56.1 at ¶ 24; Defs. Resp. 56.1 at ¶ 24.)

It is unclear if Defendants are objecting to whether the plain language of the liquidated damages provision states that the nurse "agrees and binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.,* Magtoles Contract at 3.) An identical provision is in the contracts requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

In any event, because Defendants fail to submit admissible evidence to support their objections, Plaintiffs' factual statements that are supported by admissible evidence are considered undisputed. *See* Fed. R. Civ. P. 56(e)(2); *Baity v. Kralik,* 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases) (holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration, citation, and internal quotation marks omitted)); *see also United States v. Gentges,* 531 F. Supp. 3d 731, 735 n.1 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.").

6     As discussed *supra* note 5, Defendants have not stated nor cited to any grounds for "objecting" to Plaintiffs' factual assertion that a nurse who was to work 6,000 hours would owe United Staffing for 4,000 remaining hours if the nurse left United Staffing after completing 2,000 hours, based on simple math and the plain language of the contract: the nurse "binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.,* Magtoles Contract at 3). An identical provision is in the contract requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

7     Two of the plaintiffs in this action, Ana Myrene Espinosa and Ana Mervine Espinosa, have notably similar names. In this Memorandum and Order, the Court refers to Ms. Ana Myrene Espinosa by her full name or as "Ms. Espinosa," and refers to Ms. Ana Mervine Espinosa as "Ms. Bhyng Espinosa," as stated in Plaintiffs' Rule 56.1 Statement ¶ 4.

8     In response to Defendants' submission of the "supplemental affidavit," Plaintiffs submitted a second Declaration from counsel John J.P. Howley with an exhibit entitled "Defendants' Response to Plaintiffs' Interrogatory No. 3." (ECF Nos. 56-1, 56-2.) As the Court is not considering the supplemental affidavit submitted by Defendants, the Court also will not consider the Second Declaration nor the attached exhibit. (*See* Pls. Reply. at 5 n.1.)

9     The Court also notes the following, rather troublesome, facts. Felix Vinluan, one of Defendants' counsel in the instant action, was retained by Filipina nurse Ronariza Beltran (who is not a class member) to review

her contract with United Staffing. Beltran relied upon Vinluan for legal advice in connection with the contract. At the same time, Vinluan was representing United Staffing in connection with Beltran's contract. (Pls. 56.1 at ¶¶ 117-19; Defs. Resp. 56.1 at ¶¶ 117-19.) Although Vinluan informed Beltran that he was also United Staffing's lawyer, Beltran testified that she did not sign anything waiving any conflicts of interest presented by Vinluan's dual representation of Defendants and their prospective employee. (ECF No. 45-11 ("Beltran Dep.") at 35:15-35:21.)

Defendants rhetorically dispute Plaintiffs' assertion that "Vinluan did not request or obtain from Beltran a waiver of conflicts of interest," speculating that "said waiver could have been granted through a different manner," but offer no evidence of waiver. (Defs. Resp. 56.1 at ¶ 120.) Notably, Defendants' speculation is distinct from any admissible evidence that any such waiver *was* ever granted. Vinluan, an "experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years," (Pls. 56.1 at ¶ 154; Defs. Resp. 56.1 at ¶ 154), should have recognized the importance of a written waiver of a conflict so plain, but there is no record evidence that he obtained any written conflict waiver.

10   Defendants dispute Plaintiffs' assertion: "When Tan was scheduled to work the 3 p.m. to 11 p.m. shift, she usually ended up working until 2 a.m. or 3 a.m." but was not paid for hours worked past 11 p.m. Defendants respond that the statement "generalizes Tan's work schedules, although the statement may be true only in [sic] few occasions while she worked at the Regal Heights facility and only if it refers to her sometimes working until 2 am, but not until 3 am." (Defs. Resp. 56.1 at ¶ 51.) The Court finds that Defendants' failure to proffer admissible evidence fails to create a genuine dispute, because Defendants admit the relevant part of the assertion — that there were times when Tan worked multiple hours past her scheduled shift hours, for which she was not paid.

11   The Court finds immaterial factual assertions regarding "full-time work" because this term does not appear in the contract. The Court notes, however, that the 2,000 hours specified in the contract divided by 52 weeks per year is approximately 38.46 hours per week, which could be considered "full time."

---

**End of Document** <span style="float:right">© 2023 Thomson Reuters. No claim to original U.S. Government Works.</span>

109 Nev. 1153
Supreme Court of Nevada.

David MASON, George Randal, Madeline Davis,
James Dunn, John Mason, Melvin Steinberg,
Thomas Bohnett, Robert Fitzgerald and Joseph
Royce, d/b/a Puebla Estates, a Nevada general
partnership, Appellants/Cross–Respondents,

v.

Manouchehr FAKHIMI, Respondent/Cross–Appellant.

No. 22383.
|
Dec. 23, 1993.

**Synopsis**

Vendor brought suit against purchaser of real estate seeking
award of liquidated damages for breach of contract.
Purchaser counterclaimed for attorney's fees. The Eighth
Judicial District Court, Clark County, Donald M. Mosley,
J., awarded damages for lesser amount than specified
in liquidated damages provision after finding provision
unenforceable. Vendor appealed, and purchaser cross-
appealed. The Supreme Court held that: (1) liquidated
damages provision in contract was not penalty and was
therefore enforceable, and (2) defaulting purchaser in auction
setting was not entitled to return of deposit because deposit
did not amount to an unenforceable penalty.

Reversed and remanded with instructions.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*334  \*1164** Morse & Mowbray and Marsha Tarte
and Christopher H. Byrd, Las Vegas, for appellants/cross-
respondents.

Hamilton & Lynch, Reno, for respondent/cross-appellant.

*OPINION*

PER CURIAM:

*FACTS*

Appellant/cross-respondent Puebla Estates ("Puebla") is
a Nevada general partnership comprised of David Mason,
George Randal, Madeline Davis, James Dunn, John Mason,
Melvin Steinberg, Thomas Bohnett, Robert Fitzgerald and
Joseph Royce. Puebla owned thirty-five four-plex apartments
which it had purchased in March 1988 with the intent
of selling them. In August **\*1155** 1988, David Mason
("Mason"), managing partner, arranged for eighteen units
to be auctioned by Eric Nelson Auctioneering. The auction
was advertised in newspapers of general circulation in Las
Vegas; Orange County, San Francisco, and Los Angeles,
California; and Phoenix, Arizona. The advertisements noted
the location of the units near Nellis Air Force Base, and some
advertisements stressed the "prime tenants," and high income
that was possible due to the shortage of Nellis housing.

Respondent/cross-appellant Manouchehr Fakhimi
("Fakhimi") and his real estate advisor, Mike Auerbach
("Auerbach"), inspected the units the day before the auction,
which was held on October 4, 1988. Fakhimi was advised
prior to the auction that the property was being sold "as is" and
that the buyer was responsible for verifying any information
regarding the units.

Fakhimi was the highest bidder for six of the units, and his
bid was accepted by Mason on behalf of Puebla. Fakhimi
then signed a standard purchase agreement and earnest money
receipt for each of the properties and delivered a check
for $69,700 to the auctioneer. The check represented ten
percent of the total purchase price for all six units. Paragraph
six of the agreement stated, "If BUYER defaults in his
performance under this contract, SELLER may elect to
retain the deposit as reasonable liquidated damages for such
default." In his deposition, Fakhimi stated that he understood
that this paragraph meant that if he failed to perform, Puebla
could keep his deposit. Mason signed the standard purchase
agreement and earnest money receipts and returned them to
Eric Nelson, the selling agent, on October 4, 1988.

Approximately two weeks later, Fakhimi stopped payment on
the check after learning from Auerbach that a wing of Nellis
Air Force Base was possibly scheduled to close. Fakhimi did
no independent investigation prior to stopping payment, nor
did he contact either Mason or the auctioneer.

**\*\*335**  After Fakhimi defaulted on the agreement, Puebla
resold the units to the next highest bidder at a loss of
$23,000. Mason spent approximately sixty hours contacting
other buyers, negotiating sales, and arranging financing.

Mason v. Fakhimi, 109 Nev. 1153 (1993)
865 P.2d 333

Puebla filed a complaint against Fakhimi requesting an award of the liquidated damages, attorney's fees and costs. In the alternative, Puebla sought general and special damages. Fakhimi answered with seven affirmative defenses, including fraudulent concealment of material facts, and counterclaimed for attorney's fees.

The case was presented to the court on statements of fact from **1156** both parties. The district court held that Fakhimi breached the standard purchase agreements by not completing the purchase of the six units. However, the court found that liquidated damages of $69,700 were disproportionate to the actual damages of $38,000. Therefore, the liquidated damages provision was an unenforceable penalty. In the alternative, the court awarded Puebla $38,000 which represented the $23,000 loss from the resale and $15,000 as payment for the time Mason spent reselling the units.

Puebla now appeals the district court's decision that the liquidated damages provision in the purchase agreement was an unenforceable penalty. Fakhimi appeals the district court's award of damages to Puebla and its refusal to allow him to rescind the contract. We address each argument in turn.

### DISCUSSION

We turn first to the issue of whether the liquidated damages provision in this contract was an unenforceable penalty. Liquidated damages are the sum which a party to a contract agrees to pay if he fails to perform, and which, having been arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach, is recoverable as agreed-upon damages should a breach occur. *Joseph F. Sanson Investment v. 268 Limited,* 106 Nev. 429, 435, 795 P.2d 493, 496–97 (1990).

However, liquidated damages provisions may amount to unenforceable penalties.

> As distinguished from liquidated damages, the term "penalty," as used in contract law, is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages

> which may be sustained by reason of non-performance, and it involves the idea of punishment.... [The] distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance.

22 AM.JUR.2d *Damages* § 684 (1980).

This court has held that liquidated damages provisions are generally prima facie valid, and the party challenging the provision must establish that the provision amounts to a penalty. *Haromy v. Sawyer,* 98 Nev. 544, 546, 654 P.2d 1022, 1023 (1982). In order to prove that such a provision constitutes a penalty, the challenging party must persuade the court that the **1157** liquidated damages are disproportionate to the actual damages sustained by the injured party. *Id.* at 547, 654 P.2d at 1023.

Puebla argues that the liquidated damages provision in the purchase agreement is enforceable. It maintains that the stipulated amount was a reasonable forecast of damages since its out-of-pocket loss plus the additional time lost could have been more than ten percent. Puebla claims that damages upon breach were not possible to accurately estimate at the time of contracting because it had no way of predicting when resale might occur or the resale price of the units.

Fakhimi argues that the liquidated damages were disproportionate to the actual loss sustained because the actual damages were one-third of the liquidated damages. Therefore, he claims, the provision was an unenforceable penalty.

We agree with Puebla that damages in the event of breach of a real estate sales contract are very difficult to estimate with any certainty. Since it was not possible for Puebla to accurately determine what actual damages would be in the event of a breach, the provision **336** fits this court's requirements for the validity of liquidated damages provisions as stated in *Haromy.* Fakhimi did not rebut the presumption that the liquidated damages clause was valid. Fakhimi did not prove that the application of the liquidated damages clause amounts to an unenforceable penalty by demonstrating that the liquidated damages are disproportionate to the actual damages.

A number of out-of-state courts have also found that liquidated damages provisions are enforceable, particularly in the area of real estate sales contracts. *See, e.g., Hooper v. Breneman,* 417 So.2d 315 (Fla.Dist.Ct.App.1982) (13.3 percent of purchase price); *Gomez v. Pagaduan,* 613 P.2d 658 (Haw.Ct.App.1980); *Curtin v. Ogborn,* 394 N.E.2d 593 (Ill.App.Ct.1979) (approximately 7 percent of purchase price); *Wilfong v. W.A. Schickedanz Agency, Inc.,* 85 Ill.App.3d 333, 40 Ill.Dec. 625, 406 N.E.2d 828 (Ill.App.Ct.1980) (10 percent of purchase price).

In view of the foregoing, we hold that the district court erred in holding that the liquidated damages provision in the instant case was an unenforceable penalty.

We now turn to the question of whether a defaulting purchaser in an auction setting is entitled to a return of his deposit. This is an issue of first impression in this state. We note the following authority:

> [W]here it has been stipulated that the deposit shall be forfeited if the purchaser does not comply with his contract, **\*1158** the deposit, in such an event, may not be recovered back either at law or in equity.... It has been said that the test to be applied is that if the deposit is unreasonable in amount and the actual damages will be negligible or capable of actual measurement, the forfeiture of the deposit will not be permitted even though this is expressly agreed; but if the deposit is reasonable in amount, a provision forfeiting it in case of a breach will be enforced.

7A C.J.S. § 18b *Auctions and Auctioneers* (1980); *see also* 7 AM.JUR.2D *Auctions and Auctioneers* § 41 (1980).

The above authority appears to be the prevailing view. A defaulting purchaser of real estate at auction is not entitled to a return of his earnest money deposit when there is a signed liquidated damages provision in the purchase agreement, and there is no basis for the vendee's failure to perform. *See Bailey v. Montgomery,* 31 Ark.App. 1, 786 S.W.2d 594, 597–

98 (1990); *see also Bamberg v. Griffin,* 394 N.E.2d 910, 914 (Ill.App.Ct.1979) ("The provision for earnest money in a contract, in the absence of an express provision to the contrary, will be interpreted as a provision for liquidated damages and enforced without actual proof of damages being required."); *Hamrick v. Summey,* 282 S.C. 424, 320 S.E.2d 703 (1984) (deposit by a prospective purchaser to ensure compliance with the sales contract is usual and customary at auctions).

Fakhimi was fully aware of, and understood, the deposit/liquidated damages provision in the purchase agreement. Accordingly, we hold that as a defaulting purchaser, Fakhimi is not entitled to a return of his deposit, particularly because the liquidated damages provision in this agreement does not amount to a penalty. Had the liquidated damages provision amounted to a penalty, Fakhimi would have been able to recover the difference between the liquidated damages and the actual damages sustained by Puebla.

We now turn to the issue of rescission. Fakhimi argues that he is entitled to rescind the contract due to misrepresentations on the part of Puebla. However, Fakhimi did not seek rescission of the contract in the court below. We have stated that this court may decline to decide an issue that was not fully litigated or decided by the district court. *McKay v. City of Las Vegas,* 106 Nev. 203, 789 P.2d 584 (1990). Accordingly, we decline to address this issue.

In addition, we do not address the propriety of the district **\*1159** court's award of damages to Puebla for time spent reselling the units since we hold that the liquidated damages provision in this case was not an unenforceable penalty.

In conclusion, we hold that the liquidated damages provision in this contract was not a penalty and is therefore enforceable. In addition, **\*\*337** we hold that a defaulting purchaser in an auction setting is not entitled to a return of his deposit provided the deposit does not amount to an unenforceable penalty.

Accordingly, we reverse the decision of the district court regarding the enforcement of the liquidated damages provision and remand this case to the district court with instructions to enter judgment consistent with this opinion.

### All Citations

109 Nev. 1153, 865 P.2d 333

Mason v. Fakhimi, 109 Nev. 1153 (1993)

865 P.2d 333

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 180 of 438 PageID #: 529

Metromedia Steakhouses Co., L.P. v. BMJ Foods Puerto..., Not Reported in...

2008 WL 794533
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

METROMEDIA STEAKHOUSES
COMPANY, L.P., et al., Plaintiffs,
v.
BMJ FOODS PUERTO RICO, INC., Defendant.

Civil Action No. 3:07-CV-2042-D.
|
March 26, 2008.

**Attorneys and Law Firms**

Eric W. Pinker, Renee S. Strickland, Lynn Tillotson & Pinker, Dallas, TX, for Plaintiffs.

Pete Harry, Brown McCarroll, Dallas, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.

**\*1** Defendant BMJ Foods Puerto Rico, Inc. ("BMJ Foods") moves to transfer venue of this case to the District of Puerto Rico, in which a second suit is pending. Alternatively, it moves to dismiss for want of subject matter or personal jurisdiction. For reasons that follow, the court denies the motions.[1]

I

This dispute arises out of several franchise agreements that govern the operation of Ponderosa Steakhouse restaurants in the commonwealth of Puerto Rico. Franchisor-plaintiffs Metromedia Steakhouses Company, L.P. ("Metromedia") and Puerto Rico Ponderosa, Inc. ("P.R.Ponderosa") sued franchisee-defendant BMJ Foods after it withheld fees allegedly owed to Metromedia under the agreements. Shortly thereafter, BMJ Foods sued Metromedia in a Puerto Rico court for breach of the same franchise agreements and for violation of Puerto Rico law. The action was later removed to the United States District Court for the District of Puerto Rico.

II

BMJ Foods maintains first that the case must be transferred to the District of Puerto Rico under the first-to-file rule.

A

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999). "The rule rests on principles of comity and sound judicial administration." *Id.* "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 729 (5th Cir.1985). When faced with duplicative litigation, "[i]n addition to outright dismissal, it sometimes may be appropriate to transfer the action or to stay it. A stay may, for example, be appropriate to permit the court of first filing to rule on a motion to transfer." *Id.* at 729 n. 1.

B

Although Metromedia and P.R. Ponderosa filed the present lawsuit almost a month before BMJ Foods filed suit in Puerto Rico, BMJ Foods maintains that the Puerto Rico action was really "first" within the meaning of the rule. According to BMJ Foods, the Puerto Rico court was first to determine that it had jurisdiction. It points to this court's December 27, 2007 order, in which the court directed plaintiffs to amend their complaint to properly allege the citizenship of Metromedia's limited partners (for purposes of establishing diversity jurisdiction). *See Metromedia Steakhouses Co., L.P. v. BMJ Foods P.R., Inc.,* No. 3:07-CV-2042 (N.D.Tex. Dec. 27, 2007) (Fitzwater, C.J.) (order). And it maintains that, because plaintiffs had not cured the complaint's defects before jurisdiction was established in the Puerto Rico court, the later-filed action takes priority. The court disagrees.

The first-to-file rule is not a jurisdictional inquiry. Although the Fifth Circuit earlier described the rule as granting priority to the court with "prior *jurisdiction* over the common subject matter," *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403, 408 (5th Cir.1971) (emphasis added), the

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 181 of 438 PageID #:  530

Metromedia Steakhouses Co., L.P. v. BMJ Foods Puerto..., Not Reported in...

court later clarified that it is the court of the first *filing* that has priority, even if there are outstanding jurisdictional issues remaining to be resolved. *See Cadle,* 174 F.3d at 604-05. Although the court in the first-filed case may, in "[e]xceptional circumstances," choose to defer to the second court for the sake of judicial economy (e.g., if the unresolved jurisdictional issue is complicated), it is not required to do so. *See id.* at 605. And in any event, no such circumstances exist here.

### III

**\*2**  BMJ Foods next asserts that the case should be transferred pursuant to 28 U.S.C. § 1404(a).

### A

Section 1404(a) provides that, "[f] or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "The decision to transfer is made to prevent waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Bank One, N.A. v. Euro-Alamo Invs., Inc.,* 211 F.Supp.2d 808, 811 (N.D.Tex.2002) (Fitzwater, J.) (citing *Stabler v. N.Y. Times Co.,* 569 F.Supp. 1131, 1137 (S.D.Tex.1983)). Nonetheless, the court may not transfer a case where the result is merely to shift the inconvenience of the venue from one party to the other. *Fowler v. Broussard,* 2001 WL 184237, at \*6 (N.D.Tex. Jan.22, 2001) (Fitzwater, J.) (citing *Enserch Int'l Exploration, Inc. v. Attock Oil Co.,* 656 F.Supp. 1162, 1167 n. 15 (N.D.Tex.1987) (Fitzwater, J.)). "The burden rests on the [moving party] to prove by a preponderance of the evidence that [the] choice of forum should be disturbed and transfer is appropriate based on a balancing of relevant factors." *Mannatech, Inc. v. K.Y.C., Inc.,* 2006 WL 2216033, at \*2 (N.D.Tex. Aug.3, 2006) (Solis, J.) (citations omitted); *see also Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1436 (5th Cir.1989).

### B

The court first addresses "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004) (per curiam). The District of

Puerto Rico would be a proper venue for this case. "The court must then balance all relevant factors to determine whether the litigation would be more conveniently held in a different forum and whether the interests of justice would be better served by a transfer." *Mannatech,* 2006 WL 2216033, at \*2 (citing *The Whistler Group, Inc. v. PNI Corp.,* 2003 WL 22939214, at \*2 (N.D.Tex. Dec.5, 2003) (Fish, C.J.)). In making its determination, the court considers "a number of private and public interest factors, none of which are given dispositive weight." *In Re Volkswagen AG,* 371 F.3d at 203 (citing *Action Indus., Inc. v. U.S. Fid. & Guar. Co.,* 358 F.3d 337, 340 (5th Cir.2004)).

> The private concerns include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or] the application of foreign law.

**\*3**  *Id.* (citations and internal quotation marks omitted; bracketed material added).

### C

Turning now to the private interest factors, the court first considers the relative accessibility of sources of proof. Plaintiffs' franchise documents are maintained at their headquarters in the Northern District of Texas, and BMJ Foods's documents are maintained at their headquarters in the District of Puerto Rico. The court does not perceive an advantage in one forum over the other in this respect. Accordingly, this factor is neutral.

Case 1:23-cv-00203-MAC  Document 10-1  Filed 09/25/23  Page 182 of 438 PageID #: 531

Metromedia Steakhouses Co., L.P. v. BMJ Foods Puerto..., Not Reported in...

The second and third factors examine the relative availability of compulsory process and the cost of attending trial for willing witnesses. "The convenience of the witnesses is often regarded as the most important factor to be considered in deciding whether to transfer venue. However, it is the convenience of the non-party witnesses that is accorded the greatest weight." *Sargent v. Sun Trust, N.A.,* 2004 WL 1630081, at *3 (N.D.Tex. July 20, 2004) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Minka Lighting, Inc. v. Trans Globe Imps., Inc.,* 2003 WL 21251684, at *2 (N.D.Tex. May 23, 2003) (Fish, C.J.)). BMJ Foods asserts that these factors favor transfer because more nonparty witnesses reside in Puerto Rico than in Texas. But it neither offers evidence of this fact nor does it identify the supposed witnesses, as is its burden. *See, e.g., Bank One,* 211 F.Supp.2d at 812 ("The moving part[y] bear[s] the burden of proving by a preponderance of the evidence that transfer is appropriate. This requires ... identification of key witnesses and the general content of their testimony." (citations omitted)). By contrast, plaintiffs have identified by affidavit two potential nonparty witnesses who reside in north Texas: Gary Schneider, former President of Ponderosa and Bonanza Steakhouses (a division of Metromedia), and Robert Petska, former President of Metromedia. *See* Ps.App. 4-5. The court concludes that the second and third factors weigh against transferring the case.

The fourth factor examines all other practical issues associated with the choice of venue. BMJ Foods maintains that plaintiffs have a strong presence in Puerto Rico, while plaintiffs argue that they have essentially no presence there. Neither side presents evidence regarding the issue. Accordingly, this factor is neutral.

D

The court next turns to the public interest factors. The first of these considers the administrative difficulties flowing from court congestion. BMJ Foods posits that this factor favors transfer because it would be more efficient to try both the Puerto Rico and Texas lawsuits in the same forum. But while litigating both cases in the same district may be more efficient, this does not of itself support the transfer of *this* first-filed case, as opposed to the transfer of the second-filed case. Thus if this factor favors BMJ Foods at all, it does so only slightly.

The second public interest factor considers the interest in having localized interests decided at home. This factor generally favors the venue where the acts giving rise to the lawsuit occurred. *See Spiegelberg v. Collegiate Licensing Co.,* 402 F.Supp.2d 786, 792 (S.D.Tex.2005) (citing *In re Volkswagen,* 371 F.3d at 206). BMJ Foods contends that Puerto Rico is the forum where most of the events giving rise to this dispute occurred, because the restaurants involved in the dispute are located in Puerto Rico and the franchise services were received in Puerto Rico. Plaintiffs respond that most of these services were coordinated and disseminated from Metromedia's North Texas headquarters, including the provision of accounting and business procedures, advertising and marketing recommendations, the provision and protection of Ponderosa trademarks, and research and development for new food products. The record is unclear whether the operative facts occurred primarily in Texas or in Puerto Rico. Accordingly, this factor will be regarded as neutral.

**\*4** The third public interest factor is the forum's familiarity with governing law. The parties agree that the Puerto Rico Dealer's Act, P.R. Laws Ann. tit. 10, § 278 *et seq.* (1991), may apply to this case. Although plaintiffs correctly point out that other fora are capable of applying this law, there can be little question that a court sitting in Puerto Rico has greater familiarity with Puerto Rico law than does a court sitting in the Northern District of Texas. Accordingly, the third public interest factor favors transferring the case.

The fourth public interest factor concerns the avoidance of unnecessary conflicts of laws. In its motion to transfer, BMJ Foods discusses the existence of a choice-of-law provision in the franchise agreements, but it does not explain how this provision creates a conflict of laws or how such a conflict might be avoided by transferring the case. Accordingly, this factor is neutral.

E

Based on the foregoing analysis, the court finds that only one factor-the Puerto Rico court's familiarity with Puerto Rico law-definitively favors transfer, and considering all the factors *in toto,* the court holds that BMJ Foods has failed to establish that the case should be transferred to the District of Puerto Rico. Accordingly, its motion to transfer venue is denied.

Case 1:23-cv-00203-MAC  Document 10-1  Filed 09/25/23  Page 183 of 438 PageID #: 532

Metromedia Steakhouses Co., L.P. v. BMJ Foods Puerto..., Not Reported in...

IV

BMJ Foods moves in the alternative to dismiss for lack of subject matter or personal jurisdiction.

A

BMJ Foods contends that the court lacks subject matter jurisdiction because P.R. Ponderosa maintains its principal place of business in Puerto Rico. If this fact is true, it is contrary to the allegations in plaintiffs' complaint, and it would destroy complete diversity. BMJ Foods offers no evidence of this fact, however. And in response to BMJ Foods's allegation, plaintiffs have submitted affidavit evidence that P.R. Ponderosa's principal place of business is in Texas. This is sufficient to establish subject matter jurisdiction at this stage of the litigation based on complete diversity.

B

BMJ Foods next maintains that the court lacks personal jurisdiction.

1

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985) (citing *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir.1985)). The determination whether a federal district court has personal jurisdiction over a nonresident defendant is bipartite. The court first decides whether the long arm statute of the state in which it sits confers personal jurisdiction over the defendant. If it does, the court then resolves whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *See, e.g., Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir.1999). Because the Texas long arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over BMJ Foods would be consistent with the Due Process Clause of the Fourteenth Amendment. *See id.; Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 214 (5th Cir.2000).

*5  The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." To comport with due process, the defendant's conduct in connection with the forum state must be such that he "should reasonably anticipate being haled into court" in the forum state.

*Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999) (footnotes omitted). To determine whether exercising jurisdiction would satisfy traditional notions of fair play and substantial justice, the court examines "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Berry v. Lee,* 428 F.Supp.2d 546, 557 (N.D.Tex.2006) (Fitzwater, J.) (citations omitted).

A defendant's contacts with the forum may support either specific or general jurisdiction. *Mink,* 190 F.3d at 336. "For the court properly to assert specific personal jurisdiction, the defendant must have 'purposefully directed' his activities at residents of the forum, and the litigation must result from alleged injuries that 'arise out of or relate to' the defendant's activities directed at the forum." *Archer & White, Inc. v. Tishler,* 2003 WL 22456806, at *2 (N.D.Tex. Oct.23, 2003) (Fitzwater, J.) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). "General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.' " *Mink,* 190 F.3d at 336 (citations omitted).

> When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by the affidavits. Therefore, in a no-hearing situation, a plaintiff satisfies

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 184 of 438 PageID #: 533

Metromedia Steakhouses Co., L.P. v. BMJ Foods Puerto..., Not Reported in...

his burden by presenting a prima facie case for personal jurisdiction.

*Latshaw,* 167 F.3d at 211 (footnotes omitted). "This liberal standard, however, does not require the court to credit conclusory allegations, even if they remain uncontradicted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 2000 WL 35615925, at *2 (N.D.Tex. Sept.15, 2000) (Fitzwater, J.) (citing *Felch v. Transportes Lar-Mex SA DE CV,* 92 F.3d 320, 326 n. 16 (5th Cir.1996)), *aff'd,* 253 F.3d 865, 869 (5th Cir.2001) (per curiam) (affirming, inter alia, this conclusion).

2

BMJ Foods asserts that it has no "minimum contacts" with Texas because the parties did nothing more than negotiate a contract. Plaintiffs have adduced evidence, however, that the parties entered into and maintained several franchise agreements over a period of almost ten years, during which

BMJ Foods directed repeated correspondence and personal visits to Metromedia's Texas headquarters. BMJ Foods does not contest these facts with any evidence of its own. Accordingly, the court holds that BMJ Foods's contacts with the state of Texas are sufficient to confer specific personal jurisdiction over it. And because BMJ Foods does not argue that asserting jurisdiction would offend "traditional notions of fair play and substantial justice," its motion to dismiss cannot be granted on that basis. *See Latshaw,* 167 F.3d at 211.

* * *

 **\*6** BMJ Foods's February 11, 2008 motion to transfer venue and motion to dismiss for want of jurisdiction are denied.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 794533

---

## Footnotes

1    Plaintiffs responded to BMJ Foods's motion on March 3, 2008. Under N.D. Tex.R. 7.1(f), BMJ Foods's reply brief, if any, was due March 18, 2008. It did not file a reply brief, and the motions are now ripe for determination.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3013371
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Michael MOATES, Plaintiff,

v.

FACEBOOK INC., Defendant.

Civil Action No. 4:20-cv-896-ALM-KPJ
|
Signed 05/14/2021

**Attorneys and Law Firms**

Michael Moates, Denton, TX, Pro Se.

Christopher C. Kearney, W. Hamilton Jordan, Keker & Van Nest LLP, San Francisco, CA, Earl Glenn Thames, Jr., Potter Minton, a Professional Corporation, Tyler, TX, for Defendant.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

KIMBERLY C. PRIEST JOHNSON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendant Facebook Inc.'s ("Facebook") Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (the "Motion") (Dkt. 29), wherein Facebook requests this action be transferred to the Northern District of California pursuant to three forum selection clauses. On March 3, 2021, Plaintiff Michael Moates ("Plaintiff") filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39). Having considered the arguments and applicable authorities, the Court recommends the Motion (Dkt. 29) be **GRANTED**.

## I. BACKGROUND

On November 19, 2020, Plaintiff filed an Original Complaint (Dkt. 1) against Facebook, which was superseded by a First Amended Complaint (Dkt. 5) and a Second Amended Complaint (Dkt. 20). [1] In his forty-seven paged Second Amended Complaint (Dkt. 20), Plaintiff represents he operates online Facebook Pages and Groups, through which he facilitates "likes, followers, and engagement." *See* Dkt. 20 at 9. Since August 29, 2020, Plaintiff "invested" $10,546.00 in advertising to build a following of users who would like,

follow, and engage with content hosted by the social media platform. *Id.*

Facebook subsequently terminated Plaintiff's access to his Facebook, Instagram, WhatsApp, Oculus, and CrowdTangle accounts, as Facebook alleges Plaintiff's accounts "represent[ed]" QAnon, and Plaintiff's activities violated Facebook's community standards. *See* Dkt. 20 at 10–13; Dkt. 20-3; Dkt. 20-5; Dkt. 20-18. Plaintiff then initiated this lawsuit, wherein he asserts a panoply of claims. Plaintiff alleges violations of the following constitutional, statutory, and regulatory provisions:

(1) "Right to privacy" under the Texas Constitution, though Plaintiff does not specify which "zone of privacy" was violated; [2]

(2) Violations of the Texas Business and Commerce Code, namely TEX. BUS. & COM. CODE § 17.41 *et seq.* (deceptive trade practice) and § 503.001 (unlawful capture or use of biometric identifier);

(3) Texas Student Privacy Act, TEX. EDUC. CODE § 32.152;

(4) Texas Medical Records Privacy Act, TEX. HEALTH & SAFETY CODE § 181.001 *et seq.*;

(5) "Uniform Trade Secrets Act," presumably the Texas Uniform Trade Secrets Act ("TUTSA"), TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*;

(6) Section 2 of the Sherman Act of 1890, 15 U.S.C. § 2;

(7) Section 7 of the Clayton Act of 1914, 15 U.S.C. § 18;

(8) Regulation FD of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*; 17 C.F.R. § 243.100 *et seq.*;

(9) Lanham Act, also known as the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*;

(10) Regulation E of the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq.*; 12 C.F.R. §§ 1005.1–1005.36;

(11) Federal Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g *et seq.*;

(12) Title III of the American Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*;

**\*2**  (13) Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), 42 U.S.C. § 1320d-1 *et seq.*; 45 C.F.R. § 160.001 *et seq.*; and

(14) 18 U.S.C. § 594 (Intimidation of Voters).

*See* Dkt. 20.

Plaintiff also asserts claims of common law fraud, common law breach of contract, and "data theft," though the Court is unaware on what legal basis the "data theft" claim arises. *Id.* Lastly, Plaintiff argues Section 230 the Communications Decency Act of 1996, 47 U.S.C. § 230, is unconstitutional under the First Amendment. *Id.* at 16.

On February 3, 2021, Facebook filed the present Motion, wherein it requests that this matter be transferred to the Northern District of California pursuant to three forum selection clauses. *See* Dkt. 29 at 3. Facebook represents Plaintiff registered two Facebook accounts—one in 2014 and one in 2017. *See id.* at 2. From 2014 (when Plaintiff first registered a Facebook account) to 2020 (when Plaintiff lost access to his accounts), three different terms of service (collectively, the "Terms of Service") with nearly identical forum selection clauses and choice of law provisions were in place. *See id.* at 2–3; Dkt. 29-1; Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4; Dkt. 29-4 at 5. [3] The first and second Terms of Service, dated November 15, 2013 and January 30, 2015, respectively, have identical forum selection clauses and choice of law provisions. *See* Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4. They provide:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to [these Terms] or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and

us, without regard to conflict of law provisions.

**\*3**  *Id.*

The third Terms of Service, dated October 1, 2020, provides:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

Dkt. 29-4 at 6, 7.

On March 3, 2021, Plaintiff filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39).

## II. LEGAL STANDARD

### A. TRANSFER PURSUANT TO A FORUM SELECTION CLAUSE

Because a forum selection clause represents the parties' agreement as to the most proper forum, "a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases." *Atlantic Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Such clauses are enforced through a motion to transfer venue under 28 U.S.C. § 1404(a). *See id.* at 59. Under § 1404(a), a district court may transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice, ... to any other district or division where it might have been brought or to any district or division to which all parties have consented." *See id.* To determine

whether transfer is appropriate, the Court determines: (1) whether the forum selection clause is valid and enforceable; (2) whether the forum selection clause is mandatory or permissive; (3) whether the plaintiff's claims fall within its scope; and (4) whether extraordinary circumstances counsel against transfer. *See Coleman v. Brozen,* No. 4:19-cv-705-ALM, 2020 WL 2200220, at \*2–3 (E.D. Tex. May 6, 2020).

### B. CHOICE OF LAW

When conducting a forum selection clause analysis, courts must ensure they apply the proper substantive law at each step. *See Sabal Ltd. LP v. Deutsche Bank AG,* 209 F. Supp. 3d 907, 918–19 (2016) (reprimanding federal district and circuit courts for "inelegant and confusing" legal analysis regarding forum selection clauses). In the Fifth Circuit, district courts apply federal law to determine the enforceability of forum selection clauses in both diversity and federal question cases. *See Barnett v. DynCorp Int'l, LLC,* 831 F.3d 296, 301–02 (5th Cir. 2016).

With respect to the mandatory or permissive nature of the forum selection clause and whether a plaintiff's claims fall under the forum selection clause's scope, federal courts first apply the choice of law rules of the state in which it sits. *Weber v. PACT XPP Techs., AG,* 811 F.3d 758, 771 (5th Cir. 2016); *Sabal,* 209 F. Supp. 3d at 919. The applicable substantive law then guides these steps of the analysis. *See id.*

### III. <u>ANALYSIS</u>

**\*4**  The Court begins with a choice of law analysis to ascertain the applicable state law for the second and third steps of the forum selection clause analysis, as articulated in *Atlantic Marine. See Sabal,* 209 F. Supp. 3d at 919; *Unique Dev. Grp., LLC v. Normandy Cap. Tr. & Cohen Fin.,* No. 4:18-cv-4542, 2021 WL 1027570, at \*2 (S.D. Tex. Mar. 17, 2021).

### A. CHOICE OF LAW

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir. 2004). Here, the forum state is Texas. Texas applies the "most significant relationship" test from the Second Restatement of Conflicts to decide choice of law issues. *See id.*; *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex. 2000); Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. L. Inst. 1971). Under the most significant relationship test, contractual choice

of law provisions will apply to claims pertaining to the instrument. *Smith v. EMC Corp.,* 393 F.3d 590, 597 (5th Cir. 2004). However, Texas courts will not enforce choice of law provisions if the law of the chosen state violates a fundamental public policy of Texas or the contract bears no reasonable relation to the chosen state. *See Exxon Corp. v. Burglin,* 4 F.3d 1294, 1298 n.5 (5th Cir. 1993) (citing *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex. 1990), *cert. denied,* 498 U.S. 1048 (1991)).

Here, the Terms of Service provide California law "will govern" claims arising between the parties. *See* Dkt. 29-2 at 7; Dkt. 29-3 at 4; Dkt. 29-4 at 6. Because Facebook is headquartered in California, *see* Dkt. 29 at 2, the Terms of Service bear a reasonable relation to California. *See Marquis Software Sols, Inc. v. Robb,* No. 3:20-cv-372-B, 2020 WL 955901, at \*4 (N.D. Tex. Feb. 27, 2020). Further, the parties do not identify an aspect of California law that violates a fundamental public policy of Texas. Accordingly, California law will guide the Court's analysis as to the second and third portions of the Court's *Atlantic Marine* analysis: the mandatory nature of the forum selection clauses and whether Plaintiff's claims fall under the forum selection clauses' scope. *See Exxon Corp.,* 4 F.3d at 1298.

### B. VALIDITY AND ENFORCEABILITY

Courts apply federal law to determine the validity and enforceability of a forum selection clause. *See Alliance Health Grp., LLC v. Bridging Health Options, LLC,* 553 F.3d 397, 399 (5th Cir. 2008). In the Fifth Circuit, "[a] forum selection provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Kevlin Servs., Inc. v. Lexington State Bank,* 46 F.3d 13, 15 (5th Cir. 1995). The party opposing enforcement bears a "heavy burden" to establish unreasonableness. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 592 (1991). Unreasonableness potentially exists where: (1) the incorporation of the forum selection clause to the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will practically be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; and (4) enforcement of the forum selection clause would contravene a strong public policy in the forum state. *See Haynsworth v. The Corp.,* 121 F.3d 956, 963 (5th Cir. 1997).

**\*5** Here, Plaintiff argues enforcing the forum selection clauses would pose grave difficulties and would violate the public policies of Texas. *See* Dkt. 37.

### 1. Grave Inconvenience of the Selected Forum

Because the inconvenience of a forum is foreseeable at the time of contracting, invalidating a forum selection clause due to a grave inconvenience requires the resisting party to show he will, for all practical purposes, be deprived of his day in court. *See Haynsworth*, 121 F.3d at 963; *Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 545 (W.D. Tex. 2014). Essentially, the resisting party must show it is impossible for the party to try the case, and litigating in another forum will require the party to abandon his claims *See Pratt v. Silversea Cruises, Ltd.*, No. C 05-0693 SI, 2005 WL 1656891, at \*4 (N.D. Cal. July 13, 2005); *O'Hollaren v. Hill-Rom Co., Inc.*, No. CV 08-45-ST, 2008 WL 3853350, at \*7 (D. Ore. Aug. 14, 2008).

In *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d 1135 (N.D. Cal. 2000), for example, the court found enforcing a forum selection clause would pose grave difficulties on two plaintiffs. *Id.* at 1136, 1141–42. Both plaintiffs had such limited financial means that travel to another state would have been prohibitively expensive. *See id.* at 1141. One plaintiff received less than \$400 a month in disposable income to provide for herself, her husband, and two children. *Id.* The other plaintiff received less than \$700 per month to provide for himself and three family members. *Id.* On average, a plane ticket from Northern California to Florida cost \$490, and a train ticket cost \$1,858. *Id.* at 1140–41. The court found the plaintiffs would experience extreme financial hardship if required to litigate out of state. *Id.* at 1141.

The *Walker* court also noted both plaintiffs lived with severe disabilities. *Id.* One plaintiff suffered from chronic progressive multiple sclerosis, and the other lived with quadriplegia. *Id.* Both plaintiffs were wheelchair bound and suffered from bowel and bladder incontinence. *Id.* Because of their incontinence, the narrow configuration of an airplane or train's restroom precluded the plaintiffs' ability to use such facilities. *Id.* The plaintiffs also reported that, in their prior attempts to travel, they suffered from numerous embarrassing and humiliating incidents, and passengers made condescending remarks to them as a result of these incidents. *Id.* On these facts, the court did not enforce the forum selection clause. *See id.*; *see also Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137, 1142–43 (9th Cir. 2004) (holding grave difficulty existed where the plaintiff was

elderly, disabled, had no disposable income, could not drive due to disabilities, and the plaintiff's wife could not drive him due to her own disabilities).

Here, Plaintiff contends he cannot travel due to asthma, sleep apnea, anxiety, attention deficit hyperactivity disorder, binge eating disorder, and insomnia. *See* Dkt. 37 at 1. In his affidavit, Plaintiff testifies he has "been rushed to the emergency room multiple times during the coronavirus pandemic for concern while struggling to breath." Dkt. 37-1 at 1. He further testifies that wearing a mask once induced him to cough until his face was purple and his anxiety regarding travel puts him at risk of experiencing these difficulties. *See* Dkt. 37-1. Plaintiff did not provide the Court with any financial information. [4]

**\*6** Having reviewed the record, the Court finds Plaintiff has not met the heavy burden of showing travel to Northern California constitutes a grave difficulty. Plaintiff states he was hospitalized multiple times during the coronavirus pandemic, but he only submits one hospital record dated May 14, 2020. *See* Dkt. 37-3. The hospital record states Plaintiff's reason for visiting is "SOB/COUGH," *id.*, which the Court construes as "shortness of breath" and coughing. *See Jimenez v. Wynne*, No. 9:16-cv-2, 2019 WL 1141939, at \*5 (E.D. Tex. Jan. 16, 2019). The hospital record merely states Plaintiff may have a COVID-19 infection and/or pneumonia, rather than stating Plaintiff actually had an infection or pneumonia. Dkt. 37-3. Beyond this sparse information, the hospital record contains no physician notes, observations, diagnosis, or post-visit instructions. *Id.* On this record, the Court is not convinced a report documenting one visit to a medical facility, with no narrative or elaboration, demonstrates Plaintiff will have to relinquish his claims if he has to litigate his claims in the Northern District of California. *See O'Hollaren*, 2008 WL 3853350, at \*7.

Additionally, Plaintiff's claim that he "may" experience anxiety and shortness of breath if he were to wear a mask and board a plane is too speculative. *See Murphy*, 362 F.3d at 1137, 1142–43; *Walker*, 107 F. Supp. 2d at 1141–42. Plaintiff alleges that on one occasion, a mask caused him to cough until his face was purple. *See* Dkt. 37-1. One adverse experience with wearing a mask after more than a year of a global pandemic does not convince the Court that he cannot fly to Northern California and litigate his claims. Moreover, Plaintiff has not established he is unable to drive to California. *See Murphy*, 362 F.3d at 1137, 1142–43. On this record, Plaintiff has failed to show he will experience

grave difficulties if required to travel to Northern California. *See Ftjea v. Facebook, Inc.*, 841 F. Supp. 2d 829, 844 (S.D.N.Y. 2012) (finding an inner ear disorder associated with spinning and dizziness does not preclude a party from flying); *Earll v. eBay, Inc.*, Dkt. 20 at 14, 764 F. Supp. 2d 1148, 1150 (W.D. Mo. 2011) (finding no grave difficulty where the plaintiff was deaf and needed a service animal to travel by airplane); *Universal Grading Serv. v. eBay, Inc.*, No. 08-cv-3557 (CPS), 2009 WL 2029796, at *19 (E.D.N.Y. June 10, 2009) (finding no grave difficulty where party had severe coronary artery disease, hypertension, and a prostate condition); *Rimkus Consulting Grp., Inc. v. Rault Resources, Inc.*, No. H-07-1494, 2008 WL 901483, at *8 (S.D. Tex. Mar. 31, 2008) (finding no grave difficulty where party could not fly due to surgery for a detached retina, as party did not indicate how long the no-fly instruction would last and party could still drive); *Hesterly v. Royal Caribbean Cruises, Ltd.* No. 06-3206-CV-S-RED, 2006 WL 2948082, at *4 (W.D. Mo. Oct. 16, 2006) (finding no grave difficulty where physician did not clear the plaintiff to fly because of injured leg and the plaintiff did not provide financial information).

### 2. Texas Public Policy

Though Plaintiff's response contains no heading discussing violations of Texas public policy, he nevertheless argues the forum selection clauses should not be enforced because (1) some of his claims arise under Texas statutes, (2) Texas does not have a mask mandate, and (3) the Terms of Service are adhesion contracts. *See* Dkt. 37 at 4–5. Plaintiff advances the first two arguments under a heading titled "Public Interest Factor." However, Plaintiff's actual argument discusses grave inconvenience and how travel "would be contrary to public policy." *Id.* Plaintiff's third argument lies under a heading titled "Exceptional Case." The Court construes these three arguments as advancing reasons why enforcing the forum selection clauses would violate Texas public policy. As explained below, these arguments are unavailing.

#### a. Claims arising under Texas statutes

Plaintiff's response merely states, "Texas statutes are being evaluated." *Id.* at 4. Plaintiff seems to assert the following: Because some claims arise under Texas law, this case should not be transferred to California. This argument is misguided. Texas state courts and Texas federal courts do not have a monopoly on adjudicating Texas constitutional, statutory, and common law claims. In fact, "federal judges routinely apply

the law of a State other than the State in which they sit." *Atlantic Marine*, 571 U.S. at 67. It is unpersuasive to argue a federal judge sitting in California applying Texas law violates Texas public policy.

#### b. Texas's lack of a mask mandate

*7 Plaintiff's response states, "[A]s of this filing the State of Texas does NOT have a mask mandate in place ... Texas is a 100% open [state] with no plans to close down." *Id.* at 4. Plaintiff's contention refers to Governor Abbott's Executive Order GA-34, which ended pandemic-related restrictions for various establishments and the statewide mask mandate in Texas. *See* The Governor of the State of Texas, Executive Order No. GA-34, 46 Tex. Reg. 1,567 (Mar. 2, 2021). Plaintiff's reasoning seems to proceed as follows: Because Executive Order GA-34 lifts the mandate that private individuals wear a mask, engage in social distancing, or comply with other public health measures, *see id.* at 1,567–68, requiring Plaintiff to board a plane, wear a mask, and appear in a California federal court violates Texas public policy. *See* Dkt. 37 at 4–5.

This argument is wholly unsupported by the Executive Order. The Executive Order states, "[I]ndividuals are strongly encouraged to wear face coverings" and "Nothing in this executive order precludes businesses or other establishments from requiring employees or customers to follow additional hygiene measures, including the wearing of a face covering." *Id.* at 1,568. The Executive Order GA-34 merely states the Texas gubernatorial branch will no longer use its authority to require individuals to adhere to certain public health protocols, but establishments may still impose such restrictions, so long as such restrictions do not run afoul of another law.

#### c. Adhesion contract

Plaintiff contends the three Terms of Service are adhesion contracts, arguing he agreed to the Terms of Service due to "an absence of meaningful choice." *See* Dkt. 37 at 5–6. According to Plaintiff, the Terms of Service are unconscionable, and the forum selection clauses contained therein should not be enforced. *Id.*

Both Texas and California law define adhesion contracts as standardized forms offered on a "take it or leave it"

basis without affording the consumer a realistic opportunity to bargain. *See Fluor Western, Inc. v. G & H Offshore Towing Co.*, 447 F.2d 35, 38–40 (5th Cir. 1971); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006); *Grosser v. Red Mango Fc, LLC*, No. 3:21-cv-2691-N, 2013 WL 12134086, at *7 (N.D. Tex. Apr. 25, 2013). Because Plaintiff appears to argue the Terms of Service, as adhesion contracts, contravene Texas public policy, the Court analyzes the Terms of Service under Texas law.

In Texas, an adhesion contract is not automatically unconscionable, unenforceable, or void. *See In re AdvancePCS Health LP*, 172 S.W.3d 603, 608 (Tex. 2005); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 233 (Tex. 2000); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992). "The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006). "[W]e consider whether a contract results in unfair surprise or oppression.... [P]arties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequence of failing to meet that obligation." *In re Lyon*, 257 S.W.3d at 233.

Here, the Court does not discern any unfair surprise or oppression. The forum selection clauses were not deceptively placed or sized, and Plaintiff could have easily read the Terms of Service and discovered them. *See In re Lyon*, 257 S.W.3d at 233 (no surprise where terms were in all capital letters); *Pugh v. Arrow Elecs., Inc.*, 304 F. Supp. 2d 890, 895 (N.D. Tex. 2003) (no unfair surprise where forum selection clause was printed in a suitable font size and placed right above signature block); *Fteja*, 841 F. Supp. 2d at 839 (finding "it is not too much to expect" an Internet user would click Facebook's hyperlinked Terms of Use and read it). Likewise, there is no indication that Facebook set California as the forum to discourage plaintiffs from pursuing legitimate claims. *See Shute*, 499 U.S. at 595. Finally, the Court is further persuaded by the reasoning of other federal courts that have upheld Facebook's forum selection clauses. *See Franklin v. Facebook, Inc.*, No. 1:15-cv-655-LMM, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("[T]he forum selection clause contained has been addressed by numerous courts in actions involving [Facebook]. The Court cannot identify a single instance where any federal court has struck down [Facebook's Terms] as an impermissible contract of adhesion...."). Because the Terms of Service are

not unconscionable under Texas law, enforcing them does not violate Texas public policy. *See In re Palm Harbor*, 195 S.W.3d at 679.

## C. MANDATORY OR PERMISSIVE

**\*8** The Court now determines whether the forum selection clauses are mandatory or permissive under California law. If venue is specified with mandatory language, the forum selection clause will be enforced. *See Ten-X, Inc. v. Pasha Realty Holdings, LLC*, No. SACV 20-02004JVS(ADSx), 2021 WL 971153, at *6 (C.D. Cal. Mar. 3, 2021). If venue is specified as permissive, the forum selection clause will not be enforced. *See id.*

"To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Northern Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). In California, where a forum selection clause uses the word "exclusively" or "exclusive," the forum selection clause is mandatory. *See Berg v. MTC Elecs. Techs. Co.*, 71 Cal. Rptr. 2d 523, 530 (Cal. Ct. App. 1998) ("[L]anguage giving exclusive jurisdiction to the forum is required."); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77–78 (9th Cir. 1987) (noting forum selection clause that confers exclusive jurisdiction in a forum is mandatory).

Here, the November 15, 2013 and January 30, 2015 Terms of Service state, "You will resolve any claim ... arising out of or relating to this Statement or Facebook *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims." Dkt. 29-2 at 7; Dkt. 29-3 at 4 (emphasis added). Similarly, the October 1, 2020 Terms of Service state, "You will resolve any claim ... *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County...." Dkt. 29-4 at 5 (emphasis added). The forum selection clauses are mandatory. *See Berg*, 71 Cal. Rptr. 2d at 530; *Hunt Wesson Foods*, 817 F.2d at 77–78.

## D. SCOPE

Next, the Court examines whether, under California law, Plaintiff's causes of actions fall under the Terms of Services' scope.

Under California law, a "broad" clause contains language such as "any claim arising from or related to this agreement" or "arising in connection with the agreement." *See Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Cal. Ct. App. 2018) (italics removed). Broadly worded clauses will encompass tort claims that may arise under, or from, the contractual relationship. *See id.*; *Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278 (Cal. Ct. App. 2006) (holding "all disputes arising under this Agreement" encompasses all causes of action arising from or related to the agreement regardless of how they are categorized). "There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that the dispute must arise out of the contract." *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 563 (Cal. Ct. App. 2016) (italics removed). In other words, broad clauses will encompass allegations that "touch matters" covered by the contract. *See Ramos v. Superior Ct.*, 239 Cal. Rptr. 3d 679, 689 (2018).

Here, two Terms of Service require Plaintiff to litigate "any claim, cause of action or dispute" "arising out of or relating to this [the Terms of Service] or Facebook." Dkt. 29-2 at 7; Dkt. 29-3 at 4. The third (and most recent) Terms of Service contains these provisions nearly word for word, though the forum selection clause encompasses claims arising out of, or relating to, "Facebook Products" rather than just "Facebook." Dkt. 29-4 at 6. Thus, all three Terms of Service contain broad forum selection clauses, and the forum selection clauses will apply to Plaintiff's contractual claims, his tort claims arising from the contractual claims, and all claims that "touch" the Terms of Service or Facebook products. *See Ramos*, 239 Cal. Rptr. 3d at 689.

**\*9** Although Plaintiff's claims extend to many areas of the law, all of his claims fall under the forum selection clauses' scope. His Texas law, Sherman Act, Clayton Act, Lanham Act, FERPA, ADA, HIPPA, Regulation E, Regulation FD, common law fraud, breach of contract, and "data theft" claims all concern his Facebook accounts, his activities conducted while using the accounts, Facebook's collection of information from his online activities, the termination of his accounts, and Facebook's allegedly fraudulent acts. *See* Dkt. 20. For example, Plaintiff's fraud and breach of contract claims are based on his allegations that Facebook disabled his accounts after charging him for advertising, which caused him to lose an audience and anticipated revenue. *See* Dkt. 20 at 33–34. These claims "touch matters" concerning the Terms of Service. *Ramos*, 239 Cal. Rptr. 3d at 689.

Moreover, Plaintiff's allegation that Section 230 of the Communications Decency Act is unconstitutional and that Facebook intimidated voters in violation of 18 U.S.C. § 594 relate to Facebook and its products. *See* Dkt. 20 at 16, 23. These claims also fall under the forum selection clauses' scope.

## E. EXTRAORDINARY CIRCUMSTANCES

If a forum selection clause is valid, mandatory, and encompasses the plaintiff's claims, the court must then determine whether any extraordinary circumstances unrelated to the convenience of the parties warrant denial of transfer. *Sabal*, 209 F. Supp. 3d at 924. In making this determination, the court considers "public interest factors" such as: (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law. *Atlantic Marine*, 571 U.S. at 64; *Weber*, 811 F.3d at 776. The party resisting the forum selection clause "must bear the burden of showing that public interest factors *overwhelmingly* disfavor a transfer." *Atlantic Marine*, 571 U.S. at 67 (emphasis added). Practically, the forum selection clause should control except in unusual cases. *Id.* at 64.

### 1. Administrative Difficulties Flowing from Court Congestion

This factor considers "not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another court because of its less crowded docket." *Hillestad v. LLOG Expl. Co., LLC*, No. 3:17-cv-341, 2018 WL 4938708, at \*7 (S.D. Tex. Sept. 20, 2018) (cleaned up), *report and recommendation adopted*, 2018 WL 4931783 (S.D. Tex. Oct. 11, 2018). Of the four public interest factors, this factor "appears to be the most speculative," and it alone should not outweigh the other public interest factors. *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012).

For a twelve-month period ending in September 30, 2020, judges in the Eastern District of Texas had approximately 392 civil cases per judgeship, with a median time of 8.9 months for disposing a civil case. [5] For the Northern District of California, there were approximately 639 civil cases per judgeship, with a median time of 11.4 months for disposing a civil case. [6] Because the Eastern District of Texas has fewer

cases per judgeship and disposes of cases faster than the Northern District of California, this factor weighs against transfer. *See Frito-Lay*, 867 F. Supp. 2d at 871–72 (finding this factor weighs in favor of the federal district with fewer cases per judge); *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 679 (E.D. Tex. 2001) (same, but for a division of a federal district).

### 2. Local Interests in Having Localized Interests Decided at Home

**\*10** The second public interest factor is the "local interest in having localized interests decided at home." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315, 317–18 (5th Cir. 2008). This factor "generally favors where the acts giving rise to the lawsuit occurred." *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-cv-2042-D, 2008 WL 794533, at \*3 (N.D. Tex. Mar. 26, 2008). Further, a "judicial district's local interest in a case is strong 'when the cause of action calls into question the work and reputation of several individuals residing in or near the district who presumably conduct business in that community.' " *Zix Corp. v. Echoworx Corp.*, No. 2:15-cv-1272-JRG, 2016 WL 7042221, at \*4 (E.D. Tex. June 9, 2016) (quoting *In re Hoffman-La Roche, Inc.*, 587 F.3d 1333, 1337 (Fed. Cir. 2009)). Here, Facebook is headquartered in California; hence, the Northern District of California has a strong local interest in deciding this case. *See Zix Corp.*, 2016 WL 7042221, at \*4; Dkt. 29 at 1.

Regarding local interests in Texas, Plaintiff does not allege any non-party witness resides in Texas, or that the case calls into question the work and reputation of any other individual residing in the Eastern District of Texas. *See Zix Corp.*, 2016 WL 7042221, at \*4 (finding factor weighs neutrally where one party was headquartered in transferee district party and the majority of non-party witnesses reside in transferor district). Nor does Plaintiff allege any issues unique to the local venue, such as water and oil rights. *See Sabal*, 209 F. Supp. 3d at 925. The only connection between this case and the Eastern District of Texas is that Plaintiff himself lives and conducts business in Denton, Texas. *See* Dkt. 20 at 8. While a party's place of residence is not necessarily determinative, it does provide Texas some local interest. *See Perez v. Linkedin Corp.*, No. 4:20-cv-2188, 2020 WL 5997196, at \*5 (S.D. Tex. Oct. 9, 2020) (finding this factor weighs neutrally where one party is headquartered in Northern District of California and one party is a resident in the Southern District of Texas); *Sabal*, 209 F. Supp. 3d at 924–25 (A "party's residence does not necessarily establish a truly localized interest."). The Court finds this factor weighs neutrally.

### 3. Familiarity of the Forum with the Law That Will Govern the Case

This case involves a mix of federal and state law. By the Court's count, Plaintiff has brought six claims arising under Texas law, ten federal claims, two common law claims, and a "data theft" claim of unknown origin. *See* Dkt. 20; *see also supra* Section I. The Northern District of California, as a federal court, is well-equipped to adjudicate the ten federal claims. With respect to the common law claims, the choice of law provisions specifies these claims will be determined under California law. Dkt. 29 at 2. A federal court sitting in California would be more familiar with California law than this Court. *See Abramov v. Otis Elevator Co.*, No. 3:11-cv-440-D, 2011 WL 5081560, at \*8 (N.D. Tex. Oct. 25, 2011) (concluding Nevada court would be more familiar with Nevada law, though Texas court was equally capable). However, Plaintiff brings six claims arising under the Texas Constitution and Texas statutes, with which this Court would be more familiar. *See* Dkt. 20; *Abramov*, 2011 WL 5081560, at \*8. Given this array of federal, California, and Texas claims, this factor, at first glance, appears to weigh neutrally.

However, the Court takes judicial notice of other lawsuits filed against Facebook in federal court and subsequently removed to the Northern District of California under the same forum selection clauses. *See, e.g., Kidstar v. Facebook, Inc.*, No. 2:18-cv-13558, 2020 WL 4382279, at \*3 n.6, \*5 (D.N.J. July 31, 2020); *Loomer v. Facebook, Inc.*, No. 19-cv-80893, 2020 WL 2926357, at \*4 (S.D. Fla. Apr. 13, 2020); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1161 (D. Haw. 2018). Because the Northern District of California is deeply familiar with suits filed against Facebook by its former and current users, the Court finds this factor weighs in favor of transfer. *See Stellar Restoration*, No. 4:20-cv-382-SDJ-KPJ, 2021 WL 1345534, at \*19 (E.D. Tex. Mar. 11, 2021) (finding this factor weighs in favor of transfer where the plaintiff regularly brought suit in the Eastern District of Texas under the same formulaic contract), *report and recommendation adopted*, 2021 WL 1185960 (E.D. Tex. Mar. 30, 2021).

### 4. Avoidance of Unnecessary Conflict of Laws Problems

**\*11** Finally, there are no conflict of law issues or problems that may arise from the application of foreign law. Because there is no meaningful dispute regarding this factor, the Court finds it weighs neutrally. *See Hanby*, 144 F. Supp. 2d at 679; *Stellar Restoration*, 2021 WL 1345534, at \*19.

Thus, one public interest factors weighs in favor of transferring this action to the Northern District of California, one factor weighs against transfer, and two factors weigh neutrally. Because the comparative congestion of the courts is the "most speculative" factor, the Court affords it little weight. *See Frito-Lay*, 867 F. Supp. 2d at 871. On balance, the Court recommends transferring this action to the Northern District of California.

## IV. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends Facebook's Motion (Dkt. 29) be **GRANTED**. The Court further recommends that it be **ORDERED** that this matter is transferred to the Northern District of California.

Within fourteen (14) days after service of magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.*; *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 29 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 14th day of May, 2021.**

**All Citations**

Slip Copy, 2021 WL 3013371

## Footnotes

1   This action originally included another co-plaintiff and three other defendants; however, they are no longer live before the Court. *See* Dkt. 1; Dkt. 5; Dkt. 26 at 2 n.1.

2   The Texas Constitution contains no express guarantee of a right to privacy. *See Texas State Emps. Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987). However, the Texas Supreme Court has recognized that the Texas Constitution contains provisions that implicitly create protected "zones of privacy," and as such, the "right to privacy" can generally be described as the right to be free from "unreasonable government intrusions and unwarranted interference with personal autonomy." *See id.* at 205; *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 265 (Tex. 2002). Because "personal autonomy" is a rather broad concept, the Texas Supreme Court has discussed this right in an array of contexts. *See Texas State Emps. Union*, 746 S.W.2d at 204–05 (discussing right in context of mandatory polygraph policy); *Bell*, 95 S.W.3d at 264–65 (discussing right in context of indigent women seeking abortions); *City of Sherman v. Henry*, 928 S.W.2d 464, 465, 474 (Tex. 1996) (discussing right where police officer's sexual affair precluded his promotion); *State v. Morales*, 869 S.W.2d 941, 942 (Tex. 1994) (discussing right in context of anti-sodomy statute).

3   While the first two Terms of Service are entitled "Statement of Rights and Responsibilities," Facebook's affidavit explains they are in fact Terms of Service. *See* Dkt. 29-1 at 2; Dkt. 29-2 at 2; Dkt. 29-3 at 2.

4   In his response, Plaintiff also raises arguments concerning the doctrines of impossibility of performance and frustration of performance, though he does not tether these doctrines to any portion of the forum selection clause analysis. *See* Dkt. 37 at 4. Generally, once a breach of contract case reaches the underlying merits, if

a party can establish the doctrines of impossibility or frustration of performance apply, the party is discharged from performing under the contract. *See In re CEC Ent., Inc.*, 625 B.R. 344, 357–64 (Bankr. S.D. Tex. 2020) (describing the doctrines under various state law regimes). Because Plaintiff's argument concerning these doctrines involves his purported medical conditions, alleged inability to wear a mask, and the "impossibility" of flying, the Court construes these arguments as duplicative of his "grave inconvenience" argument and, thus, will not discuss them further herein.

Plaintiff also advances an argument concerning a force majeure clause in "Section 12 of the Facebook Advertising Terms and Conditions." *See* Dkt. 37 at 3–4. Plaintiff argues "he cannot be held liable for 'the acts of God' or the coronavirus pandemic." *Id.* at 3. Plaintiff's argument misses the mark. At this juncture, Facebook has not filed a counterclaim to hold Plaintiff liable for anything and, thus, the force majeure clause has no relevance to the pending Motion.

5    *See* U.S. District Courts—National Judicial Caseload Profiles, UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.

6    *See id.*

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

784 P.2d 954

105 Nev. 855
Supreme Court of Nevada.

MORT WALLIN OF LAKE TAHOE,
INC., Appellant/Cross–Respondent,

v.

COMMERCIAL CABINET CO., INC., a Nevada
corporation, Respondent/Cross–Appellant.

No. 19266.
|
Dec. 28, 1989.
|
Rehearing Denied March 6, 1990.

**Synopsis**

Construction contractor brought action against store owner
for monies due, and store owner filed complaint for
compensatory and punitive damages for defective work and
materials. The Eighth Judicial District Court, Clark County,
Donald M. Mosley, J., awarded $116,714 to contractor and
$110,000 to owner, and appeals were taken. The Supreme
Court, 103 Nev. 238, 737 P.2d 515, affirmed damage award
to contractor, but remanded for District Court to set out more
clearly the basis for store owner's award. After remand, the
Supreme Court held that: (1) award of $10,000 damages
for remedial repairs to defective wall panels was adequately
supported in the record, and (2) damage award for diminution
of value of property caused by breach of contract was not
supported by the record.

Affirmed in part and vacated in part.

**Attorneys and Law Firms**

**\*\*954  \*855** George E. Graziadei and Scott M. Cantor, Las
Vegas, for appellant/cross-respondent.

Lang & Leeds, Las Vegas, for respondent/cross-appellant.

**\*856** OPINION

PER CURIAM:

This is an appeal from the district court's Supplemental
Findings of Facts and Conclusions **\*\*955** of Law rendered
in response to our original order of remand. In that order,

we affirmed the district court's damage award to Commercial
Cabinet but remanded for the district court to set out more
clearly the basis for Wallin's award. *Commercial Cabinet Co.
v. Wallin,* 103 Nev. 238, 737 P.2d 515 (1987). From the record
before us at that time, we could not effectively review the
lump sum award to Wallin. *Id.* at 240, P.2d at 517.

Upon remand, the district court determined that $10,000.00
of Wallin's award was for remedial repairs to the defective
wall panels and $100,000.00 was for diminution in value to
the store. We affirm the $10,000.00 award for cost of remedial
repair. Such an award is more than adequately supported in the
record, was not contested on appeal and therefore will stand
undisturbed by this court. *Brandon v. Travitsky,* 86 Nev. 613,
615, 472 P.2d 353, 355 (1970).

The defect we perceive in the proceedings below is in the
basis for the $100,000.00 award for diminution of value. We
agree with the district court that on these facts the award
of approximately $350,000.00 sought by Wallin for the cost
of removal and completion would have been economically
wasteful. Because we agree with the district court's economic
waste conclusion, we discern no error in its determination that
the appropriate measure of damages is the diminution in the
value of the property caused by the breach.

Having agreed with the district court's reasoning and
determination regarding the measure of damages, we
nevertheless conclude that there is insufficient support in the
record for the damages awarded. Appellant claims that there
is substantial evidence to support the district court's award.
We disagree.

The fact that the property suffered at least some diminution
in value seems obvious. However, the record reveals no
evidence **\*857** directed to an evaluation of the diminished
value of the premises as a result of Commercial Cabinet's
actual performance compared with the anticipated value of
the premises if performance had been rendered as required by
the contract between the parties.

The party seeking damages has the burden of proving both the
fact of damages and the amount thereof. *Kelly Broadcasting
v. Sovereign Broadcast,* 96 Nev. 188, 193–194, 606 P.2d
1089, 1093 (1980); *Alper v. Stillings,* 80 Nev. 84, 86–87, 389
P.2d 239, 240 (1964). The latter aspect of the burden need
not be met with mathematical exactitude, but there must be
an evidentiary basis for determining a reasonably accurate
amount of damages. *Central Bit Supply v. Waldrop Drilling,*

Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co., Inc., 105 Nev. 855 (1989)

784 P.2d 954

102 Nev. 139, 142, 717 P.2d 35, 37 (1986); *Haner v. Quincy Farm Chemicals, Inc.,* 97 Wash.2d 753, 649 P.2d 828, 830 (1982); *Reposa v. Buhler,* 770 P.2d 235, 230 (Wyo.1989). Therefore, evidence going only to the fact of diminution in value alone will not, without more, establish a basis for an award of substantial damages.

The plaintiff must provide to the court an evidentiary basis upon which it may properly determine the amount of plaintiff's damages. *Short v. Wise,* 239 Kan. 171, 718 P.2d 604, 609 (1986); *State ex rel. Stephan v. Wolfenbarger and McCulley, P.A.,* 236 Kan. 183, 690 P.2d 380, 385 (1984). This case required qualified expert testimony about diminution in value or other equally competent evidence on the issue. There is no requirement that absolute certainty be achieved. Obviously, once the fact of damage has been established, some uncertainty in the amount is allowed. *Bader v. Cerri,* 96 Nev. 352, 357–58, 609 P.2d 314, 318 (1980). However, here there is a complete absence of any competent evidence to allow the trier of fact to arrive at any sustainable amount of diminution in value, much less $100,000.00.

Wallin failed to establish a proper evidentiary foundation for the $100,000.00 diminution award granted by the district court. In an attempt to reach fairness and bridge the evidentiary gap in Wallin's evidence, the trial judge personally visited the work site. Such a visit may be helpful in analyzing or understanding evidence of diminution in value; however, it alone cannot **\*\*956** be the source of the evidence. The court cannot assume the role of an expert and thereby relieve plaintiff of the need to present evidence in support of its claim. Evidence essential to sustain a damages award must be in the record and available for meaningful appellate review.

**\*858** Because Wallin failed to carry its burden to reasonably establish the amount of the diminution in property value, it is only entitled to the $10,000.00 for remedial repairs.

We have considered all other issues and objections raised by Wallin but not discussed herein and conclude that they lack merit.

For the reasons noted above, we vacate the $100,000.00 award and affirm the $10,000.00 award for remedial repairs.

**All Citations**

105 Nev. 855, 784 P.2d 954

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4647608

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Rose Ann PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff,

v.

PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ Sentosa Services, Sentosacare LLC, Sentosa Nursing Recruitment Agency, Benjamin Landa, Bent Philipson, Berish Rubenstein a/k/a Barry Rubenstein, Francis Luyun, Golden Gate Rehabilitation & Health Care Center LLC, and Spring Creek Rehabilitation and Nursing Center, Defendants.

17-cv-1302 (NG) (JO)
|
Signed 09/23/2019
|
Filed 09/24/2019

**Attorneys and Law Firms**

Leandro Bolesa Lachica, John J.P. Howley, Law Offices of John Howley, New York, NY, for Plaintiff.

Elliot Hahn, Hahn Eisenberger PLLC, Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY, Sheldon Eisenberger, Alan M. Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY, for Defendants.

### OPINION & ORDER

GERSHON, United States District Judge:

**\*1** Plaintiff Rose Ann Paguirigan brings claims, on behalf of herself and a class of similarly situated Filipino nurses, for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 et seq., against defendants Prompt Nursing Employment Agency LLC ("Prompt Nursing"), Sentosacare LLC ("Sentosacare"), Sentosa Nursing Recruitment Agency ("Sentosa Agency"), Benjamin Landa, Bent Philipson, Berish Rubenstein, Francis Luyun, Golden Gate Rehabilitation and Health Care Center LLC ("Golden Gate"), and Spring Creek Rehabilitation and Nursing Center ("Spring Creek"). Plaintiffs also seek damages for breach of contract against Prompt Nursing,

Rubenstein, Landa, and Philipson, and a declaratory judgment regarding certain aspects of their employment contracts.

All defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the TVPA claims and the declaratory judgment claim, and defendants Landa, Philipson, and Rubenstein moved to dismiss the breach of contract claim as alleged against them individually. I denied that motion in full. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017). I subsequently granted the named plaintiff's motion to certify a class comprised of "all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008," and I appointed her counsel as class counsel under Rule 23(g). *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 2018 WL 4337799 (E.D.N.Y. Sept. 12, 2018). The records defendants produced at the class certification stage establish that there are more than 200 known class members.

Defendants now move for summary judgment dismissing all of plaintiffs' claims, and granting Prompt Nursing's counterclaim for breach of the named plaintiff's employment contract. Plaintiffs also move for summary judgment on all of their claims, including a declaration that the liquidated damages provision and confessions of judgment are unenforceable, and a permanent injunction preventing defendants from threatening or attempting to enforce either.

### I. Factual Background
Except as otherwise noted, the following facts are undisputed.

#### A. Defendants' Employment of the Named Plaintiff and their Legal Actions Against Her
In either 2006 or 2007, plaintiff, a Filipino citizen, attended a meeting in the Philippines regarding a nursing home job in New York. The meeting was organized by defendant Sentosa Agency, a recruiting agency registered in the Philippines. Defendants Luyun—who is the sole proprietor of Sentosa Agency—and Philipson were in attendance.

In 2007, defendant Golden Gate, a nursing home located in Staten Island, New York, submitted a visa application on plaintiff's behalf. After plaintiff and Golden Gate agreed that a visa application would be submitted, the U.S. government issued a Prevailing Wage Determination for plaintiff of $26.87 per hour. Eight years later, plaintiff was notified of a visa interview with the United States Consulate in the

Philippines. At the time of the interview, the United States Consulate required confirmation that a job was still available. On April 15, 2015, defendant Landa, who is the CEO, managing partner, and one of the owners of Golden Gate, [1] signed a letter addressed to the U.S. Consulate affirming that an employment position was still available and stating that Golden Gate had offered plaintiff a position at $29.00 per hour. On that day, Landa also signed the last page of plaintiff's employment contract with Golden Gate.

**\*2** On April 22, 2015, one week later, plaintiff herself signed the employment contract with defendant Golden Gate, which was for a three-year term. When plaintiff signed the contract, Landa's letter to the U.S. Consulate was attached to the front of the contract. Plaintiff's signature appears on each page of the contract, but does not appear on the letter. [2]

The contract states the following regarding wages:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). (The parties dispute the exact mechanism by which the National Prevailing Wage and Helpdesk Center ("NPWC") determines a prevailing wage, but it is agreed that in essence the NPWC determines prevailing wages at the request of an employer for a particular employee as part of the visa process and also lists the prevailing wage by geographic area online and elsewhere. NPWC determines prevailing wages on an hourly and annual salary basis.)

"Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as described in Article IV." Contract III.

The contract further provides that:

> Both the Employer and Employee agree that the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area. In as much as the parties agree that damages would be difficult to calculate if the Employee willfully, voluntarily, and without cause terminates the Agreement before the completion of the three (3) year term, and/or if the Employer terminated the Agreement pursuant to Article VI(2)(i) or (ii), [3] the parties agree that such an act shall result in an obligation by the Employee to pay the Employer and/or its designee/assignee Twenty Five Thousand Dollars ($25,000) as liquidated damages (the "Liquidated Damage").

Contract VII (4). Section VII (4)(a) states that the liquidated damages are reduced to $16,666.67 should plaintiff pre-terminate or breach the employment contract in her second year, and are reduced to $8,333.34 should she do so in her third year. Contract VII (4)(a).

**\*3** Finally, "in order to secure Employee's performance of the Employment Term," Section VII (4) of the contract requires plaintiff to execute a confession of judgment for the amount of liquidated damages, which may be filed in court in the event that she fails "to complete the employment term." Plaintiff is also required to "pay upon demand all reasonable costs and expenses (including attorney's fees), and disbursements[ ] incurred by the Employer and/or its designee/assignee to enforce any of [the] rights of the Employer and/or its designee/assignee hereunder and/or collect the aforementioned liquidated damages." Contract VII (4).

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 199 of 438 PageID #:  548

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

In a separate document dated April 22, 2015, plaintiff signed an acknowledgment of costs related to her recruitment. This document is titled "Declaration and Undertaking" and states that Sentosacare expended $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with plaintiff's hiring and travel to the United States. Sentosacare is a company co-owned by defendants Landa and Philipson that provides consultants to nursing homes.

Once plaintiff arrived in the United States, Golden Gate verbally assigned her contract to defendant Prompt Nursing, a staffing agency owned by defendant Rubenstein that provides nurses to nursing homes. On June 22, 2015, plaintiff began working at defendant Spring Creek, a nursing home located in Brooklyn, New York. Landa is a managing partner and owner of Spring Creek. [4]  On or about June 22, 2015, plaintiff signed an "Employer and Wage Acknowledgment" form, which states that her employer is Prompt Nursing and that her pay is $29.00 per hour.

Plaintiff quit her job on March 7, 2016. Defendant Prompt Nursing then sued plaintiff and two other Filipino nurses to enforce the $25,000 liquidated damages provision in their contracts and for $250,000 from each for tortious interference with contract and prospective business relations, and an additional $250,000 from each in punitive damages. Those lawsuits were voluntarily dismissed after plaintiff filed this action.

### B. Legal Actions Directed at Other Nurses

Plaintiff has presented evidence concerning past legal actions taken by defendants against Filipino nurses. Defendants acknowledge that these actions occurred, but they dispute their responsibility. The events are recounted in detail in other judicial opinions, including one case—*Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011)—which is ongoing in this district. *See Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240 (2d Dep't 2009); *SentosaCare LLC v. Anilao*, Index No. 6079/2006 (Sup. Ct. Nassau Cty. May 20, 2010) (hereafter "*Anilao*, Order").

Briefly, in April 2006, ten nurses recruited by Sentosa Agency in the Philippines resigned from their jobs at nursing homes in New York. Following these resignations, an administrator at one of the nursing homes alerted the New York State Education Department ("Education Department") that the nurses had abandoned their patients by simultaneously resigning without adequate notice. After an investigation, the Education Department took no action against the nurses.

Subsequently, defendants Philipson and Landa met with the Suffolk County District Attorney on May 31, 2006. In March 2007, a Suffolk County grand jury indicted the ten nurses and their attorney for conspiracy to endanger the welfare of a child and endangering the welfare of a physically disabled person. The nurses and the attorney sought a writ of prohibition to stop the criminal proceeding. The Appellate Division, Second Department, granted the writ, declining to find that "this is such an 'extreme case' that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer." *Vinluan*, 60 A.D.3d at 249. The court further held that "the prosecution impermissibly violates [the attorney's] constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments." *Id.* at 250.

**\*4**  During the period from 2006 through 2008, defendants Sentosacare, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, and other nursing homes owned by defendants brought a series of civil suits against more than 30 Filipino nurses in attempts to enforce the liquidated damages provision. In one decision related to those lawsuits, the New York State Supreme Court, Nassau County, found that "the liquidated damages provision at issue is unenforceable as damages flowing from any proven breach by defendant Nurses will easily be ascertained at trial." *Anilao*, Order at 6.

Additional relevant undisputed facts not discussed here will be addressed in the discussion section below.

## II. Discussion

### A. Legal Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor. *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. Where, as here, both parties move for summary judgment, the court need not "grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

### B. Plaintiffs' Breach of Contract Claim

Both sides move for summary judgment on plaintiffs' breach of contract claim against defendants Prompt Nursing, Rubenstein, Landa, and Philipson. The named plaintiff claims she was owed more than $29.00 per hour under the contract and that she was to be paid a base salary as opposed to an hourly wage. In order to recover for breach of contract, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *Javier v. Beck*, 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N. V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for

the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 459 (1957)).

**\*5** If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions...." *Id.* (citations omitted).

As stated above, the contract's relevant wage provision provides:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). "Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as provided in Article IV." Contract III.

Neither party argues that the contract is ambiguous. Defendants urge me to find that the phrase "as determined by National Prevailing Wage and Helpdesk Center" refers to the prevailing wage determination provided to plaintiff in 2007. They also note that, under the contract, plaintiff was entitled to only $12.00 per hour for her first four weeks of employment and argue that the contract's inclusion of the phrase "[a]s of the Commencement Date" is meant only to indicate when this initial four-week period ends. Plaintiff argues that defendants'

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 201 of 438 PageID #:  550

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

interpretation is contrary to the contract's plain language and that the contract requires that plaintiff be paid the prevailing wage as of the Commencement Date. In 2007, the hourly prevailing wage was $26.87. The parties agree that, when plaintiff began working for Prompt Nursing in 2015, the prevailing wage exceeded this amount.

The contract is unambiguous. I also find that defendants' interpretation is at odds with the contract's plain language and must be rejected. The phrase "prevailing wage" refers to the prevailing wage as of the Commencement Date. There is nothing in the text of the contract to suggest that the phrase "as determined by National Prevailing Wage and Helpdesk Center" is meant to refer to the prevailing wage determination that was made almost a decade prior to the Commencement Date. Even if one purpose for the inclusion of the phrase "[a]s of the Commencement Date" was to indicate when the initial four-week period ends, the meaning of the text is unchanged.

Defendants argue that the holding in *Rosales v. Hispanic Emp. Leasing Program, LLC*, 2008 U.S. Dist. LEXIS 96417, at *4–6, 2008 WL 5083507 (W.D. Mich. Nov. 26, 2008), must be treated "as part of the contract 'as though it were expressed or referred to therein.' " Defs.' Reply at 11. That decision, of course, is not binding on this court, and there is no sound basis for treating it as part of the contract. Moreover, the *Rosales* court was not addressing the issue presented here. In *Rosales*, the court held that the employer was obligated to pay the prevailing wage previously calculated by the government and not the prevailing wage in effect when the employees began working. There is no indication that the *Rosales* court was asked to interpret a contract that provides for payment of the prevailing wage as of the employee's Commencement Date.

Alternatively, defendants argue that I should reject plaintiff's interpretation because it undermines the protections given United States workers under 8 U.S.C. § 1182(a)(5)(A) and 20 C.F.R. § 656.21. But defendants have failed to convince me that an interpretation that requires defendants to pay their employees the prevailing wage "[a]s of the Commencement Date" undermines the policies underlying these provisions.

 **\*6** Defendants also make much of the letter affixed to plaintiff's contract, which states that she was to be paid $29.00 per hour; they argue that it should be treated as the "first page" of the contract. Whether multiple writings should be construed as one agreement depends on the intent of the parties. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). "Under New York law, 'all writings

which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.' " *Id.*

Here, the letter is plainly not part of the contract. According to Philipson, the letter was created for the purpose of confirming that a job was still available. Philipson Declaration, ¶ 9. Therefore, it did not share the "same purpose" as the contract. *TVT Records*, 412 F.3d at 89. The letter is from Landa to the U.S. Embassy in Manila, was signed by Landa a week prior to the contract's execution and, unlike each of the 10 pages of the contract, was not signed by plaintiff. Although "the fact that the two documents at issue here were not executed at the same time or by the same parties is not dispositive, this fact does weigh against a conclusion that the documents were intended to be read together as a single contract." *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012), *aff'd*, 513 F. App'x 75 (2d Cir. 2013) (citations omitted). While it is typically a fact issue whether multiple writings should be construed as one agreement, the question is a matter of law if, as here, "the documents in question reflect no ambiguity as to whether they should be read as a single contract." *TVT Records*, 412 F.3d at 89.

Defendants contend that *Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.*, 26 A.D.2d 481, 484 (1st Dep't 1966), *aff'd*, 20 N.Y.2d 871 (1967), requires me to treat the letter as part of the contract because "letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto." *Id.* However, that case held that "[t]he purpose of a written agreement must be ascertained from the instrument itself, if it is possible to do so...." *Id.* (internal quotation marks omitted). Here, I can do just that: the contract is straightforward, and defendants may not introduce parol evidence, such as the letter, to "*create* an ambiguity in the agreement" that is otherwise unambiguous. *W. W. W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (emphasis in original).

Notably, the contract's integration clause provides that the contract "supersedes all previous employment contracts and *constitutes the entire agreement* between the parties," Contract VIII (7) (emphasis added), and Section VIII (3) states that any amendments are to be "in writing and executed in multiple copies." In sum, I decline to treat the letter as part of the contract.

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 202 of 438 PageID #:  551

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

I further reject defendants' argument that plaintiff ratified the contents of the April 15 letter through her subsequent conduct. In support of this argument, defendants rely on a wage acknowledgment form that plaintiff signed, which states that her hourly pay is $29.00 per hour, as well as plaintiff's deposition testimony, where she stated that she understood that the letter was an offer to be paid $29.00 per hour pursuant to the contract, and that the contract was for $29.00 when she signed it.

The cases that defendants rely on discuss whether a party has ratified the contract such that it may no longer assert claims for fraud and fraudulent inducement, *Sotheby's Fin. Servs., Inc. v. Baran*, 2003 WL 21756126, at *5–6 (S.D.N.Y. July 29, 2003), *aff'd*, 107 F. App'x 235 (2d Cir. 2004), or that a deed was forged, *Cashel v. Cashel*, 94 A.D.3d 684, 686–687 (2d Dep't 2012), or that the principal did not authorize its agent to enter into the contract, *Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 286 A.D.2d 118, 126–129 (1st Dep't 2001). In other words, these cases focus on parties' attempts to be relieved from contractual obligations.

 *7 Here, plaintiff is not attempting to disavow or dispute the contract. Rather, relying on the contract's clear language, she asserts that the defendants breached by failing to pay her the prevailing wage and a base salary. Plaintiff should not be faulted for initially accepting defendants' representation that the $29.00 hourly rate was in fact the prevailing wage. Indeed, she testified that she learned the prevailing wage was higher than $29.00 per hour only after she came to New York and spoke to her colleagues, which was after she had signed the wage acknowledgment form.

Finally, defendants assert that plaintiff has provided no basis for her claim that she was to be paid a base salary as opposed to an hourly wage. To the contrary, plaintiff has provided a basis: the contract's clear language. As noted above, the contract states that, "[a]s of the Commencement Date, Employee will be paid a *base salary* in accordance with the prevailing wage for the geographic area in which the employee is assigned to work...." Contract IV (1) (emphasis added). In light of the contract's unambiguous text, no further support is needed. Defendants also assert that plaintiff has failed to satisfy the damages element of her breach of contract claim and argue that she was actually overpaid. Plaintiff has submitted a summary pursuant to Federal Rule of Evidence 1006 depicting the difference between what each class member was paid and what each is owed if paid the prevailing wage as of their Commencement Date and a base

salary. This document is sufficient to show that damages accrued, and, because plaintiff was owed a base salary, it is apparent that her damages exceed the amount by which defendants claim she was overpaid.

Based on these undisputed facts, I find that plaintiff has met the elements for her breach of contract claim. She has proven that a contract existed between her and defendant Prompt Nursing; that she performed under the contract; that Prompt Nursing breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary; and that she was damaged. *See Javier*, 2014 WL 3058456, at *9.

As for the rest of the class, the provisions specifying the wage and defining "Commencement Date" are identical in each contract defendants produced at the class certification stage. Each contract references a base salary, and each was assigned to Prompt Nursing. It is undisputed that none of the class members was paid a base salary commensurate with the prevailing wage in effect as of his or her "Commencement Date." There is therefore no meaningful difference between the named plaintiff and the class as to each element of the breach of contract claim. Accordingly, class-wide liability has been established against Prompt Nursing for breach of contract.

### C. Plaintiffs' Application to Find the Liquidated Damages Provision Unenforceable

Plaintiffs request a declaratory judgment finding the liquidated damages provision unenforceable. They also request that defendants be enjoined from attempting or threatening to enforce the liquidated damages provision or the confessions of judgment.

The question of whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement"; it will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). Accordingly, "[a] provision that does not serve the

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 203 of 438 PageID #:  552

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

**\*8** " 'New York courts will construe a purported liquidated damages provision strictly,' and 'where the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.' " *Agerbrink*, 196 F. Supp. 3d at 417 (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004)). While the New York Court of Appeals has cautioned courts against interfering with liquidated damages provisions, if either of these factors is not satisfied, the provision will be deemed unenforceable. *Union Capital LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at \*7 (S.D.N.Y. Mar. 31, 2017). In doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages," and the party challenging the liquidated damages provision bears the burden of proving its unenforceability. *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169–170 (S.D.N.Y. 1990) (internal quotation marks omitted). Courts also often consider the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arms length "in determining whether one side is not exacting an unconscionable penalty." *Id.* at 172 (internal quotation marks omitted).

Here, the liquidated damages provision is a penalty. The contract required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that plaintiff terminated her contract early. Contract VII (4). Considering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing. This supports the conclusion that this provision is "intended to operate as a means to compel performance," ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms. *Rattigan*, 739 F. Supp. at 169; *see Perthou v. Stewart*, 243 F. Supp. 655, 658 (D. Or. 1965). Indeed, even though it is immaterial that the parties may describe the provision as a penalty, *Truck Rent–A–Ctr.*, 41 N.Y.2d at 425, the confession of judgment provision goes

much further and outright states that its purpose is to "secure Employee's performance of the Employment Term," Contract VII (4). Furthermore, although New York courts are hesitant to invalidate such provisions when they are negotiated at arms length, here I agree with the Nassau County Supreme Court's assessment that the parties were of "unequal bargaining power" and that the contract was "not achieved through arms length negotiation." *Anilao*, Order at 6. Plaintiff was not represented by counsel when she executed the contract, and there is no evidence she had any familiarity with American contract law. [5]

Turning to the question of ascertainability, I agree with the Nassau County Supreme Court's conclusion that the liquidated damages provision is unenforceable because defendants' damages were ascertainable. *See Anilao*, Order at 6. [6] The contract states that the liquidated damages provision was implemented to reimburse defendants for several types of costs:

> the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area.

Contract VII (4).

**\*9** Plaintiff signed a Declaration and Undertaking indicating that $3,685.50 in costs were incurred on her behalf for lawyer's fees, filing fees, visa fees, ICHP visa screening fees, miscellaneous expenses, and airfare. As demonstrated by this form, many of the costs listed in Section VII (4) of the contract were tracked, easy to determine, and could be ascertained at the time the contract was entered into. Upon arrival in New York, defendants gave plaintiff temporary housing for two months. The apartment's monthly rent was $1,500 per month, totaling $375 per nurse living there. Thus, the total cost of plaintiff's housing was $750—one could not reasonably argue that this was unascertainable. Finally, the contract permitted

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 204 of 438 PageID #:  553

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

defendants to recoup "further orientation and 'hands on' training costs" [7] by initially only paying plaintiff $12 per hour for her first four weeks on the job, which invites the question why liquidated damages would be needed to account for training and orientation costs in the first place. Contract IV (2). In light of defendants' extensive experience in this business, it is simply not possible that any of these costs would be difficult or impossible to determine from one nursing contract to the next. *See, e.g.*, Philipson Deposition ("Dep.") at 9–10 (stating that he first went to the Philippines to recruit nurses around 2000 and has been there "many" times).

In order to demonstrate that the liquidated damages provision is proportional to their probable loss, defendants offer the expert testimony of Michael Kupka. Kupka is the Managing Director of the Forensic Accounting and Dispute Resolution Department of Mazars USA LLP's New York location. He has more than 17 years of experience in public and forensic accounting. He is a certified public accountant, accredited in business evaluation and financial forensics, a certified fraud examiner, and a certified valuation analyst. Kupka concludes that, as to the named plaintiff, Golden Gate's potential damages are up to $26,182 in recruiting costs and up to $114,114 in increased operating costs, and that Prompt Nursing's damages can be measured as either $26,182 in recruiting costs or $35,951 in lost profits. Kupka Report ("Rep.") at 13.

Rule 56(e) requires that affidavits submitted on summary judgment "set forth such facts as would be admissible in evidence." "Therefore 'it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' and the trial court need only consider admissible evidence in ruling on a summary judgment motion." *Cibbarelli v. Bombardier, Inc.*, 2004 WL 3090594, at *3 (E.D.N.Y. Sept. 3, 2004) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). An expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001). Here, Kupka's opinion lacks a proper evidentiary basis and is therefore unreliable.

**\*10** First, Kupka assumed that Golden Gate incurred direct recruiting costs, and used that as a basis for calculating Golden Gate's potential damages of $26,182. Kupka Rep. at 3; Kupka Dep. at 15. This assumption, however, is belied by Philipson's testimony that the nursing home does not pay anything towards the cost of recruiting. Defendants argue that Golden Gate, and Prompt Nursing, once it was assigned the contract, were responsible for paying recruitments costs that were expended by other entities. But when asked about the costs listed in the Declaration and Undertaking, Kupka admitted that he did not see any documents stating that "Golden Gate was responsible for any of" those expenses and that his basis for believing that Golden Gate paid for or was responsible for these costs "was communicated to [him] as part of the underlying facts of this case" by counsel. Kupka Dep. at 18–20. Similarly, Kupka stated that his assumption that Golden Gate was responsible for costs associated with sponsoring nurses' visa status was based on "discussions with the counsel" and "[a]n employment agreement that was signed by Golden Gate," but admitted that he has not "seen any evidence that Golden Gate actually paid any" of these costs. *Id.* at 21–23. Nor does the "Documents and Information Considered" page in Kupka's report reference any documents purporting to show that Golden Gate reimbursed other entities for recruitment costs. Kupka Rep., Attachment 3; *see Supply & Bldg. Co.*, 2001 WL 1602976, at *5 (excluding

expert testimony when expert's opinion was based on client's assurances that were contradicted by other evidence).

Furthermore, Kupka reached the $26,182 recruiting costs figure by assuming that Prompt Nursing incurred a variety of costs related to recruitment in 2015, including but not limited to, $388,510 for office expenses, $105,225 for auto and travel expenses, and $97,352 for licenses and permits, for a total of $864,373. Kupka Dep. at 50–57. Kupka determined the average cost of recruiting a nurse in 2015 was $26,182 by rounding down the recruiting costs to $864,000, and then dividing by 33, the number of nurses that were recruited in that year. Kupka Rep. at 11. The figures Kupka relied on, however, were solely derived from a one-page summary that was provided by defendants' counsel that Kupka refers to as a "Profit and Loss Statement" for Prompt Nursing. [8]

Kupka, at his deposition, revealed that he knew little about the numbers listed in this one-page summary. Kupka did not know where the numbers came from, who created the document, when it was created, or why it was created. For the "general and administrative" expenses, Kupka did not know the specifics of what is included in each number listed (such as what is included in office expenses). Kupka Dep. at 50–89. Kupka did not know whether the summary was created in the ordinary course of business or whether it was created specifically for this lawsuit. *Id.* at 48. When asked whether a specific cost, such as "Maintenance" costs, constituted all of Prompt Nursing's "Maintenance" costs (as it seems), or just its "Maintenance" costs allocated to recruitment, Kupka either stated that he did not know, or that he assumed the cost was only related to recruitment because the document's header says recruitment costs and because that is what defendants' attorneys told him. *Id.* at 50–89. Other than defendant Rubenstein, Kupka never spoke with anyone at Prompt Nursing about its recruitment costs. *Id.* at 10.

Similarly, regarding Golden Gate's increased operating costs of up to $114,114, Kupka determined that number by assuming that Golden Gate would have to pay $52.20 per hour for a permanent replacement nurse from a third-party staffing agency for the remainder of plaintiff's contract term, or approximately 27 months. Kupka Report at 3; Kupka Dep. at 32, 36–37. The $52.20 figure is based solely on a redacted invoice provided to Kupka by defendants' counsel for a staffing agency nurse in 2015 addressed to Sentosacare. Kupka's assumption that "defendants could not simply replace one sponsored nurse from the Philippines with another" was based on his understanding of the facts

of the case presented to him by counsel for defendants and "[his] understanding of the overall industry." Kupka Dep. at 28–32. When asked about the sources that informed his understanding of the industry, Kupka referenced only "articles I have read, just to familiarize myself with the overall state of the industry," and stated that he did not list these in his report because "[i]t's general information that I obtained with no specific documents that I could list as part of the research." *Id.*

**\*11** Like the recruiting cost summary, Kupka knew little about this invoice and the nurse referenced in it. For example, he did not know how many years of experience she had, whether she was assigned to work at Golden Gate, whether she worked on a temporary or permanent basis, whether she was a staff or supervising nurse, what shift she worked, and whether she was paid a shift differential. *Id.* at 37–40. He did not know why the invoice says Sentosacare on it or whether Sentosacare or Golden Gate paid the amount owed. *Id.* at 40. Kupka also did not know, and did not ask, who actually replaced plaintiff at Spring Creek when she resigned from Prompt Nursing, what Spring Creek did to find a replacement for her, how long it took Spring Creek and Prompt Nursing to find a replacement, whether Prompt Nursing ever found a replacement for her, whether she was replaced with a sponsored nurse, a nurse from an agency, or a nurse from Prompt Nursing. *Id.* at 33–36. Kupka never reviewed any Golden Gate documents. *Id.* at 16. Kupka never asked anyone from Golden Gate whether they would in fact need to find a permanent replacement for plaintiff from a staffing agency; his assumption that Golden Gate would face increased operating costs was based on his "discussions with the counsel." *Id.* at 11, 32.

Courts have excluded expert testimony when it is based "on the conclusory statements of [the expert's client], and not on his independent evaluation of the facts." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (quoting *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986)). "[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at \*3 (S.D.N.Y. Sept. 15, 2003). Moreover, "[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 206 of 438 PageID #:  555

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

specialized knowledge." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009). Here, Kupka's failure to base his recruiting costs and increased operating costs analysis on his own "independent evaluation," but rather on a one-page summary, an invoice, untested and contradicted facts provided by defense counsel, and a discussion with one of the defendants in this action, makes his testimony unreliable and does not assist the trier of fact. *CIT Grp*, 815 F. Supp. 2d at 677 (quoting *Argus*, 612 F. Supp. at 926). Kupka's expert opinion is therefore inadmissible.[9]

For this reason, I decline to consider the damages provided in defendants' expert report in my assessment of the liquidated damages provision, which is present in each class member's contract. I also decline to consider defendants' declarations concerning these damages, all of one of which was submitted on reply, that essentially restate and comment upon the analysis provided in the Kupka report, and fail to provide a sufficient evidentiary basis for concluding what their costs were. Given that the record contains admissible evidence of only $4,435.50[10] in damages, which plaintiff has demonstrated were ascertainable at the time of the contract, it is evident that the liquidated damages provision does not bear "a reasonable proportion to the probable loss" and is an unenforceable penalty. *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. Because each class member's contract contains the same liquidated damages provision, this conclusion applies across all contracts.

**\*12** Prompt Nursing's counterclaim for breach of contract against the named plaintiff is therefore limited to "actual damages proven." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (internal quotation marks omitted).

### D. Plaintiffs' Requested Declaratory and Injunctive Relief

In order to be entitled to a declaratory judgment, a plaintiff must demonstrate that there is "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (internal quotation marks omitted). Further, in deciding whether to entertain a declaratory judgment action, district courts should ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane*

*Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Here, there is a substantial controversy concerning whether plaintiff and the other class members may be sued under their contracts' liquidated damages provisions for resigning prior to the end of their contract terms. And a decision regarding plaintiffs' requested declaratory relief will serve the useful purpose of finalizing this aspect of the parties' dispute.

Having found the provision to be a penalty, I therefore grant plaintiffs' requested declaratory relief. The liquidated damages provision and confessions of judgment will be declared unenforceable, and defendants will be enjoined from attempting or threatening to enforce either.

### E. Piercing the Corporate Veil

Because defendants Rubenstein, Philipson, and Landa[11] were not signatories to the contract, plaintiffs seek to hold these individual defendants liable for breach of contract by piercing the corporate veil of Prompt Nursing.[12] Under New York law, a non-signatory to the contract may be held liable for breach of contract where the plaintiff demonstrates "that the non-signatory was the 'alter ego' of one or more of the signatories to the contract." *Kaliner v. Mt. Vernon Monetary Mgmt. Corp.*, 2008 WL 4127767, at *2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, plaintiff must demonstrate "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (internal quotation marks omitted). In determining whether complete control exists, courts have considered the following factors, none of which is decisive:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length;

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 207 of 438 PageID #:  556

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

(8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

**\*13** *Freeman v. Complex Computing* Co., 119 F.3d 1044, 1053 (2d Cir. 1997).

Plaintiffs argue that Prompt Nursing is a corporate shell used by defendants to harm Filipino nurses, including by paying them less than what is owed under their contracts, using an unenforceable liquidated damages provision to secure their employment, and suing them for the liquidated damages amount. Prompt Nursing does business as Sentosa Services and the other non-individual defendants (other than the nursing homes Golden Gate and Spring Creek) all bear the same Sentosa name. Plaintiffs argue that this arrangement was created so that nurses would view the Sentosa companies as a single, integrated corporate enterprise. When the nurses want to pursue legal action against defendants, however, defendants insist that Prompt Nursing is an entirely separate entity. Plaintiffs contend that this arrangement benefited defendants Rubenstein, Philipson, and Landa and nursing homes, such as Spring Creek and Golden Gate, owned by Philipson, Landa, or Philipson's wife.

The deposition testimony supports the conclusion that Prompt Nursing, which is owned by Rubenstein, did not adhere to corporate formalities and that dealings between Prompt Nursing and its nursing home clients were not conducted at arms length. Philipson travels to the Philippines to recruit nurses. When asked who pays for his trips to the Philippines to recruit nurses, Philipson stated that "[s]ometimes the nursing homes would pay for it, at times Prompt Nursing recruitment -- I don't recall, Prompt something, would have paid for it." Philipson Dep. at 14. He later clarified that initially the nursing homes paid for his trips, but once Prompt Nursing came into existence, only Prompt Nursing would. *Id.* When asked how Prompt Nursing would pay for his travel expenses, Philipson said that there was "no set specific way," and that he may be reimbursed by Prompt Nursing, or Prompt Nursing would pay his expenses in advance. *Id.* at 15.

Rubenstein testified that Prompt Nursing pays Sentosa Agency for all "expenses for the recruitment [of the nurse]" as part of the responsibilities it takes on when it assumes the

nurse's contract. Rubenstein Dep. at 86. He also stated that Prompt Nursing reimburses Sentosa Agency for its personnel and office expenses. *Id.* at 89–90. Prompt Nursing pays Sentosa Agency by wire after it receives an invoice, but only sometimes keeps a record of the payment. *Id.* Similarly, Prompt Nursing's nursing home clients pay Prompt Nursing for its services, but there is no written agreement "on what those payments are." *Id.* at 91. Rather, the amount Prompt Nursing will charge is negotiated between Philipson and Rubenstein, and nothing is put in writing. *Id.* Rubenstein stated that Prompt Nursing does not engage in any nurse recruiting, but did not know why his email address appears on letters to the U.S. Embassy. *Id.* at 12, 92.

**\*14** Rubenstein testified that ail of the nursing contracts produced by defendants in this action were assigned to Prompt Nursing. *Id.* at 27–83. He also testified that, for ail but one of the contracts, [13] assignment negotiations occurred between him, negotiating on behalf of Prompt Nursing, and Philipson, negotiating on behalf of the nursing home. *Id.* at 27–83. Landa is also authorized to enter into a general agreement to assign nurse contracts to Prompt Nursing. Philipson Dep. at 16–17. When asked if there were any contracts with Filipino nurses that Golden Gate did not assign to Prompt Nursing, Philipson stated that "I would have to check my records," and "I wouldn't know. Sitting here, I would not be able to tell you." *Id.* at 18. No evidence has been presented that Prompt Nursing provides nurses to nursing homes other than those affiliated with defendants, or that the nursing homes affiliated with defendants assign contracts to staffing agencies other than Prompt Nursing.

When it receives a nurse's contract by assignment, Prompt Nursing never pays anything for the assignment. *Id.* at 18–19. There is never a written record of the assignment, and Philipson testified that he did not think there is ever a record of the date of the assignment. *Id.* at 19.

Rubenstein's deposition also indicates that he directed Prompt Nursing's wrongful conduct. Regarding the unenforceable penalty provision that Prompt Nursing used to secure nurses' employment, Rubenstein stated that he selected [14] the liquidated damages amounts himself based on "costs of business," stating that "I went over the numbers and it made sense," and "[i]t costs Prompt Nursing a lot of money to run the business, and based on my calculations, this is an estimated number that's what I feel is the damages." Rubenstein Dep. at 37–39. Rubenstein does not recall whether any nurses ever directly paid him the liquidated damages

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 208 of 438 PageID #:  557

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

amount after resigning, and he does not know whether Prompt Nursing has records of any of those payments. *Id.* at 92–94. When asked how Prompt Nursing determined what to pay a particular nurse under her employment contract, Rubenstein stated that "we based" the wage on the prevailing wage determination that was issued in 2007, and that Prompt Nursing did not calculate what the appropriate prevailing wage was for the contract. *Id.* at 41–42. As for the lawsuits Prompt Nursing brought against the nurses who resigned in 2016, Rubenstein testified to the facts that he believes support Prompt Nursing's tortious interference claims: he discussed how the nurses were threatening to leave, and, "being in the business for a while," he could tell that "this was a coordinated effort" that was being instigated by the three nurses who resigned. *Id.* at 95–101.

Defendants have offered no evidence to rebut plaintiff's claim that Prompt Nursing's corporate veil should be pierced. They merely make a conclusory statement that each corporate defendant operates separately and maintains corporate formalities. Most importantly, defendants have offered no explanation as to why the nurses' contracts were assigned, seemingly gratuitously, [15] to Prompt Nursing without any documentation or payment. *Freeman,* 119 F.3d at 1053 (listing corporations' failure to deal at arms length as a corporate control factor).

 **\*15** The critical question in any veil piercing analysis is "whether the corporation is a 'shell' being used by the individual shareowners to advance their own 'purely personal rather than corporate ends.' " *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 138 (2d Cir. 1991). Here, I am satisfied that Prompt Nursing is just that, a shell used to carry out defendants' scheme of paying nurses less than they are owed, using an unenforceable liquidated damages provision to secure the nurses employment, and suing those nurses who quit for the liquidated damages amount. By assigning the nurses' contracts to Prompt Nursing, defendants were able to carry out this scheme while simultaneously protecting themselves, and the other nursing homes affiliated with defendants, from liability arising from these activities.

While it is apparent that this scheme benefitted all defendants, I find that only Rubenstein, as the owner of Prompt Nursing, exercised sufficient control over the company to be held liable. As for Philipson and Landa—who assign and have the authority to assign nurse contracts to Prompt Nursing—it is apparent that they participated in this scheme. But they are

unaffiliated with Prompt Nursing [16] and their dealings with Prompt Nursing were on behalf of other corporate entities. Plaintiffs have failed to prove that Philipson and Landa sufficiently dominated Prompt Nursing such that they may be held liable as "equitable owners" of the company. *Freeman,* 119 F.3d at 1051. Therefore, Prompt Nursing's veil may be pierced only to reach Rubenstein, the actual owner of the company.

Based on the undisputed facts, plaintiffs' summary judgment motion to pierce the corporate veil is granted as to Rubenstein but denied as to the other individual defendants. Defendants' summary judgment motion on the veil piercing issue is denied as to Rubenstein but granted as to Philipson and Landa. In light of my finding class-wide liability on the breach of contract claim, both Prompt Nursing and Rubenstein are liable for breach of contract damages owed to the class.

### F. TVPA Claims

Both sides move for summary judgment on plaintiffs' claims brought under 18 U.S.C. §§ 1589 *et seq.*

#### 1. 18 U.S.C. § 1589(a)

TVPA § 1589 prohibits obtaining the labor or services of a person by using:

> (1) "force, threats of force, physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) "the abuse or threatened abuse of law or legal process," or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person would suffer serious harm or physical restraint."

18 U.S.C. § 1589(a). Congress enacted § 1589 in response to the Supreme Court's holding in *United States v. Kozminski,* 487 U.S. 931 (1988), which limited the definition of involuntary servitude to "physical" or "legal" coercion. *United States v. Dann,* 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting *Kozminski,* 487 U.S. at 952). Through § 1589, Congress "intended to provide federal prosecutors with the tools to combat severe forms of worker exploitation" and to address situations in which "traffickers threaten harm to third persons" or "restrain their victims without physical violence," all while taking into account "the individual circumstances of [the] victim[ ] ... including [ ] age and background."

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 209 of 438 PageID #:  558

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

*Paguirigan*, 286 F. Supp. at 438–439 (quoting H.R. Conf. Rep. No. 106–939, at 101) (internal quotation marks omitted).

Here, plaintiffs contend that defendants violated § 1589(a) in two ways. First, plaintiffs argue that defendants' conduct constituted a threat of "serious harm" under § 1589(a)(2). TPVA § 1589(c)(2), which defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA, states:

> **\*16** any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Thus, the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." As articulated by the Second Circuit in *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015), this standard is a hybrid one. The factfinder is permitted to consider the "particular vulnerabilities of a person in the victim's position," but is required to find that "her acquiescence be objectively reasonable under the circumstances." *Id.* at 186–187; *see Hongxia Wang v. Enlander*, 2018 WL 1276854, at \*5 (S.D.N.Y. Mar. 6, 2018). In the class action context, "the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at \*8 (C.D. Cal. Dec. 12, 2011).

Second, plaintiff argues that defendants' actions constituted "abuse or threatened abuse of law or legal process" under § 1589(a)(3). That phrase is further defined as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." § 1589(c)(1).

Plaintiff relies on the following actions by defendants to support her claims under TVPA §§ 1589(a)(2) and (a)(3): The inclusion of a $25,000 liquidated damages provision in each contract; defendants' filing of lawsuits to enforce the $25,000 liquidated damages provision against nurses who resigned, including lawsuits in 2016 that included claims for $250,000 in tortious interference with contract and business relations damages, despite the liquidated damages provision having been found unenforceable by the Nassau County Supreme Court in 2010; the filing of a professional disciplinary complaint against 10 nurses who resigned in 2006 that resulted in no action against the nurses; Philipson and Landa's meeting with the Suffolk County District Attorney, followed by the prosecution of those same 10 nurses and their attorney. Defendants make multiple arguments as to why the TVPA's prohibitions are inapposite here. Each will be discussed in turn.

Defendants first correctly note that plaintiff, as well as several other nurses, testified that they were never verbally threatened by defendants. Paguirigan Dep. at 26–31, 404; Valdez Dep. at 83, 104–105; Bane Dep. at 61–62, 99; Padernal Dep. at 74. That fact alone, however, is insufficient to avoid TVPA liability, as the statute applies to subtle, nonviolent threats that may still effectively compel an individual to keep working. *See Dann*, 652 F.3d at 1169.

**\*17** Second, defendants argue that, because the liquidated damages provision is not a penalty, their efforts to enforce the provision constituted a valid exercise of their contractual rights, and therefore cannot give rise to liability under the TVPA. In support, defendants rely on *Panwar v. Access Therapies*, Inc., 2015 U.S. Dist. LEXIS 38117, at \*8–15, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015), which found that defendants' efforts to enforce a liquidated damages provision that was valid under Indiana law did not give rise to TVPA liability. Since I have already found the provision to be unenforceable as a penalty under New York law, this argument fails.

In a similar vein, defendants argue that plaintiff is essentially claiming that her labor was obtained through economic duress, and they make several arguments as to why economic duress is not applicable in this context. But plaintiff is not arguing that she was subjected to economic duress. Economic

duress is typically used to void a contract on the ground that "the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." *Stewart M. Muller Constr. Co. v. New York Tel. Co.*, 40 N.Y.2d 955, 956 (1976). Here, plaintiff is not seeking to void or disavow the contract. Economic duress is simply not in issue.

Defendants' reference to 20 C.F.R. § 655.731(c)(10)(i)(B), which states that "the employer is permitted to receive bona fide liquidated damages from the H-1B nonimmigrant who ceases employment with the employer prior to an agreed date," is similarly misplaced. First, the visas at issue in this lawsuit are not H-1B visas, but EB-3 visas. Second, of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts. The provision at issue here, however, is a penalty under New York law, and 20 C.F.R. § 655.731(c)(10)(i)(A) explicitly provides that the "employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date."

Defendants also make much of the named plaintiff's and other class members' deposition testimony, and argue that it supports their argument that the liquidated damages provision did not amount to a "threat of serious harm." For example, class member Padernal testified that she entered into the contract with the intent to work only for the first two years of her contract because the remaining payment of $8,000 was "affordable to [her]," Padernal Dep. 58, and Paguirigan testified that she entered into the contract knowing she would have to pay a penalty if she terminated her contract early, Paguirigan Dep. at 166–167. Padernal also stated that she viewed working for Sentosa as a stepping-stone; class member Bane stated that his ultimate goal was to come to America. Padernal Dep. at 94–95; Bane Dep. at 32.

Defendants misapprehend the serious harm requirement. As noted above, the serious harm requirement asks whether a reasonable person "of the same background and in the same circumstances" would "perform or ... continue performing labor or services in order to avoid incurring that harm." One nurse's testimony that she could afford $8,000 by no means establishes how a reasonable person would respond to the $25,000 penalty during the first year of work. Section 1589 was designed to combat "severe forms of worker exploitation" that do not amount to actual involuntary servitude. *Paguirigan*, 286 F. Supp. 3d at 437. An employee's prior awareness of the harm does not make a

defendant's actions, if indeed in violation of the TVPA, any less exploitative. Nor does a nurse's desire to come to the United States, or that he or she viewed the job as a stepping stone, give an employer license to subject him or her to unlawful work conditions in violation of the TVPA. [17]

 **\*18**  Moreover, defendants' references to the record omit several notable statements by plaintiff. Plaintiff stated during her deposition that the liquidated damages provision "is the reason why we were not able to leave or we are scared. We have that fear because we don't have that ability to pay the $25,000." Paguirigan Dep. at 354. She also stated that she quit because she was working "in the unsafe environment" due to understaffing, such that she felt she was putting "my professional license at stake ... if I continue working," and because of fear she felt from being "trapped because I'm thinking about the contract which says that there's the provision of the $25,000 to be paid or I will be penalized with the $25,000 if I just leave." Paguirigan Dep. at 26–30.

Finally, defendants contend that plaintiff has not provided evidence of damages resulting specifically from the TVPA violations, so her TVPA claims must be dismissed. TVPA § 1595(a) provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator ... and may recover damages and reasonable attorneys fees." The statute has been interpreted to provide both compensatory damages, including compensation for emotional distress, and punitive damages. *See Ditullio v. Boehm*, 662 F.3d 1091, 1096–1098 (9th Cir. 2011); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457–458 (E.D. Va. 2015). Defendants offer no persuasive authority that a finding of TVPA liability requires a finding of damages. In any event, the record here sufficiently supports the existence of damages under the TVPA, and this argument therefore fails.

Having reviewed the record and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated TVPA § 1589(a)(2). [18] The nurses in this lawsuit were all recent arrivals from the Philippines. They were not paid the prevailing wage and a base salary, despite the terms of their contracts. Three of the nurses who were deposed complained of being overworked or that the nursing home was understaffed, and the fourth stated that he was unjustifiably suspended. Padernal Dep. at 51; Bane Dep. at 60–61; Paguirigan Dep. at 29; Valdez Dep. at 83. Paguirigan testified that "[w]e were just ... fed the good side, but they never told us that you're going to work 16-hour shift, with less staff...." Paguirigan Dep. at 146. Critically,

if she or any nurse wanted to stop working for defendants during the first year of the contract, he or she would have had to pay the employer $25,000 pursuant to the liquidated damages provision. This provision constitutes a threat of sufficiently serious financial harm "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2). Indeed, the confession of judgment requirement, which is part of the liquidated damages provision, explicitly states that it is meant to "[s]ecure Employee's performance of the Employment Term." Contract VII (4). I also note that the $25,000 figure is larger than any sum threatened in the TVPA cases referenced by the parties. *See Dann*, 652 F.3d 1160 at 1171 (threat of $8,000 payment); *Javier*, 2014 WL 3058456, at *6 (threatened enforcement of $15,000 confession of judgment); *Nunag–Tanedo*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011) (threatened payment of $10,000); *Macolor v. Libiran*, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) ($20,000 liquidated damages provision that applied if plaintiff stopped working). In reaching my conclusion, I have considered the "particular vulnerabilities" of plaintiff and other class members—all of them recent immigrants to the United States—and have also focused on whether it would be objectively reasonable for them to continue working under the circumstances. *Rivera*, 799 F.3d at 186–187.

**\*19** Regarding TVPA § 1589(a)'s scienter requirement, the statute contains an express scienter requirement, ("[w]hoever knowingly provides or obtains the labor or services of a person...."), and one of its subsections, TVPA § 1589(a)(4), contains a second scienter requirement ("by means of any scheme, plan, or pattern *intended* to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint...."). 18 U.S.C. § 1589(a)(4) (emphasis added); *United States v. Calimlim*, 538 F.3d 706, 710–711 (7th Cir. 2008). As stated in *Muchira v. Al–Rawaf*,

> There must be evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm— from the vantage point of the victim —if she did not continue to work. The linchpin of the serious harm analysis under § 1589 is not just that

> serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment.

850 F.3d 605, 618 (4th Cir. 2017) (internal quotation marks and citations omitted). Here, the contract, of which Prompt Nursing was the assignee, explicitly states that the confession of judgment provision was meant "to secure Employee's performance of the Employment Term." Prompt Nursing also attempted to enforce the liquidated damages provision against plaintiff and two other nurses in 2016—in addition to suing for $250,000 in tortious interference damages— even though the liquidated damages provision had been found unenforceable in 2010 by the Nassau County Supreme Court. On these undisputed facts, it is apparent that Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing to work.

### 2. 18 U.S.C. § 1589(b)

Having found that Prompt Nursing violated TVPA § 1589(a), I also find on the undisputed facts that the remaining defendants are liable under TVPA § 1589(b). Section 1589(b) provides that "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589] (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d)." As discussed above, Rubenstein is the owner of Prompt Nursing; Luyun is the sole proprietor of Sentosa Agency; Landa and Philipson co-own Sentosacare; Landa is an owner of Spring Creek and Golden Gate; and Philipson or his wife is an owner of Spring Creek. [19] Therefore, each defendant played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States to work at nursing homes affiliated with defendants. Thus, each defendant "knowingly benefit[ed]" financially from labor obtained in violation of TVPA § 1589(a).

Moreover, each defendant acted with "know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services" through means

Case 1:23-cv-00203-MAC Document 10-1 Filed 09/25/23 Page 212 of 438 PageID #: 561

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

prohibited by TVPA § 1589(a)—in this case, through the contracts' liquidated damages provisions. Indeed, defendants Philipson, Luyun, and Rubenstein all testified regarding their direct knowledge of the provision, and Landa signed the contract itself. Philipson Dep. at 43–44; Luyun Dep. at 55–60; Rubenstein Dep. at 36–40; Hahn Dec. Exh. H. The standard Golden Gate contract and the standard Spring Creek contract both contain the liquidated damages provision—as do all the contracts defendants produced. Thus, Golden Gate and Spring Creek knew of the provision.

*20 As for Sentosa Agency, Luyun is the sole proprietor of Sentosa Agency, and the latter therefore has "no separate existence, but rather exists as the so-called 'alter ego' of the owner." *United Parcel Serv. of Am., Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005). As for Sentosacare, Landa and Philipson are the owners of the company, with each retaining a 50 percent ownership share. Philipson Dep. at 6–7. "As a general matter, knowledge that an agent acquires in the scope of his agency is imputed to the principal, meaning that the latter is bound by that information even if he never actually received it." *J.J J. Properties Inc. v. Travelers Indem. Co.*, 2008 WL 2735865, at *3 (S.D.N.Y. July 7, 2008).[20] Because there is no evidence that Landa or Philipson acted outside the scope of his agency, their knowledge as Sentosacare's sole owners may therefore be imputed to the company itself. *See also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (internal quotation marks omitted). In any event, both Sentosa Agency and Sentosacare operated with at least "reckless disregard" of the liquidated damages provision in light of their involvement in bringing nurses to the United States. 18 U.S.C. § 1589(b).

### 3. 18 U.S.C. § 1590(a)

TVPA § 1590(a) extends liability to "any person who knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter...." Defendants Luyun, Philipson, and Sentosa Agency "knowingly recruit[ed]" nurses to work in nursing homes; defendants Prompt Nursing, Sentosacare, Rubenstein, and Landa knowingly "provid[ed]" nurses to work in nursing homes[21]; and defendants Spring Creek and Golden Gate knowingly "obtain[ed]" nurses. Thus, each defendant knowingly recruited, provided, or obtained persons "for labor

or services in violation of this chapter." 18 U.S.C. § 1590(a). The same undisputed facts regarding each defendant's role in this enterprise therefore support their liability under TVPA § 1590(a).

### 4. 18 U.S.C. § 1594(b)

Defendants have also violated TVPA § 1594(b), the conspiracy provision, which extends liability to whoever conspires with another to violate, *inter alia*, TVPA §§ 1589 and 1590.[22] For there to be a conspiracy, there must be an agreement to violate the prohibition on forced labor. *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014). There need not be proof of an explicit agreement, but the "evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (internal quotation marks omitted). As detailed above, on the undisputed facts, defendants "entered into a joint enterprise" for purposes of bringing nurses to the United States to work at nursing homes, including at defendants Spring Creek and Golden Gate, and violated TVPA §§ 1589 and 1590 in doing so. *Id.* Defendants acted with "consciousness of [the conspiracy's] general nature and extent," as each defendant was aware of the liquidated damages provision. *Id.* Thus, each defendant is liable under TVPA § 1594(b).

### G. Damages and Attorneys' Fees Under TVPA § 1595(a)

*21 TVPA § 1595(a) provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action ... in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." Because the liquidated damages provision is in each contract, plaintiff has established class-wide liability under the TVPA against all defendants. And having found that the plaintiff and the rest of the class are entitled to damages under the TVPA, I also find that they are entitled to reasonable attorneys' fees. Class counsel may file a motion for fees at the conclusion of the case. Damages under the TVPA will be determined at a later time.

### H. Prompt Nursing's Breach of Contract Counterclaim Against the Named Plaintiff

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

The only remaining claim is Prompt Nursing's counterclaim against the named plaintiff for breach of her employment contract and attorneys' fees under the contract, which as discussed above, is limited to "actual damages proven." *JMD Holding Corp.*, 4 N.Y.3d at 380. Resolution of this claim also will be determined at a later time.

### III. Conclusion

For the reasons set forth above, the Clerk of Court is directed to enter partial summary judgment as follows:

1. Defendants' summary judgment motion regarding plaintiff's breach of contract claim is granted as to Landa and Philipson. Except for Prompt Nursing's counterclaim for breach of contract against the named plaintiff, which remains undecided, the rest of defendants' summary judgment motion is denied.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is granted against Prompt Nursing and Rubenstein. Damages to the plaintiff and the class caused by defendants' breach of contract are to be determined at a later time.

3. Plaintiffs' requested declaratory and injunctive relief is granted. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision in all plaintiffs' contracts, and the confessions of judgment, to be unenforceable and to enter an injunction permanently enjoining defendants from attempting or threatening to enforce either.

4. Plaintiffs' summary judgment motion as to liability on the TVPA claims is granted against all defendants. Damages to the plaintiff and the class under the TVPA are to be determined. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

5. The parties are directed to appear for a status conference on November 4, 2019, at 2:00 PM to address how damages are to be determined and to address Prompt Nursing's counterclaim for breach of contract as to the named plaintiff. The parties are further directed to promptly meet and confer on these issues and attempt to present a joint plan to the court. By October 17, 2019 the parties should submit written proposals to the court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4647648

---

### Footnotes

1   Landa owns approximately 55 percent of Golden Gate. Philipson's wife also has an ownership interest in Golden Gate of approximately 25 percent.

2   This appears to have been a standard practice for defendants. Each of the contracts produced at the class certification stage has a letter attached to it. Like plaintiff's contract, each page of the contract is signed by the employee, but none of the attached letters is signed by the employee.

3   Under Article VI (2)(i) and (ii), the employer may terminate the agreement under the following conditions:

   i. Employee willfully or intentionally undertakes or commits any conduct that is harmful to Employer's practice or reputation;

   ii. Breach of any term or condition of this Agreement as determined by Employer and/or its designee/assignee, which shall include, but not be limited to, Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Employer and/or its designee/assignee may establish from time to time.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

4     Landa owns approximately 48 percent of Spring Creek, and Philipson, or his wife, owns approximately 38 percent.

5     Other class members who were deposed indicated they were not represented by counsel when they signed their contracts or did not show the contract to a lawyer before signing.

6     Defendants argue that the *Anilao* decision does not have res judicata effect because the case settled before trial, and in the same decision, the court denied the nurses' motion for summary judgment. Plaintiff has not argued that the decision constitutes res judicata, and I do not rely on it as such.

7     Although the contract refers to "further" orientation and training, there is no evidence, and defendants do not argue, that any training or orientation occurred prior to the nurse beginning work in the United States. As with each provision discussed above, the provision concerning "further" orientation and training is in each contract, but several contracts specify that the applicable minimum wage would be paid as opposed to $12.00 per hour.

8     Kupka, however, admitted that this document does not show income or losses and that it could be argued that Profit and Loss Statement is "not the best description of this document." Kupka Dep. at 47–49.

9     In addition, the section of Kupka's report concerning lost profits is irrelevant. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Here, Kupka's analysis is based on Prompt Nursing's losses in relation to its nursing home clients, and is therefore properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989). There is no evidence that any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed. *Id.; see also Valentine Dolls, Inc. v. McMillan*, 25 Misc. 2d 551 (Sup. Ct. Kings Cty. 1960) (holding that lost profits are not recoverable in a breach of contract action against an employee). Therefore, even if Kupka's testimony were admissible, I would still not consider his lost profits analysis.

10    This figure is comprised of the amounts listed in the Declaration and Undertaking together with plaintiff's rent.

11    Landa signed the contract as a representative of Golden Gate, and not in his personal capacity.

12    LLC veil-piercing is permitted under New York law. *Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. 2005).

13    As to this one contract, which was between nurse Robin Ancheta and Immediate Home Care, Rubenstein could not recall who negotiated on behalf of the nursing home. At the time this contract was assigned, Rubenstein was a managing partner of Immediate Home Care. Rubenstein Dep. at 56–57.

14    Philipson testified that he was also involved in calculating the liquidated damages amounts. Philipson Dep. at 43–44.

15    Defendants argue that there was consideration for these assignments because Prompt Nursing assumed all liabilities and responsibilities under the contract. Defs.' Mot. at 7. This does not explain the purpose of this arrangement and why its existence was never documented.

16    No evidence has been presented indicating that either Philipson or Landa have an ownership interest in Prompt Nursing.

17    Defendants also point out that several nurses were aware of the "2007 incident," presumably referring to the administrative complaint, the attempted prosecution, or the civil suits for breach of contract defendants filed

against the nurses, through news reports in the Philippines, yet entered into their contracts anyway. Defs.' Mot. at 12. This argument fails for the same reasons as the others addressed above.

18    Having found liability under § 1589(a)(2), I do not reach whether any defendant violated § 1589(a)(3).

19    For several of the nursing homes that Philipson was asked about in his deposition, he could not recall whether he or his wife has an ownership interest. Philipson Dep. at 9, 37.

20    This general rule does not apply when the agent has "totally abandoned" the interests of the principal, an exception that is inapplicable here. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

21    Prompt Nursing is a staffing agency that "provides" nursing homes with nurses. Landa is involved in the visa application process—he provided the letter addressed to the embassy for plaintiff's visa—and thus he also "provides" nursing homes with nurses. Sentosacare paid the costs listed on the Declaration and Undertaking that plaintiff signed, and thus it is also involved in "provid[ing]" nursing homes with nurses. Rubenstein, in addition to being the owner of Prompt Nursing, testified to his personal involvement in Prompt Nursing's business, as described earlier. He is therefore also involved in "provid[ing]" nursing homes with nurses.

22    Having found that defendants violated §§ 1589 and 1590, there is no need to consider whether they are liable for attempt under § 1594(a).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   Appendix p. 211   19

2015 WL 1396599
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

Rituraj Singh PANWAR, Michael
Richard Bautista Agustin, Plaintiffs,
v.
ACCESS THERAPIES, INC., RN Staff Inc doing
business as Rehability Care, Ramon Villegas, Harvinder
Dhani, Manuel Garcia, Ramon Villegas, Defendants.

RN Staff Inc, Counter Claimant,
v.
Rituraj Singh Panwar on behalf of himself and
all others similarly situated, Counter Defendant.

No. 1:12–cv–00619–TWP–TAB.
|
Signed March 25, 2015.

**Attorneys and Law Firms**

Andrew P. Wirick, Hume Smith Geddes Green & Simmons,
Indianapolis, IN, Daniel Aaron Kotchen, Kotchen & Low
LLP, Washington, DC, Michael F. Brown, DVG Law Partner
LLC, Neenah, WI, for Plaintiffs.

G. John Cento, Cento Law LLC, Indinanapolis, IN, for
Defendants.

***ENTRY ON CROSS–MOTIONS
FOR SUMMARY JUDGMENT***

TANYA WALTON PRATT, District Judge.

**\*1** This matter is before the Court on a Motion for
Partial Summary Judgment filed by Plaintiffs, Rituraj Singh
Panwar ("Mr.Panwar") and Michael Richard Bautista Agustin
("Mr.Agustin") (*Filing No. 180* ), and a Cross–Motion for
Summary Judgment filed by Defendants, Access Therapies,
Inc. ("Access Therapies"), RN Staff Inc. d/b/a/ Rehability
Care ("RN Staff"), Ramon Villegas ("Mr.Villegas"), Manuel
Garcia ("Mr.Garcia"), and Harvinder Dhani ("Mr.Dhani")
(*Filing No. 190* ). Mr. Panwar and Mr. Agustin brought claims
against Defendants alleging violations of the Trafficking
Victims Protection Act, 18 U.S.C. §§ 1589–1590, 1593, 1595
("TVPA"), the Indiana Statutory Wage Law, Ind.Code § 22–

2–5–2 ("Wage Law"), and common law breach of contract
under Indiana law. For the reasons set forth below, Plaintiffs'
motion is **DENIED** and Defendants' motion is **GRANTED**.

## I. BACKGROUND

The following material facts are not disputed by the parties. [1]
Under the Immigration and Nationality Act ("INA"), a United
States employer can petition the federal government to allow
a foreign national to work in the United States as an H–1B
worker. An H–1B worker performs services in a specialty
occupation that requires a bachelor's or higher degree and
includes such professions as physical therapists. Access
Therapies and RN Staff operate nationwide healthcare and
physical therapist placement services. Defendants recruit and
hire immigrants and sponsor these individuals for H–1B visas,
and, in some cases, for lawful permanent resident status.
Access Therapies and RN Staff share several of the same
officers, including Prithvi Dhani, who is President and Chief
Operating Officer of both Access Therapies and RN Staff, and
Manuel Garcia, who is listed as an incorporator of both RN
Staff and Vice President of Access Therapies. Ramon Villegas
is a recruiter and manager for both Access Therapies and RN
Staff.

Mr. Panwar, a citizen of India, came to the United States on a
student visa. He earned a Master's degree in Kinesiology from
Southeastern Louisiana University, and a second Master's
degree in Hospital Management from the University of New
Orleans. Following graduation, Mr. Panwar obtained an H–
1B visa by accepting a position with RN Staff in April 2010.
Mr. Panwar was originally hired as a physical therapist. His
contract term was two years and the contract stated that he
would earn between $800.00 and $1,000.00 net per week,
but because he had not yet passed his permanent physical
therapist licensing examination he could only do work as
a physical therapist assistant. Mr. Panwar was instead paid
$21.00 per hour in this position.

Mr. Agustin is from the Philippines and earned a Bachelor's
degree in Physical Therapy from Far Eastern University in
Quezon City, Philippines. He applied for a position with
Access Therapies in 2009, and they agreed to hire him and
sponsor his H–1B visa. Mr. Agustin was employed as a
physical therapist with Access Therapies. His contract term
was three years and Mr. Agustin's contract stated that he
would be paid between $27.00 and $35.00 per hour, and he
was paid at least $27.00 per hour for physical therapist work.

**\*2** Both Mr. Panwar and Mr. Agustin were required to sign employment agreements setting forth the terms of employment, as well as a separate promissory note corresponding with the contracts' liquidated damages/ recovery of expenses provisions. The employment agreements provided that if an employee left his employment before the completion of the initial term, the employee was required to pay the amount of the promissory note to cover the employer's expenses and lost revenues. The liquidated damages provision of the contracts is triggered on the date upon which Defendants submit to the federal government a visa application known as an I–129 petition. Mr. Panwar's contract provided for a $20,000.00 liquidated damages provision, and Mr. Agustin's contract contained a $15,000.00 liquidated damages provision. Mr. Panwar alleges that he was not paid his contracted rate of pay, and when he complained about the underpayment Defendants threatened him with enforcement of the promissory note, loss of his visa and deportation. Mr. Agustin also alleges that he was not paid the full amount that he was entitled to under the contract, and that Defendants denied his request to waive enforcement of the promissory note when he asked to terminate his contract nine weeks early. Defendants sued employees who quit prior to a contract term for the amount due for liquidated damages and under the promissory note.

Mr. Panwar and Mr. Agustin originally brought their claims as a class action; however, the Court denied their motion for class certification. (*Filing No. 199.*) The Court found that the employment agreements signed by employees of Access Therapies and RN Staff, as well as the immigration status of the employees, were not sufficiently similar enough to meet the requirements for certification. The Court also previously ruled that Mr. Panwar and Mr. Agustin could not assert claims based upon allegations that they were not paid for "benched" or non-productive time as required by the INA for H–1B visa workers because the INA does not provide for a private right of action for these types of claims. (*Filing No. 129, at ECF p. 17.*) Additional facts will be addressed below as necessary.

## II. *LEGAL STANDARD*

Summary judgment is only appropriate by the terms of Rule 56 where there exists "no genuine issue as to any material facts and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774 (7th Cir.1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.,* 335 F.3d 643, 647 (7th Cir.2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.,* 246 F.3d 975, 983 (7th Cir.2001) (quoting *Hendricks—Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)). Because the parties do not dispute the material f3/25/2015acts in this case, the Court need only determine, based upon these undisputed facts, which party is entitled to summary judgment.

## III. *DISCUSSION*

**\*3** Mr. Panwar and Mr. Agustin have three remaining claims in this case. First, they allege that Defendants utilized a "forced labor scheme" in violation of the TVPA by means of threats of serious harm, including financial harm through enforcement of the promissory note, threats of H–1B visa revocation and deportation, and abuse of legal process. Second, they allege that Defendants breached their employment contracts by not paying them the total amount due under the terms of their employment agreements. Finally, they assert claims under the Wage Law resulting from allegedly not being paid the full amount due under their contracts. Defendants argue that they were merely enforcing their rights under the terms of the employment agreements, were complying with immigration laws, and that Plaintiffs are attempting to recharacterize their claims based upon their failure to be paid for benched time, which the Court has already dismissed.

## A. Trafficking Victims Protection Act Claims
Mr. Panwar and Mr. Agustin argue that they were forced to work for Defendants by means of threats of serious harm in violation of 18 U.S.C. § 1589(a)[2]. Specifically, Mr. Panwar argues that he could not terminate his employment with the Defendants because of the existence of the $20,000.00 promissory note, which would have constituted serious

financial harm if enforced; that Defendants had a practice of filing lawsuits against former employees who terminated their contracts prior to the end of their contract terms; and that Access Therapies threatened to revoke his visa when he complained about the terms of his employment. Mr. Agustin also argues that the threat of liability under the promissory note prevented him from terminating his employment.

Plaintiffs' TVPA claims are problematic for a number of reasons. While Plaintiffs continually refer to their employment with Access Therapies and RN Staff as a "forced labor scheme," the fact that they voluntarily entered into the employment contracts belies this characterization. There is no evidence that Mr. Panwar or Mr. Agustin were coerced or deceived into signing the employment agreements with Defendants. Agustin Dep. 16:6–21 (*Filing No. 19111, at ECF p. 16* ); Panwar Dep. 206:17–23 (*Filing No. 191–2, at ECF p. 207* ). In fact, Mr. Agustin testified that he had at least four other companies that he was considering when he decided to sign the contract with Access Therapies, three of which he believed did not have a liquidated damages provision in their employment contracts. Agustin Dep. 11:9–15:12 (*Filing No. 191–11, at ECF pp. 11–15* ). The contract terms were plainly written, and the liquidated damages provision was made conspicuous, particularly with the use of the corresponding promissory note. Both Mr. Panwar and Mr. Agustin understood the agreements and their obligations under the agreements, including the consequences of early termination. Panwar Dep. 205:3–207:1 (*Filing No. 191–2, at ECF pp. 207–208* ); Agustin Dep. 18:10–16–20:7 (*Filing No. 191–16, at ECF pp. 18–20* ). There was nothing that compelled Mr. Panwar or Mr. Agustin to sign the agreements with RN Staff and Access Therapies, or even enter into the H–1B visa program, besides their own choice.

 **\*4**  The claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA is not supported by the evidence or the applicable legal principles. An H–1B employer is not permitted to require an employee to pay a "penalty" for ceasing employment. *See* 20 C.F.R. 655.731(c)(10)(i)(A). However, "[t]he employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to the agreed date." 20 C.F.R. 655.731(c) (10)(i)(B). The distinction between what constitutes permissible liquidated damages and a prohibited penalty is made on the basis of applicable state law, which in this case is Indiana. 20 C.F.R. 655.731(c) (10)(i)(C). Under Indiana law, "[w]here the sum

stipulated in the agreement is not greatly disproportionate to the loss likely to occur, the provision will be accepted as a liquidated damages clause and not as a penalty." *Gershin v. Demming,* 685 N.E.2d 1125, 1128 (Ind.Ct.App.1997).

Mr. Panwar and Mr. Agustin do not present any evidence or argument that the stipulated sums in the liquidated damages provisions of their employment agreements were grossly disproportionate to the losses RN Staff and Access Therapies were likely to incur if an employee terminated his contract early. On the other hand, Defendants present the affidavit of Anmol Kapoor, an employee of Access Therapies with knowledge of both companies' operations, stating that RN Staff and Access Therapies must expend thousands of dollars to bring H–1B employees into the United States, including visa filing fees, lawyer fees, administrative costs, and local agency fees. (*Filing No. 191–16.*) Additionally, Access Therapies and RN Staff would lose out on potential profits earned from placing employees with paying clients. Contrary to Plaintiffs' implications, there is nothing unlawful about a company seeking to maximize its profits, so long as it does so within the confines of the law. The Court concludes that the liquidated damages provisions contained in Mr. Panwar's and Mr. Agustin's employment agreements are lawful under both the H–1B regulations and under Indiana law. The Court will not penalize Defendants under the TVPA for practices which they are explicitly permitted to utilize under the relevant laws.

Plaintiffs' argument that the threat of deportation constituted a threat of serious harm under the TVPA is also unavailing. Mr. Panwar alleges that when he complained about his lack of work assignments, RN Staff threatened to revoke his visa and that he would be deported. However, the H–1B visa program requires that nonimmigrant employees remain employed by the company that sponsored their visas. Visa revocation is not left to the discretion of the employers; an employer is required to notify the U.S. Citizenship and Immigration Service (the "Service") if it no longer employs the H–1B visa holder that it sponsored, and the Service then issues a notice of intent to revoke the underlying H–1B petition. 8 C.F.R. 214.2(h) (11). Whether the Plaintiffs had voluntarily or involuntarily left their employment with Defendants, the H–1B regulations would have required that their visas be revoked and they would have had to return to their home countries. If the Court were to accept Plaintiffs' argument, then *any* H–1B employer would be in violation of the TVPA merely by complying with the requirements of the H–1B program. This outcome is clearly not the intent of the TVPA or the H–1B visa program. Therefore, the Court finds that the threat of visa revocation

and deportation under these circumstances is not a threat of serious harm for purposes of the TVPA.

**\*5** Finally, Plaintiffs allege that Defendants threatened the abuse of legal process to force them to remain employed with RN Staff and Access Therapies. Plaintiffs repeatedly characterize RN Staff's and Access Therapies' actions against current and former employees as "abuse of legal process;" however, this legal conclusion is not supported by the evidence. Plaintiffs conflate the "use" of legal process with the "abuse" of legal process. The TVPA does not provide a definition of "abuse of law or the legal process;" however, Indiana law is instructive. Under Indiana law, abuse of legal process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. *Reichhart v. City of New Haven,* 674 N.E.2d 27, 31 (Ind.Ct.App.1996) ("A party may not be liable for abuse of process where legal process has been used to accomplish an outcome which the process was designed to accomplish."). The motive behind such action is irrelevant. *Id.*

Plaintiffs first argue that the revocation of their visas if they left Defendants' employment constituted "abuse of law or legal process" under the TVPA. As discussed above, this requirement is mandated by law, and therefore cannot also be an abuse of the legal process. There was nothing unlawful about threatening to terminate Mr. Panwar, which would ultimately result in the loss of his visa, because Indiana is an at-will employment state. Mr. Agustin admitted that he understood the requirements of the H–1B visa program, and that he would have to leave the country if he terminated his employment with Access Therapies. Agustin Dep. 37:4– 21 (*Filing No. 191–11, at ECF p. 37* ). Defendants have demonstrated that there was no unlawful use of immigration and labor law used or threatened against Mr. Panwar and Mr. Agustin.

Plaintiffs also argue that the "routine" filing of lawsuits against employees who failed to complete their contract terms in order to enforce the terms of the promissory notes constituted an abuse of legal process. However, filing lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By Plaintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of

process, which would be an absurd outcome. Thus, the Court concludes that neither the compliance with immigration laws nor the enforcement of contract rights constituted an "abuse of law or legal process" for purposes of TVPA liability.

Because Plaintiffs have not shown that they were subjected to forced labor through the imposition of or threatened imposition of serious harm, the Court concludes that Defendants did not violate the TVPA.

## B. Breach of Contract and Indiana Statutory Wage Law Claims

**\*6** Plaintiffs' two remaining claims are directly related, as they allege that Defendants breached Plaintiffs' employment agreements by not paying them the full amount of wages they were contractually entitled to, and this failure to pay the full amount of wages owed violated the Wage Law. The Wage Law applies to not only the frequency, but the amount an employer must pay its employees. *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele,* 766 N.E.2d 699, 704 (Ind.2002). "The term 'wages' means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount." I.C. § 22–2–9– 1(b). The amount of wages owed is governed by the contract between the Plaintiffs and their respective employers.

### 1. Payment for Non–Client Activities
Both Mr. Panwar and Mr. Agustin argue that Defendants failed to pay them for "non-client work activities" in breach of their employment agreements and in violation of the Wage Law.[3] Plaintiffs argue that they were entitled to payment for "non-client work" they allege they performed for Defendants, including training/orientation, studying for licensing exams, communicating with Defendants, completing forms, working on resumes and client applications, and attending client interviews. Mr. Panwar and Mr. Agustin argue that these "non-client related work duties" constitute "labor" and "service" under § 22–2–9–1(b) of the Wage Law. However, as correctly stated by Plaintiffs, the Wage Law looks to the contract between employer and employee to determine due wages. *Settle,* 766 N.E.2d at 704 n. 4. Plaintiffs are only entitled to wages for services performed under the terms of the employment agreements. Employees cannot unilaterally determine what activities they should or should not be paid to perform, which they attempt to do here.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Neither Mr. Panwar nor Mr. Agustin point to any provisions in the employment agreements indicating that Defendants were obligated to pay them for these activities. Article IV of both employment agreements state that Plaintiffs would be paid "compensation for services to be performed hereunder[.]" (*Filing No. 182–4, at ECF p. 4; Filing No. 182–6, at ECF p. 4.*) The "services to be performed hereunder" are clearly specified in Article II, paragraph 1, which states in both agreements, "Employee is hereby hired to perform services for Employer as staff **physical therapist** under the direct supervision of [Employer's] client and, in the [sic] capacity, primarily to provide professional therapy services ...." (*Filing No. 182–4, at ECF p. 3; Filing No. 182–6, at ECF p. 3* ) (emphasis in originals). There is absolutely nothing in these provisions indicating that Plaintiffs' compensation was to be for these additional "non-client duties" they are now asserting, and only indicates that they would be paid for client work. The Court finds that Defendants did not breach Mr. Panwar's and Mr. Agustin's employment agreements by not paying them for time spent on these additional activities, and therefore concludes that there was no violation of the Wage Law for failure to pay Mr. Panwar and Mr. Agustin for non-client activities.

### 2. Mr. Panwar's Alleged Underpayment

**\*7** Mr. Panwar argues that RN Staff breached his employment agreement, and thus violated the Wage Law, by failing to pay him $800.00–1,000.00 net pay per week as specified in his employment agreement. Defendants conceded that Mr. Panwar was never paid a weekly amount within this range; however, they assert this was due to the fact that Mr. Panwar never worked as a physical therapist as stated in the contract. RN Staff was only able to place Mr. Panwar in physical therapist assistant positions, for which he was paid $21 .00 per hour, because he was not licensed as a physical therapist. Mr. Panwar argues that the contract does not define "physical therapist" and gives "no indication that the term excludes work as a physical therapist assistant." (*Filing No. 194, at ECF p. 19.*) Mr. Panwar attempts to use extrinsic evidence to interpret the meaning of "physical therapist" by citing to the H–1B application submitted by Defendants to the federal government. However, the use of extrinsic evidence is not necessary when the contract terms are not ambiguous, which the Court so finds here. *See City of Indianapolis v. Kahlo,* 938 N.E.2d 734, 744 (Ind.Ct.App.2010) ("If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument.").

Mr. Panwar's employment agreement is clear that the parties intended Mr. Panwar to work and be compensated $800.00–1,000.00 net per week as a physical therapist, not a physical therapist assistant. The Court is required to construe the contract as a whole, giving effect to every portion of the agreement. *Stech v. Panel Mart, Inc.,* 434 N.E.2d 97, 100 (Ind.Ct.App.1982). "A recital is a part of a contract which should be considered in determining the intent of the parties as expressed in the entire document, and on occasion a recital may be a most important indication of the parties' intent." *Id.* The recitals of the employment agreement state, "Employee has successfully passed TOELF–IBT and NPTE examination," (*Filing No. 182–4, at ECF p. 2* ), and the operative language of the employment agreement repeatedly refers to the position of "physical therapist" or "PT," not a "physical therapist assistant" or "PTA." Mr. Panwar never passed his National Physical Therapist Exam ("NPTE"), only the National Physical Therapist Assistant Exam, and he only had his Physical Therapist Assistant ("PTA") license. Reading the requirement that Mr. Panwar successfully pass the NPTE in the recitals in conjunction with the references to the position of "physical therapist" throughout the operative portions of the contract clearly indicates that the parties intended the employment agreement to cover Mr. Panwar's work as a physical therapist, not a physical therapist assistant. The Court does not agree with Mr. Panwar that this additional position should be read into the contract, and his argument that the term "physical therapist" is somehow ambiguous is unavailing. Because Mr. Panwar did not satisfy the requirement that he be a licensed physical therapist, he was not entitled to be paid $800.001,000.00 per week for work as contemplated in the employment agreement. *See* E-mails between Panwar and RN Staff, *Filing No. 191–10* ("[W]e want you to be a fully licensed PT and getting paid as a PT *rather than as a PTA* soonest [sic].") (emphasis added).

**\*8** Mr. Panwar argues that RN Staff waived the requirement that he work as a physical therapist through its subsequent conduct of permitting Mr. Panwar to work as a physical therapist assistant, but that he still should have been paid the amounts specified in the employment agreement. Because the Court finds that Mr. Panwar was required to have a physical therapist license in order to work as a physical therapist, and therefore be paid a physical therapist's wage, Mr. Panwar's qualification to work as a licensed physical therapist is a condition precedent to RN Staff's obligation to pay Mr. Panwar $800.00–$1,000.00 per week. *See Anderson Prop. Mgmt., LLC v. H. Anthony Miller, Jr., LLC,* 943 N.E.2d 1286, 1291 (Ind.Ct.App.2011) ("[A] condition precedent is a

condition that must be ... fulfilled before the duty to perform a specific obligation arises.") (quoting *McGraw v. Marchioli,* 812 N.E.2d 1154, 1157 (Ind.Ct.App.2004)). RN Staff was not obligated to compensate Mr. Panwar pursuant to the terms of the employment agreement unless he performed the services as a staff physical therapist; thus the Court concludes that performing services as a physical therapist was a condition precedent to being compensated $800.00–1,000.00 per week.

Despite Mr. Panwar's failure to obtain a physical therapist license, RN Staff agreed to place him in a position for which he was licensed, which was a physical therapist assistant. The Court agrees that RN Staff waived the original condition requiring Mr. Panwar to work as a physical therapist through the parties' course of conduct, and effectively modified the agreement. *L.H. Controls, Inc. v. Custom Conveyor, Inc.,* 974 N.E.2d 1031, 1050–51 (Ind.Ct.App.2012) ("Waiver [of a condition] may be implied from the acts, omissions, or conduct of one of the parties to the contract."); *City of Indianapolis v. Twin Lakes Enterprises, Inc.,* 568 N.E.2d 1073, 1084 (Ind.Ct.App.1991) ("[M]odification of a contract can be implied from the conduct of the parties."). RN Staff agreed to place Mr. Panwar in a physical therapist assistant position rather than terminating his contract altogether. *See* E-mails between Panwar and RN Staff, *Filing No. 191–10, at ECF p. 16* ("In the meantime, we can ask Marketing to market you as a PTA so ... you have work to look forward to."). "A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.,* 147 F.3d 636, 641 (7th Cir.1998). The waiver of the contract provision requiring Mr. Panwar to hold a physical therapist license and work as a physical therapist did not serve to nullify the entire agreement, and the remaining provisions were still valid and enforceable.

In addition, the severability clause of the employment agreement states that "[i]f any of this Agreement shall be held to be invalid ... for any reason, the remaining provisions shall continue to be valid and enforceable." (*Filing No. 182–4, at*

*ECF p. 5.*) Mr. Panwar and RN Staff continued to perform under the terms of the contract as modified by their course of conduct, and both parties acquiesced in Mr. Panwar working as a physical therapist assistant at a reduced hourly rate of $21.00 per hour. *See Int'l Bus. Lists, Inc.,* 147 F.3d at 641 ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."). Mr. Panwar does not allege that he was not paid for the work that he did perform under the parties' modified arrangement, only that he should have been paid more. Thus, the Court finds that there was no breach of Mr. Panwar's employment agreement and no violation of the Wage Law for the failure to pay Mr. Panwar $800.00–1,000.00 per week for work as a physical therapist assistant.

## IV. *CONCLUSION*

**\*9** Based upon the forgoing, the Court finds that Defendants did not engage in threats of serious harm or abuse of legal process to create a "forced labor scheme" involving Mr. Panwar's and Mr. Agustin's employment in violation of the Trafficking Victims' Protection Act. The Court further finds that Defendants did not breach the terms of either Mr. Panwar's or Mr. Agustin's employment agreements, and did not violate the Indiana Statutory Wage Law. Because Mr. Panwar and Mr. Agustin have not shown that they have any valid claims, the Court need not address the issue of Plaintiffs' standing as to each Defendant. Therefore, Plaintiffs' Motion for Partial Summary Judgment (*Filing No. 180* ) is **DENIED,** and Defendants' Cross–Motion for Summary Judgment (*Filing No. 190* ) is **GRANTED.** Plaintiffs' claims are **DISMISSED with prejudice.**

**SO ORDERED.**

## All Citations

Not Reported in F.Supp.3d, 2015 WL 1396599

## Footnotes

1    Plaintiffs include a statement of material facts in dispute in response to Defendants' cross-motion for summary judgment; however, they do not dispute the facts themselves, but rather the implications and interpretation of those facts. Because Defendants did not dispute the facts as presented by the Plaintiffs, there was no

requirement for them to include a Statement of Material Facts in Dispute in accordance with Local Rule 56–1(d) in their response to Plaintiffs' summary judgment brief.

2    "Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)." 18 U.S.C. § 1589(a).

3    In their briefs, Plaintiffs repeatedly refer to the fact that they were not assigned client work for weeks at a time, and were not paid for this "non-productive time." The Court has already dismissed Plaintiffs' "benching" claims because the INA does not provide for a private right of action, and found that Plaintiffs may not assert the same claims under a different cause of action. (*Filing No. 129.*) Plaintiffs are not now permitted to make such arguments in support of their breach of contract or Wage Law claims, so the Court will disregard any such factual allegations made in support of the current motion.

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

498 P.3d 1290 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Court of Appeals of Nevada.

David Lee PHILLIPS, an Individual; and
Arthur Icke, an Individual, Appellants,
v.
VALLEY VIEW SURGICAL, LLC, a Nevada
Limited Liability Company, Respondent.
David Lee Phillips, an Individual; and
Arthur Icke, an Individual, Appellants,
v.
Valley View Surgical, LLC, a Nevada
Limited Liability Company, Respondent.

No. 81592-COA, No. 81793-COA
|
FILED NOVEMBER 17, 2021

David Lee Phillips and Arthur Icke appeal from the district
court's findings of facts and conclusions of law following a
bench trial and a later order awarding plaintiff attorney fees.
Eighth Judicial District Court, Clark County; Richard Scotti,
Judge.

**Attorneys and Law Firms**

Christopherson Law Offices

Royal & Miles, LLP

*ORDER OF AFFIRMANCE*

 **\*1**  Icke suffered a shoulder injury in a 2015 car accident,
and he maintained a personal injury action to recover damage
from the accident. [1]  He retained co-appellant Phillips as
his personal injury attorney. Concerned that Icke's insurance
would not cover the surgery, Phillips and Icke entertained
alternative funding options. Specifically, Phillips and Icke
contacted Valley View Surgical, LLC, about funding Icke's
shoulder surgery.

Valley View does not perform surgeries; it is a medical
financing company. In some cases, Valley View pays for a
patient's operation upfront so long as the patient signs a lien

giving Valley View an interest in the patient's subsequent
personal injury proceeds. Before entering these arrangements,
Valley View investigates the patient's claim to evaluate the
risk involved with paying for the surgery upfront. Relatedly,
Valley View only provides this service if the injured party has
retained counsel. Valley View then gives the patient and his
attorney a rough estimate of the final cost before proceeding
to fund the surgery.

After the medical services are performed, the medical
providers issue an itemized accounting to Valley View, and
Valley View issues a comprehensive invoice to the patient.
Valley View has a relationship with the medical providers, so
the rates billed to Valley View by the medical providers are
sometimes less than the amount billed to standard consumers.
Nevertheless, to make its profit, the amount in this invoice
is greater than the total amount billed to Valley View by the
medical providers. The formula used to calculate this mark-
up is proprietary, so the forms supporting the agreement are
vague with respect to how Valley View reaches the figure in its
comprehensive invoice. That invoice is then satisfied via the
lien against the patient's eventual personal injury proceeds.

Phillips, Icke, and Valley View followed that business model
here. Valley View investigated Icke's claim and gave Phillips
a general quote for the operation. In the end, Valley View
determined that the relevant car insurance policies provided
sufficient coverage to provide upfront funding for Icke's
shoulder surgery.

On the morning of his surgery, Icke reported to Affinity
Surgery Center. After arriving, and shortly before the
operation, Affinity personnel gave Icke three documents, all
of which were from Valley View, not Affinity Surgery Center.
The documents included the lien agreement, a waiver of
private medical insurance, and a disclosure that stated Valley
View was not a medical provider. In the disclosure, Icke
agreed to pay a usual and customary amount to be set by
Valley View. Icke signed all the forms and had the shoulder
surgery. After the surgery, Phillips, Icke's attorney, received
the same lien agreement (but not the other two forms), and
he signed the lien agreement under language that provided
"[t]he undersigned attorney of record acknowledges this lien
and agrees to observe the above terms for the protection of
said medical provider."

 **\*2**  With the surgery complete, Valley View received the
bills from the medical provider, composed the comprehensive
invoice for Icke and Phillips, sent the invoice to Phillips, and

started following Icke's case. Primarily, Valley View followed Icke's case by way of updates from Phillips's law firm. In the months after the surgery, Valley View representative Stefanie Hass communicated with a woman named Tiffany in Phillips's office. After some time, Tiffany left Phillips's office and Hass communicated directly with Phillips. Despite Hass's diligent efforts, communication was sparse as many of her requests for an update went unanswered. Occasionally, and as late as December 2017, Phillips responded to Hass's inquiry by saying Icke's claim was still open. Based on these representations, Valley View waited for a resolution. During this period, Hass kept a communication log as she does with all cases after Valley View pays for the medical services.

That December 2017 message was the last between Phillips and Valley View. In June 2018, after several more requests for information, Hass notified Phillips that she was going to involve Valley View's legal counsel because Phillips had stopped responding. After counsel for Valley View was involved, Valley View learned that Icke's claim had actually settled in 2016. The claim had settled for the policy limits on two applicable insurance policies, and Phillips had used Valley View's invoice to help secure $150,000 in total insurance proceeds.

Valley View sued both Icke and Phillips to enforce its lien contract. In December 2018, Valley View extended an offer of judgment under NRCP 68 to Phillips and Icke, offering to settle the case for $49,999. Phillips and Icke did not accept this offer. The case eventually went to a two-day bench trial where Valley View called two witnesses: Stefanie Hass and David Phillips. The parties submitted closing arguments in writing, and the district court issued its findings of fact and conclusions of law in July 2020. The district court found the lien contract enforceable and entered a judgment against Phillips and Icke. Subsequently, Valley View filed a motion for attorney fees based on NRCP 68. Phillips and Icke timely appealed the district court's findings and conclusions. Afterward, the district court granted the motion for attorney fees in the amount of $42,185 and for costs in the amount of $7,126.45. Phillips and Icke timely appealed the fees order as well. We now address these consolidated appeals.

Foremost is Phillips and Icke's challenge to the enforceability of the lien contract. Contract enforceability prompts a dual standard of review; we review questions of law de novo while giving deference to the district court's factual determinations. *Whitemaine v. Aniskovich*, 124 Nev. 302, 308, 183 P.3d 137, 141 (2008).

Phillips and Icke offer numerous theories, arguing each is sufficient to preclude enforcement of the lien contract here. Namely, they argue Valley View did not prove that it was entitled to Phillips and Icke's performance, that Valley View's practices are deceptive, that the agreement offends public policy, and that the agreement is unconscionable. We address each point in turn below.

First, Phillips and Icke assert they did not owe Valley View, a medical financing company, any duties because Phillips and Icke signed a lien with the "medical provider" while Valley View is a medical financier, not a medical provider. [2] In other words, Phillips and Icke argue that their misunderstanding regarding the nature of Valley View's business renders the lien agreement unenforceable. We disagree.

**3** A unilateral mistake makes a contract voidable only if the mistake is material. *Home Savers, Inc. v. United Sec. Co.*, 103 Nev. 357, 358-59, 741 P.2d 1355, 1356 (1987). Further, a "contract should be construed, if logically and legally permissible, so as to effectuate valid contractual relations, rather than in a manner which would render the agreement invalid, or render performance impossible." *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 111, 424 P.2d 101, 104 (1967).

Here, it is undisputed that Phillips, Icke, and Valley View agreed to a contractual relationship wherein Icke would receive a shoulder surgery and Phillips would ensure Valley View received compensation via a lien on Icke's later personal injury recovery. The sole dispute on this point deals with a slight incongruity between the language on the lien and the nature of Valley View's business. [3] Despite Phillips and Icke initially contacting Valley View, Valley View's investigation into Icke's personal injury claim, and the quote from Valley View to Phillips and Icke, they assert language discrepancy renders the entire agreement unenforceable notwithstanding the parties' understanding of the relationship before Icke underwent surgery. Phillips and Icke agreed to a lien on Icke's personal injury recovery with Valley View; their only arguable mistake is with respect to their interpretations of Valley View's business. This lien contract can be logically construed as a valid agreement, and because any mistake on the part of the parties was immaterial, we elect to construe it as an enforceable agreement.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In all, we disagree that the use of the "medical provider" language in Valley View's lien can invalidate an otherwise understood and agreed-to lien contract.

After challenging the language of the lien, Phillips and Icke assert the agreement should not be enforced because Valley View's business is a deceptive trade practice. While we acknowledge some understandable confusion we agree with the district court that no deceptive practice occurred.

Under the Nevada Deceptive Trade Practices Act (NDTPA), a business may not knowingly make a false representation as to its affiliation with another entity, NRS 598.0915(3), or any other element of the transaction, NRS 598.0915(15). "Knowingly" is "the intent to do that which the law prohibits." *Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. 280, 283-84, 449 P.3d 479, 483 (Ct. App. 2019) (internal quotation marks omitted). And finally, the commercial entity's misrepresentation must relate to a material fact, meaning either (a) a reasonable person would attach importance to the fact, or (b) the representing party has reason to know the recipient will find the fact important. *Id.* at 287-90, 449 P.3d at 485-87.

Here, and similar to the discussion above, any mistake or alleged deception falls to an inconsequential fact. Phillips and Icke sought alternative funding solutions for Icke's shoulder surgery, and they started the process with Valley View. In the end, the parties agreed to a lien on Icke's recovery in exchange for upfront surgery funding. The nature of Valley View's business is immaterial. Moreover, Phillips and Icke cite NRS 598.0915(3) and (15), but they fail to show Valley View knowingly misrepresented any affiliation. Phillips and Icke merely demonstrate that Valley View's full name (Valley View Surgical) is similar to another entity in the area (Valley View Surgery Center).

 **4** Thus, Phillips and Icke have failed to show that Valley View acted with the requisite intent to violate the NDTPA, and the district court did not err on this point when it enforced the lien contract.

Next, Phillips and Icke assert the lien should not be enforced because it offends public policy. We disagree.

Any contract that tends to operate to the detriment of the public interest is void. *Clark County v. Bonanza No. 1*, 96 Nev. 643, 652, 615 P.2d 939, 945 (1980). A contract operates to the detriment of the public interest when the

interest in the contract's enforcement is clearly outweighed by a public policy against enforcement. *Sylver v. Regents Bank, N.A.*, 129 Nev. 282, 290, 300 P.3d 718, 723 (2013). For example, the Nevada Supreme Court has refused to enforce contracts that deter whistleblowing. *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 480-81, 25 P.3d 215, 223-24 (2001) (noting whistleblowing was one of two justifications for denying enforceability). Thus, to refuse enforcement under public policy, the effects of the contract must have implications for the public at large.

Here, the lien contract does not threaten the public at large. Unlike agreements that deter whistleblowing, the public is, on an individual scale, helped by lien contracts such as the one in this case. Phillips and Icke entertained alternative funding solutions because they were concerned that Icke's insurance would not cover the operation. After Valley View agreed to fund the operation, Icke proceeded with the surgery to repair his shoulder. We acknowledge Phillips and Icke's arguments regarding Valley View's proprietary formula for cost calculation and the fact that paying for an operation through Valley View may be more expensive than it would be otherwise. At the same time, however, we recognize that Icke may not have received the surgery without Valley View.

Thus, the district court did not err when it enforced the contract despite Phillips and Icke's public policy challenges. [4]

Finally, Phillips and Icke ask this court to refuse enforcement of the lien because it is unconscionable. Again, we not persuaded.

This court may refuse to enforce a contract upon a determination that the contract is unconscionable. *Burch v. Second Judicial Dist. Court*, 118 Nev. 438, 441, 49 P.3d 647, 649 (2002). To prevent enforcement, the party arguing unconscionability must establish both procedural and substantive unconscionability. *D.R. Horton, Inc. v. Green*, 120 Nev. 549, 553-54, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by U.S. Home Corp. v. Michael Ballesteros Tr.*, 134 Nev. 180, 192, 415 P.3d 32, 42 (2018). Procedural unconscionability occurs when a party lacks an opportunity to meaningfully review the terms or the meaning of those terms are not readily apparent from the face of the agreement. *Id.* at 554, 96 P.3d at 1162. Put another way, procedural unconscionability generally involves one party's failure to reasonably inform the other. *U.S. Home Corp.*, 134 Nev. at 190, 415 P.3d at 40-41. Substantive unconscionability refers

more to the one-sidedness of the terms. *D.R. Horton*, 120 Nev. at 554, 96 P.3d at 1162-63.

 **\*\*5** The documents here are not unconscionable and do not warrant this court's intervention. Procedurally, Icke was in a challenging position where he was presented with the forms at the medical center shortly before his surgery. However, the procedural concerns on this agreement end there. The forms themselves do not contain any fine print or hidden clauses, they are not overwhelmingly long, and they are not difficult to understand. Moreover, the documents are clearly titled and affiliated with Valley View. Substantively, Phillips and Icke concede in their briefing that this half of the analysis is the weaker of the two. The terms here are not especially one-sided. Icke receives a shoulder surgery without any upfront payment. Valley View receives a profitable return at a later date after bearing the risk of Icke receiving a personal injury recovery and in a sufficient amount.

Accordingly, the agreement here is neither procedurally nor substantively unconscionable, and we decline to intervene on these grounds.

Having determined the lien contract is enforceable, we turn now to the district court's award of attorney fees under NRCP 68. We will not disturb a fee award under NRCP 68 absent an abuse of discretion by the district court. *O'Connell v. Wynn Las Vegas, LLC*, 134 Nev. 550, 555-56, 429 P.3d 664, 669 (Ct. App. 2018).

NRCP 68 governs offers of judgment and the concomitant penalties. It applies to multiple defendants if (1) there is a single common theory of liability against the defendants, and (2) the same plaintiff entity is authorized to settle the case against the defendants. NRCP 68(c)(2). This rule was amended in 1999; the rule now permits un-apportioned offers to multiple defendants. Under NRCP 68(f), if defendants reject a qualifying offer, the defendants-offerees "must pay the offeror's post-offer costs and expenses." To assist in future analyses, the Nevada Supreme Court issued factors in the *Beattie* decision:

> (1) whether the plaintiffs claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiffs decision to reject the

offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount.

*Beattie v. Thomas*, 99 Nev. 579, 588-89, 668 P.2d 268, 274 (1983). These are factors for the district court to weigh; they are not elements. *Id.* at 589, 668 P.2d at 274. The district court must consider these factors before awarding the full amount of fees requested. *Id.*

Here, the fact that Valley View made the offer to multiple defendants without apportioning the offer is immaterial due to the 1999 NRCP 68 amendments. Next, the district court considered all the factors under *Beattie* on the way to granting fees under the offer of judgment rule. The district court couched its *Beattie* analysis in the fact that the offer of judgment, $49,999, was reasonable compared to Valley View's actual recovery of over $60,000.

Thus, Phillips and Icke's arguments on the un-apportioned offer are misplaced based on outdated court rules, and the district court considered the *Beattie* factors before awarding fees. We discern no abuse of discretion here.

In addition to the propriety of the award, Phillips and Icke also challenge its amount as outrageous for a two-day trial. When determining the reasonableness of an award, a district court must consider the *Brunzell* factors:

> (1) the qualities of the advocate: his ability, his training, education, experience, professional standing and skill; (2) the character of the work to be done: its difficulty, its intricacy, its importance, time and skill required, the responsibility imposed and the prominence and character of the parties where they affect the importance of the litigation; (3) the work actually performed by the lawyer: the skill, time and attention given to the work; (4) the result: whether the attorney was successful and what benefits were derived.

**\*\*6** *Brunzell v. Golden Gate Nat'l Bank*, 85 Nev. 345, 349, 455 P.2d 31, 33 (1969).

Here, Phillips and Icke's argument misconstrues the nature of the fee award. As an award issued under NRCP 68, this award does not compensate Valley View for the trial; it compensates Valley View for fees incurred between Phillips and Icke's rejection of the Rule 68 offer and the case's final resolution. From this perspective, the attorney fees are understandable as Valley View issued the offer in December 2018 and the trial concluded in March 2020.

Without more, there is insufficient evidence the district court abused its discretion here. Accordingly, we

ORDER the judgment of the district court **\*1291** AFFIRMED. [5]

### All Citations

498 P.3d 1290 (Table), 2021 WL 5370984

## Footnotes

1    We recount the facts only as necessary for our disposition.

2    Phillips and Icke also challenge the lien because it does not fit any of the statutory lien categories under NRS Chapter 108; however, they do not offer any authority to support the proposition that all liens must come from NRS Chapter 108 and in fact argue this case as a lien contract. Accordingly, we reject this argument. *Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

3    As an aside, we note that this argument only applies to Phillips because Icke signed a separate acknowledgement that explained the nature of Valley View's business.

4    Further, a contract may be void for public policy if its formation represents a violation of a statute. *See Sylver*, 129 Nev. at 290-91, 300 P.3d at 724. We considered the statutes cited by Phillips and Icke and conclude they are inapplicable. *E.g.*, NRS Chapter 604C (passed in 2019 and not retroactive); NRS 645E.920 (repealed statute governing mortgage bankers).

5    Insofar as the parties raise arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3073345
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

PROTHERA, INC., d\b\a SFI USA, Plaintiff,
v.
ZHOU J. YE, Defendant.

Case No. 3:18-cv-00410-MMD-CLB
|
Signed 06/10/2020

**Attorneys and Law Firms**

Glenn Mark Azzinari, Pro Hac Vice, A.Y. Strauss, New York, NY, Frank C. Gilmore, Robison, Sharp, Sullivan & Brust, Reno, NV, for Plaintiff.

W. West Allen, Ryan T. O'Malley, Howard & Howard Attorneys PLLC, Las Vegas, NV, for Defendant.

ORDER

MIRANDA M. DU, CHIEF UNITED STATES DISTRICT JUDGE

**I. SUMMARY**

 *1  Plaintiff Prothera, Inc., doing business as SFI USA, sued Defendant Zhou J. Ye for trademark infringement, breach of contract, and related causes of action, for pretending to be a doctor in order to purchase Plaintiff's nutraceuticals, and then selling them—without permission and at a profit—on Amazon's online marketplace. (ECF No. 1.) Before the Court is Plaintiff's motion for partial summary judgment on only its breach of contract claim ("Motion").[1] (ECF No. 43.) Because the Court is persuaded by the only argument Defendant raised in opposition to the Motion, that the liquidated damages clause in the contract between the parties upon which Plaintiff relies in its Motion is unenforceable —and as further explained below—the Court will deny the Motion.

**II. BACKGROUND**

Notably, there are no factual disputes pertinent to the Motion. (ECF Nos. 43 at 3-7, 47 at 1-5, 51 at 2.) Defendant instead makes the single, and purely legal, argument that the Motion should be denied because the liquidated damages clause in

the operative contract is unenforceable, and Plaintiff seeks to establish its damages in the Motion via that liquidated damages clause. (ECF No. 47 at 5-13.)

Plaintiff seeks to sell its products only through healthcare providers. (ECF No. 51 at 2.) Defendant is not a healthcare provider. (*Id.*) To get Plaintiff's products for resale, Defendant pretended to be a healthcare provider, specifically by finding healthcare providers' names and credentials on the internet, and using those assumed identities to enter into a contract with Plaintiff to resell Plaintiff's products. (*Id.*) More specifically, to obtain Plaintiff's products for unauthorized resale, Defendant executed the ProThera Inc. d/b/a SFI USA HCP Product Purchase Terms and Conditions (the "Agreement"). (*Id.*; *see also* ECF No. 47-1 (Agreement).) The Agreement prohibits advertising, listing, offering for sale, selling, or distributing Plaintiff's products online, including through Amazon. (ECF No. 51 at 2.) Nonetheless, Defendant did. (*Id.*)

The Agreement contains a liquidated damages clause. (*Id.*) It reads:

> **Liquidated Damages**. HCP acknowledges that the Sections are necessary and proper in order to protect SFI's brand reputation and goodwill, and to preserve authorized health care practitioners' (including HCP's) ability to make a reasonable margin on Product sales. HCP agrees that if it violates the Sections, SFI will be damaged in an amount that will be difficult or impossible to ascertain. Accordingly, HCP agrees to pay liquidated damages to compensate SFI for damages resulting from HCP's breach of the Sections (the "Liquidated Damages"). The parties have made advance provision for Liquidated Damages to avoid controversy, delay and expense in the event of any breach of the Sections. Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section.

For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00. The Liquidated Damages are estimated based on the various damages that SFI expects to suffer upon any breach of the Sections, including lost sales; infringement of SFI's trademarks and other intellectual property; irreparable harm to SFI's business, customer relationships, goodwill and quality control procedures; and costs of investigating breaches. HCP agrees that the Liquidated Damages are not a penalty and are reasonably estimated in light of the anticipated or actual harm that would be caused by a breach and the difficulty of proving the amount of loss and otherwise providing an adequate remedy to SFI and other affected health care providers. HCP hereby waives any defense to SFI's right to obtain liquidated damages on the basis that actual damages are calculable or that the liquidated damages do not represent a reasonable determination of damages or otherwise constitute a penalty.

**\*2**  (ECF No. 47-1 at 3.) There is no dispute here that Defendant is "HCP," and Plaintiff is "SFI," as those terms are used in the liquidated damages clause.

As Plaintiff explains, the only dispute as to the Motion is about this liquidated damages clause. (ECF No. 51 at 2.) Plaintiff relies on the liquidated damages clause for the damages element of its prima facie breach of contract claim. (ECF No. 43 at 10-13.) Using this clause, Plaintiff calculated that Defendant breached the Agreement 300 times because Defendant made 300 unauthorized sales of Plaintiff's products, and thus Plaintiff is entitled to $150,000 in damages, or $500 per breach multiplied by the 300 breaches. (*Id.* at 12-13.) As noted, Defendant counters that Plaintiff has not shown it is entitled to summary judgment because its breach

of contract claim depends in part on the liquidated damages clause, which Defendant argues is unenforceable. (ECF No. 47.)

## III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## IV. DISCUSSION

**\*3** Defendant argues the liquidated damages clause in the Agreement is unenforceable because it imposes a penalty for breach that does not reasonably approximate the actual damages Plaintiff will suffer in the event of breach—nor did it here. (ECF No. 47 at 7.) Plaintiff counters that liquidated damages clauses are presumed valid in Nevada, and the clause is enforceable as written despite Defendant's contrary interpretation, which Plaintiff argues is unreasonable. (ECF No. 51 at 5-8.) The Court agrees with Defendant. The Court will first discuss the governing law, and then analyze the liquidated damages clause in the context of the parties' arguments.

To start, "[a] plaintiff in a breach of contract action must 'show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach.' " *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (quoting *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920-21 (D. Nev. 2006)).[2] The parties' arguments about the liquidated damages clause are situated within the damages element of Plaintiff's breach of contract claim, as Plaintiff moved for summary judgment on its breach of contract claim only. (ECF Nos. 43, 47.)

Next, the parties' arguments about the liquidated damages clause require the Court to interpret that clause in light of the Agreement. Interpretation of a contract is a question of law. *See Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003).[3] "A basic rule of contract interpretation is that '[e]very word must be given effect if at all possible.' " *Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998) (alteration in original) (quoting *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966)). Additionally, when construing a contract, a court should consider the contract as a whole and "should not interpret a contract so as to make meaningless its provisions." *Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978). Under contract law generally, when a term is unambiguous, a court must construe it from the language contained within it. *See Chwialkowski v. Sachs*, 834 P.2d 405, 406 (Nev. 1992). A contract is unambiguous if it is not susceptible to more than one reasonable interpretation. *See Margrave v. Dermody Props.*, 878 P.2d 291, 293 (Nev. 1994). "The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other. That task of construction is for the court." *Peterson v. Minidoka Cty. Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir.), *amended by* 132 F.3d 1258 (9th Cir. 1997).

**\*4** But most importantly here, whether the liquidated damages clause is enforceable turns on whether it is a penalty. Liquidated damages provisions are presumed valid in Nevada. *See Khan v. Bakhsh*, 306 P.3d 411, 414 (Nev. 2013). Their purpose is to "serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable." *Id.* (citation omitted). To successfully argue a liquidated damages provision is unenforceable, the party challenging its application must establish that it amounts to a penalty. *See Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev. 1982). "In order to prove a liquidated damage clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Id.* (citation omitted). The "distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance." *Mason v. Fakhimi*, 865 P.2d 333, 335 (1993) (citation omitted).

In the Agreement, Plaintiff is entitled to liquidated damages if the other party (here, Defendant) breaches any of the Sections. (ECF No. 47-1 at 3, § 11.) The Sections are elsewhere defined as sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement. (*Id.* at § 10.) Section 2 requires Defendant to represent that he would only purchase Plaintiff's products to resell to patients under his direct professional care,[4] and that Defendant would not sell them on the internet. (*Id.* at 2 § 2.) Section 5 restricts Defendant to only selling Plaintiff's products to his patients for their personal use, in reasonable quantities. (*Id.* at § 5.) Section 6 prohibits Defendant from reselling Plaintiff's products online without first getting Plaintiff's written permission, specifically including on Amazon, and from advertising online, though resale on certain online dispensaries is permitted. (*Id.* at § 6.) Section 6 also specifically prohibits certain acts, stating that Defendant: "shall not advertise, list, offer for sale, sell or distribute" Plaintiff's products online. (*Id.*) Section 7 prohibits resale to other resellers. (*Id.* at § 7.) Section 8 provides that Defendant may only market Plaintiff's products at Defendant's physical place of business, subject to certain further restrictions. (*Id.* at 2-3, § 8.) Section 9 imposes certain quality assurance obligations on Defendant, and requires that he immediately report any adverse events to Plaintiff. (*Id.* at 3, § 9.) Section 13 specifies that Plaintiff continues to own its intellectual property, and gives Defendant a license to use that intellectual property to sell and market Plaintiff's products. (*Id.* at 3-4, § 13.) Thus, violation of any of these sections, including

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

engaging in any of the acts they prohibit, or failing to comply with any of the obligations they impose, entitles Plaintiff to liquidated damages.

As Plaintiff repeatedly emphasizes in its briefing (ECF No. 43 at 11, 51 at 7-8), much of the liquidated damages clause is devoted to explaining why it should not be construed as a penalty. (ECF No. 47-1 at 3, § 11.) But the key portion, which actually specifies how liquidated damages must be calculated, provides:

> Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section. For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00.

**\*5**  (*Id.*) Product is elsewhere defined as any of Plaintiff's products that Defendant purchases. (*Id.* at 2.) Thus, reading the liquidated damages provision in light of the rest of the Agreement, Defendant must pay Plaintiff $500 for each and every breach of sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement, per day that Plaintiff is in breach.

As Defendant argues, calculating the amount Defendant owes Plaintiff in line with the plain meaning of this liquidated damages provision leads to staggering liability—much more than the $150,000 Plaintiff seeks here. (ECF No. 47 at 8-10.) Plaintiff calculated the $150,000 it seeks using a spreadsheet that showed Defendant's actual sales, and then multiplied those sales by $500. (ECF No. 43 at 12-13, 51 at 6.) But this approach does not follow from the liquidated damages clause, or even from Plaintiff's own argument. Immediately before laying out this calculation, Plaintiff correctly argues that "the liquidated damages clause is triggered by any breaches of sections 2, 5, 6, 7, 8, 9, or 13" of the agreement. (ECF No. 42 at 12.) Thus, breach cannot be limited merely to sales, as those sections prohibit many acts and omissions beyond sales. And in this case, there is no dispute that Defendant committed myriad breaches—many more than the 300 sales

Plaintiff seeks to hold him liable for. Plaintiff's calculation of damages therefore does not align with the language of the Agreement.

There are also other reasons why Plaintiff's calculation is incorrect given the terms of the Agreement. First, Plaintiff's calculation does not account for the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) Construing only a sale as a breach means you can only have one breach per product. But the Agreement must have intended to treat more than just sales as a breach, because, logically, it is unlikely you could have a sale of Plaintiff's product across multiple days. [5] The 'each day of breach' concept appears more likely an attempt to capture the "advertise, list, offer for sale" concepts that are also prohibited by Section 6. (*Id.* at 2, § 6.) Thus, limiting breach to individual sales, without also going after the advertising, listing, and offering also prohibited by the Agreement does not align with the language of the Agreement. Second, Plaintiff's calculation does not align with the example offered in the liquidated damages provision, which expressly relies on the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) The example assumes breach as to three different products over 10 days, and arrives at 30 breaches. (*Id.*) If Plaintiff used the same formula to calculate Defendant's damages liability here, it would have arrived at a much higher number than it did in its Motion. Third, Plaintiff's calculation does not account for the 'each breach with respect to a Product will be considered a separate breach' concept. That concept contemplates liability for at least products offered for sale, but not actually sold—but Plaintiff's calculation does not.

To the contrary, Defendant's absurd [6] argument he should be on the hook for approximately $2.8 million instead of the $150,000 Plaintiff seeks is actually more persuasive—as it aligns better with the language of the Agreement. (ECF No. 47 at 8-10.) As described *supra*, the liquidated damages clause of the Agreement makes a number of different actions or omissions a breach—well beyond mere sales—and then multiplies liability for those breaches by product, and by day of breach. (ECF No. 47-1 at 3, § 11.) Given Defendant's myriad breaches of the Agreement, his interpretation of the liquidated damages clause matches the plain language of the Agreement.

**\*6**  This finding does not mean the Agreement is ambiguous. Quite to the contrary. It is instead unambiguous that the liquidated damages clause was intended as a penalty. It seeks to impose massive liability for breaching the contract

*Prothera, Inc. v. Zhou Ye, Slip Copy (2020)*

—evidencing its intent to secure compliance. *See Mason,* 865 P.2d at 335 (explaining that a liquidated damages clause constitutes a penalty, and is thus unenforceable, when its purpose is to secure compliance and not reasonably estimate damages). Moreover, the damages Plaintiff could recover under the liquidated damages clause as written are entirely untethered from, and greatly exceed, actual damages. *See Am. Fire & Safety, Inc. v. City of N. Las Vegas,* 849 P.2d 352, 355 (Nev. 1993) ("[a] penalty is a sum named, which is disproportionate to the damage which could have been anticipated from breach of the contract") (citing 5 *Williston on Contracts* § 776). This case is a good example, where Defendant argues he only made some $25,000 in profit reselling Plaintiff's products (ECF No. 47 at 8), and Plaintiff argues Defendant made some $87,000 in revenue (ECF No. 43 at 7). Both amounts are significantly lower than both the amount Defendant persuasively argues he should be required to pay if Plaintiff enforced the liquidated damage as written, and even the amount Plaintiff seeks. *See Khan,* 306 P.3d at 414 (invalidating liquidated damages clause when, by its terms, it sought 150% of actual damages). In sum, the liquidated damages clause is unenforceable because it was intended as a penalty.

And while the Court does not condone Defendant's wanton disregard for the Agreement, and appreciates Plaintiff's restraint in not seeking the overwhelming damages it could seek against Defendant under the liquidated damages clause, the Court's findings here are actually informed by a different set of considerations. That is Nevada's prohibition on 'blue penciling,' or re-writing unenforceable contract provisions to make them enforceable. *See Golden Rd. Motor Inn, Inc. v. Islam,* 376 P.3d 151, 156 (Nev. 2016) (invalidating overbroad noncompete provision in employment contract, and also stating the general principle that, "[r]ightfully, we have long refrained from reforming or 'blue penciling' private parties' contracts.") (footnote omitted). [7] As explained *supra,* Plaintiff's proposed interpretation of the liquidated damages clause does just that. By narrowing the definition of breach to only unauthorized sales to arrive at a damages amount closer to actual damages, Plaintiff's approach attempts to reform the liquidated damages clause to make it enforceable—which the Court cannot do.

In addition, the Court agrees with Defendant that liquidated damages clauses should be interpreted based on their effect, not based on disclaimer language added by the drafter stating the liquidated damages clause is not a penalty. (ECF No. 47

at 12.) If the converse were true, parties would—as Plaintiff did here (ECF No. 47-1 at 3)—include language explaining why their liquidated damages provision was not a penalty, and thus be free to impose punitive liquidated damages clauses on counterparties to their agreements. Plaintiff's approach of relying on disclaimer language in a liquidated damages clause (ECF No. 43 at 11, 51 at 7-8) would also render the analysis as to whether the liquidated damages clause constituted a penalty unnecessary. But, again as discussed *supra,* Nevada law is clear that is the analysis the Court must undertake. Thus, the Court accords no weight to the disclaimer language in the Agreement's liquidated damages clause.

Plaintiff also argues that the Court should not find for Defendant here because Plaintiff has presented evidence, and Defendant has presented none. (ECF No. 51 at 1, 3-6, 8.) But the applicable standard does not require Defendant to present any evidence. *See, e.g., Mason,* 865 P.2d at 335 ("In order to prove that such a provision constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party."). Defendant is merely required to persuade the Court. And here, Defendant has persuaded the Court the liquidated damages clause of the Agreement constitutes a penalty. The liquidated damages clause is therefore unenforceable.

**\*7** Because the liquidated damages clause is unenforceable, Plaintiff has not satisfied its initial burden to make out a prima facie breach of contract claim. *See, e.g., Brown,* 531 F. Supp. 2d at 1240 (stating that damages are an element of a breach of contract claim). The Court must therefore deny Plaintiff's Motion.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion for summary judgment (ECF No. 43) is denied.

### All Citations

Slip Copy, 2020 WL 3073345

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Footnotes

1       Defendant filed a response (ECF No. 47), and Plaintiff filed a reply (ECF No. 51). Both parties filed declarations with exhibits in support of their briefing. (ECF Nos. 44, 48.)

2       Some courts characterize a breach of contract claim under Nevada law as having four elements. *See, e.g., Padilla Constr. Co. of Nevada v. Big-D Constr. Corp.*, 386 P.3d 982 (Table), 2016 WL 6837851, at *1 (Nev. 2016) ("there are four elements to a claim for breach of contract in Nevada[:] '(1) formation of a valid contract; (2) performance or excuse of performance by plaintiff; (3) material breach by the defendant; and (4) damages' ") (quoting *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011)). In this case, Plaintiff characterized it as having three elements. (ECF No. 43 at 8.) Regardless, to the extent there is a fourth element, it is immaterial here—for two reasons. First, the parties' dispute centers on the damages prong, which is present in either the three or four element formulation. Second, there is no dispute here that Plaintiff performed its obligations under the Agreement.

3       This makes the parties' arguments as to whether the liquidated damages clause is enforceable suitable for resolution by the Court at summary judgment. In addition, and separately, the Court notes neither party disputes that Nevada law governs the Court's analysis.

4       Of course, all the references to patients here do not really apply to these circumstances, because Defendant is not a healthcare provider. But the fact that Defendant clearly breached many provisions of the Agreement is not particularly relevant to the parties' arguments, so the Court will not repeatedly mention the many ways in which Defendant breached the Agreement in reselling Plaintiff's products on Amazon.

5       Installment payments and financing are of course common for many types of sales, but there is no evidence before the Court this is how end customers pay for Plaintiff's products, which are, for example, bottles of Vitamin C tablets.

6       At first blush, because he is asking to be held significantly more liable than Plaintiffs asked for him to be. But this strategy is merely an effective rhetorical device.

7       In *Golden Road*, the Nevada Supreme Court explained this doctrine is supported by public policy considerations. *See* 376 P.3d at 156. The *Golden Road* court specifically explained that allowing blue-pencilling would virtually allow a court to write a new contract for the parties, which impermissibly tramples on the contracting parties' intent. *See id.* at 157. The prohibition on blue-pencilling also preserves judicial resources (*see id.* at 157-58), and protects less sophisticated parties who may comply with a particularly punitive or onerous contractual term simply because they are unaware the clause is unenforceable (*see id.* at 157).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 5907790
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

PROVITAS, LLC, Plaintiff,
v.
QUALITY INGREDIENTS
CORPORATION, Defendant.

Civil Action No. 4:21-CV-00196
|
Signed 12/14/2021

**Attorneys and Law Firms**

Haroon Farid Hashmi, James Logan Sowder, Thompson Coe
Cousins & Irons, LLP, Dallas, TX, for Plaintiff.

Tressie Elizabeth McKeon, Jamie-Lee Denton, Fox
Rothschild LLP, Dallas, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT
JUDGE

 **\*1** Pending before the Court is Defendant's Amended
Motion to Dismiss, Or In The Alternative, For Transfer
Pursuant To 28 U.S.C. § 1404 (Dkt. #16).[1] Having
considered the motion and the relevant pleadings, the Court
finds that it should be **DENIED in part** and **GRANTED in
part**.

### BACKGROUND

This case arises out of a business relationship between
the plaintiff, Provitas, LLC ("Provitas"), the defendant,
Quality Ingredients Corporation ("QIC"), and non-party,
DSM Nutritional Products, LLC ("DSM") (Dkt. #1). This
is the fourth lawsuit involving these parties, each stemming
from a batch of plant-based powder manufactured by QIC that
was allegedly contaminated with animal products (Dkt. #16
at p. 2).

Provitas is a Texas based corporation "that supplies oil-
soluble vitamins and nutrients to end-user-product producers
in the food, dietary supplement, and personal care products

industries" (Dkt. #1 ¶ 18). QIC is a Minnesota based
corporation "that takes raw ingredients provided by its
customers" and "mixes them per the customer's specifications
into liquid slurries which are then dried into powders" (Dkt.
#16 at p. 3). DSM is an end-user-product producer
incorporated in Delaware (Dkt. #8 Ex. 9). In early 2014,
Provitas was interested in exploring a business relationship
with QIC, and the two parties subsequently entered into a
Mutual Confidentiality Agreement (the "Agreement") (Dkt.
#13 Ex. A-1).

The Agreement created the initial relationship between the
parties but left open the possibility for QIC and Provitas to
enter into subsequent agreements that would subject them
to additional commitments (Dkt. #13 Ex. A-1 ¶¶ A–B).
However, the Agreement contained a clause indicating that
future transactional agreements would be "conditional upon
and subject to the terms of" the initial Agreement (Dkt. #13
Ex. A-1 ¶ C). Notably, the Agreement also contained a choice
of law provision—indicating Minnesota law would govern
interpretation of the Agreement—and a forum selection
clause binding the parties to adjudication in Minnesota under
particular circumstances (Dkt. #13 Ex. A-1 ¶ 12).

One particular subsequent transaction is at issue here. On May
18, 2017, Provitas placed an order with QIC for Vitamin D2
and Vitamin D3 powders to fulfill an order placed by DSM
(Dkt. #16 at p. 3). Provitas supplied QIC with liquid Vitamin
D2 and D3, starch, and malto dextrin (Dkt. #16 at p. 3). It
also "provided the specific formulation, cleaning protocols,
and sequencing to be utilized" in processing the raw materials
(Dkt. #16 at p. 4). The Vitamin D2 was mixed and dried
at the QIC facility in Minnesota in accordance with these
protocols, "which required the manufacturing of Vitamin D3
before the manufacture of Vitamin D2 with only a dry clean
between" (Dkt. #16 at p. 4). QIC then "processed the liquid
Vitamin D2 into the dry Vitamin D2 product, packaged the
dry Vitamin D2 powder that it had produced in plastic lined
cardboard boxes, labeled the boxes, and shipped the boxes"
to Provitas at its facility in Prosper, Texas (Dkt. #1 ¶ 24). This
is the typical chain of events that Provitas carries out when its
customers order a Vitamin D2 or D3 powder to add to their
food product (Dkt. #1 ¶ 21).

 **\*2** Upon receipt of the shipment, Provitas, "without
opening or otherwise tampering with the packaged powder
manufactured by QIC," subsequently shipped these products
to DSM's facilities in New York and Ontario (Dkt. #16 at
p. 4). "DSM alleges that it received the Vitamin D2 powder

supplement and integrated the dry Vitamin D2 powder manufactured by QIC into 106,000 kilograms of vegan soy milk product" (Dkt. #1 ¶ 26). Afterwards, DSM complained to Provitas that the vegan soy milk had been contaminated by Vitamin D3, an animal product (Dkt. #1 ¶ 27). DSM alleges "that because the Vitamin D2 contained an animal by-product, the soy milk was not marketable and had to be destroyed" (Dkt. #1 ¶ 27).

Provitas tested its own liquid Vitamin D2 and found no defect (Dkt. #1 ¶ 28). It concluded that any contamination in the end product could only have occurred as a result of QIC's manufacturing (Dkt. #1 ¶ 28). On March 26, 2020, Provitas brought an action against both QIC and DSM in the United States District Court for the District of Minnesota (Dkt. #16 at p. 2). But on June 5, 2020, Provitas filed a Notice of Voluntary Dismissal without prejudice (Dkt. #16 at p. 2). On March 27, 2020, DSM commenced an action based on the same or similar facts in the District of New Jersey, and that court signed a Stipulation of Dismissal on April 15, 2020 (Dkt. #16 at p. 2). Then, on April 27, 2020, DSM filed a complaint in the Northern District of New York against Provitas seeking economic damages for the losses incurred by the allegedly contaminated soy milk (Dkt. #16 at p. 2). Provitas filed a Third Party Complaint against QIC, and QIC filed a motion to dismiss the complaint for lack of personal jurisdiction (Dkt. #16 at p. 3). The Northern District of New York granted this motion (Dkt. #16 at p. 3).

On March 12, 2021, Provitas filed its complaint with the undersigned Court (Dkt. #1). QIC filed its Motion to Dismiss on April 15, 2021 (Dkt. #8), and Provitas responded on May 7, 2020 (Dkt. #13). On May 21, 2021, QIC filed its reply (Dkt. #14). On May 28, 2021, Provitas filed a sur-reply (Dkt. #17). The Court ordered supplemental briefing (Dkt. #29) on whether QIC had waived one of the arguments in its reply brief; the parties responded on November 23, 2021 (Dkts. #30, #31).

## LEGAL STANDARD

When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d 681, 683 n.3 (5th Cir. 1977). Further, "[a]ny genuine,

material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 161, 1067 (5th Cir. 1992)).

## ANALYSIS

### I. Personal Jurisdiction

QIC asks this Court to dismiss Provitas' claims under Federal Rule of Civil Procedure 12(b)(2). This rule requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 202 (5th Cir. 1989)). To satisfy that burden, the party seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

**\*3** A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cinega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *Id.*

It is undisputed that the Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992). Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion*, 895 F.2d at 216. The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts with a forum state can be satisfied by contacts that give rise

to either general jurisdiction or specific jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

Provitas contends that QIC has established sufficient minimum contacts in Texas through its ongoing business relationship with Provitas, continued presence at Texas tradeshows, product deliveries to Texas, and its role as a food-products manufacturer (Dkt. #13 ¶ 19). Accordingly, Provitas alleges this Court has both general and specific jurisdiction over QIC (Dkt. #13 ¶ 19). QIC argues that Provitas fails to allege general jurisdiction in its Complaint—and therefore cannot assert it in its response—but that in any circumstance, this Court has neither general nor specific jurisdiction over QIC for three reasons: 1) Provitas fails to establish that its claims arise out of QIC's contacts with Texas; 2) QIC's contacts with Texas are minimal; and 3) the exercise of personal jurisdiction would be neither fair nor reasonable (Dkt. #16 at pp. 9–11). Provitas responds in opposition to each of QIC's points and asks this Court to grant Provitas leave to amend its Complaint so that it may allege general jurisdiction (Dkt. #17 at p. 8).

**A. General Jurisdiction**
General jurisdiction exists only when the defendant's contacts with the forum state are so " 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see Cent. Freight Lines v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citing *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414, n.8 (1984)). Substantial, continuous, and systematic contact with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1992) (citation omitted). However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 609 (citing *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 596 (5th Cir. 1999)).

**\*4** The Court need not grant Provitas leave to amend its Complaint for the purpose of allowing it to allege general jurisdiction. Leave to amend should be granted under Federal Rule of Civil Procedure 15(a) only "if it appears at all possible

that the plaintiff can correct the defect." FED. R. CIV. P. 12(b)(2); 2 MOORE, FEDERAL PRACTICE, § 15.10 at 838 (2d ed. 1948). Correction to the defect is not possible here. The alleged facts, taken as true and in the light most favorable to Plaintiff, are insufficient to meet the high standard necessary for the Court to exercise general jurisdiction over QIC.

QIC's principal place of business and place of incorporation is Minnesota (Dkt. #16 at p. 11). It has no offices, officers, or employees in Texas; has never recruited Texas residents; has never maintained a Texas mailing address or telephone number; and has not appointed an agent for service in Texas. Even if, as Provitas alleges, QIC advertises in Texas and maintains business relationships with Texas companies (in addition to Provitas), this is not enough to "render [QIC] essentially at home" in Texas. *Daimler*, 571 U.S. at 127. Accordingly, the Court moves to its specific jurisdiction analysis.

**B. Specific Jurisdiction**
QIC argues this Court lacks specific jurisdiction because QIC has not purposely directed any activities at Texas by merely placing products into the stream of commerce that arrived in Texas at some point (Dkt. #16). Accordingly, QIC argues, there is no relationship between it, the forum, and the litigation that would create the requisite contacts for the Court to exercise personal jurisdiction (Dkt. #16). Provitas contends that personal jurisdiction is proper under a stream of commerce theory. Specifically, it argues that it "need only show that [QIC] placed the product in the stream of United States commerce and made no attempt to limit its sale in Texas" (Dkt. #13 ¶ 23). Because the Fifth Circuit applies the less stringent "mere foreseeability or awareness" stream of commerce analysis, the Court finds Provitas has made a prima facie case to support specific jurisdiction.

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros*, 466 U.S. at 414, n.8. Defendants who " 'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). (citing *Travelers Health Ass'n. v. Virginia*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.* For the court to exercise

specific jurisdiction, the court must determine "(1) whether the defendant has ... purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King*, 471 U.S. at 475).

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477. Nonetheless, "[i]t is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

### 1. Purposeful Availment

**\*5** A defendant establishes minimum contacts with a state if "the defendant's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474 (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). There must be some act whereby the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 475. A nonresident "may permissibly structure his primary conduct so as to avoid being haled into court in a particular state." *World–Wide Volkswagen*, 444 U.S. at 297. However, "even when a defendant has no physical presence in the forum state, a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact." *Nuovo Pignone*, 310 F.3d at 379.

Regarding interstate contractual obligations, the Supreme Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and

sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 474 (quoting *Travelers Health*, 339 U.S. at 647. *See also McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222–23 (1957)). The Supreme Court has held generally that the stream of commerce theory provides a valid basis for establishing minimum contacts. *See World–Wide Volkswagen*, 444 U.S. at 297–98. "The forum does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.*

In *Asahi Metal Industry Co. v. Superior Court*, however, the Supreme Court split as to the precise application of the stream of commerce theory. 480 U.S. 102, 112, (1987). Justice Brennan, concurring in the judgment, concluded that "[m]ere placement in the stream of commerce is sufficient" for specific jurisdiction. *Id.* at 112, 116 (Brennan, J., concurring). For Justice Brennan, the "stream of commerce refers ... to the regular and anticipated flow of products from manufacture to distribution to retail sale," and due process is not offended "as long as a [defendant] ... is aware that the final product is being marketed in the forum state." *Id.* at 116–17. Justice O'Connor, writing for a plurality of the Court, would have required more. Specifically, Justice O'Connor reasoned that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112.

The Fifth Circuit, recognizing the Supreme Court's conflicting stream-of-commerce precedent, has interpreted *World–Wide Volkswagen* to hold that "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993) (quoting *Asahi*, 480 U.S. at 111. It rejects the *Asahi* plurality's assertion that more is required. *Id.* A defendant satisfies mere foreseeability or awareness when it introduces products into the stream of commerce but does not control the distribution system). *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081 (5th Cir. 1984).

Under the "mere foreseeability" stream of commerce analysis, Provitas has plausibly alleged that QIC purposefully availed itself of the privileges accompanied with its business conduct in Texas. QIC argues, given the nature of its business, it did not know where the product would ultimately be consumed, so it could not have foreseen the product would

be consumed in Texas (Dkt. #16 at p. 10). This assertion does not comport with the established Fifth Circuit analysis, and it conflicts with Provitas' Complaint. *Nuovo Pignone*, 310 F.3d at 380 (finding that defendant, "[a]s a voluntary member of the economic chain that brought the [product] to Louisiana, purposely has availed itself of the privilege of conducting business in that state"). It is not enough for QIC to claim unawareness of the final destination of its product. Because it shipped its product via the stream of commerce to a Texas-based company, QIC was on notice that its product would arrive in Texas. Further, QIC took no steps to control the final destination of its product, so QIC was unaware that the product it shipped to Texas "would have any final destination other than Texas" (Dkt. #13 at p. 12).

 **\*6** Even if QIC's unawareness of the product's final destination were enough, the Court at this stage accepts as true the facts alleged in the well-pleaded complaint; Provitas alleges that a QIC representative previously admitted QIC's purposeful business activities were directed at Texas, and that QIC shipped soluble vitamin powders to Texas where QIC expected them to be consumed (Dkt. #1 ¶ 13). Thus, Provitas has plausibly alleged that QIC "reach[ed] out beyond [Minnesota] and create[d] continuing relationships and obligations with citizens of [Texas]." *Burger King*, 471 U.S. at 474. Consequently, QIC is "subject to regulation and sanctions in [Texas] for the consequences of [its] activities." *Id.*

### 2. Cause of Action Arising from Contacts

Due process requires, in addition to purposeful availment, that "the litigation results from alleged injuries that 'arise out of or relate to' " the activities associated with the availment. *Id.* at 472–73 (quoting *Helicopteros*, 466 U.S. at 414). Provitas contends that the causes of action it brings against QIC arise from QIC's contacts with Texas (Dkt. #1 ¶ 14). But QIC asserts the "suit-related conduct and the basis of [the] claims involve the mixing of vitamins at [QIC]'s facility in Minnesota" (Dkt. #16 at p. 10). The Court finds Provitas has plausibly alleged the sufficient nexus required for specific jurisdiction.

Specific jurisdiction is proper over a nonresident defendant only when a "sufficient nexus" exists "between the [defendant]'s contacts with the forum and the cause of action." *Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Helicopteros*, 466 U.S. at 414, n.8). Under this

prong, courts focus on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). That the defendant acts extensively in the forum is not sufficient to establish jurisdiction; rather, specific jurisdiction is only proper when the defendant's activities in the forum state are connected to the plaintiff's claims. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017).

The claims here so relate. QIC and Provitas have maintained ongoing business relationships by which QIC has sent numerous orders to the Provitas facility in Texas (Dkt. #1 ¶ 16). This cause of action arises out of and relates to an allegedly contaminated order of vitamin powders that QIC shipped to Provitas in Texas to satisfy Provitas' purchase order (Dkt. #1 ¶ 14). Therefore, the Court finds Provitas has alleged facts that plausibly create the sufficient nexus under this prong.

### 3. Fair and Reasonable

"Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Nuovo Pignone*, 310 F.3d at 380 (citing *Wien Air Alaska*, 195 F.3d at 215). The defendant must make a "compelling case," *Burger King*, 471 U.S. at 477, because "it is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." *McFadin*, 587 F.3d at 759–60 (quoting *Wien Air Alaska*, 195 F.3d at 215). As mentioned, *supra* p. 8, a court analyzes five factors in deciding whether exercise of personal jurisdiction over a nonresident defendant is fair and reasonable. However, these "considerations usually may be accommodated through means short of finding jurisdiction unconstitutional"—for example, "a defendant claiming substantial inconvenience may seek a change of venue." *Burger King*, 471 U.S. at 477.

The Court finds that the considerations under the fair and reasonable inquiry may be accommodated through a change of venue. Accordingly, the Court finds it has specific, personal jurisdiction over QIC. The Court addresses below why this case must be transferred.

### II. 12(b)(3) Improper Venue

 **\*7** Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action for "improper venue." FED.

R. CIV. P. 12(b)(3). Once a defendant raises improper venue by motion, "the burden of sustaining venue will be on [the] Plaintiff." *Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.*, No. 1:07-CV-699, 2008 WL 686156 at *5 (E.D. Tex. Mar. 6, 2008). "Plaintiff may carry this burden by establishing facts that, if taken to be true, establish proper venue." *Id.* (citations omitted). The court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685 at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)). In determining whether venue is proper, "the Court may look beyond the complaint to evidence submitted by the parties." *Ambraco*, 570 F.3d at 238. If venue is improper, the court must dismiss, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); FED. R. CIV. P. 12(b)(3).

When a party challenges venue, the court must determine whether the plaintiff brought the action in a district outlined in one of 28 U.S.C. § 1391(b)'s three categories: (1) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) a district within the "fallback option." *Atl. Marine Const. Co. v. U.S. Dist. Ct. W. Dist. of Tex.*, 571 U.S. 49, 56 (2013). This fallback option is triggered "if there is no district in which an action may otherwise be brought as provided in this section" and allows "any judicial district in which any defendant is subject to the court's personal jurisdiction" to be considered a proper venue. § 1391(b)(3).

If the plaintiff can establish the action falls into one of these categories, venue is proper in that district; if the plaintiff cannot, venue is improper in that district, and the Court must dismiss the case or transfer it pursuant to § 1406(a) or § 1404(a), respectively. *Id.* Importantly, the presence of a forum selection clause in the parties' agreement giving rise to the transaction is irrelevant for purposes of determining whether venue is proper under § 1391(b). *Id.* [2] As a result, "a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Id.*

QIC argues this Court should dismiss the case for improper venue because this case does not fall within any of the § 1391(b) categories. Specifically, it asserts QIC does not reside

in the Eastern District of Texas, the substantial part of the events giving rise to the claims arose in Minnesota, and Provitas has previously stated that all factors point to the District of Minnesota as the proper venue for this case (Dkt. #16, pp. 11–13). [3] Provitas responds that venue is proper under both (b)(1) and (b)(2). [4] It claims that, under § 1391(c), QIC is a resident of the Eastern District of Texas and that the substantial part of the events giving rise to its claims arose in this district (Dkt. #13 ¶¶ 38–42).

**\*8** The Court finds that the Eastern District of Texas is a proper venue under § 1391(b)(1). Under § 1391(c), a corporate defendant is deemed to reside in any judicial district in which the defendant is subject to personal jurisdiction. In a state with multiple districts such as Texas, the question is whether the defendant would be subject to personal jurisdiction in the district where the action was filed, assuming the district was a separate state. § 1391(d). As previously discussed, Provitas has made a prima facie showing that this Court may exercise personal jurisdiction over QIC based on its contacts with Texas. Specifically though, the requisite minimum contacts arise from QIC's business relationship with Provitas—a corporation with its principal place of business in the Eastern District of Texas. For this, the Court finds QIC would be subject to this Court's personal jurisdiction, assuming the Eastern District of Texas was a separate state. Accordingly, QIC "resides" in this district for venue purposes. Venue is proper.

Having determined Provitas made a prima facie case allowing this Court to exercise personal jurisdiction, and finding that venue is proper under § 1391(b)(1), the Court denies QIC's Motion to Dismiss (Dkt. #16). The Court now addresses QIC's alternative motion for transfer under 28 U.S.C. § 1404(a).

## III. Section 1404(a) Motion to Transfer

Section 1404 to Chapter 28 of the United States Code permits a district court to transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice ... to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). This section "is intended to place discretion in the district court to adjudicate motions for transfer according to 'an individualized, case-by-case consideration of convenience and fairness.' " *Stewart*, 487 U.S. at 29 (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The purpose of § 1404 "is to prevent the waste 'of time, energy and money' and 'to protect the litigants, witnesses and the public against unnecessary inconvenience

and expense.' " *Van Dusen*, 376 U.S. at 616 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 27 (1960)).

The threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties consent to a particular jurisdiction. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). In the typical § 1404(a) analysis, once that threshold inquiry is met, the district court weighs the relevant public and private factors and decides whether, on balance, a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice." *Id.* The private factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Id.* The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the interest in having localized issues decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.* A court also gives some weight to the plaintiff's choice of forum. *Atl. Marine*, 571 U.S. at 62, n.6.

However, "[t]he existence of a mandatory, enforceable [forum selection clause] dramatically alters this analysis." *Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 916 (W.D. Tex. 2016). This is primarily because "a forum-selection clause ... may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms." *Atl. Marine*, 571 U.S. at 66. In fact, it may "have been a critical factor in their agreement to do business together in the first place." *Id.* As such, "when parties have contracted in advance to litigate disputes in a particular forum," district courts should adjust their usual § 1404(a) analysis in three ways so as not to "not unnecessarily disrupt the parties' settled expectations." *Id.* at 66–67.

**\*9**  First, the plaintiff's choice of forum "merits no weight"; rather, the plaintiff has the burden of establishing that § 1404(a) transfer is unwarranted. *Id.* Second, the court will not consider the private-interest factors. Because the parties have contracted for a specific forum, they "waive the right to challenge the preselected forum as inconvenient." *Id.* at 64. Instead, the court considers only the public-interest factors. *Id.* "Because those factors will rarely defeat a transfer motion,

the practical result is that forum selection clauses should control except in unusual cases." *Id.* Cases in which the public-interest factors are sufficiently strong to outweigh a valid forum selection clause "will not be common." *Id. See also Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767 (5th Cir. 2016).

## A. Whether the District of Minnesota Would Have Been a Proper Venue

As mentioned, the threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *Volkswagen I*, 371 F.3d at 203. This requires the court to conduct a proper venue analysis under § 1391(b). Under § 1391(b)(1), venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" § 1391(b)(1).

QIC is the sole defendant in this matter. It maintains its principal place of business in Minnesota, where it is also incorporated (Dkt. #16 at p. 11). Provitas does not dispute this. Thus, QIC resides in the District of Minnesota, and, accordingly, that district would have been a proper venue for this matter. § 1391(b)(1).

## B. Waiver of the Forum Selection Clause

Prior to addressing the forum selection clause, the Court must determine whether QIC waived its rights under the clause or waived its opportunity to raise the argument. Provitas claims that QIC did not raise the forum selection clause argument until its reply brief, thereby waiving it as a matter of both substance and procedure (Dkt. #30). QIC asserts that it did not waive its right to invoke the forum selection clause and did not procedurally waive the argument because the clause was within the scope of Provitas' response brief (Dkt. #31). Alternatively, QIC argues that if it did procedurally waive the argument, the Court should still consider the argument because Provitas had the opportunity —and used that opportunity—to fully respond (Dkt #31). The Court will discuss both the substantive and procedural waiver arguments.

### 1. Waiver Legal Standard

In the context of forum selection clauses, the Fifth Circuit has noted "[t]here is a lack of authority determining whether

federal or state law principles control the standard for determining a party's waiver of rights under a forum selection clause." *Hampton v. Equity Tr. Co.*, 736 F. App'x 430, 434–35 (5th Cir. 2018) (quoting *Wellogix, Inc. v. SAP Am., Inc.*, 648 F. App'x. 398, 401 (5th Cir. 2016) (unpublished)). Similarly, the Fifth Circuit has not yet settled on a single approach for assessing whether a party has waived its rights under a forum selection clause. *Id.*

One approach is a traditional inquiry that asks whether a party "intentionally or voluntarily relinquished its rights under the clause," *Wellogix*, 648 F. App'x. at 401, which requires "(1) an existing right, benefit, or advantage; (2) actual or constructive knowledge of its existence; and (3) actual intent to relinquish that right." *SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Europe GmbH*, 839 F.3d 422, 426 (5th Cir. 2016) (quoting *GP Plastics Corp. v. Interboro Packaging Corp.*, 108 F. App'x. 832, 836 (5th Cir. 2004)). "Waiver can also occur if a party engages in 'conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.' " *Id.* (quoting *N. Am. Specialty Ins. Co. v. Debis Fin. Servs. Inc.*, 513 F.3d 466, 470 (5th Cir. 2007)).

 *10  The Fifth Circuit has also recognized "[a] second line of authority, articulating both federal and Texas law, [which] would apply essentially the test used by federal courts to assess waiver of arbitration clauses"—"a species of forum selection clause[s]." *Wellogix*, 648 F. App'x. at 401. "Under the second approach, 'the party to the forum selection clause waives its right if it (1) substantially invokes the judicial process in derogation of the forum selection clause and (2) thereby causes detriment or prejudice to the other party.' " *Hampton*, 736 F. App'x at 435 (quoting *SGIC Strategic*, 839 F.3d at 426); *accord In re ADM Inv'r Servs.*, 304 S.W.3d 371, 374 (Tex. 2010). "To invoke the judicial process, a 'party must, at the very least, engage in some overt act in court that evinces a desire to resolve the ... dispute through litigation.' " *In re Mirant Corp.*, 613 F.3d 584, 589 (5th Cir. 2010) (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999)). Notably, the Fifth Circuit does not consider "filing a mere 'perfunctory motion to dismiss' " a substantial invocation of the judicial process. *Id.* (quoting *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995)); *see also In re ADM*, 304 S.W.3d at 374 ("Simultaneously filing an answer and motion to transfer venue with a motion to dismiss falls short of substantially invoking the judicial process to [plaintiff's] detriment or prejudice.").

As a matter of procedure, "[g]enerally, neither this court nor the district courts of this circuit will 'review arguments raised for the first time in [a] reply brief.' " *RedHawk Holdings Corp. v. Schreiber Tr. of Schreiber Living Tr.*, 836 F. App'x 232, 235 (5th Cir. 2020) (quoting *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)); *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (district court following the "court's practice of declining to consider arguments raised for the first time in a reply brief"). "On occasion, however, a district court may consider arguments and evidence raised for the first time in a reply brief without abusing its discretion 'so long as it gives the non-movant an adequate opportunity to respond prior to a ruling.' " *RedHawk*, 836 F. App'x at 235 (quoting *Thompson v. Dall. City Attorney's Office*, 913 F.3d 464, 471 (5th Cir. 2019) (internal citations omitted)). To be sure, "[t]he court has discretion to consider issues in the reply brief in certain circumstances ... including when the new issue is raised in the nonmovant's brief and the movant responds to that issue in the reply." *Dean v. Cty.*, No. H-13-00073, 2013 WL 2452673, at *10 (S.D. Tex. June 5, 2013) (citing *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 905 F.2d 840, 854 (5th Cir. 1990)).

### 2. Waiver Analysis

Provitas argues that QIC waived its forum selection clause rights under both Fifth Circuit approaches. Specifically, QIC's conduct in filing a lengthy motion to dismiss with no mention of the forum selection clause was so inconsistent with the intent to enforce the right that QIC relinquished it (Dkt. #30). Additionally, Provitas contends that QIC "has engaged in extensive discovery[,] ... taken [ ] depositions," presented four different QIC employees for Provitas to depose, and "engaged in motion and stipulation practice relating to expert discovery and mediation" (Dkt. #30 at p. 5). Thus, "QIC's conduct has caused all parties, including Provitas, to spend significant time and money on this litigation" (Dkt. #30 at p. 5).

QIC asserts it "has not substantially invoked the judicial process, and Provitas is not prejudiced by QIC's delay, if any, of seeking to enforce the forum selection clause" (Dkt. #31 at p. 7). QIC further contends it has only engaged in the judicial process to the level required by the Court's scheduling order while it awaits disposition of its Motion to Dismiss.

The Court finds that QIC did not waive its right to enforce the forum selection clause under either approach articulated

**Provitas, LLC v. Quality Ingredients Corporation, Slip Copy (2021)**

by the Fifth Circuit. First, QIC has not "intentionally or voluntarily relinquished its rights under the clause." *Wellogix*, 648 F. App'x. at 401. At no point has QIC engaged in "conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *SGIC Strategic*, 839 F.3d at 426. As QIC correctly notes, just one month after Provitas filed its complaint "QIC filed a Motion to Dismiss arguing that the District of Minnesota was the proper venue ..., rather than filing a general denial" (Dkt. #31 at p. 8). Even though QIC did not mention the forum selection clause in the Motion to Dismiss, its arguments were consistent with enforcement of the clause. Moreover, QIC filed its reply seeking to enforce the forum selection clause just over two months after Provitas filed its complaint (Dkt. #31 at p. 8). Such conduct cannot reasonably be deemed inconsistent with the intent to enforce the right.

 **\*11**  Second, QIC has not "invoke[d] the judicial process." *Mirant*, 613 F.3d at 589. QIC has urged at every point in the litigation that the case be dismissed or transferred to the District of Minnesota. At no turn has QIC sought a decision on the merits of this case from this Court. In fact, it has filed "a mere 'perfunctory motion to dismiss' "—conduct that the Fifth Circuit has not considered a substantial invocation of the judicial process. *Id.* (quoting *Cigna*, 56 F.3d at 661). Consequently, QIC has not caused Provitas to suffer detriment or prejudice through the judicial process. Any detriment or prejudice Provitas suffers now is the result of its own invocation of the judicial process.

Provitas also argues that QIC procedurally waived the forum selection clause argument. Provitas correctly contends that QIC "makes no mention of the forum selection clause" until its reply brief (Dkt. #30 at p. 5). Thus, Provitas asserts that both the Fifth Circuit's practice and this Court's Local Rules preclude this Court's consideration of the forum selection clause argument (Dkt. #30). QIC claims it did not raise an entirely new argument in its reply brief because Provitas attached the Agreement as an exhibit to its Response to the Motion to Dismiss (Dkt. #13). For this, QIC claims its forum selection clause argument was within the scope of the response. QIC also argues that, even if the forum selection clause was an entirely new argument, Provitas had the opportunity to respond, so this Court should still consider it (Dkt. #31).

As mentioned, "[t]he court generally does not hear arguments asserted for the first time in a movant's reply brief, in order to avoid unfair surprise to the nonmovant." *Dean*, 2013 WL

2452673. But when "the movant responds to that issue in the reply," the court has discretion to consider the argument. *Id.* (citing *Ramirez*, 557 F.3d at 203). The Court chooses to exercise that discretion here. Provitas had the "meaningful opportunity to respond" to QIC's forum selection clause argument, and, as discussed below, the Court accounted for those arguments in its analysis of the clause. *Jackson v. Dall. Cnty. Juvenile Prob. Dep't*, No. 3:06-CV-264-M, 2007 WL 2187250, at \*4 (N.D. Tex. July 30, 2007).

Further, QIC insists that to the extent its Motion to Dismiss is not granted, QIC "intends to file a Motion to Dismiss based solely on the forum selection clause and choice of law provision" (Dkt. #31 at p. 7). Thus, although Provitas "urge[s] the Court to strike the arguments in the Reply brief, the more expedient course is" for the Court to exercise its discretion to consider the argument at this stage. *White v. City of Red Oak, Tex.*, No. 3:13-CV-4477-P, 2014 WL 11460871, at \*1 (N.D. Tex. July 31, 2014). "This will hopefully expedite consideration of the pending motions by avoiding another full round of briefing on an inevitable future motion to [dismiss]." *Id.*

Accordingly, the Court will consider the mandatory nature, applicability, and enforceability of the forum selection clause.

### C. Mandatory Nature, Applicability, and Enforceability of the Forum Selection Clause

Before the Court may weigh the public interest factors in the forum selection clause § 1404(a) analysis, the Court must determine that the forum selection clause at issue is both mandatory and enforceable. *Sabal Ltd. LP*, 209 F. Supp. 3d at 916. While federal law governs the enforceability of a forum selection clause, *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997), "the question of enforceability is analytically distinct from the issue of interpretation: [o]nly after the court has interpreted the contract to determine whether it is mandatory or permissive does its enforceability come into play." *Weber*, 811 F.3d at 770.

 **\*12**  The Court finds that, under the applicable law, the forum selection clause contained in the parties' Agreement is both mandatory and enforceable. The Court discusses each point in turn.

Provitas, LLC v. Quality Ingredients Corporation, Slip Copy (2021)

### 1. Whether the Forum Selection Clause in the Agreement is Mandatory or Permissive

The Court must determine whether the forum selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *accord Caldas & Sons*, 17 F.3d at 127. "For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974)); *see also Weber*, 811 F.3d at 768 (holding that a forum selection clause is mandatory only if it contains clear language specifying that litigation must occur in the specified forum. "[L]anguage merely indicating that the courts of a particular place shall have jurisdiction (or similar) is insufficient to make a[ ] [forum selection clause] mandatory.").

Although enforceability of a forum selection clause is analyzed under federal law, where there exist both valid forum selection and choice of law clauses, the substantive law identified in the choice of law clause governs interpretation of the forum selection clause. *See Atl. Marine*, 571 U.S. at 62 (observing that lower court "erred in failing to make the adjustments required" because "the transfer motion [was] premised on a forum-selection clause"); *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("[C]ourts must apply the law contractually chosen by the parties to interpret the [forum selection] clause."). However, a court sitting in diversity applies the forum's choice of law rules to determine what substantive law should guide the court's interpretation of the forum selection clause. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97 (1941). [5] To be sure, "the presence or absence of a specific choice-of-law clause does not alter the core obligation of a federal court, sitting in diversity, to ascertain which body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction." *Weber*, 811 F.3d at 770–71. This action was brought in a Texas federal court, so under *Klaxon*, Texas choice of law rules apply. "Texas law gives effect to choice of law clauses regarding construction of a contract." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) (citing *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002)).

**\*13** The parties negotiated a choice of law clause in their Agreement. It states that "the relationship of the parties hereunder shall be governed by the laws of the State of Minnesota" (Dkt. #13 Ex. A-1 ¶ 12). Because Texas choice of law rules give effect to choice of law clauses, such as the clause included in this Agreement, the Court will apply Minnesota substantive law to interpret the contract.

Under Minnesota law, "the primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When a contract is unambiguous, the "language must be given its plain and ordinary meaning." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted). A contract is ambiguous only when its terms are "susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). "The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (internal citations omitted).

Minnesota law provides further guidance to courts interpreting contracts. Specifically, "courts should 'construe a contract as a whole' " and " 'attempt to avoid an interpretation of the contract that would render a provision meaningless.' " *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754–55 (8th Cir. 2018) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990)). Additionally, "[w]here there is an apparent conflict between two clauses or provisions of a contract, it is the court's duty to find harmony between them and to reconcile them if possible." *Id.* at 755 (quoting *Nat'l City Bank v. Engler*, 777 N.W.2d 762, 765 (Minn. Ct. App. 2010)).

The forum selection clause in the Agreement between QIC and Provitas reads:

> any claim, cause of action, suit or demand allegedly arising out of or related to this Agreement, or the relationship of the parties, shall be brought exclusively in Minnesota

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

10

District Court or United States Federal District Court located in Minneapolis, Minnesota U.S.A., and the parties irrevocably consent to the exclusive jurisdiction and venue of such courts and waive any objections they may have at any time to such exclusive jurisdiction and venue.

(Dkt. #13 Ex. A-1 ¶ 12).[6] QIC argues that the forum selection clause is "undoubtedly mandatory" given the words "shall" and "exclusively" (Dkt. #14 at pp. 7–8). Further, QIC asserts Provitas cannot circumvent such language because the clause also provides for the parties' "irrevocabl[e] consent" (Dkt. #14 at pp. 7–8). Provitas does not, and cannot, argue that the language in the forum selection clause is anything but mandatory. Instead, Provitas contends the clause is an "unambiguously inapplicable" "red herring" in this particular lawsuit (Dkt. #17 ¶¶ 6, 14). The Court will address applicability of the forum selection clause below, in accordance with the enforceability framework.

*14  But, because the exclusive language in this provision is unambiguous, the Court finds that, if the forum selection clause is applicable and legally enforceable, the forum selection clause is also mandatory in this suit.

### 2. Applicability of the Forum Selection Clause

When the forum selection clause is mandatory, the court must also determine whether the causes of action at issue arise under the forum selection clause.[7] *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998)). To make this determination, the court interprets the forum selection clause to evaluate its applicability to the instant dispute. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 304 (5th Cir. 2016). Again, because this Agreement contains a choice of law provision, the Court will apply Minnesota substantive law to interpret the contract. As previously stated, regarding the interpretation of contracts, Minnesota law prioritizes the plain meaning of the text, the parties' intentions, and the context of the contract in its entirety.

Provitas contends that the Agreement containing the forum selection clause applies only to issues of confidentiality between the parties, and points to the title of the Agreement itself—that is, the "Mutual Confidentiality Agreement" (Dkt. #17 ¶¶ 2–6). It also highlights portions of the recitals that indicate the parties would enter subsequent agreements termed the "Transactions" (Dkt. #17 ¶¶ 2–4). For this, Provitas argues that the current suit does not arise out of or relate to issues of confidentiality, and therefore, QIC's entire argument rests "on the idea that the present dispute is based on the 'relationship of the parties' " (Dkt. #17 ¶¶ 2–4); (Dkt. #13 Ex. A-1 ¶ 12). Additionally, Provitas asserts that this dispute is not connected to the relationship of the parties because the Agreement describes the relationship as one between "Disclosing Party" and "Recipient" of confidential information, which is not at issue in this case (Dkt. #17 ¶ 4). Consequently, Provitas claims the forum selection clause is inapplicable (Dkt. #17 ¶ 4).

QIC argues that this dispute does involve the relationship of the parties (Dkt. #14 at p. 9). It cites to a Minnesota Court of Appeals decision regarding a contract with a forum selection clause covering that "Agreement and any claim related directly or indirectly to th[at] Agreement." *Gander Mountain Co. v. Lazard Middle Mkt., LLC*, No. A11-221, 2012 WL 118236 at *3 (Minn. Ct. App. Jan. 17, 2012). The court found that the claims were "at least indirectly related to ... the relationship between the parties created by the contract." *Id.* Further, QIC contends that "[t]he intent of the parties in the Agreement" was to litigate exclusively in the District of Minnesota "any suit relating to the relationship of Provitas and QIC" (Dkt. #14 at p. 9).

*15  The Court finds that the language in the forum selection clause is unambiguous. The current suit arises out of and relates to the relationship between the parties. The business relationship between Provitas and QIC would not exist without the initial Agreement, which by its text subjects Provitas and QIC to all of the terms within the Agreement should they "enter into any [subsequent] Transactions" (Dkt. #13 Ex. A-1 ¶ C). The relationship between the parties, therefore, is not limited to issues of confidentiality. To be sure, Provitas' reading of the clause "relationship between the parties" would render that clause superfluous. If the "relationship" was limited to the parties as "Disclosing Party" and "Recipient," the first portion of the forum selection clause would be of sufficient scope because the "claim, cause of action, suit or demand" would "allegedly aris[e] out of or relat[e] to" the Agreement (Dkt. #13 Ex. A-1 ¶ 12). As

mentioned, Minnesota law directs that courts "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Qwinstar*, 882 F.3d at 754–55 (quoting *Chergosky*, 463 N.W.2d at 525 (internal quotations omitted)).

In addition to the forum selection clause itself, there are other textual phrases that support application of the forum selection clause in this matter. First, the text of the forum selection clause is broad. It indicates that "*any* claim, cause of action, suit or demand allegedly *arising out of* or *related to* this Agreement, or the *relationship of the parties*, shall be brought exclusively in Minnesota District Court" (Dkt. #13 Ex. A-1 ¶ 12) (emphasis added). Second, the recitals contain a provision demanding that "[e]ach party's willingness to ... enter into any Transaction is conditional upon and subject to the terms of this Agreement" (Dkt. #13 Ex. A-1 ¶ C). Third, the recitals do not limit the relationship between Provitas and QIC as strictly as Provitas contends. The Agreement states that Provitas "has indicated an interest in exploring a *relationship* with QIC and potentially entering into ... 'Transactions' " (Dkt. #13 Ex. A-1 ¶ A) (emphasis added). The relationship, therefore, would be further defined in the subsequent Transactions, which, as noted above, are "conditional upon and subject to the terms" of the Agreement containing the forum selection clause (Dkt. #13 Ex. A-1 ¶¶ A, C, 12).

Though few cases exist in which Minnesota courts have interpreted contracts concerning the language at issue here, some cases are instructive, and their reasoning supports application of the forum selection clause in this case. As QIC argued, the court in *Gander Mountain Co.* concluded that a forum selection clause was "of sufficient breadth to cover claims associated with the relationship of the parties created under" multiple agreements. 2012 WL 118236 at *3.

The court in *Knutson v. Rexair, Inc.* interpreted a forum selection clause in a distributor agreement that covered "[a]ny cause of action, claim, suit or demand by [Plaintiff], allegedly arising from or related to the terms of this agreement or the relationship of the parties." 749 F. Supp. 214, 215 (D. Minn. 1990). Though the plaintiff argued that his claim did "not arise out of the 'relationship of the parties' as that term [was] defined in the distributor agreement [8]," the court found that "[p]lainly, the provision [was] not definitional and was not intended to be applied in construing the forum selection clause." *Id.* at 216–17. The court also reasoned that, even though the claim at issue did not pertain directly to the relationship expressly discussed in the distributor

agreement, "the distributor agreement at issue incorporate[d] the terms of" subsequent agreements. *Id.* at 217. [9] Further, "the plaintiff's claim ar[ose] directly from the parties' business relationship. This relationship [was] evidenced by the distributor agreement, and the forum selection clause [was] drafted in sufficiently broad terms to apply to plaintiff's claim." *Id.*

**\*16** The forum selection clause here features language that is similarly broad and a relationship also established by an initial Agreement and built upon in subsequent agreements. The forum selection clause covers "any claim" that even "allegedly arises out of or relates to the Agreement" (Dkt. #13 Ex. A-1 ¶ 12). The drafters then extended the coverage further, using the disjunctive "or" rather than the conjunctive "and" (Dkt. #13 Ex. A-1 ¶ 12). Specifically, the forum selection clause would also apply to "any claim" that "allegedly relates to ... the relationship of the parties" (Dkt. #13 Ex. A-1 ¶ 12). This language, combined with the language in the recitals rendering any subsequent Transaction "conditional upon and subject to the terms of" the initial Agreement, illustrates an intent for the forum selection clause to cover actions that involve the business relationship between QIC and Provitas. The claims here involve such a relationship.

Comparatively, the court in *Express Diagnostics, Inc. v. Phamatech, Inc.* found a forum selection clause did not apply. No. A13-2156, 2014 WL 4056031 at *1 (Minn. Ct. App. Aug. 18, 2014). In its interpretative analysis, the court specifically reasoned the clause did not apply because "[n]either agreement referred to the other" nor included "a merger clause or stated that it represented the entire relationship between the parties." *Id.* Here, the parties did reference subsequent agreements in the initial Agreement and, notably, rendered those subsequent agreements "conditional upon and subject to the terms" of the initial Agreement" (Dkt. #13 Ex. A-1 ¶ C).

Given the text of the Agreement, the apparent intent of the parties, and the instructive Minnesota case law, the Court interprets the Agreement's forum selection clause to apply in this dispute.

### 3. Enforceability of the Agreement's Forum Selection Clause

Lasty, the court must decide whether the forum selection clause is enforceable. "We begin with federal law, not

state law, to determine the enforceability of a forum-selection clause. Under federal law, forum-selection clauses are presumed enforceable, and the party resisting enforcement bears a 'heavy burden of proof.' " *Ginter*, 536 F.3d at 441 (quoting *Haynsworth*, 121 F.3d at 961. "[F]ederal law applies ... in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007)) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974)); see also *Stewart*, 487 U.S. at 32 ("Federal law also governs district courts' decisions "whether to give effect to the parties' forum-selection clause."). Under federal law, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).

Here, QIC asserts "there is nothing to suggest [it] used fraud or overreaching to secure the forum selection clause between two business-savvy parties" (Dkt. #14 at p. 8). Again, Provitas does not dispute this point. The Court, therefore, finds no reason the forum selection clause should be deemed unreasonable. Accordingly, the forum selection clause is enforceable.

### D. Section 1404 Factors

Having found the forum selection clause in the Agreement is mandatory, applicable, and enforceable, the Court now turns to weigh the public interest factors in the altered forum selection clause § 1404(a) analysis. As discussed, "when parties have contracted in advance to litigate disputes in a particular forum," district courts should adjust their usual § 1404(a) analysis in three ways so as not to "not unnecessarily disrupt the parties' settled expectations." *Atl. Marine*, 571 U.S. at 66–67.

First, the plaintiff's choice of forum "merits no weight"; rather, the plaintiff has the burden of establishing that § 1404(a) transfer is unwarranted. *Id.* at 66–67. Second, the court will not consider the private-interest factors. Because the parties have contracted for a specific forum, they "waive the right to challenge the preselected forum as inconvenient." *Id.* at 64. Instead, the court considers only the public-interest factors. *Id.* The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the interest in having localized issues decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.* Importantly, because these "factors will rarely defeat a transfer motion, the practical

result is that forum selection clauses should control except in unusual cases." *Id.*

**\*17** Provitas has not established that a § 1404 transfer is unwarranted nor that this is an unusual case in which the public factors defeat the motion to transfer. Rather, the Court finds that the facts of this case favor adjudication in Minnesota.

### 1. Provitas' Burden to Establish that Transfer is Unwarranted

Provitas does not show that transfer of this case to Minnesota is unwarranted. In fact, it showed just the opposite in its cases before the Districts of New Jersey and Minnesota involving this exact dispute and the same three parties—Provitas, QIC, and DSM (Dkt. #8 Ex. 9 at pp. 22–33); (Dkt. #8 Ex. 2 ¶ 8). [10] DSM sued Provitas in the District of New Jersey. In its Motion to Dismiss, Provitas asserted that the " 'substantial part of the events' giving rise to [the] claims arose in Minnesota where the product was manufactured, packaged, and labeled" (Dkt. #8 Ex. 9 at p. 27). It further argued that the "vast majority of the evidence, including the QIC witnesses who manufactured, packaged, labeled, and shipped the subject product are located in Minnesota" (Dkt. #8 Ex. 9 at p. 27). For these reasons, Provitas argued "the action should be venued in the Federal District Court for the District of Minnesota" (Dkt. #8 Ex. 9 at p. 27). Additionally, in the case before the District of Minnesota, Provitas declared the District of Minnesota as the "judicial district [ ] where the substantial part of the events or omissions giving rise to the claim occurred, specifically the acts and omissions of QIC in its production and packaging of the subject product in its facility located in the State of Minnesota" (Dkt. #8 Ex. 2 ¶ 8).

The Court recognizes the case in the District of New Jersey is not identical to that before the Court here. In the New Jersey case, DSM was situated as the plaintiff and Provitas the defendant, and DSM arguably had less connection to the Eastern District of Texas than QIC maintains there (Dkt. #17 ¶ 13). But the relative position of the parties does not change the fact that a "substantial part of the events giving rise to the claims" in this case "arose in Minnesota" and that "the vast majority of the evidence" remains there (Dkt. #8 Ex. 9 at p. 27). As Provitas stated, "the [subject] product was manufactured, packaged, and labeled" in Minnesota where "the QIC witnesses who manufactured, packaged, labeled,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

and shipped the subject product are" also located (Dkt. #8 Ex. 9 at p. 27).

In this case, each of those statements remains true. The product at issue "was manufactured, packaged, and labeled" in Minnesota where "the QIC witnesses who manufactured, packaged, labeled, and shipped the subject product are" also located (Dkt. #8 Ex. 9 at p. 27). That some witnesses for Provitas live in Texas does not change the fact that a "substantial part of the events giving rise to the claims" in this case "arose in Minnesota" or that "the vast majority of the evidence" remains there (Dkt. #8 Ex. 9 at p. 27). Accordingly, Provitas has not met its burden of showing that transfer of this case to Minnesota is unwarranted.

### 2. The Public Factors

Likewise, the public factors do not weigh in favor of or against transfer to the District of Minnesota—they are neutral. First, the administrative difficulties flowing from court congestion are neutral. In considering this factor, the speed with which a case can come to trial and be resolved may be relevant. *See In re Volkswagen of Am., Inc.,* 545 F.3d 304, 316 (5th Cir. 2008); *Gates Learjet Corp. v. Jenson,* 743 F.2d 1325, 1337 (9th Cir. 1984). In 2020, the District of Minnesota had 2,993 cased filed and seven active district judges. https://www.uscourts.gov/statistics-reports/us-district-courts-judicial-business-2020. The Eastern District of Texas had 4,249 cases filed and eight active district judges. *Id.* Though federal courts across the country face congested dockets, the Eastern District of Texas maintains a heavier case load than the District of Minnesota. Conversely, the most recent statistics obtained by the Court for the twelve-month period ending on September 30, 2020 indicate that the median time from filing to disposition in civil cases was 8.9 months in the Eastern District of Texas and 14.3 months in the District of Minnesota. https://www.uscourts.gov/statistics-reports/judicial-business-2020-tables. Notably, in that same time frame, the Eastern District of Texas completed 22 trials, whereas the District of Minnesota completed just six. *Id.* Thus, this factor is neutral, as the congestion in the Eastern District of Texas is greater than that of the District of Minnesota, but the time frame for disposition in the Eastern District of Texas appears to be shorter.

**\*18** Next, the Court finds that the interest in having localized issues decided at home is a neutral factor. Provitas argues that QIC must be "held accountable for its failures to abide

by proper manufacturing standards for a food product it shipped to Texas, for a Texas-business to then sell to its customers" (Dkt. #13 ¶ 53). Accordingly, Provitas claims the "lawsuit is for the benefit of a Texas business and its customers" (Dkt. #13 ¶ 53). However, an argument with equal cogency can be made for dispute-resolution in Minnesota. QIC is a Minnesota based company that allegedly created a product that should have been vegan but was actually contaminated with animal products (Dkt. #1). The alleged contamination occurred at its facility in Minnesota (Dkt. #1). Minnesota businesses and QIC customers in Minnesota have an interest in holding accountable their home-based companies. Thus, this factor is neutral.

The latter two factors are also neutral. While the Court today does not engage in a choice of law analysis to determine whether Texas or Minnesota law will govern the merits of this case, the Court finds that in either circumstance, the District of Minnesota, as a federal court, is well-suited to deal in either area of law. Just as this Court applied Minnesota substantive law to interpret the Agreement, the District of Minnesota can apply Texas law, should it determine Texas law will govern the matter. The Court also recognizes that the District of Minnesota has already adjudicated a similar matter involving Provitas, QIC, and DSM (Dkt. #8 Ex. 2), so it would certainly be capable of adjudicating this dispute.

Consequently, the public factors cut neither for nor against transfer of this case to the District of Minnesota. As discussed, only in unusual cases will the public factors defeat the motion to transfer when there is a valid, enforceable forum selection clause. Because a valid forum selection clause exists and the public factors are largely neutral here, this is not one of those unusual cases.

### CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss (Dkt. #16) is **DENIED** and Defendant's Motion to Transfer to the District of Minnesota (Dkt. #16) is hereby **GRANTED.**

It is therefore **ORDERED** that this case is transferred to the United States District Court for the District of Minnesota.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5907790

## Footnotes

1   The original Motion to Dismiss (Dkt. #8) is identical to the Amended Motion to Dismiss (Dkt. #16) sans four missing pages at the end of the motion. The Amended Motion to Dismiss includes the full 18 pages that Defendant intended to include at the outset (Dkt. #16 at p. 1).

2   *See also, e.g.*, *Atl. Marine*, 571 U.S. at 59 (indicating the proper way to enforce a mandatory forum selection clause that points to another federal judicial district is by a motion to transfer under 28 U.S.C. 1404(a), not by a motion to dismiss under 28 USC 1406(a) or FRCP 12(b)(3)); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring) (holding § 1404(a) mandates that valid forum selection clauses be given "controlling weight in all but the most exceptional cases").

3   The Court discusses this *infra* p. 7.

4   Though Provitas did not allege the (b)(1) argument in its complaint, the Court may look beyond the complaint for venue purposes. *Ambraco*, 570 F.3d at 238.

5   In *Weber*, the Fifth Circuit indicated that neither it, nor the "sister circuits appear to have hewn closely to this principle in interpreting forum selection clauses. The courts have interpreted forum selection clauses according to general common-law contract principles without addressing the precise source of that law." 811 F.3d 758 at 770. It reasoned "[t]he use of this general-law approach may be because, in this circuit and others, the enforceability of a [forum selection clause] is governed by federal law." *Id.*

6   The forum selection clause carved out an exception for equitable relief: "Notwithstanding the foregoing, in the event of any breach or threatened breach of this Agreement injunctive or equitable relief may be sought from any court having equity jurisdiction" (Dkt. #13 Ex. A-1 ¶ 12). Because Provitas does not seek equitable relief, this clause is not at issue.

7   In the typical analysis, courts consider applicability after enforceability. *See Ginter*, 536 F.3d at 441–45. Here, however, Minnesota law applies to determine whether the forum selection clause is mandatory and whether it is applicable, whereas federal law applies to determine its enforceability. The Court, therefore, adjusted the organization of its analysis for clarity as to which law applies.

8   The initial agreement provided that:

The relationship between Rexair and Distributor during the term of this agreement will be that of vendor and vendee. Distributor is not the agent or representative of Rexair for any purpose whatsoever and is not granted under this agreement or otherwise any express or implied authority to assume or create any obligation or responsibility on behalf of or in the name of Rexair or to bind Rexair in any manner or thing whatsoever.

*Id.* at 217.

9   The court in *Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.* also found claims were governed by a forum selection clause that was included in an initial agreement but not in a subsequent agreement. 646 N.W.2d 904, 908 (Minn. Ct. App. 2002). In that case, the language of the forum-selection clause covered "any dispute

or controversy between the parties [that] arises out of or is related to this Authorization, and/or performance or termination thereof." *Id.* The appellant argued that its claims arose out of a subsequent agreement, rather than the "Authorization." The court disagreed, reasoning:

> The Authorization created and defined the parties' entire business relationship by authorizing appellant to resell [appellee's] products.... In particular, appellant's claims are based on a right to resell [appellee's] products exclusively to certain customers—a right bargained for in the [subsequent agreement]. But this exclusive right could not exist without the basic right to resell [appellee's] products as granted in the Authorization. Because appellant's claims based on the Account Agreement amount to a dispute based on appellant's right to resell [appellee's] products, appellant's claims arise out of and relate to the Authorization and are thus governed by the forum-selection clause.

> *Id.*

10    The Court may consider these documents because it is not limited to the complaint for venue purposes. *Ambraco*, 570 F.3d at 238.

---

**End of Document**                                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4480329
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Jason PUTNAM, Plaintiff,
v.
PERFICIENT, INC., Defendant,

CIVIL NO. 4:21-CV-00739-SDJ-CAN
|
Signed July 20, 2022

**Attorneys and Law Firms**

Amy Elizabeth Gibson, David L. Wiley, Gibson Wiley PLLC, Dallas, TX, for Plaintiff.

Kevin Robinowitz, Stinson LLP, Dallas, TX, for Defendant.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendant Perficient, Inc.'s Motion to Transfer Venue [Dkt. 6]. Defendant asks to transfer this matter to the Eastern District of Missouri pursuant to a forum selection clause in Plaintiff's "Confidentiality, Restrictive Covenant and Inventions Agreement." Plaintiff opposes the request, contending: (1) Plaintiff's disability discrimination claims are outside of the scope of the forum selection clause; and (2) the ADA's special venue provision makes the forum selection clause unenforceable [Dkt. 8 at 13, 16]. Plaintiff also advances both the private and public interest factors weigh against transfer. After reviewing the Motion to Transfer [Dkt. 6], Plaintiff's Response [Dkt. 8], Defendant's Reply [Dkt. 9], Plaintiff's Sur-Reply [Dkt. 11], and all other relevant filings, the Court recommends Defendant's Motion to Transfer be **DENIED** as set forth herein.

## BACKGROUND

On August 27, 2021, Plaintiff Jason Putnam ("Plaintiff") filed suit in the 199th Judicial District Court, Collin County, Texas against his former employer Defendant Perficient, Inc. ("Defendant") alleging disability discrimination [Dkts.

1-1; 3]. After removal to this District (and after the filing of Defendant's Motion to Transfer), on October 28, 2021, Plaintiff filed his First Amended Complaint asserting claims under both federal and state law, specifically "under the Texas Commission on Human Rights Act ("TCHRA") [Texas Labor Code Chapter 21] and the Americans with Disabilities Act ("ADA") [42 U.S.C. 12101 et. seq.]" [Dkt. 7 at 1].

Defendant is a digital and information-technology consulting firm incorporated in Delaware and based in Missouri, with offices in Texas [Dkts. 1-3 at 1; 6 at 1]. Plaintiff, a Texas resident, was hired by Defendant in November 2018 as a Strategic Account Manager [*See* Dkt. 6-1 at 6]. Plaintiff worked remotely while occasionally reporting to a Perficient Office, specifically, Defendant's headquarters for its North Texas operations at 5340 Legacy Drive, Ste. 125 Plano, Collin County, Texas (the "Plano Office"), which is located in the Eastern District of Texas [Dkts. 6 at 1; 7 at 3, 7]. Plaintiff's live complaint pleads that, on or about January 25, 2019, Plaintiff suffered from a seizure while giving a presentation to the sales team [Dkt. 7 at 8]. Plaintiff alleges that after this incident, Defendant's employees began treating him differently [Dkt. 7 at 10]. Plaintiff alleges Defendant obtained medical information from his neurologist, including his seizure disorder diagnosis, which Plaintiff alleges constitutes a disability, and the medical precautions he was directed to take—including no driving [Dkt. 7 at 8]. Notwithstanding the precautions dictated by his neurologist, after the incident, Plaintiff's travel was increased as he was required to come into the Plano Office more often, and Defendant's employees were directed not to reach out, assist, or communicate with Plaintiff [Dkt. 7 at 10]. These actions caused Plaintiff significant stress and worsened his medical condition [Dkt. 7 at 11]. Due to a medication intolerance and increasing seizures, Plaintiff was approved for medical leave [Dkt. 7 at 11]. While on leave, a human resources representative informed Plaintiff his employment would likely be terminated upon his return to work due to poor job performance and because he had not been employed long enough to trigger leave under FMLA [Dkt. 7 at 11-12]. Plaintiff pleads Defendant should have known leave may be a reasonable accommodation for a disability [Dkt. 7 at 15]. Plaintiff's employment with Defendant was ultimately terminated upon his return to work [Dkt. at 12].

**\*2** Relevant to the instant Motion, Plaintiff pleads venue is proper in the Eastern District of Texas under both the ADA and general venue statute because Defendant hired Plaintiff in Texas, employed Plaintiff in Texas, fired Plaintiff

Putnam v. Perficient, Inc., Slip Copy (2022)

in Texas, and committed unlawful employment practices in Texas, and because Defendant has offices in Texas, employs persons in Texas, and services clients in Texas [Dkt. 7 at 4-5]. Defendant urges to the contrary that upon being hired Plaintiff signed a "Confidentiality, Restrictive Covenant and Inventions Agreement" ("Agreement") containing a valid forum selection clause ("FSC"), which covers Plaintiff's claims and mandates a transfer of venue; the Agreement states, in pertinent part:

### Employment and Duties

1. The employment relationship between the Company and Employee is at-will, i.e., it is not of a definite term and will continue only so long as both Employee and the Company wish for it to continue.

2. Employee owes a duty of loyalty, confidentiality and allegiance to act at all times In the best interests of the Company. Employee agrees not to do any act which would Injure the Company's business, Interests, or reputation.

....

### General Provisions

22. Employee agrees that no modification to this Agreement is valid unless it is in writing and signed by an authorized representative of the Company.

23. The Employee acknowledges and agrees that this Agreement is made, formed and accepted in the State of Missouri and the interpretation, validity and effect of this Agreement shall be governed by the laws of the State of Missouri without regard to its conflicts of laws principles, or any rule or decision that would apply the substantive laws of another jurisdiction.

24. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT SHALL BE INSTITUTED AND LITIGATED EXCLUSIVELY IN THE COURTS OF THE STATE OF MISSOURI LOCATED IN THE COUNTY OF ST. LOUIS (OR, IF THERE IS JURISDICTION, THEN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE EASTERN DISTRICT OF MISSOURI), AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. ALL PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE THAT VENUE

IN SUCH COURTS IS PROPER AND WAIVE ANY CLAIM THAT VENUE IN SUCH COURTS IS NOT PROPER, THAT IT IS AN INCONVENIENT FORUM, OR THAT THE CASE SHOULD BE TRANSFERRED TO ANOTHER FORUM.

[Dkt. 6-1 at 2, 5-6].

### MOTION TO TRANSFER

*Applicable Legal Standard*

28 U.S.C. § 1404(a) governs the Court's decision whether to give effect to the FSC. Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Ordinarily, deciding a § 1404(a) motion to transfer venue, requires a two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice a transfer is appropriate. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). But when the parties have agreed to a valid forum-selection clause this analysis changes, and a district court should ordinarily transfer the case to the forum specified in that clause." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). Indeed, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Id.* at 63 (internal quotations marks and citations omitted). The Supreme Court has made clear that its "analysis presuppose[d] a contractually valid forum-selection clause." *Id.* at 62 n.5. Thus, before applying this modified analysis, a court must determine whether a valid and enforceable forum selection clause applies to the parties' dispute; stated differently, the inquiry into a clause's validity and scope thus precedes the question of transfer pursuant to that clause. *See, e.g., Indus. Print Techs. LLC v. Canon U.S.A., Inc.*, No. 2:14-CV-00019, 2014 WL 7240050, at *1-2 (E.D. Tex. Dec. 19, 2014) ("[T]he *Atlantic Marine* analysis ... presupposes a valid contract and a dispute that unquestionably falls within the scope of that contract."). [1]

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

### Choice of Law

**\*3** Defendant does not substantively brief the choice of law issues in this case. Federal law governs the enforceability of a forum selection clause, *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997); however, the question of enforceability is distinct from the issue of interpretation. Plaintiff advances the Parties have agreed Missouri law applies to determine scope. While Defendant initially urged Texas and Fifth Circuit authority in its Motion to Transfer Venue, in its Reply, Defendant seemingly concedes Missouri law governs the Court's scope analysis. "[T]o interpret the meaning and scope of a forum selection clause, a court must use the forum's choice of law rules to determine what substantive law governs." *See Weber*, 811 F.3d at 770-71; *Barnett v. DynCorp Int'l, LLC*, 831 F.3d 296, 304 (5th Cir. 216); *Patrick Henry Med., LLC v. Prochant, Inc.*, No. 4:21-cv-00430, 2021 WL 5578680, at \*3 (E.D. Tex. Nov. 29, 2021) ("[A] court sitting in diversity applies the forum's choice of law rules to determine what substantive law should guide the court's interpretation of the forum selection clause."). Texas choice of law rules, therefore, apply. The Agreement contains a choice-of-law provision, stating: "this Agreement shall be governed by the laws of the State of Missouri" [Dkt. 6-1 at 5]. Because Texas choice of law rules give effect to choice of law clauses, this Court will apply Missouri substantive law to ascertain the applicability of the forum selection clause. *Patrick Henry Med.*, 2021 WL 5578680, at \*3 (citing *Benchmark Elec., Inc., v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003)) ("Texas law gives effect to choice of law clauses regarding construction of a contract."); *see also, FCX Solar, LLC v. FTC Solar, Inc.*, No. 6:21-cv-548-ADA, 2021 WL 4953912, at \*3 (W.D. Tex. Oct. 25, 2021); *Blacklands R.R. v. Northeast Tex. Rural Rail Transp. Dist.*, No. 1:19-cv-250, 2019 WL 3613071, at \*4 (E.D. Tex. Aug. 5, 2019).

### Enforceability of the FSC and the ADA Special Venue Statute

Plaintiff, acknowledging a split in authority and no known Fifth Circuit precedent, briefly argues that the ADA's special venue provision makes the FSC unenforceable [Dkt. 8 at 16]. In Plaintiff's view, "public policy is thwarted" if civil rights plaintiffs can be required to litigate far from home as a condition of employment [Dkt. 8 at 17-18]. The ADA incorporates Title VII of the Civil Rights Act's special venue provision, which grants a plaintiff a range of possible venues in which to bring discrimination claims. 42 U.S.C. §§ 2000e–

5(f)(3), 12117(a); *see Bolar v. Frank*, 938 F.2d 377, 378-79 (2d Cir. 1991) (per curiam) (42 U.S.C. § 2000e–5(f)(3) governs venue for claims brought under Rehabilitation Act). More specifically, Title VII permits a suit to be brought in any of three specified venues: (i) "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed," (ii) "in the judicial district in which the employment records relevant to such practice are maintained and administered," or (iii) "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C. § 2000e–5(f)(3). The provision was designed to prevent "national companies with distant offices" from seeking to discourage plaintiffs by "forc[ing] plaintiffs to litigate far from their homes." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 505 (9th Cir. 2000).

The inclusion of a special venue provision in an act of Congress may express a broader federal policy of ensuring access to a federal forum to enforce certain statutory claims; and certainly, no Party disputes that the ADA special venue provision plainly authorizes commencement of this action in this District as Plaintiff pleads that a substantial portion of the acts or omissions giving rise to Plaintiff's claims occurred in this District. "Yet, an across-the-board rule—i.e., that forum-selection clauses are unenforceable in all [ADA] suits as incompatible with the public policy concerns reflected in the statute's venue provision—is hard to reconcile with *Atlantic Marine*." *Barnes v. Fisher & Co., Inc.*, No. 3:19-cv-00224, 2020 WL 8714821, at \*4 (S.D. Ind. May 18, 2020) (citing *Kessler v. Direct Consulting Assocs., LLC*, No. 17-11943, 2018 WL 7890862 (E.D. Mich. July 6, 2018)). Indeed, in *Atlantic Marine*, the Supreme Court emphasized that "courts should not unnecessarily disrupt the parties' settled expectations" as embodied in a forum-selection clause, thus, forum selection clauses should be enforced except in "unusual cases." 571 U.S. at 66. "A flat refusal to enforce forum selection clauses in all Title VII actions would not be confined to 'unusual cases.'" *Kessler*, 2018 WL 7890862, at \*7. It follows, then considering *Atlantic Marine*, that "the impact of Title VII's venue provision on the enforceability of a forum selection clause should be evaluated on a case-by-case basis." *Id.*

**\*4** The Second Circuit's decision in *DeBello v. VolumeCocomo Apparel, Inc.*, 720 F. App'x 37, 40 (2d. Cir. 2017) finding the public policy interest did not override Plaintiff's knowing and voluntary agreement to

an employment agreement with a forum selection clause underscores this rationale:

> We conclude ... that in the circumstances here, DeBello's public policy argument does not overcome the presumption that a valid forum-selection clause should be given controlling weight in all but the most exceptional cases. This is not an exceptional case. In *Martinez*, we upheld a forum selection clause designating England as the exclusive forum for the plaintiff's claims under the Americans with Disabilities Act, despite the Act's incorporation of Title VII's special venue provision and the "Act's identification of a strong federal interest in combatting discrimination based on disability." 740 F.3d at 229. We are not persuaded here that the freely-bargained forum selection clause is unenforceable based solely on its conflict with a policy preference reflected in Title VII's special venue provision. Although DeBello is deprived of his choice of venue, he retains his right to litigate his discrimination claims. Moreover, DeBello, an experienced professional who was hired for an executive position at a relatively high salary, willingly entered into his employment agreement knowing it contained a forum selection clause, and he did so after he had the opportunity to consult with an attorney and make changes to the Agreement. [The defendant employer] is headquartered in Los Angeles and DeBello regularly interacted with [the company's] California-based employees.

> We emphasize that forum selection clauses do not have dispositive effect where the civil rights laws are concerned, and we do not foreclose the possibility that a conflict with Title VII's special venue provision, combined with other factors, may render a forum selection clause unenforceable. We hold simply that DeBello has not made a sufficient showing here.

*DeBello*, 720 F. App'x at 41. This reasoning is persuasive. *See Kessler*, 2018 WL 7890862, at *9 (declining to enforce Title VII special venue provision over forum selection clause); *Martinez v. Bloomberg LP*, 740 F.3d 211, 229-230 (2d. Cir. 2014) (calling it a "close question" but declining to enforce ADA special venue provision over forum selection clause). The undersigned declines to adopt Plaintiff's position, that forum selection clauses are *per se* unenforceable in light of the ADA's special venue provision. *See Chapman v. Dell*, NO. EP-09-cv-KC, 2009 WL 1024635, at *3 n.3 (W.D. Tex. Apr. 15, 2009) (rejecting *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954 (M.D. Tenn. 2008) and *Thomas v. Rehab Servs. of Columbus, Inc.*, 45 F. Supp. 2d 1375 (M.D. Ga. 1999), the

cases relied on by Plaintiff, which announced a bright-line rule that forum selection clauses are invalidated by Title VII's venue provision in all cases).[2]

### Scope of the Forum Selection Clause

Even if a forum selection clause is valid, it may nevertheless not apply to all claims between the parties to a contract. Here, the FSC calls for "any legal suit, action or proceeding arising out of or based upon this agreement" to proceed in Missouri state or federal courts. Defendant urges the broad language of the forum selection clause covers Plaintiff's disability discrimination claims [Dkt. 6 at 4]. While Plaintiff contends to the contrary that, in Missouri, such a clause only covers claims that are neither dependent on, nor require reference to, the contract, thus Plaintiff's claims are outside the scope of the FSC [Dkt. 8 at 12].

**\*5** As set forth *supra*, Missouri law governs the question of the scope or applicability of the instant FSC [*See* Dkts. 8 at 10; 9 at 1]. Both Parties agree that Missouri looks at the scope of a forum selection clause like it does the scope of an arbitration clause [Dkts. 8 at 11; 9 at 2]. Under Missouri law,

> In determining whether the parties have contracted to arbitrate, the usual rules of state contract law and canons of contract interpretation apply. The guiding principles of contract interpretation under Missouri law is that a court will seek to ascertain the intention of the parties and to give effect to that intent. The intent of the parties' contract is presumed to be expressed by the ordinary meaning of the contract's terms. If the contract is unambiguous, it will be enforced according to its terms. If ambiguous, it will be construed against the drafter.

> The trial court should order arbitration of any dispute that touches matters covered by the parties' contract. As part of the scope analysis, the court must look to any exclusions or exceptions in the arbitration agreement. Express provisions excluding particular grievances from arbitration are enforceable.

> For a tort claim to be subject to arbitration, it must raise some issue the resolution of which requires reference to or construction of some portion of the parties' contract. Where a tort claim is independent of the contract terms and does not require reference to the underlying contract, arbitration is not required. The relationship between the tort claim and the contract is not satisfied simply because the

dispute would not have arisen absent the existence of the contract between the parties.

*St. Louis Regional Convention v. National Football League*, 581 S.W.3d 608, 617 (Mo. Ct. App. 2019). Applying these principles to forum selection clauses, Missouri courts have found "whether a forum-selection clause that by its terms applies to contract actions also reaches non-contract claims 'depends on whether resolution of the claims relates to interpretation of the contract.' " *Major v. McCallister*, 302 S.W.3d 227, 231 (Mo. Ct. App. 2009) (citing *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988)); *Reed v. Reilly Co.*, 534 S.W.3d 809, 811 (Mo. 2017). In other words, forum selection clauses reach non-contractual claims when those claims "cannot be adjudicated without analyzing whether the parties were in compliance with the contract." *Corel Corp. v. Ferrellgas Partners, L.P.*, 633 S.W.3d 849, 856 (Mo. Ct. App. 2021) (quoting *Major*, 302 S.W.3d at 232); *see also January v. Invasix, Inc.*, No. 4:20-CV-01203-JAR, 2021 WL 168750, at *6 (E.D. Mo. Jan. 19, 2021) (citing *Reed*, 534 S.W.3d at 811) (finding that if the "resolution of [the] claims would necessarily require an inquiry into the terms and enforceability of the agreement" the claims would be considered within the scope of the arbitration clause). Thus, as Plaintiff argues, forum selection clauses under Missouri law do not reach non-contractual claims where the claims are "independent of the contract terms and do[ ] not require reference to the underlying contract." *Seaboard Corp. v. Grindrod, Ltd.*, 248 S.W.3d 27, 32-33 (Mo. Ct. App. 2008) ("None of the claims are based on actions connected to the Agreement or carried out under the Agreement. None of the allegations require reference to or construction of the Agreement. All of the claims alleged in the Petition could have been brought even if the Agreement had never been signed. Based on the claims raised in the Petition, the arbitration clause in the Agreement is not applicable."); *see also Greenwood v. Sherfield*, 895 S.W.2d 169, 175 (Mo. Ct. App. 1995) (finding that the arbitration clause did not apply to tort claims where "there [was] no meaningful connection between Plaintiffs' tort claims and the terms, conditions, or subject matter of the" agreement). [3]

**\*6** Plaintiff's Amended Complaint states three claims for relief: (1) "disability discrimination"; (2) "failure to consider or provide reasonable accommodation"; and (3) "separate ADA claim" [Dkt. 7 at 14-16]. Plaintiff has not alleged a breach of the Agreement itself and does not invoke its terms in his First Amended Complaint. *Greenwood*, 895 S.W.2d at 175 (finding the arbitration clause inapplicable where

"Plaintiffs' action is in no way based on an alleged breach of the Merchant Contract and neither invokes nor needs to invoke the Merchant Contract."). Moreover, Plaintiff's discrimination claims exist by statute regardless of the existence of the Agreement; the claims do not depend on the existence of the Agreement, nor do they require interpretation of the Agreement.

Notwithstanding, Defendant, in reliance on *State ex rel. Todd Hewitt v. Honorable Kristine Kerr*, 461 S.W.3d 798 (Mo. 2015), urges Plaintiff's claims have a "meaningful connection" to the Agreement. Defendant argues that it is by no means a "stretch" to determine that Plaintiff's employment discrimination claims "touch upon or refer to" Plaintiff's employment with Defendant, which was the basis of the Agreement [Dkt. 9 at 3]. In *Hewitt*, the agreement stated "[t]he Rams and Hewitt also severally and mutually promise and agree that [ ] any dispute which may arise between them," shall be submitted to arbitration. *Id.* at 804. Considering this language, *Hewitt* Court found, with limited discussion, that plaintiff's age discrimination claim under the Missouri Human Rights Act was within the scope of the arbitration clause. Indeed, in its entirety, the *Hewitt* Court opined:

> Under Missouri law, "[i]f a contract is unambiguous, the intent of the parties is to be discerned from the contract alone based on the plain and ordinary meaning of the language used." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012) (internal quotations omitted). The agreement at issue here mandates arbitration of "any dispute which may arise" between Mr. Hewitt and the Rams. "Any dispute" plainly means any dispute, including Mr. Hewitt's statutory claims under the MHRA. Mr. Hewitt's efforts to characterize this language as too ambiguous to be inclusive of statutory claims are unavailing.

*Id.* at 814. The present case is distinguishable. As the *Hewitt* Court alluded, whether or not a forum selection clause applies depends on what the specific clause at issue says. *Worley v. Celebrate Children Int'l, Inc.*, No. 1:16-cv-96, 2016 WL 6777899, at *3 (E.D. Mo. Nov. 16, 2016) (quoting *Berrett v. Life Ins. Co. of the Southwest*, 623 F. Supp. 946, 948-49 (D. Utah 1985)) ("Whether tort claims are to be governed by forum selection provisions depends upon the intention of the parties reflected in the wording of particular clauses and the facts of each case."). While in *Hewitt*, the agreement broadly applied to any dispute between the Parties, here, the FSC is more limited, encompassing only suits "arising out of or based upon this agreement" [Dkt. 6-1 at 6]. *See Ross*

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*v. Extreme Techs., Inc.*, No. 09-0787-CV-W-SOW, 2009 WL 10671679, at *5 (W.D. Mo. Dec. 21, 2009) ("The words 'relating to' are less restrictive than 'arising out of' and indicate that a claim may be 'associated with' an agreement to be covered."); *Qualls v. Prewett Enterprises, Inc.*, No. 3:21-cv-00192, 2022 WL 889034, at *4 (S.D. Tex. Mar. 25, 2022) (forum selection clauses that cover disputes that "relate to" an agreement are generally interpreted broadly, while clauses that use the language "arising out of" an agreement are construed narrowly). The phrases "arising out" and "based upon" signal the forum selection clause should be interpreted more narrowly than that in *Hewitt. Buc-ee's, Ltd. v. Bucks, Inc.*, 262 F. Supp. 3d 453, 460 (S.D. Tex. 2017) (quoting OXFORD DICTIONARY (3d ed. 2010)) (finding the phrase "brought under" akin to the wording of narrow forum selection clauses, such as those applying to claims "arising out of" an agreement).

**\*7**  The facts of *Moore v. Perficient, Inc.*, 1:20-cv-2124, 2020 WL 11884718 (N.D. Georgia Sept. 17, 2020), are persuasive in such interpretation. In *Moore*, the plaintiff sued Defendant Perficient under the ADA, raising claims for disability discrimination and failure to accommodate. *Id.* at *1. Interestingly, in *Moore*, the plaintiff pleaded that after making Perficient aware of her alleged disability her travel assignments were increased. *Id.* There too, Defendant moved to transfer venue to the Eastern District of Missouri citing the plaintiff's execution of a "Confidentiality and Intellectual Property Agreement." *Id.* at *2. Though not identical to the terms of the Agreement in this case, the *Moore* agreement states, among other things, "[t]he Company and Employee agree that the state and federal courts situated in St. Louis, Missouri shall have personal jurisdiction over the Company and Employee to hear all disputes *arising under* this Agreement." *Id.* (emphasis added). The *Moore* Court found "nothing in [this language] suggests that its scope extends to employment discrimination claims arising under federal law." *Id.* Indeed, the *Moore* Court continued, "it applies only to 'certain aspects of Employee's employment with the Company' which appear principally to be confidentiality and intellectual property matters." *Id.* Thus, the *Moore* Court declined Perficient's request to transfer, opining that the "Confidentiality and Intellectual Property Assignment Agreement" did not cover the plaintiff's employment discrimination law claims. *Id.* at *3.

Similarly, here, the language of the Agreement does not suggest its scope extends to Plaintiff's disability discrimination claims. Nothing in the Agreement specifically addresses the issue of discrimination and Plaintiff's right to be free of discrimination. The Agreement, as in *Moore*, focuses on confidential information, inventions, and intellectual property, "[t]here is no meaningful connection between Plaintiff's [employment discrimination claims] and the terms, conditions, or subject matter" of the Agreement. *Greenwood*, 895 S.W.2d 169 at 175. Further, to reiterate, the claims alleged by Plaintiff could have been brought had the Agreement never been signed; they do not depend on the existence of the Agreement. They can also be adjudicated without analyzing whether the Parties were in compliance with the Agreement. As they neither "arise from" nor are "based on" the Agreement, Plaintiff's live claims do not fall within the scope of the FSC. *Jitterswing, Inc. v. Francorp, Inc.*, 311 S.W.3d 828, 830 (Mo. Ct. App. 2010) (finding "any dispute arising under this Agreement" did not apply to statutory tort claim); *Luebbering v. Varia*, 637 S.W.3d 366, 372 (Mo. Ct. App. 2021) (finding forum selection clause stating "[a]ny dispute arising under or in connection with this [contract] and any claim affecting its validity, construction, effect, performance or termination...." was insufficient to encompass tort claims).

### *Section 1404(a) Analysis*

Having determined the FSC does not apply, the Court turns to the traditional two-step analysis to determine whether it should still transfer Plaintiff's claims. Again, the initial determination under 1404(a) is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties have consented to a particular jurisdiction. *Volkswagen I*, 371 F.3d at 203; *ATEN Int'l Inc. v. Emine Tech Co., Ltd.*, 261 F.R.D. 112, 123 (E.D. Tex. 2009). Venue is proper in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought, any judicial district in which any defendant is subject to the court's personal jurisdiction. *See* 28 U.S.C. § 1391(b). Then second, whether the movant has shown the convenience of the parties and witnesses and the interest of justice counsel in favor of transfer. *Volkswagen I*, 371 F.3d at 203. The Fifth Circuit has held that "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004). The private interest factors include (1) the relative ease of access to sources of proof; (2) the availability

of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("*Volkswagen II*"). The public interest factors include (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id.* These factors are not exhaustive or exclusive, and no single factor is dispositive. *Id.* The party seeking transfer of venue must show good cause for the transfer. *Id.* The moving party must show that the transferee venue is "clearly more convenient" than the transferor venue. *Id.*

### Eligibility for Transfer

**\*8** The threshold inquiry, whether this case is eligible to be transferred, is met in this case.

> A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's jurisdiction concerning such action.

28 U.S.C. § 1391(b). Defendant moves the Court to transfer this case to the Eastern District of Missouri [Dkt. 6 at 6]. Defendant Perficient, Inc., a corporation, is essentially at home in the St. Louis, Missouri; Defendant's principal place of business is located in St. Louis, Missouri, squarely within the Eastern District of Missouri. 28 U.S.C. § 105(a)(1). Because Defendant is subject to personal jurisdiction in the Eastern District of Missouri, it can be said to reside in that jurisdiction, meaning that district court could be

a proper venue. *Hill-Green v. Experian Info. Sols., Inc.*, No. 3:19CV708, 2020 WL 5539042, at \*5 (E.D. Va. Sept. 15, 2020) (citing 28 U.S.C. § 1391(b)(1)) (internal citation omitted). Defendant has met its burden under 28 U.S.C. § 1391(b)(1) to establish this action could have been filed in the transferee forum.

### Private Interest Factors

Defendant has a heavy burden to show that Plaintiff's choice of venue is a clearly more convenient forum. *EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC*, 705 F. Supp. 2d 560, 567 (N.D. Tex. 2010) ("It is well settled that the party moving for a change of venue bears the burden of demonstrating why the forum should be changed. Placing the burden on the moving party to show 'good cause' for the transfer 'reflects the appropriate deference to which the plaintiff's choice of venue is entitled.' "). Moreover, "[a] Defendant must properly establish relevant venue facts by affidavit, deposition, or otherwise[,] as opposed to making unsupported assertions." *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 567, 571 (E.D. Tex. 2004). Defendant's Motion to Transfer notably fails to offer any analysis of the private interest factors. Indeed, Defendant advances: "the Employment Agreement's forum-selection clause is valid and covers the claims made in Plaintiff's Complaint. Consequently, Plaintiff's reference to private interest factors is completely irrelevant" [Dkt. 9 at 5]. Plaintiff argues that by declining to address them, Defendant loses all four private interest factors by default. *Alliance Transp. & Logistics, LLC v. G&J Truck Sales, Inc.*, No. 3:20-CV-3451-B, 2021 WL 5882820, at \*4 (N.D. Tex. Dec. 31, 2021) ("[B]ecause [defendant] failed to identify any [considerations of this factor], the Court cannot find this factor favors transfer."). Plaintiff further urges that "all four [private interest factors] would favor the present forum anyway" [Dkt. 8 at 18-21].

#### (1) Relative Ease of Access to Sources of Proof

**\*9** "When considering the relative ease of access to sources of proof, a court looks to where documentary evidence, such as documents and physical evidence, are stored." *Garrett v. Hanson*, 429 F. Supp. 3d 311, 318 (E.D. Tex. 2019) (citing *Volkswagen II*, 545 F.3d at 316). This relative ease of access to sources of proof is still a relevant part of the transfer analysis despite technological advances that have made transporting large volumes of documents across the country more convenient. *Volkswagen II*, 545 F.3d at 316. There is no indication at this juncture that documents or physical evidence are located within the Eastern District

of Missouri, as opposed to the Eastern District of Texas where Defendant's Plano Office is located and where Plaintiff reported for work. *See Lozada-Leoni v. MoneyGram Int'l, Inc.*, No. 5:19CV11-RWS-CMC, 2019 WL 7875058, at *16 (E.D. Tex. Nov. 25, 2019) (quoting *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013)) ("The Fifth Circuit found the relative ease of access to sources of proof weighed in favor of transfer 'because all of the documents and physical evidence [were] located in the [transferee district].' "), *report and recommendation adopted*, No. 519CV00011RWSCMC, 2020 WL 428080 (E.D. Tex. Jan. 28, 2020). Moreover, Plaintiff states the sources of proof identified thus far are witnesses present in Texas. This factor weighs against transfer. *See Texas v. Google, Inc.*, No. 4:20-cv-957, 2021 WL 2043184, at *4 (E.D. Tex. May 5, 2021) (finding the ease-of-access factor weighed against transfer where defendant failed to demonstrate that "the ease of access to sources of proof is relatively greater in the [transferee district] than in the [transferor district].").

**(2) Availability of Compulsory Process to Secure Attendance of Unwilling Witnesses**

"The second private interest factor instructs the Court to consider the availability of compulsory process to secure the attendance of witnesses, particularly non-party witnesses whose attendance may need to be secured by a court order." *Garrett*, 429 F. Supp. 3d at 318 (citing *Volkswagen II*, 545 F.3d at 316). However, "[o]nly witnesses who are likely to have 'relevant and material information; as to the instant litigation count towards this factor. And, significantly, only witnesses who are likely unwilling to attend trial are considered under this factor." *Adams v. Experian*, No. 4:21-CV-069-SDJ, 2021 WL 4891381, at *3 (E.D. Tex. Oct. 20, 2021) (internal citations omitted); *see also Google*, 2021 WL 2043184, at *4. A court's subpoena power is governed by the Federal Rules of Civil Procedure 45. FED. R. CIV. P. 45. "For purposes of § 1404(a), there are three important parts to Rule 45." *Garrett*, 429 F. Supp. 3d at 318 (citing *VirtualAgility, Inc. v. Salesforce.com, Inc.*, No. 2:13-cv-00011, 2014 WL 459719, at *4 (E.D. Tex. Jan. 31, 2014)). Under Federal Rule of Civil Procedure 45, this Court "has subpoena power over witnesses that live or work within 100 miles of the courthouse." *Id.* (citing FED. R. CIV. P. 45(c)(1)(A)). "Second, [this Court] has subpoena power over residents of the state in which the district court sits—a party or a party's officer that lives or works in the state can be compelled to attend trial, and non-party residents can be similarly compelled as long as their attendance would not result in 'substantial expense.' " *Id.* (quoting FED. R. CIV. P. 45(c)(1)(B)(i)-(ii)). "Third,

[this Court has the] power to compel a non-party witness's attendance at a deposition within 100 miles of where the witness lives or works." *Id.* (citing FED. R. CIV. P. 45(a)(2), (c)(1)). Plaintiff avers that the non-party witnesses identified reside "here in Texas [where he worked], who are outside of his control, could become outside subpoena range" [Dkt. 8 at 20]. Plaintiff, however, offers no explanation as to their willingness or the importance of their testimony. As such, the Court finds that this factor only weighs slightly against transfer. *See Adams*, 2021 WL 4891381, at *3.

**(3) Cost of Attendance of Willing Witnesses**

"The convenience of the witnesses is probably the single most important factor in a transfer analysis." *Garrett*, 429 F. Supp. 3d at 319 (quoting *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (5th Cir. 2009)). "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen II*, 545 F.3d at 317 (citation omitted); *accord Techradium Inc. v. Athoc, Inc.*, No. 2:09-CV-275, 2010 WL 1752535, at *2 (E.D. Tex. Apr. 29, 2010) (citing *Volkswagen I*, 371 F.3d at 204-05). Significantly, this factor relates primarily to the inconvenience placed on willing nonparty witnesses, not party witnesses. *See, e.g., Seven Networks, LLC v. Google LLC*, No. 2:17-CV-00442, 2018 WL 4026760, at *9 (E.D. Tex. Aug. 15, 2018) (collecting cases); *Frederick v. Advanced Fin. Sols., Inc.*, 558 F.Supp.2d 699, 704 (E.D. Tex. 2007) ("[T]he availability and convenience of party-witnesses is generally insignificant because a transfer based on this factor would only shift the inconvenience from movant to nonmovant."). Again, the Court is provided little information other than the fact that the witnesses identified by and between the Parties, willing or unwilling, reside in Texas. Due to the witnesses alleged closeness to this District and, thus, the increase in cost for travel and lodging in St. Louis alone, the Court finds on the facts before it this factor too weighs against transfer.

**(4) All Other Practical Problems**

**\*10** Practical problems include those that are rationally based on judicial economy. Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer." *Garrett*, 429 F. Supp. 3d at 319 (citing *Eolas Techs., Inc. v. Adobe Sys., Inc.*, No. 6:09-CV-446, 2010 WL 3835762, at *6 (E.D. Tex. Sept. 28, 2010)). Plaintiff offers no

practical problems for transferring the case, and merely states "Perficient identifies no practical problems with keeping this case here" [Dkt. 8 at 21]. As stated *supra*, Defendant offers no argument on any of the private interest factors. Thus, this factor is neutral. *Alliance Transp. & Logistics*, 2021 WL 5882820, at *4.

### *Public Interest Factors*

#### (1) Court Congestion

Defendant's Motion to Transfer also fails to offer analysis of the public interest factors, save this one court congestion. The first public-interest factor is the "speed with which a case can come to trial and be resolved." *Garrett*, 429 F. Supp. 3d at 319 (quoting *Genentech*, 566 F.3d at 1347). "Generally, this factor favors a district that can bring a case to trial faster." *Ho Keung Tse v. Blockbuster, LLC*, No. 4:12-CV-328, 2013 WL 949844, at *5 (E.D. Tex. Jan. 17, 2013), *report and recommendation adopted*, No. 4:12-CV-328, 2013 WL 942496 (E.D. Tex. Mar. 8, 2013). However, this factor is "the most speculative," and "case-disposition statistics may not always tell the whole story" because "[c]omplex cases ... need more time for discovery and take longer to get to trial," no matter where they proceed. *Virginia Innovation Sci., Inc. v. Amazon.com, Inc.*, No. 4:18-CV-474–477, 2019 WL 3082314, at *32 (E.D. Tex. July 15, 2019). Plaintiff postures that even though the Eastern District of Texas may have more cases, this District is less congested based on speed. As Plaintiff explains: from 2019-2020, the Eastern District of Texas had 1200 more cases than the Eastern District of Missouri; however "[d]uring the same period, the median time interval from filing to disposition during trial in months is EDTX (19.1) v. EDMO (29.8)" [Dkt. 8 at 21 (citing Table C-5 U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2020, https://www.uscourts.gov/statistics/table/c-5/federal-judicial-caseload-statistics/2020/03/31)]. Consideration of those median times dictates that the first public interest factor weighs against transfer. *See Google*, 2021 WL 2043184, at *9 (finding that "based on both the shorter median disposition and trial times in this district and the likelihood of a shorter discovery period if this action is kept separate, the Court concludes that this factor weighs against transfer.")

#### (2) Deciding Local Interest at Home

Second, the Court must consider the local interest in the litigation because "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Lozada-Leoni*, 2019 WL 7875058, at *18 (citing *Potter v. Cardinal Health 200, LLC*, No. 2:19-cv-00007, 2019 WL 2150923, at *5 (E.D. Tex. May 16, 2019)). While a defendant entity is a resident in the district that is home to its principal place of business, a defendant entity is also a resident of "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Plaintiff, while still a resident of Texas, does not presently reside in the Eastern District of Texas [Dkt. 7 at 2 (now resides in Tarrant County)], Defendant's Plano Office is within the Eastern District of Texas. Thus, Defendant is a resident of the transferee and transferor district. However, because Defendant's principal place of business is in the transferor district and Plaintiff does not reside in the Eastern District of Texas, the Eastern District of Missouri has a stronger local interest in deciding this case. *Adams*, 2021 WL 4891381, at *6 (finding this factor weighed in favor of transfer where defendant's headquarters was located in the transferee district).

#### (3) Familiarity with Texas Law

**\*11** The Court must next consider its "familiarity of [ ] the law that will govern the case[.]" *Radmax*, 720 F.3d at 288. Because Plaintiff brings claims under Texas law, which this Court has more familiarity with than the Missouri court, the Court finds this factor weighs against transfer. *See Google*, 2021 WL 2043184, at *9.

#### (4) Absence of foreign law problems

Finally, in deciding whether to transfer the case, the Court must consider "the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Radmax*, 720 F.3d at 288. Plaintiff states only there is no problem applying foreign law here. This factor is neutral. The Court, having considered each of the relevant factors, concludes that Defendant's Motion to Transfer should be denied.

### CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that Defendant Perficient, Inc.'s Motion to Transfer Venue [Dkt. 6] be **DENIED** as set forth herein.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglas v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Slip Copy, 2022 WL 4480329

## Footnotes

1    A court, upon finding a forum-selection clause both mandatory and enforceable, must alter its traditional § 1404(a) analysis in three ways, such that: (1) plaintiff's "choice of forum when filing the lawsuit "merits no weight;" (2) the court does not consider the private interest factors; and (3) "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." *Scrum Alliance, Inc. v. Scrum, Inc.*, 4:20-CV-227, 2021 WL 798310, at *2 (E.D. Tex. Feb. 26, 2021) (quoting *Atl. Marine*, 571 U.S. at 64); *see also Weber v. PACT XPP Technologies, AG*, 811 F.3d 758, 767 (5th Cir. 2016). Thus, pursuant to *Atlantic Marine*, when determining whether extraordinary circumstances exist that warrant denial of transfer despite a valid forum-selection clause, only the public interest factors of a traditional § 1404(a) analysis are considered.

2    While there may be a scenario where the possibility that a conflict with the ADA's special venue provision, combined with other factors, may render a forum selection clause unenforceable, here Plaintiff has not argued such.

3    In *Kleiman v. Kings Point Capital Management, LLC*, NO. 4:178CV2278HEA, 2018 WL 3328012 (E.D. Mo. July 6, 2018), the Court outlines that the Eighth Circuit, which encompasses Missouri, considers three tests for determining whether the forum selection clause will apply. Generally, a forum selection clause will apply in the following cases: (1) where the tort claims ultimately depend on the existence of a contractual relationship between the parties; (2) where resolution of the tort claims relates to interpretation of the contract; or (3) where the tort claims involve the same operative facts as a parallel claim for breach of contract. *Id.* (citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983)); *Manetti–Farrow, Inc.*, 858 F.2d at 514; *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993).

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.   Appendix p. 255   10

**Putnam v. Perficient, Inc., Slip Copy (2022)**

2022 WL 4474901
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Jason PUTNAM

v.

PERFICIENT, INC.,

CIVIL CASE NO. 4:21-CV-739-SDJ
|
Signed September 26, 2022

**Attorneys and Law Firms**

Amy Elizabeth Gibson, David L. Wiley, Gibson Wiley PLLC, Dallas, TX, for Jason Putnam.

Kevin Robinowitz, Stinson LLP, Dallas, TX, for Perficient, Inc.

**MEMORANDUM ADOPTING REPORT
AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

**\*1**   Came on for consideration the Report and Recommendation of the United States Magistrate Judge ("Report"), this matter having been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636. On July 20, 2022, the Report of the Magistrate Judge, (Dkt. #24), was entered containing proposed findings of fact and recommendations that Defendant Perficient, Inc.'s Motion to Transfer Venue, (Dkt. #6), be denied. Having assessed the Report and the record in this case, and no objections to the Report having been timely filed, the Court determines that the Magistrate Judge's Report should be adopted.

It is therefore **ORDERED** that Defendant Perficient, Inc.'s Motion to Transfer Venue, (Dkt. #6), is **DENIED**.

**So ORDERED and SIGNED this 26th day of September, 2022.**

**All Citations**

Slip Copy, 2022 WL 4474901

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

119 Nev. 492
Supreme Court of Nevada.

Maryann C. SHELTON, n/k/
a Maryann C. Mitchell, Appellant,

v.

Roland A. SHELTON, Respondent.

No. 37483

|

Oct. 29, 2003.

**Synopsis**

Former wife brought motion to enforce divorce decree providing her with half of former husband's military pension after former husband waived pension in order to receive disability benefits. The District Court, Clark County, Robert E. Gaston, J., denied motion, and former wife appealed. The Supreme Court, Shearing, J., held that former husband was contractually obligated by divorce settlement agreement to continue to pay former wife $577 per month.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*507** Amesbury & Schutt and David C. Amesbury, Las Vegas, for Appellant.

Leavitt Law Firm and Glenn C. Schepps, Las Vegas, for Respondent.

Before AGOSTI, C.J., SHEARING and BECKER, JJ.

**\*\*508  \*493** *OPINION*

SHEARING, J.

The principal issue in this appeal is whether relief is available to a former spouse when a veteran unilaterally waives his military pension in order to receive disability benefits, resulting in the former spouse's loss of her community share in the pension. We conclude that, although courts are prohibited by federal law from determining veterans' disability pay to be community property, state law of contracts is not preempted by federal law. Thus, respondent must satisfy his contractual obligations to his former spouse, and the district court erred in denying former spouse's motion solely on the basis that federal law does not permit disability pay to be divided as community property.

*FACTS*

Respondent Roland Shelton and appellant Maryann Shelton were married on September 6, 1980, in San Diego, California. Roland **\*494** served in the United States Navy for more than ten years during the marriage. On January 17, 1997, the Sheltons jointly petitioned for a summary decree of divorce in Clark County District Court. On January 29, 1997, the district court entered a decree of divorce incorporating the parties' joint petition.

Under the terms of the agreement, the parties designated both Roland's military retirement pay and military disability pay as community property, although the agreement awarded all of the disability pay to Roland. The parties, who negotiated the terms without the aid of counsel, agreed that Roland, individually, would be allotted "half of [his] military retirement pay in the amount of $500 and military disability pay in the amount of $174." Maryann would be allotted the other "half of HUSBAND'S military retirement pay in the amount of $577, until her demise." [1]  At the time of the divorce, Roland had an outstanding military pension of $1,000 per month, and a disability payment of $174 per month based upon a determination that he was ten percent disabled. Both Roland and Maryann waived any right to spousal support; however, Maryann remained as beneficiary under Roland's military retirement insurance.

Beginning in January 1997, Roland regularly made his required payments to Maryann. In 1999, the Department of Veterans Affairs reevaluated Roland's disability status and concluded that Roland was 100 percent disabled, effective May 1, 1998. Roland elected to waive all his military retirement benefits for an equivalent amount of tax-exempt disability pay as federal law allows. [2]  Upon receiving notice of an increased disability rating on February 26, 1999, Roland ceased his payments to Maryann.

Thereafter, Maryann moved the district court for an order enforcing the decree of divorce. Maryann asked for half of Roland's military pension, or $577, as had been agreed upon before the divorce and as was incorporated in the divorce decree. Roland opposed Maryann's motion on the grounds that the divorce decree did not allocate disability pay to

Maryann, and that federal law prohibited community property division of veterans' disability benefits. The district court denied Maryann's motion on the basis of the United States Supreme Court's decision in *Mansell v. Mansell* (*Mansell I* ),[3] despite repeatedly stating how unfair the result was to Maryann. In *Mansell I*, the Supreme Court held that federal law prevents states from treating military disability pay as divisible community property.[4] The district court also refused to grant **\*495** Maryann equitable relief for the loss of her $577 monthly income on the basis that it lacked jurisdiction to hear a request for alimony when alimony had been waived in the final divorce decree.

### DISCUSSION

Domestic relations are generally within the purview of state courts.[5] However, **\*\*509** in *McCarty v. McCarty*, a 1981 decision, the United States Supreme Court construed federal statutes to prevent state courts from treating military retirement pay as community property.[6] The United States Supreme Court reasoned that federal preemption was necessary as the federal government was interested in maintaining military retirement schemes as an inducement for enlistment and reenlistment and for effective military personnel management.[7] In response to the broad preemption ruling in *McCarty*, Congress enacted the Uniformed Services Former Spouses' Protection Act (USFSPA) in 1982.[8] The USFSPA authorizes state courts to divide "disposable retired pay" among spouses in accordance with community property law.[9] Although the USFSPA clearly subjected military retirement pay to community property laws, it did not clearly address whether disability benefits were also subject to state community property or equitable distribution laws.

Subsequently, in *Mansell I*, the Supreme Court considered whether state courts may treat veterans' disability benefits as community property. The Court initially noted that "[i]n order to prevent double dipping, a military retiree may receive disability benefits only to the extent that he waives a corresponding amount of his military retirement pay."[10] The Court then held that under USFSPA's "plain and precise language, state courts have been granted the authority to treat disposable retired pay as community property; they have not been granted the authority to treat total retired pay [which includes disability pay] as community property."[11] Because

Roland elected to receive full disability pay in lieu of his **\*496** retirement pay, he argues that *Mansell I* prevents any payments to Maryann, thus depriving her of her community property interest in Roland's pension. Based on the cases decided after *Mansell I*, we do not agree.

Many courts have determined that a recipient of military disability payments may not deprive a former spouse of marital property.[12] The courts proceed under various theories, but the underlying theme is that it is unfair for a veteran spouse to unilaterally deprive a former spouse of a community property interest simply by making an election to take disability pay in lieu of retirement pay.[13] Although states cannot divide disability payments as community property, states are not preempted from enforcing orders that are res judicata[14] or from enforcing contracts[15] or from reconsidering divorce decrees,[16] even when disability pay is involved.

**\*\*510** In *Poullard v. Poullard*, the Louisiana Court of Appeal held that the husband had stipulated to give his former wife one half of his retirement pay in consideration of her alimony waiver.[17] The court held that "[n]othing in either the state or federal law prevents a person from agreeing to give a part of his disability benefit to another.... [T]he redesignation of pay cannot defeat the prior agreement of the parties."[18]

In *Hisgen v. Hisgen*, the Supreme Court of South Dakota enforced a property settlement agreement, stating:

> That case [*Mansell I* ], however, does not preclude state courts from interpreting divorce settlements to allow a spouse to receive property or money equivalent to half a veteran's retirement entitlement. "[T]he source of the payments need not come from his exempt disability pay; the husband is free to **\*497** satisfy his obligations to his former wife by using other available assets."[19]

The question of the interpretation of a contract when the facts are not in dispute is a question of law.[20] "A contract is ambiguous if it is reasonably susceptible to more than one interpretation."[21] The best approach for interpreting an ambiguous contract is to delve beyond its express terms and "examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties."[22] This examination includes not only the circumstances surrounding the contract's execution, but also

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

subsequent acts and declarations of the parties.[23] Also, a specific provision will qualify the meaning of a general provision.[24] Finally, "[a]n interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract."[25]

The property settlement agreement between Roland and Maryann is ambiguous. The agreement states that Roland's military disability is community property, but it awards the entire amount to Roland. The award of military retirement pay to Maryann describes the award as "[o]ne half of HUSBAND'S military retirement in the amount of $577, until her demise," but the amount designated is more than one-half the amount of Roland's retirement pay at the time. Roland paid Maryann $577 until the time he elected to take disability pay in lieu of retirement pay.

It appears, therefore, that the agreement of the parties was that Roland pay Maryann $577 each month for her portion of the community asset, rather than pay her one-half of his retirement pay, since $577 is more specific than "one-half." Moreover, the parties' subsequent conduct reinforces this conclusion, in that Roland ratified the terms of the agreement by performing his obligations **\*498** under the decree for a period of two years.[26] In addition, this interpretation yields

a fair and reasonable result, as opposed to a harsh and unfair result. Roland cannot escape his contractual obligation by voluntarily choosing to forfeit his retirement pay.[27] It appears **\*\*511** that Roland possesses ample other assets from which to pay his obligation without even touching his disability pay. Even if he lacks these assets, nothing prevents him from using his disability payments to satisfy his contractual obligation.[28]

## CONCLUSION

Although states are precluded by federal law from treating disability benefits as community property, states are not precluded from applying state contract law, even when disability benefits are involved. The district court's order is reversed and this matter is remanded to the district court for further proceedings consistent with this opinion.

We concur: AGOSTI, C.J. and BECKER, J.

**All Citations**

119 Nev. 492, 78 P.3d 507

## Footnotes

1    Despite the purported equal division, the numerical disparity between the respective portions of military retirement pay was never addressed.

2    38 U.S.C. § 5305 (2000).

3    490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989).

4    *Id.* at 594–95, 109 S.Ct. 2023.

5    *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979).

6    453 U.S. 210, 232–35, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981); *see also Mansell I,* 490 U.S. at 584, 109 S.Ct. 2023 (discussing *McCarty* ).

7    *McCarty,* 453 U.S. at 213, 234, 101 S.Ct. 2728.

8    Pub.L. No. 97–252, 96 Stat. 730 (codified as amended at 10 U.S.C. § 1408). The parties refer to the 1982 version of the statute; however, the relevant parts of the statute have not changed since 1982.

9    10 U.S.C. § 1408(c)(1) (2000). Disposable retired pay refers to monthly retired pay minus statutory exceptions. *Id.* § 1408(a)(4).

10   *Mansell I,* 490 U.S. at 583, 109 S.Ct. 2023; *see also* 38 U.S.C. § 5305 (2000) (previously codified at 38 U.S.C. § 3105 (1988)).

11   490 U.S. at 589, 109 S.Ct. 2023.

12   *In re Marriage of Mansell,* 217 Cal.App.3d 219, 265 Cal.Rptr. 227 (Ct.App.1989) (*Mansell II* ), *cert. denied,* 498 U.S. 806, 111 S.Ct. 237, 112 L.Ed.2d 197 (1990); *Ford v. Ford,* 30 Ark.App. 147, 783 S.W.2d 879 (1990); *McHugh v. McHugh,* 124 Idaho 543, 861 P.2d 113 (1993); *Adams v. Adams,* 725 A.2d 824 (Pa.1999); *Trahan v. Trahan,* 894 S.W.2d 113 (Tex.App.1995); *Owen v. Owen,* 14 Va.App. 623, 419 S.E.2d 267 (1992); *In re Marriage of Jennings,* 138 Wash.2d 612, 980 P.2d 1248 (1999).

13   Virtually any military retiree eligible for disability will elect to receive disability pay rather than retirement pay since disability pay is not subject to federal, state and local taxation, and thus increases the recipient's after-tax income. 38 U.S.C. § 5301(a) (2000) (previously codified at 38 U.S.C. § 3101(a) (1988)); *Mansell I,* 490 U.S. at 583–84, 109 S.Ct. 2023.

14   *Mansell II,* 265 Cal.Rptr. at 227; *Ford,* 783 S.W.2d at 879; *Trahan,* 894 S.W.2d at 113.

15   *Adams,* 725 A.2d at 824; *McHugh,* 861 P.2d at 113; *Owen,* 419 S.E.2d at 267.

16   *Marriage of Jennings,* 980 P.2d at 1248.

17   780 So.2d 498, 499–500 (La.Ct.App.2001).

18   *Id.* at 500 (internal quotation marks omitted).

19   554 N.W.2d 494, 498 (S.D.1996) (quoting *Holmes v. Holmes,* 7 Va.App. 472, 375 S.E.2d 387, 395 (1988)).

20   *Grand Hotel Gift Shop v. Granite St. Ins.,* 108 Nev. 811, 815, 839 P.2d 599, 602 (1992).

21   *Margrave v. Dermody Properties,* 110 Nev. 824, 827, 878 P.2d 291, 293 (1994); *see also Pressler v. City of Reno,* 118 Nev. 506, ——, 50 P.3d 1096, 1098 (2002).

22   *Hilton Hotels v. Butch Lewis Productions,* 107 Nev. 226, 231, 808 P.2d 919, 921 (1991).

23   *See Trans Western Leasing v. Corrao Constr. Co.,* 98 Nev. 445, 447, 652 P.2d 1181, 1183 (1982).

24   *See Mayer v. Pierce County Medical Bureau,* 80 Wash.App. 416, 909 P.2d 1323, 1327 (1995).

25   *Dickenson v. State, Dep't of Wildlife,* 110 Nev. 934, 937, 877 P.2d 1059, 1061 (1994).

26   *Hoskins v. Skojec,* 265 A.D.2d 706, 696 N.Y.S.2d 303, 304 (1999).

27   *Dexter v. Dexter,* 105 Md.App. 678, 661 A.2d 171, 174–75 (1995) (holding that under Maryland contract law, "the pensioned party may not hinder the ability of the party's spouse to receive the payments she has bargained for, by voluntarily ... waiving ... the pension benefits"); *Johnson v. Johnson,* 37 S.W.3d 892, 897 (Tenn.2001) (holding that the spouse's "vested interest cannot thereafter be unilaterally diminished by an act of the military spouse," and that the trial court must enforce the decree to provide the spouse with guaranteed monthly payment).

Shelton v. Shelton, 119 Nev. 492 (2003)

78 P.3d 507

28    *Poullard,* 780 So.2d at 500 (holding that "[n]othing in either state or federal law prevents a person from agreeing to give part of his disability benefit to another").

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

527 P.3d 973 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Court of Appeals of Nevada.

Richard L. SHERMAN, an Individual, Appellant,
v.
Larry SMEAD, an Individual, Respondent.
Richard L. Sherman, an Individual, Appellant,
v.
Larry Smead, an Individual, Respondent.

No. 83603-COA, No. 84071-COA
|
Filed April 14, 2023

Richard L. Sherman appeals from both a district court order granting partial summary judgment, certified as final under NRCP 54(b), Docket No. 83603-COA, and an order granting a motion for attorney fees and costs, Docket No. 84701-COA, which have been consolidated for this appeal. Eighth Judicial District Court, Clark County; Carli Lynn Kierny, Judge.

**Attorneys and Law Firms**

Olson, Cannon, Gormley, & Stoberski

Maier Gutierrez & Associates

*ORDER OF REVERSAL AND REMAND*

*Facts and Procedural History*

 **\*1**  In this case, former employees of respondent Larry Smead, who is a private electrical contractor and the owner of SASCO and related entities, retained Sherman to represent them in employment matters against Smead. [1] In November 2011, one of the former employees reached a settlement agreement with Smead to resolve the employment dispute between them. This 2011 settlement agreement contained the following Covenants clause pertaining to Sherman and the lawyers in his firm:

> 6. Covenants of Magpiong's Attorneys. Magpiong's Attorneys, and each member of their respective firms, each further covenant and agree that

he/she/it shall not publish any of the Smead Released Parties names in any manner in association with their law practice or in any way publish, promote, advertise or reference their participation in any action against any of the Smead Released Parties, inclusive of this Action.

The 2011 settlement agreement also generally allowed for an award of attorney fees and costs to be awarded to the nonbreaching party in the event of a breach of the agreement:

> e. Attorneys' Fees. In the event of the bringing of any action, arbitration or suit by a Party hereto against another Party hereunder by reason of any breach of any of the covenants, agreements or provisions on the part of the other Party arising out of this Agreement, then in that event, the prevailing Party will be entitled to have recovery of and from the other Party all costs and expenses of the action, arbitration or suit, reasonable attorneys' fees and any other professional fees resulting therefrom.

Subsequently, in 2018, Sherman was retained by two other former employees of Smead, Richard Rivetti and Jeffrey Hicks, to represent them in separate employment matters against Smead. Sherman sent a prelitigation letter to Smead on behalf of Rivetti—attempting to foster early settlement negotiations—and in doing so, alluded to prior litigation against Smead without stating any specific names. In the letter, Sherman stated the following:

> [a]s you may recall, our office previously asserted claims on behalf of not less than five (5) high-level employees of yours in the past. Mr. Rivetti's claims are strikingly similar to the claims previously filed against you, and the stories we have heard countless times from your former employees.
>
> ...

As was the case in the five previous cases filed by our office (each of which settled, but only after you had paid your lawyers sums that could have been avoided had you not rejected our offers to engage in early settlement discussions), we are willing to discuss the scheduling of a mediation or settlement meeting ....

**\*2**  Further, in a footnote, Sherman added:

> [w]e note here the Motion for Terminating Sanctions, which was filed against you and your companies in one of the previous cases we handled, based upon attempts to hide relevant documents in that case. You may recall that Motion was filed shortly before that matter settled and after the initial hearing thereon, but before an order was issued by the Court.

In 2019, Sherman sent a similar prelitigation letter to Smead on behalf of Hicks. In a footnote, Sherman specifically referenced the prior 2011 litigation against Smead:

> [w]e are especially dismayed that Larry would continue to destroy emails and insist they not exist after we filed a Motion for Terminating Sanctions against him in the Magpiong case for this very misconduct, where he attempted to defraud the Court by deleting the key emails in the case.

In the body of the letter, Sherman also emphasized Smead's conduct in the case involving Hicks to that in the Magpiong litigation:

> Larry instructed Mr. Hicks to [engage in conduct] (which you may recall was similar to the illegal misconduct that Mr. Magpiong had observed and objected to, leading to his own wrongful terminations and his lawsuit in California);
>
> ...

[W]e know this is because Larry uses the "forgiving" of these notes as a weapon against employees whom he wishes to retaliate against, as we experienced first-hand with Mr. Magpiong ....

In response to receiving these prelitigation letters, Smead filed a complaint in district court, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and requesting attorney fees and costs. Smead alleged that Sherman breached the 2011 settlement agreement by disparaging Smead and referencing the 2011 litigation in Sherman's letters to him. Smead also sought a judicial declaration "that the [s]ettlement [a]greement is valid and binding and that Sherman's failure to comply with the terms of the [s]ettlement [a]greement is a breach thereof. Smead has sustained damages in excess of $15,000.00 as a direct and proximate result of Sherman's breach of the [s]ettlement [a]greement."

In July 2021, Smead filed a motion for partial summary judgment alleging that there were no genuine disputes of material fact as to Sherman's breach of the 2011 settlement agreement by referencing the 2011 litigation in the letters, and that Smead was entitled to declaratory relief to establish the validity of the settlement agreement and to an award of attorney fees and costs. In turn, Sherman filed his own motion for summary judgment arguing that he did not breach the 2011 settlement agreement and later arguing that Smead's opposition failed to counter Sherman's motion with genuine disputes of material fact to support such a breach, and therefore, Sherman was entitled to summary judgment. After conducting a hearing, the district court granted Smead's motion for partial summary judgment in August 2021 and denied Sherman's motion. [2]

 **\*3**  In its order, the district court found that Sherman breached the terms of the 2011 settlement agreement by referencing the prior litigation in the prelitigation letters sent on behalf of Rivetti and Hicks, and that the breach of contract claim damages were proven as evidenced by the attorney fees and costs incurred by Smead in having to litigate the claims. The district court further granted Smead's request for declaratory relief, finding that (1) the 2011 settlement agreement was valid and enforceable; (2) Sherman breached the agreement; and (3) an award to Smead of monetary damages in the form of attorney fees and costs was appropriate. Sherman appealed that decision. After Smead filed his memorandum for attorney fees and costs, the

court awarded him the amount of $60,266.96. Subsequently, Sherman also appealed the award of attorney fees and costs. In February 2022, the district court entered the parties' stipulation and order to certify the court's August 2021 order granting Smead's motion for partial summary judgment as a final judgment, pursuant to NRCP 54(b). [3]  The appeals were consolidated.

On appeal, Sherman argues that the district court erred in granting summary judgment because (1) its interpretation of the 2011 settlement agreement in Smead's favor was incorrect, (2) Smead did not present evidence in support of the element of damages for his breach of contract claim, (3) declaratory relief should not have been granted for the purpose of awarding monetary damages, and (4) the award of attorney fees and costs was not justified.

Conversely, Smead argues that the district court properly granted his claim for declaratory relief, and any error in granting summary judgment on the breach of contract claim and awarding attorney fees as damages was harmless because the grant of declaratory relief allowed the district court to award such damages. Nevertheless, Smead also argues that Sherman breached the 2011 settlement agreement, and that the award of attorney fees permitted under the settlement agreement qualifies as special damages to support his breach of contract claim. Alternatively, Smead contends that the award of attorney fees and costs was warranted as he was the prevailing party. We agree with Sherman and therefore necessarily reverse and remand.

*Standard of Review and Relevant Authority*
As a preliminary matter, we review a district court's grant of summary judgment de novo. *Iliescu, Tr. of John Iliescu, Jr. & Sonnia Iliescu 1992 Family Tr. v. Reg'l Transp. Comm'n of Washoe Cty.,* 138 Nev., Adv. Op. 72, 522 P.3d 453, 458 (Ct. App. 2022). Summary judgment is proper if the pleadings and all other evidence on file demonstrate that there exists no genuine dispute of material fact "and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted); *see also* NRCP 56(a). "A factual dispute is genuine when the evidence is such that a rational trier of fact could return a verdict for the nonmoving party." *Wood v. Safeway, Inc.,* 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005). In rendering a decision on a motion for summary judgment, all evidence "must be viewed in a light most favorable to the nonmoving party." *Id.* at 729, 121 P.3d at 1029. Additionally, while we generally review an award of

attorney fees for an abuse of discretion, *Albios v. Horizon Cmtys., Inc.,* 122 Nev. 409, 417, 132 P.3d 1022, 1027-28 (2006), whether attorney fees constitute special damages for the purpose of satisfying a breach of contract claim is subject to de novo review because this issue involves a question of law, *Pardee Homes of Nev. v. Wolfram,* 135 Nev. 173, 176, 444 P.3d 423, 426 (2019). Furthermore, whether a determination in an action for declaratory judgment is proper is a matter for the district court's discretion and will not be disturbed on appeal unless the district court abused that discretion. *Cty. of Clark, ex rel. Univ. Med. Ctr. v. Upchurch,* 114 Nev. 749, 752, 961 P.2d 754, 756 (1998).

**\*4** Relevant here, "[a] settlement agreement is a contract governed by general principles of contract law." *Power Co. v. Henry,* 130 Nev. 182, 189, 321 P.3d 858, 863 (2014). To prove a breach of contract, a plaintiff must demonstrate that a valid contract exists, there was a breach of the contract, and that damages occurred. *See Iliescu,* 138 Nev., Adv. Op. 72, 522 P.3d at 458. Breach of contract is the material failure to perform "a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.,* 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987) (internal quotation marks omitted).

This court also reviews contract interpretation de novo by looking to the language of the contract and surrounding circumstances. *Redrock Valley Ranch, LLC v. Washoe County,* 127 Nev. 451, 460, 254 P.3d 641, 647-48 (2011). When reviewing a contract, the objective "is to discern the intent of the contracting parties." *Davis v. Beling,* 128 Nev. 301, 321, 278 P.3d 501, 515 (2012) (internal quotation marks omitted). In doing so, we will enforce the contract as written, so long as it is clear and unambiguous. *Id.; see also Canfora v. Coast Hotels & Casinos, Inc.,* 121 Nev. 771, 776, 121 P.3d 599, 603 (2005) (noting that the appellate court interprets unambiguous contracts according to the plain language of their written terms). However, "[a]n interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract." *Dickenson v. State, Dep't of Wildlife,* 110 Nev. 934, 937, 877 P.2d 1059, 1061 (1994). And we will not construe a contract "so as to lead to an absurd result." *Reno Club, Inc. v. Young Inv. Co.,* 64 Nev. 312, 325, 182 P.2d 1011, 1017 (1947). We now address each of Sherman's arguments.

*The district court erred in its interpretation of the Covenants clause*
Sherman argues that the district court erred in its interpretation of the Covenants clause to find that he breached

the 2011 settlement agreement by merely referencing the Magpiong litigation in subsequent prelitigation letters sent to Smead. We agree. By interpreting the Covenants clause to prohibit the mere "reference" to the parties' prior litigation, the district court failed to consider the context of how the word reference is used in the agreement. "The doctrine of *noscitur a sociis* teaches us that 'words are known by—acquire meaning from—the company they keep.' " *Bldg. Energetix Corp. v. EHE, LP,* 129 Nev. 78, 85, 294 P.3d 1228, 1234 (2013) (quoting *Ford v. State,* 127 Nev. 608, 622 n.8, 262 P.3d 1123, 1132 n.8 (2011)). "When several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012).

In this case, the Covenants clause contained a list of similar words that were associated with one another: "publish, promote, advertise or reference." [4] The district court erred by assigning an overly broad meaning to the word "reference" that did not comport with the meaning of the related terms, all of which contemplated some form of communication to a third party in an effort to solicit business. Thus, it was unreasonable for the district court to interpret the contract to preclude Sherman from merely referencing the prior litigation in discussions with Smead, as Smead could not be considered a third party as he was already aware of the Magpiong litigation, and could not be surprised by the information, nor harmed by it. *See Dickenson,* 110 Nev. at 937, 877 P.2d at 1061. Instead, based on our review of the plain language of the contract, the Covenants clause was designed to ensure that Sherman would not publicize the prior litigation or use it for advertising purposes, such as to solicit new clients against Smead. There is no indication in the record, at this point in the litigation, that either of the letters or the information related to the Magpiong litigation was used to advertise or solicit further business for Sherman, as the prelitigation letters were specifically sent to Smead to foster early settlement negotiations after Sherman had already been retained by Rivetti and Hicks. Thus, based on the principles of statutory construction, we conclude that the district court erred, without more, in finding that mere references to the Magpiong litigation in subsequent prelitigation letters was sufficient to demonstrate a breach.

*Smead's breach of contract claim currently fails for lack of damages*

**\*5**  Sherman argues that even if there was a breach of the settlement agreement, Smead failed to set forth the element of damages required for a breach of contract claim, and therefore his claim fails as a matter of law. *See Richardson v. Jones & Denton,* 1 Nev. 405, 408 (1865) ("It is necessary to establish actual damages resulting from [a claimed] breach [of contract]."). Conversely, Smead argues that the attorney fees he incurred in litigating his case constitute such damages. We agree with Sherman and address this argument in the alternative.

Attorney fees may be awarded as either (1) "fees as a cost of litigation" or (2) "fees as an element of damage[s]." *Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n,* 117 Nev. 948, 955, 35 P.3d 964, 968-69 (2001), *receded from on other grounds by Morgan v. Felton,* 123 Nev. 577, 586, 170 P.3d 982, 988 (2007); *see generally Liu v. Christopher Homes, LLC,* 130 Nev. 147, 321 P.3d 875 (2014) (clarifying the extent to which *Horgan* receded from *Sandy Valley)*. While attorney fees are not awarded "unless there is a statute, rule or contract providing for such an award," the Nevada Supreme Court has allowed for attorney fees to constitute special damages [5] in limited circumstances. *Pardee,* 135 Nev. at 174, 444 P.3d at 424.

In *Sandy Valley,* the supreme court concluded that attorney fees are only to be considered special damages "when a party claims it has incurred attorney fees as foreseeable damages arising from tortious conduct or a breach of contract." 117 Nev. at 956, 35 P.3d at 969. However, the supreme court also indicated that "[b]ecause parties always know lawsuits are possible when disputes arise, the mere fact that a party was forced to file or defend a lawsuit is insufficient to support an award of attorney fees as damages." *Id.* at 957, 35 P.3d at 969. Further, the supreme court has specifically stated that special damages are inappropriate where "a plaintiff merely seeks to recover fees incurred for prosecuting a breach-of-contract action against a breaching defendant." *Pardee,* 135 Nev. at 178, 444 P.3d at 426.

The supreme court outlined the necessary steps to properly plead a claim for attorney fees as special damages and defined three limited circumstances in which a party can request such fees as special damages. *Sandy Valley,* 117 Nev. at 956-58, 35 P.3d at 969-70. To properly plead and potentially receive an award of fees, (1) the attorney fees "must be pleaded as special damages in the complaint pursuant to NRCP 9(g)"; (2) the attorney fees must be "proved by competent evidence just as any other element of damages"; and (3) the attorney

fees "must be the natural and proximate consequence of the injurious conduct." *Id.* at 956-57, 35 P.3d at 969. The three limited circumstances to recover attorney fees as special damages are when (1) the fees are "an element of damage in cases when a plaintiff becomes involved in a third-party legal dispute as a result of a breach of contract or tortious conduct by the defendant"; (2) the fees are incurred while recovering real or personal property taken because of the wrongful conduct of the defendant or when clarifying or removing a cloud upon the title of the property; and (3) in actions for declaratory or injunctive relief when "the actions were necessitated by the opposing party's bad faith conduct." *Id.* at 957-58, 35 P.3d at 970.

**\*6** In this case, at this point in time, the only damages Smead has alleged for his breach of contract claim are in the form of attorney fees and costs incurred as a result of bringing a civil suit against Sherman for allegedly breaching the 2011 settlement agreement. [6] As noted above, *Sandy Valley* and *Pardee Homes* prohibit an award of attorney fees as special damages incurred simply by commencing an action based on the injurious conduct of another. *See Pardee Homes*, 135 Nev. at 178, 444 P.3d at 427 ("[U]nder [the respondents'] theory, any breach-of-contract suit would warrant attorney fees as special damages because it would be foreseeable that an aggrieved party would retain the services of an attorney to remedy a breach. This conflicts with our caselaw."). Further, merely bringing a lawsuit which results in fees and costs being incurred does not support that such fees and costs are the "natural and proximate consequence" of Sherman's conduct. *See Sandy Valley*, 117 Nev. at 957, 35 P.3d at 969-70 ("As a practical matter, attorney fees are rarely awarded as [special] damages simply because parties have a difficult time demonstrating that the fees were proximately and necessarily caused by the actions of the opposing party and that the fees were a reasonably foreseeable consequence of the breach or conduct.").

Therefore, we conclude that Smead has failed to prove the element of damages required for breach of contract, thereby precluding the grant of summary judgment. *See Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989) ("The party seeking damages has the burden of proving both the fact of damages and the amount thereof."); *see also Nev. Cap. Ins. Co. v. Farmers Ins. Exch.*, No. 70572, 2018 WL 4614152, at \*2 (Nev. Sept. 21, 2018) (stating that "a failure to establish 'the existence or cause of damage' will bar recovery" (quoting *Knier v. Azores Constr. Co.*, 78 Nev. 20, 24, 368 P.2d 673, 675 (1962))).

Further, we are also not persuaded by Smead's allegation that he was disparaged by the reminder of the litigation in the letters and that this was sufficient to satisfy the damages element for a breach of contract claim. We note that the Rivetti letter did not specifically refer to any former employees by name or identify the litigation by party name. And to the extent the Hicks letter referenced Magpiong by name, this information was directed to Smead, who was already in possession of it, thus the mere reference to it in the letter could not have given rise to money damages necessary to recover on a breach of contract claim. *Cf. Rd. & Highway Builders, LLC v. N. Nev. Rebar, Inc.*, 128 Nev. 384, 392, 284 P.3d 377, 382 (2012) (stating that money damages ordinarily "make the aggrieved party whole and ... place the plaintiff in the position he would have been in had the contract not been breached" (internal quotation marks omitted)). Smead also fails to disclose any damages he sustained as a result of the disclosure for the purpose of settlement negotiations that was directed to him and not to a third party. *Cf. Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718, 57 P.3d 82, 91 (2002) (holding that to establish defamation a false statement must be published to a third party without privilege); *Nev. Ind. Broadcasting v. Allen*, 99 Nev. 404, 418, 664 P.2d 337, 346 (1983) (concluding that a political candidate was entitled to recover under defamation per se for comments that were publicly made and thus injured his professional reputation).

**\*7** Accordingly, Smead has not demonstrated any breach of contract damages incurred as a result of receiving the prelitigation letters from Sherman. And as noted above, the district court erred by finding that the attorney fees Smead incurred merely as the cost of litigation constituted special damages in contravention of *Sandy Valley*. Thus, even assuming there was a breach of the settlement agreement, Smead has failed at this juncture to establish the element of damages necessary to support his claim for breach of contract as a matter of law and, therefore, the district court erred in granting Smead summary judgment on his breach of contract claim.

### The district court abused its discretion in resolving the declaratory relief claim

Sherman argues that the district court abused its discretion in granting declaratory relief to award attorney fees and costs as special damages. The Nevada Supreme Court has held that "declaratory relief determines [the parties'] legal rights *without* undertaking to compel either party to pay money or to take some other action to satisfy such rights as are determined

to exist by the declaratory judgment." *Aronoff v. Katleman*, 75 Nev. 424, 432, 345 P.2d 221, 225 (1959) (emphasis added). To the extent the district court granted declaratory relief in its entirety for the purpose of awarding Smead his attorney fees and costs as monetary damages to satisfy a breach of the 2011 settlement agreement, not to determine a legal right, the district court abused its discretion in awarding declaratory relief.

In reaching this decision, we are mindful that a court is permitted to award attorney fees and costs as special damages under the limited declaratory relief exception stated in *Sandy Valley*, 117 Nev. at 957-58, 35 P.3d at 970. Even assuming, without deciding, that this exception applies, the district court failed to make findings as to whether Sherman's conduct constituted bad faith to properly award Smead his attorney fees and costs based on the declaratory relief exception set forth in *Sandy Valley*. Further, whether Sherman engaged in bad faith conduct is typically a decision for the jury or trier of fact, and therefore, summary judgment is inappropriate where genuine disputes remain as to Sherman's intent in referencing the prior litigation. *See Lee v. GNLV Corp.*, 117 Nev. 291, 296, 22 P.3d 209, 212 (2001) ("Whether a defendant's conduct was 'reasonable' under a given set of facts is generally an issue for the jury to decide."); *see also Myers v. Miller*, No. 81189, 2021 WL 4238033, at *1 (Nev. Sept. 16, 2021) (Order of Reversal and Remand) (concluding that the district court erred when it found that the appellant's conduct was unreasonable and constituted bad faith at the summary judgment stage on a breach of contract claim, because that is a question for the jury); *cf. Armentrout v. Mead*, No. 83858-COA, 2022 WL 17185094, at *9 (Nev. Ct. App. Nov. 23, 2022) (Order of Affirmance) (concluding, in the alternative, that attorney fees as special damages were incurred when the district court found that a party acted in bad faith). Thus, the district court abused its discretion in granting declaratory relief for the purpose of awarding attorney fees and costs as special damages without making the requisite findings necessary under *Sandy Valley*.

Therefore, we reverse the district court's order granting partial summary judgment because mere references to the prior litigation did not, in and of themselves, constitute a breach of the Covenants clause, and because Smead has failed to demonstrate the element of damages necessary to state a claim for breach of contract, and further failed to establish a claim for declaratory relief at this time. We also necessarily reverse the order granting attorney fees and costs. *See, e.g., Cain v. Price,* 134 Nev. 193, 198, 415 P.3d 25, 30 (2018) (explaining that where a district court's order granting summary judgment is reversed, it is no longer appropriate to consider the respondents the prevailing party, and an award of attorney fees is inappropriate).

 **\*8** Accordingly, we

ORDER the judgments of the district court REVERSED AND REMAND this matter to the district court for proceedings consistent with this order. [7]

**All Citations**

527 P.3d 973 (Table), 2023 WL 2960921

<hr>

## Footnotes

1    We do not recount the facts except as necessary to our disposition.

2    We note that Sherman did not appeal the district court's denial of his motion for summary judgment. Our order should not be taken as an opinion as to the merits of that denial.

3    We note that NRCP 54(b) certification was required as the district court did not resolve all claims pending below.

4    In interpreting the contract, we look to the plain language contained in the Covenants clause. Black's Law Dictionary defines "publish" as "to communicate (defamatory words) to someone other than the person defamed." *Publish*, *Black's Law Dictionary* (11th ed. 2019). An advertisement or to advertise is defined as "[a] commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients

or customers." *Advertisement, Black's Law Dictionary* (11th ed. 2019). To reference is defined as "the act of referring or consulting." *See Reference, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). Further, to promote is to "move forward" and "contribute to the growth or prosperity of." *Promote, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020).

5    Special damages are actual pecuniary losses that can be determined with relative certainty. 25 C.J.S Damages § 4 (2022).

6    To the extent Smead contends that the attorney fees and costs incurred in pursuing his claim of breach of contract can satisfy the element of contractual damages via the settlement agreement's "prevailing party" language, this argument fails in light of our disposition. As discussed above, pursuant to *Sandy Valley,* attorney fees incurred in pursuing a lawsuit do not satisfy the required element of contract damages, but assuming there are quantifiable contract damages, attorney fees and costs may be recoverable by the prevailing party where a contract so provides. *Miller v. Wilfong,* 121 Nev. 619, 623, 119 P.3d 727, 730 (2005) (noting that attorney fees are recoverable if "allowed by express or implied agreement or when authorized by statute or rule" (internal quotation marks omitted)); *cf. Golightly & Vannah, PLLC v. TJ Allen, LLC,* 132 Nev. 416, 422, 373 P.3d 103, 107 (2016) (stating that where judgment in favor of the respondent must be reversed, the respondent is no longer the prevailing party and the award of fees and costs is reversed).

7    Insofar as the parties have raised arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 11613239
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas.

Michael David STUNTZ, Plaintiff,

v.

LION ELASTOMERS, L.L.C., Howard
Scott Hardegree, Trudy Lord, Tom Rogers,
Paula Sharp, and James Mosley, Defendants.

CIVIL ACTION NO. 1:17-CV-33
|
Signed 09/12/2017

**Attorneys and Law Firms**

John Gerard Werner, Reaud Morgan & Quinn LLP, Mark William Frasher, Mark Frasher, Attorney at Law, PC, Beaumont, TX, for Plaintiff.

Michael David Stuntz, Port Neches, TX, Pro Se.

Teresa S. Valderrama, Mauro Ramirez, Fisher & Phillips, LLP, Houston, TX, for Defendants Lion Elastomers LLC, Howard Scott Hardegree, Trudy Lord, Tom Rogers.

**MEMORANDUM AND ORDER**

MARCIA A. CRONE, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the court is Defendants Howard Scott Hardegree ("Hardegree"), Trudy Lord ("Lord"), Tom Rogers ("Rogers"), Paula Sharp ("Sharp"), and James Mosley's ("Mosley") (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint (#30). After considering the motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the Defendants' motion should be granted in part and denied in part.

I. Background
Plaintiff Michael David Stuntz ("Stuntz") was employed by Defendant Lion Elastomers, L.L.C. ("Lion"), from December 2014 until January 2015 at its elastomers plant located in Port Neches, Texas. Prior to December 2014, Ashland Elastomers, L.L.C. ("Ashland") owned and operated the Port Neches plant. At all times relevant to this action, Hardegree, Lord,

Rogers, and Mosley were employed by either Ashland or Lion in various capacities. Hardegree served as the Plant Manager, Lord headed the Human Resources Department at the plant level, Rogers was the Operations Manager over the Production Department, and Mosley was the Assistant Production Manager under Rogers. Sharp was employed by Goradia Capital, L.L.C., the parent company of Lion, as the Human Resources Manager. There are no facts indicating that Sharp was employed at any time by either Ashland or Lion.

Stuntz alleges retaliation under the Fair Labor Standards Act ("FLSA") based on the following actions that began while Ashland still owned the elastomers plant. In May 2013, Stuntz and some of his coworkers submitted a grievance against Ashland alleging FLSA violations related to overtime pay. Lord responded in June 2013, explaining that the alleged violation was not a grievance under the collective bargaining agreement with the United Steelworkers Union. Accordingly, he advised the aggrieved employees to direct this complaint to the appropriate federal office. By September 2013, Ashland and Defendants Hardegree, Lord, and Rogers came to an agreement that Stuntz and his coworkers were entitled to additional compensation and liquidated damages. Stuntz and his coworkers, believing their payout to be incorrect, demanded that Hardegree remedy the situation and, if not, they would file a claim with the Department of Labor. Despite additional payments, Stuntz and his coworkers claimed that the payments were still insufficient under the FLSA. Subsequently, they filed a collective action styled *Michael David Stuntz v. Ashland Elastomers, LLC, et al.*, Civil Action No. 1:14-CV-00173, in the United States District Court for the Eastern District of Texas to enforce their right to overtime pay from Ashland. This suit was initially filed on March 21, 2014, and is still pending. Lion purchased the Port Neches plant in December 2014.

On January 23, 2015, Stuntz did not report for work due to chronic respiratory problems and asthma symptoms. Stuntz informed Lion's supervisor on duty that he would be seeing a physician for his condition. Later that day, Lord notified Stuntz that he would be placed on administrative leave pending an investigation into his absence. On January 26, 2015, Stuntz attempted to schedule a meeting with Rogers to provide Rogers his medical records and certification from his treating physician, but he was unable to schedule an appointment with Rogers.

**\*2** On January 27, 2015, Rogers terminated Stuntz's employment with Lion. During the termination process,

Stuntz again attempted to give Rogers a copy of his medical records. Rogers briefly reviewed the records before returning them to Stuntz. Rogers, Hardegree, and Lord jointly decided to terminate Stuntz's employment without conducting an investigation into Stuntz's medical condition. Additionally, Rogers, Lord, and Hardegree all had the authority to decide whether to discipline Stuntz. Immediately prior to Stuntz's termination, he was approved for leave under the Family and Medical Leave Act ("FMLA") to care for his mother during her illness.

After Stuntz's termination, he initiated a grievance seeking reinstatement to his job. Hardegree, Rogers, Lord, Mosley, and Sharp each allegedly took part in determining whether to reinstate Stuntz and had the authority under the Lion policy to reinstate Stuntz. On February 23, 2015, Hardegree officially rejected Stuntz's request for reinstatement because Stuntz's absence allegedly violated a last chance agreement. [1]

Stuntz initiated this suit on January 24, 2017, claiming that Defendants interfered with his rights under the FMLA and that Hardegree, Lord, Rogers, and Sharp retaliated against him due to his FLSA claims. Stuntz filed his first amended complaint on June 26, 2017. In response, the Defendants filed the instant motion to dismiss for failure to state a claim upon which relief can be granted.

## II. Discussion

### A. Dismissal for Failure to State a Claim Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). It is not a procedure for resolving contests about the facts or the merits of a case. *See* 5B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2004 & Supp. 2015). In ruling on such a motion, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 415 (5th Cir. 2014); *Leal v. McHugh*, 731 F.3d 405, 410 (5th

Cir. 2013) (noting that at the 12(b)(6) stage, the court must construe all facts in favor of the non-moving party); *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir.), *cert. denied*, 567 U.S. 936 (2012). Nevertheless, "the plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Ramming*, 281 F.3d at 161 (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *accord In re La. Crawfish Producers*, 772 F.3d 1026, 1029 (5th Cir. 2014); *Gibson v. Tex. Dep't. of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 233 (5th Cir. 2012).

Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999); *see Hicks v. Lingle*, 370 F. App'x 497, 497 (5th Cir. 2010); *Wilson*, 667 F.3d at 595. The court, may, however, consider "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). A court may also review documents "attached to a response to a motion to dismiss when [they are] sufficiently referenced in the complaint and [their] authenticity is unquestioned." *Am. Gen. Life Ins. Co. v. Mickelson*, No. H-11-3421, 2012 WL 1355591, at *2 (S.D. Tex. Apr. 18, 2012) (citing *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008) (relying on documents that were "explicitly referenced in the complaint, acknowledged in the answers, and attached to [Plaintiff]'s opposition to the Defendants' motions to dismiss")); *see also United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 531 n.9 (N.D. Tex. 2012); *Keel v. Wal-Mart Stores, Inc.*, No. 1:11-CV-248, 2012 WL 488248, at *2 (E.D. Tex. Jan. 11, 2012).

**\*3** "[A] motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.' " *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)); *accord Leal*, 731 F.3d at 410. "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citation omitted); *accord Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (noting that at the 12(b)(6) stage the court's task "is to determine whether the plaintiff [has] stated a

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    2

legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success" (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012))); *Leal*, 731 F.3d at 410. "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.' " *Ramming*, 281 F.3d at 161-62 (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992)).

A Rule 12(b)(6) motion to dismiss must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure. *Twombly*, 550 U.S. at 555. Accordingly, a district court should not dismiss a complaint for failure to state a claim unless a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *accord Leal*, 731 F.3d at 410; *Wilson*, 667 F.3d at 595; *Turner*, 663 F.3d at 775; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Coleman v. Sweetin*, 745 F.3d 756, 763 (5th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Thompson*, 764 F.3d at 503; *Harold H. Huggins Realty, Inc.*, 634 F.3d at 796. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *Gibson*, 700 F.3d at 233. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. In other words, to state a cognizable cause of action, the complaint must allege sufficient facts to "nudge" the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Leal*, 731 F.3d at 410. Generally, at the 12(b)(6) stage, a plaintiff is simply required to inform the defendants of the factual basis of his complaint in order to avoid dismissal for failure to state a claim. *See Johnson v. City of Shelby*, ––– U.S. ––––, ––––, 135 S. Ct. 346, 346-47 (2014) (citing FED. RULE CIV. P. 8(a)(2)); *Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016).

**B.** Employer under the FLSA and FMLA
For Stuntz to succeed on his FLSA and FMLA allegations, each defendant, in his, her, or its individual capacity, must qualify as an employer. Without weighing the merits of Stuntz's case, the court must ascertain whether Stuntz has

pleaded sufficient facts that could, viewing the facts in the light most favorable to the plaintiff and resolving all doubt in his favor, establish that the individual defendants are employers under the FLSA and the FMLA.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Similarly, the FMLA defines an employer as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Id.* § 2611(4)(A)(ii)(I). Accordingly, the United States Court of Appeals for the Fifth Circuit has agreed that "[t]he fact that Congress, in drafting the FMLA, chose to make the definition of 'employer' materially identical to that in the FLSA means that decisions interpreting the FLSA offer the best guidance for construing the term 'employer' as it has been used in the FMLA." *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006) (quoting *Wascura v. Carver*, 169 F.3d 683, 686 (11th Cir. 2006)). For that reason, the court will proceed with the analysis of both claims applying the FLSA's definition of employer.

**\*4** In determining the status of a putative employer in FLSA cases, the Fifth Circuit has applied the "economic reality" test. *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014); *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012); *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990). Under the economic reality test, the court considers whether the alleged employer "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Orozco*, 757 F.3d at 448; *Gray*, 673 F.3d at 355; *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010). A claimant does not have to establish every element. *Orozco*, 757 F.3d at 448. While "[t]he absence of one factor is not necessarily dispositive, ... the absence of all factors is fatal." *Joaquin v. Coliseum Inc.*, No. A-15-CV-787-LY, 2016 WL 3906820, at *2 (W.D. Tex. July 13, 2016). In cases where the plaintiff alleges more than one potential employer, the court must "apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test." *Watson*, 909 F.2d at 1549; *see Gray*, 673 F.3d at 352.

"The FLSA's definition of employer must be liberally construed to effectuate Congress' remedial intent." *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993); *Crane v. Gore Design Completion, Ltd.*, 21 F. Supp.

3d 769, 783 (W.D. Tex. 2014). Nevertheless, "[w]hen taken out of context," the definition of employer can "potentially implicate[ ] a broad swath of low-to mid-level supervisors." *Crane*, 21 F. Supp. 3d at 769 (referencing *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983)). Accordingly, "[t]he dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Martin v. Spring Break #83 Prods., LLC*, 688 F.3d 247, 251 (5th Cir. 2012) (quoting *Gray*, 673 F.3d at 357). The case law does not suggest, however, that "merely being an officer or shareholder subjects an individual to FLSA liability." *Gray*, 673 F.3d at 355-56; *Branum v. Richardson*, No. 3:10CV852, 2014 WL 795080, at *3 (S.D. Miss. Feb. 27, 2014) ("A shareholder, member, or officer of an entity is not individually liable as an employer simply because of his or her position."). Indeed, "individuals ordinarily are shielded from personal liability when they do business in a corporate form, and ... it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA." *Gray*, 673 F.3d at 356 (quoting *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998)).

Therefore, only individuals "who have operating control over employees" may be held individually liable for FLSA violations committed by the company. *Gray*, 673 F.3d at 357; *Branum*, 2014 WL 795080 at *3. The Supreme Court of the United States has held that " 'managerial' and 'substantial control' of the terms and conditions of the [employer's] work create statutory employer status." *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)). If a corporate officer has operational control of the corporation's actions, the officer is considered an employer and can be held jointly and severally liable for the FLSA violations. *Id.* at 972 (quoting *Donovan*, 712 F.2d at 1511).

#### 1. Hardegree

At all relevant times, Hardegree was the Plant Manager at the Port Neches plant. Viewing the facts in the light most favorable to Stuntz, the pleadings regarding Hardegree's status as an employer under the FLSA are sufficient. Stuntz alleges that Hardegree had the power to hire and terminate employees as well as discipline employees who disregarded the Attendance Policy. While Stuntz does not allege that Hardegree "determined the method or rate of payment," or that Hardegree "maintained employment records," the third and fourth prongs, respectively, of the economic reality test, "each element need not be present in every case." *Gray*,

673 F.3d at 355, 357. Additionally, Hardegree approved the Attendance Policy created by Lord, and Hardegree had the authority to decide whether Stuntz's absences violated his current FMLA status. Thus, Stuntz has pleaded sufficient facts to create an inference that Hardegree had "operating control" over Stuntz. *Id.* at 357. For the preceding reasons, the court finds that Stuntz has stated sufficient facts to overcome a motion for failure to state a claim against Hardegree.

#### 2. Lord

**\*5** Stuntz has pleaded sufficient facts concerning Lord's status as an employer. Lord, as the director of the Human Resources Department, had the authority to hire and fire employees, exercised control over the employees' schedules, prepared the Attendance Policy, and maintained policies and records of employees. It is inconsequential that Stuntz does not allege that Lord "determined the method or rate of payment." *See Gray*, 673 F.3d at 355, 357. Further, the facts asserted raise an inference that Lord had a managerial role and substantial control of the terms and conditions of employment. Accordingly, Stuntz has set forth sufficient facts from which a reasonable inference could be drawn that Lord is an employer.

#### 3. Rogers

Stuntz has pleaded sufficient facts to raise an inference that Rogers is an employer under the FLSA. Applying the economic reality test, Rogers had the authority to terminate employees, could control employee work schedules, and maintained some types of employee records. [2] Given the facts provided in Stuntz's pleadings, a plausible claim could be made that Rogers had managerial authority or that Rogers had substantial control of the terms and conditions of employment. Consequently, the court finds that Stuntz has alleged adequate facts as to Rogers's status as an employer.

#### 4. Mosley

Stuntz pleaded few facts involving Mosley. Stuntz alleges that Mosley: (a) is the Assistant Production Manager who took part in considering the facts surrounding Stuntz's termination; (b) had the authority to reinstate employees; and (c) had the authority to determine whether an employee violated the Attendance Policy. Stuntz directly addressed only one prong of the economic reality test: the authority to supervise or control the employee's work schedule. Moreover, Stuntz failed to provide facts indicating that reviewing an employee's compliance with the Attendance Policy is akin

to controlling the employee's work schedule. Even viewing Stuntz's pleadings in the most favorable light, he fails to allege facts sufficient to meet the economic reality test with regard to Mosley.

Additionally, Stuntz failed to plead facts indicating that Mosley is in "operating control" of Stuntz. As stated above, merely having a title in a business does not give rise to individual FLSA liability. *See* Gray, 673 F.3d at 355-56; Branum, 2014 WL 795080, at \*3. Further, Stuntz provides no facts from which the court could infer that Mosley had significant managerial responsibilities or that he had substantial control over the terms or conditions of employment. Finding Mosley to be an employer under the FLSA based on his title alone would implicate the "broad swath" of liability for low-to mid-level supervisors the *Crane* court cautioned against. Crane, 21 F. Supp. 3d at 769. Therefore, the court finds that Stuntz failed to plead sufficient facts to create an inference that Mosley, in his individual capacity, is an employer under the FLSA.

### 5. Sharp

Stuntz failed to plead sufficient facts for the court to infer that Sharp is an employer. Indeed, Stuntz pleaded little more than Sharp's position in the Human Resources Department of Lion's parent company. Stuntz failed to assert facts indicating that Sharp could hire or fire employees of the subsidiary organization. While Stuntz contends that Sharp played a role in the decision to reinstate employees of a subsidiary, that falls short of the required test. Further, Stuntz maintains that Sharp had the authority to grant FMLA leave "and/or require other Defendants to grant Plaintiff's FMLA and reinstate plaintiff," but does not supply any facts indicating that Sharp had operating control over the employees themselves.

 \*6  In addition, Stuntz failed to allege facts that support any of the four prongs of the economic reality test with respect to Sharp. While not every element is required in every case, "finding employer status when none of the factors are present would make the test meaningless." Gray, 673 F.3d at 357. Defendants cannot be held individually liable simply because they are corporate officers. *Id.* The limitations of individual liability under the FLSA are similar to the concept of piercing the corporate veil. *See* Branum, 2014 WL 795080, at \*3. As stated, the shield individuals enjoy in the corporate context cannot simply be disregarded for the definition of an employer under the FLSA. Under these circumstances, Stuntz's conclusory statement that the actions and/or omissions of Sharp constitute an FMLA violation does

not meet the requirements of Rule 8(a). Iqbal, 556 U.S. at 678; *see* Lehman Bros. Holdings, Inc. v. Cornerstone Mortg. Co., No. H-09-0672, 2009 WL 2900740, at \*5 (S.D. Tex. Aug. 31, 2009); *see also* Flynn v. CIT Grp., 294 F. App'x 152, 154 (5th Cir. 2008). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal...." ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 348 (5th Cir. 2002); *accord* Iqbal, 556 U.S. at 678; In re Reliant Energy ERISA Litig., 336 F. Supp. 2d 646, 663-64 (S.D. Tex. 2004). Accordingly, the court finds that Stuntz fails to meet the minimum pleading standard by relying almost exclusively on Sharp's position with a parent company to assert employer status. Stuntz has failed to plead any facts demonstrating that Sharp is an employer using the economic reality test or through Sharp's exertion of operational control.

### C. Opportunity to Amend

Generally, however, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend. Hart v. Bayer Corp., 199 F.3d 239, 248 n.6 (5th Cir. 2000) (plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *accord* Young v. U.S. Postal Serv. ex rel. Donahoe, 620 F. App'x 241, 245 (5th Cir. 2015); Goldstein v. MCI WorldCom, 340 F.3d 238, 254 (5th Cir. 2003); O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 675-76 (2d Cir. 1991).

> Under Rule 12(b)(6), a plaintiff with an arguable claim is ordinarily accorded notice of a pending motion to dismiss for failure to state a claim and an opportunity to amend the complaint before the motion is ruled upon. These procedures alert him to the legal theory underlying the defendant's challenge, and enable him meaningfully to respond by opposing the motion to dismiss on legal grounds or by clarifying his factual allegations so as to conform with the requirements of a valid legal cause of action.

Neitzke v. Williams, 490 U.S. 319, 329-30 (1989).

Where, however, a claim is frivolous or the "complaint alleges the plaintiff's best case," a further factual statement from the plaintiff need not be allowed. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999); *A.W. v. Humble Indep. Sch. Dist.*, 23 F. Supp. 3d 973, 1008 (S.D. Tex. 2014), *aff'd sub nom. King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754 (5th Cir. 2015); *see Neitzke*, 490 U.S. at 327-28; *Hart*, 199 F.3d at 248 n.6. Moreover, when the plaintiff declares the sufficiency of his pleadings and makes no attempt to amend his complaint in response to the defendant's challenge pursuant to Rule 12(b)(6), dismissal is proper when the plaintiff's allegations fail to state a claim for which relief can be granted. *See Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 419 (5th Cir. 2010); *Sullivan v. Leor Energy, LLC*, 600 F. 3d 542, 551 n.38 (5th Cir. 2010). In addition, a plaintiff should not be granted leave to amend after being afforded repeated opportunities to do so. *Sullivan*, 600 F. 3d at 551 (leave to amend was properly denied where plaintiff was on notice of deficiencies for nine months and did not attempt to correct them); *Torch Liquidating Tr. ex rel. Bridge Assoc. L.L.C. v. Stockstill*, 561 F.3d 377, 391 (5th Cir. 2009) (finding that plaintiff had ample opportunity to cure noted defects through a prior amendment); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 404 (5th Cir. 2004) (noting that "pleading review is not a game where the plaintiff is permitted to file serial amendments until he finally gets it right"); *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (holding leave to amend was properly denied where the relator had previously filed two amended complaints). Furthermore, "where a proposed amendment would be a futile act, a court does not abuse its discretion in denying leave to amend." *SB Int'l, Inc. v. Jindal*, No. 3:06-CV-1174-G, 2007 WL 2410007, at *3 (N.D. Tex. Aug. 23, 2007) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)); *accord Marucci Sports, L.L.C. v. Nat'l Coll. Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009).

**\*7** "Whether leave to amend should be granted is entrusted to the sound discretion of the district court." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir.), *cert. denied*, 537 U.S. 1044 (2002) (quoting *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998)); *accord Marucci Sports, L.L.C.*, 751 F.3d at 378. Here, it appears that additional amendments are unwarranted. Stuntz has already amended his complaint once. Additionally, he has been afforded ample opportunity to rectify any pleading defects. *See Adrian*, 363 F.3d at 404 (opining that the district court did not abuse its discretion by denying leave to amend where the plaintiff did not indicate "what additional facts he could plead that would correct the deficiencies in his previous complaints"). Therefore, at this juncture, dismissal of the complaint as to the allegations against Mosley and Sharp is appropriate.

III. Conclusion

Consistent with the foregoing analysis, while Plaintiff has pleaded sufficient facts to raise a plausible claim against Hardegree, Lord, and Rogers, he fails to do so in his claims against Mosley and Sharp. Accordingly, Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (#30) is DENIED with respect to Plaintiff's claims against Hardegree, Lord, and Rogers. Defendant's motion as to Plaintiff's claims against Mosley and Sharp is GRANTED, and these claims are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 11613239

---

## Footnotes

1    Based on Stuntz's pleadings, there was a last chance agreement between Stuntz and Lion. It is unclear, based on the given facts, the contents of this last chance agreement or who participated in its negotiation or execution.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2    Plaintiff provides an email wherein Rogers states that Stuntz failed to report to work or inform his supervisor of his absence. The email further identifies this as a violation of the last chance agreement. These facts indicate that Rogers had access to Stuntz's employment records.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   Appendix p. 275   7

TMX, Inc. v. Volk, Not Reported in P.3d (2015)
131 Nev. 1355

131 Nev. 1355
Only the Westlaw citation is currently available.

An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

Court of Appeals of Nevada.

TMX, INC., A Nevada Corporation;
and Chester L. Mallory, Appellants,
v.
Iris A. VOLK, Respondent.
TMX, Inc., A Nevada Corporation;
and Chester Mallory, Appellants,
v.
Iris A. Volk, Respondent.

Nos. 65807, 66222.
|
Aug. 31, 2015.

**Attorneys and Law Firms**

Charles R. Kozak.

Woodburn & Wedge.

Before GIBBONS, C.J., TAO and SILVER, JJ.

*ORDER AFFIRMING IN PART,
REVERSING IN PART AND REMANDING*

**\*1** This is an appeal from a district court's order granting respondent Iris Volk's motion to dismiss. Second Judicial District Court, Washoe County; Janet J. Berry, Judge.

This case arises from appraisals made by Iris Volk from 2005 to 2008 regarding TMX, Inc.'s assets. Volk allegedly failed to deduct scrap metal when calculating TMX's value, eventually leading to an overinflated buy-out price when a partner, Eddie Smyth, left TMX in 2008. TMX agreed to buy out Smyth's stock, and Chester Mallory personally guaranteed $450,000 of the promissory note. TMX later defaulted on its payments, and in 2011 Smyth sued to enforce the note. The jury eventually found for Smyth against Mallory. In 2013, appellants TMX and Mallory (collectively "Mallory") filed suit against Volk for breach of contract and fraud, but the district court dismissed the complaint. Mallory appeals the

district court's dismissal. Additional facts underlying this case are extensive; however, as the parties are aware of those facts, we need not recite them here.

On appeal, Mallory argues the district court erred in dismissing appellants' complaint. The primary issue we consider is whether the district court erred in concluding the statute of limitations barred Mallory's claims. [1]

We review de novo an order granting a motion to dismiss. *Brown v. Eddie World, Inc.,* 131 Nev. ——, ——, 348 P.3d 1002, 1003 (2015). In asserting a claim for relief, the plaintiff need only state "a short and plain statement of the claim showing that the pleader is entitled to relief." NRCP 8(a). A pleading "is sufficient so long as the pleading gives fair notice of the nature and basis of the claim," *Crucil v. Carson City,* 95 Nev. 583, 585, 600 P.2d 216, 217 (1979). We accept the nonmoving party's factual allegations as true and draw every fair factual inference from them. *Shoen v. SAC Holding Corp.,* 122 Nev. 621, 635, 137 P.3d 1171, 1180 (2006). Dismissal for failure to state a claim is appropriate "only if it appears beyond a doubt that [the nonmoving party] could prove no set of facts, which, if true, would entitle it to relief." *Buzz Stew, LLC v. City of North Las Vegas,* 124 Nev. 224, 228, 181 P.3d 670, 672 (2008) (*Buzz Stew I* ). The supreme court clarified in *Buzz Stew I* the standard is not one of "reasonable doubt," but one of *any* doubt. *Id.* at 228 n. 6, 181 P.3d at 672 n. 6.

An action based upon a written contract must be brought within six years, NRS 11.190(1)(b). Actions based upon an oral contract must be brought within four years. NRS 11.190(2)(c). Actions for fraud and misrepresentation have a three-year statute of limitations . [2] NRS 11.190(3)(d). The date on which a statute of limitations accrues is normally a question of fact, and the district court may determine that date as a matter of law only when the uncontroverted evidence irrefutably demonstrates the accrual date. *Winn v. Sunrise Hosp. & Med. Ctr.,* 128 Nev. at ——, ——, 277 P.3d at 458, 462–63 (2012). Non-compliance with a statute of limitations is a non-jurisdictional, affirmative defense, *see, e.g., Dozier v. State,* 124 Nev. 125, 129, 178 P.3d 149, 152 (2008), and the party asserting an affirmative defense bears the burden of proof. *See Nev. Ass'n Servs., Inc. v. Eighth Judicial Dist. Court,* 130 Nev. ——, ——, 338 P.3d 1250, 1254 (2014). As judging the validity of an affirmative defense "often requires consideration of facts outside of the complaint[,]" an affirmative defense generally does not provide grounds for a court to grant a motion to dismiss. *Kelly–Brown v. Winfrey,* 717 F.3d 295, 308 (2d Cir.2013); *see also In re*

*CityCenter Constr. Lien Master Litig.,* 129 Nev. ——, ——, n. 3, 310 P.3d 574, 579 n. 3 (2013) (noting courts generally do not consider matters outside the pleading in determining a motion to dismiss); *Lubin v. Kunin,* 117 Nev. 107, 116, 17 P.3d 422, 428 (2001) (noting defenses generally should not be considered on a motion to dismiss).

**\*2** "The general rule concerning statutes of limitation is that a cause of action accrues when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen,* 106 Nev. 271, 274, 792 P.2d 18, 20 (1990). But, the Nevada Supreme Court has provided an exception to the general rule, referred to as the discovery rule, under which "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action ." *Id.* The discovery rule generally applies where the statute of limitations does not specify when a cause of action accrues. *Bemis v. Estate of Bemis,* 114 Nev. 1021, 1025 n. 1, 967 P.2d 437, 440 n. 1 (1998). Because NRS 11.190(1)(b) is silent as to when accrual occurs and NRS 11.190(3)(d) expressly incorporates the discovery rule, the discovery rule applies to both of Mallory's claims. Thus, we first consider when Mallory discovered or reasonably should have discovered the harm.

On appeal, Mallory argues the statute of limitations began to run in 2013 only after Volk testified during the earlier trial involving Smyth's breach of guarantee claim against Mallory, and only after judgment was entered against Mallory in that action. We disagree.

The uncontroverted facts show Mallory suffered harm in 2008 when the inflated valuation led to an inflated buy-out price. Although the 2013 judgment against Mallory enforced the promissory note, the damage itself—Mallory's duty to pay more for the company's stock than they were worth—occurred at the time of the buy-out. And, Mallory was aware in January 2009 the company's worth had been overestimated and that the buy-out amount was likewise inflated. The facts forming the basis of the present complaint, that Volk purposely or negligently failed to exclude scrap metal from her valuation in breach of her contractual duty to TMX, were actually discovered or could have been discovered with reasonable diligence at that time. Specifically, the parties knew in January of 2009 the company's value had been inflated by the inclusion of scrap metal in the valuations involving Volk's accounting. Further, we note Mallory's argument to this court differs from what he previously asserted to the district court: that the statute of limitations

began to run in 2010. *See Old Aztec Mine, Inc. v. Brown,* 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (holding we need not consider a point not urged in the trial court). As such, we agree with the district court that the statute of limitation was triggered in January 2009 when appellants learned of the miscalculation of assets.

Because the applicable statute of limitations began to run in January 2009, Mallory was required to bring his fraud claim by January 2012. Yet, Mallory did not bring suit until December 2013, and, therefore, his fraud claim is barred. Thus, we need not consider whether the complaint was pleaded with sufficient particularity for fraud under *Rocker v. KPMG LLP,* 122 Nev. 1185, 148 P.3d 703 (2006) (overruled on other grounds by *Buzz Stew I,* 124 Nev. at 228, 181 P.3d at 672), or whether the district court should have given leave to amend the complaint to add a claim for negligent misrepresentation,[3] which likewise would have been barred by the statute of limitations.

**\*3** Whether the contract claim was also barred depends upon whether the district court erred in converting Mallory's claim from one founded upon a written contract to one founded upon an oral contract. If the claim was based upon a written contract, the statute of limitations would not have expired before January 2015; if it was based on an oral contract, however, the statute of limitations would have expired in January 2013, nearly a year before Mallory filed suit against Volk. *See* NRS 11.190(1)(b) and (2)(c).

Here, although Mallory's complaint is, perhaps, inartful, it is clear Mallory based the breach of contract claim upon a written contract. Volk moved to dismiss for failure to state a claim under NRCP 12(b)(5). Specifically, Volk argued that because Mallory failed to show the existence of a written contract, the claim could only be based upon an oral agreement and was, therefore, barred by the four-year statute of limitations.

We conclude the district court erred in converting Mallory's breach of contract claim to one based upon an oral contract and finding it was barred by the four-year statute of limitations. First, the complaint was sufficient under NRCP 8(a): it notified Volk of Mallory's belief in the existence of a written contract, and set forth facts detailing the alleged breach of that contract. Second, an issue of fact remains as to whether Mallory's breach of contract claim was filed within the statute of limitations. Taking Mallory's facts as true, and drawing all inferences in the light most favorable

to Mallory, it is possible that discovery will yield a copy of a written contract, should one exist. If evidence of a written contract is produced during discovery and the six-year statute of limitations is found to apply, the breach of contract claim was timely filed. Further, as the party asserting the affirmative defense, Volk, not Mallory, bears the burden of proving the statute of limitations bars Mallory's claim. Accordingly, it was inappropriate for the district court to conclude, on a motion to dismiss, that the breach of contract claim was barred by the four-year statute of limitations, and we reverse the district

court on this issue. This conclusion likewise requires us to vacate the award of attorney fees and costs. Accordingly, we

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

**All Citations**

Not Reported in P.3d, 131 Nev. 1355, 2015 WL 5176619

## Footnotes

1      Volk also argues Mallory does not have standing to sue, but as guarantor of the buy-out agreement and an assignee of TMX's claims, Mallory has standing to bring suit. *See* NRCP 17(a); *Szilagyi v. Testa,* 99 Nev. 834, 838, 673 P.2d 495, 498 (1983) (describing real parties in interest and explaining standing focuses on the party seeking adjudication rather than the issues of the case).

2      The Nevada Supreme Court has not clarified whether negligent misrepresentation claims fall under NRS 11.190(3)(d) (misrepresentation, three years) or NRS 11.190(4)(e) (negligence, two years). However, in light of our conclusions, we need not address that issue.

3      We note Mallory did not raise negligent misrepresentation below nor does the record demonstrate Mallory ever moved to amend the complaint to include a claim for negligent misrepresentation. We generally will not consider arguments not raised before the district court. *See Old Aztec Mine,* 97 Nev. at 52, 623 P.2d at 983.

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

710 P.2d 1379

101 Nev. 742
Supreme Court of Nevada.

The TRUSTEES OF the CARPENTERS FOR
SOUTHERN NEVADA HEALTH AND WELFARE
TRUST; the Trustees of the Construction Industry
and Carpenters Joint Pension Trust for Southern
Nevada; the Trustees of the Vacation Trust Carpenters
Local No. 1780 and the Trustees of the Southern
Nevada Carpenters and Millwrights Apprentice
Training Trust, Appellants and Cross-Respondents,
v.
BETTER BUILDING COMPANY,
Respondent and Cross-Appellant.

No. 15830.
|
Dec. 12, 1985.

**Synopsis**

Trustees for various trusts for carpenters brought action against employer to recover allegedly unpaid contributions. The Eighth Judicial District Court, Clark County, Thomas J. O'Donnell, J., entered judgment on verdict for employer and trustees appealed. The Supreme Court, Steffen, J., held that: (1) evidence was sufficient to support finding that tool rental payments were not disguised compensation for work performed by carpenters and benefit contributions were not owed by employer; (2) evidence was sufficient to support finding that trustees were not entitled to recover damages for breach of contract; and (3) employer was not entitled to recovery of attorney's fees on basis that trustees did not recover more favorable judgment than their offer of judgment under Rule 68.

Affirmed.

Springer, C.J., dissented and filed opinion.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*1380   \*743**  Lionel Sawyer & Collins and Evan J. Wallach, Las Vegas, for appellants and cross-respondents.

Robert K. Dorsey, Las Vegas, for respondent and cross-appellant.

**\*744**  OPINION

STEFFEN, Justice.

Appellants contend the lower court committed reversible error in refusing to grant their motions for a new trial and judgment notwithstanding the verdict.

At trial, the proponent of a proposition essentially has two burdens relative to **\*\*1381** his proof. The first being to produce evidence which proves or tends to prove his position. The second burden is to persuade the trier of fact that his evidence is more credible or entitled to the greater weight. *See Koesling v. Basamakis,* 539 P.2d 1043 (Utah 1975).

Appellants' proposition at trial was that they were entitled to unpaid contributions to the Employee Benefit Trust Fund for thirteen carpenters employed by Better Building Company (Better Building) during the audit period. Appellants also asserted that contributions were owed for "tool rental" payments to Better Building's employees because allegedly such payments were actually compensation payable by reason of the employees' work. The jury, however, was not swayed by appellants' arguments.

An examination of the record reveals that appellants did not meet their burden of proof. Based upon the evidence presented at trial, the jury could reasonably conclude that contributions were properly made on behalf of all employed carpenters by Better Building during the audit period and therefore no contributions were owed for the thirteen questioned individuals. In addition, the evidence indicates that payments for tool rental were properly so categorized and were not a subterfuge for wages in order to avoid paying benefit contributions to the trust fund. The carpenters' wages, upon which benefit contributions were made, **\*745** remained the same. Better Building merely paid a "tool rental" to the carpenters to furnish and transport whatever tools they needed in an attempt to eliminate the loss of tools and the lost time resulting from the distribution, gathering, maintenance and repair of the tools previously supplied by Better Building. The jury's decision that the tool rental payments were not disguised compensation for work performed is reasonable and fully supported by the record.

Moreover, the trial court instructed the jury that "a nonbreaching party to a contract is entitled to all sums which that party would have received had the contract not

been breached." The appellants' contention that the jury disregarded this instruction is meritless. Had the contract which forbade employers from making tool rental payments not been breached, Better Building would have applied the tool rental payments towards the purchase, maintenance and repair of their own tools, the wages would have remained the same, and the appellants would not, therefore, have received any additional benefit payments. Appellants were not damaged by respondent's breach. Also, as discussed earlier, tool rentals were contractually prohibited because some contractors were using them as a subterfuge to avoid paying benefits. This is not the case here. The jury properly concluded that appellants were not entitled to recover damages for breach of contract.

Appellants also contend that the lower court committed prejudicial error by allowing respondent to offer testimony as to rulings of the Internal Revenue Service (IRS) and the Nevada Industrial Commission (NIC) which accepted Better Building's tool rental payments as such. Our review of the record convinces us that in view of the other evidence presented concerning the tool rental payments, the admission of the IRS ruling, even if properly objected to, was harmless and does not necessitate a reversal. *See* NRCP 61. Testimony concerning NIC's acceptance was also harmless, but more importantly, was never objected to at trial. We will not, therefore, consider it on appeal. *Old Aztec Mine, Inc. v. Brown,* 97 Nev. 49, 623 P.2d 981 (1981).

In *Bates v. Chronister,* 100 Nev. 675, 691 P.2d 865 (1984), this Court held that:

> [A] motion for [JNOV] may be granted *only* when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence or there is insufficient evidence **\*\*1382** to make a "one-way" verdict proper, [JNOV] should be **\*746** awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict.

*See also, Hernandez v. City of Salt Lake,* 100 Nev. 504, 686 P.2d 251 (1984). Viewing the evidence in the light most favorable to Better Building, the jury could reasonably reach a verdict contrary to that desired by appellants. Accordingly, the trial court did not err by denying appellants' motions for new trial and JNOV. Moreover, because there is substantial evidence to support the jury's decision, we will not disturb it. *Udevco, Inc. v. Wagner,* 100 Nev. 185, 678 P.2d 679 (1984).

Better Building asserts in its cross appeal that the trial court abused its discretion when it failed to grant them attorney's fees since appellants did not recover a more favorable judgment than their Rule 68 offer of judgment.

This Court recently noted in *Beattie v. Thomas,* 99 Nev. 579, 668 P.2d 268 (1983), that the purpose of Rule 68 "is not to force plaintiffs unfairly to forego legitimate claims" and that:

> In exercising its *discretion* regarding the allowance of fees and costs under NRCP 68 ... the trial court must carefully evaluate the following factors: (1) whether the plaintiff's claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount. [Emphasis added.]

The trustees in this case had a fiduciary duty to collect from signatory employers all amounts due as contributions to the trust funds for each hour worked by every carpenter employee. When Better Building's books were audited, appellants were refused access to the general ledger or cash disbursement journal. Without access to those records, no accurate determination could be made of whether Better Building had fully reported and paid benefits on all hours worked by its carpenter employees. It was not until nine months after the Rule 68 offer of judgment was made that such documents were produced. A Rule 68 offer expires ten days after its tender. Hence, absent the essential documents, it

710 P.2d 1379

cannot be said appellants' decision to proceed with litigation was unreasonable or in bad faith. We are convinced the lower court did not abuse its discretion in refusing to award Better Building attorney's fees.

Better Building also argues that NRS 18.010(5) should be **\*747** extended to permit them an award of attorney's fees. We disagree. NRS 18.010(2)(c) specifically precludes Better Building from receiving an award of attorney's fees in this case. NRS 18.010(5) states that subsection 2 does not apply "to any action arising out of a written instrument or agreement which entitled *the prevailing party* to an award of reasonable attorney's fees." In the present case, the contract entered into between the parties provided that appellants were entitled to attorney's fees if they prevailed, not that such fees were permitted to the prevailing party. We simply cannot construe the statutory language as covering the unilateral provision for fees set forth in the parties' contract. Better Building was properly refused an award of attorney's fees.

The respondent in this case also appeals to this court, claiming that the lower court abused its discretion when it did not award Better Building the expenses and costs of their expert utilized for preparation of their defense. Better Building's rationale is unpersuasive. Although a Rule 68 offer does not provide for payment of expert witness fees, respondent proposes **\*\*1383** that NRS 17.115, which does provide for a discretionary award of expert witness fees, should be read together with NRCP 68. Better Building cites to *Armstrong v. Riggi,* 92 Nev. 280, 549 P.2d 753 (1976), for analogous support of this proposition. This Court, however, need not address this question inasmuch as Better Building's offer of judgment in this case was tendered expressly pursuant to Rule 68. The refused offer was necessarily subject to the terms under which it was made.

Moreover, Better Building's expert, Mr. Goodman, was never sworn and did not testify at trial. Accordingly, the lower court did not abuse its discretion be refusing to award Better Building expert witness fees. *Mays v. Todaro,* 97 Nev. 195, 626 P.2d 260 (1981).

Finally, Better Building contends that the trial court erred in refusing to increase its award of expert witness fees to Richard Strahlem. NRS 18.005(5) makes discretionary an award of more than $750.00 for an expert witness. Unless "the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee," $750.00 is sufficient. Our review of the record discloses a lack of such

necessity and therefore the lower court did not abuse its discretion.

We have considered the remaining contentions of error and consider them to be without merit. Accordingly, we affirm the judgment entered upon the jury verdict.

MOWBRAY, GUNDERSON and YOUNG, JJ., concur.

**\*748** SPRINGER, Chief Justice, dissenting:

During the course of trial the district court permitted Better Building to introduce testimony, over objection, that the Internal Revenue Service had "accepted Better Building's tool rental payments as such."[1] Clearly, this second-hand testimony of the Internal Revenue Service's out-of-court opinion was offered to prove the truth of the matter asserted (that the tool rental payments were such and not salary as contended by the Trustees). It cannot be claimed that the testimony was anything other than legally inadmissible hearsay. NRS 51.035; NRS 51.065; *Archibald v. State,* 77 Nev. 301, 362 P.2d 721 (1961); *United Association of Journeyman v. Stone,* 76 Nev. 189, 351 P.2d 965 (1960); *Las Vegas Sun v. Franklin,* 74 Nev. 282, 329 P.2d 867 (1958); *State v. McKay,* 63 Nev. 118, 165 P.2d 389 (1946); *Zelavin v. Tonopah Belmont Dev. Co.,* 39 Nev. 1, 149 P. 188 (1915); *In Re Kelly,* 28 Nev. 491, 83 P. 223 (1905); *Jones and Colla v. O'Farrel, James and Co.,* 1 Nev. 354 (1865). This much appears to be recognized by the majority; however, after conceding the inadmissible nature of the testimony and timely objection thereto, the majority then declares the error "harmless."[2]

The majority's resort to the "harmless error" rule in order to reach its preferred result is an usurpation of the jury's exclusive role as fact finder. In literally hundreds of cases this court has held that it is the exclusive province of the jury to serve as finder of fact; however, the majority opinion seems to ignore that rule and conclusively presumes to find "other evidence" to support the verdict. Majority Opinion at 1381. That conclusion exceeds our scope of review.

In a civil case the plaintiff must establish his or her case by a preponderance of the evidence. As stated above, it is exclusively the province of the jury to weigh the evidence **\*\*1384** and determine where the preponderance lies. *Ewing v. Sargent,* 87 Nev. 74, 482 P.2d 819 (1971); *Briggs v. Zamalloa,* 83 Nev. 400, 432 P.2d 672 (1967); *Barreth v. Reno*

710 P.2d 1379

*Bus Lines,* 77 Nev. 196, 360 P.2d 1037 (1961). It is hard to conceive that the jury's "weighing" of the evidence would not be influenced by testimony that an agency of **\*749** the federal government had already found as fact a matter at issue in the instant trial. [3]

Just how much the jury was influenced by this testimony is uncertain; it may have contributed only in a minor way or it may have been the factor that most influenced the jury. The truth is we don't know where the jury would have found the preponderance of evidence without this testimony. Regardless, the majority is prepared to state conclusively that it had no impact whatsoever. Unable to agree with such a conclusion, I dissent.

**All Citations**

101 Nev. 742, 710 P.2d 1379

## Footnotes

1      Better Building was also permitted to introduce testimony that the Nevada Industrial Commission had also accepted that characterization of the payments. Although the majority invokes a procedural bar to consideration of the admissibility of that testimony, all that follows in this dissent is equally applicable to that testimony.

2      The Trustees objected to this testimony on the grounds that it was hearsay, irrelevant and lacked foundation. The majority does not seem to deny the presence of those evidentiary faults. The record clearly supports the merit of all three objections.

3      This conclusion is all the more certain in light of the fact that the Internal Revenue Service, an entity whose decisions influence affect all Americans, was the agency involved.

**End of Document**                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.   Appendix p. 282   4

2020 WL 2841398
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Amarillo Division.

VENABLE'S CONSTRUCTION INC., Plaintiff,

v.

ONEOK ARBUCKLE II PIPELINE, LLC, Defendant.

2:20-CV-018-Z-BR
|
Signed 06/01/2020

**Attorneys and Law Firms**

Jeremi K. Young, Young & Newsom, P.C., Amarillo, TX, Brian G. Corgan, Pro Hac Vice, Jacob S. Edwards, Pro Hac Vice, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, for Plaintiff.

Aaron D. Davidson, Cole Schotz PC, Dallas, TX, P. Scott Hathaway, Conners & Winters LLP, Tulsa, OK, for Defendant.

### MEMORANDUM OPINION AND ORDER

MATTHEW J. KACSMARYK, UNITED STATES DISTRICT JUDGE

*1 For approximately 450 miles, the southern bank of the Red River forms the boundary line separating Texas and Oklahoma. For over 150 years, the Red River has served as the backdrop for myriad "border battles" between Texans and Oklahomans: (1) the Greer County War, 1867–1894; (2) United States v. Texas, 162 U.S. 1 (1896); (3) Oklahoma v. Texas, 258 U.S. 574 (1922), 260 U.S. 606 (1923), 265 U.S. 500 (1924); (4) the Red River Bridge War of 1931; and (5) the annual Red River Showdown football game between the Texas Longhorns and the Oklahoma Sooners.[1] Here, the Court must resolve a *jurisdictional* dispute between a Texas-based construction company and an Oklahoma-based natural gas company regarding a pipeline running *under* the Red River—from Duncan, Oklahoma, to Bowie, Texas.

### I. BACKGROUND

Venable's Construction Inc. ("Plaintiff"), is a Texas construction company based in Amarillo, Texas. ONEOK Arbuckle II Pipeline, LLC ("Defendant") is a natural gas

company based in Tulsa, Oklahoma. In the summer of 2018, Plaintiff and Defendant entered into a Construction Services Agreement ("Contract"). Under the original Contract, Plaintiff would construct "Spread 2" of Defendant's Arbuckle II Pipeline Project (the "Pipeline"). Spread 2 spans approximately eighty miles—from Duncan, Oklahoma to Bowie, Texas. Relevant here, the Pipeline would be constructed through the Western District of Oklahoma, under the Red River, and into the Northern District of Texas.

For reasons to be determined, the Pipeline was not constructed in accordance with the Contract. Plaintiff claims that Defendant failed to provide the proper right of ways—leading to interruptions and disruptions that prevented Plaintiff from timely constructing the Pipeline. Defendant claims that Plaintiff failed to properly manage the construction operations—leading to Plaintiff's own sluggish performance that caused Defendant to amend the Contract and re-bid the Texas work to another construction company. Essentially, both parties allege the other is in breach of the Contract and both seek damages and other forms of relief. When mediation proved unsuccessful, the parties raced to the court.

At 2:00:04 p.m. (CST), on January 20, 2020, Plaintiff filed its original complaint against Defendant in this Court—the Northern District of Texas, Amarillo Division ("Texas Action"). Three hours later, at 5:00 p.m. (CST), Defendant filed its own suit against Plaintiff, but in the Western District of Oklahoma, Oklahoma City Division ("Oklahoma Action"). These parallel proceedings contain substantially similar claims arising from the same underlying subject matter.

Before the Court are two motions—one from each party. On February 21, 2020, Plaintiff filed its Motion to Enjoin (ECF No. 12), seeking to prevent Defendant from prosecuting the case in the Western District of Oklahoma. On February 26, 2020, Defendant filed its Motion to Transfer (ECF No. 16), seeking to transfer this case to the Western District of Oklahoma. While neither party disputes that venue is proper in the Amarillo Division, the primary dispute is over what venue is *most* appropriate—Amarillo or Oklahoma City.

### II. STATEMENT OF JURISDICTION

*2 This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendant.

### III. LEGAL STANDARD

Under 28 U.S.C. § 1404(a), courts have broad discretion to transfer "any civil action to any other district or division where it might have been brought" initially when it is "[f]or the convenience of parties and witnesses, in the interest of justice." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314 (5th Cir. 2008) (hereinafter, "*Volkswagen II*") (citing *Veba–Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1247 (5th Cir. 1983); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981) (noting the "relaxed standards for transfer")). This rule is met if, at the time of filing: (1) any defendant resided in that district or division, and (2) all defendants resided within the state. 28 U.S.C. § 1391(b)(1). Venue is also proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2).

The moving party bears the burden to show that there is "good cause" for transfer and must demonstrate "that the transferee venue is clearly more convenient," and "in the interest of justice." *Volkswagen II*, 545 F.3d at 315. In most transfer cases, courts examine eight private and public interest factors. *Id.* The four *private* interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and Inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (hereinafter, "*Volkswagen I*") (citing *Piper Aircraft*, 454 U.S. at n.6). The four *public* interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.*

While these factors "are not necessarily exhaustive or exclusive," the Fifth Circuit notes that "none ... can be said to be of dispositive weight." *Volkswagen II*, 545 F.3d at 315 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947); *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004)). "Public and private factors aside, a court must also independently consider how much weight to assign a plaintiff's choice of forum." *Seramur v. Fed. Ins. Co.*, No. 3:19-CV-1678-B, 2019 WL 3253369, at *2 (N.D. Tex. June 19, 2019) (Boyle, J.) (citing *Davis v. City of Fort Worth*, No. 3:14-CV-1698-D, 2014 WL 2915881, at *2 (N.D. Tex. June 25, 2014)) (Fitzwater, J.). "A plaintiff's choice is normally entitled to deference, but when she files suit outside her home forum, the weight accorded to the choice is diminished." *Id.* (internal marks omitted) (quoting *Sivertson v. Clinton*, No. 3:11-CV-0836-D, 2011 WL 4100958, at *4 (N.D. Tex. Sept. 14, 2011)) (Fitzwater, J.). Furthermore, courts shall not consider the convenience of counsel because it is irrelevant to the analysis. *In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003); *see also Volkswagen I*, 371 F.3d at 206 (holding that it is reversible error for the district court to consider the convenience of counsel). Therefore, "within the district court's sound discretion, exercised in light of the particular circumstances of the case ... the court must balance the two categories of interest—private and public—to resolve whether the movant has carried his burden." *Nat'l Union Fire Ins. Co. of Pittsburgh PA v. Lauren Engineers & Constructors, Inc.*, No. 3:19-CV-1742-S, 2019 WL 6071073, at *1 (N.D. Tex. Nov. 14, 2019) (Scholer, J.) (internal marks omitted).

### IV. ANALYSIS

**\*3** The parties do not dispute, and the Court concludes, Plaintiff could have originally brought this action in either the Northern District of Texas or the Western District of Oklahoma. Thus, the Court finds venue is proper in this district and division. Accordingly, since venue is proper in either district, the Court turns its attention to the balance of the private and public factors.

### A. Private Factors for the Convenience of the Parties

Defendant asserts that transfer to the Western District of Oklahoma is appropriate based on the private factors for convenience. Defendant argues that all private factors weigh in favor of transfer, but Plaintiff disagrees. Accordingly, the Court will examine each factor and determine whether each factor weighs in favor of transfer.

### 1. Relative Ease of Access to Sources of Proof

First, the Court looks to the relative ease of access to sources of proof. *Volkswagen I*, 371 F.3d at 203. Defendant argues that the location of non-party witnesses is what should control in assessing this factor. Specifically, Defendant cites to *BNSF Ry. Co. v. OOCL (USA), Inc.*, and its determination that "[t]he convenience of the witnesses is often regarded as the most important factor to be considered in deciding

whether to transfer venue." 667 F. Supp. 2d 703, 711 (N.D. Tex. 2009). However, *BNSF* runs contrary to Defendant's argument. Ultimately, the *BNSF* Court found that transfer was <u>not</u> warranted. *Id.* The *BNSF* Court explained that (1) the movant's desired court was not the closest court to the location of the underlying events, (2) the movant failed to show any accessibility problems to "documentary or electronically-stored data," and (3) the "suit will turn on proof of the terms of [the] agreement" between the parties and whether there was a breach of contract. *Id.* at 710–11.

Similar to *BNSF*, Defendant's arguments fail under this factor. First, while Oklahoma City is closer to the Pipeline than Amarillo, another court, the Wichita Falls Division of the Northern District of Texas, is *even closer* to the Pipeline than Oklahoma City. And Defendant does not seek transfer to the court that is the *closest* to the location of the underlying events —the Lawton Division of the Western District of Oklahoma. Second, Defendant fails to show that sources of proof such as documentary or electronically-stored data is less accessible with venue in Amarillo. Third, this case will turn on the terms of the Contract and whether either party breached the terms contained therein. Thus, the most important evidence will come from the parties to the contract rather than non-parties.

Based on the claims for breach of contract, fraud, and misrepresentation as detailed by Plaintiff's claims and Defendant's counterclaims, the parties would have *suffered* harm in the location of the parties' principle places of business. In other words, evidence from Amarillo and Tulsa will hold paramount significance in determining damages and other relief. Thus, there is some evidence in Amarillo, some evidence in Tulsa, and some evidence scattered along the eighty miles of construction from Duncan, Oklahoma to Bowie, Texas.

Alternatively, Defendant identifies third-party witnesses that will be inconvenienced with travel to Amarillo as compared to Oklahoma City. ECF No. 16, at 9. However, while the location of non-party witnesses is important under other private factors, Defendant fails to show—due to proximity —that these sources of proof are inaccessible with an Amarillo venue. In particular, there is no requirement that these witnesses must travel to Amarillo or Oklahoma City to provide evidence—especially with modern video-conferencing technology and amidst the novel COVID-19/ Coronavirus Pandemic. Defendant also fails to identify *specific* evidence will be more accessible in Oklahoma City, or inaccessible in Amarillo. Therefore, Defendant does not

pursuade the Court that this factor weighs in favor of transfer. At best, this factor is neutral. *See Bedrock Logistics, LLC v. Braintree Labs., Inc.*, No. 3:16-CV-2815-M, 2017 WL 1547013, at *2 (N.D. Tex. Apr. 28, 2017) (Lynn, C.J.) (finding this factor to be neutral because "neither party describes specific documents that will be more accessible if the case is tried in Texas instead of Massachusetts"); *see also SEC v. Blackburn*, No. 4:14-CV-812-LG-CMC, 2015 WL 11120724, at *2 (E.D. Tex. June 30, 2015) (finding this factor to be neutral because there was "little dispute that most of the relevant documents in this action are available or are capable of being produced electronically").

### *2. Availability of Compulsory Process to Secure the Attendance of Witnesses*

**\*4** "The second private interest factor, the availability of compulsory process to secure the attendance of witnesses, favors transfer when a transferee district has absolute subpoena power over a greater number of non-party witnesses." *Moore v. Payson Petroleum Grayson, LLC*, No. 3:17-CV-1436-M-BH, 2018 WL 514258, at *5 (N.D. Tex. Jan. 23, 2018) (Carrillo-Ramirez, M.J.) (cleaned up). "A subpoena may command a person to attend a trial, hearing, or deposition" if it is "within 100 miles of where the person resides, is employed, or regularly transacts business in person...." FED. R. CIV. P 45(c)(1)(A). However, the party seeking transfer must "specifically identify the key witnesses and outline the substance of their testimony." *Moore*, 2018 WL 514258 at *5 (cleaned up).

Here, Defendant identifies potential witnesses and their locations in relation to the two courts. ECF No. 16, at 9–13. Defendant specifically proffers evidence from some of these witnesses, but not for others. *Id.* With regard to non-party witnesses and their proximity to the Court, Defendant correctly argues that the Western District of Oklahoma has subpoena power over more non-party witnesses to compel their testimony at trial. However, there is no evidence that any of the non-party witnesses are unwilling to testify, thereby necessitating the compulsory process to secure their attendance. *See McNew v. C.R. Bard, Inc.*, No. 1:19-CV-195-H, 2020 WL 759299, at *3 (N.D. Tex. Feb. 14, 2020) (Hendrix, J.) ("this factor is neutral because [the defendant] has not provided the Court with any reason to suspect that there may be unwilling witnesses in this case."). While this factor may indeed prove to be neutral, at this time, the Court concludes this factor weighs in favor of transfer.

### 3. The Cost of Attendance for Willing Witnesses

The next factor is the cost of attendance for willing witnesses. *Volkswagen I*, 371 F.3d at 203. The Court may only consider the convenience of the parties and witnesses and cannot afford any consideration to the convenience for counsel. *Id.* at 206. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* at 204–05. "Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment." *Id.* at 205.

Here, Defendant is correct in that the cost of attendance for some non-party witnesses could be lower in the Western District of Oklahoma. Defendant claims that certain non-party witnesses have "relevant" information and dubs them as the parties "most likely to possess information and employ persons who can provide testimony that is directly relevant to [Plaintiff]'s claims." ECF No. 16, at 11. However, of the parties that allegedly *might* testify, Defendant does not assert that any are *expected* to testify. *See Bevil v. Smit Americas, Inc.*, 883 F. Supp. 168, 170 (S.D. Tex. 1995). Tellingly, Defendant argues that these persons are "key" non-party witnesses because they have "the most personal knowledge ... of a significant portion of [Plaintiff's claims]"— that is—"[a]side from perhaps ONEOK" and its employees. ECF No. 16, at 10.

Defendant claims that Dustin Weese, Kiley Nail, Bryan Jewett, Levi Lee, and William Hamby are persons with the most knowledge of Defendant's counterclaims and defenses. *Id.* at 12. Defendant posits that "testimony and records of these witnesses will be critical evidence in support of Defendant's affirmative claims related to inspection costs, as well as Defendant's setoff defense against [Plaintiff's] claim based on the same grounds." *Id.* at 12–13. These generalizations do not qualify as identifying witnesses and outlining their testimony with specificity. *See BNSF*, 667 F. Supp. 2d at 711. Accordingly, because Defendant fails to delineate why these witnesses are critical to the disposition of the case, the Court rejects considering these witnesses in the convenience analysis.

**\*5** Furthermore, based on Defendant's arguments, the Court observes that the Oklahoma City Division of the Western District of Oklahoma is not the *most* convenient court to all parties and witnesses. Both the Lawton Division of the Western District of Oklahoma and the Wichita Falls Division of the Northern District of Texas are closer to the pipeline than the transferee court. But Defendant doesn't seek transfer to these "local" courts. Instead, Defendant seeks transfer to the Oklahoma City Division of the Western District of Oklahoma—a venue not far from Defendant's headquarters in Tulsa. And it is improper for the Court to shift the burden of convenience from one party to another. *See First Preston Mgmt., Inc. v. AFR & Assocs., Inc.*, No. 308-CV-0690-G, 2008 WL 5136916, at \*5 (N.D. Tex. Dec. 5, 2008) ("This court has observed that litigation is usually inconvenient for all parties involved, and cases should not be transferred where the only practical effect is to shift inconvenience from the moving party to the nonmoving party."). Accordingly, based on the consideration of a few allegedly critical non-party witnesses, the Court concludes that this factor weighs in favor of transfer, but with little weight.

### 4. All Other Practical Problems for an
### Easy, Expeditious, and Inexpensive Trial

The last private factor to consider is the catchall of "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen I*, 371 F.3d at 203; *see also Moore*, 2018 WL 514258, at \*7 (finding factor was neutral when movant failed to specifically address any "other practical problems" and only reiterated previous arguments). Defendant argues that this factor weighs in favor of transfer. ECF No. 16, at 14. The Court disagrees.

First, most arguments presented are reiterations of previous arguments. Specifically, Defendant points to compelling witnesses to testify, travel distance for counsel, location of witnesses, increased costs of travel, and familiarity with Oklahoma law. But this factor contemplates *other* practical problems. The only new argument presented by Defendant is as follows: Plaintiff's "behavior acknowledges the strong connection between the subject claims and the Western District of Oklahoma" because Plaintiff engaged in (1) a "contractually required meeting" and (2) a mediation in Oklahoma City, Oklahoma. *Id.* at 14–15.

The Court refuses to find that Plaintiff's faithful commitment to its contractual obligations to attend meetings and

mediation is somehow evidence that transfer would make trial easy, expeditious, and inexpensive. To find otherwise would surely incentivize forum-shopping litigants to curtail their contractual responsibilities. Defendant's argument also backfires. Here, Defendant has *also* exhibited behavior acknowledging a strong connection between Defendant and the Northern District of Texas as it entered the into the Contract with an Amarillo-based construction company to build a natural gas pipeline across Texas. Thus, while both parties have strong connections with both states, this fact bears no relation to "other practical problems."

While the Court will address the public factors below, it must note the Fifth Circuit's admonishment in another case seeking transfer:

> This case is not being consigned to the wastelands of Siberia or some remote, distant area of the continental United States. The minor inconvenience Exxon may suffer in having to litigate this case in Tyler—only 203 miles distant—rather than in Houston, can in no rational way support the notion of abuse of discretion.

*Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988). Further, as noted in a recent case before this Court, "the Court's civil docket is open for an easy, expeditious, and inexpensive trial—one that the Court is pleased to schedule." *Barton v. C. R. Bard, Inc.*, No. 2:19-CV-181-Z, 2020 WL 1809702, at *5 (N.D. Tex. Apr. 9, 2020) (Kacsmaryk, J.). If the parties so choose, the Court is amenable to amending the scheduling order and set a trial date within one year from this date. The Court concludes that Defendant has failed to meet its burden for transfer under this factor.

### B. Public Factors in the Interest of Justice

 **\*6**  Defendant asserts that all four public factors also weigh "heavily" in favor of transfer. ECF No. 16, at 6. In summary, Defendant argues transfer is warranted because (1) this Court is burdened by its pending caseload, (2) Oklahoma's public policy dictates that this suit be heard in local Oklahoma courts, (3) the Western District of Oklahoma is more familiar

with the applicable law, and (4) unnecessary problems in the application of foreign law would be avoided. The Court will address the public factors each in turn.

### 1. Administrative Difficulties Flowing from Court Congestion

The first public factor examines administrative difficulties flowing from court congestion. *See Volkswagen I*, 371 F.3d at 203. Defendant presents the Court with a rough data analysis in an attempt to show that *this* Court is "congested" when compared to the Western District of Oklahoma. ECF No. 16, at 7. Defendant posits that, on average, each district judge in the Northern District of Texas is assigned 1,349 cases—which is allegedly "six times the average caseload of judges in the Western District of Oklahoma." *Id.* Defendant concludes its data-analysis by stating:

> These figures starkly reflect that the Northern District of Texas, as a whole, is significantly more overburdened than the Western District of Oklahoma and certainly suggests that the parties would find less administrative backlog and a shorter path to a trial setting on the subject claims in the Western District of Oklahoma.

*Id.* at 8. But this factor does not apply to *district* congestion —and certainly not to a district as large and diverse as the Northern District of Texas "as a whole." *Id.* As the language clearly states, this factor applies to *court* congestion. *Volkswagen I*, 371 F.3d at 203. Accordingly, this Court rejects Defendant's proposed data analysis. Certainly, as one skilled statistician put it, "data is useless without context." NATE SILVER, THE SIGNAL AND THE NOISE: WHY SO MANY PREDICTIONS FAIL-BUT SOME DON'T 254 (2012).

Of the myriad reasons the Court rejects Defendant's data analysis, it will address three fatal flaws. First, the number of cases in this *district* is neither indicative of the number of cases pending before this *Court* nor indicative of district-wide congestion.[2] Thus, applying the 16,182 pending cases with a one-to-one ratio produces misleading results. And with the

addition of context, *thousands* of the 16,182 cases arise from a colossal products-liability action pending before Judge Ed Kincaid in the Dallas Division. Second, while the disposition of these cases affects the perceived average age of cases pending in this *district*, they have no effect on the average age of cases pending before this *Court*. Third, the average number of cases before each district judge is vastly different from the *actual* number of cases before this district judge. As of June 1, 2020, the number of civil cases actually pending before the Court was 309. To be sure, the Court does not have the administrative backlog that Defendant postulates.

On the contrary, beginning January 1, 2020, the Court began retaining additional civil cases. As the Court recently found, "[t]he Amarillo Division is not strained or backlogged with civil actions waiting to be set for trial." *Barton*, 2020 WL 1809702, at *5. The Court will not assume, based on speculation, that the Western District of Oklahoma would dispose of this case in an easier, more expeditious, and less expensive manner. The Court will properly and promptly address any and all difficulties that may arise during the course of this case. The Court finds that this factor weighs against transfer.

### 2. Local Interest in Having Localized Interests Decided at Home

**\*7**  The second public interest factor is "the local interest in having localized interests decided at home." *Volkswagen I*, 371 F.3d at 203. "A local interest is demonstrated by a relevant factual connection between the events and the venue." *LeBlanc v. C.R. England, Inc.*, 961 F. Supp. 2d 819, 832-33 (N.D. Tex. 2013) (Boyle, J.) (cleaned up). The Court also considers "those actually affected—directly and indirectly—by the controversies and events giving rise to a case." *Volkswagen II*, 545 F.3d at 318.

This factor does not favor transfer. It is clear that both districts have local interests in this case. Defendant is correct that "Oklahoma has a local interest in having localized construction disputes decided at home." [3] ECF No. 16, at 7. But Texas has a "local interest" in this construction dispute, too. This case involves business interactions where a Texas corporation allegedly "suffered its substantial damages in this district—its home forum." *Id.* at 11. Specifically, Plaintiff's suit is based on fraud and misrepresentation in the execution of the contract, as well as the financial injuries that flowed from the alleged breach of contract—events and injuries

that occurred in Amarillo, Texas. ECF No. 43, at 10–11. Additionally, Plaintiff claims it "drilled and constructed the pipeline under the Red River, and into the Northern District of Texas." ECF No. 43, at 8.

Defendant's counterclaims involve an alleged breach of contract for the construction of the remainder of the pipeline —from the Red River to Bowie, Texas—construction that occurred wholly in this district. [4] *See generally* ECF No. 15. Further, this Court sits in the same location as Plaintiff's principle place of business, while the Defendant's principle place of business lies in the *Northern* District of Oklahoma. While the injuries would not necessarily be *felt* in the Western District of Oklahoma, the parties would be "actually affected —directly and indirectly" in Amarillo and Tulsa. *Volkswagen II*, 545 F.3d at 318.

Accordingly, the Court finds that while there are local interests favoring both districts, the local interests in Amarillo are not outweighed by those in Oklahoma City. *See Moore*, 2018 WL 514258, at *7 (denying a motion to transfer where "a substantial amount of events that gave rise to this suit ... occurred across many different locations and venues."); *see also Pension Advisory Group*, 771 F. Supp. 2d at 711 (finding this factor neutral where Texans brought suit against non-Texans involving business interactions between the parties and both the Texas forum and the non-Texas forum had a significant interest in the matter). At best, this factor is neutral.

### 3. Familiarity of the Forum with the Law that will Govern the Case

**\*8**  Third, the Court must weigh "the familiarity of the forum with the law that will govern the case." *Volkswagen I*, 371 F.3d at 203. Defendant argues that "the Western District of Oklahoma is far more familiar with Oklahoma law than this Court, having employed it in nearly every case sitting before it in diversity jurisdiction." ECF No. 16, at 6. But this is a federal court and "federal judges routinely apply the law of a State other than the State in which they sit." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 67 (2013). And because Defendant fails to detail *any* differences between Oklahoma and Texas contract law, this Court is "not aware of any exceptionally arcane features of [Oklahoma] contract law that are likely to defy comprehension by a federal judge sitting in [Texas]." *Id.* The Court concludes this factor is neutral.

#### 4. Avoidance of Unnecessary Problems of Conflict of Laws or in the Application of Foreign Law

The last public interest factor is "the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Volkswagen I, 371 F.3d at 203.* Dovetailing with the previous factor, Defendant's only argument is that "[g]iven its familiarity with Oklahoma law, adjudication of [Plaintiff]'s claims in the Western District of Oklahoma would make it more likely that unnecessary problems in the application of foreign law are avoided." ECF No. 16, at 6. For the same reasons as with the previous factor, the application of Oklahoma law in this case does not favor transfer. And neither party has proffered any argument to that effect. This factor is neutral.

#### C. Combined Factors and Conclusion

Upon consideration of all the private and public factors, the Court concludes that the Western District of Oklahoma is not a clearly more convenient venue than the Northern District of Texas. "[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Volkswagen II, 545 F.3d at 315.* Therefore, Plaintiff's choice of forum, in this case, tips the scales <u>against</u> transfer. The Court also acknowledges that "[t]he preference for honoring a plaintiff's choice of forum is simply that, a preference; it is not a right." *Moore, 2018 WL 514258, at *10* (cleaned up). Further, Plaintiff—the "proper plaintiff"—chose to file suit in its home venue and did not engage in any improper forum shopping. Accordingly transfer to the Western District of Oklahoma is not warranted and the Court DENIES Defendant's Motion to Transfer (ECF No. 16).

#### V. PLAINTIFF'S MOTION TO ENJOIN PROSECUTION OF PARALLEL PROCEEDINGS

Next, the Court must determine whether it should enjoin Defendant from prosecuting the case it filed in the Western District of Oklahoma. "The Fifth Circuit adheres to the general rule, that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *In re Amerijet, Inc., 785 F.3d 967, 976 (5th Cir. 2015)*, as

revised (May 15, 2015) (per curiam) (quoting *Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 950 (5th Cir. 1997); Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 603 (5th Cir. 1999)*). District courts have discretion to enjoin the filing of related lawsuits in other district courts. *In re Amerijet, Inc., 785 F.3d at 976.*

After reviewing the evidence and the applicable law, Plaintiff meets all the requisite factors for the injunction under the first-to-file-rule. The Texas Action was the first-filed suit, even by just three hours. Further, the cases substantially overlap. Defendant's primary defense in the Texas Action is substantially similar to its claims in the Oklahoma Action. In the Oklahoma Action, Defendant seeks declaratory judgement against Plaintiff's claims in the Texas Action. "As such, there is a substantial risk that rulings in" the Oklahoma Action would " 'trench upon the authority' of the other court and could lead to 'piecemeal resolution of the issues that call for a uniform result.' " *Id.* (quoting *Cadle, 174 F.3d at 603*).

**\*9** However, it is the Court's determination that injunctive relief is not necessary—at this time—based on the representations by Defendant. Defendant represented to the Court that it will dismiss or "not prosecute the Oklahoma Action without a ruling from this Court granting its Motion to Transfer." ECF No. 41, at 8. Because the Court previously denied Defendant's Motion to Transfer, the Court is certain that Defendant will abide by its intention—expressed to the Court—to voluntarily dismiss or refrain from prosecuting the Oklahoma Action. Accordingly, it is the opinion of the Court that Plaintiff's Motion to Enjoin (ECF No. 12) is DENIED without prejudice as to re-filing subject to Defendant's prosecution of the Oklahoma Action.

#### VI. CONCLUSION

For the foregoing reasons and after considering all arguments, it is ORDERED that Defendant's Motion to Transfer (ECF No. 16) is DENIED. It is further ORDERED that Plaintiff's Motion to Enjoin (ECF No. 12) is DENIED without prejudice as to refiling.

**SO ORDERED.**

#### All Citations

Slip Copy, 2020 WL 2841398

## Footnotes

1    The University of Texas leads the overall series (62–48–5), but the University of Oklahoma has won seven of the last ten games played in Dallas, Texas. (The 2018 Big XII Championship game was played at AT&T Stadium in Arlington, Texas, did not involve the Golden Hat trophy, and is not counted as a Red River Showdown game.)

2    Using another rough estimate, the approximately eight million people residing in just the Northern District of Texas more than doubles the population of the entirety of Oklahoma—not considering the population of only the Western District of Oklahoma. Thus, simply comparing the two districts by the number of pending cases does not provide the Court with an accurate estimation.

3    Defendant also points to Oklahoma law in support of its argument that litigating this case in the Northern District of Texas is against Oklahoma public policy. ECF No. 16, at 6–7. However, the statutes cited are irrelevant to the case at hand. Simply put, Oklahoma law makes construction contracts "void and unenforceable" if they contain *forum selection clauses* that "require" disputes be resolved in a state other than Oklahoma. *See* OKLA. STAT. tit. 15, § 221(E) (2006). But nothing in the contract *required* this case be brought in Texas. And nothing in Oklahoma law *prohibits* the parties from litigating before this Court.

4    The fact that Defendant's counterclaims are based on construction in Texas further undermines its argument for transfer. As stated by Defendant, "state legislatures, including the Texas legislature, 'are in favor of local courts resolving in-state construction disputes' even where a large general contractor involved in the work is headquartered elsewhere...." ECF No. 16, at 7. Thus, both states have a public policy interest in this case.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7291458
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

Sesha Sai VORREY, Plaintiff,
v.
CITY OF BROWNSVILLE, TEXAS, Defendant.

Civil Action No. B: 17-cv-222
|
Signed 10/05/2018

**Attorneys and Law Firms**

Anthony P. Troiani, Brownsville, TX, for Plaintiff.

John-Michael Wyman Hayward, Ricardo J. Navarro, Robert Lee Drinkard, Denton Navarro Rocha Bernal & Zech, P.C., Harlingen, TX, for, Defendant.

<u>**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**</u>

Ronald G. Morgan, United States Magistrate Judge

**\*1** On July 16, 2018, Defendant – City of Brownsville, Texas ("the City") – filed a motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 18.

On August 7, 2018, Plaintiff – Sesha Sai Vorrey ("Vorrey") – filed a response. Dkt. No. 27.

On August 10, 2018, the City filed a reply, as well as a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

The motion to dismiss has been referred to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the record and the relevant caselaw, it is recommended that the motion to dismiss be granted, for the reasons set out below. [1]

**I. Background**

**A. Factual Background**

In April 2004, Vorrey was hired as the airport operations director for the Brownsville/South Padre Island International Airport. Dkt. No. 16, pp. 3-4; Dkt. No. 16-1, p. 1. Vorrey is a native of India and was authorized to work in the United States as the result of a H-1B non-resident visa. Id.

"To obtain an H-1B visa, an employer must first obtain approval from the U.S. Department of Labor ("DoL") by filing a Labor Condition Application ("LCA"). The LCA requires an employer to represent that it intends to employ a particular foreign worker for a specific position for a given period of time." U.S. v. Nanda, 867 F.3d 522, 525 (5th Cir. 2017), cert. denied, 138 S. Ct. 1578, 200 L.Ed. 2d 765 (2018). Once the visa is issued, "the worker possesses lawful nonimmigrant status and may reside in the United States and work for the sponsoring employer until either the visa expires or her employment with the sponsoring employer is terminated." Id.

In June 2008, Vorrey was promoted to Chief Operations Officer at the airport. Dkt. No. 16-1, p. 1.

Vorrey's H-1B visa "was extended without issue in 2007, 2010 and 2013." Dkt. No. 16, p. 4. Vorrey served as the acting interim director of the airport from August 2015 until April 2016. Id.

Vorrey applied for the permanent airport director position, but in April 2016, the City hired Bryant Walker for that position. Dkt. No. 16, pp. 4-5. Vorrey was chosen, instead, to be the assistant airport director. Id.

On April 12, 2016, Vorrey attended a meeting with the City Manager, the City External Auditor, an airport consultant and the interim Director of Aviation for the airport. Dkt. No. 16, p. 5. During a lunch, the City Manager stated that Vorrey looked like a "Pakistani" and that Vorrey "needed to wear a tag to let everyone know that he is Indian and not Pakistani." Id. Vorrey claims to have been "deeply offended" by these remarks, but, at the time, took no action. Id.

On August 25, 2016, "the City of Brownsville scheduled a meeting between the airport staff and a local advertising agency." Dkt. No. 16, p. 5. Vorrey was not invited to the meeting or made aware of its existence. Id. Walker took an intern to the meeting instead. Id.

**\*2** The next day, Walker "allegedly submitted" another H-1B visa extension request to USCIS; the request was returned by USCIS, seeking additional information. Dkt. No. 16, p. 6. USCIS sought "a job description and percentage of

the time worked" and requested a response by December 24, 2016. Id.

On September 22, 2016, Walker assigned Vorrey the task of estimating the new airport terminal expenses and requested a response by the close of business that day. Dkt. No. 16, p. 6. A similar request was made to the maintenance supervisor, who is not Indian, but the maintenance supervisor was given more time to complete the task. Id.

On September 23, 2016, Federal Aviation Officials met with airport officials. Dkt. No. 16, p. 6. Despite the importance of the meeting, Vorrey, again, was not invited or informed about the meeting and Walker, again, took an intern to the meeting instead of Vorrey. Id.

On September 28, 2016, Vorrey's immigration attorney asked the City and Walker to provide "a job description and percentage of the time worked," in response to USCIS's request for additional information. Dkt. No. 16, p. 6. Walker never responded. Id, p. 7.

In October 2016, Walker informed USCIS that he believed that Vorrey had forged his, i.e. Walker's, signature on the LCA documentation. Dkt. No. 16-3, p. 2.

On November 29, 2016, the City Manager notified Vorrey that he was suspended and that an investigation was being undertaken as to whether Vorrey had forged Walker's signature on the LCA. Dkt. No. 16, p. 7.

On that same day, Walker emailed Terry Damman, a USCIS official, asking if there was "any requirement or obligation" that the City respond to the request for information and what the result would be if the City chose not to respond. Dkt. No. 16-3, p. 1.

On November 30, 2016, Damman responded to Walker that if a response was not provided by the deadline – December 24, 2016 – then the H-1B visa application would be "automatically denied for failure to respond." Dkt. No. 16-3, p. 1.

On January 31, 2017, USCIS formally denied Vorrey's H-1B visa extension application. Dkt. No. 16, p. 7.

On February 6, 2017, Ms. Wendy Carlson – a handwriting expert hired by Vorrey – determined that neither Vorrey nor Walker were the person who signed Walker's name on the

disputed LCA form. Dkt. No. 16, p. 8. The complaint does not state if Carlson ever identified the person who signed Walker's name.

On February 10, 2017, Walker issued a formal termination letter to Vorrey. Dkt. No. 16-4. In justifying the decision, Walker cited the denial of the visa application, "as well as ... my loss of confidence in your credibility and your ability to carry out the duties and functions of the position you held at the airport." Id.

On April 27, 2017, Vorrey filed a claim with the Equal Employment Opportunity Commission, claiming employment discrimination. Dkt. No. 16, p. 10. On June 9, 2017, Vorrey received a "right to sue letter." Id.

**B. Procedural Background**

On September 8, 2017, Vorrey filed a complaint in the 197th District Court in Cameron County, Texas. Dkt. No. 1-1. Vorrey pled claims of discrimination based on race, color and national origin, libel, quantum meruit, retaliation, and slander against the City. Id.

On September 22, 2017, Vorrey served the City with a copy of his complaint. Dkt. No. 1.

**\*3** On October 23, 2017, the City timely [2] removed the case to this Court, alleging that the state court complaint raised claims under federal law. Dkt. No. 1. Vorrey agrees that the Court has subject matter jurisdiction over his claims. Dkt. No. 3, p. 2.

On February 23, 2018, the City filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 6.

On March 16, 2018, Vorrey timely filed his first amended petition, which he was permitted to file as a matter of right under FED. R. CIV. P. 15(a). Dkt. No. 7. On March 23, 2018, the Court denied the City's motion to dismiss as moot, based on the amended complaint. Dkt. No. 8.

On March 28, 2018, the City filed a renewed motion to dismiss. Dkt. No. 9. On May 1, 2018, Vorrey filed an opposed motion for leave to file a second amended complaint. Dkt. No. 12. The City never filed a response in opposition to the motion for leave.

On July 5, 2018, the Court granted the motion for leave to file the second amended complaint, making that complaint the operative complaint in this case. Dkt. No. 15.

In the second amended complaint, Vorrey alleged that (1) the City discriminated against him based on his "race, color and national origin"; and, (2) the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. Dkt. No. 16. As to the first claim, Vorrey alleges that the City discriminated against him by: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. Id. Vorrey abandoned his claims of libel, quantum meruit, retaliation, and slander against the City. Id.

On July 16, 2018, the City filed a renewed motion to dismiss the second amended complaint. Dkt. No. 18. In that motion, the City argues that, as to the alleged discriminatory acts, the failure to promote claim is untimely filed and that Vorrey has not pled a prima facie case of discrimination as to the remaining three claims. Regarding the failure to reimburse claim, the City argues that there is no private right of action for such a failure and any claim must first be pursued administratively. Id.

On August 7, 2018, Vorrey timely filed a response to the motion to dismiss. Dkt. No. 27. Vorrey argues that the entire series of events – "a string of adverse actions" – create an adverse employment action, so he has made a prima facie case of discrimination. He also reasserts his argument that the failure to reimburse Vorrey violated federal law. Id. Vorrey attached exhibits to his response, including documents that he provided to the City regarding his immigration status, immigration applications and his proof that he did not forge Walker's signature.

On August 10, 2018, the City filed a reply brief and a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. The City argued that the Court cannot consider those documents in deciding a motion to dismiss. Id. [3]

**\*4** On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

## II. Applicable Law

### A. Motion to Dismiss For Lack of Jurisdiction

The threshold question, before considering the substance of any claim, is whether the court possesses jurisdiction over the claim. This is the case, because federal courts are courts of limited jurisdiction, whose authority exists only within the boundaries established by Congress and the United States Constitution. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583-84 (1999). A plaintiff bears the burden of proving jurisdiction. Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012).

In determining whether jurisdiction exists, the Court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001). Conclusory allegations or "legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Wells v. Ali, 304 Fed. App'x. 292, 293 (5th Cir. 2008) (quoting Fernandez–Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993) ).

### B. Motion to Dismiss For Failure To State A Claim

"A motion to dismiss under Rule 12(b)(6) tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or merits of the case .... [T]he Court must take the plaintiffs' allegations as true, view them in a light most favorable to plaintiffs, and draw all inferences in favor of the plaintiffs." Askanase v. Fatjo, 828 F. Supp. 465, 469 (S.D. Tex. 1993) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ); Garrett v. Commonwealth Mortgage Corp. of Am., 938 F.2d 591, 593 (5th Cir. 1991) ).

The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Consistent with this requirement, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." City of Clinton v. Pilgrim's Pride Corp., 632 F.3d 148, 152-53 (5th Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 589. "[R]egardless of whether the plaintiff is proceeding pro se or is represented by counsel, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." McConathy v. Dr.Pepper/Seven Up Corp., 131 F.3d 558, 561 (5th Cir. 1998).

Whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' "Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2) ).

### C. Employment Discrimination

 **\*5**  It is not entirely clear from the second amended complaint whether Vorrey is making his employment discrimination claims under state or federal law, so the Court will consider it under both. Both state and federal law, however, utilize the three-part, burden-shifting test, known as the McDonnell Douglas [4] test, to judge claims of employment discrimination. Goudeau v. Nat'l Oilwell Varco, L.P., 793 F.3d 470, 474 (5th Cir. 2015).

"Under the McDonnell Douglas analysis, a plaintiff is entitled to a presumption of discrimination if he can meet the minimal initial burden of establishing a prima facie case." Reed v. Neopost USA, Inc., 701 F.3d 434, 439 (5th Cir. 2012). The standards for whether a plaintiff has pled a prima facie case of discrimination are identical under both state and federal law. Goudeau, 793 F.3d at 474.

The elements of a prima facie case of employment discrimination are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than those outside of the protected class. Mission Consol. Independent School Dist. v. Garcia, 372 S.W.3d 629, 634 (Tex. 2012); Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trustees, 709 F. App'x 243, 247 (5th Cir. 2017). The plaintiff must meet "every element of a prima facie case." Cherry v. CCA Properties of Am. Liab. Corp., 438 F. App'x 348, 352 (5th Cir. 2011). The defendant is entitled to dismissal if the plaintiff fails to show any single element of the prima facie case. McCoy v. Texas Instruments, Inc., 183 S.W.3d 548, 555 (Tex. App. 2006).

"After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory

reason for the adverse employment action." Black v. Pan Am. Labs., L.L.C., 646 F.3d 254, 259 (5th Cir. 2011). The Court does not reach this step unless the plaintiff has first demonstrated every element of a prima facie case. Byers v. Dallas Morning News, Inc., 209 F.3d 419, 429 (5th Cir. 2000).

If the defendant meets its burden at the second step, then "the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005). "A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is pretext for discrimination." Id.

## III. Analysis

In the operative complaint, Vorrey has asserted five separate claims. The first four claims are based on four distinct actions of employment discrimination: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. As to the first claim, it was not timely filed under federal or state law, depriving the Court of subject matter jurisdiction under state law and failing to state a claim for relief under federal law. As to the second, third, and fourth claims, each claim fails to establish a prima facie case under McDonnell-Douglas, albeit for a different reason on each claim.

The fifth claim made by Vorrey is that the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. The Court lacks subject matter jurisdiction over this claim.

 **\*6**  With this summary in mind, the Court turns to the examination of each claim.

### A. Employment Discrimination

#### 1. Failure to Promote

Vorrey asserts that the City discriminated against him when it failed to promote him to the position of airport director. This claim is untimely filed.

In April 2016, the City hired Bryant Walker for the position of airport director. Dkt. No. 16, pp. 4-5. It wasn't until April

Case 1:23-cv-00203-MAC   Document 10-1   Filed 09/25/23   Page 299 of 438 PageID #:  648

Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)

27, 2017, that Vorrey filed a claim with the EEOC, claiming employment discrimination. Dkt. No. 16, p. 10.

Whether considered under state or federal law, Vorrey's claim was not timely filed. Under state law, "[a]n aggrieved employee must file his formal complaint with the EEOC or [Texas Commission on Human Rights] no later than 180 days after the date of the alleged unlawful employment practice." Harris v. BASF Corp., 81 F. App'x 495, 496 (5th Cir. 2003). Even if the Court assumes that Walker was hired on April 30, 2016, then the complaint had to be filed no later than October 27, 2016, which is 180 days later. Under state law, the failure to timely file a complaint is jurisdictional. Manuel v. Sanderson Farms Inc., Processing Div., 90 F. App'x 714, 717 (5th Cir. 2004) (citing Jones v. Grinnell Corp., 235 F.3d 972, 974 (5th Cir. 2001) ). Thus, the Court lacks jurisdiction as to this claim under state law.

Under federal law, Vorrey had 300 days from the date that Walker was hired to file a claim with the EEOC. 42 U.S.C. § 2000e-5(e); Tillison v. Trinity Valley Elec. Co-op. Inc., 204 F. App'x 346, 348 (5th Cir. 2006) ("a claimant must file a charge of discrimination within 300 days of the alleged discriminatory action."). Thus, if Walker was hired on April 30, 2016, then Vorrey had until February 24, 2017, to timely file his claim with the EEOC. Again, Vorrey did not file his complaint until April 27, 2017, which makes it untimely filed.

Unlike state law, where the failure to timely file is jurisdictional, Manuel, 90 F. App'x at 717, under federal law, the failure to timely exhaust is not jurisdictional, but, instead constitutes an affirmative defense. Davis v. Fort Bend Cty., 893 F.3d 300, 307 (5th Cir. 2018). Such claims are subject to equitable tolling. "Under the equitable-tolling doctrine, failure to [timely file] may be excused, particularly (although not exclusively) in three circumstances: (1) a pending action between the parties in the incorrect forum; (2) the claimant's unawareness of facts supporting her claim because the defendant intentionally concealed them; and (3) the claimant's being misled by the EEOC about her rights." Tillison, 204 F. App'x at 348. The plaintiff has the burden to establish that equitable tolling is appropriate. Id. In any event, such tolling should be applied "sparingly." Id.

At the time of filing, the limitations period had already passed. Vorrey has pled no facts showing that equitable tolling is appropriate and none are evident from the record, even if the Court goes beyond the instances expressly listed in Tillison.

This claim should be dismissed for failure to state a claim upon which relief can be granted.

## 2. False Accusation & Investigation

**\*7** Vorrey alleges that the City discriminated against him when it investigated him for allegedly forging Walker's signature on the LCA paperwork. Despite the allegation, Vorrey does not state a prima facie case of employment discrimination.

One of the prongs of a prima facie case of discrimination, under both state and federal law, is that Vorrey must have suffered an adverse employment action. Mission Consol. Independent School Dist., 372 S.W.3d at 634; Malcolm, 709 F. App'x at 247. The allegation of forging Walker's signature – regardless of the truth of the claim – and the ensuing investigation, do not constitute an adverse employment action.

The Fifth Circuit "has analyzed the 'adverse employment action' element in a stricter sense than some other circuits." Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 878 (5th Cir. 1999). Under Fifth Circuit precedent, only "ultimate" employment decisions – "such as hiring, granting leave, discharging, promoting, and compensating" – are considered adverse employment actions. Id.

The Fifth Circuit has consistently held that interlocutory decisions – even if they lead to an eventual termination – are not adverse employment actions. Wakefield v. State Farm Ins., 229 F.3d 1148 (5th Cir. 2000). This is because the intermediate decision did not have the immediate effect of altering the terms and conditions of employment. Wakefield, 229 F.3d at 1148 (failure to be recommended for a promotion not sufficiently adverse); Clayton v. Rumsfeld, 106 F. App'x 268, 270 (5th Cir. 2004) ("possible spying, a non-promotable rating, scrutinization, a letter of warning, rejection of [plaintiff's] request to have a third person of her choosing present at weekly meetings with her supervisors" not adverse); Cothran v. Potter, No. 3:08-CV-0785-O, 2010 WL 1062564, at *3 (N.D. Tex. Mar. 22, 2010), aff'd, 398 F. App'x 71 (5th Cir. 2010) (increased supervision of employee not adverse); Julian v. City of Houston, No. 4:12-CV-2973, 2014 WL 3795580, at *23 (S.D. Tex. July 31, 2014), aff'd, 618 F. App'x 211 (5th Cir. 2015) ("unfavorable performance ratings" not adverse); Garcia v. Potter, No. SA-09-CV-973-XR, 2010 WL 2025068, at *4 (W.D. Tex. May 18, 2010)

("letters of warning" in personnel file not adverse). Thus, in each case, a decision was made that did not necessarily have to result in the eventual termination or demotion of the employee and that decision was not an adverse employment action.

In short, an investigation that does not result in a change in pay, benefits, responsibility, or prospects for promotion is not an adverse employment action. Mora v. Ashcroft, 142 F. App'x 206, 207 n. 2 (5th Cir. 2005) (unpubl.); see Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 331 (5th Cir. 2004) (holding that a claim that the employer instituted a "baseless racial harassment investigation" against the employee was not an adverse employment action).

Thus, the decision to investigate Vorrey and the apparent forgery of Walker's signature on the LCA form was not an adverse employment action. The failure to plead facts as to any single prong of the prima facie case is fatal to Vorrey's claim. Cherry, 438 F. App'x at 352. Given this failure, this claim should be denied for failure to state a claim upon which relief can be granted.

### 3. Failure to Complete the LCA Form

**\*8** Vorrey alleges that the City discriminated against him when it chose not to return the LCA Form, constructively denying him his H-1B visa. Again, Vorrey's complaint fails to state a claim upon which relief can be granted.

As previously noted, the four elements of an employment discrimination claim are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees, who are not members of the protected class. Malcolm, 709 F. App'x at 247. Vorrey has pled that he is a member of a legally protected class. Furthermore, at the time that the LCA form was due, Vorrey still had a legally valid H-1B visa and has pled that he was qualified to remain in his position. Thus, at the time that Walker chose not to return the LCA form, the first two elements of the prima facie case were satisfied. Accordingly, the Court will assume these well-pled facts to be true and construe them in Vorrey's favor. Villarreal v. Wells Fargo Bank, N.A., 814 F.3d 763, 766 (5th Cir. 2016). Given this conclusion, the Court will focus upon the third and fourth elements.

When analyzing whether the failure to file the LCA form was an adverse employment action, "[a] determining factor in the analysis is whether [the Plaintiff's] employment status [was] significantly altered" by the employer's decision. McFall v. Gonzales, 143 F. App'x 604, 608 (5th Cir. 2005). "For example, a decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action." Banks v. E. Baton Rouge Par. Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003).

As previously discussed, an employer's action, that does not immediately alter the terms or conditions of employment, is not an adverse employment action. Wakefield, 229 F.3d 1148. But this claim differs in one key respect from the cases where an employer instituted an investigation or put an employee under increased supervision or issued a negative performance review. Unlike those cases, the decision not to complete the LCA resulted in Vorrey losing his authorization to work for the City as a matter of law. See 20 C.F.R. § 655.730(b) ("Incomplete or obviously inaccurate LCAs will not be certified by [DOL]"). The failure to complete the LCA had the practical effect of terminating Vorrey's employment with the City, which Walker knew when he refused to complete the form. Dkt. No. 16-3, p. 1. This decision terminated Vorrey's legal authorization to work for the City at the expiration of his visa. Indeed, it was a discharge in all but name. As such, it constituted an ultimate employment decision and was an adverse employment action. That finding, however, does not end the analysis. As noted earlier, each element must be present to state a claim. Here the failure lies as to the last element.

As to the fourth element, Vorrey has failed to plead facts showing that he was treated less favorably than similarly situated employees who are not members of the protected class. "There must be 'nearly identical' circumstances for employees to be considered similarly situated." Maestas v. Apple, Inc., 546 F. App'x 422, 427 (5th Cir. 2013). Vorrey, then, must be compared to other H-1B visa holders working for the City. Vorrey has pled no facts showing that the City completed LCA applications for workers who were not Indian, or who were younger than he was. In fact, Vorrey has not pled any facts as to any other City workers who held H-1B visas. Given this failure, Vorrey has failed to plead a prima facie case of discrimination as to this claim and it should be dismissed.

### 4. Termination

**\*9**  Vorrey asserts that he was discriminated against when the City formally terminated his employment. Once again, he has failed to state a claim upon which relief can be granted.

One of the prongs of a prima facie case is that the employee was qualified for the position. It is undisputed that Vorrey is an Indian national. For aliens, "being 'qualified' for the position is not determined by the applicant's capacity to perform the job-rather, it is determined by whether the applicant was an alien authorized for employment in the United States at the time in question." Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184, 187 (4th Cir. 1998) (en banc). Vorrey's work authorization expired on January 31, 2017. Dkt. No. 16, p. 7. Vorrey's employment was terminated on February 10, 2017. Dkt. No. 16-4. Thus, at the time of termination, Vorrey was no longer authorized to work for the City. In short, he was no longer qualified for the position. Thus, Vorrey has failed to pled facts showing a prima facie case of discrimination and this claim should be dismissed.

### B. Fees

Vorrey claims that the City was required to reimburse him for his fees and costs in connection with his H-1B visa. The Court lacks jurisdiction over this claim.

Under federal regulations, an employer may not "recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H-1B petition)." 20 C.F.R. § 655.731(b)(9)(ii). If an employer does recoup these expenses, the Department of Labor "will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction." 20 C.F.R. § 655.731(b)(12).

The proper remedy, in the event that an employer unlawfully deducts H-1B fees and costs, is to file a complaint with the Administrator of the Wage and Hour Division, Employment Standards Administration in the Department of Labor ("the Administrator"). 20 C.F.R. § 655.731(d). If the Administrator finds that a violation has occurred, the Administrator will seek a prevailing wage determination from the Employment and Training Administration ("ETA"), asking the ETA to determine any violations and to compute any necessary back wages from the unauthorized deduction. Id.

Any appeals from a determination by the ETA go to an administrative law judge, and then to the Department of Labor's Administrative Review Board ("ARB"). Kutty v. U.S. Dep't of Labor, 764 F.3d 540, 543 (6th Cir. 2014). A party may appeal the ARB's decision as a final agency action under the Administrative Procedures Act. Dongsheng Huang v. Admin. Review Bd., U.S. Dep't of Labor, 579 F. App'x 228, 231 (5th Cir. 2014).

Vorrey has alleged that the City "unlawfully required him to pay the application fees for his H-1B visa." Dkt. No. 16, p. 13. There is, however, "no private right of action" to recover the costs of filing an H-1B visa. Watson v. Bank of Am., 196 F. App'x 306, 307 (5th Cir. 2006)

There is no evidence in the record that Vorrey ever filed a claim with the Department of Labor making these allegations. Absent making such a claim – and following the administrative process to completion – the Court lacks jurisdiction over the claim. Shah v. Wilco Sys., Inc., 126 F. Supp. 2d 641, 648 (S.D.N.Y. 2000) (noting that judicial review can only happen "once the administrative procedure has been exhausted.").

**\*10**  The absence of any administrative process deprives the Court of jurisdiction over this claim. Shah, 126 F. Supp. 2d at 647-48. Accordingly, this claim should be dismissed for lack of jurisdiction.

### IV. Recommendation

It is recommended that the motion to dismiss filed by the City of Brownsville be granted. Dkt. No. 18.[5]

It is further recommended that:

– Any claim of employment discrimination under the Texas Commission on Human Rights Act, relating to the failure to promote Vorrey to airport director, be dismissed without prejudice for lack of jurisdiction.

– Any remaining claims of employment discrimination under the Texas Commission on Human Rights Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

– All claims of employment discrimination under either Title VII or the Age Discrimination in Employment Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

– Any claims for unreimbursed fees and costs relating to the H-1B visa process be dismissed without prejudice for lack of jurisdiction.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Fernando Rodriguez, Jr., United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file timely objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on October 5, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 7291458

## Footnotes

1     As discussed later, the Court recommends that the motion to strike the exhibits, attached to Vorrey's response, be dismissed as moot.

2     The 30th day for service was on October 22, 2017, which was a Sunday. Pursuant to FED. R. CIV. P. 6(a)(1)(C), the following day, October 23, 2017, became the deadline to timely remove the case.

3     The Court is typically not permitted to consider matters outside of the pleadings when deciding a motion to dismiss. LeBeouf v. Manning, 575 F. App'x 374, 375 (5th Cir. 2014) (citing Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013) ). Even if the Court considers the exhibits provided by Vorrey, it does not alter the Court's analysis and the outcome remains the same. Accordingly, the motion to strike the exhibits should be denied as moot.

4     McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

5     Vorrey has sought the opportunity to amend and replead his complaint in the event that the Court is inclined to grant the motion to dismiss. Dkt. No. 27, p. 9. The Court should not permit another amendment. Vorrey has already amended his complaint twice, giving him ample opportunity to put forward his best-pled complaint. "[P]laintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold.". Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986).

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

90 Nev. 240
Supreme Court of Nevada.

WESTERN CAB COMPANY a Nevada corporation and
Johnnie Crockett, Appellants and Cross-Respondents,
v.
Charles L. KELLAR and Cornelia Kellar,
Respondents and Cross-Appellants.

No. 7295.
|
June 28, 1974.
|
Rehearing Denied July 26, 1974.

**Synopsis**

A husband and wife brought an action against a corporation and one of its shareholders in which the wife alleged that she was sole owner of the corporation by virtue of a transfer of its stock to her by her husband and the husband alleged that he was entitled under an oral agreement to enforce certain promises made to him in exchange for his testifying on behalf of the corporation's application for operating authority as a taxicab company. The Eighth Judicial District Court, Clark County, James D. Santini, J., found insufficient credible evidence to support a claim of ownership on behalf of the wife, but awarded recovery to the husband, and cross appeals were filed by the parties. The Supreme Court, Zenoff, J., held that the evidence refuted the wife's assertion that she had acquired ownership of the corporation's stock; that the husband was estopped by his actions from denying the validity of a prior transaction in which he was alleged to have sold the company's stock to the individual defendant; and that the alleged oral agreement, under which the husband was to receive money and stock in exchange for supporting the company's application for operating authority and for forebearing from asserting any claim of ownership in the company, was unenforceable as being against public policy.

Affirmed in part and reversed in part.

Breen, J., dissented and filed opinion.

**Attorneys and Law Firms**

**\*241 \*\*843** Boyd, Leavitt & Freedman, Las Vegas, for appellants.

Charles L. Kellar, Kermitt L. Waters, Las Vegas, for respondents.

**\*242** OPINION

ZENOFF, Justice:

The genesis of the appellant corporation occurred in the early 1950's when Western Enterprises, Inc. was organized to operate the franchise of Western Cab Company. During a subsequent reorganization of Western Enterprises following various financial difficulties, respondent and cross-appellant Charles Kellar obtained an ownership interest in the corporation and assumed responsibility as a corporate officer. Further financial difficulties led to the transfer of all of the corporation's right, title and interest in the franchise to operate **\*\*844** the cab company to Kellar. This occurred in July of 1964. In 1966, the corporation's charter was revoked by the state.

Thereafter, appellant Crockett, one of the founders of the business, sought to reactivate the then defunct corporation. In consideration of Crockett's payment of $500.00 and assumption of outstanding obligations of Western Enterprises, Charles Kellar executed an instrument dated May 16, 1968 purporting to convey all of his interest in the business. The agreement, which recited that Kellar was the sole owner of Western Enterprises, was notarized by respondent and cross-appellant, Cornelia Kellar.

Crockett then proceeded to reactivate the company. The corporation's charter was reinstated with the Secretary of State in June of 1968 at which time the corporation's nane was changed to Western Cab Company. With the assistance of a substantial cash investment by Herbert Tobman, one of the defendants in the lower court, business was resumed. From June of 1968 through July of 1970, Crockett, Tobman and Myron Leavitt, also a defendant in the lower court action, engaged in the exclusive ownership and management of the cab company. At no time during this interval was any ownership interest asserted for or on behalf of either Charles or Cornelia Kellar.

Respondents first put forth a claim of ownership in June of 1970 when the defendants filed an application with the Taxicab Authority to change the name listed on the certificates of **\*243** public convenience and necessity to conform with the new name of the corporation and for authority to issue stock. Charles Kellar appeared at a hearing on the application

with the apparent intention of contesting the defendants' ownership of the corporation. That same day, during a luncheon meeting with Tobman, Crockett and Leavitt, it was agreed on behalf of the corporation to pay Kellar $6,000.00 cash and to reimburse him for monies expended on behalf of the corporation between May 16, 1968 and July 16, 1970. In addition, appellant Crockett promised to transfer five hundred of his shares in the corporation to Kellar. In consideration of these promises, Charles Kellar agreed to support the application then pending before the Taxicab Authority and to forbear asserting any claim of ownership in the cab company. In furtherance of this agreement, Kellar appeared before the Authority and gave sworn testimony acknowledging the agreement of May 16, 1968 and receipt of Crockett's $500.00 payment. At that time he represented that on the date of sale he was the sole owner of Western Enterprises, Inc.

Upon failure of the corporation's officers to execute a written memorandum of the luncheon agreement or to pay the agreed consideration, an action was filed on September 24, 1970, on behalf of Cornelia Kellar alleging that by virtue of a transfer from her husband of all stock in Western Enterprises, Inc. in 1964, she was the sole owner of the corporation. Following protracted litigation, the lower court found insufficient credible evidence to support a claim of ownership on behalf of Cornelia Kellar but awarded recovery to her husband Charles on the basis of the agreement relative to his testimony before the Taxicab Authority.

1. There is abundant evidence in the record to refute respondent and cross-appellant Cornelia Kellar's assertion that she acquired the sole ownership of the stock in Western Enterprises, Inc. on December 1, 1964. This evidence includes: (1) an agreement executed by Charles Kellar on May 16, 1968, and notarized by his wife, which states that Charles Kellar is 'the sole owner of all rights, interests of Western Enterprises, Inc. . . .' (2) Charles Kellar's sworn testimony before the Taxicab Authority of the State of Nevada to the same effect, and (3) a stock certificate representing 200 shares of stock in Western Enterprises, Inc. endorsed to Cornelia Kellar wherein it appears that the original date of the endorsement has been erased and changed. The trial court's **845 finding, *244 supported by substantial evidence in the record, will not be disturbed on appeal. Briggs v. Zamalloa, 83 Nev. 400, 432 P.2d 672 (1967).

2. Respondent Kellar asserts as error the lower court's conclusion that the agreement of May 16, 1968 effectively conveyed his interest in the corporation to Crockett for the reason that a stock certificate representing 200 shares in Western Enterprises was not delivered to Crockett. We hold

that Kellar is estopped to deny the validity of the transfer by reason of his conduct. On two occasions, in 1966 when the agreement of sale was executed and in 1970 before the Taxicab Authority, Kellar first purported to convey all ownership in Western Enterprises and then testified under oath that he had done so. From June of 1968 to July of 1970, when the cab company was being operated by Crockett, Tobman and Leavitt, the Kellars asserted no ownership rights in the corporation. By virtue of the 1968 agreement, both Charles and Cornelia Kellar had knowledge of the transfer. To entertain a defense of nondelivery at this late stage would be manifestly unjust and tantamount to permitting the prepetration of fraud upon the defendant parties.

3. The trial court erred however in allowing Kellar to recover on the basis of the July 1970 agreement. In consideration of this agreement the lower court found that Charles Kellar's obligations were two-fold: (1) to support the application then pending before the Taxicab Authority and (2) to forbear asserting any claim of ownership in Western Cab Company. According to Charles Kellar's own memorandum of the agreement, payments was contingent on the successful outcome of the defendants' application then pending before the Taxicab Authority. Kellar testified in open court that in advance of his testimony before the Authority, he had agreed to testify precisely in the manner suggested by the defendants.

A contract to pay a witness for testifying coupled with the condition that the right of the witness to compensation depends upon the result of the suit in which his testimony is to be used, is contrary to public policy and void for the reason that it is the tendency of such a contract to lead to perjury and the perversion of justice. Burchell v. Ledford, 226 Ky. 155, 10 S.W.2d 622 (1928); see also Apter v. Joffo, 32 Mich.App. 411, 189 N.W.2d 7 (1971); Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978 (6th Cir. 1937). We do not hesitate to apply *245 this rule when, as in the present case, the witness's only interest in the outcome of the litigation is that created by contract. See M. Farbman and Sons, Inc. v. Continental Casualty Co., 62 Misc.2d 236, 308 N.Y.S.2d 493, aff'd 66 Misc.2d 146, 319 N.Y.S.2d 775 (1971). Whatever initial interest Kellar may have had in the outcome of the application before the Taxicab Authority, it was superseded by the July 16 agreement promising payment in the event of approval.

All contracts the purpose of which is to create a situation which tends to operate to the detriment of the public interest are against public policy and void whether in a particular case the purpose of the contract is effectuated. King v. Randall, 44

Nev. 118, 190 P. 979 (1920). For this reason we reverse that part of the decision in the lower court granting recovery to Charles Kellar and affirm in all other respects.

THOMPSON, C.J., and MOWBRAY and BATJER, JJ., concur.

BREEN, District Judge.

I dissent.

I disagree with that part of the majority opinion which reverses the lower court. I agree with the proposition that a contract made by a witness who testified for a consideration which is contingent upon the outcome of litigation is void as against public policy. However, where that witness is otherwise interested in the result of the litigation; where the witness has a legitimate **846 and otherwise potentially valid claim pertaining to the subject matter of the litigation which he also gives up, there is sufficient consideration to support an enforceable contract.

It is true that Mr. Kellar's testimony was given for a consideration which was, in part, contingent on the outcome of the taxicab proceedings. In addition to that, Mr. Kellar agreed to forebear asserting a claim of right. I do not believe this contract is against public policy because the policy considerations are absent in such a case.

I do not think perjury is promoted any more in this case than testimony which is the result of a compromise of a divorce case or any other compromise litigation between the parties.

When one testifies for a consideration, at least three possibilities arise with respect to that person's status toward the litigation.

If the person has no independent interest in the subject matter, nor the outcome of the proceedings, he is a stranger to the litigation and perhaps the general rule would apply. But one may be an adverse party to the proceedings or one may stand *246 to gain or lose rights as a result of the proceedings and thus be an 'interested witness'. In these cases, the fact that part of the consideration itself may have illegal aspects won't defeat the agreement. There is ample authority for this proposition of law. Johnson v. Country Life Insurance Co., 12 Ill.App.3d 158, 300 N.E.2d 11 (1973); Schara v. Thiede,

58 Wis.2d 489, 206 N.W.2d 129 (1973); Ingle v. Perkins, 95 Idaho 416, 510 P.2d 480 (1973); Wilson v. Maryland Cas. Co., La.App., 269 So.2d 562 (1972); Seufert v. Greenfield, Or., 496 P.2d 197 (1972); River Garden Farms v. Superior Court, 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972); Willcher v. Willcher, D.C.App., 294 A.2d 486 (1972); Ferro v. Bologna, 31 N.Y.2d 30, 334 N.Y.S.2d 856, 286 N.E.2d 244 (1972); Sealy Mattress Co. v. Sealy, Inc., D.C., 346 F.Supp. 353 (1972); Cox v. Hope, Tex.Civ.App., 498 S.W.2d 436 (1973); Thatcher v. Darr, 27 Wyo. 452, 199 P. 938; Dodge v. Stiles, 26 Conn. 463 (1857).

I believe there was substantial evidence to conclude that part of the consideration for the July 16, 1970 contract was good faith forebearance to assert a prior existing disputed claim. If this were the case, the agreement would be valid and enforceable. For example, at the time of the agreement in Western Cab Company in question, Keller or his wife were stockholders of record and had been notified of the proceedings before the Taxicab Authority.

The majority's view that Keller's only interest was created by the contract itself amounts to a substitution of its view of the evidence for that of the trial court. This violates the proposition, used by the majority opinion, that a trial court's finding, if supported by substantial evidence in the record, will not be disturbed on appeal. Briggs v. Zamalloa, 83 Nev. 400, 432 P.2d 672 (1967).

The majority opinion concludes that Kellar's only interest in the outcome of the litigation was created by the July 16 contract, which they say is illegal. Yet they also say that 'whatever prior interest Kellar may have had in the outcome of the application before the taxicab authority, it was superseded by the July 16 agreement promising payment in the event of approval.' This is confusing to me because it appears to make the agreement both valid and invalid in order to support the conclusion reached. If the July 16 agreement superseded any prior interest, and I agree it did, it must have been supported by good and sufficient consideration otherwise it would not be enforceable.

I would affirm the lower court because its conclusion is supported by substantial evidence in the record and sound legal theory.

**All Citations**

90 Nev. 240, 523 P.2d 842

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 969186
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Matthew WIGGINS, Plaintiff,
v.
Andrew SEELEY, Richard Ooms, and
Tiffany Ooms Seeley, Defendants.

3:16–cv–00642–HDM–WGC
|
Signed 03/13/2017

**Attorneys and Law Firms**

Julie Bachman, Primm, NV, Richard Anthony Salvatore, Stephanie Rice, Hardy Law Group, Reno, NV, for Plaintiff.

Michael J. McLaughlin, Feldman McLaughlin Thiel LLP, Zephyr Cove, NV, for Defendants.

ORDER

Judge D. McKibben, UNITED STATES DISTRICT JUDGE

 **\*1**  Before the court is defendants Andrew Seeley, Richard Ooms and Tiffany Seeley's motion to dismiss for improper venue or transfer. (ECF No. 6). Plaintiff responded (ECF No. 12) and defendants replied (ECF No. 14).

Also before the court is plaintiff's motion to remand. (ECF No. 13). Defendants responded (ECF No. 16) and plaintiff replied (ECF No. 17).

**I. Background**
This dispute arises out of a contract entered into on May 26, 2016. (ECF No. 2 at 6). According to the complaint, defendants failed to make the full payments as agreed upon under the contract. (*Id.* at 7). As a result, plaintiff alleges that defendants owe him $79,316.39. (*Id.* at 8).

On September 22, 2016, plaintiff filed a complaint for breach of contract in Ninth Judicial District in and for the State of Nevada. (ECF No. 2 at 6–9). On November 7, 2016, defendants removed the action to this court pursuant to 28 U.S.C. § 1332(a). (ECF No. 2).

Defendants move to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b) (3) or to transfer the case to the Southern District of California pursuant to 28 U.S.C. § 1404. (ECF No. 6). Plaintiff moves to remand the action to Douglas County, Nevada in accordance with the forum selection clause set forth in the Private Investment Agreement. (ECF No. 13). The court addresses each motion in turn.

**II. Motion to Dismiss for Improper Venue**
Defendants move the court to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue. Venue of removed actions is governed by 28 U.S.C. § 1441(a). *See Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953) (holding that 28 U.S.C. § 1391 has no application in removed actions). Section 1441(a) provides that, when an action is removed from state court, venue is automatically proper in the federal district court where the state action was pending. 28 U.S.C. § 1441(a). There is only one official federal judicial district in the state of Nevada. Therefore, venue is proper in this court. Defendants' motion to dismiss for improper venue is denied.

**III. Motion to Transfer**
Defendants also request the court transfer the action to the Southern District of California for the convenience of the parties and witnesses. Section 1404 establishes that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

In determining whether transfer is appropriate in a particular case, the court is required to weigh multiple factors. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). The court may consider the following factors:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

**\*2** *Id.* at 498–99. The presence of a forum selection clause is also a "significant factor" in the court's § 1404(a) analysis. *Id.* A "defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (citation omitted).

Defendants request the court to transfer venue of this case to the Southern District of California. As an initial matter, defendants assert that the matter may be properly brought in the Southern District of California as all defendants are California residents and live in San Diego. *See* 28 U.S.C. 1391(b)(1). In support of transfer, defendants state that, other than plaintiff, all parties encumbered by the Private Investment Agreement reside in California, travel to Nevada would be a hardship on defendants, defendants may call some witnesses who are residents in California, any documents that relate to the operations of Getaway San Diego will be located in California, and that nearly all operative facts occurred in California. Defendants further assert that "[t]here are financial institutions and witnesses in California that may need to be subpoenaed and may not be willing to testify." (ECF No. 6 at 9).

Defendants provide no evidence or affidavit to support the contention regarding financial institutions or witnesses in California that may not be willing to testify. Defendants also fail to explain why travel to Nevada would be more expensive for them than it would be for plaintiff to travel to California. Additionally, defendants fail to address the significance of the forum selection clause in the Private Investment Agreement. The Private Investment Agreement provides that "[t]his agreement will be governed and construed in accordance with the laws of Douglas County, Nevada. Jurisdiction is Douglas County, Nevada." (ECF No. 6 at 12).

A valid forum selection clause "represents the parties' agreement as to the most proper forum." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S.Ct. 568, 581 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). Here, plaintiff followed the terms of the forum selection clause under the Private Investment Agreement by filing suit in Douglas County, Nevada. As

discussed below, defendants do not dispute the validity of the forum selection clause. Moreover, Nevada is most familiar with the governing law and plaintiff is a Nevada resident. Accordingly, weighing the factors for and against transfer, the court finds that transfer would not promote "the interest of justice." Defendant's motion to transfer is therefore denied.

## IV. Motion to Remand

Plaintiff seeks to remand this action based upon a forum selection clause in the contract which states, "Jurisdiction is Douglas County, Nevada." (ECF No. 12–1 at 3). Defendants do not dispute the validity of the forum selection clause. Rather, defendants argue that the forum selection clause is permissive, not mandatory, and that removal is not barred.

A forum selection clause will be enforced only where venue is specified with mandatory language. *Docksider, Ltd. v. Sea Technology, Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989). The question of whether a forum selection clause is permissive or mandatory is a question of contract interpretation. *N. California Dist. Council of Laborers v. Pittsburgh–Des Moines, Inc.*, 69 F.3d 1034, 1036 (9th Cir. 1995).

**\*3** "To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Id.* at 1037. For example, the Ninth Circuit held that the clause containing the language that "venue of any action brought hereunder shall be deemed to be in Glouscester County, Virginia" is mandatory. *Docksider,* 875 F.2d at 764. Similarly, in *Pellport Investors, Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 275 (9th Cir. 1984) the Ninth Circuit held the clause "this Agreement shall be litigated only in the Superior Court for Los Angeles, California (and in not other) ..." is mandatory. On the other hand, a forum selection clause providing a particular court or state has jurisdiction, but says nothing about it being exclusive jurisdiction, is permissive and generally will not be enforced. *See N. California Dist. Council of Laborers*, 69 F.3d at 1037 (holding that the language 'shall be enforceable' is permissive); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987)(holding the language "shall have jurisdiction over the parties in any action" is permissive).

The forum selection clause in the parties' Private Investment Agreement provides that "Jurisdiction is Douglas County, Nevada." The clause specifies that jurisdiction will be in Douglas County, but it fails to contain any language about Douglas County having exclusive jurisdiction. Hence, the forum selection clause is permissive and the action

was properly removed to this court. Accordingly, plaintiff's motion to remand is denied.

**V. Conclusion**

**IT IS ORDERED** that defendants' motion to dismiss or transfer (ECF No. 6) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to remand (ECF No. 13) is **DENIED**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 969186

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 13870507
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

WORD TO INFO, INC., Plaintiff,

v.

FACEBOOK, INC., Defendant.

Civil Action No. 3:14-CV-4387-K

|

Signed 07/23/2015

### Attorneys and Law Firms

Steven R. Daniels, Farney Daniels PC, Georgetown, TX,
James Robert Gourley, Carstens & Cahoon, Dallas, TX, for
Plaintiff.

E. Leon Carter, Linda R. Stahl, Carter Scholer Arnett Hamada
& Mockler PLLC, Dallas, TX, Heidi Keefe, Lowell D. Mead,
Mark Randolph Weinstein, Cooley LLP, Palo Alto, CA, for
Defendant.

### ORDER

ED KINKEADE, UNITED STATES DISTRICT JUDGE

**\*1**  Before the Court is Defendant Facebook, Inc.'s Motion
to Transfer Venue Pursuant to 28 U.S.C. § 1406 and § 1404
(Doc. No. 19). After careful consideration of the motion,
the response, the reply, the supplemental memorandum and
response, the applicable law, and the relevant record, the
Court **GRANTS** the motion.

### I. Factual and Procedural Background

Plaintiff Word to Info, Inc. ("WTI") is a Texas corporation
with its place of business in Richardson, Texas. Defendant
Facebook, Inc. ("Facebook") is a Delaware corporation with
its principal place of business in Menlo Park, California.
WTI sued Facebook in this Court for infringing on
seven (7) patents to which it holds the exclusive rights,
title and interests: United States Patent Nos. 5,715,468
("'468 Patent"); 6,138,087 ("'087 Patent"); 6,609,091
("'091 Patent"); 7,349,840 ("'840 Patent"); 7,873,509 ("'509
Patent"); 8,326,603 ("'603 Patent"); and 8,688,436 ("'436
Patent")(collectively "patents-in-suit"). The patents-in-suit
describe and claim inventions relating to memory systems
for storing and retrieving experience and knowledge with

natural language utilizing state representation data, word
sense numbers, function codes and/or directed graphs. WTI
contends that a Facebook product, Graph Search, infringes
on the patents-in-suit. Facebook subsequently filed the instant
motion to transfer.

### II. Analysis

Facebook moves this Court to transfer this case to the United
States District Court for the Northern District of California
because (1) venue in this District is improper because there
is neither general nor specific jurisdiction, and, alternatively,
(2) it is clearly more convenient and fair. WTI argues that the
Northern District of Texas is the proper venue for this case.
WTI also argues that transferring the case to the Northern
District of California would only burden WTI, not reduce
any inconvenience. Under 28 U.S.C. § 1404(a), a court may
transfer a case upon a showing that the proposed transferee
forum is more convenient, and that such a transfer is in the
interest of justice. *In re Radmax, Ltd.*, 720 F.3d 285, 287-88
(5th Cir. 2013).

The Court first analyzes Facebook's argument that
convenience and fairness dictate the case be transferred to the
Northern District of California under § 1404(a).

### A. Applicable Legal Standards

Section 1404(a) provides that "for the convenience of parties
and witnesses, in the interest of justice, a district court may
transfer any civil action to any other district or division
where it might have been brought." 28 U.S.C. § 1404(a). A
motion to transfer venue may be granted upon a showing
that the transferee venue is clearly more convenient than
the venue chosen by the plaintiff. *See In re Nintendo Co.*,
589 F.3d 1194, 1197 (Fed. Cir. 2009); *In re Genentech, Inc.*,
566 F.3d 1338, 1342 (Fed. Cir. 2009); *In re TS Tech USA
Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008); *In re Volkswagen
of Am., Inc. (Volkswagen II)*, 545 F.3d 304, 315 (5th Cir.
2008) (en banc), *cert. denied*, 555 U.S. 1172 (2009). The
plaintiff's choice of venue is not a factor in this analysis, but it
does contribute to the defendant's burden in proving that the
transferee venue is clearly more convenient than the transferor
venue. *Volkswagen II*, 545 F.3d at 314-15.

**\*2**  The initial question in applying the provisions of
section 1404(a) is whether the suit could have been brought
in the proposed transferee district. *In re Volkswagen AG*

*(Volkswagen I)*, 371 F.3d 201, 203 (5th Cir. 2004). If the potential transferee district is a proper venue, then the court must weigh the relative public and private factors of the current venue against the transferee venue. *Id.* In making such a convenience determination, the court considers several private and public interest factors, none of which are given dispositive weight. *Id.* The private interest factors include: "1) the relative ease of access to sources of proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Nintendo*, 589 F.3d at 1198; *see Genetech*, 566 F.3d at 1342; *TS Tech.*, 551 F.3d at 1319; *Volkswagen II*, 545 F.3d at 315. The public interest factors include: "1) the administrative difficulties flowing from court congestion; 2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws in the application of the foreign law." *Id.* Although the letter of section 1404(a) might suggest otherwise, it is well established that "the interest of justice" is an important factor in the transfer analysis. *DataTreasury Corp. v. First Data Corp.*, 243 F. Supp.2d 591, 593-94 (N.D. Tex. 2003) (Kaplan, M.J.) (citing *In re Medrad, Inc.*, 1999 WL 507359, *2 (Fed Cir. 1999)).

**B. Application of the Law to the Facts**

WTI is a Texas corporation, with its business address in Richardson, Texas. It is the assignee of the seven (7) patents-in-suit. The sole inventor of the seven (7) patents-in-suit is Robert L. Budzinski, the President and sole Director of WTI, whose home address is the same as WTI's business address. The record establishes that Mr. Budzinski is the sole employee of WTI, and it also appears from the record that WTI conducts no business in Texas other than filing the instant lawsuit and a similar lawsuit against Google Inc., both in the Northern District of Texas for infringement of the patents-in-suit.

Facebook is a Delaware corporation with its principal place of business in Menlo Park, California, which is located within the Northern District of California. Facebook has two (2) offices Texas—a 271-person in Austin, which is located within the Western District of Texas, and a 22-person office in Dallas, which is located within this District. Facebook also made a recent public announcement that it has begun construction on a new data center in Ft. Worth, which is also located within this District.

Before considering the private and public interest factors, as well as the question of whether a transfer is in the interest of justice, the Court must determine the threshold issue of whether this case could have originally been brought in the Northern District of California. Any proposed transferee court must have subject matter jurisdiction and personal jurisdiction over the defendant. WTI concedes that this lawsuit could have been brought in the proposed transferee district. Therefore, this threshold question is satisfied. The Court now turns to the private and public interest factors to determine whether a transfer is appropriate.

1. Private Interest Factors

The first private factor is the relative ease of access to sources of proof. "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *Genetech*, 566 F.3d at 1345 (quoting *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp.2d 325, 330 (E.D.N.Y. 2006)). Facebook has presented that "the bulk" of its relevant evidence is located at its headquarters in Menlo Park, California, which is in the Northern District of California. Facebook states that evidence on its general operations, marketing and financials, as well its "highly proprietary documentation, source code and physical systems operating Graph Search," are located at its headquarters. Furthermore, almost every Facebook employees who developed, designed and currently work on the allegedly infringing program resides in the Northern District of California, with the exception of a few engineers in Seattle, Washington. Facebook also states that none of its relevant evidence is located in Texas.

 **\*3**  Although the technological convenience of e-discovery may diminish concerns associated with the location of evidence, it does not negate the significance of or eliminate consideration of this factor in a section 1404(a) transfer analysis. *Radmax*, 720 F.3d at 288; *see also Volkswagen II*, 545 F.3d at 316 (stating that the standard is "relative ease of access, not absolute ease of access" and finding this factor weighed in favor of transfer to a venue where documents were physically kept). WTI identifies "at least twelve handwritten lab notebooks, dating back to at least 1989" kept by Mr. Budzinski, as "all of WTI's documents", which originated and are located in the Northern District of Texas. (Emphasis in the original.) WTI argues these notebooks are fragile, not

easily scanned and transferred electronically, and "should not be subject to be damaged or destroyed by being transported to California," whereas Facebook's documents can easily be electronically transported to this District. However, any convenience offered from e-discovery does not negate the significance or eliminate consideration of this factor in a section 1404(a) transfer analysis. *Radmax*, 720 F.3d at 288; *see Eight One Two, LLC v. Purdue Pharma L.P.*, Civ. No. 3:13-CV-2981-K, 2014 WL 7740476, *2 (N.D. Tex. May 16, 2014). Furthermore, assuming the notebooks are truly fragile as alleged, Mr. Budzinski's lab notebooks risk damage in being transported during discovery or to this Court during a trial were the Court to deny transfer. There is no question that WTI's documentary evidence, which consists of the handwritten lab notebooks and prosecution records and which is located in this District, will be vastly outnumbered by Facebook's documentary evidence related to Graph Search, which is all or almost all located in the transferee district. *See Genentech*, 566 F.3d at 1345 ("In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."). Because the majority of the relevant documentary evidence is located in the Northern District of California and more readily accessible there, the first factor of relative ease of access to sources of proof favors transfer.

Next, the Court considers the availability of compulsory process or subpoena power to secure the attendance of unwilling witnesses. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947); *Volkswagen II*, 545 F.3d at 315. Under recently amended Federal Rule of Civil Procedure 45, federal courts may enforce subpoenas issued to any witness for trial, hearing or deposition within 100 miles of the place in which that witness resides, works, or regularly transacts business in person, or for a trial, anywhere within the state in which the witness works, resides, or regularly transacts business in person, provided that witness does not incur substantial expense. FED. R. CIV. P. 45(c)(1)(A)-(B).

A venue that has absolute subpoena power for both deposition and trial is favored over one that does not. *Thomas Swan & Co. Ltd. v. Finisar Corp.*, 2014 WL 47343, *3 (E.D. Tex. 2014) (quoting *Volkswagen II*, 545 F.3d at 316). The court gives more weight to specifically identified witnesses, and less weight to vague assertions that witnesses are likely to be found in a particular forum. *U.S. Ethernet Innovations, LLC v. Samsung Electronics Co. Ltd.*, 2013 WL 1363613, *3 (E.D. Tex. 2013). Current employees of a party are considered to be

willing witnesses whose testimony can be presented without reliance upon subpoena power, and their locations are not persuasive in the court's analysis for this factor. *Rosemond v. United Airlines, Inc.*, Civ. Action No. H-13-2190, 2014 WL 1338690, *3 (S.D. Tex. 2014); *Net Navigation Systems, LLC v. Cisco Systems, Inc.*, Cause No. 4:11-CV-660, 2012 WL 7827544, *4 (E.D. Tex. 2012).

In its Rule 26(a)(1) initial disclosures, Facebook identified three (3) non-party witnesses, in addition to six (6) party witnesses, all located within the absolute subpoena power of the proposed transferee court, the Northern District of California. WTI identified only one (1) witness—Mr. Budzinski, who resides in this District. Mr. Budzinski is the President and sole Director of WTI, so as a party witness, his location is not persuasive for purposes of this analysis. *See Rosemond*, Civ. Action No. H-13-2190, 2014 WL 1338690, at *3. WTI does not identify any non-party witnesses. After considering all of the pertinent evidence and the applicable law, the Court finds the availability of compulsory process favors transfer.

The Court must also consider the cost of attendance for willing witnesses, which is "probably the single most important factor in the transfer analysis." *Genentech*, 566 F.3d at 1343. The Fifth Circuit established the "100 mile rule" that requires "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen II*, 545 F.3d at 317. This inconvenience factor includes additional travel time, meal, lodging expenses, and time away from their regular employment. *Volkswagen I*, 371 F.3d at 205. The court must also consider the personal costs associated with being away from work, family, and community. *In re Acer America Corp.*, 626 F.3d 1252, 1255 (Fed. Cir. 2010), *cert. denied*, 131 S.Ct. 2447 (2011) (*citing Volkswagen II*, 545 F.3d at 317).

**\*4** Facebook has identified nine (9) relevant party and non-party witnesses who are all located in or near the Northern District of California. *See also Genentech*, 566 F.3d at 1343 (defendant not required "to show that the potential witness has more than relevant and material information at this point in the litigation."). Facebook states that Graph Search was designed and developed at its headquarters in the Northern District of California, and the Facebook employees knowledgeable about this allegedly infringing program reside primarily in the Northern District of California, except for a

few engineers in Seattle, Washington. These witnesses with relevant knowledge about the allegedly infringing program would each be burdened with travel of more than 1,500 miles each way to testify in this District. There would be significantly less travel for the witnesses by transferring this case to the Northern District of California. Further, Facebook has no employees or other witnesses with knowledge of the allegedly infringing products who are located in this District or even in the state of Texas. WTI identified only one witness, Mr. Budzinski, a party witness, who lives in this District. He would be burdened with travel of more than 1,500 miles each way to testify in the Northern District of California. WTI has not identified any non-party witnesses. Facebook argues the witnesses it has identified will have real and avoidable burdens, tangible and intangible, if they're required to travel to this Court, rather than the Northern District of California. WTI responds that Facebook is more capable of bearing the costs of litigation in this District than Mr. Budzinski, "a retired man of limited means," should the case be transferred to the Northern District of California. However, Mr. Budzinski's personal financial situation is not relevant to this analysis because he is not a party; WTI is the only named Plaintiff and it offers no evidence as to its financial situation or resources. Additionally, the Court takes into account not only the tangible burdens, such as out-of-pocket expenses which Mr. Budzinski focuses his argument on, but also the intangible costs, such as time away from work and family. *See Acer America*, 626 F.3d at 1255. There are three (3) non-party witnesses, located in the Northern District of California, identified by Facebook and none by WTI; the inconvenience to non-party witnesses bears more weight in this analysis. *See Mohamed v. Mazda Motor Corp.*, 90 F.Supp.2d 757, 775 (E.D. Tex. 2000)("[I]t is the convenience of non-party witnesses ... that is the more important factor and is accorded greater weight in a transfer of venue analysis."). In addition, there are six (6) relevant party witnesses identified by Facebook who all reside in the Northern District of California, compared with the one (1) party witness identified by WTI, who resides in this District. The Court finds that the factor of the convenience of the relevant witnesses favors transfer.

The final private interest factor is "all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Volkswagen II*, 545 F.3d at 315. Facebook argues this factor is neutral because no "rare and special circumstances" exist in relation to this case. *See In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003). WTI makes no argument in relation to this factor. The Court finds this factor is neutral.

## 2. Public Interest Factors

Having evaluated the private interest factors, the Court must now apply the public interest factors to the relevant facts. The first public interest factor is administrative difficulties flowing from court congestion. *Nintendo*, 589 F.3d at 1198. Facebook and WTI agree that recent statistics indicate this District has 997 cases pending per judge, whereas the Northern District of California has 455 cases pending per judge. Facebook states that although both districts dispose of a case, on average, in less than three years, which meets the standards of the Administrative Office of the United States Courts, this District is "substantially more congested ... with more than twice as many cases per judge." Facebook argues this factor "slightly favors transfer" or is neutral. WTI notes that the actual disposition time for a civil case in this District is 23.8 months compared to 30.9 months in the Northern District of California, and argues this weighs against transfer. While it may, on average, take a shorter time for a case to reach trial in this District, the Court does not view this factor as a "race between the courts." Each case is unique, and whether or not the case would progress more rapidly here or in the Northern District of California is largely a matter of speculation. Both courts have an average case disposition time of less than three years, meeting the standards of the Administrative Office of the United States Courts. Therefore, the Court cannot describe either District's docket as "congested" for purposes of a section 1404(a) venue transfer analysis. *See Genetech*, 566 F.3d at 1347. The Court finds this factor is neutral.

Next, the Court must evaluate whether there is a local interest in deciding local issues at home. *Volkswagen II*, 545 F.3d at 315. A local interest is demonstrated by a relevant factual connection between the events and the venue. *Leblanc v. C.R. England, Inc.*, 961 F.Supp.2d 819, 832 (N.D. Tex. 2013) (Boyle, J.). Facebook contends that this factor favors transfer because "the activity giving rise to WTI's patent infringement allegations center in Northern California, the accused Graph Search system was designed and developed in Northern California, and employees in Northern California manage and work on Graph Search." WTI counters that this District does have an local interest because Google receives "a portion of the value of the infringing product from Facebook users with desktop computers and handheld devices located in Texas," that the relevancy of Facebook's witnesses is speculative, and the patent rights of a resident of this District have allegedly been infringed.

**\*5**  There is a relevant factual connection between these events and the Northern District of California. Most, if not all, of the decisions regarding the accused infringing products were made at Facebook's headquarters which is located in the Northern District of California. The Northern District of California is the venue where many of the witnesses and most of the evidence concerning the alleged infringement are located. On the other hand, there is no legitimate local interest with respect to the alleged infringement in this District. The fact that Facebook users in Texas provide information which is then collected by the infringing products does not establish an actual local interest in this District because these allegedly infringing products almost certainly collect information from Facebook users across the nation; there is no allegation that the information of only Facebook users in Texas is collected. *Cf. Volkswagen II*, 545 F.3d at 318 (interests that could apply to virtually any district or division in the United States due to nationwide sale of infringing products are disregarded in favor of particularized local interests). Further, while Mr. Budzinski lives in this District, he is a witness, not a party, so his presence here does not impact the analysis of this factor. As for WTI, it was formed and incorporated in 2013 with the purpose, according to WTI, of protecting the rights to the patents-in-suit, including filing lawsuits against infringers. WTI's limited business presence in this District is not substantial enough for the Court to conclude that the citizens of this District would have a substantial interest in the outcome of this case. *See Eight One Two*, Civ. No. 3:13-CV-2981-K, 2014 WL 7740476, at \*5. Therefore, the Court finds the local interest factor favors transfer.

The last two components of the public interest analysis involve the respective court's familiarity with federal patent law, and whether there are any potential conflicts of law that would arise. Both parties agree that these two factors are neutral as courts in both districts are familiar with the law that will govern the case and there are no conflicts of law to avoid. Therefore, the Court finds both the third and fourth public interest factors are neutral.

In conclusion, the Court has considered the private factors, and finds that the relative ease of access to sources of proof, the availability of compulsory process for witnesses, and the costs of attendance for willing witnesses all favor transfer. The private interest factor "all other practical problems that make trial of a case easy, expeditious, and inexpensive," is neutral. *Volkswagen II*, 545 F.3d at 315. In evaluating the public interest, the factors of administrative difficulty flowing from court congestion, the respective courts' familiarity with applicable law, and potential conflicts of law are all neutral. The public interest factor of local interest in deciding local controversies at home favors transfer. Having considered all private and public interest factors and the relative convenience of the parties and witnesses, the Court has determined that, viewed in their totality, these factors favor transfer and further, and that such a transfer would be in the overall interest of justice.

Because the Court finds transfer is appropriate under § 1404(a), the Court need not address Facebook's arguments based on § 1406.

### III. Conclusion

The Court has analyzed the private and public interest factors and the relative convenience of the parties and witnesses and finds that they weigh in favor of transfer. Because the Court finds the proposed transferee forum is more convenient and a transfer is in the interest of justice, the Court **grants** Facebook's Motion to Transfer Venue under 28 U.S.C. § 1404. This case is hereby transferred to the United States District Court for the Northern District of California.

**SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 13870507

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 20. Employees' Benefits
    Chapter V. Employment and Training Administration, Department of Labor
      Part 656. Labor Certification Process for Permanent Employment of Aliens in the United States (Refs & Annos)
        Subpart C. Labor Certification Process

20 C.F.R. § 656.12

§ 656.12 Improper commerce and payment.

Effective: July 16, 2007
Currentness

The following provision applies to applications filed under both this part and 20 CFR part 656 in effect prior to March 28, 2005, and to any certification resulting from those applications:

(a) Applications for permanent labor certification and approved labor certifications are not articles of commerce. They shall not be offered for sale, barter or purchase by individuals or entities. Any evidence that an application for permanent labor certification or an approved labor certification has been sold, bartered, or purchased shall be grounds for investigation under this part and may be grounds for denial under § 656.24, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

(b) An employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application, except when work to be performed by the alien in connection with the job opportunity would benefit or accrue to the person or entity making the payment, based on that person's or entity's established business relationship with the employer. An alien may pay his or her own costs in connection with a labor certification, including attorneys' fees for representation of the alien, except that where the same attorney represents both the alien and the employer, such costs shall be borne by the employer. For purposes of this paragraph (b), payment includes, but is not limited to, monetary payments; wage concessions, including deductions from wages, salary, or benefits; kickbacks, bribes, or tributes; in kind payments; and free labor.

(c) Evidence that an employer has sought or received payment from any source in connection with an application for permanent labor certification or an approved labor certification, except for a third party to whose benefit work to be performed in connection with the job opportunity would accrue, based on that person's or entity's established business relationship with the employer, shall be grounds for investigation under this part or any appropriate Government agency's procedures, and may be grounds for denial under § 656.32, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

**Credits**
[72 FR 27945, May 17, 2007]

SOURCE: 69 FR 77386, Dec. 27, 2004; 72 FR 27944, May 17, 2007; 73 FR 78068, Dec. 19, 2008; 85 FR 63915, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, 26177, May 13, 2021; 86 FR 70731, Dec. 13, 2021, unless otherwise noted.

§ 656.12 Improper commerce and payment., 20 C.F.R. § 656.12

AUTHORITY: 8 U.S.C. 1182(a)(5)(A), 1182(p)(1); sec.122, Public Law 101–649, 109 Stat. 4978; and Title IV, Public Law 105–277, 112 Stat. 2681.

Current through Sept. 22, 2023, 88 FR 65327. Some sections may be more current. See credits for details.

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 20. Employees' Benefits
    Chapter V. Employment and Training Administration, Department of Labor
      Part 655. Temporary Employment of Foreign Workers in the United States (Refs & Annos)
        Subpart H. Labor Condition Applications and Requirements for Employers Seeking to Employ Nonimmigrants
        on H–1b Visas in Specialty Occupations and as Fashion Models, and Requirements for Employers Seeking to
        Employ Nonimmigrants on H–1b1 and E–3 Visas in Specialty Occupations (Refs & Annos)

20 C.F.R. § 655.731

§ 655.731 What is the first LCA requirement, regarding wages?

Effective: December 13, 2021
Currentness

An employer seeking to employ H–1B nonimmigrants in a specialty occupation or as a fashion model of distinguished merit and ability shall state on Form ETA 9035 or 9035E that it will pay the H–1B nonimmigrant the required wage rate. For the purposes of this section, "H–1B" includes "E–3 and H–1B1" as well.

(a) Establishing the wage requirement. The first LCA requirement shall be satisfied when the employer signs Form ETA 9035 or 9035E attesting that, for the entire period of authorized employment, the required wage rate will be paid to the H–1B nonimmigrant(s); that is, that the wage shall be the greater of the actual wage rate (as specified in paragraph (a)(1) of this section) or the prevailing wage (as specified in paragraph (a)(2) of this section). The wage requirement includes the employer's obligation to offer benefits and eligibility for benefits provided as compensation for services to H–1B nonimmigrants on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(1) The actual wage is the wage rate paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question. In determining such wage level, the following factors may be considered: Experience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors. "Legitimate business factors," for purposes of this section, means those that it is reasonable to conclude are necessary because they conform to recognized principles or can be demonstrated by accepted rules and standards. Where there are other employees with substantially similar experience and qualifications in the specific employment in question —i.e., they have substantially the same duties and responsibilities as the H–1B nonimmigrant—the actual wage shall be the amount paid to these other employees. Where no such other employees exist at the place of employment, the actual wage shall be the wage paid to the H–1B nonimmigrant by the employer. Where the employer's pay system or scale provides for adjustments during the period of the LCA—e.g., cost of living increases or other periodic adjustments, or the employee moves to a more advanced level in the same occupation—such adjustments shall be provided to similarly employed H–1B nonimmigrants (unless the prevailing wage is higher than the actual wage).

(2) The prevailing wage for the occupational classification in the area of intended employment must be determined as of the time of filing the application. The employer shall base the prevailing wage on the best information available as of the time of filing the application. Except as provided in this section, the employer is not required to use any specific methodology to determine the prevailing wage and may utilize a wage obtained from an OFLC NPC (OES), an independent authoritative source, or other legitimate sources of wage data. One of the following sources shall be used to establish the prevailing wage:

(i) A collective bargaining agreement which was negotiated at arms-length between a union and the employer which contains a wage rate applicable to the occupation;

(ii) If the job opportunity is in an occupation which is not covered by paragraph (a)(2)(i) of this section, the prevailing wage shall be the arithmetic mean of the wages of workers similarly employed, except that the prevailing wage shall be the median when provided by paragraphs (a)(2)(ii)(A), (b)(3)(iii)(B)(2), and (b)(3)(iii)(C)(2) of this section. The prevailing wage rate shall be based on the best information available. The following prevailing wage sources may be used:

(A) OFLC National Processing Center (NPC) determination. Prior to January 1, 2010, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests, but shall do so in accordance with these regulatory provisions and Department guidance. On or after January 1, 2010, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance. Upon receipt of a written request for a PWD on or after January 1, 2010, the NPC will determine whether the occupation is covered by a collective bargaining agreement which was negotiated at arm's length, and, if not, determine the arithmetic mean of wages of workers similarly employed in the area of intended employment. The wage component of the Bureau of Labor Statistics Occupational Employment Statistics survey shall be used to determine the arithmetic mean, unless the employer provides an acceptable survey. The NPC shall determine the wage in accordance with secs. 212(n) and 212(t) of the INA. If an acceptable employer-provided wage survey provides a median and does not provide an arithmetic mean, the median shall be the prevailing wage applicable to the employer's job opportunity. In making a PWD, the Chicago NPC will follow 20 CFR 656.40 and other administrative guidelines or regulations issued by ETA. The Chicago NPC shall specify the validity period of the PWD, which in no event shall be for less than 90 days or more than 1 year from the date of the determination.

(1) An employer who chooses to utilize an NPC PWD shall file the labor condition application within the validity period of the prevailing wage as specified in the PWD. Any employer desiring review of an NPC PWD, including judicial review, shall follow the appeal procedures at 20 CFR 656.41. Employers which challenge an NPC PWD under 20 CFR 656.41 must obtain a ruling prior to filing an LCA. In any challenge, the Department and the NPC shall not divulge any employer wage data collected under the promise of confidentiality. Once an employer obtains a PWD from the NPC and files an LCA supported by that PWD, the employer is deemed to have accepted the PWD (as to the amount of the wage) and thereafter may not contest the legitimacy of the PWD by filing an appeal with the CO (see 20 CFR 656.41) or in an investigation or enforcement action.

(2) If the employer is unable to wait for the NPC to produce the requested prevailing wage for the occupation in question, or for the CO and/or the BALCA to issue a decision, the employer may rely on other legitimate sources of available wage information as set forth in paragraphs (a)(2)(ii)(B) and (C) of this section. If the employer later discovers, upon receipt of the PWD from the NPC, that the information relied upon produced a wage below the final PWD and the employer was paying the NPC–determined wage, no wage violation will be found if the employer retroactively compensates the H–2B nonimmigrant(s) for the difference between the wage paid and the prevailing wage, within 30 days of the employer's receipt of the PWD.

(3) In all situations where the employer obtains the PWD from the NPC, the Department will deem that PWD as correct as to the amount of the wage. Nevertheless, the employer must maintain a copy of the NPC PWD. A complaint alleging inaccuracy of an NPC PWD, in such cases, will not be investigated.

(B) An independent authoritative source. The employer may use an independent authoritative wage source in lieu of an NPC PWD. The independent authoritative source survey must meet all the criteria set forth in paragraph (b) (3)(iii)(B) of this section.

(C) Another legitimate source of wage information. The employer may rely on other legitimate sources of wage data to obtain the prevailing wage. The other legitimate source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(C) of this section. The employer will be required to demonstrate the legitimacy of the wage in the event of an investigation.

(iii) For purposes of this section, "similarly employed" means "having substantially comparable jobs in the occupational classification in the area of intended employment," except that if a representative sample of workers in the occupational category can not be obtained in the area of intended employment, "similarly employed" means:

(A) Having jobs requiring a substantially similar level of skills within the area of intended employment; or

(B) If there are no substantially comparable jobs in the area of intended employment, having substantially comparable jobs with employers outside of the area of intended employment.

(iv) A prevailing wage determination for LCA purposes made pursuant to this section shall not permit an employer to pay a wage lower than required under any other applicable Federal, state or local law.

(v) Where a range of wages is paid by the employer to individuals in an occupational classification or among individuals with similar experience and qualifications for the specific employment in question, a range is considered to meet the prevailing wage requirement so long as the bottom of the wage range is at least the prevailing wage rate.

(vi) The employer shall enter the prevailing wage on the LCA in the form in which the employer will pay the wage (e.g., an annual salary or an hourly rate), except that in all cases the prevailing wage must be expressed as an hourly wage if the H–1B nonimmigrant will be employed part-time. Where an employer obtains a prevailing wage determination (from any of the sources identified in paragraphs (a)(2)(i) and (ii) of this section) that is expressed as an hourly rate, the employer may convert this determination to a yearly salary by multiplying the hourly rate by 2080. Conversely, where an employer obtains a prevailing wage (from any of these sources) that is expressed as a yearly salary, the employer may convert this determination to an hourly rate by dividing the salary by 2080.

(vii) In computing the prevailing wage for a job opportunity in an occupational classification in an area of intended employment in the case of an employee of an institution of higher education or an affiliated or related nonprofit entity, a nonprofit research organization, or a Governmental research organization as these terms are defined in 20 CFR 656.40(e), the prevailing wage level shall only take into account employees at such institutions and organizations in the area of intended employment.

(viii) An employer may file more than one LCA for the same occupational classification in the same area of employment and, in such circumstances, the employer could have H–1B employees in the same occupational classification in the same area of employment, brought into the U.S. (or accorded H–1B status) based on petitions approved pursuant to different

LCAs (filed at different times) with different prevailing wage determinations. Employers are advised that the prevailing wage rate as to any particular H–1B nonimmigrant is prescribed by the LCA which supports that nonimmigrant's H–1B petition. The employer is required to obtain the prevailing wage at the time that the LCA is filed (see paragraph (a)(2) of this section). The LCA is valid for the period certified by ETA, and the employer must satisfy all the LCA's requirements (including the required wage which encompasses both prevailing and actual wage rates) for as long as any H–1B nonimmigrants are employed pursuant to that LCA (§ 655.750). Where new nonimmigrants are employed pursuant to a new LCA, that new LCA prescribes the employer's obligations as to those new nonimmigrants. The prevailing wage determination on the later/subsequent LCA does not "relate back" to operate as an "update" of the prevailing wage for the previously-filed LCA for the same occupational classification in the same area of employment. However, employers are cautioned that the actual wage component to the required wage may, as a practical matter, eliminate any wage-payment differentiation among H–1B employees based on different prevailing wage rates stated in applicable LCAs. Every H–1B nonimmigrant is to be paid in accordance with the employer's actual wage system, and thus is to receive any pay increases which that system provides.

(3) Once the prevailing wage rate is established, the H–1B employer then shall compare this wage with the actual wage rate for the specific employment in question at the place of employment and must pay the H–1B nonimmigrant at least the higher of the two wages.

(b) Documentation of the wage statement.

(1) The employer shall develop and maintain documentation sufficient to meet its burden of proving the validity of the wage statement required in paragraph (a) of this section and attested to on Form ETA 9035 or 9035E. The documentation shall be made available to DOL upon request. Documentation shall also be made available for public examination to the extent required by § 655.760. The employer shall also document that the wage rate(s) paid to H–1B nonimmigrant(s) is(are) no less than the required wage rate(s). The documentation shall include information about the employer's wage rate(s) for all other employees for the specific employment in question at the place of employment, beginning with the date the labor condition application was submitted and continuing throughout the period of employment. The records shall be retained for the period of time specified in § 655.760. The payroll records for each such employee shall include:

(i) Employee's full name;

(ii) Employee's home address;

(iii) Employee's occupation;

(iv) Employee's rate of pay;

(v) Hours worked each day and each week by the employee if:

(A) The employee is paid on other than a salary basis (e.g., hourly, piece-rate; commission); or

(B) With respect only to H–1B nonimmigrants, the worker is a part-time employee (whether paid a salary or an hourly rate).

(vi) Total additions to or deductions from pay each pay period, by employee; and

(vii) Total wages paid each pay period, date of pay and pay period covered by the payment, by employee.

(viii) Documentation of offer of benefits and eligibility for benefits provided as compensation for services on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers (see paragraph (c)(3) of this section):

(A) A copy of any document(s) provided to employees describing the benefits that are offered to employees, the eligibility and participation rules, how costs are shared, etc. (e.g., summary plan descriptions, employee handbooks, any special or employee-specific notices that might be sent);

(B) A copy of all benefit plans or other documentation describing benefit plans and any rules the employer may have for differentiating benefits among groups of workers;

(C) Evidence as to what benefits are actually provided to U.S. workers and H–1B nonimmigrants, including evidence of the benefits selected or declined by employees where employees are given a choice of benefits;

(D) For multinational employers who choose to provide H–1B nonimmigrants with "home country" benefits, evidence of the benefits provided to the nonimmigrant before and after he/she went to the United States. See paragraph (c)(3)(iii)(C) of this section.

(2) Actual wage. In addition to payroll data required by paragraph (b)(1) of this section (and also by the Fair Labor Standards Act), the employer shall retain documentation specifying the basis it used to establish the actual wage. The employer shall show how the wage set for the H–1B nonimmigrant relates to the wages paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question at the place of employment. Where adjustments are made in the employer's pay system or scale during the validity period of the LCA, the employer shall retain documentation explaining the change and clearly showing that, after such adjustments, the wages paid to the H–1B nonimmigrant are at least the greater of the adjusted actual wage or the prevailing wage for the occupation and area of intended employment.

(3) Prevailing wage. The employer also shall retain documentation regarding its determination of the prevailing wage. This source documentation shall not be submitted to ETA with the labor condition application, but shall be retained at the employer's place of business for the length of time required in § 655.760(c). Such documentation shall consist of the documentation described in paragraph (b)(3)(i), (ii), or (iii) of this section and the documentation described in paragraph (b)(1) of this section.

(i) If the employer used a wage determination issued pursuant to the provisions of the Davis–Bacon Act, 40 U.S.C. 276a et seq. (see 29 CFR part 1), or the McNamara–O'Hara Service Contract Act, 41 U.S.C. 351 et seq. (see 29 CFR part 4), the

documentation shall include a copy of the determination showing the wage rate for the occupation in the area of intended employment.

(ii) If the employer used an applicable wage rate from a union contract which was negotiated at arms-length between a union and the employer, the documentation shall include an excerpt from the union contract showing the wage rate(s) for the occupation.

(iii) If the employer did not use a wage covered by the provisions of paragraph (b)(3)(i) or (b)(3)(ii) of this section, the employer's documentation shall consist of:

(A) A copy of the prevailing wage finding from the NPC for the occupation within the area of intended employment.

(B) A copy of the prevailing wage survey for the occupation within the area of intended employment published by an independent authoritative source. For purposes of this paragraph (b)(3)(iii)(B), a prevailing wage survey for the occupation in the area of intended employment published by an independent authoritative source shall mean a survey of wages published in a book, newspaper, periodical, loose-leaf service, newsletter, or other similar medium, within the 24–month period immediately preceding the filing of the employer's application. Such survey shall:

(1) Reflect the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Be based upon recently collected data—e.g., within the 24–month period immediately preceding the date of publication of the survey; and

(4) Represent the latest published prevailing wage finding by the independent authoritative source for the occupation in the area of intended employment; or

(C) A copy of the prevailing wage survey or other source data acquired from another legitimate source of wage information that was used to make the prevailing wage determination. For purposes of this paragraph (b)(3)(iii)(C), a prevailing wage provided by another legitimate source of such wage information shall be one which:

(1) Reflects the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Is based on the most recent and accurate information available; and

(4) Is reasonable and consistent with recognized standards and principles in producing a prevailing wage.

(c) Satisfaction of required wage obligation.

(1) The required wage must be paid to the employee, cash in hand, free and clear, when due, except that deductions made in accordance with paragraph (c)(9) of this section may reduce the cash wage below the level of the required wage. Benefits and eligibility for benefits provided as compensation for services must be offered in accordance with paragraph (c)(3) of this section.

(2) "Cash wages paid," for purposes of satisfying the H–1B required wage, shall consist only of those payments that meet all the following criteria:

(i) Payments shown in the employer's payroll records as earnings for the employee, and disbursed to the employee, cash in hand, free and clear, when due, except for deductions authorized by paragraph (c)(9) of this section;

(ii) Payments reported to the Internal Revenue Service (IRS) as the employee's earnings, with appropriate withholding for the employee's tax paid to the IRS (in accordance with the Internal Revenue Code of 1986, 26 U.S.C. 1, et seq.);

(iii) Payments of the tax reported and paid to the IRS as required by the Federal Insurance Contributions Act, 26 U.S.C. 3101, et seq. (FICA). The employer must be able to document that the payments have been so reported to the IRS and that both the employer's and employee's taxes have been paid except that when the H–1B nonimmigrant is a citizen of a foreign country with which the President of the United States has entered into an agreement as authorized by section 233 of the Social Security Act, 42 U.S.C. 433 (i.e., an agreement establishing a totalization arrangement between the social security system of the United States and that of the foreign country), the employer's documentation shall show that all appropriate reports have been filed and taxes have been paid in the employee's home country.

(iv) Payments reported, and so documented by the employer, as the employee's earnings, with appropriate employer and employee taxes paid to all other appropriate Federal, State, and local governments in accordance with any other applicable law.

(v) Future bonuses and similar compensation (i.e., unpaid but to-be-paid) may be credited toward satisfaction of the required wage obligation if their payment is assured (i.e., they are not conditional or contingent on some event such as the employer's annual profits). Once the bonuses or similar compensation are paid to the employee, they must meet the requirements of paragraphs (c)(2)(i) through (iv) of this section (i.e., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(3) Benefits and eligibility for benefits provided as compensation for services (e.g., cash bonuses; stock options; paid vacations and holidays; health, life, disability and other insurance plans; retirement and savings plans) shall be offered to the H–1B nonimmigrant(s) on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(i) For purposes of this section, the offer of benefits "on the same basis, and in accordance with the same criteria" means that the employer shall offer H–1B nonimmigrants the same benefit package as it offers to U.S. workers, and may not provide more strict eligibility or participation requirements for the H–1B nonimmigrant(s) than for similarly employed U.S. workers(s) (e.g., full-time workers compared to full-time workers; professional staff compared to professional staff). H–1B nonimmigrants are not to be denied benefits on the basis that they are "temporary employees" by virtue of their nonimmigrant status. An employer may offer greater or additional benefits to the H–1B nonimmigrant(s) than are offered to similarly employed U.S. worker(s), provided that such differing treatment is consistent with the requirements of all applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17). Offers of benefits by employers shall be made in good faith and shall result in the H–1B nonimmigrant(s)'s actual receipt of the benefits that are offered by the employer and elected by the H–1B nonimmigrant(s).

(ii) The benefits received by the H–1B nonimmigrant(s) need not be identical to the benefits received by similarly employed U.S. workers(s), provided that the H–1B nonimmigrant is offered the same benefits package as those workers but voluntarily chooses to receive different benefits (e.g., elects to receive cash payment rather than stock option, elects not to receive health insurance because of required employee contributions, or elects to receive different benefits among an array of benefits) or, in those instances where the employer is part of a multinational corporate operation, the benefits received by the H–1B nonimmigrant are provided in accordance with an employer's practice that satisfies the requirements of paragraph (c)(3)(iii)(B) or (C) of this section. In all cases, however, an employer's practice must comply with the requirements of any applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17).

(iii) If the employer is part of a multinational corporate operation (i.e., operates in affiliation with business entities in other countries, whether as subsidiaries or in some other arrangement), the following three options (i.e., (A), (B) or (C)) are available to the employer with respect to H–1B nonimmigrants who remain on the "home country" payroll.

(A) The employer may offer the H–1B nonimmigrant(s) benefits in accordance with paragraphs (c)(3)(i) and (ii) of this section.

(B) Where an H–1B nonimmigrant is in the U.S. for no more than 90 consecutive calendar days, the employer during that period may maintain the H–1B nonimmigrant on the benefits provided to the nonimmigrant in his/her permanent work station (ordinarily the home country), and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers, provided that the employer affords reciprocal benefits treatment for any U.S. workers (i.e., allows its U.S. employees, while working out of the country on a temporary basis away from their permanent work stations in the United States, or while working in the United States on a temporary basis away from their permanent work stations in another country, to continue to receive the benefits provided them at their permanent work stations). Employers are cautioned that this provision is available only if the employer's practices do not constitute an evasion of the benefit requirements, such as where the H–1B nonimmigrant remains in the United States for most of the year, but briefly returns to the "home country" before any 90–day period would expire.

(C) Where an H–1B nonimmigrant is in the U.S. for more than 90 consecutive calendar days (or from the point where the worker is transferred to the U.S. or it is anticipated that the worker will likely remain in the U.S. more than 90 consecutive days), the employer may maintain the H–1B nonimmigrant on the benefits provided in his/her home country (i.e., "home country benefits") (and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers) provided that all of the following criteria are satisfied:

(1) The H–1B nonimmigrant continues to be employed in his/her home country (either with the H–1B employer or with a corporate affiliate of the employer);

(2) The H–1B nonimmigrant is enrolled in benefits in his/her home country (in accordance with any applicable eligibility standards for such benefits);

(3) The benefits provided in his/her home country are equivalent to, or equitably comparable to, the benefits offered to similarly employed U.S. workers (i.e., are no less advantageous to the nonimmigrant);

(4) The employer affords reciprocal benefits treatment for any U.S. workers while they are working out of the country, away from their permanent work stations (whether in the United States or abroad), on a temporary basis (i.e., maintains such U.S. workers on the benefits they received at their permanent work stations);

(5) If the employer offers health benefits to its U.S. workers, the employer offers the same plan on the same basis to its H–1B nonimmigrants in the United States where the employer does not provide the H–1B nonimmigrant with health benefits in the home country, or the employer's home-country health plan does not provide full coverage (i.e., coverage comparable to what he/she would receive at the home work station) for medical treatment in the United States; and

(6) The employer offers H–1B nonimmigrants who are in the United States more than 90 continuous days those U.S. benefits which are paid directly to the worker (e.g., paid vacation, paid holidays, and bonuses).

(iv) Benefits provided as compensation for services may be credited toward the satisfaction of the employer's required wage obligation only if the requirements of paragraph (c)(2) of this section are met (e.g., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(4) For salaried employees, wages will be due in prorated installments (e.g., annual salary divided into 26 bi-weekly pay periods, where employer pays bi-weekly) paid no less often than monthly except that, in the event that the employer intends to use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus), the employer's documentation of wage payments (including such supplemental payments) must show the employer's commitment to make such payment and the method of determining the amount thereof, and must show unequivocally that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period. An employer that is a school or other educational institution may apply an established salary practice under which the employer pays to H–1B nonimmigrants and U.S. workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, provided that the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment and the application of the salary practice to the nonimmigrant does not otherwise cause him/her to violate any condition of his/her authorization under the INA to remain in the U.S.

(5) For hourly-wage employees, the required wages will be due for all hours worked and/or for any nonproductive time (as specified in paragraph (c)(7) of this section) at the end of the employee's ordinary pay period (e.g., weekly) but in no event less frequently than monthly.

(6) Subject to the standards specified in paragraph (c)(7) of this section (regarding nonproductive status), an H–1B nonimmigrant shall receive the required pay beginning on the date when the nonimmigrant "enters into employment" with the employer.

(i) For purposes of this paragraph (c)(6), the H–1B nonimmigrant is considered to "enter into employment" when he/she first makes him/herself available for work or otherwise comes under the control of the employer, such as by waiting for an assignment, reporting for orientation or training, going to an interview or meeting with a customer, or studying for a licensing examination, and includes all activities thereafter.

(ii) Even if the H–1B nonimmigrant has not yet "entered into employment" with the employer (as described in paragraph (c)(6)(i) of this section), the employer that has had an LCA certified and an H–1B petition approved for the H–1B nonimmigrant shall pay the nonimmigrant the required wage beginning 30 days after the date the nonimmigrant first is admitted into the U.S. pursuant to the petition, or, if the nonimmigrant is present in the United States on the date of the approval of the petition, beginning 60 days after the date the nonimmigrant becomes eligible to work for the employer. For purposes of this latter requirement, the H–1B nonimmigrant is considered to be eligible to work for the employer upon the date of need set forth on the approved H–1B petition filed by the employer, or the date of adjustment of the nonimmigrant's status by DHS, whichever is later. Matters such as the worker's obtaining a State license would not be relevant to this determination.

(7) Wage obligation(s) for H–1B nonimmigrant in nonproductive status—

(i) Circumstances where wages must be paid. If the H–1B nonimmigrant is not performing work and is in a nonproductive status due to a decision by the employer (e.g., because of lack of assigned work), lack of a permit or license, or any other reason except as specified in paragraph (c)(7)(ii) of this section, the employer is required to pay the salaried employee the full pro-rata amount due, or to pay the hourly-wage employee for a full-time week (40 hours or such other number of hours as the employer can demonstrate to be full-time employment for hourly employees, or the full amount of the weekly salary for salaried employees) at the required wage for the occupation listed on the LCA. If the employer's LCA carries a designation of "part-time employment," the employer is required to pay the nonproductive employee for at least the number of hours indicated on the I–129 petition filed by the employer with the DHS and incorporated by reference on the LCA. If the I–129 indicates a range of hours for part-time employment, the employer is required to pay the nonproductive employee for at least the average number of hours normally worked by the H–1B nonimmigrant, provided that such average is within the range indicated; in no event shall the employee be paid for fewer than the minimum number of hours indicated for the range of part-time employment. In all cases the H–1B nonimmigrant must be paid the required wage for all hours performing work within the meaning of the Fair Labor Standards Act, 29 U.S.C. 201 et seq.

(ii) Circumstances where wages need not be paid. If an H–1B nonimmigrant experiences a period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile accident which temporarily incapacitates the nonimmigrant), then the employer shall not be obligated to pay the required wage rate during that period, provided that such period is not subject to payment under the employer's benefit plan or other statutes such as the Family and Medical Leave Act (29 U.S.C. 2601 et seq.) or the Americans with Disabilities Act (42 U.S.C. 12101 et seq.). Payment need not be made if there has been a bona fide termination of the employment relationship. DHS regulations require the employer to notify the DHS that the employment relationship has been terminated so that the petition is canceled (8 CFR 214.2(h)(11)), and require the employer to provide the employee with payment for transportation home under certain circumstances (8 CFR 214.2(h)(4)(iii)(E)).

(8) If the employee works in an occupation other than that identified on the employer's LCA, the employer's required wage obligation is based on the occupation identified on the LCA, and not on whatever wage standards may be applicable in the occupation in which the employee may be working.

(9) "Authorized deductions," for purposes of the employer's satisfaction of the H–1B required wage obligation, means a deduction from wages in complete compliance with one of the following three sets of criteria (i.e., paragraph (c)(9)(i), (ii), or (iii))—

(i) Deduction which is required by law (e.g., income tax; FICA); or

(ii) Deduction which is authorized by a collective bargaining agreement, or is reasonable and customary in the occupation and/or area of employment (e.g., union dues; contribution to premium for health insurance policy covering all employees; savings or retirement fund contribution for plan(s) in compliance with the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq.), except that the deduction may not recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H–1B petition); the deduction must have been revealed to the worker prior to the commencement of employment and, if the deduction was a condition of employment, had been clearly identified as such; and the deduction must be made against wages of U.S. workers as well as H–1B nonimmigrants (where there are U.S. workers); or

(iii) Deduction which meets the following requirements:

(A) Is made in accordance with a voluntary, written authorization by the employee (Note to paragraph (c)(9)(iii)(A): an employee's mere acceptance of a job which carries a deduction as a condition of employment does not constitute voluntary authorization, even if such condition were stated in writing);

(B) Is for a matter principally for the benefit of the employee (Note to paragraph (c)(9)(iii)(B): housing and food allowances would be considered to meet this "benefit of employee" standard, unless the employee is in travel status, or unless the circumstances indicate that the arrangements for the employee's housing or food are principally for the convenience or benefit of the employer (e.g., employee living at worksite in "on call" status));

(C) Is not a recoupment of the employer's business expense (e.g., tools and equipment; transportation costs where such transportation is an incident of, and necessary to, the employment; living expenses when the employee is traveling on the employer's business; attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer (e.g., preparation and filing of LCA and H–1B petition)). (For purposes of this section, initial transportation from, and end-of-employment travel, to the worker's home country shall not be considered a business expense.);

(D) Is an amount that does not exceed the fair market value or the actual cost (whichever is lower) of the matter covered (Note to paragraph (c)(9)(iii)(D): The employer must document the cost and value); and

(E) Is an amount that does not exceed the limits set for garnishment of wages in the Consumer Credit Protection Act, 15 U.S.C. 1673, and the regulations of the Secretary pursuant to that Act, 29 CFR part 870, under which garnishment(s) may not exceed 25 percent of an employee's disposable earnings for a workweek.

(10) A deduction from or reduction in the payment of the required wage is not authorized (and is therefore prohibited) for the following purposes (i.e., paragraphs (c)(10)(i) and (ii)):

(i) A penalty paid by the H–1B nonimmigrant for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer.

(A) The employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date. Therefore, the employer shall not make any deduction from or reduction in the payment of the required wage to collect such a penalty.

(B) The employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date. However, the requirements of paragraph (c)(9)(iii) of this section must be fully satisfied, if such damages are to be received by the employer via deduction from or reduction in the payment of the required wage.

(C) The distinction between liquidated damages (which are permissible) and a penalty (which is prohibited) is to be made on the basis of the applicable State law. In general, the laws of the various States recognize that liquidated damages are amounts which are fixed or stipulated by the parties at the inception of the contract, and which are reasonable approximations or estimates of the anticipated or actual damage caused to one party by the other party's breach of the contract. On the other hand, the laws of the various States, in general, consider that penalties are amounts which (although fixed or stipulated in the contract by the parties) are not reasonable approximations or estimates of such damage. The laws of the various States, in general, require that the relation or circumstances of the parties, and the purpose(s) of the agreement, are to be taken into account, so that, for example, an agreement to a payment would be considered to be a prohibited penalty where it is the result of fraud or where it cloaks oppression. Furthermore, as a general matter, the sum stipulated must take into account whether the contract breach is total or partial (i.e., the percentage of the employment contract completed). (See, e.g., Vanderbilt University v. DiNardo, 174 F.3d 751 (6th Cir. 1999) (applying Tennessee law); Overholt Crop Insurance Service Co. v. Travis, 941 F.2d 1361 (8th Cir. 1991) (applying Minnesota and South Dakota law); BDO Seidman v. Hirshberg, 712 N.E.2d 1220 (N.Y. 1999); Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999); Wojtowicz v. Greeley Anesthesia Services, P.C., 961 P.2d 520 (Colo.Ct.App. 1998); see generally, Restatement (Second) Contracts § 356 (comment b); 22 Am.Jur.2d Damages §§ 683, 686, 690, 693, 703). In an enforcement proceeding under subpart I of this part, the Administrator shall determine, applying relevant State law (including consideration where appropriate to actions by the employer, if any, contributing to the early cessation, such as the employer's constructive discharge of the nonimmigrant or non-compliance with its obligations under the INA and its regulations) whether the payment in question constitutes liquidated damages or a penalty. (Note to paragraph (c)(10)(i)(C): The $500/$1,000 filing fee, if any, under section 214(c) of the INA can never be included in any liquidated damages received by the employer. See paragraph (c)(10)(ii), which follows.)

(ii) A rebate of the $500/$1,000 filing fee paid by the employer, if any, under section 214(c) of the INA. The employer may not receive, and the H–1B nonimmigrant may not pay, any part of the $500 additional filing fee (for a petition filed prior to December 18, 2000) or $1,000 additional filing fee (for a petition filed on or subsequent to December 18, 2000), whether

directly or indirectly, voluntarily or involuntarily. Thus, no deduction from or reduction in wages for purposes of a rebate of any part of this fee is permitted. Further, if liquidated damages are received by the employer from the H–1B nonimmigrant upon the nonimmigrant's ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer, such liquidated damages shall not include any part of the $500/$1,000 filing fee (see paragraph (c)(10)(i) of this section). If the filing fee is paid by a third party and the H–1B nonimmigrant reimburses all or part of the fee to such third party, the employer shall be considered to be in violation of this prohibition since the employer would in such circumstances have been spared the expense of the fee which the H–1B nonimmigrant paid.

(11) Any unauthorized deduction taken from wages is considered by the Department to be non-payment of that amount of wages, and in the event of an investigation, will result in back wage assessment (plus civil money penalties and/or disqualification from H–1B and other immigration programs, if willful).

(12) Where the employer depresses the employee's wages below the required wage by imposing on the employee any of the employer's business expenses(s), the Department will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction.

(13) Where the employer makes deduction(s) for repayment of loan(s) or wage advance(s) made to the employee, the Department, in the event of an investigation, will require the employer to establish the legitimacy and purpose(s) of the loan(s) or wage advance(s), with reference to the standards set out in paragraph (c)(9)(iii) of this section.

(d) Enforcement actions.

(1) In the event that a complaint is filed pursuant to subpart I of this part, alleging a failure to meet the "prevailing wage" condition or a material misrepresentation by the employer regarding the payment of the required wage, or pursuant to such other basis for investigation as the Administrator may find, the Administrator shall determine whether the employer has the documentation required in paragraph (b)(3)of this section, and whether the documentation supports the employer's wage attestation. Where the documentation is either nonexistent or is insufficient to determine the prevailing wage (e.g., does not meet the criteria specified in this section, in which case the Administrator may find a violation of paragraph (b)(1), (2), or (3), of this section); or where, based on significant evidence regarding wages paid for the occupation in the area of intended employment, the Administrator has reason to believe that the prevailing wage finding obtained from an independent authoritative source or another legitimate source varies substantially from the wage prevailing for the occupation in the area of intended employment; or where the employer has been unable to demonstrate that the prevailing wage determined by another legitimate source is in accordance with the regulatory criteria, the Administrator may contact ETA, which shall provide the Administrator with a prevailing wage determination, which the Administrator shall use as the basis for determining violations and for computing back wages, if such wages are found to be owed. The 30–day investigatory period shall be suspended while ETA makes the prevailing wage determination and, in the event that the employer timely challenges the determination (see § 655.731(d)(2)), shall be suspended until the challenge process is completed and the Administrator's investigation can be resumed.

(2) In the event the Administrator obtains a prevailing wage from ETA pursuant to paragraph (d)(1) of this section, and the employer desires review, including judicial review, the employer shall challenge the ETA prevailing wage only by filing a request for review under § 656.41 of this chapter within 30 days of the employer's receipt of the PWD from the Administrator. If the request is timely filed, the decision of OFLC is suspended until the Center Director issues a determination on the employer's appeal. If the employer desires review, including judicial review, of the decision of the NPC Center Director, the employer shall make a request for review of the determination by the Board of Alien Labor

Certification Appeals (BALCA) under § 656.41(e) of this chapter within 30 days of the receipt of the decision of the Center Director. If a request for review is timely filed with the BALCA, the determination by the Center Director is suspended until the BALCA issues a determination on the employer's appeal. In any challenge to the wage determination, neither ETA nor the NPC shall divulge any employer wage data collected under the promise of confidentiality.

(i) Where an employer timely challenges an OFLC PWD obtained by the Administrator, the 30–day investigative period shall be suspended until the employer obtains a final ruling. Upon such a final ruling, the investigation and any subsequent enforcement proceeding shall continue, with the PWD as determined by the BALCA serving as the conclusive determination for all purposes.

(ii) [Reserved]

(3) For purposes of this paragraph (d), OFLC may consult with the NPC to ascertain the prevailing wage applicable under the circumstances of the particular complaint.

**Credits**

[65 FR 80214, Dec. 20, 2000; 66 FR 10814, Feb. 20, 2001; 66 FR 63302, Dec. 5, 2001; 69 FR 68228, Nov. 23, 2004; 69 FR 77384, Dec. 27, 2004; 71 FR 35521, June 21, 2006; 71 FR 37804, June 30, 2006; 73 FR 19949, April 11, 2008; 73 FR 78067, Dec. 19, 2008; 74 FR 45561, Sept. 3, 2009; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021]

SOURCE: 42 FR 45899, Sept. 13, 1977; 51 FR 24141, July 2, 1986; 51 FR 30351, Aug. 26, 1986; 52 FR 20507, June 1, 1987; 54 FR 28046, July 5, 1989; 55 FR 29358, July 19, 1990; 55 FR 50510, Dec. 6, 1990; 56 FR 24666, May 30, 1991; 56 FR 54738, Oct. 22, 1991; 56 FR 56875, Nov. 6, 1991; 57 FR 1337, Jan. 13, 1992; 57 FR 40989, Sept. 8, 1992; 59 FR 897, Jan. 6, 1994.; 59 FR 5484, Feb. 4, 1994; 59 FR 65659, Dec. 20, 1994; 59 FR 65676, Dec. 20, 1994; 60 FR 3976, Jan. 19, 1995; 65 FR 43542, July 13, 2000; 65 FR 51149, Aug. 22, 2000; 65 FR 80208, Dec. 20, 2000; 65 FR 80209, Dec. 20, 2000; 67 FR 59779, Sept. 24, 2002; 69 FR 68226, Nov. 23, 2004; 71 FR 37804, June 30, 2006; 73 FR 19947, April 11, 2008; 73 FR 77207, Dec. 18, 2008; 73 FR 78052, Dec. 19, 2008; 74 FR 25985, May 29, 2009; 75 FR 6959, Feb. 12, 2010; 75 FR 10403, March 5, 2010; 78 FR 24061, April 24, 2013; 80 FR 24108, April 29, 2015; 80 FR 63066, Oct. 16, 2015; 81 FR 43448, July 1, 2016; 81 FR 48700, July 26, 2016; 84 FR 12431, April 1, 2019; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021, unless otherwise noted.

AUTHORITY: Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Pub.L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub.L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; sec. 412(e), Pub.L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub.L. 107–296, 116 Stat. 2135, as amended; Pub.L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub.L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).; Subpart A issued under 8 CFR 214.2(h).; Subpart B issued under 8 U.S.C. 1101(a)(15) (H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).; Subpart E issued under 48 U.S.C. 1806.; Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note.; Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub.L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub.L. 114–75 at section 701.; Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub.L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

Notes of Decisions (4)

Current through Sept. 22, 2023, 88 FR 65327. Some sections may be more current. See credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

N.R.S. 18.010

18.010. Award of attorney's fees

Currentness

1. The compensation of an attorney and counselor for his or her services is governed by agreement, express or implied, which is not restrained by law.

2. In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney's fees to a prevailing party:

(a) When the prevailing party has not recovered more than $20,000; or

(b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party. The court shall liberally construe the provisions of this paragraph in favor of awarding attorney's fees in all appropriate situations. It is the intent of the Legislature that the court award attorney's fees pursuant to this paragraph and impose sanctions pursuant to Rule 11 of the Nevada Rules of Civil Procedure in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses because such claims and defenses overburden limited judicial resources, hinder the timely resolution of meritorious claims and increase the costs of engaging in business and providing professional services to the public.

3. In awarding attorney's fees, the court may pronounce its decision on the fees at the conclusion of the trial or special proceeding without written motion and with or without presentation of additional evidence.

4. Subsections 2 and 3 do not apply to any action arising out of a written instrument or agreement which entitles the prevailing party to an award of reasonable attorney's fees.

**Credits**
Added by CPA (1911), § 434. Amended by Laws 1951, p. 59; NRS amended by Laws 1957, p. 129; Laws 1967, p. 1254; Laws 1969, pp. 435, 667; Laws 1971, pp. 165, 802; Laws 1975, p. 309; Laws 1977, p. 774; Laws 1985, p. 327; Laws 1999, c. 183, § 1, eff. May 20, 1999; Laws 2003, c. 508, § 153, eff. July 1, 2003.

Notes of Decisions (243)

N. R. S. 18.010, NV ST 18.010
Current through legislation of the 82nd Regular Session (2023) effective through October 1, 2023. Text subject to revision and classification by the Legislative Counsel Bureau.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**22 Am. Jur. 2d Damages § 24**

**American Jurisprudence, Second Edition**  |  May 2023 Update

**Damages**

Robert E. Anderson, J.D., of the staff of the National Legal Research Group, Inc.; Barbara J. Van Arsdale, J.D.; John A. Glenn, J.D.;
Candyce Vana Ingwersen, J.D.; Alan J. Jacobs, J.D.; Jack K. Levin, J.D.; Karl Oakes, J.D. and Jeffrey J. Shampo, J.D.

**III. Compensatory Damages**

**A. Overview**

**1. Definitions**

# § 24. Compensatory damages

Topic Summary  |  Correlation Table  |  References

---

**West's Key Number Digest**

- West's Key Number Digest, Damages ⚷ 15

---

**A.L.R. Library**

- Excessiveness or Adequacy of Damages for Wrongful Termination of At-Will Employee Under State Law, 86 A.L.R.5th 397
- Award of compensatory damages under 42 U.S.C.A. s 1981a for violation of Title VII of Civil Rights Act of 1964, 154 A.L.R. Fed. 347

---

**Forms**

- Am. Jur. Legal Forms 2d § 83:2 (Breach of contract—Compensatory damages—Payment of expenses)
- Am. Jur. Pleading and Practice Forms, Damages § 135 (Instructions to jury—Definition of compensatory damages)

---

Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.[1]  Their objective is to repair the damage caused to one party by the wrong of another.[2]  In both contract and tort actions, compensatory damages are awarded for the purpose of making the injured party whole[3] by reimbursing,[4]

compensating,[5] or indemnifying[6] him or her for the loss or harm suffered, to the extent that it is possible to measure his or her injury in terms of money.[7] The term covers all loss recoverable as a matter of right and includes all damages (beyond nominal damages) other than punitive or exemplary damages.[8]

---

**Observation:**

Compensatory damages, as opposed to criminal sanctions, are not a form of punishment.[9]

---

**CUMULATIVE SUPPLEMENT**

**Cases:**

Compensatory damages indemnify the plaintiff for injury to property, loss of time, necessary expenses, and other actual losses; they are proportionate or equal in measure or extent to plaintiff's injuries, or such as measure the actual loss, and are given as amends therefor. Brooks v. City of Huntington, 768 S.E.2d 97 (W. Va. 2014).

**[END OF SUPPLEMENT]**

© 2023 Thomson Reuters. 33-34B © 2023 Thomson Reuters/RIA. No Claim to Orig. U.S. Govt. Works. All rights reserved.

**Footnotes**

1    Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001); Arnold v. Wilder, 657 F.3d 353, 86 Fed. R. Evid. Serv. 664 (6th Cir. 2011); Qwest Services Corp. v. Blood, 252 P.3d 1071 (Colo. 2011), as modified on denial of reh'g, (June 20, 2011) and cert. dismissed, 132 S. Ct. 1087, 181 L. Ed. 2d 805 (2012).

     Compensatory damages are awarded to a person in satisfaction of or in response to a loss or injury sustained. Calise v. Hidden Valley Condominium Ass'n, Inc., 773 A.2d 834 (R.I. 2001).

2    RJAM, Inc. v. Miletello, 103 So. 3d 503 (La. Ct. App. 2d Cir. 2012) (breach of contract); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 34 Misc. 3d 895, 936 N.Y.S.2d 513 (Sup 2012), aff'd as modified, 105 A.D.3d 412, 963 N.Y.S.2d 21 (1st Dep't 2013).

3    § 28.

4    Ex parte S & M, LLC, 2012 WL 6062565 (Ala. 2012).

5    Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc., 279 S.W.3d 179 (Mo. 2009).

6       Fairways Offshore Exploration, Inc. v. Patterson Services, Inc., 355 S.W.3d 296 (Tex. App. Houston 1st Dist. 2011).

7       R.J. Reynolds Tobacco Co. v. Townsend, 90 So. 3d 307 (Fla. 1st DCA 2012), review denied, 110 So. 3d 441 (Fla. 2013) and review dismissed, 110 So. 3d 442 (Fla. 2013); Crutcher v. Harrod Concrete and Stone Co., 2013 WL 1163945 (Ky. Ct. App. 2013).

8       Comer v. Age-Herald Pub. Co., 151 Ala. 613, 44 So. 673 (1907); Carmichael v. Bell Telephone Co., 157 N.C. 21, 72 S.E. 619 (1911); Shebester, Inc. v. Ford, 1961 OK 67, 361 P.2d 200 (Okla. 1961); News Leader Co. v. Kocen, 173 Va. 95, 3 S.E.2d 385, 122 A.L.R. 842 (1939); Baldwin v. Alberti, 58 Wash. 2d 243, 362 P.2d 258 (1961).

9       Cohen v. Cowles Media Co., 501 U.S. 663, 111 S. Ct. 2513, 115 L. Ed. 2d 586 (1991).

---

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## U.S. District Court — Judicial Caseload Profile

**TEXAS EASTERN**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mar 31 2018 | Mar 31 2019 | Mar 31 2020 | Mar 31 2021 | Mar 31 2022 | Mar 31 2023 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | 4,021 | 4,188 | 4,095 | 4,263 | 4,327 | 4,360 | | | |
| | Terminations | 4,668 | 3,935 | 3,772 | 3,834 | 4,014 | 3,989 | | | |
| | Pending | 4,740 | 4,986 | 5,082 | 5,518 | 5,887 | 6,269 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 8.4 | 4.1 | 6.5 | 2.3 | 0.8 | | | 52 | 7 |
| | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | | |
| | Vacant Judgeship Months ² | 37.0 | 45.0 | 6.3 | 0.0 | 0.0 | 0.0 | | | |
| **Actions per Judgeship** | Filings Total | 503 | 524 | 512 | 533 | 541 | 545 | | 24 | 5 |
| | Civil | 395 | 390 | 380 | 393 | 380 | 399 | | 28 | 5 |
| | Criminal Felony | 106 | 133 | 131 | 138 | 161 | 145 | | 15 | 3 |
| | Supervised Release Hearings | 1 | 1 | 1 | 1 | 1 | 1 | | 93 | 9 |
| | Pending Cases ² | 593 | 623 | 635 | 690 | 736 | 784 | | 17 | 4 |
| | Weighted Filings ² | 618 | 604 | 568 | 626 | 674 | 684 | | 8 | 3 |
| | Terminations | 584 | 492 | 472 | 479 | 502 | 499 | | 34 | 6 |
| | Trials Completed | 12 | 11 | 13 | 11 | 16 | 15 | | 47 | 7 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 11.5 | 9.9 | 10.8 | 12.9 | 14.7 | 19.3 | | 78 | 9 |
| | Civil ² | 7.8 | 8.7 | 9.2 | 8.7 | 8.1 | 8.7 | | 31 | 4 |
| | From Filing to Trial ² (Civil Only) | 20.2 | 18.3 | 17.7 | 19.5 | 24.2 | 19.0 | | 1 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | 232 6.9 | 216 6.6 | 216 6.6 | 245 7.4 | 249 8.1 | 230 7.2 | | 33 | 6 |
| | Average Number of Felony Defendants Filed per Case | 1.8 | 1.9 | 1.6 | 1.7 | 2.0 | 1.8 | | | |
| | Jurors — Avg. Present for Jury Selection | 37.1 | 45.1 | 45.0 | 54.1 | 44.1 | 50.6 | | | |
| | Jurors — Percent Not Selected or Challenged | 29.5 | 38.5 | 28.7 | 43.9 | 42.6 | 44.6 | | | |

| 2023 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,194 | 58 | 43 | 1,026 | 9 | 78 | 74 | 375 | 230 | 667 | 294 | 6 | 334 |
| Criminal ¹ | 1,159 | 16 | 567 | 63 | 221 | 151 | 29 | 26 | 3 | 10 | 9 | 11 | 53 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."



# ANNUAL REPORT
## of the
# NEVADA JUDICIARY

---

# Fiscal Year 2022
# Appendix Tables

# <u>Table of Contents</u>

## <u>Summary Information:</u>
Table 1:     Summary of Population, Judicial Positions, and Cases Processed by Court       Page 1

## <u>Judicial District Summaries:</u>
| | | |
|---|---|---|
| 1st JD: | Carson City and Storey County Trial Courts | Page 3 |
| 2nd JD: | Washoe County Trial Courts | Page 4 |
| 3rd JD: | Lyon County Trial Courts | Page 5 |
| 4th JD: | Elko County Trial Courts | Page 6 |
| 5th JD: | Esmeralda and Nye County Trial Courts | Page 7 |
| 6th JD: | Humboldt County Trial Courts | Page 8 |
| 7th JD: | Eureka, Lincoln, and White Pine County Trial Courts | Page 9 |
| 8th JD: | Clark County Trial Courts | Page 10 |
| 9th JD: | Douglas County Trial Courts | Page 11 |
| 10th JD: | Churchill County Trial Courts | Page 12 |
| 11th JD: | Lander, Mineral, and Pershing County Trial Courts | Page 13 |

## <u>Figures:</u>
| | | |
|---|---|---|
| Figure 1: | Non-Traffic Filings per Judicial Position, Fiscal Year 2022 | Page 15 |
| Figure 2: | Non-Traffic Criminal Cases by USJR Classification, Fiscal Year 2022 | Page 16 |
| Figure 3: | Non-Criminal Case Distribution by USJR Classification, Fiscal Year 2022 | Page 16 |
| Figure 4: | District Courts, Quarterly Analysis, Fiscal Years 2018-22 | Page 17 |
| Figure 5: | Justice and Municipal Courts, Quarterly Analysis, Fiscal Years 2018-22 | Page 18 |

## <u>Aggregate Comparison Tables, Fiscal Years 2021-22:</u>
| | | |
|---|---|---|
| Table A1: | District Court Criminal and Civil Cases | Page 19 |
| Table A2: | District Court Family and Juvenile Cases | Page 20 |
| Table A3: | District Court Juvenile Traffic Cases Filed and Disposed | Page 21 |
| Table A4: | Justice Court Non-Traffic Cases Filed and Disposed | Page 22 |
| Table A5: | Justice Court Traffic Cases Filed and Disposed | Page 23 |
| Table A6: | Municipal Court Non-Traffic Cases Filed and Disposed | Page 24 |
| Table A7: | Municipal Court Traffic Cases Filed and Disposed | Page 25 |



# <u>Table of Contents</u>

## <u>Fiscal Year 2022 Caseload Statistics:</u>

| | | |
|---|---|---|
| Table B1-1: | District Court: Criminal Caseload, Aggregates | Page 27 |
| Table B1-2: | District Court: Criminal Caseload, Case Types: | |
| | Felony | Page 29 |
| | Gross Misdemeanor | Page 32 |
| Table B2-1: | District Court: Civil Caseload, Aggregates | Page 35 |
| Table B2-2: | District Court: Civil Caseload, Case Types: | |
| | Real Property and Tort | Page 37 |
| | Probate, Construction Defect, and Contract | Page 40 |
| | Judicial Review/Appeal, Civil Writ, and Other Civil | Page 43 |
| Table B3: | District Court: Family Caseload | Page 46 |
| Table B4: | District Court: Juvenile Non-Traffic Caseload | Page 49 |
| Table B5-1: | Justice Court: Criminal Caseload, Aggregate | Page 52 |
| Table B5-2: | Justice Court: Criminal Caseload, Case Types: | |
| | Felony | Page 56 |
| | Gross Misdemeanor | Page 62 |
| | Misdemeanor | Page 68 |
| Table B6-1: | Justice Court: Civil Caseload, Aggregate | Page 74 |
| Table B6-2: | Justice Court: Civil Caseload, Case Types | Page 78 |
| Table B7-1: | Municipal Court: Criminal Caseload, Aggregates | Page 82 |
| Table B7-2: | Municipal Court: Criminal Caseload, Case Types | Page 84 |
| Table B8: | Municipal Court: Civil Caseload, Aggregates | Page 87 |
| Table B9: | Juvenile Traffic Caseload | Page 89 |

## <u>Fiscal Year 2022 Specialty Court Statistics:</u>

| | | |
|---|---|---|
| Table C1: | Program Distributions with General Fund Appropriation | Page 90 |
| Table C2: | Program Distributions with Administrative Assessment Revenue | Page 91 |
| Table C3: | Summary of Specialty Court Statistics | Page 92 |

## <u>Glossary:</u>

| | | |
|---|---|---|
| | Criminal Caseload Glossary | Page 93 |
| | Civil Caseload Glossary | Page 95 |
| | Family Caseload Glossary | Page 97 |
| | Juvenile Caseload Glossary | Page 98 |
| | Juvenile Traffic Caseload Glossary | Page 99 |



Supreme Court of Nevada
Administrative Office of the Courts
201 South Carson Street
Carson City, Nevada 89701
www.nvcourts.gov

For additional information, contact the Research and
Statistics Unit at statistics@nvcourts.nv.gov.

Table 1. Summary of Population, Judicial Positions, and Cases Processed by Court for Nevada Judiciary, Fiscal Year 2022.[a]

| Nevada Trial Courts, Population, Judicial Position, and Caseload Summaries (1 of 2) | Population as of 7/1/2021[b] | Authorized Judicial Positions[c] Elected/(Quasi) | Non-Traffic Cases[d] | | | | Traffic & Parking[d] | |
|---|---|---|---|---|---|---|---|---|
| | | | Criminal Cases Filed | Non-Criminal Cases Filed[f] | Total Cases Filed | Total Cases Disposed | Total Cases | Total Dispositions |
| **Nevada Trial Court Totals (N=73)** | **3,158,539** | **189/(32.05)** | **120,221** | **242,223** | **362,444** | **362,234** | **342,882** | **243,058** |
| District Courts (N=17) | | 90/(27.65) | 17,392 | 111,085 | 128,477 | 130,083 | 2,093 | 1,949 |
| Justice Courts (N=40) | | 68/(3.40) * | 65,905 | 129,974 | 195,879 | 191,365 | 236,027 | 142,178 |
| Municipal Courts (N=16) | | 31/(1.00) * | 36,924 | 1,164 | 38,088 | 40,786 | 104,762 | 98,931 |
| **First Judicial District** | **61,432** | **2/(1.20)** | **376** | **2,590** | **2,966** | **2,600** | **195** | **130** |
| Carson City District Court | 57,073 | | 375 | 2,524 | 2,899 | 2,559 | 193 | 128 |
| Storey County District Court | 4,359 | | 1 | 66 | 67 | 41 | 2 | 2 |
| Carson City | | | | | | | | |
| Carson City Justice Court | 57,073 | 2/(0.40) ** | 1,974 | 1,815 | 3,789 | 3,162 | 7,099 | 6,405 |
| Storey County | | | | | | | | |
| Virginia City Justice Court | 4,359 | 1 | 198 | 48 | 246 | 232 | 1,221 | 1,149 |
| **Second Judicial District** | **485,113** | **16/(6.00)** | **2,268** | **14,754** | **17,022** | **15,583** | **1,286** | **1,239** |
| Washoe County District Court | 485,113 | | 2,268 | 14,754 | 17,022 [g] | 15,583 [h] | 1,286 [g] | 1,239 |
| Washoe County | | | | | | | | |
| Incline Village Justice Court | 12,169 | 1 | 195 | 72 | 267 | 332 | 1,467 | 1,580 |
| Reno Justice Court | 312,339 | 6 [i] | 5,985 | 7,964 | 13,949 | 13,992 | 14,652 | 14,114 |
| Sparks Justice Court | 157,649 | 3 | 2,987 | 3,920 | 6,907 | 7,273 [h] | 3,183 | 3,737 [h] |
| Wadsworth Justice Court | 2,956 | 1 | 88 | 14 | 102 | 82 | 1,731 | 1,693 |
| Reno Municipal Court | 264,318 | 4 | 5,657 | 60 | 5,717 | 5,951 | 13,607 | 13,268 |
| Sparks Municipal Court | 107,489 | 2 | 1,576 [g] | 16 | 1,592 | 1,799 | 4,038 [g] | 4,184 |
| **Third Judicial District** | **58,051** | **2/(0.55)** | **253** | **1,361** | **1,614** | **1,542** | **131** | **134** |
| Lyon County District Court | 58,051 | | 253 | 1,361 [k] | 1,614 | 1,542 | 131 | 134 |
| Lyon County | | | | | | | | |
| Canal Justice Court | 21,105 | 1 ** | 467 | 781 | 1,248 | 1,174 | 470 | 454 |
| Dayton Justice Court | 23,824 | 1 | 364 | 563 | 927 | 1,016 | 1,210 | 1,385 |
| Walker River Justice Court | 13,122 | 1 | 341 | 595 | 936 | 1,061 [h] | 1,446 | 1,487 |
| Fernley Municipal Court | 21,105 | 1 ** | 304 | 2 | 306 | 320 | 2,251 | 2,250 |
| Yerington Municipal Court | 3,538 | 1 | 82 | 0 | 82 | 102 | 50 | 46 |
| **Fourth Judicial District** | **54,546** | **3/(1.00)** | **484** | **1,663** | **2,147** | **2,154** | **174** | **147** |
| Elko County District Court | 54,546 | | 484 | 1,663 | 2,147 | 2,154 | 174 | 147 |
| Elko County | | | | | | | | |
| Carlin Justice Court | 2,845 | 1 ** | 67 | 50 | 117 | 118 | 689 | 633 |
| Eastline Justice Court | 4,452 | 1 ** | 141 | 61 | 202 | 173 | 297 | 200 |
| Elko Justice Court | 42,677 | 2 ** | 1,510 | 986 [k] | 2,496 | 2,666 [h] | 4,690 | 4,180 |
| Wells Justice Court | 4,572 | 1 ** | 106 | 38 | 144 | 124 | 2,675 | 2,548 |
| Carlin Municipal Court | 2,615 | 1 ** | 37 | 0 | 37 | 35 | 31 | 35 |
| Elko Municipal Court | 20,976 | 2 ** | 220 | 4 | 224 | 259 [h] | 214 | 202 |
| Wells Municipal Court | 1,272 | 1 ** | 5 | 0 | 5 | 10 | 21 | 17 |
| West Wendover Municipal Court | 4,452 | 1 ** | 110 | 0 | 110 | 85 | 298 | 255 |
| **Fifth Judicial District** | **50,289** | **2/(0.12)** | **277** | **1,370** | **1,647** | **988** | **55** | **58** |
| Esmeralda County District Court | 1,000 | | 4 | 27 [k] | 31 | 10 | 1 | 5 |
| Nye County District Court | 49,289 | | 273 | 1,343 | 1,616 | 978 | 54 | 53 |
| Esmeralda County | | | | | | | | |
| Esmeralda Justice Court | 1,000 | 1 | 32 | 13 | 45 | 26 | 1,459 | 1,423 |
| Nye County | | | | | | | | |
| Beatty Justice Court | 2,087 | 1 | 79 | 41 | 120 | 115 [h] | 970 | 898 |
| Pahrump Justice Court | 42,722 | 2 | 1,688 | 962 | 2,650 | 2,248 | 2,276 | 2,353 |
| Tonopah Justice Court | 4,480 | 1 | 118 | 112 | 230 | 215 | 1,162 | 1,170 |
| **Sixth Judicial District** | **17,202** | **1/(1.70)** | **57** | **653** | **710** | **608** | **84** | **68** |
| Humboldt County District Court | 17,202 | | 57 | 653 | 710 | 608 | 84 | 68 |
| Humboldt County | | | | | | | | |
| Union Justice Court | 17,202 | 1 | 427 | 404 | 831 | 773 | 3,629 | 3,390 |

\*  Totals reflect statewide judicial positions per jurisdictional level. Some judges serve in both justice and municipal courts in specific townships and cities.

\*\*  The judges serve in both justice and municipal courts.

[a]  Totals reflect aggregate information from the Nevada Trial Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. See appendix tables B1-B9 for greater detailed statistics and clarifying footnotes.

[b]  Source: Nevada State Demographer 2021 certified estimates. "Township boundaries may not correspond to incorporated cities, and are estimated using a different method than the city/town estimates. Because of this, they will differ from city estimates." Estimates are rounded and may include partial persons.

[c]  Elected positions per NRS 3.011-3.0197, NRS 4.020, and NRS 5.020. Quasi-judicial includes positions such as masters, commissioners, and referees in accordance with NRCP and JCRCP Rule 53. All information as of 6/30/2022.

[d]  Criminal cases include felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeals. Traffic and parking cases include juvenile traffic statistics from the courts that process these matters (see Table B9). Counts may include reopened cases.

[f]  Non-criminal cases include civil, family, and juvenile (non-traffic) cases for District Court and civil cases for Justice and Municipal Courts.

[g]  Reopened (cases) not reported or under-reported.

[h]  Includes administrative case closures.

[i]  Authorized positions, one department was vacant in November 2020 and will remain vacant until January 2023.

[k]  High-risk protection orders not reported or incomplete.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table 1. Summary of Population, Judicial Positions, and Cases Processed by Court for Nevada Judiciary, Fiscal Year 2022.** [a]

| Nevada Trial Courts, Population, Judicial Position, and Caseload Summaries (2 of 2) | Population as of 7/1/2021 [b] | Authorized Judicial Positions [c] Elected/(Quasi) | Non-Traffic Cases [d] | | | | Traffic & Parking [d] | |
|---|---|---|---|---|---|---|---|---|
| | | | Criminal Cases Filed | Non-Criminal Cases Filed [f] | Total Cases Filed | Total Cases Disposed | Total Cases | Total Dispositions |
| **Seventh Judicial District** | **17,379** | **2** | **183** | **425** | **608** | **546** | **0** | **0** |
| Eureka County District Court | 1,898 | | 7 | 36 | 43 | 30 | (l) | (l) |
| Lincoln County District Court | 5,188 | | 40 | 58 | 98 | 83 | (l) | (l) |
| White Pine County District Court | 10,293 | | 136 | 331 | 467 | 433 | (l) | (l) |
| Eureka County | | | | | | | | |
| Eureka Justice Court | 1,898 | 1 | 35 | 20 | 55 | 46 | 538 | 465 |
| Lincoln County | | | | | | | | |
| Meadow Valley Justice Court | 3,567 | 1 ** | 105 | 45 [k] | 150 | 145 | 1,072 | 1,040 |
| Pahranagat Valley Justice Court | 1,621 | 1 | 49 | 14 | 63 | 40 | 2,832 | 2,653 |
| White Pine County | | | | | | | | |
| Ely Justice Court | 10,293 | 1 | 323 | 248 | 571 | 531 | 1,443 | 1,380 |
| Lincoln County | | | | | | | | |
| Caliente Municipal Court | 1,100 | 1 ** | 0 | 0 | 0 | 0 | 0 | 0 |
| White Pine County | | | | | | | | |
| Ely Municipal Court | 4,138 | 1 | 150 | 0 | 150 | 156 | 311 | 318 |
| **Eighth Judicial District** | **2,320,551** | **58/(15.00)** | **12,793** | **85,041** | **97,834** | **102,387** | **0** | **0** |
| Clark County District Court | 2,320,551 | | 12,793 | 85,041 | 97,834 | 102,387 [h,m] | (l) | (l) |
| Clark County | | | | | | | | |
| Boulder Justice Court | 15,798 | 1 ** | 107 | 273 | 380 | 362 | 1,498 | 1,580 |
| Bunkerville Justice Court | 987 | 1 | 21 | 0 | 21 | 15 | 1,267 | 1,153 |
| Goodsprings Justice Court | 4,477 | 1 | 393 | 50 | 443 | 494 [h] | 6,202 | 8,803 [h] |
| Henderson Justice Court | 331,659 | 3 | 1,645 | 9,552 | 11,197 | 10,881 | 2,713 | 3,017 |
| Las Vegas Justice Court | 1,623,412 | 15/(3.00) | 40,637 | 89,294 | 129,931 | 127,887 | 143,822 [g] | 44,716 [m] |
| Laughlin Justice Court | 9,358 | 1 | 387 | 239 | 626 | 628 | 4,855 | 7,375 [h] |
| Mesquite Justice Court | 23,099 | 1 ** | 190 | 192 | 382 | 510 [h] | 6 | 3 |
| Moapa Justice Court | 1,605 | 1 | 72 | 20 | 92 | 135 [h] | 1,576 | 2,583 [h] |
| Moapa Valley Justice Court | 6,496 | 1 | 104 | 71 | 175 | 191 [h] | 1,033 | 1,205 [h] |
| North Las Vegas Justice Court | 302,406 | 3 | 2,098 | 9,753 | 11,851 | 9,480 [h] | 606 | 626 |
| Searchlight Justice Court | 1,254 | 1 | 120 | 33 | 153 | 127 | 4,763 | 5,757 |
| Boulder Municipal Court | 15,189 | 1 ** | 392 | 2 | 394 | 385 | 1,427 | 1,613 [h] |
| Henderson Municipal Court | 330,561 | 3 | 6,381 | 92 | 6,473 | 6,320 [h] | 20,481 | 17,418 |
| Las Vegas Municipal Court | 664,960 | 6/(1.00) | 16,773 | 840 | 17,613 | 19,961 [h] | 44,235 | 42,320 |
| Mesquite Municipal Court | 22,981 | 1 ** | 746 | 4 | 750 | 643 | 1,245 | 1,191 |
| North Las Vegas Municipal Court | 275,733 | 2 | 4,237 | 143 | 4,380 | 4,563 | 16,205 | 15,508 |
| **Ninth Judicial District** | **49,661** | **2/(0.50)** | **346** | **1,434** | **1,780** | **1,580** | **82** | **81** |
| Douglas County District Court | 49,661 | | 346 | 1,434 | 1,780 | 1,580 | 82 | 81 |
| Douglas County | | | | | | | | |
| East Fork Justice Court | 41,581 | 1 | 1,035 | 440 | 1,475 | 1,424 | 2,490 | 2,356 |
| Tahoe Justice Court | 8,080 | 1 | 437 | 89 | 526 | 684 [h] | 1,203 | 1,130 |
| **Tenth Judicial District** | **26,310** | **1/(0.58)** | **266** | **1,306** | **1,572** | **1,547** | **72** | **74** |
| Churchill County District Court | 26,310 | | 266 | 1,306 | 1,572 | 1,547 | 72 | 74 |
| Churchill County | | | | | | | | |
| New River Justice Court | 26,310 | 1 | 726 | 828 | 1,554 | 1,558 | 3,774 | 3,725 |
| Fallon Municipal Court | 9,123 | 1 | 254 | 1 | 255 | 197 | 348 | 306 |
| **Eleventh Judicial District** | **18,005** | **1/(1.00)** | **89** | **488** | **577** | **548** | **14** | **18** |
| Lander County District Court | 6,195 | | 17 | 172 | 189 | 147 | 2 | 3 |
| Mineral County District Court | 4,826 | | 44 | 126 | 170 | 143 | 10 | 12 |
| Pershing County District Court | 6,984 | | 28 | 190 | 218 | 258 [h] | 2 | 3 |
| Lander County | | | | | | | | |
| Argenta Justice Court | 5,916 | 1 | 132 | 115 | 247 | 263 [h] | 186 | 278 [h] |
| Austin Justice Court | 279 | 1 | 8 | 6 | 14 | 112 [h] | 756 | 794 |
| Mineral County | | | | | | | | |
| Hawthorne Justice Court | 4,826 | 1 | 342 | 134 | 476 | 727 [h] | 2,690 | 2,265 |
| Pershing County | | | | | | | | |
| Lake Justice Court | 6,984 | 1 | 172 | 119 | 291 | 343 [h] | 376 | 475 [h] |

**     The judges serve in both justice and municipal courts.

[a]    Totals reflect aggregate information from the Nevada Trial Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. See appendix tables B1-B9 for greater detailed statistics and clarifying footnotes.

[b]    Source: Nevada State Demographer 2021 certified estimates. "Township boundaries may not correspond to incorporated cities, and are estimated using a different method than the city/town estimates. Because of this, they will differ from city estimates." Estimates are rounded and may include partial persons.

[c]    Elected positions per NRS 3.011-3.0197, NRS 4.020, and NRS 5.020. Quasi-judicial includes positions such as masters, commissioners, and referees in accordance with NRCP and JCRCP Rule 53. All information as of 6/30/2022.

[d]    Criminal cases include felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeals. Traffic and parking cases include juvenile traffic statistics from the courts that process these matters (see Table B9). Counts may include reopened cases.

[f]    Non-criminal cases include civil, family, and juvenile (non-traffic) cases for District Court and civil cases for Justice and Municipal Courts.

[g]    Reopened (cases) not reported or under-reported.

[h]    Includes administrative case closures.

[k]    High-risk protection orders not reported or incomplete.

[l]    Juvenile traffic violations handled and reported by limited jurisdiction courts.

[m]    See footnotes in Appendix Tables A2 (District Court) and A5 (Justice Court) for greater dispositional information for the respective courts.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

# FIRST
## JUDICIAL DISTRICT



Carson City Courthouse



Storey County Courthouse

## FIRST JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carson City District Court | 272 | 399 | 1,050 | 116 | 1,062 | 2,899 | 2,559 | 88% | 193 | 128 | 66% |
| Storey County District Court | 1 | 32 | 22 | 3 | 9 | 67 | 41 | 61% | 2 | 2 | 100% |
| Carson City Justice Court [d] | 1,962 | 1,812 | - | - | 15 | 3,789 | 3,162 | 83% | 7,099 | 6,405 | 90% |
| Virginia City Justice Court | 198 | 47 | - | - | 1 | 246 | 232 | 94% | 1,221 | 1,149 | 94% |
| **TOTAL** | **2,433** | **2,290** | **1,072** | **119** | **1,087** | **7,001** | **5,994** | **86%** | **8,515** | **7,684** | **90%** |

a   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
b   Family and Juvenile case types only heard in District Courts.
c   Traffic and Parking includes juvenile traffic statistics.
d   Carson City Justice Court includes municipal court information.

## NON-TRAFFIC CASE DISTRIBUTION



Criminal, 36%

Civil, 35%

Family, 25%

Juvenile, 4%

## NON-TRAFFIC TOTAL CASES PER JUDGE



DC (2)

JC (3)

0   200   400   600   800   1,000   1,200   1,400   1,600



### District Demographics

Population: 61,432 [a]
Geographic Size: 408 sq. mi.[b]
Population Density: 151/sq. mi.
Most Populous Township: Carson City

a Source: Nevada State Demographer
b Source: U.S. Census Bureau

## FIRST JUDICIAL DISTRICT
### NON-TRAFFIC CASES AND DISPOSITIONS
### FISCAL YEARS 2018-22



- District Courts (Filings)
- Justice Courts (Filings)
- District Courts (Dispositions)
- Justice Courts (Dispositions)

QUICK FACTS | **2%** OF STATEWIDE NON-TRAFFIC CASELOAD
**2%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 338

# SECOND
# JUDICIAL DISTRICT



Washoe County Courthouse

## SECOND JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Cases | Disposed | Disp. Rate |
| Washoe County DC | 1,702 | 2,952 | 7,655 | 1,995 | 2,718 [d] | 17,022 | 15,583 [f] | 92% | 1,286 [d] | 1,239 | 96% |
| Incline Village Justice Court | 142 | 68 | - | - | 57 | 267 | 332 | 124% | 1,467 | 1,580 | 108% |
| Reno Justice Court | 4,770 | 7,312 | - | - | 1,867 | 13,949 | 13,992 | 100% | 14,652 | 14,114 | 96% |
| Sparks Justice Court | 2,172 | 3,601 | - | - | 1,134 | 6,907 | 7,273 [f] | 105% | 3,183 | 3,737 [f] | 117% |
| Wadsworth Justice Court | 81 | 10 | - | - | 11 | 102 | 82 | 80% | 1,731 | 1,693 | 98% |
| Reno Municipal Court | 4,987 | 58 | - | - | 672 | 5,717 | 5,951 | 104% | 13,607 | 13,268 | 98% |
| Sparks Municipal Court | 1,559 | 16 | - | - | 17 [g] | 1,592 | 1,799 | 113% | 4,038 [g] | 4,184 | 104% |
| TOTAL | 15,413 | 14,017 | 7,655 | 1,995 | 6,476 | 45,556 | 45,012 | 99% | 39,964 | 39,815 | 100% |

[a]  Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]  Family and Juvenile case types only heard in District Courts.
[c]  Traffic and Parking includes juvenile traffic statistics.
[d]  Reopened cases not reported for juvenile and juvenile traffic matters.
[f]  Includes administrative closures.
[g]  Reopened cases under-reported for criminal and traffic matters.

## NON-TRAFFIC CASE DISTRIBUTION



Criminal, 41%    Civil, 34%    Family, 21%    Juvenile, 4%



### District Demographics

Population: 485,113 [a]
Geographic Size: 6,302 sq. mi.[b]
Population Density: 77/sq. mi.
Most Populous Township: Reno
[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau

## NON-TRAFFIC TOTAL CASES PER JUDGE



*Authorized positions as of June 30, 2022. Actual filed positions were used to calculate reported magnitudes. For greater detail see footnotes on Table 1.

## SECOND JUDICIAL DISTRICT
### NON-TRAFFIC CASES AND DISPOSITIONS
### FISCAL YEARS 2018-22



## QUICK FACTS

**13%** OF STATEWIDE NON-TRAFFIC CASELOAD

**12%** OF STATEWIDE TRAFFIC CASELOAD

# THIRD
# JUDICIAL DISTRICT


Lyon County Courthouse

## THIRD JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Cases | Disposed | Disp. Rate |
| Lyon County District Court | 182 | 314 | 442 [d] | 127 | 549 | 1,614 | 1,542 | 96% | 131 | 134 | 102% |
| Canal Justice Court | 459 | 780 | - | - | 9 | 1,248 | 1,174 | 94% | 470 | 454 | 97% |
| Dayton Justice Court | 363 | 552 | - | - | 12 | 927 | 1,016 | 110% | 1,210 | 1,385 | 114% |
| Walker River Justice Court | 339 | 481 | - | - | 116 | 936 | 1,061 [f] | 113% | 1,446 | 1,487 | 103% |
| Fernley Municipal Court | 303 | 2 | - | - | 1 | 306 | 320 | 105% | 2,251 | 2,250 | 100% |
| Yerington Municipal Court | 80 | 0 | - | - | 2 | 82 | 102 | 124% | 50 | 46 | 92% |
| TOTAL | 1,726 | 2,129 | 442 | 127 | 689 | 5,113 | 5,215 | 102% | 5,558 | 5,756 | 104% |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   High-risk protection orders not reported or incomplete.
[f]   Includes administrative closures.

## NON-TRAFFIC CASE DISTRIBUTION



Civil, 45%
Criminal, 35%
Family, 17%
Juvenile, 3%

## NON-TRAFFIC TOTAL CASES PER JUDGE



DC (2)
JC (3)
MC (2)

0   200   400   600   800   1,000   1,200



### District Demographics

Population: 58,051 [a]
Geographic Size: 2,001 sq. mi.[b]
Population Density: 29/sq. mi.
Most Populous Township: Dayton

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau

## THIRD JUDICIAL DISTRICT
## NON-TRAFFIC CASES AND DISPOSITIONS
## FISCAL YEARS 2018-22



Legend:
District Court (Filings)    Justice Courts (Filings)    Municipal Courts (Filings)
District Court (Dispositions)    Justice Courts (Dispositions)    Municipal Courts (Dispositions)

## QUICK FACTS

**1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**2%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 340

# FOURTH
## JUDICIAL DISTRICT



Elko County Courthouse

## FOURTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Elko County District Court | 341 | 330 | 559 | 181 | 736 | 2,147 | 2,154 | 100% | 174 | 147 | 84% |
| Carlin Justice Court | 67 | 50 | - | - | 0 | 117 | 118 | 101% | 689 | 633 | 92% |
| Eastline Justice Court | 123 | 61 | - | - | 18 | 202 | 173 | 86% | 297 | 200 | 67% |
| Elko Justice Court | 1,228 | 947 [d] | - | - | 321 | 2,496 | 2,666 [f] | 107% | 4,690 | 4,180 | 89% |
| Wells Justice Court | 106 | 38 | - | - | 0 | 144 | 124 | 86% | 2,675 | 2,548 | 95% |
| Carlin Municipal Court | 37 | 0 | - | - | 0 | 37 | 35 | 95% | 31 | 35 | 113% |
| Elko Municipal Court | 131 | 4 | - | - | 89 | 224 | 259 [f] | 116% | 214 | 202 | 94% |
| Wells Municipal Court | 5 | 0 | - | - | 0 | 5 | 10 | 200% | 21 | 17 | 81% |
| West Wendover MC | 97 | 0 | - | - | 13 | 110 | 85 | 77% | 298 | 255 | 86% |
| **TOTAL** | **2,135** | **1,430** | **559** | **181** | **1,177** | **5,482** | **5,624** | **103%** | **9,089** | **8,217** | **90%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   High-risk protection orders not reported or incomplete.
[f]   Includes administrative closures.

## NON-TRAFFIC CASE DISTRIBUTION



Criminal, 49%
Civil, 28%
Family, 19%
Juvenile, 4%



### District Demographics

Population: 54,546 [a]
Geographic Size: 17,170 sq. mi.[b]
Population Density: 3/sq. mi.
Most Populous Township: Elko
[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau

## NON-TRAFFIC TOTAL CASES PER JUDGE



## FOURTH JUDICIAL DISTRICT
### NON-TRAFFIC CASES AND DISPOSITIONS
### FISCAL YEARS 2018-22



QUICK FACTS

**2%** OF STATEWIDE NON-TRAFFIC CASELOAD

**3%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 341

# FIFTH
## JUDICIAL DISTRICT



Esmeralda County Courthouse



Nye County Courthouse

### FIFTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Esmeralda County DC | 4 | 23 | 4 [d] | 0 | 0 | 31 | 10 | 32% | 1 | 5 | 500% |
| Nye County District Court | 238 | 519 | 511 | 177 | 171 | 1,616 | 978 | 61% | 54 | 53 | 98% |
| Beatty Justice Court | 79 | 41 | - | - | 0 | 120 | 115 [f] | 96% | 970 | 898 | 93% |
| Esmeralda Justice Court | 32 | 13 | - | - | 0 | 45 | 26 | 58% | 1,459 | 1,423 | 98% |
| Pahrump Justice Court | 1,572 | 939 | - | - | 139 | 2,650 | 2,248 | 85% | 2,276 | 2,353 | 103% |
| Tonopah Justice Court | 116 | 111 | - | - | 3 | 230 | 215 | 93% | 1,162 | 1,170 | 101% |
| **TOTAL** | **2,041** | **1,646** | **515** | **177** | **313** | **4,692** | **3,592** | **77%** | **5,922** | **5,902** | **100%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   High-risk protection orders not reported or incomplete.
[f]   Includes administrative closures.

## NON-TRAFFIC CASE DISTRIBUTION



Criminal, 47%

Civil, 38%

Family, 11%

Juvenile, 4%

## NON-TRAFFIC TOTAL CASES PER JUDGE





### District Demographics

Population: 50,289 [a]
Geographic Size: 21,764 sq. mi.[b]
Population Density: 2/sq. mi.
Most Populous Township: Pahrump

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau



### FIFTH JUDICIAL DISTRICT
### NON-TRAFFIC CASES AND DISPOSITIONS
### FISCAL YEARS 2018-22

Legend:
District Courts (Filings) — Justice Courts (Filings)
District Courts (Dispositions) — Justice Courts (Dispositions)

## QUICK FACTS

**1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**2%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 342

# SIXTH
# JUDICIAL DISTRICT



Humboldt County Courthouse

## SIXTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Cases | Disposed | Disp. Rate |
| Humboldt County DC | 51 | 149 | 365 | 72 | 73 | 710 | 608 | 86% | 84 | 68 | 81% |
| Union Justice Court | 423 | 404 | - | - | 4 | 831 | 773 | 93% | 3,629 | 3,390 | 93% |
| **TOTAL** | **474** | **553** | **365** | **72** | **77** | **1,541** | **1,381** | **90%** | **3,713** | **3,458** | **93%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.

## NON-TRAFFIC CASE DISTRIBUTION



Civil, 36%
Criminal, 31%
Family, 28%
Juvenile, 5%

## NON-TRAFFIC TOTAL CASES PER JUDGE





### District Demographics

Population: 17,202 [a]
Geographic Size: 9,641 sq. mi.[b]
Population Density: 2/sq. mi.
Most Populous Township: Union

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau

## SIXTH JUDICIAL DISTRICT
## NON-TRAFFIC CASES AND DISPOSITIONS
## FISCAL YEARS 2018-22



District Court (Filings)    Justice Court (Filings)
District Court (Dispositions)    Justice Court (Dispositions)

## QUICK FACTS

**<1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**1%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 343

# SEVENTH
# JUDICIAL DISTRICT



Eureka County Courthouse



Lincoln County Courthouse



White Pine County Courthouse

## SEVENTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Cases | Disposed | Disp. Rate |
| Eureka County District Court | 6 | 17 | 11 | 6 | 3 | 43 | 30 | 70% | (d) | (d) | (d) |
| Lincoln County District Court | 36 | 22 | 27 | 5 | 8 | 98 | 83 | 85% | (d) | (d) | (d) |
| White Pine County DC | 110 | 82 | 85 | 128 | 62 | 467 | 433 | 93% | (d) | (d) | (d) |
| Ely Justice Court | 320 | 223 | - | - | 28 | 571 | 531 | 93% | 1,443 | 1,380 | 96% |
| Eureka Justice Court | 35 | 20 | - | - | 0 | 55 | 46 | 84% | 538 | 465 | 86% |
| Meadow Valley Justice Court | 103 | 45 [f] | - | - | 2 | 150 | 145 | 97% | 1,072 | 1,040 | 97% |
| Pahranagat Valley JC | 48 | 14 | - | - | 1 | 63 | 40 | 63% | 2,832 | 2,653 | 94% |
| Caliente Municipal Court | 0 | 0 | - | - | 0 | 0 | 0 | - | 0 | 0 | - |
| Ely Municipal Court | 145 | 0 | - | - | 5 | 150 | 156 | 104% | 311 | 318 | 102% |
| **TOTAL** | **803** | **423** | **123** | **139** | **109** | **1,597** | **1,464** | **92%** | **6,196** | **5,856** | **95%** |

a   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
b   Family and Juvenile case types only heard in District Courts.
c   Traffic and Parking includes juvenile traffic statistics.
d   Juvenile traffic violations handled and reported by Justice Courts.
f   High-risk protection orders not reported or incomplete.

## NON-TRAFFIC CASE DISTRIBUTION



Civil, 28%

Criminal, 53%

Family, 10%

Juvenile, 9%



### District Demographics

Population: 17,379 [a]
Geographic Size: 23,685 sq. mi.[b]
Population Density: <1/sq. mi.
Most Populous Township: Ely

a   Source: Nevada State Demographer
b   Source: U.S. Census Bureau

## NON-TRAFFIC TOTAL CASES PER JUDGE



DC (2)
JC (4)
MC (2)

0    50    100    150    200    250    300    350

## SEVENTH JUDICIAL DISTRICT
## NON-TRAFFIC CASES AND DISPOSITIONS
## FISCAL YEARS 2018-22



- District Courts (Filings)  — Justice Courts (Filings)  — Municipal Courts (Filings)
- District Courts (Dispositions)  — Justice Courts (Dispositions)  — Municipal Courts (Dispositions)

## QUICK FACTS

**<1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**2%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 344

# EIGHTH
## JUDICIAL DISTRICT



Regional Justice Center

### EIGHTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
#### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clark County District Court | 8,466 | 22,300 | 41,972 | 3,910 | 21,186 | 97,834 | 102,387[d,f] | 105% | (g) | (g) | (g) |
| Boulder Justice Court | 107 | 272 | - | - | 1 | 380 | 362 | 95% | 1,498 | 1,580 | 105% |
| Bunkerville Justice Court | 21 | 0 | - | - | 0 | 21 | 15 | 71% | 1,267 | 1,153 | 91% |
| Goodsprings Justice Court | 389 | 50 | - | - | 4 | 443 | 494 [d] | 112% | 6,202 | 8,803 [d] | 142% |
| Henderson Justice Court | 1,611 | 9,190 | - | - | 396 | 11,197 | 10,881 | 97% | 2,713 | 3,017 | 111% |
| Las Vegas Justice Court | 38,085 | 78,661 | - | - | 13,185 | 129,931 | 127,887 | 98% | 143,822 [h] | 44,716 [f] | 31% |
| Laughlin Justice Court | 387 | 239 | - | - | 0 | 626 | 628 | 100% | 4,855 | 7,375 [d] | 152% |
| Mesquite Justice Court | 190 | 192 | - | - | 0 | 382 | 510 [d] | 134% | 6 | 3 | 50% |
| Moapa Justice Court | 72 | 18 | - | - | 2 | 92 | 135 [d] | 147% | 1,576 | 2,583 [d] | 164% |
| Moapa Valley Justice Court | 103 | 71 | - | - | 1 | 175 | 191 [d] | 109% | 1,033 | 1,205 [d] | 117% |
| North Las Vegas Justice Court | 2,084 | 9,729 | - | - | 38 | 11,851 | 9,480 [d] | 80% | 606 | 626 | 103% |
| Searchlight Justice Court | 120 | 33 | - | - | 0 | 153 | 127 | 83% | 4,763 | 5,757 | 121% |
| Boulder Municipal Court | 385 | 2 | - | - | 7 | 394 | 385 | 98% | 1,427 | 1,613 [d] | 113% |
| Henderson Municipal Court | 4,516 | 92 | - | - | 1,865 | 6,473 | 6,320 [d] | 98% | 20,481 | 17,418 | 85% |
| Las Vegas Municipal Court | 16,731 | 624 | - | - | 258 | 17,613 | 19,961 [d] | 113% | 44,235 | 42,320 | 96% |
| Mesquite Municipal Court | 746 | 4 | - | - | 0 | 750 | 643 | 86% | 1,245 | 1,191 | 96% |
| North Las Vegas MC | 4,237 | 143 | - | - | 0 | 4,380 | 4,563 | 104% | 16,205 | 15,508 | 96% |
| TOTAL | 78,250 | 121,620 | 41,972 | 3,910 | 36,943 | 282,695 | 284,969 | 101% | 251,934 | 154,868 | 61% |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   Includes administrative closures.
[f]   See footnotes in Appendix Tables A2 (District Court) and A5 (Justice Court) for greater dispositional information for the respective courts.
[g]   Juvenile traffic violations handled and reported by Justice and Municipal Courts.
[h]   Reopened cases under-reported or not reported.

## NON-TRAFFIC CASE DISTRIBUTION



Civil, 48%
Criminal, 31%
Juvenile, 1%
Family, 20%

## NON-TRAFFIC TOTAL CASES PER JUDGE



DC (58)
JC (29)
MC (13)

0   500   1,000   1,500   2,000   2,500   3,000   3,500   4,000   4,500



### District Demographics

Population: 2,320,551 [a]
Geographic Size: 7,891 sq. mi.[b]
Population Density: 294/sq. mi.
Most Populous Township: Las Vegas

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau



### EIGHTH JUDICIAL DISTRICT
#### NON-TRAFFIC CASES AND DISPOSITIONS, FY 2018-22

FY 2018   FY 2019   FY 2020   FY 2021   FY 2022

— District Court (Filings)   — Justice Courts (Filings)   — Municipal Courts (Filings)
District Court (Dispositions)   Justice Courts (Dispositions)   Municipal Courts (Dispositions)

## QUICK FACTS

**78%** OF STATEWIDE NON-TRAFFIC CASELOAD

**73%** OF STATEWIDE TRAFFIC CASELOAD

# NINTH
# JUDICIAL DISTRICT



Douglas County Courthouse

## NINTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas County District Court | 217 | 319 | 569 | 116 | 559 | 1,780 | 1,580 | 89% | 82 | 81 | 99% |
| East Fork Justice Court | 907 | 437 | - | - | 131 | 1,475 | 1,424 | 97% | 2,490 | 2,356 | 95% |
| Tahoe Justice Court | 420 | 88 | - | - | 18 | 526 | 684 [d] | 130% | 1,203 | 1,130 | 94% |
| **TOTAL** | **1,544** | **844** | **569** | **116** | **708** | **3,781** | **3,688** | **98%** | **3,775** | **3,567** | **94%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   Includes administrative closures.

## NON-TRAFFIC CASE DISTRIBUTION



Criminal, 48%
Civil, 27%
Juvenile, 4%
Family, 21%

## NON-TRAFFIC TOTAL CASES PER JUDGE





### District Demographics

Population: 49,661 [a]
Geographic Size: 710 sq. mi.[b]
Population Density: 70/sq. mi.
Most Populous Township: East Fork

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau



NINTH JUDICIAL DISTRICT
NON-TRAFFIC CASES AND DISPOSITIONS
FISCAL YEARS 2018-22

QUICK FACTS

**1%**  OF STATEWIDE NON-TRAFFIC CASELOAD

**1%**  OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 346

# TENTH
# JUDICIAL DISTRICT



Churchill County Courthouse

## TENTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Cases | Disposed | Disp. Rate |
| Churchill County District Court | 196 | 157 | 608 | 109 | 502 | 1,572 | 1,547 | 98% | 72 | 74 | 103% |
| New River Justice Court | 725 | 808 | - | - | 21 | 1,554 | 1,558 | 100% | 3,774 | 3,725 | 99% |
| Fallon Municipal Court | 253 | 1 | - | - | 1 | 255 | 197 | 77% | 348 | 306 | 88% |
| **TOTAL** | **1,174** | **966** | **608** | **109** | **524** | **3,381** | **3,302** | **98%** | **4,194** | **4,105** | **98%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.

## NON-TRAFFIC CASE DISTRIBUTION



## NON-TRAFFIC TOTAL CASES PER JUDGE





### District Demographics

Population: 26,310 [a]
Geographic Size: 4,930 sq. mi.[b]
Population Density: 5/sq. mi.
Most Populous Township: New River

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau



## TENTH JUDICIAL DISTRICT
## NON-TRAFFIC CASES AND DISPOSITIONS
## FISCAL YEARS 2018-22

QUICK
FACTS

**1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**1%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 347

# ELEVENTH
## JUDICIAL DISTRICT


Lander County Courthouse


Mineral County Courthouse


Pershing County Courthouse

### ELEVENTH JUDICIAL DISTRICT CASELOAD FILINGS AND DISPOSITIONS
### Fiscal Year 2022

| Court | Criminal Filings[a] | Civil Filings | Family Filings[b] | Juvenile Filings[b] | Reopened Cases | Total Cases | Total Disposed | Disp. Rate | Traffic and Parking[c] Cases | Disposed | Disp. Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lander County District Court | 10 | 52 | 87 | 11 | 29 | 189 | 147 | 78% | 2 | 3 | 150% |
| Mineral County District Court | 38 | 49 | 35 | 13 | 35 | 170 | 143 | 84% | 10 | 12 | 120% |
| Pershing County District Court | 17 | 84 | 43 | 34 | 40 | 218 | 258[d] | 118% | 2 | 3 | 150% |
| Argenta Justice Court | 129 | 102 | - | - | 16 | 247 | 263[d] | 106% | 186 | 278[d] | 149% |
| Austin Justice Court | 8 | 6 | - | - | 0 | 14 | 112[d] | 800% | 756 | 794 | 105% |
| Hawthorne Justice Court | 331 | 96 | - | - | 49 | 476 | 727[d] | 153% | 2,690 | 2,265 | 84% |
| Lake Justice Court | 172 | 119 | - | - | 0 | 291 | 343[d] | 118% | 376 | 475[d] | 126% |
| **TOTAL** | **705** | **508** | **165** | **58** | **169** | **1,605** | **1,993** | **124%** | **4,022** | **3,830** | **95%** |

[a]   Criminal includes felony, gross misdemeanor, non-traffic misdemeanor, and criminal appeal (District Court only) filings.
[b]   Family and Juvenile case types only heard in District Courts.
[c]   Traffic and Parking includes juvenile traffic statistics.
[d]   Includes administrative closures.

## NON-TRAFFIC CASE DISTRIBUTION



## NON-TRAFFIC TOTAL CASES PER JUDGE





### District Demographics

Population: 18,005 [a]
Geographic Size: 15,280 sq. mi.[b]
Population Density: 1/sq. mi.
Most Populous Township: Lake

[a] Source: Nevada State Demographer
[b] Source: U.S. Census Bureau



### ELEVENTH JUDICIAL DISTRICT
### NON-TRAFFIC CASES AND DISPOSITIONS
### FISCAL YEARS 2018-22

## QUICK FACTS

**<1%** OF STATEWIDE NON-TRAFFIC CASELOAD

**1%** OF STATEWIDE TRAFFIC CASELOAD

Appendix p. 348

(Page intentionally left blank)

**Figure 1. Nevada Trial Court Non-Traffic Cases per Judicial Position, Fiscal Year 2022.**

Number of judicial positions in parenthesis. Does not include quasi-judicial positions.

Reopened cases included.

"*" indicates vacant judicial positions. For further detail, see footnotes in Table 1 on pages 1-2 regarding authorized judicial positions.

### District Courts



### Justice Courts



| | |
|---|---|
| Tahoe (1) | 526 |
| Hawthorne (1) | 476 |
| Goodsprings (1) | 443 |
| Mesquite (1) | 382 |
| Boulder (1) | 380 |
| Lake (1) | 291 |
| Incline Village (1) | 267 |
| Argenta (1) | 247 |
| Virginia City (1) | 246 |
| Tonopah (1) | 230 |
| Eastline (1) | 202 |
| Moapa Valley (1) | 175 |
| Searchlight (1) | 153 |
| Meadow Valley (1) | 150 |
| Wells (1) | 144 |
| Beatty (1) | 120 |
| Carlin (1) | 117 |
| Wadsworth (1) | 102 |
| Moapa (1) | 92 |
| Pahranagat Valley (1) | 63 |
| Eureka (1) | 55 |
| Esmeralda (1) | 45 |
| Bunkerville (1) | 21 |
| Austin (1) | 14 |

### Municipal Courts



**Figure 2. Nevada Non-Traffic Criminal Case Types by USJR Classification, by Jurisdictional Level, Fiscal Year 2022.** [a,b]

| | Persons | Property | Drugs | Weapons | Public Order | DUI | Other | Total |
|---|---|---|---|---|---|---|---|---|
| District Courts | 6,046 | 6,053 | 1,924 | 1,797 | 213 | 409 | 950 | **17,392** |
| Justice Courts [c] | 8,833 | 6,228 | 2,226 | 189 | 2,677 | 7,131 | 5,466 | **32,750** |
| Municipal Courts | 11,305 | 5,669 | 2,983 | 214 | 3,605 | 5,156 | 7,992 | **36,924** |
| **TOTAL** | **26,184** | **17,950** | **7,133** | **2,200** | **6,495** | **12,696** | **14,408** | **87,066** |



[a] District Court includes felony and gross misdemeanor criminal cases; Justice and Municipal Courts include misdemeanor cases only. Reopened cases included. Persons include person-crimes, domestic violence, older/vulnerable person-crimes, child abuse, and protection order violations.

[b] Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[c] Justice Courts hear preliminary matters for felony and gross misdemeanor cases typically adjudicated in District Courts, and these cases are excluded from this table.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Figure 3. Nevada Non-Criminal Case Distribution by Major USJR Classification, by Jurisdictional Level, Fiscal Year 2022.** [a]



[a] Municipal Courts excluded from this table due to all non-criminal cases being classified as Other Civil or Petitions to Seal Record actions. District Court Other classification includes Civil Other, Writs, and Construction Defect case types, as well as Juvenile Miscellaneous Petitions and Status Petitions case types. Justice Court Other classification includes Torts, Contested Liens, Petitions to Seal Records, and Other Civil Matters case types.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Figure 4: Nevada District Courts, Quarterly Analysis, Fiscal Years 2018-22.** [a]



Cases Filed by Major Case Classification, Fiscal Years 2018-22.



Criminal Cases Filed by Quarter.



Civil Cases Filed by Quarter.



Family Cases Filed by Quarter.



Juvenile Non-Traffic Cases Filed by Quarter.



Juvenile Traffic Cases Filed by Quarter.*

*Only includes juvenile traffic cases filed in district courts.

---

[a] Totals reflect aggregate information from the Nevada Trial Courts. Information contained herein may reflect non-standard reporting. See Tables B1-B9 from the respective fiscal years' Annual Report Appendices for greater detailed statistics and clarifying footnotes. Juvenile traffic cases only include cases filed in district courts and exclude cases filed in limited jurisdiction courts.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Figure 5: Nevada Justice and Municipal Courts, Quarterly Analysis, Fiscal Years 2018-22.** [a]

**Cases Filed by Major Case Classification, Fiscal Years 2018-22.**

**Justice Court Criminal Cases Filed by Quarter.**

**Municipal Court Criminal Cases Filed by Quarter.**

**Justice Court Civil Cases Filed by Quarter.**

**Municipal Court Civil Cases Filed by Quarter.**

**Justice Court Adult Traffic Cases Filed by Quarter.***

*Excludes juvenile traffic cases filed in justice courts.

**Municipal Court Adult Traffic Cases Filed by Quarter.***

*Excludes juvenile traffic cases filed in municipal courts.

[a] Totals reflect aggregate information from the Nevada Trial Courts. Information contained herein may reflect non-standard reporting. See Tables B1-B9 from the respective fiscal years' Annual Report Appendices for greater detailed statistics and clarifying footnotes. Adult traffic cases include parking cases.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A1. Summary of District Court Criminal and Civil Cases, Fiscal Years 2021-22.** [a]
(See Table A3 for Juvenile Traffic.)

| Court | Criminal (Non-Traffic) Cases [b] | | | | | | Civil Cases | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Filed | | Disposed | | Pending | | Filed | | Disposed | | Pending | |
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2022 Active | FY 2022 Inactive | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2022 Active | FY 2022 Inactive |
| **First Judicial District** | | | | | | | | | | | | |
| Carson City District Court | 341 | 375 | 227 | 247 | 147 [c] | - [d] | 528 | 539 | 409 | 515 | 251 [c] | - [d] |
| Storey County District Court | 5 | 1 | 1 | 0 | 28 [c] | - [d] | 39 | 34 | 40 | 25 | 25 [c] | - [d] |
| **Second Judicial District** | | | | | | | | | | | | |
| Washoe County District Court | 1,781 | 2,268 | 1,443 | 1,550 | 480 | 1,061 | 3,356 | 3,243 | 2,942 | 3,094 | 1,609 | 197 |
| **Third Judicial District** | | | | | | | | | | | | |
| Lyon County District Court | 259 | 253 | 260 | 216 | 106 | 136 | 357 | 333 | 337 | 301 | 322 | 2 |
| **Fourth Judicial District** | | | | | | | | | | | | |
| Elko County District Court | 521 | 484 | 515 | 512 | 156 | 67 | 381 | 426 | 377 | 425 | 277 | 0 |
| **Fifth Judicial District** | | | | | | | | | | | | |
| Esmeralda County District Court | 4 | 4 | 2 | 1 | 15 | 11 | 19 | 23 | 13 | 6 | 122 | 61 |
| Nye County District Court | 170 | 273 | 126 | 120 | 380 [f] | 50 | 545 | 624 | 142 | 402 | 3,801 [f] | 68 |
| **Sixth Judicial District** | | | | | | | | | | | | |
| Humboldt County District Court | 75 | 57 | 117 | 59 | 77 | 74 | 130 | 151 | 128 | 138 | 302 | 3 |
| **Seventh Judicial District** | | | | | | | | | | | | |
| Eureka County District Court | 10 | 7 | 6 | 5 | 4 | 1 | 15 | 17 | 14 | 15 | 14 | 0 |
| Lincoln County District Court | 51 | 40 | 50 | 44 | 56 | 1 | 41 | 23 | 49 | 15 | 40 | 0 |
| White Pine County District Court | 111 | 136 | 103 | 113 | 88 | 56 | 114 | 85 | 95 | 101 | 57 | 0 |
| **Eighth Judicial District** | | | | | | | | | | | | |
| Clark County District Court | 12,314 | 12,793 | 11,895 | 12,702 | 6,056 | 8,238 | 25,815 | 24,144 | 24,236 | 25,825 | 31,115 | 1,412 |
| **Ninth Judicial District** | | | | | | | | | | | | |
| Douglas County District Court | 195 | 346 | 149 | 254 | 161 | 106 | 361 | 482 | 275 | 477 | 257 | 7 |
| **Tenth Judicial District** | | | | | | | | | | | | |
| Churchill County District Court | 241 | 266 | 244 | 260 | 59 | 86 | 205 | 241 | 178 | 220 | 80 | 12 |
| **Eleventh Judicial District** | | | | | | | | | | | | |
| Lander County District Court | 22 | 17 | 22 | 18 | 13 | 11 | 42 | 56 | 25 | 32 | 66 | 46 |
| Mineral County District Court | 28 | 44 | 22 | 47 | 31 | 9 | 54 | 51 | 18 | 33 | 49 | 123 |
| Pershing County District Court | 29 | 28 | 38 | 52 [g] | 25 | 8 | 116 | 93 | 97 | 108 | 104 | 51 |
| **Total** | **16,157** | **17,392** | **15,220** | **16,200** | **7,882** | **9,915** | **32,118** | **30,565** | **29,375** | **31,732** | **38,491** | **1,982** |

[a]   Case statistics include cases that may have been reopened. Pending cases reported by the courts as of June 30, 2022.
[b]   Includes criminal appeals of limited jurisdiction courts.
[c]   Estimated from fiscal years 2017-22 new filings less dispositions. Reopened cases not included.
[d]   Statistic not reported by the court.
[f]   Active pending cases over-inclusive due in part to conversion to a new case management system.
[g]   Includes administrative case closures.
Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A2. Summary of District Court Family and Juvenile Cases, Fiscal Years 2021-22.** [a]
(See Table A3 for Juvenile Traffic.)

| Court | Family Cases | | | | | | Juvenile (Non-Traffic) Cases | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Filed | | Disposed | | Pending | | Filed | | Disposed | | Pending | |
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2022 Active | FY 2022 Inactive | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2022 Active | FY 2022 Inactive |
| **First Judicial District** | | | | | | | | | | | | |
| Carson City District Court | 1,516 | 1,709 | 1,380 | 1,543 | 0 [b] | - [c] | 253 | 276 | 201 | 254 | 0 [b] | - [c] |
| Storey County District Court | 32 | 29 | 22 | 13 | 39 [b] | - [c] | 1 | 3 | 1 | 3 | 0 [b] | - [c] |
| **Second Judicial District** | | | | | | | | | | | | |
| Washoe County District Court | 9,541 | 9,516 | 7,619 | 8,056 | 2,053 | 15 | 913 [d] | 1,995 [d] | 1,626 [f] | 2,883 [f] | 524 | 283 |
| **Third Judicial District** | | | | | | | | | | | | |
| Lyon County District Court | 1,017 | 872 [g] | 1,012 | 875 | 273 | 8 | 141 | 156 | 141 | 150 | 93 | 19 |
| **Fourth Judicial District** | | | | | | | | | | | | |
| Elko County District Court | 922 | 1,021 | 885 | 1,040 | 554 | 3 | 172 | 216 | 189 | 177 | 100 | 25 |
| **Fifth Judicial District** | | | | | | | | | | | | |
| Esmeralda County District Court | 4 | 4 [g] | 3 | 2 | 29 | 8 | 2 | 0 | 0 | 1 | 9 | 0 |
| Nye County District Court | 628 | 541 | 402 | 375 | 4,579 [h] | 45 | 151 | 178 | 104 | 81 | 533 [h] | 31 |
| **Sixth Judicial District** | | | | | | | | | | | | |
| Humboldt County District Court | 534 | 429 | 791 [f] | 358 | 665 | 0 | 109 | 73 | 117 [j] | 53 | 129 | 0 |
| **Seventh Judicial District** | | | | | | | | | | | | |
| Eureka County District Court | 15 | 13 | 6 | 10 | 12 | 0 | 1 | 6 | 3 | 0 | 7 | 0 |
| Lincoln County District Court | 25 | 28 | 26 | 18 | 96 | 12 | 19 | 7 | 15 | 6 | 31 | 0 |
| White Pine County District Court | 140 | 113 | 117 | 110 | 39 | 0 | 122 | 133 | 137 | 109 | 41 | 3 |
| **Eighth Judicial District** | | | | | | | | | | | | |
| Clark County District Court | 51,847 [r] | 56,560 | 47,430 [r] | 54,621 | 26,214 | 4,588 | 3,644 | 4,337 | 7,093 [f] | 9,239 [r,k] | 3,516 | 866 |
| **Ninth Judicial District** | | | | | | | | | | | | |
| Douglas County District Court | 590 | 813 | 500 | 753 | 180 | 0 | 105 | 139 | 73 | 96 | 74 | 2 |
| **Tenth Judicial District** | | | | | | | | | | | | |
| Churchill County District Court | 1,023 | 875 | 1,026 | 907 | 182 | 53 | 122 | 190 | 132 | 160 | 36 | 12 |
| **Eleventh Judicial District** | | | | | | | | | | | | |
| Lander County District Court | 143 | 105 | 131 | 81 | 98 | 25 | 25 | 11 | 16 | 16 | 26 | 1 |
| Mineral County District Court | 70 | 61 | 35 | 55 | 67 | 206 | 18 | 14 | 28 | 8 | 90 | 297 |
| Pershing County District Court | 57 | 54 | 33 | 57 | 61 | 5 | 58 | 43 | 32 | 41 | 24 | 0 |
| **Total** | 68,104 [r] | 72,743 | 61,418 [r] | 68,874 | 35,141 | 4,968 | 5,856 | 7,777 | 9,908 | 13,277 | 5,233 | 1,539 |

[a]   Case statistics include cases that may have been reopened. Pending cases reported by the courts as of June 30, 2022.
[b]   Estimated from fiscal years 2017-22 new filings less dispositions. Reopened cases not included.
[c]   Statistic not reported by the court.
[d]   Reopened (cases) not reported or under-reported.
[f]   Includes administrative case closures not related to footnote (k).
[g]   High-risk protection orders not reported or incomplete.
[h]   Active pending cases over-inclusive due in part to conversion to a new case management system.
[j]   Excludes a large number of administrative closures (1,062 delinquency and 98 dependency cases) unrelated to the filings in the respective fiscal year.
[k]   Court reported a large number of administrative closures (7,356 Delinquency dispositions). Because many of these dispositions are unrelated to the filings for the current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total dispositions but are provided in this footnote for general information.
[r]   Revised from previous publications.
Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A3. Summary of Juvenile Traffic Cases Filed and Disposed in District Court, Fiscal Years 2021-22.** [a]

| Court | Total Cases | | Total Charges | | Total Disposed | |
|---|---|---|---|---|---|---|
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 |
| **First Judicial District** | | | | | | |
| Carson City District Court | 196 | 193 | 265 | 258 | 142 | 128 |
| Storey County District Court | 5 | 2 | 7 | 2 | 4 | 2 |
| **Second Judicial District** | | | | | | |
| Washoe County District Court | 1,074 [b] | 1,286 [b] | 1,575 | 1,879 | 1,146 | 1,239 |
| **Third Judicial District** | | | | | | |
| Lyon County District Court | 143 | 131 | 202 | 159 | 138 | 134 |
| **Fourth Judicial District** | | | | | | |
| Elko County District Court | 201 | 174 | 238 | 209 | 192 | 147 |
| **Fifth Judicial District** | | | | | | |
| Esmeralda County District Court | 10 | 1 | 10 | 1 | 9 | 5 |
| Nye County District Court | 67 | 54 | 90 | 68 | 10 | 53 |
| **Sixth Judicial District** | | | | | | |
| Humboldt County District Court | 68 | 84 | 81 | 102 | 150 [c] | 68 |
| **Seventh Judicial District** | | | | | | |
| Eureka County District Court | (d) | (d) | (d) | (d) | (d) | (d) |
| Lincoln County District Court | (d) | (d) | (d) | (d) | (d) | (d) |
| White Pine County District Court | (d) | (d) | (d) | (d) | (d) | (d) |
| **Eighth Judicial District** | | | | | | |
| Clark County District Court | (d) | (d) | (d) | (d) | (d) | (d) |
| **Ninth Judicial District** | | | | | | |
| Douglas County District Court | 166 | 82 | 210 | 107 | 137 | 81 |
| **Tenth Judicial District** | | | | | | |
| Churchill County District Court | 93 | 72 | 121 | 91 | 92 | 74 |
| **Eleventh Judicial District** | | | | | | |
| Lander County District Court | 6 | 2 | 6 | 3 | 8 | 3 |
| Mineral County District Court | 21 | 10 | 30 | 16 | 21 | 12 |
| Pershing County District Court | 9 | 2 | 12 | 3 | 9 | 3 |
| **Total** | **2,059** | **2,093** | **2,847** | **2,898** | **2,058** | **1,949** |

[a]   Table contains juvenile traffic statistics (see appendix table B9). Case statistics include cases that may have been reopened.

[b]   Reopened (cases) not reported.

[c]   Includes administrative case closures.

[d]   Juvenile traffic violations handled and reported by limited jurisdiction courts.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A4. Summary of Justice Court Non-Traffic Cases Filed and Disposed, Fiscal Years 2021-22.**[a]
(See Table A5 for traffic data.)

| Court | Criminal Cases | | | | Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|
| | Filed | | Disposed | | Filed | | Disposed | |
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 |
| **First Judicial District** | | | | | | | | |
| **Carson City** | | | | | | | | |
| Carson City Justice Court[b] | 1,916 | 1,974 | 1,272 | 1,301 | 2,138 | 1,815 | 2,420 | 1,861 |
| **Storey County** | | | | | | | | |
| Virginia City Justice Court | 231 | 198 | 113 | 199 | 39 | 48 | 39 | 33 |
| **Second Judicial District** | | | | | | | | |
| **Washoe County** | | | | | | | | |
| Incline Village Justice Court | 282 | 195 | 253 | 248 | 102 | 72 | 72 | 84 |
| Reno Justice Court | 5,296 | 5,985 | 4,192 | 6,335 | 7,158 | 7,964 | 8,028 | 7,657 |
| Sparks Justice Court | 3,105 | 2,987 | 2,843 | 3,598[c] | 2,954 | 3,920 | 3,053 | 3,675 |
| Wadsworth Justice Court | 68 | 88 | 56 | 67 | 11 | 14 | 17 | 15 |
| **Third Judicial District** | | | | | | | | |
| **Lyon County** | | | | | | | | |
| Canal Justice Court | 378 | 467 | 430 | 459 | 909 | 781 | 686 | 715 |
| Dayton Justice Court | 378 | 364 | 357 | 361 | 636 | 563 | 582 | 655 |
| Walker River Justice Court | 455 | 341 | 511 | 367 | 544 | 595 | 620 | 694[c] |
| **Fourth Judicial District** | | | | | | | | |
| **Elko County** | | | | | | | | |
| Carlin Justice Court | 86 | 67 | 81 | 69 | 57 | 50 | 81 | 49 |
| Eastline Justice Court | 177 | 141 | 117 | 119 | 78 | 61 | 70 | 54 |
| Elko Justice Court | 1,646 | 1,510 | 1,673 | 1,409 | 1,059 | 986[d] | 1,113 | 1,257[c] |
| Wells Justice Court | 137 | 106 | 92 | 107 | 44 | 38 | 32 | 17 |
| **Fifth Judicial District** | | | | | | | | |
| **Esmeralda County** | | | | | | | | |
| Esmeralda Justice Court | 0 | 32 | 0 | 14 | 12 | 13 | 12 | 12 |
| **Nye County** | | | | | | | | |
| Beatty Justice Court | 76 | 79 | 91 | 91[c] | 46 | 41 | 55 | 24 |
| Pahrump Justice Court | 1,142 | 1,688 | 1,192 | 1,228 | 1,025 | 962 | 866 | 1,020 |
| Tonopah Justice Court | 150 | 118 | 167 | 110 | 63 | 112 | 64 | 105 |
| **Sixth Judicial District** | | | | | | | | |
| **Humboldt County** | | | | | | | | |
| Union Justice Court | 473 | 427 | 498 | 395 | 503 | 404 | 440 | 378 |
| **Seventh Judicial District** | | | | | | | | |
| **Eureka County** | | | | | | | | |
| Eureka Justice Court | 52 | 35 | 49 | 32 | 32 | 20 | 27 | 14 |
| **Lincoln County** | | | | | | | | |
| Meadow Valley Justice Court | 126 | 105 | 117 | 100 | 58 | 45[d] | 60 | 45 |
| Pahranagat Valley Justice Court | 58 | 49 | 100[c] | 33 | 12 | 14 | 10 | 7 |
| **White Pine County** | | | | | | | | |
| Ely Justice Court | 336 | 323 | 367 | 327 | 254 | 248 | 245 | 204 |
| **Eighth Judicial District** | | | | | | | | |
| **Clark County** | | | | | | | | |
| Boulder Justice Court | 172 | 107 | 153 | 113 | 290 | 273 | 228 | 249 |
| Bunkerville Justice Court | 13 | 21 | 13 | 15 | 5 | 0 | 8 | 0 |
| Goodsprings Justice Court | 414 | 393 | 334 | 461[c] | 46 | 50 | 36 | 33 |
| Henderson Justice Court | 2,062 | 1,645 | 2,074 | 1,943 | 7,740 | 9,552 | 6,254 | 8,938 |
| Las Vegas Justice Court | 45,654 | 40,637 | 46,256 | 42,627 | 63,683 | 89,294 | 57,109 | 85,260 |
| Laughlin Justice Court | 557 | 387 | 446 | 385 | 264 | 239 | 192 | 243 |
| Mesquite Justice Court | 240 | 190 | 291[c] | 285[c] | 228 | 192 | 176 | 225[c] |
| Moapa Justice Court | 80 | 72 | 68 | 119[c] | 12 | 20 | 17 | 16 |
| Moapa Valley Justice Court | 88 | 104 | 81 | 131[c] | 83 | 71 | 52 | 60 |
| North Las Vegas Justice Court | 2,449 | 2,098 | 2,427 | 2,511[c] | 6,547 | 9,753 | 8,367[c] | 6,969 |
| Searchlight Justice Court | 66 | 120 | 58 | 97 | 15 | 33 | 12 | 30 |
| **Ninth Judicial District** | | | | | | | | |
| **Douglas County** | | | | | | | | |
| East Fork Justice Court | 1,186 | 1,035 | 1,163 | 940 | 643 | 440 | 595 | 484 |
| Tahoe Justice Court | 673 | 437 | 573 | 554[c] | 81 | 89 | 81 | 130[c] |
| **Tenth Judicial District** | | | | | | | | |
| **Churchill County** | | | | | | | | |
| New River Justice Court | 739 | 726 | 757 | 755 | 743 | 828 | 652 | 803 |
| **Eleventh Judicial District** | | | | | | | | |
| **Lander County** | | | | | | | | |
| Argenta Justice Court | 180 | 132 | 170 | 157[c] | 131 | 115 | 113 | 106 |
| Austin Justice Court | 5 | 8 | 19[c] | 108[c] | 7 | 6 | 2 | 4 |
| **Mineral County** | | | | | | | | |
| Hawthorne Justice Court | 375 | 342 | 292 | 140 | 101 | 134 | 114 | 587[c] |
| **Pershing County** | | | | | | | | |
| Lake Justice Court | 224 | 172 | 264[c] | 210[c] | 118 | 119 | 136 | 133 |
| **Total** | **71,745** | **65,905** | **70,010** | **68,520** | **98,471** | **129,974** | **92,736** | **122,845** |

[a]   Case statistics include cases that may have been reopened.

[b]   Carson City Justice Court includes municipal court information.

[c]   Includes administrative case closures.

[d]   High-risk protection orders not reported or incomplete.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table A5. Summary of Justice Court Traffic Cases Filed and Disposed, Fiscal Years 2021-22. [a]

| Court | Total Cases | | Total Charges | | Total Disposed [b] | |
|---|---|---|---|---|---|---|
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 |
| **First Judicial District** | | | | | | |
| **Carson City** | | | | | | |
| Carson City Justice Court [c] | 7,572 | 7,099 | 9,816 | 9,554 | 6,559 | 6,405 |
| **Storey County** | | | | | | |
| Virginia City Justice Court | 1,495 | 1,221 | 1,963 | 1,720 | 1,417 | 1,149 |
| **Second Judicial District** | | | | | | |
| **Washoe County** | | | | | | |
| Incline Village Justice Court | 3,770 | 1,467 | 3,934 | 1,690 | 3,579 | 1,580 |
| Reno Justice Court | 15,398 | 14,652 | 18,597 | 18,038 | 14,789 | 14,114 |
| Sparks Justice Court | 4,389 | 3,183 | 5,911 | 4,610 | 4,620 | 3,737 [d] |
| Wadsworth Justice Court | 1,684 | 1,731 | 2,002 | 2,197 | 1,542 | 1,693 |
| **Third Judicial District** | | | | | | |
| **Lyon County** | | | | | | |
| Canal Justice Court | 418 | 470 | 577 | 730 | 360 | 454 |
| Dayton Justice Court | 1,792 | 1,210 | 2,204 | 1,584 | 1,749 | 1,385 |
| Walker River Justice Court | 2,354 | 1,446 | 2,912 | 1,859 | 2,182 | 1,487 |
| **Fourth Judicial District** | | | | | | |
| **Elko County** | | | | | | |
| Carlin Justice Court | 514 | 689 | 613 | 784 | 538 | 633 |
| Eastline Justice Court | 187 | 297 | 256 | 397 | 193 | 200 |
| Elko Justice Court | 4,382 | 4,690 | 5,086 | 5,463 | 4,624 | 4,180 |
| Wells Justice Court | 3,888 | 2,675 | 4,304 | 3,017 | 3,597 | 2,548 |
| **Fifth Judicial District** | | | | | | |
| **Esmeralda County** | | | | | | |
| Esmeralda Justice Court | 1,510 | 1,459 | 1,510 | 1,732 | 1,510 | 1,423 |
| **Nye County** | | | | | | |
| Beatty Justice Court | 965 | 970 | 1,160 | 1,126 | 808 | 898 |
| Pahrump Justice Court | 3,017 | 2,276 | 3,860 | 2,903 | 3,009 | 2,353 |
| Tonopah Justice Court | 2,055 | 1,162 | 2,277 | 1,429 | 2,018 | 1,170 |
| **Sixth Judicial District** | | | | | | |
| **Humboldt County** | | | | | | |
| Union Justice Court | 5,170 | 3,629 | 5,839 | 4,344 | 5,039 | 3,390 |
| **Seventh Judicial District** | | | | | | |
| **Eureka County** | | | | | | |
| Eureka Justice Court | 489 | 538 | 542 | 587 | 478 | 465 |
| **Lincoln County** | | | | | | |
| Meadow Valley Justice Court | 1,112 | 1,072 | 1,187 | 1,146 | 971 | 1,040 |
| Pahranagat Valley Justice Court | 2,144 | 2,832 | 2,315 | 3,034 | 2,075 | 2,653 |
| **White Pine County** | | | | | | |
| Ely Justice Court | 1,901 | 1,443 | 2,103 | 1,630 | 1,732 | 1,380 |
| **Eighth Judicial District** | | | | | | |
| **Clark County** | | | | | | |
| Boulder Justice Court | 3,060 | 1,498 | 3,413 | 1,694 | 2,975 | 1,580 |
| Bunkerville Justice Court | 954 | 1,267 | 1,091 | 1,444 | 848 | 1,153 |
| Goodsprings Justice Court | 7,083 | 6,202 | 8,790 | 7,364 | 9,620 [d] | 8,803 [d] |
| Henderson Justice Court | 4,003 | 2,713 | 5,069 | 3,569 | 4,189 | 3,017 |
| Las Vegas Justice Court | 143,741 [f] | 143,822 [f] | 177,714 | 182,146 | 95,632 | 44,716 [g,h] |
| Laughlin Justice Court | 5,897 | 4,855 | 7,282 | 5,666 | 4,944 | 7,375 [d] |
| Mesquite Justice Court | 0 | 6 | 12 | 15 | 0 | 3 |
| Moapa Justice Court | 1,742 | 1,576 | 2,021 | 1,870 | 1,577 | 2,583 [d] |
| Moapa Valley Justice Court | 1,075 | 1,033 | 1,267 | 1,176 | 1,081 | 1,205 [d] |
| North Las Vegas Justice Court | 1,042 | 606 | 1,673 | 1,096 | 949 | 626 |
| Searchlight Justice Court | 3,178 | 4,763 | 3,729 | 5,313 | 3,033 | 5,757 |
| **Ninth Judicial District** | | | | | | |
| **Douglas County** | | | | | | |
| East Fork Justice Court | 3,187 | 2,490 | 4,201 | 3,291 | 3,177 | 2,356 |
| Tahoe Justice Court | 1,744 | 1,203 | 2,166 | 1,515 | 1,594 | 1,130 |
| **Tenth Judicial District** | | | | | | |
| **Churchill County** | | | | | | |
| New River Justice Court | 3,818 | 3,774 | 4,734 | 4,680 | 3,328 | 3,725 |
| **Eleventh Judicial District** | | | | | | |
| **Lander County** | | | | | | |
| Argenta Justice Court | 451 | 186 | 501 | 225 | 619 [d] | 278 [d] |
| Austin Justice Court | 1,273 | 756 | 1,339 | 847 | 1,095 | 794 |
| **Mineral County** | | | | | | |
| Hawthorne Justice Court | 4,305 | 2,690 | 5,046 | 3,159 | 3,796 | 2,265 |
| **Pershing County** | | | | | | |
| Lake Justice Court | 507 | 376 | 615 | 439 | 956 [d] | 475 [d] |
| **Total** | **253,266** | **236,027** | **309,631** | **295,083** | **202,802** | **142,178** |

[a]   Table contains adult traffic and parking statistics (see table B5-1). Information may include cases that may have been reopened or juvenile traffic statistics (see table B9).

[b]   Dispositions may include increases due to necessary administrative actions that implement legislative changes in creating civil infractions beginning January 2023.

[c]   Carson City is a consolidated municipality and statistics are reported in the Justice Court table.

[d]   Includes administrative case closures.

[f]   Reopened (cases) not reported or under-reported.

[g]   Court reported a large number of administrative closures (170,134 traffic, 193 parking, and 1,134 juvenile traffic dispositions). Because many of these dispositions are unrelated to the filings for the current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total dispositions but are provided in this footnote for general information.

[h]   Disposition data incomplete due to the development of new online platform and limited IT programming resources needed to implement improved business processes. Complete data will be updated in future Annual Report publications.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A6. Summary of Municipal Court Non-Traffic Cases Filed and Disposed, Fiscal Years 2021-22.** [a]
(See Table A7 for traffic data.)

| | Criminal Cases | | | | Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|
| | Filed | | Disposed | | Filed | | Disposed | |
| Court | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 |
| **First Judicial District** | | | | | | | | |
| Carson City Municipal Court | (b) | (b) | (b) | (b) | (b) | (b) | (b) | (b) |
| **Second Judicial District** | | | | | | | | |
| Reno Municipal Court | 5,309 | 5,657 | 5,881 | 5,877 | 87 | 60 | 69 | 74 |
| Sparks Municipal Court | 1,630 [c] | 1,576 [c] | 1,841 | 1,788 | 21 | 16 | 20 | 11 |
| **Third Judicial District** | | | | | | | | |
| Fernley Municipal Court | 348 | 304 | 306 | 320 | 2 | 2 | 0 | 0 |
| Yerington Municipal Court | 61 | 82 | 43 | 102 | 0 | 0 | 0 | 0 |
| **Fourth Judicial District** | | | | | | | | |
| Carlin Municipal Court | 29 | 37 | 30 | 35 | 0 | 0 | 0 | 0 |
| Elko Municipal Court | 349 | 220 | 372 | 258 [d] | 2 | 4 | 1 | 1 |
| Wells Municipal Court | 10 | 5 | 8 | 10 | 0 | 0 | 0 | 0 |
| West Wendover Municipal Court | 145 | 110 | 103 | 85 | 1 | 0 | 1 | 0 |
| **Seventh Judicial District** | | | | | | | | |
| Caliente Municipal Court | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Ely Municipal Court | 124 | 150 | 127 | 156 | 0 | 0 | 0 | 0 |
| **Eighth Judicial District** | | | | | | | | |
| Boulder Municipal Court | 581 | 392 | 505 | 383 | 5 | 2 | 4 | 2 |
| Henderson Municipal Court | 7,295 | 6,381 | 6,447 | 6,202 | 130 | 92 | 168 | 118 [d] |
| Las Vegas Municipal Court | 21,043 | 16,773 | 15,831 | 19,099 [d] | 730 | 840 | 733 | 862 |
| Mesquite Municipal Court | 659 | 746 | 531 | 641 | 4 | 4 | 3 | 2 |
| North Las Vegas Municipal Court | 4,086 | 4,237 | 4,342 | 4,420 | 58 | 143 | 58 | 143 |
| **Tenth Judicial District** | | | | | | | | |
| Fallon Municipal Court | 311 | 254 | 316 | 197 | 1 | 1 | 0 | 0 |
| **Total** | **41,981** | **36,924** | **36,684** | **39,573** | **1,041** | **1,164** | **1,057** | **1,213** |

[a]   Case statistics include cases that may have been reopened.

[b]   Carson City is a consolidated municipality and statistics are reported in the Justice Court tables.

[c]   Reopened (cases) under-reported.

[d]   Includes administrative case closures.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table A7. Summary of Municipal Court Traffic Cases Filed and Disposed, Fiscal Years 2021-22.** [a]

| Court | Total Cases | | Total Charges | | Total Disposed [b] | |
|---|---|---|---|---|---|---|
| | FY 2021 | FY 2022 | FY 2021 | FY 2022 | FY 2021 | FY 2022 |
| **First Judicial District** | | | | | | |
| Carson City Municipal Court | (c) | (c) | (c) | (c) | (c) | (c) |
| **Second Judicial District** | | | | | | |
| Reno Municipal Court | 12,815 | 13,607 | 16,871 | 16,977 | 13,055 | 13,268 |
| Sparks Municipal Court | 3,263 [d] | 4,038 [d] | 5,044 | 6,305 | 3,301 | 4,184 |
| **Third Judicial District** | | | | | | |
| Fernley Municipal Court | 2,018 | 2,251 | 2,739 | 2,955 | 1,931 | 2,250 |
| Yerington Municipal Court | 70 | 50 | 99 | 66 | 66 | 46 |
| **Fourth Judicial District** | | | | | | |
| Carlin Municipal Court | 87 | 31 | 97 | 33 | 95 | 35 |
| Elko Municipal Court | 221 | 214 | 283 | 263 | 245 | 202 |
| Wells Municipal Court | 8 | 21 | 8 | 23 | 6 | 17 |
| West Wendover Municipal Court | 299 | 298 | 324 | 328 | 294 | 255 |
| **Seventh Judicial District** | | | | | | |
| Caliente Municipal Court | 0 | 0 | 0 | 0 | 0 | 0 |
| Ely Municipal Court | 261 | 311 | 344 | 433 | 269 | 318 |
| **Eighth Judicial District** | | | | | | |
| Boulder Municipal Court | 2,545 | 1,427 | 3,474 | 1,977 | 2,925 | 1,613 [f] |
| Henderson Municipal Court | 18,635 | 20,481 | 18,966 | 20,764 | 16,497 | 17,418 |
| Las Vegas Municipal Court | 43,617 | 44,235 | 55,615 | 56,817 | 43,043 | 42,320 |
| Mesquite Municipal Court | 1,238 | 1,245 | 1,604 | 2,872 | 1,073 | 1,191 |
| North Las Vegas Municipal Court | 16,177 | 16,205 | 25,251 | 25,781 | 14,457 | 15,508 |
| **Tenth Judicial District** | | | | | | |
| Fallon Municipal Court | 276 | 348 | 402 | 483 | 302 | 306 |
| **Total** | **101,530** | **104,762** | **131,121** | **136,077** | **97,559** | **98,931** |

[a]  Table contains adult traffic and parking statistics (see table B7-1). Information may include cases that may have been reopened or juvenile traffic statistics (see table B9).

[b]  Dispositions may include increases due to necessary administrative actions that implement legislative changes in creating civil infractions beginning January 2023.

[c]  Carson City is a consolidated municipality and statistics are reported in the Justice Court tables.

[d]  Reopened (cases) under-reported.

[f]  Includes administrative case closures.

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

(Page intentionally left blank)

Table B1-1. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Aggregate (1 of 2) | | | Felony, Total | Gross Misdemeanor, Total | Criminal Appeal from LJ Courts | Totals |
|---|---|---|---|---|---|---|
| **Totals**[a] | Nevada District Courts | **New Filings (cases)** | **9,727** | **2,093** | **67** | **11,887** |
| | | Reopened (cases) | 4,839 | 664 | 2 | 5,505 |
| | | Charges | 16,474 | 2,714 | 0 | 19,188 |
| | | Grand Total Dispositions | 13,472 | 2,651 | 77 | 16,200 |
| | | Total Non-Trial Dispositions | 13,344 | 2,647 | 77 | 16,068 |
| | | Total Bench Trial Dispositions | 8 | 2 | 0 | 10 |
| | | Total Jury Trial Dispositions | 120 | 2 | 0 | 122 |
| **1st Judicial District** | Carson City | Carson City District Court | **New Filings (cases)** | **215** | **50** | **7** | **272** |
| | | Reopened (cases) | 80 | 23 | 0 | 103 |
| | | Charges | 309 | 72 | 0 | 381 |
| | | Grand Total Dispositions | 187 | 60 | 0 | 247 |
| | | Total Non-Trial Dispositions | 187 | 60 | 0 | 247 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | Storey County | Storey County District Court | **New Filings (cases)** | **0** | **0** | **1** | **1** |
| | | Reopened (cases) | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| **2nd Judicial District** | Washoe County | Washoe County District Court | **New Filings (cases)** | **1,415** | **279** | **8** | **1,702** |
| | | Reopened (cases) | 507 | 59 | 0 | 566 |
| | | Charges | 2,014 | 397 | 0 | 2,411 |
| | | Grand Total Dispositions | 1,260 | 290 | 0 | 1,550 |
| | | Total Non-Trial Dispositions | 1,241 | 290 | 0 | 1,531 |
| | | Total Bench Trial Dispositions | 1 | 0 | 0 | 1 |
| | | Total Jury Trial Dispositions | 18 | 0 | 0 | 18 |
| **3rd Judicial District** | Lyon County | Lyon County District Court | **New Filings (cases)** | **141** | **40** | **1** | **182** |
| | | Reopened (cases) | 51 | 20 | 0 | 71 |
| | | Charges | 196 | 50 | 0 | 246 |
| | | Grand Total Dispositions | 163 | 49 | 4 | 216 |
| | | Total Non-Trial Dispositions | 161 | 49 | 4 | 214 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 2 | 0 | 0 | 2 |
| **4th Judicial District** | Elko County | Elko County District Court | **New Filings (cases)** | **217** | **111** | **13** | **341** |
| | | Reopened (cases) | 94 | 49 | 0 | 143 |
| | | Charges | 350 | 140 | 0 | 490 |
| | | Grand Total Dispositions | 328 | 173 | 11 | 512 |
| | | Total Non-Trial Dispositions | 313 | 173 | 11 | 497 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 15 | 0 | 0 | 15 |
| **5th Judicial District** | Esmeralda County | Esmeralda County District Court | **New Filings (cases)** | **4** | **0** | **0** | **4** |
| | | Reopened (cases) | 0 | 0 | 0 | 0 |
| | | Charges | 24 | 0 | 0 | 24 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | Nye County | Nye County District Court | **New Filings (cases)** | **201** | **37** | **0** | **238** |
| | | Reopened (cases) | 24 | 11 | 0 | 35 |
| | | Charges | 230 | 38 | 0 | 268 |
| | | Grand Total Dispositions | 91 | 29 | 0 | 120 |
| | | Total Non-Trial Dispositions | 91 | 29 | 0 | 120 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| **6th Judicial District** | Humboldt County | Humboldt County District Court | **New Filings (cases)** | **38** | **7** | **6** | **51** |
| | | Reopened (cases) | 6 | 0 | 0 | 6 |
| | | Charges | 65 | 8 | 0 | 73 |
| | | Grand Total Dispositions | 53 | 4 | 2 | 59 |
| | | Total Non-Trial Dispositions | 53 | 3 | 2 | 58 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 1 | 0 | 1 |

[a]   Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-1. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Aggregate (2 of 2) | | | | Felony, Total | Gross Misdemeanor, Total | Criminal Appeal from LJ Courts | Totals |
|---|---|---|---|---|---|---|---|
| 7th Judicial District | Eureka County | Eureka County District Court | **New Filings (cases)** | **4** | **2** | **0** | **6** |
| | | | Reopened (cases) | 1 | 0 | 0 | 1 |
| | | | Charges | 20 | 3 | 0 | 23 |
| | | | **Grand Total Dispositions** | 5 | 0 | 0 | 5 |
| | | | Total Non-Trial Dispositions | 5 | 0 | 0 | 5 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | Lincoln County | Lincoln County District Court | **New Filings (cases)** | **35** | **1** | **0** | **36** |
| | | | Reopened (cases) | 2 | 2 | 0 | 4 |
| | | | Charges | 48 | 1 | 0 | 49 |
| | | | **Grand Total Dispositions** | 41 | 3 | 0 | 44 |
| | | | Total Non-Trial Dispositions | 41 | 3 | 0 | 44 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | White Pine County | White Pine County District Court | **New Filings (cases)** | **107** | **2** | **1** | **110** |
| | | | Reopened (cases) | 26 | 0 | 0 | 26 |
| | | | Charges | 224 | 2 | 0 | 226 |
| | | | **Grand Total Dispositions** | 110 | 3 | 0 | 113 |
| | | | Total Non-Trial Dispositions | 105 | 3 | 0 | 108 |
| | | | Total Bench Trial Dispositions | 1 | 0 | 0 | 1 |
| | | | Total Jury Trial Dispositions | 4 | 0 | 0 | 4 |
| 8th Judicial District | Clark County | Clark County District Court | **New Filings (cases)** | **6,938** | **1,502** | **26** | **8,466** |
| | | | Reopened (cases) | 3,857 | 469 | 1 | 4,327 |
| | | | Charges | 12,413 | 1,923 | 0 | 14,336 |
| | | | **Grand Total Dispositions** | 10,700 | 1,963 | 39 | 12,702 |
| | | | Total Non-Trial Dispositions | 10,620 | 1,960 | 39 | 12,619 |
| | | | Total Bench Trial Dispositions | 6 | 2 | 0 | 8 |
| | | | Total Jury Trial Dispositions | 74 | 1 | 0 | 75 |
| 9th Judicial District | Douglas County | Douglas County District Court | **New Filings (cases)** | **197** | **20** | **0** | **217** |
| | | | Reopened (cases) | 110 | 19 | 0 | 129 |
| | | | Charges | 267 | 32 | 0 | 299 |
| | | | **Grand Total Dispositions** | 221 | 31 | 2 | 254 |
| | | | Total Non-Trial Dispositions | 215 | 31 | 2 | 248 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 6 | 0 | 0 | 6 |
| 10th Judicial District | Churchill County | Churchill County District Court | **New Filings (cases)** | **170** | **25** | **1** | **196** |
| | | | Reopened (cases) | 62 | 8 | 0 | 70 |
| | | | Charges | 257 | 29 | 0 | 286 |
| | | | **Grand Total Dispositions** | 228 | 31 | 1 | 260 |
| | | | Total Non-Trial Dispositions | 227 | 31 | 1 | 259 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 1 | 0 | 0 | 1 |
| 11th Judicial District | Lander County | Lander County District Court | **New Filings (cases)** | **7** | **3** | **0** | **10** |
| | | | Reopened (cases) | 6 | 1 | 0 | 7 |
| | | | Charges | 9 | 3 | 0 | 12 |
| | | | **Grand Total Dispositions** | 14 | 3 | 1 | 18 |
| | | | Total Non-Trial Dispositions | 14 | 3 | 1 | 18 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court | **New Filings (cases)** | **29** | **8** | **1** | **38** |
| | | | Reopened (cases) | 5 | 1 | 0 | 6 |
| | | | Charges | 37 | 9 | 0 | 46 |
| | | | **Grand Total Dispositions** | 31 | 8 | 8 | 47 |
| | | | Total Non-Trial Dispositions | 31 | 8 | 8 | 47 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court | **New Filings (cases)** | **9** | **6** | **2** | **17** |
| | | | Reopened (cases) | 8 | 2 | 1 | 11 |
| | | | Charges | 11 | 7 | 0 | 18 |
| | | | **Grand Total Dispositions** [b] | 39 | 4 | 9 | 52 [b] |
| | | | Total Non-Trial Dispositions | 39 | 4 | 9 | 52 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 |

[b]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| | | District Court, Criminal Caseload, Felony (1 of 3) | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | | Nevada District Courts | | | | | | | | | | | | | |
| | | New Filings (cases) | 2,928 | 162 | 36 | 180 | 16 | 3,193 | 1,192 | 1,099 | 125 | 371 | 156 | 107 | 162 |
| | | Reopened (cases) | 1,466 | 91 | 19 | 85 | 10 | 1,890 | 618 | 457 | 34 | 38 | 36 | 33 | 62 |
| | | Charges | 5,705 | 415 | 112 | 479 | 16 | 4,788 | 1,667 | 2,069 | 199 | 417 | 221 | 157 | 229 |
| | | Grand Total Dispositions | 4,234 | 268 | 48 | 271 | 23 | 4,694 | 1,619 | 1,353 | 127 | 370 | 137 | 120 | 208 |
| | | Total Non-Trial Dispositions | 4,143 | 266 | 48 | 271 | 23 | 4,675 | 1,612 | 1,350 | 127 | 367 | 134 | 120 | 208 |
| | | Total Bench Trial Dispositions | 1 | 1 | 0 | 0 | 0 | 4 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 90 | 1 | 0 | 0 | 0 | 15 | 6 | 2 | 0 | 3 | 3 | 0 | 0 |
| 1st Judicial District | Carson City County | Carson City District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 37 | 5 | 0 | 7 | 0 | 49 | 71 | 14 | 2 | 16 | 2 | 4 | 8 |
| | | Reopened (cases) | 14 | 1 | 0 | 3 | 0 | 29 | 25 | 2 | 0 | 3 | 0 | 0 | 3 |
| | | Charges | 67 | 9 | 0 | 10 | 0 | 70 | 91 | 26 | 2 | 17 | 3 | 5 | 9 |
| | | Grand Total Dispositions | 24 | 4 | 0 | 4 | 0 | 53 | 60 | 16 | 1 | 13 | 1 | 2 | 9 |
| | | Total Non-Trial Dispositions | 24 | 4 | 0 | 4 | 0 | 53 | 60 | 16 | 1 | 13 | 1 | 2 | 9 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County | Storey County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 318 | 40 | 2 | 27 | 3 | 469 | 256 | 110 | 7 | 102 | 10 | 23 | 48 |
| | | Reopened (cases) | 85 | 3 | 1 | 4 | 1 | 245 | 104 | 21 | 6 | 9 | 2 | 11 | 15 |
| | | Charges | 502 | 62 | 2 | 37 | 3 | 617 | 355 | 182 | 31 | 116 | 11 | 33 | 63 |
| | | Grand Total Dispositions | 230 | 36 | 2 | 22 | 1 | 506 | 218 | 83 | 7 | 82 | 7 | 25 | 41 |
| | | Total Non-Trial Dispositions | 217 | 35 | 2 | 22 | 1 | 505 | 216 | 82 | 7 | 81 | 7 | 25 | 41 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 13 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 0 |
| 3rd Judicial District | Lyon County | Lyon County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 27 | 3 | 0 | 0 | 4 | 39 | 32 | 14 | 0 | 13 | 1 | 2 | 6 |
| | | Reopened (cases) | 6 | 1 | 0 | 0 | 0 | 20 | 11 | 8 | 0 | 3 | 1 | 1 | 0 |
| | | Charges | 47 | 3 | 0 | 0 | 4 | 53 | 38 | 26 | 0 | 13 | 3 | 2 | 7 |
| | | Grand Total Dispositions | 34 | 3 | 0 | 0 | 2 | 50 | 41 | 19 | 0 | 11 | 2 | 1 | 0 |
| | | Total Non-Trial Dispositions | 33 | 3 | 0 | 0 | 2 | 49 | 41 | 19 | 0 | 11 | 2 | 1 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Elko County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 38 | 7 | 2 | 1 | 0 | 68 | 77 | 5 | 1 | 15 | 0 | 1 | 2 |
| | | Reopened (cases) | 11 | 0 | 0 | 1 | 1 | 35 | 40 | 5 | 1 | 0 | 0 | 0 | 0 |
| | | Charges | 82 | 10 | 3 | 2 | 0 | 99 | 114 | 13 | 2 | 17 | 1 | 2 | 5 |
| | | Grand Total Dispositions | 55 | 2 | 0 | 4 | 2 | 110 | 118 | 14 | 1 | 17 | 0 | 2 | 3 |
| | | Total Non-Trial Dispositions | 45 | 2 | 0 | 4 | 2 | 108 | 115 | 14 | 1 | 17 | 0 | 2 | 3 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 10 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Felony (2 of 3) | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **5th Judicial District** | **Esmeralda County** | Esmeralda County District Court — New Filings (cases) | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Nye County** | Nye County District Court — New Filings (cases) | 47 | 8 | 1 | 8 | 0 | 64 | 38 | 18 | 3 | 3 | 0 | 6 | 5 |
| | | Reopened (cases) | 3 | 0 | 0 | 1 | 0 | 6 | 7 | 3 | 0 | 1 | 0 | 1 | 2 |
| | | Charges | 72 | 10 | 1 | 8 | 0 | 64 | 38 | 19 | 3 | 3 | 0 | 7 | 5 |
| | | Grand Total Dispositions | 28 | 2 | 2 | 1 | 0 | 29 | 14 | 3 | 0 | 2 | 1 | 3 | 6 |
| | | Total Non-Trial Dispositions | 28 | 2 | 2 | 1 | 0 | 29 | 14 | 3 | 0 | 2 | 1 | 3 | 6 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **6th Judicial District** | **Humboldt County** | Humboldt County District Court — New Filings (cases) | 15 | 0 | 0 | 0 | 2 | 10 | 8 | 0 | 1 | 2 | 0 | 0 | 0 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Charges | 34 | 0 | 0 | 0 | 2 | 12 | 14 | 0 | 1 | 2 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 20 | 0 | 0 | 0 | 0 | 16 | 13 | 0 | 0 | 4 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 20 | 0 | 0 | 0 | 0 | 16 | 13 | 0 | 0 | 4 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **7th Judicial District** | **Eureka County** | Eureka County District Court — New Filings (cases) | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 10 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Lincoln County** | Lincoln County District Court — New Filings (cases) | 9 | 0 | 1 | 1 | 0 | 8 | 4 | 2 | 0 | 2 | 1 | 2 | 5 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 10 | 0 | 1 | 2 | 0 | 16 | 12 | 2 | 0 | 2 | 1 | 2 | 7 |
| | | Grand Total Dispositions | 7 | 1 | 0 | 0 | 0 | 9 | 12 | 2 | 0 | 0 | 0 | 1 | 9 |
| | | Total Non-Trial Dispositions | 7 | 1 | 0 | 0 | 0 | 9 | 12 | 2 | 0 | 0 | 0 | 1 | 9 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **White Pine County** | White Pine County District Court — New Filings (cases) | 31 | 2 | 0 | 5 | 0 | 7 | 33 | 18 | 0 | 2 | 2 | 1 | 6 |
| | | Reopened (cases) | 3 | 0 | 0 | 0 | 0 | 3 | 15 | 1 | 2 | 0 | 0 | 0 | 2 |
| | | Charges | 70 | 7 | 0 | 5 | 0 | 22 | 79 | 27 | 0 | 2 | 3 | 1 | 8 |
| | | Grand Total Dispositions | 30 | 4 | 0 | 2 | 0 | 11 | 39 | 12 | 0 | 3 | 1 | 2 | 6 |
| | | Total Non-Trial Dispositions | 27 | 4 | 0 | 2 | 0 | 11 | 39 | 11 | 0 | 2 | 1 | 2 | 6 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Felony (3 of 3) | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District | Clark County | Clark County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 2,339 | 92 | 28 | 120 | 6 | 2,390 | 504 | 904 | 109 | 191 | 138 | 57 | 60 |
| | | Reopened (cases) | 1,306 | 86 | 16 | 76 | 8 | 1,499 | 331 | 411 | 25 | 12 | 33 | 19 | 35 |
| | | Charges | 4,705 | 293 | 99 | 376 | 6 | 3,698 | 722 | 1,756 | 154 | 220 | 196 | 92 | 96 |
| | | Grand Total Dispositions | 3,725 | 212 | 39 | 235 | 17 | 3,779 | 887 | 1,183 | 117 | 205 | 123 | 77 | 101 |
| | | Total Non-Trial Dispositions | 3,663 | 211 | 39 | 235 | 17 | 3,765 | 887 | 1,182 | 117 | 205 | 121 | 77 | 101 |
| | | Total Bench Trial Dispositions | 1 | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 61 | 0 | 0 | 0 | 0 | 10 | 0 | 1 | 0 | 0 | 2 | 0 | 0 |
| 9th Judicial District | Douglas County | Douglas County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 26 | 1 | 2 | 4 | 1 | 50 | 86 | 4 | 1 | 15 | 1 | 5 | 1 |
| | | Reopened (cases) | 22 | 0 | 0 | 0 | 0 | 30 | 45 | 4 | 0 | 7 | 0 | 1 | 1 |
| | | Charges | 40 | 5 | 6 | 8 | 1 | 61 | 111 | 5 | 5 | 15 | 2 | 6 | 2 |
| | | Grand Total Dispositions | 41 | 2 | 1 | 2 | 1 | 61 | 86 | 7 | 0 | 16 | 1 | 2 | 1 |
| | | Total Non-Trial Dispositions | 40 | 2 | 1 | 2 | 1 | 60 | 84 | 7 | 0 | 15 | 0 | 2 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 0 |
| 10th Judicial District | Churchill County | Churchill County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 32 | 1 | 0 | 2 | 0 | 29 | 63 | 7 | 1 | 10 | 0 | 4 | 21 |
| | | Reopened (cases) | 13 | 0 | 1 | 0 | 0 | 15 | 27 | 1 | 0 | 2 | 0 | 0 | 3 |
| | | Charges | 58 | 4 | 0 | 5 | 0 | 63 | 76 | 8 | 1 | 10 | 0 | 5 | 27 |
| | | Grand Total Dispositions | 33 | 1 | 1 | 0 | 0 | 53 | 85 | 8 | 1 | 13 | 0 | 4 | 29 |
| | | Total Non-Trial Dispositions | 32 | 1 | 1 | 0 | 0 | 53 | 85 | 8 | 1 | 13 | 0 | 4 | 29 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District | Lander County | Lander County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 2 | 0 | 0 | 0 | 0 | 0 | 6 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 4 | 6 | 2 | 0 | 1 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 4 | 6 | 2 | 0 | 1 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 3 | 0 | 0 | 2 | 0 | 6 | 13 | 3 | 0 | 0 | 1 | 1 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 3 | 1 | 0 | 3 | 0 | 8 | 17 | 3 | 0 | 0 | 1 | 1 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 7 | 16 | 4 | 0 | 1 | 1 | 1 | 0 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 7 | 16 | 4 | 0 | 1 | 1 | 1 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court | | | | | | | | | | | | | |
| | | New Filings (cases) | 3 | 1 | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Reopened (cases) | 2 | 0 | 1 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Charges | 3 | 1 | 0 | 1 | 0 | 3 | 2 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Grand Total Dispositions [b] | 4 | 1 | 1 | 0 | 0 | 5 | 24 | 0 | 0 | 2 | 0 | 0 | 2 |
| | | Total Non-Trial Dispositions | 4 | 1 | 1 | 0 | 0 | 5 | 24 | 0 | 0 | 2 | 0 | 0 | 2 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[b]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Gross Misdemeanor (1 of 3) | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor | Criminal Appeal from Limited Jurisdiction Courts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada District Courts | New Filings (cases) | 519 | 19 | 8 | 227 | 20 | 708 | 74 | 193 | 49 | 4 | 272 | 67 |
| | | Reopened (cases) | 176 | 4 | 1 | 72 | 7 | 262 | 40 | 48 | 5 | 4 | 45 | 2 |
| | | Charges | 691 | 39 | 10 | 259 | 36 | 877 | 92 | 314 | 59 | 5 | 332 | 0 |
| | | Grand Total Dispositions | 673 | 19 | 8 | 295 | 18 | 920 | 124 | 251 | 32 | 7 | 304 | 77 |
| | | Total Non-Trial Dispositions | 672 | 19 | 8 | 295 | 18 | 919 | 124 | 251 | 32 | 7 | 302 | 77 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 1st Judicial District | Carson City County | Carson City District Court — New Filings (cases) | 11 | 1 | 0 | 6 | 1 | 16 | 2 | 6 | 1 | 0 | 6 | 7 |
| | | Reopened (cases) | 4 | 0 | 0 | 4 | 0 | 9 | 2 | 2 | 0 | 0 | 2 | 0 |
| | | Charges | 16 | 1 | 0 | 14 | 1 | 21 | 4 | 8 | 1 | 0 | 6 | 0 |
| | | Grand Total Dispositions | 12 | 0 | 0 | 8 | 1 | 23 | 2 | 7 | 0 | 1 | 6 | 0 |
| | | Total Non-Trial Dispositions | 12 | 0 | 0 | 8 | 1 | 23 | 2 | 7 | 0 | 1 | 6 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County | Storey County District Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court — New Filings (cases) | 66 | 5 | 1 | 18 | 3 | 117 | 6 | 22 | 4 | 0 | 37 | 8 |
| | | Reopened (cases) | 11 | 0 | 0 | 2 | 1 | 35 | 4 | 3 | 1 | 0 | 2 | 0 |
| | | Charges | 121 | 9 | 1 | 20 | 6 | 139 | 13 | 35 | 5 | 0 | 48 | 0 |
| | | Grand Total Dispositions | 63 | 2 | 1 | 16 | 3 | 134 | 12 | 26 | 1 | 0 | 32 | 0 |
| | | Total Non-Trial Dispositions | 63 | 2 | 1 | 16 | 3 | 134 | 12 | 26 | 1 | 0 | 32 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3rd Judicial District | Lyon County | Lyon County District Court — New Filings (cases) | 8 | 0 | 1 | 2 | 8 | 16 | 2 | 2 | 0 | 0 | 1 | 1 |
| | | Reopened (cases) | 8 | 0 | 0 | 0 | 1 | 10 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | Charges | 11 | 0 | 1 | 2 | 8 | 20 | 4 | 2 | 0 | 0 | 2 | 0 |
| | | Grand Total Dispositions | 17 | 0 | 1 | 3 | 5 | 19 | 2 | 1 | 0 | 0 | 1 | 4 |
| | | Total Non-Trial Dispositions | 17 | 0 | 1 | 3 | 5 | 19 | 2 | 1 | 0 | 0 | 1 | 4 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Elko County District Court — New Filings (cases) | 17 | 0 | 0 | 4 | 3 | 17 | 54 | 4 | 1 | 2 | 9 | 13 |
| | | Reopened (cases) | 4 | 0 | 0 | 1 | 0 | 10 | 31 | 2 | 0 | 1 | 0 | 0 |
| | | Charges | 22 | 0 | 0 | 6 | 3 | 28 | 57 | 7 | 1 | 2 | 14 | 0 |
| | | Grand Total Dispositions | 30 | 0 | 0 | 9 | 3 | 22 | 93 | 7 | 1 | 3 | 5 | 11 |
| | | Total Non-Trial Dispositions | 30 | 0 | 0 | 9 | 3 | 22 | 93 | 7 | 1 | 3 | 5 | 11 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]    Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

**District Court, Criminal Caseload, Gross Misdemeanor (2 of 3)**

| Judicial District | County | Court | Measure | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor | Criminal Appeal from Limited Jurisdiction Courts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5th Judicial District | Esmeralda County | Esmeralda County District Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County | Nye County District Court | New Filings (cases) | 8 | 1 | 3 | 8 | 1 | 11 | 1 | 1 | 0 | 0 | 3 | 0 |
| | | | Reopened (cases) | 0 | 0 | 1 | 1 | 0 | 7 | 0 | 0 | 0 | 1 | 1 | 0 |
| | | | Charges | 8 | 1 | 3 | 8 | 1 | 11 | 1 | 2 | 0 | 0 | 3 | 0 |
| | | | Grand Total Dispositions | 2 | 2 | 1 | 5 | 0 | 14 | 0 | 2 | 0 | 0 | 3 | 0 |
| | | | Total Non-Trial Dispositions | 2 | 2 | 1 | 5 | 0 | 14 | 0 | 2 | 0 | 0 | 3 | 0 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | Humboldt County District Court | New Filings (cases) | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 4 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | | Grand Total Dispositions | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7th Judicial District | Eureka County | Eureka County District Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Lincoln County | Lincoln County District Court | New Filings (cases) | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | White Pine County District Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B1-2. Criminal Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Criminal Caseload, Gross Misdemeanor (3 of 3) | | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor | Criminal Appeal from Limited Jurisdiction Courts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District | Clark County | Clark County District Court | New Filings (cases) | 391 | 12 | 2 | 185 | 2 | 504 | 3 | 155 | 43 | 1 | 204 | 26 |
| | | | Reopened (cases) | 142 | 4 | 0 | 59 | 5 | 179 | 0 | 41 | 3 | 0 | 36 | 1 |
| | | | Charges | 492 | 28 | 4 | 203 | 15 | 623 | 4 | 256 | 52 | 1 | 245 | 0 |
| | | | Grand Total Dispositions | 522 | 15 | 3 | 242 | 5 | 685 | 4 | 206 | 30 | 3 | 248 | 39 |
| | | | Total Non-Trial Dispositions | 522 | 15 | 3 | 242 | 5 | 684 | 4 | 206 | 30 | 3 | 246 | 39 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 9th Judicial District | Douglas County | Douglas County District Court | New Filings (cases) | 4 | 0 | 0 | 2 | 0 | 8 | 1 | 1 | 0 | 0 | 4 | 0 |
| | | | Reopened (cases) | 5 | 0 | 0 | 5 | 0 | 4 | 2 | 0 | 1 | 1 | 1 | 0 |
| | | | Charges | 5 | 0 | 0 | 4 | 0 | 11 | 4 | 2 | 0 | 0 | 6 | 0 |
| | | | Grand Total Dispositions | 8 | 0 | 0 | 9 | 1 | 7 | 4 | 0 | 0 | 0 | 2 | 2 |
| | | | Total Non-Trial Dispositions | 8 | 0 | 0 | 9 | 1 | 7 | 4 | 0 | 0 | 0 | 2 | 2 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10th Judicial District | Churchill County | Churchill County District Court | New Filings (cases) | 7 | 0 | 0 | 1 | 0 | 12 | 2 | 1 | 0 | 0 | 2 | 1 |
| | | | Reopened (cases) | 2 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 2 | 0 |
| | | | Charges | 7 | 0 | 0 | 1 | 0 | 16 | 2 | 1 | 0 | 0 | 2 | 0 |
| | | | Grand Total Dispositions | 10 | 0 | 0 | 1 | 0 | 12 | 4 | 2 | 0 | 0 | 2 | 1 |
| | | | Total Non-Trial Dispositions | 10 | 0 | 0 | 1 | 0 | 12 | 4 | 2 | 0 | 0 | 2 | 1 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District | Lander County | Lander County District Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court | New Filings (cases) | 1 | 0 | 1 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 2 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 2 | 0 | 1 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 2 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 2 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 8 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 2 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 8 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 2 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Charges | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 |
| | | | Grand Total Dispositions [b] | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | [b] |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[b]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-1. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Civil Caseload, Aggregate (1 of 2) | | | Real Property | Tort | Probate | Construction Defect | Contract | Judicial Review/ Appeal | Civil Writ | Other Civil | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada District Courts | New Filings (cases) | 1,355 | 7,749 | 7,215 | 42 | 2,740 | 2,441 | 568 | 5,690 | 27,800 |
| | | Reopened (cases) | 152 | 714 | 679 | 1 | 325 | 173 | 50 | 671 | 2,765 |
| | | Grand Total Dispositions | 1,443 | 10,793 | 5,611 | 26 | 4,020 | 2,414 | 633 | 6,792 | 31,732 |
| | | Total Non-Trial Dispositions | 1,397 | 10,595 | 5,608 | 23 | 3,964 | 2,413 | 632 | 6,761 | 31,393 |
| | | Total Bench Trial Dispositions | 37 | 28 | 3 | 2 | 54 | 1 | 1 | 22 | 148 |
| | | Total Jury Trial Dispositions | 9 | 170 | 0 | 1 | 2 | 0 | 0 | 9 | 191 |
| 1st Judicial District | Carson City District Court | New Filings (cases) | 7 | 66 | 153 | 1 | 25 | 60 | 5 | 82 | 399 |
| | | Reopened (cases) | 1 | 6 | 111 | 0 | 5 | 3 | 2 | 12 | 140 |
| | | Grand Total Dispositions | 10 | 61 | 255 | 0 | 34 | 64 | 11 | 80 | 515 |
| | | Total Non-Trial Dispositions | 9 | 59 | 254 | 0 | 34 | 64 | 11 | 80 | 511 |
| | | Total Bench Trial Dispositions | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County District Court | New Filings (cases) | 5 | 1 | 16 | 0 | 5 | 2 | 0 | 3 | 32 |
| | | Reopened (cases) | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Grand Total Dispositions | 5 | 4 | 8 | 0 | 4 | 2 | 0 | 2 | 25 |
| | | Total Non-Trial Dispositions | 5 | 4 | 8 | 0 | 4 | 2 | 0 | 2 | 25 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County District Court | New Filings (cases) | 42 | 381 | 938 | 4 | 160 | 295 | 14 | 1,118 | 2,952 |
| | | Reopened (cases) | 4 | 30 | 7 | 0 | 63 | 16 | 1 | 170 | 291 |
| | | Grand Total Dispositions | 50 | 477 | 1,111 | 1 | 181 | 165 | 8 | 1,101 | 3,094 |
| | | Total Non-Trial Dispositions | 50 | 473 | 1,111 | 1 | 181 | 165 | 8 | 1,098 | 3,087 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | Total Jury Trial Dispositions | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 6 |
| 3rd Judicial District | Lyon County District Court | New Filings (cases) | 23 | 20 | 201 | 0 | 19 | 14 | 3 | 34 | 314 |
| | | Reopened (cases) | 2 | 0 | 13 | 0 | 0 | 1 | 1 | 2 | 19 |
| | | Grand Total Dispositions | 26 | 15 | 187 | 0 | 23 | 13 | 6 | 31 | 301 |
| | | Total Non-Trial Dispositions | 25 | 15 | 187 | 0 | 23 | 13 | 6 | 31 | 300 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 4th Judicial District | Elko County District Court | New Filings (cases) | 10 | 27 | 197 | 1 | 28 | 25 | 12 | 30 | 330 |
| | | Reopened (cases) | 0 | 0 | 91 | 0 | 0 | 0 | 2 | 3 | 96 |
| | | Grand Total Dispositions | 8 | 30 | 287 | 1 | 31 | 22 | 19 | 27 | 425 |
| | | Total Non-Trial Dispositions | 8 | 30 | 287 | 1 | 31 | 22 | 19 | 27 | 425 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5th Judicial District | Esmeralda County District Court | New Filings (cases) | 3 | 1 | 13 | 0 | 0 | 0 | 2 | 4 | 23 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 4 | 1 | 6 |
| | | Total Non-Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 4 | 1 | 6 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County District Court | New Filings (cases) | 30 | 39 | 346 | 2 | 39 | 15 | 5 | 43 | 519 |
| | | Reopened (cases) | 0 | 0 | 100 | 0 | 1 | 0 | 0 | 4 | 105 |
| | | Grand Total Dispositions | 17 | 29 | 282 | 0 | 32 | 9 | 5 | 28 | 402 |
| | | Total Non-Trial Dispositions | 17 | 27 | 282 | 0 | 32 | 9 | 5 | 27 | 399 |
| | | Total Bench Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| | | Total Jury Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 6th Judicial District | Humboldt County District Court | New Filings (cases) | 16 | 5 | 68 | 0 | 13 | 19 | 7 | 21 | 149 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| | | Grand Total Dispositions | 13 | 5 | 66 | 0 | 15 | 11 | 7 | 21 | 138 |
| | | Total Non-Trial Dispositions | 13 | 5 | 66 | 0 | 14 | 11 | 6 | 19 | 134 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 4 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B2-1. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court, Civil Caseload, Aggregate (2 of 2) | | | Real Property | Tort | Probate | Construction Defect | Contract | Judicial Review/Appeal | Civil Writ | Other Civil | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **7th Judicial District** | Eureka County | Eureka County District Court | New Filings (cases) | 1 | 4 | 10 | 0 | 0 | 0 | 0 | 2 | 17 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 5 | 15 |
| | | | Total Non-Trial Dispositions | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 5 | 15 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Lincoln County | Lincoln County District Court | New Filings (cases) | 6 | 1 | 11 | 0 | 1 | 0 | 0 | 3 | 22 |
| | | | Reopened (cases) | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Grand Total Dispositions | 1 | 1 | 8 | 0 | 0 | 1 | 2 | 2 | 15 |
| | | | Total Non-Trial Dispositions | 1 | 1 | 8 | 0 | 0 | 1 | 2 | 2 | 15 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | White Pine County District Court | New Filings (cases) | 8 | 5 | 38 | 0 | 2 | 6 | 10 | 13 | 82 |
| | | | Reopened (cases) | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | | Grand Total Dispositions | 12 | 8 | 39 | 0 | 5 | 5 | 17 | 15 | 101 |
| | | | Total Non-Trial Dispositions | 12 | 8 | 39 | 0 | 5 | 5 | 17 | 15 | 101 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **8th Judicial District** | Clark County | Clark County District Court | New Filings (cases) | 1,162 | 7,155 | 4,896 | 33 | 2,392 | 1,956 | 487 | 4,219 | 22,300 |
| | | | Reopened (cases) | 131 | 673 | 123 | 1 | 250 | 152 | 44 | 470 | 1,844 |
| | | | Grand Total Dispositions | 1,258 | 10,105 | 2,878 | 24 | 3,611 | 2,072 | 526 | 5,351 | 25,825 |
| | | | Total Non-Trial Dispositions | 1,215 | 9,915 | 2,877 | 21 | 3,557 | 2,071 | 526 | 5,328 | 25,510 |
| | | | Total Bench Trial Dispositions | 35 | 25 | 1 | 2 | 52 | 1 | 0 | 18 | 134 |
| | | | Total Jury Trial Dispositions | 8 | 165 | 0 | 1 | 2 | 0 | 0 | 5 | 181 |
| **9th Judicial District** | Douglas County | Douglas County District Court | New Filings (cases) | 20 | 33 | 165 | 1 | 40 | 21 | 1 | 38 | 319 |
| | | | Reopened (cases) | 12 | 3 | 139 | 0 | 4 | 1 | 0 | 4 | 163 |
| | | | Grand Total Dispositions | 29 | 38 | 268 | 0 | 70 | 18 | 1 | 53 | 477 |
| | | | Total Non-Trial Dispositions | 29 | 38 | 267 | 0 | 70 | 18 | 1 | 52 | 475 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **10th Judicial District** | Churchill County | Churchill County District Court | New Filings (cases) | 11 | 6 | 72 | 0 | 11 | 22 | 1 | 34 | 157 |
| | | | Reopened (cases) | 0 | 1 | 82 | 0 | 0 | 0 | 0 | 1 | 84 |
| | | | Grand Total Dispositions | 11 | 13 | 146 | 0 | 9 | 25 | 1 | 15 | 220 |
| | | | Total Non-Trial Dispositions | 10 | 13 | 146 | 0 | 8 | 25 | 1 | 15 | 218 |
| | | | Total Bench Trial Dispositions | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **11th Judicial District** | Lander County | Lander County District Court | New Filings (cases) | 2 | 1 | 37 | 0 | 4 | 1 | 0 | 7 | 52 |
| | | | Reopened (cases) | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 4 |
| | | | Grand Total Dispositions | 1 | 1 | 21 | 0 | 3 | 0 | 0 | 6 | 32 |
| | | | Total Non-Trial Dispositions | 1 | 1 | 21 | 0 | 3 | 0 | 0 | 6 | 32 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court | New Filings (cases) | 4 | 1 | 23 | 0 | 0 | 2 | 0 | 19 | 49 |
| | | | Reopened (cases) | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| | | | Grand Total Dispositions | 0 | 0 | 16 | 0 | 0 | 3 | 0 | 14 | 33 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 16 | 0 | 0 | 3 | 0 | 14 | 33 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court | New Filings (cases) | 5 | 3 | 31 | 0 | 1 | 3 | 21 | 20 | 84 |
| | | | Reopened (cases) | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 4 | 9 |
| | | | Grand Total Dispositions | 2 | 5 | 29 | 0 | 2 | 4 | 26 | 40 | 108 |
| | | | Total Non-Trial Dispositions | 2 | 5 | 29 | 0 | 2 | 4 | 26 | 39 | 107 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

District Court Civil Caseload, Real Property and Tort (1 of 3)

| | | | Real Property | | | | | | Tort | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unlawful Detainer | Other Landlord/Tenant | Judicial Foreclosure | Other Title to Property | Condemnation/Eminent Domain | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Medical/Dental | Legal | Accounting | Other Malpractice | Product Liability | Intentional Misconduct | Employment Tort | Insurance Tort | Other Tort |
| **Totals** [a] | **Nevada District Courts** | **New Filings (cases)** | 23 | 94 | 168 | 759 | 1 | 310 | 5,142 | 1,241 | 464 | 155 | 24 | 11 | 3 | 48 | 165 | 120 | 119 | 257 |
| | | Reopened (cases) | 3 | 15 | 7 | 78 | 5 | 44 | 385 | 111 | 51 | 27 | 8 | 0 | 0 | 7 | 34 | 10 | 47 | 34 |
| | | **Grand Total Dispositions** | 34 | 151 | 133 | 766 | 16 | 343 | 7,298 | 1,656 | 589 | 247 | 31 | 5 | 3 | 78 | 257 | 114 | 138 | 377 |
| | | Total Non-Trial Dispositions | 34 | 147 | 130 | 736 | 14 | 336 | 7,170 | 1,638 | 577 | 233 | 31 | 5 | 3 | 77 | 243 | 114 | 136 | 368 |
| | | Total Bench Trial Dispositions | 0 | 4 | 2 | 25 | 0 | 6 | 12 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 2 |
| | | Total Jury Trial Dispositions | 0 | 0 | 1 | 5 | 2 | 1 | 116 | 16 | 8 | 14 | 0 | 0 | 0 | 1 | 6 | 0 | 2 | 7 |
| **1st Judicial District** | **Carson City** | **Carson City District Court** — **New Filings (cases)** | 0 | 1 | 1 | 1 | 0 | 4 | 45 | 9 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 6 |
| | | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 |
| | | **Grand Total Dispositions** | 0 | 2 | 0 | 3 | 0 | 5 | 40 | 7 | 3 | 2 | 0 | 0 | 1 | 0 | 3 | 0 | 1 | 4 |
| | | Total Non-Trial Dispositions | 0 | 2 | 0 | 2 | 0 | 5 | 38 | 7 | 3 | 2 | 0 | 0 | 1 | 0 | 3 | 0 | 1 | 4 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Storey County** | **Storey County District Court** — **New Filings (cases)** | 0 | 0 | 1 | 2 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | **Grand Total Dispositions** | 0 | 0 | 1 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| | | Total Non-Trial Dispositions | 0 | 0 | 1 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2nd Judicial District** | **Washoe County** | **Washoe County District Court** — **New Filings (cases)** | 1 | 6 | 2 | 33 | 0 | 0 | 249 | 43 | 33 | 5 | 1 | 0 | 0 | 3 | 7 | 6 | 10 | 24 |
| | | Reopened (cases) | 2 | 0 | 0 | 2 | 0 | 0 | 16 | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 2 |
| | | **Grand Total Dispositions** | 0 | 7 | 13 | 30 | 0 | 0 | 313 | 50 | 44 | 10 | 2 | 2 | 0 | 5 | 14 | 3 | 7 | 27 |
| | | Total Non-Trial Dispositions | 0 | 7 | 13 | 30 | 0 | 0 | 310 | 50 | 44 | 10 | 2 | 2 | 0 | 4 | 14 | 3 | 7 | 27 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| **3rd Judicial District** | **Lyon County** | **Lyon County District Court** — **New Filings (cases)** | 0 | 1 | 2 | 10 | 0 | 10 | 12 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Grand Total Dispositions** | 0 | 1 | 1 | 9 | 3 | 12 | 5 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 2 |
| | | Total Non-Trial Dispositions | 0 | 1 | 1 | 9 | 3 | 11 | 5 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 2 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **4th Judicial District** | **Elko County** | **Elko County District Court** — **New Filings (cases)** | 0 | 0 | 0 | 5 | 0 | 5 | 16 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Grand Total Dispositions** | 0 | 0 | 1 | 4 | 0 | 3 | 14 | 8 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 1 |
| | | Total Non-Trial Dispositions | 0 | 0 | 1 | 4 | 0 | 3 | 14 | 8 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court Civil Caseload, Real Property and Tort (2 of 3) | | | Real Property | | | | | | Tort | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unlawful Detainer | Other Landlord/Tenant | Judicial Foreclosure | Other Title to Property | Condemnation/Eminent Domain | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Medical/Dental | Legal | Accounting | Other Malpractice | Product Liability | Intentional Misconduct | Employment Tort | Insurance Tort | Other Tort |
| **5th Judicial District** — Esmeralda County — Esmeralda County District Court | **New Filings (cases)** | | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Non-Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nye County — Nye County District Court | **New Filings (cases)** | | 0 | 0 | 3 | 21 | 0 | 6 | 15 | 6 | 5 | 0 | 0 | 5 | 0 | 2 | 0 | 0 | 1 | 5 |
| | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 3 | 12 | 0 | 2 | 15 | 1 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| | Total Non-Trial Dispositions | | 0 | 0 | 3 | 12 | 0 | 2 | 14 | 1 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **6th Judicial District** — Humboldt County — Humboldt County District Court | **New Filings (cases)** | | 0 | 0 | 0 | 11 | 0 | 5 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | Reopened (cases) | | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 1 | 10 | 0 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Total Non-Trial Dispositions | | 0 | 0 | 1 | 10 | 0 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **7th Judicial District** — Eureka County — Eureka County District Court | **New Filings (cases)** | | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Non-Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lincoln County — Lincoln County District Court | **New Filings (cases)** | | 0 | 0 | 0 | 3 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Non-Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| White Pine County — White Pine County District Court | **New Filings (cases)** | | 0 | 0 | 0 | 3 | 0 | 5 | 1 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | | 0 | 0 | 0 | 9 | 0 | 3 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 |
| | Total Non-Trial Dispositions | | 0 | 0 | 0 | 9 | 0 | 3 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 |
| | Total Bench Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court Civil Caseload, Real Property and Tort (3 of 3) | | | Real Property | | | | | | Tort | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unlawful Detainer | Other Landlord/Tenant | Judicial Foreclosure | Other Title to Property | Condemnation/Eminent Domain | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Medical/Dental | Legal | Accounting | Other Malpractice | Product Liability | Intentional Misconduct | Employment Tort | Insurance Tort | Other Tort |
| 8th Judicial District | Clark County | Clark County District Court — New Filings (cases) | 22 | 85 | 156 | 645 | 1 | 253 | 4,782 | 1,166 | 404 | 145 | 23 | 2 | 3 | 43 | 154 | 110 | 105 | 218 |
| | | Reopened (cases) | 1 | 14 | 7 | 63 | 4 | 42 | 365 | 105 | 47 | 25 | 7 | 0 | 0 | 7 | 30 | 9 | 47 | 31 |
| | | Grand Total Dispositions | 34 | 140 | 109 | 668 | 13 | 294 | 6,876 | 1,578 | 518 | 231 | 29 | 1 | 2 | 69 | 234 | 110 | 127 | 330 |
| | | Total Non-Trial Dispositions | 34 | 136 | 106 | 639 | 11 | 289 | 6,754 | 1,560 | 507 | 217 | 29 | 1 | 2 | 69 | 220 | 110 | 125 | 321 |
| | | Total Bench Trial Dispositions | 0 | 4 | 2 | 24 | 0 | 5 | 9 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 2 |
| | | Total Jury Trial Dispositions | 0 | 0 | 1 | 5 | 2 | 0 | 113 | 16 | 7 | 14 | 0 | 0 | 0 | 0 | 6 | 0 | 2 | 7 |
| 9th Judicial District | Douglas County | Douglas County District Court — New Filings (cases) | 0 | 1 | 3 | 8 | 0 | 8 | 14 | 5 | 10 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 11 | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 1 | 4 | 12 | 0 | 12 | 19 | 9 | 7 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 1 | 4 | 12 | 0 | 12 | 19 | 9 | 7 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10th Judicial District | Churchill County | Churchill County District Court — New Filings (cases) | 0 | 0 | 0 | 6 | 0 | 5 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 3 | 0 | 8 | 7 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 3 | 0 | 7 | 7 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District | Lander County | Lander County District Court — New Filings (cases) | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court — New Filings (cases) | 0 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court — New Filings (cases) | 0 | 0 | 0 | 3 | 0 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court Civil Caseload, Probate, Construction Defect, and Contract (1 of 3) | | | Probate | | | | | | Construction Defect | | Contract | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Summary Administration | General Administration | Special Administration | Set Aside | Probate Trust/Conservatorship | Other Probate | Chapter 40 | Other Construction Defect | Uniform Commercial Code (UCC) | Building and Construction | Insurance Carrier | Commercial Instrument | Collection of Accounts | Employment Contract | Other Contract |
| Totals [a] | Nevada District Courts | New Filings (cases) | 1,685 | 1,363 | 1,372 | 1,469 | 323 | 1,003 | 33 | 9 | 23 | 53 | 131 | 23 | 1,480 | 33 | 997 |
| | | Reopened (cases) | 205 | 173 | 195 | 45 | 17 | 44 | 0 | 1 | 2 | 6 | 23 | 6 | 187 | 3 | 98 |
| | | Grand Total Dispositions | 1,450 | 1,164 | 842 | 1,203 | 139 | 813 | 22 | 4 | 28 | 53 | 183 | 70 | 2,286 | 44 | 1,356 |
| | | Total Non-Trial Dispositions | 1,450 | 1,164 | 839 | 1,203 | 139 | 813 | 20 | 3 | 27 | 49 | 183 | 69 | 2,279 | 44 | 1,313 |
| | | Total Bench Trial Dispositions | 0 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 1 | 3 | 0 | 1 | 7 | 0 | 42 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 1st Judicial District | Carson City | Carson City District Court New Filings (cases) | 31 | 41 | 30 | 33 | 7 | 11 | 0 | 1 | 2 | 3 | 2 | 0 | 12 | 0 | 6 |
| | | Reopened (cases) | 31 | 44 | 29 | 2 | 4 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 1 |
| | | Grand Total Dispositions | 57 | 93 | 46 | 36 | 13 | 10 | 0 | 0 | 2 | 0 | 3 | 0 | 24 | 0 | 5 |
| | | Total Non-Trial Dispositions | 57 | 93 | 45 | 36 | 13 | 10 | 0 | 0 | 2 | 0 | 3 | 0 | 24 | 0 | 5 |
| | | Total Bench Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County | Storey County District Court New Filings (cases) | 6 | 4 | 2 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 1 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 |
| | | Total Non-Trial Dispositions | 2 | 1 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court New Filings (cases) | 175 | 252 | 176 | 192 | 47 | 96 | 3 | 1 | 2 | 8 | 1 | 0 | 109 | 4 | 36 |
| | | Reopened (cases) | 2 | 0 | 1 | 1 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 58 | 0 | 4 |
| | | Grand Total Dispositions | 224 | 304 | 229 | 202 | 51 | 101 | 1 | 0 | 2 | 7 | 1 | 0 | 135 | 1 | 35 |
| | | Total Non-Trial Dispositions | 224 | 304 | 229 | 202 | 51 | 101 | 1 | 0 | 2 | 7 | 1 | 0 | 135 | 1 | 35 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3rd Judicial District | Lyon County | Lyon County District Court New Filings (cases) | 49 | 48 | 30 | 52 | 9 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 4 |
| | | Reopened (cases) | 2 | 2 | 5 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 52 | 24 | 40 | 52 | 8 | 11 | 0 | 0 | 0 | 1 | 0 | 0 | 16 | 0 | 6 |
| | | Total Non-Trial Dispositions | 52 | 24 | 40 | 52 | 8 | 11 | 0 | 0 | 0 | 1 | 0 | 0 | 16 | 0 | 6 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Elko County District Court New Filings (cases) | 27 | 13 | 39 | 114 | 3 | 1 | 0 | 1 | 1 | 2 | 3 | 0 | 11 | 1 | 10 |
| | | Reopened (cases) | 42 | 16 | 26 | 4 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 72 | 27 | 63 | 118 | 3 | 4 | 0 | 1 | 0 | 1 | 2 | 0 | 19 | 0 | 9 |
| | | Total Non-Trial Dispositions | 72 | 27 | 63 | 118 | 3 | 4 | 0 | 0 | 0 | 1 | 2 | 0 | 19 | 0 | 9 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court Civil Caseload, Probate, Construction Defect, and Contract (2 of 3) | | | Probate | | | | | | Construction Defect | | Contract | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Summary Administration | General Administration | Special Administration | Set Aside | Probate Trust/Conservatorship | Other Probate | Chapter 40 | Other Construction Defect | Uniform Commercial Code (UCC) | Building and Construction | Insurance Carrier | Commercial Instrument | Collection of Accounts | Employment Contract | Other Contract |
| 5th Judicial District | Esmeralda County | **Esmeralda County District Court** New Filings (cases) | 0 | 0 | 0 | 8 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County | **Nye County District Court** New Filings (cases) | 55 | 14 | 85 | 70 | 20 | 102 | 0 | 2 | 0 | 0 | 0 | 0 | 23 | 1 | 15 |
| | | Reopened (cases) | 21 | 4 | 51 | 3 | 1 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | Grand Total Dispositions | 50 | 12 | 90 | 54 | 10 | 66 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 9 |
| | | Total Non-Trial Dispositions | 50 | 12 | 90 | 54 | 10 | 66 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 9 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | **Humboldt County District Court** New Filings (cases) | 18 | 6 | 11 | 30 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 1 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | Grand Total Dispositions | 16 | 4 | 19 | 25 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 4 |
| | | Total Non-Trial Dispositions | 16 | 4 | 19 | 25 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 3 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7th Judicial District | Eureka County | **Eureka County District Court** New Filings (cases) | 0 | 4 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 4 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 4 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Lincoln County | **Lincoln County District Court** New Filings (cases) | 1 | 4 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 5 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 5 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | **White Pine County District Court** New Filings (cases) | 8 | 4 | 6 | 14 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 7 | 3 | 7 | 16 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 |
| | | Total Non-Trial Dispositions | 7 | 3 | 7 | 16 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court Civil Caseload, Probate, Construction Defect, and Contract (3 of 3) | | | Probate | | | | | | Construction Defect | | Contract | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Summary Administration | General Administration | Special Administration | Set Aside | Probate Trust/Conservatorship | Other Probate | Chapter 40 | Other Construction Defect | Uniform Commercial Code (UCC) | Building and Construction | Insurance Carrier | Commercial Instrument | Collection of Accounts | Employment Contract | Other Contract |
| **8th Judicial District** / **Clark County** / **Clark County District Court** | New Filings (cases) | 1,247 | 903 | 937 | 845 | 219 | 745 | 30 | 3 | 18 | 39 | 125 | 23 | 1,289 | 25 | 873 |
| | Reopened (cases) | 25 | 23 | 30 | 28 | 5 | 12 | 0 | 1 | 2 | 4 | 21 | 6 | 123 | 3 | 91 |
| | Grand Total Dispositions | 829 | 546 | 253 | 616 | 37 | 597 | 21 | 3 | 24 | 44 | 177 | 70 | 2,040 | 42 | 1,214 |
| | Total Non-Trial Dispositions | 829 | 546 | 252 | 616 | 37 | 597 | 19 | 2 | 23 | 40 | 177 | 69 | 2,033 | 42 | 1,173 |
| | Total Bench Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 1 | 3 | 0 | 1 | 7 | 0 | 40 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| **9th Judicial District** / **Douglas County** / **Douglas County District Court** | New Filings (cases) | 32 | 51 | 28 | 32 | 16 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 39 |
| | Reopened (cases) | 39 | 64 | 28 | 3 | 4 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | 68 | 106 | 42 | 33 | 15 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 68 |
| | Total Non-Trial Dispositions | 68 | 106 | 41 | 33 | 15 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 68 |
| | Total Bench Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **10th Judicial District** / **Churchill County** / **Churchill County District Court** | New Filings (cases) | 20 | 15 | 16 | 15 | 1 | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 5 | 0 | 5 |
| | Reopened (cases) | 41 | 18 | 19 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| | Grand Total Dispositions | 58 | 31 | 34 | 17 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 2 |
| | Total Non-Trial Dispositions | 58 | 31 | 34 | 17 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 1 |
| | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **11th Judicial District** / **Lander County** / **Lander County District Court** | New Filings (cases) | 11 | 1 | 1 | 18 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | Reopened (cases) | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | 6 | 1 | 3 | 5 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 |
| | Total Non-Trial Dispositions | 6 | 1 | 3 | 5 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 |
| | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Mineral County** / **Mineral County District Court** | New Filings (cases) | 1 | 2 | 3 | 16 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | Grand Total Dispositions | 6 | 2 | 1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Non-Trial Dispositions | 6 | 2 | 1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Pershing County** / **Pershing County District Court** | New Filings (cases) | 4 | 1 | 6 | 18 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | Reopened (cases) | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | 3 | 1 | 11 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | Total Non-Trial Dispositions | 3 | 1 | 11 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.

| District Court Civil Caseload, Judicial Review/Appeal, Civil Writ, and Other Civil (1 of 3) | | | Judicial Review/Appeal | | | | | | | Civil Writ | | | | | Other Civil | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Petition to Seal Records | Mental Competency | Department of Motor Vehicle Appeal | Worker's Compensation Appeal | Other Nevada State Agency Appeal | Appeal from Lower Court | Other Judicial Review/Appeal | Writ of Habeas Corpus | Writ of Mandamus | Writ of Quo Warranto | Writ of Prohibition | Other Civil Writ | Compromise of Minor's Claim | Foreign Judgment | Other Civil Matters |
| Totals[a] | Nevada District Courts | New Filings (cases) | 910 | 191 | 1 | 88 | 218 | 843 | 190 | 345 | 194 | 1 | 7 | 21 | 1,854 | 411 | 3,425 |
| | | Reopened (cases) | 29 | 1 | 0 | 12 | 5 | 119 | 7 | 39 | 7 | 0 | 0 | 4 | 300 | 16 | 355 |
| | | Grand Total Dispositions | 919 | 126 | 2 | 128 | 113 | 975 | 151 | 439 | 160 | 1 | 8 | 25 | 2,317 | 410 | 4,065 |
| | | Total Non-Trial Dispositions | 919 | 126 | 2 | 127 | 113 | 975 | 151 | 438 | 160 | 1 | 8 | 25 | 2,317 | 410 | 4,034 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| 1st Judicial District | Carson City | Carson City District Court — New Filings (cases) | 5 | 0 | 0 | 1 | 18 | 8 | 28 | 1 | 3 | 0 | 1 | 0 | 14 | 4 | 64 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 3 | 1 | 8 |
| | | Grand Total Dispositions | 6 | 0 | 1 | 6 | 25 | 5 | 21 | 2 | 8 | 0 | 1 | 0 | 13 | 2 | 65 |
| | | Total Non-Trial Dispositions | 6 | 0 | 1 | 6 | 25 | 5 | 21 | 2 | 8 | 0 | 1 | 0 | 13 | 2 | 65 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County | Storey County District Court — New Filings (cases) | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court — New Filings (cases) | 83 | 160 | 0 | 0 | 12 | 15 | 25 | 0 | 13 | 0 | 1 | 0 | 117 | 21 | 980 |
| | | Reopened (cases) | 8 | 1 | 0 | 2 | 2 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 169 |
| | | Grand Total Dispositions | 18 | 94 | 0 | 8 | 4 | 14 | 27 | 0 | 7 | 0 | 0 | 1 | 119 | 21 | 961 |
| | | Total Non-Trial Dispositions | 18 | 94 | 0 | 8 | 4 | 14 | 27 | 0 | 7 | 0 | 0 | 0 | 119 | 21 | 958 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 3rd Judicial District | Lyon County | Lyon County District Court — New Filings (cases) | 5 | 5 | 0 | 0 | 3 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 6 | 0 | 28 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Grand Total Dispositions | 5 | 5 | 0 | 0 | 2 | 0 | 1 | 5 | 0 | 0 | 0 | 1 | 5 | 1 | 25 |
| | | Total Non-Trial Dispositions | 5 | 5 | 0 | 0 | 2 | 0 | 1 | 5 | 0 | 0 | 0 | 1 | 5 | 1 | 25 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Elko County District Court — New Filings (cases) | 12 | 9 | 0 | 0 | 2 | 2 | 0 | 12 | 0 | 0 | 0 | 0 | 12 | 4 | 14 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| | | Grand Total Dispositions | 8 | 10 | 0 | 0 | 2 | 2 | 0 | 15 | 2 | 0 | 0 | 2 | 12 | 3 | 12 |
| | | Total Non-Trial Dispositions | 8 | 10 | 0 | 0 | 2 | 2 | 0 | 15 | 2 | 0 | 0 | 2 | 12 | 3 | 12 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]    Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court Civil Caseload, Judicial Review/Appeal, Civil Writ, and Other Civil (2 of 3) | | | Judicial Review/Appeal | | | | | | | Civil Writ | | | | | Other Civil | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Petition to Seal Records | Mental Competency | Department of Motor Vehicle Appeal | Worker's Compensation Appeal | Other Nevada State Agency Appeal | Appeal from Lower Court | Other Judicial Review/Appeal | Writ of Habeas Corpus | Writ of Mandamus | Writ of Quo Warranto | Writ of Prohibition | Other Civil Writ | Compromise of Minor's Claim | Foreign Judgment | Other Civil Matters |
| **5th Judicial District** | **Esmeralda County** | **Esmeralda County District Court** New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Nye County** | **Nye County District Court** New Filings (cases) | 9 | 0 | 0 | 0 | 0 | 2 | 4 | 0 | 4 | 0 | 0 | 1 | 7 | 10 | 26 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 |
| | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 1 | 4 | 1 | 0 | 4 | 0 | 0 | 1 | 7 | 1 | 20 |
| | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 1 | 4 | 1 | 0 | 4 | 0 | 0 | 1 | 7 | 1 | 19 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **6th Judicial District** | **Humboldt County** | **Humboldt County District Court** New Filings (cases) | 4 | 7 | 0 | 0 | 2 | 0 | 6 | 5 | 2 | 0 | 0 | 0 | 1 | 1 | 19 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 3 | 6 | 0 | 0 | 0 | 0 | 2 | 7 | 0 | 0 | 0 | 0 | 0 | 1 | 20 |
| | | Total Non-Trial Dispositions | 3 | 6 | 0 | 0 | 0 | 0 | 2 | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 18 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **7th Judicial District** | **Eureka County** | **Eureka County District Court** New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Lincoln County** | **Lincoln County District Court** New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **White Pine County** | **White Pine County District Court** New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 3 | 0 | 8 | 1 | 0 | 1 | 0 | 0 | 2 | 11 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 13 | 3 | 0 | 1 | 0 | 0 | 0 | 15 |
| | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 13 | 3 | 0 | 1 | 0 | 0 | 0 | 15 |
| | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B2-2. Civil Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court Civil Caseload, Judicial Review/Appeal, Civil Writ, and Other Civil (3 of 3) | | | | Judicial Review/Appeal | | | | | | | Civil Writ | | | | | Other Civil | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Petition to Seal Records | Mental Competency | Department of Motor Vehicle Appeal | Worker's Compensation Appeal | Other Nevada State Agency Appeal | Appeal from Lower Court | Other Judicial Review/Appeal | Writ of Habeas Corpus | Writ of Mandamus | Writ of Quo Warranto | Writ of Prohibition | Other Civil Writ | Compromise of Minor's Claim | Foreign Judgment | Other Civil Matters |
| 8th Judicial District | Clark County | Clark County District Court | New Filings (cases) | 769 | 0 | 1 | 87 | 175 | 801 | 123 | 307 | 156 | 1 | 4 | 19 | 1,688 | 362 | 2,169 |
| | | | Reopened (cases) | 19 | 0 | 0 | 10 | 2 | 116 | 5 | 37 | 4 | 0 | 0 | 3 | 290 | 13 | 167 |
| | | | Grand Total Dispositions | 852 | 0 | 1 | 114 | 76 | 932 | 97 | 385 | 118 | 1 | 6 | 16 | 2,148 | 377 | 2,826 |
| | | | Total Non-Trial Dispositions | 852 | 0 | 0 | 113 | 76 | 932 | 97 | 385 | 118 | 1 | 6 | 16 | 2,148 | 377 | 2,803 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 9th Judicial District | Douglas County | Douglas County District Court | New Filings (cases) | 10 | 0 | 0 | 0 | 2 | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 3 | 5 | 30 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 |
| | | | Grand Total Dispositions | 8 | 0 | 0 | 0 | 2 | 6 | 2 | 1 | 0 | 0 | 0 | 0 | 5 | 3 | 45 |
| | | | Total Non-Trial Dispositions | 8 | 0 | 0 | 0 | 2 | 6 | 2 | 1 | 0 | 0 | 0 | 0 | 5 | 3 | 44 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 10th Judicial District | Churchill County | Churchill County District Court | New Filings (cases) | 6 | 9 | 0 | 0 | 2 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 5 | 0 | 29 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Grand Total Dispositions | 8 | 10 | 0 | 0 | 0 | 7 | 0 | 0 | 1 | 0 | 0 | 0 | 6 | 0 | 9 |
| | | | Total Non-Trial Dispositions | 8 | 10 | 0 | 0 | 0 | 7 | 0 | 0 | 1 | 0 | 0 | 0 | 6 | 0 | 9 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District | Lander County | Lander County District Court | New Filings (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Mineral County District Court | New Filings (cases) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 17 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Pershing County District Court | New Filings (cases) | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 9 | 11 | 0 | 0 | 1 | 0 | 0 | 20 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | | Grand Total Dispositions | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 5 | 17 | 0 | 0 | 4 | 0 | 0 | 40 |
| | | | Total Non-Trial Dispositions | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 5 | 17 | 0 | 0 | 4 | 0 | 0 | 39 |
| | | | Total Bench Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Jury Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B3. Family Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Family Caseload (1 of 3) | | | Domestic Relations Case | | | | | | Support | | | TPR[a] | | Protection Orders | | | | Mental Health Case | Guardianships Case | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Marriage Dissolution | Paternity | Visitation (Non-Divorce) | Adoptions | Custody (Non-Divorce) | IV-D UIFSA | IV-D Intrastate | Other Support | State Initiated (TPR) Petition | Other (TPR) Petition | Request for Domestic Violence Protective Orders (TPOs) | High-Risk Protection Orders | Other Domestic Relations | | | |
| Totals[b] | Nevada District Courts | New Filings (cases) | 16,711 | 536 | 126 | 1,185 | 3,951 | 966 | 3,665 | 34 | 132 | 504 | 12,393 | 8 | 3,196 | 7,987 | 2,651 | 54,045 |
| | | Reopened (cases) | 4,837 | 214 | 18 | 82 | 2,368 | 1,397 | 1,359 | 67 | 5 | 52 | 946 | 0 | 248 | 4,929 | 2,176 | 18,698 |
| | | Grand Total Dispositions | 21,828 | 719 | 142 | 1,213 | 6,063 | 1,637 | 3,938 | 87 | 117 | 584 | 12,429 | 8 | 3,414 | 11,195 | 5,500 | 68,874 |
| | | Total Non-Trial Dispositions | 21,341 | 697 | 134 | 1,108 | 5,763 | 1,629 | 3,925 | 86 | 112 | 555 | 12,429 | 8 | 3,386 | 10,989 | 5,278 | 67,440 |
| | | Total Trial Dispositions | 487 | 22 | 8 | 105 | 300 | 8 | 13 | 1 | 5 | 29 | 0 | 0 | 28 | 206 | 222 | 1,434 |
| 1st Judicial District | Carson City | Carson City District Court | New Filings (cases) | 358 | 3 | 0 | 62 | 119 | 5 | 49 | 9 | 41 | 18 | 105 | 0 | 78 | 124 | 79 | 1,050 |

| 1st Judicial District | Carson City | Carson City District Court | New Filings (cases) | 358 | 3 | 0 | 62 | 119 | 5 | 49 | 9 | 41 | 18 | 105 | 0 | 78 | 124 | 79 | 1,050 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Reopened (cases) | 123 | 0 | 0 | 4 | 69 | 132 | 106 | 61 | 4 | 3 | 5 | 0 | 3 | 0 | 149 | 659 |
| | | Grand Total Dispositions | 416 | 3 | 0 | 60 | 132 | 131 | 163 | 71 | 37 | 21 | 100 | 0 | 62 | 104 | 243 | 1,543 |
| | | Total Non-Trial Dispositions | 415 | 3 | 0 | 60 | 130 | 131 | 163 | 71 | 37 | 20 | 100 | 0 | 62 | 104 | 243 | 1,539 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| | Storey County | Storey County District Court | New Filings (cases) | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 5 | 22 |
| | | Reopened (cases) | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 7 |
| | | Grand Total Dispositions | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 13 |
| | | Total Non-Trial Dispositions | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 13 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court | New Filings (cases) | 1,812 | 27 | 31 | 150 | 487 | 478[c] | (c) | 0 | 91 | 0 | 1,960 | 2 | 108 | 2,068 | 441 | 7,655 |
| | | Reopened (cases) | 670 | 19 | 6 | 7 | 384 | 636 | | 0 | 1 | 2 | 59 | 0 | 3 | 1 | 73 | 1,861 |
| | | Grand Total Dispositions | 1,826 | 28 | 31 | 149 | 456 | 621 | | 0 | 75 | 0 | 2,046 | 2 | 101 | 2,237 | 484 | 8,056 |
| | | Total Non-Trial Dispositions | 1,780 | 26 | 30 | 71 | 419 | 621 | | 0 | 70 | 0 | 2,046 | 2 | 97 | 2,032 | 285 | 7,479 |
| | | Total Trial Dispositions | 46 | 2 | 1 | 78 | 37 | 0 | | 0 | 5 | 0 | 0 | 0 | 4 | 205 | 199 | 577 |
| 3rd Judicial District | Lyon County | Lyon County District Court | New Filings (cases) | 178 | 1 | 0 | 9 | 55 | 25 | 77 | 0 | 0 | 10 | 4 | ND | 39 | 0 | 44 | 442 |
| | | Reopened (cases) | 62 | 0 | 0 | 0 | 41 | 40 | 117 | 0 | 0 | 1 | 0 | | 0 | 0 | 169 | 430 |
| | | Grand Total Dispositions | 232 | 0 | 0 | 9 | 90 | 67 | 212 | 0 | 0 | 9 | 3 | | 47 | 0 | 206 | 875 |
| | | Total Non-Trial Dispositions | 232 | 0 | 0 | 9 | 90 | 67 | 212 | 0 | 0 | 9 | 3 | | 47 | 0 | 206 | 875 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Elko County District Court | New Filings (cases) | 211 | 4 | 2 | 46 | 59 | 15 | 88 | 0 | 0 | 17 | 29 | 0 | 47 | 0 | 41 | 559 |
| | | Reopened (cases) | 81 | 2 | 0 | 5 | 13 | 41 | 93 | 5 | 0 | 2 | 4 | 0 | 3 | 0 | 213 | 462 |
| | | Grand Total Dispositions | 275 | 13 | 5 | 46 | 79 | 52 | 188 | 6 | 2 | 26 | 34 | 0 | 52 | 0 | 262 | 1,040 |
| | | Total Non-Trial Dispositions | 251 | 12 | 3 | 46 | 67 | 52 | 188 | 5 | 2 | 26 | 34 | 0 | 52 | 0 | 262 | 1,000 |
| | | Total Trial Dispositions | 24 | 1 | 2 | 0 | 12 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

[a] NRS Chapter 128 allows termination of parental rights through motion in existing juvenile child abuse and neglect cases (Table B4). These terminations through motion are not captured in the USJR statistics.

[b] Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.

[c] All IV-D matters reported in the IV-D UIFSA case type.

ND   No Data.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B3. Family Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Family Caseload (2 of 3) | | | Marriage Dissolution | Paternity | Visitation (Non-Divorce) | Adoptions | Custody (Non-Divorce) | IV-D UIFSA | IV-D Intrastate | Other Support | State Initiated (TPR) Petition | Other (TPR) Petition | Request for Domestic Violence Protective Orders (TPOs) | High-Risk Protection Orders | Other Domestic Relations | Mental Health Case | Guardianships Case | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5th Judicial District | Esmeralda County | Esmeralda County District Court — New Filings (cases) | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ND | 0 | 0 | 1 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 2 |
| | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| | Nye County | Nye County District Court — New Filings (cases) | 285 | 5 | 2 | 11 | 41 | 62 | 16 | 0 | 0 | 8 | 1 | 0 | 40 | 0 | 40 | 511 |
| | | Reopened (cases) | 17 | 1 | 0 | 0 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 | 30 |
| | | Grand Total Dispositions | 285 | 3 | 0 | 8 | 21 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 34 | 0 | 17 | 375 |
| | | Total Non-Trial Dispositions | 277 | 3 | 0 | 5 | 21 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 31 | 0 | 16 | 360 |
| | | Total Trial Dispositions | 8 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 15 |
| 6th Judicial District | Humboldt County | Humboldt County District Court — New Filings (cases) | 223 | 1 | 0 | 11 | 22 | 6 | 21 | 19 | 0 | 7 | 20 | 0 | 18 | 0 | 17 | 365 |
| | | Reopened (cases) | 18 | 2 | 0 | 0 | 2 | 11 | 30 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 64 |
| | | Grand Total Dispositions | 218 | 7 | 0 | 10 | 17 | 14 | 30 | 5 | 0 | 3 | 20 | 0 | 14 | 0 | 20 | 358 |
| | | Total Non-Trial Dispositions | 218 | 7 | 0 | 10 | 17 | 14 | 30 | 5 | 0 | 3 | 20 | 0 | 14 | 0 | 18 | 356 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| 7th Judicial District | Eureka County | Eureka County District Court — New Filings (cases) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 | 11 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | | Grand Total Dispositions | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 10 |
| | | Total Non-Trial Dispositions | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 10 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Lincoln County | Lincoln County District Court — New Filings (cases) | 13 | 0 | 0 | 2 | 0 | 3 | 2 | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 2 | 27 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Grand Total Dispositions | 13 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 18 |
| | | Total Non-Trial Dispositions | 13 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 18 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | White Pine County District Court — New Filings (cases) | 41 | 1 | 0 | 3 | 13 | 3 | 7 | 0 | 0 | 0 | 0 | 0 | 4 | 5 | 8 | 85 |
| | | Reopened (cases) | 8 | 0 | 0 | 0 | 7 | 5 | 8 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 28 |
| | | Grand Total Dispositions | 48 | 1 | 0 | 5 | 15 | 9 | 14 | 0 | 0 | 1 | 0 | 0 | 4 | 2 | 11 | 110 |
| | | Total Non-Trial Dispositions | 41 | 1 | 0 | 0 | 15 | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 4 | 1 | 6 | 72 |
| | | Total Trial Dispositions | 7 | 0 | 0 | 5 | 0 | 8 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 38 |

[a]   NRS Chapter 128 allows termination of parental rights through motion in existing juvenile child abuse and neglect cases (Table B4). These terminations through motion are not captured in the USJR statistics.

ND   No Data.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B3. Family Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Family Caseload (3 of 3) | | | Marriage Dissolution | Paternity | Visitation (Non-Divorce) | Adoptions | Custody (Non-Divorce) | IV-D UIFSA | IV-D Intrastate | Other Support | State Initiated (TPR) Petition | Other (TPR) Petition | Request for Domestic Violence Protective Orders (TPOs) | High-Risk Protection Orders | Other Domestic Relations | Mental Health Case | Guardianships Case | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **Support** | | | **TPR** [a] | | **Protection Orders** | | | | | |
| **8th Judicial District** | **Clark County** | **Clark County District Court** New Filings (cases) | 12,700 | 353 | 91 | 837 | 3,128 | 326 | 3,354 | 5 | 0 | 422 | 10,259 | 6 | 2,832 | 5,772 | 1,887 | 41,972 |
| | | Reopened (cases) | 3,679 | 176 | 12 | 62 | 1,823 | 415 | 943 | 0 | 0 | 42 | 871 | 0 | 237 | 4,928 | 1,400 | 14,588 |
| | | Grand Total Dispositions | 17,473 | 511 | 106 | 880 | 5,185 | 554 | 3,232 | 4 | 1 | 498 | 10,202 | 6 | 3,073 | 8,833 | 4,063 | 54,621 |
| | | Total Non-Trial Dispositions | 17,089 | 493 | 101 | 862 | 4,940 | 554 | 3,232 | 4 | 1 | 472 | 10,202 | 6 | 3,052 | 8,833 | 4,049 | 53,890 |
| | | Total Trial Dispositions | 384 | 18 | 5 | 18 | 245 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 21 | 0 | 14 | 731 |
| **9th Judicial District** | **Douglas County** | **Douglas County District Court** New Filings (cases) | 354 | 135 | 0 | 18 | 0 | 19 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 42 | 569 |
| | | Reopened (cases) | 81 | 13 | 0 | 2 | 0 | 18 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 121 | 244 |
| | | Grand Total Dispositions | 403 | 145 | 0 | 15 | 0 | 62 | 13 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 114 | 753 |
| | | Total Non-Trial Dispositions | 391 | 144 | 0 | 15 | 0 | 62 | 13 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 113 | 739 |
| | | Total Trial Dispositions | 12 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 14 |
| **10th Judicial District** | **Churchill County** | **Churchill County District Court** New Filings (cases) | 427 | 1 | 0 | 20 | 23 | 23 | 29 | 0 | 0 | 13 | 15 | 0 | 16 | 18 | 23 | 608 |
| | | Reopened (cases) | 68 | 0 | 0 | 1 | 21 | 92 | 37 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 41 | 267 |
| | | Grand Total Dispositions | 526 | 1 | 0 | 18 | 49 | 120 | 56 | 0 | 1 | 10 | 24 | 0 | 19 | 19 | 64 | 907 |
| | | Total Non-Trial Dispositions | 522 | 1 | 0 | 18 | 45 | 120 | 56 | 0 | 1 | 9 | 24 | 0 | 19 | 19 | 64 | 898 |
| | | Total Trial Dispositions | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 9 |
| **11th Judicial District** | **Lander County** | **Lander County District Court** New Filings (cases) | 68 | 1 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 7 | 87 |
| | | Reopened (cases) | 14 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| | | Grand Total Dispositions | 63 | 4 | 0 | 8 | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 81 |
| | | Total Non-Trial Dispositions | 62 | 4 | 0 | 7 | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 79 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | **Mineral County** | **Mineral County District Court** New Filings (cases) | 12 | 1 | 0 | 1 | 3 | 1 | 11 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 3 | 35 |
| | | Reopened (cases) | 4 | 0 | 0 | 0 | 3 | 4 | 12 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 26 |
| | | Grand Total Dispositions | 13 | 2 | 0 | 1 | 5 | 5 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 55 |
| | | Total Non-Trial Dispositions | 13 | 2 | 0 | 1 | 5 | 5 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 53 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | **Pershing County** | **Pershing County District Court** New Filings (cases) | 12 | 3 | 0 | 6 | 1 | 0 | 11 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 7 | 43 |
| | | Reopened (cases) | 6 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 |
| | | Grand Total Dispositions | 22 | 1 | 0 | 3 | 7 | 1 | 7 | 0 | 1 | 4 | 0 | 0 | 2 | 0 | 9 | 57 |
| | | Total Non-Trial Dispositions | 22 | 1 | 0 | 3 | 7 | 1 | 7 | 0 | 1 | 4 | 0 | 0 | 2 | 0 | 9 | 57 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   NRS Chapter 128 allows termination of parental rights through motion in existing juvenile child abuse and neglect cases (Table B4). These terminations through motion are not captured in the USJR statistics.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B4. Juvenile Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Juvenile Non-Traffic Caseload (1 of 3) | | Person | Property | Drug | Public Order | Other Delinquency | Status Petition | Child Abuse/ Neglect Petition | Dependent (no fault) | Other Dependency Child Victim | Miscellaneous Petition | Totals | Informal Hearings (Involving a Judicial Officer) | Detention Hearings | Extradition Hearings | Protective Custody Hearings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Delinquency | | | | | | Dependency/ Child Victim[a] | | | | | | Hearings | | |
| **Totals[b]** | **Nevada District Courts** New Filings (cases) | 2,243 | 977 | 532 | 278 | 819 | 140 | 1,909 | 1 | 3 | 101 | 7,003 | 128 | 2,790 | 1 | 2,160 |
| | Reopened (cases) | 191 | 104 | 44 | 32 | 76 | 8 | 314 | 0 | 1 | 4 | 774 | | | | |
| | Charges | 4,261 | 2,486 | 898 | 782 | 2,942 | 154 | - | - | - | - | 11,523 | | | | |
| | Grand Total Dispositions | 3,239 | 2,834 | 964 | 617 | 2,627 | 99 | 2,834 | 2 | 3 | 58 | 13,277 | | | | |
| | Total Non-Trial Dispositions | 3,207 | 2,816 | 962 | 612 | 2,623 | 98 | 2,311 | 2 | 3 | 57 | 12,691 | | | | |
| | Total Trial Dispositions | 32 | 18 | 2 | 5 | 4 | 1 | 523 | 0 | 0 | 1 | 586 | | | | |
| **1st Judicial District** — **Carson City** | **Carson City District Court** New Filings (cases) | 36 | 17 | 5 | 3 | 2 | 29 | 22 | 0 | 0 | 2 | 116 | 0 | 121 | 0 | 28 |
| | Reopened (cases) | 16 | 10 | 4 | 1 | 0 | 0 | 129 | 0 | 0 | 0 | 160 | | | | |
| | Charges | 77 | 47 | 8 | 8 | 23 | 29 | - | - | - | - | 192 | | | | |
| | Grand Total Dispositions | 39 | 28 | 14 | 4 | 1 | 3 | 165 | 0 | 0 | 0 | 254 | | | | |
| | Total Non-Trial Dispositions | 37 | 28 | 14 | 4 | 0 | 3 | 163 | 0 | 0 | 0 | 249 | | | | |
| | Total Trial Dispositions | 2 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 5 | | | | |
| **Storey County** | **Storey County District Court** New Filings (cases) | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | Charges | 0 | 1 | 0 | 0 | 0 | 2 | - | - | - | - | 3 | | | | |
| | Grand Total Dispositions | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | | | | |
| | Total Non-Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | | | | |
| | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| **2nd Judicial District** — **Washoe County** | **Washoe County District Court** New Filings (cases) | 669 | 316 | 299 | 27 | 121 | NR | 563[c] | (c) | (c) | NR | 1,995 | NR | 909[d] | (d) | 615 |
| | Reopened (cases)[f] | - | - | - | - | - | | - | | | | -[f] | | | | |
| | Charges | 1,201 | 648 | 488 | 96 | 605 | | - | | | | 3,038 | | | | |
| | Grand Total Dispositions[g] | 814 | 436 | 235 | 39 | 166 | | 1,193 | | | | 2,883[g] | | | | |
| | Total Non-Trial Dispositions | 813 | 432 | 235 | 39 | 166 | | 811 | | | | 2,496 | | | | |
| | Total Trial Dispositions | 1 | 4 | 0 | 0 | 0 | | 382 | | | | 387 | | | | |
| **3rd Judicial District** — **Lyon County** | **Lyon County District Court** New Filings (cases) | 24 | 27 | 9 | 8 | 3 | 34 | 20 | 0 | 0 | 2 | 127 | 0 | 50 | 0 | 0 |
| | Reopened (cases) | 7 | 10 | 3 | 6 | 0 | 3 | 0 | 0 | 0 | 0 | 29 | | | | |
| | Charges | 55 | 52 | 12 | 13 | 3 | 36 | - | - | - | - | 171 | | | | |
| | Grand Total Dispositions | 27 | 36 | 11 | 20 | 1 | 34 | 20 | 0 | 0 | 1 | 150 | | | | |
| | Total Non-Trial Dispositions | 27 | 35 | 11 | 20 | 1 | 33 | 20 | 0 | 0 | 1 | 148 | | | | |
| | Total Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | | | | |
| **4th Judicial District** — **Elko County** | **Elko County District Court** New Filings (cases) | 46 | 31 | 12 | 9 | 50 | 20 | 13 | 0 | 0 | 0 | 181 | 0 | 80 | 0 | 31 |
| | Reopened (cases) | 2 | 1 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 35 | | | | |
| | Charges | 87 | 60 | 16 | 19 | 101 | 22 | - | - | - | - | 305 | | | | |
| | Grand Total Dispositions | 23 | 28 | 9 | 7 | 49 | 19 | 42 | 0 | 0 | 0 | 177 | | | | |
| | Total Non-Trial Dispositions | 22 | 28 | 9 | 7 | 49 | 19 | 33 | 0 | 0 | 0 | 167 | | | | |
| | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 10 | | | | |

[a]    May include termination of parental right actions filed through motion per NRS Chapter 128 in existing child abuse/neglect cases. These terminations through motion are not separately captured in the USJR statistics.
[b]    Totals reflect aggregate information from the Nevada District Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Delinquency case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.
[c]    All Dependency/ Child Victim matters reported in the Child Abuse/Neglect Petition case type.
[d]    Detention hearings include extradition hearings counts.
[f]    Reopened (cases) not reported.
[g]    Includes administrative case closures.
NR    Not reported.
Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B4. Juvenile Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Juvenile Non-Traffic Caseload (2 of 3) | | | | Delinquency | | | | | Status Petition | Dependency/ Child Victim [a] | | | | Totals | Hearings | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Person | Property | Drug | Public Order | Other Delinquency | | Child Abuse/ Neglect Petition | Dependent (no fault) | Other Dependency Child Victim | Miscellaneous Petition | | Informal Hearings (Involving a Judicial Officer) | Detention Hearings | Extradition Hearings | Protective Custody Hearings |
| 5th Judicial District | Esmeralda County | Esmeralda County District Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | - | - | - | - | 0 | | | | |
| | | | Grand Total Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | | | | |
| | | | Total Non-Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | Nye County | Nye County District Court | New Filings (cases) | 43 | 17 | 4 | 8 | 20 | 32 | 22 | 0 | 1 | 30 | 177 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | | | | |
| | | | Charges | 63 | 31 | 4 | 8 | 22 | 32 | - | - | - | - | 160 | | | | |
| | | | Grand Total Dispositions | 24 | 4 | 3 | 3 | 10 | 18 | 7 | 0 | 0 | 12 | 81 | | | | |
| | | | Total Non-Trial Dispositions | 24 | 4 | 3 | 3 | 10 | 18 | 7 | 0 | 0 | 12 | 81 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| 6th Judicial District | Humboldt County | Humboldt County District Court | New Filings (cases) | 15 | 8 | 4 | 27 | 2 | 0 | 16 | 0 | 0 | 0 | 72 | 0 | 16 | 0 | 1 |
| | | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | | | | |
| | | | Charges | 25 | 13 | 6 | 41 | 4 | 0 | - | - | - | - | 89 | | | | |
| | | | Grand Total Dispositions | 14 | 0 | 3 | 30 | 0 | 0 | 5 | 0 | 0 | 1 | 53 | | | | |
| | | | Total Non-Trial Dispositions | 14 | 0 | 3 | 30 | 0 | 0 | 5 | 0 | 0 | 1 | 53 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| 7th Judicial District | Eureka County | Eureka County District Court | New Filings (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 6 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | | | Charges | 2 | 0 | 0 | 0 | 0 | 0 | - | - | - | - | 2 | | | | |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | Lincoln County | Lincoln County District Court | New Filings (cases) | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 1 | 0 | 0 |
| | | | Reopened (cases) | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | | | | |
| | | | Charges | 1 | 9 | 0 | 0 | 2 | 0 | - | - | - | - | 12 | | | | |
| | | | Grand Total Dispositions | 1 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | | | | |
| | | | Total Non-Trial Dispositions | 1 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | White Pine County | White Pine County District Court | New Filings (cases) | 10 | 20 | 20 | 7 | 60 | 5 | 6 | 0 | 0 | 0 | 128 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | | | | |
| | | | Charges | 13 | 26 | 26 | 9 | 70 | 5 | - | - | - | - | 149 | | | | |
| | | | Grand Total Dispositions | 13 | 15 | 15 | 8 | 52 | 5 | 1 | 0 | 0 | 0 | 109 | | | | |
| | | | Total Non-Trial Dispositions | 13 | 15 | 15 | 8 | 52 | 5 | 1 | 0 | 0 | 0 | 109 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |

[a]   May include termination of parental right actions filed through motion per NRS Chapter 128 in existing child abuse/neglect cases. These terminations through motion are not separately captured in the USJR statistics.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B4. Juvenile Caseload Processed by District Courts in Nevada, Fiscal Year 2022.**

| District Court, Juvenile Non-Traffic Caseload (3 of 3) | | | | Delinquency | | | | | | Dependency/ Child Victim[a] | | | | Totals | Hearings | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Person | Property | Drug | Public Order | Other Delinquency | Status Petition | Child Abuse/ Neglect Petition | Dependent (no fault) | Other Dependency Child Victim | Miscellaneous Petition | | Informal Hearings (Involving a Judicial Officer) | Detention Hearings | Extradition Hearings | Protective Custody Hearings |
| 8th Judicial District | Clark County | Clark County District Court | New Filings (cases) | 1,324 | 510 | 165 | 169 | 489 | NR | 1,225 | 1 | 0 | 27 | 3,910 | NR | 1,569 | 1 | 1,481 |
| | | | Reopened (cases) | 150 | 75 | 30 | 15 | 60 | | 97 | 0 | 0 | 0 | 427 | | | | |
| | | | Charges | 2,651 | 1,555 | 313 | 546 | 1,950 | | - | - | - | - | 7,015 | | | | |
| | | | Grand Total Dispositions[h,k] | 2,232 | 2,250 | 658 | 477 | 2,277 | | 1,333 | 2 | 0 | 10 | 9,239[h,k] | | | | |
| | | | Total Non-Trial Dispositions | 2,204 | 2,237 | 656 | 472 | 2,274 | | 1,204 | 2 | 0 | 9 | 9,058 | | | | |
| | | | Total Trial Dispositions | 28 | 13 | 2 | 5 | 3 | | 129 | 0 | 0 | 1 | 181 | | | | |
| 9th Judicial District | Douglas County | Douglas County District Court | New Filings (cases) | 19 | 13 | 4 | 2 | 53 | 0 | 7 | 0 | 2 | 16 | 116 | 0 | 6 | 0 | 0 |
| | | | Reopened (cases) | 2 | 3 | 2 | 0 | 10 | 0 | 5 | 0 | 0 | 1 | 23 | | | | |
| | | | Charges | 19 | 29 | 7 | 10 | 57 | 10 | - | - | - | - | 132 | | | | |
| | | | Grand Total Dispositions | 9 | 14 | 6 | 2 | 41 | 0 | 7 | 0 | 3 | 14 | 96 | | | | |
| | | | Total Non-Trial Dispositions | 9 | 14 | 6 | 2 | 41 | 0 | 7 | 0 | 3 | 14 | 96 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| 10th Judicial District | Churchill County | Churchill County District Court | New Filings (cases) | 43 | 10 | 5 | 16 | 7 | 18 | 10 | 0 | 0 | 0 | 109 | 128 | 24 | 0 | 4 |
| | | | Reopened (cases) | 7 | 4 | 3 | 10 | 2 | 4 | 51 | 0 | 0 | 0 | 81 | | | | |
| | | | Charges | 55 | 11 | 13 | 30 | 14 | 18 | - | - | - | - | 141 | | | | |
| | | | Grand Total Dispositions | 32 | 12 | 6 | 26 | 8 | 18 | 58 | 0 | 0 | 0 | 160 | | | | |
| | | | Total Non-Trial Dispositions | 32 | 12 | 6 | 26 | 8 | 18 | 57 | 0 | 0 | 0 | 159 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | | | | |
| 11th Judicial District | Lander County | Lander County District Court | New Filings (cases) | 0 | 0 | 0 | 2 | 8 | 0 | 1 | 0 | 0 | 0 | 11 | 0 | 1 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | | | Charges | 0 | 0 | 0 | 2 | 14 | 0 | - | - | - | - | 16 | | | | |
| | | | Grand Total Dispositions | 0 | 2 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 16 | | | | |
| | | | Total Non-Trial Dispositions | 0 | 2 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 16 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | Mineral County | Mineral County District Court | New Filings (cases) | 8 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 1 | 13 | 0 | 2 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | | | | |
| | | | Charges | 8 | 1 | 0 | 0 | 11 | 0 | - | - | - | - | 20 | | | | |
| | | | Grand Total Dispositions | 4 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 8 | | | | |
| | | | Total Non-Trial Dispositions | 4 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 8 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| | Pershing County | Pershing County District Court | New Filings (cases) | 4 | 3 | 5 | 0 | 2 | 0 | 1 | 0 | 0 | 19 | 34 | 0 | 11 | 0 | 0 |
| | | | Reopened (cases) | 2 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 3 | 9 | | | | |
| | | | Charges | 4 | 3 | 5 | 0 | 66 | 0 | - | - | - | - | 78 | | | | |
| | | | Grand Total Dispositions | 7 | 4 | 4 | 0 | 5 | 0 | 1 | 0 | 0 | 20 | 41 | | | | |
| | | | Total Non-Trial Dispositions | 7 | 4 | 4 | 0 | 5 | 0 | 1 | 0 | 0 | 20 | 41 | | | | |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |

[a]   May include termination of parental right actions filed through motion per NRS Chapter 128 in existing child abuse/neglect cases. These terminations through motion are not separately captured in the USJR statistics.

[h]   Court reported a large number of administrative closures (2,040 Person, 1,560 Property, 735 Drug, 614 Public Order, and 2,407 Other Delinquency dispositions). Because many of these dispositions are unrelated to the filings for the current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total dispositions but are provided in this footnote for general information.

[k]   Includes administrative case closures not related to footnote (h).

NR   Not reported.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-1. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Aggregate (1 of 4) | | | Felony, Total | Gross Misdemeanor, Total | Misdemeanor (Non-Traffic), Total | Criminal Case Totals | Traffic and Parking Totals |
|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada Justice Courts | New Filings (cases) | 26,223 | 4,262 | 30,114 | 60,599 | 233,109 |
| | | Reopened (cases) | 2,109 | 561 | 2,636 | 5,306 | 957 |
| | | Charges | 54,993 | 8,814 | 43,719 | 107,526 | 292,404 |
| | | Grand Total Dispositions | 29,402 | 4,490 | 34,628 | 68,520 | 139,157 |
| | | Total Non-Trial Dispositions | 29,399 | 4,488 | 34,434 | 68,321 | 138,956 |
| | | Total Trial Dispositions | 3 | 2 | 194 | 199 | 201 |
| 1st Judicial District | Carson City | Carson City Justice Court [b] New Filings (cases) | 872 | 146 | 944 | 1,962 | 7,097 |
| | | Reopened (cases) | 6 | 2 | 4 | 12 | 2 |
| | | Charges | 1,435 | 301 | 1,824 | 3,560 | 9,554 |
| | | Grand Total Dispositions | 488 | 95 | 718 | 1,301 | 6,405 |
| | | Total Non-Trial Dispositions | 488 | 95 | 706 | 1,289 | 6,398 |
| | | Total Trial Dispositions | 0 | 0 | 12 | 12 | 7 |
| | Storey County | Virginia City Justice Court New Filings (cases) | 24 | 12 | 162 | 198 | 1,220 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 1 |
| | | Charges | 30 | 19 | 189 | 238 | 1,720 |
| | | Grand Total Dispositions | 21 | 10 | 168 | 199 | 1,149 |
| | | Total Non-Trial Dispositions | 21 | 10 | 162 | 193 | 1,138 |
| | | Total Trial Dispositions | 0 | 0 | 6 | 6 | 11 |
| 2nd Judicial District | Washoe County | Incline Village Justice Court New Filings (cases) | 29 | 7 | 106 | 142 | 1,444 |
| | | Reopened (cases) | 6 | 0 | 47 | 53 | 23 |
| | | Charges | 52 | 10 | 141 | 203 | 1,690 |
| | | Grand Total Dispositions | 36 | 2 | 210 | 248 | 1,580 |
| | | Total Non-Trial Dispositions | 36 | 2 | 206 | 244 | 1,576 |
| | | Total Trial Dispositions | 0 | 0 | 4 | 4 | 4 |
| | | Reno Justice Court New Filings (cases) | 2,875 | 518 | 1,377 | 4,770 | 14,204 |
| | | Reopened (cases) | 501 | 106 | 608 | 1,215 | 448 |
| | | Charges | 4,811 | 876 | 3,079 | 8,766 | 18,038 |
| | | Grand Total Dispositions | 3,073 | 453 | 2,809 | 6,335 | 14,114 |
| | | Total Non-Trial Dispositions | 3,073 | 453 | 2,784 | 6,310 | 14,085 |
| | | Total Trial Dispositions | 0 | 0 | 25 | 25 | 29 |
| | | Sparks Justice Court New Filings (cases) | 1,296 | 221 | 655 | 2,172 | 3,081 |
| | | Reopened (cases) | 348 | 71 | 396 | 815 | 102 |
| | | Charges | 2,179 | 413 | 1,523 | 4,115 [c] | 4,610 |
| | | Grand Total Dispositions [c] | 1,538 | 279 | 1,781 | 3,598 [c] | 3,737 [c] |
| | | Total Non-Trial Dispositions | 1,538 | 279 | 1,767 | 3,584 | 3,726 |
| | | Total Trial Dispositions | 0 | 0 | 14 | 14 | 11 |
| | | Wadsworth Justice Court New Filings (cases) | 0 | 0 | 81 | 81 | 1,702 |
| | | Reopened (cases) | 0 | 0 | 7 | 7 | 29 |
| | | Charges | 0 | 0 | 87 | 87 | 2,197 |
| | | Grand Total Dispositions | 0 | 0 | 67 | 67 | 1,693 |
| | | Total Non-Trial Dispositions | 0 | 0 | 66 | 66 | 1,677 |
| | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 16 |
| 3rd Judicial District | Lyon County | Canal Justice Court New Filings (cases) | 153 | 31 | 275 | 459 | 468 |
| | | Reopened (cases) | 5 | 0 | 3 | 8 | 2 |
| | | Charges | 280 | 74 | 343 | 697 | 730 |
| | | Grand Total Dispositions | 170 | 37 | 252 | 459 | 454 |
| | | Total Non-Trial Dispositions | 170 | 37 | 250 | 457 | 454 |
| | | Total Trial Dispositions | 0 | 0 | 2 | 2 | 0 |
| | | Dayton Justice Court New Filings (cases) | 73 | 20 | 270 | 363 | 1,207 |
| | | Reopened (cases) | 1 | 0 | 0 | 1 | 3 |
| | | Charges | 117 | 33 | 350 | 500 | 1,584 |
| | | Grand Total Dispositions | 75 | 28 | 258 | 361 | 1,385 |
| | | Total Non-Trial Dispositions | 75 | 28 | 256 | 359 | 1,385 |
| | | Total Trial Dispositions | 0 | 0 | 2 | 2 | 0 |
| | | Walker River Justice Court New Filings (cases) | 62 | 11 | 266 | 339 | 1,444 |
| | | Reopened (cases) | 2 | 0 | 0 | 2 | 2 |
| | | Charges | 89 | 16 | 392 | 497 | 1,859 |
| | | Grand Total Dispositions | 63 | 9 | 295 | 367 | 1,487 |
| | | Total Non-Trial Dispositions | 63 | 9 | 295 | 367 | 1,487 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |

[a]    Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[b]    Carson City Justice Court includes Municipal Court information.

[c]    Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-1. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Aggregate (2 of 4) | | | Felony, Total | Gross Misdemeanor, Total | Misdemeanor (Non-Traffic), Total | Criminal Case Totals | Traffic and Parking Totals |
|---|---|---|---|---|---|---|---|
| **4th Judicial District** | **Elko County** | Carlin Justice Court | | | | | |
| | | New Filings (cases) | 0 | 1 | 66 | 67 | 689 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 1 | 96 | 97 | 784 |
| | | Grand Total Dispositions | 0 | 0 | 69 | 69 | 633 |
| | | Total Non-Trial Dispositions | 0 | 0 | 68 | 68 | 631 |
| | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 2 |
| | | Eastline Justice Court | | | | | |
| | | New Filings (cases) | 0 | 0 | 123 | 123 | 289 |
| | | Reopened (cases) | 0 | 0 | 18 | 18 | 8 |
| | | Charges | 0 | 0 | 180 | 180 | 397 |
| | | Grand Total Dispositions | 0 | 0 | 119 | 119 | 200 |
| | | Total Non-Trial Dispositions | 0 | 0 | 117 | 117 | 200 |
| | | Total Trial Dispositions | 0 | 0 | 2 | 2 | 0 |
| | | Elko Justice Court | | | | | |
| | | New Filings (cases) | 519 | 75 | 634 | 1,228 | 4,593 |
| | | Reopened (cases) | 50 | 11 | 221 | 282 | 97 |
| | | Charges | 999 | 175 | 981 | 2,155 | 5,463 |
| | | Grand Total Dispositions | 522 | 69 | 818 | 1,409 | 4,180 |
| | | Total Non-Trial Dispositions | 522 | 69 | 806 | 1,397 | 4,171 |
| | | Total Trial Dispositions | 0 | 0 | 12 | 12 | 9 |
| | | Wells Justice Court | | | | | |
| | | New Filings (cases) | 1 | 0 | 105 | 106 | 2,673 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 2 |
| | | Charges | 1 | 0 | 127 | 128 | 3,017 |
| | | Grand Total Dispositions | 0 | 0 | 107 | 107 | 2,548 |
| | | Total Non-Trial Dispositions | 0 | 0 | 107 | 107 | 2,546 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 2 |
| **5th Judicial District** | **Esmeralda County** | Esmeralda Justice Court | | | | | |
| | | New Filings (cases) | 17 | 1 | 14 | 32 | 1,459 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 47 | 1 | 24 | 72 | 1,732 |
| | | Grand Total Dispositions | 8 | 1 | 5 | 14 | 1,423 |
| | | Total Non-Trial Dispositions | 7 | 1 | 3 | 11 | 1,417 |
| | | Total Trial Dispositions | 1 | 0 | 2 | 3 | 6 |
| | **Nye County** | Beatty Justice Court | | | | | |
| | | New Filings (cases) | 14 | 9 | 56 | 79 | 969 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 1 |
| | | Charges | 36 | 13 | 59 | 108 | 1,126 |
| | | Grand Total Dispositions [c] | 21 | 4 | 66 | 91 [c] | 898 |
| | | Total Non-Trial Dispositions | 21 | 4 | 66 | 91 | 897 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 |
| | | Pahrump Justice Court | | | | | |
| | | New Filings (cases) | 629 | 126 | 817 | 1,572 | 2,217 |
| | | Reopened (cases) | 40 | 8 | 68 | 116 | 59 |
| | | Charges | 980 | 248 | 957 | 2,185 | 2,903 |
| | | Grand Total Dispositions | 446 | 75 | 707 | 1,228 | 2,353 |
| | | Total Non-Trial Dispositions | 446 | 75 | 699 | 1,220 | 2,351 |
| | | Total Trial Dispositions | 0 | 0 | 8 | 8 | 2 |
| | | Tonopah Justice Court | | | | | |
| | | New Filings (cases) | 29 | 10 | 77 | 116 | 1,161 |
| | | Reopened (cases) | 2 | 0 | 0 | 2 | 1 |
| | | Charges | 36 | 14 | 81 | 131 | 1,429 |
| | | Grand Total Dispositions | 28 | 4 | 78 | 110 | 1,170 |
| | | Total Non-Trial Dispositions | 28 | 4 | 78 | 110 | 1,170 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| **6th Judicial District** | **Humboldt County** | Union Justice Court | | | | | |
| | | New Filings (cases) | 122 | 16 | 285 | 423 | 3,621 |
| | | Reopened (cases) | 3 | 0 | 1 | 4 | 8 |
| | | Charges | 214 | 25 | 359 | 598 | 4,344 |
| | | Grand Total Dispositions | 90 | 18 | 287 | 395 | 3,390 |
| | | Total Non-Trial Dispositions | 90 | 18 | 283 | 391 | 3,387 |
| | | Total Trial Dispositions | 0 | 0 | 4 | 4 | 3 |

[c]    Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-1. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Aggregate (3 of 4) | | | Felony, Total | Gross Misdemeanor, Total | Misdemeanor (Non-Traffic), Total | Criminal Case Totals | Traffic and Parking Totals |
|---|---|---|---|---|---|---|---|
| **7th Judicial District** | **Eureka County** | Eureka Justice Court — New Filings (cases) | 9 | 3 | 23 | 35 | 536 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 10 | 4 | 37 | 51 | 585 |
| | | Grand Total Dispositions | 10 | 3 | 19 | 32 | 464 |
| | | Total Non-Trial Dispositions | 10 | 3 | 17 | 30 | 459 |
| | | Total Trial Dispositions | 0 | 0 | 2 | 2 | 5 |
| | **Lincoln County** | Meadow Valley Justice Court — New Filings (cases) | 43 | 11 | 49 | 103 | 1,067 |
| | | Reopened (cases) | 2 | 0 | 0 | 2 | 0 |
| | | Charges | 85 | 23 | 109 | 217 | 1,141 |
| | | Grand Total Dispositions | 32 | 5 | 63 | 100 | 1,035 |
| | | Total Non-Trial Dispositions | 32 | 5 | 63 | 100 | 1,034 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 |
| | | Pahranagat Valley Justice Court — New Filings (cases) | 21 | 3 | 24 | 48 | 2,808 |
| | | Reopened (cases) | 0 | 0 | 1 | 1 | 11 |
| | | Charges | 34 | 12 | 37 | 83 | 3,019 |
| | | Grand Total Dispositions | 8 | 2 | 23 | 33 | 2,644 |
| | | Total Non-Trial Dispositions | 8 | 2 | 23 | 33 | 2,642 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 2 |
| | **White Pine County** | Ely Justice Court — New Filings (cases) | 179 | 15 | 126 | 320 | 1,420 |
| | | Reopened (cases) | 2 | 0 | 1 | 3 | 0 |
| | | Charges | 316 | 59 | 164 | 539 | 1,603 |
| | | Grand Total Dispositions | 180 | 16 | 131 | 327 | 1,356 |
| | | Total Non-Trial Dispositions | 180 | 16 | 124 | 320 | 1,354 |
| | | Total Trial Dispositions | 0 | 0 | 7 | 7 | 2 |
| **8th Judicial District** | **Clark County** | Boulder Justice Court — New Filings (cases) | 52 | 10 | 45 | 107 | 1,493 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 136 | 21 | 56 | 213 | 1,688 |
| | | Grand Total Dispositions | 60 | 6 | 47 | 113 | 1,575 |
| | | Total Non-Trial Dispositions | 60 | 6 | 47 | 113 | 1,575 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| | | Bunkerville Justice Court — New Filings (cases) | 7 | 0 | 14 | 21 | 1,245 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 8 |
| | | Charges | 8 | 3 | 17 | 28 | 1,422 |
| | | Grand Total Dispositions | 4 | 0 | 11 | 15 | 1,136 |
| | | Total Non-Trial Dispositions | 4 | 0 | 10 | 14 | 1,136 |
| | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 0 |
| | | Goodsprings Justice Court — New Filings (cases) | 56 | 5 | 328 | 389 | 6,142 |
| | | Reopened (cases) | 1 | 0 | 3 | 4 | 46 |
| | | Charges | 115 | 8 | 354 | 477 [c] | 7,347 |
| | | Grand Total Dispositions [c] | 57 | 4 | 400 | 461 [c] | 8,780 [c] |
| | | Total Non-Trial Dispositions | 57 | 4 | 399 | 460 | 8,778 |
| | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 2 |
| | | Henderson Justice Court — New Filings (cases) | 1,114 | 176 | 321 | 1,611 | 2,646 |
| | | Reopened (cases) | 31 | 2 | 1 | 34 | 25 |
| | | Charges | 2,991 | 468 | 723 | 4,182 | 3,513 |
| | | Grand Total Dispositions | 1,316 | 183 | 444 | 1,943 | 2,970 |
| | | Total Non-Trial Dispositions | 1,316 | 183 | 442 | 1,941 | 2,969 |
| | | Total Trial Dispositions | 0 | 0 | 2 | 2 | 1 |
| | | Las Vegas Justice Court — New Filings (cases) | 15,360 | 2,403 | 20,322 | 38,085 | 142,055 |
| | | Reopened (cases) | 1,068 | 355 | 1,129 | 2,552 | 0 [d] |
| | | Charges | 34,871 | 5,023 | 27,641 | 67,535 | 179,708 |
| | | Grand Total Dispositions | 18,093 | 2,717 | 21,817 | 42,627 | 41,944 [f,g] |
| | | Total Non-Trial Dispositions | 18,091 | 2,716 | 21,777 | 42,584 | 41,934 |
| | | Total Trial Dispositions | 2 | 1 | 40 | 43 | 10 |
| | | Laughlin Justice Court — New Filings (cases) | 116 | 10 | 261 | 387 | 4,836 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 2 |
| | | Charges | 236 | 43 | 333 | 612 | 5,645 |
| | | Grand Total Dispositions | 128 | 10 | 247 | 385 | 7,333 [c] |
| | | Total Non-Trial Dispositions | 128 | 10 | 247 | 385 | 7,333 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| | | Mesquite Justice Court — New Filings (cases) | 169 | 17 | 4 | 190 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 341 | 59 | 30 | 430 | 15 |
| | | Grand Total Dispositions [c] | 263 | 18 | 4 | 285 [c] | 3 |
| | | Total Non-Trial Dispositions | 263 | 18 | 4 | 285 | 3 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |

[c]   Includes administrative case closures.

[d]   Reopened cases under-reported.

[f]   Court reported a large number of administrative closures (170,134 traffic and 193 parking dispositions). Because many of these dispositions are unrelated to the filings for the current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total dispositions but are included in this footnote for general information.

[g]   Disposition data incomplete due to the development of a new online platform and limited IT programming resources needed to implement improved business processes. Complete data will be updated in future Annual Report publications.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-1. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Aggregate (4 of 4) | | | | Felony, Total | Gross Misdemeanor, Total | Misdemeanor (Non-Traffic), Total | Criminal Case Totals | Traffic and Parking Totals |
|---|---|---|---|---|---|---|---|---|
| 8th Judicial District Cont. | Clark County Cont. | Moapa Justice Court | New Filings (cases) | 23 | 3 | 46 | 72 | 1,555 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 3 |
| | | | Charges | 50 | 4 | 56 | 110 | 1,848 |
| | | | Grand Total Dispositions [c] | 19 | 2 | 98 | 119 [c] | 2,556 [c] |
| | | | Total Non-Trial Dispositions | 19 | 2 | 98 | 119 | 2,552 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 4 |
| | | Moapa Valley Justice Court | New Filings (cases) | 20 | 0 | 83 | 103 | 999 |
| | | | Reopened (cases) | 0 | 0 | 1 | 1 | 3 |
| | | | Charges | 47 | 2 | 167 | 216 | 1,141 |
| | | | Grand Total Dispositions [c] | 24 | 0 | 107 | 131 [c] | 1,177 [c] |
| | | | Total Non-Trial Dispositions | 24 | 0 | 107 | 131 | 1,175 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 2 |
| | | North Las Vegas Justice Court | New Filings (cases) | 1,526 | 270 | 288 | 2,084 | 602 |
| | | | Reopened (cases) | 9 | 4 | 1 | 14 | 2 |
| | | | Charges | 3,012 | 577 | 690 | 4,279 | 1,092 |
| | | | Grand Total Dispositions [c] | 1,883 | 311 | 317 | 2,511 [c] | 620 |
| | | | Total Non-Trial Dispositions | 1,883 | 311 | 317 | 2,511 | 620 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| | | Searchlight Justice Court | New Filings (cases) | 8 | 5 | 107 | 120 | 4,745 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 10 |
| | | | Charges | 13 | 9 | 114 | 136 | 5,304 |
| | | | Grand Total Dispositions | 9 | 2 | 86 | 97 | 5,742 |
| | | | Total Non-Trial Dispositions | 9 | 2 | 81 | 92 | 5,702 |
| | | | Total Trial Dispositions | 0 | 0 | 5 | 5 | 40 |
| 9th Judicial District | Douglas County | East Fork Justice Court | New Filings (cases) | 219 | 36 | 652 | 907 | 2,445 |
| | | | Reopened (cases) | 21 | 2 | 105 | 128 | 45 |
| | | | Charges | 333 | 63 | 827 | 1,223 | 3,291 |
| | | | Grand Total Dispositions | 221 | 35 | 684 | 940 | 2,356 |
| | | | Total Non-Trial Dispositions | 221 | 34 | 662 | 917 | 2,345 |
| | | | Total Trial Dispositions | 0 | 1 | 22 | 23 | 11 |
| | | Tahoe Justice Court | New Filings (cases) | 87 | 11 | 322 | 420 | 1,198 |
| | | | Reopened (cases) | 1 | 0 | 16 | 17 | 5 |
| | | | Charges | 148 | 17 | 409 | 574 | 1,515 |
| | | | Grand Total Dispositions | 107 | 14 | 433 | 554 | 1,130 |
| | | | Total Non-Trial Dispositions | 107 | 14 | 425 | 546 | 1,128 |
| | | | Total Trial Dispositions | 0 | 0 | 8 | 8 | 2 |
| 10th Judicial District | Churchill County | New River Justice Court | New Filings (cases) | 266 | 53 | 406 | 725 | 3,772 |
| | | | Reopened (cases) | 1 | 0 | 0 | 1 | 2 |
| | | | Charges | 526 | 127 | 498 | 1,151 | 4,680 |
| | | | Grand Total Dispositions | 265 | 51 | 439 | 755 | 3,725 |
| | | | Total Non-Trial Dispositions | 265 | 51 | 430 | 746 | 3,711 |
| | | | Total Trial Dispositions | 0 | 0 | 9 | 9 | 14 |
| 11th Judicial District | Lander County | Argenta Justice Court | New Filings (cases) | 18 | 4 | 107 | 129 | 186 |
| | | | Reopened (cases) | 3 | 0 | 0 | 3 | 0 |
| | | | Charges | 26 | 4 | 127 | 157 | 225 |
| | | | Grand Total Dispositions [c] | 22 | 7 | 128 | 157 [c] | 278 [c] |
| | | | Total Non-Trial Dispositions | 22 | 7 | 127 | 156 | 278 |
| | | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 0 |
| | | Austin Justice Court | New Filings (cases) | 1 | 1 | 6 | 8 | 756 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 1 | 1 | 6 | 8 | 847 |
| | | | Grand Total Dispositions [c] | 0 | 1 | 107 | 108 [c] | 794 |
| | | | Total Non-Trial Dispositions | 0 | 1 | 107 | 108 | 794 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Hawthorne Justice Court | New Filings (cases) | 162 | 15 | 154 | 331 | 2,683 |
| | | | Reopened (cases) | 6 | 0 | 5 | 11 | 7 |
| | | | Charges | 314 | 56 | 377 | 747 | 3,159 |
| | | | Grand Total Dispositions | 62 | 7 | 71 | 140 | 2,265 |
| | | | Total Non-Trial Dispositions | 62 | 7 | 71 | 140 | 2,265 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Lake Justice Court | New Filings (cases) | 52 | 7 | 113 | 172 | 376 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 74 | 12 | 155 | 241 | 439 |
| | | | Grand Total Dispositions [c] | 60 | 12 | 138 | 210 [c] | 475 [c] |
| | | | Total Non-Trial Dispositions | 60 | 12 | 137 | 209 | 473 |
| | | | Total Trial Dispositions | 0 | 0 | 1 | 1 | 2 |

[c]    Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Felony (1 of 6) | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals** [a] | Nevada Justice Courts | New Filings (cases) | 6,271 | 2,278 | 109 | 948 | 65 | 8,029 | 5,512 | 1,632 | 300 | 435 | 28 | 252 | 364 |
| | | Reopened (cases) | 409 | 269 | 4 | 109 | 2 | 592 | 517 | 118 | 8 | 40 | 1 | 19 | 21 |
| | | Charges | 12,191 | 3,543 | 194 | 1,731 | 92 | 20,411 | 9,677 | 4,773 | 550 | 533 | 118 | 561 | 619 |
| | | Grand Total Dispositions | 7,015 | 2,534 | 123 | 1,114 | 74 | 9,073 | 6,221 | 1,796 | 257 | 529 | 30 | 251 | 385 |
| | | Total Non-Trial Dispositions | 7,015 | 2,534 | 123 | 1,114 | 74 | 9,073 | 6,219 | 1,796 | 257 | 529 | 29 | 251 | 385 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| **1st Judicial District** — Carson City | Carson City Justice Court [b] | New Filings (cases) | 117 | 15 | 2 | 37 | 5 | 157 | 468 | 24 | 0 | 8 | 1 | 14 | 24 |
| | | Reopened (cases) | 3 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 211 | 19 | 2 | 65 | 6 | 280 | 697 | 76 | 6 | 9 | 4 | 22 | 38 |
| | | Grand Total Dispositions | 88 | 11 | 3 | 19 | 3 | 110 | 218 | 14 | 0 | 5 | 0 | 2 | 15 |
| | | Total Non-Trial Dispositions | 88 | 11 | 3 | 19 | 3 | 110 | 218 | 14 | 0 | 5 | 0 | 2 | 15 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Storey County | Virginia City Justice Court | New Filings (cases) | 8 | 0 | 0 | 0 | 1 | 6 | 6 | 1 | 0 | 1 | 0 | 1 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 11 | 0 | 0 | 1 | 7 | 7 | 7 | 2 | 0 | 1 | 0 | 1 | 0 |
| | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 0 | 10 | 7 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 10 | 7 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2nd Judicial District** — Washoe County | Incline Village Justice Court | New Filings (cases) | 4 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 6 | 0 | 0 | 0 | 0 | 18 | 24 | 3 | 0 | 0 | 0 | 1 | 0 |
| | | Grand Total Dispositions | 4 | 1 | 0 | 3 | 1 | 8 | 18 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Total Non-Trial Dispositions | 4 | 1 | 0 | 3 | 1 | 8 | 18 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Reno Justice Court | New Filings (cases) | 697 | 137 | 12 | 132 | 2 | 808 | 836 | 77 | 10 | 72 | 4 | 30 | 58 |
| | | Reopened (cases) | 137 | 69 | 1 | 37 | 0 | 98 | 126 | 13 | 1 | 9 | 0 | 6 | 4 |
| | | Charges | 1,031 | 195 | 14 | 202 | 3 | 1,325 | 1,481 | 288 | 28 | 89 | 7 | 60 | 88 |
| | | Grand Total Dispositions | 762 | 201 | 8 | 179 | 3 | 827 | 822 | 87 | 14 | 74 | 4 | 31 | 61 |
| | | Total Non-Trial Dispositions | 762 | 201 | 8 | 179 | 3 | 827 | 822 | 87 | 14 | 74 | 4 | 31 | 61 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Sparks Justice Court | New Filings (cases) | 213 | 61 | 0 | 56 | 5 | 406 | 427 | 52 | 1 | 27 | 0 | 20 | 28 |
| | | Reopened (cases) | 48 | 49 | 0 | 18 | 1 | 99 | 106 | 13 | 2 | 6 | 0 | 5 | 1 |
| | | Charges | 330 | 84 | 0 | 77 | 11 | 749 | 665 | 164 | 4 | 30 | 1 | 29 | 35 |
| | | Grand Total Dispositions [c] | 255 | 115 | 0 | 84 | 8 | 476 | 455 | 54 | 4 | 39 | 0 | 29 | 19 |
| | | Total Non-Trial Dispositions | 255 | 115 | 0 | 84 | 8 | 476 | 455 | 54 | 4 | 39 | 0 | 29 | 19 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Wadsworth Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[b]   Carson City Justice Court includes Municipal Court information.

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Felony (2 of 6) | | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3rd Judicial District | Lyon County | Canal Justice Court | New Filings (cases) | 26 | 0 | 0 | 2 | 2 | 56 | 50 | 10 | 0 | 5 | 0 | 1 | 1 |
| | | | Reopened (cases) | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 46 | 0 | 0 | 2 | 2 | 127 | 76 | 17 | 0 | 5 | 0 | 4 | 1 |
| | | | Grand Total Dispositions | 22 | 0 | 0 | 0 | 3 | 68 | 54 | 9 | 0 | 8 | 1 | 4 | 1 |
| | | | Total Non-Trial Dispositions | 22 | 0 | 0 | 0 | 3 | 68 | 54 | 9 | 0 | 8 | 1 | 4 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Dayton Justice Court | New Filings (cases) | 17 | 1 | 0 | 1 | 1 | 17 | 24 | 6 | 0 | 2 | 0 | 2 | 2 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 39 | 2 | 0 | 2 | 1 | 24 | 29 | 12 | 0 | 2 | 0 | 4 | 2 |
| | | | Grand Total Dispositions | 13 | 3 | 1 | 3 | 2 | 18 | 21 | 6 | 0 | 6 | 0 | 0 | 2 |
| | | | Total Non-Trial Dispositions | 13 | 3 | 1 | 3 | 2 | 18 | 21 | 6 | 0 | 6 | 0 | 0 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Walker River Justice Court | New Filings (cases) | 11 | 1 | 0 | 0 | 2 | 13 | 27 | 4 | 0 | 1 | 0 | 0 | 3 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 12 | 1 | 0 | 0 | 2 | 22 | 30 | 14 | 0 | 1 | 0 | 3 | 4 |
| | | | Grand Total Dispositions | 12 | 1 | 0 | 1 | 2 | 11 | 25 | 4 | 0 | 3 | 1 | 0 | 3 |
| | | | Total Non-Trial Dispositions | 12 | 1 | 0 | 1 | 2 | 11 | 25 | 4 | 0 | 3 | 1 | 0 | 3 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Carlin Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Eastline Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Justice Court | New Filings (cases) | 87 | 7 | 5 | 8 | 2 | 160 | 206 | 8 | 1 | 8 | 1 | 11 | 15 |
| | | | Reopened (cases) | 11 | 0 | 0 | 6 | 0 | 15 | 15 | 0 | 0 | 3 | 0 | 0 | 0 |
| | | | Charges | 134 | 12 | 5 | 17 | 2 | 365 | 353 | 43 | 3 | 11 | 5 | 24 | 25 |
| | | | Grand Total Dispositions | 93 | 4 | 4 | 11 | 3 | 157 | 202 | 7 | 1 | 15 | 2 | 10 | 13 |
| | | | Total Non-Trial Dispositions | 93 | 4 | 4 | 11 | 3 | 157 | 202 | 7 | 1 | 15 | 2 | 10 | 13 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Wells Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Felony (3 of 6) | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **5th Judicial District** | **Esmeralda County** | **Esmeralda Justice Court** New Filings (cases) | 1 | 0 | 0 | 2 | 0 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 3 | 0 | 0 | 6 | 0 | 2 | 31 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 0 | 2 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | **Nye County** | **Beatty Justice Court** New Filings (cases) | 5 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 1 | 2 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 13 | 2 | 0 | 1 | 0 | 3 | 4 | 3 | 0 | 1 | 8 | 0 | 1 |
| | | Grand Total Dispositions [c] | 5 | 0 | 0 | 1 | 1 | 6 | 6 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | Total Non-Trial Dispositions | 5 | 0 | 0 | 1 | 1 | 6 | 6 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Pahrump Justice Court** New Filings (cases) | 176 | 18 | 6 | 27 | 5 | 191 | 126 | 19 | 0 | 8 | 0 | 0 | 53 |
| | | Reopened (cases) | 11 | 4 | 1 | 0 | 0 | 10 | 10 | 1 | 0 | 0 | 0 | 0 | 3 |
| | | Charges | 264 | 22 | 12 | 38 | 5 | 322 | 191 | 44 | 1 | 8 | 0 | 0 | 73 |
| | | Grand Total Dispositions | 114 | 17 | 3 | 14 | 1 | 120 | 109 | 15 | 0 | 7 | 0 | 0 | 46 |
| | | Total Non-Trial Dispositions | 114 | 17 | 3 | 14 | 1 | 120 | 109 | 15 | 0 | 7 | 0 | 0 | 46 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Tonopah Justice Court** New Filings (cases) | 9 | 4 | 0 | 0 | 0 | 8 | 4 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| | | Charges | 10 | 4 | 0 | 0 | 0 | 8 | 8 | 0 | 0 | 0 | 1 | 2 | 3 |
| | | Grand Total Dispositions | 9 | 6 | 0 | 0 | 1 | 4 | 5 | 0 | 0 | 0 | 0 | 1 | 2 |
| | | Total Non-Trial Dispositions | 9 | 6 | 0 | 0 | 1 | 4 | 5 | 0 | 0 | 0 | 0 | 1 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **6th Judicial District** | **Humboldt County** | **Union Justice Court** New Filings (cases) | 25 | 3 | 0 | 1 | 4 | 27 | 51 | 1 | 0 | 0 | 0 | 8 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 73 | 3 | 0 | 1 | 5 | 33 | 78 | 8 | 0 | 0 | 0 | 10 | 3 |
| | | Grand Total Dispositions | 19 | 2 | 1 | 0 | 4 | 24 | 34 | 3 | 0 | 3 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 19 | 2 | 1 | 0 | 4 | 24 | 34 | 3 | 0 | 3 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **7th Judicial District** | **Eureka County** | **Eureka Justice Court** New Filings (cases) | 1 | 0 | 0 | 3 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 1 | 0 | 0 | 3 | 0 | 0 | 5 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 2 | 0 | 1 | 3 | 0 | 0 | 2 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 2 | 0 | 1 | 3 | 0 | 0 | 2 | 0 | 0 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]    Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Felony (4 of 6) | | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7th Judicial District Cont. | Lincoln County | Meadow Valley Justice Court | New Filings (cases) | 13 | 4 | 1 | 0 | 0 | 13 | 5 | 1 | 0 | 2 | 1 | 0 | 3 |
| | | | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Charges | 21 | 6 | 3 | 0 | 0 | 33 | 9 | 4 | 0 | 2 | 1 | 1 | 5 |
| | | | Grand Total Dispositions | 12 | 3 | 0 | 0 | 0 | 10 | 3 | 1 | 0 | 1 | 1 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 12 | 3 | 0 | 0 | 0 | 10 | 3 | 1 | 0 | 1 | 1 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Pahranagat Valley Justice Court | New Filings (cases) | 0 | 0 | 0 | 1 | 0 | 13 | 1 | 2 | 0 | 2 | 0 | 1 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 1 | 0 | 25 | 2 | 2 | 0 | 2 | 0 | 1 | 1 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 2 | 1 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 2 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | Ely Justice Court | New Filings (cases) | 34 | 9 | 1 | 6 | 0 | 29 | 66 | 4 | 0 | 5 | 1 | 4 | 20 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 55 | 13 | 1 | 6 | 0 | 48 | 119 | 26 | 0 | 5 | 1 | 8 | 34 |
| | | | Grand Total Dispositions | 39 | 9 | 1 | 5 | 0 | 27 | 69 | 7 | 0 | 5 | 0 | 2 | 16 |
| | | | Total Non-Trial Dispositions | 39 | 9 | 1 | 5 | 0 | 27 | 69 | 7 | 0 | 5 | 0 | 2 | 16 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8th Judicial District | Clark County | Boulder Justice Court | New Filings (cases) | 11 | 3 | 1 | 5 | 1 | 21 | 2 | 5 | 0 | 1 | 0 | 1 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 23 | 4 | 1 | 6 | 2 | 80 | 4 | 10 | 0 | 1 | 0 | 2 | 3 |
| | | | Grand Total Dispositions | 10 | 4 | 1 | 6 | 3 | 22 | 9 | 3 | 0 | 1 | 0 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 10 | 4 | 1 | 6 | 3 | 22 | 9 | 3 | 0 | 1 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Bunkerville Justice Court | New Filings (cases) | 2 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 2 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Goodsprings Justice Court | New Filings (cases) | 5 | 3 | 0 | 1 | 0 | 22 | 15 | 3 | 0 | 3 | 2 | 2 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 13 | 3 | 0 | 1 | 0 | 42 | 38 | 7 | 0 | 3 | 3 | 5 | 0 |
| | | | Grand Total Dispositions [c] | 10 | 2 | 0 | 1 | 1 | 20 | 15 | 6 | 0 | 0 | 0 | 1 | 1 |
| | | | Total Non-Trial Dispositions | 10 | 2 | 0 | 1 | 1 | 20 | 15 | 6 | 0 | 0 | 0 | 1 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Henderson Justice Court | New Filings (cases) | 256 | 198 | 11 | 53 | 1 | 412 | 113 | 50 | 3 | 11 | 1 | 4 | 1 |
| | | | Reopened (cases) | 14 | 4 | 1 | 1 | 0 | 7 | 2 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | | Charges | 497 | 277 | 17 | 85 | 3 | 1,706 | 218 | 142 | 6 | 14 | 5 | 19 | 2 |
| | | | Grand Total Dispositions | 295 | 175 | 9 | 70 | 5 | 524 | 167 | 45 | 4 | 11 | 1 | 8 | 2 |
| | | | Total Non-Trial Dispositions | 295 | 175 | 9 | 70 | 5 | 524 | 167 | 45 | 4 | 11 | 1 | 8 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]    Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Felony (5 of 6) | | | | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District Cont. | Clark County Cont. | Las Vegas Justice Court | New Filings (cases) | 3,935 | 1,642 | 61 | 478 | 26 | 4,930 | 2,327 | 1,223 | 272 | 217 | 9 | 120 | 120 |
| | | | Reopened (cases) | 176 | 141 | 1 | 46 | 1 | 346 | 232 | 89 | 4 | 11 | 1 | 8 | 12 |
| | | | Charges | 8,127 | 2,586 | 124 | 1,001 | 35 | 13,773 | 4,319 | 3,538 | 474 | 278 | 65 | 304 | 247 |
| | | | Grand Total Dispositions | 4,571 | 1,791 | 84 | 577 | 22 | 5,797 | 3,042 | 1,386 | 224 | 294 | 14 | 126 | 165 |
| | | | Total Non-Trial Dispositions | 4,571 | 1,791 | 84 | 577 | 22 | 5,797 | 3,040 | 1,386 | 224 | 294 | 14 | 126 | 165 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Laughlin Justice Court | New Filings (cases) | 30 | 13 | 0 | 6 | 0 | 49 | 11 | 5 | 0 | 1 | 0 | 0 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 73 | 20 | 0 | 8 | 0 | 78 | 21 | 33 | 0 | 1 | 0 | 1 | 1 |
| | | | Grand Total Dispositions | 38 | 7 | 0 | 3 | 2 | 50 | 19 | 5 | 1 | 1 | 0 | 1 | 1 |
| | | | Total Non-Trial Dispositions | 38 | 7 | 0 | 3 | 2 | 50 | 19 | 5 | 1 | 1 | 0 | 1 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Mesquite Justice Court | New Filings (cases) | 10 | 7 | 1 | 3 | 2 | 63 | 81 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 41 | 10 | 1 | 5 | 2 | 128 | 144 | 9 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions <sup>c</sup> | 21 | 4 | 1 | 4 | 0 | 90 | 136 | 3 | 0 | 0 | 0 | 0 | 4 |
| | | | Total Non-Trial Dispositions | 21 | 4 | 1 | 4 | 0 | 90 | 136 | 3 | 0 | 0 | 0 | 0 | 4 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Moapa Justice Court | New Filings (cases) | 5 | 1 | 0 | 2 | 0 | 6 | 4 | 1 | 0 | 1 | 0 | 3 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 12 | 1 | 0 | 2 | 0 | 23 | 4 | 1 | 0 | 3 | 0 | 3 | 1 |
| | | | Grand Total Dispositions <sup>c</sup> | 5 | 0 | 0 | 2 | 0 | 3 | 5 | 1 | 0 | 1 | 0 | 2 | 0 |
| | | | Total Non-Trial Dispositions | 5 | 0 | 0 | 2 | 0 | 3 | 5 | 1 | 0 | 1 | 0 | 2 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Moapa Valley Justice Court | New Filings (cases) | 4 | 4 | 1 | 0 | 0 | 5 | 5 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 15 | 5 | 1 | 1 | 0 | 9 | 13 | 3 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions <sup>c</sup> | 6 | 3 | 1 | 0 | 1 | 4 | 8 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Non-Trial Dispositions | 6 | 3 | 1 | 0 | 1 | 4 | 8 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | North Las Vegas Justice Court | New Filings (cases) | 435 | 132 | 3 | 93 | 4 | 407 | 285 | 115 | 9 | 21 | 3 | 10 | 9 |
| | | | Reopened (cases) | 4 | 1 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 932 | 253 | 8 | 157 | 10 | 777 | 525 | 255 | 21 | 24 | 7 | 30 | 13 |
| | | | Grand Total Dispositions <sup>c</sup> | 494 | 158 | 3 | 103 | 6 | 493 | 449 | 121 | 8 | 20 | 3 | 10 | 15 |
| | | | Total Non-Trial Dispositions | 494 | 158 | 3 | 103 | 6 | 493 | 449 | 121 | 8 | 20 | 3 | 10 | 15 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Searchlight Justice Court | New Filings (cases) | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 7 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 |
| | | | Grand Total Dispositions | 3 | 0 | 0 | 1 | 0 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 2 | 0 | 0 | 1 | 0 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

<sup>c</sup>   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| | | Justice Court, Criminal Caseload, Felony (6 of 6) | Crimes Against Persons, Felony | Domestic Violence, Felony | Older/Vulnerable Persons Abuse, Felony | Child Abuse & Neglect, Felony | Protection Order Violation, Felony | Crimes Against Property, Felony | Drugs, Felony | Weapons, Felony | Public Order, Felony | Motor Vehicle - DUI, Felony | Motor Vehicle - Reckless, Felony | Motor Vehicle - Other, Felony | Other, Felony |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **9th Judicial District** | **Douglas County** | **East Fork Justice Court** New Filings (cases) | 32 | 2 | 0 | 4 | 2 | 59 | 94 | 8 | 0 | 9 | 2 | 5 | 2 |
| | | Reopened (cases) | 2 | 0 | 0 | 0 | 0 | 6 | 7 | 0 | 0 | 6 | 0 | 0 | 0 |
| | | Charges | 48 | 2 | 1 | 6 | 2 | 88 | 149 | 11 | 0 | 10 | 3 | 9 | 4 |
| | | Grand Total Dispositions | 26 | 2 | 0 | 3 | 2 | 53 | 105 | 9 | 0 | 12 | 2 | 6 | 1 |
| | | Total Non-Trial Dispositions | 26 | 2 | 0 | 3 | 2 | 53 | 105 | 9 | 0 | 12 | 2 | 6 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Tahoe Justice Court** New Filings (cases) | 7 | 1 | 0 | 2 | 0 | 29 | 45 | 0 | 0 | 2 | 0 | 1 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Charges | 8 | 1 | 0 | 3 | 0 | 48 | 78 | 1 | 2 | 3 | 2 | 2 | 0 |
| | | Grand Total Dispositions | 13 | 5 | 0 | 4 | 0 | 33 | 45 | 0 | 0 | 6 | 0 | 1 | 0 |
| | | Total Non-Trial Dispositions | 13 | 5 | 0 | 4 | 0 | 33 | 45 | 0 | 0 | 6 | 0 | 1 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **10th Judicial District** | **Churchill County** | **New River Justice Court** New Filings (cases) | 46 | 7 | 0 | 13 | 0 | 63 | 106 | 5 | 0 | 15 | 0 | 5 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 72 | 12 | 0 | 20 | 0 | 172 | 186 | 25 | 0 | 17 | 0 | 9 | 13 |
| | | Grand Total Dispositions | 53 | 8 | 2 | 7 | 0 | 73 | 96 | 4 | 0 | 10 | 0 | 7 | 5 |
| | | Total Non-Trial Dispositions | 53 | 8 | 2 | 7 | 0 | 73 | 96 | 4 | 0 | 10 | 0 | 7 | 5 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **11th Judicial District** | **Lander County** | **Argenta Justice Court** New Filings (cases) | 3 | 0 | 0 | 1 | 0 | 1 | 9 | 2 | 0 | 0 | 0 | 1 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 4 | 0 | 0 | 1 | 0 | 1 | 9 | 9 | 0 | 0 | 0 | 1 | 1 |
| | | Grand Total Dispositions c | 2 | 0 | 0 | 0 | 0 | 3 | 14 | 2 | 0 | 0 | 0 | 1 | 0 |
| | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 3 | 14 | 2 | 0 | 0 | 0 | 1 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Austin Justice Court** New Filings (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions c | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Mineral County** | **Hawthorne Justice Court** New Filings (cases) | 29 | 1 | 4 | 7 | 0 | 37 | 66 | 3 | 0 | 6 | 1 | 4 | 4 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Charges | 36 | 2 | 4 | 8 | 0 | 79 | 137 | 21 | 0 | 7 | 4 | 5 | 11 |
| | | Grand Total Dispositions | 7 | 0 | 1 | 4 | 0 | 12 | 31 | 2 | 0 | 1 | 0 | 2 | 2 |
| | | Total Non-Trial Dispositions | 7 | 0 | 1 | 4 | 0 | 12 | 31 | 2 | 0 | 1 | 0 | 2 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Pershing County** | **Lake Justice Court** New Filings (cases) | 13 | 2 | 0 | 3 | 0 | 7 | 17 | 0 | 2 | 3 | 0 | 1 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 20 | 2 | 0 | 5 | 0 | 15 | 20 | 1 | 2 | 3 | 0 | 1 | 5 |
| | | Grand Total Dispositions c | 10 | 2 | 0 | 5 | 0 | 14 | 20 | 0 | 0 | 3 | 0 | 2 | 4 |
| | | Total Non-Trial Dispositions | 10 | 2 | 0 | 5 | 0 | 14 | 20 | 0 | 0 | 3 | 0 | 2 | 4 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

c   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Gross Misdemeanor (1 of 6) | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | | **Nevada Justice Courts** New Filings (cases) | **1,509** | **203** | **17** | **127** | **82** | **1,689** | **65** | **235** | **20** | **39** | **276** |
| | | Reopened (cases) | 131 | 46 | 0 | 9 | 4 | 322 | 7 | 21 | 2 | 0 | 19 |
| | | Charges | 2,620 | 453 | 35 | 202 | 101 | 3,490 | 215 | 875 | 56 | 43 | 724 |
| | | Grand Total Dispositions | 1,446 | 234 | 15 | 146 | 76 | 1,890 | 80 | 300 | 17 | 18 | 268 |
| | | Total Non-Trial Dispositions | 1,446 | 234 | 15 | 146 | 75 | 1,890 | 80 | 300 | 17 | 18 | 267 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1st Judicial District | Carson City | Carson City Justice Court [b] New Filings (cases) | **30** | **1** | **2** | **17** | **5** | **52** | **15** | **11** | **0** | **0** | **13** |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 50 | 1 | 4 | 40 | 6 | 103 | 48 | 25 | 0 | 0 | 24 |
| | | Grand Total Dispositions | 20 | 1 | 1 | 3 | 5 | 46 | 6 | 7 | 0 | 0 | 6 |
| | | Total Non-Trial Dispositions | 20 | 1 | 1 | 3 | 5 | 46 | 6 | 7 | 0 | 0 | 6 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Storey County | Virginia City Justice Court New Filings (cases) | **2** | **0** | **0** | **1** | **0** | **3** | **2** | **2** | **0** | **1** | **1** |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 4 | 0 | 0 | 1 | 0 | 6 | 2 | 3 | 1 | 1 | 1 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 1 | 1 | 5 | 0 | 1 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 1 | 1 | 5 | 0 | 1 | 0 | 0 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Incline Village Justice Court New Filings (cases) | **3** | **0** | **0** | **2** | **0** | **1** | **0** | **0** | **1** | **0** | **0** |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 3 | 0 | 0 | 2 | 0 | 4 | 0 | 0 | 1 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reno Justice Court New Filings (cases) | **168** | **8** | **1** | **18** | **8** | **263** | **12** | **12** | **1** | **3** | **24** |
| | | Reopened (cases) | 29 | 10 | 0 | 1 | 2 | 56 | 1 | 5 | 0 | 0 | 2 |
| | | Charges | 257 | 24 | 1 | 28 | 11 | 426 | 33 | 52 | 2 | 3 | 39 |
| | | Grand Total Dispositions | 134 | 18 | 0 | 26 | 6 | 220 | 10 | 18 | 0 | 1 | 20 |
| | | Total Non-Trial Dispositions | 134 | 18 | 0 | 26 | 6 | 220 | 10 | 18 | 0 | 1 | 20 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Sparks Justice Court New Filings (cases) | **74** | **9** | **0** | **8** | **3** | **97** | **4** | **5** | **2** | **3** | **16** |
| | | Reopened (cases) | 21 | 8 | 0 | 2 | 0 | 31 | 4 | 0 | 1 | 0 | 4 |
| | | Charges | 133 | 17 | 0 | 14 | 5 | 185 | 11 | 19 | 2 | 3 | 24 |
| | | Grand Total Dispositions [c] | 77 | 19 | 0 | 25 | 2 | 109 | 13 | 10 | 5 | 1 | 18 |
| | | Total Non-Trial Dispositions | 77 | 19 | 0 | 25 | 2 | 109 | 13 | 10 | 5 | 1 | 18 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Wadsworth Justice Court New Filings (cases) | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes.
     Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.
[b]   Carson City Justice Court includes Municipal Court information.
[c]   Includes administrative case closures.
Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Gross Misdemeanor (2 of 6) | | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3rd Judicial District | Lyon County | Canal Justice Court | New Filings (cases) | 7 | 0 | 0 | 4 | 6 | 10 | 2 | 0 | 0 | 0 | 2 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 12 | 0 | 0 | 4 | 7 | 31 | 11 | 6 | 0 | 0 | 3 |
| | | | Grand Total Dispositions | 6 | 0 | 0 | 6 | 8 | 10 | 2 | 4 | 0 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 6 | 0 | 0 | 6 | 8 | 10 | 2 | 4 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Dayton Justice Court | New Filings (cases) | 5 | 0 | 0 | 2 | 4 | 6 | 0 | 2 | 0 | 0 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 8 | 0 | 0 | 2 | 4 | 14 | 0 | 3 | 0 | 0 | 2 |
| | | | Grand Total Dispositions | 7 | 0 | 0 | 3 | 8 | 4 | 3 | 2 | 0 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 7 | 0 | 0 | 3 | 8 | 4 | 3 | 2 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Walker River Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 5 | 6 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 2 | 0 | 0 | 0 | 5 | 8 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 6 | 3 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 6 | 3 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Carlin Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Eastline Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Justice Court | New Filings (cases) | 37 | 1 | 2 | 8 | 5 | 11 | 2 | 5 | 1 | 0 | 3 |
| | | | Reopened (cases) | 1 | 2 | 0 | 0 | 1 | 6 | 0 | 1 | 0 | 0 | 0 |
| | | | Charges | 61 | 1 | 2 | 17 | 5 | 39 | 8 | 17 | 1 | 0 | 24 |
| | | | Grand Total Dispositions | 28 | 3 | 2 | 9 | 4 | 12 | 2 | 2 | 1 | 0 | 6 |
| | | | Total Non-Trial Dispositions | 28 | 3 | 2 | 9 | 4 | 12 | 2 | 2 | 1 | 0 | 6 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Wells Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Gross Misdemeanor (3 of 6) | | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5th Judicial District | Esmeralda County | Esmeralda Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County | Beatty Justice Court | New Filings (cases) | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 4 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 5 | 0 | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 4 | 0 |
| | | | Grand Total Dispositions [c] | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Pahrump Justice Court | New Filings (cases) | 38 | 0 | 3 | 28 | 0 | 30 | 3 | 5 | 0 | 0 | 19 |
| | | | Reopened (cases) | 2 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 2 |
| | | | Charges | 55 | 0 | 16 | 33 | 0 | 64 | 10 | 18 | 0 | 0 | 52 |
| | | | Grand Total Dispositions | 24 | 0 | 1 | 11 | 0 | 16 | 3 | 3 | 0 | 0 | 17 |
| | | | Total Non-Trial Dispositions | 24 | 0 | 1 | 11 | 0 | 16 | 3 | 3 | 0 | 0 | 17 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Tonopah Justice Court | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 4 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 3 | 0 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 4 | 3 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | Union Justice Court | New Filings (cases) | 3 | 0 | 0 | 3 | 3 | 7 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 3 | 0 | 0 | 4 | 4 | 9 | 0 | 5 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 3 | 0 | 1 | 3 | 3 | 6 | 0 | 2 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 3 | 0 | 1 | 3 | 3 | 6 | 0 | 2 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7th Judicial District | Eureka County | Eureka Justice Court | New Filings (cases) | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Reopened (cases) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Charges | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Gross Misdemeanor (4 of 6) | | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7th Judicial District Cont. | Lincoln County | Meadow Valley Justice Court | New Filings (cases) | 3 | 0 | 1 | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 3 | 0 | 1 | 6 | 0 | 3 | 1 | 1 | 0 | 0 | 8 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Pahranagat Valley Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 1 | 0 | 10 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | Ely Justice Court | New Filings (cases) | 2 | 0 | 3 | 1 | 0 | 5 | 0 | 3 | 0 | 0 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 11 | 1 | 5 | 3 | 0 | 20 | 6 | 8 | 2 | 0 | 3 |
| | | | Grand Total Dispositions | 1 | 0 | 3 | 1 | 0 | 5 | 0 | 4 | 0 | 0 | 2 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 3 | 1 | 0 | 5 | 0 | 4 | 0 | 0 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8th Judicial District | Clark County | Boulder Justice Court | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 5 | 0 | 1 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 7 | 0 | 0 | 0 | 1 | 12 | 0 | 1 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Bunkerville Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Goodsprings Justice Court | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions [c] | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Henderson Justice Court | New Filings (cases) | 81 | 10 | 0 | 2 | 9 | 61 | 0 | 3 | 0 | 0 | 10 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 180 | 25 | 0 | 2 | 10 | 222 | 1 | 17 | 0 | 0 | 11 |
| | | | Grand Total Dispositions | 82 | 12 | 0 | 2 | 7 | 65 | 1 | 5 | 0 | 0 | 9 |
| | | | Total Non-Trial Dispositions | 82 | 12 | 0 | 2 | 7 | 65 | 1 | 5 | 0 | 0 | 9 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Gross Misdemeanor (5 of 6) | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District Cont. | Clark County Cont. | Las Vegas Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 884 | 149 | 1 | 15 | 17 | 997 | 17 | 160 | 14 | 8 | 141 |
| | | Reopened (cases) | 76 | 26 | 0 | 6 | 1 | 218 | 2 | 14 | 1 | 0 | 11 |
| | | Charges | 1,505 | 333 | 1 | 21 | 24 | 1,965 | 43 | 631 | 38 | 8 | 454 |
| | | Grand Total Dispositions | 886 | 156 | 2 | 34 | 13 | 1,231 | 22 | 211 | 10 | 6 | 146 |
| | | Total Non-Trial Dispositions | 886 | 156 | 2 | 34 | 13 | 1,231 | 22 | 211 | 10 | 6 | 145 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Laughlin Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 1 | 3 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 15 | 3 | 0 | 0 | 0 | 14 | 1 | 1 | 2 | 0 | 7 |
| | | Grand Total Dispositions | 3 | 2 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 2 |
| | | Total Non-Trial Dispositions | 3 | 2 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Mesquite Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 4 | 1 | 1 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 14 | 5 | 1 | 0 | 0 | 38 | 0 | 0 | 0 | 0 | 1 |
| | | Grand Total Dispositions [c] | 3 | 2 | 1 | 0 | 0 | 9 | 1 | 2 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 3 | 2 | 1 | 0 | 0 | 9 | 1 | 2 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Moapa Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 |
| | | Grand Total Dispositions [c] | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Moapa Valley Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions [c] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | North Las Vegas Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 118 | 19 | 0 | 5 | 3 | 72 | 1 | 16 | 1 | 11 | 24 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 |
| | | Charges | 215 | 39 | 0 | 8 | 5 | 207 | 1 | 49 | 6 | 15 | 32 |
| | | Grand Total Dispositions [c] | 133 | 20 | 0 | 8 | 3 | 93 | 4 | 17 | 1 | 5 | 27 |
| | | Total Non-Trial Dispositions | 133 | 20 | 0 | 8 | 3 | 93 | 4 | 17 | 1 | 5 | 27 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Searchlight Justice Court | | | | | | | | | | | |
| | | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 3 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 2 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Gross Misdemeanor (6 of 6) | | | | | Crimes Against Persons, Gross Misdemeanor | Domestic Violence, Gross Misdemeanor | Older/Vulnerable Persons Abuse, Gross Misdemeanor | Child Abuse & Neglect, Gross Misdemeanor | Protection Order Violation, Gross Misdemeanor | Crimes Against Property, Gross Misdemeanor | Drugs, Gross Misdemeanor | Weapons, Gross Misdemeanor | Public Order, Gross Misdemeanor | Motor Vehicle - Other, Gross Misdemeanor | Other, Gross Misdemeanor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9th Judicial District | Douglas County | East Fork Justice Court | New Filings (cases) | | 6 | 1 | 1 | 1 | 7 | 10 | 2 | 3 | 0 | 1 | 4 |
| | | | Reopened (cases) | | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | | 7 | 1 | 1 | 3 | 7 | 16 | 11 | 6 | 0 | 1 | 10 |
| | | | Grand Total Dispositions | | 6 | 0 | 2 | 2 | 7 | 9 | 4 | 2 | 0 | 0 | 3 |
| | | | Total Non-Trial Dispositions | | 6 | 0 | 2 | 2 | 6 | 9 | 4 | 2 | 0 | 0 | 3 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Tahoe Justice Court | New Filings (cases) | | 4 | 0 | 0 | 1 | 1 | 3 | 1 | 0 | 0 | 1 | 0 |
| | | | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | | 4 | 1 | 0 | 1 | 1 | 7 | 2 | 0 | 0 | 1 | 0 |
| | | | Grand Total Dispositions | | 2 | 0 | 0 | 1 | 0 | 6 | 4 | 1 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | | 2 | 0 | 0 | 1 | 0 | 6 | 4 | 1 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10th Judicial District | Churchill County | New River Justice Court | New Filings (cases) | | 11 | 1 | 2 | 5 | 4 | 18 | 2 | 3 | 0 | 1 | 6 |
| | | | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | | 24 | 2 | 2 | 7 | 4 | 52 | 16 | 6 | 0 | 1 | 13 |
| | | | Grand Total Dispositions | | 10 | 1 | 2 | 4 | 2 | 23 | 3 | 2 | 0 | 1 | 3 |
| | | | Total Non-Trial Dispositions | | 10 | 1 | 2 | 4 | 2 | 23 | 3 | 2 | 0 | 1 | 3 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District | Lander County | Argenta Justice Court | New Filings (cases) | | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | | Reopened (cases) | | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | | Charges | | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions [c] | | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 |
| | | | Total Non-Trial Dispositions | | 1 | 0 | 0 | 2 | 0 | 1 | 1 | 1 | 0 | 1 | 0 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Austin Justice Court | New Filings (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Charges | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Grand Total Dispositions [c] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Total Non-Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Hawthorne Justice Court | New Filings (cases) | | 5 | 0 | 0 | 1 | 0 | 3 | 0 | 2 | 0 | 2 | 2 |
| | | | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | | 21 | 0 | 1 | 3 | 1 | 14 | 6 | 4 | 0 | 2 | 4 |
| | | | Grand Total Dispositions | | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 |
| | | | Total Non-Trial Dispositions | | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Lake Justice Court | New Filings (cases) | | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| | | | Reopened (cases) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | | 6 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 |
| | | | Grand Total Dispositions [c] | | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 2 | 0 | 0 | 2 |
| | | | Total Non-Trial Dispositions | | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 2 | 0 | 0 | 2 |
| | | | Total Trial Dispositions | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]     Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Misdemeanor (1 of 6) | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada Justice Courts | New Filings (cases) | 4,377 | 3,758 | 1 | 137 | 5,992 | 1,987 | 161 | 2,609 | 5,757 | 1,469 | 3,866 | 224,997 | 8,112 |
| | | Reopened (cases) | 193 | 361 | 0 | 6 | 236 | 239 | 28 | 68 | 1,374 | 39 | 92 | 956 | 1 |
| | | Charges | 5,816 | 7,387 | 3 | 192 | 7,836 | 3,559 | 283 | 3,301 | 6,737 | 1,756 | 6,849 | 283,455 | 8,949 |
| | | Grand Total Dispositions | 4,352 | 4,505 | 1 | 142 | 6,731 | 2,514 | 210 | 2,599 | 7,708 | 1,400 | 4,466 | 135,365 | 3,792 |
| | | Total Non-Trial Dispositions | 4,315 | 4,478 | 1 | 141 | 6,707 | 2,513 | 208 | 2,592 | 7,650 | 1,386 | 4,443 | 135,164 | 3,792 |
| | | Total Trial Dispositions | 37 | 27 | 0 | 1 | 24 | 1 | 2 | 7 | 58 | 14 | 23 | 201 | 0 |
| 1st Judicial District | Carson City | Carson City Justice Court [b] New Filings (cases) | 103 | 79 | 0 | 17 | 184 | 97 | 2 | 69 | 212 | 29 | 152 | 6,980 | 117 |
| | | Reopened (cases) | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |
| | | Charges | 133 | 118 | 0 | 25 | 294 | 544 | 13 | 109 | 262 | 57 | 269 | 9,427 | 127 |
| | | Grand Total Dispositions | 80 | 73 | 0 | 19 | 144 | 71 | 2 | 69 | 131 | 17 | 112 | 6,292 | 113 |
| | | Total Non-Trial Dispositions | 79 | 70 | 0 | 19 | 143 | 71 | 2 | 67 | 127 | 16 | 112 | 6,285 | 113 |
| | | Total Trial Dispositions | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 2 | 4 | 1 | 0 | 7 | 0 |
| | Storey County | Virginia City Justice Court New Filings (cases) | 10 | 12 | 0 | 1 | 11 | 12 | 3 | 10 | 44 | 38 | 21 | 1,180 | 40 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Charges | 11 | 14 | 0 | 1 | 16 | 14 | 4 | 10 | 49 | 41 | 29 | 1,678 | 42 |
| | | Grand Total Dispositions | 13 | 7 | 0 | 2 | 16 | 14 | 4 | 12 | 51 | 33 | 16 | 1,115 | 34 |
| | | Total Non-Trial Dispositions | 13 | 7 | 0 | 2 | 15 | 14 | 4 | 12 | 49 | 30 | 16 | 1,104 | 34 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 3 | 0 | 11 | 0 |
| 2nd Judicial District | Washoe County | Incline Village Justice Court New Filings (cases) | 13 | 4 | 0 | 1 | 26 | 11 | 0 | 4 | 25 | 5 | 17 | 738 | 706 |
| | | Reopened (cases) | 3 | 3 | 0 | 1 | 6 | 6 | 0 | 0 | 27 | 0 | 1 | 22 | 1 |
| | | Charges | 19 | 7 | 0 | 1 | 29 | 19 | 0 | 7 | 28 | 6 | 25 | 971 | 719 |
| | | Grand Total Dispositions | 13 | 8 | 0 | 0 | 51 | 21 | 0 | 12 | 78 | 4 | 23 | 855 | 725 |
| | | Total Non-Trial Dispositions | 13 | 7 | 0 | 0 | 51 | 21 | 0 | 12 | 76 | 4 | 22 | 851 | 725 |
| | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 4 | 0 |
| | | Reno Justice Court New Filings (cases) | 146 | 47 | 0 | 13 | 129 | 166 | 18 | 51 | 491 | 73 | 243 | 14,185 | 19 |
| | | Reopened (cases) | 36 | 49 | 0 | 3 | 65 | 77 | 8 | 12 | 331 | 4 | 23 | 448 | 0 |
| | | Charges | 301 | 268 | 0 | 41 | 439 | 524 | 36 | 100 | 663 | 106 | 601 | 18,016 | 22 |
| | | Grand Total Dispositions | 215 | 147 | 0 | 20 | 333 | 418 | 28 | 62 | 812 | 72 | 702 | 14,097 | 17 |
| | | Total Non-Trial Dispositions | 214 | 146 | 0 | 20 | 332 | 418 | 28 | 61 | 793 | 72 | 700 | 14,068 | 17 |
| | | Total Trial Dispositions | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 19 | 0 | 2 | 29 | 0 |
| | | Sparks Justice Court New Filings (cases) | 83 | 46 | 0 | 8 | 66 | 110 | 4 | 17 | 197 | 20 | 104 | 3,076 | 5 |
| | | Reopened (cases) | 27 | 45 | 0 | 2 | 34 | 92 | 0 | 6 | 152 | 3 | 35 | 102 | 0 |
| | | Charges | 162 | 150 | 0 | 15 | 207 | 375 | 14 | 42 | 263 | 35 | 260 | 4,603 | 7 |
| | | Grand Total Dispositions [c] | 130 | 208 | 0 | 16 | 176 | 317 | 7 | 85 | 525 | 38 | 279 | 3,731 [c] | 6 [c] |
| | | Total Non-Trial Dispositions | 128 | 205 | 0 | 16 | 176 | 317 | 7 | 85 | 520 | 37 | 276 | 3,720 | 6 |
| | | Total Trial Dispositions | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 3 | 11 | 0 |
| | | Wadsworth Justice Court New Filings (cases) | 7 | 4 | 0 | 0 | 4 | 6 | 0 | 2 | 35 | 13 | 10 | 1,699 | 3 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 | 1 | 29 | 0 |
| | | Charges | 7 | 4 | 0 | 0 | 4 | 6 | 0 | 2 | 39 | 14 | 11 | 2,192 | 5 |
| | | Grand Total Dispositions | 2 | 2 | 0 | 0 | 2 | 4 | 0 | 3 | 30 | 15 | 9 | 1,690 | 3 |
| | | Total Non-Trial Dispositions | 2 | 2 | 0 | 0 | 2 | 4 | 0 | 3 | 29 | 15 | 9 | 1,674 | 3 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 16 | 0 |

[a]   Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[b]   Carson City Justice Court includes Municipal Court information.

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Misdemeanor (2 of 6) | | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3rd Judicial District | Lyon County | Canal Justice Court | New Filings (cases) | 22 | 71 | 0 | 13 | 43 | 48 | 2 | 8 | 44 | 5 | 19 | 468 | 0 |
| | | | Reopened (cases) | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| | | | Charges | 23 | 75 | 0 | 18 | 53 | 64 | 4 | 10 | 54 | 8 | 34 | 730 | 0 |
| | | | Grand Total Dispositions | 21 | 71 | 0 | 14 | 55 | 36 | 1 | 8 | 31 | 3 | 12 | 454 | 0 |
| | | | Total Non-Trial Dispositions | 21 | 71 | 0 | 14 | 54 | 36 | 1 | 8 | 31 | 2 | 12 | 454 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Dayton Justice Court | New Filings (cases) | 29 | 45 | 0 | 13 | 34 | 43 | 2 | 17 | 39 | 8 | 40 | 1,207 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| | | | Charges | 37 | 47 | 0 | 13 | 44 | 52 | 2 | 21 | 49 | 11 | 74 | 1,583 | 1 |
| | | | Grand Total Dispositions | 24 | 48 | 0 | 12 | 31 | 26 | 2 | 15 | 43 | 11 | 46 | 1,385 | 0 |
| | | | Total Non-Trial Dispositions | 24 | 48 | 0 | 12 | 31 | 26 | 2 | 15 | 42 | 11 | 45 | 1,385 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| | | Walker River Justice Court | New Filings (cases) | 13 | 41 | 0 | 10 | 24 | 46 | 0 | 14 | 53 | 19 | 46 | 1,444 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | | Charges | 15 | 43 | 0 | 10 | 31 | 67 | 0 | 15 | 59 | 23 | 129 | 1,858 | 1 |
| | | | Grand Total Dispositions | 8 | 39 | 0 | 11 | 36 | 36 | 1 | 8 | 45 | 20 | 91 | 1,487 | 0 |
| | | | Total Non-Trial Dispositions | 8 | 39 | 0 | 11 | 36 | 36 | 1 | 8 | 45 | 20 | 91 | 1,487 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Carlin Justice Court | New Filings (cases) | 20 | 2 | 0 | 7 | 9 | 5 | 1 | 7 | 8 | 1 | 6 | 688 | 1 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 25 | 2 | 0 | 9 | 12 | 7 | 1 | 20 | 10 | 1 | 9 | 780 | 4 |
| | | | Grand Total Dispositions | 20 | 6 | 0 | 3 | 8 | 7 | 1 | 7 | 10 | 4 | 3 | 632 | 1 |
| | | | Total Non-Trial Dispositions | 20 | 6 | 0 | 3 | 8 | 7 | 1 | 7 | 9 | 4 | 3 | 630 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 |
| | | Eastline Justice Court | New Filings (cases) | 11 | 16 | 0 | 5 | 28 | 47 | 2 | 5 | 3 | 3 | 3 | 289 | 0 |
| | | | Reopened (cases) | 8 | 8 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 8 | 0 |
| | | | Charges | 12 | 19 | 0 | 5 | 38 | 69 | 2 | 12 | 5 | 4 | 14 | 397 | 0 |
| | | | Grand Total Dispositions | 27 | 12 | 0 | 3 | 25 | 38 | 2 | 5 | 1 | 1 | 5 | 200 | 0 |
| | | | Total Non-Trial Dispositions | 25 | 12 | 0 | 3 | 25 | 38 | 2 | 5 | 1 | 1 | 5 | 200 | 0 |
| | | | Total Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Justice Court | New Filings (cases) | 123 | 65 | 0 | 0 | 152 | 50 | 4 | 34 | 97 | 11 | 98 | 4,587 | 6 |
| | | | Reopened (cases) | 26 | 51 | 0 | 0 | 40 | 13 | 2 | 10 | 73 | 1 | 5 | 97 | 0 |
| | | | Charges | 165 | 87 | 0 | 0 | 222 | 90 | 7 | 116 | 117 | 22 | 155 | 5,457 | 6 |
| | | | Grand Total Dispositions | 157 | 91 | 0 | 0 | 190 | 72 | 5 | 44 | 147 | 10 | 102 | 4,175 | 5 |
| | | | Total Non-Trial Dispositions | 154 | 87 | 0 | 0 | 188 | 72 | 5 | 44 | 145 | 10 | 101 | 4,166 | 5 |
| | | | Total Trial Dispositions | 3 | 4 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 1 | 9 | 0 |
| | | Wells Justice Court | New Filings (cases) | 11 | 8 | 0 | 4 | 12 | 16 | 0 | 7 | 22 | 10 | 15 | 2,664 | 9 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | | Charges | 15 | 9 | 0 | 4 | 15 | 21 | 0 | 8 | 27 | 10 | 18 | 3,006 | 11 |
| | | | Grand Total Dispositions | 9 | 7 | 0 | 2 | 13 | 17 | 0 | 11 | 23 | 7 | 18 | 2,536 | 12 |
| | | | Total Non-Trial Dispositions | 9 | 7 | 0 | 2 | 13 | 17 | 0 | 11 | 23 | 7 | 18 | 2,534 | 12 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |

Source: Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Criminal Caseload, Misdemeanor (3 of 6) | | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5th Judicial District | Esmeralda County | Esmeralda Justice Court | **New Filings (cases)** | **0** | **4** | **0** | **0** | **0** | **1** | **0** | **0** | **3** | **0** | **6** | **1,459** | **0** |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 4 | 0 | 12 | 1,732 | 0 |
| | | | **Grand Total Dispositions** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **1** | **1** | **0** | **3** | **1,423** | **0** |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 1,417 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 6 | 0 |
| | Nye County | Beatty Justice Court | **New Filings (cases)** | **3** | **0** | **0** | **1** | **25** | **5** | **0** | **0** | **4** | **10** | **8** | **969** | **0** |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Charges | 3 | 0 | 0 | 1 | 26 | 5 | 0 | 0 | 4 | 10 | 10 | 1,126 | 0 |
| | | | **Grand Total Dispositions** [c] | **8** | **0** | **0** | **0** | **22** | **9** | **0** | **5** | **8** | **9** | **5** | **898** | **0** |
| | | | Total Non-Trial Dispositions | 8 | 0 | 0 | 0 | 22 | 9 | 0 | 5 | 8 | 9 | 5 | 897 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | Pahrump Justice Court | **New Filings (cases)** | **193** | **101** | **0** | **14** | **183** | **88** | **7** | **33** | **82** | **0** | **116** | **2,214** | **3** |
| | | | Reopened (cases) | 12 | 19 | 0 | 0 | 13 | 11 | 3 | 1 | 8 | 0 | 1 | 59 | 0 |
| | | | Charges | 199 | 113 | 0 | 14 | 205 | 111 | 9 | 40 | 92 | 0 | 174 | 2,900 | 3 |
| | | | **Grand Total Dispositions** | **154** | **74** | **0** | **15** | **138** | **64** | **6** | **17** | **102** | **0** | **137** | **2,352** | **1** |
| | | | Total Non-Trial Dispositions | 151 | 74 | 0 | 15 | 138 | 64 | 6 | 17 | 102 | 0 | 132 | 2,350 | 1 |
| | | | Total Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 0 |
| | | Tonopah Justice Court | **New Filings (cases)** | **17** | **7** | **0** | **3** | **7** | **1** | **0** | **3** | **11** | **5** | **23** | **1,160** | **1** |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | Charges | 17 | 7 | 0 | 3 | 8 | 2 | 0 | 3 | 11 | 5 | 25 | 1,428 | 1 |
| | | | **Grand Total Dispositions** | **10** | **10** | **0** | **2** | **4** | **3** | **0** | **6** | **15** | **4** | **24** | **1,169** | **1** |
| | | | Total Non-Trial Dispositions | 10 | 10 | 0 | 2 | 4 | 3 | 0 | 6 | 15 | 4 | 24 | 1,169 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | Union Justice Court | **New Filings (cases)** | **56** | **31** | **0** | **4** | **63** | **37** | **5** | **4** | **7** | **22** | **56** | **3,615** | **6** |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 8 | 0 |
| | | | Charges | 70 | 36 | 0 | 5 | 74 | 41 | 6 | 7 | 7 | 24 | 89 | 4,337 | 7 |
| | | | **Grand Total Dispositions** | **43** | **19** | **0** | **2** | **69** | **28** | **5** | **10** | **39** | **20** | **52** | **3,385** | **5** |
| | | | Total Non-Trial Dispositions | 43 | 18 | 0 | 2 | 68 | 28 | 5 | 10 | 38 | 19 | 52 | 3,382 | 5 |
| | | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 3 | 0 |
| 7th Judicial District | Eureka County | Eureka Justice Court | **New Filings (cases)** | **1** | **4** | **0** | **0** | **2** | **1** | **2** | **2** | **3** | **0** | **8** | **535** | **1** |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 1 | 6 | 0 | 0 | 2 | 4 | 2 | 3 | 5 | 0 | 14 | 583 | 2 |
| | | | **Grand Total Dispositions** | **1** | **0** | **0** | **1** | **3** | **0** | **1** | **2** | **3** | **0** | **7** | **463** | **1** |
| | | | Total Non-Trial Dispositions | 1 | 1 | 0 | 1 | 3 | 0 | 1 | 2 | 3 | 0 | 5 | 458 | 1 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 0 |

[c]      Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Misdemeanor (4 of 6) | | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7th Judicial District Cont. | Lincoln County | Meadow Valley Justice Court | New Filings (cases) | 7 | 3 | 0 | 3 | 6 | 5 | 1 | 3 | 5 | 3 | 13 | 1,067 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 13 | 14 | 0 | 4 | 14 | 12 | 2 | 6 | 12 | 3 | 29 | 1,141 | 0 |
| | | | Grand Total Dispositions | 8 | 3 | 0 | 2 | 8 | 7 | 0 | 4 | 8 | 4 | 19 | 1,035 | 0 |
| | | | Total Non-Trial Dispositions | 8 | 3 | 0 | 2 | 8 | 7 | 0 | 4 | 8 | 4 | 19 | 1,034 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Pahranagat Valley Justice Court | New Filings (cases) | 3 | 0 | 0 | 0 | 7 | 1 | 0 | 0 | 1 | 8 | 4 | 2,808 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 | 0 |
| | | | Charges | 3 | 2 | 0 | 0 | 11 | 3 | 0 | 3 | 1 | 10 | 4 | 3,019 | 0 |
| | | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 7 | 1 | 0 | 0 | 4 | 6 | 3 | 2,644 | 0 |
| | | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 7 | 1 | 0 | 0 | 4 | 6 | 3 | 2,642 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | White Pine County | Ely Justice Court | New Filings (cases) | 12 | 12 | 0 | 6 | 20 | 6 | 3 | 13 | 23 | 8 | 23 | 1,418 | 2 |
| | | | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 12 | 15 | 0 | 6 | 21 | 12 | 4 | 18 | 29 | 10 | 37 | 1,599 | 4 |
| | | | Grand Total Dispositions | 16 | 16 | 0 | 5 | 13 | 10 | 4 | 13 | 25 | 6 | 23 | 1,355 | 1 |
| | | | Total Non-Trial Dispositions | 14 | 15 | 0 | 4 | 13 | 10 | 4 | 12 | 25 | 4 | 23 | 1,353 | 1 |
| | | | Total Trial Dispositions | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 2 | 0 |
| 8th Judicial District | Clark County | Boulder Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 5 | 4 | 0 | 0 | 9 | 23 | 4 | 1,491 | 2 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 0 | 3 | 0 | 0 | 6 | 5 | 0 | 0 | 12 | 25 | 5 | 1,682 | 6 |
| | | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 4 | 1 | 0 | 1 | 8 | 26 | 5 | 1,573 | 2 |
| | | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 4 | 1 | 0 | 1 | 8 | 26 | 5 | 1,573 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Bunkerville Justice Court | New Filings (cases) | 2 | 3 | 0 | 0 | 3 | 1 | 0 | 1 | 0 | 1 | 3 | 1,242 | 3 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| | | | Charges | 2 | 5 | 0 | 0 | 3 | 1 | 0 | 1 | 1 | 1 | 3 | 1,419 | 3 |
| | | | Grand Total Dispositions | 4 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1,134 | 2 |
| | | | Total Non-Trial Dispositions | 4 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1,134 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Goodsprings Justice Court | New Filings (cases) | 10 | 5 | 0 | 0 | 16 | 4 | 1 | 1 | 50 | 225 | 16 | 6,128 | 14 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 46 | 0 |
| | | | Charges | 15 | 6 | 0 | 0 | 19 | 5 | 1 | 1 | 52 | 229 | 26 | 7,329 | 18 |
| | | | Grand Total Dispositions [c] | 20 | 11 | 0 | 0 | 36 | 24 | 2 | 8 | 60 | 203 | 36 | 8,767 [c] | 13 [c] |
| | | | Total Non-Trial Dispositions | 20 | 11 | 0 | 0 | 36 | 24 | 1 | 8 | 60 | 203 | 36 | 8,765 | 13 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | Henderson Justice Court | New Filings (cases) | 24 | 18 | 0 | 0 | 29 | 5 | 3 | 1 | 122 | 40 | 79 | 2,619 | 27 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 25 | 0 |
| | | | Charges | 75 | 167 | 0 | 0 | 168 | 11 | 5 | 6 | 139 | 47 | 105 | 3,472 | 41 |
| | | | Grand Total Dispositions | 26 | 23 | 0 | 0 | 49 | 12 | 5 | 3 | 154 | 51 | 121 | 2,939 | 31 |
| | | | Total Non-Trial Dispositions | 26 | 22 | 0 | 0 | 49 | 12 | 5 | 3 | 154 | 51 | 120 | 2,938 | 31 |
| | | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |

[c]      Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Misdemeanor (5 of 6) | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District Cont. | Clark County Cont. | Las Vegas Justice Court — New Filings (cases) | 3,196 | 2,842 | 1 | 0 | 4,315 | 908 | 89 | 2,158 | 3,744 | 713 | 2,356 | 135,515 | 6,540 |
| | | Reopened (cases) | 66 | 166 | 0 | 0 | 55 | 4 | 15 | 35 | 742 | 26 | 20 | 0 d | 0 d |
| | | Charges | 4,128 | 5,617 | 1 | 0 | 5,086 | 1,057 | 139 | 2,498 | 4,209 | 854 | 4,052 | 172,464 | 7,244 |
| | | Grand Total Dispositions | 3,064 | 3,307 | 1 | 0 | 4,696 | 976 | 120 | 2,040 | 4,881 | 659 | 2,073 | 39,591 f,g | 2,353 f,g |
| | | Total Non-Trial Dispositions | 3,049 | 3,303 | 1 | 0 | 4,691 | 976 | 119 | 2,039 | 4,869 | 659 | 2,071 | 39,581 | 2,353 |
| | | Total Trial Dispositions | 15 | 4 | 0 | 0 | 5 | 0 | 1 | 1 | 12 | 0 | 2 | 10 | 0 |
| | | Laughlin Justice Court — New Filings (cases) | 50 | 40 | 0 | 0 | 85 | 5 | 0 | 11 | 28 | 19 | 23 | 4,509 | 327 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | Charges | 53 | 62 | 0 | 0 | 106 | 7 | 1 | 11 | 39 | 20 | 34 | 5,311 | 334 |
| | | Grand Total Dispositions | 35 | 29 | 0 | 0 | 56 | 6 | 1 | 8 | 24 | 30 | 58 | 7,131 c | 202 c |
| | | Total Non-Trial Dispositions | 35 | 29 | 0 | 0 | 56 | 6 | 1 | 8 | 24 | 30 | 58 | 7,131 | 202 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Mesquite Justice Court — New Filings (cases) | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 4 | 9 | 0 | 0 | 13 | 1 | 0 | 0 | 0 | 0 | 3 | 15 | 0 |
| | | Grand Total Dispositions c | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Moapa Justice Court — New Filings (cases) | 4 | 1 | 0 | 0 | 4 | 1 | 1 | 0 | 16 | 12 | 7 | 1,553 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| | | Charges | 4 | 3 | 0 | 0 | 5 | 1 | 1 | 0 | 18 | 14 | 10 | 1,840 | 8 |
| | | Grand Total Dispositions c | 2 | 1 | 0 | 0 | 3 | 16 | 2 | 0 | 14 | 46 | 14 | 2,554 c | 2 c |
| | | Total Non-Trial Dispositions | 2 | 1 | 0 | 0 | 3 | 16 | 2 | 0 | 14 | 46 | 14 | 2,550 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| | | Moapa Valley Justice Court — New Filings (cases) | 6 | 3 | 0 | 0 | 12 | 3 | 0 | 0 | 6 | 3 | 50 | 957 | 42 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| | | Charges | 12 | 4 | 0 | 0 | 14 | 3 | 0 | 0 | 6 | 3 | 125 | 1,098 | 43 |
| | | Grand Total Dispositions c | 4 | 3 | 0 | 0 | 10 | 3 | 0 | 1 | 7 | 1 | 78 | 1,138 c | 39 c |
| | | Total Non-Trial Dispositions | 4 | 3 | 0 | 0 | 10 | 3 | 0 | 1 | 7 | 1 | 78 | 1,136 | 39 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | North Las Vegas Justice Court — New Filings (cases) | 40 | 118 | 0 | 0 | 17 | 0 | 2 | 1 | 94 | 4 | 12 | 602 | |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | |
| | | Charges | 86 | 304 | 0 | 0 | 82 | 12 | 9 | 10 | 131 | 6 | 50 | 1,090 | 2 |
| | | Grand Total Dispositions c | 42 | 129 | 0 | 0 | 33 | 2 | 0 | 3 | 94 | 3 | 11 | 620 | |
| | | Total Non-Trial Dispositions | 42 | 129 | 0 | 0 | 33 | 2 | 0 | 3 | 94 | 3 | 11 | 620 | |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Searchlight Justice Court — New Filings (cases) | 6 | 2 | 0 | 0 | 10 | 0 | 0 | 0 | 8 | 78 | 3 | 4,739 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 |
| | | Charges | 6 | 7 | 0 | 0 | 10 | 0 | 0 | 0 | 9 | 78 | 4 | 5,292 | 12 |
| | | Grand Total Dispositions | 6 | 4 | 0 | 0 | 10 | 0 | 0 | 1 | 11 | 46 | 8 | 5,734 | 8 |
| | | Total Non-Trial Dispositions | 6 | 3 | 0 | 0 | 10 | 0 | 0 | 1 | 10 | 43 | 8 | 5,694 | 8 |
| | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 40 | 0 |

c   Includes administrative case closures.

d   Reopened cases under-reported.

f   Court reported a large number of administrative closures (170,134 traffic and 193 parking dispositions). Because many of these dispositions are unrelated to the filings for the current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total dispositions but are provided in this footnote for general information.

g   Disposition data incomplete due to the development of a new online platform and limited IT programming resources needed to implement improved business processes. Complete data will be updated in future Annual Report publications.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B5-2. Criminal Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Criminal Caseload, Misdemeanor (6 of 6) | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9th Judicial District | Douglas County | East Fork Justice Court — New Filings (cases) | 56 | 39 | 0 | 0 | 206 | 104 | 4 | 44 | 101 | 19 | 79 | 2,421 | 24 |
| | | Reopened (cases) | 11 | 14 | 0 | 0 | 17 | 29 | 0 | 2 | 28 | 1 | 3 | 45 | 0 |
| | | Charges | 58 | 57 | 2 | 0 | 231 | 145 | 5 | 76 | 109 | 25 | 119 | 3,253 | 38 |
| | | Grand Total Dispositions | 63 | 50 | 0 | 0 | 209 | 106 | 7 | 40 | 123 | 19 | 67 | 2,333 | 23 |
| | | Total Non-Trial Dispositions | 55 | 48 | 0 | 0 | 203 | 105 | 7 | 38 | 122 | 19 | 65 | 2,322 | 23 |
| | | Total Trial Dispositions | 8 | 2 | 0 | 0 | 6 | 1 | 0 | 2 | 1 | 0 | 2 | 11 | 0 |
| | | Tahoe Justice Court — New Filings (cases) | 52 | 21 | 0 | 1 | 129 | 39 | 1 | 37 | 22 | 2 | 18 | 999 | 199 |
| | | Reopened (cases) | 2 | 3 | 0 | 0 | 2 | 3 | 0 | 0 | 6 | 0 | 0 | 5 | 0 |
| | | Charges | 57 | 28 | 0 | 2 | 149 | 55 | 2 | 63 | 27 | 2 | 24 | 1,289 | 226 |
| | | Grand Total Dispositions | 70 | 29 | 0 | 2 | 158 | 57 | 1 | 45 | 45 | 4 | 22 | 946 | 184 |
| | | Total Non-Trial Dispositions | 70 | 25 | 0 | 2 | 156 | 57 | 1 | 45 | 43 | 4 | 22 | 944 | 184 |
| | | Total Trial Dispositions | 0 | 4 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| 10th Judicial District | Churchill County | New River Justice Court — New Filings (cases) | 21 | 35 | 0 | 6 | 55 | 79 | 2 | 28 | 95 | 16 | 69 | 3,766 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | | Charges | 25 | 43 | 0 | 7 | 66 | 93 | 3 | 31 | 110 | 21 | 99 | 4,672 | 8 |
| | | Grand Total Dispositions | 22 | 52 | 0 | 7 | 64 | 77 | 2 | 26 | 102 | 10 | 77 | 3,719 | 6 |
| | | Total Non-Trial Dispositions | 22 | 51 | 0 | 7 | 61 | 77 | 2 | 26 | 100 | 8 | 76 | 3,705 | 6 |
| | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 2 | 2 | 1 | 14 | 0 |
| 11th Judicial District | Lander County | Argenta Justice Court — New Filings (cases) | 11 | 10 | 0 | 3 | 15 | 8 | 0 | 4 | 5 | 2 | 49 | 186 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 11 | 10 | 0 | 4 | 18 | 11 | 1 | 5 | 7 | 3 | 57 | 225 | 0 |
| | | Grand Total Dispositions [c] | 16 | 8 | 0 | 3 | 19 | 10 | 0 | 7 | 13 | 2 | 50 | 278 [c] | 0 |
| | | Total Non-Trial Dispositions | 16 | 8 | 0 | 3 | 19 | 10 | 0 | 7 | 13 | 2 | 49 | 278 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | Austin Justice Court — New Filings (cases) | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 2 | 0 | 1 | 756 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 2 | 0 | 1 | 846 | 1 |
| | | Grand Total Dispositions [c] | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 105 | 794 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 105 | 794 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | Hawthorne Justice Court — New Filings (cases) | 8 | 10 | 0 | 2 | 23 | 15 | 1 | 15 | 31 | 19 | 30 | 2,682 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 0 | 7 | 0 |
| | | Charges | 29 | 14 | 0 | 2 | 57 | 93 | 9 | 37 | 59 | 23 | 54 | 3,156 | 3 |
| | | Grand Total Dispositions | 2 | 5 | 0 | 0 | 6 | 3 | 0 | 10 | 16 | 14 | 15 | 2,264 | 1 |
| | | Total Non-Trial Dispositions | 2 | 5 | 0 | 0 | 6 | 3 | 0 | 10 | 16 | 14 | 15 | 2,264 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | Lake Justice Court — New Filings (cases) | 8 | 8 | 0 | 1 | 29 | 9 | 0 | 5 | 15 | 2 | 36 | 376 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 8 | 8 | 0 | 1 | 37 | 13 | 0 | 10 | 17 | 5 | 56 | 439 | 0 |
| | | Grand Total Dispositions [c] | 13 | 10 | 0 | 1 | 29 | 20 | 1 | 6 | 22 | 2 | 34 | 474 [c] | 1 [c] |
| | | Total Non-Trial Dispositions | 13 | 10 | 0 | 1 | 29 | 20 | 1 | 6 | 21 | 2 | 34 | 472 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 |

[c]     Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B6-1. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Civil Caseload, Aggregate (1 of 4) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada Justice Courts | New Filings (cases) | 61,348 | 394 | 41,462 | 18 | 560 | 1,012 | 4,851 | 8,035 | 117,680 |
| | | Reopened (cases) | 11,167 | 12 | 350 | 0 | 4 | 37 | 286 | 438 | 12,294 |
| | | Grand Total Dispositions | 68,687 | 454 | 38,002 | 10 | 550 | 1,366 | 5,527 | 8,249 | 122,845 |
| | | Total Non-Trial Dispositions | 67,996 | 445 | 37,990 | 10 | 550 | 1,349 | 4,291 | 8,249 | 120,880 |
| | | Total Trial Dispositions | 691 | 9 | 12 | 0 | 0 | 17 | 1,236 | 0 | 1,965 |
| 1st Judicial District | Carson City | Carson City Justice Court [b] New Filings (cases) | 692 | 3 | 432 | 1 | 0 | 47 | 147 | 490 | 1,812 |
| | | Reopened (cases) | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 3 |
| | | Grand Total Dispositions | 594 | 5 | 661 | 1 | 0 | 48 | 121 | 431 | 1,861 |
| | | Total Non-Trial Dispositions | 508 | 5 | 657 | 1 | 0 | 46 | 16 | 431 | 1,664 |
| | | Total Trial Dispositions | 86 | 0 | 4 | 0 | 0 | 2 | 105 | 0 | 197 |
| | Storey County | Virginia City Justice Court New Filings (cases) | 8 | 0 | 5 | 0 | 0 | 1 | 5 | 28 | 47 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Grand Total Dispositions | 7 | 0 | 5 | 0 | 0 | 0 | 3 | 18 | 33 |
| | | Total Non-Trial Dispositions | 7 | 0 | 5 | 0 | 0 | 0 | 3 | 18 | 33 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Incline Village Justice Court New Filings (cases) | 18 | 0 | 14 | 0 | 0 | 8 | 10 | 18 | 68 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| | | Grand Total Dispositions | 17 | 1 | 22 | 0 | 0 | 11 | 11 | 22 | 84 |
| | | Total Non-Trial Dispositions | 17 | 1 | 22 | 0 | 0 | 11 | 2 | 22 | 75 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 9 |
| | | Reno Justice Court New Filings (cases) | 3,328 | 64 | 2,079 | 0 | 0 | 77 | 1,098 | 666 | 7,312 |
| | | Reopened (cases) | 445 | 1 | 69 | 0 | 0 | 3 | 113 | 21 | 652 |
| | | Grand Total Dispositions | 3,626 | 37 | 2,098 | 0 | 0 | 179 | 1,081 | 636 | 7,657 |
| | | Total Non-Trial Dispositions | 3,312 | 37 | 2,094 | 0 | 0 | 174 | 975 | 636 | 7,228 |
| | | Total Trial Dispositions | 314 | 0 | 4 | 0 | 0 | 5 | 106 | 0 | 429 |
| | | Sparks Justice Court New Filings (cases) | 1,211 | 12 | 1,537 | 0 | 0 | 83 | 489 | 269 | 3,601 |
| | | Reopened (cases) | 224 | 0 | 20 | 0 | 0 | 6 | 36 | 33 | 319 |
| | | Grand Total Dispositions | 1,443 | 15 | 1,398 | 0 | 0 | 83 | 440 | 296 | 3,675 |
| | | Total Non-Trial Dispositions | 1,376 | 15 | 1,398 | 0 | 0 | 80 | 385 | 296 | 3,550 |
| | | Total Trial Dispositions | 67 | 0 | 0 | 0 | 0 | 3 | 55 | 0 | 125 |
| | | Wadsworth Justice Court New Filings (cases) | 3 | 0 | 1 | 0 | 0 | 0 | 1 | 5 | 10 |
| | | Reopened (cases) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | Grand Total Dispositions | 7 | 0 | 3 | 0 | 0 | 0 | 0 | 5 | 15 |
| | | Total Non-Trial Dispositions | 5 | 0 | 3 | 0 | 0 | 0 | 0 | 5 | 13 |
| | | Total Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 3rd Judicial District | Lyon County | Canal Justice Court New Filings (cases) | 300 | 0 | 248 | 0 | 2 | 0 | 45 | 185 | 780 |
| | | Reopened (cases) | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Grand Total Dispositions | 225 | 0 | 251 | 0 | 1 | 0 | 57 | 181 | 715 |
| | | Total Non-Trial Dispositions | 212 | 0 | 251 | 0 | 1 | 0 | 39 | 181 | 684 |
| | | Total Trial Dispositions | 13 | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 31 |
| | | Dayton Justice Court New Filings (cases) | 135 | 0 | 154 | 0 | 0 | 20 | 16 | 227 | 552 |
| | | Reopened (cases) | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 3 | 11 |
| | | Grand Total Dispositions | 128 | 0 | 261 | 0 | 0 | 20 | 18 | 228 | 655 |
| | | Total Non-Trial Dispositions | 112 | 0 | 261 | 0 | 0 | 17 | 16 | 228 | 634 |
| | | Total Trial Dispositions | 16 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 21 |
| | | Walker River Justice Court New Filings (cases) | 172 | 0 | 45 | 0 | 0 | 22 | 35 | 207 | 481 |
| | | Reopened (cases) | 72 | 0 | 1 | 0 | 0 | 0 | 0 | 41 | 114 |
| | | Grand Total Dispositions [c] | 268 | 0 | 95 | 0 | 0 | 15 | 37 | 279 | 694 [c] |
| | | Total Non-Trial Dispositions | 267 | 0 | 95 | 0 | 0 | 13 | 19 | 279 | 673 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 2 | 18 | 0 | 21 |

[a]   Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Petitions to Seal Records are USJR Phase III-specific measures and reported in Other Civil Matters in the USJR Phase II statistics as defined in the Nevada Courts Statistical Reporting Dictionary.

[b]   Carson City Justice Court includes Municipal Court information.

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-1. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Civil Caseload, Aggregate (2 of 4) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4th Judicial District | Elko County | **Carlin Justice Court** — New Filings (cases) | 16 | 0 | 11 | 0 | 0 | 0 | 3 | 20 | 50 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 12 | 0 | 15 | 0 | 0 | 1 | 2 | 19 | 49 |
| | | Total Non-Trial Dispositions | 12 | 0 | 15 | 0 | 0 | 1 | 1 | 19 | 48 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | **Eastline Justice Court** — New Filings (cases) | 6 | 0 | 13 | 0 | 0 | 1 | 8 | 33 | 61 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 5 | 0 | 14 | 0 | 0 | 1 | 2 | 32 | 54 |
| | | Total Non-Trial Dispositions | 5 | 0 | 14 | 0 | 0 | 1 | 2 | 32 | 54 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Elko Justice Court** — New Filings (cases) | 154 | 1 | 337 | 0 | 0 | 13 | 68 | 374 [d] | 947 |
| | | Reopened (cases) | 3 | 0 | 5 | 0 | 0 | 1 | 0 | 30 | 39 |
| | | Grand Total Dispositions [c] | 162 | 1 | 354 | 0 | 0 | 200 | 147 | 393 | 1,257 [c] |
| | | Total Non-Trial Dispositions | 159 | 1 | 354 | 0 | 0 | 200 | 139 | 393 | 1,246 |
| | | Total Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 11 |
| | | **Wells Justice Court** — New Filings (cases) | 4 | 0 | 10 | 0 | 0 | 0 | 3 | 21 | 38 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 13 | 17 |
| | | Total Non-Trial Dispositions | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 13 | 17 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5th Judicial District | Esmeralda County | **Esmeralda Justice Court** — New Filings (cases) | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 8 | 13 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 12 |
| | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 12 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County | **Beatty Justice Court** — New Filings (cases) | 6 | 0 | 9 | 0 | 0 | 1 | 2 | 23 | 41 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 1 | 0 | 10 | 0 | 0 | 1 | 1 | 11 | 24 |
| | | Total Non-Trial Dispositions | 1 | 0 | 10 | 0 | 0 | 1 | 1 | 11 | 24 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Pahrump Justice Court** — New Filings (cases) | 135 | 1 | 419 | 0 | 7 | 0 | 26 | 351 | 939 |
| | | Reopened (cases) | 3 | 0 | 17 | 0 | 0 | 0 | 1 | 2 | 23 |
| | | Grand Total Dispositions | 126 | 2 | 507 | 0 | 6 | 0 | 26 | 353 | 1,020 |
| | | Total Non-Trial Dispositions | 124 | 2 | 507 | 0 | 6 | 0 | 13 | 353 | 1,005 |
| | | Total Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 15 |
| | | **Tonopah Justice Court** — New Filings (cases) | 11 | 0 | 22 | 0 | 0 | 0 | 6 | 72 | 111 |
| | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | Grand Total Dispositions | 11 | 0 | 15 | 0 | 0 | 0 | 5 | 74 | 105 |
| | | Total Non-Trial Dispositions | 11 | 0 | 15 | 0 | 0 | 0 | 5 | 74 | 105 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | **Union Justice Court** — New Filings (cases) | 49 | 0 | 82 | 0 | 0 | 10 | 54 | 209 | 404 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 39 | 0 | 86 | 0 | 0 | 9 | 36 | 208 | 378 |
| | | Total Non-Trial Dispositions | 31 | 0 | 86 | 0 | 0 | 9 | 36 | 208 | 370 |
| | | Total Trial Dispositions | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |

[c]  Includes administrative case closures.

[d]  High-risk protection orders not reported or incomplete.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-1. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Civil Caseload, Aggregate (3 of 4) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **7th Judicial District** | Eureka County | Eureka Justice Court — New Filings (cases) | 1 | 0 | 10 | 0 | 0 | 0 | 0 | 9 | 20 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 11 | 14 |
| | | Total Non-Trial Dispositions | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 11 | 14 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Lincoln County | Meadow Valley Justice Court — New Filings (cases) | 2 | 0 | 8 | 0 | 0 | 4 | 6 | 25 [d] | 45 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 0 | 7 | 0 | 0 | 5 | 7 | 24 | 45 |
| | | Total Non-Trial Dispositions | 1 | 0 | 7 | 0 | 0 | 5 | 2 | 24 | 39 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 6 |
| | | Pahranagat Valley Justice Court — New Filings (cases) | 3 | 0 | 4 | 0 | 0 | 1 | 1 | 5 | 14 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 7 |
| | | Total Non-Trial Dispositions | 2 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 7 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | Ely Justice Court — New Filings (cases) | 40 | 0 | 56 | 0 | 0 | 0 | 44 | 83 | 223 |
| | | Reopened (cases) | 5 | 0 | 13 | 0 | 0 | 0 | 3 | 4 | 25 |
| | | Grand Total Dispositions | 36 | 0 | 41 | 0 | 0 | 0 | 43 | 84 | 204 |
| | | Total Non-Trial Dispositions | 36 | 0 | 41 | 0 | 0 | 0 | 20 | 84 | 181 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 23 |
| **8th Judicial District** | Clark County | Boulder Justice Court — New Filings (cases) | 70 | 0 | 83 | 0 | 0 | 0 | 14 | 105 | 272 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | Grand Total Dispositions | 61 | 0 | 76 | 0 | 0 | 0 | 9 | 103 | 249 |
| | | Total Non-Trial Dispositions | 61 | 0 | 76 | 0 | 0 | 0 | 7 | 103 | 247 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| | | Bunkerville Justice Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Goodsprings Justice Court — New Filings (cases) | 14 | 0 | 23 | 0 | 0 | 0 | 2 | 11 | 50 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 7 | 0 | 15 | 0 | 0 | 0 | 1 | 10 | 33 |
| | | Total Non-Trial Dispositions | 6 | 0 | 15 | 0 | 0 | 0 | 1 | 10 | 31 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| | | Henderson Justice Court — New Filings (cases) | 4,348 | 10 | 4,004 | 2 | 0 | 27 | 202 | 597 | 9,190 |
| | | Reopened (cases) | 319 | 0 | 24 | 0 | 0 | 1 | 3 | 15 | 362 |
| | | Grand Total Dispositions | 4,420 | 12 | 3,734 | 0 | 0 | 20 | 175 | 577 | 8,938 |
| | | Total Non-Trial Dispositions | 4,350 | 12 | 3,734 | 0 | 0 | 20 | 152 | 577 | 8,845 |
| | | Total Trial Dispositions | 70 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 93 |
| | | Las Vegas Justice Court — New Filings (cases) | 44,714 | 296 | 27,368 | 14 | 551 | 471 | 2,292 | 2,955 | 78,661 |
| | | Reopened (cases) | 10,067 | 11 | 177 | 0 | 4 | 24 | 101 | 249 | 10,633 |
| | | Grand Total Dispositions | 52,840 | 364 | 25,126 | 8 | 543 | 449 | 2,750 | 3,180 | 85,260 |
| | | Total Non-Trial Dispositions | 52,743 | 355 | 25,126 | 8 | 543 | 448 | 1,969 | 3,180 | 84,372 |
| | | Total Trial Dispositions | 97 | 9 | 0 | 0 | 0 | 1 | 781 | 0 | 888 |
| | | Laughlin Justice Court — New Filings (cases) | 106 | 0 | 101 | 0 | 0 | 0 | 1 | 31 | 239 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 106 | 0 | 98 | 0 | 0 | 1 | 1 | 37 | 243 |
| | | Total Non-Trial Dispositions | 106 | 0 | 94 | 0 | 0 | 1 | 1 | 37 | 239 |
| | | Total Trial Dispositions | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | Mesquite Justice Court — New Filings (cases) | 51 | 0 | 43 | 0 | 0 | 2 | 12 | 84 | 192 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions [c] | 56 | 0 | 88 | 0 | 0 | 1 | 10 | 70 | 225 [c] |
| | | Total Non-Trial Dispositions | 55 | 0 | 88 | 0 | 0 | 1 | 6 | 70 | 220 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 5 |

[c]    Includes administrative case closures.

[d]    High-risk protection orders not reported or incomplete.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B6-1. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.

| Justice Court, Civil Caseload, Aggregate (4 of 4) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District Cont. | Clark County Cont. | **Moapa Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 9 | 18 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Grand Total Dispositions | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 12 | 16 |
| | | Total Non-Trial Dispositions | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 12 | 16 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Moapa Valley Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 8 | 0 | 16 | 0 | 0 | 0 | 0 | 47 | 71 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 7 | 0 | 17 | 0 | 0 | 0 | 0 | 36 | 60 |
| | | Total Non-Trial Dispositions | 7 | 0 | 17 | 0 | 0 | 0 | 0 | 36 | 60 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **North Las Vegas Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 5,417 | 6 | 3,871 | 1 | 0 | 43 | 114 | 277 | 9,729 |
| | | Reopened (cases) | 15 | 0 | 1 | 0 | 0 | 0 | 2 | 6 | 24 |
| | | Grand Total Dispositions | 4,108 | 15 | 2,415 | 1 | 0 | 37 | 119 | 274 | 6,969 |
| | | Total Non-Trial Dispositions | 4,107 | 15 | 2,415 | 1 | 0 | 37 | 67 | 274 | 6,916 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 52 | 0 | 53 |
| | | **Searchlight Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 20 | 0 | 5 | 0 | 0 | 0 | 1 | 7 | 33 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 18 | 0 | 5 | 0 | 0 | 0 | 2 | 5 | 30 |
| | | Total Non-Trial Dispositions | 18 | 0 | 5 | 0 | 0 | 0 | 2 | 5 | 30 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9th Judicial District | Douglas County | **East Fork Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 41 | 0 | 170 | 0 | 0 | 17 | 34 | 175 | 437 |
| | | Reopened (cases) | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 3 |
| | | Grand Total Dispositions | 42 | 0 | 224 | 0 | 0 | 17 | 19 | 182 | 484 |
| | | Total Non-Trial Dispositions | 36 | 0 | 224 | 0 | 0 | 17 | 17 | 182 | 476 |
| | | Total Trial Dispositions | 6 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 8 |
| | | **Tahoe Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 13 | 0 | 17 | 0 | 0 | 17 | 8 | 33 | 88 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | Grand Total Dispositions [c] | 16 | 0 | 40 | 0 | 0 | 21 | 17 | 36 | 130 [c] |
| | | Total Non-Trial Dispositions | 15 | 0 | 40 | 0 | 0 | 21 | 14 | 36 | 126 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 4 |
| 10th Judicial District | Churchill County | **New River Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 173 | 0 | 184 | 0 | 0 | 126 | 56 | 269 | 808 |
| | | Reopened (cases) | 3 | 0 | 11 | 0 | 0 | 2 | 3 | 1 | 20 |
| | | Grand Total Dispositions | 151 | 0 | 202 | 0 | 0 | 126 | 58 | 266 | 803 |
| | | Total Non-Trial Dispositions | 150 | 0 | 202 | 0 | 0 | 125 | 53 | 266 | 796 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 1 | 5 | 0 | 7 |
| 11th Judicial District | Lander County | **Argenta Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 15 | 0 | 39 | 0 | 0 | 2 | 10 | 36 | 102 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 13 |
| | | Grand Total Dispositions | 21 | 2 | 30 | 0 | 0 | 1 | 4 | 48 | 106 |
| | | Total Non-Trial Dispositions | 21 | 2 | 30 | 0 | 0 | 1 | 4 | 48 | 106 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Austin Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 4 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 1 | 4 |
| | | Total Non-Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 1 | 4 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mineral County | **Hawthorne Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 25 | 0 | 7 | 0 | 0 | 9 | 16 | 39 | 96 |
| | | Reopened (cases) | 4 | 0 | 0 | 0 | 0 | 0 | 20 | 14 | 38 |
| | | Grand Total Dispositions [c] | 90 | 0 | 58 | 0 | 0 | 116 | 266 | 57 | 587 [c] |
| | | Total Non-Trial Dispositions | 90 | 0 | 58 | 0 | 0 | 116 | 266 | 57 | 587 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pershing County | **Lake Justice Court** | | | | | | | | | |
| | | New Filings (cases) | 36 | 0 | 27 | 0 | 0 | 8 | 20 | 28 | 119 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 27 | 0 | 22 | 0 | 0 | 0 | 55 | 29 | 133 |
| | | Total Non-Trial Dispositions | 27 | 0 | 22 | 0 | 0 | 0 | 55 | 29 | 133 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[c]  Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-2. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

Justice Court, Civil Caseload (1 of 4)

| District / County / Court | Row | Real Property — Landlord Tenant (Summary Eviction) | Unlawful Detainer Complaint | Other Real Property | Tort — Auto Negligence | Premises Liability | Other Negligence | Intentional Misconduct | Other Tort | Contract — Credit Card Collection | Payday Loan Collection | Debt Collection Agency | Other Debt Collection | Other Contract Buyer Plaintiff | Other Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders — Request for DV Protection Orders | Request for Non-DV Protection Orders | High-Risk Protection Orders |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals [a]** — Nevada Justice Courts | New Filings (cases) | 60,281 | 714 | 353 | 241 | 5 | 31 | 25 | 92 | 25,737 | 8,394 | 2,931 | 2,695 | 149 | 1,556 | 18 | 560 | 1,012 | 4,851 | 1,471 | 6,564 | 0 |
| | Reopened (cases) | 11,139 | 23 | 5 | 6 | 1 | 1 | 1 | 3 | 138 | 34 | 89 | 43 | 5 | 41 | 0 | 4 | 37 | 286 | 74 | 364 | 0 |
| | Grand Total Dispositions | 67,774 | 553 | 360 | 329 | 4 | 27 | 6 | 88 | 23,952 | 4,720 | 4,020 | 3,153 | 160 | 1,997 | 10 | 550 | 1,366 | 5,527 | 1,511 | 6,738 | 0 |
| | Total Non-Trial Dispositions | 67,200 | 447 | 349 | 321 | 3 | 27 | 6 | 88 | 23,948 | 4,720 | 4,017 | 3,152 | 159 | 1,994 | 10 | 550 | 1,349 | 4,291 | 1,511 | 6,738 | 0 |
| | Total Trial Dispositions | 574 | 106 | 11 | 8 | 1 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 1 | 3 | 0 | 0 | 17 | 1,236 | 0 | 0 | 0 |
| **1st Judicial District** — Carson City — Carson City Justice Court [b] | New Filings (cases) | 689 | 2 | 1 | 1 | 1 | 1 | 0 | 0 | 384 | 0 | 12 | 24 | 6 | 6 | 1 | 0 | 47 | 147 | 238 | 252 | 0 |
| | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Grand Total Dispositions | 593 | 1 | 0 | 3 | 1 | 1 | 0 | 0 | 393 | 0 | 219 | 18 | 8 | 23 | 1 | 0 | 48 | 121 | 213 | 218 | 0 |
| | Total Non-Trial Dispositions | 507 | 1 | 0 | 3 | 1 | 1 | 0 | 0 | 393 | 0 | 217 | 18 | 8 | 21 | 1 | 0 | 46 | 16 | 213 | 218 | 0 |
| | Total Trial Dispositions | 86 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 2 | 105 | 0 | 0 | 0 |
| Storey County — Virginia City Justice Court | New Filings (cases) | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 9 | 19 | 0 |
| | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Grand Total Dispositions | 5 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 7 | 11 | 0 |
| | Total Non-Trial Dispositions | 5 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 7 | 11 | 0 |
| | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2nd Judicial District** — Washoe County — Incline Village Justice Court | New Filings (cases) | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 8 | 10 | 3 | 15 | (c) |
| | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | |
| | Grand Total Dispositions | 16 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 13 | 0 | 4 | 1 | 0 | 4 | 0 | 0 | 11 | 11 | 3 | 19 | |
| | Total Non-Trial Dispositions | 16 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 13 | 0 | 4 | 1 | 0 | 4 | 0 | 0 | 11 | 2 | 3 | 19 | |
| | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | |
| Washoe County — Reno Justice Court | New Filings (cases) | 3,291 | 24 | 13 | 24 | 0 | 4 | 24 | 12 | 1,608 | 193 | 51 | 85 | 11 | 131 | 0 | 0 | 77 | 1,098 | 0 | 666 | (c) |
| | Reopened (cases) | 445 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 9 | 2 | 46 | 3 | 0 | 9 | 0 | 0 | 3 | 113 | 0 | 21 | |
| | Grand Total Dispositions | 3,588 | 25 | 13 | 26 | 0 | 1 | 0 | 10 | 1,549 | 118 | 171 | 122 | 8 | 130 | 0 | 0 | 179 | 1,081 | 0 | 636 | |
| | Total Non-Trial Dispositions | 3,283 | 24 | 5 | 26 | 0 | 1 | 0 | 10 | 1,549 | 118 | 170 | 121 | 7 | 129 | 0 | 0 | 174 | 975 | 0 | 636 | |
| | Total Trial Dispositions | 305 | 1 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 5 | 106 | 0 | 0 | |
| Washoe County — Sparks Justice Court | New Filings (cases) | 1,199 | 8 | 4 | 8 | 0 | 0 | 0 | 4 | 806 | 576 | 11 | 106 | 1 | 37 | 0 | 0 | 83 | 489 | 0 | 269 | (c) |
| | Reopened (cases) | 222 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 2 | 6 | 1 | 0 | 1 | 0 | 0 | 6 | 36 | 0 | 33 | |
| | Grand Total Dispositions | 1,429 | 10 | 4 | 11 | 0 | 1 | 0 | 3 | 929 | 261 | 89 | 71 | 6 | 42 | 0 | 0 | 83 | 440 | 0 | 296 | |
| | Total Non-Trial Dispositions | 1,367 | 7 | 2 | 11 | 0 | 1 | 0 | 3 | 929 | 261 | 89 | 71 | 6 | 42 | 0 | 0 | 80 | 385 | 0 | 296 | |
| | Total Trial Dispositions | 62 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 55 | 0 | 0 | |
| Washoe County — Wadsworth Justice Court | New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 | (c) |
| | Reopened (cases) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | Grand Total Dispositions | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | |
| | Total Non-Trial Dispositions | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | |
| | Total Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **3rd Judicial District** — Lyon County — Canal Justice Court | New Filings (cases) | 297 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 215 | 0 | 6 | 14 | 3 | 10 | 0 | 2 | 0 | 45 | 53 | 132 | 0 |
| | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| | Grand Total Dispositions | 225 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 209 | 0 | 8 | 13 | 4 | 17 | 0 | 1 | 0 | 57 | 52 | 129 | 0 |
| | Total Non-Trial Dispositions | 212 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 209 | 0 | 8 | 13 | 4 | 17 | 0 | 1 | 0 | 39 | 52 | 129 | 0 |
| | Total Trial Dispositions | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 0 |
| Lyon County — Dayton Justice Court | New Filings (cases) | 135 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 133 | 0 | 1 | 10 | 1 | 9 | 0 | 0 | 20 | 16 | 82 | 145 | 0 |
| | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| | Grand Total Dispositions | 128 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 168 | 0 | 58 | 14 | 3 | 18 | 0 | 0 | 20 | 18 | 83 | 145 | 0 |
| | Total Non-Trial Dispositions | 112 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 168 | 0 | 58 | 14 | 3 | 18 | 0 | 0 | 17 | 16 | 83 | 145 | 0 |
| | Total Trial Dispositions | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 0 |
| Lyon County — Walker River Justice Court | New Filings (cases) | 170 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 39 | 0 | 1 | 5 | 0 | 0 | 0 | 0 | 22 | 35 | 92 | 115 | 0 |
| | Reopened (cases) | 71 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 18 | 0 |
| | Grand Total Dispositions [d] | 264 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 26 | 7 | 1 | 1 | 0 | 0 | 15 | 37 | 134 | 145 | 0 |
| | Total Non-Trial Dispositions | 263 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 26 | 7 | 1 | 1 | 0 | 0 | 13 | 19 | 134 | 145 | 0 |
| | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 18 | 0 | 0 | 0 |

[a]  Totals reflect aggregate information from the Nevada Justice Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Petitions to Seal Records are USJR Phase III-specific measures and reported in Other Civil Matters in the USJR Phase II statistics as defined in the Nevada Courts Statistical Reporting Dictionary.

[b]  Carson City Justice Court includes Municipal Court information.

[c]  High-risk protection orders typically filed and disposed in the district court of this county.

[d]  Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-2. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

Justice Court, Civil Caseload (2 of 4)

| District | County | Court | | Real Property | | | Tort | | | | | Contract | | | | | | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Landlord Tenant (Summary Eviction) | Unlawful Detainer Complaint | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Intentional Misconduct | Other Tort | Credit Card Collection | Payday Loan Collection | Debt Collection Agency | Other Debt Collection | Contract Buyer Plaintiff | Other Contract | | | | | Request for DV Protection Orders | Request for Non-DV Protection Orders | High-Risk Protection Orders |
| 4th Judicial District | Elko County | Carlin Justice Court | New Filings (cases) | 14 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 11 | 9 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 1 | 2 | 11 | 8 | 0 |
| | | | Total Non-Trial Dispositions | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 11 | 8 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Eastline Justice Court | New Filings (cases) | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 2 | 1 | 2 | 0 | 0 | 1 | 8 | 8 | 25 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 1 | 2 | 8 | 24 | 0 |
| | | | Total Non-Trial Dispositions | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 1 | 2 | 8 | 24 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Justice Court | New Filings (cases) | 136 | 16 | 2 | 1 | 0 | 0 | 0 | 0 | 226 | 0 | 2 | 104 | 2 | 3 | 0 | 0 | 13 | 68 | 223 | 151 | (f) |
| | | | Reopened (cases) | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions [d] | 147 | 14 | 1 | 1 | 0 | 0 | 0 | 0 | 221 | 0 | 21 | 106 | 1 | 5 | 0 | 0 | 200 | 147 | 238 | 155 | |
| | | | Total Non-Trial Dispositions | 145 | 13 | 1 | 1 | 0 | 0 | 0 | 0 | 221 | 0 | 21 | 106 | 1 | 5 | 0 | 0 | 200 | 139 | 238 | 155 | |
| | | | Total Trial Dispositions | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | |
| | | Wells Justice Court | New Filings (cases) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 17 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 11 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 11 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5th Judicial District | Esmeralda County | Esmeralda Justice Court | New Filings (cases) | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 6 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 4 | 0 |
| | | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 4 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Nye County | Beatty Justice Court | New Filings (cases) | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 11 | 12 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 7 | 0 |
| | | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 7 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Pahrump Justice Court | New Filings (cases) | 132 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 405 | 0 | 0 | 12 | 2 | 0 | 0 | 7 | 0 | 26 | 151 | 200 | 0 |
| | | | Reopened (cases) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 |
| | | | Grand Total Dispositions | 125 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 472 | 0 | 3 | 32 | 0 | 0 | 0 | 6 | 0 | 26 | 153 | 200 | 0 |
| | | | Total Non-Trial Dispositions | 123 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 472 | 0 | 3 | 32 | 0 | 0 | 0 | 6 | 0 | 13 | 153 | 200 | 0 |
| | | | Total Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 |
| | | Tonopah Justice Court | New Filings (cases) | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 6 | 27 | 45 | 0 |
| | | | Reopened (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 33 | 41 | 0 |
| | | | Total Non-Trial Dispositions | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 33 | 41 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6th Judicial District | Humboldt County | Union Justice Court | New Filings (cases) | 47 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 66 | 0 | 0 | 8 | 3 | 5 | 0 | 0 | 10 | 54 | 81 | 128 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 39 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72 | 0 | 3 | 5 | 1 | 5 | 0 | 0 | 9 | 36 | 78 | 130 | 0 |
| | | | Total Non-Trial Dispositions | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72 | 0 | 3 | 5 | 1 | 5 | 0 | 0 | 9 | 36 | 78 | 130 | 0 |
| | | | Total Trial Dispositions | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7th Judicial District | Eureka County | Eureka Justice Court | New Filings (cases) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 3 | 0 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 3 | 0 |
| | | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 3 | 0 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[d]   Includes administrative case closures.

[f]   High-risk protection orders not reported or incomplete.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-2. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Civil Caseload (3 of 4) | | | Real Property | | | Tort | | | | | Contract | | | | | | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Landlord Tenant (Summary Eviction) | Unlawful Detainer Complaint | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Intentional Misconduct | Other Tort | Credit Card Collection | Payday Loan Collection | Debt Collection Agency | Other Debt Collection | Contract Buyer Plaintiff | Other Contract | | | | | Request for DV Protection Orders | Request for Non-DV Protection Orders | High-Risk Protection Orders |
| **7th Judicial District Cont.** | **Lincoln County** | **Meadow Valley Justice Court** New Filings (cases) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 6 | 5 | 20 | (f) |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Grand Total Dispositions | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 5 | 7 | 5 | 19 | |
| | | Total Non-Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 5 | 2 | 5 | 19 | |
| | | Total Trial Dispositions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | |
| | | **Pahranagat Valley Justice Court** New Filings (cases) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 1 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 |
| | | Total Non-Trial Dispositions | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **White Pine County** | **Ely Justice Court** New Filings (cases) | 36 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 0 | 18 | 4 | 1 | 0 | 0 | 0 | 44 | 53 | 30 | 0 | |
| | | Reopened (cases) | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 2 | 2 | 2 | 1 | 0 | 0 | 3 | 3 | 1 | 0 | |
| | | Grand Total Dispositions | 33 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 13 | 2 | 3 | 0 | 0 | 0 | 43 | 52 | 32 | 0 | |
| | | Total Non-Trial Dispositions | 33 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 13 | 2 | 3 | 0 | 0 | 0 | 20 | 52 | 32 | 0 | |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | |
| **8th Judicial District** | **Clark County** | **Boulder Justice Court** New Filings (cases) | 67 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 14 | 20 | 85 | 0 c |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Grand Total Dispositions | 58 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 3 | 1 | 1 | 0 | 0 | 9 | 20 | 83 | 0 | |
| | | Total Non-Trial Dispositions | 58 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 3 | 1 | 1 | 0 | 0 | 7 | 20 | 83 | 0 | |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | |
| | | **Bunkerville Justice Court** New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 c |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | **Goodsprings Justice Court** New Filings (cases) | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 9 | 0 c |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Grand Total Dispositions | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 8 | 0 | |
| | | Total Non-Trial Dispositions | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 8 | 0 | |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | **Henderson Justice Court** New Filings (cases) | 4,278 | 42 | 28 | 8 | 0 | 0 | 0 | 2 | 2,855 | 607 | 163 | 210 | 12 | 157 | 2 | 0 | 27 | 202 | 0 | 597 | (c) |
| | | Reopened (cases) | 319 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 3 | 0 | 5 | 0 | 5 | 0 | 0 | 1 | 3 | 0 | 15 | |
| | | Grand Total Dispositions | 4,355 | 38 | 27 | 9 | 0 | 2 | 0 | 1 | 2,757 | 288 | 126 | 343 | 8 | 212 | 0 | 0 | 20 | 175 | 0 | 577 | |
| | | Total Non-Trial Dispositions | 4,289 | 34 | 27 | 9 | 0 | 2 | 0 | 1 | 2,757 | 288 | 126 | 343 | 8 | 212 | 0 | 0 | 20 | 152 | 0 | 577 | |
| | | Total Trial Dispositions | 66 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | |
| | | **Las Vegas Justice Court** New Filings (cases) | 43,902 | 559 | 253 | 191 | 4 | 26 | 1 | 74 | 15,526 | 6,308 | 2,527 | 1,866 | 78 | 1,063 | 14 | 551 | 471 | 2,292 | 0 | 2,955 | (c) |
| | | Reopened (cases) | 10,045 | 18 | 4 | 5 | 1 | 1 | 1 | 3 | 67 | 26 | 33 | 24 | 3 | 24 | 0 | 4 | 24 | 101 | 0 | 249 | |
| | | Grand Total Dispositions | 52,154 | 418 | 268 | 265 | 3 | 21 | 5 | 70 | 14,672 | 3,838 | 3,104 | 2,063 | 87 | 1,362 | 8 | 543 | 449 | 2,750 | 0 | 3,180 | |
| | | Total Non-Trial Dispositions | 52,154 | 321 | 268 | 257 | 2 | 21 | 5 | 70 | 14,672 | 3,838 | 3,104 | 2,063 | 87 | 1,362 | 8 | 543 | 448 | 1,969 | 0 | 3,180 | |
| | | Total Trial Dispositions | 0 | 97 | 0 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 781 | 0 | 0 | |
| | | **Laughlin Justice Court** New Filings (cases) | 106 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 0 | 1 | 3 | 0 | 22 | 0 | 0 | 1 | 10 | 21 | 0 c |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Grand Total Dispositions | 106 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 59 | 0 | 1 | 3 | 0 | 35 | 0 | 0 | 1 | 14 | 23 | 0 | |
| | | Total Non-Trial Dispositions | 106 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 | 0 | 1 | 3 | 0 | 35 | 0 | 0 | 1 | 14 | 23 | 0 | |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | **Mesquite Justice Court** New Filings (cases) | 51 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 2 | 12 | 38 | 46 | 0 c |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Grand Total Dispositions d | 54 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 71 | 1 | 2 | 10 | 1 | 3 | 0 | 0 | 1 | 10 | 33 | 37 | 0 |
| | | Total Non-Trial Dispositions | 53 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 71 | 1 | 2 | 10 | 1 | 3 | 0 | 0 | 1 | 6 | 33 | 37 | 0 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |

c   High-risk protection orders typically filed and disposed in the district court of this county.

d   Includes administrative case closures.

f   High-risk protection orders not reported or incomplete.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B6-2. Civil Caseload Processed by Justice Courts in Nevada, Fiscal Year 2022.**

| Justice Court, Civil Caseload (4 of 4) | | Row | Real Property | | | Tort | | | | | Contract | | | | | | Contested Liens | Petitions to Seal Records | Other Civil Matters | Small Claims | Protection Orders | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Landlord Tenant (Summary Eviction) | Unlawful Detainer Complaint | Other Real Property | Auto Negligence | Premises Liability | Other Negligence | Intentional Misconduct | Other Tort | Credit Card Collection | Payday Loan Collection | Debt Collection Agency | Other Debt Collection | Contract Buyer Plaintiff | Other Contract | | | | | Request for DV Protection Orders | Request for Non-DV Protection Orders | High-Risk Protection Orders |
| 8th Judicial District Cont. — Clark County Cont. | Moapa Justice Court | New Filings (cases) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 3 | 0[d] |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| | | Grand Total Dispositions | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 3 | 0 |
| | | Total Non-Trial Dispositions | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 9 | 3 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Moapa Valley Justice Court | New Filings (cases) | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 36 | 0[d] |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 8 | 28 | 0 |
| | | Total Non-Trial Dispositions | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 8 | 28 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | North Las Vegas Justice Court | New Filings (cases) | 5,328 | 40 | 49 | 6 | 0 | 0 | 0 | 0 | 2,724 | 709 | 122 | 199 | 24 | 93 | 1 | 0 | 43 | 114 | 0 | 277 | (c) |
| | | Reopened (cases) | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 6 | 0 |
| | | Grand Total Dispositions | 4,039 | 28 | 41 | 13 | 0 | 1 | 0 | 1 | 1,735 | 214 | 63 | 278 | 17 | 108 | 1 | 0 | 37 | 67 | 0 | 274 | 0 |
| | | Total Non-Trial Dispositions | 4,038 | 28 | 41 | 13 | 0 | 1 | 0 | 1 | 1,735 | 214 | 63 | 278 | 17 | 108 | 1 | 0 | 37 | 15 | 0 | 274 | 0 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 0 |
| | Searchlight Justice Court | New Filings (cases) | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 3 | 4 | 0[d] |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 4 | 0 |
| | | Total Non-Trial Dispositions | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 4 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9th Judicial District — Douglas County | East Fork Justice Court | New Filings (cases) | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 146 | 0 | 6 | 17 | 0 | 1 | 0 | 0 | 17 | 34 | 82 | 93 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 41 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 143 | 0 | 56 | 23 | 0 | 2 | 0 | 0 | 17 | 19 | 83 | 99 | 0 |
| | | Total Non-Trial Dispositions | 35 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 143 | 0 | 56 | 23 | 0 | 2 | 0 | 0 | 17 | 17 | 83 | 99 | 0 |
| | | Total Trial Dispositions | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Tahoe Justice Court | New Filings (cases) | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 17 | 8 | 12 | 21 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Grand Total Dispositions[d] | 15 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 2 | 6 | 1 | 5 | 0 | 0 | 21 | 17 | 15 | 21 | 0 |
| | | Total Non-Trial Dispositions | 14 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 2 | 6 | 1 | 5 | 0 | 0 | 21 | 14 | 15 | 21 | 0 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| 10th Judicial — Churchill County | New River Justice Court | New Filings (cases) | 173 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 163 | 0 | 2 | 10 | 1 | 8 | 0 | 0 | 126 | 56 | 157 | 112 | 0 |
| | | Reopened (cases) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 1 | 0 |
| | | Grand Total Dispositions | 151 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 161 | 0 | 7 | 16 | 6 | 12 | 0 | 0 | 126 | 58 | 155 | 111 | 0 |
| | | Total Non-Trial Dispositions | 150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 161 | 0 | 7 | 16 | 6 | 12 | 0 | 0 | 125 | 53 | 155 | 111 | 0 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 0 | 0 | 0 |
| 11th Judicial District — Lander County | Argenta Justice Court | New Filings (cases) | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 0 | 7 | 1 | 0 | 2 | 0 | 0 | 2 | 10 | 28 | 8 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 2 | 0 |
| | | Grand Total Dispositions | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 23 | 0 | 5 | 2 | 0 | 0 | 0 | 0 | 1 | 4 | 38 | 10 | 0 |
| | | Total Non-Trial Dispositions | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 23 | 0 | 5 | 2 | 0 | 0 | 0 | 0 | 1 | 4 | 38 | 10 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Austin Justice Court | New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District — Mineral County | Hawthorne Justice Court | New Filings (cases) | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 23 | 16 | 0 |
| | | Reopened (cases) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 10 | 4 | 0 |
| | | Grand Total Dispositions[d] | 89 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 22 | 10 | 1 | 1 | 0 | 0 | 116 | 266 | 30 | 27 | 0 |
| | | Total Non-Trial Dispositions | 89 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 22 | 10 | 1 | 1 | 0 | 0 | 116 | 266 | 30 | 27 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11th Judicial District — Pershing County | Lake Justice Court | New Filings (cases) | 36 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 0 | 1 | 4 | 0 | 0 | 8 | 20 | 15 | 13 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 26 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 0 | 5 | 0 | 1 | 2 | 0 | 0 | 0 | 55 | 15 | 14 | 0 |
| | | Total Non-Trial Dispositions | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 55 | 15 | 14 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

c   High-risk protection orders typically filed and disposed in the district court of this county.

d   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B7-1. Criminal Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.**

| Municipal Court, Criminal Caseload, Aggregate (1 of 2) | | | Misdemeanor (Non-Traffic), Total | Traffic and Parking Totals |
|---|---|---|---|---|
| Totals [a] | Nevada Municipal Courts | New Filings (cases) | **34,212** | **99,948** |
| | | Reopened (cases) | 2,712 | 4,394 |
| | | Charges | 44,181 | 135,586 |
| | | Grand Total Dispositions | 39,573 | 98,526 |
| | | Total Non-Trial Dispositions | 39,403 | 98,364 |
| | | Total Trial Dispositions | 170 | 162 |
| 2nd Judicial District | Washoe County | Reno Municipal Court | | |
| | | New Filings (cases) | **4,987** | **13,079** |
| | | Reopened (cases) | 670 | 528 |
| | | Charges | 5,653 | 16,977 |
| | | Grand Total Dispositions | 5,877 | 13,268 |
| | | Total Non-Trial Dispositions | 5,859 | 13,244 |
| | | Total Trial Dispositions | 18 | 24 |
| | | Sparks Municipal Court | | |
| | | New Filings (cases) | **1,559** | **4,037** |
| | | Reopened (cases) [b] | 17 | 1 |
| | | Charges | 1,814 | 6,305 |
| | | Grand Total Dispositions | 1,788 | 4,184 |
| | | Total Non-Trial Dispositions | 1,785 | 4,183 |
| | | Total Trial Dispositions | 3 | 1 |
| 3rd Judicial District | Lyon County | Fernley Municipal Court | | |
| | | New Filings (cases) | **303** | **2,249** |
| | | Reopened (cases) | 1 | 2 |
| | | Charges | 442 | 2,955 |
| | | Grand Total Dispositions | 320 | 2,250 |
| | | Total Non-Trial Dispositions | 317 | 2,249 |
| | | Total Trial Dispositions | 3 | 1 |
| | | Yerington Municipal Court | | |
| | | New Filings (cases) | **80** | **50** |
| | | Reopened (cases) | 2 | 0 |
| | | Charges | 85 | 66 |
| | | Grand Total Dispositions | 102 | 46 |
| | | Total Non-Trial Dispositions | 102 | 46 |
| | | Total Trial Dispositions | 0 | 0 |
| 4th Judicial District | Elko County | Carlin Municipal Court | | |
| | | New Filings (cases) | **37** | **31** |
| | | Reopened (cases) | 0 | 0 |
| | | Charges | 59 | 33 |
| | | Grand Total Dispositions | 35 | 35 |
| | | Total Non-Trial Dispositions | 35 | 35 |
| | | Total Trial Dispositions | 0 | 0 |
| | | Elko Municipal Court | | |
| | | New Filings (cases) | **131** | **201** |
| | | Reopened (cases) | 89 | 13 |
| | | Charges | 184 | 263 |
| | | Grand Total Dispositions | 258 [c] | 202 |
| | | Total Non-Trial Dispositions | 256 | 202 |
| | | Total Trial Dispositions | 2 | 0 |
| | | Wells Municipal Court | | |
| | | New Filings (cases) | **5** | **21** |
| | | Reopened (cases) | 0 | 0 |
| | | Charges | 6 | 23 |
| | | Grand Total Dispositions | 10 | 17 |
| | | Total Non-Trial Dispositions | 10 | 17 |
| | | Total Trial Dispositions | 0 | 0 |
| | | West Wendover Municipal Court | | |
| | | New Filings (cases) | **97** | **296** |
| | | Reopened (cases) | 13 | 2 |
| | | Charges | 120 | 328 |
| | | Grand Total Dispositions | 85 | 255 |
| | | Total Non-Trial Dispositions | 83 | 254 |
| | | Total Trial Dispositions | 2 | 1 |

[a]   Totals reflect aggregate information from the Nevada Municipal Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[b]   Reopened (cases) under-reported.

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B7-1. Criminal Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.

| Municipal Court, Criminal Caseload, Aggregate (2 of 2) | | | Misdemeanor (Non-Traffic), Total | Traffic and Parking Totals |
|---|---|---|---|---|
| **7th Judicial District** | **Lincoln County** | **Caliente Municipal Court** New Filings (cases) | 0 | 0 |
| | | Reopened (cases) | 0 | 0 |
| | | Charges | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 |
| | **White Pine County** | **Ely Municipal Court** New Filings (cases) | 145 | 305 |
| | | Reopened (cases) | 5 | 6 |
| | | Charges | 176 | 433 |
| | | Grand Total Dispositions | 156 | 318 |
| | | Total Non-Trial Dispositions | 155 | 316 |
| | | Total Trial Dispositions | 1 | 2 |
| **8th Judicial District** | **Clark County** | **Boulder Municipal Court** New Filings (cases) | 385 | 1,396 |
| | | Reopened (cases) | 7 | 4 |
| | | Charges | 580 | 1,941 |
| | | Grand Total Dispositions | 383 | 1,583 [c] |
| | | Total Non-Trial Dispositions | 376 | 1,581 |
| | | Total Trial Dispositions | 7 | 2 |
| | | **Henderson Municipal Court** New Filings (cases) | 4,516 | 16,311 |
| | | Reopened (cases) | 1,865 | 3,810 |
| | | Charges | 5,983 | 20,352 |
| | | Grand Total Dispositions | 6,202 | 17,073 |
| | | Total Non-Trial Dispositions | 6,179 | 17,048 |
| | | Total Trial Dispositions | 23 | 25 |
| | | **Las Vegas Municipal Court** New Filings (cases) | 16,731 | 44,207 |
| | | Reopened (cases) | 42 | 28 |
| | | Charges | 22,611 | 56,817 |
| | | Grand Total Dispositions | 19,099 [c] | 42,320 |
| | | Total Non-Trial Dispositions | 19,012 | 42,245 |
| | | Total Trial Dispositions | 87 | 75 |
| | | **Mesquite Municipal Court** New Filings (cases) | 746 | 1,212 |
| | | Reopened (cases) | 0 | 0 |
| | | Charges | 905 | 2,829 |
| | | Grand Total Dispositions | 641 | 1,161 |
| | | Total Non-Trial Dispositions | 639 | 1,160 |
| | | Total Trial Dispositions | 2 | 1 |
| | | **North Las Vegas Municipal Court** New Filings (cases) | 4,237 | 16,205 |
| | | Reopened (cases) | 0 | 0 |
| | | Charges | 5,302 | 25,781 |
| | | Grand Total Dispositions | 4,420 | 15,508 |
| | | Total Non-Trial Dispositions | 4,398 | 15,478 |
| | | Total Trial Dispositions | 22 | 30 |
| **10th Judicial District** | **Churchill County** | **Fallon Municipal Court** New Filings (cases) | 253 | 348 |
| | | Reopened (cases) | 1 | 0 |
| | | Charges | 261 | 483 |
| | | Grand Total Dispositions | 197 | 306 |
| | | Total Non-Trial Dispositions | 197 | 306 |
| | | Total Trial Dispositions | 0 | 0 |

[c]     Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B7-2. Criminal Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.**

| Municipal Court, Criminal Caseload, Misdemeanor (1 of 3) | | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals[a] | Nevada Municipal Courts | New Filings (cases) | 3,765 | 6,124 | 17 | 519 | 5,169 | 2,612 | 211 | 3,466 | 4,490 | 662 | 7,177 | 98,817 | 1,131 |
| | | Reopened (cases) | 142 | 663 | 1 | 74 | 500 | 371 | 3 | 139 | 666 | 36 | 117 | 4,361 | 33 |
| | | Charges | 4,723 | 6,447 | 18 | 619 | 5,880 | 3,787 | 354 | 4,566 | 6,879 | 989 | 9,919 | 134,264 | 1,322 |
| | | Grand Total Dispositions | 3,691 | 7,069 | 16 | 538 | 5,777 | 3,048 | 179 | 3,625 | 4,592 | 545 | 10,493 | 97,486 | 1,040 |
| | | Total Non-Trial Dispositions | 3,644 | 7,033 | 16 | 535 | 5,755 | 3,044 | 178 | 3,612 | 4,575 | 542 | 10,469 | 97,325 | 1,039 |
| | | Total Trial Dispositions | 47 | 36 | 0 | 3 | 22 | 4 | 1 | 13 | 17 | 3 | 24 | 161 | 1 |
| 2nd Judicial District | Washoe County | Reno Municipal Court — New Filings (cases) | 467 | 384 | 15 | 24 | 1,886 | 206 | 17 | 798 | 685 | 88 | 417 | 13,075 | 4 |
| | | Reopened (cases) | 37 | 100 | 1 | 3 | 133 | 31 | 0 | 84 | 232 | 15 | 34 | 527 | 1 |
| | | Charges | 504 | 402 | 16 | 36 | 2,076 | 248 | 23 | 864 | 731 | 125 | 628 | 16,945 | 32 |
| | | Grand Total Dispositions | 467 | 452 | 15 | 21 | 2,096 | 240 | 16 | 999 | 838 | 109 | 624 | 13,263 | 5 |
| | | Total Non-Trial Dispositions | 464 | 450 | 15 | 21 | 2,091 | 240 | 16 | 998 | 833 | 108 | 623 | 13,239 | 5 |
| | | Total Trial Dispositions | 3 | 2 | 0 | 0 | 5 | 0 | 0 | 1 | 5 | 1 | 1 | 24 | 0 |
| | | Sparks Municipal Court — New Filings (cases) | 138 | 281 | 0 | 44 | 529 | 136 | 18 | 77 | 202 | 36 | 98 | 3,978 | 59 |
| | | Reopened (cases)[b] | 0 | 2 | 0 | 2 | 4 | 0 | 0 | 2 | 6 | 0 | 1 | 1[b] | 0[b] |
| | | Charges | 144 | 294 | 0 | 46 | 590 | 187 | 18 | 105 | 222 | 44 | 164 | 6,186 | 119 |
| | | Grand Total Dispositions | 169 | 358 | 0 | 46 | 523 | 160 | 14 | 75 | 280 | 34 | 129 | 4,110 | 74 |
| | | Total Non-Trial Dispositions | 168 | 358 | 0 | 46 | 522 | 160 | 13 | 75 | 280 | 34 | 129 | 4,109 | 74 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 3rd Judicial District | Lyon County | Fernley Municipal Court — New Filings (cases) | 48 | 0 | 0 | 3 | 72 | 29 | 0 | 18 | 68 | 7 | 58 | 2,241 | 8 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 |
| | | Charges | 50 | 0 | 0 | 3 | 84 | 38 | 0 | 22 | 81 | 12 | 152 | 2,947 | 8 |
| | | Grand Total Dispositions | 47 | 1 | 0 | 2 | 90 | 20 | 1 | 23 | 61 | 8 | 67 | 2,243 | 7 |
| | | Total Non-Trial Dispositions | 46 | 1 | 0 | 2 | 90 | 20 | 1 | 23 | 60 | 7 | 67 | 2,242 | 7 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 |
| | | Yerington Municipal Court — New Filings (cases) | 4 | 2 | 0 | 1 | 7 | 3 | 0 | 36 | 8 | 0 | 19 | 50 | 0 |
| | | Reopened (cases) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| | | Charges | 4 | 2 | 0 | 1 | 7 | 3 | 0 | 40 | 8 | 0 | 20 | 66 | 0 |
| | | Grand Total Dispositions | 4 | 6 | 0 | 1 | 6 | 1 | 0 | 66 | 8 | 0 | 10 | 46 | 0 |
| | | Total Non-Trial Dispositions | 4 | 6 | 0 | 1 | 6 | 1 | 0 | 66 | 8 | 0 | 10 | 46 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada Municipal Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Case types determined by the USJR charge hierarchy defined in the Nevada Courts Statistical Reporting Dictionary.

[b]   Reopened (cases) under-reported.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B7-2. Criminal Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.**

| | | Municipal Court, Criminal Caseload, Misdemeanor (2 of 3) | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4th Judicial District | Elko County | Carlin Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 19 | 0 | 0 | 15 | 25 | 6 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 28 | 0 | 0 | 28 | 27 | 6 |
| | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 18 | 0 | 0 | 12 | 28 | 7 |
| | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 18 | 0 | 0 | 12 | 28 | 7 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Municipal Court — New Filings (cases) | 2 | 0 | 0 | 0 | 32 | 0 | 0 | 16 | 45 | 5 | 31 | 197 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 9 | 50 | 0 | 7 | 12 | 1 |
| | | Charges | 2 | 0 | 0 | 0 | 37 | 0 | 0 | 26 | 48 | 15 | 56 | 259 | 4 |
| | | Grand Total Dispositions [c] | 5 | 0 | 0 | 0 | 76 | 0 | 0 | 45 | 75 | 6 | 51 | 195 | 7 |
| | | Total Non-Trial Dispositions | 5 | 0 | 0 | 0 | 76 | 0 | 0 | 44 | 74 | 6 | 51 | 195 | 7 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | Wells Municipal Court — New Filings (cases) | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 21 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 23 | 0 |
| | | Grand Total Dispositions | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 3 | 17 | 0 |
| | | Total Non-Trial Dispositions | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 3 | 17 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | West Wendover Municipal Court — New Filings (cases) | 14 | 0 | 0 | 0 | 38 | 1 | 1 | 7 | 27 | 2 | 7 | 296 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 1 | 6 | 0 | 2 | 2 | 0 |
| | | Charges | 16 | 0 | 0 | 0 | 43 | 1 | 1 | 11 | 32 | 5 | 11 | 328 | 0 |
| | | Grand Total Dispositions | 20 | 0 | 0 | 0 | 22 | 0 | 1 | 8 | 20 | 3 | 11 | 255 | 0 |
| | | Total Non-Trial Dispositions | 19 | 0 | 0 | 0 | 22 | 0 | 1 | 7 | 20 | 3 | 11 | 254 | 0 |
| | | Total Trial Dispositions | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 7th Judicial District | Lincoln County | Caliente Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | Ely Municipal Court — New Filings (cases) | 11 | 0 | 0 | 1 | 26 | 5 | 3 | 67 | 21 | 3 | 8 | 304 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 6 | 0 |
| | | Charges | 11 | 0 | 0 | 1 | 27 | 5 | 3 | 90 | 25 | 5 | 9 | 431 | 2 |
| | | Grand Total Dispositions | 18 | 0 | 0 | 0 | 24 | 8 | 3 | 62 | 27 | 4 | 10 | 300 | 18 |
| | | Total Non-Trial Dispositions | 18 | 0 | 0 | 0 | 24 | 8 | 3 | 61 | 27 | 4 | 10 | 298 | 18 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |

[c]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table B7-2. Criminal Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.**

| | | Municipal Court, Criminal Caseload, Misdemeanor (3 of 3) | | Crimes Against Persons, Misdemeanor | Domestic Violence, Misdemeanor | Older/Vulnerable Persons Abuse, Misdemeanor | Protection Order Violation, Misdemeanor | Crimes Against Property, Misdemeanor | Drugs, Misdemeanor | Weapons, Misdemeanor | Public Order, Misdemeanor | Motor Vehicle - DUI, Misdemeanor | Motor Vehicle - Reckless, Misdemeanor | Other, Misdemeanor | Traffic, Misdemeanor | Parking |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th Judicial District | Clark County | Boulder Municipal Court | New Filings (cases) | 40 | 28 | 0 | 3 | 40 | 62 | 6 | 34 | 88 | 39 | 45 | 1,377 | 19 |
| | | | Reopened (cases) | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 0 | 4 | 0 |
| | | | Charges | 45 | 36 | 0 | 3 | 59 | 140 | 6 | 49 | 106 | 46 | 90 | 1,917 | 24 |
| | | | Grand Total Dispositions | 56 | 7 | 0 | 5 | 30 | 50 | 5 | 33 | 86 | 61 | 50 | 1,554 c | 29 c |
| | | | Total Non-Trial Dispositions | 55 | 7 | 0 | 4 | 27 | 50 | 5 | 32 | 85 | 61 | 50 | 1,552 | 29 |
| | | | Total Trial Dispositions | 1 | 0 | 0 | 1 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 0 |
| | | Henderson Municipal Court | New Filings (cases) | 333 | 1,113 | 1 | 103 | 915 | 545 | 11 | 116 | 432 | 29 | 918 | 15,745 | 566 |
| | | | Reopened (cases) | 101 | 543 | 0 | 69 | 329 | 337 | 3 | 36 | 356 | 19 | 72 | 3,798 | 12 |
| | | | Charges | 349 | 1,173 | 1 | 115 | 1,017 | 869 | 12 | 143 | 505 | 32 | 1,767 | 19,752 | 600 |
| | | | Grand Total Dispositions | 444 | 1,603 | 0 | 185 | 1,175 | 877 | 26 | 165 | 786 | 52 | 889 | 16,618 | 455 |
| | | | Total Non-Trial Dispositions | 441 | 1,592 | 0 | 185 | 1,173 | 876 | 26 | 165 | 785 | 52 | 884 | 16,593 | 455 |
| | | | Total Trial Dispositions | 3 | 11 | 0 | 0 | 2 | 1 | 0 | 0 | 1 | 0 | 5 | 25 | 0 |
| | | Las Vegas Municipal Court | New Filings (cases) | 2,344 | 3,346 | 0 | 261 | 1,008 | 1,099 | 116 | 2,225 | 2,158 | 226 | 3,948 | 43,885 | 322 |
| | | | Reopened (cases) | 2 | 17 | 0 | 0 | 5 | 2 | 0 | 3 | 11 | 1 | 1 | 9 | 19 |
| | | | Charges | 3,215 | 3,521 | 0 | 306 | 1,233 | 1,648 | 240 | 3,113 | 4,329 | 442 | 4,564 | 56,493 | 324 |
| | | | Grand Total Dispositions c | 2,067 | 3,587 | 0 | 195 | 1,106 | 1,174 | 74 | 2,074 | 1,708 | 86 | 7,028 | 42,034 | 286 |
| | | | Total Non-Trial Dispositions | 2,037 | 3,570 | 0 | 193 | 1,098 | 1,171 | 74 | 2,066 | 1,702 | 86 | 7,015 | 41,960 | 285 |
| | | | Total Trial Dispositions | 30 | 17 | 0 | 2 | 8 | 3 | 0 | 8 | 6 | 0 | 13 | 74 | 1 |
| | | Mesquite Municipal Court | New Filings (cases) | 32 | 54 | 0 | 5 | 322 | 130 | 4 | 49 | 123 | 4 | 23 | 1,185 | 27 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 32 | 58 | 0 | 6 | 358 | 207 | 6 | 70 | 132 | 5 | 31 | 2,802 | 27 |
| | | | Grand Total Dispositions | 28 | 63 | 0 | 4 | 280 | 93 | 2 | 51 | 88 | 4 | 28 | 1,136 | 25 |
| | | | Total Non-Trial Dispositions | 28 | 62 | 0 | 4 | 279 | 93 | 2 | 51 | 88 | 4 | 28 | 1,135 | 25 |
| | | | Total Trial Dispositions | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | North Las Vegas Municipal Court | New Filings (cases) | 319 | 900 | 0 | 68 | 254 | 392 | 35 | 0 | 596 | 223 | 1,450 | 16,093 | 112 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 336 | 945 | 0 | 96 | 305 | 436 | 45 | 0 | 623 | 258 | 2,258 | 25,608 | 173 |
| | | | Grand Total Dispositions | 346 | 979 | 0 | 73 | 311 | 418 | 37 | 0 | 588 | 177 | 1,491 | 15,383 | 125 |
| | | | Total Non-Trial Dispositions | 339 | 974 | 0 | 73 | 309 | 418 | 37 | 0 | 586 | 176 | 1,486 | 15,353 | 125 |
| | | | Total Trial Dispositions | 7 | 5 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 1 | 5 | 30 | 0 |
| 10th Judicial District | Churchill County | Fallon Municipal Court | New Filings (cases) | 12 | 16 | 1 | 6 | 34 | 4 | 0 | 4 | 36 | 0 | 140 | 345 | 3 |
| | | | Reopened (cases) | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | Charges | 14 | 16 | 1 | 6 | 38 | 5 | 0 | 4 | 36 | 0 | 141 | 480 | 3 |
| | | | Grand Total Dispositions | 14 | 13 | 1 | 6 | 33 | 7 | 0 | 5 | 27 | 1 | 90 | 304 | 2 |
| | | | Total Non-Trial Dispositions | 14 | 13 | 1 | 6 | 33 | 7 | 0 | 5 | 27 | 1 | 90 | 304 | 2 |
| | | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

c   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B8. Civil Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.

| Municipal Court, Civil Caseload, Aggregate (1 of 2) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Totals [a] | Nevada Municipal Courts | New Filings (cases) | 0 | 0 | 0 | 0 | 232 | 714 | 946 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 218 | 218 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 257 | 956 | 1,213 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 257 | 956 | 1,213 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Judicial District | Washoe County | Reno Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 58 | 58 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 74 | 74 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 74 | 74 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Sparks Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 16 | 16 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 11 | 11 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 11 | 11 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3rd Judicial District | Lyon County | Fernley Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Yerington Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4th Judicial District | Elko County | Carlin Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Elko Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Wells Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | West Wendover Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[a]   Totals reflect aggregate information from the Nevada Municipal Courts. Information contained herein may reflect non-standard reporting and is noted by subsequent footnotes. Petitions to Seal Records are USJR Phase III-specific measures and reported in Other Civil Matters in the USJR Phase II statistics as defined in the Nevada Courts Statistical Reporting Dictionary.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B8. Civil Caseload Processed by Municipal Courts in Nevada, Fiscal Year 2022.

| Municipal Court, Civil Caseload, Aggregate (2 of 2) | | | Real Property | Tort | Contract | Contested Liens | Petitions to Seal Records | Other Civil Matters | Totals |
|---|---|---|---|---|---|---|---|---|---|
| 7th Judicial District | Lincoln County | Caliente Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White Pine County | Ely Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8th Judicial District | Clark County | Boulder Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Henderson Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 89 | 3 | 92 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions [b] | 0 | 0 | 0 | 0 | 114 | 4 | 118 [b] |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 114 | 4 | 118 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Las Vegas Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 624 | 624 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 216 | 216 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 862 | 862 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 862 | 862 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Mesquite Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | North Las Vegas Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 143 | 0 | 143 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 143 | 0 | 143 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 143 | 0 | 143 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10th Judicial District | Churchill County | Fallon Municipal Court — New Filings (cases) | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | | Reopened (cases) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Grand Total Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Non-Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Total Trial Dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[b]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

Table B9. Juvenile Traffic Caseload Processed by Courts in Nevada, Fiscal Year 2022.

| Juvenile Traffic | | | New Filings (cases) | Reopened | Charges | Grand Total Dispositions | Total Non-Trial Dispositions | Total Bench Trial Dispositions |
|---|---|---|---|---|---|---|---|---|
| Totals [a] | | Nevada Trial Courts | 4,445 | 29 | 6,068 | 5,375 | 5,363 | 12 |
| | | District Court Total | 2,090 | 3 | 2,898 | 1,949 | 1,937 | 12 |
| | | Justice Court Total | 1,961 | 0 | 2,679 | 3,021 | 3,021 | 0 |
| | | Municipal Court Total | 394 | 26 | 491 | 405 | 405 | 0 |
| 1st Judicial District | Carson City | Carson City District Court | 191 | 2 | 258 | 128 | 128 | 0 |
| | Storey County | Storey County District Court | 2 | 0 | 2 | 2 | 2 | 0 |
| 2nd Judicial District | Washoe County | Washoe County District Court | 1,286 | 0 [b] | 1,879 | 1,239 | 1,229 | 10 |
| 3rd Judicial District | Lyon County | Lyon County District Court | 131 | 0 | 159 | 134 | 134 | 0 |
| 4th Judicial District | Elko County | Elko County District Court | 174 | 0 | 209 | 147 | 147 | 0 |
| 5th Judicial District | Esmeralda County | Esmeralda County District Court | 1 | 0 | 1 | 5 | 5 | 0 |
| | Nye County | Nye County District Court | 54 | 0 | 68 | 53 | 53 | 0 |
| 6th Judicial District | Humboldt County | Humboldt County District Court | 84 | 0 | 102 | 68 | 68 | 0 |
| 7th Judicial District | Eureka County | Eureka County District Court [c] | - | - | - | - | - | - |
| | | Eureka Justice Court | 2 | 0 | 2 | 1 | 1 | 0 |
| | Lincoln County | Lincoln County District Court [c] | - | - | - | - | - | - |
| | | Meadow Valley Justice Court | 5 | 0 | 5 | 5 | 5 | 0 |
| | | Pahranagat Valley Justice Court | 13 | 0 | 15 | 9 | 9 | 0 |
| | White Pine County | White Pine County District Court [c] | - | - | - | - | - | - |
| | | Ely Justice Court | 23 | 0 | 27 | 24 | 24 | 0 |
| 8th Judicial District | Clark County | Clark County District Court [c] | - | - | - | - | - | - |
| | | Boulder Justice Court | 5 | 0 | 6 | 5 | 5 | 0 |
| | | Bunkerville Justice Court | 14 | 0 | 22 | 17 | 17 | 0 |
| | | Goodsprings Justice Court | 14 | 0 | 17 | 23 | 23 | 0 |
| | | Henderson Justice Court | 42 | 0 | 56 | 47 | 47 | 0 |
| | | Las Vegas Justice Court | 1,767 | 0 [b] | 2,438 | 2,772 [d] | 2,772 | 0 |
| | | Laughlin Justice Court | 17 | 0 | 21 | 42 [f] | 42 | 0 |
| | | Moapa Justice Court | 18 | 0 | 22 | 27 | 27 | 0 |
| | | Moapa Valley Justice Court | 31 | 0 | 35 | 28 | 28 | 0 |
| | | North Las Vegas Justice Court | 2 | 0 | 4 | 6 | 6 | 0 |
| | | Searchlight Justice Court | 8 | 0 | 9 | 15 | 15 | 0 |
| | | Boulder Municipal Court | 25 | 2 | 36 | 30 | 30 | 0 |
| | | Henderson Municipal Court | 336 | 24 | 412 | 345 | 345 | 0 |
| | | Mesquite Municipal Court | 33 | 0 | 43 | 30 | 30 | 0 |
| 9th Judicial District | Douglas County | Douglas County District Court | 82 | 0 | 107 | 81 | 79 | 2 |
| 10th Judicial District | Churchill County | Churchill County District Court | 71 | 1 | 91 | 74 | 74 | 0 |
| 11th Judicial District | Lander County | Lander County District Court | 2 | 0 | 3 | 3 | 3 | 0 |
| | Mineral County | Mineral County District Court | 10 | 0 | 16 | 12 | 12 | 0 |
| | Pershing County | Pershing County District Court | 2 | 0 | 3 | 3 | 3 | 0 |

[a]   Totals reflect aggregate information from the Nevada Trial Courts. Information contained herein may reflect non-standard reporting and is noted by
      subsequent footnotes.

[b]   Reopen counts not reported or under-reported.

[c]   Juvenile traffic violations handled and reported by limited jurisdiction courts.

[d]   Court reported a large number of administrative closures (1,134 dispositions). Because many of these dispositions are unrelated to the filings for the
      current fiscal year and in an effort to more accurately reflect actual dispositions of active cases, these administrative closures were not included in total
      dispositions but are provided in this footnote for general information.

[f]   Includes administrative case closures.

Source:  Uniform System for Judicial Records, Nevada AOC, Research and Statistics Unit.

**Table C1. Summary of Specialty Court Program Distributions with General Fund Appropriation, Fiscal Year 2022.**[a]

| Jurisdiction | Court Type | Fiscal Year 2022 Expended | Fiscal Year 2022 Returned [b] | Fiscal Year 2022 Approved |
|---|---|---|---|---|
| **Western Region** | | | | |
| Western Region | Felony DUI | $17,855.68 | $844.32 | $18,700.00 |
| | Medication-Assisted Treatment | $57,671.00 | $0.00 | $57,671.00 |
| | Mental Health | $31,450.00 | $0.00 | $31,450.00 |
| First Judicial District | Juvenile Drug | $779.00 | $0.00 | $779.00 |
| Carson City Justice | Misdemeanor Treatment | $23,665.00 | $0.00 | $23,665.00 |
| East Fork Justice | Alcohol and Drug | $12,073.00 | $0.00 | $12,073.00 |
| | **Western Region Total** | **$143,493.68** | **$844.32** | **$144,338.00** |
| **Washoe Region** | | | | |
| Second Judicial District [c] | Medication-Assisted Treatment | $211,336.00 | $0.00 | $211,336.00 |
| | Prison Re-entry Court | $50,000.00 | $0.00 | $50,000.00 |
| Reno Justice | DUI Court | $20,020.52 | $229.48 | $20,250.00 |
| | Community Court | $95,291.31 | $4,472.69 | $99,764.00 |
| Sparks Justice | Recovery Court | $30,576.29 | $973.71 | $31,550.00 |
| Reno Municipal [c] | Community Court | $17,500.00 | $0.00 | $17,500.00 |
| | Young Adult Recovery Court | $12,500.00 | $0.00 | $12,500.00 |
| Sparks Municipal | Drug and Alcohol | $39,568.66 | $27,531.34 | $67,100.00 |
| | **Washoe Region Total** | **$476,792.78** | **$33,207.22** | **$510,000.00** |
| **Eastern Region** | | | | |
| Fourth Judicial District | Adult Drug | $15,000.00 | $0.00 | $15,000.00 |
| | Family Preservation | $15,000.00 | $0.00 | $15,000.00 |
| | Juvenile Drug | $32,600.48 | $65.52 | $32,666.00 |
| Seventh Judicial District | Adult Drug | $32,331.00 | $0.00 | $32,331.00 |
| | **Eastern Region Total** | **$94,931.48** | **$65.52** | **$94,997.00** |
| **Fifth Judicial Region** | | | | |
| Nye County–Tonopah | Adult Drug | $23,665.00 | $0.00 | $23,665.00 |
| | **Fifth Judicial Region Total** | **$23,665.00** | **$0.00** | **$23,665.00** |
| **Central Region** | | | | |
| Humboldt County [c] | Adult Drug | $71,000.00 | $0.00 | $71,000.00 |
| | Family Treatment | $45,000.00 | $0.00 | $45,000.00 |
| | Juvenile Diversion | $10,000.00 | $0.00 | $10,000.00 |
| | Mental Health | $61,000.00 | $0.00 | $61,000.00 |
| | **Central Region Total** | **$187,000.00** | **$0.00** | **$187,000.00** |
| **Clark Region** | | | | |
| Eighth Judicial District | Adult Drug Co-Occurring Court | $725,727.00 | $0.00 | $725,727.00 |
| | Gambling Treatment Diversion Court | $1,000.00 | $0.00 | $1,000.00 |
| | M.A.T. Re-entry Court | $5,000.00 | $0.00 | $5,000.00 |
| | Mental Health Court | $725,727.00 | $0.00 | $725,727.00 |
| | Veteran's Treatment Court | $93,700.00 | $0.00 | $93,700.00 |
| Las Vegas Justice [c] | Adult Drug | $49,699.89 | $100,300.11 | $150,000.00 |
| | Veterans Treatment | $50,000.00 | $0.00 | $50,000.00 |
| Laughlin Justice | Adult Drug | $33,683.72 | $38,404.28 | $72,088.00 |
| North Las Vegas Justice | Community Court | $11,082.27 | $28,480.73 | $39,563.00 |
| Boulder City Municipal | Habitual Offender | $30,000.00 | $0.00 | $30,000.00 |
| Henderson Municipal | Veterans Treatment | $50,675.00 | $0.00 | $50,675.00 |
| Las Vegas Municipal | Drug Court | $15,000.00 | $0.00 | $15,000.00 |
| | Veterans Treatment | $12,492.36 | $2,507.64 | $15,000.00 |
| | HOPE Court | $15,000.00 | $0.00 | $15,000.00 |
| | Women in Need | $1,204.27 | $13,795.73 | $15,000.00 |
| | Mental Health | $15,000.00 | $0.00 | $15,000.00 |
| Mesquite Municipal | Habitual Offender | $21,520.00 | $0.00 | $21,520.00 |
| | **Clark Region Total** | **$1,856,511.51** | **$183,488.49** | **$2,040,000.00** |
| **Grand  Total Specialty Court GF Distributions** | | **$2,782,394.45** | **$217,605.55** | **$3,000,000.00** |

[a]  Includes General Fund funded specialty courts. Court counts as listed may not correspond to Table C3.
[b]  Returned monies were reverted back to the State General Fund.
[c]  Does not include courts reported in Table C3 due to separate funding sources.
Source: Nevada Administrative Office of the Courts, Specialty Courts Program.

**Table C2. Summary of Specialty Court Program Distributions with Administrative Assessment Revenue, Fiscal Year 2022.** [a]

| Jurisdiction | Court Type | Fiscal Year 2021 Carry Forward [b] | Fiscal Year 2022 Distributed | Fiscal Year 2022 Approved |
|---|---|---|---|---|
| **Western Region** | | | | |
| Western Region | Adult Drug (5 Programs) | $0.00 | $400,064.00 | $400,064.00 |
| First Judicial District | Juvenile Drug | $1,043.40 | $9,435.60 | $10,479.00 |
| Carson City/Douglas | DUI Court [c] | $3,483.55 | $24,459.45 | $27,943.00 |
| Carson City Justice | Mental Health | $4,107.00 | $54,096.00 | $58,203.00 |
| | **Western Region Total** | **$8,633.95** | **$488,055.05** | **$496,689.00** |
| **Washoe Region** | | | | |
| Second Judicial District [d] | Adult Drug (2 Tracks) | $0.00 | $583,020.00 | $583,020.00 |
| | Family Treatment | $0.00 | $69,346.00 | $69,346.00 |
| | Felony DUI | $0.00 | $55,821.00 | $55,821.00 |
| | Mental Health | $0.00 | $17,391.00 | $17,391.00 |
| | Veterans Treatment | $0.00 | $81,975.00 | $81,975.00 |
| Reno Justice | Drug and Alcohol | $1,186.81 | $124,168.19 | $125,355.00 |
| Reno Municipal [d] | DUI (Dept. 1) Fresh Start | $0.00 | $27,085.00 | $27,085.00 |
| | Co-Occurring Disorders Court | $0.00 | $52,301.00 | $52,301.00 |
| Sparks Municipal | Drug and Alcohol | $7,390.25 | $14,351.75 | $21,742.00 |
| | **Washoe Region Total** | **$8,577.06** | **$1,025,458.94** | **$1,034,036.00** |
| **Eastern Region** | | | | |
| Fourth Judicial District | Adult Drug | $0.00 | $112,677.00 | $112,677.00 |
| | Juvenile Drug | $0.00 | $51,509.00 | $51,509.00 |
| Seventh Judicial District | Adult Drug (2 Tracks) | $0.00 | $66,516.00 | $66,516.00 |
| | **Eastern Region Total** | **$0.00** | **$230,702.00** | **$230,702.00** |
| **Fifth Judicial Region** | | | | |
| Nye County–Pahrump | Adult Drug | $0.00 | $100,536.00 | $100,536.00 |
| | **Fifth Judicial Region Total** | **$0.00** | **$100,536.00** | **$100,536.00** |
| **Central Region** | | | | |
| Humboldt County (6th JD) [d] | Adult Drug | $0.00 | $49,124.00 | $49,124.00 |
| Pershing County (11th JD) [f] | Adult Drug | $30,507.50 | $14,616.50 | $45,124.00 |
| | **Central Region Total** | **$30,507.50** | **$63,740.50** | **$94,248.00** |
| **Clark Region** | | | | |
| Eighth Judicial District | Adult Drug (3 Tracks) | $113,066.55 | $1,446,067.45 | $1,559,134.00 |
| | Family/Child Support Drug (2 Tracks) | $114,971.72 | $322,896.28 | $437,868.00 |
| | Felony DUI | $33,928.08 | $144,576.92 | $178,505.00 |
| | Juvenile Drug | $116,876.58 | $120,918.42 | $237,795.00 |
| | Mental Health | $166,264.32 | $296,387.68 | $462,652.00 |
| Las Vegas Justice [d] | Adult Drug | $7,555.00 | $213,248.00 | $220,803.00 |
| | DUI Court (Dept. 5A) [g] | $0.00 | $29,027.00 | $29,027.00 |
| | DUI Court (Dept. 5B) [g] | $0.00 | $29,027.00 | $29,027.00 |
| Henderson Municipal | ABC Court | $1,809.14 | $25,564.86 | $27,374.00 |
| Las Vegas Municipal | Adult Drug | $0.14 | $52,141.86 | $52,142.00 |
| | DUI Court | $35,118.86 | $35,276.14 | $70,395.00 |
| | HOPE Court | $12,134.21 | $96,988.79 | $109,123.00 |
| | Women in Need | $3,590.31 | $33,363.69 | $36,954.00 |
| | **Clark Region Total** | **$605,314.91** | **$2,845,484.09** | **$3,450,799.00** |
| **Grand Total Specialty Court AA Distributions** | | **$653,033.42** | **$4,753,976.58** | **$5,407,010.00** |

[a]  Includes fee funded specialty courts. Court counts as listed may not correspond to Table C3.

[b]  Carry forward is used to fund first-quarter distributions of the following fiscal year.

[c]  Statistics reported as Western Region courts in Table C3.

[d]  Does not include courts reported in Table C3 due to separate funding sources.

[f]  Does not include courts reported in Table C3 due to aggregated funding source.

[g]  The DUI Court Program is a single program but is reported with separate funding amounts due to operation by separate judicial officers.

Source: Nevada Administrative Office of the Courts, Specialty Courts Program.

**Table C3. Summary of Specialty Court Statistics, Fiscal Year 2022.** [a]

| Jurisdiction | New Admissions [b] | Graduates | Terminations [c] | Active Cases at Year's End | Drug Free Babies [d] |
|---|---|---|---|---|---|
| **Western Region** | | | | | |
| First Judicial District Court [f] | 3 | 2 | 5 | 4 | 0 |
| Western Region (10 Specialty Courts) | 218 | 120 | 37 | 447 | 0 |
| Carson City Justice Court (2 Specialty Courts) | 43 | 16 | 20 | 47 | 0 |
| East Fork Justice Court | 4 | 4 | 2 | 7 | 0 |
| **Western Region Total** | **268** | **142** | **64** | **505** | **0** |
| **Washoe Region** | | | | | |
| Second Judicial District Court (11 Specialty Courts) | 329 | 286 | 130 | 416 | 5 |
| Reno Justice Court (3 Specialty Courts) | 132 | 51 | 64 | 176 | 0 |
| Sparks Justice Court | 26 | 20 | 13 | 21 | 0 |
| Reno Municipal Court (5 Specialty Courts) | 311 | 94 | 108 | 219 | 0 |
| Sparks Municipal Court (2 Specialty Courts) [f] | 19 | 14 | 4 | 26 | 0 |
| **Washoe Region Total** | **817** | **465** | **319** | **858** | **5** |
| **Eastern Region** | | | | | |
| Fourth Judicial District Court (5 Specialty Courts) [f] | 42 | 16 | 29 | 39 | 0 |
| Seventh Judicial District Court (2 Specialty Courts) [f] | 13 | 13 | 6 | 18 | 0 |
| **Eastern Region Total** | **55** | **29** | **35** | **57** | **0** |
| **Fifth Judicial Region** | | | | | |
| Fifth Judicial District Court (2 Specialty Courts) | 28 | 36 | 14 | 45 | 1 |
| **Fifth Judicial Region Total** | **28** | **36** | **14** | **45** | **1** |
| **Central Region** | | | | | |
| Sixth Judicial District Court (5 Specialty Courts) [f,g] | 40 | 39 | 15 | 44 | 4 |
| Eleventh Judicial District Court (2 Specialty Courts) | 12 | 5 | 9 | 12 | 0 |
| **Central Region Total** | **52** | **44** | **24** | **56** | **4** |
| **Clark Region** | | | | | |
| Eighth Judicial District Court (13 Specialty Courts) | 1,058 | 429 | 514 | 1,166 | 6 |
| Las Vegas Justice Court (8 Specialty Courts) | 155 | 85 | 96 | 196 | 2 |
| Laughlin Justice Court | 4 | 0 | 3 | 16 | 0 |
| North Las Vegas Justice Court | 7 | 1 | 3 | 13 | 0 |
| Boulder City Municipal Court | 5 | 6 | 3 | 11 | 1 |
| Henderson Municipal Court (2 Specialty Courts) | 24 | 13 | 6 | 43 | 0 |
| Las Vegas Municipal Court (7 Specialty Courts) [f] | 114 | 47 | 70 | 112 | 5 |
| Mesquite Municipal Court | 8 | 8 | 3 | 9 | 1 |
| **Clark Region Total** | **1,375** | **589** | **698** | **1,566** | **15** |
| **All Specialty Courts** | **2,595** | **1,305** | **1,154** | **3,087** | **25** |

[a] Includes General Fund, fee funded, and community funded specialty courts. Court counts as listed in the Nevada Drug Court Case Management System unless otherwise footnoted.

[b] Includes new admissions and voluntary admissions.

[c] Includes terminations, transfers, other outcomes, and participants who died while in the program.

[d] Drug free babies as reported from the respective court to the Research and Statistics Unit.

[f] Court reports separate funding sources as one court in the Nevada Drug Court Case Management System.

[g] Court count will differ from tables C1 and C2 due to included unfunded courts.

Source: Nevada Drug Court Case Management System.

# Criminal Caseload Glossary

**When to Count Filings**: Cases are counted by defendants in District Court when the court receives notification of a bind over from a lower court or receives the formal charging document from the District Attorney's Office. Felony and gross misdemeanor filings in Justice Court are counted by defendants when the court receives the formal charging document, generally a complaint or citation. Misdemeanor and traffic filings in Justice and Municipal Courts are counted by defendants when the court receives the citation or complaint. Cases with multiple charges that span different categories and types are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary* and can be found at http://nvcourts.gov/.

**Criminal Case Categories**: A broad classification category for trial court caseload that includes cases involving the alleged violation of a state law, local ordinance, or federal regulation (traffic only).
*[Listed in hierarchal order, felony = highest]*

- **Felony** – Cases heard at District Court, with preliminary hearings at Justice Court, for defendants charged with a violation of state law that is punishable by death or imprisonment in the state prison.
- **Gross Misdemeanor** – Cases heard at District Court, with preliminary hearings at Justice Court, for defendants charged with a violation of state law that involves an offense that does not fit within the definitions of felony, misdemeanor, or traffic cases. Gross misdemeanor offenses are punishable by fine or incarceration or both for no more than $2,000 or 1 year, respectively (unless the statute in force at the time of commission of such an offense prescribed a different penalty).
- **Misdemeanor (Non-Traffic)** – Cases heard at Justice and Municipal Courts for defendants charged with the violation of state law or local ordinance that involves an offense punishable by fine or incarceration or both for no more than $1,000 or 6 months, respectively (unless the statute in force at the time of commission of such an offense prescribed a different penalty).
- **Traffic Misdemeanor** – Cases heard at Justice and Municipal Courts for moving and non-moving violations of traffic law or ordinance that do not pertain to parking of a motor vehicle.
- **Parking Violations** – Cases heard at Justice and Municipal Courts for parking of a motor vehicle in violation of a traffic law or ordinance.
- **Appeal from Limited Jurisdiction Court** – Cases heard at District Court in which the court reviews the judgment of a Justice or Municipal Court for a criminal case.

**Criminal Case Types**: The following case types can be felony, gross misdemeanor, or misdemeanor (non-traffic) criminal case categories, unless otherwise noted. *[Listed in hierarchal order, Crimes Against Persons = highest]*

- **Crimes Against Persons** – A case type in which a defendant is charged with a crime against person(s). Examples include assault with a deadly weapon, rape, kidnapping, murder, manslaughter, and robbery.
- **Domestic Violence** – A case type involving allegations of violence, coercion, or intimidation by a family or household member against another family or household member.
- **Older/Vulnerable Persons Abuse** – A case type allegations involving of abusing, neglecting, exploiting, or isolating older or vulnerable persons.
- **Child Abuse and Neglect** – A case type in which a person is charged with willfully exposing, causing, or permitting a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect. This case type is only reported in felony or gross misdemeanor case categories.
- **Protection Order Violation** – A case type alleging violation of a court order that was issued to help protect an individual from stalking and harassment or to protect minors from harm.
- **Crimes Against Property** – A case type in which a defendant is charged with a crime against property. Examples include grand larceny, burglary, auto theft, arson, forgery, fraud, embezzlement, vandalism, and bad checks.
- **Drugs** – A case type involving illegal possession, sale, use, manufacture, trafficking, or furnishing of drugs.
- **Weapons** – A case type involving violations of regulations or statutes controlling the carrying, using, possessing, furnishing, and manufacturing of deadly weapons or silencers.
- **Public Order** – A case type involving violations of liquor laws, drunkenness, gambling, and prostitution. Some jurisdictions refer to these as "public nuisance" or "quality of life" offenses, or "crimes against society."
- **Motor Vehicle - DUI** – A case type that involves a charge of driving under the influence of either alcohol or drugs (DUI), or driving while impaired. This case type is only reported in felony or misdemeanor case categories.
- **Motor Vehicle - Reckless Driving** – A case type that involves a charge of driving a motor vehicle in such a way as to willfully or wantonly endanger the safety of others or with disregard for the consequences. This case type is only reported in felony or misdemeanor case categories.
- **Motor Vehicle - Other** – A case type including cases of unknown specificity or cases not attributable to one of the other previously defined motor vehicle case types. This case type is only reported in felony or gross misdemeanor case categories.
- **Other** – A case type including cases of unknown specificity or cases not attributable to one of the other previously defined case categories. Other can be classified as "Other Felony," "Other Gross Misdemeanor," and "Other Non-Traffic Misdemeanor."

# Criminal Caseload Glossary

**Pending Cases**: Cases requiring disposition or cases that have requests to modify or require enforcement of existing judgments.
- **Active Cases**: Pending cases that have not been classified as inactive.
- **Inactive Cases**: Pending cases administratively classified as inactive due to issues that require resolution (outside the courts' purview) before the adjudication process can be resumed. Examples include court-issued stays, warrants, and diversion.

**Reopened Cases**: Cases where judgments have been previously entered but have been restored to the pending caseload due to the filing of a request to modify or enforce existing judgments. Cases remanded with correction from appeals are included.

**When to Count Dispositions**: A criminal case is considered disposed when adjudication for that case occurs. For statistical purposes, adjudication is defined as date of sentencing, date of adjudication, or date charges are disposed, whichever occurs last. Cases with multiple charges that require multiple types of disposition are only counted as one type and are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary* and can be found at http://nvcourts.gov/.

**Non-Trial Dispositions (District Court)**: A subtype of case dispositions where the case is resolved without a bench or jury trial. This subtype includes:
- Other Manner of Disposition
- Nolle Prosequi (before trial)
- Transferred (before/during trial)
- Dismissed (before trial)
- Guilty Plea with Sentence (before trial)
- Dismissed (after diversion)

**Bench Trial Dispositions (District Court)**: A subtype of case dispositions where the case is resolved with a judicial officer determining both the issues of fact and law in a criminal case. This subtype includes:
- Dismissed (during trial)
- Acquittal
- Guilty Plea with Sentence (during trial)
- Conviction

**Jury Trial Dispositions (District Court)**: A subtype of case dispositions where the case is resolved with an empaneled jury determining the issues of fact and returning a verdict in a criminal case. This subtype includes:
- Dismissed (during trial)
- Acquittal
- Guilty Plea with Sentence (during trial)
- Conviction

**Non-Trial Dispositions (Justice and Municipal Courts)**: A subtype of case dispositions where the case is resolved without a bench or jury trial. This subtype includes:
- Other Manner of Disposition
- Bail Forfeiture
- Nolle Prosequi (before trial)
- Transferred (before/during trial)
- Dismissed (before trial)
- Guilty Plea with Sentence (before trial)
- Dismissed (after diversion)
- Waiver of Preliminary Hearing
- Dismissed (during preliminary hearing)
- Guilty Plea with Sentence (during preliminary hearing)
- Bindover

**Trial Dispositions (Justice and Municipal Courts)**: A subtype of case dispositions where the case is resolved with a judicial officer or an empaneled jury determining both the issues of fact and law in a criminal case. In Justice Courts, these manners of disposition are only used for misdemeanor charges in felony and gross misdemeanor cases. This subtype includes:
- Dismissed (during trial)
- Acquittal
- Guilty Plea with Sentence (during trial)
- Conviction

# Civil Caseload Glossary

**When to Count Filings**: Cases are counted when a petition or complaint is filed with the court or the court receives a motion.

**Civil Case Types**: A broad classification category for caseload statistics that includes cases requesting the enforcement or protection of a right and/or the redress or prevention of a wrong, within the jurisdictional limits of the court.

### District Court Case Types:

- **Real Property** – Cases that deal with ownership or rights in real property excluding construction defect or negligence; includes unlawful detainer and other landlord/tenant disputes; judicial foreclosure and other title to property issues; condemnation and eminent domain issues; and other real property cases that do not fit in one of the other mentioned subtypes.
- **Torts** – Cases that deal with an injury or wrong committed either against a person or person's property by a party who either did or did not do something they were or were not supposed to do; includes negligence issues for autos, premises, and other negligence issues that do not fit in one of the other mentioned subtypes; includes malpractice issues concerning medical and dental, legal, accounting, and other malpractice issues that do not fit in one of the other mentioned subtypes; and includes product liability, intentional misconduct, employment, insurance, and other tort case issues that do not fit in one of the other mentioned subtypes.
- **Probate** – Cases that deal with the probate of a will, trust, or estate of a deceased person; includes summary administration, general administration, special administration, set aside, probate trust, and other probate cases that do not fit in one of the other mentioned subtypes.
- **Construction Defect** – Cases that deal with defects in construction; includes matters that involve NRS Chapter 40 and other construction defect issues.
- **Contract** – Cases that deal with an alleged failure to perform any promise that forms the whole or part of a contract; includes uniform commercial code, building and construction, insurance carrier, commercial instrument, collection of accounts, employment, and other contract matters that do not fit in one of the other mentioned subtypes.
- **Judicial Review/Appeal** – Cases that deal with the judicial review of decisions by administrative agencies, lower courts, and other matters; includes review of foreclosure mediation, petition to seal records, mental competency, and administrative agency appeals concerning the department of motor vehicles, worker's compensation, and other Nevada state agencies, as well as appeals from lower courts and other judicial review/appeal matters that do not fit in one of the other mentioned subtypes.
- **Civil Writs** – Cases that deal with any order requiring performance or adherence of performance of an act not associated with an existing case and whereby no other legal remedy exists; includes writs of habeas corpus, mandamus, quo warranto, prohibition, and other civil writs that do not fit in one of the other mentioned subtypes.
- **Other Civil** – Cases that deal with compromise of minor's claim, foreign judgment, and all other civil matters that do not fit in one of the above case types.

### Justice and Municipal Court Case Types:

- **Real Property** – Cases that deal with ownership or rights in real property excluding construction defect or negligence; includes summary eviction, unlawful detainer, and other real property cases that do not fit in one of the other mentioned subtypes.
- **Torts** – Cases that deal with an injury or wrong committed either against a person or person's property by a party who either did or did not do something they were or were not supposed to do; includes negligence issues for autos, premises, and other negligence issues that do not fit in one of the other mentioned subtypes; and includes intentional misconduct and other tort case issues that do not fit in one of the other mentioned subtypes.
- **Contract** – Cases that deal with an alleged failure to perform any promise that forms the whole or part of a contract; includes seller plaintiff issues concerning collection of credit card debt and payday loan debt, debt collection agency matters, or other debt collection matters that do not fit in one of the other mentioned subtypes; and includes contract buyer plaintiff and other contract matters that do not fit in one of the other mentioned subtypes.
- **Contested Liens** – Cases that deal with the validity of liens or requests the enforcement of liens.
- **Petition to Seal Records** – Cases requesting the court to seal records of a previous court case or other matters under the court's jurisdiction (criminal, civil, or administrative matters).
- **Other Civil** – Cases that deal with all other civil matters that do not fit in one of the above case types.
- **Small Claims** – Cases that deal with recovery of money only, where the amount does not exceed the jurisdictional limit (currently $10,000), and the defendant named is currently a resident, does business in, or is employed in the township where the court is located. Small claims are heard in Justice Court only.
- **Protection Orders** – Cases that deal with requests for temporary order for protection against domestic violence, harassment in the workplace, sexual assault, stalking, or threat to life, and high-risk behavior. Heard in Justice Court only. Includes:
  - Request for Domestic Violence Protection Order
  - Request for Protection Order (Non-Domestic Violence)
  - Request for High-Risk Protection Order

# Civil Caseload Glossary

**Pending Cases**: Cases requiring disposition or cases that have requests to modify or require enforcement of existing judgments.
- **Active Cases**: Pending cases that have not been classified as inactive.
- **Inactive Cases**: Pending cases administratively classified as inactive due to issues that require resolution (outside the courts' purview) before the adjudication process can be resumed, typically due to court-issued stays.

**Reopened Cases**: Cases where judgments have been previously entered but have been restored to the pending caseload due to the filing of a request to modify or enforce existing judgments. Cases remanded with correction from appeals are included.

**When to Count Dispositions**: A civil case is considered disposed when adjudication of the matter occurs. For statistical purposes, adjudication is defined as the date judgment is entered. Cases where multiple claims or parties are adjudicated are only reported as one type, determined by the court of record.

**Non-Trial Dispositions (All Jurisdictions, Non- Protection Orders)**: A subtype of case dispositions where the case is resolved without a bench or jury trial. This subtype includes:
- Other Manner of Disposition
- Voluntary Dismissal
- Involuntary Dismissal
- Transferred (before trial)
- Judgment on Arbitration
- Stipulated Dismissal
- Stipulated Judgment
- Default Judgment
- Motion to Dismiss by the Defendant(s)
- Summary Judgment

**Non-Trial Dispositions (Justice Court, Protection Orders Only)**: A subtype of case dispositions where the case is resolved without a bench or jury trial. This subtype includes:
- Voluntary Dismissal
- Involuntary Dismissal
- Transferred (before trial)
- Denied without Hearing
- Granted without Hearing
- Denied with Hearing
- Granted with Hearing

**Bench Trial Dispositions (District Court)**: A subtype of case dispositions where the case is resolved when a judicial officer hears a trial of matter or cause to determine both the issues of fact and law in a civil case. This subtype includes:
- Disposed After Trial Start (bench trial)
- Judgment Reached (bench trial)

**Jury Trial Dispositions (District Court)**: A subtype of case dispositions where the case is resolved with an empaneled jury to hear a trial of matter or cause in a civil case. This subtype includes:
- Disposed After Trial Start (jury trial)
- Verdict Reached

**Trial Dispositions (Justice and Municipal Courts)**: A subtype of case dispositions where the case is resolved with a judicial officer or an empaneled jury to hear a trial of matter or cause in a civil case. This subtype includes:
- Disposed After Trial Start (bench trial)
- Judgment Reached (bench trial)
- Disposed After Trial Start (jury trial)
- Verdict Reached

# Family Caseload Glossary

**When to Count Filings**: Cases are counted when the court receives an originating petition, request, or complaint.

**Family Case Types**: A broad classification category for caseloads involving domestic or family-related matters (excluding juvenile-related) in District Courts; the processing of which follows Nevada statutes, court rules, local regulations, and federal regulations.

- **Marriage Dissolution** – Cases that involve divorce, annulment, or separate maintenance, as well as all issues concerning custody, support, and visitation resulting from the dissolution of the relationship.
- **Paternity** – Cases that involve paternity issues as defined by Nevada statute.
- **Custody (Non-Divorce)** – Cases that involve individual requests where the court makes a determination regarding the control or care of a child.
- **IV-D - UIFSA (Uniform Interstate Family Support Act)** – Cases that require maintenance, under Title IV-D of the Social Security Act of 1973, of a spouse or child when one party resides in another state.
- **IV-D Intrastate (Non-Divorce)** – Cases that require maintenance, under Title IV-D of the Social Security Act of 1973, of a spouse or child when both parties reside in Nevada.
- **Other Support (Non-Divorce)** – Cases of unknown specificity or cases not attributable to one of the other previously defined support case categories.
- **Visitation (Non-divorce)** – Cases that involve individual requests that a court schedule the time an individual will spend with the minor children.
- **State Initiated (TPR) Petition** – Cases that are initiated by a state agency requesting that the court terminate the legal relationship of parent and child.
- **Other (TPR) Petition** – Cases that are initiated by a parent/guardian of a child requesting that the court terminate an existing legal relationship of parent and child.
- **Adoptions** – Cases that involve a request for the establishment of a new, permanent relationship of parent and child between persons not having that relationship naturally.
- **Requests for Domestic Violence Protection Orders** – Cases for temporary order for protection when sufficient evidence exists that there has been domestic violence, or the threat of domestic violence exists.
- **Requests for High-Risk Protection Orders** – Cases for temporary order for protection against high risk behavior alleging that a person poses an imminent risk of causing personal injury by possessing, controlling, or purchasing a firearm or other deadly weapon, and less restrictive options have been exhausted or are not effective.
- **Other Domestic Relations Case** – Cases that involve a domestic relations issue that does not fit in one of the other family case types. Examples include name change or permission to marry.
- **Mental Health Cases** – Cases that deal with legal determination as to whether an individual is mentally ill or incompetent and should be placed or remain under care, custody, or treatment.
- **Guardianship** – Cases that deal with guardianship issues involving adults, minors, or trusts.

**Pending Cases**: Cases requiring disposition or cases that have requests to modify or require enforcement of existing judgments.

- **Active Cases**: Pending cases that have not been classified as inactive.
- **Inactive Cases**: Pending cases administratively classified as inactive due to issues that require resolution (outside the courts' purview) before the adjudication process can be resumed, typically due to court-issued stays.

**Reopened Cases**: Cases where judgments have been previously entered but have been restored to the pending caseload due to the filing of a request to modify or enforce existing judgments. Cases remanded with correction from appeals are included.

**When to Count Dispositions**: A family case is considered disposed when the decision is handed down and/or the final order is filed, whichever occurs first. Cases that require multiple types of adjudication are only counted as one type and are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary* and can be found at http://nvcourts.gov/.

**Non-Trial Dispositions**: A subtype of case dispositions where the case is resolved without a (bench) trial. This subtype includes:

- **Other Manner of Disposition**
- **Voluntary Dismissals**
- **Involuntary Dismissals**
- **Transferred**
- **Default Judgments**
- **Settled/Withdrawn without Judicial Conference**
- **Settled/Withdrawn with Judicial Conference**
- **Settled/Withdrawn by Alternative Dispute Resolution (ADR)**

**Trial Decisions**: A subtype of case dispositions where the case is resolved with a judicial officer determining both the issues of fact and law in a family case. This subtype includes Disposed After Trial Start and Judgment Reached resolution types.

# Juvenile Caseload Glossary

**When to Count Filings**: Cases are counted when the court receives the petition or citation. For delinquency petitions, cases with multiple charges that span different case types are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary* and can be found at http://nvcourts.gov/.

**Juvenile Case Types**: A broad classification category for caseloads involving juveniles in District Courts (or their designated court), the processing of which follows Nevada statutes, local regulations, and federal regulations for handling matters pertaining to individuals who are defined as juveniles.

- **Delinquency Petitions** – Cases that include a behavior that would be a crime if committed by an adult. Delinquency is characterized by five case types:
  - **Person** – Cases involving murder/manslaughter, sexual assault (including rape and sexual battery), robbery, and assault.
  - **Property** – Cases involving burglary, larceny, auto theft, arson, forgery and counterfeiting, fraud, embezzlement, stolen property (buying or receiving), and vandalism.
  - **Drug** – Cases involving the illegal possession, sale, use, or manufacture of drugs.
  - **Public Order** – Cases involving violations of liquor laws, public drunkenness, disorderly conduct, gambling, prostitution, and other vice. Some jurisdictions refer to these as "public nuisance" or "quality of life" offenses, or "crimes against society."
  - **Other Delinquency** – Cases of unknown specificity or cases not attributable to one of the other previously defined delinquency case categories.
- **Status Petitions** – Cases that includes petitions involving a juvenile in need of supervision. The juvenile may require guidance, treatment, or rehabilitation because of habitual truancy, habitual disobedience, being ungovernable, or behavior that is injurious or dangerous to others.
- **Child Abuse/Neglect Petitions** – Cases where the behavior of someone other than the juvenile causes the court to concern itself with the well-being of the juvenile. Adults charged with abuse or neglect are counted in the appropriate criminal category.
- **Dependent (no fault)** – Cases alleging one or more of the grounds for dependency without specifically faulting the parent(s) or guardian.
- **Other Dependency/Child Victim** – Cases of unknown specificity or cases not attributable to one of the other previously defined Dependency/Child Victim case categories.
- **Miscellaneous Petitions** – Cases heard at District Court that involves juvenile cases that do not fit in one of the other juvenile categories. An example is Petition for Emancipation.

**Juvenile-Related Proceeding**: A broad classification category for trial court caseload inventory that include juvenile-related proceedings that are not considered cases. Juvenile related proceedings are related to an already filed (counted) case or one that will not result in an official case filing.

- **Informal Hearing** – Any hearing by a judicial officer in which no formal charge has been filed with the court.
- **Detention Hearing** – Any hearing requesting a juvenile to be held in detention, or continued to be held in detention, pending further court action within the same or another jurisdiction.
- **Extradition Hearing** – Any hearing in which evidence is presented so that the court can determine if a juvenile should be surrendered to another state jurisdiction.
- **Protective Custody Hearing** – Any hearing held to determine if the risk to a child is great enough to warrant removal, or continued removal, from their custodian.

**Pending Cases**: Cases requiring disposition or cases that have requests to modify or require enforcement of existing judgments.

- **Active Cases**: Pending cases that have not been classified as inactive.
- **Inactive Cases**: Pending cases administratively classified as inactive due to issues that require resolution (outside the courts' purview) before the adjudication process can be resumed. Examples include court-issued stays, warrants, and diversion.

**Reopened Cases**: Cases where judgments have been previously entered but have been restored to the pending caseload due to the filing of a request to modify or enforce existing judgments. Cases remanded with correction from appeals are included.

# Juvenile Caseload Glossary

**When to Count Dispositions**: A juvenile case is considered disposed when adjudication of the matter occurs. Cases that require multiple types of adjudication are only counted as one type and are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary* and can be found at http://nvcourts.gov/.

**Non-Trial Dispositions**: A subtype of case dispositions where the case is resolved without a (bench) trial. This subtype includes:
- Other Manner of Disposition
- Dismissal/Non-Adjudicated
- Waiver/Certify/Transfer to Adult Court
- Transferred to Another Juvenile Court (before/during trial)
- Adjudicated by Default
- Disposed by Alternative Dispute Resolution (ADR)
- Adjudicated by Plea/Admission/Stipulation

**Trial Dispositions**: A subtype of case dispositions where the case is resolved with a judicial officer determining both the issues of fact and law in a juvenile case through a (bench) trial or evidentiary hearing. This subtype includes
- Adjudicated After Evidentiary Hearing/Bench Trial

# Juvenile Traffic Caseload Glossary

**When to Count Filings**: Cases are counted when the court receives the citation.

**Juvenile Traffic Case Type**: Cases that involves any matter that originates in the court as a traffic citation involving a juvenile that is classified as a misdemeanor traffic violation for an adult.

**Pending Cases**: Cases requiring disposition or cases that have requests to modify or require enforcement of existing judgments.
- **Active Cases**: Pending cases that have not been classified as inactive.
- **Inactive Cases**: Pending cases administratively classified as inactive due to issues that require resolution (outside the courts' purview) before the adjudication process can be resumed. Examples include court-issued stays, warrants, and diversion.

**Reopened Cases**: Cases where judgments have been previously entered but have been restored to the pending caseload due to the filing of a request to modify or enforce existing judgments. Cases remanded with correction from appeals are included.

**When to Count Dispositions**: A juvenile case is considered disposed when adjudication of the matter occurs. Cases that require multiple types of adjudication are only counted as one type and are classified by hierarchies that are defined in the *Nevada Courts Statistical Reporting Dictionary*, and can be found at http://nvcourts.gov/.

**Non-Trial Dispositions**: A subtype of case dispositions where the case is resolved without a bench or jury trial. This subtype includes:
- Other Manner of Disposition
- Bail Forfeiture
- Nolle Prosequi (before trial)
- Transferred to Another Juvenile Court (before/during trial)
- Dismissed (before trial)
- Guilty Plea with Sentence (before preliminary hearing)
- Dismissed (after diversion)

**Bench Trial Dispositions**: A subtype of case dispositions where the case is resolved with a judicial officer determining both the issues of fact and law in a traffic case. This subtype includes:
- Dismissed (during trial)
- Acquittal
- Guilty Plea with Sentence (during trial)
- Conviction