## <u>APPENDIX TABLE OF CONTENTS</u>

Exhibit 4: The following authorities –

20 C.F.R. § 655.731 .................................................................................................001

20 C.F.R. § 656.12 ...................................................................................................016

Nev. Rev. Stat. § 18.010 ..........................................................................................018

*Am. First Fed. Credit Union v. Soro*, 359 P.3d 105 (2015). ....................................019

*Blue Racer Midstream v. Kelchner, Inc.*,
No. 3:16-CV-3296-K, 2018 WL 993781 (N.D. Tex. Feb. 21, 2018) ........................023

*Burch v. 2d Judicial Dist. Ct.*, 118 Nev. 438 (2002) ...............................................027

*Carmen v. Health Carousel, LLC*,
No. 1:20-cv-313, 2023 WL 5104066 (S.D. Ohio. Aug. 9, 2023) ..............................032

*Coppola v. Baron*,
No. 2:07-CV-00664-BES-RJJ, 2007 WL 4180590 (D. Nev. Nov. 20, 2007)............048

*Dobron v. Bunch*, 125 Nev. 460 (2009)...................................................................052

*Estavilla v. Goodman Group, LLC*,
No. CV 21-68-M-KLD, 2022 WL 539192 (D. Mont. Feb. 23, 2022) .......................059

*Fed. Nat'l Mortgage Ass'n v. Eighth Judicial Dist. Ct.*,
528 P.3d 586, 2022 WL 19697697 (Nev. Dec. 22, 2022).........................................076

*Halcyon Silver, LLC v. Evelynmoe*,
526 P.3d 1110, 2023 WL 2661524 (Nev. Ct. App. Mar. 24, 2023)...........................080

*Heaven Media Ltd. v. Everts*,
No. A-22-CV-00025-LY, 2022 WL 18585892 (W.D. Tex. May 10, 2022) ...............089

*Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686 (2015)......................094

*Magtoles v. United Staffing Registry, Inc.*,
No. 21-CV-1850 (KAM) (PK), 2023 WL 2710178 (E.D.N.Y. Mar. 30, 2023) ........104

*Moates v. Facebook, Inc.*,
No. 4:20-cv-896-ALM-KPJ, 2021 WL 3013371 (E.D. Tex. May 14, 2021) .............133

*Paguirigan v. Prompt Nursing Employment Agency, LLC*,
No. 17-CV-1302 (NG), 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ....................144

*Panwar v. Access Therapies, Inc.*,
No. 1:12-cv-00619-TWP-TAB, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) ......................... 164

*Prothera, Inc. v. Zhou Ye*,
No. 3:18-cv-00410-MMD-CLB, 2020 WL 3073345 (D. Nev. June 10, 2020). ......................... 171

*R&O Constr. Co. v. Fire Materials Grp. LLC*,
No. 209CV00147KJDRJJ, 2010 WL 11579363 (D. Nev. Mar. 19, 2010) ................................. 178

*TMX, Inc. v. Volk*, 131 Nev. 1355, 2015 WL 5176619 (Nev. Ct. App. Aug. 31, 2015).............. 184

*Trustees of Carpenters for Southern Nevada Health & Welfare Trust v. Better Bldg. Co.*,
101 Nev. 742 (1985).......................................................................................................... 188

*Vidal v. Advanced Care Staffing*,
No. 1:22-cv-05535-NRM-MMH, 2023 WL 2783251 (E.D.N.Y. Apr. 4, 2023)......................... 193

*Vorrey v. City of Brownsville*, No. 17-cv-222, 2018 WL 7291458 (S.D. Tex. Oct. 5, 2018) ...... 217

*Wiggins v. Seeley*,
No. 3:16-cv-00642-HDM-WGC, 2017 WL 969186 (D. Nev. Mar. 13, 2017)........................... 227

Code of Federal Regulations
   Title 20. Employees' Benefits
      Chapter V. Employment and Training Administration, Department of Labor
         Part 655. Temporary Employment of Foreign Workers in the United States (Refs & Annos)
            Subpart H. Labor Condition Applications and Requirements for Employers Seeking to Employ Nonimmigrants
            on H–1b Visas in Specialty Occupations and as Fashion Models, and Requirements for Employers Seeking to
            Employ Nonimmigrants on H–1b1 and E–3 Visas in Specialty Occupations (Refs & Annos)

20 C.F.R. § 655.731

§ 655.731 What is the first LCA requirement, regarding wages?

Effective: December 13, 2021

Currentness

An employer seeking to employ H–1B nonimmigrants in a specialty occupation or as a fashion model of distinguished merit and ability shall state on Form ETA 9035 or 9035E that it will pay the H–1B nonimmigrant the required wage rate. For the purposes of this section, "H–1B" includes "E–3 and H–1B1" as well.

(a) Establishing the wage requirement. The first LCA requirement shall be satisfied when the employer signs Form ETA 9035 or 9035E attesting that, for the entire period of authorized employment, the required wage rate will be paid to the H–1B nonimmigrant(s); that is, that the wage shall be the greater of the actual wage rate (as specified in paragraph (a)(1) of this section) or the prevailing wage (as specified in paragraph (a)(2) of this section). The wage requirement includes the employer's obligation to offer benefits and eligibility for benefits provided as compensation for services to H–1B nonimmigrants on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(1) The actual wage is the wage rate paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question. In determining such wage level, the following factors may be considered: Experience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors. "Legitimate business factors," for purposes of this section, means those that it is reasonable to conclude are necessary because they conform to recognized principles or can be demonstrated by accepted rules and standards. Where there are other employees with substantially similar experience and qualifications in the specific employment in question —i.e., they have substantially the same duties and responsibilities as the H–1B nonimmigrant—the actual wage shall be the amount paid to these other employees. Where no such other employees exist at the place of employment, the actual wage shall be the wage paid to the H–1B nonimmigrant by the employer. Where the employer's pay system or scale provides for adjustments during the period of the LCA—e.g., cost of living increases or other periodic adjustments, or the employee moves to a more advanced level in the same occupation—such adjustments shall be provided to similarly employed H–1B nonimmigrants (unless the prevailing wage is higher than the actual wage).

(2) The prevailing wage for the occupational classification in the area of intended employment must be determined as of the time of filing the application. The employer shall base the prevailing wage on the best information available as of the time of filing the application. Except as provided in this section, the employer is not required to use any specific methodology to determine the prevailing wage and may utilize a wage obtained from an OFLC NPC (OES), an independent authoritative source, or other legitimate sources of wage data. One of the following sources shall be used to establish the prevailing wage:

(i) A collective bargaining agreement which was negotiated at arms-length between a union and the employer which contains a wage rate applicable to the occupation;

(ii) If the job opportunity is in an occupation which is not covered by paragraph (a)(2)(i) of this section, the prevailing wage shall be the arithmetic mean of the wages of workers similarly employed, except that the prevailing wage shall be the median when provided by paragraphs (a)(2)(ii)(A), (b)(3)(iii)(B)(2), and (b)(3)(iii)(C)(2) of this section. The prevailing wage rate shall be based on the best information available. The following prevailing wage sources may be used:

(A) OFLC National Processing Center (NPC) determination. Prior to January 1, 2010, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests, but shall do so in accordance with these regulatory provisions and Department guidance. On or after January 1, 2010, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance. Upon receipt of a written request for a PWD on or after January 1, 2010, the NPC will determine whether the occupation is covered by a collective bargaining agreement which was negotiated at arm's length, and, if not, determine the arithmetic mean of wages of workers similarly employed in the area of intended employment. The wage component of the Bureau of Labor Statistics Occupational Employment Statistics survey shall be used to determine the arithmetic mean, unless the employer provides an acceptable survey. The NPC shall determine the wage in accordance with secs. 212(n) and 212(t) of the INA. If an acceptable employer-provided wage survey provides a median and does not provide an arithmetic mean, the median shall be the prevailing wage applicable to the employer's job opportunity. In making a PWD, the Chicago NPC will follow 20 CFR 656.40 and other administrative guidelines or regulations issued by ETA. The Chicago NPC shall specify the validity period of the PWD, which in no event shall be for less than 90 days or more than 1 year from the date of the determination.

(1) An employer who chooses to utilize an NPC PWD shall file the labor condition application within the validity period of the prevailing wage as specified in the PWD. Any employer desiring review of an NPC PWD, including judicial review, shall follow the appeal procedures at 20 CFR 656.41. Employers which challenge an NPC PWD under 20 CFR 656.41 must obtain a ruling prior to filing an LCA. In any challenge, the Department and the NPC shall not divulge any employer wage data collected under the promise of confidentiality. Once an employer obtains a PWD from the NPC and files an LCA supported by that PWD, the employer is deemed to have accepted the PWD (as to the amount of the wage) and thereafter may not contest the legitimacy of the PWD by filing an appeal with the CO (see 20 CFR 656.41) or in an investigation or enforcement action.

(2) If the employer is unable to wait for the NPC to produce the requested prevailing wage for the occupation in question, or for the CO and/or the BALCA to issue a decision, the employer may rely on other legitimate sources of available wage information as set forth in paragraphs (a)(2)(ii)(B) and (C) of this section. If the employer later discovers, upon receipt of the PWD from the NPC, that the information relied upon produced a wage below the final PWD and the employer was paying the NPC–determined wage, no wage violation will be found if the employer retroactively compensates the H–2B nonimmigrant(s) for the difference between the wage paid and the prevailing wage, within 30 days of the employer's receipt of the PWD.

(3) In all situations where the employer obtains the PWD from the NPC, the Department will deem that PWD as correct as to the amount of the wage. Nevertheless, the employer must maintain a copy of the NPC PWD. A complaint alleging inaccuracy of an NPC PWD, in such cases, will not be investigated.

(B) An independent authoritative source. The employer may use an independent authoritative wage source in lieu of an NPC PWD. The independent authoritative source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(B) of this section.

(C) Another legitimate source of wage information. The employer may rely on other legitimate sources of wage data to obtain the prevailing wage. The other legitimate source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(C) of this section. The employer will be required to demonstrate the legitimacy of the wage in the event of an investigation.

(iii) For purposes of this section, "similarly employed" means "having substantially comparable jobs in the occupational classification in the area of intended employment," except that if a representative sample of workers in the occupational category can not be obtained in the area of intended employment, "similarly employed" means:

(A) Having jobs requiring a substantially similar level of skills within the area of intended employment; or

(B) If there are no substantially comparable jobs in the area of intended employment, having substantially comparable jobs with employers outside of the area of intended employment.

(iv) A prevailing wage determination for LCA purposes made pursuant to this section shall not permit an employer to pay a wage lower than required under any other applicable Federal, state or local law.

(v) Where a range of wages is paid by the employer to individuals in an occupational classification or among individuals with similar experience and qualifications for the specific employment in question, a range is considered to meet the prevailing wage requirement so long as the bottom of the wage range is at least the prevailing wage rate.

(vi) The employer shall enter the prevailing wage on the LCA in the form in which the employer will pay the wage (e.g., an annual salary or an hourly rate), except that in all cases the prevailing wage must be expressed as an hourly wage if the H–1B nonimmigrant will be employed part-time. Where an employer obtains a prevailing wage determination (from any of the sources identified in paragraphs (a)(2)(i) and (ii) of this section) that is expressed as an hourly rate, the employer may convert this determination to a yearly salary by multiplying the hourly rate by 2080. Conversely, where an employer obtains a prevailing wage (from any of these sources) that is expressed as a yearly salary, the employer may convert this determination to an hourly rate by dividing the salary by 2080.

(vii) In computing the prevailing wage for a job opportunity in an occupational classification in an area of intended employment in the case of an employee of an institution of higher education or an affiliated or related nonprofit entity, a nonprofit research organization, or a Governmental research organization as these terms are defined in 20 CFR 656.40(e), the prevailing wage level shall only take into account employees at such institutions and organizations in the area of intended employment.

(viii) An employer may file more than one LCA for the same occupational classification in the same area of employment and, in such circumstances, the employer could have H–1B employees in the same occupational classification in the same area of employment, brought into the U.S. (or accorded H–1B status) based on petitions approved pursuant to different

LCAs (filed at different times) with different prevailing wage determinations. Employers are advised that the prevailing wage rate as to any particular H–1B nonimmigrant is prescribed by the LCA which supports that nonimmigrant's H–1B petition. The employer is required to obtain the prevailing wage at the time that the LCA is filed (see paragraph (a)(2) of this section). The LCA is valid for the period certified by ETA, and the employer must satisfy all the LCA's requirements (including the required wage which encompasses both prevailing and actual wage rates) for as long as any H–1B nonimmigrants are employed pursuant to that LCA (§ 655.750). Where new nonimmigrants are employed pursuant to a new LCA, that new LCA prescribes the employer's obligations as to those new nonimmigrants. The prevailing wage determination on the later/subsequent LCA does not "relate back" to operate as an "update" of the prevailing wage for the previously-filed LCA for the same occupational classification in the same area of employment. However, employers are cautioned that the actual wage component to the required wage may, as a practical matter, eliminate any wage-payment differentiation among H–1B employees based on different prevailing wage rates stated in applicable LCAs. Every H–1B nonimmigrant is to be paid in accordance with the employer's actual wage system, and thus is to receive any pay increases which that system provides.

(3) Once the prevailing wage rate is established, the H–1B employer then shall compare this wage with the actual wage rate for the specific employment in question at the place of employment and must pay the H–1B nonimmigrant at least the higher of the two wages.

(b) Documentation of the wage statement.

(1) The employer shall develop and maintain documentation sufficient to meet its burden of proving the validity of the wage statement required in paragraph (a) of this section and attested to on Form ETA 9035 or 9035E. The documentation shall be made available to DOL upon request. Documentation shall also be made available for public examination to the extent required by § 655.760. The employer shall also document that the wage rate(s) paid to H–1B nonimmigrant(s) is(are) no less than the required wage rate(s). The documentation shall include information about the employer's wage rate(s) for all other employees for the specific employment in question at the place of employment, beginning with the date the labor condition application was submitted and continuing throughout the period of employment. The records shall be retained for the period of time specified in § 655.760. The payroll records for each such employee shall include:

(i) Employee's full name;

(ii) Employee's home address;

(iii) Employee's occupation;

(iv) Employee's rate of pay;

(v) Hours worked each day and each week by the employee if:

(A) The employee is paid on other than a salary basis (e.g., hourly, piece-rate; commission); or

(B) With respect only to H–1B nonimmigrants, the worker is a part-time employee (whether paid a salary or an hourly rate).

(vi) Total additions to or deductions from pay each pay period, by employee; and

(vii) Total wages paid each pay period, date of pay and pay period covered by the payment, by employee.

(viii) Documentation of offer of benefits and eligibility for benefits provided as compensation for services on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers (see paragraph (c)(3) of this section):

(A) A copy of any document(s) provided to employees describing the benefits that are offered to employees, the eligibility and participation rules, how costs are shared, etc. (e.g., summary plan descriptions, employee handbooks, any special or employee-specific notices that might be sent);

(B) A copy of all benefit plans or other documentation describing benefit plans and any rules the employer may have for differentiating benefits among groups of workers;

(C) Evidence as to what benefits are actually provided to U.S. workers and H–1B nonimmigrants, including evidence of the benefits selected or declined by employees where employees are given a choice of benefits;

(D) For multinational employers who choose to provide H–1B nonimmigrants with "home country" benefits, evidence of the benefits provided to the nonimmigrant before and after he/she went to the United States. See paragraph (c) (3)(iii)(C) of this section.

(2) Actual wage. In addition to payroll data required by paragraph (b)(1) of this section (and also by the Fair Labor Standards Act), the employer shall retain documentation specifying the basis it used to establish the actual wage. The employer shall show how the wage set for the H–1B nonimmigrant relates to the wages paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question at the place of employment. Where adjustments are made in the employer's pay system or scale during the validity period of the LCA, the employer shall retain documentation explaining the change and clearly showing that, after such adjustments, the wages paid to the H–1B nonimmigrant are at least the greater of the adjusted actual wage or the prevailing wage for the occupation and area of intended employment.

(3) Prevailing wage. The employer also shall retain documentation regarding its determination of the prevailing wage. This source documentation shall not be submitted to ETA with the labor condition application, but shall be retained at the employer's place of business for the length of time required in § 655.760(c). Such documentation shall consist of the documentation described in paragraph (b)(3)(i), (ii), or (iii) of this section and the documentation described in paragraph (b)(1) of this section.

(i) If the employer used a wage determination issued pursuant to the provisions of the Davis–Bacon Act, 40 U.S.C. 276a et seq. (see 29 CFR part 1), or the McNamara–O'Hara Service Contract Act, 41 U.S.C. 351 et seq. (see 29 CFR part 4), the

documentation shall include a copy of the determination showing the wage rate for the occupation in the area of intended employment.

(ii) If the employer used an applicable wage rate from a union contract which was negotiated at arms-length between a union and the employer, the documentation shall include an excerpt from the union contract showing the wage rate(s) for the occupation.

(iii) If the employer did not use a wage covered by the provisions of paragraph (b)(3)(i) or (b)(3)(ii) of this section, the employer's documentation shall consist of:

(A) A copy of the prevailing wage finding from the NPC for the occupation within the area of intended employment.

(B) A copy of the prevailing wage survey for the occupation within the area of intended employment published by an independent authoritative source. For purposes of this paragraph (b)(3)(iii)(B), a prevailing wage survey for the occupation in the area of intended employment published by an independent authoritative source shall mean a survey of wages published in a book, newspaper, periodical, loose-leaf service, newsletter, or other similar medium, within the 24–month period immediately preceding the filing of the employer's application. Such survey shall:

(1) Reflect the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Be based upon recently collected data—e.g., within the 24–month period immediately preceding the date of publication of the survey; and

(4) Represent the latest published prevailing wage finding by the independent authoritative source for the occupation in the area of intended employment; or

(C) A copy of the prevailing wage survey or other source data acquired from another legitimate source of wage information that was used to make the prevailing wage determination. For purposes of this paragraph (b)(3)(iii)(C), a prevailing wage provided by another legitimate source of such wage information shall be one which:

(1) Reflects the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Is based on the most recent and accurate information available; and

(4) Is reasonable and consistent with recognized standards and principles in producing a prevailing wage.

(c) Satisfaction of required wage obligation.

(1) The required wage must be paid to the employee, cash in hand, free and clear, when due, except that deductions made in accordance with paragraph (c)(9) of this section may reduce the cash wage below the level of the required wage. Benefits and eligibility for benefits provided as compensation for services must be offered in accordance with paragraph (c)(3) of this section.

(2) "Cash wages paid," for purposes of satisfying the H–1B required wage, shall consist only of those payments that meet all the following criteria:

(i) Payments shown in the employer's payroll records as earnings for the employee, and disbursed to the employee, cash in hand, free and clear, when due, except for deductions authorized by paragraph (c)(9) of this section;

(ii) Payments reported to the Internal Revenue Service (IRS) as the employee's earnings, with appropriate withholding for the employee's tax paid to the IRS (in accordance with the Internal Revenue Code of 1986, 26 U.S.C. 1, et seq.);

(iii) Payments of the tax reported and paid to the IRS as required by the Federal Insurance Contributions Act, 26 U.S.C. 3101, et seq. (FICA). The employer must be able to document that the payments have been so reported to the IRS and that both the employer's and employee's taxes have been paid except that when the H–1B nonimmigrant is a citizen of a foreign country with which the President of the United States has entered into an agreement as authorized by section 233 of the Social Security Act, 42 U.S.C. 433 (i.e., an agreement establishing a totalization arrangement between the social security system of the United States and that of the foreign country), the employer's documentation shall show that all appropriate reports have been filed and taxes have been paid in the employee's home country.

(iv) Payments reported, and so documented by the employer, as the employee's earnings, with appropriate employer and employee taxes paid to all other appropriate Federal, State, and local governments in accordance with any other applicable law.

(v) Future bonuses and similar compensation (i.e., unpaid but to-be-paid) may be credited toward satisfaction of the required wage obligation if their payment is assured (i.e., they are not conditional or contingent on some event such as the employer's annual profits). Once the bonuses or similar compensation are paid to the employee, they must meet the requirements of paragraphs (c)(2)(i) through (iv) of this section (i.e., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(3) Benefits and eligibility for benefits provided as compensation for services (e.g., cash bonuses; stock options; paid vacations and holidays; health, life, disability and other insurance plans; retirement and savings plans) shall be offered to the H–1B nonimmigrant(s) on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(i) For purposes of this section, the offer of benefits "on the same basis, and in accordance with the same criteria" means that the employer shall offer H–1B nonimmigrants the same benefit package as it offers to U.S. workers, and may not provide more strict eligibility or participation requirements for the H–1B nonimmigrant(s) than for similarly employed U.S. workers(s) (e.g., full-time workers compared to full-time workers; professional staff compared to professional staff). H–1B nonimmigrants are not to be denied benefits on the basis that they are "temporary employees" by virtue of their nonimmigrant status. An employer may offer greater or additional benefits to the H–1B nonimmigrant(s) than are offered to similarly employed U.S. worker(s), provided that such differing treatment is consistent with the requirements of all applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17). Offers of benefits by employers shall be made in good faith and shall result in the H–1B nonimmigrant(s)'s actual receipt of the benefits that are offered by the employer and elected by the H–1B nonimmigrant(s).

(ii) The benefits received by the H–1B nonimmigrant(s) need not be identical to the benefits received by similarly employed U.S. workers(s), provided that the H–1B nonimmigrant is offered the same benefits package as those workers but voluntarily chooses to receive different benefits (e.g., elects to receive cash payment rather than stock option, elects not to receive health insurance because of required employee contributions, or elects to receive different benefits among an array of benefits) or, in those instances where the employer is part of a multinational corporate operation, the benefits received by the H–1B nonimmigrant are provided in accordance with an employer's practice that satisfies the requirements of paragraph (c)(3)(iii)(B) or (C) of this section. In all cases, however, an employer's practice must comply with the requirements of any applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17).

(iii) If the employer is part of a multinational corporate operation (i.e., operates in affiliation with business entities in other countries, whether as subsidiaries or in some other arrangement), the following three options (i.e., (A), (B) or (C)) are available to the employer with respect to H–1B nonimmigrants who remain on the "home country" payroll.

(A) The employer may offer the H–1B nonimmigrant(s) benefits in accordance with paragraphs (c)(3)(i) and (ii) of this section.

(B) Where an H–1B nonimmigrant is in the U.S. for no more than 90 consecutive calendar days, the employer during that period may maintain the H–1B nonimmigrant on the benefits provided to the nonimmigrant in his/her permanent work station (ordinarily the home country), and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers, provided that the employer affords reciprocal benefits treatment for any U.S. workers (i.e., allows its U.S. employees, while working out of the country on a temporary basis away from their permanent work stations in the United States, or while working in the United States on a temporary basis away from their permanent work stations in another country, to continue to receive the benefits provided them at their permanent work stations). Employers are cautioned that this provision is available only if the employer's practices do not constitute an evasion of the benefit requirements, such as where the H–1B nonimmigrant remains in the United States for most of the year, but briefly returns to the "home country" before any 90–day period would expire.

(C) Where an H–1B nonimmigrant is in the U.S. for more than 90 consecutive calendar days (or from the point where the worker is transferred to the U.S. or it is anticipated that the worker will likely remain in the U.S. more than 90 consecutive days), the employer may maintain the H–1B nonimmigrant on the benefits provided in his/her home country (i.e., "home country benefits") (and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers) provided that all of the following criteria are satisfied:

(1) The H–1B nonimmigrant continues to be employed in his/her home country (either with the H–1B employer or with a corporate affiliate of the employer);

(2) The H–1B nonimmigrant is enrolled in benefits in his/her home country (in accordance with any applicable eligibility standards for such benefits);

(3) The benefits provided in his/her home country are equivalent to, or equitably comparable to, the benefits offered to similarly employed U.S. workers (i.e., are no less advantageous to the nonimmigrant);

(4) The employer affords reciprocal benefits treatment for any U.S. workers while they are working out of the country, away from their permanent work stations (whether in the United States or abroad), on a temporary basis (i.e., maintains such U.S. workers on the benefits they received at their permanent work stations);

(5) If the employer offers health benefits to its U.S. workers, the employer offers the same plan on the same basis to its H–1B nonimmigrants in the United States where the employer does not provide the H–1B nonimmigrant with health benefits in the home country, or the employer's home-country health plan does not provide full coverage (i.e., coverage comparable to what he/she would receive at the home work station) for medical treatment in the United States; and

(6) The employer offers H–1B nonimmigrants who are in the United States more than 90 continuous days those U.S. benefits which are paid directly to the worker (e.g., paid vacation, paid holidays, and bonuses).

(iv) Benefits provided as compensation for services may be credited toward the satisfaction of the employer's required wage obligation only if the requirements of paragraph (c)(2) of this section are met (e.g., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(4) For salaried employees, wages will be due in prorated installments (e.g., annual salary divided into 26 bi-weekly pay periods, where employer pays bi-weekly) paid no less often than monthly except that, in the event that the employer intends to use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus), the employer's documentation of wage payments (including such supplemental payments) must show the employer's commitment to make such payment and the method of determining the amount thereof, and must show unequivocally that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period. An employer that is a school or other educational institution may apply an established salary practice under which the employer pays to H–1B nonimmigrants and U.S. workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, provided that the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment and the application of the salary practice to the nonimmigrant does not otherwise cause him/her to violate any condition of his/her authorization under the INA to remain in the U.S.

(5) For hourly-wage employees, the required wages will be due for all hours worked and/or for any nonproductive time (as specified in paragraph (c)(7) of this section) at the end of the employee's ordinary pay period (e.g., weekly) but in no event less frequently than monthly.

(6) Subject to the standards specified in paragraph (c)(7) of this section (regarding nonproductive status), an H–1B nonimmigrant shall receive the required pay beginning on the date when the nonimmigrant "enters into employment" with the employer.

(i) For purposes of this paragraph (c)(6), the H–1B nonimmigrant is considered to "enter into employment" when he/she first makes him/herself available for work or otherwise comes under the control of the employer, such as by waiting for an assignment, reporting for orientation or training, going to an interview or meeting with a customer, or studying for a licensing examination, and includes all activities thereafter.

(ii) Even if the H–1B nonimmigrant has not yet "entered into employment" with the employer (as described in paragraph (c)(6)(i) of this section), the employer that has had an LCA certified and an H–1B petition approved for the H–1B nonimmigrant shall pay the nonimmigrant the required wage beginning 30 days after the date the nonimmigrant first is admitted into the U.S. pursuant to the petition, or, if the nonimmigrant is present in the United States on the date of the approval of the petition, beginning 60 days after the date the nonimmigrant becomes eligible to work for the employer. For purposes of this latter requirement, the H–1B nonimmigrant is considered to be eligible to work for the employer upon the date of need set forth on the approved H–1B petition filed by the employer, or the date of adjustment of the nonimmigrant's status by DHS, whichever is later. Matters such as the worker's obtaining a State license would not be relevant to this determination.

(7) Wage obligation(s) for H–1B nonimmigrant in nonproductive status—

(i) Circumstances where wages must be paid. If the H–1B nonimmigrant is not performing work and is in a nonproductive status due to a decision by the employer (e.g., because of lack of assigned work), lack of a permit or license, or any other reason except as specified in paragraph (c)(7)(ii) of this section, the employer is required to pay the salaried employee the full pro-rata amount due, or to pay the hourly-wage employee for a full-time week (40 hours or such other number of hours as the employer can demonstrate to be full-time employment for hourly employees, or the full amount of the weekly salary for salaried employees) at the required wage for the occupation listed on the LCA. If the employer's LCA carries a designation of "part-time employment," the employer is required to pay the nonproductive employee for at least the number of hours indicated on the I–129 petition filed by the employer with the DHS and incorporated by reference on the LCA. If the I–129 indicates a range of hours for part-time employment, the employer is required to pay the nonproductive employee for at least the average number of hours normally worked by the H–1B nonimmigrant, provided that such average is within the range indicated; in no event shall the employee be paid for fewer than the minimum number of hours indicated for the range of part-time employment. In all cases the H–1B nonimmigrant must be paid the required wage for all hours performing work within the meaning of the Fair Labor Standards Act, 29 U.S.C. 201 et seq.

(ii) Circumstances where wages need not be paid. If an H–1B nonimmigrant experiences a period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile accident which temporarily incapacitates the nonimmigrant), then the employer shall not be obligated to pay the required wage rate during that period, provided that such period is not subject to payment under the employer's benefit plan or other statutes such as the Family and Medical Leave Act (29 U.S.C. 2601 et seq.) or the Americans with Disabilities Act (42 U.S.C. 12101 et seq.). Payment need not be made if there has been a bona fide termination of the employment relationship. DHS regulations require the employer to notify the DHS that the employment relationship has been terminated so that the petition is canceled (8 CFR 214.2(h)(11)), and require the employer to provide the employee with payment for transportation home under certain circumstances (8 CFR 214.2(h)(4)(iii)(E)).

(8) If the employee works in an occupation other than that identified on the employer's LCA, the employer's required wage obligation is based on the occupation identified on the LCA, and not on whatever wage standards may be applicable in the occupation in which the employee may be working.

(9) "Authorized deductions," for purposes of the employer's satisfaction of the H–1B required wage obligation, means a deduction from wages in complete compliance with one of the following three sets of criteria (i.e., paragraph (c)(9)(i), (ii), or (iii))—

(i) Deduction which is required by law (e.g., income tax; FICA); or

(ii) Deduction which is authorized by a collective bargaining agreement, or is reasonable and customary in the occupation and/or area of employment (e.g., union dues; contribution to premium for health insurance policy covering all employees; savings or retirement fund contribution for plan(s) in compliance with the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq.), except that the deduction may not recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H–1B petition); the deduction must have been revealed to the worker prior to the commencement of employment and, if the deduction was a condition of employment, had been clearly identified as such; and the deduction must be made against wages of U.S. workers as well as H–1B nonimmigrants (where there are U.S. workers); or

(iii) Deduction which meets the following requirements:

(A) Is made in accordance with a voluntary, written authorization by the employee (Note to paragraph (c)(9)(iii)(A): an employee's mere acceptance of a job which carries a deduction as a condition of employment does not constitute voluntary authorization, even if such condition were stated in writing);

(B) Is for a matter principally for the benefit of the employee (Note to paragraph (c)(9)(iii)(B): housing and food allowances would be considered to meet this "benefit of employee" standard, unless the employee is in travel status, or unless the circumstances indicate that the arrangements for the employee's housing or food are principally for the convenience or benefit of the employer (e.g., employee living at worksite in "on call" status));

(C) Is not a recoupment of the employer's business expense (e.g., tools and equipment; transportation costs where such transportation is an incident of, and necessary to, the employment; living expenses when the employee is traveling on the employer's business; attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer (e.g., preparation and filing of LCA and H–1B petition)). (For purposes of this section, initial transportation from, and end-of-employment travel, to the worker's home country shall not be considered a business expense.);

(D) Is an amount that does not exceed the fair market value or the actual cost (whichever is lower) of the matter covered (Note to paragraph (c)(9)(iii)(D): The employer must document the cost and value); and

(E) Is an amount that does not exceed the limits set for garnishment of wages in the Consumer Credit Protection Act, 15 U.S.C. 1673, and the regulations of the Secretary pursuant to that Act, 29 CFR part 870, under which garnishment(s) may not exceed 25 percent of an employee's disposable earnings for a workweek.

(10) A deduction from or reduction in the payment of the required wage is not authorized (and is therefore prohibited) for the following purposes (i.e., paragraphs (c)(10)(i) and (ii)):

(i) A penalty paid by the H–1B nonimmigrant for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer.

(A) The employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date. Therefore, the employer shall not make any deduction from or reduction in the payment of the required wage to collect such a penalty.

(B) The employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date. However, the requirements of paragraph (c)(9)(iii) of this section must be fully satisfied, if such damages are to be received by the employer via deduction from or reduction in the payment of the required wage.

(C) The distinction between liquidated damages (which are permissible) and a penalty (which is prohibited) is to be made on the basis of the applicable State law. In general, the laws of the various States recognize that liquidated damages are amounts which are fixed or stipulated by the parties at the inception of the contract, and which are reasonable approximations or estimates of the anticipated or actual damage caused to one party by the other party's breach of the contract. On the other hand, the laws of the various States, in general, consider that penalties are amounts which (although fixed or stipulated in the contract by the parties) are not reasonable approximations or estimates of such damage. The laws of the various States, in general, require that the relation or circumstances of the parties, and the purpose(s) of the agreement, are to be taken into account, so that, for example, an agreement to a payment would be considered to be a prohibited penalty where it is the result of fraud or where it cloaks oppression. Furthermore, as a general matter, the sum stipulated must take into account whether the contract breach is total or partial (i.e., the percentage of the employment contract completed). (See, e.g., Vanderbilt University v. DiNardo, 174 F.3d 751 (6th Cir. 1999) (applying Tennessee law); Overholt Crop Insurance Service Co. v. Travis, 941 F.2d 1361 (8th Cir. 1991) (applying Minnesota and South Dakota law); BDO Seidman v. Hirshberg, 712 N.E.2d 1220 (N.Y. 1999); Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999); Wojtowicz v. Greeley Anesthesia Services, P.C., 961 P.2d 520 (Colo.Ct.App. 1998); see generally, Restatement (Second) Contracts § 356 (comment b); 22 Am.Jur.2d Damages §§ 683, 686, 690, 693, 703). In an enforcement proceeding under subpart I of this part, the Administrator shall determine, applying relevant State law (including consideration where appropriate to actions by the employer, if any, contributing to the early cessation, such as the employer's constructive discharge of the nonimmigrant or non-compliance with its obligations under the INA and its regulations) whether the payment in question constitutes liquidated damages or a penalty. (Note to paragraph (c)(10)(i)(C): The $500/$1,000 filing fee, if any, under section 214(c) of the INA can never be included in any liquidated damages received by the employer. See paragraph (c)(10)(ii), which follows.)

(ii) A rebate of the $500/$1,000 filing fee paid by the employer, if any, under section 214(c) of the INA. The employer may not receive, and the H–1B nonimmigrant may not pay, any part of the $500 additional filing fee (for a petition filed prior to December 18, 2000) or $1,000 additional filing fee (for a petition filed on or subsequent to December 18, 2000), whether

directly or indirectly, voluntarily or involuntarily. Thus, no deduction from or reduction in wages for purposes of a rebate of any part of this fee is permitted. Further, if liquidated damages are received by the employer from the H–1B nonimmigrant upon the nonimmigrant's ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer, such liquidated damages shall not include any part of the $500/$1,000 filing fee (see paragraph (c)(10)(i) of this section). If the filing fee is paid by a third party and the H–1B nonimmigrant reimburses all or part of the fee to such third party, the employer shall be considered to be in violation of this prohibition since the employer would in such circumstances have been spared the expense of the fee which the H–1B nonimmigrant paid.

(11) Any unauthorized deduction taken from wages is considered by the Department to be non-payment of that amount of wages, and in the event of an investigation, will result in back wage assessment (plus civil money penalties and/or disqualification from H–1B and other immigration programs, if willful).

(12) Where the employer depresses the employee's wages below the required wage by imposing on the employee any of the employer's business expenses(s), the Department will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction.

(13) Where the employer makes deduction(s) for repayment of loan(s) or wage advance(s) made to the employee, the Department, in the event of an investigation, will require the employer to establish the legitimacy and purpose(s) of the loan(s) or wage advance(s), with reference to the standards set out in paragraph (c)(9)(iii) of this section.

(d) Enforcement actions.

(1) In the event that a complaint is filed pursuant to subpart I of this part, alleging a failure to meet the "prevailing wage" condition or a material misrepresentation by the employer regarding the payment of the required wage, or pursuant to such other basis for investigation as the Administrator may find, the Administrator shall determine whether the employer has the documentation required in paragraph (b)(3)of this section, and whether the documentation supports the employer's wage attestation. Where the documentation is either nonexistent or is insufficient to determine the prevailing wage (e.g., does not meet the criteria specified in this section, in which case the Administrator may find a violation of paragraph (b)(1), (2), or (3, of this section); or where, based on significant evidence regarding wages paid for the occupation in the area of intended employment, the Administrator has reason to believe that the prevailing wage finding obtained from an independent authoritative source or another legitimate source varies substantially from the wage prevailing for the occupation in the area of intended employment; or where the employer has been unable to demonstrate that the prevailing wage determined by another legitimate source is in accordance with the regulatory criteria, the Administrator may contact ETA, which shall provide the Administrator with a prevailing wage determination, which the Administrator shall use as the basis for determining violations and for computing back wages, if such wages are found to be owed. The 30–day investigatory period shall be suspended while ETA makes the prevailing wage determination and, in the event that the employer timely challenges the determination (see § 655.731(d)(2)), shall be suspended until the challenge process is completed and the Administrator's investigation can be resumed.

(2) In the event the Administrator obtains a prevailing wage from ETA pursuant to paragraph (d)(1) of this section, and the employer desires review, including judicial review, the employer shall challenge the ETA prevailing wage only by filing a request for review under § 656.41 of this chapter within 30 days of the employer's receipt of the PWD from the Administrator. If the request is timely filed, the decision of OFLC is suspended until the Center Director issues a determination on the employer's appeal. If the employer desires review, including judicial review, of the decision of the NPC Center Director, the employer shall make a request for review of the determination by the Board of Alien Labor

Certification Appeals (BALCA) under § 656.41(e) of this chapter within 30 days of the receipt of the decision of the Center Director. If a request for review is timely filed with the BALCA, the determination by the Center Director is suspended until the BALCA issues a determination on the employer's appeal. In any challenge to the wage determination, neither ETA nor the NPC shall divulge any employer wage data collected under the promise of confidentiality.

(i) Where an employer timely challenges an OFLC PWD obtained by the Administrator, the 30–day investigative period shall be suspended until the employer obtains a final ruling. Upon such a final ruling, the investigation and any subsequent enforcement proceeding shall continue, with the PWD as determined by the BALCA serving as the conclusive determination for all purposes.

(ii) [Reserved]

(3) For purposes of this paragraph (d), OFLC may consult with the NPC to ascertain the prevailing wage applicable under the circumstances of the particular complaint.

## Credits

[65 FR 80214, Dec. 20, 2000; 66 FR 10814, Feb. 20, 2001; 66 FR 63302, Dec. 5, 2001; 69 FR 68228, Nov. 23, 2004; 69 FR 77384, Dec. 27, 2004; 71 FR 35521, June 21, 2006; 71 FR 37804, June 30, 2006; 73 FR 19949, April 11, 2008; 73 FR 78067, Dec. 19, 2008; 74 FR 44561, Sept. 3, 2009; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021]

SOURCE: 42 FR 45899, Sept. 13, 1977; 51 FR 24141, July 2, 1986; 51 FR 30351, Aug. 26, 1986; 52 FR 20507, June 1, 1987; 54 FR 28046, July 5, 1989; 55 FR 29358, July 19, 1990; 55 FR 50510, Dec. 6, 1990; 56 FR 24666, May 30, 1991; 56 FR 54738, Oct. 22, 1991; 56 FR 56875, Nov. 6, 1991; 57 FR 1337, Jan. 13, 1992; 57 FR 40989, Sept. 8, 1992; 59 FR 897, Jan. 6, 1994.; 59 FR 5484, Feb. 4, 1994; 59 FR 65659, Dec. 20, 1994; 59 FR 65676, Dec. 20, 1994; 60 FR 3976, Jan. 19, 1995; 65 FR 43542, July 13, 2000; 65 FR 51149, Aug. 22, 2000; 65 FR 80208, Dec. 20, 2000; 65 FR 80209, Dec. 20, 2000; 67 FR 59779, Sept. 24, 2002; 69 FR 68226, Nov. 23, 2004; 71 FR 37804, June 30, 2006; 73 FR 19947, April 11, 2008; 73 FR 77207, Dec. 18, 2008; 73 FR 78052, Dec. 19, 2008; 74 FR 25985, May 29, 2009; 75 FR 6959, Feb. 12, 2010; 75 FR 10403, March 5, 2010; 78 FR 24061, April 24, 2013; 80 FR 24108, April 29, 2015; 80 FR 63066, Oct. 16, 2015; 81 FR 43448, July 1, 2016; 81 FR 48700, July 26, 2016; 84 FR 12431, April 1, 2019; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021, unless otherwise noted.

AUTHORITY: Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Pub.L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub.L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; sec. 412(e), Pub.L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub.L. 107–296, 116 Stat. 2135, as amended; Pub.L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub.L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806.).; Subpart A issued under 8 CFR 214.2(h).; Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).; Subpart E issued under 48 U.S.C. 1806.; Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note.; Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub.L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub.L. 114–74 at section 701.; Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub.L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

Notes of Decisions (4)

Current through Sept. 8, 2023, 88 FR 61985. Some sections may be more current. See credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 20. Employees' Benefits
    Chapter V. Employment and Training Administration, Department of Labor
      Part 656. Labor Certification Process for Permanent Employment of Aliens in the United States (Refs & Annos)
        Subpart C. Labor Certification Process

20 C.F.R. § 656.12

§ 656.12 Improper commerce and payment.

Effective: July 16, 2007
Currentness

The following provision applies to applications filed under both this part and 20 CFR part 656 in effect prior to March 28, 2005, and to any certification resulting from those applications:

(a) Applications for permanent labor certification and approved labor certifications are not articles of commerce. They shall not be offered for sale, barter or purchase by individuals or entities. Any evidence that an application for permanent labor certification or an approved labor certification has been sold, bartered, or purchased shall be grounds for investigation under this part and may be grounds for denial under § 656.24, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

(b) An employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application, except when work to be performed by the alien in connection with the job opportunity would benefit or accrue to the person or entity making the payment, based on that person's or entity's established business relationship with the employer. An alien may pay his or her own costs in connection with a labor certification, including attorneys' fees for representation of the alien, except that where the same attorney represents both the alien and the employer, such costs shall be borne by the employer. For purposes of this paragraph (b), payment includes, but is not limited to, monetary payments; wage concessions, including deductions from wages, salary, or benefits; kickbacks, bribes, or tributes; in kind payments; and free labor.

(c) Evidence that an employer has sought or received payment from any source in connection with an application for permanent labor certification or an approved labor certification, except for a third party to whose benefit work to be performed in connection with the job opportunity would accrue, based on that person's or entity's established business relationship with the employer, shall be grounds for investigation under this part or any appropriate Government agency's procedures, and may be grounds for denial under § 656.32, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

**Credits**
[72 FR 27945, May 17, 2007]

SOURCE: 69 FR 77386, Dec. 27, 2004; 72 FR 27944, May 17, 2007; 73 FR 78068, Dec. 19, 2008; 85 FR 63915, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, 26177, May 13, 2021; 86 FR 70731, Dec. 13, 2021, unless otherwise noted.

---

AUTHORITY: 8 U.S.C. 1182(a)(5)(A), 1182(p)(1); sec.122, Public Law 101–649, 109 Stat. 4978; and Title IV, Public Law 105–277, 112 Stat. 2681.

Current through Sept. 8, 2023, 88 FR 61985. Some sections may be more current. See credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Nevada Revised Statutes Annotated
  Title 2. Civil Practice (Chapters 10-22)
    Chapter 18. Costs and Disbursements (Refs & Annos)

N.R.S. 18.010

18.010. Award of attorney's fees

Currentness

1. The compensation of an attorney and counselor for his or her services is governed by agreement, express or implied, which is not restrained by law.

2. In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney's fees to a prevailing party:

(a) When the prevailing party has not recovered more than $20,000; or

(b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party. The court shall liberally construe the provisions of this paragraph in favor of awarding attorney's fees in all appropriate situations. It is the intent of the Legislature that the court award attorney's fees pursuant to this paragraph and impose sanctions pursuant to Rule 11 of the Nevada Rules of Civil Procedure in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses because such claims and defenses overburden limited judicial resources, hinder the timely resolution of meritorious claims and increase the costs of engaging in business and providing professional services to the public.

3. In awarding attorney's fees, the court may pronounce its decision on the fees at the conclusion of the trial or special proceeding without written motion and with or without presentation of additional evidence.

4. Subsections 2 and 3 do not apply to any action arising out of a written instrument or agreement which entitles the prevailing party to an award of reasonable attorney's fees.

**Credits**
Added by CPA (1911), § 434. Amended by Laws 1951, p. 59; NRS amended by Laws 1957, p. 129; Laws 1967, p. 1254; Laws 1969, pp. 435, 667; Laws 1971, pp. 165, 802; Laws 1975, p. 309; Laws 1977, p. 774; Laws 1985, p. 327; Laws 1999, c. 183, § 1, eff. May 20, 1999; Laws 2003, c. 508, § 153, eff. July 1, 2003.

N. R. S. 18.010, NV ST 18.010
Current through legislation of the 82nd Regular Session (2023) effective through October 1, 2023. Text subject to revision and classification by the Legislative Counsel Bureau.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**AMERICA FIRST FEDERAL CREDIT UNION, A Federally Chartered Credit Union, Appellant,**

v.

**Franco SORO, an Individual; Myra Taigman–Farrell, an Individual; Isaac Farrell, an Individual; Kathy Arrington, an Individual; and Audie Embestro, an Individual, Respondents.**

No. 64130.

Supreme Court of Nevada.

Sept. 24, 2015.

**Background:** After lender held trustee's sale of property that secured commercial loan, lender brought action deficiency action against borrowers. The Eighth Judicial District Court, Clark County, Jerry A. Wiese, J., 2013 WL 10871290, dismissed for lack of subject matter jurisdiction. Lender appealed.

**Holding:** On an issue of apparent first impression, the Supreme Court, Hardesty, C.J., held that forum selection clause was permissive rather than mandatory.

Reversed and remanded.

**1. Appeal and Error** ⟨∞⟩**893(1)**

 The Supreme Court reviews a district court's decision regarding subject matter jurisdiction de novo.

**2. Appeal and Error** ⟨∞⟩**893(1)**

 Contract interpretation is a question of law and, as long as no facts are in dispute, the Supreme Court views contract issues de novo, looking to the language of the agreement and the surrounding circumstances.

**3. Contracts** ⟨∞⟩**147(1)**

 The objective of interpreting contracts is to discern the intent of the contracting parties.

**4. Contracts** ⟨∞⟩**143(1, 2)**

 When interpreting a contract, the Supreme Court initially determines whether the language of the contract is clear and unam-

biguous; if it is, the contract will be enforced as written.

**5. Contracts** ⟨∞⟩**143(2), 155**

 An ambiguous contract is susceptible to more than one reasonable interpretation, and any ambiguity should be construed against the drafter.

**6. Contracts** ⟨∞⟩**206**

 Clause in commercial loan agreement stating that the parties were required to "submit themselves to the jurisdiction of" another state constituted a permissive forum selection clause, rather than a mandatory forum selection clause, and therefore clause did not deprive trial court of subject matter jurisdiction over action seeking to recover deficiency following trustee's sale of real property that secured loan, where no language within clause containing words of exclusivity.

———

 Ballard Spahr, LLP, and Stanley W. Parry, Timothy R. Mulliner, and Matthew D. Lamb, Las Vegas, for Appellant.

 Bogatz Law Group and I. Scott Bogatz and Charles M. Vlasic III, Las Vegas, for Respondents.

Before the Court En Banc.

*OPINION*

By the Court, HARDESTY, C.J.:

 In this opinion, we must determine whether a contract clause stating that the parties "submit themselves to the jurisdiction of" another state results in a mandatory forum selection clause requiring dismissal of the Nevada action. We hold that such a clause consenting to jurisdiction is permissive and therefore reverse the district court's order granting a motion to dismiss based on lack of subject matter jurisdiction in Nevada.

*FACTS AND PROCEDURAL HISTORY*

 In 2002, appellant America First Federal Credit Union (the credit union) loaned $2.9 million, secured by real property in Mes-

quite, Nevada, to respondents (borrowers)[1] for the purchase of a liquor/mini-mart. The borrowers defaulted, and the credit union held a trustee's sale, resulting in a deficiency on the loan balance of approximately $2.4 million. The Utah-based credit union sued the borrowers in Clark County to recover the deficiency.

The borrowers moved to dismiss the action under NRCP 12(b)(1), arguing that the credit union could not sue to recover the deficiency in Nevada and citing several clauses in the "Commercial Promissory Note" and "Business Loan Agreement" to support their argument. An "Applicable Law" clause in the loan agreement stated that "[t]his Agreement (and all loan documents in connection with this transaction) shall be governed by and construed in accordance with the laws of the State of Utah." The loan agreement also contained the following: "Jurisdiction. The parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." A clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located."

The district court agreed with the borrowers and granted the motion to dismiss. The district court found that the note and loan agreement "contain language which clearly expresses the parties' intent to submit litigation relating to the Agreement and the Note, to the jurisdiction of the State of Utah . . . . [T]he language clearly enough identifies Utah as the forum[,] which they selected for purposes of subject matter jurisdiction." This appeal followed.

## DISCUSSION

On appeal, the credit union argues that the district court erred in enforcing the clauses in question to preclude its complaint for a deficiency action.[2] More specifically, the credit union argues that the jurisdiction

clauses here were permissive, and while the complaint could have been brought in Utah, the clauses do not mandate that Utah was the exclusive forum. In response, the borrowers contend that whether a forum selection clause is mandatory or permissive is a matter of contract interpretation, and therefore, the clauses are ambiguous and must be construed against the credit union as the contract drafter. Whether forum selection clauses may be mandatory or permissive is an issue of first impression for this court.

### Standard of review

**[1–5]**  This court reviews a district court's decision regarding subject matter jurisdiction de novo. *Ogawa v. Ogawa*, 125 Nev. 660, 667, 221 P.3d 699, 704 (2009). Additionally, "[c]ontract interpretation is a question of law and, as long as no facts are in dispute, this court reviews contract issues de novo, looking to the language of the agreement and the surrounding circumstances." *Redrock Valley Ranch, LLC v. Washoe Cnty.*, ⸺ Nev. ⸺, ⸺, 254 P.3d 641, 647–48 (2011). The objective of interpreting contracts "is to discern the intent of the contracting parties. Traditional rules of contract interpretation are employed to accomplish that result." *Davis v. Beling*, ⸺ Nev. ⸺, ⸺, 278 P.3d 501, 515 (2012) (citation and internal quotation marks omitted). This court initially determines whether the "language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." *Id.* An ambiguous contract is susceptible to more than one reasonable interpretation, and "[a]ny ambiguity, moreover, should be construed against the drafter." *Anvui, LLC v. G.L. Dragon, LLC*, 123 Nev. 212, 215–16, 163 P.3d 405, 407 (2007).

### The district court erred when it dismissed the case based on the forum selection clauses

**[6]**  The credit union argues that the clauses do not contain any mandatory lan-

---

**1.** While eight individuals signed the note and loan agreement, the only borrowers in the instant action are Franco Soro, Myra Taigman–Farrell, Isaac Farrell, Kathy Arrington, and Audie Embestro.

**2.** Additionally, the credit union argues that Nevada's six-month statute of limitations for recovery of deficiency judgments applies to the action, not Utah's three-month statute of limitations. However, because the district court did not decide this issue, we do not address it here.

guage and, therefore, all of the forum selection clauses are merely permissive. We agree.

We have not yet distinguished between mandatory and permissive forum selection clauses. In *Tuxedo International, Inc. v. Rosenberg,* 127 Nev. 11, 251 P.3d 690 (2011), we reversed a district court's grant of a motion to dismiss based on the defendants' argument that any litigation must be brought in Peru. *Id.* at 14, 24–25, 251 P.3d at 692, 699. There, we remanded the case to the district court to determine which of three separate forum selection clauses potentially controlled the dispute. *Id.* at 26, 251 P.3d at 699–700. In analyzing the clauses, we noted that one of the clauses contained both a consent to jurisdiction in Peru and a Peruvian choice-of-law provision. *Id.* at 22–23, 251 P.3d at 697. We then stated:

> It can be argued, however, that there is no requirement contained in this clause that Peru is the *exclusive* forum for jurisdiction over any dispute between the parties. *See, e.g., Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76–77 (9th Cir.1987) (distinguishing between exclusive and non-exclusive forum selection clauses). If it is determined that the parties did not intend for the clause to act as an *exclusive* forum selection clause, then arguably, there is no contractual bar to [plaintiff] bringing its tort claims in the Nevada district court.

*Id.* at 23–24, 251 P.3d at 698 (second emphasis added). We also noted that another clause "resemble[d] a traditional exclusive forum selection clause," containing language that "any action . . . must be brought in a court in the Country of Peru." *Id.* at 24, 251 P.3d at 698. Thus, *Tuxedo International* observed the distinctions between mandatory and permissive forum selection clauses, but the facts of the case did not provide an opportunity for us to affirmatively adopt a rule. *See id.* at 26 n. 5, 251 P.3d at 700 n. 5.

Other state courts have distinguished between mandatory and permissive forum selection clauses. *See, e.g., Garcia Granados Quinones v. Swiss Bank Corp. (Overseas), S.A.,* 509 So.2d 273, 274 (Fla.1987) (recognizing that a mandatory jurisdiction clause requires "a particular forum be the exclusive jurisdiction for litigation," while permissive jurisdiction is merely a consent to jurisdiction in a venue (internal quotation marks omitted)); *Polk Cnty. Recreational Ass'n v. Susquehanna Patriot Commercial Leasing Co.,* 273 Neb. 1026, 734 N.W.2d 750, 758–59 (2007) (distinguishing a mandatory forum selection clause based on the words "shall be brought only in" a particular jurisdiction from a permissive forum selection clause where parties only "consent and submit to the jurisdiction" of other courts); *Caperton v. A.T. Massey Coal Co.,* 225 W.Va. 128, 690 S.E.2d 322, 338–39 (2009) ("[T]o be enforced as mandatory, a forum-selection clause must do more than simply mention or list a jurisdiction; in addition, it must either specify venue in mandatory language, or contain other language demonstrating the parties' intent to make jurisdiction exclusive."). For example, the Wisconsin Court of Appeals stated:

> Clauses in which a party agrees to submit to jurisdiction are not necessarily mandatory. Such language means that the party agrees to be subject to that forum's jurisdiction *if sued there.* It does not prevent the party from bringing suit in another forum. The language of a mandatory clause shows more than that jurisdiction is *appropriate* in a designated forum; it unequivocally mandates *exclusive* jurisdiction. Absent specific language of exclusion, an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere.

*Converting/Biophile Labs., Inc. v. Ludlow Composites Corp.,* 296 Wis.2d 273, 722 N.W.2d 633, 640–41 (2006) (citations and internal quotation marks omitted).

> Similarly, federal circuit courts generally agree that where venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive.

*Paper Express, Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753, 757 (7th Cir.1992); *see Excell, Inc. v. Sterling Boiler & Mech., Inc.,* 106 F.3d 318, 321 (10th Cir.1997) (describing

the "mandatory/permissive dichotomy" and concluding that the clause, "jurisdiction shall be in the State of Colorado, and venue shall lie in the County of El Paso, Colorado," was mandatory (internal quotation marks omitted)); *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.,* 22 F.3d 51, 52–53 (2d Cir.1994) (holding the forum selection clause, "[a]ny dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts," as permissive (internal quotation marks omitted)); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76–78 (9th Cir.1987) (holding the forum selection clause, "[t]he courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract," as permissive, and noting that to be considered mandatory, a forum selection clause must clearly require that a particular court is the only one that has jurisdiction (internal quotation marks omitted)); *Keaty v. Freeport Indon., Inc.,* 503 F.2d 955, 956–57 (5th Cir. 1974) (holding the forum selection clause, "[t]his agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York," as permissive (internal quotation marks omitted)).

We agree with the distinctions made by other state and federal courts regarding mandatory and permissive forum selection clauses described above. Here, there are two jurisdictional clauses at issue. First, the loan agreement contains a clause entitled "Jurisdiction," which provides that "[t]he parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." We conclude that this language is permissive as there is no language within the clause containing words of exclusivity. Absent such language, we deem the clause permissive.

Second, a clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located." This language is also permissive as there is no language within the clause containing words

of exclusivity. *See Golden Palm Hospitality, Inc. v. Stearns Bank Nat'l Ass'n,* 874 So.2d 1231, 1233–37 (Fla.Dist.Ct.App.2004) (concluding that the language, "[i]f there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of STEARNS County, the State of Minnesota" as permissive, and thus permitted, but did not require, that the action be brought in Minnesota (internal quotation marks omitted)). Thus, the case may be heard in another appropriate venue besides the courts in Utah.

Without articulating why, the borrowers argue that the forum selection clauses are ambiguous and therefore must be construed against the credit union. We conclude that this argument is without merit as the clauses are clear and unambiguous and this court need not interpret the contract any differently from the contract's plain meaning. *See, e.g., Hunt Wesson Foods,* 817 F.2d at 77 ("A primary rule of interpretation is that '[t]he common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it.'") (quoting 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 618 (3d ed.1961)). The clauses provide no words of exclusivity and to interpret the clauses as mandatory forum selection clauses would read language into the contract that is not there.

### CONCLUSION

In this case, none of the clauses contain exclusive language. Accordingly, all clauses are permissive forum selection clauses, and the district court erred when it found Utah was the sole forum for any controversy and dismissed the case for lack of subject matter jurisdiction. We therefore reverse the district court's order dismissing the case and remand this matter to the district court for further proceedings.

PARRAGUIRRE, CHERRY, GIBBONS, DOUGLAS, SAITTAA and PICKERING, JJ.



2018 WL 993781
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

BLUE RACER MIDSTREAM, LLC, Plaintiff,

v.

KELCHNER, INC., Defendant/Third-Party Plaintiff,

Civil Action No. 3:16-CV-3296-K
|
Signed 02/21/2018

**Attorneys and Law Firms**

Chad Arnette, Anneke Cronje, Kelly Hart & Hallman LLP, Melinda Hoffman Barlow, Lacy Malone Steppick Ryder & Menefee PLLC, Fort Worth, TX, for Plaintiff.

Roy L. Stacy, Clinton D. Howie, Stacy & Conder, LLP, Dallas, TX, for Defendant/Third-Party Plaintiff.

## MEMORANDUM OPINION AND ORDER

ED KINKEADE, UNITED STATES DISTRICT JUDGE

*1  Before the Court is Defendant Kelchner, Inc.'s Motion to Transfer Venue (Doc. No. 27). After carefully considering the motion, response, reply, and applicable law, the Court **DENIES** Defendant Kelchner, Inc.'s motion to transfer venue because the forum-selection clause is valid, enforceable, and public interest factors do not outweigh the bargained-for forum.

### I. Background

Plaintiff Blue Racer Midstream, LLC ("Blue Racer"), a citizen of Delaware, Virginia, Texas, Oklahoma with its principal place of business in Texas, entered a contract with Defendant Kelchner, Inc. ("Kelchner") to perform services on a pipeline in Ohio. The contract included a forum-selection clause and a choice-of-law clause naming Dallas County, Texas, as the forum and choosing Texas law. On October 28, 2014, part of the pipeline exploded in Monroe County, Ohio. As a result of this explosion, Blue Racer filed suit against Kelchner alleging it caused the explosion by improperly applying polyurethane foam to the pipeline. Blue Racer filed this suit in Texas pursuant to a forum-selection clause in the contract.

### II. Legal Standard

Section 1391 dictates where a plaintiff may properly bring a civil suit unless the parties negotiated a forum-selection clause. 28 U.S.C. § 1391. For venue purposes, a plaintiff limited liability company resides where it has its principal place of business. *See* § 1391(c); *see Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1221 (5th Cir. 1969) (unincorporated entities are treated like corporations for venue purposes); *see Nayani v. Horseshoe Entm't*, No. 3:06-CV-01540-M, 2007 WL 1062561, *8 (N.D. Tex. Apr. 10, 2007) (Lynn, J.). The United States Supreme Court has established that when contracting parties enter a forum-selection clause, the "valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for Western Dist. of Tex.*, 134 S. Ct. 568, 581 (2013). The party seeking to defy the forum-selection clause bears the burden of establishing why the court should transfer the case to a different venue than the bargained-for venue. *See id.*

A forum-selection clause alters the usual venue transfer analysis because the court deems the private interest factors weigh in favor of the parties' preselected forum. *See id.* at 582; *see also* 28 U.S.C. § 1404(a). "A district court may consider arguments about public-interest factors;" however, the public interest factors "will rarely defeat" the forum-selection clause. *Id.* The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 315 (5th Cir. 2008).

### III. Analysis

Blue Racer filed this suit for state law claims of breach of contract, breach of warranty, negligence, and products liability in Dallas County state court pursuant to the forum-selection clause. Kelchner removed the case to this Court and now moves to transfer venue to the Southern District of Ohio. Kelchner argues the forum-selection clause is invalid based on an Ohio statute and the venue transfer analysis weighs in favor of transferring venue to Ohio. Blue Racer responds by arguing the forum-selection clause is valid and public interest factors do not outweigh the bargained-for forum.

#### A. The Forum-Selection Clause is Valid.

**\*2**  While the Supreme Court in *Atlantic Marine* assumed the forum-selection clause was valid, Kelchner argues the forum-selection clause here is invalid under Ohio state law and both private and public interest factors apply to determine if venue should be transferred to Ohio. *See* OHIO REV. CODE 4113.62(D)(2) (West 2017). Section 4113.62(D)(2) states forum-selection clauses are unenforceable when the clause requires litigation of a construction contract relating to Ohio real estate be brought in another state. *Id.* Kelchner argues the court should apply Texas choice-of-law rules to determine the forum-selection clause is invalid under the Ohio statute, making the *Atlantic Marine* analysis inapplicable. However, Blue Racer argues the forum-selection clause is valid and the *Atlantic Marine* analysis applies, resulting in Texas being the proper forum.

However, the circuits are split on what law applies to determine the validity of a forum-selection clause so as to apply *Atlantic Marine*'s analysis to venue transfer. *See Barnett v. DynCorp International, L.L.C.,* 831 F.3d 296, 301 (5th Cir. 2016); *see In re Union Elec. Co.,* 787 F.3d 903, 906–07 (8th Cir. 2015) (In *Atlantic Marine,* "the Court assumed the existence of a valid forum-selection clause for the purpose of its analysis, thereby providing no direct holding as to when such clauses should be deemed invalid."); *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd.,* No. 16-16187, 2018 WL 359998, \*10–11 (11th Cir. Jan. 11, 2018) (The court assumes valid and enforceable are synonymous and consider the factors for determining if a forum selection clause is enforceable.). In diversity cases, courts apply federal law to the enforceability of forum-selection clauses. *Haynsworth v. The Corp.,* 121 F.3d 956, 962 (5th Cir. 1997). A party seeking to overcome the presumption that the forum-selection clause is enforceable must prove the clause is "unreasonable under the circumstances." *Id.* at 963. However, when the court must interpret the forum-selection clause, the court "applies the forum state's choice-of-law rules to determine which substantive law will apply." *Weber v. PACT XPP Techs., AG,* 811 F.3d 758, 770 (5th Cir. 2016). The Fifth Circuit has not stated if federal or state law applies to determine whether a forum-selection clause is valid. *See Barnett,* 831 F.3d at 301–03.

Kelchner argues state law applies to determine the validity of the forum-selection clause. Kelchner cites two Texas district courts that have considered which law applies to determine a forum-selection clause's validity. *See TSI USA, LLC v. Uber Technologies, Inc.,* Civ. Action No. 3:16-cv-2177-L, 2017 WL 106835, at \*2 (N.D. Tex. Jan. 11, 2017) (Horan, MJ.); *See Brown v. Federated Capital Corp.,* 991 F. Supp.2d 857, 861–62 (S.D. Tex. Jan. 6, 2014). Both cases recognized the law is unsettled and decided the motion to transfer not on validity but on contract interpretation, which required state choice-of-law rules to determine which state's substantive law applied. *See TSI USA,* 2017 WL 106835, at \*2; *See Brown,* 991 F. Supp.2d at 861–62.

While the parties framed the issue before the court in *TSI USA v. Uber* as one of forum-selection clause validity, the court found the underlying issue was whether the forum-selection clause survived the termination of the contract, which "is a question of scope, not validity." *TSI USA,* 2017 WL 106835, at \*2. In an opinion preceding the Supreme Court's *Atlantic Marine* decision, a district court loosely referred to the forum-selection clause issue as one of validity, but the true issue was whether the credit

card user was bound to the terms of the contract that contained the forum-selection clause, which substantive law determined. *Brown*, 991 F. Supp.2d at 861–62. The courts in these two cases applied substantive state law because the arguments before the courts were actually contract interpretation issues, not the validity of the forum-selection clause. *See TSI USA*, 2017 WL 106835, at *2; *See Brown*, 991 F. Supp.2d at 861–62.

**\*3** Because Kelchner does not ask the Court to interpret the contract but argues a state law invalidates the forum-selection clause, the case before the Court is distinguishable from Kelchner's two cited cases. Because the Court does not need to interpret Kelchner and Blue Racer's contract, substantive state law does not apply. Furthermore, Kelchner does not argue the forum-selection clause is unenforceable and the Court sees no basis for such a finding, and so the clause is enforceable. *See Haynsworth*, 121 F.3d at 962.

Moreover, the Fifth Circuit "do[es] not appear to have drawn [a] distinction between validity and enforceability, instead seeming to treat those words as synonymous in the forum-selection clause context." *Barnett*, 831 F.3d at 302. In *Stewart Org., Inc. v. Ricoh Crop.*, the Supreme Court found that a state law prohibiting forum-selection clauses was not determinative in a motion to transfer but was a consideration under the balancing factors in the venue transfer analysis. 487 U.S. 22, 30–31 (1988); *see* 28 U.S.C § 1404(a); *see Barnett*, 831 F.3d at 302–03. "The forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration (as respondent might have it) nor no consideration (as [state] law might have it) but rather the consideration for which Congress provided in § 1404(a)." *Stewart Org.*, 487 U.S. at 31.

Thus, the proper place to consider the Ohio statute, if Ohio law even applies, is as a public interest factor under the venue transfer analysis. *See id.*; *see* 28 U.S.C. § 1404(a).

### B. The Public Interest Factors Do Not Outweigh the Parties' Contractually Agreed Forum.

Under the transfer venue analysis, the Court deems the private interest factors weigh heavily in favor of the chosen forum because the parties agreed to the valid forum-selection clause, but the court may consider public interest factors. *Atlantic Marine*, 134 S. Ct. at 582. However, public interest factors rarely defeat the agreed upon forum because the party opposing the agreed-to forum must show the public interest factors "overwhelmingly disfavor" that forum. *See Atlantic Marine*, 134 S. Ct. at 582–83.

#### 1. Administrative Difficulties Flowing from Court Congestion Favor Texas.

The factor considering administrative difficulties flowing from court congestion favors Texas because the parties will go to trial more quickly here. The Fifth Circuit considers "the speed with which a case can come to trial and be resolved," not just the statistics of the court's case load. *In re Genetech, Inc.*, 566 F.3d 1338, 1347 (5th Cir. 2009). A trial date is already set for later this year before the Court and discovery is almost complete; whereas, transferring the case to Ohio would likely greatly delay the trial in this case. Thus, the court congestion factor favors Texas to ensure a speedy trial. *See id.*

#### 2. Both Texas and Ohio Have a Local Interest in Having the Case Decided at Home.

This second public interest factor recognizes that localized interests should be decided at home. *LeBlanc v. C.R. England, Inc.* 961 F. Supp.2d 819, 832 (N.D. Tex. 2013) (Boyle, J.). A court has local interest when there is a "relevant factual connection between the events and the venue." *Id.* Blue Racer resides in Texas because its principal place of business is in Dallas, Texas. *See Penrod Drilling Co.*, 414 F.2d at 1221; *see Nayani*, 2007 WL 1062561, *8 (a plaintiff unincorporated entity resides where its principal place of business is located for venue purposes). While Ohio has a localized interest because the pipeline explosion occurred in Ohio, Texas has an interest in the outcome of this case because it concerns a transaction with a Texas resident. *See Tim Moore v. Payson Petroleum Grayson, LLC*, Civ. Action No. 3:17-CV-1436-M-BH, *8 (N.D. Tex. Jan. 23, 2018) (Ramirez,

MJ.); *see Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp.2d 680, 711 (S.D. Tex. 2011). Because Texas and Ohio both have a local interest in the case, this factor is neutral. *See id.*

### 3. The Familiarity of the Forum and the Avoidance of Unnecessary Problems of Conflict of Laws or the Application of Foreign Law Favors a Texas Forum.

**\*4** Kelchner argues Ohio law applies to this case despite the contract's choice-of-law clause which states Texas law shall govern the contract. Sitting in diversity, federal courts apply Texas choice-of-law rules to determine what substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Provident Fin. Inc. v. Strategic Energy L.L.C.*, 404 Fed. Appx. 835, 839 (5th Cir. 2010). Texas applies the "party autonomy rule," allowing parties to agree to be governed by the law of another state. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014). Texas courts regularly enforce choice-of-law clauses "unless the chosen law has no substantial relationship with the parties or unless there is a state with a materially greater interest in the dispute *and* applying the chosen law is against fundamental policy of the state with materially greater interest." *Grosser v. Red Mango FC, LLC*, Civ. Action No. 3:12-CV-2691-N, 2013 WL 12134086, \*7 (N.D. Tex. April 25, 2013) (Godbey, J.); *see DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). Texas has a substantial relationship with the parties because Blue Racer resides in Texas. *See Gator Apple, LLC v. Apple Tex. Rests., Inc.*, 442 S.W.3d 521, 533 (Tex. App.—Dallas 2014, pet. denied). Thus, the Court must determine if there is a state with a materially greater interest in the dispute and, if so, whether applying Texas law is against a fundamental policy of that state.

Blue Racer's principal place of business is in Dallas, Texas. Blue Racer's employees, including the project manager for the pipeline, are located in Texas. While the Court recognizes the actual pipeline explosion took place in Ohio, this is not enough to persuade the Court that Ohio has a materially greater relationship to this suit than Texas. This case is based on a contract with a bargained-for Texas forum-selection clause and choice-of-law clause entered into by a Texas resident. Texas has a strong interest in enforcing its residents' transactions and contracts. *See TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp.2d 742, 751 (S.D. Tex. 2009). Taking all the facts together there is not enough to persuade the Court at this stage that Ohio has a materially greater relationship to justify ignoring the parties' negotiated and agreed upon choice-of-law. Thus, Texas law applies at this stage in the case, and the last two public interest factors favor the Texas forum.

### IV. Conclusion

Because the forum-selection clause is valid and Kelchner has not overcome the high burden of showing the public interest factors overwhelmingly disfavor the bargained-for forum, the Court **DENIES** Kelchner's motion to transfer venue.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 993781

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

James BURCH and Linda
Burch, Petitioners,

v.

The SECOND JUDICIAL DISTRICT
COURT OF the STATE of Nevada, in
and for the COUNTY OF WASHOE, and
the Honorable Steven R. Kosach, Dis-
trict Judge, Respondents,

and

Double Diamond Ranch, LLC, A Nevada
Corporation;  and  Double  Diamond
Homes, LLC, A Nevada Corporation,
Real Parties in Interest.

No. 38283.

Supreme Court of Nevada.

July 17, 2002.

Rehearing Denied Sept. 11, 2002.

Home purchasers brought action against
developer for breach of express and implied
warranties, negligence, and fraud and mis-
representation. The Second Judicial District
Court, Washoe County, Steven R. Kosach, J.,
granted developer's motion to compel arbi-
tration. Home purchasers petitioned for writ
of mandamus. The Supreme Court held that
arbitration clause in home warranty was pro-
cedurally and substantively unconscionable.

Petition granted.

1. Arbitration ⟺6.2
    Home buyers warranty offered by devel-
oper was procedurally unconscionable adhe-
sion contract, and thus arbitration clause in
warranty was unenforceable, where applica-
tion and warranty were pre-printed, stan-
dardized contract forms, home buyers were
not given opportunity to negotiate warranty's
terms with developer or its insurer, home
buyers did not receive copy of warranty's
terms until after developer paid premium to
enroll home in warranty program and almost
four months after they closed escrow on their
home, developer told buyers that warranty's
issuance was automatic and it offered extra
protection for their home, when in fact war-
ranty limited their protection under Nevada
law, home buyers did not have opportunity to

read application form, 31-page warranty
booklet, or view video explaining warranty
before signing application, home buyers were
not sophisticated consumers, and warranty's
disclaimers were not conspicuous.

2. Mandamus ⟺3(3), 26, 28
    When there is no plain, speedy, and
adequate remedy at law, a writ of mandamus
is available to compel the district court to
perform a required act, or to control an
arbitrary or capricious abuse of discretion.
West's NRSA 34.160, 34.170.

3. Contracts ⟺1
    The Supreme Court permits the enforce-
ment of adhesion contracts where there is
plain and clear notification of the terms and
an understanding consent, and if it falls with-
in the reasonable expectations of the weaker
party.

4. Arbitration ⟺6.2
    Contracts ⟺1
    The Supreme Court need not enforce a
contract, or any clause of a contract, includ-
ing an arbitration clause, that is unconsciona-
ble.

5. Arbitration ⟺6.2
    Although the Federal Arbitration Act
(FAA) establishes a strong public policy fa-
voring arbitration for the purpose of avoiding
the unnecessary expense and delay of litiga-
tion where parties have agreed to arbitrate,
it does not mandate the enforcement of an
unconscionable contract or arbitration clause.
9 U.S.C.A. § 1 et seq.

6. Contracts ⟺1
    Both procedural and substantive uncon-
scionability generally must be present in or-
der for a court to exercise its discretion to
refuse to enforce a contract or clause as
unconscionable.

7. Arbitration ⟺6.2
    Arbitration clause in home warranty was
substantively, as well as procedurally uncon-
scionable, where clause granted insurer uni-
lateral and exclusive right to decide rules
that govern arbitration and to select arbitra-
tors.

**648**  Nev.          **49 PACIFIC REPORTER, 3d SERIES**

Robert C. Maddox & Associates and Samuel S. Crano, Reno, for Petitioners.

Walther Key Maupin Oats Cox & LeGoy and Donald A. Lattin, Reno, for Real Parties in Interest.

Vannah Costello Canepa Riedy Rubino & Lattie, Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

Before SHEARING, ROSE and BECKER, JJ.

*OPINION*

PER CURIAM:

This petition challenges a district court order granting a motion to compel arbitration in favor of real parties in interest Double Diamond Ranch, LLC and Double Diamond Homes, LLC (Double Diamond). Petitioners James and Linda Burch purchased a new home and a homebuyer warranty from Double Diamond. When problems developed in their home, they contacted Double Diamond to fix them. After attempts at mediation failed, the Burches filed a complaint in district court for damages relating to Double Diamond's construction of their new home. The district court concluded that the Burches had entered into a valid contractual agreement, via the homebuyer warranty, to resolve any disputes concerning their home through arbitration. We disagree, and we, therefore, grant this petition for a writ of mandamus.

*FACTS*

In March 1997, the Burches purchased a new Diamond Country home developed and constructed by real parties in interest Double Diamond. In October 1997, approximately four months after closing, Double Diamond gave Linda Burch a thirty-one-page warranty booklet and asked her to sign a one-page "Application for Home Enrollment" for the 2–10 Home Buyers Warranty (HBW) offered by Double Diamond. She signed the "application" form, but she did not read the thirty-one-page booklet.

The HBW purports to be an express limited warranty. It provides one-year coverage that warrants the home will be free from materials and workmanship defects. In the second year, the coverage narrows to electrical, plumbing, and mechanical systems defects. For ten years, the HBW provides coverage that warrants the home will be free from structural defects.

The one-page "Application for Home Enrollment" states in paragraph nine that,

[b]y signing, Homebuyer acknowledges that s/he has viewed and received a video of "Warranty Teamwork: You, Your Builder & HBW", read the warranty and has received a copy of this form with the Home Buyers Warranty Booklet and CONSENTS TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION contained therein.

The HBW's arbitration clause provides, in pertinent part, that:

Any controversy, claim or complaint arising out of or relating to Builder's workmanship/systems limited warranty coverages provided by Builder under the terms of this agreement which Homebuyer and Builder do not resolve by mutual agreement shall be settled by *final and binding* arbitration in accordance with the Construction Arbitration Services (CAS) or other [National Home Insurance Company] NHIC/HBW approved rules applicable to the home warranty industry in effect at the time of the arbitration. . . .

Any controversy concerning a claim arising out of or relating to the Builder's ten year structural coverage (insured by NHIC) shall be settled by final and binding arbitration. . . . Arbitration of all structural warranty disputes will be conducted by arbitrators supplied by an NHIC approved arbitration service.

This arbitration clause further provides that the final and binding arbitration is governed by the Federal Arbitration Act (FAA)[1] "to the exclusion of any provisions of state arbitration law."

---

**1.**  9 U.S.C. §§ 1–16 (2000).

BURCH v. DIST. CT.        Nev. **649**
Cite as 49 P.3d 647 (Nev. 2002)

In January 1999, the Burches complained to Double Diamond about "serious problems underneath [their] house"—saturated floor joists, wet insulation, muddy ground, and a wet, moldy foundation. They requested that Double Diamond remedy the situation by removing the insulation, professionally treating the area with mildew and fungicide controls, installing upgraded insulation with proper venting, constructing a proper water barrier underneath the house, and reimbursing them for all current and future fees for professional inspections. While contesting liability, Double Diamond offered to completely dry the crawl space underneath the house, install two additional foundation vents and a six-mill vapor barrier, treat all areas of active fungus with an approved fungicide, and reinstall insulation except at the rim joist.

The Burches were not satisfied with this offer. After both parties stipulated to waive mediation, the Burches filed a complaint for damages with the district court, alleging breach of express and implied warranties, negligence, and fraud and misrepresentation. Double Diamond filed a motion for a stay and a motion to compel arbitration, arguing that the HBW provided for final and binding arbitration of all disputes relating to the construction of the Burch home. The district court found the HBW valid and granted the motion to compel arbitration. The Burches now request that this court issue a writ of mandamus directing the district court to vacate its order compelling the Burches to arbitrate their claims against Double Diamond.

## DISCUSSION

[1, 2] Because an order compelling arbitration is not directly appealable, the Burch-

es appropriately seek writ relief from this court.[2] When there is no plain, speedy, and adequate remedy at law, a writ of mandamus is available to compel the district court to perform a required act, or to control an arbitrary or capricious abuse of discretion.[3] Under the circumstances of this case, the HBW is an unconscionable adhesion contract and, therefore, unenforceable. The district court should not have compelled arbitration under the unenforceable clause. Accordingly, we grant the petition for a writ of mandamus.

[3, 4] This court has defined an adhesion contract as "a standardized contract form offered to consumers . . . on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." [4] "The distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms." [5] Here, the one-page "application" and the HBW were pre-printed, standardized contract forms. The Burches, the weaker party, were not given an opportunity to negotiate the HBW's terms with Double Diamond or its insurer, National Home Insurance Company (NHIC); they were required to "take it or leave it." Therefore, the HBW agreement between the Burches and Double Diamond is an adhesion contract. This court permits the enforcement of adhesion contracts where there is "plain and clear notification of the terms and an understanding consent[,]" [6] and "if it falls within the reasonable expectations of the weaker . . . party." [7] This court need not, however, enforce a contract, or any clause of a contract, including an arbitration clause,[8] that is unconsciona-

2.  See NRS 38.205 (no direct appeal from order granting motion to compel arbitration); NRS 34.170 (writ to issue when no plain, speedy, and adequate remedy in law exists); Kindred v. Dist. Ct., 116 Nev. 405, 409, 996 P.2d 903, 906 (2000) (recognizing that mandamus is an appropriate method to challenge an order compelling arbitration).

3.  See NRS 34.160; NRS 34.170; see also Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 603–04, 637 P.2d 534, 536 (1981).

4.  Obstetrics and Gynecologists v. Pepper, 101 Nev. 105, 107, 693 P.2d 1259, 1260 (1985).

5.  Id.

6.  Id. at 108, 693 P.2d at 1261.

7.  See id. at 107–08, 693 P.2d at 1261; see also Bernstein v. GTE Directories Corp., 827 F.2d 480, 482 (9th Cir.1987) (applying Nevada law).

8.  See NRS 38.035 ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." (emphasis added)).

**650** Nev.          **49 PACIFIC REPORTER, 3d SERIES**

ble.[9]

[5] Although the FAA establishes a strong public policy favoring arbitration for the purpose of avoiding the unnecessary expense and delay of litigation where parties have agreed to arbitrate,[10] it does not mandate the enforcement of an unconscionable contract or arbitration clause.[11] The United States Supreme Court has interpreted § 2 of the FAA and held that "[s]tates may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' " [12] Unconscionability, therefore, is a legitimate ground upon which to refuse to enforce the HBW and its arbitration clause.[13]

[6] Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a contract or clause as unconscionable.[14] The circumstances present in this case significantly render the HBW procedurally unconscionable. The Burches did not receive a copy of the HBW's terms until after Double Diamond had paid the premium to enroll the Burch home in the warranty program and almost four months after they closed escrow on their home.

Double Diamond told the Burches that the HBW's issuance was "automatic" and offered extra protection for their home, when in fact the warranty limited their protection under Nevada law.[15] The Burches did not have an opportunity to read the one-page "application" form, or the thirty-one-page HBW booklet, or to view the HBW video before signing the "application." The arbitration clause was located on page six of the HBW booklet, after five pages of material only relevant to persons residing outside of Nevada. The Burches were not sophisticated consumers, they did not understand the HBW's terms, and the HBW's disclaimers were not conspicuous.[16] Under these circumstances, the Burches did not have a meaningful opportunity to decide if they wanted to agree to the HBW's terms, including its arbitration provision. As a result, the HBW was procedurally unconscionable.

[7] Because the procedural unconscionability in this case is so great, less evidence of substantive unconscionability is required to establish unconscionability.[17] The HBW's arbitration clause is also substantively unconscionable because it grants Double Diamond's insurer, NHIC, the unilateral and exclusive right to decide the rules that govern the arbitration and to select the arbitra-

---

**9.** *See* NRS 104.2302(1) (court may refuse to enforce an unconscionable contract).

**10.** *See Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

**11.** *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding that generally applicable contract defenses, such as unconscionability, may be used to invalidate an arbitration clause).

**12.** *Allied–Bruce Terminix*, 513 U.S. at 281, 115 S.Ct. 834 (quoting 9 U.S.C. § 2 (emphasis added)); *see also Doctor's Associates*, 517 U.S. at 687, 116 S.Ct. 1652.

**13.** *See Doctor's Associates*, 517 U.S. at 687, 116 S.Ct. 1652.

**14.** *See, e.g., First Family Financial Services, Inc. v. Fairley*, 173 F.Supp.2d 565, 569–71 (S.D.Miss. 2001); *Data Based Systems, Intern., Inc. v. Hewlett–Packard Co.*, No. CIV. 00–CV–4425, 2001 WL 1251212, at *10 (E.D.Pa. Sept.26, 2001); *Thomas Engineering, Inc. v. Trane Co.*, No. 92 C 1251,

1994 WL 692698, at *2–3 (N.D.Ill.Dec.1, 1994); *Armendariz v. Foundation Health Psychcare*, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000); *Villa Milano Homeowners Ass'n v. Il Davorge*, 84 Cal.App.4th 819, 102 Cal.Rptr.2d 1, 6–7 (2000); *Complete Interiors, Inc. v. Behan*, 558 So.2d 48, 52 (Fla.Dist.Ct.App.1990); *M.A. Mortenson Co. v. Timberline Software*, 140 Wash.2d 568, 998 P.2d 305, 314–15 (2000).

**15.** *Cf. Sierra Diesel Injection Service v. Burroughs Corp.*, 890 F.2d 108, 113 (9th Cir.1989) ("[E]x-clusions of warranties are generally disfavored . . . . They are subject to the general obligation of good faith and of not imposing unconscionable terms upon a party.").

**16.** *See* NRS 104.1201(10) ("Whether a term or clause is 'conspicuous' or not is for decision by the court."); *see also Sierra Diesel*, 890 F.2d at 115 (explaining that even the use of capital letters in disclaimers will not be "effective in all cases").

**17.** *See Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 690.

tors. These provisions are "oppressive terms," [18] and as such, are substantively unconscionable and unenforceable. We do not hold that a homebuyer warranty with an arbitration clause will always be unconscionable or unenforceable. Under the circumstances in this case, however, the HBW and its arbitration clause *are* unconscionable and, therefore, unenforceable.

We, therefore, grant the petition and direct the clerk of this court to issue a writ of mandamus directing the district court to vacate its order compelling arbitration.[19]



**Larry ROSEQUIST, Appellant,**

v.

**INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 1908, Respondent.**

**No. 36506.**

Supreme Court of Nevada.

July 18, 2002.

Firefighter who was denied disability benefits brought action against county and his union, claiming breach of collective bargaining agreement, breach of duty of fair representation, improper submission of grievances, breach of covenant of good faith and fair dealing, wrongful termination of his employment, and conspiracy to violate collective bargaining agreement. The Eighth Judicial District Court, Clark County, Mark R. Denton, J., granted summary judgment in favor of county and granted union's motion to dismiss without prejudice. Firefighter appealed. The Supreme Court held that: (1) firefighter's allegations against union were within exclusive jurisdiction of the Employee-

Management Relations Board (EMRB), and (2) firefighter was required to exhaust his administrative remedies before the EMRB before filing his complaint in district court.

Affirmed.

**1. Labor Relations** ⟺**510**

Firefighter's allegations that union breached collective bargaining agreement, breached duty of fair representation, improperly submitted grievances, breached duties of good faith and fair dealing, and conspired to violate collective bargaining agreement fell within scope of the Employee-Management Relations Act and, thus, were within the exclusive jurisdiction of the Employee-Management Relations Board (EMRB). West's NRSA 288.110, subd. 2, 288.270, subd. 2(a).

**2. Pretrial Procedure** ⟺**554**

A motion to dismiss is properly granted when there is a lack of subject matter jurisdiction on the face of the complaint.

**3. Administrative Law and Procedure** ⟺**229**

Failure to exhaust administrative remedies generally deprives a district court of subject matter jurisdiction.

**4. Appeal and Error** ⟺**893(1)**

The construction of a statute is a question of law subject to de novo review.

**5. Statutes** ⟺**190**

If the plain meaning of a statute is clear on its face, then the court will not go beyond the language of the statute to determine its meaning.

**6. Labor Relations** ⟺**219**

Fair representation of an employee by a union involving the implementation of the terms of a collective bargaining agreement is a right arising under the Employee-Management Relations Act and the failure of a union to fairly represent an employee interferes with that right. West's NRSA 288.270, subd. 2(a).

---

**18.** *24 Hour Fitness, Inc. v. Superior Court,* 66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533, 541 (1998).

**19.** *See* NRS 34.160; *see also Round Hill,* 97 Nev. at 603–04, 637 P.2d at 536.

2023 WL 5104066
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Novie Dale CARMEN, et al., Plaintiffs,

v.

HEALTH CAROUSEL, LLC, Defendant.

Case No. 1:20-cv-313
|
Signed August 9, 2023

**Attorneys and Law Firms**

Robert E. DeRose, II, Jacob Assaf Mikalov, Barkan Meizlish DeRose Cox, LLP, Columbus, OH, Anna P. Prakash, Pro Hac Vice, Charles A. Delbridge, Pro Hac Vice, Nicole J. Schladt, Pro Hac Vice, Nichols Kaster, PLLP, Minneapolis, MN, Bryce W. Ashby, Pro Hac Vice, Donati Law, PLLC, Memphis, TN, David H. Seligman, Pro Hac Vice, Valerie L. Collins, Pro Hac Vice, Towards Justice, Denver, CO, Jennifer Dale Bennett, Pro Hac Vice, Gupta Wessler LLP, San Francisco, CA, for Plaintiffs.

Beth A. Bryan, Russell S. Sayre, Spencer S. Cowan, Taft Stettinius & Hollister LLP, Cincinnati, OH, Kenneth Foisy, Taft Stettinius & Hollister LLP, Covington, KY, for Defendant.

## OPINION AND ORDER

DOUGLAS R. COLE, UNITED STATES DISTRICT JUDGE

**\*1** This cause comes before the Court on Defendant Health Carousel, LLC's (Health Carousel) Motion to Dismiss (Doc. 44) Plaintiffs Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores' Third Amended Complaint (Doc. 43). Health Carousel also moves to Strike Plaintiffs' Class Allegations (Doc. 45) and to Stay Discovery (Doc. 47). For the reasons discussed below, the Court **DENIES** Health Carousel's Motion to Dismiss (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay (Doc. 47) **AS MOOT**.

## BACKGROUND

This is a putative class action. Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores bring this case on behalf of similarly situated immigrants that Health Carousel currently or previously employed. (3d Am. Compl., Doc. 43, #986). And this is not Defendant's first Motion to Dismiss in this case. On June 17, 2021, the Court issued an Opinion denying Health Carousel's combined Motion to Dismiss Carmen's (first) Amended Complaint and Motion to Strike Class Allegations (Doc. 21). Later, Carmen amended her Complaint two more times, resulting in the now-operative Third Amended Complaint, filed on December 17, 2021. (Doc. 43).

The Third Amended Complaint removed some previously alleged facts, while also adding new allegations, two new plaintiffs (Amistoso and Flores), and five new causes of action. (*See id.*). In response, Health Carousel has now moved to dismiss the Third Amended Complaint, to strike class allegations, and to stay discovery while the Court considered these Motions. (Docs. 44, 45, 47).

**\*2** The Court has already extensively detailed the general facts in its previous Opinion and Order. (Doc. 21, #598–608). Yet that was two years ago. So the Court will repeat those common allegations that appear in both the Amended Complaint and the Third Amended Complaint, before turning to note the differences. [1]

Health Carousel is a recruiting and staffing company headquartered in Hamilton County, Ohio, that enlists foreign nurses, primarily from the Philippines, to work in healthcare facilities across the United States. The healthcare facilities that employ the nurses pay Health Carousel an amount in excess of the nurse's hourly wages. Health Carousel then pays the nurses the wages to which they are entitled, keeping the difference for itself. As the description suggests, the amount of return that Health Carousel generates for a given nurse depends on how many hours that nurse works through the auspices of the Health Carousel program.

The nurses receive several benefits from Health Carousel in exchange for their participation in the arrangement. Beyond the obvious benefit of placing the nurses in a job, Health Carousel also sponsors the nurses' permanent U.S. resident visa petitions; pays related expenses, including examination, filing, and attorney's fees; pays airfare to the United States; provides free temporary housing in the United States; pays cash bonuses when participating nurses arrive in the United States; and provides medical benefits and life insurance.

Those benefits last, however, only while the nurse is employed through Health Carousel. So, for example, if a nurse is residing in Health Carousel-supplied housing, that nurse must leave such housing within 48-hours after her last shift as a Health Carousel employee. Health Carousel calls its business model the "Passport USA" program.

Each nurse executes two agreements as part of this business arrangement. The first is a form contract, the "Employment Contract," which each foreign nurse signs to initiate her employment relationship with Health Carousel. As this agreement is executed before Health Carousel begins the visa process, nurses will almost always sign this contract while still abroad.

As relevant to this case, the Employment Contract includes four provisions that set forth a participating nurse's obligations. First, the contract contains a "Commitment Period" provision. This term requires the participating nurse to work "for a period of time commencing upon the completion of [the nurse's] orientation ... and becoming fully licensed and ending upon the later of (i) 36 months or (ii) 6,240 regular-time work hours." In other words, the period starts upon the later of orientation or licensure, and then continues for at least three years of 52-week-per-year, forty-hour work weeks (i.e., 3 x 52 x 40 = 6,240). Moreover, any hours of overtime do not count toward the 6,240-hour target. And, if a nurse takes any vacation, of course, that time off likewise will not accrue any hours in regard to the contractually-specified Commitment Period.

Second, each Employment Contract contains an "Exclusivity" provision. Here, a participating nurse acknowledges that Health Carousel will invest "a significant amount of time, effort, and money" into the participating nurse's licensing and visa processing. Based on that, the nurse agrees not to seek sponsorship or accept any employment in the United States from another company, without Health Carousel's written consent, before that nurse has fulfilled his or her obligations under the Employment Contract.

Third and relatedly, each Employment Contract contains a non-compete and non-solicitation clause. This term prohibits a nurse from "seek[ing] employment ... with any other healthcare provider within 50 miles of [the nurse's] Client facilities for one year after [the date the nurse leaves Health Carousel if the nurse violated the terms of the Employment Contract]." A nurse who left Health Carousel before the end of the Commitment Period, for example, would trigger this non-compete obligation.

Fourth and finally, each of Health Carousel's Employment Contracts contains a "Breach Obligation" provision. This clause states that, in the event of a given nurse's breach, "[the nurse] agree[s] that damages sustained by Health Carousel ... are impossible, or at least very difficult, to estimate accurately and, for that reason, [the nurse] agree[s] that the [liquidated damages] amount is a reasonable forecast of fair compensation for any such breach." The Employment Contract does not specify a dollar figure for the liquidated damages, but rather sets forth a list of expenses and potential lost profit items that both parties agree will be used to determine the liquidated damages amount in a given case. And rather than provide a precise

computation, the term merely states, if the nurse breaches the Employment Contract, the nurse "shall pay the liquidated damages to be agreed upon and shall be settled amicably by the parties without prejudice of filing the case in the proper court."

**\*3**  But the Employment Contract at issue here also includes an Addendum that further amends the Breach Obligation provision. Through the Addendum, the parties agree to a range of specifically identified liquidated damages figures. The applicable figure in each case depends on when the breach occurs in relation to the progress on the nurse's visa application. More specifically, the liquidated damages are set at: $1,000 if the breach occurs before Health Carousel filed for the visa; $10,000 if the breach occurs after filing but before issuance of the visa; and finally, $20,000 if the breach occurs after the issuance of the visa but before the end of the ("Commitment Period."). The Complaint further alleges that Health Carousel amended the Addendum over time to increase the liquidated damages figures for nurses who were recruited later—for example, raising the top amount from $20,000 to $35,000. Upon arrival in the United States, a nurse receives and signs various agreements that, together, form a 183-page "Employee Handbook." (Employee Handbook). The Handbook mostly consists of Health Carousel's workplace policies and employee benefits information. Some of these policies simply notify Health Carousel employees of standard safety practices, like how to react in the case of a fire or how to safely transport a patient. Other policies provide rules that govern the nurse's workplace behaviors. For example, the Handbook prevents nurses from discussing the terms and conditions of their employment and prohibits "gossip" at work. Still other policies further describe the relationship between Health Carousel and the nurses. The Handbook, for instance, explains that "[a]s long as [a nurse] remain[s] in good standing with Health Carousel, we will continue to be [that nurse's] advocate for immigration purposes."

The Handbook also revises some provisions in a nurse's earlier Employment Contract. Two of those revisions are relevant to Health Carousel's Motion. First, while the Employment Contract provides that a nurse's "Commitment Period" does not begin until the nurse obtains full licensure, the Handbook explains that "[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility." Second, the Handbook tweaks the Breach Obligation provision from the Employment Contract. The Handbook does not alter the liquidated damages figures, but it does use different language when describing other consequences that flow from a breach. Specifically, while the Employment Contract provides that the liquidated damages shall be "settled amicably," the Handbook drops that language and states only that any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment. Further, the Handbook indicates that Health Carousel will file suit and seek damages from any nurse who breaches the Employment Contract and fails to pay liquidated damages. The Handbook then warns nurses that if they "leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad."


A. Health Carousel Employs Carmen.

Carmen is a citizen of the Republic of the Philippines. She worked there as an emergency-room nurse from approximately 2014 to 2018. "Lured" by the opportunity to come to the United States, in late-2014, Carmen contacted Health Carousel about its Passport USA programs. A few months later, on April 6, 2015, Carmen and Health Carousel executed an Employment Contract. Under the terms of that Contract, Carmen joined Health Carousel's Global Express Program.

In her Employment Contract, Carmen agreed to the (1) non-compete agreement; (2) Breach Obligation provision; and (3) Commitment Period. The Addendum in her agreement specified that Carmen would owe $20,000 in liquidated damages if "[e]arly termination occurs after the issuance of [her] visa but prior to completing [her] Commitment Period."

After Carmen executed her Employment Contract, nearly three years passed before she received the visa that she needed to enter the United States. Carmen arrived in this country on January 17, 2018. The day after her arrival, Health Carousel presented Carmen with the Handbook, and required her to sign it at the time that she received it. Carmen alleges that many of the terms in the Handbook "surprised" her, including, for example, the Handbook's threat to litigate if Carmen breached the agreement. In any event, Carmen signed the Handbook and began working at The University of Pittsburgh Medical Center ("UPMC") in Muncy, Pennsylvania, less than a month later, i.e., the second week of February 2018. Carmen officially became a Health Carousel employee on her first day of work with UPMC Muncy.

**\*4**  When Carmen began at UPMC, she had not yet obtained her permanent nursing license from Pennsylvania, but instead was working under a temporary license. ... Given that the Commitment Period provision in her Employment Contract only began to run when Carmen was fully licensed, Carmen's work before August 2018 did not count against her Commitment Period, although it did benefit Health Carousel.

B. Carmen Leaves Health Carousel.

Not long after Carmen began working for Health Carousel, she learned that her colleagues who were working directly for UPMC (i.e., not through Health Carousel) were earning more than her. Her salary, among other factors, led Carmen to conclude that she wished to terminate her employment with Health Carousel.

Carmen claims that the terms in Health Carousel's contracts, however, forced her to continue working. Her first, and apparently most pressing, concern was that Health Carousel would sue her for $20,000 in liquidated damages under the Breach Obligation provision of her Employment Contract if she left her position before the expiration of the Commitment Period. Second, Carmen alleges that she felt forced to continue working for Health Carousel because the non-compete in her Employment Contract limited her employment options.

Finally, Carmen claims that she hesitated to terminate her employment because the Handbook "implies" that any nurse who leaves before the end of the Commitment Period will suffer adverse immigration consequences. The relevant section of the Handbook states "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes." Carmen reasons that the opposite is also true: that if she leaves early, Health Carousel will try to send her back to the Philippines.

Despite her claimed fears, Carmen terminated her employment with Health Carousel in November 2019. At the time she quit, Carmen had worked for Heath Carousel for 22 months—i.e., since February 2018. As Carmen did not gain her full license until August 2018, only about sixteen of those months counted toward Carmen's three-year Commitment Period. When Carmen left, she borrowed $20,000 from her boyfriend to pay Health Carousel the liquidated damages for her early termination due under both the Employment Contract and the Handbook. Carmen alleges that she has experienced hardship, stress, anxiety, guilt, and depression as a result of having to borrow this money from her boyfriend. At some point after paying Health Carousel, Carmen moved to Hershey, Pennsylvania, where she found a nursing job that pays more than her old position at Health Carousel.

(Doc. 21, #598–608 (citations omitted)).

Carmen includes the same principal allegations in her Third Amended Complaint, but with a few key differences. First, Carmen once alleged that Health Carousel "slow-rolled" or otherwise interfered with her obtaining her license so it could extract more labor from her. (*Id.* at #605–06). Carmen has now dropped that allegation. (*Compare* Am. Compl., Doc. 11, #139–40, *with* Doc. 43). Second, Carmen now alleges that Health Carousel falsely reported in visa applications to the United States Citizenship and Immigration Services (USCIS) that Health Carousel would pay workers the prevailing wage after arrival. (Doc. 43, #1016–17). Third, Carmen alleges that in those same applications Health Carousel falsely reported that Plaintiffs had "full-time, permanent employment" awaiting them, despite knowing their work depended on matching immigrants with companies. (*Id.*). Fourth, Carmen provided additional facts relating to her claim that Health Carousel paid her beneath the prevailing wage—alleging Health Carousel paid her just $25.50 per hour, while her domestic-born coworkers received "almost $29 per hour." (*Id.* at #1007).

**\*5**  The Third Amended Complaint also added two additional named Plaintiffs—Amistoso and Flores. (*Id.* at #985). Similar to Carmen, both immigrated to the United States through Health Carousel's program, and both believe Health Carousel illegally exploited them. (*Id.* at #988, 991–1020). In addition, both signed initial contracts in the Philippines, and Health Carousel subjected both to a Commitment Period and a liquidated damages penalty if they did not complete their obligations. (*Id.*). And both claim Health Carousel isolated them, demanding they not discuss their contract with others. (*Id.* at #1004–05).

Beyond these similarities, Amistoso and Flores also had their differences. Amistoso, a native of the Philippines, worked for Health Carousel as a physical therapist in the Denver, Colorado region. (*Id.* at #1003). After arriving in the United States, Health Carousel had her undergo a three-month unpaid orientation, despite allegedly leading her to believe it would last two weeks. (*Id.* at #996). Moreover, despite working during this orientation, Amistoso's labor did not count toward her Commitment Period. (*Id.*). As with Carmen, Health Carousel had Amistoso sign the New Employee Binder upon arrival, which contained new terms absent from the Philippines contract. (*Id.* at #994). Yet unlike Carmen, Health Carousel paid Amistoso not by the hour but by patient visit. (*Id.* at #1009). Her alleged pay disparity is more striking—she claims to have been paid $45.56 per visit, while her domestic-born coworkers earned anywhere from $75 to $105 per visit. (*Id.* at 1008–09). Amistoso also claimed she had more experience than her counterparts, yet Health Carousel paid her less because "she went to school in the Philippines and not in the United States." (*Id.* at #1009).

Health Carousel assigned Amistoso a mandatory 30-visit weekly target, all in-person and spread over a large geographic region. She claims she at times drove over 100 miles per day to administer care but did not receive compensation for her travel. (*Id.* at #1009). Then, when she got home, Amistoso allegedly worked into the night to finish paperwork from the day's visits, also receiving no compensation for this work. (*Id.*). Amistoso also claims she received no respite from her weekly visit goal. (*Id.*). For holidays and personal time, she simply had to make up her missed visits elsewhere.

According to Amistoso, this arrangement contradicted representations Health Carousel had made in the Philippines while recruiting her. (*Id.*). And when she later talked with Health Carousel personnel in this country about her concerns, they allegedly suggested that "if she was not still working for Health Carousel, she could not remain in the United States." (*Id.* at #1007).

Then in January 2020, the facility employing Amistoso downsized, ending her contract. (*Id.* at #1013). Health Carousel allegedly informed Amistoso that she would have to wait, without pay, until Health Carousel could find a new employer, and that her new job would likely require Amistoso to move outside Colorado. (*Id.* at #1013–14). With a new baby, Amistoso balked at moving, but Health Carousel insisted her only other alternative would be coughing up the $20,000 liquidated damages. (*Id.*). And Health Carousel provided Amistoso an accounting of its expected damages to justify the $20,000 demand, which included about $8,000 in "back office administrative support fees." (*Id.*).

Ultimately, Amistoso refused to move and breached her contract. (*Id.* at #1014). But she did not have money to pay the liquidated damages. (*Id.*). Worried, Amistoso contacted Legal Aid, who sent a letter to Health Carousel contesting the liquidated damages provision's legality. (*Id.* at #1014–15). Since then, Health Carousel has allegedly not contacted Amistoso about the damages, and it appears Amistoso has not paid. (*Id.* at #1015).

 **\*6**  Flores, a Registered Nurse, faced her own difficulties. (*Id.* at #992). Unlike Carmen and Amistoso, the Third Amended Complaint does not explicitly allege Flores received or signed the New Employee Binder upon arrival. (*See id.* at #994–95). But it does claim she "was subject to substantially the same rules upon her arrival" and "was also surprised by Health Carousel's policies and practices." (*Id.*). Health Carousel placed Flores with the West Virginia University Health System, and she underwent her unpaid orientation from November 12 through January 6. (*Id.* at #996). Flores claims her orientation period ended January 6, yet Health Carousel "objected and insisted Flores's time be classified as orientation time for an additional six days." (*Id.*).

After orientation, Flores began working long hours, only to realize that her overtime did not count toward her commitment period. (*Id.* at #1010). Flores also worried because Health Carousel had assigned her work she felt untrained to handle. (*Id.* at #1011). When she complained, Health Carousel ignored her. (*Id.*). Flores then discussed breaching her contract with Health Carousel, and staff members allegedly "suggested to [her] that if she terminated her contract without paying the breach fee, she would have immigration-related problems." (*Id.* at #1007).

In September 2021, the facility employing Flores restructured, ending her contract. (*Id.* at #1015). Health Carousel told Flores she would receive daily "ad hoc" assignments with the West Virginia Health Care Systems. (*Id.*). Flores protested, believing she did not have the training to "provide care in the variety of units they attempted to place her." (*Id.*). But Health Carousel persisted.

(*Id.*). Flores became despondent, taking off "three days of accrued personal time off." (*Id.*). After that, Health Carousel ended her contract and demanded $30,000 in liquidated damages immediately. (*Id.*). Flores, not having the money, offered $10,000 as full satisfaction. (*Id.*). Health Carousel accepted the money, but still demanded the additional $20,000. (*Id.*). The $20,000 remains outstanding. (*Id.*).

Collectively, Carmen, Amistoso, and Flores bring ten claims in their Third Amended Complaint. These are: (1) Violations of the Trafficking Victims Protection Act (TVPA) under 18 U.S.C. § 1589(a); (2) Violation of the TVPA under 18 U.S.C. § 1589(b); (3) Violation of the TVPA under 18 U.S.C. § 1590(a); (4) Violation of the TVPA under 18 U.S.C. § 1594(a); (5) Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act under 18 U.S.C. § 1962 predicated on Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351; (6) Violations of the RICO Act predicated on Visa Fraud under 18 U.S.C. § 1546; (7) Violations of the RICO Act predicated on Trafficking under 18 U.S.C. § 1590; (8) Violation of Ohio Corrupt Practices Act (OCPA) under Ohio Rev. Code § 2923.32; (9) Violations as to Carmen of the Fair Labor Standards Act (FLSA) under 29 U.S.C. § 201 *et seq.*; (10) Violation of Ohio's Human Trafficking Law under Ohio Rev. Code § 2905.32. (*Id.* at #1026–37). Carmen had pled five in her Amended Complaint—only the RICO, OCPA, and FLSA claims appear for the first time.

On January 3, 2022, Health Carousel moved under Rule 12(b)(6) to dismiss the Third Amended Complaint. (Doc. 44). Health Carousel also moved to strike class allegations from the Third Amended Complaint, arguing Plaintiffs' allegations were not suited to class treatment. (*See* Doc. 45). Finally, three days later, Health Carousel moved to stay discovery while the Court considered these motions. (Doc. 47). All three are now ripe.

## STANDARD OF REVIEW

Plaintiffs press ten claims, and Health Carousel moves to dismiss all ten for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In resolving that motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted).

**\*7** That is so, however, only as to well-pled factual allegations. The Court need not accept " 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, there must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

The Court has already addressed the sufficiency of five of the ten claims in a previous Opinion denying a motion to dismiss. Although the Third Amended Complaint presents some different allegations, they do not change the outcome as to those claims. As for the new claims, the Court finds Plaintiffs have plausibly alleged each cause of action. Separately, the Court denies Health Carousel's Motion to Strike Class Allegations. And because the Court denies both these Motions, it also denies Health Carousel's Motion to Stay Discovery as moot.

### A. Plaintiffs Again Plausibly Allege Trafficking Victims Protection Act Claims.

Let's start with how we got here. When first examining Carmen's Amended Complaint (before Amistoso and Flores joined the suit), the Court found that she had plausibly alleged her four TVPA counts. (Doc. 21, #621). After finding Carmen's TVPA claims came down to whether she suffered the threat of a "serious harm," the Court set about defining how such harm could be shown. (*Id.* at #611). The Court noted that an employment contract, even if voluntarily entered, can at times result in illegally compelled labor. (*Id.* at #612–13). The Court highlighted that no one clause or term is dispositive but that a court should "consider all the

surrounding circumstances" to determine whether the total effect is coercive. (*Id.* at #615). The Court further recognized that a "bait-and-switch" tactic could create coercive effects, where a party is misled about the terms in a way that compels their labor. (*Id.* at #615–16). Then, the Court summarized:

> In short, it is not the existence or non-existence of an employment contract that controls. Rather, the key questions relate to the substantive terms of the alleged contract (e.g., are they too one-sided?), as well as the parties' conduct in the formation and performance of the agreement. Indeed, in some ways, it is not unlike the contractual unconscionability framework, which also has both a substantive and procedural component.

(*Id.* at #617).

Applying that framework, the Court found Carmen's Amended Complaint had plausibly alleged that she had suffered a risk of serious harm that compelled her labor. And the Court highlighted two bait-and-switch allegations. First, that Health Carousel impeded Carmen's ability to obtain her full license, in turn extending her Commitment Period. (*Id.* at #618). Second, that Health Carousel compelled her to work extensive overtime without counting those hours towards her Commitment Period. (*Id.*). Separately, the Court found that Carmen pled sufficient "allegations of substantive egregiousness" through the liquidated damages "penalty." (*Id.* at #619).

Fast forward to today. Now in the Third Amended Complaint, the Court concludes that Plaintiffs Carmen, Amistoso, and Flores have plausibly alleged their TVPA claims. They provide sufficient allegations that Health Carousel created a threat of "serious harm" to compel their labor. Many of the same allegations from the Amended Complaint remain, including allegations that Health Carousel forced the Plaintiffs to work excessive overtime and that Health Carousel used liquidated damages as a "penalty" to lock Plaintiffs in. (Doc. 43, #995, 998).

**\*8**  True, Carmen no longer alleges Health Carousel stalled her full licensure. Even without Plaintiffs' "stalling" allegation, though, Plaintiffs have still plausibly alleged a threat of serious harm. As the Court held previously, assessing a serious harm requires a holistic analysis. And looking at the surrounding circumstances here, the Court finds it plausible, based on the allegations in the now-operative Complaint, that Health Carousel subjected Plaintiffs to a threat of serious harm though its liquidated damages provision and working conditions.

This case in many ways mirrors *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019). There, the healthcare staffing company defendant contracted to pay the immigrant plaintiffs the prevailing wage upon their arrival. *Id.* at \*2. Yet after arrival, the defendant failed to pay the prevailing wage, and threatened plaintiffs with a $25,000 liquidated damage penalty to ensure they continued to work. *Id.* at \*18. On a motion for summary judgment, the *Paguirigan* court found the $25,000 liquidated damages "provision constitutes a threat of sufficiently serious financial harm." *Id.* Here too, Plaintiffs allege Health Carousel seeks to compel Plaintiffs' labor through the liquidated damages penalty.

In response, Health Carousel asks the Court to apply the Rule of Lenity. (Doc. 44, #1075). Health Carousel argues no prior caselaw gave it notice that its employment contracts violated the TVPA. (*Id.* at #1075–76). And as statutory language must have the same meaning in both criminal and civil contexts, Health Carousel says, the Court must hold that the statute cannot be applied in this "new" context, even civilly. (*Id.* at #1076). The company summarizes, "[i]f there is any doubt whether liquidated damages could cause 'serious harm' under the TVPA, ... the Court should apply the rule of lenity." (*Id.* at #1076).

The Rule of Lenity reflects the notion that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States*

*v. Lanier*, 520 U.S. 259, 266 (1997). Yet the Rule of Lenity is triggered *only* when "after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.' " *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)).

Health Carousel, on the other hand, fashions its own conception of the Rule. In the company's view, the Rule demands that Plaintiffs identify an exact case match that put Health Carousel on notice—almost akin to the "clearly established" principle from qualified immunity. But that is not and never has been the law. The Rule is not triggered simply through a novel application of a criminal statute. After all, every statute has to be invoked for a first time. Rather, the Rule comes into play when a novel application implicates an unacceptable vagueness latent *within the statute itself*. Before invoking the Rule of Lenity, then, Health Carousel must first grapple with the TVPA's text and context. It did not.

Accordingly, the Court finds, again, that Plaintiffs have plausibly alleged sufficient facts to support their four claims under the TVPA. Again, that is not to suggest that Plaintiffs will succeed on those claims. But that is not the question now.

### B. Plaintiffs Again Plausibly Allege An Ohio Human Trafficking Statute Claim.

In its previous Opinion, the Court explained that Ohio's Human Trafficking statute "expressly contemplates that 'fraud,' which leads to 'compelled ... labor,' could establish a claim" and found that standard plausibly met. (Doc. 21, #622–23). But there, the Court focused on Carmen's claim that Health Carousel stalled her licensure. (*Id.*). Now, the Third Amended Complaint has dropped that allegation.

**\*9** Still, the Court finds the Third Amended Complaint plausibly alleges Health Carousel used fraud to compel Plaintiffs' labor, although based on different allegations. Plaintiffs says that Health Carousel, while recruiting them to come to the United States, misled them about working conditions, pay rates, work expectations, hours, and overall length of service. (Doc. 43, #995–96, 1008, 1010–11). For example, Plaintiffs say they did not know Health Carousel would make them work overtime. Yet after arrival, Plaintiffs say they felt compelled to work overtime, for fear of otherwise being assessed the liquidated damages "penalty." (*Id.* at #986). And if Health Carousel in fact made material misrepresentations to Plaintiffs about their contractual obligation to work overtime or other material aspects of their employment, that may suffice to show the company violated Ohio's human trafficking statute.

Health Carousel otherwise only responds with recycled arguments the Court has already considered and rejected in its prior Opinion. Thus, the Court finds Plaintiffs have plausibly stated a claim under the Ohio Human Trafficking statute.

### C. Plaintiffs Plausibly Allege RICO Claims.

Now for Third Amended Complaint's novel claims, starting with Plaintiffs' three RICO claims. A civil RICO plaintiff starts with four core elements they must show as to the defendant: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); 18 U.S.C. § 1962(c). As part of that, a plaintiff must also show "(1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022). Covered predicate acts are listed in 18 U.S.C. § 1961(1), and include the three predicate acts on which Plaintiffs rely here: Fraud in Foreign Labor Contracting (18 U.S.C. § 1351); Visa Fraud (18 U.S.C. § 1546); and Trafficking (18 U.S.C. § 1590). (Doc. 43, #1029–35). "[T]he term 'enterprise' denotes any legal entity, such as a corporation, or 'any union or group of individuals associated in fact although not a legal entity.' " *Grow Michigan*, 50 F.4th at 594 (citing 18 U.S.C. § 1961(4)).

The RICO statute sweeps broadly so courts construe it liberally. *Sedima*, 473 U.S. at 497–98. But its scope is not unlimited. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 568 (6th Cir. 2013). For example, RICO only allows recovery for commercial-based injuries to "business or property." 18 U.S.C. § 1964(c); *see also Jackson*, 731 F.3d at 562. Finally, a

plaintiff must show but-for and proximate cause between the predicate act and their injury. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).

Plaintiffs say that Health Carousel (and its affiliates) carry out a business plan that routinely violates multiple federal criminal statutes. (Doc. 43, #1029–35). Off the bat, it appears to the Court—and no party disputes—that Health Carousel is an enterprise operating in interstate commerce. Instead, the parties mainly contest whether Plaintiffs plausibly allege the following three elements: (1) that Health Carousel committed the requisite predicate acts; (2) that Plaintiffs suffered a RICO injury; and (3) that Health Carousel proximately caused said RICO injury. Ultimately, the Court agrees that Plaintiffs plausibly allege each of these elements.

#### 1. Plaintiffs Plausibly Allege Health Carousel Committed Predicate Acts.

**\*10** Plaintiffs' RICO predicates can be grouped into two categories: fraud-based and trafficking-based. Start with the two fraud-based predicate acts: Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351 and Visa Fraud under 18 U.S.C. § 1546. The two statutes prohibit largely the same conduct, but differ in the person to whom the defendant directs the misrepresentations. Fraud in Foreign Labor Contracting focuses on alleged misrepresentations to the foreign worker:

> (a) Work Inside the United States.--Whoever knowingly and with intent to defraud recruits, solicits, or hires a person outside the United States or causes another person to recruit, solicit, or hire a person outside the United States, or attempts to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment shall be fined under this title or imprisoned for not more than 5 years, or both.

18 U.S.C. § 1351. Visa Fraud, on the other hand, covers, in part, situations where the defendant misrepresents material facts on immigration forms submitted to the government. 18 U.S.C. § 1546.

Plaintiffs have plausibly alleged Health Carousel committed both. Plaintiffs contend that Health Carousel misrepresented its intent to pay Plaintiffs the prevailing wage upon their arrival in this country, and that it made this representation both to the Plaintiffs and to immigration officials. As to the former, Plaintiffs claim Health Carousel told them, before they signed on, to expect to be paid the prevailing wage. (Doc. 43, #1029–30). Indeed, their contracts state: "Health Carousel will pay you an hourly wage rate in accordance with United States Department of Labor prevailing wage guidelines and the premium rate provided by state or federal law for all authorized and properly documented overtime worked for the Client facility(ies)." [2] (Doc. 1-2, #36). And, as to the latter, Plaintiffs say Health Carousel made a similar guarantee in their Form I-140 applications for Plaintiffs' visas to the USCIS. (Doc. 43, #1032–34).

But, according to Plaintiffs, Health Carousel never intended to pay Plaintiffs the prevailing wage upon arrival in the United States, and Plaintiffs' pay in fact fell well below the wages their peers earned. [3] (*Id.* at #1007–10, 1016–17). And while the Court applies the heightened fraud pleading standard of Rule 9(b) to these fraud predicates, *see Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017), Plaintiffs have met that standard here. They present the actual contractual terms containing the alleged misrepresentations. [4] Indeed, Plaintiffs appear to say the contract terms and visa applications themselves contained fraud because Health Carousel had no intention to follow through on them. This specificity puts Health Carousel on notice of its alleged fraud. [5] *See U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (recognizing the "overarching purpose [of Rule 9(b)] is to ensure that a defendant possesses sufficient information to respond to an allegation of fraud").

**\*11** Moving on, Plaintiffs have also plausibly alleged Health Carousel committed Trafficking. That statute criminalizes:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1590. Notably, "in violation of this chapter" includes the TVPA allegations described above. As Health Carousel plausibly violated Plaintiffs' rights under the TVPA, Plaintiffs have adequately pled the predicate act of Trafficking. (Doc. 43, #1035).

### 2. Plaintiffs Plausibly Allege RICO Injuries.

As noted, only injuries to business or property constitute a RICO injury. 18 U.S.C. § 1962(c). Injuries, even monetary injuries, that " 'aris[e] directly out of' a personal injury" fall outside RICO's scope. *Jackson*, 731 F.3d at 565. Rather, "[p]laintiffs must allege a 'proprietary type of damage' to establish a RICO claim." *Id.* at 569. This can include "lost wages," but only if they arise from such a "proprietary" (non-personal injury) harm. *Id.*

Plaintiffs have, at minimum, alleged a RICO injury from Health Carousel denying them their contractual right to a prevailing wage. In the Employment Contracts, Health Carousel bound itself to pay Plaintiffs the prevailing wage. (Doc. 1-2, #36). And Plaintiffs claim their pay fell below that level—violating the Employment Contracts. (*See, e.g.*, Doc. 43, #1007). That plausibly alleges a RICO injury. *See Jackson*, 731 F.3d at 569.

Health Carousel responds in two ways. First, it protests that Plaintiffs cannot claim an injury in an unknown wage differential. (Doc. 44, #1085–86). Health Carousel also says wage differences, like those here, are a common part of life and so cannot be a RICO injury. (*Id.*). Neither argument works. To start, Health Carousel agreed to pay Plaintiffs "in accordance with United States Department of Labor prevailing wage guidelines." (Doc. 1-2, #36). The Department of Labor, in turn, defines "prevailing wage" as "the average wage paid to similarly employed workers in a specific occupation in the area of intended employment." [6] If Health Carousel failed to meet that standard, as alleged, then any damages presumably can be calculated by reference to that definition. True, Plaintiffs may (or may not) need expert testimony to establish exactly what that is, depending on the nature of the proof otherwise available. But the need for expert testimony does not render those damages too speculative for recovery. And Plaintiffs are not "just" underpaid workers. Taking Plaintiffs' allegations and the reasonable inferences that follow from them at face value, Health Carousel violated provisions of its contract with the Plaintiffs—provisions meant to induce them to uproot their lives and travel halfway around the world.

### 3. Plaintiffs Plausibly Allege Health Carousel Caused Their RICO injuries.

Lastly, RICO plaintiffs must show the predicate act was both a but-for and proximate cause of their injuries, with "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.*, 559 U.S. at 9. Stemming from § 1964(c)'s "by reason of" language, proximate cause exists where "the defendant's racketeering offense 'led directly to the plaintiff's injuries.' " *Grow Michigan*, 50 F.4th at 594 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). Merely foreseeing that the injury may occur is not enough. *Id.* Similarly, "derivative or passed-on" indirect injuries cannot meet the proximate cause threshold. *Id.* at 595. Rather, courts generally require the most "immediate victims of an alleged RICO violation" to bring claims where they have an incentive to sue. *Id.* at 596 (quoting *Anza*, 547 U.S. at 460); *Hemi Grp.*, 559 U.S. at 11–12. Such a requirement helps avoid the "risk of duplicative injuries," as well as the danger of extending the RICO statute beyond its appropriate context. *Grow Michigan*, 50 F.4th at 594 (quoting *Anza*, 547 U.S. at 459). Courts generally decline "to go beyond the first step" in determining causation. *Hemi Grp.*, 559 U.S. at 10.

**\*12** Plaintiffs say, among other things, that Health Carousel intentionally refused to compensate them at the prevailing wage. Plaintiffs also allege that Health Carousel furthered its scheme through the multiple predicate acts discussed. To Plaintiffs, Health Carousel defrauded the Plaintiffs by lying about its intention to pay them the prevailing wage, defrauded the USCIS by lying about the same, and transported Plaintiffs into the country to have them work for less than the prevailing wage. (Doc. 43, #986, 1007, 1035). Finally, they contend they "are the best situated to bring suit based on Health Carousel's racketeering" and in the "best position to 'to gather information about [Health Carousel's] conduct.' " (*Id.* (quoting *Alix v. McKinsey & Co.*, 23 F.4th 196, 208 (2d Cir. 2022))).

Plaintiffs have plausibly alleged that Health Carousel's predicate acts proximately caused their RICO injury. First, Health Carousel (again allegedly) committed each predicate act as essential steps furthering its scheme to underpay Plaintiffs and generate profit for itself. Put another way, Health Carousel's Fraud in Foreign Labor Contracting persuaded Plaintiffs to immigrate, its Visa Fraud got them into the country, and its Trafficking delivered them to the site where the alleged exploitation occurred. Plaintiffs are also the most natural RICO plaintiffs to recover on their prevailing wage injury. As parties to the Employment Contract, they are the most "immediate victims," making them best suited to recover for any violation of those contracts. *See Grow Michigan*, 50 F.4th at 595. Finally, Health Carousel has little danger of duplicative judgments. Although Health Carousel potentially could have exposure to criminal liability based on the predicate acts (if they in fact occurred), no other victims besides Plaintiffs and the putative class appear likely to recover financially in RICO. *See id.*

In fact, this case in some ways resembles *Bridge v. Phoenix Bond & Indem. Co.* 553 U.S. 639 (2008). In *Bridge*, the Supreme Court examined a RICO claim where a contractor defrauded a county government by improperly submitting multiple bids for the right to buy tax liens. *Id.* at 642–43. A losing bidder sued the contractor under RICO, predicating its claim on the mail fraud against the county. *Id.* The Court ultimately held the competitor's RICO claim could proceed because first-person reliance is not an element of mail fraud, although it can help to show proximate causation. *Id.* at 648–49. In so doing, the Court recognized the flexible concept of proximate cause did not always require first-person reliance, and that a RICO claim may proceed even where the predicate act was directed toward a governmental third party. *Id.* at 659. Here too, Plaintiffs' Visa Fraud allegation can further their RICO claim even though Health Carousel allegedly defrauded the United States. As *Bridge* recognized, Plaintiffs need not show they personally relied on the Visa Fraud to show proximate cause, so long as the USCIS relied.

Health Carousel resists this outcome, pointing to decisions from the Fourth and Fifth Circuit: *Molina-Aranda v. Black Magic Enters. LLC*, 983 F.3d 779 (5th Cir. 2020), and *Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012). In both, the defendants allegedly lied to immigration officials about immigrant workers' anticipated pay upon arrival in the country. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. Those courts held that fraudulent statements to immigration officials did not proximately cause the eventual harm to the immigrants after arrival. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. The *Molina-Aranda* court, for example, relying heavily on *Walters*, stated that "[p]laintiffs' allegations ... do not support a conclusion that their underpayment injuries were directly caused by the ... alleged fraud in obtaining the H-2B visas. Rather, their complaint shows that the injury was caused by the alleged underpayments which were not required by the alleged fraud." 983 F.3d at 784–85.

**\*13** The Court is not convinced. *Walters* involved a very different set of facts. There, the plaintiffs were local workers at the same facility at which the foreign workers were employed. 684 F.3d at 437–38. They claimed that the employer's failure to pay the foreign workers in accordance with the promises it made in the H-2B paperwork had a carry-over impact of depressing wages for the local workers, as well. *Id.* at 438. That extra step between the fraud (relating to one set or workers) and the pay (for a different set of workers) makes causation more attenuated then here. So *Walters* can be distinguished.

True, the facts of *Molina-Aranda* appear far closer to the facts Plaintiffs allege in this matter. There as here, the *Molina-Aranda* plaintiffs were the immigrant workers themselves. 983 F.3d at 784–85. But in this Court's view, the *Molina-Aranda* court adopted too narrow a reading of RICO's flexible causation standard. After all, RICO penalizes illicit *schemes*, furthered through predicate acts. And as the Supreme Court clarified in *Bridges*, the RICO plaintiff need not be the target of the predicate

act to recover. Thus, visa fraud on immigration officials, committed as part of a scheme to import and underpay immigrant laborers, strikes the Court as causally linked with the injury those laborers suffer when they immigrate and are underpaid.

Beyond that, even taking *Molina-Aranda* and *Walters* at face value, those cases concerned fraudulent statements made *to immigration officials*. Thus, they have little bearing on whether Plaintiffs meet proximate cause as to their RICO claims predicated on Fraud in Foreign Labor Contracting and Trafficking.

### D. Plaintiffs Plausibly Allege An Ohio Corrupt Practices Act Claim.

The Ohio Corrupt Practices Act states:

> No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

Ohio Rev. Code § 2923.32(A)(1). The statute is modeled after the federal RICO statute. *Portnoy v. Nat'l Credit Sys., Inc.*, 837 F. App'x 364, 372 (6th Cir. 2020). Thus, much like in the federal context, "a plaintiff must show the following: (1) the 'conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses;' (2) 'the prohibited criminal conduct of the defendant constitutes a pattern;' and (3) the 'defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise.' " *Id.* (quoting *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E. 2d 696, 708 (Ohio Ct. App. 2009)). Moreover, the predicate crimes must "be related and pose a threat of continued criminal activity." *Morrow*, 915 N.E. 2d at 708. And here as well, a plaintiff must show the defendant's illicit conduct was a but-for and proximate cause of their injury. *Bradley v. Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015).

Drawing on the analysis above, the Court finds that Plaintiffs have plausibly stated a claim under the OCPA. Plaintiffs have alleged Health Carousel operated an enterprise through illegal conduct designed to import and exploit underpaid foreign labor. (Doc. 43, #1035–36). Plaintiffs claim they have been harmed by, among other things, "reduced wages"—beneath what Health Carousel contractually agreed to. (*Id.*). And as discussed above, Health Carousel's alleged predicate acts proximately and directly caused this injury. (*Id.*).

Health Carousel responds that Plaintiffs failed to cite the specific provision of the OCPA they intend to proceed under, and that Plaintiffs have failed to adequately allege Health Carousel engaged in any criminal activity. (Doc. 44, #1094–95). Not so. Plaintiffs' Third Amended Complaint makes clear which provision they proceed under by using the language of the statute: "Defendant's multiple and repeated commissions of various felonies ... form a pattern of corrupt activities through which Defendant conducted or participated in the affairs of the enterprise in violation of OCPA." (Doc. 43, #1035–36). This suffices for notice pleading. And the Court has already determined that Plaintiffs have adequately alleged Health Carousel committed criminal activity to further its enterprise. Therefore, Plaintiffs' OCPA claim has been plausibly alleged and may proceed.

### E. Carmen Plausibly Alleges A Fair Labor Standards Act Claim.

**\*14** Under the FLSA, an employer must compensate an employee with at least the minimum wage. 29 U.S.C. § 206(a). To be considered "paid," wages must be "paid finally and unconditionally or 'free and clear.' " 29 C.F.R. § 531.35. Wages will not be "free and clear" where an employer directly or indirectly deducts "kick-backs" intended for the employer's benefit. *Id.*; *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 531 (6th Cir. 2017); *Parker v. Battle Creek Pizza, Inc.*, 600 F. Supp. 3d 809, 812 (W.D. Mich. 2022) ("[E]mployers cannot shift business expenses to their employees if doing so drops the employees' wages below minimum wage."). And likewise, an employer may not demand illegal kickbacks even after a paycheck is delivered. *See Stein*, 873 F.3d at 531.

Examples of potentially illegal deductions or demands include costs to acquire the tools of trade for the employer's business, safety implements for workers, electricity used for commercial purposes, taxes and insurance on commercial buildings, and employer-required uniforms. 29 C.F.R. § 531.3, 531.32. On the other hand, an employer may lawfully deduct or demand reimbursement of expenses for items that primarily benefit the employee, like employee meals from a company restaurant, employee housing, and some commuter transportation. *See id.* § 531.32. Accordingly, where the employer demands liquidated damages for an employee's breach of an employment contract, courts assess how those damages are calculated to determine whether they constitute permissible or illicit recoveries. *See, e.g.*, *Gordon v. City of Oakland*, 627 F.3d 1092, 1095–96 (9th Cir. 2010) (not counting contractual damages as a kickback because the damages recuperated employee training expenses); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) (same).

The parties disagree about whether the relocation costs from the Philippines to the United States count as expenses incurred for the employer's benefit or for the employee's benefit. Courts disagree too. *Compare Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1248 (11th Cir. 2002), *with Castellanos-Contreras v. Decatur Hotels, LLC*, 601 F.3d 621, 400–01 (5th Cir. 2010). Contributing to the confusion, the U.S. Department of Labor appears to have changed its view on this issue over the past decades in the context of temporary work visa laborers. *Compare* 73 Fed. Reg. at 78041, *with* 75 Fed. Reg. at 6915, *and Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 898–99 (9th Cir. 2013). Of course, Plaintiffs became permanent residents, not temporary workers, so that may matter, as well. In any event, the Court finds that it unnecessary to wade into that debate at this time.

That is because Carmen alleges she worked 51 hours her final week and received $1,300 as a result. Upon terminating her employment, Health Carousel demanded, and Carmen paid, $20,000 in liquidated damages. So the narrow question before the Court (for now) appears to be whether any portion of the $20,000 liquidated damages was intended to recoup expenses incurred for Health Carousel's benefit. (Doc. 44, #1095–96).

Health Carousel says no, claiming its liquidated damages merely recoup expenses it incurred for the immigrant employees' benefit, "including visa fees, attorney's fees, airfare, an 'arrival bonus,' and temporary housing while the professional locates her permanent housing." (Doc. 44, #1053). Yet when demanding liquidated damages from Amistoso, Health Carousel provided a line-item justification for the $20,000 figure—including $8,000 for "back office administrative support fees." (Doc. 43, #1014). And although Amistoso never paid, Carmen did. In effect, Carmen seeks to incorporate this break-down of expenses, suggesting that $8,000 of the $20,000 she paid compensated Health Carousel for its internal operating costs.

**\*15** For pleading, that is enough. Carmen has plausibly alleged that $8,000 of her liquidated damages covered Health Carousel's own operating expenses. And as Carmen only received $1,300 her final week, an $8,000 kickback would reduce her net pay below zero. Of course, she will still need to prove that this same breakdown applies to her. And separately, Health Carousel may eventually show, with additional facts, that the company *properly* demanded "administrative support fees"—i.e., that these fees derived from services for Carmen's benefit, not Health Carousel's. But at least for now, Carmen has nudged this claim into the realm of plausibility.

## F. The Court Denies Health Carousel's Motion to Strike Class Allegations.

As noted, Health Carousel previously moved to strike class allegations. (Doc. 12). The Court denied that Motion in its prior Opinion. (Doc. 21, #624–30). Now, Health Carousel again moves to strike class allegations from the Third Amended Complaint. (Doc. 45).

In making that argument, Health Carousel faces an uphill battle. That is because a court can only strike class allegations where, "from the face of the ... complaint[,] ... it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 575 (M.D. Tenn. 2020) (quoting *Schilling v. Kenton County*, No. 10-cv-143, 2011 WL 293759, at \*4 (E.D. Ky. Jan. 27, 2011)). Without that showing, a court should deny the motion and allow discovery to proceed. *See id.* (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996)).

To begin, Health Carousel has failed to even discuss why Plaintiffs' RICO and OCPA claims and Carmen's FLSA claim should not proceed with class allegations. At most, Health Carousel claims Plaintiffs' RICO claims are "dubious." (*Id.* at #1135). Without an affirmative showing from Health Carousel, the Court declines to hold that it would be impossible for Plaintiffs' RICO, OCPA, and FLSA claims to be certified in a class action.

As to the TVPA claims, Health Carousel argues that common issues will not predominate over individual issues and that a class action is not a superior method of adjudicating the claims. (*See* Doc. 45). Let's start with predominance. Under Federal Rule of Civil Procedure 23(b)(3), before certifying a class, the district court must find that common issues of law or fact "predominate over any questions affecting only individual members." Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins.*, 646 F.3d 347, 352–53 (6th Cir. 2011)).

But "[a] plaintiff class need not prove that each element of a claim can be established by classwide proof." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 858 (citing *Amgen, Inc. v. Connecticut Ret. Plans & Tr. Fund*, 568 U.S. 455, 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

The Court finds it at least possible that common issues will predominate. To start, multiple issues seem to lend themselves to common resolution. For example, the putative class members claim to have entered largely uniform contracts with Health Carousel. (Doc. 43, #990). Plaintiffs allege these contracts created uniform compulsion from the liquidated damages clauses, isolation, and fear of deportation—resulting in a supposedly common fear of "serious harm." (*Id.* at #1026). And Plaintiffs allege the putative class members uniformly experienced forced overtime. (*Id.* at #995). These allegations provide a relevant foundation for a common resolution of the TVPA claims.

**\*16**  True, Health Carousel is correct that some differences exist within the class. Carmen, Amistoso, and Flores each left Health Carousel on different terms, and only Carmen paid liquidated damages. (*Id.* at #1011–16). Each worked different roles in different conditions, with Carmen and Flores at a single site and Amistoso traveling between patients. (*See id.* at #1009). But the Court cannot say at this stage that these differences *necessarily* predominate over any common issues. While discovery may change that, the Court maintains its view that it is at least possible that Plaintiffs will be able to make the necessary predominance showing.

Health Carousel also says a class action is not a superior method of adjudicating the Plaintiffs' claims. (Doc. 45, #1139). There, Health Carousel argues, "[e]ach putative class member has a compelling incentive to pursue individual claims" and "[t]hese allegedly high-value and individualized claims are best left to each individual." (*Id.* at #1139–40).

Health Carousel may be on to something. The superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Amchem*, 521 U.S. at 615). "Use of the class method is warranted particularly because class members are not likely to file individual actions —the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861. Potentially small individual recoveries to class members support the use of class treatment. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007).

But again, the Court cannot say, based solely on the pleadings and as a matter of law, that a class action is not superior to individual actions. For example, as immigrants, the class members are likely unfamiliar with the American legal system. *See, e.g.*, *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2018 WL 4347799, at *10 (E.D.N.Y. Sept. 12, 2018). And Plaintiffs specifically allege Health Carousel currently employs some putative class members and does not permit

them to speak about their contract terms with anyone. (Doc. 43, #986). Some putative class members may interpret that directive as barring them from seeking legal advice or bringing their own action to vindicate their rights.

Accordingly, the Court cannot say it would be "impossible to certify the class as alleged." And finally, as the Court has denied Health Carousel's other requested relief, the Court also denies its Motion to Stay as moot.

## CONCLUSION

The Court is not today saying that Plaintiffs will ultimately prevail on their claims. Nor is the Court saying they won't. And the Court does not pronounce that this case is definitely amenable to class treatment, or that it isn't. Rather, the Court merely finds that Plaintiffs have alleged enough to render their claims plausible and open the doors to discovery, including discovery intending to show whether this case should proceed as a class action. What follows from that is a question for another day.

For the above reasons, the Court **DENIES** Health Carousel's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay Discovery (Doc. 47) **AS MOOT**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5104066

## Footnotes

1    For purposes of Health Carousel's Motion to Dismiss, the Court assumes true all factual allegations stated in the Third Amended Complaint. Therefore, the Court presents these allegations as fact for now, but without prejudice to Health Carousel challenging them in future filings.

2    Plaintiffs attached a contract to their initial Complaint. Health Carousel has never contested the accuracy of the contract. Although Plaintiffs did not re-attach the contract to the Third Amended Complaint, there seems little justification to disregard the contract simply because it was not needlessly re-submitted.

3    Health Carousel argues that Carmen has not alleged "Health Carousel paid her less than the hourly rate promised in her Employment Contract." (Doc. 44, #1059). But the Employment Contract states that Carmen will be paid the prevailing wage, and Plaintiffs do indeed contend that they received below prevailing wage. (Doc. 43, #1007). Of course, the Court for now takes no position on whether Plaintiffs' compensation actually fell below the prevailing wage.

4    To state a fraud claim with particularly under Rule 9(b), "a plaintiff, at a minimum, to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)).

5    Granted, this means Plaintiffs must be able to hold Health Carousel liable for fraudulent representations made within contractual terms. In the common law fraud context, courts are divided as to whether a misrepresentation within a contract can give rise to a fraud cause of action. *Compare NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293,

308–09 (7th Cir. 2018) ("The general rule in New York is that 'a fraud cause of action ... does not arise where the alleged fraud merely relates to a breach of contract.' "), *with Sofka v. Thal*, 662 S.W.2d 502, 507 (Mo. 1983) (en banc) (noting that under Missouri law, a "promise accompanied by a present intent not to perform is ... sufficient to constitute actionable fraud" (emphasis omitted)). Yet Fraud in Foreign Labor Contracting makes no direct reference as to whether the "materially false or fraudulent pretenses, representations, or promises" can be made in the terms of a contract itself. *See* 18 U.S.C. § 1351. But analogizing the common law, the Court concludes that fraud arises if contractual promises are made with "a present intent not to perform." *See Sofka*, 662 S.W.2d at 507.

6    *See Prevailing Wage Information and Resources*, U.S. Dep't of Labor (last visited August 8, 2023), https://www.dol.gov/ agencies/eta/foreign-labor/wages.

---

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4180590

2007 WL 4180590
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Anthony F. COPPOLA, as Trustee of the Anthony F. Coppola Living Trust (A), Plaintiff,

v.

Jed BARON, individually and doing business as Nevada Title
Loans; Nevada Title Loans; E & G Investments, Inc., Defendants.

No. 2:07–CV–00664–BES–RJJ.
|
Nov. 20, 2007.

**Attorneys and Law Firms**

Neil J. Beller, Neil J. Beller, Ltd., Las Vegas, NV, for Plaintiff.

Richard A. Schonfeld, Las Vegas, NV, for Defendants.

Terrence A. Mazura, Santa Ana, CA.

**ORDER**

BRIAN E. SANDOVAL, District Judge.

**\*1**  Presently before this Court is a Motion to Dismiss (# 11) filed on June 25, 2007 by Defendants Jed Baron, Nevada Title Loans and E & G Investments, Inc. ("Defendants"). Plaintiff Anthony F. Coppola, as Trustee of the Anthony F. Coppola Living Trust ("Coppola") filed an Opposition to the Motion to Dismiss (# 16) on July 12, 2007. No Reply was filed.

**I.** *Background*

This dispute arises out of three promissory notes executed by Nevada Title Loans in favor of the Coppola Trust. According to the Complaint (# 1) filed on May 23, 2007, between August 2005 and April of 2006, Nevada Title Loans executed three separate promissory notes in favor of the Coppola Trust. The total amount owed to the Coppola Trust based upon the three notes was the sum of $200,000 plus interest. Coppola alleges that Defendant E & G Investments and Defendant Jed Baron ("Baron") are both guarantors of the notes. Baron signed a separate Guaranty Agreement which was attached to the Complaint. The maturity date of each note has passed. Coppola made a written demand for payment to each of the Defendants, but the Defendants have failed to pay the money due under any of the notes.

Coppola filed the Complaint in the federal district court of Nevada in Clark County. In the Complaint, Coppola seeks money damages for breach of contract for each of the three notes. Each of the notes contains a forum selection clause which states, "Venue of any action brought hereon shall be Clark County, Nevada."

Defendants seek dismissal of the Complaint for lack of venue based upon the forum selection clause. Defendants also seek dismissal of all claims against Baron on the basis that Coppola has failed to state a claim upon which relief can be granted, primarily because the Complaint does not allege that Baron received consideration for guaranteeing the debt.

2007 WL 4180590

## II. *Analysis*

### A. Motion to Dismiss Based Upon Venue

Defendant has requested that Plaintiffs' Complaint be dismissed "pursuant to 28 U.S.C. § 1391(a) for improper venue. Such a motion is recognized by Rule 12(b)(3) as a motion to dismiss for improper venue. On a 12(b)(3) motion, the pleadings need not be accepted as true. *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1137 (9th Cir.2004). In the context of a Rule 12(b)(3) motion based upon a forum selection clause, the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. *Murphy v. Schneider National, Inc.,* 362 F.3d 1133, 1138 (9th Cir.2004).

The Ninth Circuit has held that forum selection clauses should be enforced as written. *See, Mannetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 (9th Cir.1988). Forum selection clauses are prima facie valid and are enforceable absent a strong showing by the party opposing the clause that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching. *Id.* (citation omitted).

 **\*2**  Here, Defendants are not arguing that the forum selection clause is invalid. Instead, Defendants are taking a position that the forum selection clause mandates that an action be filed in the state courts for Clark County. A forum selection clause will be enforced only where venue is specified with mandatory language. *Docksider, Ltd. v. Sea Technology, Ltd.,* 875 F.2d 762, 764 (9th Cir.1989). If the language of the forum selection clause is non-mandatory, the forum selection clause will not preclude suit elsewhere. *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). Hence, the issue before the Court is whether the forum selection clause is mandatory or permissive.

To be a mandatory forum selection clause, the clause must contain language that clearly designates a forum as the exclusive one. *Northern California Dist. Council of Laborers v. Pittsburg–Des Moines Steel Co.,* 69 F.3d 1034, 1037 (9th Cir.1995). The prevailing rule is clear that where venue is specified with mandatory language the clause will be enforced. *Docksider, Ltd.,* 875 F.2d at 763–764. "When only jurisdiction is specified, the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Docksider,* 875 F.2d at 764. A forum selection clause needs to contain mandatory language requiring a case be litigated in only one forum. *Council of Laborers,* 69 F.3d at 1037.

A forum selection clause providing a particular court or state has jurisdiction, but says nothing about it being exclusive jurisdiction, is permissive rather than mandatory. *Hunt Wesson Foods Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). The effect of the language is merely that the parties consent to the jurisdiction of that particular court or state. *Kachal, Inc. v. Menzie,* 738 F.Supp. 371, 373 (D.Nev.1990). Such consent does not preclude the action from being litigated in another court. *Id; Northern California Dist. Council of Laborers,* 69 F.3d at 1036.

The forum selection clause in the parties' promissory notes provides that "Venue of any action brought hereon shall be Clark County, Nevada." This clause specifies that venue will be in Clark County, however, it does not specify whether the forum is the state court or the federal district court, both of which are located in Clark County. The language in the forum selection clause states nothing about the Clark County state courts having exclusive jurisdiction. The effect of the language is merely that the parties consent to the jurisdiction of the Clark County courts.

The language in the forum selection clause here is similar to that found in *Hunt Wesson Foods.* In *Hunt Wesson Foods,* 817 F .2d 75, the clause at issue contained the following language: "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter of the interpretation of this contract." *Id.* at 76. The Ninth Circuit held that the clause was permissive because "in cases in which forum selection clauses have been held to require litigation in a particular court, the language of the clauses clearly required exclusive jurisdiction." *Id.* at 77. Hence, the forum selection clause in this case is permissive rather than mandatory and the action is not precluded from being litigated in the federal district court.

Coppola v. Baron, Not Reported in F.Supp.2d (2007)

2007 WL 4180590

**\*3**  Defendants rely on *Docksider Ltd. v. Sea Technology Ltd.,* 875 F.2d 762 (9th Cir.1989), which had a similar clause as the present one and which held that the matter must be pursued in state court. In *Docksider Ltd.,* the forum selection clause stated, "Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia" and the court held that the action must be held in the county courts for Gloucester County. *Docksider Ltd.,* 875 F.2d at 763–764. However, of importance in that case is the fact that there were no federal courts in Gloucester County. Hence, the court in *Docksider Ltd.* never addressed the issue of whether the state or federal court was the more appropriate venue and instead analyzed the issue in terms of the suit being brought in Virginia as opposed to courts in other states. As such, the *Docksider Ltd.* case is distinguishable from the facts of this case.

The Court has determined that the forum selection clause in this case is permissive. A permissive forum selection clause does not divest this Court of jurisdiction. This Court's subject matter jurisdiction is properly based on diversity of citizenship. Venue is proper in the district of Nevada under 28 U.S.C. § 1391(a).

### B. Motion to Dismiss Baron

Defendant's Motion also challenges jurisdiction over Baron, asserting that the Complaint should be dismissed because it fails to state a claim upon which relief can be granted against Baron because he did not sign the promissory notes in his personal capacity and the Complaint fails to state that Baron received any consideration for signing the Guaranty Agreement.

When considering a motion to dismiss under Rule 12(b)(6), the challenged complaint is construed liberally in favor of the plaintiff, and all factual allegations set forth in the complaint are accepted as true. *McGary v. City of Portland,* 386 F.3d 1259, 1261 (9th Cir.2004). However, a complaint, or portion thereof, will be dismissed for failure to state a claim upon which relief may be granted if Plaintiff cannot establish "any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* ––– U.S. ––––, 127 S.Ct. 1955, 1968–69 (2007). Plaintiff's obligation to provide the "grounds" of her entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. *Id.* at 1964–65. To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Id.* at 1969. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004). In other words, "a complaint must be dismissed if it does not plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* at 1974; *Garvais v. U.S.,* 2007 WL 1724956, \*4 (E.D.Wash.,2007).

 **\*4**  Defendants argue that the Guaranty Agreement violates the statute of frauds because the Guaranty Agreement fails to express that any consideration was given in return for the guaranty by Baron. However, the facts as alleged and presented in the Complaint and the accompanying documents do not support Defendants' position. The Guaranty Agreement specifically states that the guaranty was being given for good consideration.[1] Furthermore, the Guaranty Agreement was signed by Baron and indicates that the Guaranty Agreement was executed by Baron in favor of Coppola. Hence, construing the Complaint liberally in favor of Coppola and accepting all factual allegations set forth in the Complaint as true, Coppola has stated a claim for relief against Baron under the Guaranty Agreement. As such, Baron is not dismissed from this matter.

### II. *Conclusion*

Based on the foregoing, IT IS ORDERED that Defendants' Motion to Dismiss (# 11) is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4180590

**Coppola v. Baron, Not Reported in F.Supp.2d (2007)**

2007 WL 4180590

## Footnotes

1       Defendants argue that the consideration was lined out of the guaranty agreement, making the guaranty agreement
        invalid for failure of consideration. However, the Court finds that this crossed-out language only went to supplemental
        information regarding the guarantors' reasons for entering into the Guaranty Agreement.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

215 P.3d 35

125 Nev. 460

Supreme Court of Nevada.

Thomas DOBRON, Individually, Appellant,

v.

Del BUNCH, Jr., and Ernestine L. Bunch, Respondents.

No. 48730.

|

Sept. 10, 2009.

**Synopsis**

**Background:** After creditor successfully defended against debtors' claims of usury, creditor brought action against guarantor to loans, seeking attorney fees and costs that were incurred during the usury lawsuit. The Eighth Judicial District Court, Clark County, Stewart L. Bell, J., entered judgment in favor of guarantor. The Supreme Court remanded, concluding that attorney fees were potentially recoverable in an independent action based on the guaranty agreement. On remand, the district court found that creditor was entitled to attorney fees as damages under the guaranty agreement because defending the usury action directly affected its ability to collect the full amount of the loans, and that sufficient proof had been presented to support the amount of attorney fees awarded. Guarantor appealed.

The Supreme Court, Hardesty, C.J., held that guarantor was not liable under guaranty agreement for attorney fees incurred by creditor in defending against usury action brought by debtors.

Reversed.

Pickering, J., issued concurring opinion in which Cherry, J., agreed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*36** Wingert Grebing Brubaker & Goodwin LLP and Stephen C. Grebing, Henderson; John S. Addams, San Diego, CA, for Appellant.

Ellsworth, Moody & Bennion and Charles W. Bennion, Las Vegas, for Respondents.

Before the Court En Banc.

*OPINION*

By the Court HARDESTY, C.J.

**\*461** This appeal raises the issue of whether a guarantor to a loan may be held liable for attorney fees incurred by the lender in defending **\*462** a usury action brought by the borrowers. We have previously held that a guarantor's obligation to a lender under a guaranty agreement should be strictly construed and will not require a guarantor to be responsible for obligations beyond those specified in the guaranty agreement. But we have also recognized a distinction between a surety who is compensated and one who is not and eliminated the strict construction rule in favor of the surety when the surety is compensated. While our

prior precedent is unclear as to the application of this distinction to guaranty agreements, we nevertheless conclude that such a distinction is no longer necessary. Consequently, when interpreting a guaranty agreement, whether a guarantor is compensated is not relevant, and rather than apply a strict rule of construction, we will apply general contract construction rules.

In this case, the guaranty agreements stated that an obligation to pay attorney fees exists only in "collecting or compromising any such indebtedness" or in the enforcement of the guaranty agreement against the guarantor. Under general contract rules, specifically the rule that an attorney fees provision will not be interpreted more broadly than written, we conclude that the guarantor was not liable for attorney fees incurred by the lender in defending a usury action that did not include any affirmative effort on the part of the lender to collect any of the underlying loans. Accordingly, we reverse the district court's judgment awarding attorney fees to respondents.

*FACTS*

Appellant Thomas Dobron owned a number of companies that borrowed money from respondents Del Bunch, Jr., and Ernestine L. Bunch and their company. The transactions were incorporated into five different loan agreements. In connection with these loans, Dobron signed guaranty agreements with the Bunches, in which he promised to repay the loans if the companies failed to do so. All of the guaranty agreements contained identical language, except for the identification of which loan was guaranteed.

Shortly after entering into the loans, the Dobron companies filed a usury action against the Bunches in California, claiming that the interest rate on the loans was usurious and therefore illegal. Dobron, personally, was not a party to that action. Under California's usury law, if a loan's interest rate is usurious, the borrower can recover three times the amount of interest paid in damages. The Bunches successfully removed the case to federal court and then transferred it to Nevada. The Nevada federal district court held that Nevada law applied to the loans, and as Nevada does not have a usury law, ruled in favor of the Bunches. The Ninth Circuit Court of Appeals affirmed. In the Ninth Circuit, the Bunches requested **37** that the case be remanded to the Nevada federal district court for a determination of attorney fees and costs. This request was granted, however, the *463* Bunches never sought the attorney fees or costs in the federal district court.

Approximately one year later, the Bunches filed suit in the Nevada state district court against Dobron personally, seeking attorney fees and costs that were incurred during the usury lawsuit. The Bunches based their claim on section 8 of the guaranty agreement, which states in relevant part that the "Guarantor [Dobron] shall also pay Lender's [the Bunches'] reasonable attorneys' fees and all costs and other expenses which Lender expends or incurs in collecting or compromising any such indebtedness or in enforcing this Guarantee against Guarantor." Following a short bench trial, the district court found in favor of the Bunches, and Dobron appealed.

After concluding that attorney fees were potentially recoverable in an independent action based on the guaranty agreement, this court remanded the case to the district court and directed the court to make specific findings as to whether the guaranty agreement provided for attorney fees for the Bunches' defense of the usury action and whether the amount of attorney fees was properly proved as damages based on the guaranty agreement. On remand, the district court found that the Bunches were entitled to attorney fees as damages under the guaranty agreement because defending the usury action directly affected their ability to collect the full amount of the loans, and that sufficient proof had been presented to support the amount of attorney fees awarded. The present appeal ensued.

*DISCUSSION*

*Determining the appropriate standard of review*

We review the interpretation of a contract de novo. *May v. Anderson,* 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). Previously, this court has held that the obligation of a guarantor will be strictly construed, *Adelson v. Wilson & Co.,* 81 Nev. 15, 21, 398

P.2d 106, 109 (1965), and we will not require the guarantor to be responsible for anything beyond what it clearly agreed to pay. *Homewood Inv. Co. v. Wilt,* 97 Nev. 378, 381, 632 P.2d 1140, 1143 (1981). This court has also held, however, in the context of interpreting a surety agreement, that the strict construction rule in favor of the surety does not apply when there is a compensated surety. *Zuni Constr. Co. v. Great Am. Ins. Co.,* 86 Nev. 364, 367, 468 P.2d 980, 982 (1970). While it is unclear how our prior precedent has applied this compensated/uncompensated distinction to guaranty contracts, we conclude that there is no sound reason to continue to use such distinctions, and thus, we reject any further use of different treatment based on whether the guarantor is compensated. In connection with removing the distinction of whether a guarantor is compensated, we **\*464** eliminate the construction rule that a guaranty agreement be strictly construed in any party's favor. Instead, general contract interpretation principles apply to interpret guaranty agreements.

This conforms with the modern trend stated in Restatement (Third) of Suretyship and Guaranty, section 14, comment c (1996). *See also WXI/Z Southwest Malls v. Mueller,* 137 N.M. 343, 110 P.3d 1080, 1083 (Ct.App.2005). The elimination of determining whether a party is compensated and the special interpretation rule provides a clearer, less mechanical approach to the interpretation of guaranty agreements and, as recognized by the Restatement, the policy behind the strict interpretation rule to protect an accommodating guarantor who is not in the guaranty business and derives no compensation from entering into the guaranty agreement is still covered by other general contract interpretation rules and substantive law protections.

Following this new approach in the present case, the applicable general contract interpretation rule concerns the interpretation of attorney fees provisions. This court has held that "[w]here a contract provision purports to allow attorney's fees in an action arising out of the terms of the instrument, we will not construe the provision to have broader application." **\*38** *Campbell v. Nocilla,* 101 Nev. 9, 12, 692 P.2d 491, 493 (1985). Such a rule has been applied on more than one occasion to determine that an attorney fees provision in a guaranty agreement that relates to collecting on the underlying note or loan, but that does not expressly state that it applies to enforcement of the guaranty agreement itself, results in no recovery for attorney fees by a lender when bringing suit against the guarantor to enforce the guaranty agreement. *See Servaites v. Lowden,* 99 Nev. 240, 246, 660 P.2d 1008, 1012 (1983); *Securities Investment Co. v. Donnelley,* 89 Nev. 341, 349, 513 P.2d 1238, 1243 (1973).

*The guaranty agreement's attorney fees and costs provision*

The main issue raised in this appeal concerns whether the guaranty agreement provides for the recovery of attorney fees and costs incurred in defending the usury action. The attorney fees provision in the guaranty agreement provides two bases for recovery of attorney fees from the guarantor—the lender's attempts to "collect or compromise" the loan and the enforcement of the guarantee agreement:

> Guarantor [Dobron] shall also pay Lender's [the Bunches'] reasonable attorneys' fees and all costs and other expenses which Lender expends or incurs in collecting or compromising any such indebtedness or in enforcing this Guarantee against Guarantor, whether or not suit is filed, including, without limitation, all such fees, costs and expenses incurred in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving Guarantor which in any way **\*465** affect the exercise by Lender of its rights and remedies hereunder.

The attorney fees at issue here were incurred in the defense of the usury action and did not involve an action to enforce the guaranty agreement, especially in light of the fact that Dobron, the guarantor, was not even a party to the usury action. Thus, the only issue before us for resolution is whether the defense of the usury action falls under the "collecting or compromising" language of the guaranty agreement as a basis for the recovery of attorney fees and costs. We conclude that it does not.

Dobron argues that defending the usury action does not fit within the meaning of "collecting or compromising" on the loan, and therefore, he cannot be held liable for the attorney fees and costs incurred. He points to the fact that the Bunches instituted

separate actions to collect on the debts to support his assertion that the defense in the usury action was not a collection or compromise.

The Bunches contend that their defense in the usury action meets the requirement of "collecting or compromising" the loan because if they had not defended the suit they would have lost the ability to collect a large amount of the loans. The Bunches note that California's usury laws allow for treble damages, and in the usury case, the Dobron companies sought recovery of damages in excess of $2,700,000, while the loans were for $5,708,000. Thus, according to the Bunches, if they failed to defend the action, their ability to collect the loans would have been reduced substantially.

The district court held that the defense in the usury action fell under the guaranty agreement because the Bunches had to defend it in order to be able to collect the full amount of the loans given to the companies. Therefore, the court determined that the defense was sufficient to meet the requirement that the fees be incurred in "collecting" the loans.

 As stated above, we apply general contract interpretation rules to determine whether the clause at issue provides for the recovery of attorney fees. The applicable contract interpretation rule in this case is that "[w]here a contract provision purports to allow attorney's fees in an action arising out of the terms of the instrument, we will not construe the provision to have broader application." *Campbell v. Nocilla,* 101 Nev. 9, 12, 692 P.2d 491, 493 (1985). Applying this rule to the present case, we conclude that the Bunches' defense of the usury action did not fall within the attorney fees provision of the guaranty agreement because it was not an action to collect or compromise the loan. There was no affirmative effort on the part of the Bunches to recover the debt from  **39**  either the borrowers or the guarantor Dobron in the usury action. In fact, the Bunches elected instead  **466**  to file separate actions to collect the debts, in which they were entitled to recover attorney fees pursuant to the guaranty agreement. The language of the guarantee agreement does not provide, however, for the recovery of attorney fees for defending the usury claim that did not also involve an attempt to collect under the loans.

*Additional authority supports the conclusion that the guaranty agreement's attorney fees provision does not allow for the recovery of attorney fees when there is no affirmative attempt to collect or compromise the loans*
Our conclusion is supported by this court's holding in *Campbell v. Nocilla,* 101 Nev. 9, 692 P.2d 491 (1985). In *Campbell,* the owners of real property brought a declaratory relief action against their real estate agent, seeking indemnification for damages from breach of contract claims brought by potential buyers of the property. *Id.* at 10, 692 P.2d at 492. Judgment was entered in favor of the real estate agent, along with attorney fees pursuant to the real estate listing agreement, which stated that the real estate agent was entitled to fees if suit was brought to enforce the contract. *Id.* at 10–12, 692 P.2d at 492–93. This court reversed the attorney fees award and determined that the property owner's declaratory relief action did not involve enforcement of the contract, and therefore, the real estate agent was not entitled to attorney fees for defending the indemnification claim. *Id.* at 12, 692 P.2d at 493. The present case is comparable to the *Campbell* case, in that the usury action, similar to the declaratory relief action in *Campbell,* was not brought specifically to collect or enforce the underlying debts, and as a result, attorney fees are not recoverable because the action does not fall under the specific provision in the contract allowing for recovery of fees.

Court decisions in other jurisdictions, which narrowly construe attorney fees obligations pursuant to guaranty agreements, are also consistent with our holding today. *See First Nat. Park Bank v. Johnson,* 553 F.2d 599, 602–03 (9th Cir.1977) (holding that an attorney fees provision allowing for recovery of attorney fees for enforcing a note did not provide for recovery of attorney fees in an action against the guarantor to enforce the guaranty agreement); *In re LCO Enterprises, Inc.,* 180 B.R. 567, 570–71 (B.A.P. 9th Cir.1995) (holding that attorney fees incurred by the lessor in defending a bankruptcy preference action by the lessee's bankruptcy trustee to recover money paid to the lessor were not recoverable under an attorney fees provision in a lease agreement because it was not an action to enforce the lease contract); *In re Wetzler,* 192 B.R. 109, 119–20 (Bankr.D.Md.1996) (holding that one of several guarantors on a guaranty agreement who incurred attorney fees to settle a claim by the lender against the guarantors could not recover a portion of those attorney fees from another guarantor because the guaranty agreement  **467**  only provided for attorney fees for enforcing payment of the underlying note or performance of the guaranty, and the settlement agreement was not an action by the guarantor to enforce the note or the guaranty agreement). Particularly supportive of our conclusion is *Zimmerman v. First Production Credit Ass'n,* 89 Ill.App.3d 1074, 45 Ill.Dec. 83, 412 N.E.2d 216 (1980).

In *Zimmerman,* the obligor on a note brought a declaratory relief action seeking a court order that the note was unenforceable. The note contained an attorney fees provision that required the obligor on the note to pay attorney fees if the note was given to an attorney or a lawsuit was instigated to collect on the note. *Id.,* 45 Ill.Dec. 83, 412 N.E.2d at 217. In resolving the appeal, the Illinois court addressed whether the obligor had to pay attorney fees to the payee on the note for the payee's defense of the declaratory relief action seeking to have the note invalidated. *Id.* The court concluded that, because the suit was not an attempt to collect on the note, attorney fees were not available pursuant to the attorney fees clause. *Id.* The defense of the declaratory relief action to invalidate the note directly affected the payee's ability to collect on the note. The court concluded, however, that because there was no affirmative effort to collect on the note, attorney fees were unavailable according to the language of the attorney fees clause. *Id.*

 **40  Likewise, in the present case, while the defense of the usury action may have had a potential impact on the lenders' ability to collect the debts, the absence of an affirmative action to recover the loans precludes recovery of attorney fees under section 8 of the guaranty agreement. While the *Zimmerman* court also relied on the contract construction rule that a contract will be construed against the drafter, which does not apply in the present case because the parties have not provided evidence or argument regarding which party drafted the guaranty agreement, the reasoning of the *Zimmerman* court regarding the interpretation of the attorney fees clause requiring an attempt to collect on the note to recover attorney fees is still persuasive and supports our conclusion in the present case.

*Dobron would not have necessarily benefited from the usury action*

In concluding that the guaranty agreement does not provide for the recovery of attorney fees in this case, we reject the Bunches' assertion that Dobron would have necessarily benefited from a successful usury action. Dobron did not initiate the action and was not a party to the usury suit. In addition, as guarantor, Dobron's obligation on the loans was contingent in the context of the usury action because he was not required to make any payments on the loans unless and until the borrower defaulted. As the usury action was instituted by the borrowers and neither the borrowers nor the Bunches sought to bring Dobron into the action under an argument that he was currently responsible for payment of the notes, the usury action  **468  did not directly benefit Dobron.[1]  Thus, there is no support for the argument that Dobron would necessarily have benefited from the usury action and therefore should be liable for the attorney fees.

*CONCLUSION*

Based on the language of the guaranty agreement, we conclude that Dobron was not liable for the Bunches' attorney fees in defending the usury action brought by the borrowers of the loans. The defense of the usury action did not constitute a recovery action by the Bunches. Therefore, since there was no affirmative attempt to collect or compromise the loans, the attorney fees provision in the guaranty agreement does not allow for the recovery of attorney fees. Accordingly, we reverse the judgment of the district court.

We concur: PARRAGUIRRE, DOUGLAS, SAITTA, and GIBBONS, JJ.

PICKERING, J., with whom CHERRY, J., agrees, concurring:

I join the majority based on the particular attorney fees clause involved. The guaranty provided for the Bunches, as "Lender," to recover fees the "Lender expends or incurs in collecting or compromising [the] indebtedness...."[1]  Fees spent to defend the borrower's usury suit, which apparently did not involve any affirmative claims by the Bunches against the borrower, were not incurred by the Bunches "in collecting or compromising [the] indebtedness." Unlike California, Cal. Civ.Code § 1717, Nevada permits one-sided attorney fees clauses, *see Trustees, Carpenters v. Better Building Co.,* 101 Nev. 742, 746–47, 710 P.2d 1379, 1382 (1985), but the one-sided clause in favor of the lender in this case ended up being too restrictive to cover fees incurred defensively.

**\*\*41** I write separately to emphasize that the outcome depends on the fee clause involved. If the clause here had been worded more broadly, fees incurred defensively might well have been recoverable, even though incurred in a separate suit. *See Exchange Nat. Bank of Chicago v. Daniels,* 763 F.2d 286, 294 (7th Cir.1985) (upholding award of fees incurred to defend separate suits and counterclaims because **\*469** the fee clause "authorize[d] fees for all work in both the 'collection' and the 'enforcement' of the note"); *Thunderbird Investment Corporation v. Rothschild,* 19 Cal.App.3d 820, 97 Cal.Rptr. 112, 118 (1971) (upholding award of fees incurred to defend a note's interest provisions against a usury challenge where the fee clause provided for fees "[i]f action be instituted on this note"); *see also Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 524–25 (2d Cir. 1990) (discussing differences among various fee clauses and their application to fees incurred defensively).

While I join the majority's sound opinion, including its recognition of the rule stated in the Restatement (Third) of Suretyship and Guaranty section 14 (1996), I except from my joinder its suggestion that we are adopting a special rule that requires us to "narrowly construe attorney fees obligations pursuant to guaranty agreements." *Ante* at 39, citing *First Nat. Park Bank v. Johnson,* 553 F.2d 599, 602–03 (9th Cir.1977); *In re LCO Enterprises, Inc.,* 180 B.R. 567, 570–71 (B.A.P. 9th Cir.1995); *In re Wetzler,* 192 B.R. 109, 119–20 (Bankr.D.Md.1996). It is not clear to me that the cases cited establish this proposition,[2] or that we need a special rule of construction to decide this appeal. But more importantly, by statute, Nevada allows agreements that require one party to pay the other party's attorney fees, NRS 18.010(4), with particular reference to commercial agreements involving "money due or to become due on any contract." *See* NRS 99.050 (providing that "parties may agree for the payment of any rate of interest on money due or to become due on any contract, for the compounding of interest if they choose, *and for any other charges or fees* ") (emphasis added). Perhaps because agreements allowing one side to recover its fees from the other depart from the normal "American Rule," the court has historically examined the language the parties used to establish their right to fees to be sure there was, in fact, an agreement to pay fees that applies. *Cf. First Commercial Title v. Holmes,* 92 Nev. 363, 550 P.2d 1271 (1976), *cited in Campbell v. Nocilla,* 101 Nev. 9, 12, 692 P.2d 491, 493 (1985). But I do not see this as a special rule of construction, and if it is, our cases have applied it to all fee-shifting agreements, not just those in guaranties.

I concur: CHERRY, J.

**All Citations**

125 Nev. 460, 215 P.3d 35

## Footnotes

1   In fact, it is possible that the usury action negatively affected Dobron, as he potentially could have raised a usury defense himself in a future collection action against him under the guaranty agreement. He would be precluded from raising such a defense based on the borrowers' usury action under issue preclusion principles. We need not address this issue, however, as the parties did not argue this point and it is unnecessary for resolution of this appeal.

1   The language at the end of the fee clause saying it applies to a range of reorganization or insolvency proceedings doesn't help. It is self-limiting, applying to fees incurred in "proceedings involving Guarantor which in any way affect the exercise by Lender of its rights and remedies hereunder." The guarantor is Dobron, who was not a party to the usury suit, and the reference to the lender's "rights and remedies hereunder" applies to the guaranty, not the note. The fees at issue here were incurred to defend the Bunches' rights against the borrower under the note, not rights against Dobron under the guaranty.

2    *First National Park Bank* involved a guaranty fee clause that only applied to suits to collect the note, not to suits arising under the guaranty, 553 F.2d at 602–03, which differs from the clause here, which specified that it applied to both. *LCO* involved a fee clause in a lease, not a guaranty. 180 B.R. at 568–69. And *Wetzler* involved a dispute between co-guarantors asserting indemnity claims against each other for fees one co-guarantor incurred dealing with litigation by the lender, which the court found were not covered by the fee clause in the guaranty, which only apply to litigation involving "payment of any amount due under the Note or performance of the Guaranty." 192 B.R. at 119.

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 539192
Only the Westlaw citation is currently available.
United States District Court, D. Montana,
Missoula Division.

Jee Irene ESTAVILLA, individually, and on behalf of all similarly situated individuals, Plaintiffs,

v.

The GOODMAN GROUP, LLC; Community Nursing Inc., d/b/a The Village Health &
Rehabilitation f/k/a The Village Health Care Center and John Does 1-10, Defendants.

CV 21-68-M-KLD
|
Signed 02/23/2022

**Attorneys and Law Firms**

Robert Farris-Olsen, Scott L. Peterson, Morrison, Sherwood, Wilson & Deola, PLLP, Helena, MT, for Plaintiffs.

Christopher K. Oliveira, Kenneth K. Lay, Crowley Fleck PLLP, Helena, MT, for Defendants The Goodman Group, LLC,
Community Nursing, Inc.

ORDER

Kathleen L. DeSoto, United States Magistrate Judge

**\*1** This matter comes before the Court on Defendants The Goodman Group, LLC ("Goodman") and Community Nursing Inc.,
d/b/a The Village Health & Rehabilitation f/k/a The Village Health Care Center's ("Village Health") (collectively "Defendants")
motion to dismiss Plaintiff Jee Irene Estavilla's ("Estavilla") Complaint for failure to state a claim upon which relief can be
granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' motion is granted for the reasons discussed below.

# I. **Background** [1]

Village Health is a skilled nursing facility located in Missoula, Montana and is a subsidiary of Goodman, which manages The
Village and several other senior communities across the United States. (Doc. 5, at ¶¶ 2-3). Estavilla, a citizen of the Republic
of the Philippines, is a registered nurse and former employee of Village Health. (Doc. 5, at ¶ 1).

On August 19, 2015, Village Health sent a conditional offer of employment to Estavilla, who was residing at the time in Cebut
City, Philippines. ("Offer Letter") (Doc. 5, at ¶ 6; Doc. 9-1). Village Health offered Estavilla employment as a registered nurse at
its Missoula facility, with a base compensation rate of $25.52 per hour. (Doc. 5, at ¶ 7; Doc. 9-1, at 2). The Offer Letter advised
Estavilla that in order for her to be eligible for employment, Village Health would need to sponsor her as an employment-based
immigrant and she would have to meet the immigration requirements of the United States. (Doc. 5, at ¶ 8; Doc. 9-1, at 3).
Village Health also agreed to advance other compensation and costs, including: (1) an initial incentive payment in the amount
of $1,000; (2) meals, lodging, and utilities for the first three months of Estavilla's employment; and (3) the costs associated with
Estavilla's immigration to the United States. (Doc. 5, at ¶¶ 10-11; Doc. 9-1, at 3-4).

The Offer Letter explained that Village Health would "expend in excess of $20,000.00 USD to enable you to have this
employment opportunity," with the "specific figure for the Advanced Amount [to] be determined following your completion of
the RN Onboarding Program and any additional worksite orientation at the Facility." (Doc. 9-1, at 4-5). The Offer Letter further

advised Estavilla that the Advanced Amount "is considered an advancement," but one half of the Advanced Amount would be forgiven after two years of employment with Village Health, and the remainder would be forgiven if she remained employed with Village Health for three years. (Doc. 5, at ¶ 12; Doc. 9-1, at 5).

Also relevant here, the Offer Letter stated that "failure to make restitution or meet any of your obligations under the terms of this letter" would be reported "to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency under applicable immigration fraud statutes." (Doc. 9-1, at 6). In addition, the Offer Letter contained a non-compete clause stating that if Estavilla did not remain employed for three years, she agreed that she would not work for "any health care or assisted living facility" in Montana "for a period of twelve (12) months after termination of employment. (Doc. 5, at ¶ 39; Doc. 9-1, at 6).

**\*2** Estavilla signed the Offer Letter on August 21, 2015, and Village Health reaffirmed the offer on or about July 3, 2017. (Doc. 5, at ¶ 17; Doc. 9-1, at 2 & 7). Estavilla moved to Montana and began working for Village Health on or about November 6, 2017. (Doc. 5, at ¶ 18).

Estavilla's obligation to repay the Advanced Amount was documented in a promissory note in the amount of $26,642.47. ("Promissory Note") (Doc. 9-2). Estavilla alleges Village Health forced her to sign the Promissory Note, which contained provisions similar to those set forth in the Offer Letter. (Doc. 5, at ¶ 19). Estavilla further alleges that she signed the Promissory Note about three months after she moved to Montana, but at the request of Village Health she back-dated it to November 6, 2017. (Doc. 5, at ¶ 20). Estavilla claims "this was the first time she learned that the funds were considered an 'advance' and not a gift or other consideration for her to uproot her life in the Philippines and move to Montana." (Doc. 5, at ¶ 20).

Estavilla worked for Village Health until May 24, 2019, when her employment was terminated. (Doc. 5, at ¶ 21). Because Estavilla was terminated after having worked for only 18 months, Village Health demanded that Estavilla repay the Advanced Amount in full. (Doc. 5, at ¶ 24). Estavilla was unable to pay that amount, and in early October 2019 Village Health commenced a lawsuit against her in Minnesota state court (the "Previous Litigation"). [2] (Doc. 5, at ¶ 24; Doc 9-4; Doc. 9-5). Village Health asserted claims against Estavilla for breach of contract and, alternatively, for unjust enrichment. (Doc. 9-4). Estavilla, who was proceeding pro se at the time, answered and counterclaimed for wrongful termination of contract. (Doc. 9-5). She also alleged affirmative defenses of "failure of consideration" and "discrimination and harassment." (Doc. 9-5). Village Health prevailed on summary judgment, and on March 12, 2020 the Minnesota court entered judgment against Estavilla in the total amount of $28,353.45. (Doc. 9-6). In doing so, the court determined that the Offer Letter was a "valid, binding contract" and that Estavilla's counterclaim was not supported by any evidence. (Doc. 9-6). Estavilla did not appeal this decision.

On May 11, 2021, Estavilla filed this putative class action in Montana state court on behalf of herself and others similarly situated. (Doc. 5). Defendants removed the case to this Court on June 3, 2021 based on federal question jurisdiction and diversity jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1441. (Doc. 1). Estavilla alleges federal forced labor and trafficking claims pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589, 1590, 1594(a)(b), 1595. (Doc. 5, at 11-15). Estavilla additionally alleges state law claims under Mont. Code Ann. § 27-1-755, which permits a civil action under Montana's criminal statutes prohibiting human trafficking and involuntary servitude, Mont. Code Ann. §§ 45-5-702 and 45-5-703. (Doc. 5, at 16). Estavilla's Complaint also includes a declaratory judgment claim seeking a determination that the contractual venue and choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5, at 16).

**\*3** Defendants move to dismiss under Rule 12(b)(6) on the ground that the Complaint fails to state a claim for relief.

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A cause of action may be dismissed under Fed. R. Civ. P. 12(b)(6) either when it asserts a legal theory that is not

*Estavilla v. Goodman Group, LLC, Slip Copy (2022)*

cognizable as a matter of law, or if it fails to allege sufficient facts to support an otherwise cognizable legal claim. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). When reviewing a Rule 12(b)(6) motion to dismiss, the court is to accept all factual allegations in the complaint as true and construe the pleading in the light most favorable to the nonmoving party. *Hospital Bldg. Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 740 (1976); *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir. 1989).

The court's review under Rule 12(b)(6) is informed by the provision of Fed. R. Civ. P. 8(a)(2) which requires that "a pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 129 S.Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must offer more than " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action ...'" *Ashcroft*, 129 S.Ct. at 1249 (quoting *Twombly*, 550 U.S. at 555).

To withstand a motion to dismiss under Rule 12(b)(6), "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.' " *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974). This means that the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule 12(b)(6) is appropriate. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *National Association of the Advancement of Psychoanalysis, v. California Board of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (citing *Halkin v. VeriFone, Inc.*, 11 F.3d 865, 868 (9th Cir. 1993)). Additionally, "the court is not required to accepts legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.2d 752, 754-55 (9th Cir. 1994).

As a general rule, "a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion." *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). But the court "may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. National Education Assoc.*, 629 F.3d 992, 998 (9th Cir. 2010) (citations omitted). In addition, a court may consider "matters of which a court may take judicial notice" when ruling on Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). This includes matters of public record, such as publicly-filed pleadings in other judicial proceedings. See *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Duckett v. Godinez*, 67 F.3d 734, 741 (9th Cir. 1995).

**\*4** Under these standards, the Offer Letter, Promissory Note, and Minnesota state court pleadings submitted with Defendants' motion are properly considered by the Court in determining whether the Complaint states a claim for relief.[3]

## III. Discussion

Defendants maintain that Estavilla fails to state a claim for relief because: (1) the claims alleged in the Complaint were compulsory counterclaims that she should have asserted in the Minnesota state court litigation; and (2) the Complaint does not adequately allege the elements necessary to state a claim for relief under the TVPA or Montana law.

### A. Compulsory Counterclaims

As defined in Federal Rule of Civil Procedure 13(a), a compulsory counterclaim is "any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." The purpose of Rule 13(a) is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes

arising out of common matters." *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962). A party who fails to plead a compulsory counterclaim is held to have waived the claim and is precluded by principles of res judicata from later asserting the claim in separate litigation. [4] *Local Union No. 11, International Brotherhood of Electrical Workers, AFL-CIO v. G.P. Thompson Electric, Inc.*, 363 F.2d 181, 184 (9th Cir. 1966).

Whether a claim is a compulsory counterclaim that should have been pled in an earlier state court action is a question of state law. *Pochiro v. Prudential Ins. Co.*, 826 F.2d 1246, 1249 (9th Cir. 1987). Because Village Health brought the Previous Litigation in Minnesota state court, whether Estavilla's claims are compulsory counterclaims that she has waived by failing to plead them in the Previous Litigation is governed by Minnesota law. See *Pochiro*, 826 F.2d at 1249.

Minnesota Rule of Civil Procedure 13.01 on compulsory counterclaims provides in relevant part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction that is the subject matter of the opposing party's claim ...." Minn. R. Civ. P. 13.01. Minnesota Rule 13.01 is different from its federal counterpart, Fed. R. Civ. P. 13(a), in one material respect: it refers to counterclaims arising out of "the transaction" that is the subject of the opposing party's claim, while the federal rule refers more broadly to counterclaims arising out of the same "the transaction or occurrence." Fed. R. Civ. P. 13(a)(1). As initially drafted, Minnesota Rule 13.01 would have followed the federal rule and referred to counterclaims arising out of the same "transaction or occurrence." *House v. Hanson*, 72 N.W. 874, 877-78 (Minn. 1955). After further consideration, however, the Minnesota Supreme Court's advisory committee "revised the tentative draft of Rule 13.01 by substituting for the words 'transaction or occurrence' the words 'contract or transaction'." *House*, 72 N.W.2d at 878. Consistent with the advisory committee's recommendation, the Minnesota Supreme Court approved Rule 13.01 in its final version, which describes compulsory counterclaims as those arising from the "transaction" that is the subject matter of the opposing party's claim. *House*, 72 N.W.2d at 878.

**\*5** *House* is the seminal Minnesota Supreme Court case addressing application of Minnesota Rule 13.01. *House* considered the legal issue of whether under Rule 13.01 "a defendant in a tort action arising out of an automobile collision must interpose as a counterclaim any claims he has against the plaintiff which arise out of the same collision or be forever barred from asserting them in another suit." *House*, 72 N.W.2d at 875. After considering the drafting history, the Minnesota Supreme Court held "that the word 'transaction' as used in Rule 13.01 does not embrace claims in tort and that therefore the failure of a defendant to assert as a counterclaim any claim he has against the plaintiff does not estop him from asserting such claim in an independent action against the plaintiff." *House*, 72 N.S.2d at 878.

Minnesota's intermediate appellate courts have since split on the issue of whether, under *House*, counterclaims that sound in tort can be compulsory counterclaims under Rule 13.01. [5] Compare *Leinedecker v. Asian Women United of Minnesota*, 731 N.W.2d 836 (Minn. Ct. App. 2007) (concluding that tort counterclaims are always permissive and cannot be compulsory); *St. Stephen State Bank v. Johannsen*, 2003 WL 1875500 (Minn. Ct. App. 2003) (concluding that while tort counterclaims cannot be compulsory in a tort action, they may be compulsory in a non-tort action).

In *Liendecker*, the Minnesota Court of Appeals concluded based on its reading of *House* "that the word 'transaction' in rule 13.01 does not embrace counterclaims in tort, whether the prior action was a tort action or a non-tort action." *Liendecker*, 731 N.W.2d at 840. "Instead, the Minnesota version of rule 13.01 provides a blanket exclusion for tort counterclaims." *Liendecker*, 731 N.W.2d at 840. Thus, *Liendecker* effectively held that tort counterclaims are always permissive, and can never be compulsory under Rule 13.01.

In *St. Stephen,* the Minnesota Court of Appeals read *House* differently and rejected the argument that tort counterclaims cannot be compulsory counterclaims under Rule 13.01. *St. Stephen*, 2003 WL 1875500, at \*2. *St. Stephen* interpreted *House* as holding "that the word 'transaction,' as used in rule 13.01, does not embrace claims in tort, therefore a defendant's failure to assert as a counterclaim, *in a tort action*, any claim defendant has against plaintiff does not estop defendant from asserting such claim in a subsequent action against plaintiff. *St. Stephen*, 2003 WL 1875500, at \*2 (emphasis in original). The *St. Stephen* court found that the appellants were "misread[ing] *House* to say that counterclaims that sound in tort are never compulsory counterclaims,"

when in fact what "*House* actually says [is] that there are no compulsory counterclaims in a tort action." *St. Stephen*, 2003 WL 1875500, at *2.

The Court agrees with *St. Stephen*'s interpretation of *House*, which is consistent with plain language of Rule 13.01. Under the Minnesota rule, a counterclaim is compulsory "if it arises out of the transaction that is the subject matter of the opposing party's claim." Minn. R. Civ. P. 13.01. *House* held that "the word 'transaction' as used in rule 13.01 does not embrace claims in tort," which means that a defendant's failure to assert a counterclaim in a tort action does not preclude the plaintiff from later asserting the claim in an independent action against the plaintiff. *House*, 72 N.W.2d at 878. Under *House*, whether the original action is a tort action or non-tort action is certainly relevant to whether a claim can be considered compulsory under Rule 13.01. Whether the counterclaim itself sounds in tort, however, is immaterial. *House* did not consider whether the counterclaims at issue sounded in tort, and it does not appear that the Minnesota Supreme Court has ever applied Rule 13.01 to hold that a counterclaim is not compulsory if it sounds in tort.

 *6 Because it is consistent with *House* and the plain language of Rule 13.01, the Court follows the *St. Stephen* court's reasoning. The fact that Estavilla's TVPA claims sound in tort does not mean they were necessarily permissive in the Previous Litigation, which was not a tort action. See e.g. *Rydberg Land, Inc. v. Pine City Bank*, 1989 WL 1551 (Minn. Ct. App. 1989) (affirming trial court's ruling that mortgagor's tort claims were compulsory counterclaims that should have been asserted in the original foreclosure action and were therefore barred by Rule 13.01). Thus, the Court will consider whether Estavilla's TVPA claims were compulsory counterclaims under the applicable test.

Minnesota courts have not established a test for interpreting the language of Minnesota's compulsory counterclaim rule, and thus look to federal caselaw interpreting Federal Rule of Civil Procedure 13(a) for guidance. *Bank of New York Mellon v. Kieran*, 2016 WL 4421302, at *4 (Ct. App. Minn. Aug. 22, 2016). The Eighth Circuit has previously identified four tests federal courts have applied in determining whether a counterclaim arises out the same transaction or occurrence: (1) whether the issues of fact and law raised by the claim and counterclaim are largely the same; (2) whether res judicata would bar a subsequent suit on the defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute the plaintiff's claim as well as the defendant's counterclaim; and (4) whether there is a logical relation between the claim and counterclaim. *Tullos v. Parks*, 915 F.2d 1192, 1195 & n. 8 (8th Cir. 1990) (citing *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 264 (8th Cir. 1979)) In *Tullos*, the Eighth Circuit agreed "with the majority of the federal courts that the logical relation test provides the needed flexibility for applying Rule 13(a)." *Tullos*, 915 F.2d at 1195 (citing Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1410 at 61-65 (2d ed. 1990)).

As the *Mellon* court thus recognized, the Eighth Circuit generally prefers the logical relation test to determine if a counterclaim is compulsory. *Mellon*, 2016 WL 4421302, at *4 (citing *Tullos v. Parks*, 915 F.2d 1192, 1195 (8th Cir. 1990)). "Under the logical-relation test, courts ask whether a counterclaim stems from the same 'aggregate of operative facts' as the original claim." *Mellon*, 2016 WL 4421302, at *4 (quoting *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000)).

The Ninth Circuit also applies "the logical relationship test for compulsory counterclaims." *Mattel, Inc. v. MGA Entertainment, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013) (quoting *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195-96 (9th Cir. 2005)). Thus, Ninth Circuit caselaw is instructive for purposes of determining whether Estavilla's claims are compulsory counterclaims that should have been pled in the Previous Litigation.

Much like the Eighth Circuit, the Ninth Circuit has said that that "[a] logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *Mattel*, 394 F.3d at 1196 (quoting *In re Pegasus Gold Corp.*, 394 F.3d at 1196).

Defendants argue the logical relation test is satisfied here because the claims alleged in the Complaint and the claims litigated in the Previous Litigation are all based on the same set of operative facts, specifically, Estavilla's employment with Village

Health and the terms of the Offer Letter and Promissory Note. To illustrate their argument, Defendants compare the complaints in both lawsuits and note that both pleadings extensively refer to and quote the terms of the Offer Letter and Promissory Note. As Defendants point out, every factual allegation in Village Health's complaint in the Previous Litigation either: (a) references or quotes the Offer Letter or Promissory Note (Doc. 9-4, at ¶¶ 3, 4, 7, 8, 9, 11, 13, and 14); (b) describes when Estavilla began and ended her employment with Village Health (Doc. 9-4, at ¶¶ 5, 10, and 12); or (c) references that Village Health sponsored Estavilla for employment-based immigration to the United States (Doc. 9-4, at ¶ 6).

**\*7** Estavilla's Complaint contains similar factual allegations. For example, Defendants note that in the section setting forth the facts specific to Estavilla as the named plaintiff, nearly every factual allegation is derived from what is set forth in the Offer Letter (Doc. 5, at ¶¶ 6-17) or outlines language from the Promissory Note (Doc. 5, at ¶¶ 19-20). The few remaining allegations in this section of the Complaint relate to whether Village Health terminated Estavilla for cause. (Doc. 5, at ¶¶ 21-23). The Complaint also contains a section setting forth the facts common to all claims. (Doc. 5, at 6-9). While the factual allegations in this section relate more generally to the foreign nurse sponsorship program, nearly all of them are based on what is set forth in the Offer Letter or Promissory Note. (Doc. 5, at ¶¶ 28-41). Focusing on the substantial overlap in the underlying facts alleged in both pleadings, Defendants take the position that Estavilla's claims are barred because they should have been brought as compulsory counterclaims in the Previous Litigation.

Estavilla makes three arguments in response. First, she maintains that Goodman cannot be dismissed because it was not a party to the Previous Litigation, which means she could not have asserted a counterclaim against it. Next, Estavilla contends that her claims in this case are based on a significantly broader set of aggregate operative facts, and so were permissive rather than compulsory counterclaims in the Previous Litigation. Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

### 1. Rule 13.01's "Opposing Party" Requirement

Estavilla first argues that her claims against Goodman cannot be considered compulsory counterclaims under Rule 13.01 because Goodman was not a party to the Previous Litigation. Again looking to federal court decisions for guidance, Defendants counter that this unduly restrictive reading of Rule 13(a) and its reference to "any opposing party" has been rejected. Because it appears the Eighth and Ninth Circuits have not addressed the issue, Defendants cite the Third Circuit's decision in *Transamerica Occidental Life Ins. Co. v. Aviation of Am., Inc.*, for the proposition that "an unnamed party may be so closely identified with a named party as to qualify as an 'opposing party' under Rule 13(a)." 292 F.3d 384, 390 (3d. Cir. 2002) (citing and following *Avemco Ins. Co. v. Cessna Aircraft Co.*, 11 F.3d 998 (10th Cir. 1993)). Likewise, "a party not named in litigation may still be an opposing party for Rule 13 purposes in certain cases in which the party is functionally identical to the actual opposing party named in the litigation." *Transamerica*, 292 F.2d at 390 (citing and following *Banco Nacional de Cuba v. National City Bank of New York*, 478 F.2d 191, 193 n. 1 (2d. Cir. 1973). The Third Circuit reasoned that interpreting "opposing party" broadly would "give effect to the policy rationale of judicial economy underlying Rule 13." *Transamerica*, 292 F.3d at 391

The Court finds this reasoning persuasive, particularly in light of the fact that there does not appear to be any authority to the contrary in the Eighth or Ninth Circuits. Here, Estavilla's Complaint alleges that Goodman manages Village Health, and that Village Health is "a subsidiary of the Goodman Group." (Doc. 5, at ¶¶ 2-3). Throughout the Complaint, Estavilla alleges conduct by "the Defendants" collectively and does not differentiate between the actions of Village Health and Goodman. Taking the allegations in the Complaint as true, Goodman is so closely identified with Village Health that it is properly considered an "opposing party" within the meaning of Rule 13 and Minnesota Rule 13.01.

Again citing *Transamerica*, Defendants further argue that the doctrine of res judicata supports application of the compulsory counterclaim rule to Goodman. In *Transamerica*, the Third Circuit found that the doctrine of res judicata provided additional support for its approach, noting "the close connection" between Rule 13(a) and doctrine of claim preclusion. *Transamerica*, 292

F.2d at 39. The Eighth and Ninth Circuits have also recognized the connection between Rule 13(a) and concepts of res judicata. See e.g. *G.P. Thompson Electric, Inc.*, 363 F.2d at 184 (a party who fails to plead a compulsory counterclaim is precluded by principles of res judicata from later asserting the claim in separate litigation); *Tullos*, 915 F.2d at 1195 n. 8 (noting that one test traditionally used by the Eighth Circuit to determine if a counterclaim is compulsory asks whether res judicata would bar a subsequent suit on the counterclaim).

 **\*8** The doctrine of "[r]es judicata, or claim preclusion, prevents relitigation of claims that were raised, or could have been raised, in prior actions between the same parties or their privies." *Benson v. Kemske*, 2020 WL 4783886, at \* (D. Minn. Aug. 18, 2020). The fact that res judicata applies to both the named parties and their privies provides further support for interpreting "opposing party" to mean the named party and those in privity with it for purposes of Rule 13(a). See e.g., *Waldnew v. Bush*, 2006 WL 3312039, at 5 (D. South Dak. Nov. 13 2006) (describing res judicata as "the close relative of compulsory counterclaims" and concluding that an "opposing party" for purposes of Rule 13(a) includes an unnamed party in privity with the named party in earlier litigation).

As stated above, taking the allegations in Estavilla's Complaint as true, Goodman and Village Health are in privity with one another. Accordingly, and for the reasons discussed above, the Court concludes that Goodman is an "opposing party" within the meaning of Rule 13(a) and Minnesota Rule 13.01.

## 2. Permissive or Compulsory Counterclaims

Estavilla next argues that the human trafficking claims she alleges here are based on a on a significantly broader set of aggregate operative facts than those previously alleged by Village Health, and so are properly characterized as permissive counterclaims rather than compulsory counterclaims in the Previous Litigation.

Estavilla concedes there is some factual overlap between her current lawsuit and the Previous Litigation, but emphasizes that the allegations in her Complaint date back to 2015 and relate more broadly to Defendants' conduct in recruiting her, facilitating her move to the United States, employing her, terminating her, bringing suit and obtaining a judgment against her, and including an unenforceable non-compete clause in the Offer Letter. Estavilla contrasts the allegations in her Complaint with those made by Village Health in the Previous Litigation, which she characterizes as revolving around whether she was terminated for cause and what damages she owed. According to Estavilla, the difference in the breadth of her human trafficking claims is sufficient to establish them as permissive rather than compulsory counterclaims, notwithstanding that many of the facts and written documents at issue in both cases overlap.

For support, Estavilla relies on *Popp Telecom v. American Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000), which she cites for the proposition that claims dealing with a limited transaction do not render claims concerning a larger set of overlapping transactions compulsory counterclaims. In *Popp Telecom*, the Eighth Circuit applied the logical relationship standard to determine whether a fraud counterclaim was compulsory. *Popp Telecom*, 210 F.3d at 941. The fraud claim was based on the method employed by a corporation to secure funds to purchase stock, while the prior appraisal proceeding dealt with a limited transaction, i.e., the exchange of money for stock. *Popp Telecom*, 210 F.3d at 941. Because the basis of the fraud counterclaim was not a concern in the prior proceeding, the Eighth Circuit concluded the fraud counterclaim "was not compulsory and it did not 'arise out of the transaction' of the appraisal proceeding nor did it 'stem from the same aggregate of operative facts'." [6] *Popp Telecom*, 210 F.3d at 941.

 **\*9** Here, unlike *Popp Telecom*, the claims alleged in this action and in the Previous Litigation all stem from the same written agreements and core set of operative facts. The breach of contract and unjust enrichment claims asserted in the Previous Litigation stemmed from Estavilla's failure to reimburse Village Health for the Advanced Amount as required under the terms of the Offer Letter and Promissory Note. Estavilla's human trafficking claims are based on Estavilla's employment with Village Health as documented in the Offer Letter and Promissory Note. As a comparison between the two pleadings reflects, the claims

alleged in this case and those litigated in the Previous Litigation all relate to Estavilla's employment with Village Health and, more specifically, the terms of the Offer Letter and Promissory Note and surrounding circumstances.

While the legal theory upon which Estavilla's human trafficking claims are premised is certainly different from the contractual legal theories advanced by Village Health in the Previous Litigation, the claims all arise from the same aggregate set of operative facts involving Estavilla's employment and the terms of the Offer Letter and Promissory Note. When applying the logical relation standard, "[t]he focus is on the similarity of the facts upon which the claims are premised, rather than the legal theory advanced by the parties. *Mattel*, 705 F.3d at 1110. In other words, "[w]hat matters is not the legal theory, but the facts." *Mattel*, 705 F.3d at 1110. In *Mattel*, the Ninth Circuit held the fact that the parties may advance the same legal theory is not enough to make a counterclaim compulsory. Here, the opposite is true. The claims raised in Estavilla's Complaint and in the Previous Litigation advance different legal theories based on the same aggregate core set of facts.

Estavilla also relies on *Paguarian v. Prompt Nursing Employment Agency, LLC,* 827 F. App'x 116 (2d. Cir. 2020) (*Paguarian III*) to support her argument that her trafficking claims were not compulsory counterclaims in the Previous Litigation. In *Paguarian III,* the defendant companies recruited the plaintiff, a Filipino nurse, to come to the United States to work in New York-based nursing homes. *Paguarian III*, 827 F. App'x at 117. After working at one of the defendant nursing homes for nine months, the plaintiff quit and filed a class action suit alleging the defendants underpaid their nurses and violated federal human trafficking laws. *Paguarian III*, 827 F. App'x at 117. On the parties' subsequent cross-motions for summary judgment, the district court determined, "among other things, that (i) the nurses were paid below their contractually guaranteed amount, (ii) the liquidated damages provision in the nurses' contracts was an unenforceable penalty, and (iii) the use of that liquidated damages provision violated federal anti-trafficking laws." *Paguarian III*, 827 F. App'x at 117-18. The district also "entered a declaratory judgment that the liquidated damages clause was unenforceable and an injunction preventing Defendants from enforcing or threatening to enforce the liquidated damages clause against any class member." *Paguarian III*, 827 F. App'x at 118.

On appeal by the defendants, it was undisputed that the Second Circuit had jurisdiction to review the district court's decision concerning the liquidated damages provision because it was inextricably intertwined with the injunction. *Paguarian III*, 827 F. App'x at 118. At issue was whether the Second Circuit had pendent appellate jurisdiction over the plaintiff's federal trafficking claim. *Paguarian III*, 827 F. App'x at 118. Under Second Circuit law, pendent appellate jurisdiction is reserved for "exceptional circumstances," which "exist only when the unappealable issue is either 'inextricably intertwined with' or must be decided to 'ensure meaningful review' of the appealable issue." *Paguarian III*, 827 F. App'x at 118.

 **\*10**  The Second Circuit held this standard was not satisfied because the plaintiff's federal trafficking claim was "neither inextricably intertwined with, nor necessary to decide, the liquidated damages issue." *Paguarian III*, 827 F. App'x at 118. While the court agreed that the topics were "related, since the illegality of the damages provision was the catalyst for the district court's decision that several of the Defendants had violated anti-trafficking laws," the court found there was no sound basis for taking pendent jurisdiction over the federal trafficking claim because it was not necessary to decide that claim before reviewing the district court's decision concerning the liquidated damages provision. *Paguarian III*, 827 F. App'x at 118.

*Paguarian III* is not particularly helpful here, however, because it addressed the standard for pendent appellate jurisdiction and did not involve any compulsory counterclaim issues or apply the logical relationship test. The issue here is not whether Estavilla's trafficking claims are inextricably intertwined with Village Health's breach of contract and unjust enrichment claims, but rather whether the claims all stem from the set of operative facts. In addition, as discussed at greater length below, the factual and legal scenario in the *Paguarian* litigation is materially distinguishable from the circumstances presented here for several reasons.

To the extent Estavilla also relies on *Javier v. Beck,* 2014 WL 3058456 (S.D. N.Y. July 3, 2014), that case is similarly distinguishable. In *Javier,* the plaintiff signed an employment agreement providing, among other things, that defendants would take all reasonable steps to obtain authorization for the plaintiff to work in the United States and would pay all fees associated with his visa application. *Javier,* 2014 WL 3058456, at \*1. The plaintiff later sued the defendants, alleging that they charged

him thousands of dollars for visa application fees, required that he sign a confession of judgment for $15,000 as a condition of employment, threatened that if he left their employment for any reason he would be forced to pay them $15,000, and threatened to withdraw their visa petition on his behalf if he questioned their conduct or refused to work as assigned. *Javier*, 2014 WL 3058456, at *2. The plaintiff asserted asserted several claims, including claims for violations of the TVPA, breach of contract, and unjust enrichment. *Javier*, 2014 WL 3058456, at *1.

In holding that the plaintiff had sufficiently pled a claim under the TVPA, the court observed that "[r]egardless of whether the contract was enforceable, the Complaint alleges that the Defendants used it as a threat to obtain [the plaintiff's] continued services." *Javier*, 2014 WL 3058456, at *2. Estavilla relies on this observation by the court to support her argument that her TVPA claims are not compulsory counterclaims because they do not involve the same set of operative facts as the breach of contract and unjust enrichment claims asserted by Village Health in the Previous Litigation. As with *Paguarian III*, however, *Javier* is largely inapposite because it did not involve the logical relationship test for compulsory counterclaims.

Here, the Court finds that the trafficking claims alleged in the Complaint and the claims litigated in the Previous Litigation all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note, as required to make them compulsory counterclaims.

### 3. Ripeness

Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

**\*11** Minnesota's compulsory counterclaim rule provides in part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party...." Minn. R. Civ. P. 13.01. This rule applies "only if the claim is ripe, i.e., if the claim is mature in the sense that a cause of action exists for which a lawsuit may properly be commenced." *Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 841 (Minn. App. 2007). The federal compulsory counterclaim rule is similar in that it applies to "any claim that – at the time of its service – the pleader has against an opposing party...." Fed. R. Civ. P. 13(a)(1). Whether a claim is mature for purposes of Fed. R. Civ. P. 13(a)(1) is synonymous with whether a claim has accrued for statute of limitations purposes. See e.g. *Cabrera v. Courtesy Auto, Inc.*, 192 F.Supp.2d 1012, 1015 (D. Neb. 2002).

As a general rule, under Minnesota law, "[a] cause of action accrues when all of its elements exist to the extent that the claim could withstand a motion to dismiss for failure to state a claim upon which relief can be granted." *Abarca v. Little*, 54 F.Supp.3d 1064, 1070 (D. Minn. 2014) (citing *Noske v. Friedberg*, 656 N.W.2d 409, 412 (Minn. Ct. App. 2003); see also *Hermann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999).

Estavilla emphasizes that her TVPA claims involve two timelines – one based on alleged threats presented in the contractual language and the other based on actual harm caused by Defendants and actual abuse of the legal process. Even if she waived her threat-based trafficking claims by failing to bring them as compulsory counterclaims in the Previous Litigation, Estavilla argues, she did not waive her actual serious harm and abuse of legal process claims because they did not mature, or accrue, until Village Health actually obtained a monetary judgment against her.

Estavilla advances several claims under the TVPA's civil remedies provision, 18 U.S.C. § 1595, including a forced labor claim under 18 U.S.C. § 1589. Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by several means, including by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(2) & (3). Estavilla argues § 1589 thus distinguishes between "serious harm" and "threatened serious harm," and "abuse of law or legal process" and "threatened abuse of law or legal process."

Estavilla argues she did not actually suffer serious harm or abuse of legal process until the Previous Litigation was completed and judgment was entered against her, which means she could not have claims based on "serious harm" under the TVPA while the Previous Litigation was ongoing. Because those claims did not mature until after the Previous Litigation ended, Estavilla argues, they were not compulsory counterclaims.

While § 1589(a) imposes liability for existing and threatened serious harm and abuse of legal process, Estavilla does not provide a basis for distinguishing between the two under the circumstances. Estavilla does not dispute that she could have asserted a claim based on threatened serious harm and abuse of legal process while the Previous Litigation was pending. Estavilla does not explain how any additional claims she might have asserted under subsections (2) and (3) after the Previous Litigation ended would have involved any different legal theories or potentially exposed Defendants to any additional liability. Because Estavilla could have asserted forced labor claims under § 1589(a)(2) and (3) while the Previous Litigation was pending, those claims were mature for purposes of Minnesota Rule 13.01 and Fed. R. Civ. P. 13(a)(1).

### B. TVPA Claims

**\*12** Congress enacted the TVPA as part of the Victims of Trafficking and Violence Protection Act of 2000 "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386, § 102(a) (codified at 22 U.S.C. § 7101(a)). In doing so, Congress recognized that "the means used by modern-day traffickers 'are increasingly subtle' " *U.S. v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R.Rep. No. 106-939, at 10, 2000 U.S.C.C.A.N. 1380, 1392-93 (2000) (Conf. Rep.). Congress thus intended the TVPA " 'to reach cases in which persons are held in a condition of servitude through nonviolent coercion.' " *U.S. v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting 22 U.S.C. § 7101(b)(13)). In 2003, Congress amended the TVPA to provide for civil liability against individuals who violate the TVPA. 18 U.S.C. § 1595.

Estavilla advances several claims under the TVPA's civil remedies provision, alleging that Defendants violated the TVPA's prohibitions against forced labor under § 1589, forced labor trafficking under § 1590, attempt to engage in these offenses under § 1594(a), and conspiracy to engage in these offenses under § 1594(b). Defendants argue these claims are subject to dismissal because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subjected to forced labor, as required to state a claim for relief under §§ 1589, 1590, and §§ 1594(a) & (b) of the TVPA.

### 1. Section 1589

Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Estavilla does not allege that Defendants used any of the means specified in subsections (1) or (4) to obtain forced labor or services from her. Focusing instead on subsections (2) and (3), Estavilla claims that Defendants knowingly obtained her labor or services by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(2) & (3).

a. *Serious harm or threats of serious harm*

In light of its stated purpose, the TVPA defines harm broadly as:

> as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continued performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). In other words, harm or threatened harm must be serious enough to compel a reasonable person in the victim's circumstances to continue working when she otherwise would have left. See e.g. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011); *Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923, 952 (N.D. Cal. 2019). In evaluating serious harm, courts must consider "all the surrounding circumstances." *Dann*, 652 F.3d at 1171.

Defendants take the position that the harm alleged by Estavilla does not rise to the level of serious harm or threatened serious harm within the meaning of the TVPA. Defendants list several examples of conduct and conditions that courts have found may constitute "serious harm or threats of serious harm" as defined in the TVPA, including: withholding or threatening to withhold payment for work performed; threats of deportation, arrest, or imprisonment; intolerable working or living conditions; extreme isolation; threats of retaliation for an employee voicing criticism; threats to allow visas to expire without renewal; threats to terminate employment when employees ask for reimbursement for housing fees; extortion; systemic fraud; and confiscating and withholding passports, identity documents, or immigration documents. (Doc. 8, at 27); citing *Echon v. Sackett*, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017); *Lesnik v. Eisenman SE*, 374 F.Supp.3d 923, 953 (N.D. Cal. 2019); *United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011); *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008); *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008). Because nothing comparable is alleged here, Defendants argue, Estavilla fails to state a forced labor claim under § 1589(a)(2).

*13 Estavilla responds that Defendants' argument is based on an outdated interpretation of human trafficking and ignores the plain language of the TVPA. It is well-settled that financial pressure, including the threat of financial harm, may constitute serious harm under the TVPA. See e.g. *Dann*, 652 F.3d at 1170-71; *Carmen v. Health Carousel*, LLC, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021); *Paguirigan v. Prompt Nursing Employment Agency LLC*, 2018 WL 437799, at *8 (E.D. N.Y. Sept. 12, 2018) (*Paguirigan II*); *Javier v. Beck*, 2014 WL 3058456, at *6 (S.D. N.Y. July 3, 2014); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011). "To constitute 'financial harm' within the meaning of the TVPA," however, "the threatened harm must be in some way improper or illicit." *Carmen*, 2021 WL 2476882, at *6.

Focusing on the TVPA's reference to financial harm, Estavilla maintains the liquidated damages provision in the Offer Letter and the threat of liability under the Promissory Notes constituted a "threat of serious harm," and the judgment subsequently entered against her in the Previous Litigation constituted actual "serious harm" within the meaning of § 1589. Estavilla argues this serious harm was further compounded by her at-will employment status, which allowed Defendants to terminate her employment at any time still collect the Advance Amount, as well as the Offer Letter's non-compete clause.

To support her position, Estavilla relies primarily on *Paguirigan* and *Carmen*, both of which involved Filipino nurses who were recruited to work at healthcare facilities in the United States and later brought suit under the TVPA. In *Paguirigan*, the employment contract at issue contained a liquidated damages provision that required nurses to pay a $25,000 contract termination fee if they left their jobs before the end of the contract term. *Paguirigan v Prompt Nursing Employment Agency*, 286 F.Supp.3d 430, 435 (E.D. N.Y. 2017) (*Paguirigan I*). The nurses were also required to execute a $25,000 confession of judgment in favor of their employer as a condition of employment before leaving the Philippines. *Paguirigan I*, 286 F.Supp.3d at 435.

On summary judgment, the district court determined, among other things, that the liquidated damages provision was an unenforceable penalty intended to operate as a means to compel performance, ensuring that the plaintiff and other nurses did not resign before the end of their contract terms. *Paguirigan II*, 2019 WL 4647648, at *19. Notably, the confession of judgment provision went even further and "outright state[ed] that its purposes [was] to 'secure Employee's performance of the Employment Term.' " *Paguirigan II*, 2019 WL 4647648, at *19. The court also determined that the liquidated damages provision was an unenforceable penalty because the defendants' losses were ascertainable at the time of the contract, and the $25,000 did not bear a reasonable proportion to the probable loss, which the evidence demonstrated was only $4,435.50. *Paguirigan II*, 2019 WL 4647648, at *11.

Defendants argue that *Paguirigan* is distinguishable. Unlike the liquidated damages provision at issue in *Paguirigan*, which was for a set amount that bore no reasonable relation to the defendants' probable loss, the Advanced Amount at issue here was documented in a Promissory Note that Estavilla signed after she began working for Village Health. Defendants maintain that, unlike the liquidated damages provision in *Paguirigan*, the Advanced Amount represents the actual amounts Estavilla agreed to have Village Health advance on her behalf, and is a debt she voluntarily incurred for actual expenses. (Doc. 20, at 11). Importantly, Village Health prevailed in the Previous Litigation to enforce the repayment provisions of the Offer Letter and obtained a judgment requiring Estavilla to reimburse it for the actual amounts expended on her behalf. (Doc. 5, at ¶¶ 18-19). This is quite unlike *Paguirigan,* where the defendants filed several lawsuits against nurses based on a liquidated damages provision that courts had previously found to be unenforceable. For these reasons, the Court agrees with Defendant that the *Paguirigan* litigation is materially distinguishable.

 *14  The second case Estavilla relies on, *Carmen v. Health Carousel, LLC*, 2021 WL 2476882 (S.D. Ohio June 17, 2021), is also distinguishable. In *Carmen*, the plaintiff alleged that the defendant used a variety of tactics to compel her and other nurses to continue working, including: (1) requiring a nurse to leave temporary employer-supplied housing within 48 hours of the nurse's last shift; (2) including a non-compete clause in the employment contract prohibiting a nurse from seeking employment with any healthcare provider within 50 miles of the employer's facility for one year; (3) using a liquidated damages provision that did not specify a dollar figure and stated that if the nurse breaches the employment contract, the nurse shall pay an unspecified amount of liquidated damages "to be agreed upon" and "settled amicably" by the parties; (4) requiring nurses to sign a handbook upon arrival in the United States that revised provisions in the earlier employment contract, including stating that the any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment; (5) including a provision in the same handbook stating that the employer will continue to be an advocate for immigration purposes only so "as long as the nurse remains in good standing" with the employer, thereby making the implied threat that the employer would advocate for negative immigration outcomes if the nurse left; (6) implementing an "isolating no-gossip policy" between nurses; (7) purposeful delay in obtaining the nurse's permanent license. *Carmen*, 2021 WL 2476882, at **1-2; 6.

With the exception of the non-compete clause and immigration provision contained in the Offer Letter, Estavilla does not allege that Defendants engaged in any of the coercive tactics that the *Carmen* court found were sufficient to survive dismissal for failure to state a claim for relief under § 1589 of the TVPA. Notably, in *Carmen*, the plaintiff alleged in her complaint that she felt forced to continue working for the defendant because of the non-compete clause, and hesitated to terminate her employment because of the immigration provision in her employer's handbook. *Carmen*, 2021 WL 2476882, at *4. Estavilla makes no similar allegations here. Nor does she allege that Defendants enforced or threatened to enforce those provisions against her. Unlike *Carmen*, Estavilla's allegations are based entirely on the contents of the Offer Letter and Promissory Note, which were held to be enforceable in the Previous Litigation.

Given the distinction between Estavilla's allegations and those made by the plaintiff in *Carmen,* Defendants argue that the standards articulated by the court in *Panwar v. Access Therapies, Inc.*, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) should apply. The Court agrees. In *Panwar*, the defendants recruited the plaintiffs to work as physical therapists at a rehabilitation facility in the United States and agreed to sponsor their visa applications. *Panwar*, 2015 WL 1396599, at *1. The plaintiffs "were required to sign employment agreements setting forth the terms of employment, as well as a separate promissory note

corresponding with the contracts' liquidated damages/recovery of expenses provisions." *Panwar*, 2015 WL 1396599, at *2. The employment agreements provided that if an employee left employment before completing the contract term, the employee was required to pay the amount of the promissory note to reimburse the employer's expenses and lost revenues. *Panwar*, 2015 WL 1396599, at *2. Both plaintiffs alleged they were not paid the full amount they were entitled to under the contract, and that the defendants threatened them with enforcement of the promissory note. *Panwar*, 2015 WL 1396599, at *2.

One plaintiff also alleged that the defendant threatened him with loss of his visa and deportation. *Panwar*, 2015 WL 1396599, at *2. The plaintiffs filed suit alleging, among other claims, that the defendants used a forced labor scheme in violation of the TVPA by means of threats of serious harm, including financial harm through enforcement of the promissory note, threats of visa revocation and deportation, and abuse of legal process. *Panwar*, 2015 WL 1396599, at *2.

The *Panwar* court found the plaintiffs' TVPA claims were problematic for a number of reasons, and granted summary judgment in favor of the defendants. *Panwar*, 2015 WL 1396599, at **3-5. Relevant here, the court found the plaintiffs' claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA was not supported by the evidence or the law. *Panwar*, 2015 WL 1396599, at **3-5. The court noted that the plaintiffs had not presented any evidence that the stipulated sums in the liquidated damages provisions of their employment agreements were grossly disproportionate to the losses the defendants were likely to incur if an employee terminated his contract early. *Panwar*, 2015 WL 1396599, at *4. Because the defendants had submitted evidence that the stipulated sums were proportionate to the loss likely to occur, the court upheld the liquidated damages provisions and refused to penalize the defendants "under the TVPA for practices which they are explicitly permitted to utilize under the relevant laws." *Panwar*, 2015 WL 1396599, at *4.

 **15**  The *Panwar* court also rejected the plaintiffs' argument that the threat of deportation constituted a threat of serious harm under the TVPA. *Panwar*, 2015 WL 1396599, at *4. One of the *Panwar* plaintiffs alleged that the defendants "threatened to revoke his visa and that he would be deported." *Panwar*, 2015 WL 1396599, at *4. Because the plaintiff's visa program required "that nonimmigrant employees remain employed by the company that sponsored their visas," the court reasoned that visa revocation was not left to the discretion of employers, who are required by law to notify the U.S. Citizenship and Immigration Service if a visa holder is no longer employed. *Panwar*, 2015 WL 1396599, at *4. If it were to accept the plaintiffs' argument, the court reasoned, any employer would be in violation of the TVPA merely by complying with the requirements of the visa program. *Panwar*, 2015 WL 1396599, at *4. The court therefore found that the threat of visa revocation and deportation under the circumstances was not a threat of serious harm for purposes of the TVPA. *Panwar*, 2015 WL 1396599, at *4.

Here, as in *Panwar*, the Advance Amount clause provides for a specific amount based on actual expenses, as evidenced by the fact that the contractual provision was found enforceable in the Previous Litigation. Likewise, to the extent Estavilla argues the Offer Letter's statement that "failure to meet any of your obligations under the terms of this letter" would be reported "to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency under applicable immigration fraud statues" (Doc. 9-1, at 6) constituted a threat of serious harm, the Court is not persuaded. Estavilla has not shown that the mere presence of this clause addressing Village Health's reporting duty under federal law constitutes harm or the threat of serious harm under the TVPA. As pointed out above, Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. To the contrary, the fact that she counterclaimed for wrongful termination of contract in the Previous Litigation indicates that, if anything, she did not want her employment with Village Health to come to an end.

In sum, even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly state a claim for relief based on "serious harm or the threat of serious harm" within the meaning of § 1589(a)(2) of the TVPA.

b. *Abuse or threatened abuse of law or legal process.*

Estavilla also claims that Defendants knowingly obtained her labor or services by means of "the abuse or threatened abuse of law or legal process" in violation of 18 U.S.C. § 1589(a)(3).

The TVPA defines the term "abuse or threatened abuse of law or legal process" as:

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(a).

Estavilla first argues that Defendants threatened the abuse of law in violation of § 1589(a)(3) by including the liquidated damages provision in the Offer Letter and suing her in Minnesota state court to enforce that provision. As discussed above, however, Defendants prevailed in the Previous Litigation. This case is thus different from *Paguirigan I,* where the court determined that the plaintiffs had sufficiently alleged abuse of legal process because the defendants brought suit against the plaintiff and other nurses to enforce the liquidated damages provision even after it had been declared unenforceable. *Paguirigan I,* 286 F.Supp.3d at 435.

Here, in contrast, the Minnesota state court ruled in Defendants' favor and enforced the liquidated damages provision in the Offer Letter. Estavilla's argument conflates permissible "use" of the legal process with "abuse" of the legal process. See *Panwar,* 2015 WL 1396599, at \*5. Under these circumstances, it is difficult to see how Defendants could be said to have used the legal process "in any manner or for any purpose for which the law was not designed," as required to establish "abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3).

 **\*16** Estavilla next argues that Defendants violated § 1589(a)(3) by including threatening in the Offer Letter to report her to immigration authorities if she failed to pay restitution. The threat of deportation may constitute threatened abuse of legal process under § 1590(a)(3). See *Nunag-Tanedo v. E. Baton Rough Parish Sch. Bd.,* 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011). In addition, courts have held that threatening other adverse immigration consequences may be an abuse of legal process within the meaning of the TVPA. See *Adia v. Grandeur Mgmt., Inc.,* 933 F.3d 89, 93 (2d. Cir. 2019); *Mairi Nunag-Tanedo v. e. Baton Rouge Par. Sch. Bd.,* 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011). But the provision in the Offer Letter that Estavilla relies on relates to Village Health's reporting duty under federal law, and Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. As such it does not constitute an abuse of legal process within the meaning of the TVPA.

Finally, Estavilla maintains that Defendants impermissibly threatened abuse of law or legal process by including an illegal non-compete clause in the Offer Letter. Absent some allegation by Estavilla that she felt forced to continue working for Village Health because of the non-compete clause, or that Defendants attempted to enforce the clause against her, the Court finds this allegation is not sufficient establish "abuse or threatened abuse of law or legal process" as defined in § 1589(c)(1).

For the reasons outlined above, the even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly show that Defendants used or threatened use of a law or legal process in a manner for which the law was not designed, as required to establish "the abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3) of the TVPA.

Because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subject to forced labor within the meaning of § 1589(a), she fails to state a claim for relief under this section of the TVPA.


### 2. Section 1590

Estavilla also brings a claim under 18 U.S.C. § 1590, which prohibits human trafficking to further forced labor. Section 1590 imposes liability on "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a).

This claim fails for the same reasons that Estavilla's claim under § 1589(a) fails. Because Estavilla has not sufficiently alleged that she was subjected to forced labor, she has not stated a claim for relief under § 1590.


### 3. Section 1594(a),(b)

Estavilla further alleges claims for attempt to violate the TVPA under § 1594(a) and conspiracy to violate the TVPA under § 1594(b). Section 1594(a) extends liability to "whoever attempts to violate section 1581, 1583, 1589, 1590, or 1591" of the TVPA. Section 1594(b) imposes liability on "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592" of the TVPA.

Because Estavilla has not stated a claim for relief under §§ 1589 and 1590, she similarly fails to state a claim for relief under § 1594.


### 2. Montana law

In addition to her claims under the TVPA, Estavilla alleges a state law human trafficking claim under Mont. Code Ann. § 27-1-755. (Doc. 5, at 16). This civil remedies provision provides that "[a] victim of human trafficking may bring a civil action against a person who commits an offense against the victim under 45-5-702, 45-5-703, 45-5-704, or 45-5-705 for compensatory damages, punitive damages, injunctive relief, or any other appropriate relief. Mont. Code. Ann. § 27-1-755(1).

**\*17** Estavilla alleges corresponding violations of Mont. Code Ann. § 27-2-702 and Mont. Code Ann. § 27-2-703. Section 702 provides for liability against anyone who purposely or knowingly:

> (a) recruits, transports, transfers, harbors, receives, provides, obtains, isolates, maintains, or entices another person intending or knowing that the person will be subjected to involuntary servitude ...; or

> (b) benefits, financially or by receiving anything of value, from facilitating any conduct described in subsection (1)(a) or from participation in a venture that has subject another person to involuntary servitude ...

Mont. Code Ann. § 45-5-702. Section 703, in turn, extends liability for involuntary servitude to anyone who "purposely or knowingly uses coercion to compel another person to provide labor or services, unless the conduct is otherwise permissible under federal or state law." Mont. Code. Ann. § 45-5-703.

For purposes of Montana's civil remedies provision, "coercion" is defined, in relevant part, to include the following:

> (a) the use or threat of force against, abduction of, serious harm to, or physical restraint of a person;

(b) the use of a plan, pattern, or statement with intent to cause a person to believe that failure to perform an act will result in the use of force against, abduction of, serious harm to, or physical restraint of a person;

(c) the abuse or threatened abuse of law or legal process; ...

(f) the use of debt bondage.

Mont. Code. Ann. § 45-5-701(2).

Defendants take the position that Estavilla's statutory claims under Montana law fail for the same reasons that her claims under the TVPA fail, namely, because she has not alleged sufficient facts to demonstrate human trafficking, or that she was subject to involuntary servitude or compelled to provide labor or services in violation of §§ 45-5-702 or 45-5-703. (Doc. 17, at 31).

In response, Estavilla focuses on the involuntary servitude provisions of § 45-5-703, which prohibits a person from using "coercion to compel another person to provide labor or services." Turning to the statutory definition of coercion, Estavilla agrees with Defendants that subsections (a) through (c) overlap with the TVPA's requirements. (Doc. 17, at 31). Thus, to the extent Estavilla's state law claims are premised on allegations of "serious harm," those claims rise and fall with her claims under the TVPA.

While Estavilla agrees that subsections (a) and (c) overlap with the TVPA, she maintains that subsection (f), which prohibits "the use of debt bondage," is unique and independent of her claims under the TVPA. As relevant to Estavilla's argument, "debt bondage" is defined as "inducing a person to provide: ... (b) labor or services in payment toward or satisfaction of a real or purported debt if: (i) the reasonable value of the labor or services is not applied toward the liquidation of the debt." Mont. Code. Ann. § 45-5-701(4).

Estavilla contends that she has alleged sufficient facts demonstrating that Defendants engaged in this form of debt bondage. Estavilla claims that she was "forced" to sign a promissory note that required her to pay back $26,642.47 plus interest. Under the terms of the Promissory Note, that debt would be forgiven, but only if remained employed with Village Health through November 5, 2020. Village Health terminated Estavilla's employment on May 24, 2019, however, and sued her for repayment of the full amount. Estavilla thus contends that Defendants did not apply any of her labor or services to the liquidation of the debt, and engaged in coercion through debt bondage by failing to account for any of the 18 months that she was employed by Village Health. (Doc. 17, at 32).

 *18  Defendants maintain in reply that, contrary to Estavilla's argument, debt bondage is contemplated under the TVPA and is governed by the "financial harm" standards discussed above. With respect to Estavilla's allegation that they did not apply "the reasonable value of her labor against the debt amount to liquidate the debt," Defendants maintain that the Minnesota court assessed the reasonable value of Estavilla's labor and services in the in the Previous Litigation. The Court agrees with Defendants that Estavilla's argument is foreclosed by the final judgment entered in the Previous Litigation, which has res judicata effect.

Moreover, like Estavilla's claims under the TVPA, her state law human trafficking claims are compulsory counterclaims that she has waived by failing to bring them in the Previous Litigation because they all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note.

### 3. Declaratory Judgment

Estavilla's Complaint also includes a declaratory judgment claim seeking a determination that the contractual venue and choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5, at 16).

Neither party addresses this claim in their briefs. Presumably, the parties agree that whether Estavilla's declaratory judgment claim survives dismissal depends entirely on whether any of her claims under the TVPA or Montana law also survive.

### IV. Conclusion

For the reasons discussed above,

IT IS ORDERED that Defendants' Motion to Dismiss the Complaint for Failure to State a Claim for Relief under Rule 12(b)(6) is GRANTED.

### All Citations

Slip Copy, 2022 WL 539192

## Footnotes

1       Consistent with the legal standards applicable to Rule 12(b)(6) motions, the following facts are taken from the Complaint, evidence on which the Complaint necessarily relies, and state court documents of which this Court may take judicial notice.

2       The Offer Letter contained a choice of venue provision making Minnesota the proper venue for the Previous Litigation, and a choice of law provision stating that "the rights of the parties under this Offer Letter will be governed by, interpreted, and enforced in accordance with the laws of the State of Minnesota.... (Doc. 9-1, at 6).

3       The Court need not, and does not, consider the newspaper article Defendants have submitted as an exhibit in support of their motion. (Doc. 9-7).

4       The rule is the same in the Eighth Circuit, which encompasses Minnesota. See *Nelson v. Repossessors, Inc.*, 2018 WL 1891494, at *2 (D. Minn. Apr. 20, 2018) ("A compulsory counterclaim that is not brought is waived in subsequent litigation.") (citing *Schinzing v. Mid-States Stainless, Inc.* 415 F.3d 807, 813 (8th Cir. 2005))

5       As directed by the Court, the parties have submitted supplemental briefing addressing the impact, if any, of *Liendecker* and *St. Stephen* on the issue of whether Estavilla's TVPA claims can be considered compulsory counterclaims in the Previous Litigation under Minnesota Rule 13.01.

6       Notably, the court considered Minnesota Rule 13.01 and the "logical relation" in determining whether a fraud counterclaim arose from the "same aggregate of operative facts" or "out of the transaction" that was the subject of the original proceeding, without regard to the fact that the counterclaim at issue was a tort claim. *Popp*, 210 F.3d at 941. This bolsters the Court's conclusion above, that tort counterclaims can be considered compulsory under Minnesota Rule 13.01 if they meet the applicable test.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

528 P.3d 586 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Petitioner,

v.

The EIGHTH JUDICIAL DISTRICT COURT of the State of Nevada, IN AND FOR the
COUNTY OF CLARK; and the Honorable Mark R. Denton, District Judge, Respondents,

and

Westland Liberty Village, LLC, a Nevada Limited Liability Company; Westland Village Square, LLC, a Nevada Limited
Liability Company; Amusement Industry, Inc.; Westland Corona LLC; Westland Amber Ridge LLC; Westland Hacienda
Hills LLC; 1097 North State, LLC; Westland Tropicana Royale LLC; Vellagio Apts of Westland LLC; the Alevy Family
Protection Trust; Westland AMT, LLC; AFT Industry NV, LLC; and A&D Dynasty Trust, Real Parties in Interest.

No. 84575
|
Filed December 22, 2022

**Attorneys and Law Firms**

Snell & Wilmer, LLP/Las Vegas

Snell & Wilmer, LLP/Reno

Cooper & Kirk PLLC/Wash DC

Campbell & Williams

Law Offices of John Benedict

John W. Hofsaess

*ORDER GRANTING PETITION FOR EXTRAORDINARY WRIT RELIEF*

**\*\*1**  This original petition for extraordinary writ relief challenges a district court order denying petitioner's motion to dismiss.

Real parties in interest Westland Liberty Village and Westland Village Square (collectively, Westland) acquired properties secured by loan agreements for which petitioner Federal National Mortgage Association (Fannie Mae) is the successor-in-interest to the original lender. Fannie Mae commenced an action in district court, seeking the appointment of a receiver as part of the process to foreclose on the properties. Westland answered and asserted counterclaims against Fannie Mae. As part of its first amended countercomplaint, Westland joined several affiliated corporate entities as parties (collectively with Westland, RPIs) and asserted two counterclaims related to those entities and a Master Credit Facility Agreement (MCFA). The MCFA provided a credit line that RPIs allege Fannie Mae improperly restricted. The MCFA contains a forum selection clause providing that MCFA claims shall be litigated in the District of Columbia. Fannie Mae filed a motion to dismiss, arguing that the MCFA counterclaims could not be litigated in Nevada. The district court denied Fannie Mae's motion to dismiss, and Fannie Mae petitioned this court for a writ of prohibition.

A writ of prohibition may issue when a district court acts without or in excess of its jurisdiction and the petitioner lacks a plain, speedy, and adequate remedy at law. NRS 34.320; NRS 34.330; *Smith v. Eighth Judicial Dist. Court,* 107 Nev. 674, 677, 818 P.2d 849, 851 (1991). A writ of mandamus, by contrast, is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station or to control an arbitrary or capricious exercise of discretion. NRS 34.160; *Int'l Game Tech., Inc. v. Second Judicial Dist. Court,* 124 Nev. 193, 197, 179 P.3d 556, 558 (2008). This court may treat a petition seeking prohibition as a petition for a writ of mandamus where, although prohibition is not available, mandamus is appropriate. *City of Sparks v. Second. Judicial Dist. Court,* 112 Nev. 952, 953 n.1, 920 P.2d 1014, 1015 n.1 (1996). We grant the petition for extraordinary writ relief after concluding that the district court committed clear legal error amounting to a manifest abuse of discretion in failing to dismiss the MCFA counterclaims based on the mandatory forum selection clause to which the parties agreed.

When a contract contains a forum selection clause, courts determine whether the clause is mandatory, meaning that the specified forum is the exclusive forum agreed upon by the parties, or permissive, meaning that the parties merely consented to venue in a particular forum. *Am. First Fed. Credit Union v. Soro,* 131 Nev. 737, 740-42, 359 P.3d 105, 107-08 (2015) (noting and agreeing with other courts' explanation of the dichotomy between mandatory and permissive forum selection clauses). As with other issues of contractual interpretation, whether a forum selection clause is mandatory turns on its language, looking for "words of exclusivity." *Id.* at 742, 359 P.3d at 108; *see also id.* at 737, 739, 359 P.3d at 106 (providing that the court reviews contracts de novo and interprets clear and unambiguous provisions according to the contractual language as written). When a forum selection clause is mandatory and suit is brought in the incorrect forum, the matter should be dismissed. *See id.* at 738, 359 P.3d at 105 (reversing dismissal where forum selection clause was permissive, not mandatory).

**\*\*2** The MCFA has a forum selection clause entitled "Choice of Law; Consent to Jurisdiction" that provides that "Borrower agrees that *any controversy* arising under or in relation to the Notes, the Security Documents (other than the Security Instruments), or any other Loan Document *shall be*, except as otherwise provided herein, *litigated in the District of Columbia."* (Emphasis added.) It further provides that D.C. courts "shall ... have jurisdiction over all controversies which may arise under or in relation to the Loan Documents ...." It continues that "Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from [the loan instrument] and *waives any other venue* to which it might be entitled." (Emphasis added.) The clause also provides that it does not bar the Lender from bringing suit against the Borrower or the collateral in another forum and that any such action does not waive the designation of D.C. law as the controlling law.

We conclude that the forum selection clause here is mandatory. The clause states that litigation for "any controversy" arising under its loan documents "shall be litigated" in the District of Columbia. The phrase "shall be litigated," while not conclusive, strongly suggests that the forum selection clause is mandatory. *Soro,* 131 Nev. at 741-42, 359 P.3d at 107-08 (collecting and comparing forum selection clause cases). Confirming that the clause mandates Washington, D.C. as the forum for litigating MCFA claims, the agreement irrevocably consents to the jurisdiction and forum of D.C. courts and waives "any other venue." *E.g., Aguas Lenders Recovery Grp. v. Suez, S.A.,* 585 F.3d 696, 700 (2d Cir. 2009); *AAR Int'l, Inc. v. Nimelias Enters. S.A.,* 250 F.3d 510, 526 (7th Cir. 2001). Because the clause here goes further than signaling merely that D.C. courts are an appropriate forum and includes both irrevocable consent to the designated forum and a waiver of all other fora the borrower might otherwise be entitled to access, we conclude that the forum selection clause demonstrates an intent to designate the District of Columbia exclusively and is therefore mandatory.

RPIs make three additional arguments against enforcing this clause as mandatory, none of which is persuasive. First, RPIs maintain the clause cannot be mandatory because it permits Fannie Mae to bring suit outside the District of Columbia. But one-sided forum selection clauses are permissible when the parties voluntarily agree to them. *See Montoya v. Fin. Fed. Credit, Inc.,* 872 F. Supp. 2d 1251, 1276 (D.N.M. 2012) (rejecting an argument that a forum selection clause was not binding where it was permissive as to actions filed by the lender but mandatory as to those filed by the borrower); *see also Union Steel Am. Co. v. M/V Sanko Spruce,* 14 F. Supp. 2d 682, 687 (D.N.J. 1998) (concluding that a forum selection clause was mandatory despite providing the cargo carrier alone with an option to pursue arbitration). Second, RPIs characterize their counterclaims as compulsory and argue that this takes them outside a mandatory forum selection clause. Even assuming the accuracy of this characterization,

which is debatable, we agree with courts elsewhere that have held that this does not defeat a mandatory forum selection clause. *See, e.g., Publicis Commc'n v. True N. Commc'ns Inc.,* 132 F.3d 363, 366 (7th Cir. 1997) (enforcing forum selection clause "whether or not they would be 'compulsory' counterclaims" because the defendant had contracted not to litigate those claims in forums other than that designated in the forum selection clause); *see also Water & Sand Int'l Capital, Ltd. v. Capacitive Deionization Tech. Sys., Inc.,* 563 F. Supp. 2d 278, 284 (D.D.C. 2008) (refusing to allow parties to evade enforceable forum selection clauses by alleging what may be properly considered compulsory counterclaims). And finally, insofar as RPIs contend that fairness requires trying the counterclaims in Nevada courts, we disagree. "The parties are sophisticated corporations that freely contracted with each other, and enforcement of the forum selection clause does not offend due process." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.,* 485 F.3d 450, 457 (9th Cir. 2007). [1]

**\*\*3** The dispute asserted in counterclaims three and four arises from the MCFA, so the mandatory forum selection clause applies, and requires that those claims "shall be litigated" in Washington, D.C. Nevada public policy favors enforcing freely negotiated mandatory forum selection clauses that are not unreasonable or unjust and are entered into by sophisticated parties. *See Soro,* 131 Nev. at 741, 359 P.3d at 741 (quoting with approval decisions recognizing that mandatory forum selection clauses will be enforced); *Whitemaine v. Aniskovich,* 124 Nev. 302, 312 n.31, 183 P.3d 137, 144 n.31 (2008) (recognizing that the parties were sophisticated counterparts in determining whether appellant knowingly, voluntarily, and intelligently entered into an arbitration agreement); *Tandy Comput. Leasing v. Terina's Pizza, Inc.,* 105 Nev. 841, 844, 784 P.2d 7, 8 (1989) (barring enforcement of a forum selection clause that was not "freely negotiated" and would be "unreasonable and unjust" to enforce (internal quotation marks omitted); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972) (looking to declarations by statute or judicial decision to determine a states public policy concerning the enforcement of forum selection clauses); *Tuxedo Int'l Inc. v. Rosenberg,* 127 Nev. 11, 22, 251 P.3d 690, 697 (2011) (recognizing that parties are free to agree to binding forum selection clauses). The district court clearly erred in not applying the mandatory forum selection clause in this instance. *See Soro,* 131 Nev. at 739, 359 P.3d at 105 (providing that clear contractual provisions will be enforced as written).

The final question concerns the form, of writ relief appropriate. This court has original jurisdiction to issue a writ of prohibition to "arrest" proceedings that are "without or in excess of the jurisdiction" of the district court. NRS 34.320. The mandatory forum selection clause mandates Washington, D.C. as the venue for the MCFA counterclaims; it does not destroy jurisdiction in Nevada. *See Marra v. Papandreou,* 216 F.3d 1119, 1123 (D.C. Cir. 2000) ("[W]hile the forum-selection clause defense is a creature that has evaded precise classification, most courts and commentators have characterized it as a venue objection[.]") (footnote omitted; collecting cases). This raises a question whether prohibition is available in this setting. *See* C.P. Jhong, Annotation, *Prohibition as an Appropriate Remedy to Restrain Civil Action for Lack of Venue,* 93 A.L. R.2d 882 (1962). But it is not necessary to decide the question here, since the district judge committed clear legal error amounting to a manifest abuse of discretion in not enforcing the parties' mandatory forum selection clause as to the MCFA counterclaims. This error qualifies for mandamus relief and we therefore elect to treat the petition as one seeking mandamus relief. *See City of Sparks,* 112 Nev. at 953 n.1, 920 P.2d at 1015 n.1. Although an appeal from final judgment would generally be an adequate legal remedy, because there is no factual dispute and a clear rule warranted dismissal, we grant writ relief as to these counterclaims. *Int'l Game Tech.,* 124 Nev. at 197-98, 179 P.3d at 559.

Accordingly, we

ORDER the petition **\*587** GRANTED AND DIRECT THE CLERK OF THIS COURT TO ISSUE A WRIT OF MANDAMUS directing the district court to grant petitioner's motion to dismiss counterclaims three and four. [2]

**All Citations**

528 P.3d 586 (Table), 2022 WL 19697697

2022 WL 19697697

## Footnotes

1       RPIs argue that the clause is not mandatory because its inclusion of the phrase "except as otherwise provided herein"
        adds unspecified exceptions to its scope. Because RPIs do not explain this argument in detail or provide supporting
        caselaw, therefore we do not consider it. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n.38, 130 P.3d
        1280, 1288 n.38 (2006).

2       The Honorable Patricia Lee did not participate in the decision in this matter.

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

526 P.3d 1110 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.
Court of Appeals of Nevada.

HALCYON SILVER, LLC, d/b/a Metropolitan Auto Body & Paint,
A Nevada Corporation; and Charles Fox, an Individual, Appellants,
v.
Hollis EVELYNMOE, an Individual, Respondent.

No. 84299-COA
|
Filed March 24, 2023

Halcyon Silver, LLC, d/b/a Metropolitan Auto Body & Paint (Metropolitan), and Charles Fox appeal from a final judgment in a contract action concerning automotive repair and restoration. [1] Eighth Judicial District Court, Clark County; Crystal Eller, Judge.

**Attorneys and Law Firms**

McAvoy Amaya & Revero, Attorneys

Law Office of S. Don Bennion

*ORDER AFFIRMING IN PART, REVERSING IN PART, AND REMANDING*

**\*1** In 2013, Hollis Evelynmoe took his 1970 Ford Mustang (vehicle) to Vegas Stang—at the time, an auto body shop in Las Vegas—which conducted numerous repairs. [2] As relevant to this case, Evelynmoe made the following approximate payments to Vegas Stang: $2,500 for a rebuilt engine, $2,550 for a rebuilt transmission, $1,300 for a new exhaust system, and at least $400 for four tires and rims. Vegas Stang went out of business in 2016, at which time Evelynmoe decided to take his vehicle to Metropolitan for completion of additional repairs. In November 2016, Evelynmoe delivered his vehicle to Metropolitan along with the rebuilt engine, transmission, exhaust system, tires and rims, and the remaining parts installed by Vegas Stang. On November 4, 2016, Evelynmoe paid Metropolitan $4,039.38 to strip the vehicle down to bare metal and examine its component parts, which allowed Metropolitan to generate a preliminary estimate of $40,918.03 for the cost of the full repair and restoration work to be performed. Metropolitan later revised this estimate to reflect Evelynmoe's desire for his vehicle to be converted to a fastback. The revised estimate reflected a cost of $68,704.28, which Evelynmoe approved.

On December 15, 2016, Evelynmoe met with Fox, the owner of Metropolitan, to sign a work authorization contract for Metropolitan to begin working on his vehicle. The contract did not contain a "time is of the essence" provision, nor did it list a specific date in which the work would be completed. Rather, it merely stated that Metropolitan would not be "responsible for the availability of parts, or delays in part shipments beyond their control." Additionally, the contract contained a bolded provision which read, "PLEASE NOTE: A daily storage charge may be applied of up to $70.30 per day for motor vehicles that have not been picked up after 3 working days from the date of notification that repairs have been complete." Further, the contract contained a brief paragraph in which the signee agreed to "pay all legal fees associated with any and all disputes." The contract also stated that "[a]n express mechanics lien is hereby acknowledged on the above vehicle to secure the amount of repairs thereto." Upon signing the contract, Evelynmoe paid Metropolitan $20,000 to begin the work. When Evelynmoe signed the contract, Fox explained that he could reasonably expect the work to be completed by the end of summer 2017.

In the six months after Evelynmoe signed the contract, Metropolitan obtained and installed a fastback conversion kit in the amount of \$4,944 and made preparations for paint in the amount of \$1,500. In this same timeframe, Evelynmoe made payments of \$15,367.46 on January 4, 2017, and \$20,000 on February 4, 2017. However, at some point during that time frame, Metropolitan stopped working on Evelynmoe's vehicle. On May 31, 2017, Evelynmoe visited Metropolitan to examine his vehicle's status and select a paint color. Upon visiting, Evelynmoe learned that Metropolitan had not resumed work on his vehicle since the work stoppage. After selecting a paint color, Evelynmoe made a final payment of \$12,736.82 to Metropolitan, bringing his collective payments to the \$68,704.28 estimated for the completed repair and restoration work. [3]  Upon making this final payment, Fox again told Evelynmoe that he could expect the work on his vehicle to be completed by the end of summer 2017.

**\*2**  After making his final payment, Evelynmoe returned to Metropolitan approximately once a month to check on the status of his vehicle, only to learn that no further work had been performed by Metropolitan. On April 25, 2018—approximately 11 months after Evelynmoe paid the full price for the repair and restoration work—Evelynmoe discovered again that Metropolitan had performed no further work on his vehicle, whereupon he demanded that Metropolitan cease performing any further work and that they relinquish possession of his vehicle. Evelynmoe then took extensive photographs, which demonstrated that Metropolitan had not completed a majority of the contracted work.

Before Evelynmoe was allowed to retrieve his vehicle, Fox presented him with two forms, an indemnification agreement and a "Stop Work" order. The indemnification agreement required Evelynmoe to forego all legal claims against Metropolitan. The Stop Work order required Evelynmoe to pay Metropolitan \$70.30 per day in storage fees and to agree that his vehicle received all of the contracted work. Believing that these agreements misrepresented the condition of his vehicle and required him to forego legal action that he was entitled to pursue, Evelynmoe refused to sign them. Thus, Fox and Metropolitan refused to relinquish Evelynmoe's vehicle to him on April 25, 2018. Evelynmoe arranged for a tow truck to retrieve his vehicle on April 25, 2018; however, he cancelled the tow truck because Fox and Metropolitan would not release any part of the vehicle without him signing the two agreements.

On May 11, 2018, Evelynmoe received a letter from Metropolitan demanding that he pay substantial storage fees or his vehicle would be sold at auction on June 27, 2018. This forced Evelynmoe to file a motion for preliminary injunction, the hearing for which took place on June 26, 2018. The court found Evelynmoe's testimony regarding the work performed by Metropolitan and its refusal to release his vehicle to be credible, and the court granted the preliminary injunction. In its order, the court demanded that Metropolitan return Evelynmoe's vehicle to him "at a mutually convenient time to the parties." Additionally, the court ordered that Metropolitan's lien on Evelynmoe's vehicle for storage fees was still valid. Finally, the court ordered Evelynmoe to post a bond in the amount of \$2,000 to secure payment of storage fees should they be awarded. Despite the court's order, Evelynmoe did not post the required bond until September 4, 2019.

Metropolitan did not release Evelynmoe's vehicle until September 5, 2019, when a tow truck hired by Silver Arrow, another auto body shop in Las Vegas, picked it up. Gregory Young, the owner of Silver Arrow, was present at Silver Arrow when Evelynmoe's vehicle arrived. Young recalled that only the shell of the vehicle was received, and that it was missing, at a minimum, the engine, transmission, exhaust system, and four tires with rims that Evelynmoe received from Vegas Stang, as well as the driveshaft, radiator, wiring harness, air conditioning assembly, seats, door panels, glass windows other than the rear window, gas tank, and rear bank drums.

Evelynmoe initiated the underlying action against Metropolitan and Fox in June of 2018. In the operative complaint, Evelynmoe alleged that Metropolitan breached the work authorization contract and the implied covenant of good faith and fair dealing by failing to perform the contracted work on his vehicle. Evelynmoe also asserted a claim for conversion against Metropolitan and Fox, alleging that they wrongfully exerted dominion over his vehicle in a manner inconsistent with his ownership rights. Evelynmoe additionally alleged that Fox made an intentional misrepresentation when he communicated that the contracted work would be completed by the end of summer 2017. In their answer, appellants contested each of Evelynmoe's claims and asserted a counterclaim for unjust enrichment, as they believed they were entitled to storage fees incurred from the time Evelynmoe's motion for preliminary injunction was granted to the time that Evelynmoe posted the \$2,000 bond mandated by the court's order.

**\*3** Following a three-day bench trial, the district court entered its findings of fact, conclusions of law, and judgment. Preliminarily, the district court found that "Evelynmoe's testimony was consistent throughout the trial and was extremely credible," and that "Fox'[s] testimony was somewhat inconsistent and at times thoroughly unbelievable." The district court found that Metropolitan materially breached the work authorization contract by failing "to perform a majority of its promised work between December 16, 2016, and April 25, 2018." The district court further found that Metropolitan breached the implied covenant of good faith and fair dealing by performing in a manner that was unfaithful to the purpose of the contract. Moreover, the district court found that Metropolitan and Fox were liable for conversion for exerting wrongful dominion over Evelynmoe's vehicle and parts in a manner inconsistent with his ownership rights. Finding that the legal fees provision of the contract was both procedurally and substantively unconscionable, the district court refused to enforce the provision. And because the written contract governed the duties of the parties, the district court denied both parties' claims for unjust enrichment. Finally, the court found that the estimated completion date communicated by Fox was an estimate rather than a guarantee, and thus, Fox did not make any intentional misrepresentation to Evelynmoe. In accordance with its findings of fact and conclusions of law, the district court awarded Evelynmoe damages of $76,332.90, which were broken down as follows:

    a. $58,232.90 in monetary losses for work not performed by Metropolitan pursuant to the [work authorization] contract;

    b. $11,350.00 for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration; [4]

    c. $400.00 for the conversion of four tires and rims;

    d. $2,500.00 for the conversion of [Evelynmoe]'s rebuilt engine;

    e. $2,550.00 for the conversion of [Evelynmoe]'s transmission; and

    f. $1,300.00 for the conversion of [Evelynmoe]'s exhaust system.

On appeal, appellants argue that the district court erred in ruling in Evelynmoe's favor on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. [5] Appellants further aver that the district court's award of damages violated the double recovery doctrine. Finally, appellants assert that the district court erred in denying their unjust enrichment claim, as well as in refusing to enforce the legal fees provision of the contract as unconscionable.

While Evelynmoe fails to address several of appellants' arguments, he argues that the district court appropriately ruled in his favor on his contract and conversion claims and that the district court correctly denied appellants' unjust enrichment claim and refused to enforce the contract's legal fees provision.

*Metropolitan breached the implied covenant of good faith and fair dealing by failing to perform a majority of its promised work between December 16, 2016, and April 25, 2018*

Metropolitan argues that, because the work authorization contract contained no "time is of the essence" provision, Evelynmoe never expressed dissatisfaction with appellants' progress in completing the contracted work, and both parties were experienced in transactions of this kind, its failure to complete the contracted work on Evelynmoe's vehicle between December 16, 2016, and April 25, 2018, cannot be considered a material breach under *Mayfield v. Koroghli,* 124 Nev. 343, 184 P.3d 362 (2008). Metropolitan further contends that the district court erred in concluding that it breached the implied covenant of good faith and fair dealing because the district court did not make explicit findings of bad faith on its part, even though the district court found that Metropolitan "failed to complete the repair and restoration work on [the vehicle] in a reasonable time" and that Evelynmoe's "justified expectations were denied." Conversely, Evelynmoe argues that, because Metropolitan failed to perform a majority of the contracted work between December 16, 2016, and April 25, 2018, the district court correctly found that Metropolitan materially breached the work authorization contract.

**\*4**  We review the district court's determination that Metropolitan materially breached the contract for clear error. *See Sheehan & Sheehan v. Nelson Malley & Co.,* 121 Nev. 481, 486, 117 P.3d 219, 223 (2005) ("[T]he district court's determination that the contract was or was not breached will be affirmed unless clearly erroneous ...."). Similarly, we review the district court's findings regarding Metropolitan's breach of the implied covenant of good faith and fair dealing for clear error, which will be upheld so long as such findings are supported by substantial evidence. *APCO Constr., Inc. v. Helix Elec. of Nev., LLC,* 138 Nev., Adv. Op. 31, 509 P.3d 49, 53-54 (2022). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Unionamerica Mortg. & Equity Tr. v. McDonald,* 97 Nev. 210, 211-12, 626 P.2d 1272, 1273 (1981) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)).

The time for performance pursuant to a contract is not considered of the essence unless indicated by an express provision or the circumstances so imply. *Mayfield,* 124 Nev. at 349, 184 P.3d at 366. Where a contract does not contain a clause indicating that time for performance is of the essence, the parties generally must render performance within a reasonable time. *Id.* "What constitutes a reasonable time for a contract's performance is a question of fact to be determined based on the nature of the contract and the circumstances surrounding its making." *Id.* at 346, 184 P.3d at 364. However, in the absence of a provision making time of the essence, "a party's failure to perform within a reasonable time generally does not constitute a material breach of the agreement." *Id.* at 349, 184 P.3d at 366. Nevertheless, we need not decide whether the district court correctly determined that Metropolitan materially breached the contract, as the district court appropriately held Metropolitan liable for breach of the implied covenant of good faith and fair dealing.

Even where a defendant does not breach the express terms of a contract, a plaintiff may still recover contract damages for a defendant's breach of the implied covenant of good faith and fair dealing. *APCO Constr., Inc.,* 138 Nev., Adv. Op. 31, 509 P.3d at 53. A party to a contract breaches the implied covenant of good faith and fair dealing where it performs "in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.,* 107 Nev. 226, 234, 808 P.2d 919, 923 (1991). Whether a party's performance denies another of their reasonable expectations under a contract "is determined by the various factors and special circumstances that shape these expectations." *See id.* at 234, 808 P.2d at 924.

Our jurisprudence has noted that whether a party acted in bad faith is the primary inquiry in determining whether they breached the implied covenant of good faith and fair dealing. *See Renown Health v. Holland & Hart, LLP,* No. 72039, 2019 WL 1530161, at \*2 (Nev. Apr. 5, 2019) (Order of Affirmance) (citing *Geysen v. Securitas Sec. Servs. USA, Inc.,* 142 A.3d 227, 237-38 (Conn. 2016)). "Examples of bad faith include 'evasion of the spirit of the bargain, *lack of diligence and slacking off,* willful rendering of imperfect performance ... and interference with or failure to cooperate in the other party's performance.' " *Id.* at \*2 (emphasis added) (quoting Restatement (Second) of Contracts § 205 cmt. d (Am. Law Inst. 1981)).

Despite Evelynmoe making his final payment on May 31, 2017, and despite Fox's estimation that the work would be completed by summer 2017, Metropolitan performed no further work on Evelynmoe's vehicle from then until April 25, 2018, when Evelynmoe demanded that his vehicle be returned to him. [6] Metropolitan's lack of diligence in completing the contracted work, which denied Evelynmoe his justified expectations under the contract, illustrates that Metropolitan acted in bad faith, thereby breaching the implied covenant of good faith and fair dealing. [7] Therefore, we affirm the district court's award of damages for the work not performed by Metropolitan, not under the theory that Metropolitan materially breached the contract, but under the alternate theory that Metropolitan breached the implied covenant of good faith and fair dealing.

*Appellants exerted wrongful dominion over the component parts of Evelynmoe's vehicle and are thus liable for conversion*

**\*5**  Whether a conversion has occurred is a question of fact. *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000). As such, we defer to the district court's findings regarding appellants' conversion of the component parts of Evelynmoe's vehicle so long as they are not clearly erroneous and supported by substantial evidence. *Certified Fire Prot. Inc. v. Precision Constr., Inc.,* 128 Nev. 371, 377, 283 P.3d 250, 254 (2012) ("Where a question of fact has been determined by the

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 86 of 231 PageID #:  892

trial court, this court will not reverse unless the judgment is clearly erroneous and not based on substantial evidence." (quoting *Kockos v. Bank of Nev.,* 90 Nev. 140, 143, 520 P.2d 1359, 1361 (1974))).

"Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title rights.' " *Evans,* 116 Nev. at 606, 5 P.3d at 1048 (quoting *Wantz v. Redfield,* 74 Nev. 196, 198, 326 P.2d 413, 414 (1958)). A party is not considered to have exerted wrongful dominion over property "where it affirmatively submits a genuine dispute regarding the property to the courts and then appropriately holds the subject property pending the court's decision." *Nev. State Educ. Assn v. Clark Cty. Educ. Assn,* 137 Nev. 76, 86, 482 P.3d 665, 675 (2021).

At trial, counsel for appellants claimed that the title to Evelynmoe's vehicle was transferred to Fox following the June 26, 2018, preliminary injunction hearing and before the order granting the preliminary injunction was entered and Evelynmoe posted the requisite $2,000 bond. But the record does not support that the title was transferred, nor was such transfer permitted by the court following the preliminary injunction hearing, The requisite bond pursuant to the preliminary injunction was only to ensure that appellants would be able to recover storage fees should they be awarded by the court pursuant to their counterclaim, not to prevent the sale of the vehicle that the court unequivocally prohibited in its order. Because appellants attempted to transfer the title of Evelynmoe's vehicle to Fox, which the district court prohibited, their actions suggest that they were attempting to assert wrongful dominion over Evelynmoe's vehicle in violation of Nevada law. *See Nev. State Educ. Ass'n,* 137 Nev. at 86, 482 P.3d at 675 ("Of course, [the rule that a party does not exert wrongful dominion over property where it submits a genuine dispute regarding the property to the courts and holds the property pending the court's decision] would not apply if the party s claim of right is made with 'malice,' or if the party improperly disposes of the property." (citations omitted)). Further, the fact that appellants did not raise the dispute of the vehicle's ownership to the court prior to allegedly transferring the title of the vehicle to Fox s name, coupled with the court's finding that appellants never released Evelynmoe's four tires and rims, rebuilt engine, transmission, and exhaust system demonstrates that their actions were inconsistent with Evelynmoe's ownership of the property, and supported the court's finding of liability for conversion. *Id.* at 85-86, 482 P.3d at 674. Therefore, we conclude that the district court did not err in finding that appellants were liable for the conversion of these missing parts and in awarding their corresponding values as damages.[8]

*The district court awarded Evelynmoe duplicative damages in violation of the double recovery doctrine*

**\*6**  "Whether a party is entitled to a particular measure of damages is a question of law reviewed de novo." *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.,* 127 Nev. 480, 483, 255 P.3d 286, 288 (2011) (internal quotation marks omitted). Our jurisdiction applied the double recovery doctrine in *Elyousef v. O Reilly & Ferrario, LLC,* 126 Nev. 441, 442, 245 P.3d 547, 548 (2010). "[A] plaintiff can recover only once for a single injury even if the plaintiff asserts multiple legal theories." *Id.* at 444, 245 P.3d at 549. Accordingly, "satisfaction of the plaintiff's damages for an injury bars further recovery for that injury." *Id.*

At trial, testimony established that Evelynmoe suffered damages of $750 to remove the body of his vehicle from Metropolitan. Additionally, Young's testimony demonstrated that as of September 1, 2020, Evelynmoe owed Silver Arrow $2,600 for "[t]he initial retrieval of the car, the moving of the car into the warehouse, and storage [fees] incurred." This testimony indicates that the $2,600 figure also reflected the $750 cost to remove Evelynmoe's vehicle from Metropolitan. Nonetheless, the district court apparently awarded both these amounts in calculating Evelynmoe's damages. Because awarding Evelynmoe both amounts may have permitted him to recover damages twice for the same injury, the district court may have erred by awarding double recovery in violation of the double recovery doctrine and, thus, the court will need to recalculate these damages on remand. *See id.*

Turning to the value of Evelynmoe's vehicle and/or its parts, despite appellants' assertion that no testimony was offered at trial to establish the value of the vehicle when it was first dropped off at Metropolitan, Fox testified that "[t]he entire vehicle as a whole, as a coupe, is probably worth 3,500 to 8 grand." Because Evelynmoe first delivered his vehicle to Metropolitan along with the rebuilt engine, transmission, exhaust system, and four rims with tires, it stands to reason that this estimated value

given by Fox included the value of these parts that accompanied the vehicle. Despite this, the district court awarded Evelynmoe damages of $11,350 "for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration," as well as "$400.00 for the conversion of four tires and rims; $2,500.00 for the conversion of Plaintiff's rebuilt engine; $2,550.00 for the conversion of Plaintiff's transmission; and $1,300.00 for the conversion of Plaintiff's exhaust system."

While the district court did not provide a complete breakdown of the $11,350 figure awarded to Evelynmoe, the order suggests that the court included the higher estimate of $8,000 for the vehicle with parts as provided by Fox's testimony, $2,600 for storage fees charged by Silver Arrow, and $750 for the removal of Evelynmoe's vehicle from Metropolitan. Assuming this correctly demonstrates the district court's award of damages to Evelynmoe, the court erred in awarding double recovery damages based on Metropolitan's conversion of the components after they were already accounted for as part of the vehicle's value when it was delivered to Metropolitan. *See id.* Further, the court may have erred in awarding an amount for the body of the vehicle, as it appears that the body without the component parts was delivered to Silver Arrow Car Restoration and, therefore, returned to Evelynmoe. For these reasons, we reverse and remand this matter to the district court to recalculate the conversion damages awarded so as to not violate the double recovery doctrine based on the award of $11,350. *See id.*

### *The district court properly denied appellants' unjust enrichment claim*

 **\*7**  On appeal, appellants are seeking recovery of storage fees incurred as the result of storing Evelynmoe's vehicle under the theory of unjust enrichment. "Whether a claimant has been unjustly enriched is a mixed question of law and fact." *See Desert Miriah, Inc. v. B & L Auto, Inc.,* 12 P.3d 580, 582 (Utah 2000). Here, the district court after making factual findings declined to award appellants' damages for their storage fees based on unjust enrichment.

We review a district court's factual findings for clear error and will uphold such findings so long as they are supported by substantial evidence. *Vegas United Inv. Series 105, Inc. v. Celtic Bank Corp.,* 135 Nev. 456, 458-59, 453 P.3d 1229, 1231 (2019). "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortg. & Equity Tr.,* 97 Nev. at 212, 626 P.2d at 1273. A claim for unjust enrichment is unavailable when there is an express, written contract. *Leasepartners Corp. v. Robert L. Brooks Tr.,* 113 Nev. 747, 755, 942 P.2d 182, 187 (1997). "[Permitting] recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles." *Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 379, 566 P.2d 819, 824 (1977).

In this case, the district court determined that the written contract governed the duties of Metropolitan and Evelynmoe, and therefore, the equitable remedy of unjust enrichment did not apply. *See Leasepartners,* 113 Nev. at 755, 942 P.2d at 187. The district court further determined that Evelynmoe did not owe the storage fees to appellants because the "necessity for said storage was caused by [appellants'] refusal to return [Evelynmoe]'s vehicle when requested on April 25, 2018 and not by [Evelynmoe]'s lack of diligence in picking up his car upon completion of repairs." This factual determination by the district court is supported by substantial evidence in the record, including Evelynmoe's testimony, which the district court found credible throughout trial. Therefore, appellants' counterclaim for unjust enrichment as it relates to the storage fees for Evelynmoe's vehicle fails. *Id.* For this reason, we conclude that the district court did not err in denying appellants' counterclaim for unjust enrichment.[9]

### *The contract's legal fees provision was unconscionable, and the district court did not err in refusing to enforce it*

"Whether, given the trial court's factual findings, a contractual provision is unconscionable is a question of law subject to de novo review." *D.R. Horton, Inc. v. Green,* 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by U.S. Home Corp. v. Michael Ballesteros Tr.,* 134 Nev. 180, 415 P.3d 32 (2018). We will uphold a lower court's findings of fact supporting a finding of unconscionability so long as they are supported by substantial evidence. *Id.*

 **\*8**  Generally, both procedural and substantive unconscionability are required before a court will render a contractual provision unenforceable by reason of unconscionability. *Burch v. Second Judicial Dist. Court,* 118 Nev. 438, 443, 49 P.3d 647, 650 (2002). Procedural unconscionability is present where a contract is presented on a pre-printed, standardized form, which does

not permit the weaker party to negotiate its terms. *See id.* at 442, 443-44, 49 P.3d at 649-50 (explaining that an application form is procedurally unconscionable where the application is presented on a pre-printed, standardized form, which does not allow the signee "a meaningful opportunity to decide if they [want] to agree" to its terms). On the other hand, "[t]he substantive element of unconscionability focuses on the actual terms of the contract and assesses whether those terms are overly harsh or one-sided." *See, e.g., Henderson v. Watson,* Docket No. 64545, 2015 WL 2092073, at *2 (Nev. Apr. 29, 2015) (Order Affirming in Part, Reversing in Part, and Remanding) (citing *Armendariz v. Found. Health Psycheare Servs., Inc.,* 6 P.3d 669, 690 (Cal. 2000)). A contractual provision is not substantively unconscionable where the provision applies equally to both parties. *Id.* at *2. Procedural and substantive unconscionability need not be present in the same magnitude, and less evidence of procedural unconscionability is required where the presence of substantive unconscionability is so substantial. *See Armendariz,* 6 P.3d at 690.

Here, the contract provided by Metropolitan was a pre-printed, standardized form that Metropolitan utilizes when customers appear inperson to finalize their agreements for repair and/or restoration work. The only portions of the contract that did not contain a pre-printed term were blanks for consumers to fill out their personal information, as well as for the price of the repair and restoration work sought. The legal fees provision in question states, "I agree to pay all legal fees associated with any and all disputes."

Because the work authorization contract was a pre-printed and standardized form, Evelynmoe did not appear to have the ability to negotiate regarding the legal fees provision and was instead required to "take it or leave it." *See Burch,* 118 Nev. at 442, 49 P.3d at 649. This demonstrates the presence of procedural unconscionability. *Id.* at 443-44, 49 P.3d at 650. Although appellants suggest that Evelynmoe could have negotiated a different contract, no language in the contract suggests that this was an option.

Additionally, the presence of substantive unconscionability in the legal fees provision is significant. The contract's requirement that Evelynmoe "pay all legal fees associated with any and all disputes" is entirely one-sided, as it does not require appellants to pay legal fees under any circumstance. Appellants attempt to argue that a reversal of the district court's refusal to enforce the legal fees provision is warranted because the district court relied on *Horton* in coming to its conclusion, which is no longer good law. However, the principle in *Horton* that a provision that is procedurally unconscionable where it is not more conspicuous than other terms in a contract, was overruled only in its application to arbitration provisions, which is distinguishable from the legal fees provision at issue here. *U.S. Home Corp.,* 134 Nev. at 190, 415 P.3d at 41 ("Requiring an arbitration clause to be more conspicuous than other contract provisions is exactly the type of law ... the FAA preempts ...." (citation omitted)). The district court's findings still support the presence of procedural unconscionability. *See Burch,* 118 Nev. at 443-44, 49 P.3d at 650. Further, the significant substantive unconscionability of the legal fees provision required less evidence of procedural unconscionability for the court to refuse to enforce the provision. *Armendariz,* 6 P.3d at 690. For the foregoing reasons, we conclude that the district court did not err in refusing to enforce the legal fees provision. [10]

 **\*9** In light of the foregoing, we affirm the district court's judgment as to appellants' liability, but we reverse the judgment for a partial recalculation of damages in accordance with our disposition.

It is so ORDERED.

**All Citations**

526 P.3d 1110 (Table), 2023 WL 2661524

**Footnotes**

1    Metropolitan and Fox are hereinafter collectively referred to as appellants where appropriate.

2    We recount the facts only as necessary for our disposition.

3    We note that Evelynmoe's payments total $68,104.28, which is $600 short of the $68,704.28 price for the completed repair and restoration work. However, we note that Metropolitan charged Evelynmoe a credit card fee of $600, which is reflected in Metropolitan's invoice for the repair and restoration work and would account for this discrepancy.

4    Although this breakdown of damages does not reflect it, the district court stated in its conclusions of law that "[Evelynmoe] sustained damages in the amount of $11,350.00 caused by Metropolitan's breach of the implied covenant of good faith and fair dealing, because [Evelynmoe]'s justified expectations were denied."

5    This court need not reach appellants' argument that the district court abused its discretion by letting Evelynmoe testify regarding the value of his vehicle and its components, as appellants fail to cite any relevant legal authority to support that expert testimony was required to establish these values of which Evelynmoe had personal knowledge. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

6    We reject appellants' contention that Evelynmoe's testimony regarding the estimated completion date constituted impermissible parol evidence. *See State ex rel. List v. Courtesy Motors,* 95 Nev. 103, 106, 590 P.2d 163, 165 (1979) (providing that "parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict ... written instruments which ... are contractual in nature and which are valid, complete, [u]nambiguous, and unaffected by accident or mistake" (first alteration in original) (internal quotation marks omitted)). The district court did not look to the testimony to vary the terms of the parties' agreement; rather, the court considered the testimony as evidence concerning what constituted a reasonable time for performance by appellants under the contract. Because the contract was silent as to time for performance and, therefore, there was no term in the contract for this extrinsic oral evidence to contradict, we conclude that the district court did not abuse its discretion in admitting Evelynmoe's testimony regarding the estimated completion date.

7    We note that, while the district court did not label Metropolitan's actions as "bad faith conduct," such may be inferred by their failure to conduct any work for nearly a year after Evelynmoe paid in full for the contracted work. *See Pease v. Taylor,* 86 Nev. 195, 197, 467 P.2d 109, 110 (1970) ("[E]ven in the absence of express findings, if the record is clear and will support the judgment, findings may be implied.").

8    We note that the damages awarded to Evelynmoe pursuant to his conversion claim are applicable to both Fox and Metropolitan, and to the extent these damages were or could have been awarded against Metropolitan under the breach of the implied covenant of good faith and fair dealing, we note that the district court must avoid counting these damages twice in recalculating Evelynmoe's appropriate award in accordance with our analysis below.

9    Even if Evelynmoe's failure to timely post the bond voided the preliminary injunction, the work authorization contract supports that appellants still would not be entitled to the return of their storage fees. The work authorization contract states, "PLEASE NOTE: A daily storage charge may be applied of up to $70.30 per day for motor vehicles that have not been picked up after 3 working days from the date of *notification that repairs have been complete.*" (Emphasis added.) The plain language of this provision suggests that the storage fees would only begin accruing three days after Metropolitan's completion of the contracted repairs, which never occurred. Further, the preliminary injunction was only related to the storage fees and was not required to preserve the title to the vehicle that remained in Evelynmoe's name following the hearing on the preliminary injunction without the requirement of posting a bond.

10    Insofar as the parties have raised arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

**Halcyon Silver, LLC v. Evelynmoe, 526 P.3d 1110 (2023)**

2023 WL 2661524

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 18585892
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

HEAVEN MEDIA LIMITED, Plaintiff,

v.

Rebecca EVERTS and Reset Nation, LLC, Defendants.

CAUSE NO. A-22-CV-00025-LY
|
Signed May 10, 2022

**Attorneys and Law Firms**

Becky Leigh Caruso, Greenberg Traurig, LLP, Florham Park, NJ, Craig A. Duewall, R. Kent Love, Greenberg Traurig, LLP, Austin, TX, for Plaintiff.

Andrew R. Gray, Littler Mendelson PC, Austin, TX, Michael P. Royal, Littler Mendelson, P.C., Dallas, TX, for Defendant Rebecca Everts.

Michael P. Royal, Littler Mendelson, P.C., Dallas, TX, for Defendant Reset Nation, LLC.

## <u>ORDER</u>

LEE YEAKEL, UNITED STATES DISTRICT JUDGE

**\*1** Before the court in the above styled and numbered removed action are, *inter alia*, Defendants Rebecca Everts and Reset Nation, LLC's Defendants' *Forum Non Conveniens* Motion to Dismiss, and In the Alternative, Motion to Dismiss For Failure to State a Claim filed February 24, 2022 (Doc. # 12), Plaintiff Heaven Media Limited's Plaintiff's Response to Defendants' *Forum Non Conveniens* Motion to Dismiss, and In the Alternative, Motion to Dismiss For Failure to State a Claim filed March 14, 2022 (Doc. #18), and Defendants' Reply in Further Support of It's Motion to Dismiss filed March 21, 2022 (Doc. #23). [1] On March 31, 2022, the court held a hearing on the Defendants' motion at which all parties were represented by counsel. Having considered the motion, response, reply, the arguments of counsel, and the applicable law, the court will grant the motion to dismiss for *forum non conveniens.* [2]

## Background

Plaintiff Heaven Media, a full-service, international, gaming-marketing agency formed in 2000 as a United Kingdom private liability company, employed Defendant Rebecca Everts. As a condition of employment, Heaven Media submitted two employment agreements to Everts, which both parties signed on December 10, 2019: (1) Project: New Business Manager NA, Freelance Contractor Agreement ("Contract"); and (2) Confidentiality and Non-Disclosure Agreement ("NDA"). According to the Contract, Everts was hired by Heaven Media to develop business opportunities and local accounts so that Heaven Media could deliver its services in Europe, Australia, and North America. The Contract provided that Everts's normal place of work would be her home in Austin, Texas, however, she may be asked to visit Heaven Media locations in the United Kingdom from time to time, or work in one-month increments elsewhere outside of the United States. The Contract was effective December 11, 2019, and the time period for the agreement was January 2, 2020, through January 2, 2021.

The amended complaint alleges that in February 2021, the parties negotiated in good faith and agreed to extend the agreements as well as to make them retroactive to January 3, 2021. Although the parties exchanged red-lined versions, Everts did not return a signed copy of the finalized agreement to Heaven Media. Despite this, the parties continued to work under the agreements through August 25, 2021. Everts gave a two-week notice that she would leave employment with Heaven Media on August 12, 2021, and Everts received her full and final payment from Heaven Media on August 27, 2021.

**\*2**  The Contract included a 12-month Restrictive Covenant, which provided Everts would not engage in competing activities in North America beginning when Everts leaves Heaven Media-Everts "cannot be in, or be concerned, engaged or interested in, or in any way assist, a business which competes with any business carried on by [Heaven Media] as at leaving date." It appears that the parties considered Everts's last day of employment to be August 25, 2021, therefore, the 12-month period ends August 25, 2022.

Also, each agreement included a governing-law and jurisdiction clause. The Contract provided:

12.10 **Governing Law.** The Contract, and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by, and construed in accordance with the law of England and Wales.

12.12 **Jurisdiction.** Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with the Contract or its subject matter or formation.

Similarly, the NDA provided:

9. **Choice of Law and Jurisdiction:** The validity of this Agreement and all matters relating to its interpretation and performance shall be interpreted in accordance with the laws of the United Kingdom applicable to contracts made and fully performed therein, but without regard to principles of conflicts of law. The Courts of the United Kingdom shall have exclusive jurisdiction over any controversy arising under this Agreement and the parties waive any claim or defen[s]e that such forum or venue is not convenient or proper. [3]

Despite these provisions, Heaven Media commenced this action against Everts in Texas state court. Heaven Media alleged that a recent investigation revealed that in July 2021, Everts, using Heaven Media's confidential and proprietary information, attempted to divert business opportunities away from Heaven Media. The investigation included information that Everts had solicited at least seven other Heaven Media employees to join her in a new competing venture–Reset Nation–a new business entity. Everts removed the action based on diversity, after which Heaven Media filed a verified amended complaint, adding Defendant Reset Nation and additional claims against Everts.

In reviewing the amended pleading, all claims alleged against Reset Nation are closely tied to and interconnected with the claims alleged against Everts. [4]  There are no claims alleged against Reset Nation independent of Everts's actions.

**Arguments**

**\*3**  Everts and Reset Nation move the court to enforce the forum-selection clauses in the agreements, which provide that this litigation must occur in a foreign jurisdiction–the United Kingdom-and to dismiss this action for *forum non conveniens. See Atlantic Marine Const. Co. v. United States Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013); *Fintech Fund, F.L.P. v. Horne,*

836 Fed. App'x 215, 222-27 (5th Cir. 2020). Everts and Reset Nation argue that the forum-selection clauses are mandatory, valid, and enforceable as there are no unusual facts or circumstances that render this action truly exceptional or rare, and therefore, dismissal is required. *See Atlantic Marine*, 571 U.S. at 61; *Weber v. PACTXPP Techs., AG*, 811 F.3d 758, 776 (5th Cir. 2016). Everts and Reset Nation request that the court award them an unspecified amount of attorney's fees and costs for bringing the motion.

Although the agreements were developed and produced by Heaven Media, it responds that under federal and Texas law, the forum-selection clauses are not valid, and the analysis outlined in *Atlantic Marine* does not apply. *See Barnett v. Dyncorp Int'l, LLC*, 831 F.3d 296, 301 (5th Cir. 2016) (In *Atlantic Marine*, "no dispute that the forum-selection clause was valid"); *Rieder v. Woods*, 603 S. W.3d 86, 93 (Tex. 2020). Heaven Media suggests that the forum-selection clauses here should not be enforced because the facts present an exceptional case of corporate espionage. Additionally, Heaven Media argues that Reset Nation, a nonsignatory to the agreements, cannot piggy-back with Everts's *forum non conveniens* arguments. Also, enforcement of the forum-selection clauses would deprive Heaven Media of its day in court and of a temporary legal remedy if it must restart legal proceedings in the United Kingdom. Heaven Media argues that because of Defendants' delay, there are only a few months remaining on Everts's restrictive covenant, and that Everts is likely to continue to violate the covenant. Heaven Media also argues that enforcement of the clauses would lead to the application of United Kingdom law to determine the enforceability of the restrictive convenant, and that contravenes a strong public policy of Texas. *See DeSantis v. Wackenhut Corp.*, 793 S. W.2d 670, 681 (Tex. 1990) (applying law of foreign state to determine enforceability of noncompete governing Texas resident would be contrary to fundamental policy of Texas); *see also Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 534 (5th Cir. 2020).

**Law**

A motion to dismiss for *forum non conveniens* is appropriate to enforce a mandatory forum-selection clause that requires legal action among the parties to occur in a different state or country. *Atlantic Marine*, 571 U.S. at 60. With a valid forum-selection clause, the *forum non conveniens* analysis is simplified because the plaintiff's choice of forum is given no weight and the private-interest factors weigh in favor of the parties' preselected forum, so that the court is only required to consider the public-interest factors. *Id.* at 63-64. Clauses that include terms such as "shall" or "exclusively" renders a forum-selection clause mandatory. *Barnett*, 831 F.3d at 299. Instances of a court overriding a forum-selection clause are "truly exceptional" and "rare." *Atlantic Marine*, 571 U.S. at 61; *Weber*, 811 F.3d at 776.

**Analysis**

The court disagrees with Heaven Media's position that the forum-selection clause is invalid. All of Heaven Media's claims against Everts and Reset Nation, even the tort claims, are related to the terms of the agreements. The court takes a common-sense view of the claims to determine whether the clauses are broad enough to cover the alleged tort actions. Additionally, "courts in this country.... enforce forum selection clauses in favor of non-parties 'closely related' to a signatory." *Freitsch v. Refco*, 56 F.3d 825, 827 (7th Cir. 1995). Given the types of claims alleged against Reset Nation, it is indisputable that Reset Nation and Everts are closely related and that all of the alleged conduct is within the scope of the forum-selection clause. Heaven Media does not allege any claims solely against Reset Nation, rather all alleged wrongful conduct by Reset Nation is in concert with Everts and only Everts. Finally, based on the language of the forum-selection clauses, both mandate that the United Kingdom "*shall* have *exclusive* jurisdiction for any disputes arising under the agreements." Additionally, a forum-selection clause with identical language to those at issue was before the Fifth Circuit in *Fintech Fund, F.L.P. v. Home*, 836 F. App'x 215 (5th Cir. 2020). The Circuit held English, not Texas law, should apply; English law requires forum-selection clauses to be construed broadly; and the mandatory forum-selection clause should be enforced. *Id.* Here, the court finds nothing that invalidates the forum-selection clauses.

 **\*4**  The court also disagrees with Heaven Media's position that this is a "truly exceptional" case and the enforceability of the forum-selection clauses is unreasonable when applying the public-interest factors. The court considered the public interest factors:

> (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Barnett*, 831 F.3d at 309. As for the first factor, nothing has been shown that there are any administrative difficulties with court congestion in the United Kingdom. Second, there is no local interest in resolving these nonlocal issues, which are basically contract disputes between Everts, a Texas resident, and Heaven Media, a United Kingdom private limited company. Additionally, the agreements specify that the laws of the United Kingdom govern any dispute. A United Kingdom court will be best acquainted with the nation's own laws. With regard to the fourth factor, a court in the United Kingdom would apply its local law. Finally, the United Kingdom is not an unrelated forum, as Heaven Media is a United Kingdom private limited company. The court finds that the record and the agreements themselves provide that the overwhelming weight of the public interest factors weigh in favor of upholding the parties' intent as expressed in the agreements' forum-selection clauses.

The court also concludes that Reset Nation may enforce the forum-selection clauses as the claims alleged against it are closely linked to Everts and to the agreements. *See Alternative Delivery Solutions v. R. R. Donnelley & Sons Co.*, No. SA-05-CV-0172, 2005 WL 1862631, at * 15 (W.D. Tex. July 8, 2005) (allowing individual defendant to enforce forum-selection clause in arbitration agreement); *see also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause"); *Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997) ("foreign arbitration clauses are but a subset of foreign forum selection clauses in general").

**Conclusion**

The court concludes that the forum-selection clauses in Heaven Media's Contract and the NDA are valid. Further, Heaven Media has failed to show that this is an exceptional case, and therefore, the court concludes the forum-selection clauses in the Contract and the NDA are enforceable. The court will dismiss all claims alleged by Plaintiff Heaven Media against Defendants Rebecca Everts and Reset Nation for *forum non conveniens*.

The court will include a return-jurisdiction clause, as such a clause remedies the concern that the United Kingdom may refuse to accept jurisdiction of this case or that defendants will refuse to submit to its jurisdiction. *See Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 675 (5th Cir. 2003). A return jurisdiction clause remedies this concern by permitting parties to return to the dismissing court should the lawsuit become impossible in the foreign forum. *Id.*

 **\*5**  Because all claims are dismissed for *forum non conveniens*, the court does address Defendants' alternative request that the action be dismissed for failure to state a claim. Finally, in Everts and Reset Nation's reply to Heaven Media's response, Everts and Reset Nation request that the court award them attorney's fees and costs incurred in bringing the motion to dismiss to redress Heaven Media's breach of the parties' forum-selection and choice-of-law provisions. Lacking from the case file is any support for a reasonable sum certain amount of attorney's fees incurred by Everts and Reset Nation, and therefore, the court will deny the request for attorney's fees. The court will however, order that Heaven Media bear the court costs.

**IT IS ORDERED** that Defendants Rebecca Everts and Reset Nation, LLC's Defendants' *Forum Non Conveniens* Motion to Dismiss, and In the Alternative, Motion to Dismiss For Failure to State a Claim filed February 24, 2022 (Doc. #12) is **GRANTED.**

**IT IS FURTHER ORDERED** that all claims alleged by Plaintiff Heaven Media against Defendants Rebecca Everts and Reset Nation, LLC are **DISMISSED FOR *FORUM NON CONVENIENS.***

**IT IS FURTHER ORDERED** that if the courts of the United Kingdom refuse to accept jurisdiction of this case for reasons other than Plaintiff Heaven Media's refusal to pursue an action or to comply with the procedural requirements of United Kingdom courts, upon timely notification, this court may reassert jurisdiction.

**IT IS FURTHER ORDERED** that Defendants Rebecca Everts and Reset Nation, LLC's request for attorney's fees is **DENIED.**

**All Citations**

Slip Copy, 2022 WL 18585892

### Footnotes

1    Also pending are Plaintiff's Motion for Preliminary Injunction filed February 24, 2022 (Doc. #11) and Plaintiff's Opposed Motion for Expedited Discovery filed March 2, 2022 (Doc. #13).

2    Alternatively, Everts and Reset Nation seek dismissal of this action for failure to state a claim for which relief may be granted because Heaven Media failed to comply with the Texas law that requires a foreign entity be registered with the Texas Secretary of State before maintaining a lawsuit in Texas that is based on a transaction in the state. *See* Tex. Bus. Org. Code Ann. § 9.051(b) (West 2020). The court declines to address the alternative argument as the court will dismiss all claims for *forum non conveniens.*

3    Although the Contract refers to the laws and courts of "England and Wales," and the NDA refers to the laws and courts of the "United Kingdom," the parties raise no argument that this difference favors or disfavors either party. The court concludes that this difference is of no consequence to the analysis of the legal issues presented. The court will refer to the laws and courts of the United Kingdom.

4    Heaven Media alleges 9 types of claims against Everts and Reset Nation: (1) breach of contract–restrictive covenant against Everts; (2) breach of contract–NDA against Everts; (3) breach of contract against Everts "and/or destruction of Heaven Media materials and property" against Everts and Reset Nation; (4) misappropriation of trade secrets under Title 18 United States Code section 1836 against Everts and Reset Nation; (5) breach of fiduciary duty against Everts; (6) tortious interference with existing contracts against Everts and Reset Nation; (7) tortious interference with prospective relations against Everts and Reset Nation; (8) unjust enrichment against Everts and Reset Nation; and (9) conspiracy against Everts and Reset Nation. Additionally, Heaven Media seeks a temporary and permanent injunction against Everts and Reset Nation.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

131 Nev. 686
Supreme Court of Nevada.

LAND BARON INVESTMENTS, Inc., a Nevada Corporation; Michael Chernine, a Trustee
of the Misha Trust; and Robert Black, Jr., Trustee of the Blackbush Family Trust, Appellants,

v.

BONNIE SPRINGS FAMILY LIMITED PARTNERSHIP, a Nevada Limited Partnership;
Bonnie Springs Management Company, a Nevada Limited Liability Corporation; Alan Levinson,
an Individual; Bonnie Levinson, an Individual; and April Boone, an Individual, Respondents.

No. 59687
|
Sept. 17, 2015.
|
Rehearing denied November 24, 2015.
|
Reconsideration En Banc Denied Jan. 22, 2016.

**Synopsis**

**Background:** Land purchaser brought action against vendor for rescission based on mutual mistake, misrepresentation and nondisclosure, and other claims, and vendor counterclaimed for abuse of process and nuisance, among others, arising out of purchaser's difficulty in obtaining access and water rights for purchased land. The District Court, Clark County, Douglas W. Herndon, Kathleen E. Delaney, and Gloria Sturman, JJ., granted summary judgment to vendor on water rights issues, denied purchaser summary judgment on mutual mistake claim and abuse of process and nuisance counterclaims, 2010 WL 7281239, and, after jury trial, awarded damages to vendor for abuse of process and nuisance, 2011 WL 3565163. Purchaser appealed.

**Holdings:** The Supreme Court, Hardesty, C.J., held that:

purchaser bore risk of mistake;

there was no evidence vendor represented facts as required for misrepresentation claim;

vendor was not liable for alleged nondisclosure;

there was no evidence that purchaser held improper motive as required for abuse of process counterclaim; and

sufficient evidence supported award of damages for nuisance claim.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*\*514** Cotton, Driggs, Walch, Holley, Woloson & Thompson and John H. Cotton and Christopher G. Rigler, Las Vegas, for Appellants.

Land Baron Inv. v. Bonnie Springs Family LP, 131 Nev. 686 (2015)

356 P.3d 511, 131 Nev. Adv. Op. 69

Greenberg Traurig, LLP, and Tyler R. Andrews and Philip M. Hymanson, Las Vegas, for Respondents.

Darren J. Welsh, Chtd., and Darren J. Welsh, Las Vegas, for Amicus Curiae Prudential Americana Group, Realtors.

BEFORE HARDESTY, C.J., PARRAGUIRRE and CHERRY, JJ.

*OPINION*

By the Court, HARDESTY, C.J.:

 **\*689**  This appeal arises from a failed land sale contract and raises three issues of first impression. First, we must consider whether a mutual mistake will provide a ground for rescission where one of the parties bears the risk of mistake. Second, we must determine whether an abuse of process claim may be supported by a complaint to an administrative agency instead of one involving a legal process. Finally, we consider whether a nuisance claim seeking to recover only emotional distress damages requires proof of physical harm.

In addressing the first issue, we adopt the Restatement (Second) of Contracts § 154(b) (1981), which provides that a party bears the risk when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." In this,  **\*690**  we reject mutual mistake as a basis for rescission. We also reject the assertions that an abuse of process claim may be supported by a complaint to an administrative agency or that a nuisance claim seeking only emotional distress damages must be supported by proof of physical harm. Accordingly, we affirm in part and reverse in part the district court's orders and judgment.

*FACTS*

*Factual background*

In 2004, appellants Land Baron Investments, Inc., Michael Chernine, and Robert Black, Jr. (collectively, Land Baron), contracted to purchase land for $17,190,000 from respondents Bonnie Springs Family Limited Partnership, Bonnie Springs Management Company, Alan Levinson, Bonnie Levinson, and April Boone (collectively, Bonnie Springs) for the express purpose of building a subdivision. The property lies next to the Bonnie Springs Ranch, beyond the outskirts of Las Vegas and is surrounded largely by undeveloped land.

Prior to signing the purchase agreement, Land Baron verified that Bonnie Springs had title to the property but did not inquire into water or access rights or do any other due diligence. Land Baron drafted the purchase agreement, which stated that Bonnie Springs would allow Land Baron to use some of its treated wastewater for landscaping but did not mention access or water rights or make the contract contingent upon its ability to secure access, water, or any other utility necessary for the planned subdivision. Immediately after signing the agreement and while the sale was pending, Land Baron also began listing and relisting the property for sale, first as a single piece of property and then as separate parcels. However, obtaining access and water proved to be difficult, and beginning in December 2004, the parties amended the purchase agreement five times to extend the escrow period, with Land Baron paying a nonrefundable fee of $50,000 for each extension.

 **\*\*515**  The property is flanked by two gravel roads, Los Loros Lane and Gunfighter Lane, both of which overlap or border Federal Bureau of Land Management (BLM) land. Clark County informed Land Baron it would not approve either road as access into the proposed subdivision unless the road was widened and paved. After further researching the issue, Land Baron discovered that Gunfighter Lane could not be paved or widened because a right-of-way [1] would not  **\*691**  allow it and that Los Loros Lane [2] likewise could not be paved or widened because it was on National Conservation Land and use of that road could constitute a trespass.

In September 2005, Land Baron began a search for water rights for the subject property. An attempt to buy existing water rights from another owner in the area failed because the rights were not in the same water basin. Land Baron was unable to find a viable option for obtaining water rights from nearby water sources and was unable to bring in water by a pipeline from another development. Land Baron asked Bonnie Springs if it would be willing to share its commercial water rights from the Bonnie Springs Ranch, but Bonnie Springs informed Land Baron that it could not allow its commercial water to be used in the residential development. Despite these issues, Land Baron never attempted to amend the language of the agreement with Bonnie Springs to address concerns with access or water.

The parties met in August 2007 to discuss the access and water rights issues. Land Baron informed Bonnie Springs that, because the property would likely need to be sold as a single parcel rather than as individual lots in a subdivision, its value was greatly reduced. Following this meeting, Land Baron failed to make a payment to extend the escrow period through September 2007. On September 26, 2007, Bonnie Springs notified Land Baron that it was in breach and that Bonnie Springs was terminating escrow and keeping the deposits as liquidated damages. The next day, Bonnie Springs notified the title company of Land Baron's breach and requested that escrow be terminated.

Subsequent negotiations proved unsuccessful, and Land Baron filed a citizen's complaint with the Clark County Commissioner's office alleging that there were multiple county code violations on the Bonnie Springs Ranch. The complaints were based on investigations allegedly performed at Bonnie Springs Ranch by individuals it hired to search for code violations. These investigators allegedly found horses that had been electrocuted or infected with West Nile virus; turtles in the petting zoo that were infected with salmonella; licensing issues with the motel and business; code violations with the walkways, handrails, restrooms, shade structures, electrical wiring, and stairways; and other health, waste, and zoning issues. As a result, the county commissioner and multiple state and local regulatory agencies performed a large-scale inspection of the Bonnie Springs Ranch during business hours, when guests and school children were present. Officials from each county office arrived at the ranch in police vehicles that had lights flashing. No violations were found on the Bonnie Springs Ranch.

**\*692** *Procedural background*

The same month it filed the citizen's complaint, Land Baron also filed a complaint against Bonnie Springs in district court, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation and nondisclosure, negligent misrepresentation, rescission based on mutual mistake, rescission based on unilateral mistake, rescission based on failure of consideration, and rescission based on fraud in the inducement. All of the claims centered on Land Baron's difficulty obtaining access and water rights for the subject property. Bonnie Springs counterclaimed for breach of contract, abuse of **\*\*516** process, nuisance, fraudulent misrepresentation, intentional interference with contractual relations, and slander of title.

Several summary judgment motions were filed. Of note, Bonnie Springs filed a motion for summary judgment on the ground that it had no legal or contractual duty to provide or secure water rights for the property. And Land Baron filed a motion for summary judgment to confirm its right to rescind the contract based on mutual mistake.

The district court granted Bonnie Springs' motion for summary judgment on the water rights issues. It found that Bonnie Springs had no contractual duty to provide notice of water rights issues or to help secure water rights for the subject property, and that the burden was on Land Baron to secure water rights.

The district court then denied Land Baron's motion for summary judgment regarding mutual mistake. The court found that there was no mutual mistake because the parties did not know, at the time of the agreement, whether there were sufficient access and water rights to support a subdivision on the property, and it assigned the risk of that mistake to Land Baron. Finally, the district court granted Land Baron's second summary judgment motion dismissing Bonnie Springs' intentional interference with contractual relations and fraudulent misrepresentation claims because it found that there were no remaining factual issues.

Land Baron Inv. v. Bonnie Springs Family LP, 131 Nev. 686 (2015)

356 P.3d 511, 131 Nev. Adv. Op. 69

However, it denied the motion as to Bonnie Springs' counterclaims for breach of contract, abuse of process, nuisance, and slander of title because it found that factual issues remained.

The parties proceeded to trial on Bonnie Springs' remaining counterclaims for abuse of process and nuisance. [3] Prior to closing arguments, Land Baron made a motion for a directed verdict, arguing that Bonnie Springs had failed to satisfy the elements of each **\*693** claim and had failed to prove the physical harm necessary to support emotional distress damages under the nuisance claim. The district court denied the motion. [4]

The jury returned a unanimous verdict for Bonnie Springs on its nuisance and abuse of process counterclaims, awarding Bonnie Springs $1,250,000 as compensatory damages for its abuse of process counterclaim and $350,000 as compensatory damages for its nuisance counterclaim. The jury awarded Bonnie Springs an additional $1,512,500 in punitive damages on the abuse of process counterclaim and an additional $762,500 in punitive damages on the nuisance counterclaim.

Land Baron moved for a mistrial. It argued, among other things, that emotional distress damages may not be awarded on a nuisance or abuse of process claim absent proof of physical harm. The district court denied the motion, finding that a party did not need to prove physical harm in order to recover emotional distress damages for nuisance and abuse of process claims in Nevada. Judgment on the jury verdict, including an award of attorney fees and costs in favor of Bonnie Springs, was entered. After, Land Baron moved for reconsideration, which the district court denied.

Land Baron now appeals.

### DISCUSSION

On appeal, the parties dispute whether the district court erred in denying Land Baron's motion for summary judgment on its rescission claim and granting Bonnie Springs' motion for summary judgment on Land Baron's misrepresentation and nondisclosure claims. Land Baron also argues that the district **\*\*517** court improperly denied its motions for a directed verdict on Bonnie Springs' abuse of process and nuisance claims.

 We review de novo the grant or denial of summary judgment. *Wood v. Safeway, Inc.,* 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005); *see also* NRCP 56(c). Summary judgment should be granted when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact remaining in the case, and where the moving party is entitled to judgment as a matter of law. *Id.* at 729, 121 P.3d at 1029. In reviewing a ruling for or against a directed verdict, this court applies the same standard as the trial court, viewing the evidence in the light most favorable " 'to the party against whom the motion is made.' " **\*694** *M.C. Multi–Family Dev., LLC v. Crestdale Assocs., Ltd.,* 124 Nev. 901, 910, 193 P.3d 536, 542 (2008) (quoting *Bliss v. DePrang,* 81 Nev. 599, 601, 407 P.2d 726, 727 (1965)).

*The district court did not err in denying Land Baron's motion for summary judgment on its mutual mistake rescission claim*
Land Baron argues that it was entitled to summary judgment on its rescission claim because both Land Baron and Bonnie Springs mistakenly believed there would be sufficient access and water rights for a subdivision on the property, giving rise to a mutual mistake that would render the contract voidable.

 A contract may be rescinded on the basis of mutual mistake " 'when both parties, at the time of contracting, share a misconception about a vital fact upon which they based their bargain.' " *Gramanz v. Gramanz,* 113 Nev. 1, 8, 930 P.2d 753, 758 (1997) (quoting *Gen. Motors v. Jackson,* 111 Nev. 1026, 1032, 900 P.2d 345, 349 (1995)). However, mutual mistake will not provide grounds for rescission where a party bears the risk of mistake. Restatement (Second) of Contracts §§ 152(1), 154(b), (c) (1981). If the party is aware at the time he enters into the contract "that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient," that party will bear the risk. Restatement

(Second) of Contracts § 154(b) (1981). Moreover, if the risk is reasonably foreseeable and yet the contract fails to account for that risk, a court may infer that the party assumed that risk. *United States v. Winstar Corp.,* 518 U.S. 839, 905–06, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (noting that in considering if a risk is foreseeable in a regulatory setting, absent a specific contract provision, the party assumes the risk); *see also Tarrant v. Monson,* 96 Nev. 844, 845–46, 619 P.2d 1210, 1211 (1980) ("One who is uncertain assumes the risk that the facts will turn out unfavorably to his interests," and where the party bargains "with conscious uncertainty," there cannot be mutual mistake). The party also bears the risk of mistake if the court allocates that risk to the party on the ground that to do so is reasonable under the circumstances. Restatement (Second) of Contracts § 154(c) (1981).

 Here, we need not determine whether Land Baron and Bonnie Springs shared a mistaken assumption about the certainty of procuring access and water rights because Land Baron bore the risk of mistake, foreclosing any possibility of rescinding the contract based on a mutual mistake. Land Baron is a sophisticated and experienced land buyer and developer, and in this instance, it contracted to purchase property that was well beyond the outskirts of Las Vegas, surrounded by land that was mostly undeveloped, flanked by dirt  **\*695**  roads, and only a few minutes away from Red Rock Canyon, a well-known conservation area. Land Baron also drafted the contract and its amendments. Yet, despite including a section for contingencies, Land Baron failed to include language to address the possibilities that a narrow gravel road may not provide sufficient access to a subdivision, or that water may not be available to support a neighborhood complete with large homes and horse pastures. At best, this was a significant oversight for this type of project, and it can be fairly inferred that by failing to provide for such contingencies, Land Baron assumed the risk of mistake as to these issues. *Winstar Corp.,* 518 U.S. at 906, 116 S.Ct. 2432.

 **\*\*518**  Land Baron argues that Bonnie Springs assured it that water, at least, would not be a problem. However, Land Baron points to no evidence (as opposed to Land Baron's assertions) that Bonnie Springs ever actually made such a statement and thus fails to show a genuine issue of material fact. Rather, the record indicates that Land Baron entered into the contract without conducting any due diligence, [5] hoping that it could procure water, access, and any other utility necessary to obtain development permits. A hope that things will work out is not the same as a reasonable belief in a set of facts, and Land Baron assumed the risk by proceeding with the contract despite having limited knowledge of the actual conditions as to water and access. Thus, rescission is not appropriate on grounds of mutual mistake. [6] The district court did not err in granting summary judgment on Land Baron's rescission claims.

 Land Baron argues that Bonnie Springs misrepresented, either intentionally or negligently, Land Baron's ability to obtain access or water rights. Specifically, it alleges that Bonnie Springs knew Los Loros Lane was on BLM land and had previously dealt with the BLM regarding land use issues on the surrounding property, and that Bonnie Springs knew Land Baron would not be able to get water rights for the subdivision and had represented to Land Baron that Bonnie Springs would provide water. It asserts that genuine issues of material fact remain and that the district court erred in dismissing these claims on summary judgment.

 At the threshold, to establish a claim for either intentional or negligent misrepresentation, Land Baron must show that Bonnie  **\*696**  Springs supplied Land Baron with false information. *Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 446–47, 449, 956 P.2d 1382, 1386–87 (1998). Summary judgment is appropriate on either of these claims if Land Baron has not provided evidence of this essential element. *Id.* at 447, 956 P.2d at 1386. Here, Land Baron has provided no evidence that Bonnie Springs ever represented that there would be no impediment to gaining access for a subdivision via either Los Loros or Gunfighter Lanes, or that Bonnie Springs had stated that it would supply the property with water. Because the record does not indicate that Bonnie Springs ever misrepresented any facts regarding access or water to Land Baron, summary judgment was appropriate on the misrepresentation claims.

*The district court did not err in granting Bonnie Springs' motion for summary judgment on Land Barons nondisclosure claim*
 Land Baron next argues that Bonnie Springs knew, and did not disclose, that the property could not be supplied with adequate water and that both Los Loros and Gunfighter Lanes were on BLM land, giving rise to a claim for nondisclosure. Nondisclosure arises where a seller is aware of materially adverse facts that "could not be discovered by the buyer" after diligent inquiry. *Mackintosh v. Jack Matthews & Co.,* 109 Nev. 628, 633, 855 P.2d 549, 552 (1993). "[W]hen the defect is patent and obvious,

*Land Baron Inv. v. Bonnie Springs Family LP, 131 Nev. 686 (2015)*

356 P.3d 511, 131 Nev. Adv. Op. 69

and when the buyer and seller have equal opportunities of knowledge," a seller cannot be liable for nondisclosure. *Collins v. Burns,* 103 Nev. 394, 397, 741 P.2d 819, 821 (1987). Liability for nondisclosure is generally not imposed where the buyer either knew of or could have discovered the defects prior to the purchase. *Mitchell v. Skubiak,* 248 Ill.App.3d 1000, 188 Ill.Dec. 443, 618 N.E.2d 1013, 1017 (1993).

 The record makes clear that Land Baron could have, and did, discover the facts surrounding the difficulty or impossibility of obtaining sufficient water and access for a subdivision on the property. Those defects arose from government regulations, were public knowledge, and were available to anyone upon inquiry. Thus, even if Bonnie **\*\*519** Springs had known about these facts and not disclosed them, there would still be no viable nondisclosure claim because the facts were discoverable and Land Baron had an "equal opportunit[y]" to discover, and did discover, those facts before closing. *Collins,* 103 Nev. at 397, 741 P.2d at 821. We also note that the record shows that Bonnie Springs was not aware, prior to signing the contract, that Land Baron would be unable to obtain water rights or that neither Los Loros Lane nor Gunfighter Lane would provide **\*697** suitable access.[7] Moreover, water rights are public information that can be accessed through the Nevada District of Water Resources' (NDWR) website, and Black testified that Land Baron, through its engineering firm, was in the best position to know how much water was going to be needed for the proposed subdivision and whether it would be possible to procure that amount of water. Also, Land Baron was aware that it would need to obtain access approval across BLM land, as is evidenced by its August 2006 request for permission from Clark County to request a right-of-way across BLM land.[8]

Thus, we conclude that Bonnie Springs cannot be liable for nondisclosure regarding water rights or access.[9] Accordingly, we conclude that summary judgment was appropriate as a matter of law on Land Baron's nondisclosure claim.

*The district court's denial of Land Baron's motion for a directed verdict on Bonnie Springs' abuse of process and nuisance counterclaims*

 We next turn to whether the damages award was proper on Bonnie Springs' abuse of process and nuisance counterclaims, and whether Bonnie Springs was required to provide evidence of physical harm in order to recover emotional distress damages. We review questions of law de novo. *See Gonski v. Second Judicial Dist. Court,* 126 Nev. 551, 557, 245 P.3d 1164, 1168 (2010).

*Abuse of process*

 To support an abuse of process claim, a claimant must show " '(1) an ulterior purpose by the [party abusing the process] other **\*698** than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding.' " *LaMantia v. Redisi,* 118 Nev. 27, 31, 38 P.3d 877, 880 (2002); *Posadas v. City of Reno,* 109 Nev. 448, 457, 851 P.2d 438, 444–45 (1993) (quoting *Kovacs v. Acosta,* 106 Nev. 57, 59, 787 P.2d 368, 369 (1990)); *see also Exec. Mgmt., Ltd. v. Ticor Title Ins. Co.,* 114 Nev. 823, 843, 963 P.2d 465, 478 (1998). Thus, the claimant must provide facts, rather than conjecture, showing that the party intended to use the legal process to further an ulterior purpose. *LaMantia,* 118 Nev. at 31, 38 P.3d at 880 (holding that where the party presented only conjecture and no evidence that the opposing party actually intended to improperly use the legal process for a purpose other than to resolve the legal dispute, there was no abuse of process). The utilized process must be judicial, as the tort protects the integrity of the court. *ComputerXpress, Inc. v. Jackson,* 93 Cal.App.4th 993, 113 Cal.Rptr.2d 625, 644 (2001); *Stolz v. Wong Commc'ns Ltd. P'ship,* 25 Cal.App.4th 1811, 31 Cal.Rptr.2d 229, 236 (1994). Furthermore, the tort requires a "willful act," and **\*\*520** the majority of courts have held that merely filing a complaint and proceeding to properly litigate the case does not meet this requirement. *See, e.g.,Pomeroy v. Rizzo,* 182 P.3d 1125, 1128 (Alaska 2008); *Ramona Unified Sch. Dist. v. Tsiknas,* 135 Cal.App.4th 510, 37 Cal.Rptr.3d 381, 389 (2005); *Weststar Mortg. Corp. v. Jackson,* 133 N.M. 114, 61 P.3d 823, 831 (2002); *Muro–Light v. Farley,* 95 A.D.3d 846, 944 N.Y.S.2d 571, 572 (2012); *Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now (C.L.E.A.N.),* 119 Wash.App. 665, 82 P.3d 1199, 1217 (2004).

 We agree with the majority rule that filing a complaint does not constitute abuse of process. The tort requires a "willful act" that would not be "proper in the regular conduct of the proceeding," *Kovacs,* 106 Nev. at 59, 787 P.2d at 369, and filing a

complaint does not meet this requirement. Moreover, we agree with other jurisdictions' holdings that abuse of process claims do not encompass actions involving administrative agencies. *See, e.g., ComputerXpress,* 113 Cal.Rptr.2d at 644. The tort requires the abuse of "legal process," *Kovacs,* 106 Nev. at 59, 787 P.2d at 369, but courts are not usually involved in the conduct of administrative agencies. *Crowe v. Horizon Homes, Inc.,* 116 S.W.3d 618, 623 (Mo.Ct.App.2003) (in contrast to administrative process, legal process is founded upon court authority).

 Here, Bonnie Springs failed to establish the elements of abuse of process. Bonnie Springs alleges that Land Baron abused process by filing a civil complaint and by filing a citizen's complaint with the county commissioner for the ulterior purpose of coercion. However, filing a citizen's complaint does not demonstrate abuse of *legal*  **\*699**  process, and Bonnie Springs has alleged no facts that show Land Baron improperly abused the legal process in filing its complaint or litigating the case. Nor did it present any evidence at trial of an improper motive, other than its own allegations that Land Baron filed its complaint for an ulterior purpose. Therefore, we conclude that the district court erred in denying Land Baron's motion for a directed verdict on the abuse of process counterclaim. [10]

*Nuisance*

 Nuisance arises where one party interferes with another party's use and enjoyment of land, and that interference is both substantial and unreasonable. *Sowers v. Forest Hills Subdivision,* ––– Nev. ––––, ––––, 294 P.3d 427, 432 (2013). In its answer to the complaint, Bonnie Springs based its nuisance counterclaim on the complaint filed with the county commissioner and the resulting inspection, alleging that this inspection caused "needless expense and loss of income" and that recoverable costs were incurred when Bonnie Springs paid attorney fees to defend itself in the ensuing litigation. During trial, however, Bonnie Springs' representatives admitted that it had suffered no known economic harm as a result of the inspection, and although it believed the inspection had damaged its reputation, it presented no evidence to that extent. Instead, they urged the jury to award damages for the emotional pain and suffering inflicted by the nuisance. [11]

Courts differ on whether a plaintiff must prove physical harm to recover for emotional distress arising under a nuisance claim. *Compare Bailey v. Shriberg,* 31 Mass.App.Ct. 277, 576 N.E.2d 1377, 1380 (1991) (concluding that evidence of physical injury is necessary in an emotional distress claim based on nuisance), *with Herzog v. Grosso,* 41 Cal.2d 219, 259 P.2d 429, 433 (1953) (determining that occupants could recover for mere annoyance and discomfort, such as lack of sleep, for a cause of action for nuisance). However,

> **\*\*521**  [i]t seems to be the prevailing view in most jurisdictions that, in a nuisance action, an owner or occupant of real estate is entitled to recover damages for personal inconvenience, discomfort, annoyance, anguish, or sickness, distinct from, or in  **\*700**  addition to, damages for depreciation in value of property or its use.

Tracy A. Bateman, Annotation, *Nuisance as Entitling Owner or Occupant of Real Estate to Recover Damages for Personal Inconvenience, Discomfort, Annoyance, Anguish, or Sickness, Distinct From, or in Addition To, Damages for Depreciation in Value of Property or Its Use,* 25 A.L.R. 5th 568 (1994). *See, e.g., Kornoff v. Kingsburg Cotton Oil Co.,* 45 Cal.2d 265, 288 P.2d 507, 512 (1955) (reiterating that "[o]nce a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue") (internal quotations omitted); *Webster v. Boone,* 992 P.2d 1183, 1185–86 (Colo.App.1999) (holding that damages for nuisance claim can include discomfort and annoyance); *Reichenbach v. Kraska Enters., LLC,* 105 Conn.App. 461, 938 A.2d 1238, 1245 (2008) (holding that trier of fact can consider discomfort and annoyance in nuisance damages claim). Further, Restatement (Second) of Torts § 929(1)(c) (1979) provides that the damages for nuisance include "discomfort and annoyance" to the occupants.

This court has not previously addressed emotional distress damages arising under a nuisance claim. We conclude that California, Colorado, Connecticut, and the Restatement offer the better-reasoned approach for recovering damages based on a nuisance claim. Because damages for nuisance include personal inconvenience, discomfort, annoyance, anguish, or sickness, an occupant need not show physical harm to recover.

Bonnie Springs bases its nuisance counterclaim on Land Baron's complaint to the county commissioner and the resulting inspection of Bonnie Springs Ranch. The record shows that the inspection lasted several hours, during which the group of inspecting agents separately moved through the property conducting a thorough search, which included pulling apart beds in the motel and searching dark areas with a black light. Bonnie Springs' representatives testified that the inspection caused an interruption in business and that it believed the ranch's reputation had suffered as a result, even though the county failed to find evidence of any of the violations alleged by Land Baron. Bonnie Springs' representatives also testified that they lost sleep, had anxiety, and were very upset from the investigations and inspection.

While we do not opine as to whether the facts are sufficient to support a nuisance claim, the facts here support the damages arising under such a claim. Accordingly, we conclude that the district court **\*701** did not err by denying Land Baron's motion for a directed verdict on the nuisance counterclaim, as Bonnie Springs presented evidence sufficient to merit a damages award.

## CONCLUSION

Because insufficient facts exist to support the abuse of process counterclaim, the district court erred in refusing to enter a directed verdict on this counterclaim. Therefore, the judgment on the jury's award of compensatory and punitive damages [12] for the abuse **\*\*522** of process claim must be reversed. Conversely, we affirm the damages award and corresponding punitive damages award under the nuisance counterclaim. [13] Based on our decision, we thus affirm the district court's award of attorney fees and costs. [14]

Accordingly, for the reasons set forth above, we affirm in part and reverse in part the district court's orders and judgment.

We concur: PARRAGUIRRE and CHERRY, JJ.

**All Citations**

131 Nev. 686, 356 P.3d 511, 131 Nev. Adv. Op. 69

## Footnotes

[1]    The BLM informed Land Baron that Gunfighter Lane was known as an "R.S. 2477 right-of-way" road. An employee from Clark County Development Services indicated that R.S. 2477 roads are roads across BLM land that have been adopted and maintained by the county as public roads but that cannot be altered from their original condition in any way.

[2]    At the time of this appeal, Land Baron's application with the BLM to widen and pave Los Loros Lane was still pending approval.

[3]    The parties also went to trial on Bonnie Springs' breach of contract and slander of title counterclaims. Bonnie Springs filed a separate trial brief seeking judicial determination in its favor on the breach of contract counterclaim, which the

district court granted. The district court also granted Land Baron's motion for a directed verdict on the slander of title counterclaim, and the parties do not dispute either ruling on appeal.

4 The motion was brought on behalf of three parties: appellants Michael Chernine, Robert Black, and Land Baron. The motion was granted as to Chernine but denied as to the other parties. The parties do not appeal the grant in favor of Chernine.

5 Land Baron admitted that the only step it took was to ask a friend of the corporation whether Bonnie Springs actually held title to the property.

6 Because we conclude that Land Baron was not entitled to rescind the contract on the basis of mutual mistake, we do not address Bonnie Springs' arguments that Land Baron is precluded from seeking rescission because (1) the doctrine of unclean hands precludes equitable relief, and (2) Land Baron failed to seek rescission within a reasonable time.

7 Alan Levinson and April Boone both testified that they were not aware of these issues prior to signing the agreement, and that they had never attempted to widen or pave the roads themselves. Although there is evidence that at some point an official advised Bonnie Springs that the county would not approve a transfer of water rights from Bonnie Springs to the property for purposes of supplying water to a subdivision, that testimony does not show that Bonnie Springs knew, in advance of the contract, that Land Baron would be unable to procure *any* water rights for the property.

8 We reject Land Baron's argument that a prior dispute between Bonnie Springs and the BLM regarding a parking lot on the Bonnie Springs Ranch indicated that Bonnie Springs was aware of potential access issues because that dispute did not concern widening or paving either Los Loros Lane or Gunfighter Lane.

9 Because the record reveals that Bonnie Springs was not aware of the water rights and access issues, we do not address amicus curiae party Prudential Americana Group's argument that allowing Bonnie Springs not to disclose these issues will detrimentally harm purchasers of real estate by reinstating strict application of the rule of caveat emptor in Nevada.

10 We likewise conclude that the district court abused its discretion by denying Land Baron's motion for reconsideration on this issue. *AA Primo Builders, LLC v. Washington,* 126 Nev. 578, 589, 245 P.3d 1190, 1197 (2010) (noting that a motion for reconsideration is reviewed for an abuse of discretion when appealed with the underlying judgment).

11 On appeal, Land Baron does not argue that the district court inappropriately included the Bonnie Springs' entities in the counter-plaintiff category and, thus, does not argue whether such entities are incapable of emotion. *See HM Hotel Properties v. Peerless Indem. Ins. Co.,* 874 F.Supp.2d 850, 854 (D.Ariz.2012). Accordingly, we do not address this distinction.

12 Punitive damages generally may not be awarded when there is no basis for compensatory damages. *See Tucker v. Marcus,* 142 Wis.2d 425, 418 N.W.2d 818 (1988). *See also* Richard C. Tinney, J.D., Annotation, *Sufficiency of Showing Actual Damages to Support Award of Punitive Damages—Modern Cases,* 40 A.L.R.4th 11, § 2[a] (1985) ("The general rule that punitive damages may not be awarded unless the party seeking them has sustained actual damage is accepted universally...."); J.D. Lee & Barry A. Lindahl, 2 *Modern Tort Law: Liability and Litigation* § 21:49 (2d ed. 2002) ("As a general rule a plaintiff is required to establish actual damages before he or she may be entitled to recover punitive damages."); John J. Kircher & Christine M. Wiseman, 1 *Punitive Damages: Law and Practice* 2d § 5:21, 401 (2015) ("Abundant authority exists to support the proposition that a finding must be entered entitling the plaintiff to actual damages before that plaintiff will be allowed to recover punitive damages.").

13 After review, we conclude that Land Baron's remaining arguments are without merit.

14 We disagree that sanctions should issue for Bonnie Springs' "trial by ambush." Trial by ambush traditionally occurs where a party withholds discoverable information and then later presents this information at trial, effectively ambushing the opposing party through gaining an advantage by the surprise attack. *See, e.g., Clark v. Trailways, Inc.,* 774 S.W.2d

**Land Baron Inv. v. Bonnie Springs Family LP, 131 Nev. 686 (2015)**

356 P.3d 511, 131 Nev. Adv. Op. 69

644, 646 (Tex.1989); *Johnson v. Berg,* 848 S.W.2d 345, 349 (Tex.App.1993). Here, Land Baron points to instances where Bonnie Springs briefly raised arguments and evidence that Land Baron was already aware of and objected to during the trial. The trial judge either overruled these objections or sustained them and took steps necessary to mitigate any damage. Such is not the type of action or level of seriousness that constitutes trial by ambush.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2710178

2023 WL 2710178
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Mary Grace MAGTOLES, Aira C. Tan, Ana Myrene Espinosa, and Ana Mervine
Espinosa, individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED STAFFING REGISTRY, INC. d/b/a United Home Care and Benjamin H. Santos, Defendants.

21-CV-1850 (KAM) (PK)
|
Signed March 30, 2023

**Synopsis**

**Background:** Citizens of Republic of Philippines who worked as healthcare professionals in New York area brought putative class action lawsuit against staffing company which employed them and its owner, president, and chief executive officer (CEO), asserting claims under Trafficking Victims Protection Act (TVPA) and state law for breach of contract, unjust enrichment, and fraud, and seeking declaratory and injunctive relief regarding liquidated damages and noncompete-clauses in their employment contracts. Healthcare professionals moved for summary judgment.

**Holdings:** The District Court, Kiyo A. Matsumoto, J., held that:

liquidated damages clause in standard employment contract between healthcare professionals and staffing company was unenforceable;

non-compete clause in standard employment contract between staffing company and nurses was unenforceable;

staffing company breached provision of standard employment contract stating that employer undertook and agreed to pay employees prevailing wages based on location;

company was liable under TVPA provision creating liability for knowingly providing or obtaining labor by means of serious harm or threats of serious harm;

CEO was liable under TVPA provision creating liability for knowingly benefiting from participation in venture engaged in providing or obtaining of labor or services in violation of TVPA; and

fact issues precluded summary judgment on healthcare professional's claims for fraud and unjust enrichment.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment; Request for Declaratory Judgment; Motion for Permanent Injunction.

**Attorneys and Law Firms**

John J.P. Howley, The Howley Law Firm P.C., New York, NY, for Plaintiffs.

Felix Q. Vinluan, Law Office of Felix Q. Vinkuan, Woodside, NY, Manuel B. Quintal, New York, NY, for Defendants.

## MEMORANDUM & ORDER

KIYO A. MATSUMOTO, United States District Judge:

**\*1** Plaintiffs are citizens of the Republic of the Philippines who work as healthcare professionals in the New York area. Plaintiffs bring this putative class action against Defendants United Staffing Registry, Inc. ("the company"), and its sole owner, president, and chief executive officer, Benjamin H. Santos (collectively "Defendants"), for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.* The complaint also asserts individual claims for breach of contract, unjust enrichment, and fraud, and seeks declaratory and injunctive relief and damages as to specific aspects of Plaintiffs' employment contracts.

Presently before the Court is Plaintiffs' motion for summary judgment. (ECF No. 54.) Plaintiffs request entry of summary judgment: (1) declaring that the liquidated damages and non-compete clauses in their standard employment contracts are unenforceable under both the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et. seq.,* and under New York common law; (2) permanently enjoining Defendants from threatening or attempting to enforce either the liquidated damages provision or the non-compete clause; (3) finding both Defendants liable for breach of contract in amounts to be determined at trial or inquest, including piercing the corporate veil of corporate Defendant United Staffing Registry, Inc. to hold individual Defendant Santos personally liable; (4) finding both Defendants liable for violations of the TVPA in amounts to be determined at trial or inquest; and (5) awarding Plaintiffs reasonable attorneys' fees and the costs of this action as authorized by 18 U.S.C. § 1595(a). For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.

## BACKGROUND

The following facts are drawn from the parties' submissions in connection with this motion, including the parties' Local Civil Rule 56.1 Statements of Facts, opposing 56.1 Statements, and reply 56.1 Statements. [1] Upon consideration of a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### I. Factual Background

**\*2** The Court finds the following undisputed facts from the parties' submissions, unless otherwise noted.

#### A. The Defendants

Defendant Benjamin Santos is the sole owner, president, and chief executive officer ("CEO") of Defendant United Staffing Registry, Inc. ("United Staffing"), a staffing company in the business of recruiting foreign-trained nurses and other healthcare professionals, sponsoring them for lawful immigration status that will allow them to work in the United States, and employing them in New York. (Pls. 56.1 at ¶ 9; Defs. Resp. 56.1 at ¶ 9; *see also* ECF No. 45-1 ("United Staffing Dep.") at 17.) United Staffing assigns nurses to work at nursing homes and medical clinics owned and operated by its clients. (Pls. 56.1 at ¶ 7; Defs. Resp. 56.1 at ¶ 7.) Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Most of the nurses employed by United Staffing are from the Philippines. (Pls. 56.1 at ¶ 6; Defs. Resp. 56.1 at ¶ 6.)

United Staffing requires registered nurses ("RNs") that it sponsors to sign an Employment Agreement, although the timing may depend on whether the nurse was recruited from outside the United States or from within the United States. (ECF No. 45-5 ("Pascual Decl.") at ¶ 6.) Before foreign recruits are sponsored through the immigration process, United Staffing requires them to sign a three-year employment agreement with the company. (Pls. 56.1 at ¶ 11; Defs. Resp. 56.1 at ¶ 11; *see also* ECF

No. 45-4 ("Santos Decl.") at ¶¶ 6-7 ("Those we recruit from abroad are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview."); Pascual Decl. at ¶¶ 6-7 ("United Staffing generally requires [non-U.S. citizens and non-lawful permanent residents RNs] whom we recruit and sponsor through the immigration process to sign a three-year Employment Agreement"; "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process.")). [2]

### B. The Nurse Plaintiffs and Their Employment Contracts

**\*3**  In 2018 and 2019, Plaintiffs Mary Grace Magtoles, Aira C. Tan, and Ana Myrene Espinosa (collectively, the "Nurse Plaintiffs") each signed United Staffing's "Standard Contract" to work for the company as an RN. (Pls. 56.1 at ¶ 13; Defs. Resp. 56.1 at ¶ 13; *see, e.g.*, ECF Nos. 28-2 ("Magtoles Contract"), 28-3 ("Tan Contract"), 28-4 ("Ana Myrene Espinosa Contract").) [3] Four provisions of the contracts are relevant to the instant motion.

*First*, United Staffing's standard contract requires nurses to work a minimum number of hours during the three-year contract period. (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) Most of United Staffing's foreign recruits — including the Nurse Plaintiffs and more than fifty others — signed a contract requiring 6,000 hours of work over the three-year period. [4] (*See, e.g.*, Magtoles Contract; Pascual Decl. ¶ 22.) If a nurse leaves United Staffing's employ before working the specified number of hours, the contract requires the nurse to pay $15 in "liquidated damages" for each hour that the nurse did not complete. [5] (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) For example, if a nurse signed a contract requiring 6,000 hours of work and then left United Staffing after completing 2,000 hours of work over the course of one year, the nurse would owe $60,000 in "liquidated damages" for the 4,000 remaining hours. [6]

**\*4**  *Second*, the contracts include a three-year, nationwide non-compete clause. (Pls. 56.1 at ¶ 37; Defs. Resp. 56.1 at ¶ 37; *see, e.g.*, Magtoles Contract at 3.) If a nurse leaves United Staffing before completing the minimum number of hours over the course of three years, the nurse cannot:

  1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

  2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.*, Magtoles Contract at 3.)

*Third*, the contracts provide that United Staffing will pay the Nurse Plaintiffs "a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility" where the nurse works. (*See, e.g.*, Magtoles Contract at 4; ECF No. 40-40, Ex. O at 4; ECF No. 40-45, Ex. T at 4.)

*Fourth*, the contracts provide that, if the nurse breaches the contract, United Staffing "will report" a change in employment status to "appropriate government authorities, including but not limited to the United States Citizenship and Immigration Service (USCIS) and the Immigration and Customs enforcement (ICE)." (*See, e.g.*, Magtoles Contract at 4.) The contracts also state that "such report may lead to the termination of the Permanent Resident Card (Green Card) and deportation of EMPLOYEE from the United States." (*See, e.g.*, Magtoles Contract at 4; ECF No. 40-40, Ex. O at 11; ECF No. 40-45, Ex. T at 4.)

### C. Plaintiff Ana Mervine Espinosa

Plaintiff Ana Mervine Espinosa (a/k/a "Bhyng Espinosa" [7]) is a licensed physical therapy aide and a citizen of the Republic of the Philippines. (Pls. 56.1 at ¶ 4; Defs. Resp. 56.1 at ¶ 4.)

## II. Procedural History

Plaintiffs commenced this putative class action on April 6, 2021, bringing claims for violations of the TVPA, conspiracy to violate the TVPA, and attempting to violate the TVPA. (ECF No. 1 ("Compl.") ¶¶ 93-120.) The Nurse Plaintiffs also assert claims for breach of contract and seek declaratory judgment and injunctive relief, and Plaintiff Bhyng Espinosa brings claims for unjust enrichment and fraud. (*Id.* ¶¶ 121-47.)

On June 21, 2021, Defendants filed a letter requesting a pre-motion conference for their motion to dismiss the Complaint for failure to state a claim. (ECF No. 15.) After considering the parties' submissions, this Court issued a Memorandum & Order on December 30, 2021, granting in part and denying in large part Defendants' motion to dismiss. *Magtoles v. United Staffing Registry*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021). Based on the liquidated damages provision, non-compete clause, and the immigration notification provision in United Staffing's standard contract, the court concluded that the Nurse Plaintiffs stated plausible claims for violations of the TVPA, breach of contract, and grounds for declaratory judgment. *Id.* at *3-11. Although the Court concluded that Plaintiff Bhyng Espinosa could not assert claims under Section 1589 of the TVPA — because the Complaint failed to allege that she ever started work for United Staffing — the Court found that Ms. Bhyng Espinosa stated plausible claims for trafficking, conspiracy, and attempt under the TVPA, as well as for fraud and unjust enrichment under New York law. *Id.* at *10, *12. On February 8, 2022, Magistrate Judge Kuo issued an order certifying the close of all discovery. (2/8/22 Docket Order.) On May 25, 2022, this Court granted the Nurse Plaintiffs' motion for class certification and approved the notices to the putative class. *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2022 WL 1667005 (E.D.N.Y. May 25, 2022).

**\*5** Finally, on August 30, 2022, less than a week before the opt-out deadline, Defendants sent an email — without seeking leave from this Court — to United Staffing employees, including members of the certified class in this action, encouraging them to opt out of the class. (ECF No. 57-2 ("8/30/22 Email").) On September 2, 2022, class counsel moved by order to show cause, pursuant to Federal Rule of Civil Procedure 23(d), for an order: (1) prohibiting Defendants and their attorneys, employees, agents, and representatives from communicating with class members regarding this action and the claims asserted without prior court approval; (2) directing Defendants to provide class counsel with the names and email addresses of all individuals who received Defendants' August 30, 2022 email; and (3) authorizing class counsel to send a curative notice to class members. (ECF No. 57-4 at 1.) The Court held an Order to Show Cause Hearing on September 6, 2022. In a September 6, 2022 Memorandum & Order granting class counsel's motion, the Court found:

> As the employer of class members, Defendants sent an email warning class members that "United Staffing filed counterclaims against the nurses for preterminating their contracts." (8/30/22 Email at 1.) Viewed in context, this statement conveys an implicit threat, by the Defendants to their employee class members, that they too will be sued if they choose to remain in the class. This statement is also misleading because it suggests that nurses will face liability for "preterminating their contracts" (*id.*), regardless of whether those contracts (as Plaintiffs contend) are unenforceable.
>
> ...
>
> Most notably, Defendants' email suggests that class members opt out with the following response: "I do not understand how your clients are claiming United Staffing forced them to work, when all of us voluntarily signed and we all understood the terms of our employment contract. I guess your clients just would like to get out of their 3-year contracts." (8/30/22 Email at 2.) Defendants' suggested responses also contain several other one-sided statements that parrot Defendants' defenses in this action and encourage class members to opt out, including: "I was not forced to work by United Staffing," "I signed my contract voluntarily," "The contract was clear," and "I was paid correctly." (*Id.*)

(ECF No. 61 at 10-11.)

This Court held that Defendants' unauthorized email was "misleading, coercive, and otherwise interfered with the proper administration of this class action." (*Id.* at 8.)

Plaintiffs now move for summary judgment as to: Defendants' liability under the TVPA and on the breach of contract claim; a declaration that the "liquidated damages" and "non-compete" clauses of the standard contract are invalid and unenforceable; and an injunction against the actual or threatened enforcement of those clauses. Plaintiffs also seek summary judgment in favor of Plaintiff Bhyng Espinosa on her claims for fraud and unjust enrichment, on the grounds that she paid Defendants $7,532.00 in connection with obtaining a labor certification, in violation of 20 C.F.R. § 656.12. (ECF No. 54-1 ("Pls. Mem.") at 10.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.' " *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. 2505 (citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A moving party may indicate the absence of a factual dispute by "showing ... that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Finally, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## DISCUSSION

### I. Enforceability of the Liquidated Damages Provision

**\*6**  Plaintiffs request a declaratory judgment finding the liquidated damages provision of the contracts unenforceable. They also request that Defendants be enjoined from attempting or threatening to enforce the provision.

#### A. Legal Standard

Whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (summary order) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). A liquidated damages provision will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Id.* Accordingly, "[a] provision that

2023 WL 2710178

does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413, 68 S.Ct. 123, 92 L.Ed. 32 (1947)).

To that end, "New York courts will construe a purported liquidated damages provision strictly." *Agerbrink*, 196 F. Supp. 3d at 417. Courts will uphold and enforce liquidated damages provisions where (1) actual damages may be difficult to determine *and* (2) the damages amount awarded pursuant to the clause is not clearly disproportionate to the possible loss. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004). If the liquidated damages provision "does not satisfy one or both of these factors then it is considered an impermissible penalty and will not be enforced by the courts." *Union Cap. LLC v. Vape Holdings Inc.*, No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017).

Though the party challenging the liquidated damages provision bears the burden of demonstrating unenforceability, in doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages." *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990) (citation omitted); *see also Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) ("[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of a construction which holds that the provision is a penalty.").

Finally, in determining whether one side is exacting an unconscionable penalty, courts should also consider factors such as the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arm's length. *See Rattigan*, 739 F. Supp. at 172 (internal quotation marks omitted); *Union Cap. LLC*, 2017 WL 1406278, at *7.

### B. Damages Disproportionate to Potential Loss

 **\*7**  Here, Section 3(b) of the liquidated damages provision provides that "[i]n the event of a breach," a nurse must pay United Staffing $15 for "each hour or part of an hour not performed" of the required 6,000 hours in the contract. (*See, e.g.*, Magtoles Contract at 3.) Section 3(a), in turn, states in relevant part "... that the EMPLOYEE breaches the contract by severing its relationship with the EMPLOYER before completion of the term of THREE (3) YEARS[.]" (*Id.*)

Under these liquidated damages provisions, then, if a nurse pre-terminated his or her contract with United Staffing prior to completing any of the 6,000 hours, the nurse would owe a total of $90,000 — $15 for each hour. As discussed *supra* note 6, Defendants inexplicably "object" to this simple arithmetic based on the contract provisions' plain language, stating it is somehow "not a statement of fact." (Defs. Resp. 56.1 at ¶ 25; Pls. 56.1 at ¶ 25; *see also supra*, notes 5, 6.) The Court finds that this factual calculation, based on Defendants' own contract term, is undisputed.

In *Paguirigan v. Prompt Nursing Employment Agency, LLC*, the employment contracts between the class of Filipino nurses and the employment agency included a liquidated damages provision stating that the employees would pay the "Employer and/or its designee/assignee" $25,000 in the event that the nurses pre-terminated or otherwise breached the employment contract. *See* No. 17-CV-1302 (NG), 2019 WL 4647648, at *2, *8 (E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020) (summary order). Judge Gershon found that the $25,000 was disproportionate to the contemplated injury, and was an unenforceable penalty, because "[c]onsidering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing." *Id.* at *8.

Here, too, the liquidated damages provision in Plaintiffs' contracts are unenforceable penalties because the damages awarded pursuant to the liquidated damages clause are patently disproportionate to the potential loss. Indeed, the potential liquidated damages that a nurse could be liable for, $90,000, is significantly larger than the amount in *Paguirigan*. Even if a nurse were to pre-terminate her employment agreement with United Staffing after one year and completion of 2,000 hours — the minimum number of hours required annually under Section 1(c) of the contract (*see, e.g.*, Magtoles Contract at 3) — the nurse would still owe $60,000 to United Staffing for the remaining 4,000 hours. Similarly, if a nurse were to cease working for United Staffing

2023 WL 2710178

after two years and completion of 4,000 hours, the nurse would still owe $30,000 to United Staffing for the remaining 2,000 hours.

Here, Plaintiff Magtoles' payroll records indicate that in a week where she worked 40.00 hours at her hourly rate of $31.00, her net pay was $924.36 per week after taxes. (ECF No. 43-17 ("Magtoles Payroll Records") at 19.) It would have taken Magtoles approximately 97 weeks — almost *two years* — to pay off a liquidated damages amount of $90,000 had she quit United Staffing's employ without completing any hours, provided she put every dollar she earned towards paying off the amount and provided she "had no other expenditures such as food or housing," or any other living expense — an impossibility. *See Paguirigan*, 2019 WL 4647648, at *8. This nearly two-year period of time necessary to pay liquidated damages would be more than double the time (nine months) that constituted disproportionality in *Paguirigan*.

 **8**  Moreover, *Paguirigan* found that the nine months it would have taken the plaintiff to pay off the $25,000 liquidated damages further supported "the conclusion that this provision is *intended to operate as a means to compel performance*, ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms." *Id.* (internal quotation marks and citation omitted) (emphasis added); *see also Rattigan*, 739 F. Supp. at 169 ("If [a liquidated damages clause] is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced.") (citing *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977)). Accordingly, the Court follows the reasoning of *Paguirigan* to reach the same conclusion here: the liquidated damages provision is an unenforceable penalty.

Defendants argue that because the liquidated damages provision amount could "diminish[ ] over time, as the employee continues to perform under the agreement," this is "another factor indicating that the amount of actual damages Defendants anticipated resulting from a termination of the agreements prior to their execution was reasonably proportionate to the probable loss from the breach." (ECF No. 55 ("Defs. Mem.") at 23.) This argument is unavailing. The liquidated damages provision in *Paguirigan* also provided for a diminishing of liquidated damages to $16,666.67 or $8,333.34 if the plaintiff pre-terminated or breached the contract in her second or third year, respectively. *Paguirigan*, 2019 WL 4647648, at *2. As in *Paguirigan*, the "diminishing nature" of the liquidated damages amount does not impact the finding of disproportionate damages here.

Defendants also argue that unlike in *Paguirigan*, the standard contracts here do not contain (1) a confession of judgment that Defendants could file in court "should a plaintiff or recruited nurse [terminate] his or her contract early," or (2) language that the provision was intended "to secure Employee's performance of the Employment Term." (Defs. Mem. at 24); *see Paguirigan*, 2019 WL 4647648, at *7. Defendants then assert, in a conclusory fashion, that "[t]hus, the liquidated damages provision in United Staffing's contracts is not a penalty." (Defs. Mem. at 24.)

Defendants mention these distinctions without any accompanying legal authority or arguments as to their legal relevance. Defendants notably fail to recognize that Judge Gershon noted both points only after stating that "it is immaterial that the parties may describe the provision as a penalty." *Paguirigan*, 2019 WL 4647648, at *7. The immateriality of a party's characterization of a liquidated damages provision is a well-established principle of assessing the enforceability of liquidated damages clauses. *See, e.g., Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977) ("In interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' ... or have styled it as a penalty.") Neither a confession of judgment nor language that the purpose of a liquidated damages provision is "to secure Employee's performance of the Employment Term" ultimately speak to the crux of the analysis, specifically, whether the liquidated damages provision is plainly disproportionate to the contemplated injury or whether actual damages may be difficult to determine. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70 (2d Cir. 2004). Defendants fail to argue or cite contrary material facts or legal authority, and thus fail to present a triable issue of material fact as to the provision's disproportionality to potential loss. The Court therefore finds that the liquidated damages provision is an unenforceable penalty based on disproportionality.

### C. Difficulty of Ascertaining Damages

**\*9**  Because the Court has found that the liquidated damages amount is plainly disproportionate to the contemplated injury, the liquidated damages provision is an unenforceable penalty. The Court, however, also finds that the liquidated damages provision is separately unenforceable because actual damages upon a nurse's pre-termination of or breach of the contract would not have been difficult to ascertain when the parties entered into the standard contract.

First, Defendants argue that "the portion of the costs incurred by United Staffing recruitment team in recruiting a particular RN would be unknown at the time the RN executed the agreement, because the total number of RNs that would be successfully recruited on any given recruitment trip to the Philippines would be unknown at the time." (Defs. Mem. at 21.) In affirming the district court's holding that the liquidated damages provision in *Paguirigan* was an unenforceable penalty, the Second Circuit rejected the defendants' argument that the liquidated damages provision was necessary to account for recruiting costs:

> [B]y their very nature, these costs had already been incurred by the time the parties signed the contract — after all, Defendants no longer had to expend funds recruiting [plaintiff] once she had signed on the dotted line. As a result, it would be eminently reasonable to expect that [defendant] could have reviewed its expenses (*averaging them to provide a per-nurse cost if necessary*) so as to arrive at a figure for the cost they incurred to recruit [plaintiff].

*Paguirigan v. Prompt Nursing Emp. Agency, LLC*, 827 Fed. App'x 116, 121 (2d Cir. 2020) (summary order) (emphasis added).

This Court arrives at the same conclusion here. By the time a nurse and United Staffing were entering into the standard contract — in other words, the time at which liquidated damages would be estimated — recruiting costs would already have been incurred by United Staffing, and could be averaged to ascertain a "per-nurse" cost if necessary, as the Second Circuit has noted. Therefore, recruiting costs are not difficult to ascertain. Further, Defendants concede that reimbursements for "immigration sponsorship costs, training and living orientation costs ... would have been easily ascertained, considering United Staffing has indeed been in the business for about twenty years now." (Defs. Mem. at 22.)

Defendants also argue that "the costs of replacing a recruited RN that terminated his or her employment prematurely also could not be known at the time United Staffing entered into a contract with the nurse," and, relatedly, that "United Staffing could not know whether or when a nurse would leave his or her employment when hiring the nurse, which would render an amortization of the recruitment costs impossible at the time the contract was entered into." (Defs. Mem. at 21.) It is undisputed, however, that: (1) Most of the nurses employed by United Staffing are from the Philippines, from which Defendants have recruited nurses for years; (2) United Staffing has assigned nurses to work at twenty client facilities in New York City and on Long Island; and (3) Defendants Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than twenty years. (Pls. 56.1 at ¶¶ 6, 8, 10; Defs. Resp. 56.1 at ¶¶ 6, 8, 10.) Based on the undisputed facts before the Court and the unambiguous liquidated damages formula in the contracts, the Court respectfully rejects Defendants' argument that they could not reasonably ascertain the costs of replacing a nurse with their over two decades of experience in recruiting, employing, and assigning nurses, especially because multiple nurses have previously left Defendants' employ. (*See* United Staffing Dep. at 65:02-65:22 (discussing nurses terminating their contracts with United Staffing); at 26:24-27:03 (discussing United Staffing maintaining a nurse's file for at least "six years" after the nurse left United Staffing's employ).) Therefore, far from such costs being "incapable or difficult of precise estimation," the sophistication and experience of United Staffing show otherwise.

**\*10**  Defendants attempt to distinguish the standard contract here with that in *Paguirigan*, arguing that the *Paguirigan* contracts list numerous costs encompassed in the liquidated damages amount: "recruiting the employee," "sponsoring the Employee for an Immigrant Visa," "training the Employee in practice and procedures," and "orienting the Employee to living in the New York area" (Defs. Mem. at 21-22); *see also Paguirigan*, 2019 WL 4647648, at \*2, whereas here, Defendants argue that the damages "envisioned in United Staffing's contracts also include, in addition, estimates for lost profit or lost income." (Defs. Mem. at 22.)

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)
2023 WL 2710178

To support their argument that damages are difficult to ascertain, Defendants point to Human Resources Manager Ferdinand Pascual's "supplemental affidavit," filed months after Defendants' Responsive 56.1 Statement (ECF No. 44) was submitted. As an initial matter, this "supplemental affidavit" contravenes this Court's Chambers Practices III.B.4(i), which states: "Supplements to a 56.1 statement are not permitted absent leave of the Court and a showing of good cause." *See CIT Bank, N.A. v. Donnatin,* No. 17-CV-02167 (ADS), 2020 WL 248996, at *2 (E.D.N.Y. Jan. 16, 2020) ("The Court has broad discretion to determine whether to overlook a party's failure to comply with its individual rules." (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001))) (cleaned up); *cf. Perez v. U.S. Immigr. & Customs Enf't,* No. 19-CV-3154 (PGG), 2020 WL 4557387, at *3 (S.D.N.Y. Aug. 6, 2020), *report and recommendation adopted,* No. 19-CV-3154 (PGG), 2020 WL 5362356 (S.D.N.Y. Sept. 8, 2020) ("A court may enforce its rules and orders by striking noncompliant portions of a party's brief.") (collecting cases).

Here, Defendants failed to request leave of the Court — let alone show good cause — prior to submitting Pascual's "supplemental affidavit." Defendants failed to request leave of the Court at any point after filing their Responsive 56.1 Statement and exhibits on May 10, 2022, nor in the *three full months* prior to the motion being fully submitted on August 25, 2022. Belated supplements to the record deprive a party of the opportunity to appropriately incorporate, respond to, or cite to any such "evidence" in their 56.1 Statements. [8]

Moreover, even if the "supplemental affidavit" did not violate this Court's motion practices, the portions to which Defendants cite in support of their lost profits argument would be inadmissible, to the extent Pascual relies on hearsay or lacks personal knowledge, and because those portions are not relevant to the ascertainment of damages analysis under Fed. R. Evid. 401, 402. Any consideration of lost profits or lost income here would be properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *See Kenford Co. v. Cty. of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 109 (2d Cir. 2007).

**\*11** Defendants argue:

> The "lost income" or "lost profit" cannot be ascertained at the time of the execution of the contract because there is no way of knowing when a RN would preterminate; because there is no way of knowing where the RN would be assigned at, and because the future worksite facility is unknown, it cannot be known at the execution of the contract how much said worksite facility would be paying United Staffing for the services of its employees, as various healthcare facilities have different and varying pay schedules and pay rates.

(Defs. Mem. at 22-23.)

Therefore, Defendants' lost income and lost profit arguments are clearly based on "losses in relation to its nursing home clients, and thus properly categorized as consequential damages." *See Paguirigan,* 2019 WL 4647648, at *11 n.9. There is no admissible evidence in the record that "any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed," *see id.,* nor is there any admissible evidence suggesting that Defendants themselves contemplated lost profit damages at the time the standard contracts were executed. *Cf. Shred-It USA, Inc. v. Bartscher,* No. 02-CV-4082 (JO), 2005 WL 2367613, at *11 (E.D.N.Y. Sept. 27, 2005) ("Shred-It claims that it can recover its lost profits from the White & Case account. Such a theory requires Shred-It to prove first that the allegedly lost profits constitute damages caused by Bartscher's breach, second that such lost profits are capable of being proved with reasonable certainty, and third *that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement.*") (emphasis added).

*Magtoles v. United Staffing Registry, Inc.,* --- F.Supp.3d ---- (2023)

2023 WL 2710178

Finally, the standard contract's failure to list some or any of the costs contemplated by the liquidated damages provision in fact lends *more* support to finding the provision unenforceable. Unlike in *Paguirigan*, the plain language of the liquidated damages provision here reflects nothing of what costs may have been contemplated by the parties in including such a provision, let alone how the provision is a "reasonable measure" of anticipated damages from breach. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70-71 (2d Cir. 2004) (internal quotation marks and citation omitted) ("New York courts will sustain a liquidated damages provision 'only where the specified amount is a reasonable measure of the anticipated harm.' "); *compare Union Cap. LLC v. Vape Holdings Inc.,* No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) ("Union offers no explanation for how the daily payment is even conceivably linked to the damages Union suffered as a result of Vape's failure to deliver its converted shares. Obviously, the provision serves only to encourage Vape to abide by the terms of the contract, and it thus functions as the prototypical forbidden penalty — an invalid 'added spur to performance.' ") (citation omitted), *with GFI Brokers, LLC v. Santana,* Nos. 06-CV-3988 (GEL), 06-CV-4611 (GEL), 2009 WL 2482130, at *4 (S.D.N.Y. Aug. 13, 2009) (in assessing enforceability of a liquidated damages provision, noting that testimony from the party seeking enforcement "adequately explained the difficulties GFI prospectively anticipated").

### D. Attendant Circumstances

**\*12** The Court also concludes that the liquidated damages provision is an unenforceable penalty after "due consideration for the nature of the contract and the attendant circumstances." *See U.S. Fid. & Guar. Co.,* 369 F.3d at 71 (citation omitted). The parties' respective bargaining power is also a factor when determining "if one side is exacting an unconscionable penalty." *PacifiCorp Cap. Inc. v. Tano, Inc.,* 877 F. Supp. 180, 184 (S.D.N.Y. 1995); *see also Glob. Crossing Bandwith, Inc. v. OLS, Inc.,* 566 F. Supp. 2d 196, 202 (W.D.N.Y. 2008) (collecting cases).

Ferdinand Pascual is and was the Human Resources Manager at United Staffing, where he has been employed for more than 15 years. (Pls. 56.1 at ¶¶ 106-107; Defs. Resp. 56.1 at ¶¶ 106-107.) Pascual was responsible for making sure that the nurses signed the standard contract. He was also responsible for explaining the standard contract to nurses and answering their questions. (Pls. 56.1 at ¶¶ 108-10; Defs. Resp. 56.1 at ¶¶ 108-10.) Plaintiff Ana Myrene Espinosa testified that, on the date the contract was presented to her, she "needed somebody to explain" the contract, had "to bring it back on that day, the same day," "did not have time to consult someone else," and "didn't really get the chance to read thoroughly the contract, because [she] had to go back before they closed the agency," and "Mr. Ferdi Pasquale [sic] asked [her] to submit it right away." She also testified: "I do understand the contract. *It's just at the time I was really eager to work.* I read it, scanned it really fast, and then signed." (ECF No. 40-28 ("Ana Myrene Espinosa Dep.") at 89:22-91:07 (emphasis added).) In addition, when asked if there came a point when she complained to the United States embassy about the employment agreement, Plaintiff Magtoles testified: "No. I was nervous." (ECF No. 40-26 ("Magtoles Dep.") at 106:15-106:18.)

Moreover, it is undisputed that Defendants were highly experienced in the practice of recruiting Filipino/Filipina nurses and in the use of their contracts that included the liquidated damages provision, which Defendants inserted into dozens of standardized contracts, in contrast to some nurses who relied on Defendants' representatives (such as Pascual) to explain the standard contract. Furthermore, nothing in the record before the Court suggests the parties engaged in any negotiations in the inclusion of the provision, that Plaintiffs had any hand in drafting or including the liquidated damages provision, or that Plaintiffs had any particular "familiarity with American contract law." *See Paguirigan,* 2019 WL 4647648, at *8.

In short, from the undisputed facts, the Court finds that the parties' respective bargaining power was grossly unequal. Under these circumstances and based on the undisputed evidence in the record, the Court cannot find that the liquidated damages provision was a valid and enforceable term of the contract "made by the parties at the time they enter[ed] into their agreement." *See Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.S.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). The Court also reiterates that if there is "any doubt" as to whether a liquidated damages clause is an unenforceable penalty or a permissible provision, courts should construe such a provision as a penalty. *See, e.g., Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,* 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) (collecting cases); *see also Jordache Enter., Inc. v. Glob. Union Bank,*

688 F.Supp. 939, 944 (S.D.N.Y. 1988) ("Hostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker."). [9]

## II. Enforceability of Non-Compete Clause

### A. Declaratory Judgment

**\*13**  As an initial matter, Defendants do not argue that the non-compete clause is, in fact, enforceable. Instead, Defendants state only that Plaintiffs have "failed to show that there is a 'substantial controversy' 'of sufficient immediacy and reality' to warrant the issuance of a declaratory judgment," and that "there is nothing in the record of the case that will indicate Defendants had threatened to enforce the 'non-compete' provisions of Plaintiffs' employment agreements." (Def. Mem. at 24, 26); *see also Niagara Mohawk Power v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

Tellingly, Defendants have not represented that they will *not* seek enforcement, leaving nurses (and any of their potential employers) "uncertain as to whether [the nurse] will be embroiled in a lawsuit if [the nurse] accepts a position with [a competitor]." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (determining that employer's contention that "Plaintiff has failed to identify any facts that indicate that Omnicare plans to enforce the covenant against her" was "facetious"). It is well-established that where, as here, Plaintiffs are unsure whether they can pursue other employment to make a living, clarification and resolution of the uncertain enforcement of the liquidated damages provision serves "one of the main purposes of declaratory judgments." *See, e.g., id.*; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir. 2005) ("In order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.").

In sum, Defendants cannot have their cake and eat it too — they cannot argue that Plaintiffs have not shown that Defendants intend to enforce the agreement, while simultaneously preserving the possibility of enforcement down the line. *See Arakelian,* 735 F. Supp. 2d at 41 (on summary judgment, holding that the employer "cannot move to dismiss [employee's] claim; refuse to agree not to enforce the Restrictive Covenants Agreement; and at the same time claim that [employee] has not shown that it intends to enforce the agreement"). The Court agrees with Plaintiffs that, "[h]aving created uncertainty by including the nationwide non-compete clause in their Standard Contract, defendants should not be able to keep the nurses in a state of suspense and apprehension." (ECF No. 56 ("Pls. Reply") at 6.)

### B. Legal Standard of Enforceability

Non-compete provisions are enforceable under New York law only if they are (1) reasonable in duration and geographic scope, (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999 (VM), 2020 WL 1320867, at \*19 (S.D.N.Y. Mar. 20, 2020) (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1223 (1999) (citations omitted)). A violation of any prong renders the non-compete clause invalid. *Id.* Further, because restrictive covenants in employment agreements may restrain competition, "impinge on individual agency," and restrict "an employee's ability to make a living," New York courts subject such covenants to heightened judicial scrutiny. *Id.* (citing *Oliver Wyman, Inc. v. Eielson,* 282 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (collecting cases)).

### C. Application

**\*14**  If a nurse employee were to leave United Staffing before completing the minimum number of hours over the course of three years, the nurse would be prohibited from:

1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.,* Magtoles Contract at 3.)

### i. Reasonable in duration and geographic scope

Here, the sheer nationwide breadth of the geographic scope alone dooms the clause. Both subsections are unreasonable in geographic scope. As this Court previously noted in denying Defendants' motion to dismiss the action:

> The limitation that a future employer be in competition with United Staffing in the United States – as well as the three-year time limitation – appear to apply only to the clause's second subsection. The first subsection, on its face, prohibits former employees from working as nurses without any limitation as to duration, geography, or a future employer's status as a competitor.

*See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063, at *6 (E.D.N.Y. Dec. 30, 2021).

It is undisputed that United Staffing places nurses only at facilities in New York City and on Long Island, and that United Staffing has never placed a nurse anywhere outside the State of New York. (Pls. 56.1 at ¶¶ 35-36; Defs. Resp. 56.1 at ¶¶ 35-36.) The ban that Nurse Plaintiffs cannot "operate, own, lease (as landlord or tenant), engage or participate in" *any* business in competition with United Staffing *within the United States* is baldly unreasonable. *See, e.g., Good Energy, L.P. v. Kosachuk*, 49 A.D.3d 331, 332, 853 N.Y.S.2d 75 (1st Dep't 2008) (non-compete covenant was unreasonable because employer operated in only eight states); *compare Yedlin v. Lieberman*, 102 A.D.3d 769, 770, 961 N.Y.S.2d 186 (2d Dep't 2013) ("The restrictive covenant here *applied to the entire United States*, and would have *precluded the plaintiff from merely 'participating'* in projects that involved the defendants' present or former clients.") (emphasis added), *with Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D.3d 856, 857-58, 768 N.Y.S.2d 504 (3d Dep't 2003) (finding a 35-mile restriction that was "narrower than [employer's] service area" to be "reasonable").

### ii. Necessary to protect the employer's legitimate interests

Cognizable employer interests include the "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Flatiron Health, Inc.*, 2020 WL 1320867, at *19. Nothing in the record comes even close to implicating any of these, or any other, employer interests. Again, Defendants have simply made no arguments about what possible interest they would have in such an overbroad non-compete provision and, as before, this Court "struggles to imagine how a nurse would possess United Staffing's trade secrets, or how every nurse who signed United Staffing's 'standard employment contract' offered unique or extraordinary services." *See Magtoles*, 2021 WL 6197063, at *7.

### iii. Not harmful to the general public

**\*15**  Although the Court recognizes that there are other nurses in the New York area, it would be plainly harmful to the general public if dozens of licensed nurses and practitioners were prohibited from contributing their services to an industry as valuable and important as nursing. *See Flatiron Health, Inc.*, 2020 WL 1320867, at \*22 (finding that "[p]reventing [employee] from working at the job where he would be most productive and make the largest impact ... inflicts not only a private cost to [employee] but also a social cost," and recognizing that "[o]n that public policy ground, New York courts disfavor broad non-competes"). Moreover, as Defendant Santos himself affirms, there is an "ever-growing need of healthcare professionals to take care of our aging American population" and there are not "enough locally-produced registered nurses to take care of our own people." (Santos Decl. at ¶ 2.)

<strong>iv. Not unreasonably burdensome to the employee</strong>

A provision that either prevents Plaintiffs from being involved in any capacity in their industry anywhere in the United States, or, even more broadly, simply anywhere that is not United Staffing, is patently unreasonable and unenforceable. *See Good Energy, L.P.*, 49 A.D.3d at 332, 853 N.Y.S.2d 75 ("[T]he covenant effectively excludes defendant from continued employment in the industry."); *see also Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 12 N.Y.S.3d 606, 34 N.E.3d 357, 370 (2015) ("New York law provides that covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood.") (collecting cases) (cleaned up).

For the foregoing reasons, the Court declares the non-compete clause in the employment contracts to be unenforceable and enjoins Defendants from attempting or threatening to enforce it.

### III. Breach of Contract

#### A. Legal Standard

To recover for breach of contract under New York law, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at \*9 (S.D.N.Y. July 3, 2014).

In order to decide if a contract's terms were breached, a court considers whether the contract at issue is clear or ambiguous, and interprets the meaning of the contract language. "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590, 593 (1957)). If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations omitted).

#### B. Application

The relevant provision ("prevailing wages provision") in the standard contract states:

**\*16**  The EMPLOYER undertakes and agrees to pay the EMPLOYEE a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility where EMPLOYEE works, applicable to Registered Nurses (RNs) and health care givers.

(*See, e.g.,* Magtoles Contract at 4.)

The only issue here is whether Defendants breached this provision of the contract. Plaintiffs argue that Defendants breached this provision in several ways, each of which the Court shall address in turn. (*See* Pls. Mem. at 15-16.)

### i. Failure to Pay All Hours Worked

Plaintiffs first argue that Defendants breached the prevailing wages provision by "failing to pay the Nurse Plaintiffs and other class members for all the hours they worked." (Pls. Mem. at 15-16, citing 56.1 Statements at ¶¶ 47-73.) Plaintiffs' evidence includes Defendants' failure to pay all the hours when Plaintiffs worked overtime at their respective facilities or beyond the time that their shifts were scheduled to end, or paying Plaintiffs less than the hours on their timesheet records. (*See generally* ECF No. 40-27 ("Tan Dep."); Pls. 56.1 at ¶¶ 63-71 and exhibits cited thereto; Defs. Resp. 56.1 at ¶¶ 63-71 and exhibits cited thereto.)

### a. United Staffing's Billing and Payment System

The parties' various purported disputes ultimately rest on one, overarching issue: Although timesheet and payroll records demonstrate that some nurses were not paid for all of the hours their timesheets reflect, Defendants contend that they are not in breach of the contracts because they "rely on the figures of work-hours computed and validated by the facilities" when payroll is prepared. (ECF No. 40-33 ("Ofendo-Reyes Decl.") at ¶ 9.)

Ofendo-Reyes, United Staffing's Financial Controller since 2005, described the billing and payment system, in part, as follows:

We at United Staffing do not have a hand or participation in the monitoring of our employees' work-hours at the facilities, in the computation or counting of our employees' work-hours, and in the validation of our employees' work-hours. Each facility has its own procedures and policies on how they do these functions, and each facility has its own staff or employees performing these functions.

...

We at United Staffing rely on the figures of work-hours computed and validated by the facilities when we prepare the payroll of our company. If the time sheets reflect that an employee had worked thirty seven (37) hours for that week, then that's what we prepare and process as the number of hours that our employee has to be paid.

...

We at United Staffing never make any deductions on our employees' work-hours as validated by the facilities. We always follow the computations of the healthcare facilities.

...

Our healthcare facility-clients have varied and different work-shifts, work schedules, and length of meal time or break periods.

...

The number of validated work-hours by each of our RN-employees as evidenced by the time sheets or time records we receive from each of our healthcare facility-clients is our basis for sending our invoices or for billing our healthcare facility-clients. This means that if we paid our RN-employee so many hours for a particular work-week, that would also be the number of hours that we would bill our facility-client.

**\*17**  (Ofendo-Reyes Decl. at ¶¶ 5, 9, 12, 18.)

### b. "Nurses' Compensation"

Plaintiffs assert that "[t]he nurses' compensation was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned." (Pls. 56.1 at ¶ 20.) Defendants dispute Plaintiffs' assertion and respond: "Nurses' compensation was contingent on the amount paid to United Staffing by the facility where the nurse was assigned, so long as the nurses' compensation was at least, if not more than, the prevailing wage rates." (Defs. Resp. 56.1 at ¶ 20.)

Defendants do not argue that the provision itself is ambiguous or that its meaning is not clear on its face. Defendants instead rely (almost exclusively) on the extrinsic fact that the healthcare facilities were responsible for validating employee hours, which determined the amount that Defendants paid their nurses and billed their healthcare-facility clients where Defendants assigned their nurses to work. The Court, however, reiterates that Plaintiffs allege a claim for breach of the contract between *Plaintiffs* and *Defendants*. Therefore, in assessing this purported dispute, the Court must first determine whether the contract is ambiguous.

The prevailing wages provision in the parties' contract is not conditioned on the hours validated by Defendants' third-party healthcare-facility clients. The provision states that United Staffing "undertakes and agrees to pay" its nurse employees a salary or wage "that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility[.]" (*See, e.g.,* Magtoles Contract at 4.) The language of this provision is unambiguous. *See, e.g., Abundance Partners LP v. Quamtel, Inc.,* 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("A contract is unambiguous if on its face it is reasonably susceptible of only one meaning.") (internal quotation marks and citation omitted) (cleaned up). Nowhere does the contract (let alone the section governing payments to employees, entitled "Article II – Schedule/Rates of Wages") state or even suggest that Defendants' contractual obligation to pay employees prevailing wages depends on the particular hours computed by or the validation system of, Defendants' respective facility clients. Defendants do not even bother arguing that the contract says otherwise. *See, e.g., Deutsche Bank Sec., Inc. v. Rhodes,* 578 F. Supp. 2d 652, 662 (S.D.N.Y. 2008) ("If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract.") (collecting cases); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) (holding that "parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself *rather than from extrinsic evidence as to terms that were not expressed*") (emphasis added).

Moreover, the parties to the contract are unambiguously United Staffing, through its sole owner, president, and CEO Santos, and their nurse employees. Defendants, again, do not argue about the actual substance or interpretation of the contract. They do not assert that there was, for example, an assignment of contract between Defendants and the healthcare facilities, or that the facilities were otherwise a party to the contract at issue, thereby altering Defendants' contractual obligations to Plaintiffs. Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the nurses' compensation was to be paid as specified in the contract, and was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned. *See Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 312 (2d Cir. 2008) ("Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine."); *cf. JA Apparel Corp.,* 568 F.3d at 396 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation.").

### c. Timesheet and Payroll Records

**\*18** The undisputed record before the Court establishes that Defendants breached the contract's prevailing wages provision by failing to pay multiple class members for all the hours they worked at Defendants' respective client facilities.

When asked if there were times when she worked hours she was not paid for, Plaintiff Tan testified that although she was scheduled to work "from 3:00 [p.m.] to 11:00 [p.m.]," she instead went home "by 2:00 or 3:00 in the morning," and that she was not paid for the hours between 11:00 p.m. and 2:00 a.m. or 3 a.m. [10] (Tan Dep. at 161:11-161:21.) Further, "Tan was only paid up to the time her shift was scheduled to end. She was not paid for the extra hours." (Pls. 56.1 at ¶ 54.) Defendants "dispute" Tan's sworn factual assertion by responding that "Tan, like all other employees of Defendants, was paid according to the validated number of work-hours given by her facility to Defendants." (Defs. Resp. 56.1 at ¶ 54.) The Court finds that Defendants' contention fails to present a genuine dispute of material fact because it does not directly (or even, indirectly) respond to the substance of the assertion — that Tan "was not paid for the extra hours" she worked past her shift, a violation of the contract's clear language that Defendants pay their employees prevailing wages for this work.

Defendants also admit the following: Tan told Pascual that she was working more hours than United Staffing was paying her for; Tan complained to Pascual that she was not being paid for the additional hours she worked when she worked past the scheduled end of her shift; Plaintiff Magtoles complained to Pascual several times that her scheduled work hours were from 7 a.m. to 3 p.m., but she was actually working until 5 p.m. or 6 p.m.; and Plaintiff Ana Myrene Espinosa complained to Pascual that she was not being paid properly. (Defs. Resp. 56.1 at ¶¶ 57-61.) In Defendants' Responsive 56.1 Statements to Plaintiffs' evidence and assertions, Defendants assert only that "whenever [Pascual] received complaints about wages, such as from [nurse], [he] would refer these to the Accounting Department and sometimes would try to address the concerns by calling the concerned facility and ask them to investigate if the complaint was true and to help the nurses address their concerns." (*Id.*) The portions of Pascual's deposition that Defendants cite in support of this assertion do not address the outcome of their purported requests for an investigation, and consequently, Tan's showing that she was not paid for some of the hours she worked is not disputed. (*See* ECF No. 40-30 ("Pascual Dep.") at 63:17-64:18.)

**\*19** Defendants also admit the following: "United Staffing received timeclock records from Adira at Riverside Rehab showing that, on June 28, 2020, Nurse Ellaine Garduce clocked in at 7:06 a.m. and clocked out at 4:07 p.m. for a total of nine hours, but *United Staffing paid her for only seven hours.*" (Pls. 56.1 at ¶ 63; Defs. Resp. at ¶ 63 (emphasis added).) Further, Defendants "partially admit[ ] and partially dispute[ ]" Plaintiffs' assertion by adding, "with the understanding that United Staffing paid the validated number of hours, and that Adira, with its own policies and practices, might have deducted break time or meal period, and sent the validated number of hours to United, which United did pay." (*Id.*) In a substantively identical manner, Defendants also admit the same factual assertion that *seven other nurses* (at their varying facilities that validated their timesheet records) worked hours for which they were not paid. (Pls. 56.1 at ¶¶ 64-71; Defs. Resp. at ¶¶ 64-71.) Finally, the Court notes that Defendants drafted and signed the contract with dozens of nurses and had ample opportunity to include in the contracts any explanation — or even mere reference — to the billing and payment process involving Defendants' healthcare-facility clients that Defendants now heavily rely on to dispute Plaintiffs' breach of contract claim.

In sum, the Court finds that the plain language of the contract is unambiguous, again noting that Defendants do not argue otherwise. Simply put, Defendants had a contractual obligation to pay prevailing wages to its nurses and it breached this obligation in multiple ways, as outlined above, and cannot expect the Court to exceed the explicit terms by importing extrinsic evidence. Courts may "not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (citation omitted); *see also Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous"). For the foregoing reasons, the Court finds that Defendants have failed to raise a genuine issue of fact for trial as to Plaintiffs' breach of contract claim predicated on Defendants' failure to pay Plaintiffs for all hours worked.

#### ii. Deductions for meals or breaks not allowed or taken

Plaintiffs also argue that United Staffing breached the contracts' prevailing wages provision by "deducting time for breaks that were not allowed or taken." (Pls. Mem. at 15.) Plaintiffs present evidence that: "The Nurse Plaintiffs were supposed to take 30-minute breaks when they worked an eight-hour shift, but they were not allowed or able to take breaks." (Pls. 56.1 at ¶ 74; *see also, e.g.,* Tan Dep. at 62:15-63:20 (testifying that nurses were "not able to take" a break because "we couldn't even eat because of the kind of the work that we have" at the facility, and that for "more than a year in Regal Heights," she "only can remember probably less than 10 breaks" that she took).)

Defendants dispute Plaintiffs' assertion that "Nurse-Plaintiffs were not allowed or were not able to take breaks," arguing that "Nurse-Plaintiffs were given their meal breaks, depending upon the facility where they worked." (Defs. Resp. 56.1 ¶ 74.) Defendants also cite the following from Ofendo-Reyes' Declaration: "Some facilities give the employees thirty minutes of meal period only. Other facilities would give the employees one full hour of meal time. Most facility-clients follow the 'no work, no pay' rule. So, during meal periods, which are always controlled and determined by the facilities themselves, they do not count any compensable time to our employees." (Ofendo-Reyes Decl. at ¶ 12; Defs. Resp. 56.1 at ¶ 74.) Notwithstanding that the portion of Ofendo-Reyes' Declaration cited is not based on personal knowledge, Defendants assert only that "some facilities" gave breaks of varying lengths. Defendants fail to submit evidence creating a genuine dispute as to Plaintiffs' showing that Plaintiffs were not allowed or were too busy, to take breaks, and were not paid for work during breaks.

**\*20**  The Court agrees with Plaintiffs that Defendants confuse the issue here. Plaintiffs are not claiming that they should have been paid for breaks or meal periods that they actually took, nor are Plaintiffs disputing facilities' "no work, no pay" rule. Instead, Plaintiffs are claiming and submit evidence (which is not comprehensible, as explained *infra*) that Defendants deducted time "for breaks that were not allowed or taken." The Court notes that Ofendo-Reyes lacks personal knowledge as to whether the facilities prohibited Plaintiffs from taking breaks but nonetheless deducted hours for breaks. Nonetheless, the Court cannot grant summary judgment on those grounds because Plaintiffs have not submitted evidence that would allow the Court to conclude that any disparity between the hours the Nurse Plaintiffs worked versus the hours United Staffing actually paid were attributable to deductions for meal periods or breaks. Specifically, in support of their assertions, Plaintiffs vaguely cite, in part, to "Exhibits 15-17" (ECF Nos. 43-17, 43-18, 43-19), more than 400 pages of payroll and time records for Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa. Plaintiffs, however, provide no pin citations nor any other guidance or analysis of their voluminous records to the Court to support their assertion that "Nurse Plaintiffs were paid for only 7.5 hours per day when they actually worked eight hours during their regular shifts." (Pls. 56.1 at ¶ 75.) It is well-established that a court has no obligation to sift through hundreds of pages of records — in this case, extremely detailed records spanning days, weeks, and multiple years of payroll and timesheet documents — to find support for a party's 56.1 Statement. *See, e.g., Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (citing *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 405–06 (6th Cir. 1992) ("Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record .... What concept of judicial economy is served when judges ... are required to do the work of a party's attorney?")).

Therefore, the Court denies summary judgment on these grounds because Plaintiffs failed to present evidence in a useful manner establishing that Defendants breached the prevailing wage provision by deducting time for meal periods or breaks Plaintiffs did not actually take.

#### iii. Failure to give Plaintiffs 2,000 hours of work per year

Plaintiffs also argue that Defendants breached the contract by failing to give the Nurse Plaintiffs and other class members sufficient full-time work to achieve the contract requirement of at least 2,000 hours per year (and at least 6,000 hours over three years). (Pls. 56.1 at ¶¶ 81-89; *see, e.g.*, Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants, in turn, ignore the

contract requirements that Plaintiffs work at least 2,000 hours per year and 6,000 hours over three years, and argue that there is nothing in "United Staffing's standard employment contracts with its employees that required it to give its employees 'full-time work', much less '40 hours per week.' " (Defs. Mem. at 18.) Defendants also argue that even assuming, *arguendo,* that such a provision existed, that "the term 'full-time' is subject to various interpretations, and may mean at least thirty (30) hours per week." [11] (*Id.* at 19.)

Defendants appear to misinterpret Plaintiffs' assertion in Plaintiffs' moving papers and 56.1 Statements. Plaintiffs' arguments about "full-time" work rely on the contract provision requiring at least 2,000 hours of work per year, and do not even mention a specific number of hours a week. Nor do Plaintiffs' moving papers argue that Defendants were obligated by contract to give nurses "40 hours per week" of work. Plaintiffs' 56.1 Statements focus "the lack of full-time work" claim on a six-week period between October 5 to November 15, 2019, where Plaintiffs Magtoles and Tan were not assigned any work by United Staffing. (Pls. 56.1 at ¶ 84; Defs. Resp. 56.1 at ¶ 84.) It is undisputed that United Staffing did not pay Magtoles and Tan any compensation during those six weeks; that Magtoles and Tan had no income during those six weeks; that, during those six weeks, Magtoles and Tan earned no credit towards the 6,000 hours requirement (and thereby, no credit towards the 2,000 hours per year requirement) specified in their contracts; and that, during those six weeks, Magtoles and Tan had no ability to work anywhere else because of the contractual provision requiring that they work exclusively for United Staffing. (*See* Pls. 56.1 at ¶¶ 85-88; Defs. Resp. 56.1 at ¶¶ 85-88.)

 **\*21**  Plaintiffs also state in their 56.1 Statement that, as a result, "United Staffing's failure to give nurses at least 2,000 hours of work per year resulted in the Nurse Plaintiffs being paid less than the annual prevailing wage." (Pls. 56.1 at ¶ 90.) Defendants object to this assertion and respond that it is "not a statement of fact." (Defs. Resp. 56.1 at ¶ 90.) The Court analyzes this claim based on the contract provision requiring the employee to work at least 2,000 hours per year (and at least 6,000 hours over three years). (*See, e.g.,* Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants' opposition cites to depositions of Plaintiffs Magtoles and Tan to support Defendants' assertion that they were "in-between jobs, as they resigned from Meadowbrook facility without enough notice for United to find new assignments for them." (Defs. Resp. 56.1 at ¶ 84.) As a result of this genuine dispute of material fact, summary judgment on Plaintiffs' breach of contract claim cannot be awarded on the grounds that Defendants failed to give Nurse Plaintiffs and other class members sufficient work to achieve at least 2,000 hours of work per year.

### iv. Failure to Pay the Prevailing Wage for All Hours Worked

Finally, Nurse Plaintiffs argue that Defendants failed to pay them the prevailing wage for all hours worked. (Pls. Mem. at 15, citing 56.1 Statements at ¶¶ 91-105.) Plaintiffs' assertions primarily involve Defendants paying nurses who worked at Regal Heights Nursing & Rehabilitation Center ("Regal Heights") less than the prevailing wage rate during the nurses' orientation periods. Defendants argue that "Magtoles, Tan and Espinosa each voluntarily signed an orientation wage rate agreement with United Staffing, whereby each of them agreed to be paid $15.00 during their orientation period at Regal Heights." (Defs. Mem. at 15.)

The Orientation Agreement — a letter addressed to each nurse from Pascual — states in part:

> Regal Heights Nursing & Rehabilitation Center, as per their policy, will not pay you/us with an RN rate for the first week that you attend the orientation program. However, in fairness to you and out of our benevolence, we will give you an allowance rate of $15/hour for the duration of [the] first week of the orientation to cover your transportation, food allowance, and a little extra to tide you over during the period of orientation. This is not a company policy and we consider your case as an exception.

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

2023 WL 2710178

(*See, e.g.,* ECF No. 40-51 ("Orientation Agreement") at 3.)

It is undisputed that "[d]uring their first two weeks of work at the Regal Heights Rehabilitation and Care Center in Queens, New York, the Nurse Plaintiffs were paid only $15.00 per hour." (Pls. 56.1 at ¶ 93; Defs. Resp. 56.1 at ¶ 93; *see also* Defs. Mem. at 15 ("It is conceded that Plaintiffs Magtoles, Tan and Espinosa were paid $15.00 per hour during their orientation at the Regal Heights facility sometime in November 2019.")) This plainly breaches the prevailing wage provision of the standard contract, which provides no exceptions or qualifications as to United Staffing's obligation to pay its employee "prevailing wages," nor does anything in the contract suggest that nurses would be paid less during their orientation periods.

Nowhere in the Orientation Agreement or the standard contract does it state that the Orientation Agreement supersedes the standard contract, nor do Defendants even argue now that the Orientation Agreement should supersede the standard contract, or be treated as part of the standard contract. Defendants merely assert that such agreements "were the law between the contracting parties, and United Staffing abided with such agreements." (Defs. Mem. at 15.) To the contrary, Section 2(a) of Article VI of the standard contract states: "This Agreement constitutes the entire Agreement between the parties and shall as of the effective date *hereof supersede any and all other Agreements between the parties.*" (*See, e.g.,* Magtoles Contract at 6 (emphasis added).) The effective dates of Magtoles', Tan's, and Ana Myrene Espinosa's standard contracts were respectively November 22, 2018, November [sic] 2018, and September 17, 2019 — all dates substantially preceding the orientation start date of November 13, 2019. (Magtoles Contract at 7-8; Tan Contract at 7-8; Ana Myrene Espinosa Contract at 7-8; Orientation Agreement at 2-4.) It is also undisputed that the prevailing wage for an RN was $32.21 per hour in Queens County during 2019. (Pls. 56.1 at ¶ 92; Defs. Resp. 56.1 at ¶ 92.)

**\*22** On these facts, considering that both the standard contract and the Orientation Agreement are unambiguous, liability has been established against Defendants for breach of contract for class members who were required to sign the Regal Heights Orientation Agreement and thus were paid below the prevailing wage during the orientation period. *See, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.") (citing *South Rd. Assocs. LLC v. IBM,* 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005)).

### IV. Piercing the Corporate Veil

Plaintiffs also seek to hold Defendant Santos individually liable for breach of contract by piercing the corporate veil of United Staffing. (Pls. Mem. at 21-22.) Santos signed the standard contract in his corporate capacity as sole owner, president, and CEO of United Staffing, rather than in his individual capacity.

As Defendants "do not specifically oppose, or otherwise address," Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos, they have "seemingly abandoned any defense to that claim." *See Alvarado v. GC Dealer Servs. Inc.,* 511 F. Supp. 3d 321, 353-54 (E.D.N.Y. 2021) (granting a portion of plaintiffs' motion for summary judgment on the grounds that defendants had not addressed, and thus abandoned defense of, the issue); *A.H. by Horowitz v. Precision Indus. Maint. Inc.,* No. 19-CV-298 (FJS/CFH), 2021 WL 2417610, at *2 (N.D.N.Y. June 14, 2021) (holding that the defendants abandoned affirmative defenses because they "fail[ed] to refute or even address these issues in either their opposition to Plaintiffs' motion [for summary judgment] or their cross-motion for summary judgment"); *see also Azeez v. City of New York,* No. 16-CV-342 (NGG) (SJB), 2018 WL 4017580, at *6 (E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion.")

In *Jackson v. Fed. Express,* the Second Circuit held that, "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." 766 F.3d 189, 196 (2d Cir. 2014); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.,* 834 F.3d 128, 143-44 (2d Cir. 2016) (reiterating the Second Circuit's holding in *Jackson*). The Second Circuit's reasoning in *Jackson* was as follows:

> [T]here is a relevant distinction to be drawn between fully unopposed and partially opposed motions for summary judgment in counseled cases. While the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts, a partial opposition may imply an abandonment of some claims or defenses. Generally, but perhaps not always, *a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.*

766 F.3d at 196 (emphasis added).

Here, the Court concludes that Defendants intended to and did abandon any defense to the portion of Plaintiffs' motion seeking a finding piercing the corporate veil as to Defendant Santos. (Pls. Mem. at 21-22.) The circumstances here reflect a "partial response to a motion," as discussed in *Jackson*. *Id.* at 197 (defining a "partial response to a motion" as one "referencing some claims or defenses but not others"). "Preparation of a response to a motion for summary judgment is a *particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses.* Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial." *Id.* at 196 (emphasis added).

**\*23** Defendants' opposition brief — although addressing Plaintiffs' other grounds for summary judgment and despite devoting about a third of its pages to specifically defending against Plaintiffs' breach of contract claim — makes no mention of piercing the corporate veil, let alone any reference to Plaintiffs' arguments in support. (*See generally* Defs. Mem. at 9-19); *see also Netherlands Ins. Co. v. Selective Ins. Co. of Am.*, No. 14-CV-7132 (KPF), 2016 WL 866348, at *7 (S.D.N.Y. Mar. 3, 2016) (granting declaratory judgment on an issue in plaintiff's favor because "Defendant has abandoned any arguments regarding [the issue] because it failed to discuss this issue in its response brief"); *LPD New York, LLC v. Adidas Am. Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at *27 (E.D.N.Y. Sep. 24, 2022) (granting defendants' summary judgment as to certain counterclaims because plaintiff did not dispute or respond to the counterclaims "in its memorandum in opposition ... and therefore has abandoned its defense of these claims") (also collecting cases). Defendants also did not assert any additional facts in opposition to piercing the corporate veil in their Responsive 56.1 Statements, even though those Statements span 53 pages and contain 162 Statements, each of which Defendants responded to. (*See generally* Defs. Resp. 56.1.)

Moreover, Defendants here are counseled parties and thus, their lack of opposition to the corporate veil issue appropriately reflects "a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson*, 766 F.3d at 196.

> Where a partial response to a motion is made—*i.e.*, referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. *In contrast, in the case of a counseled party*, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.

*Id.* at 197-98 (emphasis added).

In addition, Defendants' counsel Felix Vinluan "is an experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years." (Pls. 56.1 at ¶ 154; Defs Resp. 56.1 at ¶ 154.) Thus, the Court finds from the papers and circumstances viewed as a whole, as explained above, that Defendants have abandoned any defense or

2023 WL 2710178

rebuttal against Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos and, consequently, Plaintiffs' motion on that issue is granted.

## V. TVPA Claims

The TVPA provides a private right of action to persons who have been subjected to forced labor. 18 U.S.C. § 1595(a). A defendant is liable for forced labor when he "knowingly provides or obtains the labor or services of a person" by any of the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

> (2) by means of serious harm or threats of serious harm to that person or another person;

> (3) by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id.* § 1589(a).

Plaintiffs argue that Defendants are liable under the second, third, or fourth subsections of Section 1589(a).

### A. § 1589(a)(2): Serious Harm or Threats of Serious Harm

TVPA § 1589(c)(2) defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

TVPA § 1589(c)(2); *see also Paguirigan*, 2019 WL 4647648, at *16 (stating that § 1589(c)(2) "defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA").

**\*24** Thus, "the relevant question" under § 1589(c)(2) as applied to § 1589(a)(2) is whether "defendants' conduct constituted a threat of harm serious enough to 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.' " *Paguirigan*, 2019 WL 4647648 at *16. "This standard is a hybrid one," and the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances.' " *Id.* (citing *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015)).

Defendants first recycle their arguments as to why the liquidated damages provision is enforceable. (*See* Defs. Mem. at 27-28.) As this Court has already found, the liquidated damages provision specifying, *inter alia*, harsh financial consequences, is "unenforceable as a penalty under New York law," and therefore, "this argument fails." *See Paguirigan*, 2019 WL 4647648 at *17. The liquidated damages provision therefore "constitutes a threat of sufficiently serious financial harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm" under the TVPA. *Id.* at *18 (internal quotation marks omitted).

Defendants also argue without supporting evidence that:

> Plaintiffs' TVPA claims ... fail because they rest on the factually unsupported assumption that all of the recruited RNs subjectively felt compelled to provide labor or services to United Staffing due to the terms of their employment contracts. It is beyond belief that each and every recruited RN has continued to provide labor for United Staffing only because of the contractual obligations contained in their employment contracts, and not out of a desire to continue working for United Staffing, after they had applied for a position with United Staffing, obtained a visa, and moved thousands of miles to voluntarily accept the position.

(Defs. Mem. at 30-31.) Defendants then argue that, in the alternative, "[e]ven if the terms of the contract are unenforceable, Plaintiffs utterly fail to set out facts admissible in evidence which are sufficient to establish that United Staffing violated the TVPA in a class action setting solely based on the terms of the employment contracts, because they fail to prove facts that would show that each and every one of the recruited RNs" only rendered labor because of the contract provisions. (*Id.* at 31.)

Defendants' arguments fail because they have a mistaken view of the law. As stated above, the *language of the TVPA itself* defines "serious harm" as conduct that would compel "*a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2) (emphasis added). Further, "in the class action context, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *See Paguirigan*, 2019 WL 4647648, at *16 (internal quotation marks and citation omitted). In addition, the TVPA also "applies to subtle, nonviolent threats that may still effectively compel an individual to keep working." *Id.* (citation omitted) (holding that testimony from several nurses stating "they were never verbally threatened" was "insufficient to avoid TVPA liability").

 **\*25**  Defendants next argue that to their knowledge, "there is not a single case where a court had held that a defendant could be liable under the TVPA's forced labor provision solely because it entered into an employment contract containing a provision that was found to be an unenforceable penalty." (Defs. Mem. at 31.) Defendants again misunderstand the law. The inquiry under the TVPA does not turn on such a specific issue. Rather, other considerations contribute to the finding of "serious harm" and liability under § 1589(a)(2) here, including the Court's findings that Defendants breached the plain language of the employment contract in multiple ways, and included an unenforceable non-compete clause into the contract prohibiting the nurses from working in the nursing industry in the United States for three years. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering that the agency had breached the wages provision of the employment contract); *see also Dale Carmen v. Health Carousel, LLC*, No. 20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) ("[I]t is not the amount of liquidated damages, per se, that controls the analysis ... what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances — such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement.").

Moreover, multiple nurses — some working through the catastrophic COVID-19 pandemic — testified in their depositions that they were considerably overworked, that facilities were understaffed, and that the difficulties of their work caused near-daily emotional distress. Defendants offer no admissible contrary evidence on this point. In assessing TVPA liability, the Court would be remiss not to take such considerations into account. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering, among other factors, that "[t]hree of the nurses who were deposed complained of being overworked or that the nursing home was understaffed"). After all, "the relevant question" under § 1589(c)(2) is a "hybrid one." *Id.* at *16 (the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances' ") (citing *Rivera*, 799 F.3d at 186-87).

2023 WL 2710178

Plaintiff Magtoles testified in her deposition that while at Meadowbrook Facility, although she had been oriented as an "entry level" registered nurse, she was given managerial responsibilities, noting "there was no written agreement between [Magtoles], United Staffing, or the Meadowbrook that [she] will do some managerial work" such as "doing the nursing care plans, [and] attending those managerial meetings." (Magtoles Dep. at 126-27.) Magtoles also stated that, as a result, although her "supposed[ ] work hours" were 7:00 a.m. to 3:00 p.m., most of the time she would end up working until 5:00 or 6:00 p.m., without being paid for hours that she worked beyond her shift schedule. (*See id.*) Although Magtoles spoke with Pascual regarding the issue "a few times," she was told "it's still in the adjusting period." (*Id.* at 127:23-128:03.) Magtoles further stated that she experienced emotional distress every time she went to work, including insomnia and anxiety. (*Id.* at 162, 186-87.) She ultimately resigned as a result, and because she was working "more than the regular working hours. Some are unpaid." (*Id.* at 181:09-181:12.)

Plaintiff Ana Myrene Espinosa testified that at the Regal Heights facility, she "worked with 40 patients and with just two aides." (Ana Myrene Espinosa Dep. at 34:19-34:24.) She also testified that her role was "to be a charge nurse, treatment nurse, and med pass nurse all at the same time, which is impossible to take care of 40 patients," and that it was "overwhelming" and "we are overworked." (*Id.* at 34:25-35:05.) Espinosa also stated that after contracting COVID-19 a second time, United Staffing "said they are not going to pay me." "I had to ask them. I had to beg because I have been out from work for two weeks and I don't have any salary or anything." (*Id.* at 56:09-56:20.) Espinosa also stated: "I had those moments when I felt depressed, and it is like almost every day I feel the anxiety when I come to work, because I don't know if I'm going to have those patients and I believe I made Mr. Pasquale [sic] aware of that." (*Id.* at 70:20-70:24.)

**\*26** In explaining her reasons for her resignation, Espinosa testified:

> **Q:** What were the reasons for your resignation?

> **A:** Like I said, we were overworked and it is giving me almost every day anxiety whenever I go to work. It's not safe for the patients. And I even question myself if I want to be a nurse because I cannot provide quality care for my patients. Taking care of 40 patients is impossible. That is why I resigned and I was hoping to get a better job.

> **Q:** Is it fair to say because of these issues you decided to resign?

> **A:** For me it is fair because it is affecting my mental health. I believe it is really important for my profession to be mentally stable. If you are not stable, how can you give quality care?

(*Id.* at 81:20-82:12.)

Finally, Section 1589(a) contains a scienter requirement ("[w]however knowingly provides or obtains the labor or services of a person ..."). Defendants argue that the scienter requirement is not met here because, unlike in *Paguirigan*, "the record does not establish that either Defendant has sued any of the four Plaintiffs" and that there is "not even a suggestion that Defendants' standard employment contract has previously been found by any court to be unenforceable." (Defs. Mem. at 35.) Defendants have not cited nor has the Court found any authority suggesting that the § 1589(a) scienter analysis turns on such specific grounds, nor does *Paguirigan* suggest that finding scienter requires such a particular finding.

The Court finds that there is sufficient and undisputed "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm — *from the vantage point of the victim* — if she did not continue to work." *Paguirigan*, 2019 WL 4647648, at \*19 (quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017)) (emphasis added). Scienter requires sufficient evidence to "find that the defendant knew that the circumstance existed." *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008).

As described above, the Court has already found that the liquidated damages provision constitutes a threat of sufficiently serious harm. There is neither evidence nor any serious argument that Defendants, who were responsible for drafting and including the liquidated damages provision in the first place, did not intend for the nurses to believe they would, in fact, have to pay

the liquidated damages provision amount — in other words, *suffer serious financial harm* — if the nurse left United Staffing's employ. The nurses' reliance on Pascual and Vinluan to explain the contract terms, as discussed *supra*, also clearly demonstrates that Defendants "knew that the circumstance existed," *see id.*, and that Defendants "knowingly ... obtain[ed] the labor or services" of the nurses, with the understanding that the liquidated damages provision "would effectively coerce nurses into continuing to work." *See Paguirigan*, 2019 WL 4647648, at \*19.

And effectively coerce it did. Despite the extremely fraught work circumstances and adverse impacts on her physical and psychological health that Plaintiff Ana Myrene Espinosa testified to, as described above (including but not limiting to having to "beg" United Staffing to pay her the second time she contracted the COVID-19 virus), Espinosa kept working for Defendants.

**\*27  Q:** Were you forced to work by United Staffing?

**A:** I was not forced to work. I believe I have to fulfill my — *I have a contract, so I have to finish it. I don't have a choice.* Even if I feel anxiety going to work, I still have to go to work, even though they don't force us.

(Ana Myrene Espinosa Dep. at 71:07-71:14.) (emphasis added).

Such testimony evokes the circumstances that Congress intended to reach and remedy with the TVPA's broad definition of "harm" — instances "in which persons are held in a condition of servitude through nonviolent coercion." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at \*6 (S.D.N.Y. July 3, 2014).

The inclusion of the liquidated damages provision was no accident. From the "vantage point of the victim," the Court finds there is sufficient "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm ... if she did not continue to work," *Paguirigan*, 2019 WL 4647648, at \*19 (citation omitted), especially when, as the Second Circuit directed in *Rivera*, considered with the "particular vulnerabilities" of the class members here. As discussed *supra*, such vulnerabilities include but are not limited to: Plaintiffs' emotionally and physically difficult work circumstances; reliance on Defendants' representatives to understand the contract; reluctance to complain to the United States embassy about the contract due to being "nervous"; Plaintiffs' lack of negotiating or bargaining power as to the terms of the contract, in comparison to the highly experienced Defendants; and the non-compete clause in the contract, which placed unenforceable restrictions on Plaintiffs' ability to work in the nursing industry should they leave Defendants' employ.

Having found Defendants liable under § 1589(a)(2), the Court does not reach whether Defendants violated § 1589(a)(3) or § 1589(a)(4).

**B. 18 U.S.C. § 1589(b)**

Having found United Staffing liable under § 1589(a)(2), the Court also finds that Defendant Santos is liable under TVPA § 1589(b), which provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b).

As discussed above, Defendant Santos is the sole owner, president, and CEO of United Staffing. Santos clearly and undeniably "played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States to work at nursing homes affiliated with defendants," and thus, "knowingly benefit[ed] financially from labor obtained in violation of TVPA § 1589(a)." *See Paguirigan*, 2019 WL 4647648, at *19 (quotation marks omitted). Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Furthermore, Santos acted with " 'know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services' through means prohibited by TVPA § 1589(a) — in this case, through the contracts' liquidated damages provisions." *See Paguirigan*, 2019 WL 4647648, at *19. As in *Paguirigan*, individual Defendant Santos "testified regarding [his] direct knowledge of the provision" and "signed the contract itself." *Id.*; (*see, e.g.,* Santos Dep. at 90:07-90:17; United Staffing Dep. at 44:15-45:19.) Thus, Santos had clear knowledge of the provision.

## VI. Plaintiff Bhyng Espinosa's Claims of Fraud and Unjust Enrichment

 **\*28**  Finally, Plaintiff Bhyng Espinosa seeks summary judgment on her claims for fraud and unjust enrichment. (Pls. Mem. at 10.)

In relevant part, 20 C.F.R. § 656.12(b) provides that "[a]n employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application[.]" Plaintiff Bhyng Espinosa argues that, "[i]t is undisputed that, relying on the defendants' expertise in immigration matters, [Bhyng] Espinosa paid the defendants $7,532.00 for the "costs and attorneys' fees to obtain a labor certification used in connection with the employer's sponsorship of an individual for an employment-based visa," and that Defendants "should not be permitted to retain those funds." (Pls. Mem. at 10.)

In support, Plaintiff Bhyng Espinosa cites to Plaintiffs' Rule 56.1 Statement ¶ 30, where Plaintiff asserts, in relevant part, "Plaintiff Bhyng Espinosa paid United Staffing $7,532.00 to obtain a labor certification." (Pls. 56.1 ¶ 30.) Defendants, in turn, "object" to that assertion "to the extent that the alleged payments made as purportedly evidenced by Exhibit '9' do not indicate payments were made to 'United Staffing' 'to obtain a labor certification.' " (Defs. Resp. 56.1 at ¶ 30.)

Upon review of "Exhibit 9" and other submitted evidence, the Court denies summary judgment as to Plaintiff Bhyng Espinosa's fraud and unjust enrichment claims. (*See generally* ECF No. 43-11.) Although the receipts allegedly relate to Ms. Bhyng Espinosa's payments for her "lawyer's and newspaper ad fees" (*id.* at 3), "her application" (*id.* at 4), "1/2 of [illegible] — motion to reopen/L.C." (*id.* at 5), and "her balance for the legal fees," (*id.* at 6), none of these receipts clearly reference a labor certification. As such, there is a genuine dispute of material fact as to the purpose of Plaintiff Bhyng Espinosa's payments to Defendants and summary judgment is not appropriate.

### CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Plaintiffs' requested declaratory and injunctive relief is GRANTED. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision and non-compete clauses in all plaintiffs' contracts to be unenforceable and to enter an injunction permanently enjoining Defendants from attempting or threatening to enforce either.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is:

   a. GRANTED on the following grounds:

      i. failure to pay Plaintiffs for all hours worked;

    ii. failure to pay Plaintiffs the prevailing wage during Regal Heights Orientation.

  b. DENIED on the following grounds:

    i. deduction of time for meal periods or breaks that were not taken.

    ii. failure to give Plaintiffs 2,000 hours of work per year.

  c. GRANTED as to piercing the corporate veil of Defendant United Staffing to hold Defendant Santos individually liable for breach of contract.

  d. Damages to Plaintiff Magtoles and the class caused by Defendants' breach of contract are to be determined at a later date.

**\*29**  3. Plaintiffs' summary judgment motion as to Defendants' liability under the TVPA is GRANTED. Damages to Plaintiff Magtoles and the class under the TVPA are to be determined at a later date.

4. Plaintiff Bhyng Espinosa's summary judgment motion for fraud and unjust enrichment claims against Defendants is DENIED.

5. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

6. No later than one week after the date of this Memorandum and Order, the parties shall contact Magistrate Judge Peggy Kuo to schedule a settlement conference. Further, the parties are strongly encouraged to consent to Magistrate Judge Kuo's jurisdiction in this case.

7. If the parties do not resolve or settle this case, they shall: (a) file a joint status report to the Court within two business days to advise of their failure to settle, and to schedule a status conference to address: how damages are to be determined; Defendants' counterclaim for breach of contract as to Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa; and Plaintiff Bhyng Espinosa's claims for unjust enrichment and fraud, and (b) promptly meet and confer on these issues and present a joint plan to the Court.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 2710178

## Footnotes

1    (*See* ECF Nos. 43-1, Plaintiffs' Rule 56.1 Statement ("Pls. 56.1"); 67, Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. Resp. 56.1"); 46, Plaintiffs' Reply Rule 56.1 Statement ("Pls. Reply 56.1"); 43-2, Declaration of John J.P. Howley ("Howley Decl.") and exhibits attached thereto; 45, Declaration of Felix Vinluan ("Vinluan Decl.") and exhibits attached thereto; 46-1, Reply Declaration of John J.P. Howley ("Howley Reply Decl.") and exhibit attached thereto.

    The Court notes that Defendants first submitted their Response to Plaintiffs' Rule 56.1 Statement at ECF No. 44. That document contravened this Court's Chambers Practices III.B.4(c) which states: "A party's 56.1 Counter Statement to a 56.1 Statement must quote, verbatim, the 56.1 Statement, including all citations, and respond to the moving party's statements of fact immediately beneath each statement." The Court ordered Defendants to re-submit an identical version

of ECF No. 44 with an inclusion of Plaintiffs' corresponding paragraphs per III.B.4(c). (01/24/2023 Docket Entry). Defendants filed their revised Response (ECF No. 67) on January 25, 2023 in accordance with the Court's Order, which the Court cites in this Memorandum and Order.

The Court also incorporates certain documents submitted in connection to the motion to dismiss (ECF Nos. 27-31) and the motion to certify class (ECF No. 40) previously filed in this case, which the parties rely upon in connection with this motion for summary judgment but did not re-submit with the motion.

Finally, all pagination citations, except for citations to deposition transcripts, refer to the page number assigned by the Court's CM/ECF system.

2    Defendants "dispute" Plaintiffs' assertion that "United Staffing required that foreign nurses sign a contract before it would file an immigration petition to sponsor them for permanent residence status or a 'green card,' " (Pls. 56.1 at ¶ 11), arguing that "United Staffing does not have any uniform policy when to require its RN-beneficiaries to sign an Employment Agreement." (Defs. Resp. 56.1 at ¶ 11.) The Court has reviewed the Santos Declaration and Pascual Declaration cited by Defendants, and concludes that Defendants' asserted dispute as to the material fact regarding Defendants' required contract is not genuine. The portions of both Declarations that Defendants cite clearly state, *inter alia*: "Those *we recruit from abroad* are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview" (Santos Decl. ¶ 6) (emphasis added), and "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process." (Pascual Decl. ¶ 7.) "Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312 (2d Cir. 2008).

3    Defendants' Responsive 56.1 Statements frequently respond: "Undisputed, to the extent that the 'standard contract' referred to is the 'second version' of the employment contract." To the extent such Defendant Responses are attempting to cabin "undisputed" factual assertions as only applying to a "second version," the Court rejects any such attempt. On May 25, 2022, this Court certified "a class of all Filipino nurses who were employed by Defendants at any time since April 5, 2011 pursuant to an employment contract containing a liquidated damages provision, non-compete clause, immigration notification provision, and a prevailing wage requirement." *See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 WL 1667005, at *11 (E.D.N.Y. May 25, 2022). Therefore, when appropriate, the Court treats the "standard contract" in parties' 56.1 Statements as the employment agreement with the four provisions at issue, as previously certified. *See Magtoles*, 2022 WL 1667005, at *7 ("[T]he court concludes that the minor variations in the minimum number of hours do not materially affect the TVPA claims or the claims for declaratory and injunctive relief.").

4    Thirteen nurses signed an employment contract requiring the completion of 5,100 hours over the three-year period, rather than 6,000 hours. (Pascual Decl. ¶ 21; *see* ECF No. 40-40, Ex. O at 3.) Similarly, one nurse signed an employment contract requiring the completion of 5,616 hours over the three-year period. (Pascual Decl. ¶ 23; *see* ECF No. 40-45, Ex. T at 3.)

5    Defendants repeatedly dispute Plaintiff's factual statements, such as Pls. 56.1 Statement ¶ 26, without citing to supporting admissible evidence, including by stating: "OBJECTED TO. This is not a statement of fact." (*See, e.g.,* Defs. Resp. 56.1 at ¶¶ 24-27.) Defendants have not stated nor cited to any grounds for "objecting" to the factual assertion: "If a nurse stopped working before completing 6,000 hours of work, the 'liquidated damages' clause provided that she owed United Staffing $15 'for each hour or part of an hour performed of the [6,000-hour] requirement.' " (*See* Pls. 56.1 at ¶ 24; Defs. Resp. 56.1 at ¶ 24.)

It is unclear if Defendants are objecting to whether the plain language of the liquidated damages provision states that the nurse "agrees and binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not

2023 WL 2710178

performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.*, Magtoles Contract at 3.) An identical provision is in the contracts requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

In any event, because Defendants fail to submit admissible evidence to support their objections, Plaintiffs' factual statements that are supported by admissible evidence are considered undisputed. *See* Fed. R. Civ. P. 56(e)(2); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases) (holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration, citation, and internal quotation marks omitted)); *see also United States v. Gentges*, 531 F. Supp. 3d 731, 735 n.1 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.").

6    As discussed *supra* note 5, Defendants have not stated nor cited to any grounds for "objecting" to Plaintiffs' factual assertion that a nurse who was to work 6,000 hours would owe United Staffing for 4,000 remaining hours if the nurse left United Staffing after completing 2,000 hours, based on simple math and the plain language of the contract: the nurse "binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.,* Magtoles Contract at 3.) An identical provision is in the contract requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

7    Two of the plaintiffs in this action, Ana Myrene Espinosa and Ana Mervine Espinosa, have notably similar names. In this Memorandum and Order, the Court refers to Ms. Ana Myrene Espinosa by her full name or as "Ms. Espinosa," and refers to Ms. Ana Mervine Espinosa as "Ms. Bhyng Espinosa," as stated in Plaintiffs' Rule 56.1 Statement ¶ 4.

8    In response to Defendants' submission of the "supplemental affidavit," Plaintiffs submitted a second Declaration from counsel John J.P. Howley with an exhibit entitled "Defendants' Response to Plaintiffs' Interrogatory No. 3." (ECF Nos. 56-1, 56-2.) As the Court is not considering the supplemental affidavit submitted by Defendants, the Court also will not consider the Second Declaration nor the attached exhibit. (*See* Pls. Reply. at 5 n.1.)

9    The Court also notes the following, rather troublesome, facts. Felix Vinluan, one of Defendants' counsel in the instant action, was retained by Filipina nurse Ronariza Beltran (who is not a class member) to review her contract with United Staffing. Beltran relied upon Vinluan for legal advice in connection with the contract. At the same time, Vinluan was representing United Staffing in connection with Beltran's contract. (Pls. 56.1 at ¶¶ 117-19; Defs. Resp. 56.1 at ¶¶ 117-19.) Although Vinluan informed Beltran that he was also United Staffing's lawyer, Beltran testified that she did not sign anything waiving any conflicts of interest presented by Vinluan's dual representation of Defendants and their prospective employee. (ECF No. 45-11 ("Beltran Dep.") at 35:15-35:21.)

Defendants rhetorically dispute Plaintiffs' assertion that "Vinluan did not request or obtain from Beltran a waiver of conflicts of interest," speculating that "said waiver could have been granted through a different manner," but offer no evidence of waiver. (Defs. Resp. 56.1 at ¶ 120.) Notably, Defendants' speculation is distinct from any admissible evidence that any such waiver *was* ever granted. Vinluan, an "experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years," (Pls. 56.1 at ¶ 154; Defs. Resp. 56.1 at ¶ 154), should have recognized the importance of a written waiver of a conflict so plain, but there is no record evidence that he obtained any written conflict waiver.

10    Defendants dispute Plaintiffs' assertion: "When Tan was scheduled to work the 3 p.m. to 11 p.m. shift, she usually ended up working until 2 a.m. or 3 a.m." but was not paid for hours worked past 11 p.m. Defendants respond that the statement "generalizes Tan's work schedules, although the statement may be true only in [sic] few occasions while she worked at the Regal Heights facility and only if it refers to her sometimes working until 2 am, but not until 3 am." (Defs. Resp. 56.1 at ¶ 51.) The Court finds that Defendants' failure to proffer admissible evidence fails to create a genuine dispute,

because Defendants admit the relevant part of the assertion — that there were times when Tan worked multiple hours past her scheduled shift hours, for which she was not paid.

11     The Court finds immaterial factual assertions regarding "full-time work" because this term does not appear in the contract. The Court notes, however, that the 2,000 hours specified in the contract divided by 52 weeks per year is approximately 38.46 hours per week, which could be considered "full time."

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3013371
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Michael MOATES, Plaintiff,

v.

FACEBOOK INC., Defendant.

Civil Action No. 4:20-cv-896-ALM-KPJ

|

Signed 05/14/2021

**Attorneys and Law Firms**

Michael Moates, Denton, TX, Pro Se.

Christopher C. Kearney, W. Hamilton Jordan, Keker & Van Nest LLP, San Francisco, CA, Earl Glenn Thames, Jr., Potter Minton, a Professional Corporation, Tyler, TX, for Defendant.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

KIMBERLY C. PRIEST JOHNSON, UNITED STATES MAGISTRATE JUDGE

**\*1**  Pending before the Court is Defendant Facebook Inc.'s ("Facebook") Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (the "Motion") (Dkt. 29), wherein Facebook requests this action be transferred to the Northern District of California pursuant to three forum selection clauses. On March 3, 2021, Plaintiff Michael Moates ("Plaintiff") filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39). Having considered the arguments and applicable authorities, the Court recommends the Motion (Dkt. 29) be **GRANTED**.

## I. BACKGROUND

On November 19, 2020, Plaintiff filed an Original Complaint (Dkt. 1) against Facebook, which was superseded by a First Amended Complaint (Dkt. 5) and a Second Amended Complaint (Dkt. 20). [1] In his forty-seven paged Second Amended Complaint (Dkt. 20), Plaintiff represents he operates online Facebook Pages and Groups, through which he facilitates "likes, followers, and engagement." *See* Dkt. 20 at 9. Since August 29, 2020, Plaintiff "invested" $10,546.00 in advertising to build a following of users who would like, follow, and engage with content hosted by the social media platform. *Id.*

Facebook subsequently terminated Plaintiff's access to his Facebook, Instagram, WhatsApp, Oculus, and CrowdTangle accounts, as Facebook alleges Plaintiff's accounts "represent[ed]" QAnon, and Plaintiff's activities violated Facebook's community standards. *See* Dkt. 20 at 10–13; Dkt. 20-3; Dkt. 20-5; Dkt. 20-18. Plaintiff then initiated this lawsuit, wherein he asserts a panoply of claims. Plaintiff alleges violations of the following constitutional, statutory, and regulatory provisions:

(1) "Right to privacy" under the Texas Constitution, though Plaintiff does not specify which "zone of privacy" was violated; [2]

(2) Violations of the Texas Business and Commerce Code, namely TEX. BUS. & COM. CODE § 17.41 *et seq.* (deceptive trade practice) and § 503.001 (unlawful capture or use of biometric identifier);

(3) Texas Student Privacy Act, TEX. EDUC. CODE § 32.152;

(4) Texas Medical Records Privacy Act, TEX. HEALTH & SAFETY CODE § 181.001 *et seq.*;

(5) "Uniform Trade Secrets Act," presumably the Texas Uniform Trade Secrets Act ("TUTSA"), TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*;

(6) Section 2 of the Sherman Act of 1890, 15 U.S.C. § 2;

(7) Section 7 of the Clayton Act of 1914, 15 U.S.C. § 18;

(8) Regulation FD of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*; 17 C.F.R. § 243.100 *et seq.*;

(9) Lanham Act, also known as the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*;

(10) Regulation E of the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq.*; 12 C.F.R. §§ 1005.1–1005.36;

(11) Federal Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g *et seq.*;

(12) Title III of the American Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*;

**\*2** (13) Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), 42 U.S.C. § 1320d-1 *et seq.*; 45 C.F.R. § 160.001 *et seq.*; and

(14) 18 U.S.C. § 594 (Intimidation of Voters).

*See* Dkt. 20.

Plaintiff also asserts claims of common law fraud, common law breach of contract, and "data theft," though the Court is unaware on what legal basis the "data theft" claim arises. *Id.* Lastly, Plaintiff argues Section 230 the Communications Decency Act of 1996, 47 U.S.C. § 230, is unconstitutional under the First Amendment. *Id.* at 16.

On February 3, 2021, Facebook filed the present Motion, wherein it requests that this matter be transferred to the Northern District of California pursuant to three forum selection clauses. *See* Dkt. 29 at 3. Facebook represents Plaintiff registered two Facebook accounts—one in 2014 and one in 2017. *See id.* at 2. From 2014 (when Plaintiff first registered a Facebook account) to 2020 (when Plaintiff lost access to his accounts), three different terms of service (collectively, the "Terms of Service") with nearly identical forum selection clauses and choice of law provisions were in place. *See id.* at 2–3; Dkt. 29-1; Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4; Dkt. 29-4 at 5. [3]   The first and second Terms of Service, dated November 15, 2013 and January 30, 2015, respectively, have identical forum selection clauses and choice of law provisions. *See* Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4. They provide:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to [these Terms] or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.

**\*3** *Id.*

The third Terms of Service, dated October 1, 2020, provides:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

Dkt. 29-4 at 6, 7.

On March 3, 2021, Plaintiff filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39).

## II. LEGAL STANDARD

### A. TRANSFER PURSUANT TO A FORUM SELECTION CLAUSE

Because a forum selection clause represents the parties' agreement as to the most proper forum, "a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases." *Atlantic Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Such clauses are enforced through a motion to transfer venue under 28 U.S.C. § 1404(a). *See id.* at 59. Under § 1404(a), a district court may transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice, ... to any other district or division where it might have been brought or to any district or division to which all parties have consented." *See id.* To determine whether transfer is appropriate, the Court determines: (1) whether the forum selection clause is valid and enforceable; (2) whether the forum selection clause is mandatory or permissive; (3) whether the plaintiff's claims fall within its scope; and (4) whether extraordinary circumstances counsel against transfer. *See Coleman v. Brozen*, No. 4:19-cv-705-ALM, 2020 WL 2200220, at \*2–3 (E.D. Tex. May 6, 2020).

### B. CHOICE OF LAW

When conducting a forum selection clause analysis, courts must ensure they apply the proper substantive law at each step. *See Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 918–19 (2016) (reprimanding federal district and circuit courts for "inelegant and confusing" legal analysis regarding forum selection clauses). In the Fifth Circuit, district courts apply federal law to determine the enforceability of forum selection clauses in both diversity and federal question cases. *See Barnett v. DynCorp Int'l, LLC*, 831 F.3d 296, 301–02 (5th Cir. 2016).

With respect to the mandatory or permissive nature of the forum selection clause and whether a plaintiff's claims fall under the forum selection clause's scope, federal courts first apply the choice of law rules of the state in which it sits. *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 771 (5th Cir. 2016); *Sabal*, 209 F. Supp. 3d at 919. The applicable substantive law then guides these steps of the analysis. *See id.*

## III. ANALYSIS

**\*4**  The Court begins with a choice of law analysis to ascertain the applicable state law for the second and third steps of the forum selection clause analysis, as articulated in *Atlantic Marine. See Sabal*, 209 F. Supp. 3d at 919; *Unique Dev. Grp., LLC v. Normandy Cap. Tr. & Cohen Fin.*, No. 4:18-cv-4542, 2021 WL 1027570, at \*2 (S.D. Tex. Mar. 17, 2021).

## A. CHOICE OF LAW

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). Here, the forum state is Texas. Texas applies the "most significant relationship" test from the Second Restatement of Conflicts to decide choice of law issues. *See id.*; *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. L. Inst. 1971). Under the most significant relationship test, contractual choice of law provisions will apply to claims pertaining to the instrument. *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). However, Texas courts will not enforce choice of law provisions if the law of the chosen state violates a fundamental public policy of Texas or the contract bears no reasonable relation to the chosen state. *See Exxon Corp. v. Burglin*, 4 F.3d 1294, 1298 n.5 (5th Cir. 1993) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991)).

Here, the Terms of Service provide California law "will govern" claims arising between the parties. *See* Dkt. 29-2 at 7; Dkt. 29-3 at 4; Dkt. 29-4 at 6. Because Facebook is headquartered in California, *see* Dkt. 29 at 2, the Terms of Service bear a reasonable relation to California. *See Marquis Software Sols, Inc. v. Robb*, No. 3:20-cv-372-B, 2020 WL 955901, at \*4 (N.D. Tex. Feb. 27, 2020). Further, the parties do not identify an aspect of California law that violates a fundamental public policy of Texas. Accordingly, California law will guide the Court's analysis as to the second and third portions of the Court's *Atlantic Marine* analysis: the mandatory nature of the forum selection clauses and whether Plaintiff's claims fall under the forum selection clauses' scope. *See Exxon Corp.*, 4 F.3d at 1298.

## B. VALIDITY AND ENFORCEABILITY

Courts apply federal law to determine the validity and enforceability of a forum selection clause. *See Alliance Health Grp., LLC v. Bridging Health Options, LLC*, 553 F.3d 397, 399 (5th Cir. 2008). In the Fifth Circuit, "[a] forum selection provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995). The party opposing enforcement bears a "heavy burden" to establish unreasonableness. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991). Unreasonableness potentially exists where: (1) the incorporation of the forum selection clause to the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will practically be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; and (4) enforcement of the forum selection clause would contravene a strong public policy in the forum state. *See Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997).

**\*5**  Here, Plaintiff argues enforcing the forum selection clauses would pose grave difficulties and would violate the public policies of Texas. *See* Dkt. 37.

### 1. Grave Inconvenience of the Selected Forum

Because the inconvenience of a forum is foreseeable at the time of contracting, invalidating a forum selection clause due to a grave inconvenience requires the resisting party to show he will, for all practical purposes, be deprived of his day in court. *See Haynsworth*, 121 F.3d at 963; *Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 545 (W.D. Tex. 2014). Essentially, the resisting party must show it is impossible for the party to try the case, and litigating in another forum will require the party to abandon his claims. *See Pratt v. Silversea Cruises, Ltd.*, No. C 05-0693 SI, 2005 WL 1656891, at \*4 (N.D. Cal. July 13, 2005); *O'Hollaren v. Hill-Rom Co., Inc.*, No. CV 08-45-ST, 2008 WL 3853350, at \*7 (D. Ore. Aug. 14, 2008).

In *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d 1135 (N.D. Cal. 2000), for example, the court found enforcing a forum selection clause would pose grave difficulties on two plaintiffs. *Id.* at 1136, 1141–42. Both plaintiffs had such limited financial

means that travel to another state would have been prohibitively expensive. *See id.* at 1141. One plaintiff received less than $400 a month in disposable income to provide for herself, her husband, and two children. *Id.* The other plaintiff received less than $700 per month to provide for himself and three family members. *Id.* On average, a plane ticket from Northern California to Florida cost $490, and a train ticket cost $1,858. *Id.* at 1140–41. The court found the plaintiffs would experience extreme financial hardship if required to litigate out of state. *Id.* at 1141.

The *Walker* court also noted both plaintiffs lived with severe disabilities. *Id.* One plaintiff suffered from chronic progressive multiple sclerosis, and the other lived with quadriplegia. *Id.* Both plaintiffs were wheelchair bound and suffered from bowel and bladder incontinence. *Id.* Because of their incontinence, the narrow configuration of an airplane or train's restroom precluded the plaintiffs' ability to use such facilities. *Id.* The plaintiffs also reported that, in their prior attempts to travel, they suffered from numerous embarrassing and humiliating incidents, and passengers made condescending remarks to them as a result of these incidents. *Id.* On these facts, the court did not enforce the forum selection clause. *See id.*; *see also Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137, 1142–43 (9th Cir. 2004) (holding grave difficulty existed where the plaintiff was elderly, disabled, had no disposable income, could not drive due to disabilities, and the plaintiff's wife could not drive him due to her own disabilities).

Here, Plaintiff contends he cannot travel due to asthma, sleep apnea, anxiety, attention deficit hyperactivity disorder, binge eating disorder, and insomnia. *See* Dkt. 37 at 1. In his affidavit, Plaintiff testifies he has "been rushed to the emergency room multiple times during the coronavirus pandemic for concern while struggling to breath." Dkt. 37-1 at 1. He further testifies that wearing a mask once induced him to cough until his face was purple and his anxiety regarding travel puts him at risk of experiencing these difficulties. *See* Dkt. 37-1. Plaintiff did not provide the Court with any financial information.[4]

 **\*6**  Having reviewed the record, the Court finds Plaintiff has not met the heavy burden of showing travel to Northern California constitutes a grave difficulty. Plaintiff states he was hospitalized multiple times during the coronavirus pandemic, but he only submits one hospital record dated May 14, 2020. *See* Dkt. 37-3. The hospital record states Plaintiff's reason for visiting is "SOB/COUGH," *id.*, which the Court construes as "shortness of breath" and coughing. *See Jimenez v. Wynne*, No. 9:16-cv-2, 2019 WL 1141939, at \*5 (E.D. Tex. Jan. 16, 2019). The hospital record merely states Plaintiff may have a COVID-19 infection and/or pneumonia, rather than stating Plaintiff actually had an infection or pneumonia. Dkt. 37-3. Beyond this sparse information, the hospital record contains no physician notes, observations, diagnosis, or post-visit instructions. *Id.* On this record, the Court is not convinced a report documenting one visit to a medical facility, with no narrative or elaboration, demonstrates Plaintiff will have to relinquish his claims if he has to litigate his claims in the Northern District of California. *See O'Hollaren*, 2008 WL 3853350, at \*7.

Additionally, Plaintiff's claim that he "may" experience anxiety and shortness of breath if he were to wear a mask and board a plane is too speculative. *See Murphy*, 362 F.3d at 1137, 1142–43; *Walker*, 107 F. Supp. 2d at 1141–42. Plaintiff alleges that on one occasion, a mask caused him to cough until his face was purple. *See* Dkt. 37-1. One adverse experience with wearing a mask after more than a year of a global pandemic does not convince the Court that he cannot fly to Northern California and litigate his claims. Moreover, Plaintiff has not established he is unable to drive to California. *See Murphy*, 362 F.3d at 1137, 1142–43. On this record, Plaintiff has failed to show he will experience grave difficulties if required to travel to Northern California. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 844 (S.D.N.Y. 2012) (finding an inner ear disorder associated with spinning and dizziness does not preclude a party from flying); *Earll v. eBay, Inc.*, Dkt. 20 at 14, 764 F. Supp. 2d 1148, 1150 (W.D. Mo. 2011) (finding no grave difficulty where the plaintiff was deaf and needed a service animal to travel by airplane); *Universal Grading Serv. v. eBay, Inc.*, No. 08-cv-3557 (CPS), 2009 WL 2029796, at \*19 (E.D.N.Y. June 10, 2009) (finding no grave difficulty where party had severe coronary artery disease, hypertension, and a prostate condition); *Rimkus Consulting Grp., Inc. v. Rault Resources, Inc.*, No. H-07-1494, 2008 WL 901483, at \*8 (S.D. Tex. Mar. 31, 2008) (finding no grave difficulty where party could not fly due to surgery for a detached retina, as party did not indicate how long the no-fly instruction would last and party could still drive); *Hesterly v. Royal Caribbean Cruises, Ltd.* No. 06-3206-CV-S-RED, 2006 WL 2948082, at \*4 (W.D. Mo. Oct. 16, 2006) (finding no grave difficulty where physician did not clear the plaintiff to fly because of injured leg and the plaintiff did not provide financial information).

## 2. Texas Public Policy

Though Plaintiff's response contains no heading discussing violations of Texas public policy, he nevertheless argues the forum selection clauses should not be enforced because (1) some of his claims arise under Texas statutes, (2) Texas does not have a mask mandate, and (3) the Terms of Service are adhesion contracts. *See* Dkt. 37 at 4–5. Plaintiff advances the first two arguments under a heading titled "Public Interest Factor." However, Plaintiff's actual argument discusses grave inconvenience and how travel "would be contrary to public policy." *Id.* Plaintiff's third argument lies under a heading titled "Exceptional Case." The Court construes these three arguments as advancing reasons why enforcing the forum selection clauses would violate Texas public policy. As explained below, these arguments are unavailing.

### a. Claims arising under Texas statutes

Plaintiff's response merely states, "Texas statutes are being evaluated." *Id.* at 4. Plaintiff seems to assert the following: Because some claims arise under Texas law, this case should not be transferred to California. This argument is misguided. Texas state courts and Texas federal courts do not have a monopoly on adjudicating Texas constitutional, statutory, and common law claims. In fact, "federal judges routinely apply the law of a State other than the State in which they sit." *Atlantic Marine,* 571 U.S. at 67. It is unpersuasive to argue a federal judge sitting in California applying Texas law violates Texas public policy.

### b. Texas's lack of a mask mandate

**\*7**  Plaintiff's response states, "[A]s of this filing the State of Texas does NOT have a mask mandate in place ... Texas is a 100% open [state] with no plans to close down." *Id.* at 4. Plaintiff's contention refers to Governor Abbott's Executive Order GA-34, which ended pandemic-related restrictions for various establishments and the statewide mask mandate in Texas. *See* The Governor of the State of Texas, Executive Order No. GA-34, 46 Tex. Reg. 1,567 (Mar. 2, 2021). Plaintiff's reasoning seems to proceed as follows: Because Executive Order GA-34 lifts the mandate that private individuals wear a mask, engage in social distancing, or comply with other public health measures, *see id.* at 1,567–68, requiring Plaintiff to board a plane, wear a mask, and appear in a California federal court violates Texas public policy. *See* Dkt. 37 at 4–5.

This argument is wholly unsupported by the Executive Order. The Executive Order states, "[I]ndividuals are strongly encouraged to wear face coverings" and "Nothing in this executive order precludes businesses or other establishments from requiring employees or customers to follow additional hygiene measures, including the wearing of a face covering." *Id.* at 1,568. The Executive Order GA-34 merely states the Texas gubernatorial branch will no longer use its authority to require individuals to adhere to certain public health protocols, but establishments may still impose such restrictions, so long as such restrictions do not run afoul of another law.

### c. Adhesion contract

Plaintiff contends the three Terms of Service are adhesion contracts, arguing he agreed to the Terms of Service due to "an absence of meaningful choice." *See* Dkt. 37 at 5–6. According to Plaintiff, the Terms of Service are unconscionable, and the forum selection clauses contained therein should not be enforced. *Id.*

Both Texas and California law define adhesion contracts as standardized forms offered on a "take it or leave it" basis without affording the consumer a realistic opportunity to bargain. *See Fluor Western, Inc. v. G & H Offshore Towing Co.,* 447 F.2d 35, 38–40 (5th Cir. 1971); *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1281 (9th Cir. 2006); *Grosser v. Red Mango Fc, LLC,* No. 3:21-cv-2691-N, 2013 WL 12134086, at \*7 (N.D. Tex. Apr. 25, 2013). Because Plaintiff appears to argue the Terms of Service, as adhesion contracts, contravene Texas public policy, the Court analyzes the Terms of Service under Texas law.

In Texas, an adhesion contract is not automatically unconscionable, unenforceable, or void. *See In re AdvancePCS Health LP*, 172 S.W.3d 603, 608 (Tex. 2005); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 233 (Tex. 2000); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992). "The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006). "[W]e consider whether a contract results in unfair surprise or oppression.... [P]arties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequence of failing to meet that obligation." *In re Lyon*, 257 S.W.3d at 233.

Here, the Court does not discern any unfair surprise or oppression. The forum selection clauses were not deceptively placed or sized, and Plaintiff could have easily read the Terms of Service and discovered them. *See In re Lyon*, 257 S.W.3d at 233 (no surprise where terms were in all capital letters); *Pugh v. Arrow Elecs., Inc.*, 304 F. Supp. 2d 890, 895 (N.D. Tex. 2003) (no unfair surprise where forum selection clause was printed in a suitable font size and placed right above signature block); *Fteja*, 841 F. Supp. 2d at 839 (finding "it is not too much to expect" an Internet user would click Facebook's hyperlinked Terms of Use and read it). Likewise, there is no indication that Facebook set California as the forum to discourage plaintiffs from pursuing legitimate claims. *See Shute*, 499 U.S. at 595. Finally, the Court is further persuaded by the reasoning of other federal courts that have upheld Facebook's forum selection clauses. *See Franklin v. Facebook, Inc.*, No. 1:15-cv-655-LMM, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("[T]he forum selection clause contained has been addressed by numerous courts in actions involving [Facebook]. The Court cannot identify a single instance where any federal court has struck down [Facebook's Terms] as an impermissible contract of adhesion...."). Because the Terms of Service are not unconscionable under Texas law, enforcing them does not violate Texas public policy. *See In re Palm Harbor*, 195 S.W.3d at 679.

## C. MANDATORY OR PERMISSIVE

**\*8**  The Court now determines whether the forum selection clauses are mandatory or permissive under California law. If venue is specified with mandatory language, the forum selection clause will be enforced. *See Ten-X, Inc. v. Pasha Realty Holdings, LLC*, No. SACV 20-02004JVS(ADSx), 2021 WL 971153, at *6 (C.D. Cal. Mar. 3, 2021). If venue is specified as permissive, the forum selection clause will not be enforced. *See id.*

"To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Northern Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). In California, where a forum selection clause uses the word "exclusively" or "exclusive," the forum selection clause is mandatory. *See Berg v. MTC Elecs. Techs. Co.*, 71 Cal. Rptr. 2d 523, 530 (Cal. Ct. App. 1998) ("[L]anguage giving exclusive jurisdiction to the forum is required."); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77–78 (9th Cir. 1987) (noting forum selection clause that confers exclusive jurisdiction in a forum is mandatory).

Here, the November 15, 2013 and January 30, 2015 Terms of Service state, "You will resolve any claim ... arising out of or relating to this Statement or Facebook *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims." Dkt. 29-2 at 7; Dkt. 29-3 at 4 (emphasis added). Similarly, the October 1, 2020 Terms of Service state, "You will resolve any claim ... *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County...." Dkt. 29-4 at 5 (emphasis added). The forum selection clauses are mandatory. *See Berg*, 71 Cal. Rptr. 2d at 530; *Hunt Wesson Foods*, 817 F.2d at 77–78.

## D. SCOPE

Next, the Court examines whether, under California law, Plaintiff's causes of actions fall under the Terms of Services' scope.

Under California law, a "broad" clause contains language such as "any claim arising from or related to this agreement" or "arising in connection with the agreement." *See Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Cal. Ct. App. 2018) (italics

removed). Broadly worded clauses will encompass tort claims that may arise under, or from, the contractual relationship. *See id.*; *Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278 (Cal. Ct. App. 2006) (holding "all disputes arising under this Agreement" encompasses all causes of action arising from or related to the agreement regardless of how they are categorized). "There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that the dispute must arise out of the contract." *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 563 (Cal. Ct. App. 2016) (italics removed). In other words, broad clauses will encompass allegations that "touch matters" covered by the contract. *See Ramos v. Superior Ct.*, 239 Cal. Rptr. 3d 679, 689 (2018).

Here, two Terms of Service require Plaintiff to litigate "any claim, cause of action or dispute" "arising out of or relating to this [Terms of Service] or Facebook." Dkt. 29-2 at 7; Dkt. 29-3 at 4. The third (and most recent) Terms of Service contains these provisions nearly word for word, though the forum selection clause encompasses claims arising out of, or relating to, "Facebook Products" rather than just "Facebook." Dkt. 29-4 at 6. Thus, all three Terms of Service contain broad forum selection clauses, and the forum selection clauses will apply to Plaintiff's contractual claims, his tort claims arising from the contractual claims, and all claims that "touch" the Terms of Service or Facebook products. *See Ramos*, 239 Cal. Rptr. 3d at 689.

**\*9** Although Plaintiff's claims extend to many areas of the law, all of his claims fall under the forum selection clauses' scope. His Texas law, Sherman Act, Clayton Act, Lanham Act, FERPA, ADA, HIPPA, Regulation E, Regulation FD, common law fraud, breach of contract, and "data theft" claims all concern his Facebook accounts, his activities conducted while using the accounts, Facebook's collection of information from his online activities, the termination of his accounts, and Facebook's allegedly fraudulent acts. *See* Dkt. 20. For example, Plaintiff's fraud and breach of contract claims are based on his allegations that Facebook disabled his accounts after charging him for advertising, which caused him to lose an audience and anticipated revenue. *See* Dkt. 20 at 33–34. These claims "touch matters" concerning the Terms of Service. *Ramos*, 239 Cal. Rptr. 3d at 689.

Moreover, Plaintiff's allegation that Section 230 of the Communications Decency Act is unconstitutional and that Facebook intimidated voters in violation of 18 U.S.C. § 594 relate to Facebook and its products. *See* Dkt. 20 at 16, 23. These claims also fall under the forum selection clauses' scope.

## E. EXTRAORDINARY CIRCUMSTANCES

If a forum selection clause is valid, mandatory, and encompasses the plaintiff's claims, the court must then determine whether any extraordinary circumstances unrelated to the convenience of the parties warrant denial of transfer. *Sabal*, 209 F. Supp. 3d at 924. In making this determination, the court considers "public interest factors" such as: (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law. *Atlantic Marine*, 571 U.S. at 64; *Weber*, 811 F.3d at 776. The party resisting the forum selection clause "must bear the burden of showing that public interest factors *overwhelmingly* disfavor a transfer." *Atlantic Marine*, 571 U.S. at 67 (emphasis added). Practically, the forum selection clause should control except in unusual cases. *Id.* at 64.

### 1. Administrative Difficulties Flowing from Court Congestion

This factor considers "not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another court because of its less crowded docket." *Hillestad v. LLOG Expl. Co., LLC*, No. 3:17-cv-341, 2018 WL 4938708, at *7 (S.D. Tex. Sept. 20, 2018) (cleaned up), *report and recommendation adopted*, 2018 WL 4931783 (S.D. Tex. Oct. 11, 2018). Of the four public interest factors, this factor "appears to be the most speculative," and it alone should not outweigh the other public interest factors. *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012).

For a twelve-month period ending in September 30, 2020, judges in the Eastern District of Texas had approximately 392 civil cases per judgeship, with a median time of 8.9 months for disposing a civil case. [5] For the Northern District of California, there were approximately 639 civil cases per judgeship, with a median time of 11.4 months for disposing a civil case. [6] Because the

Eastern District of Texas has fewer cases per judgeship and disposes of cases faster than the Northern District of California, this factor weighs against transfer. *See Frito-Lay*, 867 F. Supp. 2d at 871–72 (finding this factor weighs in favor of the federal district with fewer cases per judge); *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 679 (E.D. Tex. 2001) (same, but for a division of a federal district).

### 2. Local Interests in Having Localized Interests Decided at Home

**\*10**  The second public interest factor is the "local interest in having localized interests decided at home." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315, 317–18 (5th Cir. 2008). This factor "generally favors where the acts giving rise to the lawsuit occurred." *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-cv-2042-D, 2008 WL 794533, at \*3 (N.D. Tex. Mar. 26, 2008). Further, a "judicial district's local interest in a case is strong 'when the cause of action calls into question the work and reputation of several individuals residing in or near the district who presumably conduct business in that community.' " *Zix Corp. v. Echoworx Corp.*, No. 2:15-cv-1272-JRG, 2016 WL 7042221, at \*4 (E.D. Tex. June 9, 2016) (quoting *In re Hoffman-La Roche, Inc.*, 587 F.3d 1333, 1337 (Fed. Cir. 2009)). Here, Facebook is headquartered in California; hence, the Northern District of California has a strong local interest in deciding this case. *See Zix Corp.*, 2016 WL 7042221, at \*4; Dkt. 29 at 1.

Regarding local interests in Texas, Plaintiff does not allege any non-party witness resides in Texas, or that the case calls into question the work and reputation of any other individual residing in the Eastern District of Texas. *See Zix Corp.*, 2016 WL 7042221, at \*4 (finding factor weighs neutrally where one party was headquartered in transferee district party and the majority of non-party witnesses reside in transferor district). Nor does Plaintiff allege any issues unique to the local venue, such as water and oil rights. *See Sabal*, 209 F. Supp. 3d at 925. The only connection between this case and the Eastern District of Texas is that Plaintiff himself lives and conducts business in Denton, Texas. *See* Dkt. 20 at 8. While a party's place of residence is not necessarily determinative, it does provide Texas some local interest. *See Perez v. Linkedin Corp.*, No. 4:20-cv-2188, 2020 WL 5997196, at \*5 (S.D. Tex. Oct. 9, 2020) (finding this factor weighs neutrally where one party is headquartered in Northern District of California and one party is a resident in the Southern District of Texas); *Sabal*, 209 F. Supp. 3d at 924–25 (A "party's residence does not necessarily establish a truly localized interest."). The Court finds this factor weighs neutrally.

### 3. Familiarity of the Forum with the Law That Will Govern the Case

This case involves a mix of federal and state law. By the Court's count, Plaintiff has brought six claims arising under Texas law, ten federal claims, two common law claims, and a "data theft" claim of unknown origin. *See* Dkt. 20; *see also supra* Section I. The Northern District of California, as a federal court, is well-equipped to adjudicate the ten federal claims. With respect to the common law claims, the choice of law provisions specifies these claims will be determined under California law. Dkt. 29 at 2. A federal court sitting in California would be more familiar with California law than this Court. *See Abramov v. Otis Elevator Co.*, No. 3:11-cv-440-D, 2011 WL 5081560, at \*8 (N.D. Tex. Oct. 25, 2011) (concluding Nevada court would be more familiar with Nevada law, though Texas court was equally capable). However, Plaintiff brings six claims arising under the Texas Constitution and Texas statutes, with which this Court would be more familiar. *See* Dkt. 20; *Abramov*, 2011 WL 5081560, at \*8. Given this array of federal, California, and Texas claims, this factor, at first glance, appears to weigh neutrally.

However, the Court takes judicial notice of other lawsuits filed against Facebook in federal court and subsequently removed to the Northern District of California under the same forum selection clauses. *See, e.g., Kidstar v. Facebook, Inc.*, No. 2:18-cv-13558, 2020 WL 4382279, at \*3 n.6, \*5 (D.N.J. July 31, 2020); *Loomer v. Facebook, Inc.*, No. 19-cv-80893, 2020 WL 2926357, at \*4 (S.D. Fla. Apr. 13, 2020); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1161 (D. Haw. 2018). Because the Northern District of California is deeply familiar with suits filed against Facebook by its former and current users, the Court finds this factor weighs in favor of transfer. *See Stellar Restoration*, No. 4:20-cv-382-SDJ-KPJ, 2021 WL 1345534, at \*19 (E.D. Tex. Mar. 11, 2021) (finding this factor weighs in favor of transfer where the plaintiff regularly brought suit in the Eastern District of Texas under the same formulaic contract), *report and recommendation adopted*, 2021 WL 1185960 (E.D. Tex. Mar. 30, 2021).

### 4. Avoidance of Unnecessary Conflict of Laws Problems

**\*11** Finally, there are no conflict of law issues or problems that may arise from the application of foreign law. Because there is no meaningful dispute regarding this factor, the Court finds it weighs neutrally. *See Hanby*, 144 F. Supp. 2d at 679; *Stellar Restoration*, 2021 WL 1345534, at \*19.

Thus, one public interest factors weighs in favor of transferring this action to the Northern District of California, one factor weighs against transfer, and two factors weigh neutrally. Because the comparative congestion of the courts is the "most speculative" factor, the Court affords it little weight. *See Frito-Lay*, 867 F. Supp. 2d at 871. On balance, the Court recommends transferring this action to the Northern District of California.

### IV. <u>CONCLUSION AND RECOMMENDATION</u>

For the foregoing reasons, the Court recommends Facebook's Motion (Dkt. 29) be **GRANTED**. The Court further recommends that it be **ORDERED** that this matter is transferred to the Northern District of California.

Within fourteen (14) days after service of magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.*; *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 29 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 14th day of May, 2021.**

**All Citations**

Slip Copy, 2021 WL 3013371

### Footnotes

1   This action originally included another co-plaintiff and three other defendants; however, they are no longer live before the Court. *See* Dkt. 1; Dkt. 5; Dkt. 26 at 2 n.1.

2   The Texas Constitution contains no express guarantee of a right to privacy. *See Texas State Emps. Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987). However, the Texas Supreme Court has recognized that the Texas Constitution contains provisions that implicitly create protected "zones of privacy," and as such, the "right to privacy" can generally be described as the right to be free from "unreasonable government intrusions and unwarranted interference with personal autonomy." *See id.* at 205; *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 265 (Tex. 2002). Because "personal autonomy" is a rather broad concept, the Texas Supreme Court has discussed this right in an array of contexts. *See Texas State Emps. Union*, 746 S.W.2d at 204–05 (discussing right in context of mandatory polygraph policy); *Bell*, 95 S.W.3d at 264–65 (discussing right in context of indigent women seeking abortions); *City of Sherman v. Henry*, 928 S.W.2d 464, 465, 474 (Tex. 1996) (discussing right where police officer's

sexual affair precluded his promotion); *State v. Morales*, 869 S.W.2d 941, 942 (Tex. 1994) (discussing right in context of anti-sodomy statute).

3       While the first two Terms of Service are entitled "Statement of Rights and Responsibilities," Facebook's affidavit explains they are in fact Terms of Service. *See* Dkt. 29-1 at 2; Dkt. 29-2 at 2; Dkt. 29-3 at 2.

4       In his response, Plaintiff also raises arguments concerning the doctrines of impossibility of performance and frustration of performance, though he does not tether these doctrines to any portion of the forum selection clause analysis. *See* Dkt. 37 at 4. Generally, once a breach of contract case reaches the underlying merits, if a party can establish the doctrines of impossibility or frustration of performance apply, the party is discharged from performing under the contract. *See In re CEC Ent., Inc.*, 625 B.R. 344, 357–64 (Bankr. S.D. Tex. 2020) (describing the doctrines under various state law regimes). Because Plaintiff's argument concerning these doctrines involves his purported medical conditions, alleged inability to wear a mask, and the "impossibility" of flying, the Court construes these arguments as duplicative of his "grave inconvenience" argument and, thus, will not discuss them further herein.

        Plaintiff also advances an argument concerning a force majeure clause in "Section 12 of the Facebook Advertising Terms and Conditions." *See* Dkt. 37 at 3–4. Plaintiff argues "he cannot be held liable for 'the acts of God' or the coronavirus pandemic." *Id.* at 3. Plaintiff's argument misses the mark. At this juncture, Facebook has not filed a counterclaim to hold Plaintiff liable for anything and, thus, the force majeure clause has no relevance to the pending Motion.

5       *See* U.S. District Courts—National Judicial Caseload Profiles, UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.

6       *See id.*

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC  Document 13-1  Filed 10/10/23  Page 146 of 231 PageID #:  952
Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

2019 WL 4647648
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Rose Ann PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff,

v.

PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ Sentosa Services, Sentosacare LLC, Sentosa Nursing
Recruitment Agency, Benjamin Landa, Bent Philipson, Berish Rubenstein a/k/a Barry Rubenstein, Francis Luyun,
Golden Gate Rehabilitation & Health Care Center LLC, and Spring Creek Rehabilitation and Nursing Center, Defendants.

17-cv-1302 (NG) (JO)
|
Signed 09/23/2019
|
Filed 09/24/2019

**Attorneys and Law Firms**

Leandro Bolesa Lachica, John J.P. Howley, Law Offices of John Howley, New York, NY, for Plaintiff.

Elliot Hahn, Hahn Eisenberger PLLC, Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY, Sheldon Eisenberger,
Alan M. Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY, for Defendants.

## OPINION & ORDER

GERSHON, United States District Judge:

**\*1**  Plaintiff Rose Ann Paguirigan brings claims, on behalf of herself and a class of similarly situated Filipino nurses, for
violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 *et seq.*, against defendants Prompt Nursing
Employment Agency LLC ("Prompt Nursing"), Sentosacare LLC ("Sentosacare"), Sentosa Nursing Recruitment Agency
("Sentosa Agency"), Benjamin Landa, Bent Philipson, Berish Rubenstein, Francis Luyun, Golden Gate Rehabilitation and
Health Care Center LLC ("Golden Gate"), and Spring Creek Rehabilitation and Nursing Center ("Spring Creek"). Plaintiffs also
seek damages for breach of contract against Prompt Nursing, Rubenstein, Landa, and Philipson, and a declaratory judgment
regarding certain aspects of their employment contracts.

All defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the TVPA claims and the declaratory
judgment claim, and defendants Landa, Philipson, and Rubenstein moved to dismiss the breach of contract claim as alleged
against them individually. I denied that motion in full. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d
430 (E.D.N.Y. 2017). I subsequently granted the named plaintiff's motion to certify a class comprised of "all nurses who were
recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since
December 23, 2008," and I appointed her counsel as class counsel under Rule 23(g). *Paguirigan v. Prompt Nursing Emp't
Agency LLC*, 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018). The records defendants produced at the class certification stage
establish that there are more than 200 known class members.

Defendants now move for summary judgment dismissing all of plaintiffs' claims, and granting Prompt Nursing's counterclaim
for breach of the named plaintiff's employment contract. Plaintiffs also move for summary judgment on all of their claims,
including a declaration that the liquidated damages provision and confessions of judgment are unenforceable, and a permanent
injunction preventing defendants from threatening or attempting to enforce either.

## I. Factual Background

Except as otherwise noted, the following facts are undisputed.

### A. Defendants' Employment of the Named Plaintiff and their Legal Actions Against Her

In either 2006 or 2007, plaintiff, a Filipino citizen, attended a meeting in the Philippines regarding a nursing home job in New York. The meeting was organized by defendant Sentosa Agency, a recruiting agency registered in the Philippines. Defendants Luyun—who is the sole proprietor of Sentosa Agency—and Philipson were in attendance.

In 2007, defendant Golden Gate, a nursing home located in Staten Island, New York, submitted a visa application on plaintiff's behalf. After plaintiff and Golden Gate agreed that a visa application would be submitted, the U.S. government issued a Prevailing Wage Determination for plaintiff of $26.87 per hour. Eight years later, plaintiff was notified of a visa interview with the United States Consulate in the Philippines. At the time of the interview, the United States Consulate required confirmation that a job was still available. On April 15, 2015, defendant Landa, who is the CEO, managing partner, and one of the owners of Golden Gate,[1] signed a letter addressed to the U.S. Consulate affirming that an employment position was still available and stating that Golden Gate had offered plaintiff a position at $29.00 per hour. On that day, Landa also signed the last page of plaintiff's employment contract with Golden Gate.

**\*2** On April 22, 2015, one week later, plaintiff herself signed the employment contract with defendant Golden Gate, which was for a three-year term. When plaintiff signed the contract, Landa's letter to the U.S. Consulate was attached to the front of the contract. Plaintiff's signature appears on each page of the contract, but does not appear on the letter.[2]

The contract states the following regarding wages:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). (The parties dispute the exact mechanism by which the National Prevailing Wage and Helpdesk Center ("NPWC") determines a prevailing wage, but it is agreed that in essence the NPWC determines prevailing wages at the request of an employer for a particular employee as part of the visa process and also lists the prevailing wage by geographic area online and elsewhere. NPWC determines prevailing wages on an hourly and annual salary basis.)

"Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as described in Article IV." Contract III.

The contract further provides that:

> Both the Employer and Employee agree that the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area. In as much as the parties agree that damages would be difficult to calculate if the Employee willfully, voluntarily, and without cause terminates the Agreement before the completion of the three (3) year term,

and/or if the Employer terminated the Agreement pursuant to Article VI(2)(i) or (ii), [3] the parties agree that such an act shall result in an obligation by the Employee to pay the Employer and/or its designee/ assignee Twenty Five Thousand Dollars ($25,000) as liquidated damages (the "Liquidated Damage").

Contract VII (4). Section VII (4)(a) states that the liquidated damages are reduced to $16,666.67 should plaintiff pre-terminate or breach the employment contract in her second year, and are reduced to $8,333.34 should she do so in her third year. Contract VII (4)(a).

**\*3** Finally, "in order to secure Employee's performance of the Employment Term," Section VII (4) of the contract requires plaintiff to execute a confession of judgment for the amount of liquidated damages, which may be filed in court in the event that she fails "to complete the employment term." Plaintiff is also required to "pay upon demand all reasonable costs and expenses (including attorney's fees), and disbursements[ ] incurred by the Employer and/or its designee/assignee to enforce any of [the] rights of the Employer and/or its designee/assignee hereunder and/or collect the aforementioned liquidated damages." Contract VII (4).

In a separate document dated April 22, 2015, plaintiff signed an acknowledgment of costs related to her recruitment. This document is titled "Declaration and Undertaking" and states that Sentosacare expended $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with plaintiff's hiring and travel to the United States. Sentosacare is a company co-owned by defendants Landa and Philipson that provides consultants to nursing homes.

Once plaintiff arrived in the United States, Golden Gate verbally assigned her contract to defendant Prompt Nursing, a staffing agency owned by defendant Rubenstein that provides nurses to nursing homes. On June 22, 2015, plaintiff began working at defendant Spring Creek, a nursing home located in Brooklyn, New York. Landa is a managing partner and owner of Spring Creek. [4] On or about June 22, 2015, plaintiff signed an "Employer and Wage Acknowledgment" form, which states that her employer is Prompt Nursing and that her pay is $29.00 per hour.

Plaintiff quit her job on March 7, 2016. Defendant Prompt Nursing then sued plaintiff and two other Filipino nurses to enforce the $25,000 liquidated damages provision in their contracts and for $250,000 from each for tortious interference with contract and prospective business relations, and an additional $250,000 from each in punitive damages. Those lawsuits were voluntarily dismissed after plaintiff filed this action.

### B. Legal Actions Directed at Other Nurses

Plaintiff has presented evidence concerning past legal actions taken by defendants against Filipino nurses. Defendants acknowledge that these actions occurred, but they dispute their responsibility. The events are recounted in detail in other judicial opinions, including one case—*Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011)—which is ongoing in this district. *See Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240 (2d Dep't 2009); *SentosaCare LLC v. Anilao*, Index No. 6079/2006 (Sup. Ct. Nassau Cty. May 20, 2010) (hereafter "*Anilao*, Order").

Briefly, in April 2006, ten nurses recruited by Sentosa Agency in the Philippines resigned from their jobs at nursing homes in New York. Following these resignations, an administrator at one of the nursing homes alerted the New York State Education Department ("Education Department") that the nurses had abandoned their patients by simultaneously resigning without adequate notice. After an investigation, the Education Department took no action against the nurses.

Subsequently, defendants Philipson and Landa met with the Suffolk County District Attorney on May 31, 2006. In March 2007, a Suffolk County grand jury indicted the ten nurses and their attorney for conspiracy to endanger the welfare of a child and endangering the welfare of a physically disabled person. The nurses and the attorney sought a writ of prohibition to stop the criminal proceeding. The Appellate Division, Second Department, granted the writ, declining to find that "this is such

Case 1:23-cv-00203-MAC  Document 13-1  Filed 10/10/23  Page 149 of 231 PageID #:  955
Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

an 'extreme case' that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer." *Vinluan*, 60 A.D.3d at 249. The court further held that "the prosecution impermissibly violates [the attorney's] constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments." *Id.* at 250.

**\*4** During the period from 2006 through 2008, defendants Sentosacare, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, and other nursing homes owned by defendants brought a series of civil suits against more than 30 Filipino nurses in attempts to enforce the liquidated damages provision. In one decision related to those lawsuits, the New York State Supreme Court, Nassau County, found that "the liquidated damages provision at issue is unenforceable as damages flowing from any proven breach by defendant Nurses will easily be ascertained at trial." *Anilao*, Order at 6.

Additional relevant undisputed facts not discussed here will be addressed in the discussion section below.

## II. Discussion

### A. Legal Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. Where, as here, both parties move for summary judgment, the court need not "grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

### B. Plaintiffs' Breach of Contract Claim

Both sides move for summary judgment on plaintiffs' breach of contract claim against defendants Prompt Nursing, Rubenstein, Landa, and Philipson. The named plaintiff claims she was owed more than $29.00 per hour under the contract and that she was to be paid a base salary as opposed to an hourly wage. In order to recover for breach of contract, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *Javier v. Beck*, 2014 WL 3058456, at \*9 (S.D.N.Y. July 3, 2014).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N. V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 150 of 231 PageID #:  956
Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 459 (1957)).

**\*5** If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions...." *Id.* (citations omitted).

As stated above, the contract's relevant wage provision provides:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). "Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as provided in Article IV." Contract III.

Neither party argues that the contract is ambiguous. Defendants urge me to find that the phrase "as determined by National Prevailing Wage and Helpdesk Center" refers to the prevailing wage determination provided to plaintiff in 2007. They also note that, under the contract, plaintiff was entitled to only $12.00 per hour for her first four weeks of employment and argue that the contract's inclusion of the phrase "[a]s of the Commencement Date" is meant only to indicate when this initial four-week period ends. Plaintiff argues that defendants' interpretation is contrary to the contract's plain language and that the contract requires that plaintiff be paid the prevailing wage as of the Commencement Date. In 2007, the hourly prevailing wage was $26.87. The parties agree that, when plaintiff began working for Prompt Nursing in 2015, the prevailing wage exceeded this amount.

The contract is unambiguous. I also find that defendants' interpretation is at odds with the contract's plain language and must be rejected. The phrase "prevailing wage" refers to the prevailing wage as of the Commencement Date. There is nothing in the text of the contract to suggest that the phrase "as determined by National Prevailing Wage and Helpdesk Center" is meant to refer to the prevailing wage determination that was made almost a decade prior to the Commencement Date. Even if one purpose for the inclusion of the phrase "[a]s of the Commencement Date" was to indicate when the initial four-week period ends, the meaning of the text is unchanged.

Defendants argue that the holding in *Rosales v. Hispanic Emp. Leasing Program, LLC*, 2008 U.S. Dist. LEXIS 96417, at \*4–6, 2008 WL 5083507 (W.D. Mich. Nov. 26, 2008), must be treated "as part of the contract 'as though it were expressed or referred to therein.' " Defs.' Reply at 11. That decision, of course, is not binding on this court, and there is no sound basis for treating it as part of the contract. Moreover, the *Rosales* court was not addressing the issue presented here. In *Rosales*, the court held that the employer was obligated to pay the prevailing wage previously calculated by the government and not the prevailing wage in effect when the employees began working. There is no indication that the *Rosales* court was asked to interpret a contract that provides for payment of the prevailing wage as of the employee's Commencement Date.

Alternatively, defendants argue that I should reject plaintiff's interpretation because it undermines the protections given United States workers under 8 U.S.C. § 1182(a)(5)(A) and 20 C.F.R. § 656.21. But defendants have failed to convince me that an interpretation that requires defendants to pay their employees the prevailing wage "[a]s of the Commencement Date" undermines the policies underlying these provisions.

**\*6**  Defendants also make much of the letter affixed to plaintiff's contract, which states that she was to be paid $29.00 per hour; they argue that it should be treated as the "first page" of the contract. Whether multiple writings should be construed as one agreement depends on the intent of the parties. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.' " *Id.*

Here, the letter is plainly not part of the contract. According to Philipson, the letter was created for the purpose of confirming that a job was still available. Philipson Declaration, ¶ 9. Therefore, it did not share the "same purpose" as the contract. *TVT Records,* 412 F.3d at 89. The letter is from Landa to the U.S. Embassy in Manila, was signed by Landa a week prior to the contract's execution, and, unlike each of the 10 pages of the contract, was not signed by plaintiff. Although "the fact that the two documents at issue here were not executed at the same time or by the same parties is not dispositive, this fact does weigh against a conclusion that the documents were intended to be read together as a single contract." *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012), *aff'd*, 513 F. App'x 75 (2d Cir. 2013) (citations omitted). While it is typically a fact issue whether multiple writings should be construed as one agreement, the question is a matter of law if, as here, "the documents in question reflect no ambiguity as to whether they should be read as a single contract." *TVT Records,* 412 F.3d at 89.

Defendants contend that *Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.*, 26 A.D.2d 481, 484 (1st Dep't 1966), *aff'd*, 20 N.Y.2d 871 (1967), requires me to treat the letter as part of the contract because "letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto." *Id.* However, that case held that "[t]he purpose of a written agreement must be ascertained from the instrument itself, if it is possible to do so...." *Id.* (internal quotation marks omitted). Here, I can do just that: the contract is straightforward, and defendants may not introduce parol evidence, such as the letter, to "*create* an ambiguity in the agreement" that is otherwise unambiguous. *W. W. W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (emphasis in original).

Notably, the contract's integration clause provides that the contract "supersedes all previous employment contracts and *constitutes the entire agreement* between the parties," Contract VIII (7) (emphasis added), and Section VIII (3) states that any amendments are to be "in writing and executed in multiple copies." In sum, I decline to treat the letter as part of the contract.

I further reject defendants' argument that plaintiff ratified the contents of the April 15 letter through her subsequent conduct. In support of this argument, defendants rely on a wage acknowledgment form that plaintiff signed, which states that her hourly pay is $29.00 per hour, as well as plaintiff's deposition testimony, where she stated that she understood that the letter was an offer to be paid $29.00 per hour pursuant to the contract, and that the contract was for $29.00 when she signed it.

The cases that defendants rely on discuss whether a party has ratified the contract such that it may no longer assert claims for fraud and fraudulent inducement, *Sotheby's Fin. Servs., Inc. v. Baran*, 2003 WL 21756126, at \*5–6 (S.D.N.Y. July 29, 2003), *aff'd*, 107 F. App'x 235 (2d Cir. 2004), or that a deed was forged, *Cashel v. Cashel*, 94 A.D.3d 684, 686–687 (2d Dep't 2012), or that the principal did not authorize its agent to enter into the contract, *Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 286 A.D.2d 118, 126–129 (1st Dep't 2001). In other words, these cases focus on parties' attempts to be relieved from contractual obligations.

**\*7**  Here, plaintiff is not attempting to disavow or dispute the contract. Rather, relying on the contract's clear language, she asserts that the defendants breached by failing to pay her the prevailing wage and a base salary. Plaintiff should not be faulted for initially accepting defendants' representation that the $29.00 hourly rate was in fact the prevailing wage. Indeed, she testified that she learned the prevailing wage was higher than $29.00 per hour only after she came to New York and spoke to her colleagues, which was after she had signed the wage acknowledgment form.

Finally, defendants assert that plaintiff has provided no basis for her claim that she was to be paid a base salary as opposed to an hourly wage. To the contrary, plaintiff has provided a basis: the contract's clear language. As noted above, the contract states that, "[a]s of the Commencement Date, Employee will be paid a *base salary* in accordance with the prevailing wage for

2019 WL 4647648

the geographic area in which the employee is assigned to work...." Contract IV (1) (emphasis added). In light of the contract's unambiguous text, no further support is needed. Defendants also assert that plaintiff has failed to satisfy the damages element of her breach of contract claim and argue that she was actually overpaid. Plaintiff has submitted a summary pursuant to Federal Rule of Evidence 1006 depicting the difference between what each class member was paid and what each is owed if paid the prevailing wage as of their Commencement Date and a base salary. This document is sufficient to show that damages accrued, and, because plaintiff was owed a base salary, it is apparent that her damages exceed the amount by which defendants claim she was overpaid.

Based on these undisputed facts, I find that plaintiff has met the elements for her breach of contract claim. She has proven that a contract existed between her and defendant Prompt Nursing; that she performed under the contract; that Prompt Nursing breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary; and that she was damaged. *See Javier*, 2014 WL 3058456, at \*9.

As for the rest of the class, the provisions specifying the wage and defining "Commencement Date" are identical in each contract defendants produced at the class certification stage. Each contract references a base salary, and each was assigned to Prompt Nursing. It is undisputed that none of the class members was paid a base salary commensurate with the prevailing wage in effect as of his or her "Commencement Date." There is therefore no meaningful difference between the named plaintiff and the class as each element of the breach of contract claim. Accordingly, class-wide liability has been established against Prompt Nursing for breach of contract.

### C. Plaintiffs' Application to Find the Liquidated Damages Provision Unenforceable

Plaintiffs request a declaratory judgment finding the liquidated damages provision unenforceable. They also request that defendants be enjoined from attempting or threatening to enforce the liquidated damages provision or the confessions of judgment.

The question of whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement"; it will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). Accordingly, "[a] provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

**\*8** " ' 'New York courts will construe a purported liquidated damages provision strictly,' and 'where the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.' " *Agerbrink*, 196 F. Supp. 3d at 417 (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004)). While the New York Court of Appeals has cautioned courts against interfering with liquidated damages provisions, if either of these factors is not satisfied, the provision will be deemed unenforceable. *Union Capital LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at \*7 (S.D.N.Y. Mar. 31, 2017). In doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages," and the party challenging the liquidated damages provision bears the burden of proving its unenforceability. *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169–170 (S.D.N.Y. 1990) (internal quotation marks omitted). Courts also often consider the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arms length "in determining whether one side is not exacting an unconscionable penalty." *Id.* at 172 (internal quotation marks omitted).

Paglirangan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

2019 WL 4647648

Here, the liquidated damages provision is a penalty. The contract required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that plaintiff terminated her contract early. Contract VII (4). Considering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing. This supports the conclusion that this provision is "intended to operate as a means to compel performance," ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms. *Rattigan*, 739 F. Supp. at 169; *see Perthou v. Stewart*, 243 F. Supp. 655, 658 (D. Or. 1965). Indeed, even though it is immaterial that the parties may describe the provision as a penalty, *Truck Rent–A–Ctr.*, 41 N.Y.2d at 425, the confession of judgment provision goes much further and outright states that its purpose is to "secure Employee's performance of the Employment Term," Contract VII (4). Furthermore, although New York courts are hesitant to invalidate such provisions when they are negotiated at arms length, here I agree with the Nassau County Supreme Court's assessment that the parties were of "unequal bargaining power" and that the contract was "not achieved through arms length negotiation." *Anilao*, Order at 6. Plaintiff was not represented by counsel when she executed the contract, and there is no evidence she had any familiarity with American contract law. [5]

Turning to the question of ascertainability, I agree with the Nassau County Supreme Court's conclusion that the liquidated damages provision is unenforceable because defendants' damages were ascertainable. *See Anilao*, Order at 6. [6] The contract states that the liquidated damages provision was implemented to reimburse defendants for several types of costs:

> the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area.

Contract VII (4).

 **\*9** Plaintiff signed a Declaration and Undertaking indicating that $3,685.50 in costs were incurred on her behalf for lawyer's fees, filing fees, visa fees, ICHP visa screening fees, miscellaneous expenses, and airfare. As demonstrated by this form, many of the costs listed in Section VII (4) of the contract were tracked, easy to determine, and could be ascertained at the time the contract was entered into. Upon arrival in New York, defendants gave plaintiff temporary housing for two months. The apartment's monthly rent was $1,500 per month, totaling $375 per nurse living there. Thus, the total cost of plaintiff's housing was $750—one could not reasonably argue that this was unascertainable. Finally, the contract permitted defendants to recoup "further orientation and 'hands on' training costs" [7] by initially only paying plaintiff $12 per hour for her first four weeks on the job, which invites the question why liquidated damages would be needed to account for training and orientation costs in the first place. Contract IV (2). In light of defendants' extensive experience in this business, it is simply not possible that any of these costs would be difficult or impossible to determine from one nursing contract to the next. *See, e.g.*, Philipson Deposition ("Dep.") at 9–10 (stating that he first went to the Philippines to recruit nurses around 2000 and has been there "many" times).

In order to demonstrate that the liquidated damages provision is proportional to their probable loss, defendants offer the expert testimony of Michael Kupka. Kupka is the Managing Director of the Forensic Accounting and Dispute Resolution Department of Mazars USA LLP's New York location. He has more than 17 years of experience in public and forensic accounting. He is a certified public accountant, accredited in business evaluation and financial forensics, a certified fraud examiner, and a certified valuation analyst. Kupka concludes that, as to the named plaintiff, Golden Gate's potential damages are up to $26,182 in recruiting costs and up to $114,114 in increased operating costs, and that Prompt Nursing's damages can be measured as either $26,182 in recruiting costs or $35,951 in lost profits. Kupka Report ("Rep.") at 13.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 154 of 231 PageID #:  960

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

2019 WL 4647648

Rule 56(e) requires that affidavits submitted on summary judgment "set forth such facts as would be admissible in evidence." "Therefore 'it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' and the trial court need only consider admissible evidence in ruling on a summary judgment motion." *Cibbarelli v. Bombardier, Inc.*, 2004 WL 3090594, at \*3 (E.D.N.Y. Sept. 3, 2004) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). An expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at \*4 (S.D.N.Y. Dec. 14, 2001). Here, Kupka's opinion lacks a proper evidentiary basis and is therefore unreliable.

**\*10** First, Kupka assumed that Golden Gate incurred direct recruiting costs, and used that as a basis for calculating Golden Gate's potential damages of $26,182. Kupka Rep. at 3; Kupka Dep. at 15. This assumption, however, is belied by Philipson's testimony that the nursing home does not pay anything towards the cost of recruiting. Defendants argue that Golden Gate, and Prompt Nursing, once it was assigned the contract, were responsible for paying recruitments costs that were expended by other entities. But when asked about the costs listed in the Declaration and Undertaking, Kupka admitted that he did not see any documents stating that "Golden Gate was responsible for any of" those expenses and that his basis for believing that Golden Gate paid for or was responsible for these costs "was communicated to [him] as part of the underlying facts of this case" by counsel. Kupka Dep. at 18–20. Similarly, Kupka stated that his assumption that Golden Gate was responsible for costs associated with sponsoring nurses' visa status was based on "discussions with the counsel" and "[a]n employment agreement that was signed by Golden Gate," but admitted that he has not "seen any evidence that Golden Gate actually paid any" of these costs. *Id.* at 21–23. Nor does the "Documents and Information Considered" page in Kupka's report reference any documents purporting to show that Golden Gate reimbursed other entities for recruitment costs. Kupka Rep., Attachment 3; *see Supply & Bldg. Co.*, 2001 WL 1602976, at \*5 (excluding expert testimony when expert's opinion was based on client's assurances that were contradicted by other evidence).

Furthermore, Kupka reached the $26,182 recruiting costs figure by assuming that Prompt Nursing incurred a variety of costs related to recruitment in 2015, including but not limited to, $388,510 for office expenses, $105,225 for auto and travel expenses, and $97,352 for licenses and permits, for a total of $864,373. Kupka Dep. at 50–57. Kupka determined the average cost of recruiting a nurse in 2015 was $26,182 by rounding down the recruiting costs to $864,000, and then dividing by 33, the number of nurses that were recruited in that year. Kupka Rep. at 11. The figures Kupka relied on, however, were solely derived from a one-page summary that was provided by defendants' counsel that Kupka refers to as a "Profit and Loss Statement" for Prompt Nursing. [8]

Kupka, at his deposition, revealed that he knew little about the numbers listed in this one-page summary. Kupka did not know where the numbers came from, who created the document, when it was created, or why it was created. For the "general and administrative" expenses, Kupka did not know the specifics of what is included in each number listed (such as what is included in office expenses). Kupka Dep. at 50–89. Kupka did not know whether the summary was created in the ordinary course of business or whether it was created specifically for this lawsuit. *Id.* at 48. When asked whether a specific cost, such as

"Maintenance" costs, constituted all of Prompt Nursing's "Maintenance" costs (as it seems), or just its "Maintenance" costs allocated to recruitment, Kupka either stated that he did not know, or that he assumed the cost was only related to recruitment because the document's header says recruitment costs and because that is what defendants' attorneys told him. *Id.* at 50–89. Other than defendant Rubenstein, Kupka never spoke with anyone at Prompt Nursing about its recruitment costs. *Id.* at 10.

Similarly, regarding Golden Gate's increased operating costs of up to $114,114, Kupka determined that number by assuming that Golden Gate would have to pay $52.20 per hour for a permanent replacement nurse from a third-party staffing agency for the remainder of plaintiff's contract term, or approximately 27 months. Kupka Report at 3; Kupka Dep. at 32, 36–37. The $52.20 figure is based solely on a redacted invoice provided to Kupka by defendants' counsel for a staffing agency nurse in 2015 addressed to Sentosacare. Kupka's assumption that "defendants could not simply replace one sponsored nurse from the Philippines with another" was based on his understanding of the facts of the case presented to him by counsel for defendants and "[his] understanding of the overall industry." Kupka Dep. at 28–32. When asked about the sources that informed his understanding of the industry, Kupka referenced only "articles I have read, just to familiarize myself with the overall state of the industry," and stated that he did not list these in his report because "[i]t's general information that I obtained with no specific documents that I could list as part of the research." *Id.*

 **\*11** Like the recruiting cost summary, Kupka knew little about this invoice and the nurse referenced in it. For example, he did not know how many years of experience she had, whether she was assigned to work at Golden Gate, whether she worked on a temporary or permanent basis, whether she was a staff or supervising nurse, what shift she worked, and whether she was paid a shift differential. *Id.* at 37–40. He did not know why the invoice says Sentosacare on it or whether Sentosacare or Golden Gate paid the amount owed. *Id.* at 40. Kupka also did not know, and did not ask, who actually replaced plaintiff at Spring Creek when she resigned from Prompt Nursing, what Spring Creek did to find a replacement for her, how long it took Spring Creek and Prompt Nursing to find a replacement, whether Prompt Nursing ever found a replacement for her, whether she was replaced with a sponsored nurse, a nurse from an agency, or a nurse from Prompt Nursing. *Id.* at 33–36. Kupka never reviewed any Golden Gate documents. *Id.* at 16. Kupka never asked anyone from Golden Gate whether they would in fact need to find a permanent replacement for plaintiff from a staffing agency; his assumption that Golden Gate would face increased operating costs was based on his "discussions with the counsel." *Id.* at 11, 32.

Courts have excluded expert testimony when it is based "on the conclusory statements of [the expert's client], and not on his independent evaluation of the facts." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (quoting *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986)). "[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003). Moreover, "[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge." *Arista Records LLC v. Usenet.com*, Inc., 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009). Here, Kupka's failure to base his recruiting costs and increased operating costs analysis on his own "independent evaluation," but rather on a one-page summary, an invoice, untested and contradicted facts provided by defense counsel, and a discussion with one of the defendants in this action, makes his testimony unreliable and does not assist the trier of fact. *CIT Grp*, 815 F. Supp. 2d at 677 (quoting *Argus*, 612 F. Supp. at 926). Kupka's expert opinion is therefore inadmissible.[9]

For this reason, I decline to consider the damages provided in defendants' expert report in my assessment of the liquidated damages provision, which is present in each class member's contract. I also decline to consider defendants' declarations concerning these damages, all of one of which was submitted on reply, that essentially restate and comment upon the analysis provided in the Kupka report, and fail to provide a sufficient evidentiary basis for concluding what their costs were. Given that the record contains admissible evidence of only $4,435.50[10] in damages, which plaintiff has demonstrated were ascertainable at the time of the contract, it is evident that the liquidated damages provision does not bear "a reasonable proportion to the probable loss" and is an unenforceable penalty. *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. Because each class member's contract contains the same liquidated damages provision, this conclusion applies across all contracts.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 156 of 231 PageID #:  962
Paglirigan v Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

**\*12**  Prompt Nursing's counterclaim for breach of contract against the named plaintiff is therefore limited to "actual damages proven." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (internal quotation marks omitted).

### D. Plaintiffs' Requested Declaratory and Injunctive Relief

In order to be entitled to a declaratory judgment, a plaintiff must demonstrate that there is "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (internal quotation marks omitted). Further, in deciding whether to entertain a declaratory judgment action, district courts should ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins.* Co., 411 F.3d 384, 389 (2d Cir. 2005). Here, there is a substantial controversy concerning whether plaintiff and the other class members may be sued under their contracts' liquidated damages provisions for resigning prior to the end of their contract terms. And a decision regarding plaintiffs' requested declaratory relief will serve the useful purpose of finalizing this aspect of the parties' dispute.

Having found the provision to be a penalty, I therefore grant plaintiffs' requested declaratory relief. The liquidated damages provision and confessions of judgment will be declared unenforceable, and defendants will be enjoined from attempting or threatening to enforce either.

### E. Piercing the Corporate Veil

Because defendants Rubenstein, Philipson, and Landa [11] were not signatories to the contract, plaintiffs seek to hold these individual defendants liable for breach of contract by piercing the corporate veil of Prompt Nursing. [12]  Under New York law, a non-signatory to the contract may be held liable for breach of contract where the plaintiff demonstrates "that the non-signatory was the 'alter ego' of one or more of the signatories to the contract." *Kaliner v. Mt. Vernon Monetary Mgmt. Corp.*, 2008 WL 4127767, at \*2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, plaintiff must demonstrate "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (internal quotation marks omitted). In determining whether complete control exists, courts have considered the following factors, none of which is decisive:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

**\*13**  *Freeman v. Complex Computing* Co., 119 F.3d 1044, 1053 (2d Cir. 1997).

Plaintiffs argue that Prompt Nursing is a corporate shell used by defendants to harm Filipino nurses, including by paying them less than what is owed under their contracts, using an unenforceable liquidated damages provision to secure their employment, and suing them for the liquidated damages amount. Prompt Nursing does business as Sentosa Services and the other non-individual defendants (other than the nursing homes Golden Gate and Spring Creek) all bear the same Sentosa name. Plaintiffs argue that this arrangement was created so that nurses would view the Sentosa companies as a single, integrated corporate enterprise. When the nurses want to pursue legal action against defendants, however, defendants insist that Prompt Nursing is

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 157 of 231 PageID #:  963
Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

an entirely separate entity. Plaintiffs contend that this arrangement benefited defendants Rubenstein, Philipson, and Landa and nursing homes, such as Spring Creek and Golden Gate, owned by Philipson, Landa, or Philipson's wife.

The deposition testimony supports the conclusion that Prompt Nursing, which is owned by Rubenstein, did not adhere to corporate formalities and that dealings between Prompt Nursing and its nursing home clients were not conducted at arms length. Philipson travels to the Philippines to recruit nurses. When asked who pays for his trips to the Philippines to recruit nurses, Philipson stated that "[s]ometimes the nursing homes would pay for it, at times Prompt Nursing recruitment -- I don't recall, Prompt something, would have paid for it." Philipson Dep. at 14. He later clarified that initially the nursing homes paid for his trips, but once Prompt Nursing came into existence, only Prompt Nursing would. *Id.* When asked how Prompt Nursing would pay for his travel expenses, Philipson said that there was "no set specific way," and that he may be reimbursed by Prompt Nursing, or Prompt Nursing would pay his expenses in advance. *Id.* at 15.

Rubenstein testified that Prompt Nursing pays Sentosa Agency for all "expenses for the recruitment [of the nurse]" as part of the responsibilities it takes on when it assumes the nurse's contract. Rubenstein Dep. at 86. He also stated that Prompt Nursing reimburses Sentosa Agency for its personnel and office expenses. *Id.* at 89–90. Prompt Nursing pays Sentosa Agency by wire after it receives an invoice, but only sometimes keeps a record of the payment. *Id.* Similarly, Prompt Nursing's nursing home clients pay Prompt Nursing for its services, but there is no written agreement "on what those payments are." *Id.* at 91. Rather, the amount Prompt Nursing will charge is negotiated between Philipson and Rubenstein, and nothing is put in writing. *Id.* Rubenstein stated that Prompt Nursing does not engage in any nurse recruiting, but did not know why his email address appears on letters to the U.S. Embassy. *Id.* at 12, 92.

 **\*14**  Rubenstein testified that ail of the nursing contracts produced by defendants in this action were assigned to Prompt Nursing. *Id.* at 27–83. He also testified that, for ail but one of the contracts, [13] assignment negotiations occurred between him, negotiating on behalf of Prompt Nursing, and Philipson, negotiating on behalf of the nursing home. *Id.* at 27–83. Landa is also authorized to enter into a general agreement to assign nurse contracts to Prompt Nursing. Philipson Dep. at 16–17. When asked if there were any contracts with Filipino nurses that Golden Gate did not assign to Prompt Nursing, Philipson stated that "I would have to check my records," and "I wouldn't know. Sitting here, I would not be able to tell you." *Id.* at 18. No evidence has been presented that Prompt Nursing provides nurses to nursing homes other than those affiliated with defendants, or that the nursing homes affiliated with defendants assign contracts to staffing agencies other than Prompt Nursing.

When it receives a nurse's contract by assignment, Prompt Nursing never pays anything for the assignment. *Id.* at 18–19. There is never a written record of the assignment, and Philipson testified that he did not think there is ever a record of the date of the assignment. *Id.* at 19.

Rubenstein's deposition also indicates that he directed Prompt Nursing's wrongful conduct. Regarding the unenforceable penalty provision that Prompt Nursing used to secure nurses' employment, Rubenstein stated that he selected [14] the liquidated damages amounts himself based on "costs of business," stating that "I went over the numbers and it made sense," and "[i]t costs Prompt Nursing a lot of money to run the business, and based on my calculations, this is an estimated number that's what I feel is the damages." Rubenstein Dep. at 37–39. Rubenstein does not recall whether any nurses ever directly paid him the liquidated damages amount after resigning, and he does not know whether Prompt Nursing has records of any of those payments. *Id.* at 92–94. When asked how Prompt Nursing determined what to pay a particular nurse under her employment contract, Rubenstein stated that "we based" the wage on the prevailing wage determination that was issued in 2007, and that Prompt Nursing did not calculate what the appropriate prevailing wage was for the contract. *Id.* at 41–42. As for the lawsuits Prompt Nursing brought against the nurses who resigned in 2016, Rubenstein testified to the facts that he believes support Prompt Nursing's tortious interference claims: he discussed how the nurses were threatening to leave, and, "being in the business for a while," he could tell that "this was a coordinated effort" that was being instigated by the three nurses who resigned. *Id.* at 95–101.

Defendants have offered no evidence to rebut plaintiff's claim that Prompt Nursing's corporate veil should be pierced. They merely make a conclusory statement that each corporate defendant operates separately and maintains corporate formalities. Most

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 158 of 231 PageID #: 964
Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

importantly, defendants have offered no explanation as to why the nurses' contracts were assigned, seemingly gratuitously, [15] to Prompt Nursing without any documentation or payment. *Freeman,* 119 F.3d at 1053 (listing corporations' failure to deal at arms length as a corporate control factor).

**\*15** The critical question in any veil piercing analysis is "whether the corporation is a 'shell' being used by the individual shareowners to advance their own 'purely personal rather than corporate ends.' " *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Here, I am satisfied that Prompt Nursing is just that, a shell used to carry out defendants' scheme of paying nurses less than they are owed, using an unenforceable liquidated damages provision to secure the nurses employment, and suing those nurses who quit for the liquidated damages amount. By assigning the nurses' contracts to Prompt Nursing, defendants were able to carry out this scheme while simultaneously protecting themselves, and the other nursing homes affiliated with defendants, from liability arising from these activities.

While it is apparent that this scheme benefitted all defendants, I find that only Rubenstein, as the owner of Prompt Nursing, exercised sufficient control over the company to be held liable. As for Philipson and Landa—who assign and have the authority to assign nurse contracts to Prompt Nursing—it is apparent that they participated in this scheme. But they are unaffiliated with Prompt Nursing [16] and their dealings with Prompt Nursing were on behalf of other corporate entities. Plaintiffs have failed to prove that Philipson and Landa sufficiently dominated Prompt Nursing such that they may be held liable as "equitable owners" of the company. *Freeman,* 119 F.3d at 1051. Therefore, Prompt Nursing's veil may be pierced only to reach Rubenstein, the actual owner of the company.

Based on the undisputed facts, plaintiffs' summary judgment motion to pierce the corporate veil is granted as to Rubenstein but denied as to the other individual defendants. Defendants' summary judgment motion on the veil piercing issue is denied as to Rubenstein but granted as to Philipson and Landa. In light of my finding class-wide liability on the breach of contract claim, both Prompt Nursing and Rubenstein are liable for breach of contract damages owed to the class.

### F. TVPA Claims
Both sides move for summary judgment on plaintiffs' claims brought under 18 U.S.C. §§ 1589 *et seq.*

### 1. 18 U.S.C. § 1589(a)

TVPA § 1589 prohibits obtaining the labor or services of a person by using:

> (1) "force, threats of force, physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) "the abuse or threatened abuse of law or legal process," or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person would suffer serious harm or physical restraint."

18 U.S.C. § 1589(a). Congress enacted § 1589 in response to the Supreme Court's holding in *United States v. Kozminski,* 487 U.S. 931 (1988), which limited the definition of involuntary servitude to "physical" or "legal" coercion. *United States v. Dann,* 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting *Kozminski,* 487 U.S. at 952). Through § 1589, Congress "intended to provide federal prosecutors with the tools to combat severe forms of worker exploitation" and to address situations in which "traffickers threaten harm to third persons" or "restrain their victims without physical violence," all while taking into account "the individual circumstances of [the] victim[ ] ... including [ ] age and background." *Paguirigan,* 286 F. Supp. 3d at 438–439 (quoting H.R. Conf. Rep. No. 106–939, at 101) (internal quotation marks omitted).

Here, plaintiffs contend that defendants violated § 1589(a) in two ways. First, plaintiffs argue that defendants' conduct constituted a threat of "serious harm" under § 1589(a)(2). TVPA § 1589(c)(2), which defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA, states:

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 159 of 231 PageID #:  965

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

2019 WL 4647648

*16 any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Thus, the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." As articulated by the Second Circuit in *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015), this standard is a hybrid one. The factfinder is permitted to consider the "particular vulnerabilities of a person in the victim's position," but is required to find that "her acquiescence be objectively reasonable under the circumstances." *Id.* at 186–187; *see Hongxia Wang v. Enlander*, 2018 WL 1276854, at *5 (S.D.N.Y. Mar. 6, 2018). In the class action context, "the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011).

Second, plaintiff argues that defendants' actions constituted "abuse or threatened abuse of law or legal process" under § 1589(a)(3). That phrase is further defined as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." § 1589(c)(1).

Plaintiff relies on the following actions by defendants to support her claims under TVPA §§ 1589(a)(2) and (a)(3): The inclusion of a $25,000 liquidated damages provision in each contract; defendants' filing of lawsuits to enforce the $25,000 liquidated damages provision against nurses who resigned, including lawsuits in 2016 that included claims for $250,000 in tortious interference with contract and business relations damages, despite the liquidated damages provision having been found unenforceable by the Nassau County Supreme Court in 2010; the filing of a professional disciplinary complaint against 10 nurses who resigned in 2006 that resulted in no action against the nurses; Philipson and Landa's meeting with the Suffolk County District Attorney, followed by the prosecution of those same 10 nurses and their attorney. Defendants make multiple arguments as to why the TVPA's prohibitions are inapposite here. Each will be discussed in turn.

Defendants first correctly note that plaintiff, as well as several other nurses, testified that they were never verbally threatened by defendants. Paguirigan Dep. at 26–31, 404; Valdez Dep. at 83, 104–105; Bane Dep. at 61–62, 99; Padernal Dep. at 74. That fact alone, however, is insufficient to avoid TVPA liability, as the statute applies to subtle, nonviolent threats that may still effectively compel an individual to keep working. *See Dann*, 652 F.3d at 1169.

*17 Second, defendants argue that, because the liquidated damages provision is not a penalty, their efforts to enforce the provision constituted a valid exercise of their contractual rights, and therefore cannot give rise to liability under the TVPA. In support, defendants rely on *Panwar v. Access Therapies*, Inc., 2015 U.S. Dist. LEXIS 38117, at *8–15, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015), which found that defendants' efforts to enforce a liquidated damages provision that was valid under Indiana law did not give rise to TVPA liability. Since I have already found the provision to be unenforceable as a penalty under New York law, this argument fails.

In a similar vein, defendants argue that plaintiff is essentially claiming that her labor was obtained through economic duress, and they make several arguments as to why economic duress is not applicable in this context. But plaintiff is not arguing that she was subjected to economic duress. Economic duress is typically used to void a contract on the ground that "the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." *Stewart*

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

*M. Muller Constr. Co. v. New York Tel. Co.*, 40 N.Y.2d 955, 956 (1976). Here, plaintiff is not seeking to void or disavow the contract. Economic duress is simply not in issue.

Defendants' reference to 20 C.F.R. § 655.731(c)(10)(i)(B), which states that "the employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date," is similarly misplaced. First, the visas at issue in this lawsuit are not H-1B visas, but EB-3 visas. Second, of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts. The provision at issue here, however, is a penalty under New York law, and 20 C.F.R. § 655.731(c)(10)(i)(A) explicitly provides that the "employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date."

Defendants also make much of the named plaintiff's and other class members' deposition testimony, and argue that it supports their argument that the liquidated damages provision did not amount to a "threat of serious harm." For example, class member Padernal testified that she entered into the contract with the intent to work only for the first two years of her contract because the remaining payment of $8,000 was "affordable to [her]," Padernal Dep. 58, and Paguirigan testified that she entered into the contract knowing she would have to pay a penalty if she terminated her contract early, Paguirigan Dep. at 166–167. Padernal also stated that she viewed working for Sentosa as a stepping-stone; class member Bane stated that his ultimate goal was to come to America. Padernal Dep. at 94–95; Bane Dep. at 32.

Defendants misapprehend the serious harm requirement. As noted above, the serious harm requirement asks whether a reasonable person "of the same background and in the same circumstances" would "perform or ... continue performing labor or services in order to avoid incurring that harm." One nurse's testimony that she could afford $8,000 by no means establishes how a reasonable person would respond to the $25,000 penalty during the first year of work. Section 1589 was designed to combat "severe forms of worker exploitation" that do not amount to actual involuntary servitude. *Paguirigan*, 286 F. Supp. 3d at 437. An employee's prior awareness of the harm does not make a defendant's actions, if indeed in violation of the TVPA, any less exploitative. Nor does a nurse's desire to come to the United States, or that he or she viewed the job as a stepping stone, give an employer license to subject him or her to unlawful work conditions in violation of the TVPA. [17]

**\*18** Moreover, defendants' references to the record omit several notable statements by plaintiff. Plaintiff stated during her deposition that the liquidated damages provision "is the reason why we were not able to leave or we are scared. We have that fear because we don't have that ability to pay the $25,000." Paguirigan Dep. at 354. She also stated that she quit because she was working "in the unsafe environment" due to understaffing, such that she felt she was putting "my professional license at stake ... if I continue working," and because of fear she felt from being "trapped because I'm thinking about the contract which says that there's the provision of the $25,000 to be paid or I will be penalized with the $25,000 if I just leave." Paguirigan Dep. at 26–30.

Finally, defendants contend that plaintiff has not provided evidence of damages resulting specifically from the TVPA violations, so her TVPA claims must be dismissed. TVPA § 1595(a) provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator ... and may recover damages and reasonable attorneys fees." The statute has been interpreted to provide both compensatory damages, including compensation for emotional distress, and punitive damages. *See Ditullio v. Boehm*, 662 F.3d 1091, 1096–1098 (9th Cir. 2011); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457–458 (E.D. Va. 2015). Defendants offer no persuasive authority that a finding of TVPA liability requires a finding of damages. In any event, the record here sufficiently supports the existence of damages under the TVPA, and this argument therefore fails.

Having reviewed the record and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated TVPA § 1589(a)(2). [18] The nurses in this lawsuit were all recent arrivals from the Philippines. They were not paid the prevailing wage and a base salary, despite the terms of their contracts. Three of the nurses who were deposed complained of being overworked or that the nursing home was understaffed, and the fourth stated that he was unjustifiably suspended. Padernal Dep. at 51; Bane Dep. at 60–61; Paguirigan Dep. at 29; Valdez Dep. at 83. Paguirigan testified that "[w]e were just ... fed the good side, but they never told us that you're going to work 16-hour shift, with less staff...." Paguirigan Dep. at 146.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 161 of 231 PageID #:  967

Pagurigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

2019 WL 4647648

Critically, if she or any nurse wanted to stop working for defendants during the first year of the contract, he or she would have had to pay the employer $25,000 pursuant to the liquidated damages provision. This provision constitutes a threat of sufficiently serious financial harm "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2). Indeed, the confession of judgment requirement, which is part of the liquidated damages provision, explicitly states that it is meant to "[s]ecure Employee's performance of the Employment Term." Contract VII (4). I also note that the $25,000 figure is larger than any sum threatened in the TVPA cases referenced by the parties. *See Dann*, 652 F.3d 1160 at 1171 (threat of $8,000 payment); *Javier*, 2014 WL 3058456, at *6 (threatened enforcement of $15,000 confession of judgment); *Nunag–Tanedo*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011) (threatened payment of $10,000); *Macolor v. Libiran*, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) ($20,000 liquidated damages provision that applied if plaintiff stopped working). In reaching my conclusion, I have considered the "particular vulnerabilities" of plaintiff and other class members—all of them recent immigrants to the United States—and have also focused on whether it would be objectively reasonable for them to continue working under the circumstances. *Rivera*, 799 F.3d at 186–187.

**\*19**  Regarding TVPA § 1589(a)'s scienter requirement, the statute contains an express scienter requirement, ("[w]hoever knowingly provides or obtains the labor or services of a person...."), and one of its subsections, TVPA § 1589(a)(4), contains a second scienter requirement ("by means of any scheme, plan, or pattern *intended* to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint...."). 18 U.S.C. § 1589(a)(4) (emphasis added); *United States v. Calimlim*, 538 F.3d 706, 710–711 (7th Cir. 2008). As stated in *Muchira v. Al–Rawaf*,

> There must be evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work. The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment.

850 F.3d 605, 618 (4th Cir. 2017) (internal quotation marks and citations omitted). Here, the contract, of which Prompt Nursing was the assignee, explicitly states that the confession of judgment provision was meant "to secure Employee's performance of the Employment Term." Prompt Nursing also attempted to enforce the liquidated damages provision against plaintiff and two other nurses in 2016—in addition to suing for $250,000 in tortious interference damages—even though the liquidated damages provision had been found unenforceable in 2010 by the Nassau County Supreme Court. On these undisputed facts, it is apparent that Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing to work.

### 2. 18 U.S.C. § 1589(b)

Having found that Prompt Nursing violated TVPA § 1589(a), I also find on the undisputed facts that the remaining defendants are liable under TVPA § 1589(b). Section 1589(b) provides that "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d)." As discussed above, Rubenstein is the owner of Prompt Nursing; Luyun is the sole proprietor of Sentosa Agency; Landa and Philipson co-own Sentosacare; Landa is an owner of Spring Creek and Golden Gate; and Philipson or his wife is an owner of Spring Creek. [19] Therefore, each defendant played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 162 of 231 PageID #:  968
Paglirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

United States to work at nursing homes affiliated with defendants. Thus, each defendant "knowingly benefit[ed]" financially from labor obtained in violation of TVPA § 1589(a).

Moreover, each defendant acted with "know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services" through means prohibited by TVPA § 1589(a)—in this case, through the contracts' liquidated damages provisions. Indeed, defendants Philipson, Luyun, and Rubenstein all testified regarding their direct knowledge of the provision, and Landa signed the contract itself. Philipson Dep. at 43–44; Luyun Dep. at 55–60; Rubenstein Dep. at 36–40; Hahn Dec. Exh. H. The standard Golden Gate contract and the standard Spring Creek contract both contain the liquidated damages provision—as do all the contracts defendants produced. Thus, Golden Gate and Spring Creek knew of the provision.

**\*20** As for Sentosa Agency, Luyun is the sole proprietor of Sentosa Agency, and the latter therefore has "no separate existence, but rather exists as the so-called 'alter ego' of the owner." *United Parcel Serv. of Am., Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005). As for Sentosacare, Landa and Philipson are the owners of the company, with each retaining a 50 percent ownership share. Philipson Dep. at 6–7. "As a general matter, knowledge that an agent acquires in the scope of his agency is imputed to the principal, meaning that the latter is bound by that information even if he never actually received it." *J.J J. Properties Inc. v. Travelers Indem. Co.*, 2008 WL 2735865, at \*3 (S.D.N.Y. July 7, 2008). [20] Because there is no evidence that Landa or Philipson acted outside the scope of his agency, their knowledge as Sentosacare's sole owners may therefore be imputed to the company itself. *See also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (internal quotation marks omitted). In any event, both Sentosa Agency and Sentosacare operated with at least "reckless disregard" of the liquidated damages provision in light of their involvement in bringing nurses to the United States. 18 U.S.C. § 1589(b).

### 3. 18 U.S.C. § 1590(a)

TVPA § 1590(a) extends liability to "any person who knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter...." Defendants Luyun, Philipson, and Sentosa Agency "knowingly recruit[ed]" nurses in nursing homes; defendants Prompt Nursing, Sentosacare, Rubenstein, and Landa knowingly "provid[ed]" nurses to work in nursing homes [21]; and defendants Spring Creek and Golden Gate knowingly "obtain[ed]" nurses. Thus, each defendant knowingly recruited, provided, or obtained persons "for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). The same undisputed facts regarding each defendant's role in this enterprise therefore support their liability under TVPA § 1590(a).

### 4. 18 U.S.C. § 1594(b)

Defendants have also violated TVPA § 1594(b), the conspiracy provision, which extends liability to whoever conspires with another to violate, *inter alia*, TVPA §§ 1589 and 1590. [22] For there to be a conspiracy, there must be an agreement to violate the prohibition on forced labor. *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014). There need not be proof of an explicit agreement, but the "evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (internal quotation marks omitted). As detailed above, on the undisputed facts, defendants "entered into a joint enterprise" for purposes of bringing nurses to the United States to work at nursing homes, including at defendants Spring Creek and Golden Gate, and violated TVPA §§ 1589 and 1590 in doing so. *Id.* Defendants acted with "consciousness of [the conspiracy's] general nature and extent," as each defendant was aware of the liquidated damages provision. *Id.* Thus, each defendant is liable under TVPA § 1594(b).

Case 1:23-cv-00203-MAC Document 13-1 Filed 10/10/23 Page 163 of 231 PageID #: 969
Pagturigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

### G. Damages and Attorneys' Fees Under TVPA § 1595(a)

**\*21** TVPA § 1595(a) provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action ... in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." Because the liquidated damages provision is in each contract, plaintiff has established class-wide liability under the TVPA against all defendants. And having found that the plaintiff and the rest of the class are entitled to damages under the TVPA, I also find that they are entitled to reasonable attorneys' fees. Class counsel may file a motion for fees at the conclusion of the case. Damages under the TVPA will be determined at a later time.

### H. Prompt Nursing's Breach of Contract Counterclaim Against the Named Plaintiff

The only remaining claim is Prompt Nursing's counterclaim against the named plaintiff for breach of her employment contract and attorneys' fees under the contract, which as discussed above, is limited to "actual damages proven." *JMD Holding Corp., 4 N.Y.3d at 380.* Resolution of this claim also will be determined at a later time.

### III. Conclusion

For the reasons set forth above, the Clerk of Court is directed to enter partial summary judgment as follows:

1. Defendants' summary judgment motion regarding plaintiff's breach of contract claim is granted as to Landa and Philipson. Except for Prompt Nursing's counterclaim for breach of contract against the named plaintiff, which remains undecided, the rest of defendants' summary judgment motion is denied.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is granted against Prompt Nursing and Rubenstein. Damages to the plaintiff and the class caused by defendants' breach of contract are to be determined at a later time.

3. Plaintiffs' requested declaratory and injunctive relief is granted. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision in all plaintiffs' contracts, and the confessions of judgment, to be unenforceable and to enter an injunction permanently enjoining defendants from attempting or threatening to enforce either.

4. Plaintiffs' summary judgment motion as to liability on the TVPA claims is granted against all defendants. Damages to the plaintiff and the class under the TVPA are to be determined. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

5. The parties are directed to appear for a status conference on November 4, 2019, at 2:00 PM to address how damages are to be determined and to address Prompt Nursing's counterclaim for breach of contract as to the named plaintiff. The parties are further directed to promptly meet and confer on these issues and attempt to present a joint plan to the court. By October 17, 2019 the parties should submit written proposals to the court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4647648

**Footnotes**

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
2019 WL 4647648

1    Landa owns approximately 55 percent of Golden Gate. Philipson's wife also has an ownership interest in Golden Gate of approximately 25 percent.

2    This appears to have been a standard practice for defendants. Each of the contracts produced at the class certification stage has a letter attached to it. Like plaintiff's contract, each page of the contract is signed by the employee, but none of the attached letters is signed by the employee.

3    Under Article VI (2)(i) and (ii), the employer may terminate the agreement under the following conditions:

> i. Employee willfully or intentionally undertakes or commits any conduct that is harmful to Employer's practice or reputation;

> ii. Breach of any term or condition of this Agreement as determined by Employer and/or its designee/assignee, which shall include, but not be limited to, Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Employer and/or its designee/assignee may establish from time to time.

4    Landa owns approximately 48 percent of Spring Creek, and Philipson, or his wife, owns approximately 38 percent.

5    Other class members who were deposed indicated they were not represented by counsel when they signed their contracts or did not show the contract to a lawyer before signing.

6    Defendants argue that the *Anilao* decision does not have res judicata effect because the case settled before trial, and in the same decision, the court denied the nurses' motion for summary judgment. Plaintiff has not argued that the decision constitutes res judicata, and I do not rely on it as such.

7    Although the contract refers to "further" orientation and training, there is no evidence, and defendants do not argue, that any training or orientation occurred prior to the nurse beginning work in the United States. As with each provision discussed above, the provision concerning "further" orientation and training is in each contract, but several contracts specify that the applicable minimum wage would be paid as opposed to $12.00 per hour.

8    Kupka, however, admitted that this document does not show income or losses and that it could be argued that Profit and Loss Statement is "not the best description of this document." Kupka Dep. at 47–49.

9    In addition, the section of Kupka's report concerning lost profits is irrelevant. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Here, Kupka's analysis is based on Prompt Nursing's losses in relation to its nursing home clients, and is therefore properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989). There is no evidence that any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed. *Id.; see also Valentine Dolls, Inc. v. McMillan*, 25 Misc. 2d 551 (Sup. Ct. Kings Cty. 1960) (holding that lost profits are not recoverable in a breach of contract action against an employee). Therefore, even if Kupka's testimony were admissible, I would still not consider his lost profits analysis.

10    This figure is comprised of the amounts listed in the Declaration and Undertaking together with plaintiff's rent.

11    Landa signed the contract as a representative of Golden Gate, and not in his personal capacity.

12    LLC veil-piercing is permitted under New York law. *Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. 2005).

13    As to this one contract, which was between nurse Robin Ancheta and Immediate Home Care, Rubenstein could not recall who negotiated on behalf of the nursing home. At the time this contract was assigned, Rubenstein was a managing partner of Immediate Home Care. Rubenstein Dep. at 56–57.

14    Philipson testified that he was also involved in calculating the liquidated damages amounts. Philipson Dep. at 43–44.

15    Defendants argue that there was consideration for these assignments because Prompt Nursing assumed all liabilities and responsibilities under the contract. Defs.' Mot. at 7. This does not explain the purpose of this arrangement and why its existence was never documented.

16    No evidence has been presented indicating that either Philipson or Landa have an ownership interest in Prompt Nursing.

17    Defendants also point out that several nurses were aware of the "2007 incident," presumably referring to the administrative complaint, the attempted prosecution, or the civil suits for breach of contract defendants filed against the nurses, through news reports in the Philippines, yet entered into their contracts anyway. Defs.' Mot. at 12. This argument fails for the same reasons as the others addressed above.

18    Having found liability under § 1589(a)(2), I do not reach whether any defendant violated § 1589(a)(3).

19    For several of the nursing homes that Philipson was asked about in his deposition, he could not recall whether he or his wife has an ownership interest. Philipson Dep. at 9, 37.

20    This general rule does not apply when the agent has "totally abandoned" the interests of the principal, an exception that is inapplicable here. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

21    Prompt Nursing is a staffing agency that "provides" nursing homes with nurses. Landa is involved in the visa application process—he provided the letter addressed to the embassy for plaintiff's visa—and thus he also "provides" nursing homes with nurses. Sentosacare paid the costs listed on the Declaration and Undertaking that plaintiff signed, and thus it is also involved in "provid[ing]" nursing homes with nurses. Rubenstein, in addition to being the owner of Prompt Nursing, testified to his personal involvement in Prompt Nursing's business, as described earlier. He is therefore also involved in "provid[ing]" nursing homes with nurses.

22    Having found that defendants violated §§ 1589 and 1590, there is no need to consider whether they are liable for attempt under § 1594(a).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1396599

Only the Westlaw citation is currently available.

United States District Court,

S.D. Indiana,

Indianapolis Division.

Rituraj Singh PANWAR, Michael Richard Bautista Agustin, Plaintiffs,

v.

ACCESS THERAPIES, INC., RN Staff Inc doing business as Rehability Care,

Ramon Villegas, Harvinder Dhani, Manuel Garcia, Ramon Villegas, Defendants.

RN Staff Inc, Counter Claimant,

v.

Rituraj Singh Panwar on behalf of himself and all others similarly situated, Counter Defendant.

No. 1:12–cv–00619–TWP–TAB.

|

Signed March 25, 2015.

**Attorneys and Law Firms**

Andrew P. Wirick, Hume Smith Geddes Green & Simmons, Indianapolis, IN, Daniel Aaron Kotchen, Kotchen & Low LLP, Washington, DC, Michael F. Brown, DVG Law Partner LLC, Neenah, WI, for Plaintiffs.

G. John Cento, Cento Law LLC, Indinanapolis, IN, for Defendants.

### ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

TANYA WALTON PRATT, District Judge.

**\*1**  This matter is before the Court on a Motion for Partial Summary Judgment filed by Plaintiffs, Rituraj Singh Panwar ("Mr.Panwar") and Michael Richard Bautista Agustin ("Mr.Agustin") (*Filing No. 180* ), and a Cross–Motion for Summary Judgment filed by Defendants, Access Therapies, Inc. ("Access Therapies"), RN Staff Inc. d/b/a/ Rehability Care ("RN Staff"), Ramon Villegas ("Mr.Villegas"), Manuel Garcia ("Mr.Garcia"), and Harvinder Dhani ("Mr.Dhani") (*Filing No. 190* ). Mr. Panwar and Mr. Agustin brought claims against Defendants alleging violations of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589–1590, 1593, 1595 ("TVPA"), the Indiana Statutory Wage Law, Ind.Code § 22–2–5–2 ("Wage Law"), and common law breach of contract under Indiana law. For the reasons set forth below, Plaintiffs' motion is **DENIED** and Defendants' motion is **GRANTED**.

### I. BACKGROUND

The following material facts are not disputed by the parties. [1] Under the Immigration and Nationality Act ("INA"), a United States employer can petition the federal government to allow a foreign national to work in the United States as an H–1B worker. An H–1B worker performs services in a specialty occupation that requires a bachelor's or higher degree and includes such professions as physical therapists. Access Therapies and RN Staff operate nationwide healthcare and physical therapist placement services. Defendants recruit and hire immigrants and sponsor these individuals for H–1B visas, and, in some cases, for lawful permanent resident status. Access Therapies and RN Staff share several of the same officers, including Prithvi Dhani, who is President and Chief Operating Officer of both Access Therapies and RN Staff, and Manuel Garcia, who is listed as an

incorporator of both RN Staff and Vice President of Access Therapies. Ramon Villegas is a recruiter and manager for both Access Therapies and RN Staff.

Mr. Panwar, a citizen of India, came to the United States on a student visa. He earned a Master's degree in Kinesiology from Southeastern Louisiana University, and a second Master's degree in Hospital Management from the University of New Orleans. Following graduation, Mr. Panwar obtained an H–1B visa by accepting a position with RN Staff in April 2010. Mr. Panwar was originally hired as a physical therapist. His contract term was two years and the contract stated that he would earn between $800.00 and $1,000.00 net per week, but because he had not yet passed his permanent physical therapist licensing examination he could only do work as a physical therapist assistant. Mr. Panwar was instead paid $21.00 per hour in this position.

Mr. Agustin is from the Philippines and earned a Bachelor's degree in Physical Therapy from Far Eastern University in Quezon City, Philippines. He applied for a position with Access Therapies in 2009, and they agreed to hire him and sponsor his H–1B visa. Mr. Agustin was employed as a physical therapist with Access Therapies. His contract term was for three years and Mr. Agustin's contract stated that he would be paid between $27.00 and $35.00 per hour, and he was paid at least $27.00 per hour for physical therapist work.

**\*2**  Both Mr. Panwar and Mr. Agustin were required to sign employment agreements setting forth the terms of employment, as well as a separate promissory note corresponding with the contracts' liquidated damages/recovery of expenses provisions. The employment agreements provided that if an employee left his employment before the completion of the initial term, the employee was required to pay the amount of the promissory note to cover the employer's expenses and lost revenues. The liquidated damages provision of the contracts is triggered on the date upon which Defendants submit to the federal government a visa application known as an I–129 petition. Mr. Panwar's contract provided for a $20,000.00 liquidated damages provision, and Mr. Agustin's contract contained a $15,000.00 liquidated damages provision. Mr. Panwar alleges that he was not paid his contracted rate of pay, and when he complained about the underpayment Defendants threatened him with enforcement of the promissory note, loss of his visa and deportation. Mr. Agustin also alleges that he was not paid the full amount that he was entitled to under the contract, and that Defendants denied his request to waive enforcement of the promissory note when he asked to terminate his contract nine weeks early. Defendants sued employees who quit prior to a contract term for the amount due for liquidated damages and under the promissory note.

Mr. Panwar and Mr. Agustin originally brought their claims as a class action; however, the Court denied their motion for class certification. (*Filing No. 199.*) The Court found that the employment agreements signed by employees of Access Therapies and RN Staff, as well as the immigration status of the employees, were not sufficiently similar enough to meet the requirements for certification. The Court also previously ruled that Mr. Panwar and Mr. Agustin could not assert claims based upon allegations that they were not paid for "benched" or non-productive time as required by the INA for H–1B visa workers because the INA does not provide for a private right of action for these types of claims. (*Filing No. 129, at ECF p. 17.*) Additional facts will be addressed below as necessary.

## II. *LEGAL STANDARD*

Summary judgment is only appropriate by the terms of Rule 56 where there exists "no genuine issue as to any material facts and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774 (7th Cir.1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.,* 335 F.3d 643, 647 (7th Cir.2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.,* 246 F.3d 975, 983 (7th Cir.2001) (quoting *Hendricks—Robinson v. Excel Corp.,*

154 F.3d 685, 692 (7th Cir.1998)). Because the parties do not dispute the material f3/25/2015acts in this case, the Court need only determine, based upon these undisputed facts, which party is entitled to summary judgment.

## III. *DISCUSSION*

**\*3** Mr. Panwar and Mr. Agustin have three remaining claims in this case. First, they allege that Defendants utilized a "forced labor scheme" in violation of the TVPA by means of threats of serious harm, including financial harm through enforcement of the promissory note, threats of H–1B visa revocation and deportation, and abuse of legal process. Second, they allege that Defendants breached their employment contracts by not paying them the total amount due under the terms of their employment agreements. Finally, they assert claims under the Wage Law resulting from allegedly not being paid the full amount due under their contracts. Defendants argue that they were merely enforcing their rights under the terms of the employment agreements, were complying with immigration laws, and that Plaintiffs are attempting to recharacterize their claims based upon their failure to be paid for benched time, which the Court has already dismissed.

## A. Trafficking Victims Protection Act Claims

Mr. Panwar and Mr. Agustin argue that they were forced to work for Defendants by means of threats of serious harm in violation of 18 U.S.C. § 1589(a)[2] . Specifically, Mr. Panwar argues that he could not terminate his employment with the Defendants because of the existence of the $20,000.00 promissory note, which would have constituted serious financial harm if enforced; that Defendants had a practice of filing lawsuits against former employees who terminated their contracts prior to the end of their contract terms; and that Access Therapies threatened to revoke his visa when he complained about the terms of his employment. Mr. Agustin also argues that the threat of liability under the promissory note prevented him from terminating his employment.

Plaintiffs' TVPA claims are problematic for a number of reasons. While Plaintiffs continually refer to their employment with Access Therapies and RN Staff as a "forced labor scheme," the fact that they voluntarily entered into the employment contracts belies this characterization. There is no evidence that Mr. Panwar or Mr. Agustin were coerced or deceived into signing the employment agreements with Defendants. Agustin Dep. 16:6–21 (*Filing No. 19111, at ECF p. 16* ); Panwar Dep. 206:17–23 (*Filing No. 191–2, at ECF p. 207* ). In fact, Mr. Agustin testified that he had at least four other companies that he was considering when he decided to sign the contract with Access Therapies, three of which he believed did not have a liquidated damages provision in their employment contracts. Agustin Dep. 11:9–15:12 (*Filing No. 191–11, at ECF pp. 11–15* ). The contract terms were plainly written, and the liquidated damages provision was made conspicuous, particularly with the use of the corresponding promissory note. Both Mr. Panwar and Mr. Agustin understood the agreements and their obligations under the agreements, including the consequences of early termination. Panwar Dep. 205:3–207:1 (*Filing No. 191–2, at ECF pp. 207–208* ); Agustin Dep. 18:10–16–20:7 (*Filing No. 191–16, at ECF pp. 18–20* ). There was nothing that compelled Mr. Panwar or Mr. Agustin to sign the agreements with RN Staff and Access Therapies, or even enter into the H–1B visa program, besides their own choice.

**\*4** The claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA is not supported by the evidence or the applicable legal principles. An H–1B employer is not permitted to require an employee to pay a "penalty" for ceasing employment. *See* 20 C.F.R. 655.731(c)(10)(i)(A). However, "[t]he employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to the agreed date." 20 C.F.R. 655.731(c) (10(i)(B). The distinction between what constitutes permissible liquidated damages and a prohibited penalty is made on the basis of applicable state law, which in this case is Indiana. 20 C.F.R. 655.731(c) (10(i)(C). Under Indiana law, "[w]here the sum stipulated in the agreement is not greatly disproportionate to the loss likely to occur, the provision will be accepted as a liquidated damages clause and not as a penalty." *Gershin v. Demming,* 685 N.E.2d 1125, 1128 (Ind.Ct.App.1997).

Mr. Panwar and Mr. Agustin do not present any evidence or argument that the stipulated sums in the liquidated damages provisions of their employment agreements were grossly disproportionate to the losses RN Staff and Access Therapies were

likely to incur if an employee terminated his contract early. On the other hand, Defendants present the affidavit of Anmol Kapoor, an employee of Access Therapies with knowledge of both companies' operations, stating that RN Staff and Access Therapies must expend thousands of dollars to bring H–1B employees into the United States, including visa filing fees, lawyer fees, administrative costs, and local agency fees. (*Filing No. 191–16.*) Additionally, Access Therapies and RN Staff would lose out on potential profits earned from placing employees with paying clients. Contrary to Plaintiffs' implications, there is nothing unlawful about a company seeking to maximize its profits, so long as it does so within the confines of the law. The Court concludes that the liquidated damages provisions contained in Mr. Panwar's and Mr. Agustin's employment agreements are lawful under both the H–1B regulations and under Indiana law. The Court will not penalize Defendants under the TVPA for practices which they are explicitly permitted to utilize under the relevant laws.

Plaintiffs' argument that the threat of deportation constituted a threat of serious harm under the TVPA is also unavailing. Mr. Panwar alleges that when he complained about his lack of work assignments, RN Staff threatened to revoke his visa and that he would be deported. However, the H–1B visa program requires that nonimmigrant employees remain employed by the company that sponsored their visas. Visa revocation is not left to the discretion of the employers; an employer is required to notify the U.S. Citizenship and Immigration Service (the "Service") if it no longer employs the H–1B visa holder that it sponsored, and the Service then issues a notice of intent to revoke the underlying H–1B petition. 8 C.F.R. 214.2(h)(11). Whether the Plaintiffs had voluntarily or involuntarily left their employment with Defendants, the H–1B regulations would have required that their visas be revoked and they would have had to return to their home countries. If the Court were to accept Plaintiffs' argument, then *any* H–1B employer would be in violation of the TVPA merely by complying with the requirements of the H–1B program. This outcome is clearly not the intent of the TVPA or the H–1B visa program. Therefore, the Court finds that the threat of visa revocation and deportation under these circumstances is not a threat of serious harm for purposes of the TVPA.

 **\*5** Finally, Plaintiffs allege that Defendants threatened the abuse of legal process to force them to remain employed with RN Staff and Access Therapies. Plaintiffs repeatedly characterize RN Staff's and Access Therapies' actions against current and former employees as "abuse of legal process;" however, this legal conclusion is not supported by the evidence. Plaintiffs conflate the "use" of legal process with the "abuse" of legal process. The TVPA does not provide a definition of "abuse of law or the legal process;" however, Indiana law is instructive. Under Indiana law, abuse of legal process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. *Reichhart v. City of New Haven,* 674 N.E.2d 27, 31 (Ind.Ct.App.1996) ("A party may not be liable for abuse of process where legal process has been used to accomplish an outcome which the process was designed to accomplish."). The motive behind such action is irrelevant. *Id.*

Plaintiffs first argue that the revocation of their visas if they left Defendants' employment constituted "abuse of law or legal process" under the TVPA. As discussed above, this requirement is mandated by law, and therefore cannot also be an abuse of the legal process. There was nothing unlawful about threatening to terminate Mr. Panwar, which would ultimately result in the loss of his visa, because Indiana is an at-will employment state. Mr. Agustin admitted that he understood the requirements of the H–1B visa program, and that he would have to leave the country if he terminated his employment with Access Therapies. Agustin Dep. 37:4–21 (*Filing No. 191–11, at ECF p. 37* ). Defendants have demonstrated that there was no unlawful use of immigration and labor law used or threatened against Mr. Panwar and Mr. Agustin.

Plaintiffs also argue that the "routine" filing of lawsuits against employees who failed to complete their contract terms in order to enforce the terms of the promissory notes constituted an abuse of legal process. However, filing lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By Plaintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of process, which would be an absurd outcome. Thus, the Court concludes that neither the compliance with immigration laws nor the enforcement of contract rights constituted an "abuse of law or legal process" for purposes of TVPA liability.

Because Plaintiffs have not shown that they were subjected to forced labor through the imposition of or threatened imposition of serious harm, the Court concludes that Defendants did not violate the TVPA.

## B. Breach of Contract and Indiana Statutory Wage Law Claims

**\*6**  Plaintiffs' two remaining claims are directly related, as they allege that Defendants breached Plaintiffs' employment agreements by not paying them the full amount of wages they were contractually entitled to, and this failure to pay the full amount of wages owed violated the Wage Law. The Wage Law applies to not only the frequency, but the amount an employer must pay its employees. *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele,* 766 N.E.2d 699, 704 (Ind.2002). "The term 'wages' means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount." I.C. § 22–2–9–1(b). The amount of wages owed is governed by the contract between the Plaintiffs and their respective employers.

### 1. Payment for Non–Client Activities

Both Mr. Panwar and Mr. Agustin argue that Defendants failed to pay them for "non-client work activities" in breach of their employment agreements and in violation of the Wage Law.[3]  Plaintiffs argue that they were entitled to payment for "non-client work" they allege they performed for Defendants, including training/orientation, studying for licensing exams, communicating with Defendants, completing forms, working on resumes and client applications, and attending client interviews. Mr. Panwar and Mr. Agustin argue that these "non-client related work duties" constitute "labor" and "service" under § 22–2–9–1(b) of the Wage Law. However, as correctly stated by Plaintiffs, the Wage Law looks to the contract between employer and employee to determine due wages. *Settle,* 766 N.E.2d at 704 n. 4. Plaintiffs are only entitled to wages for services performed under the terms of the employment agreements. Employees cannot unilaterally determine what activities they should or should not be paid to perform, which they attempt to do here.

Neither Mr. Panwar nor Mr. Agustin point to any provisions in the employment agreements indicating that Defendants were obligated to pay them for these activities. Article IV of both employment agreements state that Plaintiffs would be paid "compensation for services to be performed hereunder[.]" (*Filing No. 182–4, at ECF p. 4; Filing No. 182–6, at ECF p. 4.*) The "services to be performed hereunder" are clearly specified in Article II, paragraph 1, which states in both agreements, "Employee is hereby hired to perform services for Employer as staff **physical therapist** under the direct supervision of [Employer's] client and, in the [sic] capacity, primarily to provide professional therapy services ...." (*Filing No. 182–4, at ECF p. 3; Filing No. 182–6, at ECF p. 3*) (emphasis in originals). There is absolutely nothing in these provisions indicating that Plaintiffs' compensation was to be for these additional "non-client duties" they are now asserting, and only indicates that they would be paid for client work. The Court finds that Defendants did not breach Mr. Panwar's and Mr. Agustin's employment agreements by not paying them for time spent on these additional activities, and therefore concludes that there was no violation of the Wage Law for failure to pay Mr. Panwar and Mr. Agustin for non-client activities.

### 2. Mr. Panwar's Alleged Underpayment

**\*7**  Mr. Panwar argues that RN Staff breached his employment agreement, and thus violated the Wage Law, by failing to pay him $800.00–1,000.00 net pay per week as specified in his employment agreement. Defendants conceded that Mr. Panwar was never paid a weekly amount within this range; however, they assert this was due to the fact that Mr. Panwar never worked as a physical therapist as stated in the contract. RN Staff was only able to place Mr. Panwar in physical therapist assistant positions, for which he was paid $21 .00 per hour, because he was not licensed as a physical therapist. Mr. Panwar argues that the contract does not define "physical therapist" and gives "no indication that the term excludes work as a physical therapist assistant." (*Filing No. 194, at ECF p. 19.*) Mr. Panwar attempts to use extrinsic evidence to interpret the meaning of "physical therapist" by citing to the H–1B application submitted by Defendants to the federal government. However, the use of extrinsic evidence is not necessary when the contract terms are not ambiguous, which the Court so finds here. *See City of Indianapolis v. Kahlo,* 938 N.E.2d 734, 744 (Ind.Ct.App.2010) ("If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument.").

Mr. Panwar's employment agreement is clear that the parties intended Mr. Panwar to work and be compensated $800.00–1,000.00 net per week as a physical therapist, not a physical therapist assistant. The Court is required to construe the contract as a whole, giving effect to every portion of the agreement. *Stech v. Panel Mart, Inc.,* 434 N.E.2d 97, 100 (Ind.Ct.App.1982). "A recital is a part of a contract which should be considered in determining the intent of the parties as expressed in the entire document, and on occasion a recital may be a most important indication of the parties' intent." *Id.* The recitals of the employment agreement state, "Employee has successfully passed TOELF–IBT and NPTE examination," (*Filing No. 182–4, at ECF p. 2* ), and the operative language of the employment agreement repeatedly refers to the position of "physical therapist" or "PT," not a "physical therapist assistant" or "PTA." Mr. Panwar never passed his National Physical Therapist Exam ("NPTE"), only the National Physical Therapist Assistant Exam, and he only had his Physical Therapist Assistant ("PTA") license. Reading the requirement that Mr. Panwar successfully pass the NPTE in the recitals in conjunction with the references to the position of "physical therapist" throughout the operative portions of the contract clearly indicates that the parties intended the employment agreement to cover Mr. Panwar's work as a physical therapist, not a physical therapist assistant. The Court does not agree with Mr. Panwar that this additional position should be read into the contract, and his argument that the term "physical therapist" is somehow ambiguous is unavailing. Because Mr. Panwar did not satisfy the requirement that he be a licensed physical therapist, he was not entitled to be paid $800.001,000.00 per week for work as contemplated in the employment agreement. *See* E-mails between Panwar and RN Staff, *Filing No. 191–10* ("[W]e want you to be a fully licensed PT and getting paid as a PT *rather than as a PTA* soonest [sic].") (emphasis added).

**\*8** Mr. Panwar argues that RN Staff waived the requirement that he work as a physical therapist through its subsequent conduct of permitting Mr. Panwar to work as a physical therapist assistant, but that he still should have been paid the amounts specified in the employment agreement. Because the Court finds that Mr. Panwar was required to have a physical therapist license in order to work as a physical therapist, and therefore be paid a physical therapist's wage, Mr. Panwar's qualification to work as a licensed physical therapist is a condition precedent to RN Staff's obligation to pay Mr. Panwar $800.00–$1,000.00 per week. *See Anderson Prop. Mgmt., LLC v. H. Anthony Miller, Jr., LLC,* 943 N.E.2d 1286, 1291 (Ind.Ct.App.2011) ("[A] condition precedent is a condition that must be ... fulfilled before the duty to perform a specific obligation arises.") (quoting *McGraw v. Marchioli,* 812 N.E.2d 1154, 1157 (Ind.Ct.App.2004)). RN Staff was not obligated to compensate Mr. Panwar pursuant to the terms of the employment agreement unless he performed the services as a staff physical therapist; thus the Court concludes that performing services as a physical therapist was a condition precedent to being compensated $800.00–1,000.00 per week.

Despite Mr. Panwar's failure to obtain a physical therapist license, RN Staff agreed to place him in a position for which he was licensed, which was a physical therapist assistant. The Court agrees that RN Staff waived the original condition requiring Mr. Panwar to work as a physical therapist through the parties' course of conduct, and effectively modified the agreement. *L.H. Controls, Inc. v. Custom Conveyor, Inc.,* 974 N.E.2d 1031, 1050–51 (Ind.Ct.App.2012) ("Waiver [of a condition] may be implied from the acts, omissions, or conduct of one of the parties to the contract."); *City of Indianapolis v. Twin Lakes Enterprises, Inc.,* 568 N.E.2d 1073, 1084 (Ind.Ct.App.1991) ("[M]odification of a contract can be implied from the conduct of the parties."). RN Staff agreed to place Mr. Panwar in a physical therapist assistant position rather than terminating his contract altogether. *See* E-mails between Panwar and RN Staff, *Filing No. 191–10, at ECF p. 16* ("In the meantime, we can ask Marketing to market you as a PTA so ... you have work to look forward to."). "A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.,* 147 F.3d 636, 641 (7th Cir.1998). The waiver of the contract provision requiring Mr. Panwar to hold a physical therapist license and work as a physical therapist did not serve to nullify the entire agreement, and the remaining provisions were still valid and enforceable.

In addition, the severability clause of the employment agreement states that "[i]f any of this Agreement shall be held to be invalid ... for any reason, the remaining provisions shall continue to be valid and enforceable." (*Filing No. 182–4, at ECF p. 5.*) Mr. Panwar and RN Staff continued to perform under the terms of the contract as modified by their course of conduct, and both parties acquiesced in Mr. Panwar working as a physical therapist assistant at a reduced hourly rate of $21.00 per hour. *See Int'l Bus. Lists, Inc.,* 147 F.3d at 641 ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."). Mr. Panwar does not allege that he

was not paid for the work that he did perform under the parties' modified arrangement, only that he should have been paid more. Thus, the Court finds that there was no breach of Mr. Panwar's employment agreement and no violation of the Wage Law for the failure to pay Mr. Panwar $800.00–1,000.00 per week for work as a physical therapist assistant.

## IV. *CONCLUSION*

**\*9**  Based upon the forgoing, the Court finds that Defendants did not engage in threats of serious harm or abuse of legal process to create a "forced labor scheme" involving Mr. Panwar's and Mr. Agustin's employment in violation of the Trafficking Victims' Protection Act. The Court further finds that Defendants did not breach the terms of either Mr. Panwar's or Mr. Agustin's employment agreements, and did not violate the Indiana Statutory Wage Law. Because Mr. Panwar and Mr. Agustin have not shown that they have any valid claims, the Court need not address the issue of Plaintiffs' standing as to each Defendant. Therefore, Plaintiffs' Motion for Partial Summary Judgment (*Filing No. 180* ) is **DENIED,** and Defendants' Cross–Motion for Summary Judgment (*Filing No. 190* ) is **GRANTED.** Plaintiffs' claims are **DISMISSED with prejudice.**

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1396599

## Footnotes

1    Plaintiffs include a statement of material facts in dispute in response to Defendants' cross-motion for summary judgment; however, they do not dispute the facts themselves, but rather the implications and interpretation of those facts. Because Defendants did not dispute the facts as presented by the Plaintiffs, there was no requirement for them to include a Statement of Material Facts in Dispute in accordance with Local Rule 56–1(d) in their response to Plaintiffs' summary judgment brief.

2    "Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)." 18 U.S.C. § 1589(a).

3    In their briefs, Plaintiffs repeatedly refer to the fact that they were not assigned client work for weeks at a time, and were not paid for this "non-productive time." The Court has already dismissed Plaintiffs' "benching" claims because the INA does not provide for a private right of action, and found that Plaintiffs may not assert the same claims under a different cause of action. (*Filing No. 129.*) Plaintiffs are not now permitted to make such arguments in support of their breach of contract or Wage Law claims, so the Court will disregard any such factual allegations made in support of the current motion.

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3073345
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

PROTHERA, INC., d\b\a SFI USA, Plaintiff,

v.

ZHOU J. YE, Defendant.

Case No. 3:18-cv-00410-MMD-CLB
|
Signed 06/10/2020

**Attorneys and Law Firms**

Glenn Mark Azzinari, Pro Hac Vice, A.Y. Strauss, New York, NY, Frank C. Gilmore, Robison, Sharp, Sullivan & Brust, Reno, NV, for Plaintiff.

W. West Allen, Ryan T. O'Malley, Howard & Howard Attorneys PLLC, Las Vegas, NV, for Defendant.

ORDER

MIRANDA M. DU, CHIEF UNITED STATES DISTRICT JUDGE

## I. SUMMARY

**\*1**  Plaintiff Prothera, Inc., doing business as SFI USA, sued Defendant Zhou J. Ye for trademark infringement, breach of contract, and related causes of action, for pretending to be a doctor in order to purchase Plaintiff's nutraceuticals, and then selling them—without permission and at a profit—on Amazon's online marketplace. (ECF No. 1.) Before the Court is Plaintiff's motion for partial summary judgment on only its breach of contract claim ("Motion"). [1]  (ECF No. 43.) Because the Court is persuaded by the only argument Defendant raised in opposition to the Motion, that the liquidated damages clause in the contract between the parties upon which Plaintiff relies in its Motion is unenforceable—and as further explained below—the Court will deny the Motion.

## II. BACKGROUND

Notably, there are no factual disputes pertinent to the Motion. (ECF Nos. 43 at 3-7, 47 at 1-5, 51 at 2.) Defendant instead makes the single, and purely legal, argument that the Motion should be denied because the liquidated damages clause in the operative contract is unenforceable, and Plaintiff seeks to establish its damages in the Motion via that liquidated damages clause. (ECF No. 47 at 5-13.)

Plaintiff seeks to sell its products only through healthcare providers. (ECF No. 51 at 2.) Defendant is not a healthcare provider. (*Id.*) To get Plaintiff's products for resale, Defendant pretended to be a healthcare provider, specifically by finding healthcare providers' names and credentials on the internet, and using those assumed identities to enter into a contract with Plaintiff to resell Plaintiff's products. (*Id.*) More specifically, to obtain Plaintiff's products for unauthorized resale, Defendant executed the ProThera Inc. d/b/a SFI USA HCP Product Purchase Terms and Conditions (the "Agreement"). (*Id.*; *see also* ECF No. 47-1 (Agreement).) The Agreement prohibits advertising, listing, offering for sale, selling, or distributing Plaintiff's products online, including through Amazon. (ECF No. 51 at 2.) Nonetheless, Defendant did. (*Id.*)

The Agreement contains a liquidated damages clause. (*Id.*) It reads:

> **Liquidated Damages**. HCP acknowledges that the Sections are necessary and proper in order to protect SFI's brand reputation and goodwill, and to preserve authorized health care practitioners' (including HCP's) ability to make a reasonable margin on Product sales. HCP agrees that if it violates the Sections, SFI will be damaged in an amount that will be difficult or impossible to ascertain. Accordingly, HCP agrees to pay liquidated damages to compensate SFI for damages resulting from HCP's breach of the Sections (the "Liquidated Damages"). The parties have made advance provision for Liquidated Damages to avoid controversy, delay and expense in the event of any breach of the Sections. Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section. For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00. The Liquidated Damages are estimated based on the various damages that SFI expects to suffer upon any breach of the Sections, including lost sales; infringement of SFI's trademarks and other intellectual property; irreparable harm to SFI's business, customer relationships, goodwill and quality control procedures; and costs of investigating breaches. HCP agrees that the Liquidated Damages are not a penalty and are reasonably estimated in light of the anticipated or actual harm that would be caused by a breach and the difficulty of proving the amount of loss and otherwise providing an adequate remedy to SFI and other affected health care providers. HCP hereby waives any defense to SFI's right to obtain liquidated damages on the basis that actual damages are calculable or that the liquidated damages do not represent a reasonable determination of damages or otherwise constitute a penalty.

**\*2**  (ECF No. 47-1 at 3.) There is no dispute here that Defendant is "HCP," and Plaintiff is "SFI," as those terms are used in the liquidated damages clause.

As Plaintiff explains, the only dispute as to the Motion is about this liquidated damages clause. (ECF No. 51 at 2.) Plaintiff relies on the liquidated damages clause for the damages element of its prima facie breach of contract claim. (ECF No. 43 at 10-13.) Using this clause, Plaintiff calculated that Defendant breached the Agreement 300 times because Defendant made 300 unauthorized sales of Plaintiff's products, and thus Plaintiff is entitled to $150,000 in damages, or $500 per breach multiplied by the 300 breaches. (*Id.* at 12-13.) As noted, Defendant counters that Plaintiff has not shown it is entitled to summary judgment because its breach of contract claim depends in part on the liquidated damages clause, which Defendant argues is unenforceable. (ECF No. 47.)

## III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

**\*3** Defendant argues the liquidated damages clause in the Agreement is unenforceable because it imposes a penalty for breach that does not reasonably approximate the actual damages Plaintiff will suffer in the event of breach—nor did it here. (ECF No. 47 at 7.) Plaintiff counters that liquidated damages clauses are presumed valid in Nevada, and the clause is enforceable as written despite Defendant's contrary interpretation, which Plaintiff argues is unreasonable. (ECF No. 51 at 5-8.) The Court agrees with Defendant. The Court will first discuss the governing law, and then analyze the liquidated damages clause in the context of the parties' arguments.

To start, "[a] plaintiff in a breach of contract action must 'show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach.' " *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (quoting *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920-21 (D. Nev. 2006)). [2] The parties' arguments about the liquidated damages clause are situated within the damages element of Plaintiff's breach of contract claim, as Plaintiff moved for summary judgment on its breach of contract claim only. (ECF Nos. 43, 47.)

Next, the parties' arguments about the liquidated damages clause require the Court to interpret that clause in light of the Agreement. Interpretation of a contract is a question of law. *See Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003). [3] "A basic rule of contract interpretation is that '[e]very word must be given effect if at all possible.' " *Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998) (alteration in original) (quoting *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966)). Additionally, when construing a contract, a court should consider the contract as a whole and "should not interpret a contract so as to make meaningless its provisions." *Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978). Under contract law generally, when a term is unambiguous, a court must construe it from the language contained within it. *See Chwialkowski v. Sachs*, 834 P.2d 405, 406 (Nev. 1992). A contract is unambiguous if it is not susceptible to more than one reasonable interpretation. *See Margrave v. Dermody Props.*, 878 P.2d 291, 293 (Nev. 1994). "The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other. That task of construction is for the court." *Peterson v. Minidoka Cty. Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir.), *amended by* 132 F.3d 1258 (9th Cir. 1997).

**\*4** But most importantly here, whether the liquidated damages clause is enforceable turns on whether it is a penalty. Liquidated damages provisions are presumed valid in Nevada. *See Khan v. Bakhsh*, 306 P.3d 411, 414 (Nev. 2013). Their purpose is to "serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable." *Id.* (citation omitted). To successfully argue a liquidated damages provision is unenforceable, the party challenging its application must establish that it amounts to a penalty. *See Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev. 1982). "In order to prove a liquidated damage clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Id.* (citation omitted). The "distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance." *Mason v. Fakhimi*, 865 P.2d 333, 335 (1993) (citation omitted).

In the Agreement, Plaintiff is entitled to liquidated damages if the other party (here, Defendant) breaches any of the Sections. (ECF No. 47-1 at 3, § 11.) The Sections are elsewhere defined as sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement. (*Id.* at §

10.) Section 2 requires Defendant to represent that he would only purchase Plaintiff's products to resell to patients under his direct professional care, [4] and that Defendant would not sell them on the internet. (*Id.* at 2 § 2.) Section 5 restricts Defendant to only selling Plaintiff's products to his patients for their personal use, in reasonable quantities. (*Id.* at § 5.) Section 6 prohibits Defendant from reselling Plaintiff's products online without first getting Plaintiff's written permission, specifically including on Amazon, and from advertising online, though resale on certain online dispensaries is permitted. (*Id.* at § 6.) Section 6 also specifically prohibits certain acts, stating that Defendant: "shall not advertise, list, offer for sale, sell or distribute" Plaintiff's products online. (*Id.*) Section 7 prohibits resale to other resellers. (*Id.* at § 7.) Section 8 provides that Defendant may only market Plaintiff's products at Defendant's physical place of business, subject to certain further restrictions. (*Id.* at 2-3, § 8.) Section 9 imposes certain quality assurance obligations on Defendant, and requires that he immediately report any adverse events to Plaintiff. (*Id.* at 3, § 9.) Section 13 specifies that Plaintiff continues to own its intellectual property, and gives Defendant a license to use that intellectual property to sell and market Plaintiff's products. (*Id.* at 3-4, § 13.) Thus, violation of any of these sections, including engaging in any of the acts they prohibit, or failing to comply with any of the obligations they impose, entitles Plaintiff to liquidated damages.

As Plaintiff repeatedly emphasizes in its briefing (ECF No. 43 at 11, 51 at 7-8), much of the liquidated damages clause is devoted to explaining why it should not be construed as a penalty. (ECF No. 47-1 at 3, § 11.) But the key portion, which actually specifies how liquidated damages must be calculated, provides:

> Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section. For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00.

 **\*5**  (*Id.*) Product is elsewhere defined as any of Plaintiff's products that Defendant purchases. (*Id.* at 2.) Thus, reading the liquidated damages provision in light of the rest of the Agreement, Defendant must pay Plaintiff $500 for each and every breach of sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement, per day that Plaintiff is in breach.

As Defendant argues, calculating the amount Defendant owes Plaintiff in line with the plain meaning of this liquidated damages provision leads to staggering liability—much more than the $150,000 Plaintiff seeks here. (ECF No. 47 at 8-10.) Plaintiff calculated the $150,000 it seeks using a spreadsheet that showed Defendant's actual sales, and then multiplied those sales by $500. (ECF No. 43 at 12-13, 51 at 6.) But this approach does not follow from the liquidated damages clause, or even from Plaintiff's own argument. Immediately before laying out this calculation, Plaintiff correctly argues that "the liquidated damages clause is triggered by any breaches of sections 2, 5, 6, 7, 8, 9, or 13" of the agreement. (ECF No. 42 at 12.) Thus, breach cannot be limited merely to sales, as those sections prohibit many acts and omissions beyond sales. And in this case, there is no dispute that Defendant committed myriad breaches—many more than the 300 sales Plaintiff seeks to hold him liable for. Plaintiff's calculation of damages therefore does not align with the language of the Agreement.

There are also other reasons why Plaintiff's calculation is incorrect given the terms of the Agreement. First, Plaintiff's calculation does not account for the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) Construing only a sale as a breach means you can only have one breach per product. But the Agreement must have intended to treat more than just sales as a breach, because, logically, it is unlikely you could have a sale of Plaintiff's product across multiple days. [5]  The 'each day of breach' concept appears more likely an attempt to capture the "advertise, list, offer for sale" concepts that are also prohibited by Section 6. (*Id.* at 2, § 6.) Thus, limiting breach to individual sales, without also going after the advertising, listing, and offering also prohibited by the Agreement does not align with the language of the Agreement. Second, Plaintiff's calculation does not align with the example offered in the liquidated damages provision, which expressly relies on the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) The example assumes breach as to three different products over 10 days, and arrives at 30 breaches. (*Id.*) If

Prothera, Inc. v. Zhou Ye, Slip Copy (2020)

2020 WL 3073345

Plaintiff used the same formula to calculate Defendant's damages liability here, it would have arrived at a much higher number than it did in its Motion. Third, Plaintiff's calculation does not account for the 'each breach with respect to a Product will be considered a separate breach' concept. That concept contemplates liability for at least products offered for sale, but not actually sold—but Plaintiff's calculation does not.

To the contrary, Defendant's absurd [6] argument he should be on the hook for approximately $2.8 million instead of the $150,000 Plaintiff seeks is actually more persuasive—as it aligns better with the language of the Agreement. (ECF No. 47 at 8-10.) As described *supra*, the liquidated damages clause of the Agreement makes a number of different actions or omissions a breach—well beyond mere sales—and then multiplies liability for those breaches by product, and by day of breach. (ECF No. 47-1 at 3, § 11.) Given Defendant's myriad breaches of the Agreement, his interpretation of the liquidated damages clause matches the plain language of the Agreement.

 **6** This finding does not mean the Agreement is ambiguous. Quite to the contrary. It is instead unambiguous that the liquidated damages clause was intended as a penalty. It seeks to impose massive liability for breaching the contract—evidencing its intent to secure compliance. *See Mason*, 865 P.2d at 335 (explaining that a liquidated damages clause constitutes a penalty, and is thus unenforceable, when its purpose is to secure compliance and not reasonably estimate damages). Moreover, the damages Plaintiff could recover under the liquidated damages clause as written are entirely untethered from, and greatly exceed, actual damages. *See Am. Fire & Safety, Inc. v. City of N. Las Vegas*, 849 P.2d 352, 355 (Nev. 1993) ("[a] penalty is a sum named, which is disproportionate to the damage which could have been anticipated from breach of the contract") (citing 5 *Williston on Contracts* § 776). This case is a good example, where Defendant argues he only made some $25,000 in profit reselling Plaintiff's products (ECF No. 47 at 8), and Plaintiff argues Defendant made some $87,000 in revenue (ECF No. 43 at 7). Both amounts are significantly lower than both the amount Defendant persuasively argues he should be required to pay if Plaintiff enforced the liquidated damage as written, and even the amount Plaintiff seeks. *See Khan*, 306 P.3d at 414 (invalidating liquidated damages clause when, by its terms, it sought 150% of actual damages). In sum, the liquidated damages clause is unenforceable because it was intended as a penalty.

And while the Court does not condone Defendant's wanton disregard for the Agreement, and appreciates Plaintiff's restraint in not seeking the overwhelming damages it could seek against Defendant under the liquidated damages clause, the Court's findings here are actually informed by a different set of considerations. That is Nevada's prohibition on 'blue penciling,' or re-writing unenforceable contract provisions to make them enforceable. *See Golden Rd. Motor Inn, Inc. v. Islam*, 376 P.3d 151, 156 (Nev. 2016) (invalidating overbroad noncompete provision in employment contract, and also stating the general principle that, "[r]ightfully, we have long refrained from reforming or 'blue penciling' private parties' contracts.") (footnote omitted). [7] As explained *supra*, Plaintiff's proposed interpretation of the liquidated damages clause does just that. By narrowing the definition of breach to only unauthorized sales to arrive at a damages amount closer to actual damages, Plaintiff's approach attempts to reform the liquidated damages clause to make it enforceable—which the Court cannot do.

In addition, the Court agrees with Defendant that liquidated damages clauses should be interpreted based on their effect, not based on disclaimer language added by the drafter stating the liquidated damages clause is not a penalty. (ECF No. 47 at 12.) If the converse were true, parties would—as Plaintiff did here (ECF No. 47-1 at 3)—include language explaining why their liquidated damages provision was not a penalty, and thus be free to impose punitive liquidated damages clauses on counterparties to their agreements. Plaintiff's approach of relying on disclaimer language in a liquidated damages clause (ECF No. 43 at 11, 51 at 7-8) would also render the analysis as to whether the liquidated damages clause constituted a penalty unnecessary. But, again as discussed *supra*, Nevada law is clear that is the analysis the Court must undertake. Thus, the Court accords no weight to the disclaimer language in the Agreement's liquidated damages clause.

Plaintiff also argues that the Court should not find for Defendant here because Plaintiff has presented evidence, and Defendant has presented none. (ECF No. 51 at 1, 3-6, 8.) But the applicable standard does not require Defendant to present any evidence. *See, e.g., Mason*, 865 P.2d at 335 ("In order to prove that such a provision constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party.").

Prothera, Inc. v. Zhou Ye, Slip Copy (2020)
2020 WL 3073345

Defendant is merely required to persuade the Court. And here, Defendant has persuaded the Court the liquidated damages clause of the Agreement constitutes a penalty. The liquidated damages clause is therefore unenforceable.

**\*7**  Because the liquidated damages clause is unenforceable, Plaintiff has not satisfied its initial burden to make out a prima facie breach of contract claim. *See, e.g., Brown*, 531 F. Supp. 2d at 1240 (stating that damages are an element of a breach of contract claim). The Court must therefore deny Plaintiff's Motion.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion for summary judgment (ECF No. 43) is denied.

**All Citations**

Slip Copy, 2020 WL 3073345

## Footnotes

1    Defendant filed a response (ECF No. 47), and Plaintiff filed a reply (ECF No. 51). Both parties filed declarations with exhibits in support of their briefing. (ECF Nos. 44, 48.)

2    Some courts characterize a breach of contract claim under Nevada law as having four elements. *See, e.g., Padilla Constr. Co. of Nevada v. Big-D Constr. Corp.*, 386 P.3d 982 (Table), 2016 WL 6837851, at \*1 (Nev. 2016) ("there are four elements to a claim for breach of contract in Nevada[:] '(1) formation of a valid contract; (2) performance or excuse of performance by plaintiff; (3) material breach by the defendant; and (4) damages' ") (quoting *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011)). In this case, Plaintiff characterized it as having three elements. (ECF No. 43 at 8.) Regardless, to the extent there is a fourth element, it is immaterial here—for two reasons. First, the parties' dispute centers on the damages prong, which is present in either the three or four element formulation. Second, there is no dispute here that Plaintiff performed its obligations under the Agreement.

3    This makes the parties' arguments as to whether the liquidated damages clause is enforceable suitable for resolution by the Court at summary judgment. In addition, and separately, the Court notes neither party disputes that Nevada law governs the Court's analysis.

4    Of course, all the references to patients here do not really apply to these circumstances, because Defendant is not a healthcare provider. But the fact that Defendant clearly breached many provisions of the Agreement is not particularly relevant to the parties' arguments, so the Court will not repeatedly mention the many ways in which Defendant breached the Agreement in reselling Plaintiff's products on Amazon.

5    Installment payments and financing are of course common for many types of sales, but there is no evidence before the Court this is how end customers pay for Plaintiff's products, which are, for example, bottles of Vitamin C tablets.

6    At first blush, because he is asking to be held significantly more liable than Plaintiffs asked for him to be. But this strategy is merely an effective rhetorical device.

2020 WL 3073345

7    In *Golden Road*, the Nevada Supreme Court explained this doctrine is supported by public policy considerations. *See* 376 P.3d at 156. The *Golden Road* court specifically explained that allowing blue-pencilling would virtually allow a court to write a new contract for the parties, which impermissibly tramples on the contracting parties' intent. *See id.* at 157. The prohibition on blue-pencilling also preserves judicial resources (*see id.* at 157-58), and protects less sophisticated parties who may comply with a particularly punitive or onerous contractual term simply because they are unaware the clause is unenforceable (*see id.* at 157).

**End of Document**                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC Document 13-1 Filed 10/10/23 Page 180 of 231 PageID #: 986
R&O Construction Company v. Fire Materials Group LLC, Not Reported in Fed. Supp....
2010 WL 11579363

2010 WL 11579363
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

R&O CONSTRUCTION COMPANY, Plaintiff,

v.

FIRE MATERIALS GROUP LLC, et al., Defendants.

Case No. 2:09-CV-00147-KJD-RJJ
|
Signed 03/19/2010

**Attorneys and Law Firms**

Kent F. Larsen, Smith Larsen & Wixom, Las Vegas, NV, Michael D. Stanger, Callister Nebeker & McCullough, Salt Lake City, UT, for Plaintiff.

Randall Gustafson, Nicholas B. Salerno, Lincoln, Gustafson, Cercos, Martin J. Kravitz, Las Vegas, NV, C. Michael Johnson, Thomas Wingfield, The Johnson Firm, LLC, Atlanta, GA, for Defendants.


**ORDER**

Kent J. Dawson, United States District Judge

 **\*1** Currently before the Court is Defendant Fire Materials Group, LLC ("FMG") and Teligan Corporation's (referred to jointly herein as "Defendants") Motion to Dismiss for Improper Venue (#33). Plaintiff filed a Response in Opposition (#34), to which Defendants filed a Reply (#35). Additionally before the Court is Defendant Westchester Surplus Lines Insurance Company's ("Westchester") Motion to Dismiss for Lack of Ripeness, or Motion to Stay (#21). Plaintiff filed a Response in Opposition (#30), to which Westchester filed a Reply (#32). The Court has considered both Motions and rules on them together herein.


**I. Background**

This case involves a claim by R&O Construction ("R&O") seeking relief for alleged breach of contract and indemnity. R&O and FMG entered into a subcontract agreement on January 9, 2007, pursuant to which FMG was to complete the fire sprinkler system at a Hilton Homewood Suites being built by R&O in Las Vegas, Nevada. On two separate occasions in January and February of 2008, leaks occurred in the Hilton's fire sprinkler system during a water pressure test. R&O pursued FMG for reimbursement of its costs to repair water damages, and eventually filed this lawsuit in federal court.

The subcontract agreement between R&O and Defendants contains a governing law provision which states:

> This Agreement shall be deemed to have been made in and shall be interpreted under the laws of the State of Nevada. Jurisdiction and venue are hereby agreed to be in the District Court of Clark County, State of Nevada and the parties hereby acknowledge and agree such jurisdiction and venue are proper and reasonable.

(Motion to Dismiss for Improper Venue Ex. A at 8.) Defendants' Motion to Dismiss for Improper Venue avers that R&O has filed its lawsuit in a forum other than that designated in the forum selection clause of the subcontract agreement, and on this basis seeks that the Court dismiss the action pursuant to Fed. R. Civ. P. 12(b)(3).

## II. Standard of Law for Motion to Dismiss

On a 12(b)(3) motion, the pleadings need not be accepted as true. Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1137 (9th Cir. 2004). In the context of a Rule 12(b)(3) motion based upon a forum selection clause, the court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. Murphy v. Schneider National, Inc., 362 F.3d 1133, 1138 (9th Cir. 2004).

The Ninth Circuit has held that forum selection clauses should be enforced as written. See, Mannetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 514 (9th Cir. 1988). Forum selection clauses are prima facie valid and are enforceable absent a strong showing by the party opposing the clause that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching. Id. (citation omitted).

## III. Forum Selection Clause

Defendants here, do not aver that the forum selection clause is invalid. Rather, they aver that the forum selection clause mandates that an action be filed in the state courts for Clark County—as opposed to federal court. The Ninth Circuit has held that a forum selection clause is to be enforced only where venue is specified with "mandatory language." Docksider, Ltd. v. Sea Technology, Ltd., 875 F.2d 762, 764 (9th Cir. 1989). If the language of the forum selection clause is non-mandatory, the clause will not preclude suit elsewhere. Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 77 (9th Cir. 1987). Accordingly, the Court must determine whether the forum selection clause at issue is mandatory or permissive.

 **\*2**  To be considered mandatory, a forum selection clause must contain language that clearly designates a forum as the exclusive one. Northern California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co., 69 F.3d 1034, 1037 (9th Cir. 1995). As this Court has previously recognized, "[t]he prevailing rule is clear that where venue is specified with mandatory language the clause will be enforced." Coppola v. Baron, 2007 WL 4180590 \*2 (D. Nev. 2007) (citing Docksider, Ltd., 875 F.2d at 763–764). "When only jurisdiction is specified, the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." Id. at 764 (citations omitted). A forum selection clause must contain mandatory language requiring that a case be litigated in only one forum. Northern California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co., 69 F.3d at 1037.

Additionally, a forum selection clause providing that a particular court or state has jurisdiction, but which states nothing about said jurisdiction being exclusive, is permissive, rather than mandatory. Hunt Wesson Foods Inc. v. Supreme Oil Co., 817 F.2d 75, 77 (9th Cir. 1987). "The effect of the language is merely that the parties consent to the jurisdiction of that particular court or state." Coppola v. Baron, 2007 WL 4180590 at \*2 (citing Kachal, Inc. v. Menzie, 738 F.Supp. 371, 373 (D. Nev. 1990)). Such consent does not preclude the case from being litigated in another court. Id.; Northern California Dist. Council of Laborers, 69 F.3d at 1036.

The forum selection clause in this case provides that "[j]urisdiction and venue are hereby agreed to be in the District Court of Clark County, State of Nevada." This forum selection clause specifies that venue will be in the District Court in Clark County, Nevada, but does not specify whether the forum is the state district court or the federal district court, both of which are located in Clark County. As this Court found in Coppola, "the language in the forum selection clause states nothing about the Clark County state courts having exclusive jurisdiction. The effect of the language is merely that the parties consent to the jurisdiction of the Clark County courts." Coppola v. Barron, 2007 WL 4180590 at \*2. See also, Fremont Paving & Redi-Mix, Inc. v. R&O Const. Co., 2008 WL 501439 (D. Colo. 2008). Accordingly, Defendants' Motion to Dismiss for Improper Venue is denied.

R&O Construction Company v. Fire Materials Group LLC, Not Reported in Fed. Supp....
2010 WL 11579363

## IV. Lack of Ripeness

Defendant Weschester's Motion to Dismiss seeks that the Court dismiss Plaintiff's claim against it for lack of ripeness, or in the alternative, that the Court stay the action and compel arbitration. Westchester issued policy No. I08523307001 to Las Vegas Hotel Partners, LLC ("LVHP") for a policy period of September 21, 2006, through May 15, 2008, naming Las Vegas Hotel Partners, LLC and Western States Lodging and Management, LLC ("Western States Lodging") as named insureds (the "policy") (Weschester's Mot. to Dismiss Ex. A.) The policy identified Plaintiff as an additional insured to the extent its interest may appear, and provides coverage, pursuant to the terms, conditions and exclusion of the Policy, for the project located at Hidden Well Road and La Cienega Street, Las Vegas NV, 89119 (the "project").

Plaintiff was hired to serve as the general contractor for the construction of the project, and subcontracted the fire sprinkler work to FMG. [1] (Compl. ¶¶ 3, 7.) As stated above, on two separate occasions, significant water damage occurred at the project allegedly due to FMG's failure to glue fire sprinkler piping materials together properly. (Compl. ¶ 12.) Plaintiff undertook the repair of the damage resulting from both events and incurred costs in the amount of $354,757.48 and $302,333.39 for each repair, respectively. Plaintiff avers that it made a request to Westchester pursuant to the policy for recovery of the cost to repair the damages. After the request, Westchester's adjuster submitted proofs of loss to LVHP via e-mail for its signature and copied the in-house counsel for R&O. In an effort to provide Westchester with documentation of the repair work and replacement costs caused by the water damage, R&O submitted several binders to Westchester which contained documents detailing the repair and replacement costs for all losses. As reimbursement for the repair and replacement costs on the first event, R&O has received payments from LVHP and/or Westchester totaling $273,417.62 leaving $81,339.86 of R&O's claim unpaid. R&O has received a reimbursement for repair and replacement work on the second event in the amount of $177,504.50 leaving $124,828.89 of R&O's claim unpaid.

**\*3** Having received only partial payment from Westchester for the costs it allegedly incurred, R&O filed this case seeking payment for the alleged remaining unpaid amounts. Specifically, Plaintiff alleges Westchester has breached the insurance policy by "not fully paying for the repair of the water damage." (Compl. ¶ 43.)

Westchester's Motion avers that Plaintiff failed to submit a sworn proof of loss statement as required under the policy for the amount it now seeks, and that due to said failure, Plaintiff's claim is not ripe and is subject to being dismissed without prejudice. (Weschester Mot. to Dismiss at 3.) In the alternative, Westchester seeks that the Court stay any proceedings against Westchester in order that the parties may complete the appraisal process. (Id.) Plaintiff, in opposition, avers that Westchester's Motion fails for numerous reasons.

R&O's first argument against dismissal is that as an "additional insured" (not a "named insured") under the policy, it was not required to submit a sworn proof of loss as a condition precedent to receiving reimbursement. Second, R&O avers that its submission of detailed loss information substantially complied with the proof of loss requirement, thereby giving Westchester adequate notice of the loss. Third, R&O avers that should it be required to submit a sworn proof of loss as a condition precedent to receiving payment under the policy, that Westchester has waived the requirement inasmuch as it processed the claim and has made payments to R&O without requiring R&O to submit a sworn proof of loss. Finally, R&O avers that because Westchester did not demand appraisal within sixty days (as required under the policy) of R&O's submission of detailed loss documentation, and made payments to R&O under the policy, Westchester has waived its right to demand appraisal to adjudicate a dispute concerning the amount of loss.

Here, the Court must determine if R&O, as an additional insured, was required to submit a proof of loss statement under the policy. Additionally, the Court must determine whether Nevada courts recognize the doctrine of substantial performance in the context of a proof of loss, and if so, whether R&O's submission of loss documentation and information substantially complies with the purpose of the policy's proof of loss provision.

### A. Interpretation of Insurance Contracts

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 183 of 231 PageID #:  989
R&O Construction Company v. Fire Materials Group LLC, Not Reported in Fed. Supp....
2010 WL 11579363

Nevada law is guided by well-settled and basic rules of insurance contract interpretation. The interpretation of an insurance policy or contract is a question of law. Farmers Ins. Exch. v. Neal, 64 P.3d 472, 473 (Nev. 2003). Coverages are to be construed broadly, while limitations and exclusions are to be construed narrowly.  Cranmore v. Unumprovident Corp., 430 F.Supp. 2d 1143, 1149 (D. Nev. 2006) (interpreting Nevada law). Insurance policies are construed from the perspective of a layman rather than from "one trained in the law" and absent ambiguity, terms are to be given their plain and ordinary meaning. McDaniel v. Sierra Health & Life Ins. Co., 53 P.3d 904, 906 (Nev. 2002). It is a well known principle of insurance contract interpretation that if the language in a policy may be interpreted in two or more ways, it is to be construed in favor of the insured. Home Indemnity Company v. Desert Palace, 468 P.2d 19, 21 (Nev. 1970); Gerhauser v. North British and Merc. Ins. Co., 7 Nev. 174, 185 (1871).

### 1. Proof of Loss Requirement

 **\*4**  Plaintiff avers that as an additional insured under the policy, it is not bound by the proof of loss requirement. The Court does not agree. When interpreting an insurance policy, the policy must be construed as a whole and the court must examine the reasonable expectations of the parties entering into the agreement. Aetna, Inc. v. Sacramento-Stockton S.S. Co., 273 F. 55 (9th Cir. 1921) Here, a plain reading of the insurance contract as a whole indicates that all parties seeking reimbursement for a loss under the policy must submit a signed and sworn proof of loss stating the time and origin of loss, interest in the property, replacement costs, any other insurance on the property, and other items within sixty (60) days of the loss. Plaintiff avers that the proof of loss statement is only required of the Named Insured to the policy, as opposed to additional insured parties. Plaintiff cites to the "Coverage Information" section of the ACE Builders Risk XTRA Coverage Form, which states "[t]hroughout this policy the words you and your refer to the Named Insured shown in the Declarations." (Motion to Dismiss #21-1 Ex. A at 7.) Plaintiff avers that because the Policy Declaration lists only LVHP and Western States Lodging as a "Named Insured", (Id. Ex. A at 3, 34) it is not required to provide a proof of loss statement as required pursuant to the Loss Conditions Form BB-5W64a of the policy. [2]

Defendant's Motion seeks that the Court dismiss Plaintiff's claim because it is not ripe pursuant to the ACE Inland Marine Policy Conditions Section C, which states that "[y]ou agree not to bring suit against us unless you have complied with all the terms of this policy...." and because Plaintiff has failed to file a proof of loss statement for the remaining amount sought. (Id. Ex. A at 22.)

Upon examination, the Court finds the insurance contract at issue to be clear and unambiguous. As an additional insured, R&O was bound by the conditions of the policy, including the proof of loss requirement. Specifically, the ACE Inland Marine Additional Insured Endorsement states that R&O Construction is added as an additional insured, and that as an additional insured, R&O is "subject to the terms and conditions of the policy and this endorsement" and indicates that the endorsement "changes the policy" and "modifies insurance provided" under the Builders Risk Xtra coverage form. (Motion to Dismiss #21-1 Ex A at 42, 45.) Accordingly, whether submitted through a named insured or not, submission of a proof of loss statement was a condition precedent to any loss recovery under the policy. [3]

### 2. Substantial Compliance

Additionally, Plaintiff avers that should the Court determine the submission of a proof of loss statement is a condition precedent to loss recovery, that its submission of detailed information regarding both losses demonstrates substantial compliance with the requirement. (Resp. at 8.) Accordingly, the Court must determine whether Nevada law recognizes the doctrine of substantial performance in the context of a proof of loss, and if so, whether R&O's submission of loss documentation and information substantially complies with the purpose of the policy's proof of loss provision.

Nevada courts have upheld proof of loss documents that did not meet exact requirements or time limits listed in an insurance policy, but which were found to substantially comply with the purposes of the proof of loss requirement. See Walker v. American Bankers Ins. Group, 836 P.2d 59 (Nev. 1992) (citing Sutton v. Fire Insurance Exchange, 509 P.2d 418, 419(Or. 1973)) (stating that the test for substantial compliance is "whether the proof submitted by the insured fulfilled the purpose of the proof of loss"). In Walker, the Nevada Supreme Court adopted the generally accepted view regarding the purpose of a proof of loss requirement:

R&O Construction Company v. Fire Materials Group LLC, Not Reported in Fed. Supp....

2010 WL 11579363

**\*5** To afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form a [sic] intelligent estimate of its rights and liabilities before it is obliged to pay.... to furnish the insurer with the particulars of the loss and all data necessary to determine its liability and the amount thereof.

Id. at 537.

Accordingly, under Nevada law, the Court must determine whether the documentation and information submitted by Defendant fulfills the purposes enumerated in Walker sufficiently to overcome dismissal.

Here, the Court does not have the documents that were submitted to Westchester by R&O for recovery. Defendant avers however, that it submitted "detailed spreadsheets identifying property damaged and the corresponding costs for repair and replacement" including "binders containing documents supporting each component of the losses incurred by R&O in making the repairs." (Resp. at 4, 9; Motion to Dismiss Ex. B.) Additionally, R&O avers that as part of its efforts to obtain payment under the policy, R&O's outside counsel "exchanged much information with Neal Maddox, the insurance adjuster hired by Westchester." (Resp. at 4; Ex. 3 at ¶¶ 4–6; Ex. 4; Ex. 5; Ex. 6.) The documentation provided by outside counsel included "summary sheets for each of the two water damage claims detailing all work performed by each subcontractor, as well as the work provided by R&O in performing repairs occasioned by the water damage events and a compact disc with several hundred pages in electronic format of all backup data, invoices, work orders, time records, work descriptions, remediation inspection reports, daily field logs and reports, check copies, pictures, etc." (Resp. #30-3 ¶ 6.) Defendant, in opposition, submits the affidavit of Neal Maddox, which states, that although R&O submitted documents and spreadsheets containing substantial loss information, "they did not submit sufficient information to support their assertion for full payment of all claims as presented." (Motion to Dismiss #21 ex. B ¶ 5.) Maddox also states that "there is a continuing dispute as to the correct amount of each loss occurrence and also as to whether or not all the loss amounts being claimed for each loss occurred are covered." (Id.)

However, without more information regarding what exactly was given to Westchester, the Court cannot determine the issue of substantial compliance. There has been no allegation that the submission of said documentation was untimely or fraudulent at this stage of the proceedings and without an evidentiary hearing it cannot be determined whether there has been substantial compliance. Because the question of substantial compliance remains, Defendant's Motion to Dismiss for Ripeness is denied.

**B. Appraisal**

As stated above, Defendant seeks, should the Court choose not to dismiss the Complaint pursuant to issues of ripeness, that the Court stay the action and compel appraisal. The Loss Conditions section of the policy regarding appraisal states "[i]f we cannot agree with you on the amount of loss, either of us can demand that the following procedure be used to settle the amount." The demand for appraisal must be "in writing" and must be submitted "within 60 days from the time [Westchester] receives proof of the loss." (Motion to Dismiss #21-1 Ex. A at 23.) Defendant avers, that "the time to submit to an appraisal has not expired, as sixty (60) days has not passed from the submission of a proper Sworn Proof of Loss." (Motion to Dismiss #21 at 9.) The Court agrees. As discussed above, the submission of a proof of loss statement is a condition precedent to loss recovery under the policy at issue. Additionally, the Court has determined that the documents and information Plaintiff supplied Westchester, while possibly substantially compliant to the proof of loss requirement, do not constitute an actual sworn proof of loss. Moreover, even were the Court able to determine at this time that the documents and information given to Westchester substantially comply with the proof of loss requirement, it would not be until the Court's determination that Defendant would have notice of such, and therefore, the sixty days would not begin to run until the date of the Court's ruling. Accordingly, the Court finds that the sixty day time requirement in which to demand appraisal under the policy has not expired.

**R&O Construction Company v. Fire Materials Group LLC, Not Reported in Fed. Supp....**

2010 WL 11579363

**\*6**  Defendant avers that the Federal Arbitration Act is applicable to the appraisal provision of the policy, and that the Court may enforce the provision between the parties to this action. The Court agrees. Nevada courts treat appraisals as though "specifically include[d] ... within the arbitration law. <u>Silverman v. Fireman's Fund American Ins. Companies, 604 P.2d 805 (Nev. 1980)</u>. The Federal Arbitration Act ("FAA") creates "a body of federal substantive law of arbitration, applicable to any arbitration agreement within the coverage of the Act." <u>Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983)</u>. The FAA applies to any "written provision in ... a contract evidencing a transaction involving commerce." <u>9 U.S.C. § 2</u>. "The FAA includes a broad definition of the term commerce, <u>9 U.S.C. § 1</u>, and the insurance policy at issue here falls under that definition." <u>Herndon v. American Family Home Ins. Co.,</u> <u>2009 WL 775428 (D. Ariz. 2009)</u> (citation omitted) (finding that insurance contracts are recognized as "involving commerce" under the FAA's standard). Accordingly, the FAA is applicable to the appraisal provision of the insurance policy at issue here.

Plaintiff avers that Westchester waived its ability to demand appraisal because R&O's submission of documents and information detailing its loss constitutes substantial compliance to the proof of loss provision, and the sixty days in which the parties could have demanded appraisal has passed. As stated above however, because R&O never submitted an actual sworn proof of loss, and because Westchester has not yet received notice regarding whether R&O's submitted documents are substantially compliant with the proof of loss requirement, the sixty day time requirement in which to demand appraisal under the policy has not expired. The Court therefore, agrees to stay this action against Westchester Surplus and orders the Parties to submit to the appraisal process, as outlined in the policy to determine all issues regarding the amount of loss.

## V. Conclusion

Accordingly, and for the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant Fire Materials Group, LLC and Teligan Corporation's Motion to Dismiss for Improper Venue (#33) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Westchester Surplus Lines Insurance Company's Motion to Dismiss for Lack of Ripeness, or Motion to Stay (#21) is **GRANTED** in part, as to the Motion to Stay, and **DENIED** in part, as to dismissal.

## All Citations

Not Reported in Fed. Supp., 2010 WL 11579363

## Footnotes

1    Telgian is a successor to FMG.

2    Specifically, the Loss Conditions Form BB-5W64a of the policy states "[i]f there is a loss to your Covered Property, you have the following responsibilities ... "Give us a signed and sworn proof of loss ..." (Motion to Dismiss #21-1 Ex. A. At 23.)

3    Section G of the ACE Inland Marine Policy Conditions states that "[i]f more than one person or organization is insured under this policy, the first one named in the declarations will act on behalf of all others." (Motion to Dismiss #21-1 Ex. A at 22.)

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

131 Nev. 1355

Only the Westlaw citation is currently available.

An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

Court of Appeals of Nevada.

TMX, INC., A Nevada Corporation; and Chester L. Mallory, Appellants,

v.

Iris A. VOLK, Respondent.

TMX, Inc., A Nevada Corporation; and Chester L. Mallory, Appellants,

v.

Iris A. Volk, Respondent.

Nos. 65807, 66222.

|

Aug. 31, 2015.

**Attorneys and Law Firms**

Charles R. Kozak.

Woodburn & Wedge.

Before GIBBONS, C.J., TAO and SILVER, JJ.

### *ORDER AFFIRMING IN PART, REVERSING IN PART AND REMANDING*

**\*1** This is an appeal from a district court's order granting respondent Iris Volk's motion to dismiss. Second Judicial District Court, Washoe County; Janet J. Berry, Judge.

This case arises from appraisals made by Iris Volk from 2005 to 2008 regarding TMX, Inc.'s assets. Volk allegedly failed to deduct scrap metal when calculating TMX's value, eventually leading to an overinflated buy-out price when a partner, Eddie Smyth, left TMX in 2008. TMX agreed to buy out Smyth's stock, and Chester Mallory personally guaranteed $450,000 of the promissory note. TMX later defaulted on its payments, and in 2011 Smyth sued to enforce the note. The jury eventually found for Smyth against Mallory. In 2013, appellants TMX and Mallory (collectively "Mallory") filed suit against Volk for breach of contract and fraud, but the district court dismissed the complaint. Mallory appeals the district court's dismissal. Additional facts underlying this case are extensive; however, as the parties are aware of those facts, we need not recite them here.

On appeal, Mallory argues the district court erred in dismissing appellants' complaint. The primary issue we consider is whether the district court erred in concluding the statute of limitations barred Mallory's claims.[1]

We review de novo an order granting a motion to dismiss. *Brown v. Eddie World, Inc.,* 131 Nev. ——, ——, 348 P.3d 1002, 1003 (2015). In asserting a claim for relief, the plaintiff need only state "a short and plain statement of the claim showing that the pleader is entitled to relief." NRCP 8(a). A pleading "is sufficient so long as the pleading gives fair notice of the nature and basis of the claim," *Crucil v. Carson City,* 95 Nev. 583, 585, 600 P.2d 216, 217 (1979). We accept the nonmoving party's factual allegations as true and draw every fair factual inference from them. *Shoen v. SAC Holding Corp.,* 122 Nev. 621, 635, 137 P.3d 1171, 1180 (2006). Dismissal for failure to state a claim is appropriate "only if it appears beyond a doubt that [the nonmoving

party] could prove no set of facts, which, if true, would entitle it to relief." *Buzz Stew, LLC v. City of North Las Vegas,* 124 Nev. 224, 228, 181 P.3d 670, 672 (2008) (*Buzz Stew I* ). The supreme court clarified in *Buzz Stew I* the standard is not one of "reasonable doubt," but one of *any* doubt. *Id.* at 228 n. 6, 181 P.3d at 672 n. 6.

An action based upon a written contract must be brought within six years, NRS 11.190(1)(b). Actions based upon an oral contract must be brought within four years. NRS 11.190(2)(c). Actions for fraud and misrepresentation have a three-year statute of limitations .[2] NRS 11.190(3)(d). The date on which a statute of limitations accrues is normally a question of fact, and the district court may determine that date as a matter of law only when the uncontroverted evidence irrefutably demonstrates the accrual date. *Winn v. Sunrise Hosp. & Med. Ctr.,* 128 Nev. at ——, ——, 277 P.3d at 458, 462–63 (2012). Non-compliance with a statute of limitations is a non-jurisdictional, affirmative defense, *see, e.g., Dozier v. State,* 124 Nev. 125, 129, 178 P.3d 149, 152 (2008), and the party asserting an affirmative defense bears the burden of proof. *See Nev. Ass'n Servs., Inc. v. Eighth Judicial Dist. Court,* 130 Nev. ——, ——, 338 P.3d 1250, 1254 (2014). As judging the validity of an affirmative defense "often requires consideration of facts outside of the complaint[,]" an affirmative defense generally does not provide grounds for a court to grant a motion to dismiss. *Kelly–Brown v. Winfrey,* 717 F.3d 295, 308 (2d Cir.2013); *see also In re CityCenter Constr. Lien Master Litig.,* 129 Nev. ——, ——, n. 3, 310 P.3d 574, 579 n. 3 (2013) (noting courts generally do not consider matters outside the pleading in determining a motion to dismiss); *Lubin v. Kunin,* 117 Nev. 107, 116, 17 P.3d 422, 428 (2001) (noting defenses generally should not be considered on a motion to dismiss).

**\*2** "The general rule concerning statutes of limitation is that a cause of action accrues when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen,* 106 Nev. 271, 274, 792 P.2d 18, 20 (1990). But, the Nevada Supreme Court has provided an exception to the general rule, referred to as the discovery rule, under which "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action ." *Id.* The discovery rule generally applies where the statute of limitations does not specify when a cause of action accrues. *Bemis v. Estate of Bemis,* 114 Nev. 1021, 1025 n. 1, 967 P.2d 437, 440 n. 1 (1998). Because NRS 11.190(1)(b) is silent as to when accrual occurs and NRS 11.190(3)(d) expressly incorporates the discovery rule, the discovery rule applies to both of Mallory's claims. Thus, we first consider when Mallory discovered or reasonably should have discovered the harm.

On appeal, Mallory argues the statute of limitations began to run in 2013 only after Volk testified during the earlier trial involving Smyth's breach of guarantee claim against Mallory, and only after judgment was entered against Mallory in that action. We disagree.

The uncontroverted facts show Mallory suffered harm in 2008 when the inflated valuation led to an inflated buy-out price. Although the 2013 judgment against Mallory enforced the promissory note, the damage itself—Mallory's duty to pay more for the company's stock than they were worth—occurred at the time of the buy-out. And, Mallory was aware in January 2009 the company's worth had been overestimated and that the buy-out amount was likewise inflated. The facts forming the basis of the present complaint, that Volk purposely or negligently failed to exclude scrap metal from her valuation in breach of her contractual duty to TMX, were actually discovered or could have been discovered with reasonable diligence at that time. Specifically, the parties knew in January of 2009 the company's value had been inflated by the inclusion of scrap metal in the valuations involving Volk's accounting. Further, we note Mallory's argument to this court differs from what he previously asserted to the district court: that the statute of limitations began to run in 2010. *See Old Aztec Mine, Inc. v. Brown,* 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (holding we need not consider a point not urged in the trial court). As such, we agree with the district court that the statute of limitation was triggered in January 2009 when appellants learned of the miscalculation of assets.

Because the applicable statute of limitations began to run in January 2009, Mallory was required to bring his fraud claim by January 2012. Yet, Mallory did not bring suit until December 2013 and, therefore, his fraud claim is barred. Thus, we need not consider whether the complaint was pleaded with sufficient particularity for fraud under *Rocker v. KPMG LLP,* 122 Nev. 1185, 148 P.3d 703 (2006) (overruled on other grounds by *Buzz Stew I,* 124 Nev. at 228, 181 P.3d at 672), or whether the district court should have given leave to amend the complaint to add a claim for negligent misrepresentation,[3] which likewise would have been barred by the statute of limitations.

TMX, Inc. v. Volk, Not Reported in P.3d (2015)
131 Nev. 1355, 2015 WL 5176619

**\*3**  Whether the contract claim was also barred depends upon whether the district court erred in converting Mallory's claim from one founded upon a written contract to one founded upon an oral contract. If the claim was based upon a written contract, the statute of limitations would not have expired before January 2015; if it was based on an oral contract, however, the statute of limitations would have expired in January 2013, nearly a year before Mallory filed suit against Volk. *See* NRS 11.190(1)(b) and (2)(c).

Here, although Mallory's complaint is, perhaps, inartful, it is clear Mallory based the breach of contract claim upon a written contract. Volk moved to dismiss for failure to state a claim under NRCP 12(b)(5). Specifically, Volk argued that because Mallory failed to show the existence of a written contract, the claim could only be based upon an oral agreement and was, therefore, barred by the four-year statute of limitations.

We conclude the district court erred in converting Mallory's breach of contract claim to one based upon an oral contract and finding it was barred by the four-year statute of limitations. First, the complaint was sufficient under NRCP 8(a): it notified Volk of Mallory's belief in the existence of a written contract, and set forth facts detailing the alleged breach of that contract. Second, an issue of fact remains as to whether Mallory's breach of contract claim was filed within the statute of limitations. Taking Mallory's facts as true, and drawing all inferences in the light most favorable to Mallory, it is possible that discovery will yield a copy of a written contract, should one exist. If evidence of a written contract is produced during discovery and the six-year statute of limitations is found to apply, the breach of contract claim was timely filed. Further, as the party asserting the affirmative defense, Volk, not Mallory, bears the burden of proving the statute of limitations bars Mallory's claim. Accordingly, it was inappropriate for the district court to conclude, on a motion to dismiss, that the breach of contract claim was barred by the four-year statute of limitations, and we reverse the district court on this issue. This conclusion likewise requires us to vacate the award of attorney fees and costs. Accordingly, we

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

**All Citations**

Not Reported in P.3d, 131 Nev. 1355, 2015 WL 5176619

**Footnotes**

1    Volk also argues Mallory does not have standing to sue, but as guarantor of the buy-out agreement and an assignee of TMX's claims, Mallory has standing to bring suit. *See* NRCP 17(a); *Szilagyi v. Testa,* 99 Nev. 834, 838, 673 P.2d 495, 498 (1983) (describing real parties in interest and explaining standing focuses on the party seeking adjudication rather than the issues of the case).

2    The Nevada Supreme Court has not clarified whether negligent misrepresentation claims fall under NRS 11.190(3)(d) (misrepresentation, three years) or NRS 11.190(4)(e) (negligence, two years). However, in light of our conclusions, we need not address that issue.

3    We note Mallory did not raise negligent misrepresentation below nor does the record demonstrate Mallory ever moved to amend the complaint to include a claim for negligent misrepresentation. We generally will not consider arguments not raised before the district court. *See Old Aztec Mine,* 97 Nev. at 52, 623 P.2d at 983.

**TMX, Inc. v. Volk, Not Reported in P.3d (2015)**

131 Nev. 1355, 2015 WL 5176619

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 190 of 231 PageID #:  996
Trustees of Carpenters for Southern Nevada Health and..., 101 Nev. 742 (1985)

710 P.2d 1379

101 Nev. 742
Supreme Court of Nevada.

The TRUSTEES OF the CARPENTERS FOR SOUTHERN NEVADA HEALTH AND WELFARE
TRUST; the Trustees of the Construction Industry and Carpenters Joint Pension Trust for Southern
Nevada; the Trustees of the Vacation Trust Carpenters Local No. 1780 and the Trustees of the Southern
Nevada Carpenters and Millwrights Apprentice Training Trust, Appellants and Cross-Respondents,

v.

BETTER BUILDING COMPANY, Respondent and Cross-Appellant.

No. 15830.
|
Dec. 12, 1985.

**Synopsis**

Trustees for various trusts for carpenters brought action against employer to recover allegedly unpaid contributions. The Eighth
Judicial District Court, Clark County, Thomas J. O'Donnell, J., entered judgment on verdict for employer and trustees appealed.
The Supreme Court, Steffen, J., held that: (1) evidence was sufficient to support finding that tool rental payments were not
disguised compensation for work performed by carpenters and benefit contributions were not owed by employer; (2) evidence
was sufficient to support finding that trustees were not entitled to recover damages for breach of contract; and (3) employer
was not entitled to recovery of attorney's fees on basis that trustees did not recover more favorable judgment than their offer
of judgment under Rule 68.

Affirmed.

Springer, C.J., dissented and filed opinion.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*\*1380   \*743**  Lionel Sawyer & Collins and Evan J. Wallach, Las Vegas, for appellants and cross-respondents.

Robert K. Dorsey, Las Vegas, for respondent and cross-appellant.

**\*744**  OPINION

STEFFEN, Justice.

Appellants contend the lower court committed reversible error in refusing to grant their motions for a new trial and judgment
notwithstanding the verdict.

 At trial, the proponent of a proposition essentially has two burdens relative to  **\*\*1381**  his proof. The first being to produce
evidence which proves or tends to prove his position. The second burden is to persuade the trier of fact that his evidence is more
credible or entitled to the greater weight. *See Koesling v. Basamakis,* 539 P.2d 1043 (Utah 1975).

Appellants' proposition at trial was that they were entitled to unpaid contributions to the Employee Benefit Trust Fund for
thirteen carpenters employed by Better Building Company (Better Building) during the audit period. Appellants also asserted

Trustees of Carpenters for Southern Nevada Health and..., 101 Nev. 742 (1985)

710 P.2d 1379

that contributions were owed for "tool rental" payments to Better Building's employees because allegedly such payments were actually compensation payable by reason of the employees' work. The jury, however, was not swayed by appellants' arguments.

 An examination of the record reveals that appellants did not meet their burden of proof. Based upon the evidence presented at trial, the jury could reasonably conclude that contributions were properly made on behalf of all employed carpenters by Better Building during the audit period and therefore no contributions were owed for the thirteen questioned individuals. In addition, the evidence indicates that payments for tool rental were properly so categorized and were not a subterfuge of wages in order to avoid paying benefit contributions to the trust fund. The carpenters' wages, upon which benefit contributions were made,  **\*745** remained the same. Better Building merely paid a "tool rental" to the carpenters to furnish and transport whatever tools they needed in an attempt to eliminate the loss of tools and the lost time resulting from the distribution, gathering, maintenance and repair of the tools previously supplied by Better Building. The jury's decision that the tool rental payments were not disguised compensation for work performed is reasonable and fully supported by the record.

 Moreover, the trial court instructed the jury that "a nonbreaching party to a contract is entitled to all sums which that party would have received had the contract not been breached." The appellants' contention that the jury disregarded this instruction is meritless. Had the contract which forbade employers from making tool rental payments not been breached, Better Building would have applied the tool rental payments towards the purchase, maintenance and repair of their own tools, the wages would have remained the same, and the appellants would not, therefore, have received any additional benefit payments. Appellants were not damaged by respondent's breach. Also, as discussed earlier, tool rentals were contractually prohibited because some contractors were using them as a subterfuge to avoid paying benefits. This is not the case here. The jury properly concluded that appellants were not entitled to recover damages for breach of contract.

 Appellants also contend that the lower court committed prejudicial error by allowing respondent to offer testimony as to rulings by the Internal Revenue Service (IRS) and the Nevada Industrial Commission (NIC) which accepted Better Building's tool rental payments as such. Our review of the record convinces us that in view of the other evidence presented concerning the tool rental payments, the admission of the IRS ruling, even if properly objected to, was harmless and does not necessitate a reversal. *See* NRCP 61. Testimony concerning NIC's acceptance was also harmless, but more importantly, was never objected to at trial. We will not, therefore, consider it on appeal. *Old Aztec Mine, Inc. v. Brown,* 97 Nev. 49, 623 P.2d 981 (1981).

In *Bates v. Chronister,* 100 Nev. 675, 691 P.2d 865 (1984), this Court held that:

> [A] motion for [JNOV] may be granted *only* when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence or there is insufficient evidence  **\*\*1382**  to make a "one-way" verdict proper, [JNOV] should not be  **\*746** awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict.

*See also, Hernandez v. City of Salt Lake,* 100 Nev. 504, 686 P.2d 251 (1984). Viewing the evidence in the light most favorable to Better Building, the jury could reasonably reach a verdict contrary to that desired by appellants. Accordingly, the trial court did not err by denying appellants' motions for new trial and JNOV. Moreover, because there is substantial evidence to support the jury's decision, we will not disturb it. *Udevco, Inc. v. Wagner,* 100 Nev. 185, 678 P.2d 679 (1984).

Better Building asserts in its cross appeal that the trial court abused its discretion when it failed to grant them attorney's fees since appellants did not recover a more favorable judgment than their Rule 68 offer of judgment.

This Court recently noted in *Beattie v. Thomas,* 99 Nev. 579, 668 P.2d 268 (1983), that the purpose of Rule 68 "is not to force plaintiffs unfairly to forego legitimate claims" and that:

In exercising its *discretion* regarding the allowance of fees and costs under NRCP 68 ... the trial court must carefully evaluate the following factors: (1) whether the plaintiff's claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount. [Emphasis added.]

The trustees in this case had a fiduciary duty to collect from signatory employers all amounts due as contributions to the trust funds for each hour worked by every carpenter employee. When Better Building's books were audited, appellants were refused access to the general ledger or cash disbursement journal. Without access to those records, no accurate determination could be made of whether Better Building had fully reported and paid benefits on all hours worked by its carpenter employees. It was not until nine months after the Rule 68 offer of judgment was made that such documents were produced. A Rule 68 offer expires ten days after its tender. Hence, absent the essential documents, it cannot be said appellants' decision to proceed with litigation was unreasonable or in bad faith. We are convinced the lower court did not abuse its discretion in refusing to award Better Building attorney's fees.

Better Building also argues that NRS 18.010(5) should be **\*747** extended to permit them an award of attorney's fees. We disagree. NRS 18.010(2)(c) specifically precludes Better Building from receiving an award of attorney's fees in this case. NRS 18.010(5) states that subsection 2 does not apply "to any action arising out of a written instrument or agreement which entitled *the prevailing party* to an award of reasonable attorney's fees." In the present case, the contract entered into between the parties provided that appellants were entitled to attorney's fees if they prevailed, not that such fees were permitted to the prevailing party. We simply cannot construe the statutory language as covering the unilateral provision for fees set forth in the parties' contract. Better Building was properly refused an award of attorney's fees.

The respondent in this case also appeals to this court, claiming that the lower court abused its discretion when it did not award Better Building the expenses and costs of their expert utilized for preparation of their defense. Better Building's rationale is unpersuasive. Although a Rule 68 offer does not provide for payment of expert witness fees, respondent proposes **\*\*1383** that NRS 17.115, which does provide for a discretionary award of expert witness fees, should be read together with NRCP 68. Better Building cites to *Armstrong v. Riggi,* 92 Nev. 280, 549 P.2d 753 (1976), for analogous support of this proposition. This Court, however, need not address this question inasmuch as Better Building's offer of judgment in this case was tendered expressly pursuant to Rule 68. The refused offer was necessarily subject to the terms under which it was made.

Moreover, Better Building's expert, Mr. Goodman, was never sworn and did not testify at trial. Accordingly, the lower court did not abuse its discretion be refusing to award Better Building expert witness fees. *Mays v. Todaro,* 97 Nev. 195, 626 P.2d 260 (1981).

Finally, Better Building contends that the trial court erred in refusing to increase its award of expert witness fees to Richard Strahlem. NRS 18.005(5) makes discretionary an award of more than $750.00 for an expert witness. Unless "the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee," $750.00 is sufficient. Our review of the record discloses a lack of such necessity and therefore the lower court did not abuse its discretion.

We have considered the remaining contentions of error and consider them to be without merit. Accordingly, we affirm the judgment entered upon the jury verdict.

Trustees of Carpenters for Southern Nevada Health and..., 101 Nev. 742 (1985)

710 P.2d 1379

MOWBRAY, GUNDERSON and YOUNG, JJ., concur.

**\*748**  SPRINGER, Chief Justice, dissenting:

During the course of trial the district court permitted Better Building to introduce testimony, over objection, that the Internal Revenue Service had "accepted Better Building's tool rental payments as such." [1]  Clearly, this second-hand testimony of the Internal Revenue Service's out-of-court opinion was offered to prove the truth of the matter asserted (that the tool rental payments were such and not salary as contended by the Trustees). It cannot be claimed that the testimony was anything other than legally inadmissible hearsay. NRS 51.035; NRS 51.065; *Archibald v. State,* 77 Nev. 301, 362 P.2d 721 (1961); *United Association of Journeyman v. Stone,* 76 Nev. 189, 351 P.2d 965 (1960); *Las Vegas Sun v. Franklin,* 74 Nev. 282, 329 P.2d 867 (1958); *State v. McKay,* 63 Nev. 118, 165 P.2d 389 (1946); *Zelavin v. Tonopah Belmont Dev. Co.,* 39 Nev. 1, 149 P. 188 (1915); *In Re Kelly,* 28 Nev. 491, 83 P. 223 (1905); *Jones and Colla v. O'Farrel, James and Co.,* 1 Nev. 354 (1865). This much appears to be recognized by the majority; however, after conceding the inadmissible nature of the testimony and timely objection thereto, the majority then declares the error "harmless." [2]

The majority's resort to the "harmless error" rule in order to reach its preferred result is an usurpation of the jury's exclusive role as fact finder. In literally hundreds of cases this court has held that it is the exclusive province of the jury to serve as finder of fact; however, the majority opinion seems to ignore that rule and conclusively presumes to find "other evidence" to support the verdict. Majority Opinion at 1381. That conclusion exceeds our scope of review.

In a civil case the plaintiff must establish his or her case by a preponderance of the evidence. As stated above, it is exclusively the province of the jury to weigh the evidence  **\*\*1384**  and determine where the preponderance lies. *Ewing v. Sargent,* 87 Nev. 74, 482 P.2d 819 (1971); *Briggs v. Zamalloa,* 83 Nev. 400, 432 P.2d 672 (1967); *Barreth v. Reno Bus Lines,* 77 Nev. 196, 360 P.2d 1037 (1961). It is hard to conceive that the jury's "weighing" of the evidence would not be influenced by testimony that an agency of  **\*749**  the federal government had already found as fact a matter at issue in the instant trial. [3]

Just how much the jury was influenced by this testimony is uncertain; it may have contributed only in a minor way or it may have been the factor that most influenced the jury. The truth is we don't know where the jury would have found the preponderance of evidence without this testimony. Regardless, the majority is prepared to state conclusively that it had no impact whatsoever. Unable to agree with such a conclusion, I dissent.

**All Citations**

101 Nev. 742, 710 P.2d 1379

**Footnotes**

1  Better Building was also permitted to introduce testimony that the Nevada Industrial Commission had also accepted that characterization of the payments. Although the majority invokes a procedural bar to consideration of the admissibility of that testimony, all that follows in this dissent is equally applicable to that testimony.

2  The Trustees objected to this testimony on the grounds that it was hearsay, irrelevant and lacked foundation. The majority does not seem to deny the presence of those evidentiary faults. The record clearly supports the merit of all three objections.

710 P.2d 1379

3      This conclusion is all the more certain in light of the fact that the Internal Revenue Service, an entity whose decisions
       influence affect all Americans, was the agency involved.

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2783251
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Benzor Shem VIDAL, Plaintiff,

v.

ADVANCED CARE STAFFING, LLC, Defendant.

No. 1:22-cv-05535-NRM-MMH
|
Signed April 4, 2023

**Attorneys and Law Firms**

Anna P. Prakash, Pro Hac Vice, Nichols Kaster PLLP, Minneapolis, MN, Matthew C. Helland, Pro Hac Vice, Nichols Kaster, LLP, San Francisco, CA, David Seligman, Pro Hac Vice, Juno Turner, Valerie Collins, Pro Hac Vice, Towards Justice, Denver, CO, Patricia C. Kakalec, Hugh Baran, Kakalec Law PLLC, Brooklyn, NY, for Plaintiff.

Sami Asaad, Craig Thomas Dickinson, FordHarrison LLP, Hartford, CT, Marissa Vitolo, Epstein Becker & Green, P.C., Stamford, CT, for Defendant.

OPINION & ORDER

NINA R. MORRISON, United States District Judge:

 **\*1** This proceeding concerns a healthcare worker's legal challenge to an arbitration provision in an employment contract he entered into with Advanced Care Staffing ("ACS"), a third-party staffing agency that recruits workers from other countries and places them in hospitals and care facilities in the United States. Plaintiff Benzor Shem Vidal ("Vidal") came to the United States in 2022 on an immigrant visa sponsored by ACS. The parties' employment contract included an agreement to arbitrate their contractual disputes. After Vidal resigned from his employment with ACS—citing what he contends were "grueling and unsafe working conditions that threatened his nursing license," Compl. ¶1—ACS initiated arbitration proceedings against Vidal for his alleged breach of contract. In September 2022, Vidal filed a suit in this Court seeking a declaration that the arbitration agreement was unlawful, and an order enjoining the arbitration from proceeding.

Vidal now seeks a preliminary injunction to pause the ongoing arbitration on the ground that the arbitrator does not have the authority under the contract to consider threshold issues of "arbitrability"—such as whether the arbitration agreement is unenforceable under state or federal law. Vidal argues that the contract does not contain language unambiguously delegating these issues to the arbitrator. He further argues that even if the contract did contain a sufficiently clear delegation clause, the clause is invalid under various state and federal laws. This is because, Vidal argues, even exercising his right to contest the enforceability of the arbitration agreement could cost him thousands of dollars in ACS's attorneys' fees and arbitration costs under the contract's "loser pays" provision—an amount Vidal has no ability to pay. For the reasons stated herein, Plaintiff's motion for a preliminary injunction is GRANTED.

### I. Background

#### A. The parties

Plaintiff Benzor Shem Vidal, originally from the Philippines, came to the United States in 2022 to work as a nurse. [1] He grew up with limited financial means and sought to come to the United States to make enough money to support his family: his brother, who has a serious disability, and his father, who provides his brother with full-time care. Vidal Decl. ¶¶ 1–3, ECF No. 23-3. Vidal went to nursing school in the Philippines and in 2019 began the process to move to the United States to work as a nurse. *Id.* ¶¶ 7–8, 11–12.

Advanced Care Staffing ("ACS") is a healthcare staffing company in the business of recruiting nurses from other countries and staffing them at various healthcare facilities, including nursing homes, in the United States. Compl. ¶ 20. The arrangement between ACS and nurses it sponsors is as follows: ACS covers the nurses' relocation expenses, professional licensing costs, and, importantly, sponsors them for employment-based immigrant visas that allow the nurses to obtain lawful permanent resident status (or a "green card") in the United States—and bears the costs associated with his immigration applications. *See* Luy Decl. Ex. A ("2019 Contract") at 3–4, 9, ECF No. 30-1. [2] In exchange, ACS requires nurses to agree to work exclusively with ACS for three years. 2019 Contract at 3.

### B. The 2019 Contract

**\*2**  Hoping to access higher wages and better working conditions in the United States, Vidal contacted ACS in 2019 and signed a contract ("the 2019 Contract") on May 7, 2019. Vidal Decl. ¶¶ 11–12. Vidal did not have an opportunity to negotiate this form contract. *Id.* ¶¶ 12–13. The 2019 Contract provided for certain penalties if Vidal were to leave his employment before his three-year term expired. The contract included a liquidated damages clause stating that "the sum of $20,000.00 USD represents a reasonable and legitimate attempt by the Employer to calculate the costs incurred on the Employee's behalf and the amount of damages to which the Employer would be entitled to receive in a legal action brought against the Employee for breach of contract." 2019 Contract at 4. Attached to the contract was a promissory note in the amount of $20,000 evincing Vidal's promise to fulfill his employment term of three years or else be liable for the amount of the note. 2019 Contract at 6. The liquidated damages clause further stated: If you breach your contract you will be subject to litigation," explaining that

> The Employer may enforce the liquidated damages provisions contained above of this Employment Agreement through any or all of the following: Enforcing the terms and conditions of the attached promissory note; To the extent of allowable [sic] under New York State, Federal Immigration and Labor Department laws and regulations, the Employer at its discretion may deduct any amounts from the Employee's last Pay check(s).

2019 Contract at 4. This same paragraph also provided that ACS could "enforce the liquidated damages provisions contained above of this Employment Agreement by legal action of any type." *Id.* The 2019 Contract also contained an arbitration provision. *See id.*

Once Vidal signed the 2019 Contract, ACS began the process of securing him his immigrant visa and fulfilling the other administrative requirements for placement. Def.'s Mem. in Opp'n to Prelim. Inj. ("Def.'s Opp'n") at 4, ECF No. 29. This process took several years. Vidal Decl. ¶¶ 14–16. During this time, Vidal was bound by the exclusivity provision of the 2019 Contract. As a result, he was unable to seek or accept any other employment in the United States. Pl.'s Mem. in Supp. of Mot. Prelim. Inj. ("Pl.'s Mem.") at 3–4, ECF No. 23-1; 2019 Contract at 2. Still seeking better pay and working conditions, Vidal left the Philippines for the United Kingdom, working at a hospital in London while he waited for his visa to be approved. Vidal Decl. ¶¶ 17–18. While working in London, Vidal could barely afford basic living expenses, and any additional money he made he sent home to support his family. *Id.* ¶¶ 18–19. In late 2021, Vidal learned that his visa paperwork had finally been approved, *see id.* ¶ 20, meaning that all that remained in his application process before he would be cleared to work for ACS in the United States

was his interview with the U.S. Embassy. *See* Compl. ¶ 32; Luy Decl. Ex. B1, ECF 30-2. Once he received this news, Vidal quit his job in London, anticipating he would be moving to the United States imminently. Vidal Decl. ¶ 20; *see* Compl. ¶ 35.

### C. The 2022 Contract

On January 4, 2022—two years and eight months after he signed his exclusive contract with ACS—Vidal received a communication from ACS with several significant pieces of information. ACS informed Vidal that he had been scheduled for an interview with the U.S. Embassy in connection with his visa application and sent Vidal an email with materials to assist him in preparing that interview. Luy Decl. Ex. B1. Attached to this email were a cover letter; a letter from ACS releasing the promissory note Vidal had signed in 2019; and an amended employment contract for him to review and sign ("the 2022 Contract"). *Id.*

The cover letter stated that this new contract "was developed after consulting industry best practices and feedback from our team members." Luy Decl. Ex. B2, ECF No. 30-3. The letter explained that the differences between the 2019 Contract and the 2022 Contract included "greater clarity," and highlighted, among the changes, the following:

> **\*3  No "Liquidated Damages" or Promissory Note.** The older version specified a sum of money to
> be paid in the event of a breach and included a promissory note. We received feedback that this was
> viewed as a "buy out," which was never our intention.... This new version eliminates a specified sum of
> damages and allows for recovery of whatever damages are proven (which might be higher or lower than
> the amount specified in the older version). Attached to this letter is a separate letter waiving/cancelling
> any promissory note that you might have signed.

*Id.* The cover letter further stated: "If you have any questions before signing, please contact me as soon as possible," via provided contact information, or "[i]f you have no questions, please returned a signed copy of the new Employment Agreement ... via email." *Id.*

Also attached to the email was a short letter stating in its entirety: "[ACS] hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to [ACS], dated May 8, 2019." Luy Decl. Ex. B3, ECF No. 30-4. This letter provided Vidal with no explanation as to whether that cancelation had any impact on either party's lights or obligations under the 2019 Contract that he had signed in conjunction with the note. *See id.*

Like the 2019 Contract, the 2022 Contract provided that ACS would pay Vidal in accordance with prevailing wage requirements and would cover Vidal's relocation expenses, specifying one-way airfare, a rent subsidy for two months, $400 in gift cards for groceries, and one monthly MTA card, as well as licensing and immigration expenses. Seligman Decl. Ex. 4 ("2022 Contract") at 4, ECF No. 23-6. [3]

However, the 2022 Contract deviated in several significant ways from the 2019 Contract. First, the 2022 Contract eliminated the liquidated damages clause and substituted a provision outlining the damages ACS would suffer if Vidal left his employment before the end of the term. The provision first noted that ACS would be harmed to the extent that it fronted "expenses and costs" related to immigration and relocation expenses. 2022 Contract at 7. The clause further stated: "In addition, Employee recognizes that Employer will suffer significant loss of profits ... in the event Employee fails to fulfill Employee's obligations under this Agreement," and provided that, in the event Vidal resigned before the contract term expired, "Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement." 2022 Contract at 7. The contract also contained a statement that it superseded the previous agreement, as well as a severability clause. 2022 Contract at 8.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 198 of 231 PageID #:  1004
Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

The 2022 Contract contained an expanded arbitration agreement, set forth in a separate Schedule B, which provided:

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds.

> **\*4**  **\*\*\***

> I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision. I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

> \*\*\*

> I agree that at the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator.

> \*\*\*

> I agree that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or "blue pencil" such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.

2022 Contract at 12–13. In this proceeding, Vidal refers to the clause providing that the prevailing party in the arbitration is entitled to recover all fees and costs from the non-prevailing party as the "loser pays" provision. Pl.'s Mem. at 4.

Vidal considered himself bound by the terms of the 2019 Contract when he was presented with the 2022 Contract; he believed that if he did not sign the 2022 Contract, he would be in breach of the 2019 Contract he had already signed. Vidal Decl. ¶ 25. Vidal was never informed whether he could have opted to refuse to sign the 2022 Contract and choose, instead, to continue to work for ACS under the terms of the 2019 Contract.

At oral argument before me on February 21, 2023, I asked counsel for ACS whether, at the time he was presented with the 2022 Contract, Vidal could have declined to sign the 2022 Contract without forfeiting his long-awaited opportunity to pursue employment through ACS in the United States. That is, could Vidal have held ACS to its contractual agreement to sponsor his visa application and secure him employment in the United States under the terms of the 2019 Contract, and would ACS have been bound by that contract's original terms had he chosen to do so? Counsel for ACS answered both questions in the affirmative. Thus, in January 2022, Vidal could have chosen to avail himself of all of the benefits of the 2019 Contract, but with one significant change. In the event of an alleged breach on Vidal's part, ACS would no longer be able to seek to collect on the $20,000 promissory note against him, since ACS had unilaterally cancelled the note in January 2022. On the present record, however, it is undisputed that no one from ACS informed Vidal of this option at the time he was presented with the 2022 Contract for his signature.

Vidal did speak with an ACS staff member when he received the proposed new contract, who told him that he "should sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7, ECF No. 35-1. Accordingly, Vidal signed the 2022 Contract the same day he received it—January 4, 2022. 2022 Contract at 9.

### D. Vidal's work in the United States

**\*5**  Vidal came to the United States and began working at ACS's client facility, Downtown Brooklyn Nursing & Rehabilitation Center, on March 8, 2022. Vidal Del. ¶ 26; Compl. ¶ 44. Almost immediately, Vidal contends, he began to work under conditions that he believed were unsafe. Vidal Decl. ¶ 27. Although ACS had previously told him he would be responsible for twenty to thirty patients, Vidal bore a caseload of forty to fifty patients at a time. *Id.* ¶ 26. Vidal experienced patients buzzing his call button repeatedly because they needed urgent help, but he was unable to reach them in time. *Id.* ¶ 28. He regularly heard patients screaming out in pain. *Id.* Vidal was provided with insufficient breaks and suffered repeated illnesses during this time. *Id.* ¶¶ 29–30. Given the number of patients for whom Vidal was responsible—and the conditions under which he was working—Vidal grew increasingly "terrified" that he could not provide his patients with adequate care and was "putting [his] personal health, the health of [his] patients, and [his] professional license at risk." *Id.* ¶¶ 33–34.

Ultimately, three months after he began working for ACS, Vidal wrote to ACS to resign on June 15, 2022. Vidal Decl. ¶ 35; Luy Decl. Ex. G at 2, ECF No. 30-13. [4]

Subsequently, ACS wrote to Vidal on June 22, 2022, in response to his resignation. Asaad Decl. Ex. 1, ECF No. 31-1. In this letter, ACS wrote:

> Although [ACS]'s damages would ultimately be determined by an arbitrator pursuant to the Agreement, [ACS] will present evidence demonstrating that *its damages are at least $20,000 (not counting attorney's fees and costs that would be incurred in the arbitration).* As mentioned already, [ACS] would seek the thousands of dollars of lost investment made in helping you get to this point. Also, although [ACS] is seeking to reduce its losses by seeking a replacement, given the current market conditions, recruiting and hiring a replacement nurse(s) *is expected to cost over $9,000 dollars per year* over the remainder of your three-year term.

*Id.* at 1–2 (emphasis added). Although he feared the financial consequences of leaving his position with ACS, Vidal ultimately followed through with his resignation out of concerns that he would lose his license—his sole tool to obtain sufficient income to support himself and his family—if he remained. Vidal Decl. ¶¶ 54, 56.

### E. Arbitration proceedings and the instant litigation

On July 8, 2022, ACS initiated arbitration proceedings against Vidal with the American Arbitration Association ("AAA"). ACS alleged that Vidal had breached his contract and demanded "all available damages" including ACS's "costs and lost profits," "reasonable attorney's fees," and the "cost of arbitration." Seligman Decl. Ex. 6 at 6, ECF No. 23-8.

Proceeding without counsel in the arbitration proceedings, Vidal requested extensions to respond to the demand throughout the summer. *See* Asaad Decl. Ex. 5, ECF No. 31-5; Ex. 6, ECF No. 31-6. [5] AAA informed Vidal an arbitrator was selected on September 7, 2022. Seligman Decl. Ex. 11, ECF No. 23-13. This arbitrator's rate was $450 per hour, *id.*, and AAA charged a filing fee of $1,900 and a case management fee of $750. Compl. ¶ 76.

**\*6**  Vidal filed the instant action in the Eastern District of New York on September 16, 2022. He asserted that the arbitration was invalid under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589; New York's prohibition on labor trafficking,

Case 1:23-cv-00203-MAC Document 13-1 Filed 10/10/23 Page 200 of 231 PageID #: 1006
Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

N.Y. Pen. Law § 135.35; and federal and state minimum wage laws. He further alleged that the contractual provisions mandating arbitration were unconscionable under New York law. Vidal sought declaratory and injunctive relief enjoining the arbitration.

After filing the complaint in this Court, Vidal continued to request that the arbitration be paused while a court considered his challenge to its terms. Seligman Decl. Ex. 12, ECF No. 23-14; Ex. 13, ECF No. 23-15. ACS opposed these requests. *See* Seligman Decl. Ex. 14, ECF No. 23-16.

Vidal also submitted arguments to the arbitrator that the purported delegation clause was invalid. Seligman Decl. Ex. 15, ECF No. 23-17; Ex. 16, ECF No. 23-18. On October 24, 2022, the arbitrator issued an order stating, "Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim." Asaad Decl. Ex 11, ECF No. 31-11. The Arbitrator also noted that many of Vidal's arguments "are premature and do not support the issuance of a stay," and that he would "have the opportunity during the course of arbitration to argue that the contract at issue is unenforceable." *Id.* Vidal continued to seek stays from the arbitrator, but instead she set a schedule for discovery on the merits, originally set to be completed in mid-March. Seligman Decl. Ex. 19, ECF No. 23-21. The arbitrator later agreed on January 23, 2023, to extend discovery deadlines by 30 days, but stated that she would only stay the matter "upon party agreement or by court order." Pl.'s Letter dated Jan. 23, 2023, ECF No. 24. ACS would not consent to a stay. *See id.*; Def.'s Mot. for Extension, ECF No. 25.

This case was originally assigned to the Hon. Carol Bagley Anion. ACS filed a letter seeking a pre-motion conference on anticipated motions to dismiss Vidal's complaint and compel arbitration on October 20, 2022. Def.'s Mot. for Pre-Mot. Conf., ECF No. 11. Vidal opposed this request on October 27, 2022. Pl.'s Resp. to Def.'s Mot. for Pre-Mot. Conf., ECF No. 13. This case was transferred to me as a routine matter of court administration while ACS's request was pending.

On January 23, 2023, Plaintiff filed a motion for a preliminary injunction seeking to enjoin the ongoing arbitration. Following expedited briefing and oral argument, I entered a short written order granting the preliminary injunction on February 24, 2023. Mem. & Order, ECF No. 39. This written opinion follows to more fully explain the reasons why Vidal is entitled to preliminary injunctive relief.

## II. Discussion

"[A] party seeking a preliminary injunction [must] show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted). [6] Where a district court applies the "serious questions" standard to grant an injunction, the requirement that the balance of hardships tip decidedly in favor of the moving party is an "additional[ ]" requirement that ensures that the movant's "overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts.*, 598 F.3d at 35. Additionally, courts also consider whether "the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

**\*7** District courts have jurisdiction to enjoin or stay pending arbitrations. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 139–41 (2d Cir. 2011); *CRT Cap. Grp. v. SLS Cap., S.A.*, 63 F. Supp. 3d 367, 375 (S.D.N.Y. 2014) ("The [Second Circuit] Court of Appeals has made it clear that federal courts do have the power to enjoin domestic arbitrations...."); *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) ("Federal courts generally have remedial power to stay arbitration." (citation omitted)).

### A. Likelihood of success on the merits

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). However, this policy seeks to make "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, n. 12 (1967). "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022) (citing *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218–221 (1985)).

Generally speaking, when addressing whether a dispute is properly subject to arbitration, courts first consider "whether the parties have entered into a valid agreement to arbitrate," and then "whether the dispute at issue is subject to the arbitration agreement" *In re Am. Exp. Fin. Advisors Sec. Litig.,* 672 F.3d at 128. This second inquiry is often referred to as "arbitrability" and encompasses "threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable." *Doctor's Assocs., Inc. v. Alemayehu,* 934 F.3d 245, 251 (2d Cir. 2019).

However, "before addressing the second inquiry, [a court] must also determine *who*, the court or the arbitrator, [should] decide[ ]" such threshold questions of arbitrability. *In re Am. Exp. Fin. Advisors Sec. Litig.,* 672 F.3d at 128 (emphasis added); *Alemayehu,* 934 F.3d at 250. "In general, what is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement. Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek,* 919 F.3d 184, 189–90 (2d Cir. 2019).

Issues of arbitrability are at the core of the parties' dispute here. Vidal claims this dispute is not properly subject to arbitration because the arbitration agreement is unenforceable: he argues it is unconscionable under New York state contract law, and it violates federal statutes that protect the rights of workers like him to be free from forced labor. [7] He argues that a court, rather than the arbitrator, should resolve these legal challenges because the parties did not properly and validly delegate issues of arbitrability to the arbitrator. For its part, ACS contends that the arbitration agreement is enforceable and, in any event, contains a valid delegation clause that properly delegates any legal challenges regarding enforceability to the arbitrator.

**\*8** Therefore, the threshold question here is whether the purported delegation clause in the 2022 Contract allows this Court to consider Vidal's challenge to the contract's enforceability at all, or whether all disputes about the enforceability of the agreement's terms must go to the arbitrator in the first instance. This question directly informs the relief Vidal seeks at the preliminary injunction stage. If the delegation clause is valid, then the preliminary injunction should be denied and the arbitration should proceed, because Vidal's arguments on enforceability must go to the arbitrator. But if the delegation clause either (a) does not clearly and unmistakably reserve those questions for the arbitrator, or (b) is otherwise invalid, then a district court may (if plaintiff meets his burden under the preliminary injunction standard) proceed to grant Vidal's request for a preliminary injunction. The injunction Vidal requests would have the effect of pausing the arbitration while a court decides these issues of arbitrability—specifically whether the arbitration agreement violates state or federal law.

Vidal argues that the purported delegation language is not a sufficiently "clear and unmistakable" delegation clause to permit these questions to be resolved by the arbitrator under Supreme Court and Second Circuit precedent. He further argues that, even if it were, the delegation clause is nonetheless invalid because (a) it violates the TVPA and (b) is unconscionable under New York state law. For the following reasons, I find that Vidal is likely to succeed on the merits—or, at the very least, raises serious questions as to the merits—of each these claims.

### 1. The contract's delegation language

Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

The parties dispute whether the arbitration agreement properly delegates questions of arbitrability to the arbitrator. It is well-settled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (*quoting AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). Importantly, this test reflects a marked departure from the "presumption of arbitrability" that applies to courts' analysis of "whether a given dispute falls within the scope of the arbitration agreement." *DDK*, 6 F.4th at 317. Instead, when parties raise the question of "who should decide arbitrability, there is a presumption that the question should be resolved by the court." *Id.*; *see First Options of Chi.*, 514 U.S. at 944–45.

Accordingly, while courts generally resolve ambiguities in arbitration agreements in favor of arbitration, they resolve ambiguities as to the *delegation of arbitrability* in favor of court adjudication. *See First Options of Chi.*, 514 U.S. at 944–45 ("[C]ourts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability point' as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."); *DDK*, 6 F.4th at 317 ("This 'clear and unmistakable evidence' requirement reflects a departure from the manner in which we treat silence or ambiguity when interpreting whether a particular merits-related dispute falls within the scope of an arbitration agreement."); *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (finding that the presence of certain clauses "creates an ambiguity which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator").

The "clear and unmistakable" requirement exists in recognition that, generally, "persons involved in a dispute are ordinarily entitled to have access to a court for the resolution of [their] dispute, [and i]t is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender [this] right." *Bucsek*, 919 F.3d at 190. Accordingly, the clear and unmistakable requirement

> is designed to guard against 'the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.' Were the courts to cede to arbitrators resolution of the arbitrability of the dispute (absent the clear and unmistakable agreement of the parties to that effect), this would incur an unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented.

**\*9** *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

I find that the arbitration agreement here contains significant ambiguity such that its purported delegation language cannot be considered clear and unmistakable. In arguing otherwise, ACS points to (1) language in the arbitration agreement that "any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination *or validity* hereof) shall be resolved by arbitration," and (2) the agreement's incorporation of the AAA Commercial Rules. 2022 Contract at 12.

But these two provisions must be read in context. And taken as a whole, the agreement contains significant ambiguity regarding whether the parties intended that result. On the very next page, the agreement provides that "in the event that *any court of competent jurisdiction* shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion *so as to render it enforceable* while maintaining the parties' original intent to the maximum extent possible." 2022 Contract at 13 (emphasis added). Rather than "clearly and unmistakably" delegating the question of arbitrability to the arbitrator, *DDK*, 6 F.4th at 317, Schedule B not only repeatedly contemplates that "a court" might someday rule upon, *inter alia,* "any portion" of the contract's "scope" and "enforce[ability]," but does so without referencing any role for the arbitrator in this determination.

At oral argument, counsel for ACS contended that this provision was a "savings clause" that would allow courts to modify the agreement in the event that Congress declared that a particular type of case or legal claim could not be arbitrated. ACS pointed, by way of example, to a law passed by Congress in 2021 that precludes defendants from compelling plaintiffs to arbitrate sexual harassment or sexual assault claims even if their contracts so provide. *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117–90, 136 Stat. 26 (codified at 9 U.S.C. §§ 401, 402) (establishing that, where

2023 WL 2783251

a plaintiff "alleg[es] conduct constituting a sexual harassment dispute or sexual assault dispute" he or she may elect to render a "predispute arbitration agreement" invalid or unenforceable). Perhaps that is what ACS intended the clause to mean—but that is not what the clause says. Instead, the clause expressly contemplates that "a court of competent jurisdiction" may review this particular contract between ACS and Vidal and determine whether its provisions are "enforceable," without any limitation or caveats as to what that enforceability review may encompass. 2022 Contract at 13.

ACS has failed to point to any other case where a court has found an arbitration agreement to contain a clear and unmistakable delegation clause notwithstanding specific contractual language—as is present here—contemplating judicial resolution of enforceability issues. At least one federal district court has held that a provision anticipating a court *or an arbitrator* may declare any provision to be void or unenforceable does not render an otherwise clear and unmistakable clause ambiguous. *See Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 607 (S.D.N.Y. 2020). However, a clause that contemplates either a court or an arbitrator's intervention is distinct from the provision here, which refers *only* to "a court of competent jurisdiction." 2022 Contract at 13. A provision referring to "a court or an arbitrator" is not inconsistent with the purported delegation clause because it still contemplates an arbitrator's ability to rule on enforceability. But a provision referring only to "a court" injects significant ambiguity into the question of whether the contract actually authorizes an arbitrator *alone* to address arbitrability. From the perspective of someone signing the contract, the latter provision might certainly indicate that a court—and, perhaps, *only* a court—could determine whether the agreement was enforceable. And here, the provision twice contemplates judicial intervention: not only does it expressly state that a court may rule on the question of enforceability, but also that a court may actively preside over modification (*i.e.*, "blue-penciling") of this specific contract to ensure that its provisions are legal and enforceable. 2022 Contract at 13.

 **\*10**  Indeed, courts have recognized that provisions similar to the "savings clause" at issue here are enough to negate even an otherwise clear and unambiguous delegation clause. *See, e.g., Vargas v. Delivery Outsourcing, LLC*, No. 15-CV-03408-JST, 2016 WL 946112, at *6 (N.D. Cal. Mar. 14, 2016) (declining to enforce "an unambiguous delegation clause contradicted by another provision of the contract" that "indicates that the *court* might also find provisions in the contract unenforceable," as "not clear and unmistakable" (citations omitted)); *Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*, No. 15-CV-04718-WHO, 2016 WL 1365946, at *7 (N.D. Cal. Apr. 6, 2016) (noting that "[v]iewed holistically" the arbitration agreement was ambiguous even if one provision "[v]iewed in a vacuum" might constitute clear and unmistakable delegation where another provision allowed the "Agreement [to] be declared invalid or unenforceable by a court of competent jurisdiction"); *cf. Peni v. Daily Harvest, Inc.*, No. 22CV5443 (DLC), 2022 WL 16849451, at *7 (S.D.N.Y. Nov. 10, 2022) ("Nowhere does this provision empower a *court* to rule on the validity or enforceability of the agreement.").

ACS further argues that the test articulated by the Second Circuit in *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308 (2d Cir. 2021), applies here, and that under that framework the arbitration agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator, In *DDK*, the Second Circuit held that an "arbitration agreement [that] is broad and expresses the intent to arbitrate all aspects of all disputes ... coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability[,] constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." 6 F.4th at 318–19. The *DDK* Court concluded that the incorporation of the AAA Commercial Rules satisfies this second requirement. *Id.*

As an initial matter, the dispute in *DDK* was over a contract between two sophisticated commercial parties that were involved in a long-running business venture that ultimately dissolved. *See DDK*, 6 F.4th at 312–14. While one district court in this Circuit has applied this case to an unsophisticated individual party, "the Second Circuit has not addressed whether the import of rule incorporation differs based on the parties' sophistication." *Daily Harvest*, 2022 WL 16849451, at *7 (applying *DDK* to a form contract in a consumer rights case). Sophisticated commercial actors may be aware, following *DDK*, that the incorporation of the AAA Commercial Rules signals the existence of a delegation clause. But it is highly unlikely that a foreign nurse unfamiliar with United States law, let alone caselaw surrounding the interpretation of arbitration agreements, would see a reference to the AAA Commercial Rules in the contract and reach that same conclusion, *i.e.,* understand that such incorporation would in any way reflect an actual "intent to delegate the question of arbitrability to the arbitrator." *DDK,* 6 F.4th at 318. Indeed, even if Vidal

had followed the link in the 2022 Contract and reviewed the AAA Commercial rules, he still may not be aware of or understand that those rules might impact who would someday decide any challenges to arbitrability. [8]

**\*11**   Even assuming *DDK* required a court to consider the delegation language here to constitute a clear and unmistakable delegation clause, regardless of the parties' status, important factual distinctions remain. *DDK* says nothing about whether an arbitration agreement with a broad arbitration provision and that incorporates the AAA Commercial Rules would still clearly and unmistakably delegate arbitrability to the arbitrator *even if it* also had language explicitly providing for judicial intervention on issues of enforceability. Certainly, *DDK* does not disturb the longstanding rule that, if contracts are to delegate issues of arbitrability to an arbitrator, they must do so "clearly and unmistakably"—in fact, *DDK* restates and relies on that very principle. *DDK*, 6 F.4th at 317 (quoting *First Options of Chi.*, 514 U.S. at 944 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986))).

Accordingly, I find that Vidal is likely to succeed on the merits of his claim that the contract does not clearly and unmistakably delegate issues of arbitrability to the arbitrator, or, at the very least, has raised serious questions as to the merits of that claim.

### 2. The validity of the delegation clause

Even if the contract here does, as ACS alleges, contain an unambiguous delegation clause, a federal court may still consider whether the clause itself violates state or federal laws protecting the rights of persons like Vidal. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010); *Gingras v. Think Fin., Inc.*, 922 F. 3d 112, 128 (2d Cir. 2019).

In *Rent-A-Center*, the Supreme Court addressed an employee's challenge to an arbitration agreement that contained a delegation clause. 561 U.S. at 66. There, the employee opposed a motion to compel arbitration, arguing that the arbitration agreement was unconscionable and that the delegation clause was therefore invalid. *Id.* at 73. The Supreme Court emphasized that, in the presence of an otherwise clear and unmistakable delegation clause, a challenge to the contract as a whole must go to the arbitrator—but made clear that *specific* challenges to the *validity* of that delegation clause could be heard by a court. *Id.* at 72 ("Unless Jackson challenged the delegation provision specifically, we must treat it as valid ... Jackson challenged only the validity of a contract as a whole."); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020). Since the employee in *Rent-A-Center* had only challenged the arbitration agreement as a whole, the Supreme Court declined to address the validity of the delegation clause.

Parties can challenge a delegation clause as invalid because a delegation clause is an agreement to arbitrate a gateway issue. *Rent-A-Center*, 561 U.S. at 70. It is therefore "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce," and as such must be independently evaluated under 9 U.S.C. § 2. *Rent-A-Center*, 561 U.S. at 70. Accordingly, the delegation clause "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract.' " *Id.* (quoting 9 U.S.C. § 2).

Since *Rent-A-Center*, courts of appeals have addressed claims where parties to an arbitration agreement have brought challenges to an otherwise "clear and unmistakable" delegation clause, provided those challenges include a specific attack on the validity of the delegation clause. *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (affirming that a "specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court"); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021) ("But '[b]ecause a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator,' the court's initial inquiry focuses on whether the agreement to delegate arbitrability— the delegation clause—*is itself* unconscionable." (emphasis added) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015))).

**\*12**   Here, Vidal repeatedly mounts specific challenges to the validity of the delegation clause under state and federal law, citing the potentially ruinous financial toll of appealing before an arbitrator even to determine questions of arbitrability. Pl.'s Mem.

Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

at 17 ("*[D]elegating questions of arbitrability* to the arbitrator would require Mr. Vidal to submit to an arbitration regarding matters that, by virtue of the 'loser pays' provision, could bury him in extraordinary costs and legal fees."); *id.* at 19 ("These costs —even just those costs flowing from an arbitration over *matters of arbitrability*—amount to a threat of 'serious harm' [under the TVPA].); *id.* at 24 ("Most importantly [for a substantive unconscionability analysis] the requirement includes a loser pays term that provides that the prevailing party 'shall be entitled' to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding *preliminary matters of arbitrability.*"); Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 7, ECF No. 34 ("If Mr. Vidal were required to adjudicate the arbitration provision's *validity and enforceability* in arbitration, he would potentially face tens of thousands of dollars in arbitration costs and Defendant's attorneys' fees."); *id.* at 9–10 ("[S]erious harm exists because of the threat that an arbitration, *even regarding the threshold question of arbitrability*, could force him to bear tens of thousands of dollars in Defendant's attorney's fees and in arbitration costs."). [9]

The fact that Vidal emphasizes the impact of other clauses on the delegation clause in his specific challenge to the validity of the delegation clause does not change the analysis. As the Ninth Circuit explained in *Lim*, such arguments are permissible because the existence of other clauses can be what makes the delegation clause unlawful. *See Lim*, 8 F.4th at 1002–03 (concluding that the delegation clause itself was unconscionable because "[v]iewed collectively ... the cost-splitting, fee-shifting, and ... venue provisions rendered the delegation clause substantively unconscionable," because the "delegation clause was so 'prohibitively costly' that it deprived Lim of any proceeding to vindicate his rights"). In other words, Vidal need not confine his challenge to the terms of the delegation clause *alone* for him to satisfy *Rent-A-Center*'s specific challenge requirement.

Accordingly, *Rent-A-Center* and its subsequent application permit me to proceed to evaluate Vidal's specific attacks on the validity of the delegation clause. In so doing, I conclude that he is likely to succeed on the merits of at least two of his claims that the delegation clause is legally invalid, or, at the very least, has raised sufficiently serious questions as to the merits of these claims to warrant a pause in the arbitration. Likelihood of success on either of these two independent arguments would satisfy Vidal's burden as to this prong of his motion for a preliminary injunction.

### a. Trafficking Victims Protection Act ("TVPA")

As an antecedent agreement to arbitrate, a delegation clause is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Rent-A-Center*, 561 U.S. at 69. Under New York law, courts will not enforce contracts that are "illegal, against public policy, or deficient in some other respect." *64th Assocs., L.L.C. v. Manhattan Eye, Ear & Throat Hosp.*, 813 N.E.2d 887, 889 (N.Y. 2004).

**\*13** Vidal argues that the delegation clause, in conjunction with the "lost profits" and "loser pays" provisions of the contract, violates the Trafficking Victims Protection Act ("TVPA"). In the TVPA, Congress made it unlawful to "knowingly provide[ ] or obtain[ ] the labor or services of a person ... by means of serious harm or threats of serious harm to that person or another person," or "by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a). "The term 'serious harm' means any harm, whether physical or nonphysical, including" as relevant here, "financial ... harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform *or continue performing labor or services* in order to avoid inclining that harm." *Id.* § 1589(c)(2) (emphasis supplied). [10]

Prior to the TVPA's enactment, a plaintiff who claimed to have been subjected to "involuntary servitude" was required to show that he or she was being forced to work "by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *United States v. Kozminski*, 487 U.S. 931, 952 (1988); *see Paguirigan v. Prompt Nursing Emp. Agency LLC* ("*Paguirigan I*"), 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017) (collecting cases). Following the Supreme Court's decision in *Kozminski*, Congress passed the TVPA, which "expanded the scope of cases that could be prosecuted to include those involving non-violent coercion," *Paguirigan I*, 286 F. Supp. 3d at 437, including

"physiological, financial, or reputational" harm. 18 U.S.C. § 1589(a); *see also* H.R. Conf. Rep. No. 106–939, at 101 (Oct. 5, 2000) ("[P]rosecutors will not have to demonstrate physical harm or threats of force against victims [under § 1589(a).]"). [11]

The TVPA's purpose is thus to "combat severe forms of worker exploitation that do not amount to actual involuntary servitude." *Paguirigan v. Prompt Nursing Emp. Agency LLC* ("*Paguirigan II*"), No. 17-CV-1302 (NG) (JO), 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24, 2019) (internal quotation marks and citation omitted), *aff'd in part, appeal dismissed in part,* 827 F. App'x 116 (2d Cir. 2020). As its plain terms indicate, one objective of the TVPA is to ensure that workers will not be coerced into remaining in their jobs because they reasonably fear a threat of serious harm—including "financial" harm—if they leave.

Accordingly, "the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Paguirigan II*, 2019 WL 4647648, at *16 (internal quotation marks and citation omitted); *see Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 433 (E.D.N.Y. 2013) ("Serious harm includes threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or continue providing labor or services." (internal quotation marks and citation omitted)). This "standard is a hybrid one. The factfinder is permitted to consider the 'particular vulnerabilities of a person in the victim's position,' but is required to find that 'her acquiescence be objectively reasonable under the circumstances.' " *Paguirigan II*, 2019 WL 4647648, at *16 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)); *see also Baldia v. RN Express Staffing Registry LLC*, 19 Civ. 11268 (PGG), 2022 WL 477836, at *6 (S.D.N.Y. Oct. 3, 2022).

**\*14**  Courts around the country, including many in this Circuit, have held that contracts such as this—in which immigrant workers are threatened with severe financial penalties if they leave their employment before the end of their contract term—can violate the TVPA. *See Paguirigan II*, 2019 WL 4647648, at *18 (holding that liquidated damages provision of $25,000 violated the TVPA), *Magtoles v. United Staffing Registry*, 21-CV-1850 (KAM) (PL), 2021 WL 6197063, at *4 (E.D.N.Y. Dec. 30, 2021) (denying motion to dismiss claim that liquidated damages provisions between $90,000 and $30,000 violated the TVPA), [12] *Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (same for a $15,000 confession of judgment), *Baldia*, 2022 WL 4777836, at *7 (same, for a $33,320 liquidated damages provision); *see also Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) (same, for a $20,000 liquidated damages provision); *cf. United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (holding that an employer's threat that a foreign domestic worker would owe $8,000 if she left her employment constituted a threat of "serious harm" under the TVPA).

These decisions have not set a numerical floor for what financial penalty can give rise to serious harm; the focus is instead on the effect that these financial penalties may have on a worker deciding whether or not to leave his or her job. *See Baldia*, 2022 WL 4777836, at *7 ("When assessing serious harm under the TVPA, it is not the amount of liquidated damages, *per se*, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances...." (quoting *Magtoles*, 2021 WL 6197063, at *4)).

ACS asserts the foregoing cases are distinguishable because they addressed liquidated damages clauses—which ACS no longer includes in their contracts, and which it specifically omitted from its superseding contract with Vidal in 2022. It is true that, under the 2022 Contract, Vidal was subject to an uncapped damages provision, rather than a liquidated damages provision, stating that ACS may recover both expenses and lost profits. 2022 Contract at 7. The 2022 Contract also contained (1) an attorneys' fee-shifting provision, and (2) a requirement that he pay arbitration costs and arbitrator's fees—all of which would come due if he were to leave his ACS employment and ACS were to prevail in arbitration. 2022 Contract at 6–7, 12. However, the fact that these provisions were uncapped does not make the potential penalties any less coercive than the liquidated damages provisions at issue in the foregoing cases. The relevant analysis is whether a reasonable person in Vidal's position would have found all of ACS's threatened financial penalties serious enough to compel him or her into remaining on the job, even in the face of unsafe or intolerable working conditions. *Paguirigan II*, 2019 WL 4647648, at *16; *Rivera*, 799 F.3d at 186.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 207 of 231 PageID #:  1013
Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

Any reasonable person in Vidal's position and of similar financial circumstances would reasonably believe that these enormous potential damages, fees, and costs—even if not labeled with a specific dollar amount in the contract—would be seriously harmful. The contract specified that, if Vidal stopped working for ACS before his employment term concluded, he could be liable for ACS's lost profits for the duration of the contract term; expenses ACS expended in his relocation, licensing, and visa acquisition; arbitration costs and fees; and attorneys' fees expended in arbitration. *See* 2022 Contract at 7, 12. It is not difficult to see why any nurse in Vidal's position would reasonably believe that this provision could easily lead to an enormous judgment against him. Although ultimately an arbitrator would decide the precise amount of damages (as distinct from the ordering enforcement of a pre-set liquidated damages clause), the impact on Vidal at the moment he faced the decision of whether to leave his position with ACS was the same: he faced the threat of incurring a judgment well in excess of anything he could afford to pay. And, in any event, one need not speculate about what Vidal anticipated the liability would be based on the contract alone. ACS expressly told him in a demand letter that it would immediately initiate an arbitration where he would face "*at least* $20,000 in damages, in addition to attorney's fees." Asaad Decl. Ex. 1 (emphasis in original). Thus, from ACS's own letter, Vidal faced a clear threat of incurring (1) "at least" $20,000 in damages, *as well as* (2) what any person with even basic familiarity with the American legal system would have realized might quickly add up to thousands (if not tens of thousands) of dollars in ACS's attorneys' fees.

**\*15**  ACS makes much of the "additional factors" at play in *Paguirigan* beyond the $25,000 liquidated damages clause in the contract. But the court's conclusion of whether the liquidated damages clause violated the TVPA turned on factors similar to those present here: the nurse there was "threatened with the prospect of paying a $25,000 contract termination fee" and was "actually *sued* for recovery both of the $25,000 fee and $250,000 in tort damages." *Paguirigan I*, 286 F. Supp. 3d at 438 (emphasis in original). The court reasoned that "[a]llegations of such a severe financial burden" as a $25,000 liquidated damages clause combined with a threat to enforce it were "more than enough to rise to the level of harm necessary to state a TVPA claim." *Id.*; *see also Paguirigan II*, 2019 WL 4647648, at *18 ("This [$25,000 liquidated damages] provision constitutes a threat of sufficiently serious harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." (internal quotation marks and citation omitted)). In so concluding, the court there cited to other cases where threats of enforcement of a $15,000 confession of judgment or to collect a payment of $10,000, standing alone, constituted serious harm under the TVPA. *Id.* (citing *Javier*, 2014 WL 3058456, at *6, and *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011)). Here, as in *Paguirigan*, ACS made good on its threats to collect a significant amount of money from Vidal: it promptly initiated an arbitration against him for that very purpose. Furthermore, in *Paguirigan*, the court did not rely on the employer's attempts to have workers criminally prosecuted in its legal analysis of whether the liquidated damages clause constituted a threat of serious financial harm. *Paguirigan I*, 286 F. Supp. 3d at 437–39; *Paguirigan II*, 2019 WL 4647648, at *16–19.

Since *Paguirigan* was decided, courts in this circuit have repeatedly held that liquidated damages clauses can constitute a threat of serious harm on their own terms. In *Baldia*, a worker who was told she would be liable for a liquidated damages provision of over $33,000 sufficiently alleged a threat of serious harm under the TVPA. 2022 WL 4777836, at *9. And in *Magtoles*, the court emphasized that the specified liquidated damages amount can rise to a level of serious harm considering the surrounding circumstances, including the employee's pay rate and the enforceability of the contractual term. 2021 WL 6197063, at *4.

Whether the amount is fixed or projected, employers' threats to collect tens of thousands of dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibitions on forced labor. Under either circumstance, the question is whether the employer's conduct would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring" serious financial harm. 18 U.S.C. § 1589(c) (2); *Paguirigan II*, 2019 WL 4647648, at *16. And in either circumstance, the effect on a worker of limited means who cannot afford the anticipated cost of leaving his job is the same.

Attacking the delegation clause specifically, Vidal argues that even an assessment of costs and fees he may incur contesting issues of arbitrability would have a sufficiently coercive effect on him to constitute a threat of serious harm. The question thus is whether a reasonable person in Vidal's position considering whether to leave his employment would have considered

2023 WL 2783251

himself compelled to continue performing that labor in order to avoid the cost of challenging the arbitration agreement. In other words, would such an employee—even one who believed he had valid arguments that the dispute was not arbitrable or that the agreement was unenforceable—have reasonably concluded that the risk of incurring potentially thousands of dollars in fees and costs just to litigate these threshold questions was too great, such that he felt compelled to remain in that job for the remainder of the contract term?

Here, even if Vidal did not know the precise rate that an attorney or arbitrator charged, any reasonable person in his position (or who did a cursory online search for attorney fee rates) would rightly assume that these rates would likely be hundreds of dollars per hour, and that even 25 hours of attorneys' fees and 10 hours of arbitrator's fees could amount to several thousand dollars. *See* Vidal Decl ¶¶ 38-40 ("I don't know how much money arbitration costs exactly and I don't know how much lawyers cost ... [b]ut based on what I've heard, arbitration and attorney's charges for [ACS] could cost many thousands of dollars. I knew that much right away"). And at the time he was considering leaving his position, Vidal was making about $3,500 per month after taxes, and had at least $2,850 per month in expenses, while working to send as much money home to his father and disabled brother as possible. Vidal Decl. ¶¶ 48–52. Even the arbitration initiation fees totaling over $2,000 were beyond Vidal's means. *See id.* ¶ 44; Compl. ¶ 76.

**\*16**  Given his financial circumstances and the contract's term, Vidal is likely to succeed on the merits of his claim that the threat of uncapped arbitration costs and attorneys' fees associated with adjudicating even threshold issues of arbitrability constitute threats of "serious harm" in violation of the TVPA. At the very least, given the highly analogous caselaw invalidating liquidated damages clauses in high-dollar amounts similar to what Vidal would have faced if he did not prevail in arbitration, he has raised serious questions as to the merits of this argument.

### b. Unconscionability

Vidal also argues that the arbitration agreement—and specifically, the delegation clause contained in that agreement—is unconscionable. Under New York law, as in other states, the "doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998)). [13]  A contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (N.Y. 1988); *see Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010).

A showing of unconscionability requires a demonstration that "a contract is both procedurally and substantially unconscionable." *Ragone*, 595 F.3d at 121 (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)). "In other words, [a] contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Spinelli*, 903 F.3d at 208 (internal quotation marks and citation omitted). Generally, "procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Master Lease Corp. v. Manhattan Limousine, Ltd.*, 580 N.Y.S.2d 952, 954 (N.Y. App. Div. 1992) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983)).

### i. Procedural unconscionability

Vidal is likely to succeed on the merits of his argument that the circumstances surrounding his signing of the 2022 Contract were procedurally unconscionable; at the very least, he has raised serious questions on the merits of that claim. "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice." *Wolowitz*, 468 N.Y.S.2d at 145. "While inequality in bargaining power between employers and employees is not alone sufficient to

hold arbitration agreements unenforceable, such inequality, when coupled with high pressure tactics that coerce an employee's acceptance of onerous terms, may be sufficient to show that an employee lacked a meaningful choice." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citations omitted); *see Brower v. Gateway 2000*, 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) (describing disparity in bargaining power as informed by the "experience and education of the party claiming unconscionability"). As part of this inquiry, "a court should focus on evidence of high pressure or deceptive tactics," in addition to the disparity of bargaining power between the parties. *Brennan*, 198 F. Supp. 2d at 382; *Gillman*, 73 N.Y.2d at 11 ("The focus is on such matters as [*inter alia*] whether deceptive or high-pressured tactics were employed.").

**\*17**  The power disparity between the parties here goes beyond the typical employer-employee relationship. At the moment he signed the 2022 Contract, Vidal was in a particularly vulnerable position. He was living in London, away from home and without a job, having spent over two-and-a-half years waiting for his U.S. visa application to be processed. He had already signed and remained bound by the 2019 Contract, which forbade him from working with any employer in the United States other than ACS. 2019 Contract ¶ 5. And he had quit his job in London in reliance on the 2019 Contract—assuming, once he was notified in December 2021 that his visa interview was scheduled, that he would need to move to the United States and begin his employment light away. Vidal Decl. ¶ 20. Indeed, when he quit his job in London, Vidal had no reason to think that he would be asked to sign a second contract, when he was suddenly presented with the 2022 Contract and told by an ACS representative to "sign quickly." Supp. Vidal Decl. ¶ 7.

In addition to the clear power disparity between the parties here, Vidal identifies many coercive circumstances surrounding his signing of 2022 Contract. Vidal believed when he was presented with the 2022 Contract that he was still bound by the terms of the 2019 Contract—that is, if he walked away from his early contractual agreement to be placed in U.S.-based employment with ACS at that point or refused to sign the 2022 Contract, he would owe $20,000 in liquidated damages. Vidal Decl. ¶ 25; 2019 Contract ¶ 19. Vidal's fear was neither unreasonable nor unfounded. ACS makes much of the fact that its accompanying letter released the promissory note Vidal had previously signed. *See* Def.'s Opp'n at 7, 24. Yet, the 2019 Contract also included other methods outside the promissory note by which ACS could seek to recover the liquidated damages, including by "legal action." 2019 Contract ¶ 19. And no portion of the 2022 Contract nor anything in ACS's written communications advised Vidal that ACS could not and would not seek to collect $20,000 by other means, either immediately if he failed to sign the 2022 Contract or later if he was alleged to violate its terms.

Moreover, ACS employed what I conclude are both "high pressure" and "deceptive" tactics in January 2022 when presenting Vidal with his contract. *See Brennan*, 198 F. Supp. 2d at 382. ACS's letter explaining the changes reflected in the 2022 Contract was misleading at best. ACS told Vidal that the contract was revised because of "feedback" the company had received that the liquidated damages clause—followed by what can charitably be described as a cryptic explanation that ACS was concerned this clause "was viewed as a buy-out, which was not our intent." Luy Decl. Ex. B2. Yet as ACS was no doubt well aware, as of January 2022, a number of courts in this circuit and elsewhere had held that liquidated damages clauses in contracts between staffing agencies and immigrant healthcare workers specifically were unenforceable, because they threatened workers with serious harm in violation of the TVPA. *See, e.g.*, *Paguirigan I*, 286 F. Supp. 3d at 437; *Paguirigan II*, 2019 WL 4647648 (holding in September 2019 that Plaintiffs' TVPA claims survived Defendant's summary judgment motion); *Magtoles*, 2021 WL 6197063, at \*5; *Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at \*7 (S.D. Ohio June 17, 2021) (denying motion to dismiss TVPA claim where a $20,000 liquidated damages clause was at issue); *see also In re Attorney General Investigation*, https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058-fully_executed_9.13.22.pdf (settlement agreement executed in September 2022 in case where immigrant nurses had been subject to liquidated damages clause in amounts between $10,000 and $20,000 that was challenged as a violation of TVPA, and in which employer agreed to pay financial restitution to impacted nurses); *cf. Javier*, 2014 WL 3058456 (denying a motion to dismiss complaint in 2014 that threats to enforce a $15,000 confession of judgment against an immigrant physical therapist violated the TVPA).

**\*18**  To be sure, ACS was not under any obligation to provide Vidal a legal opinion as to the all-but-certain unenforceability of the liquidated damages clause in the 2019 Contract he had already signed. But ACS's affirmative statement that it revised

this clause due to "feedback" was highly misleading, and, in conjunction with the other circumstances, adds to the likelihood that Vidal will succeed on the procedural prong of the unconscionability analysis.

In addition, ACS now concedes that in January 2022, its decision to present Vidal with a revised contract did not automatically render the 2019 Contract invalid. It acknowledges that Vidal could have chosen to hold ACS to its end of the bargain the parties made in 2019 and come to work in the United States under the terms of the 2019 Contract. Had he done so, of course, those terms would have tilted significantly in Vidal's favor, since if he left his position before the end of the contract term, ACS would no longer have had the ability to collect on the $20,000 promissory note that Vidal signed in 2019 (as ACS had already cancelled that note). But no one at ACS informed Vidal that he had the option to work in the United States under the 2019 contract when they presented him with a revised contract to "quickly" sign.

Finally, ACS makes much of the fact that Vidal was invited to ask questions about the new contract, but that he instead signed the contract that same day. Def.'s Opp'n at 19–20. However, Vidal notes (in a statement that, at this time, is undisputed by ACS) that he did call an ACS representative when he received the 2022 Contract and was told to "sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7. Indeed, in the record provided by ACS, the company advised Vidal should "let us know too should you have any questions or clarification," in its original email attaching the 2022 Contract, Luy Decl. Ex. B1, and followed up with him to invite him to ask further questions *after* he had signed the contract. Luy Decl. Ex. E, ECF No. 30-11. ACS may dispute these circumstances or plead additional facts at a later stage in this litigation. But on the present record, these circumstances taken together demonstrate that Vidal lacked meaningful choice when presented with the 2022 Contract. *Wolowitz*, 468 N.Y.S.2d at 145.

Vidal is likely to succeed on the merits of his claim that the circumstances surrounding the execution of the 2022 Contract were procedurally unconscionable, satisfying the first prong of the unconscionability analysis. At the very least, he has raised serious questions as to the merits of that claim that warrant a pause in arbitration while the merits are fully litigated.

### ii. Substantive Unconscionability

The substantive unconscionability analysis looks to the terms of the contract itself to analyze "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12. "Unconscionability is determined by reference to the relative benefit of the bargain to the parties *at the time of its making.*" *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d Cir. 1996) (emphasis in original) (quoting *United States v. Bedford Assocs.*, 657 F.2d 1300, 1312–13 (2d Cir. 1981)).

Here, the agreement shifts costs of arbitration, the arbitrator's fees, and attorneys' fees to Vidal if ACS prevails at arbitration, 2022 Contract at 12, in what courts have referred to as a "loser pays" provision. Vidal argues that this provision is unconscionable, and that, specifically, the delegation clause is unconscionable when paired with the "loser pays" provision. This is because, Vidal argues, the portion of these fees and costs that he would face just to contest arbitrability would be in the thousands of dollars—a prohibitively high amount for someone in his financial circumstances that could prevent him from being able to vindicate his rights to make legal arguments regarding the enforceability of the arbitration agreement.[14]

**\*19** Courts applying New York law have held that similar "loser pays" provisions in arbitration agreements are substantively unconscionable where a party makes a "showing of individualized prohibitive expense that considers factors including the financial means of plaintiff and the cost differential between arbitration and litigation in court." *Valle v. ATM Nat., LLC*, 14-CV-7993 KBF, 2015 WL 413449, at \*6–7 (S.D.N.Y. Jan. 30, 2015); *Brady v. Williams Capital Grp., L.P.*, 878 N.Y.S.2d 693, 698–700 (N.Y. App. Div. 2009), *aff'd as modified* 14 N.Y. 3d 459 (NY. 2010) (holding that a fee-splitting provision of an employment arbitration agreement was substantively unconscionable given the cost of $21,150 to a plaintiff who previously was earning between $100,000 and $405,000 in the previous five years but was then unemployed); *cf. Schreiber v. K-Sea Transp.*

*Corp.*, 9 N.Y.3d 331, 341 (N.Y. 2007) ("Schreiber should not be compelled to bear costs which would effectively preclude him from pursuing his claim.").

Here, not only is the "loser pays" provision likely unconscionable on its own terms, but the delegation clause itself is likely unconscionable when paired with the "loser pays" provision. Courts in this district, in conducting similar analyses, have looked to whether the "fee splitting arrangement ... for the arbitration of *enforceability*" is "substantively unconscionable," "rather than for arbitration of more complex and fact-related aspects of the claim." *Saizhang Guan v. Uber Techs.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017) (emphasis added) (quoting *Rent-A-Center*, 561 U.S. at 74); *cf. Lim*, 8 F.4th at 1002 (concluding that under California law the cost splitting, fee shifting and venue provisions rendered the delegation clause substantively unconscionable in light of the employee's financial circumstances). It is true that it may be "more difficult to establish" the unconscionability of fees relating only to arbitrability, rather than to the entire arbitration. *Id.* However here, the issues of enforceability are complex, multi-faceted, and, as this litigation has already indicated, likely to result in many hours of work for both parties' attorneys and the decisionmaker.

Vidal has made a sufficient showing for this preliminary stage in the litigation that to even challenge the threshold issues of arbitrability before the arbitrator could cause him financial ruin. As Vidal's counsel explained at oral argument, if an attorney with fifteen years of experience has a prevailing rate of $475/hour, twenty-five hours of work on this case would amount to over $11,000 in fees. *See No Limit Auto Enters., Inc. v. No Limit Auto Body, Inc.*, No. 21-cv-04577 (AMD) (JMW), 2022 WL 18399477, at *15 (E.D.N.Y. 2022) (awarding an hourly rate of $475 for a motion that "involved more than say a straightforward default motion for breach of contract" to a partner with fifteen years of experience). Vidal has demonstrated that he cannot afford even the arbitration initiation fees of over $2,000 in this case. Vidal Decl. ¶ 44. In his current position after leaving ACS, he earns around $4,500 per month after taxes, incurs at least $2,850 worth of basic living expenses, and sends $1,000 per month to his family in the Philippines who rely on him for support. Vidal Decl. ¶¶ 47–52. Accordingly, even during the best month, Vidal would have only $650 left over, which does not account for any unexpected expenses, such as his own medical needs or unexpected emergency expenses his family may incur. Thus, even the $1,900 filing fee and $750 case management fee to initiate arbitration would be well beyond Vidal's means, let alone $10,000 or more in attorneys' fees just to resolve a dispute over arbitrability—and more still in arbitrator's fees. Seligman Decl. Ex. 11 (noting that the arbitrator's rate is "$450 per hour"). And in this case, the arbitrator's choice to reserve decision on enforceability until after discovery on the merits, *see* Asaad Decl. Ex. 11, further increases the cost Vidal may have to bear even were he to contest issues of arbitrability, since attorneys' fees on the merits of ACS's breach of contract claim issues continue to mount.

**\*20** For all these reasons, the Court concludes that Vidal is likely to succeed on the argument that the terms of this contract are substantively unfair. Under the delegation clause, to even contest the arbitrator's jurisdiction, whether the dispute is properly for arbitration, or even whether the arbitration agreement is unconscionable or illegal, Vidal is vulnerable to owing potentially thousands of dollars of legal fees simply to resolve these threshold legal questions. This would "effectively preclude" Vidal from pursuing his claim. *Schreiber v. K–Sea Transp. Corp.*, 9 N.Y.3d at 341; *Ragone*, 595 F.3d at 124. For even if Vidal believed that he had a valid argument that the arbitration agreement or contract as a whole was unenforceable, to contest the arbitrator's jurisdiction would risk potentially thousands of dollars in attorneys' fees and arbitration costs if he failed to convince the arbitrator of the merits of his legal position. *See Brady v. Williams Cap. Grp., L.P.*, 14 N.Y.3d 459, 466–67 (NY. 2010) (underscoring that under New York law, courts look to whether the cost of arbitration would "preclude a litigant from effectively vindicating his or her statutory rights in the arbitral forum" (citing, *inter alia, Green Tree Financial Corp.—Ala. v. Randolph*, 531 U.S. 79 (2000))). Faced with nearly identical arguments, the Ninth Circuit has held that, where a delegation clause and a "loser pays" provision are taken together, the presence of a "loser pays" provision "creates a chilling effect on [an employee] enforcing his rights because it exposes him to the possibility of paying attorney's fees to [the employer] if he lost at arbitration, including fees associated with the threshold issue of arbitrability." *Lim*, 8 F.4th at 1003.

Thus, although it may be "difficult" in many cases to show that a delegation clause coupled with fee-shifting arrangement is unconscionable as to issues of enforceability, *see Rent-A-Center*, 561 U.S. at 74, Vidal has made such a showing here. Conversely district courts that have rejected employees' challenges to the validity of delegation clauses in arbitration agreements with

Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

"loser pays" provisions have done so because plaintiffs have "not made a particularized showing of their inability to pay for arbitration"—which Vidal has demonstrated here. *See Saizhang Guan*, 236 F. Supp. 3d at 732–33. In *Saizhang Guan* the court also highlighted a contractual provision not present here, which specified that an employee would "not be required to bear any type of fee or expense that [he] would not be required to bear if [he] had filed the action in a court of law." *Saizhang Guan*, 236 F. Supp. 3d at 732–33. By contrast, this is precisely the type of penalty the 2022 Contract would impose on Vidal. Although the arbitration provision states that "in the event that the AAA's *initial filing fee* is higher than the filing fee for a court action ... [the employee] will only be required to contribute the cost of what [he] would have paid to file an action in Court," it imposes no such limit on other costs and fees. 2022 Contract at 12 ("[A]t the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as *all costs and fees charged by the AAA and the Arbitrator*."). Accordingly the delegation clause itself, viewed collectively in conjunction with the "loser pays" provision, is so prohibitively costly as to deprive Vidal of his right to contest its validity. Vidal is likely to succeed on the merits of—or has, at the very least, raised serious questions on the merits of—his argument that the delegation clause is unconscionable.

### c. Severability of the "loser pays" provision

In evaluating the merits of the parties' claims, I have considered whether Vidal's objections to the arbitration agreement—and the delegation clause specifically—could be addressed if the "loser pays" provision were severed from the rest of the contract. *See* 2022 Contract at 8. The Second Circuit has previously held that severance is the appropriate remedy where a particular provision in an arbitration agreement is deemed unconscionable and the agreement contains a severability provision, as the agreement here does. *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 124–25 (2d Cir. 2010). [15] As explained below, however, a severability analysis would be premature at this stage, where the only relief sought by Vidal is a preliminary injunction pausing the arbitration.

**\*21**  The parties dispute whether severance would be required if I were to find that the "loser pays" provision is unenforceable. Vidal raises several arguments as to why the "loser pays" provision is so integral to the arbitration agreement that it cannot be severed. ACS argues that the fee shifting provision is not essential to the bargain—the purpose of which is to set arbitration as the mechanism for the resolution of employment disputes—and if the "loser pays" provision cannot be enforced, the appropriate remedy is severance.

However, at this preliminary stage in the litigation, I have not made a final determination as to whether the "loser pays" provision is unconscionable or a violation of the TVPA. I have only determined that Vidal is likely to succeed on the merits (or at least raised serious questions as to the merits) of his claim that the *delegation clause*, viewed in conjunction with the "loser pays" provision, is invalid under state and federal law. It is certainly appropriate and necessary for a court to consider severability when it makes a final determination that a particular provision is unlawful or cannot be enforced. But as I have not made any such determination (nor could I, at the preliminary injunction stage), then neither the delegation clause nor any other provision in this contract has yet been deemed unenforceable—and thus, there is no offending clause to "sever" from the rest of the contract. The question at this stage is simply whether Vidal has made a sufficient showing that the delegation clause, read in conjunction with the "loser pays" provisions of the contract, is *likely* unlawful, such that the arbitration should be paused while his challenges to the contract are fully litigated. Notably, neither party has pointed to any other case—and I have found none—in which a district court has ordered a similar severance in the context of a motion for a preliminary injunction that turns on the validity of a delegation clause.

Moreover, the effect of the ruling that ACS seeks would be unproductive and confusing. If I were to hold that the delegation clause is valid only if the (likely-invalid) "loser-pays" provision were severed, such a holding would be essentially advisory. The result would be to deny the preliminary injunction and allow the arbitration to proceed. That would leave the arbitrator free to make her own *de novo* assessment of the merits of Vidal's arguments and determine for herself the enforceability of the agreement (including the "loser pays" provision)—all while ACS continues to accumulate substantial legal fees potentially

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 213 of 231 PageID #:  1019
Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

recoverable against Vidal. Such an advisory ruling should be avoided. *See County of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010) ("Obliged, as we are, to avoid issuing advisory opinions, our authority is limited to 'live' cases in which there remains a possibility that the court can grant some form of effectual relief.' "); *Long Island Lighting Co. v. County of Suffolk*, 604 F. Supp. 759, 761–62 (E.D.N.Y. 1985) ("It is fundamental that a United States District Court may not render advisory opinions.") (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Therefore, in light of my determination that Vidal is likely to succeed on the merits of (or at least has raised serious questions as to the merits of) his arguments that the delegation clause is invalid, I decline to address the parties' severance arguments at this stage. ACS remains free to argue at a later stage in the litigation that Vidal's challenges to the fee-shifting provisions of the arbitration agreement could be cured by severance, and Vidal remains free to argue the contrary. At this juncture, the appropriate remedy is simply to pause the arbitration proceeding while discovery and merits litigation continues in this Court.

### B. Irreparable harm

**\*22**  As to the remaining injunction factors, irreparable harm is the "most important." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Vidal has demonstrated that he will suffer irreparable harm if the arbitration is allowed to proceed before his legal challenges to the 2022 Contract can be adjudicated on the merits in this Court.

First, as explained *supra,* Vidal has shown a likelihood of success on the merits of his claim that threshold issues of arbitrability should be decided by the courts and not the arbitrator. Courts in this circuit have held that "[c]ompelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.' " *Citigroup Glob. Mkts. Inc. v. VCG Special Opportunities Master Fund*, No. 08-cv-5520 (BSJ), 2008 WL 4891229, at \*2 (S.D.N.Y. Nov. 12, 2008) (quoting *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at \*3 (S.D.N.Y. Feb. 13, 2004)); *Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union, Loc. 365*, 975 F. Supp. 445, 446–47 (E.D.N.Y. 1997) ("[Plaintiff] may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration....").

Here, prior to the injunction, discovery was progressing in arbitration, and the arbitrator had (1) determined that she had jurisdiction over issues of arbitrability and (2) decided she would not even consider Vidal's arguments that the arbitration agreement was unenforceable or unconscionable until she reached the merits of ACS's breach of contract claim. Asaad Decl. Ex. 11. The unauthorized arbitration of arbitrability issues is particularly harmful, given that the "right of access to courts is of such importance that courts will retain authority over the question of arbitrability in the particular dispute unless the parties clearly and unmistakably provide[d] that the question should go to arbitrators." *Bucsek,* 919 F.3d at 190 (internal quotation marks and citation omitted) ("It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to arbitration."). In the absence of an injunction, Vidal would be unable to vindicate his rights to access the courts and present his claims that the arbitration agreement is unenforceable to a judge. Accordingly, because Vidal is likely to succeed on the merits that the arbitration of his enforceability arguments is unauthorized and that, instead, a court should determine these threshold issues of enforceability, Vidal has made a showing of *per se* irreparable harm.

Second, Vidal has demonstrated a likelihood of specific irreparable harm in the form of time, energy, and expense in defending himself before the arbitrator. While as a general matter, the risk of ultimately being responsible for money damages and attorneys' fees may not amount to irreparable harm, for Vidal, the financial costs of participating in arbitration could constitute irreparable harm. Vidal has limited financial means and is living nearly paycheck to paycheck to provide his family in the Philippines with subsistence income. For him, taking shifts off work to attend arbitration proceedings or responding to discovery requests may have outsized consequences. Vidal may risk losing out on money that is essential for his family's well-being—and his own. ACS argues that any potential loss of wages is not irreparable because it can be remedied—arguing that money, by definition, can be paid back. But ACS fails to acknowledge that, for workers with as slim a financial margin as Vidal has in a given month, missing out on income because of missed shifts could have an irreparable impact. For example, even a small

amount of lost income in one month could mean the difference between Vidal's ability to pay for an unexpected medical expense, or not—and suffering more serious symptoms, pain, or a prolonged illness as a result. While ACS may argue that loss of income can never constitute irreparable harm, it is simply not the case that for a worker in Vidal's financial position, the harm from lost income can always be remedied in full through retroactive compensation.

**\*23** Thus, because of the *per se* irreparable harm of participating in an unauthorized arbitration, coupled with Vidal's specific expenditures of time and resources in defending himself against this arbitration, Vidal has demonstrated irreparable harm.

### C. Balance of the hardships

The balance of the hardships also tips decidedly in Vidal's favor. *See Citigroup Glob. Mkts.*, 598 F.3d at 35; *see Yang v. Kosinski, 960 F.3d 119, 135 (2d Cir. 2020)* (instructing courts to "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief" (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008))). In addition to the irreparable harm outlined above, Vidal also has demonstrated that participating in the arbitration is harmful to him given the serious risk of financial ruin if ACS were to prevail, the time and energy spent representing himself in the arbitration pro se, the opportunity costs inherent in that representation, and the mental toll that the ongoing proceedings and the threat of a ruinous damages award have had on him. Vidal Decl. ¶¶ 43–45, 54–56; Pl.'s Mem. at 27–28.

By contrast, ACS has pointed to no specific harm that it will suffer if the arbitration is temporarily paused while the Court adjudicates the merits of Vidal's claims. ACS makes much of the financial hardships it claims it has suffered due to Vidal's purported breach of his employment contract. Def.'s Opp'n at 27–28. But the relevant analysis at this stage is the harm that the party opposing an injunction "might suffer as a result of a preliminary injunction issuing against it," *Reuters, Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 909 (2d Cir. 1990), not of an adverse final judgment on the merits or harm caused by the events giving rise to the lawsuit. Accordingly, even if ACS can point to lost profits or other short-term losses resulting from Vidal's resignation, they are immaterial to the analysis of the balance of the hardships when considering the impact of Vidal's requested relief.

ACS argues that it has an interest in a swift and efficient resolution of the issues—an interest indeed shared by both parties. But this interest can just as easily be vindicated in this Court. At oral argument, ACS expressed that a preliminary injunction would cause a hardship because it would lead to a "snowball effect" in other cases, allegedly preventing ACS from being able to seek damages from other employees who quit before the end of their employment terms, citing two other arbitrations that the AAA indicated would be paused if this Court granted a preliminary injunction. *See* Pl.'s Feb. 14, 2023 Letter, ECF No. 33. However, I fail to see how addressing the legality of the delegation clause, whether for Vidal or other workers, harms ACS. Preventing the enforcement of an illegal arbitration provision does not constitute harm. And, of course, ACS is still free to pursue breach of contract claims on the merits in Vidal's case, and to make its intention to do so known to Vidal and others. This preliminary injunction means only that ACS must wait to resolve those claims until after litigation on the validity of the delegation clause and the enforceability of various provisions of the contract has concluded. The balance of hardships at this stage of the litigation thus tips decidedly in Vidal's favor.

### D. Public interest

**\*24** Finally, a party seeking an injunction must demonstrate that an injunction is "in the public interest." *Winter*, 555 U.S. at 20. Vidal has done so here. It is in the public interest for a potentially unauthorized arbitration to be paused while a court evaluates whether the arbitration is unconscionable or runs contrary to Congressional prohibitions on forced labor. That is especially so where ACS is seeking to enforce analogous agreements against at least two other employees who also terminated their contracts and who now face the prospect of a costly loser-pays arbitration initiated by ACS. *See* Pl.'s Feb. 14, 2023 Letter. It is in the public interest to identify and remedy any unlawful provisions in these contracts. And it is in the public interest to ensure that

Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

arbitration threats are not improperly leveraged to prevent nurses and other essential workers from leaving unsafe or unlawful employment conditions if the circumstances so warrant.

ACS argues that the injunction Vidal seeks is not in the public interest because it runs counter to the national policy in favor of arbitration. The Supreme Court has referred to the FAA as announcing a federal policy in favor of arbitration. *See Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984). It has also repeatedly emphasized, however, that this policy does not place arbitration agreements at a higher level than other contracts, but merely on equal footing with any other contract. *Morgan*, 142 S. Ct. at 1713 ("[T]he FAA's policy favoring arbitration ... is merely an acknowledgment of the FAA's commitment to ... place such agreements upon the same footing as other contracts" (quoting *Moses H. Cone*, 460 U.S. at 24; *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)) (internal quotation marks omitted)). Accordingly, where, as here, a court's application of New York or federal law leads to the conclusion that a preliminary injunction is warranted, granting an injunction is wholly consistent with the FAA's mandate.

### III. Additional considerations

Two final points bear mentioning. First, ACS took the curious step of requesting that any order granting a preliminary injunction also state that ACS's request for a pre-motion conference in anticipation of a motion to compel arbitration or dismiss the complaint is denied. *See* Def.'s Letter with Supp. Authority, ECF No. 38. ACS's pre-motion conference request is denied as moot. The pre-motion conference letter indicated the anticipated motion would raise the very same arguments ACS raised at greater length here: that the agreement contains a valid delegation clause, and as such that threshold issues of arbitrability must be decided by the arbitrator rather than a court; and that Vidal was in fact challenging the arbitration agreement as a whole as unconscionable, rather than the delegation clause specifically. Def.'s Mot. for Pre-Mot. Conf., ECF No. 11 at 2–3. Because I considered and rejected each of the foregoing contentions in concluding that Vidal is likely to succeed on the merits of his legal challenge to the delegation clause, and the arbitration is paused pending further litigation, ACS's anticipated motion to compel is clearly moot. *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 141 ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present." (citation omitted)). ACS may be suggesting that it was somehow prejudiced by the delay in addressing these legal issues until the parties fully briefed and argued them at the preliminary injunction stage. But if anything, ACS benefitted from this delay, since it allowed arbitration to continue for several more months—and ACS to attempt to accumulate fees it hopes to shift to Vidal in the process.

Second, I feel compelled to note my dismay at ACS's suggestion—with which it opened its brief opposing Vidal's motion for a preliminary injunction, and which it invoked again at oral argument—that Vidal should not be considered a trafficked worker covered by the protections of the TVPA since he was not "working in a back alley sweat shop, a remote lettuce field, or a massage parlor for substandard wages." Def.'s Opp'n at 1. The TVPA was enacted with the understanding that worker exploitation can take myriad forms. *See* 18 U.S.C. § 1589(a) (establishing that threats of, *inter alia*, psychological, financial, and reputational harm can give rise to forced labor). Courts have time and again found that employers can be held liable for violations of the TVPA in legal actions brought by immigrant nurses like Vidal *See, e.g.*, *Paguirigan II*, 2019 WL 4647648, at *18; *Magtoles*, 2021 WL 6197063, at *6; *Baldia*, 2022 WL 4777836, at *8–9; *Dale Carmen*, 2021 WL 2476882, at *9. And with good reason. Nurses and other healthcare workers toil long hours under demanding conditions to care for our nation's ill and infirm. They are no less entitled to protection against forced labor than those who sew our clothes or harvest our food. For ACS to suggest otherwise—despite its familiarity with the TVPA and the courts' prior application of that law to healthcare workers—is both troubling and highly disingenuous.

### IV. Conclusion

**\*25** For the foregoing reasons, Vidal's motion for a preliminary injunction is granted. The arbitration shall be paused while the parties litigate the merits of Vidal's claims in this Court.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2783251

## Footnotes

1   The parties each submitted factual records accompanying their briefs on the motion for a preliminary injunction. A preliminary injunction hearing was held on February 21, 2023, at which neither party offered testimony, but both presented argument. The following facts are taken from their evidentiary submissions and, unless otherwise noted, are undisputed at this stage in the litigation.

2   Page numbers for the 2019 Contract, ECF No. 30-1, refer to the ECF Page numbering.

3   Page numbers for the 2022 Contract, ECF No. 23-6, refer to the ECF page numbering.

4   Vidal maintains that prior to his resignation, he raised his concerns about his working conditions with ACS directly. ACS denies that he did so, *see* Def.'s Opp'n at 8, but has offered no declaration or other direct evidence to refute Vidal's affidavit on this point; ACS instead relies on the absence of any reference to earlier communications with ACS in Vidal's resignation email. Def.'s Opp'n at 8 (citing Luy Decl. Ex. G). In light of this factual dispute, I do not rely on this allegation by Vidal in considering the grounds for the requested injunction, which is in any event immaterial to the claims presented in this motion for a preliminary injunction.

5   Attorneys from Towards Justice, Kakalec Law PLLC, and Nichols Kaster PLLP represent Vidal in the instant lawsuit in this Court challenging the enforceability of the arbitration provisions in his 2022 contract; they represent Vidal before the arbitrator for the limited purpose of seeking a stay of the arbitration. *See* Seligman Decl. Ex. 13, ECF No. 23-15.

6   Contrary to ACS's assertions, Def.'s Opp'n at 26–27, the serious question standard is not limited to cases with the potential for particularly widespread impact or particularly complex litigation, but is applied regularly to cases that vary in terms of scope and complexity. This standard exists in recognition that "preliminary injunctions should not be mechanically confined to cases that are simple or easy." *Citigroup Glob. Mkts.*, 598 F.3d at 35. Here, further discovery may reveal additional facts and circumstances surrounding Vidal's signing of the 2022 Contract or his financial circumstances relevant to the unconscionability and TVPA analyses. Further litigation may be warranted on a more complete record for other issues of first impression in this case, such as the validity of delegation language that is contradicted by other language in the arbitration agreement or the invalidity of a delegation clause paired with a loser pays provision under the TVPA. Although it is not necessary to rely on the serious questions standard in light of my determination that Plaintiff is likely to succeed on the merits of the claims detailed in this opinion, the serious questions standard is also appropriate here.

7   Vidal also argues (1) that the delegation clause and arbitration agreement violate federal and state labor laws and (2) that the entire 2022 Contract is invalid because he signed the agreement under economic duress. *See* Compl. (Counts III–VI); Pl.'s Mem. at 21–22. However, the Court need not address these other claims and reserves decision on these claims for the merits stage. *See Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) ("To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all their claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." (citation omitted)).

8   It bears noting that the AAA rules are not particularly clear themselves, especially for a party encountering them for the first time. The AAA Commercial rules span roughly forty pages and contain more than 60 rules setting forth filing requirements, the structure of duties under the AAA, procedures for communicating with arbitrators, disqualifying

Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)

2023 WL 2783251

arbitrators, and oaths required at hearings, to name just a few. Tucked within these broad-spanning rules is Rule 7, entitled "Jurisdiction," which states that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Seligman Decl. Ex. 24 at 15, ECF No. 23-26. It is highly improbable that an unsophisticated party would even register this provision in a set of rules intended for an entirely separate purpose, let alone comprehend its implications. *See Allstate Ins. Co. v. Toll Bros., Inc.,* 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016) ("Incorporating forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.' " (internal quotation marks and citation omitted)).

9   Accordingly, this is unlike cases where courts have held, following *Rent-A-Center*, that a party's general challenge to the validity of a contract does not qualify as a challenge to the validity of an otherwise clear and unmistakable delegation clause. *See, e.g.,* *Ward,* 468 F. Supp. 3d at 604 ("Because the plaintiff's challenge in this Court is clearly directed at the Agreement as a whole, and not at the delegation provision specifically, the plaintiff's ... challenge to the Agreement ... must be submitted to the arbitrators under *Rent-A-Center* and the plain language of the delegation provision."); *Greene v. Kabbalah Ctr. Int'l Inc.,* No. 19-CV-4304-ILG-SJB, 2022 WL 4006903, at *1 (E.D.N.Y. Sept. 1, 2022) ("Plaintiffs only make a series of general attacks on the ... Agreements as a whole. Though they purport to challenge the delegation provision, they do not do so in fact."); *see also Arrigo v. Blue Fish Commodities, Inc.,* 408 F. App'x 480, 482–83 (2d Cir. 2011) (holding that a claim of procedural unconscionability "challenging the validity of the agreement as a whole" was for the arbitrator to decide).

10   Vidal also challenges ACS's actions as a "threatened abuse of legal process" under the TVPA, *see* 18 U.S.C. § 1589(c) (1), and a violation of New York's prohibition on labor trafficking. *See* N.Y. Pen. Law § 135.5. I decline to reach these argument at the preliminary injunction stage. *See Upsolve, Inc.,* 604 F. Supp. 3d at 109.

11   The TVPA also contains a provision granting a plaintiff a private right of action to allege substantive violations of the TVPA. *See* 18 U.S.C. § 1595; *Paguirigan I,* 286 F. Supp. 3d at 436 n.4.

12   On March 30, 2023, Judge Matsumoto granted summary judgment for the plaintiffs in *Magtoles* on, *inter alia,* their claim that the liquidated damages provision in their contracts violated the TVPA. *See Magtoles v. United Staffing Registry,* 21-cv-1850 (KAM) (PK), 2023 WL 2710178, at *23–27 (E.D.N. Y March 30, 2023).

13   The parties do not dispute that New York law applies here. *See* 2022 Contract at 7; Pl.'s Mem. at 22; Def.'s Opp'n at 18.

14   ACS argues that this Court should not consider whether the provision requiring Vidal to pay the costs of arbitration (including case initiating costs and the arbitrator's fees) is unconscionable since, once the arbitration began, ACS stipulated that it would agree to bear these costs notwithstanding the agreement's language to the contrary, and the arbitrator ratified that agreement. *See* Def.'s Opp'n at 11; Asaad Decl. Ex. 20. ACS argues that, since the parties have already agreed that this provision will not apply, I should not consider it in my analysis of unconscionability because ACS has already declined to enforce the provision. Def.'s Opp'n at 20; *see Ragone,* 595 F.3d at 124 (noting that "unconscionability is an equitable defense to the *enforcement* of harsh or unreasonable contract terms"). But here, Vidal is asking the Court to determine the validity of the *delegation clause* in conjunction with other contractual provisions, and at this stage of the litigation, is not seeking a final ruling as to the unconscionability of the "loser pays" provision as it applies to the arbitrator's fees. As such, ACS's arguments are premature.

15   *Ragone* emphasized that this conclusion was based on the "federal policy favoring the arbitration as an alternative means of dispute resolution," under which courts "are charged with 'encouraging and supporting arbitration.' " 595 F.3d at 121, 124 (citations omitted). However, there are at least serious questions as to the viability of this direction following the Supreme Court's decision in *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022), where the Supreme Court emphasized that the FAA's "policy favoring arbitration does not authorize federal courts to invent special,

**Vidal v. Advanced Care Staffing, LLC, Slip Copy (2023)**

2023 WL 2783251

arbitration-preferring procedural rules," and that instead of adopting a rule that "favor[s] arbitration," courts should "place [arbitration] agreements upon the same footing as other contracts." 142 S. Ct. at 1713 (citations omitted). General contract law is far more flexible in the face of an unconscionable provision than what the Second Circuit instructed in *Ragone. See Oneida Indian Nation of New York v. County of Oneida*, 617 F.3d 114, 138 (2d Cir. 2010) ("[A] court generally is allowed substantial flexibility in its choice of remedy when it determines that a contract or term thereof is unconscionable, [but] the traditional remedy for a claim of unconscionability is to deny enforcement of the relevant contract." (citing Restatement (Second) of Contracts § 208)).

---

End of Document                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)

2018 WL 7291458

2018 WL 7291458
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Brownsville Division.

Sesha Sai VORREY, Plaintiff,

v.

CITY OF BROWNSVILLE, TEXAS, Defendant.

Civil Action No. B: 17-cv-222
|
Signed 10/05/2018

**Attorneys and Law Firms**

Anthony P. Troiani, Brownsville, TX, for Plaintiff.

John-Michael Wyman Hayward, Ricardo J. Navarro, Robert Lee Drinkard, Denton Navarro Rocha Bernal & Zech, P.C., Harlingen, TX, for, Defendant.

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Ronald G. Morgan, United States Magistrate Judge

**\*1** On July 16, 2018, Defendant – City of Brownsville, Texas ("the City") – filed a motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 18.

On August 7, 2018, Plaintiff – Sesha Sai Vorrey ("Vorrey") – filed a response. Dkt. No. 27.

On August 10, 2018, the City filed a reply, as well as a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

The motion to dismiss has been referred to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the record and the relevant caselaw, it is recommended that the motion to dismiss be granted, for the reasons set out below. [1]

### I. Background

#### A. Factual Background

In April 2004, Vorrey was hired as the airport operations director for the Brownsville/South Padre Island International Airport. Dkt. No. 16, pp. 3-4; Dkt. No. 16-1, p. 1. Vorrey is a native of India and was authorized to work in the United States as the result of a H-1B non-resident visa. Id.

"To obtain an H-1B visa, an employer must first obtain approval from the U.S. Department of Labor ("DoL") by filing a Labor Condition Application ("LCA"). The LCA requires an employer to represent that it intends to employ a particular foreign worker for a specific position for a given period of time." U.S. v. Nanda, 867 F.3d 522, 525 (5th Cir. 2017), cert. denied, 138 S. Ct. 1578, 200 L.Ed. 2d 765 (2018). Once the visa is issued, "the worker possesses lawful nonimmigrant status and may reside in the United States and work for the sponsoring employer until either the visa expires or her employment with the sponsoring employer is terminated." Id.

2018 WL 7291458

In June 2008, Vorrey was promoted to Chief Operations Officer at the airport. Dkt. No. 16-1, p. 1.

Vorrey's H-1B visa "was extended without issue in 2007, 2010 and 2013." Dkt. No. 16, p. 4. Vorrey served as the acting interim director of the airport from August 2015 until April 2016. Id.

Vorrey applied for the permanent airport director position, but in April 2016, the City hired Bryant Walker for that position. Dkt. No. 16, pp. 4-5. Vorrey was chosen, instead, to be the assistant airport director. Id.

On April 12, 2016, Vorrey attended a meeting with the City Manager, the City External Auditor, an airport consultant and the interim Director of Aviation for the airport. Dkt. No. 16, p. 5. During a lunch, the City Manager stated that Vorrey looked like a "Pakistani" and that Vorrey "needed to wear a tag to let everyone know that he is Indian and not Pakistani." Id. Vorrey claims to have been "deeply offended" by these remarks, but, at the time, took no action. Id.

On August 25, 2016, "the City of Brownsville scheduled a meeting between the airport staff and a local advertising agency." Dkt. No. 16, p. 5. Vorrey was not invited to the meeting or made aware of its existence. Id. Walker took an intern to the meeting instead. Id.

 *2  The next day, Walker "allegedly submitted" another H-1B visa extension request to USCIS; the request was returned by USCIS, seeking additional information. Dkt. No. 16, p. 6. USCIS sought "a job description and percentage of the time worked" and requested a response by December 24, 2016. Id.

On September 22, 2016, Walker assigned Vorrey the task of estimating the new airport terminal expenses and requested a response by the close of business that day. Dkt. No. 16, p. 6. A similar request was made to the maintenance supervisor, who is not Indian, but the maintenance supervisor was given more time to complete the task. Id.

On September 23, 2016, Federal Aviation Officials met with airport officials. Dkt. No. 16, p. 6. Despite the importance of the meeting, Vorrey, again, was not invited or informed about the meeting and Walker, again, took an intern to the meeting instead of Vorrey. Id.

On September 28, 2016, Vorrey's immigration attorney asked the City and Walker to provide "a job description and percentage of the time worked," in response to USCIS's request for additional information. Dkt. No. 16, p. 6. Walker never responded. Id, p. 7.

In October 2016, Walker informed USCIS that he believed that Vorrey had forged his, i.e. Walker's, signature on the LCA documentation. Dkt. No. 16-3, p. 2.

On November 29, 2016, the City Manager notified Vorrey that he was suspended and that an investigation was being undertaken as to whether Vorrey had forged Walker's signature on the LCA. Dkt. No. 16, p. 7.

On that same day, Walker emailed Terry Damman, a USCIS official, asking if there was "any requirement or obligation" that the City respond to the request for information and what the result would be if the City chose not to respond. Dkt. No. 16-3, p. 1.

On November 30, 2016, Damman responded to Walker that if a response was not provided by the deadline – December 24, 2016 – then the H-1B visa application would be "automatically denied for failure to respond." Dkt. No. 16-3, p. 1.

On January 31, 2017, USCIS formally denied Vorrey's H-1B visa extension application. Dkt. No. 16, p. 7.

On February 6, 2017, Ms. Wendy Carlson – a handwriting expert hired by Vorrey – determined that neither Vorrey nor Walker were the person who signed Walker's name on the disputed LCA form. Dkt. No. 16, p. 8. The complaint does not state if Carlson ever identified the person who signed Walker's name.

2018 WL 7291458

On February 10, 2017, Walker issued a formal termination letter to Vorrey. Dkt. No. 16-4. In justifying the decision, Walker cited the denial of the visa application, "as well as ... my loss of confidence in your credibility and your ability to carry out the duties and functions of the position you held at the airport." Id.

On April 27, 2017, Vorrey filed a claim with the Equal Employment Opportunity Commission, claiming employment discrimination. Dkt. No. 16, p. 10. On June 9, 2017, Vorrey received a "right to sue letter." Id.

### B. Procedural Background

On September 8, 2017, Vorrey filed a complaint in the 197th District Court in Cameron County, Texas. Dkt. No. 1-1. Vorrey pled claims of discrimination based on race, color and national origin, libel, quantum meruit, retaliation, and slander against the City. Id.

On September 22, 2017, Vorrey served the City with a copy of his complaint. Dkt. No. 1.

 **\*3** On October 23, 2017, the City timely [2] removed the case to this Court, alleging that the state court complaint raised claims under federal law. Dkt. No. 1. Vorrey agrees that the Court has subject matter jurisdiction over his claims. Dkt. No. 3, p. 2.

On February 23, 2018, the City filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 6.

On March 16, 2018, Vorrey timely filed his first amended petition, which he was permitted to file as a matter of right under FED. R. CIV. P. 15(a). Dkt. No. 7. On March 23, 2018, the Court denied the City's motion to dismiss as moot, based on the amended complaint. Dkt. No. 8.

On March 28, 2018, the City filed a renewed motion to dismiss. Dkt. No. 9. On May 1, 2018, Vorrey filed an opposed motion for leave to file a second amended complaint. Dkt. No. 12. The City never filed a response in opposition to the motion for leave.

On July 5, 2018, the Court granted the motion for leave to file the second amended complaint, making that complaint the operative complaint in this case. Dkt. No. 15.

In the second amended complaint, Vorrey alleged that (1) the City discriminated against him based on his "race, color and national origin"; and, (2) the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. Dkt. No. 16. As to the first claim, Vorrey alleges that the City discriminated against him by: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. Id. Vorrey abandoned his claims of libel, quantum meruit, retaliation, and slander against the City. Id.

On July 16, 2018, the City filed a renewed motion to dismiss the second amended complaint. Dkt. No. 18. In that motion, the City argues that, as to the alleged discriminatory acts, the failure to promote claim is untimely filed and that Vorrey has not pled a prima facie case of discrimination as to the remaining three claims. Regarding the failure to reimburse claim, the City argues that there is no private right of action for such a failure and any claim must first be pursued administratively. Id.

On August 7, 2018, Vorrey timely filed a response to the motion to dismiss. Dkt. No. 27. Vorrey argues that the entire series of events – "a string of adverse actions" – create an adverse employment action, so he has made a prima facie case of discrimination. He also reasserts his argument that the failure to reimburse Vorrey violated federal law. Id. Vorrey attached exhibits to his response, including documents that he provided to the City regarding his immigration status, immigration applications and his proof that he did not forge Walker's signature.

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 222 of 231 PageID #:  1028
Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)
2018 WL 7291458

On August 10, 2018, the City filed a reply brief and a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. The City argued that the Court cannot consider those documents in deciding a motion to dismiss. Id.[3]

**\*4** On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

## II. Applicable Law

### A. Motion to Dismiss For Lack of Jurisdiction

The threshold question, before considering the substance of any claim, is whether the court possesses jurisdiction over the claim. This is the case, because federal courts are courts of limited jurisdiction, whose authority exists only within the boundaries established by Congress and the United States Constitution. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583-84 (1999). A plaintiff bears the burden of proving jurisdiction. Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012).

In determining whether jurisdiction exists, the Court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001). Conclusory allegations or "legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Wells v. Ali, 304 Fed. App'x. 292, 293 (5th Cir. 2008) (quoting Fernandez–Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993) ).

### B. Motion to Dismiss For Failure To State A Claim

"A motion to dismiss under Rule 12(b)(6) tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or merits of the case .... [T]he Court must take the plaintiffs' allegations as true, view them in a light most favorable to plaintiffs, and draw all inferences in favor of the plaintiffs." Askanase v. Fatjo, 828 F. Supp. 465, 469 (S.D. Tex. 1993) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ); Garrett v. Commonwealth Mortgage Corp. of Am., 938 F.2d 591, 593 (5th Cir. 1991) ).

The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Consistent with this requirement, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." City of Clinton v. Pilgrim's Pride Corp., 632 F.3d 148, 152-53 (5th Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 589. "[R]egardless of whether the plaintiff is proceeding pro se or is represented by counsel, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." McConathy v. Dr.Pepper/Seven Up Corp., 131 F.3d 558, 561 (5th Cir. 1998).

Whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' "Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2) ).

### C. Employment Discrimination

**\*5** It is not entirely clear from the second amended complaint whether Vorrey is making his employment discrimination claims under state or federal law, so the Court will consider it under both. Both state and federal law, however, utilize the three-part, burden-shifting test, known as the McDonnell Douglas[4] test, to judge claims of employment discrimination. Goudeau v. Nat'l Oilwell Varco, L.P., 793 F.3d 470, 474 (5th Cir. 2015).

Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)

2018 WL 7291458

"Under the McDonnell Douglas analysis, a plaintiff is entitled to a presumption of discrimination if he can meet the minimal initial burden of establishing a prima facie case." Reed v. Neopost USA, Inc., 701 F.3d 434, 439 (5th Cir. 2012). The standards for whether a plaintiff has pled a prima facie case of discrimination are identical under both state and federal law. Goudeau, 793 F.3d at 474.

The elements of a prima facie case of employment discrimination are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than those outside of the protected class. Mission Consol. Independent School Dist. v. Garcia, 372 S.W.3d 629, 634 (Tex. 2012); Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trustees, 709 F. App'x 243, 247 (5th Cir. 2017). The plaintiff must meet "every element of a prima facie case." Cherry v. CCA Properties of Am. Liab. Corp., 438 F. App'x 348, 352 (5th Cir. 2011). The defendant is entitled to dismissal if the plaintiff fails to show any single element of the prima facie case. McCoy v. Texas Instruments, Inc., 183 S.W.3d 548, 555 (Tex. App. 2006).

"After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action." Black v. Pan Am. Labs., L.L.C., 646 F.3d 254, 259 (5th Cir. 2011). The Court does not reach this step unless the plaintiff has first demonstrated every element of a prima facie case. Byers v. Dallas Morning News, Inc., 209 F.3d 419, 429 (5th Cir. 2000).

If the defendant meets its burden at the second step, then "the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005). "A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is pretext for discrimination." Id.

## III. Analysis

In the operative complaint, Vorrey has asserted five separate claims. The first four claims are based on four distinct actions of employment discrimination: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. As to the first claim, it was not timely filed under federal or state law, depriving the Court of subject matter jurisdiction under state law and failing to state a claim to relief under federal law. As to the second, third, and fourth claims, each claim fails to establish a prima facie case under McDonnell-Douglas, albeit for a different reason on each claim.

The fifth claim made by Vorrey is that the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. The Court lacks subject matter jurisdiction over this claim.

**\*6** With this summary in mind, the Court turns to the examination of each claim.

### A. Employment Discrimination

#### 1. Failure to Promote

Vorrey asserts that the City discriminated against him when it failed to promote him to the position of airport director. This claim is untimely filed.

In April 2016, the City hired Bryant Walker for the position of airport director. Dkt. No. 16, pp. 4-5. It wasn't until April 27, 2017, that Vorrey filed a claim with the EEOC, claiming employment discrimination. Dkt. No. 16, p. 10.

Whether considered under state or federal law, Vorrey's claim was not timely filed. Under state law, "[a]n aggrieved employee must file his formal complaint with the EEOC or [Texas Commission on Human Rights] no later than 180 days after the date

of the alleged unlawful employment practice." Harris v. BASF Corp., 81 F. App'x 495, 496 (5th Cir. 2003). Even if the Court assumes that Walker was hired on April 30, 2016, then the complaint had to be filed no later than October 27, 2016, which is 180 days later. Under state law, the failure to timely file a complaint is jurisdictional. Manuel v. Sanderson Farms Inc., Processing Div., 90 F. App'x 714, 717 (5th Cir. 2004) (citing Jones v. Grinnell Corp., 235 F.3d 972, 974 (5th Cir. 2001) ). Thus, the Court lacks jurisdiction as to this claim under state law.

Under federal law, Vorrey had 300 days from the date that Walker was hired to file a claim with the EEOC. 42 U.S.C. § 2000e-5(e); Tillison v. Trinity Valley Elec. Co-op. Inc., 204 F. App'x 346, 348 (5th Cir. 2006) ("a claimant must file a charge of discrimination within 300 days of the alleged discriminatory action."). Thus, if Walker was hired on April 30, 2016, then Vorrey had until February 24, 2017, to timely file his claim with the EEOC. Again, Vorrey did not file his complaint until April 27, 2017, which makes it untimely filed.

Unlike state law, where the failure to timely file is jurisdictional, Manuel, 90 F. App'x at 717, under federal law, the failure to timely exhaust is not jurisdictional, but, instead constitutes an affirmative defense. Davis v. Fort Bend Cty., 893 F.3d 300, 307 (5th Cir. 2018). Such claims are subject to equitable tolling. "Under the equitable-tolling doctrine, failure to [timely file] may be excused, particularly (although not exclusively) in three circumstances: (1) a pending action between the parties in the incorrect forum; (2) the claimant's unawareness of facts supporting her claim because the defendant intentionally concealed them; and (3) the claimant's being misled by the EEOC about her rights." Tillison, 204 F. App'x at 348. The plaintiff has the burden to establish that equitable tolling is appropriate. Id. In any event, such tolling should be applied "sparingly." Id.

At the time of filing, the limitations period had already passed. Vorrey has pled no facts showing that equitable tolling is appropriate and none are evident from the record, even if the Court goes beyond the instances expressly listed in Tillison. This claim should be dismissed for failure to state a claim upon which relief can be granted.

## 2. False Accusation & Investigation

**\*7**  Vorrey alleges that the City discriminated against him when it investigated him for allegedly forging Walker's signature on the LCA paperwork. Despite the allegation, Vorrey does not state a prima facie case of employment discrimination.

One of the prongs of a prima facie case of discrimination, under both state and federal law, is that Vorrey must have suffered an adverse employment action. Mission Consol. Independent School Dist., 372 S.W.3d at 634; Malcolm, 709 F. App'x at 247. The allegation of forging Walker's signature – regardless of the truth of the claim – and the ensuing investigation, do not constitute an adverse employment action.

The Fifth Circuit "has analyzed the 'adverse employment action' element in a stricter sense than some other circuits." Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 878 (5th Cir. 1999). Under Fifth Circuit precedent, only "ultimate" employment decisions – "such as hiring, granting leave, discharging, promoting, and compensating" – are considered adverse employment actions. Id.

The Fifth Circuit has consistently held that interlocutory decisions – even if they lead to an eventual termination – are not adverse employment actions. Wakefield v. State Farm Ins., 229 F.3d 1148 (5th Cir. 2000). This is because the intermediate decision did not have the immediate effect of altering the terms and conditions of employment. Wakefield, 229 F.3d at 1148 (failure to be recommended for a promotion not sufficiently adverse); Clayton v. Rumsfeld, 106 F. App'x 268, 270 (5th Cir. 2004) ("possible spying, a non-promotable rating, scrutinization, a letter of warning, rejection of [plaintiff's] request to have a third person of her choosing present at weekly meetings with her supervisors" not adverse); Cothran v. Potter, No. 3:08-CV-0785-O, 2010 WL 1062564, at \*3 (N.D. Tex. Mar. 22, 2010), aff'd, 398 F. App'x 71 (5th Cir. 2010) (increased supervision of employee not adverse); Julian v. City of Houston, No. 4:12-CV-2973, 2014 WL 3795580, at \*23 (S.D. Tex. July 31, 2014), aff'd, 618 F. App'x 211 (5th Cir. 2015) ("unfavorable performance ratings" not adverse); Garcia v. Potter, No. SA-09-CV-973-

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 225 of 231 PageID #:  1031
Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)
2018 WL 7291458

XR, 2010 WL 2025068, at *4 (W.D. Tex. May 18, 2010) ("letters of warning" in personnel file not adverse). Thus, in each case, a decision was made that did not necessarily have to result in the eventual termination or demotion of the employee and that decision was not an adverse employment action.

In short, an investigation that does not result in a change in pay, benefits, responsibility, or prospects for promotion is not an adverse employment action. Mora v. Ashcroft, 142 F. App'x 206, 207 n. 2 (5th Cir. 2005) (unpubl.); see Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 331 (5th Cir. 2004) (holding that a claim that the employer instituted a "baseless racial harassment investigation" against the employee was not an adverse employment action).

Thus, the decision to investigate Vorrey and the apparent forgery of Walker's signature on the LCA form was not an adverse employment action. The failure to plead facts as to any single prong of the prima facie case is fatal to Vorrey's claim. Cherry, 438 F. App'x at 352. Given this failure, this claim should be denied for failure to state a claim upon which relief can be granted.

### 3. Failure to Complete the LCA Form

 **\*8**  Vorrey alleges that the City discriminated against him when it chose not to return the LCA Form, constructively denying him his H-1B visa. Again, Vorrey's complaint fails to state a claim upon which relief can be granted.

As previously noted, the four elements of an employment discrimination claim are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees, who are not members of the protected class. Malcolm, 709 F. App'x at 247. Vorrey has pled that he is a member of a legally protected class. Furthermore, at the time that the LCA form was due, Vorrey still had a legally valid H-1B visa and has pled that he was qualified to remain in his position. Thus, at the time that Walker chose not to return the LCA form, the first two elements of the prima facie case were satisfied. Accordingly, the Court will assume these well-pled facts to be true and construe them in Vorrey's favor. Villarreal v. Wells Fargo Bank, N.A., 814 F.3d 763, 766 (5th Cir. 2016). Given this conclusion, the Court will focus upon the third and fourth elements.

When analyzing whether the failure to file the LCA form was an adverse employment action, "[a] determining factor in the analysis is whether [the Plaintiff's] employment status [was] significantly altered" by the employer's decision. McFall v. Gonzales, 143 F. App'x 604, 608 (5th Cir. 2005). "For example, a decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action." Banks v. E. Baton Rouge Par. Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003).

As previously discussed, an employer's action, that does not immediately alter the terms or conditions of employment, is not an adverse employment action. Wakefield, 229 F.3d 1148. But this claim differs in one key respect from the cases where an employer instituted an investigation or put an employee under increased supervision or issued a negative performance review. Unlike those cases, the decision not to complete the LCA resulted in Vorrey losing his authorization to work for the City as a matter of law. See 20 C.F.R. § 655.730(b) ("Incomplete or obviously inaccurate LCAs will not be certified by [DOL]"). The failure to complete the LCA had the practical effect of terminating Vorrey's employment with the City, which Walker knew when he refused to complete the form. Dkt. No. 16-3, p. 1. This decision terminated Vorrey's legal authorization to work for the City at the expiration of his visa. Indeed, it was a discharge in all but name. As such, it constituted an ultimate employment decision and was an adverse employment action. That finding, however, does not end the analysis. As noted earlier, each element must be present to state a claim. Here the failure lies as to the last element.

As to the fourth element, Vorrey has failed to plead facts showing that he was treated less favorably than similarly situated employees who are not members of the protected class. "There must be 'nearly identical' circumstances for employees to be considered similarly situated." Maestas v. Apple, Inc., 546 F. App'x 422, 427 (5th Cir. 2013). Vorrey, then, must be compared to other H-1B visa holders working for the City. Vorrey has pled no facts showing that the City completed LCA applications

Case 1:23-cv-00203-MAC   Document 13-1   Filed 10/10/23   Page 226 of 231 PageID #:  1032
Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)
2018 WL 7291458

for workers who were not Indian, or who were younger than he was. In fact, Vorrey has not pled any facts as to any other City workers who held H-1B visas. Given this failure, Vorrey has failed to plead a prima facie case of discrimination as to this claim and it should be dismissed.

### 4. Termination

**\*9**  Vorrey asserts that he was discriminated against when the City formally terminated his employment. Once again, he has failed to state a claim upon which relief can be granted.

One of the prongs of a prima facie case is that the employee was qualified for the position. It is undisputed that Vorrey is an Indian national. For aliens, "being 'qualified' for the position is not determined by the applicant's capacity to perform the job- rather, it is determined by whether the applicant was an alien authorized for employment in the United States at the time in question." Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184, 187 (4th Cir. 1998) (en banc). Vorrey's work authorization expired on January 31, 2017. Dkt. No. 16, p. 7. Vorrey's employment was terminated on February 10, 2017. Dkt. No. 16-4. Thus, at the time of termination, Vorrey was no longer authorized to work for the City. In short, he was no longer qualified for the position. Thus, Vorrey has failed to pled facts showing a prima facie case of discrimination and this claim should be dismissed.

### B. Fees

Vorrey claims that the City was required to reimburse him for his fees and costs in connection with his H-1B visa. The Court lacks jurisdiction over this claim.

Under federal regulations, an employer may not "recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H-1B petition)." 20 C.F.R. § 655.731(b)(9)(ii). If an employer does recoup these expenses, the Department of Labor "will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction." 20 C.F.R. § 655.731(b)(12).

The proper remedy, in the event that an employer unlawfully deducts H-1B fees and costs, is to file a complaint with the Administrator of the Wage and Hour Division, Employment Standards Administration in the Department of Labor ("the Administrator"). 20 C.F.R. § 655.731(d). If the Administrator finds that a violation has occurred, the Administrator will seek a prevailing wage determination from the Employment and Training Administration ("ETA"), asking the ETA to determine any violations and to compute any necessary back wages from the unauthorized deduction. Id.

Any appeals from a determination by the ETA go to an administrative law judge, and then to the Department of Labor's Administrative Review Board ("ARB"). Kutty v. U.S. Dep't of Labor, 764 F.3d 540, 543 (6th Cir. 2014). A party may appeal the ARB's decision as a final agency action under the Administrative Procedures Act. Dongsheng Huang v. Admin. Review Bd., U.S. Dep't of Labor, 579 F. App'x 228, 231 (5th Cir. 2014).

Vorrey has alleged that the City "unlawfully required him to pay the application fees for his H-1B visa." Dkt. No. 16, p. 13. There is, however, "no private right of action" to recover the costs of filing an H-1B visa. Watson v. Bank of Am., 196 F. App'x 306, 307 (5th Cir. 2006)

There is no evidence in the record that Vorrey ever filed a claim with the Department of Labor making these allegations. Absent making such a claim – and following the administrative process to completion – the Court lacks jurisdiction over the claim. Shah v. Wilco Sys., Inc., 126 F. Supp. 2d 641, 648 (S.D.N.Y. 2000) (noting that judicial review can only happen "once the administrative procedure has been exhausted.").

 **\*10**  The absence of any administrative process deprives the Court of jurisdiction over this claim. Shah, 126 F. Supp. 2d at 647-48. Accordingly, this claim should be dismissed for lack of jurisdiction.

### IV. Recommendation

It is recommended that the motion to dismiss filed by the City of Brownsville be granted. Dkt. No. 18. [5]

It is further recommended that:

– Any claim of employment discrimination under the Texas Commission on Human Rights Act, relating to the failure to promote Vorrey to airport director, be dismissed without prejudice for lack of jurisdiction.

– Any remaining claims of employment discrimination under the Texas Commission on Human Rights Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

– All claims of employment discrimination under either Title VII or the Age Discrimination in Employment Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

– Any claims for unreimbursed fees and costs relating to the H-1B visa process be dismissed without prejudice for lack of jurisdiction.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Fernando Rodriguez, Jr., United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file timely objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on October 5, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 7291458

### Footnotes

| | |
|---|---|
| 1 | As discussed later, the Court recommends that the motion to strike the exhibits, attached to Vorrey's response, be dismissed as moot. |
| 2 | The 30th day for service was on October 22, 2017, which was a Sunday. Pursuant to FED. CIV. P. 6(a)(1)(C), the following day, October 23, 2017, became the deadline to timely remove the case. |
| 3 | The Court is typically not permitted to consider matters outside of the pleadings when deciding a motion to dismiss. LeBeouf v. Manning, 575 F. App'x 374, 375 (5th Cir. 2014) (citing Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013) |

**Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)**

2018 WL 7291458

). Even if the Court considers the exhibits provided by Vorrey, it does not alter the Court's analysis and the outcome remains the same. Accordingly, the motion to strike the exhibits should be denied as moot.

4    McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

5    Vorrey has sought the opportunity to amend and replead his complaint in the event that the Court is inclined to grant the motion to dismiss. Dkt. No. 27, p. 9. The Court should not permit another amendment. Vorrey has already amended his complaint twice, giving him ample opportunity to put forward his best-pled complaint. "[P]laintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold.". Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986).

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 969186
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Matthew WIGGINS, Plaintiff,

v.

Andrew SEELEY, Richard Ooms, and Tiffany Ooms Seeley, Defendants.

3:16–cv–00642–HDM–WGC
|
Signed 03/13/2017

**Attorneys and Law Firms**

Julie Bachman, Primm, NV, Richard Anthony Salvatore, Stephanie Rice, Hardy Law Group, Reno, NV, for Plaintiff.

Michael J. McLaughlin, Feldman McLaughlin Thiel LLP, Zephyr Cove, NV, for Defendants.

ORDER

Judge D. McKibben, UNITED STATES DISTRICT JUDGE

 **\*1**  Before the court is defendants Andrew Seeley, Richard Ooms and Tiffany Seeley's motion to dismiss for improper venue or transfer. (ECF No. 6). Plaintiff responded (ECF No. 12) and defendants replied (ECF No. 14).

Also before the court is plaintiff's motion to remand. (ECF No. 13). Defendants responded (ECF No. 16) and plaintiff replied (ECF No. 17).

**I. Background**

This dispute arises out of a contract entered into on May 26, 2016. (ECF No. 2 at 6). According to the complaint, defendants failed to make the full payments as agreed upon under the contract. (*Id.* at 7). As a result, plaintiff alleges that defendants owe him $79,316.39. (*Id.* at 8).

On September 22, 2016, plaintiff filed a complaint for breach of contract in Ninth Judicial District in and for the State of Nevada. (ECF No. 2 at 6–9). On November 7, 2016, defendants removed the action to this court pursuant to 28 U.S.C. § 1332(a). (ECF No. 2).

Defendants move to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b) (3) or to transfer the case to the Southern District of California pursuant to 28 U.S.C. § 1404. (ECF No. 6). Plaintiff moves to remand the action to Douglas County, Nevada in accordance with the forum selection clause set forth in the Private Investment Agreement. (ECF No. 13). The court addresses each motion in turn.

**II. Motion to Dismiss for Improper Venue**

Defendants move the court to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue. Venue of removed actions is governed by 28 U.S.C. § 1441(a). *See Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953) (holding that 28 U.S.C. § 1391 has no application in removed actions). Section 1441(a) provides that, when an action is removed from state court, venue is automatically proper in the federal district court where the state action was pending. 28

U.S.C. § 1441(a). There is only one official federal judicial district in the state of Nevada. Therefore, venue is proper in this court. Defendants' motion to dismiss for improper venue is denied.

### III. Motion to Transfer

Defendants also request the court transfer the action to the Southern District of California for the convenience of the parties and witnesses. Section 1404 establishes that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

In determining whether transfer is appropriate in a particular case, the court is required to weigh multiple factors. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). The court may consider the following factors:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

**\*2** *Id.* at 498–99. The presence of a forum selection clause is also a "significant factor" in the court's § 1404(a) analysis. *Id.* A "defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (citation omitted).

Defendants request the court to transfer venue of this case to the Southern District of California. As an initial matter, defendants assert that the matter may be properly brought in the Southern District of California as all defendants are California residents and live in San Diego. *See* 28 U.S.C. § 1391(b)(1). In support of transfer, defendants state that, other than plaintiff, all parties encumbered by the Private Investment Agreement reside in California, travel to Nevada would be a hardship on defendants, defendants may call some witnesses who are residents in California, any documents that relate to the operations of Getaway San Diego will be located in California, and that nearly all operative facts occurred in California. Defendants further assert that "[t]here are financial institutions and witnesses in California that may need to be subpoenaed and may not be willing to testify." (ECF No. 6 at 9).

Defendants provide no evidence or affidavit to support the contention regarding financial institutions or witnesses in California that may not be willing to testify. Defendants also fail to explain why travel to Nevada would be more expensive for them than it would be for plaintiff to travel to California. Additionally, defendants fail to address the significance of the forum selection clause in the Private Investment Agreement. The Private Investment Agreement provides that "[t]his agreement will be governed and construed in accordance with the laws of Douglas County, Nevada. Jurisdiction is Douglas County, Nevada." (ECF No. 6 at 12).

A valid forum selection clause "represents the parties' agreement as to the most proper forum." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S.Ct. 568, 581 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). Here, plaintiff followed the terms of the forum selection clause under the Private Investment Agreement by filing suit in Douglas County, Nevada. As discussed below, defendants do not dispute the validity of the forum selection clause. Moreover, Nevada is most familiar with the governing law and plaintiff is a Nevada resident. Accordingly, weighing the factors for and against transfer, the court finds that transfer would not promote "the interest of justice." Defendant's motion to transfer is therefore denied.

### IV. Motion to Remand

Plaintiff seeks to remand this action based upon a forum selection clause in the contract which states, "Jurisdiction is Douglas County, Nevada." (ECF No. 12–1 at 3). Defendants do not dispute the validity of the forum selection clause. Rather, defendants argue that the forum selection clause is permissive, not mandatory, and that removal is not barred.

A forum selection clause will be enforced only where venue is specified with mandatory language. *Docksider, Ltd. v. Sea Technology, Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989). The question of whether a forum selection clause is permissive or mandatory is a question of contract interpretation. *N. California Dist. Council of Laborers v. Pittsburgh–Des Moines, Inc.*, 69 F.3d 1034, 1036 (9th Cir. 1995).

**\*3**  "To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Id.* at 1037. For example, the Ninth Circuit held that the clause containing the language that "venue of any action brought hereunder shall be deemed to be in Glouscester County, Virginia" is mandatory. *Docksider*, 875 F.2d at 764. Similarly, in *Pellport Investors, Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 275 (9th Cir. 1984) the Ninth Circuit held the clause "this Agreement shall be litigated only in the Superior Court for Los Angeles, California (and in not other) ..." is mandatory. On the other hand, a forum selection clause providing a particular court or state has jurisdiction, but says nothing about it being exclusive jurisdiction, is permissive and generally will not be enforced. *See N. California Dist. Council of Laborers*, 69 F.3d at 1037 (holding that the language 'shall be enforceable' is permissive); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987)(holding the language "shall have jurisdiction over the parties in any action" is permissive).

The forum selection clause in the parties' Private Investment Agreement provides that "Jurisdiction is Douglas County, Nevada." The clause specifies that jurisdiction will be in Douglas County, but it fails to contain any language about Douglas County having exclusive jurisdiction. Hence, the forum selection clause is permissive and the action was properly removed to this court. Accordingly, plaintiff's motion to remand is denied.

## V. Conclusion

**IT IS ORDERED** that defendants' motion to dismiss or transfer (ECF No. 6) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to remand (ECF No. 13) is **DENIED**.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 969186

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.